# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. D.G., by Next Friend G. Gail Stricklin; | ) |
| 2. C.S., by Next Friend Barbara Sears; | ) |
| 3. J.B., by Next Friend Buddy Faye Foster; | ) |
| 4. A.P., by Next Friend Leslie A. Ellis Kissinger; | ) |
| 5. J.A., by Next Friend Buddy Faye Foster; | ) |
| 6. J.P., by Next Friend G. Gail Stricklin; | ) |
| 7. R.J., by Next Friend Paul Naylor; | ) |
| 8. G.C., by Next Friend Anne Sublett; | ) |
| 9. K.T., by Next Friend Barbara Sears, | ) |
| for themselves and those similarly situated, | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | ) |
| 1. C. BRAD HENRY, in his official capacity as | ) |
|     Governor of the State of Oklahoma; | ) |
| 2. RICHARD L. DEVAUGHN, in his official | ) |
|     capacity as Chairman of the Oklahoma | ) |
|     Commission for Human Services; | ) |
| 3. RONALD L. MERCER, in his official capacity | ) |
|     as Vice-Chairman of the Oklahoma Commission | ) |
|     for Human Services; | ) |
| 4. WAYNE CUNNINGHAM, in his official | ) |
|     capacity as a member of the Oklahoma | ) |
|     Commission for Human Services; | ) |
| 5. JAY DEE CHASE, in his official capacity as a | ) |
|     member of the Oklahoma Commission for | ) |
|     Human Services; | ) |
| 6. PATRICE DILLS DOUGLAS, in her official | ) |
|     capacity as a member of the Oklahoma | ) |
|     Commission for Human Services; | ) |
| 7. MICHAEL L. PECK, in his official capacity as a | ) |
|     member of the Oklahoma Commission for | ) |
|     Human Services; | ) |
| 8. GAROLDINE WEBB, in her official capacity as | ) |
|     a member of the Oklahoma Commission for | ) |
|     Human Services; | ) |
| 9. ANETA F. WILKINSON, in her official capacity | ) |
|     as a member of the Oklahoma Commission for | ) |
|     Human Services; | ) |
| 10. REV. GEORGE E. YOUNG SR., in his official | ) |
|     capacity as a member of the Oklahoma | ) |
|     Commission for Human Services; and | ) |
| 11. HOWARD H. HENDRICK, in his official | ) |
|     capacity as Director of the Department of Human | ) |
|     Services, | ) |
|     Defendants. | ) |

**FILED**

FEB 1 3 2008

Phil Lombardi, Clerk
U.S. DISTRICT COURT

**08 CV - 074 GKF    FHM**

Class Action
Civil Action No. _____

COMPLAINT FOR
INJUNCTIVE AND
DECLARATORY RELIEF
AND REQUEST FOR CLASS
ACTION



## TABLE OF CONTENTS

Page No.

I.   Introduction...................................................................................................1

II.  Jurisdiction and Venue..................................................................................5

III. The Parties ...................................................................................................5

     A.   The Named Plaintiffs ..........................................................................5

     B.   The Defendants ................................................................................10

IV.  Class Action Allegations.............................................................................12

V.   Dangerous Failures in Oklahoma's Foster Care System Have Been Documented
     for Over Ten Years, Yet DHS Has Failed to Ameliorate Them or Implement
     Necessary Reform..........................................………………………………….16

VI.  Failures in the Operation of the Oklahoma Foster Care System .......................21

     A.   Plaintiff Children Are Victimized While in DHS Custody ....................21

     B.   DHS Houses Plaintiff Children in Dangerous and Inappropriate
          Placements That Fail to Provide Adequate Protection or Meet Their Needs ........24

          1.   DHS's Failure to Develop and Maintain a Sufficient Number and
               Array of Foster Care Placements ..............................................24

          2.   DHS Unnecessarily Institutionalizes Plaintiff Children in
               Dangerous and Inappropriate Emergency Shelters for Extended
               Periods of Time.......................................................................25

          3.   DHS Places Plaintiff Children in Dangerous and Inappropriate
               Homes and Facilities While in DHS Custody.............................28

          4.   DHS Frequently Moves Children From One Inappropriate
               Placement to Another, Causing Them Severe Emotional and
               Psychological Harm ...............................................................30

          5.   DHS Prevents Plaintiff Children From Maintaining Critical Family
               Ties While in State Custody .....................................................32

     C.   DHS's Failure to Adequately Monitor the Safety of Children in DHS
          Custody Subjects Plaintiff Children to Harm or Imminent Risk of Harm.............33

1.      Excessive Caseloads, Inexperienced Caseworkers, Inadequate
        Supervision, High Turnover and Inadequate Training Threaten
        Basic Child Safety......................................................................................33

2.      DHS's Dangerous Monitoring and Oversight Practices of Foster
        Homes and Facilities Harm Plaintiff Children and Expose Them to
        Imminent Risk of Harm ............................................................................35

D.      Additional Dangerous Failings by DHS Subject Plaintiff Children to Harm
        or Imminent Risk of Harm ..................................................................................38

1.      DHS Fails to Provide Adequate Foster Care Maintenance
        Payments for the Care of Plaintiff Children ...............................................38

2.      DHS Fails to Plan for and Take Mandated Steps to Find Permanent
        and Safe Homes and Exits From State Custody for Plaintiff
        Children.....................................................................................................40

3.      DHS Fails to Arrange Mental Health Services for Plaintiff
        Children.....................................................................................................41

4.      Plaintiff Children Are Denied Adequate and Effective Legal
        Representation in the Juvenile Courts........................................................42

5.      Breach of the Oklahoma State Plan Contracts Harms Plaintiff
        Children.....................................................................................................43

VII.    Additional Factual Allegations Concerning Named Plaintiffs...........................................44

VIII.   Causes of Action ......................................................................................................77

IX.     Prayer for Relief......................................................................................................85

I.      **Introduction**

1.      This case is brought by the Named Plaintiffs, nine children in foster care, on behalf of themselves and the more than 10,000 children of Oklahoma who have been removed from their homes by the State.  These foster children, who are or will be in the legal custody of the Oklahoma Department of Human Services ("DHS"), bring this action because DHS, under the supervision of Defendants, who directly and indirectly control and are responsible for the administration of Oklahoma's foster care system, have failed in their basic and fundamental duty to provide for the safety and care of these Oklahoma citizens.

2.      Children who require placement in foster care are the most vulnerable members of Oklahoma society.  They are found in the four corners of the State; they come from cities, suburbs and rural areas.

3.      In all cases, these children find themselves in DHS custody as a result of desperate and extreme circumstances that threaten their ability to live normal childhoods, to grow and develop and, in many instances, to even survive.  But as this Complaint alleges, DHS is victimizing its foster children.  Rather than discharging its duty to keep the foster children in its custody reasonably free from harm, because of its pervasive, longstanding and well-documented deficiencies in providing basic living situations, services and monitoring, DHS has harmed and continues to harm Oklahoma's foster children physically, emotionally and psychologically – repeatedly and without any plan to end that harm, as set forth herein.

4.      As just one stark example, Named Plaintiff C.S. has been in foster care since shortly after her birth, and in her eleven short months on this planet, DHS has placed her in seventeen different homes and facilities.  While in foster care, she has suffered a fractured skull as a result of physical abuse in an unsafe foster home; she has suffered severe dehydration and

1

seizures as a result of neglect in an unsafe group facility; and she has suffered a severe illness as a result of neglect in another unsafe foster home.  Plaintiffs bring this case to redress and correct the aggregate problems and failures at DHS that, *inter alia*, have resulted in such victimization.

5.      This civil rights class action is brought pursuant to 42 U.S.C. § 1983 on behalf of all foster children who are or will be in the legal custody of DHS.  The foster children name as Defendants the Governor of the State of Oklahoma, the nine members of the Oklahoma Commission for Human Services, and the Director of DHS (collectively, "Defendants").  All Defendants are sued in their official capacities.  Defendants directly and indirectly control and are responsible for the policies and practices of DHS, including those set forth herein.

6.      Oklahoma owes no higher duty than to stop victimizing her foster children. DHS's failure to provide for the basic safety and care of foster children in DHS custody subjects the children to significant, ongoing harm and imminent risk of harm, deprives them of chances for safe and stable childhoods, and violates their rights under the United States Constitution and specific federal statutes.  This action seeks solely declaratory and injunctive relief in order to stop continuing violations of the legal rights of Oklahoma's foster children and to prevent DHS, by it policies and practices, from continuing to harm the very children who rely on the State for their care and protection.

7.      The sole purpose of this case is to redress the ongoing aggregate problems and failures at DHS, an executive agency of the State of Oklahoma, including:  (1) its failure to provide safe and adequate living situations for foster children and to meet their service needs; and (2) its failure to adequately monitor the safety of foster children due to an overburdened and mismanaged workforce and dangerously inadequate oversight practices.

2

8.   DHS bears the responsibility for having operated – and continuing to operate – a foster care system in which children routinely become victims of DHS's failures.

These failures include, *inter alia*:

- **A drastic shortage of foster homes.**
  DHS fails to develop and maintain an adequate number and array of foster homes and other appropriate placements for foster children. As a result, foster children are placed wherever a bed is available and without regard to their individual needs.

- **Overcrowded and dangerous emergency shelters.**
  DHS routinely houses foster children, including infants and toddlers, in overcrowded and unsafe emergency shelters for extended periods of time, sometimes in excess of six months, because DHS has nowhere else to house them.

- **Unsafe and inappropriate foster homes and facilities.**
  DHS utilizes foster homes that jeopardize the safety of children, including homes with adults who have criminal convictions, homes that are dirty, overcrowded or lack adequate food, and homes in which supervision is dangerously lacking. DHS also utilizes facilities to house foster children that are often unsanitary, lack adequate supervision and employ staff who have not been properly trained and who have not even gone through background checks to identify criminal records or histories of abusive behavior.

- **Excessive caseworker caseloads and an inexperienced and unstable workforce.**
  For each of the past six years, the Oklahoma Child Death Review Board has recommended the hiring of more caseworkers to meet reasonable professional standards in order to reduce the number of deaths due to child abuse or neglect. While those standards limit caseloads to twelve to fifteen children per caseworker, DHS caseworkers are regularly assigned more than fifty children each, with some caseworkers responsible for more than one hundred children. As a result, caseworkers cannot make required visits with foster children and caregivers, and cannot adequately monitor child safety. The high caseloads also contribute to high turnover and an inexperienced workforce.

- **Grossly inadequate payment for the care of foster children.**
  Oklahoma fails to provide payments to those caring for foster children that even approach the actual cost of those children's care. The "foster care maintenance payments" set by DHS are grossly insufficient to provide basic support for foster children, and contribute to the shortage of foster homes.

9.   As a result of these failures, DHS harms foster children and exposes them to imminent risks of harm, including the following:

3

- **Abuse or neglect of foster children by foster parents or facility staff.**
  For the past five years, Oklahoma has been among the worst three states in the nation, and for two years the very worst in the nation, in its rate of "abuse in care" of foster children. This includes physical abuse, sexual abuse or extreme neglect inflicted on foster children by foster parents or staff at shelters or other facilities. Abuse of children in state foster care custody takes place at a higher rate than for children in the general population: in two of the past five years, the "abuse in care" rate of children in DHS custody *exceeded the rate of child abuse or neglect in the general population in Oklahoma.* And these statistics actually minimize the reality of in-care abuse; the rates reported by DHS significantly undercount the actual frequency of such abuse.

- **Abuse or neglect of foster children by their biological parents while in DHS custody.**
  While still in DHS custody, foster children in Oklahoma are victims of abuse or neglect by their biological parents when sent by DHS on overnight unsupervised visits or "trial home reunifications." The rate of this harm to foster children is more than double the rate at which children are abused or neglected by foster parents or facility staff.

- **Denial of opportunities to maintain critical family relationships.**
  Oklahoma foster children are routinely separated from their siblings who are also in DHS custody and DHS fails to arrange visits or other contact with siblings when these separations occur. DHS also fails to provide to foster children visits and other contact with biological parents, even when reunification is the goal set by DHS.

- **Frequent moves among multiple inappropriate homes and facilities.**
  Recent state data shows that 34% of foster children in Oklahoma had experienced four or more placements and 17% – approximately 1,700 children – had experienced six or more placements while in DHS custody. Such routine moves from one inappropriate placement to another inflict psychological harm and destroy these children's trust in adults, preventing them from developing an attachment to any family.

      10.    These failures and harms have been well documented and known to DHS for many years. In the face of that knowledge, DHS has consistently failed to address, let alone ameliorate, these failures. The harms – the physical, emotional and psychological injury and deterioration of foster children while in DHS custody – inflicted daily on foster children in Oklahoma, and the imminent risks of such harms to which they are repeatedly exposed, are the direct result of the failures by DHS alleged in this Complaint.

II.   **Jurisdiction and Venue**

11.   This action is brought pursuant to 42 U.S.C. § 1983, alleging violations of the United States Constitution and federal statutes.  This court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).

12.   Venue in this district is proper, pursuant to 28 U.S.C. § 1391(b), because the claims arise in this district.

III.   **The Parties**

A.   **The Named Plaintiffs[1]**

**D.G.**

13.   D.G. is a five-month-old boy in foster care in DHS custody who has been adjudicated deprived.  He has been in DHS custody since shortly after his birth and, over the past five months, DHS has already moved him through at least four placements.  DHS's placements for him have included one twenty-two-day stay at a grossly inappropriate and overcrowded emergency shelter that fails to provide adequate care and supervision for infants, where D.G. was inadequately supervised and suffered a fractured skull when he was dropped by a DHS worker who was carrying two babies at once.  DHS is likely to move D.G. yet again from his current, temporary foster home.

14.   Named Plaintiff D.G. appears through his Next Friend G. Gail Stricklin. Ms. Stricklin is the Guardian Ad Litem for D.G. in the Oklahoma County Juvenile Court.  Ms. Stricklin maintains her principal office at 2932 N.W. 122nd Street, Suite 4, Oklahoma City, Oklahoma 73120.

---

[1] Pursuant to Rule LCvR5.3 of the Local Civil Rules of the United States District Court for the Northern District of Oklahoma, the minor Named Plaintiffs are identified only by their initials.

**C.S.**

15.     C.S. is an eleven-month-old girl in foster care in DHS custody who has been adjudicated deprived. She has been in DHS custody since shortly after her birth and, over the past eleven months, DHS has already moved her through seventeen placements. DHS's placements for her have included two stays at a grossly inappropriate and overcrowded emergency shelter, a hospital stay after extreme physical abuse in an unsafe foster home that caused C.S. to suffer a fractured skull, a second hospital stay after severe neglect in an unsafe group facility that caused C.S. to suffer life-threatening dehydration and seizures, and an unsafe and poorly monitored foster home in which C.S. suffered for months with a severe, untreated respiratory tract infection. DHS is likely to move C.S. yet again from her current, temporary foster home.

16.     Named Plaintiff C.S. appears through her Next Friend Barbara Sears. Ms. Sears resides at 1532 Fir Drive, Sand Springs, OK 74063.

**J.B.**

17.     J.B. is a sixteen-month-old boy in foster care in DHS custody who has been adjudicated deprived. He has been in DHS custody since he was two days old and, over the past sixteen months, DHS has already moved him through four placements. DHS's placements for him have included an unsafe and poorly monitored trial home reunification with his biological mother, where he was neglected, and a month-long stay in a grossly inappropriate and overcrowded emergency shelter, where he was inadequately monitored and supervised and suffered first- and second-degree burns. DHS has placed J.B. in a temporary foster home while his burns heal, after which DHS is likely to move him yet again.

18.    Named Plaintiff J.B. appears through his Next Friend Buddy Faye Foster. Ms. Foster is the Court Appointed Special Advocate ("CASA") for J.B. in the Oklahoma County Juvenile Court.   Ms. Foster resides at 600 N.W. 4th Street, #120, Oklahoma City, OK 73102.

**A.P.**

19.    A.P. is a four-year-old girl in foster care in DHS custody who has been adjudicated deprived.  In the eighteen months that A.P. has been in DHS custody, DHS has already moved her through six placements.  DHS's placements for her have included the home of a relative who had a prior history of child abuse, where A.P. was sexually abused, and an unsafe and inadequately supervised trial home reunification with her biological father.  DHS is likely to move A.P. yet again from her current, temporary foster home.

20.    Named Plaintiff A.P. appears through her Next Friend Leslie A. Ellis Kissinger.  Ms. Kissinger is the court-appointed attorney for A.P. in the Rogers County Juvenile Court.  Ms. Kissinger maintains her principal office at P.O. Box 1530, Claremore, OK 74018.

**J.A.**

21.    J.A. is a five-year-old boy in foster care in DHS custody who has been adjudicated deprived.  In the twelve months that J.A. has been in DHS custody, DHS has already moved him through nine placements.  DHS's placements for him have included four separate stays in grossly inappropriate and overcrowded emergency shelters in four different counties. DHS is likely to move J.A. yet again from his current, temporary foster home.

22.    Named Plaintiff J.A. appears through his Next Friend Buddy Faye Foster. Ms. Foster is the CASA for J.A. in the Oklahoma County Juvenile Court.   Ms. Foster resides at 600 N.W. 4th Street, #120, Oklahoma City, OK 73102.

**J.P.**

       23.    J.P. is a seven-year-old boy in foster care in DHS custody who has been adjudicated deprived. In the eighteen months that J.P. has been in DHS custody, DHS has already moved him through eight placements. DHS's placements for him have included an unsafe and poorly monitored foster home where he was physically abused repeatedly for almost a year. DHS is likely to move J.P. yet again from his current, temporary foster home.

       24.    Named Plaintiff J.P. appears through his Next Friend G. Gail Stricklin. Ms. Stricklin is an attorney of record for J.P. in the Oklahoma County Juvenile Court. Ms. Stricklin maintains her principal office at 2932 N.W. 122nd Street, Suite 4, Oklahoma City, Oklahoma 73120.

**R.J.**

       25.    R.J. is a twelve-year-old boy in foster care in DHS custody who has been adjudicated deprived. He has been in and out of DHS custody for the past eight years and, during that time, DHS has moved him through more than twenty facilities and homes. DHS's placements for him have included an unsafe and inadequately supervised trial home reunification with his biological mother where he was neglected, six stays at grossly inappropriate and overcrowded emergency shelters, and an eighteen-month stay in an unsafe and poorly monitored foster home where he was regularly beaten with switches. R.J. currently languishes in an unsafe and poorly supervised group home, and continues to deteriorate in DHS custody as he waits indefinitely for a stable and permanent placement.

       26.    Named Plaintiff R.J. appears through his Next Friend Paul Naylor. Mr. Naylor is the counsel of record for R.J. in the Tulsa County Juvenile Court. Mr. Naylor maintains his principal office at 1701 S. Boston Avenue, Tulsa, OK 74119.

**G.C.**

27.     G.C. is a thirteen-year-old girl in foster care in DHS custody who has been adjudicated deprived.  She has been in DHS custody for the past four years and, during that time, DHS has moved her through at least fifteen placements all over the state.  DHS's placements for her have included an unsafe and inadequately supervised foster home where she was physically beaten, an overly restrictive and poorly monitored institutional facility where she was sexually assaulted, an extended stay at a grossly inappropriate and overcrowded emergency shelter, and an unsafe and poorly monitored trial home reunification with her biological mother.  G.C. currently lives in a poorly monitored and overly restrictive institutional facility, and continues to deteriorate while in DHS custody as she waits indefinitely for a stable and permanent placement.

28.     Named Plaintiff G.C. appears through her Next Friend Anne Sublett.  Ms. Sublett is the counsel of record for G.C. in the Tulsa County Juvenile Court.  Ms. Sublett maintains her principal office at 4000 One Williams Center, Tulsa, OK 74172-0148.

**K.T.**

29.     K.T. is a sixteen-year-old girl in foster care in DHS custody who has been adjudicated deprived.  She has been in DHS custody for the past ten years and, during that time, DHS has moved her through more than twenty placements.  DHS's placements for her have included several stays in grossly inappropriate and overcrowded emergency shelters and several unsafe and poorly monitored group homes that failed to provide services, programs or treatment for her developmental delays.  K.T. currently lives in an inappropriate, unsafe and poorly monitored group home in Tulsa, which houses foster children of all ages and lacks any

9

specialized programs or treatment for her developmental delays, and she continues to deteriorate while in DHS custody as she waits indefinitely for a stable and permanent placement.

30.     Named Plaintiff K.T. appears through her Next Friend Barbara Sears. Ms. Sears is an attorney of record for K.T. in the Oklahoma County Juvenile Court. Ms. Sears resides at 1532 Fir Drive, Sand Springs, OK 74063.

**B.     The Defendants**

31.     Defendant C. Brad Henry is the Governor of Oklahoma and is sued in his official capacity. Pursuant to Article VI, Section 8 of the Constitution of Oklahoma, the executive power of the State is vested in the Governor. Pursuant to that Section, the Governor is responsible for ensuring that all executive departments and agencies within the state, including DHS, faithfully execute and comply with applicable federal and state law. Pursuant to Article XXV, Section 3 of the Constitution of Oklahoma, the Governor has the power to appoint all nine members of the Oklahoma Commission for Human Services. Governor Henry maintains his principal place of business at the Governor's Office, State Capitol Building, 2300 N. Lincoln Boulevard., Room 212, Oklahoma City, OK 73105.

32.     Defendant Richard L. DeVaughn is Chairman of the Oklahoma Commission for Human Services and is sued in his official capacity. Pursuant to Article XXV, Sections 3 and 4 of the Constitution of Oklahoma, the Commission for Human Services is responsible for formulating the policies and adopting the rules and regulations for the administration of DHS, and for appointing the Director of DHS. The Oklahoma Commission for Human Services is a nine-member governing board for DHS whose members serve by appointment of the Governor in staggered nine-year terms. The Oklahoma Commission for

10

Human Services maintains its principal office at Oklahoma Department of Human Services,

Sequoyah Memorial Office Building, 2400 N. Lincoln Boulevard, Oklahoma City, OK 73105.

33.     Defendant Ronald C. Mercer is Vice-Chairman of the Oklahoma

Commission for Human Services and is sued in his official capacity.

34.     Defendant Wayne Cunningham is a member of the Oklahoma Commission

for Human Services and is sued in his official capacity.

35.     Defendant Jay Dee Chase is a member of the Oklahoma Commission for

Human Services and is sued in his official capacity.

36.     Defendant Patrice Dills Douglas is a member of the Oklahoma Commission

for Human Services and is sued in her official capacity.

37.     Defendant Michael L. Peck is a member of the Oklahoma Commission for

Human Services and is sued in his official capacity.

38.     Defendant Garoldine Webb is a member of the Oklahoma Commission for

Human Services and is sued in her official capacity.

39.     Defendant Aneta R. Wilkinson is a member of the Oklahoma Commission

for Human Services and is sued in her official capacity.

40.     Defendant Rev. George E. Young is a member of the Oklahoma

Commission for Human Services and is sued in his official capacity.

41.     Defendant Howard H. Hendrick is the Director of DHS and is sued in his

official capacity.  Pursuant to Article XXV, Section 4 of the Constitution of Oklahoma, the

Director of DHS serves as the chief executive and administrative officer of the Department.  The

Director of DHS is responsible for administering all DHS child welfare services and programs

and assuring that all such services and programs operate in conformity with constitutional,

11

statutory and regulatory requirements. Pursuant to Oklahoma Administrative Code § 340:1-1-4,
the Director of DHS is charged with the responsibility for day-to-day direction of the activities
necessary for DHS to accomplish its mission, and the Director's duties include serving as chief
spokesperson for DHS and ensuring that actions approved by the Commission for Human
Services are carried out. Director Hendrick serves by appointment of the Oklahoma Commission
for Human Services. Director Hendrick maintains his principal office at Oklahoma Department
of Human Services, Sequoyah Memorial Office Building, 2400 N. Lincoln Boulevard,
Oklahoma City, OK 73105.

**IV.     Class Action Allegations**

42.     This action is properly maintained as a class action pursuant to Rules 23(a)
and (b)(2) of the Federal Rules of Civil Procedure.

43.     The class is defined as "all children who are or will be in the legal custody
of the Oklahoma Department of Human Services (1) due to a report or suspicion of abuse or
neglect, or (2) who are or will be adjudicated deprived due to abuse or neglect." As used in this
Complaint, the members of the class are referred to as the "Class" or the "Plaintiff Children" or
"foster children."

44.     According to state data from 2006, approximately 10,000 foster children
were in the legal custody of DHS. The Class is sufficiently numerous to make individual joinder
impracticable.

45.     The questions of law and fact raised by the Named Plaintiffs are common to
and typical of those raised by the putative class members. Named Plaintiffs, like the other
Plaintiff Children, are children in DHS's legal custody who rely on DHS for their safety and

12

well-being, and have been harmed or are at imminent risk of harm by the common legal

deficiencies of Oklahoma's foster care system alleged in this Complaint.

     46.    Questions of fact common to the Class include:

     a.    Whether DHS has a policy or practice of failing to develop and maintain a sufficient number and array of safe and appropriate placements for Plaintiff Children, causing significant harm and risk of harm to Plaintiff Children's safety, health and well-being;

     b.    Whether DHS has a policy or practice of failing to adequately monitor the safety of Plaintiff Children, causing significant harm and risk of harm to Plaintiff Children's safety, health and well-being;

     c.    Whether DHS has a policy or practice of placing Plaintiff Children in unsafe and inappropriate homes and facilities, causing significant harm and risk of harm to Plaintiff Children's safety, health and well-being;

     d.    Whether DHS has a policy or practice that has the effect of subjecting Plaintiff Children to abuse, neglect and other maltreatment while in DHS custody, causing significant harm and risk of harm to Plaintiff Children's safety, health and well-being;

     e.    Whether DHS has a policy or practice of subjecting Plaintiff Children to unreasonably frequent moves from placement to placement, causing significant harm and risk of harm to Plaintiff Children's health and well-being;

     f.    Whether DHS has a policy or practice of failing to arrange for and facilitate Plaintiff Children's family relationships, causing significant harm and risk of harm to Plaintiff Children's health and well-being;

     g.    Whether DHS has a policy or practice of failing to place Plaintiff Children in the least restrictive and most family-like settings appropriate to their needs, causing significant harm and risk of harm to Plaintiff Children's health and well-being;

     h.    Whether DHS has a policy or practice of failing to provide adequate foster care maintenance payments and an adequate methodology for calculating those payments for the care of Plaintiff Children; and

13

i.      Whether the conduct described in sub-paragraphs a through h, above, is contrary to law, reasonable professional standards and outside the exercise of any professional judgment.

47.   Questions of law common to the Class include:

a.      Whether DHS's policies and practices violate Plaintiff Children's substantive due process rights to be reasonably free from harm and imminent risk of harm while in state custody, guaranteed by the Fourteenth Amendment to the United States Constitution;

b.      Whether DHS's policies and practices violate Plaintiff Children's rights to family association and integrity, guaranteed by the First, Ninth, and Fourteenth Amendments to the United States Constitution;

c.      Whether DHS's policies and practices violate Plaintiff Children's rights established by the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, and relevant federal regulations;

d.      Whether DHS's policies and practices violate Plaintiff Children's rights to procedural due process, guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution; and

e.      Whether DHS's policies and practices violate Plaintiff Children's rights as direct and intended third-party beneficiaries under the Title IV-E State Plan contract executed between Oklahoma and the federal government.

48.   The legal violations alleged by the Named Plaintiffs and the resultant harms

are typical of those raised by each member of the putative class.

49.   Named Plaintiffs will fairly and adequately protect the interests of the

members of the putative class.

50.   Each Named Plaintiff appears by a Next Friend pursuant to Federal Rule of

Civil Procedure 17(c), and each Next Friend is sufficiently familiar with the facts of the child's

situation to fairly and adequately represent the child's interests in this litigation, and is dedicated

to the child's best interests in this litigation.

14

51.	The Named Plaintiffs and the putative class are represented by:

a.	R. Thomas Seymour, a licensed Oklahoma attorney with extensive experience in complex civil litigation, civil rights matters and class actions in the federal courts, and the law firm of Seymour & Graham, LLP;

b.	Frederic Dorwart, a licensed Oklahoma attorney with extensive experience in complex civil litigation and class actions in the federal courts, and the law firm of Frederic Dorwart, Lawyers;

c.	Doerner, Saunders, Daniel & Anderson, LLP, an Oklahoma law firm with extensive experience in complex civil litigation and class actions in the federal courts;

d.	Day Edwards, Propester & Christensen, PC, an Oklahoma law firm with extensive experience in complex civil litigation and class actions in the federal courts;

e.	Attorneys employed by Children's Rights, a national nonprofit legal organization whose attorneys have extensive experience and expertise in child welfare class actions nationally; and

f.	Kaye Scholer LLP, an international private law firm with extensive experience in complex civil litigation and class actions in the federal courts.

52.	Counsel retained by the Named Plaintiffs are competent and experienced in class action litigation, child welfare litigation and complex civil litigation.

53.	The attorneys and entities listed above have investigated all claims in this action and have committed sufficient resources to represent the Class through trial and any appeals.

54.	The attorneys and entities listed above know of no conflicts between or among members of the putative class.

55.	Defendants, who directly and indirectly control or are responsible for the polices and practices of DHS, have acted or failed to act in a manner generally applicable to the putative class, making class-wide declaratory and injunctive relief appropriate and necessary.

15

V.     **Dangerous Failures in Oklahoma's Foster Care System Have Been Documented for Over Ten Years, Yet DHS Has Failed to Ameliorate Them or Implement Necessary Reform**

56.     Oklahoma's child welfare system has steadily deteriorated since 1997 and is and has been incapable of fulfilling its duties to Plaintiff Children.  DHS has been aware of, yet has failed to address, these well-known problems.

57.     In 1997, because of "[h]igh levels of dissatisfaction with, and lack of confidence in, Oklahoma's fragmented and complex foster care system," the Oklahoma House of Representatives Human Services Committee issued a report entitled "Interim Study of the Foster Care System Throughout Oklahoma."  This report was based on "an in-depth study of the foster care system in which every foster care home in the state was visited."  The 1997 report described several emerging problems with DHS that were causing harm to children.  It identified a shortage of foster homes and a lack of support for foster parents, stating "[w]e recruit foster parents and we don't support them afterwards, and then we lose them."

58.     The 1997 report recommended that:  DHS reorganize the agency structure to create direct linkage among DHS, policy makers and field personnel;  DHS "[r]eview number of staff, level and cases per staff to determine if more staffing or realignment of staff is required to adequately service the foster care program;" and DHS hire "[m]ore caseworkers/staffing."  As alleged below, in the ten years since that report, DHS has failed to correct any of the deficiencies identified in the report.

59.     In 1999, the Oklahoma legislature appointed a Child Welfare System Reform Review Committee to study "the policies, procedures, and statutes governing Oklahoma's child abuse and child welfare system and to make recommended revisions to this system."  This Committee issued a public report on January 24, 2000, which stated that "[t]he

16

caseloads for child protective services workers need to be within the bounds recommended by the national standard. The subcommittee believes [there is a] need for additional child welfare workers."

60.    In June of 2001, the Governor's Task Force on Children in Custody presented its Annual Report to the Governor and the Director of DHS, which focused on the lack of support given by DHS to foster parents throughout the state. The report stated that there were "foster parents with many years of experience who felt that the hassles and the lack of support from the Department made it next to impossible to continue to care for the children." The report criticized DHS for retaliating against foster parents who raised issues with DHS: "any foster parent who 'makes waves' is at risk of losing the children in their home and having their home closed by the Department. Some foster parents even expressed fear of their own children and grandchildren being removed by the Department." The report also highlighted that children in DHS custody were frequently placed in homes without foster parents receiving adequate information about the child's needs, medical history or family history, that DHS was performing only cursory face-to-face visits with children in custody, and that DHS caseworkers were not equipped to answer foster parents' most basic questions about the status of their child's case. In the years since that report was published, DHS has failed to correct any of the deficiencies identified in the report.

61.    Because Oklahoma receives federal funding to operate its child welfare system, it is subject to periodic Child and Family Service Reviews ("CFSRs"), conducted by the Administration for Children and Families, a division of the United States Department of Health and Human Services ("HHS"). These reviews are designed to assess whether states are in

17

substantial conformity with federal child welfare benchmarks in the areas of child safety, permanency and well-being.

62.    Oklahoma's initial CFSR was completed in 2002. In nearly every area reviewed, Oklahoma failed to meet federal standards, often by a wide margin. Oklahoma failed with respect to each of the seven "safety, permanency and well-being outcomes" tracked by the review, which included: protecting children from abuse and neglect; safely maintaining children at home when possible and appropriate; providing permanency and stability in children's living situations; preserving continuity of family relationships and connections; enhancing families' capacity to provide for children's needs; ensuring that children receive services to meet their educational needs; and ensuring that children receive services to meet their physical and mental health needs.

63.    The 2002 CFSR found that DHS failed to meet the requirement that "[c]hildren are, first and foremost, protected from abuse and neglect," noting that the failure was due to a "high level of staff turnover among the child welfare agency's front-line workers, which results in both inexperienced staff and excessive staff caseloads." HHS found that Oklahoma was "*[n]ot making sufficient efforts to reduce the risk of harm to children.*" (emphasis added).

64.    Oklahoma's second CFSR took place in August of 2007. Although the results of that CFSR are not yet public, DHS published its own CFSR "Statewide Assessment" in anticipation of the federal review. The CFSR Statewide Assessment documents DHS's continuing failure to protect children. For example, the reported frequency of foster children abused or neglected by foster parents or residential facility staff while in DHS custody was 1.2% for the twelve-month period ending March 31, 2006, which is nearly *four times* the maximum allowed federal benchmark of 0.32%.

18

65.     The 2007 CFSR Statewide Assessment also documented the lack of foster homes. Over 95% of DHS's Child Welfare staff who were interviewed as part of the CFSR Statewide Assessment reported there were not enough foster homes for children in DHS custody. As a result, DHS often put foster children in placements that were likely to fail, resulting in children frequently being forced to move from one placement to another.

66.     Echoing the 2002 CFSR, the 2007 CFSR Statewide Assessment repeatedly tied DHS's failures to worker turnover, inexperienced staff, excessive caseloads and an insufficient number of foster homes.

67.     The Oklahoma Child Death Review Board annually publishes the results of investigations conducted upon the death of a child. In every year from 2001-2006, the Oklahoma Child Death Review Board documented that DHS workers have caseloads two to three times higher than national standards.

68.     Every year, the Oklahoma Child Death Review Board has recommended that DHS bring worker caseloads into compliance with nationally recognized standards in order to reduce child deaths and, in 2004, the Board explicitly recommended that DHS "hire additional child welfare staff in order to be in compliance with accepted national standards . . . in order to reduce the number of deaths due to child abuse/neglect."

69.     The dangerous failures at DHS have been repeatedly documented in the Oklahoma media over the past three years. For example, on December 18, 2005, the *Tulsa World* reported on the death of Felipe Gonzalez, a three-year-old foster child in Oklahoma City who was killed while living in a foster home. The article, entitled "Who Dropped the Ball?" stated that while "Oklahoma DHS officials approved the placement of Felipe and his sister in the

19

[foster] home, state officials never conducted the required in-home visits during the six months the siblings [lived in that home]."

70.     On February 19, 2006, the *Tulsa World* published an editorial entitled "Oklahoma's Child Welfare System Needs Restructuring." This editorial stated that DHS "is the system that is supposed to protect children, but many times it is the system that re-victimizes a child. For the most part, this isn't the fault of the many caring professionals that work in the child welfare system. It is the system that needs to be turned upside down, inside out, and changed."

71.     On September 24, 2006, the *Daily Oklahoman* published an editorial entitled "Foster Care System Needs Reform." This editorial chronicled DHS's "glaring problems," including "inadequate numbers of foster homes across the state, insufficient reimbursement to foster parents for children's basic needs [and] burdensome case loads for DHS case workers who monitor these Children[.]"

72.     On December 7, 2006, an article in the *Daily Oklahoman* entitled "Welfare Workers Knew of Problems Before Child's Death, Records Show" reported on the death of Samuel Barber, a three-month-old baby who died in Oklahoma City's Pauline Mayer Emergency Shelter. The *Daily Oklahoman* reported that "state child welfare workers were aware of problems with [the] family before Oklahoma County sheriff's deputies found four children living in dog feces and garbage at a home." The article stated that the infant was kept in the Mayer Emergency Shelter for several days – in violation of DHS policy – before he died. The official DHS spokesman stated: "If there are no foster homes and no kinship, yet the court won't let them return home, there are no other options. We have to keep them in the shelter. . . . The state of Oklahoma is the worst parent a child could have."

20

## VI.     Failures in the Operation of the Oklahoma Foster Care System

73.     DHS operates a system in which the long-known, pervasive failure to provide for the basic safety and well-being of children continues to directly harm foster children in DHS custody and places them at imminent risk of harm.  As alleged herein, this failure includes, and is a direct result of:  (1) DHS's failure to provide safe and adequate living situations for Plaintiff Children and to meet their service needs, including grossly inadequate foster care maintenance payments to foster parents and the failure to plan for and take mandated steps to find permanent and safe homes for Plaintiff Children outside of state custody; and (2) DHS's failure to adequately monitor the safety of Plaintiff Children due to an overburdened and mismanaged workforce and dangerously inadequate oversight practices.  These failures are obvious, and the harm and imminent risk of harm they cause have been well documented and known to DHS, yet DHS has failed to take appropriate steps to address and ameliorate them.

74.     As a result, Defendants, who directly and indirectly control and are responsible for the policies and practices of DHS, have failed to exercise any professional judgment and have acted with deliberate indifference to the safety, well-being and legal rights of Plaintiff Children.

### A.     Plaintiff Children Are Victimized While in DHS Custody

75.     DHS's failure to provide Plaintiff Children with safe and adequate living situations and services and its failure to adequately monitor Plaintiff Children's safety directly cause Plaintiff Children to suffer from abuse or neglect while in DHS custody at an alarming rate.  This "abuse in care" rate includes reports of physical abuse, sexual abuse or extreme neglect at the hands of foster parents or facility staff who are providing direct care for Plaintiff

21

Children under the ostensible supervision of DHS. Such reports are investigated and ultimately "confirmed" by DHS.

76. According to state data, in each of the past five years, from Federal Fiscal Year ("FFY") 2001 through FFY 2005, Oklahoma has been among the worst three states in the country for confirmed abuse or neglect of foster children in state custody. In four of those five years, Oklahoma ranked worst or second worst in the nation and, in two of those years, Oklahoma had the single highest rate of confirmed abuse of foster children in state custody in the nation.

77. Oklahoma's rate of abuse or neglect of children in foster care has invariably far exceeded the benchmarks set by the federal government. In 2002, 1.62% of Oklahoma foster children were abused or neglected, almost three times greater than the federal benchmark of 0.57% for children in foster care; in 2003, the Oklahoma rate rose to 1.88%, or 3.3 times the federal benchmark. In fact, in 2002 and 2003, the rates of abuse and neglect of children in foster care in Oklahoma were so high that Plaintiff Children suffered abuse or neglect at a higher rate than children in the general population (as recorded in 2002 and 2003 at 1.57% and 1.43%, respectively).

78. In FFY 2004, 1.23% of Oklahoma foster care children were the victims of confirmed abuse or neglect while in state custody, more than twice the federal benchmark. The following year, FFY 2005, the rate was 1.17%, again more than twice the federal benchmark.

79. Most recently, Oklahoma's performance in subjecting Plaintiff Children to abuse or neglect has only worsened on a national scale. Last year, the federal government published a new benchmark of a maximum rate of abuse or neglect of 0.32%, reflecting a lower abuse in care standard nationwide. According to state data, for the twelve-month period ending

22

March 31, 2006, 1.2% of children in foster care in Oklahoma were abused or neglected while in state custody, almost four times the current national standard.

80.    The federal abuse in care measure discussed above includes only foster children abused or neglected by foster parents or residential facility staff, and excludes foster children who are the victims of confirmed abuse or neglect by their biological parents while still in the state's custody (*i.e.*, while on a visit or on trial home reunification).

81.    In Oklahoma, the number of foster children abused or neglected by their biological parents while still in DHS custody is dangerously high and increasing. According to state data, another 2.04% of Oklahoma foster care children were the victims of confirmed abuse or neglect by their biological parents while in DHS custody. In FFY 2005, this rate rose to 2.2%, and by the twelve-month period ending March 31, 2006, rose again, to 2.3%.

82.    From July 1, 2004 to March 31, 2006, over 1,700 foster children in Oklahoma were victims of confirmed abuse or neglect by foster parents, facility staff or their biological parents while in DHS custody.

83.    The official rate of abuse and neglect of foster children in DHS custody outlined above consistently underreports the occurrence of abuse in care, since those rates only include incidents of abuse or neglect which have been investigated and confirmed by DHS. Incidents of abuse or neglect, and other serious maltreatment of foster children such as the use of corporal punishment and other prohibited forms of discipline, occur regularly and are never identified or reported, let alone investigated, due to DHS's failure to adequately monitor the safety and well-being of children in its care.

23

**B.      DHS Houses Plaintiff Children in Dangerous and Inappropriate Placements That Fail to Provide Adequate Protection or Meet Their Needs**

84.      DHS has engaged in a policy, pattern, custom and/or practice of placing children in dangerous and inappropriate placements that fail to provide adequate protection and care.  DHS has been and is fully aware of the dangers of this policy, pattern, custom and/or practice, but has failed to act to prevent it or correct it.  By subjecting Plaintiff Children to placement practices that are emotionally, psychologically and physically injurious to them, DHS has acted and continues to act with deliberate indifference to the welfare of Plaintiff Children and to Plaintiff Children's legal rights, and outside any reasonable exercise of professional judgment.  This policy, pattern, custom and/or practice has caused, and is causing, direct and severe harm or imminent risk of harm to Plaintiff Children.

**1.      DHS's Failure to Develop and Maintain a Sufficient Number and Array of Foster Care Placements**

85.      DHS has failed to develop and maintain a sufficient number and array of foster care placements necessary to allow DHS to place Plaintiff Children in safe environments where their basic needs can be met.  Despite being on notice for years of a growing and drastic shortage of foster homes and other appropriate foster care placements, DHS has failed to take even the most basic steps to address the problem.

86.      The severe shortage of foster care placements strains the DHS placement system, leading to placement matches driven solely by the immediate availability of a bed rather than a child's individual needs, and resulting in the frequent "disruption" of foster homes and the movement of foster children from one placement to another.

87.      The placement shortage also causes DHS to keep open dangerous homes and facilities, without addressing known safety problems.  DHS places Plaintiff Children in

24

unsafe, unsupported or unsuitable foster homes and facilities, and leaves foster children, even infants and toddlers, languishing in emergency shelters.  The shortage is particularly severe for adolescents, and for children who require homes with foster parents who have specialized training and supports to address behavioral problems (also called "therapeutic foster care" homes), or who otherwise have significant mental health or behavioral needs.  At the same time, DHS frequently places older foster children in institutional facilities for long periods of time when they should be in less restrictive placements.

### 2.   DHS Unnecessarily Institutionalizes Plaintiff Children in Dangerous and Inappropriate Emergency Shelters for Extended Periods of Time

88.    Under federal law, DHS policy and reasonable professional standards, children taken into foster care custody must be placed in the least restrictive and most family-like environment possible, taking into account the child's needs.  DHS routinely places children of all ages – even infants and toddlers – for extended periods of time in dangerous, overcrowded and inappropriate emergency shelters without adequate staffing and services, resulting in harm or imminent risk of harm to Plaintiff Children.

89.    Because of the grave shortage of foster homes, foster children who are removed from their homes and placed in DHS custody are routinely placed in an emergency shelter – often far from their home community – as their first placement.  In fact, all children removed from their homes in Oklahoma and Tulsa Counties, the largest counties in the state, are first placed in an emergency shelter.  The 2002 CFSR confirmed that DHS "was placing children in emergency shelters without attempting to find more appropriate alternative placements, such as relatives or a foster home."  This practice continues today.  Hundreds of children in DHS custody are placed in over thirty emergency shelters throughout the state at any given time.

90.    Although the emergency shelters used to house foster children in DHS custody are intended to be very short-term placements until appropriate placements are found, children in DHS custody frequently languish in emergency shelters for many months at a time, sometimes for more than six months, because DHS has nowhere else to place them.  Plaintiff Children with special mental health or behavioral needs remain in emergency shelters for especially long periods of time.  This harmful practice violates DHS's own policy mandating that children younger than five years old remain in shelters for no more than twenty-four hours.

91.    Not only do children in DHS custody who are initially brought into shelters remain there for long periods of time, but these same children frequently return to shelters for long periods of time when other placements are disrupted, which occurs frequently due to DHS's failure to adequately match placements with Plaintiff Children's needs and its failure to provide services and supports to these placements.  The 2002 CFSR reported that this results "in a pattern of children moving in and out of shelter care."  This practice continues today.

92.    The serious shortage of appropriate out-of-home placements for children in DHS custody results in chronic and dangerous overcrowding at the two largest emergency shelters in Oklahoma.

93.    DHS operates the Pauline Mayer Emergency Shelter in Oklahoma City, which is licensed to house forty-two children, but routinely houses more than sixty children due to the lack of any alternative placements.  In order to avoid violations from the Fire Marshal for overcrowding, DHS routinely shuffles children out of this shelter and temporarily places them in day care facilities, group homes or other placements which have "shelter overflow" arrangements with DHS.

94.     DHS operates the Laura Dester Emergency Shelter in Tulsa, which is currently approved to house fifty children, but routinely houses more than sixty children. In 2005, shelter capacity reached a record high of eighty-five children in one day. The Dester Shelter was over capacity on 325 days in fiscal year 2006.

95.     Infants and toddlers are especially vulnerable and subject to harm as a result of the persistent overcrowding at DHS-operated emergency shelters. In Tulsa, most children entering the Dester Emergency Shelter are five years old or younger. The "Little House" of the Dester Emergency Shelter has twenty-five beds for newborns; at times, however, it holds over thirty babies. In Oklahoma City, the Annex building to the Pauline Mayer Emergency Shelter is used as additional shelter space to house babies, infants and toddlers who are removed from their homes and placed in DHS custody. It is licensed for sixteen children, but routinely exceeds this limit. Contrary to reasonable professional standards, DHS policy, and outside the exercise of any professional judgment, DHS routinely places infants and toddlers in shelters for extended periods of time, without appropriate staffing and services.

96.     As a result of the severe overcrowding at the Tulsa and Oklahoma City emergency shelters, Plaintiff Children are often forced to live in dangerous and grossly inappropriate conditions. Children who have just been through the trauma of being removed from their homes due to abuse or neglect are routinely forced to sleep on cots or in cribs in hallways, recreation rooms and play areas of the emergency shelters and, at times when overcrowding is too extreme, in DHS offices.

97.     Emergency shelter placements in Oklahoma City, Tulsa and elsewhere in the state also house children with aggressive physical or sexual behaviors together with

27

vulnerable children, including those who have been sexually abused or have significant developmental disabilities.  This unsafe practice puts Plaintiff Children at extreme risk of harm.

98.     Additionally, when DHS places Plaintiff Children in emergency shelters, their education is often disrupted, sometimes for many weeks, impeding their educational development and access to basic and adequate education while in state custody.

### 3.     DHS Places Plaintiff Children in Dangerous and Inappropriate Homes and Facilities While in DHS Custody

99.     As a direct result of the drastic shortage of foster care homes, DHS routinely places Plaintiff Children in dangerous and inappropriate homes and facilities, including foster homes, group or institutional placements, day care facilities and the homes of biological parents or relatives, where Plaintiff Children are harmed or subjected to imminent risk of harm.

100.   Overcrowding in foster homes is common in Oklahoma.  For example, foster homes licensed for four foster children often have seven or more foster children placed in them, in addition to any biological children of the foster parents in the home.  This overcrowding frequently prevents adequate parental supervision and places Plaintiff Children at serious risk of harm.

101.   DHS also routinely sends Plaintiff Children to stay with their biological families or relatives for unsupervised visits or for unsupervised and unmonitored trial home reunification while still in DHS custody, in which the children's safety is at risk.  Children often become victims of abuse or neglect during these unsupervised visits or unsupervised and unmonitored trial home reunifications.

102.   For example, in March of 2007, three-year-old Blake Ragsdale died while in DHS custody after DHS had unlawfully placed Blake back with his biological mother without the required court order approving the trial home reunification.  Blake was born addicted to

methamphetamine and was diagnosed with cerebral palsy and a rare metabolic dysfunction that was fatal if not treated. He could not walk or talk and required a walker, several medications and constant supervision. However, DHS placed Blake back with his biological mother two and a half weeks prior to Blake's death without notifying the Juvenile Court or Blake's attorney, although Blake's mother had not completed her treatment plan, was unemployed, did not have a home phone or car, and was woefully unequipped to take care of Blake's special medical needs. DHS also failed to provide Blake's mother with services necessary to enable her to care for her son.

103. DHS had previously reunified Blake with his mother, but Blake had been brought back into DHS custody in 2006 because he was in critical condition and because his mother had failed to take him to his necessary physical therapy appointments. A doctor diagnosed him with "failure to thrive." Despite the obvious inability of Blake's mother to take care of his serious medical needs and her negligence in caring for Blake, DHS made the decision to place Blake back with his mother again in 2007. That poor decision resulted in Blake's death.

104. DHS further abrogated its duties by failing to report Blake's death to the Child Death Review Board or the Juvenile Judge in charge of Blake's case. Instead, the matter only came to light when Blake's case was randomly chosen for an audit by DHS at the end of 2007. DHS then tried to hide its mistakes by removing vital information from the final DHS report to the District Attorney on Blake's death. Although contained in a draft report, the final version of the report omitted all text stating that there had been no court-approved trial home reunification. In addition, no one at DHS has been held accountable for Blake's death. The DHS caseworker in charge of Blake's case now works for DHS in another county.

105.   DHS also frequently mixes aggressive, or even violent, foster children, including children with histories of sexual or assault offenses, in the same foster homes, group homes and facilities, in close proximity to non-violent children, including those who have been sexually abused or have developmental disabilities, placing Plaintiff Children at imminent risk of harm.

106.   Despite the explicit prohibition in DHS policy against the use of any form of physical discipline or corporal punishment on children in DHS custody, Plaintiff Children are routinely victims of physical discipline in foster homes and residential facilities.  Even when DHS caseworkers are aware that physical discipline has been used on a foster child, corrective actions are often not taken or not monitored to ensure they are implemented.

107.   DHS also routinely places children in custody in dangerous residential facilities and group homes, where safety hazards include unsanitary conditions, staff shortages and inadequate supervision, incomplete requisite staff training and licenses, and inappropriate grants by DHS of criminal background waivers for staff.

108.   Foster children in DHS custody are also placed in DHS-licensed day care facilities, which are often inadequately monitored and supervised, and which subject Plaintiff Children to harm and imminent risk of harm.

### 4.   DHS Frequently Moves Children From One Inappropriate Placement to Another, Causing Them Severe Emotional and Psychological Harm

109.   Moving foster children among multiple homes and facilities causes them serious emotional and psychological harm, and damages their ability to trust and form relationships with adults.

110.   Due to the drastic shortage of foster homes and the chronic overcrowding in emergency shelters, children in DHS custody are routinely placed without regard to their specific

30

needs or the training and capacity of the foster parents or other caretakers with whom they are placed. As a result, children are placed wherever a bed or slot is available and placements are frequently disrupted, causing severe emotional and psychological harm to Plaintiff Children as they are shuffled from one inappropriate placement to another.

111.   The 2002 CFSR found that "children in the system are moved too frequently from one placement to another" and "placement resources are insufficient with respect to both quality and quantity." It also found "that there is too much pressure on agency workers to move children out of shelter placement into a home. Because of this pressure, placements are often made without careful supervision, and when the homes do not meet the child's needs the placement disrupts." These problems continue today.

112.   According to state data, as of March 31, 2006, more than 52% of children in DHS custody had experienced three or more placements. Almost 17% had six or more placements, which means that approximately 1,700 children in DHS custody had experienced the trauma of moving among at least six placements.

113.   In reality, Plaintiff Children move even more frequently than is reflected in state data because DHS often fails to track Plaintiff Children's location and movement once they are placed with a private provider of homes under contract with DHS, which in turn may move Plaintiff Children among many placements.

114.   DHS routinely fails to ensure that Plaintiff Children's personal belongings follow them when they move from one placement to another, adding to the trauma that children experience from frequent and abrupt moves while in DHS custody.

115.   The multiple moves to which DHS subjects foster children forces them to frequently change schools, miss an unnecessary amount of school, and fall behind in school.

31

DHS regularly fails to ensure that Plaintiff Children's educational records follow their numerous placement moves. In addition, for Plaintiff Children who require special education services, DHS routinely fails to ensure that their "Individualized Education Plans" are prepared and updated.

### 5. DHS Prevents Plaintiff Children From Maintaining Critical Family Ties While in State Custody

116.    Placing children near their home minimizes the trauma they have already suffered from removal, helps children maintain ties with parents and siblings, and avoids unnecessary separation from school, other family members, friends and existing local supports. In contrast, due to the drastic shortage of foster homes, DHS sends most children in foster care to live in placements that are distant from their homes, schools and communities, often hundreds of miles away.

117.    Due to the shortage of homes and facilities, DHS also routinely separates siblings in custody, causing them further harm by interfering with critical family relationships. The 2002 CFSR found that siblings in DHS custody are rarely placed together because of the shortage of foster homes. This problem continues today.

118.    DHS also repeatedly fails to ensure that siblings in DHS custody who are not placed together at least have frequent visits with one another. DHS's routine denial of Plaintiff Children's right to sibling visitation keeps them from maintaining critical family relationships.

119.    DHS also routinely fails to provide regular visits and contact between Plaintiff Children and their biological parents, even when reunification is the goal set by DHS. This failure deprives Plaintiff Children of critical parental relationships and family ties.

32

C.      **DHS's Failure to Adequately Monitor the Safety of Children in DHS Custody Subjects Plaintiff Children to Harm or Imminent Risk of Harm**

1.      **Excessive Caseloads, Inexperienced Caseworkers, Inadequate Supervision, High Turnover and Inadequate Training Threaten Basic Child Safety**

120.   DHS caseworkers are responsible for monitoring the safety and well-being of foster children in state custody, ensuring that their service needs are being met, ensuring that the homes and facilities that care for them are meeting their needs, and ensuring that they move toward the goal of a permanent home out of state custody. Because of the vital role played by caseworkers, national professional standards prescribe caseload limits of between twelve and fifteen children per worker for foster care services, and caseload limits of no more than twelve investigation cases for workers conducting intake and child protective service investigations. National professional standards also prescribe supervisory ratios of one supervisor to every five caseworkers.

121.   DHS caseworkers consistently have caseloads that are at least two to three times higher than national standards. Currently, individual caseloads for foster care workers (also called "permanency planning workers") routinely exceed fifty children, with some workers having caseloads of more than one hundred children. Individual caseloads for "intake" and child protective services workers, who in Oklahoma are responsible for ensuring safety and services to Plaintiff Children after they are removed from their homes and before children are assigned to a permanency planning worker, routinely exceed forty-five investigation cases (and over one hundred children). Supervisors responsible for caseworkers often supervise seven or more caseworkers – sometimes even up to eleven workers – who in turn have excessive caseloads, making adequate supervision impossible.

33

122. DHS caseworkers carry such high caseloads because DHS does not employ enough caseworkers to adequately serve all of the children in DHS custody. This pervasive problem has been well documented for many years, yet DHS has failed to address it. For example, every Annual Child Death Review Board report from 2001 to 2006 has stated that lowering caseloads to meet national standards would reduce child deaths, yet caseloads remain dangerously high today.

123. Due to a combination of unmanageable workloads and poor caseworker support from DHS, turnover remains a serious problem, and leads to a largely inexperienced workforce. For example, due to excessive turnover at DHS, as of April of 2007, there were one hundred vacant child welfare specialist positions. In a December 5, 2007 article in the Daily Oklahoman, titled "DHS Falls Behind on Cases," a DHS representative admitted that the majority of DHS staff has less than two years' experience.

124. Caseworkers leave DHS so frequently that their caseloads are absorbed by the already overloaded existing workforce. In fact, after caseworkers leave DHS, their cases often remain uncovered for weeks, or sometimes even months, until another caseworker first looks at them.

125. In addition to high caseloads and turnover, DHS fails to provide adequate training to caseworkers concerning the protection and care required of foster children and fails to ensure appropriate supervision of caseworkers. In fact, training and supervision are so minimal that caseworkers frequently are not familiar with basic DHS policies. DHS also routinely fails to hold caseworkers accountable for their failure to exercise any professional judgment in making decisions concerning the care of foster children.

34

2.   **DHS's Dangerous Monitoring and Oversight Practices of Foster Homes and Facilities Harm Plaintiff Children and Expose Them to Imminent Risk of Harm**

126.   DHS has a policy, pattern, custom and/or practice of providing inadequate monitoring and oversight of foster homes and facilities that house Plaintiff Children – both DHS-operated homes and facilities and those that are directly managed by private agencies under contract with DHS.  As a direct result of DHS's failure to appropriately screen, approve and monitor homes and facilities where children in DHS custody are placed, Plaintiff Children have been and continue to be harmed and placed at imminent risk of harm.

127.   DHS caseworkers fail to make required visits with foster children and their caregivers.  Regular caseworker visits are necessary for monitoring a child's safety and well-being and the appropriateness of the child's placement, identifying the child's needs, and arranging and monitoring the delivery of services to meet those needs.  DHS policy requires caseworkers to make regular face-to-face contact at least once a month with the Plaintiff Children on their caseloads and with those children's caregivers, and also to visit foster homes at least monthly.  For Plaintiff Children who are placed in emergency shelters, DHS caseworkers must have face-to-face contact within twenty-four hours of their entry into the shelter and a minimum of weekly visits while the child remains in the shelter.

128.   Due to excessive caseloads, DHS caseworkers routinely fail to visit Plaintiff Children for months at a time, and sometimes fail to visit Plaintiff Children for six months or more.  This failure jeopardizes the safety of Plaintiff Children on an ongoing basis, leaving them at risk of abuse, neglect or other maltreatment.  When visits to children in DHS custody do occur, they are regularly made by inexperienced and unqualified "case aides," rather than by DHS caseworkers.

35

129.   The routine placement of Plaintiff Children far from their home communities has resulted in the DHS practice of assigning "secondary" DHS caseworkers to visit Plaintiff Children in the counties where they are currently housed. However, due to excessive workloads, "secondary" DHS caseworkers often fail to visit or otherwise monitor and supervise the Plaintiff Children assigned to them. Additionally, "secondary" DHS caseworkers routinely fail to share information or coordinate efforts with "primary" DHS caseworkers, who remain responsible for Plaintiff Children's safety and well-being, and for implementing plans to seek and secure a permanent home out of state custody for Plaintiff Children.

130.   DHS routinely fails to furnish basic, accurate and current information about Plaintiff Children to the juvenile courts and to the attorneys who represent Plaintiff Children, including required timely notification of Plaintiff Children's placement moves.

131.   DHS frequently fails to adequately screen and investigate potential foster parents and their homes before approving them for the placement of children in DHS custody and before putting Plaintiff Children in their homes. For example, a recent report by the Oklahoma Commission on Children and Youth documented that, of sixteen foster homes in a particular county, four homes – or 25% – had serious safety issues and never should have been approved for placement by DHS.

132.   DHS policy requires all foster homes to be formally re-assessed and re-licensed or approved on a yearly basis. This process is not consistently followed, and DHS regularly fails to complete these annual inspections. The pressure to keep foster homes open, due to the lack of placements for foster children, contributes to the routine failure by DHS to adequately review and re-license or approve homes to ensure their safety.

36

133. DHS fails to adequately investigate reports or suspicions of abuse or neglect in foster homes and facilities, which places Plaintiff Children at serious risk of harm. DHS caseworkers regularly ignore complaints by children in DHS custody of abuse or neglect by their foster parents or facility staff and obvious signs of abuse or neglect in placements. DHS also fails to close foster homes promptly – or close them at all – where children in DHS custody have been subjected to abuse or neglect. In those instances where DHS does investigate allegations of abuse or neglect in foster homes, due to the shortage of foster homes, DHS routinely keeps children in the foster homes pending results of the investigation, even if there are allegations of serious injury.

134. DHS routinely fails to adequately screen, inspect, approve and certify the homes of relatives (also called "kinship" homes) for foster children. DHS policy allows children in custody to be placed in kinship foster homes pending DHS approval of the homes, but only after criminal background checks and an initial home assessment are completed. These basic protections are routinely ignored. The initial assessments are assigned to DHS caseworkers who are overburdened with other responsibilities and onerous caseloads, sometimes in excess of one hundred children per worker. In violation of DHS policy, DHS often fails to conduct the required criminal background checks on all other adults residing in the kinship home before placing Plaintiff Children in the home.

135. DHS inspections of facilities which house foster children are often cursory, as DHS inspectors do not interview foster children who are living in the facilities and, as a result, often overlook dangerous and inappropriate conditions. Even where violations are discovered and reported at facilities, DHS does not ensure that they are timely corrected, placing Plaintiff Children at risk of harm.

37

136.   DHS often fails to adequately supervise and monitor the safety and quality of the homes, facilities and services provided by private agencies under contract with DHS.

137.   DHS routinely fails to make reasonable efforts to locate children in DHS custody who have run away from their placements in order to ensure their safety and well-being. This poor monitoring and oversight practice harms Plaintiff Children and places them at imminent risk of harm.

138.   DHS denies adequate support to foster parents who take care of Plaintiff Children, by failing to provide adequate initial and ongoing foster parent training and by failing to provide foster parents with basic and necessary information about the foster children who are placed in their homes.  Additionally, due to excessive workloads, caseworkers are routinely inaccessible to foster parents.

139.   Foster parents also fear retaliation by DHS for advocating on behalf of the foster children for whom they care.  DHS workers sometimes remove Plaintiff Children from foster homes as a response to foster parents who assert themselves to get questions answered or to access needed services.  As a result, foster parents are often wary of requesting help to obtain for foster children the services to which they are entitled.  These practices harm Plaintiff Children and place them at imminent risk of harm, and reduce the number of appropriate foster parents who might otherwise be willing to provide homes for Plaintiff Children.

**D.      Additional Dangerous Failings by DHS Subject Plaintiff Children to Harm or Imminent Risk of Harm**

**1.      DHS Fails to Provide Adequate Foster Care Maintenance Payments for the Care of Plaintiff Children**

140.   Oklahoma receives federal funding to provide licensed foster parents with "foster care maintenance payments," which are defined by DHS policy as payments adequate to

cover "the cost of (and the cost of providing) food, clothing, shelter, daily supervisions, school

supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable

travel to the child's home for visitation." Oklahoma accepts federal funding for foster care

maintenance payments, but fails to provide payments to caregivers of foster children that cover

the reasonable actual cost of care under federal law.

141. The foster care maintenance payments in Oklahoma are not based on a

methodology reflecting the actual and reasonable payments that cover the cost of (and the cost of

providing) food, clothing, shelter, daily supervisions, school supplies, a child's personal

incidentals, liability insurance with respect to a child and reasonable travel to the child's home

for visitation.

142. The actual foster care maintenance payment rates in Oklahoma fall far short

of the actual and reasonable costs required by federal law. For example, DHS pays foster parents

a basic foster care rate of only $365 a month – less than $12 a day – to raise a child up to six

years old. According to a national research study published in 2007 by the University of

Maryland, Children's Rights and the National Foster Parent Association, Oklahoma's foster care

maintenance payments would need to be increased by over 50% before they could begin to cover

the reasonable and actual costs of raising a child pursuant to federal law.

143. DHS's failure to provide adequate foster care maintenance payments as

required by federal law directly contributes to the drastic shortage in the number and array of

foster homes for Plaintiff Children in Oklahoma. DHS provides foster parents with payments for

the direct and intended benefit of Plaintiff Children that are too low to attract and retain qualified

foster parents, or to provide foster parents with adequate resources such that Plaintiff Children

can receive basic necessities. As a result, DHS's inadequate foster care maintenance payments

directly contribute to Plaintiff Children being routinely placed in grossly inappropriate emergency shelters, and other unsafe and inappropriate homes and facilities.

144.   Additionally, because the cost of caring for foster children becomes more expensive as children get older, adequate foster care maintenance payments under federal law are higher for older children than for infants and toddlers.  However, DHS has a policy, pattern, custom and/or practice of failing to increase the basic rate for foster care maintenance payments as a function of age unless foster parents specifically request such an increase.  As a result, many foster parents in Oklahoma who are raising teenagers receive grossly inadequate foster maintenance payments that are set at the already inadequate rate for infants and toddlers.

### 2.   DHS Fails to Plan for and Take Mandated Steps to Find Permanent and Safe Homes and Exits From State Custody for Plaintiff Children

145.   DHS routinely fails to meet statutory timetables and other requirements for providing Plaintiff Children with specific services and steps to ensure their prompt placement in a permanent home outside of state custody, also called "permanency planning" services.  These requirements include determining whether children can be safely and promptly returned home and, if DHS determines that is not appropriate, taking mandated steps to place children with an alternative permanent family, usually through adoption.

146.   For example, DHS routinely fails to conduct timely required "diligent searches" for possible relatives who can care for Plaintiff Children, as soon as they are brought into state custody, in violation of DHS policy, federal law and reasonable professional standards. This DHS failure directly results in the placement of Plaintiff Children with strangers, and the loss of opportunities for Plaintiff Children to live with family members while in foster care or permanently out of state custody.  This DHS failure also subjects Plaintiff Children to the emotional and psychological trauma of additional, unnecessary placement moves, as DHS

40

routinely pulls Plaintiff Children out of the homes of foster parents with whom they have formed relationships and places them in relative homes that DHS could easily have identified earlier.

147.   Federal and state law, as well as DHS policy, require that a petition to terminate parental rights (also called a "TPR" petition) must be filed for children who have been in state custody for fifteen of the last twenty-two months in order to begin the process of making them legally available for adoption, unless compelling reasons against filing a TPR are documented in the child's case file.  According to recent state data, Oklahoma was in violation of this requirement more than half the time.  Even when parental rights have been terminated for children in DHS custody, DHS fails to take steps to move foster children promptly and safely towards adoption, forcing them to needlessly languish in state custody.

148.   DHS also fails to provide required services to foster children aged sixteen and older who cannot be returned home or adopted to help prepare them to live on their own when they are discharged from DHS custody at the age of eighteen, also known as "independent living services."  These services include job training, drivers education courses, life skills training and college preparation courses.  Such services are routinely not provided to eligible Plaintiff Children.  Additionally, required "independent living plans" are rarely provided for eligible foster youth and, when they are provided, are grossly inadequate.  As a result, older foster children routinely leave DHS custody without the basic life skills and training necessary to live on their own, and many face unemployment, long term public assistance, incarceration or homelessness.

### 3.    DHS Fails to Arrange Mental Health Services for Plaintiff Children

149.   Children entering foster care often have experienced significant trauma, resulting in physical, emotional or behavioral issues that require mental health treatment.

41

Plaintiff Children are routinely prescribed psychotropic medications to "manage" their behaviors, yet DHS fails to arrange for mental health treatment and therapy to address Plaintiff Children's mental health needs. This DHS failure harms Plaintiff Children and places them at imminent risk of harm.

### 4.   Plaintiff Children Are Denied Adequate and Effective Legal Representation in the Juvenile Courts

150.   Under Oklahoma law, an attorney must be appointed to represent every child in a proceeding to determine if the child is deprived, and every child who has been subject to abuse or neglect. These attorneys are required to provide their clients with adequate and effective legal representation and zealous advocacy in order to ensure their safety and well-being and to promote their best interests, throughout their experience in the juvenile courts.

151.   Among other things, attorneys representing Plaintiff Children in the juvenile courts must investigate cases and meet with their client children outside of court prior to court proceedings. Published national standards require that attorneys representing abused and neglected children have caseloads of no more than one hundred individual children per attorney, to make it possible for them to perform these and other critical functions in providing legal representation to foster children.

152.   However, attorneys charged with representing abused and neglected children in Oklahoma routinely carry unmanageably high caseloads. For example, attorneys representing Plaintiff Children in Oklahoma City have caseloads in excess of 1,300 children, and attorneys representing Plaintiff Children in juvenile court in Tulsa have caseloads in excess of 500 children.

153.   As a result of the excessively high workloads of attorneys assigned to represent Plaintiff Children, these lawyers are routinely unable to consult with their clients

42

before court appearances and are unable to provide adequate or effective counsel or zealous advocacy. DHS regularly fails to inform attorneys of the location of the Plaintiff Children they represent, a problem compounded by the frequent multiple moves to which foster children are subjected while in DHS custody. DHS also frequently fails to take steps to facilitate meetings between Plaintiff Children and their attorneys.

154. In 2006, due to pressure from attorneys, DHS contracted with the American Bar Association ("ABA") to conduct a study of the quality of legal representation for children in the juvenile courts. The ABA conducted the study and then circulated a draft report in 2007, which stated: "The quality of legal representation for children, parents and the State is inadequate . . . [T]here are not enough attorneys to do the work. Current caseloads leave attorneys in an untenable position; they are painfully aware of what is required to properly serve their clients and want to provide the highest quality of legal representation possible – but given unmanageably high caseloads are unable to perform fundamental responsibilities." The ABA draft report noted that, due to the sheer volume of their caseloads, these attorneys were put in positions where they were violating their ethical responsibilities to the children they represent.

155. Plaintiff Children are routinely denied adequate and effective legal representation in the juvenile courts. As a result, Plaintiff Children are also denied an important safeguard to identify potential threats to their safety and well-being while in DHS custody, placing them at risk of imminent harm.

### 5. Breach of the Oklahoma State Plan Contracts Harms Plaintiff Children

156. The federal government has approved the State Plans submitted by Oklahoma in order to receive federal financial assistance under Titles IV-B and IV-E of the Social Security Act, to help fund the state's child welfare, foster care and adoption programs.

43

These State Plans are contracts into which the State of Oklahoma enters for the express and direct benefit of Plaintiff Children, who are direct and intended third-party beneficiaries of these contracts. Defendants are directly responsible for fulfilling the obligations undertaken by Oklahoma when it entered into these State Plan contracts, including but not limited to the obligation to administer the programs in accordance with specific relevant state statutes, regulations and policies and all applicable federal statutes, regulations and other official issuances of the United States Department of Health and Human Services.

157.     Defendants, who directly and indirectly control and are responsible for the policies and practices of DHS, have breached their obligations to Plaintiff Children under these State Plan contracts, and Plaintiff Children have been harmed and placed at imminent risk of harm as a result of this breach.

## VII.     Additional Factual Allegations Concerning Named Plaintiffs

### D.G.

158.     DHS has victimized D.G. through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide services necessary to facilitate his prompt and safe reunification with his biological parents, and the failure to seek and secure another permanent home for D.G. out of state custody through adoption. These harms and D.G.'s continued instability and risk of harm are a direct result of DHS's drastic placement shortage, its failure to find an appropriate placement for D.G. and its failure to provide adequate monitoring and oversight over its placements and over his care.

159.     D.G. entered DHS custody in Oklahoma County in September of 2007, when he was only seven days old, due to his mother's chronic drug abuse. With no foster homes

available, DHS first placed D.G. in the poorly supervised baby Annex of the Pauline Mayer

Emergency Shelter in Oklahoma City. In violation of DHS policy and reasonable professional

standards limiting shelter stays for children under five years old to a maximum of twenty-four

hours, DHS kept D.G. languishing in the shelter for at least twenty-two days.

160.    In September of 2007, due to inadequate supervision by DHS at the

overcrowded Mayer Emergency Shelter, a DHS worker carrying D.G. and another infant at the

same time dropped D.G. – who was then less than a month old – and he fell and struck his head

on the floor. DHS did not take D.G. to the hospital until the next day, where he was diagnosed

with a fractured skull.

161.    After D.G.'s stay at the hospital, DHS placed D.G. in an "emergency

foster home" for seventeen days. DHS then moved D.G., at the age of two months, to another

temporary foster home, where he currently lives, likely to be moved yet again.

162.    D.G. has received dangerously poor monitoring and oversight from DHS

during his time in state custody. With no opportunity to form a relationship with a consistent and

safe adult caregiver, D.G. waits for a stable and permanent placement as he faces more and more

moves in foster care. In addition to its failure to keep D.G. safe while in state custody, DHS

failed to provide the services necessary to facilitate D.G.'s prompt and safe reunification with his

biological parents. Although the parental rights of D.G.'s parents have now been terminated,

making him legally available for adoption, DHS has failed to seek and secure another permanent

home for D.G. through adoption, so he can leave DHS custody.

163.    DHS's policies and practices have caused D.G. irreparable harm and

continue to subject D.G. to the imminent risk of irreparable harm. DHS has violated D.G.'s

constitutional and statutory rights by: failing to protect him from unnecessary harm and failing

45

to keep him reasonably safe from harm while in government custody; failing to provide him with a living environment that protects his physical, mental and emotional safety and well-being; failing to provide him with services necessary to prevent him from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing him in an emergency shelter or other emergency, temporary placements that are contrary to his individual needs and for extended periods, in violation of any reasonable professional judgment; failing to provide him with appropriate planning and services directed toward ensuring that he can leave foster care and grow up in a permanent family; failing to provide him with treatment and care consistent with the purpose of the assumption of custody by DHS; failing to provide him care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of his DHS caseworkers; failing to provide adequate monitoring of his current status and needs; failing to place him in the least restrictive placement according to his needs; failing to develop and implement timely written case plans that include mandated elements; failing to provide appropriate, adequate and timely investigations into suspected abuse or neglect while he was in DHS custody; failing to adequately screen foster homes prior to placing him in such homes; and failing to provide him with foster placements that are receiving adequate foster care maintenance payments so that they have the capacity to provide for his essential needs and services.

**C.S.**

164.    DHS has victimized C.S. through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide required visits from her DHS caseworkers, the failure to arrange regular contact with her

46

siblings, the failure to provide required medical treatment, and the failure to provide services necessary to facilitate her prompt and safe reunification with her biological mother or, if DHS determines that is not appropriate, the failure to seek and secure another permanent home for C.S. out of state custody through adoption. These harms and C.S.'s continued instability and risk of harm are a direct result of DHS's drastic placement shortage, its failure to find an appropriate placement for C.S. and its failure to provide adequate monitoring and oversight over its placements and over her care.

165.    C.S. entered DHS custody in Tulsa County in February of 2007, when she was only a few days old, due to her mother's chronic drug abuse. In her first few months in custody, DHS moved C.S. through an emergency shelter, an "emergency foster home" and three foster homes. DHS then placed C.S. with a relative in an unsafe and inadequately monitored kinship foster home, where she was thrown against a wall, fracturing her skull, and where she was likely subjected to Shaken Baby Syndrome. After C.S. was removed from the kinship foster home and hospitalized for her injuries, with no foster homes available, DHS placed the then five-month-old C.S. in the overcrowded and poorly supervised "Little House" for babies at the Laura Dester Emergency Shelter in Tulsa, a grossly inappropriate placement for an infant.

166.    DHS then moved C.S. through three temporary foster homes over the next two months, after which DHS placed her with her biological mother in a group facility in Tulsa, where C.S. remained in DHS custody. Due to DHS's failure to adequately monitor this placement, C.S. was severely neglected. Her safety and care were so poorly supervised that she was removed and hospitalized for severe dehydration and subsequently suffered from seizures.

167.    After her hospitalization, DHS moved C.S. through two more foster homes over the next few months, during which time she suffered from a severe, untreated and

worsening respiratory tract infection.  DHS failed to provide basic monitoring or supervision of
C.S.'s health and safety and, when DHS removed C.S. from the second foster home, she had
open sores on her legs, was dehydrated, was oozing puss and phlegm out of her mouth and nose,
and was struggling to breathe.

168.    When DHS placed C.S. in her next temporary foster home – her sixteenth
placement in eleven months in DHS custody – despite C.S.'s clearly critical medical condition,
DHS failed to provide the foster parents with any information about C.S.'s background, prior
harms or current medical condition or needs.  The foster mother immediately took C.S. to a
doctor, who diagnosed C.S. with a "failure to thrive" and Respiratory Syncytial Virus ("RSV"), a
highly contagious but easily treatable respiratory tract infection that can be fatal if untreated for
children under three years old, and prescribed her antibiotics.  On a later visit to the doctor, the
foster mother also learned that C.S. had serious allergies to pets, and her allergies were inflamed
because DHS had placed her in a home that had both cats and dogs.  As a result, DHS moved
C.S. to another temporary foster home where she currently resides, likely to be moved yet again.

169.    C.S. has received dangerously poor monitoring and oversight from DHS
during her time in state custody.  After suffering from severe abuse in DHS custody, and
numerous inappropriate and unnecessary placement moves, C.S. is an eleven-month-old baby
who, due to DHS's failings, has not had a single opportunity to form a relationship with a safe,
consistent adult caregiver in her entire life.  She has developed Reactive Attachment Disorder,
manifested by her crying out when an adult tries to hold her.  DHS has failed to arrange for C.S.
to have regular contact with her siblings in order to maintain critical family relationships.  DHS
has also failed to provide the services necessary to facilitate C.S.'s prompt and safe reunification
with her biological mother or, if DHS determines that is not appropriate, to seek and secure

48

another permanent home for C.S. through adoption, so she can leave DHS custody.  As a result, at any moment, C.S. is at risk of more moves, more instability and more harm from inappropriate placements.

   170. DHS's policies and practices have caused C.S. irreparable harm and continue to subject C.S. to the imminent risk of irreparable harm.  DHS has violated C.S.'s constitutional and statutory rights by:  failing to protect her from unnecessary harm and failing to keep her reasonably safe from harm while in government custody; failing to provide her with a living environment that protects her physical, mental and emotional safety and well-being; failing to provide her with services necessary to prevent her from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing her in emergency shelters or other emergency, temporary placements that are contrary to her individual needs and for extended periods, in violation of any reasonable professional judgment; failing to provide her with appropriate planning and services directed toward ensuring that she can leave foster care and grow up in a permanent family; failing to provide her with treatment and care consistent with the purpose of the assumption of custody by DHS; failing to provide her care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of her DHS caseworkers; failing to provide adequate monitoring of her current status and needs; failing to place her in the least restrictive placement according to her needs; failing to develop and implement timely written case plans that include mandated elements; failing to provide appropriate, adequate and timely investigations into suspected abuse or neglect while she was in DHS custody; failing to adequately screen foster homes prior to placing her in such homes;

failing to preserve family connections and to facilitate visits with her siblings; and failing to

provide her with foster placements that are receiving adequate foster care maintenance payments

so that they have the capacity to provide for her essential needs and services.

**J.B.**

171.   DHS has victimized J.B. through unsafe placements and numerous moves,

the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide

required visits from his DHS caseworkers, the failure to arrange regular contact with his siblings,

and the failure to provide services necessary to facilitate his prompt and safe reunification with

his biological mother or, if DHS determines that is not appropriate, the failure to seek and secure

another permanent home for J.B. out of state custody through adoption.  These harms and J.B.'s

continued instability and risk of harm are a direct result of DHS's drastic placement shortage, its

failure to find an appropriate placement for J.B. and its failure to provide adequate monitoring

and oversight over its placements and over his care.

172.   J.B. entered DHS custody in Oklahoma County in October of 2006, when

he was only two days old, due to neglect by his mother and sexual abuse perpetrated on his

siblings by a male living with his mother.  After placing J.B. in a foster home for a few months,

DHS moved J.B. and three of his siblings back into the home of their biological mother on a trial

home reunification, although DHS had not provided J.B.'s mother with the services necessary to

enable her to care for her children.  DHS retained custody of J.B. and was required to provide

him with supervision, monitoring and services to ensure his safety during the entire trial home

reunification, but failed to do so.  J.B.'s DHS caseworker failed to make required visits to J.B. in

his mother's home.  During the trial home reunification, J.B.'s mother continued to use drugs,

and she continued to allow the man who had sexually abused J.B.'s siblings to live in her house.

In October of 2007, DHS finally removed J.B. from his mother's home due to neglect and the dangerous conditions in her home.

173.    With no foster homes available, DHS placed the then one-year-old J.B. in the overcrowded and poorly supervised baby Annex of the Pauline Mayer Emergency Shelter in Oklahoma City. DHS kept J.B. in the Mayer Emergency Shelter for over thirty consecutive days, until late November of 2007, in violation of DHS policy and reasonable professional standards limiting shelter stays for children under five years old to a maximum of twenty-four hours.

174.    During DHS's placement of J.B. in the Mayer Emergency Shelter, J.B. was poorly supervised and unmonitored while in a bath, and he suffered severe burns. After the incident occurred, DHS failed to immediately report the suspected abuse or neglect. J.B. was taken to the hospital where a physician diagnosed J.B. with first- and second-degree burns on both of his feet and reported suspected abuse. The second-degree burns on J.B.'s left foot were so severe that they resulted in the complete loss of his skin from his foot to his toes. DHS then moved J.B. from the shelter to a temporary foster home where he currently lives while his burns heal, after which, DHS plans to move him yet again.

175.    J.B. has received dangerously poor monitoring and oversight from DHS during his time in state custody. After suffering from severe abuse and numerous placement moves in DHS custody, J.B. is a sixteen-month-old child who, due to DHS's failings, has not had a single opportunity to form a relationship with a safe, consistent adult caregiver in his entire life. DHS has failed to arrange for J.B. to have regular contact with his siblings in order to maintain critical family relationships. In addition, DHS has failed to provide the services necessary to facilitate J.B.'s prompt and safe reunification with his biological mother or, if DHS determines

51

that is not appropriate, to seek and secure another permanent home for J.B. through adoption, so he can leave DHS custody. Instead, J.B. waits indefinitely for a long term placement, at risk of being moved yet again.

176.   DHS's policies and practices have caused J.B. irreparable harm and continue to subject J.B. to the imminent risk of irreparable harm. DHS has violated J.B.'s constitutional and statutory rights by: failing to protect him from unnecessary harm and failing to keep him reasonably safe from harm while in government custody; failing to provide him with a living environment that protects his physical, mental and emotional safety and well-being; failing to provide him with services necessary to prevent him from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing him in emergency shelters or other emergency, temporary placements that are contrary to his individual needs and for extended periods, in violation of any reasonable professional judgment; failing to provide him with appropriate planning and services directed toward ensuring that he can leave foster care and grow up in a permanent family; failing to provide him with treatment and care consistent with the purpose of the assumption of custody by DHS; keeping him in DHS custody longer than is necessary to accomplish the purposes of taking him into DHS custody; failing to provide him care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of his DHS caseworkers; failing to provide adequate monitoring of his current status and needs; failing to place him in the least restrictive placement according to his needs; failing to develop and implement timely written case plans that include mandated elements; failing to provide appropriate, adequate and timely investigations into suspected abuse

or neglect while he was in DHS custody; failing to adequately screen foster homes prior to placing him in such homes; subjecting him to state-created dangers by placing him on unsupervised visits or trial home reunification with family members without taking reasonable steps and providing necessary supervision to ensure his safety; failing to preserve family connections and to facilitate visits with his siblings; and failing to provide him with foster placements that are receiving adequate foster care maintenance payments so that they have the capacity to provide for his essential needs and services.

**A.P.**

177.    DHS has victimized A.P. through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide required visits from her DHS caseworkers, and the failure to provide services necessary to facilitate her prompt and safe reunification with her biological parents or, if DHS determines that is not appropriate, the failure to seek and secure another permanent home for A.P. out of state custody through adoption. These harms and A.P.'s continued instability and risk of harm are a direct result of DHS's drastic placement shortage, its failure to find an appropriate placement for A.P. and its failure to provide adequate monitoring and oversight over its placements and over her care.

178.    A.P. entered DHS custody in Rogers County in July of 2006, when she was two years old, along with her four-year-old sister H.P., due to neglect and their mother's mental health problems. DHS first placed A.P. and H.P temporarily in an "emergency foster home" for two days before moving them to another foster home for a month.

179.    In October of 2006, DHS directed A.P.'s mother to undergo a psychiatric evaluation, which found that she was in a severe state of mental health crisis, and in immediate

53

need of services to stabilize her condition and put her on track to possibly resume care of her daughters. However, DHS never communicated the findings of the evaluation to A.P.'s mother and failed to implement the recommendations or provide any services. As a result, A.P.'s mother's mental health condition has significantly deteriorated, and A.P. has been denied the opportunity for a possible safe reunification with her mother.

180.    Instead, DHS removed A.P. and H.P. from their foster home and placed them with their biological father on a trial home reunification, although DHS had not provided A.P.'s father with the services necessary to enable him to care for his children. DHS retained custody of A.P. and H.P. and was required to provide them with supervision, monitoring and services to ensure their safety during the entire trial home reunification period, but failed to do so. A.P.'s DHS caseworker failed to make the required visits to her in her father's home. As part of this placement arrangement, A.P.'s father was not to allow the girls to have any contact with their mother. However, their mother was, openly, still living in the home, and her untreated and deteriorating mental health condition placed A.P. at immediate risk of harm. After A.P. and H.P. had lived in their father's home for seven months, DHS finally removed them from the trial home reunification.

181.    DHS then placed A.P. and H.P. together in a kinship home in May of 2007. Again, DHS failed to supervise and monitor the safety of the placement and the children in the home. In violation of DHS policy and reasonable professional standards, DHS failed to properly perform the required background checks prior to placing A.P. in the home. It was only after A.P. had been living in the home that DHS discovered a prior confirmed child abuse allegation against the kinship foster parent, rendering the home unsafe. In addition, H.P. started exhibiting highly inappropriate sexual behaviors toward A.P. in this home, consistent with her

having been recently sexually abused, and began to sexually abuse A.P. and other children in the home. In June of 2007, DHS moved A.P. and H.P. – together – into another foster home, where H.P. continued to sexually abuse A.P. It was not until September of 2007 that DHS finally separated A.P. from H.P. and moved her to another temporary foster home, where she currently lives, likely to be moved yet again.

182.    A.P. has received dangerously poor monitoring and oversight from DHS during her time in state custody. During A.P.'s eighteen months in DHS custody, DHS has already changed her assigned DHS caseworker five times, due to the excessive turnover in the DHS workforce. DHS has also failed to ensure that A.P. has received required visits from her caseworkers. DHS has shuffled her among several unsafe placements, and failed to provide the services necessary to facilitate A.P.'s prompt and safe reunification with her biological parents or, if DHS determines that is not appropriate, to seek and secure another permanent home for A.P. through adoption, so she can leave DHS custody. Instead, she waits indefinitely for a long term placement, at risk of being moved yet again.

183.    DHS's policies and practices have caused A.P. irreparable harm and continue to subject A.P. to the imminent risk of irreparable harm. DHS has violated A.P.'s constitutional and statutory rights by: failing to protect her from unnecessary harm and failing to keep her reasonably safe from harm while in government custody; failing to provide her with a living environment that protects her physical, mental and emotional safety and well-being; failing to provide her with services necessary to prevent her from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing her in emergency shelters or other emergency, temporary placements that are contrary to her individual

55

needs and for extended periods, in violation of any reasonable professional judgment; failing to provide her with appropriate planning and services directed toward ensuring that she can leave foster care and grow up in a permanent family; failing to provide her with treatment and care consistent with the purpose of the assumption of custody by DHS; keeping her in DHS custody longer than is necessary to accomplish the purposes of taking her into DHS custody; failing to provide her care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of her DHS caseworkers; failing to provide adequate monitoring of her current status and needs; failing to develop and implement timely written case plans that include mandated elements; failing to provide appropriate, adequate and timely investigations into suspected abuse or neglect while she was in DHS custody; failing to adequately screen foster homes prior to placing her in such homes; subjecting her to state-created dangers by placing her on unsupervised visits or trial home reunification with family members without taking reasonable steps and providing necessary supervision to ensure her safety; and failing to provide her with foster placements that are receiving adequate foster care maintenance payments so that they have the capacity to provide for her essential needs and services.

**J.A.**

184.    DHS has victimized J.A. through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to arrange regular contact with his siblings, and the failure to provide services necessary to facilitate his prompt and safe reunification with his biological parents or, if DHS determines that is not appropriate, the failure to seek and secure another permanent home for J.A. out of state custody through adoption. These harms and J.A.'s continued instability and risk of harm are the direct

result of DHS's drastic placement shortage, its failure to find an appropriate placement for J.A. and its failure to provide adequate monitoring and oversight over its placements and over his care.

185.    J.A. entered DHS custody in Oklahoma County in December of 2006, when he was four years old, due to neglect and his parents' chronic substance abuse problems. In 2002, after J.A. and his mother both tested positive for drugs at J.A.'a birth, DHS requested that J.A. be placed in state custody to ensure his safety. However, DHS was unable to locate J.A. and, instead, placed him on child protective services alert. It was only in 2006, after J.A.'s mother gave birth to another drug-addicted baby, that DHS brought J.A. into custody. With no foster homes available, DHS first placed J.A. in the overcrowded and poorly supervised baby Annex of the Pauline Mayer Emergency Shelter for a week, in violation of DHS policy and reasonable professional standards limiting shelter stays for children under five years old to a maximum of twenty-four hours.

186.    With still no foster homes available, DHS moved J.A. to an "emergency foster home" for over a month and then placed him temporarily in a kinship foster home with his uncle, without making any effort to determine if his uncle's home could be a long-term placement for J.A. After J.A. had spent six months in the kinship home and developed a relationship with his uncle's family, DHS moved him abruptly to an emergency shelter in Creek County when his uncle moved out of state with his family. During the more than six weeks that DHS kept J.A. in this emergency shelter, J.A.'s behavior became more disruptive.

187.    Still lacking placement options, DHS moved J.A. to yet another emergency shelter for five days, this time in Cleveland County, and then moved him yet again to

57

another emergency shelter for six weeks, this time in Pittsburgh County. By this time, DHS had kept J.A. in three different emergency shelters for ninety consecutive days.

188.    DHS then moved J.A. to a foster home for approximately one month, after which DHS moved J.A. to an "emergency foster home" for one day and then moved him again, this time to a residential treatment facility in Cleveland County. DHS kept J.A. in this institutional facility for over a week, after which he was placed in a temporary foster home in Canadian County, where he currently lives, likely to be moved yet again.

189.    J.A. has received dangerously poor monitoring and oversight from DHS during his time in state custody. After a year in DHS custody, J.A. has been shuffled through nine different placements, including numerous institutional facilities, without adequate stability, treatment or care from DHS. DHS has failed to arrange for J.A. to have any visits with his siblings in order to maintain critical family relationships. In addition, DHS has failed to provide the services necessary to facilitate J.A.'s prompt and safe reunification with his biological parents or, if DHS determines that is not appropriate, to seek and secure another permanent home for JA. through adoption, so he can leave DHS custody. Instead, J.A. waits indefinitely for a long term placement, at risk of being moved yet again.

190.    DHS's policies and practices have caused J.A. irreparable harm and continue to subject J.A. to the imminent risk of irreparable harm. DHS has violated J.A.'s constitutional and statutory rights by: failing to protect him from unnecessary harm and failing to keep him reasonably safe from harm while in government custody; failing to provide him with a living environment that protects his physical, mental and emotional safety and well-being; failing to provide him with services necessary to prevent him from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to

safe and secure foster placements, appropriate monitoring and supervision; placing him in emergency shelters or other emergency, temporary placements that are contrary to his individual needs and for extended periods, in violation of any reasonable professional judgment; failing to provide him with appropriate planning and services directed toward ensuring that he can leave foster care and grow up in a permanent family; failing to provide him with treatment and care consistent with the purpose of the assumption of custody by DHS; keeping him in DHS custody longer than is necessary to accomplish the purposes of taking him into DHS custody; failing to provide him care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of his DHS caseworkers; failing to provide adequate monitoring of his current status and needs; failing to place him in the least restrictive placement according to his needs; failing to develop and implement timely written case plans that include mandated elements; failing to adequately screen foster homes prior to placing him in such homes; failing to preserve family connections and to facilitate visits with his siblings; and failing to provide him with foster placements that are receiving adequate foster care maintenance payments so that they have the capacity to provide for his essential needs and services.

**J.P.**

191.    DHS has victimized J.P. through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide required visits from his DHS caseworkers, the failure to arrange regular contact with his siblings, the failure to arrange adequate and basic educational opportunities, the failure to arrange consistent and appropriate mental health services, and the failure to provide services necessary to facilitate his prompt and safe reunification with his biological parents or, if DHS determines that

59

is not appropriate, the failure to seek and secure another permanent home for J.P. out of state custody through adoption. These harms and J.P.'s continued instability and risk of harm are a direct result of DHS's drastic placement shortage, its failure to find an appropriate placement for J.P. and its failure to provide adequate monitoring and oversight over its placements and over his care.

192.    J.P. entered DHS custody in Oklahoma County in May of 2006, when he was six years old, due to physical abuse, exposure to domestic violence and lack of supervision by his aunt, with whom he and his two brothers had been living since his mother was incarcerated. With no foster homes available, DHS first placed J.P. in the overcrowded and poorly supervised Pauline Mayer Emergency Shelter in Oklahoma City for ten days. DHS then moved J.P. through three temporary foster homes in six months.

193.    In November of 2006, DHS placed J.P. in a foster home where he was physically abused by his foster mother for almost a year. During this time, J.P. did not receive required visits from his DHS caseworkers to monitor his safety. In May of 2007, although J.P. told his DHS caseworker that his foster mother and her teenage daughter regularly pinned his arms behind his back and beat him, DHS failed to adequately investigate J.P.'s allegation of abuse and kept him in this unsafe home. It was not until October of 2007, when J.P. was brought to the hospital with bruises all over his body caused by his foster mother whipping him with a belt, that DHS finally removed him from this home.

194.    After J.P.'s stay at the hospital, DHS placed him in a respite foster home for five days before placing him in another temporary foster home, where he currently lives, likely to be moved yet again.

195.   J.P. has received dangerously poor monitoring and oversight from DHS during his time in state custody. After a year and a half in DHS custody, J.P. has suffered from abuse and has been shuffled through eight different placements, without adequate stability, treatment or care from DHS. DHS has failed to arrange for J.P. to have regular visits with his brothers, who are also in DHS custody, in order to maintain critical family relationships. Although J.P. currently receives multiple psychotropic medications, DHS has failed to arrange consistent and appropriate mental health services for J.P. to address the emotional and psychological trauma he has suffered and continues to suffer in DHS custody.

196.   DHS has also failed to arrange adequate and basic educational opportunities for J.P. during his time in DHS custody. DHS has failed to ensure that J.P.'s educational records follow his numerous placement moves. DHS has caused J.P. to change schools numerous times, to miss an unnecessary amount of school, and to fall behind in school, without any plan or services to give him the educational supports he needs.

197.   DHS has failed to provide the services necessary to facilitate J.P.'s prompt and safe reunification with his biological parents or, if DHS determines that is not appropriate, to seek and secure another permanent home for J.P. through adoption, so he can leave DHS custody. Instead, J.P. waits indefinitely for a long term placement, at risk of being moved yet again.

198.   DHS's policies and practices have caused J.P. irreparable harm and continue to subject J.P. to the imminent risk of irreparable harm. DHS has violated J.P.'s constitutional and statutory rights by: failing to protect him from unnecessary harm and failing to keep him reasonably safe from harm while in government custody; failing to provide him with a living environment that protects his physical, mental and emotional safety and well-being;

61

failing to provide him with services necessary to prevent him from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing him in emergency shelters or other emergency, temporary placements that are contrary to his individual needs and for extended periods, in violation of DHS policy and any reasonable professional judgment; failing to provide him with appropriate planning and services directed toward ensuring that he can leave foster care and grow up in a permanent family; failing to provide him with treatment and care consistent with the purpose of the assumption of custody by DHS; keeping him in DHS custody longer than is necessary to accomplish the purposes of taking him into DHS custody; failing to provide him care, treatment and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of his DHS caseworkers; failing to provide adequate monitoring of his current status and needs; failing to place him in the least restrictive placement according to his needs; failing to develop and implement timely written case plans that include mandated elements; failing to provide appropriate, adequate and timely investigations into suspected abuse or neglect while he was in DHS custody; failing to preserve family connections and to facilitate visits with his siblings; failing to arrange adequate and basic educational opportunities; failing to adequately screen foster homes prior to placing him in such homes; and failing to provide him with foster placements that are receiving adequate foster care maintenance payments so that they have the capacity to provide for his essential needs and services.

**R.J.**

199.    DHS has victimized R.J. through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide required visits from his DHS caseworkers, the failure to arrange regular contact with his siblings, the failure to arrange adequate and basic educational opportunities, the failure to arrange consistent and appropriate mental health services, the failure to provide services necessary to facilitate his prompt and safe reunification with his biological mother, and the failure to seek and secure another permanent home for R.J. out of state custody through adoption. These harms and R.J.'s continued instability and risk of harm are a direct result of DHS's drastic placement shortage, its failure to find an appropriate placement for R.J. and its failure to provide adequate monitoring and oversight over its placements and over his care.

200.    R.J. entered DHS custody in Oklahoma County in October of 1999, when he was three years old, due to neglect and sexual abuse perpetrated on R.J.'s sisters by his mother's boyfriends. With no foster homes available, DHS first placed R.J. in the overcrowded and poorly supervised Pauline Mayer Emergency Shelter. DHS then moved him through two "emergency foster homes" in less than a month, followed by a placement in a foster home for one day, after which DHS moved R.J. yet again.

201.    Between 2000 and 2002, DHS shuffled R.J. through another five foster homes as his behavior became predictably more difficult due to the constant moves and DHS's poor oversight.

202.    In 2002, DHS placed R.J. and his siblings back in the home of his biological mother on a trial home reunification, although DHS had not provided R.J.'s mother with the services necessary to enable her to care for her children. DHS retained custody of R.J.

and was required to provide him with supervision, monitoring and services to ensure his safety during the entire trial home reunification period, but failed to do so. R.J.'s DHS caseworker failed to make the required visits to him in his mother's home. During the trial home reunification, R.J.'s mother continued to use drugs, and she continued to allow men in her home who had a history of sexually abusing children. In June of 2002, DHS closed the case and returned R.J. and his siblings to his mother's custody. R.J.'s mother's home remained unsafe and R.J.'s sisters were sexually abused, but it was not until October of 2004 that DHS finally removed R.J. and his siblings due to neglect and abuse.

203.    Upon re-entering DHS custody, this time in Tulsa County, DHS placed the then eight-year-old R.J. in the Laura Dester Emergency Shelter for two months because of the drastic shortage of foster homes. DHS then moved R.J. to a temporary foster home for several months, after which he was again returned to the Laura Dester Emergency Shelter.

204.    In May of 2005, DHS placed R.J. and one of his siblings in an unsafe, poorly supervised and inadequately monitored foster home in Wagoner County. R.J. lived in this home for over eighteen months and, during this time, suffered repeated physical abuse as his foster mother regularly beat him with a switch. In early 2006, DHS finally removed R.J. from this abusive foster home. However, with no foster homes available, DHS placed him in an emergency shelter in Cherokee County for about one month until, due to overcrowding in that shelter, DHS moved him to another emergency shelter in Okmulgee County.

205.    DHS then moved R.J. into a temporary foster home in Tulsa County for two weeks before placing him back in the Laura Dester Emergency Shelter for three weeks. DHS moved R.J. to another temporary foster home for six weeks, after which DHS placed him in a group home in May of 2007, where he now resides.

64

206. R.J.'s current group home placement is unsafe, poorly monitored, and fails to meet R.J.'s needs. It is located in an old motel near Interstate I-44, in walking distance of several seedy bars, strip clubs and truck stops. The only immediate outdoor space where the resident children can play is the cement parking lot outside the group home. Foster children of ages five through eighteen are housed together in this home without age or developmentally appropriate programs or treatment. Supervision in the home is so poor, and the conditions in the home so unsanitary and unsafe, that children placed in this home frequently run away from the home for their own safety.

207. R.J. is currently separated from all of his six siblings. R.J.'s brothers J.J.J. (eleven years old), E.H. (ten years old), and J.J. (eight years old) and are in foster care in DHS custody and have been adjudicated deprived. R.J.'s three brothers have been moved by DHS through 19, 11 and 17 placements, respectively. R.J. also has three sisters who are no longer in DHS custody. DHS has failed to arrange for R.J. to have regular contact with his siblings and the opportunity to maintain critical family relationships while in DHS custody.

208. R.J. has received dangerously poor monitoring and oversight from DHS during his time in state custody. While in custody, R.J. has suffered from abuse and has been shuffled through more than twenty different placements, including six stays at grossly inappropriate emergency shelters, without adequate stability, treatment or care from DHS. Although R.J. currently receives multiple psychotropic medications, DHS has failed to arrange consistent and appropriate mental health services for R.J. to address the emotional and psychological trauma he has suffered and continues to suffer in DHS custody.

209. DHS has also failed to arrange adequate and basic educational opportunities for R.J. during his time in DHS custody. DHS has failed to ensure that R.J.'s

65

educational records have followed his numerous placement moves. DHS has caused R.J. to change schools, to miss an unnecessary amount of school, and to fall behind in school, without any plan or services to give him the educational supports he needs.

210.   DHS failed to provide the services necessary to facilitate R.J.'s prompt and safe reunification with his biological mother. The parental rights of R.J.'s parents were not terminated until early 2007, making him legally available for adoption. However, DHS has failed to seek and secure another permanent home for R.J. through adoption, so he can leave DHS custody. Instead, R.J. waits indefinitely for a long term placement, at risk of being moved yet again.

211.   DHS's policies and practices have caused R.J. irreparable harm and continue to subject R.J. to the imminent risk of irreparable harm. DHS has violated R.J.'s constitutional and statutory rights by: failing to protect him from unnecessary harm and failing to keep him reasonably safe from harm while in government custody; failing to provide him with a living environment that protects his physical, mental and emotional safety and well-being; failing to provide him with services necessary to prevent him from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing him in emergency shelters or other emergency, temporary placements that are contrary to his individual needs and for extended periods, in violation of any reasonable professional judgment; failing to provide him with appropriate planning and services directed toward ensuring that he can leave foster care and grow up in a permanent family; failing to provide him with treatment and care consistent with the purpose of the assumption of custody by DHS; keeping him in DHS custody longer than is necessary to accomplish the purposes of taking him into DHS custody; failing to

provide him care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of his DHS caseworkers; failing to provide adequate monitoring of his current status and needs; failing to place him in the least restrictive placement according to his needs; failing to develop and implement timely written case plans that include mandated elements; failing to provide appropriate, adequate and timely investigations into suspected abuse or neglect while he was in DHS custody; failing to adequately screen foster homes prior to placing him in such homes; subjecting him to state-created dangers in placing him on unsupervised visits or trial home reunification with family members without taking reasonable steps and providing necessary supervision to ensure his safety; failing to preserve family connections and to facilitate visits with his siblings; failing to arrange adequate and basic educational opportunities; and failing to provide him with foster placements that are receiving adequate foster care maintenance payments so that they have the capacity to provide for his essential needs and services.

## G.C.

212.   DHS has victimized G.C. through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide required visits from her DHS caseworkers, the failure to arrange adequate and basic educational opportunities, the failure to arrange consistent and appropriate mental health services, the failure to supervise visits with relatives, and the failure to provide services necessary to facilitate her prompt and safe reunification with her biological mother or, if DHS determines that is not appropriate, the failure to seek and secure another permanent home for G.C. out of state custody through adoption.  These harms and G.C.'s continued instability and

67

risk of harm are a direct result of DHS's drastic placement shortage, its failure to find an appropriate placement for G.C. and its failure to provide adequate monitoring and oversight over its placements and over her care.

213.    G.C. entered DHS custody in Tulsa County in November of 2003, when she was nine years old, after it was revealed that her stepfather had been sexually abusing her since the age of four and her mother had failed to protect her from the abuse. With no foster homes available, DHS first placed G.C. in the overcrowded and inadequately supervised Laura Dester Emergency Shelter in Tulsa for over a month, before moving her to a foster home in Tulsa County for less than two weeks. DHS then placed G.C. in a kinship home with her grandfather in Pottawatomie County for over a year, where her step-grandmother frequently whipped her with a leather strap. DHS moved G.C. from this unsafe and abusive placement to another emergency shelter, this time in Norman, for almost two months, until she was moved to another foster home for four months.

214.    In June of 2005, DHS placed G.C. on a trial home reunification with her biological mother in Muskogee County, although DHS had not provided G.C.'s mother with the services necessary to enable her to care for her children. DHS retained custody of G.C. and was required to provide her with supervision, monitoring and services to ensure her safety during the entire trial home reunification, but failed to do so. During the five months that G.C. was on trial home reunification, G.C.'s "primary" DHS caseworker did not visit her at home once, and her "secondary" DHS caseworker from Muskogee County only saw G.C. a few brief times. In reality, G.C. was living with her aunt in the same home where G.C.'s brothers were living, while her biological mother lived separately with a boyfriend who had not undergone a required background check that would have uncovered his prior history of child abuse. While living with

68

her aunt, G.C. was emotionally abused and threatened with physical abuse by her aunt. Additionally, G.C. suffered an adverse reaction to being placed with her brothers, who strongly resembled her stepfather who had sexually abused her for years and whose criminal trial and conviction for that sexual abuse had just come to a close. As a result of this trauma, G.C. had to be hospitalized for more than a month, and she was diagnosed with Post Traumatic Stress Disorder and Reactive Attachment Disorder.

215.     After her hospitalization, at the end of 2005, DHS placed G.C. in a foster home in Rogers County where she remained for a year, and developed a relationship with her foster parents. G.C.'s "primary" DHS caseworker did not visit her in this home for four months, and her "secondary" caseworker from Rogers County only made a few brief visits. While in this placement, DHS allowed G.C. to have unsupervised visits with her biological mother and her boyfriend, who still had not undergone a required background check. DHS allowed these unsupervised visits to continue for over six months.

216.     In the fall of 2006, DHS performed a home study to qualify G.C.'s uncle and his wife as kinship foster parents for G.C. However, the home was disqualified due to unsafe and unsanitary conditions, including trash, beer cans and dirty diapers all over the front lawn, dog feces throughout the inside of the house, and exposed wires and holes in the walls inside the house. Nevertheless, a month later, DHS deemed this same home suitable for G.C. to have unsupervised overnight visits with her uncle and his family. During the first unsupervised weekend visit, G.C. was forced to clean dog feces throughout the house, and her uncle hit her on her knee, causing a serious bruise, as a warning not to speak up about the conditions in the home. During the second unsupervised visit to her uncle's home, G.C.'s aunt brought over G.C.'s

brothers, despite the trauma G.C. had suffered the last time she was placed with them.  G.C. was told by her uncle not to tell anyone that she had seen her siblings.

217.   Following the unsupervised weekend visits with her uncle and his family, G.C. reported suicidal ideations while at school and began to have flashbacks of her sexual abuse.  As a result, in February of 2007, DHS placed G.C. at an inpatient facility for two months in a program that was overly restrictive and unsafe.  Although G.C. was to be monitored on a 24-hour basis at the facility to ensure her safety and well-being, during this time, she was sexually assaulted by a male resident.  DHS failed to investigate the assault.  Not surprisingly, G.C.'s behavior significantly deteriorated during her inpatient stay.

218.   In April of 2007, DHS placed G.C. temporarily in the same foster home in Rogers County that she had been placed in prior to her hospitalization, but she was moved again several months later.

219.   Since August of 2007, DHS has moved G.C. among five different foster homes, several of which were more than one hundred miles from Tulsa, including one overcrowded foster home with seven other children and a foster parent on dialysis.  DHS has consistently failed to provide G.C.'s foster parents with necessary information on G.C.'s background, medical history and current needs.  In addition, although DHS is aware that, due to G.C.'s history, she needs to be placed in a home with no other foster children, DHS continues to place her in homes with older children, accelerating the cycle of placement disruptions and transitions.  With each new move, G.C. experiences increased feelings of detachment and rejection, a greater sense of instability and worsening psychological trauma.  As a result, G.C. has begun self-mutilating and her behavior has deteriorated.

220.    In January of 2008, DHS moved G.C. to the same institutional facility where she had previously been sexually assaulted.  G.C. remains in this overly restrictive and unsafe facility today, inadequately monitored and deteriorating in custody.

221.    G.C. has received dangerously poor monitoring and oversight from DHS during her time in state custody.  While in custody, G.C. has suffered both physical and sexual abuse and has been shuffled through at least fifteen different placements all over the state, without adequate stability, treatment or care from DHS.  Although G.C. currently receives multiple psychotropic medications, DHS has failed to arrange consistent and appropriate mental health services for G.C. to address the emotional and psychological trauma she has suffered and continues to suffer in DHS custody.  In addition, DHS has failed to provide G.C. with consistent, needed therapy to address the sexual abuse she has suffered.

222.    DHS has failed to arrange adequate and basic educational opportunities for G.C. during her time in DHS custody.  DHS has failed to ensure that G.C.'s educational records have followed her numerous placement moves.  DHS has caused G.C. to change schools, to miss an unnecessary amount of school, and to fall behind in school, without any plan or services to give her the educational supports she needs.

223.    DHS has failed to provide the services necessary to facilitate G.C.'s prompt and safe reunification with her biological mother or, if DHS determines that is not appropriate, to seek and secure another permanent home for G.C. through adoption, so she can leave DHS custody.  Instead, G.C. waits indefinitely for a long term placement, at risk of being moved yet again.

224.    DHS's policies and practices have caused G.C. irreparable harm and continue to subject G.C. to the imminent risk of irreparable harm.  DHS has violated G.C.'s

71

constitutional and statutory rights by: failing to protect her from unnecessary harm and failing to keep her reasonably safe from harm while in government custody; failing to provide her with a living environment that protects her physical, mental and emotional safety and well-being; failing to provide her with services necessary to prevent her from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing her in emergency shelters or other emergency, temporary placements that are contrary to her individual needs and for extended periods, in violation of any reasonable professional judgment; failing to provide her with appropriate planning and services directed toward ensuring that she can leave foster care and grow up in a permanent family; failing to provide her with treatment and care consistent with the purpose of the assumption of custody by DHS; keeping her in DHS custody longer than is necessary to accomplish the purposes of taking her into DHS custody; failing to provide her care, treatment, and services, determined and provided through the exercise of accepted, reasonable professional judgment; failing to provide adequate instruction, supervision, control and discipline of her DHS caseworkers; failing to provide adequate monitoring of her current status and needs; failing to place her in the least restrictive placement according to her needs; failing to develop and implement timely written case plans that include mandated elements; failing to provide appropriate, adequate and timely investigations into suspected abuse or neglect while she was in DHS custody; failing to adequately screen foster homes prior to placing her in such homes; subjecting her to state-created dangers in placing her on unsupervised visits or trial home reunification with family members without taking reasonable steps and providing necessary supervision to ensure her safety; failing to arrange adequate and basic educational opportunities; and failing to provide her with foster placements that are receiving

72

adequate foster care maintenance payments so that they have the capacity to provide for her essential needs and services.

## K.T.

225.    DHS has subjected K.T. to further harm through unsafe placements and numerous moves, the failure to provide stable and safe care from a consistent adult caregiver, the failure to provide required visits from her DHS caseworkers, the failure to arrange regular contact with her sibling, the failure to arrange special education services, the failure to arrange consistent and appropriate mental health services, the failure to supervise visits with her biological father, the failure to provide required services to enable her to live independently when she turns eighteen, and the failure to seek and secure a permanent home for K.T. out of state custody through adoption. These harms and K.T.'s continued instability and risk of harm are a direct result of DHS's drastic placement shortage, its failure to find an appropriate and permanent placement for K.T. and its failure to provide adequate monitoring and oversight over its placements and over her care.

226.    K.T. entered DHS custody in Oklahoma City in May of 1997, when she was six years old, due to physical and sexual abuse by her father and extreme neglect. With no foster homes available, DHS first placed K.T. in the overcrowded and poorly supervised Pauline Mayer Emergency Shelter in Oklahoma City before moving her to an "emergency foster home" for a month. DHS then placed her in two separate kinship placements over the next year, before moving her back to the Pauline Mayer Emergency Shelter in June of 1998. DHS kept her in the shelter for six weeks, although she was only seven years old at the time. At this point, DHS had already moved K.T. through five placements in her first year in custody, and her behavior predictably became more disruptive.

73

227.    During this time, DHS allowed K.T. dangerous unsupervised weekend visitation with her biological father who had sexually abused her.  DHS placed K.T. at great risk of harm by allowing these visits.  The visits finally ceased when K.T. reported that there was no food in her father's home, that her father and his girlfriend had engaged in inappropriate sexual behavior in front of her and that her father had invited her mother – who had relinquished her parental rights – to spend time with K.T. during these visits.

228.    Over the next eight years, DHS moved K.T. through numerous foster homes and inpatient facilities, often without receiving the required visits from her DHS caseworker or appropriate monitoring over her care and her placements.  K.T. was diagnosed with ADHD and Reactive Attachment Disorder and was prescribed multiple psychotropic medications to control her behavior during this time; however, DHS failed to arrange consistent, needed therapy and mental health treatment for K.T.  DHS also failed to provide K.T. specialized placements to address her developmental delays.  These failures by DHS caused K.T. to further deteriorate in custody.

229.    DHS then placed K.T. in two separate emergency shelters over the span of two weeks in April of 2006 before placing her in an unsafe, poorly monitored and inadequately supervised group home in Lawton for over a year.  This group home did not have any specialized staff or programs for K.T.'s developmental delays and she received none of the attention and specialized supports that she requires.

230.    In June of 2007, DHS moved K.T. to another unsafe, poorly monitored and inadequately supervised group home in Tulsa.  This group home is located in an old motel near Interstate I-44, in walking distance of several seedy bars, strip clubs and truck stops.  The only immediate outdoor space where the resident children can play is the cement parking lot

74

outside the group home. Foster children ages five through eighteen are housed together in this home without age or developmentally appropriate programs or treatment. The home does not have any specialized staff or programs for K.T.'s developmental delays and she receives none of the attention and specialized supports she requires. Supervision in the home is so poor, and the conditions in the home so unsanitary and unsafe, that children placed in this home frequently run away from the home for their own safety. Yet K.T. remains in this inappropriate and dangerous group home today, inadequately monitored and further deteriorating.

231.    K.T. has received dangerously poor monitoring and oversight from DHS during her time in state custody. After spending the past ten years in DHS custody, K.T. has been shuffled through more than twenty placements – many of them unsafe, inappropriate and inadequately supervised – without adequate stability, treatment or care from DHS. DHS has separated K.T. from her brother, who is also in DHS custody, and has failed to arrange for K.T. to have regular visits with him in order to maintain critical family relationships. Currently, although K.T. still receives multiple psychotropic medications, DHS has failed to arrange consistent and appropriate mental health services for K.T. to address the emotional and psychological trauma she has suffered and continues to suffer in DHS custody.

232.    Although K.T. is now sixteen years old and eligible for independent living services, DHS has failed to provide her with required services to prepare her to live on her own when she turns 18 and is discharged from DHS custody, a failure made even more dangerous by K.T.'s developmental delays.

233.    DHS has also failed to arrange special education services for K.T. during her time in DHS custody. DHS has failed to ensure that K.T.'s educational records follow her numerous placement moves. DHS has caused K.T. to change schools numerous times, to miss

an unnecessary amount of school, and to fall behind in school, without any plan or services to give her the special educational supports she needs.

234.     DHS failed to provide the services necessary to facilitate K.T.'s prompt and safe reunification with her biological parents. Although the parental rights of K.T.'s parents were terminated by 2000, DHS has failed to seek and secure another permanent home for K.T. through adoption, so she can leave DHS custody. DHS's permanency goal for K.T. is long term foster care, and K.T. waits indefinitely for a long term placement, at risk of being moved yet again.

235.     DHS's policies and practices have caused K.T. irreparable harm and continue to subject K.T. to the imminent risk of irreparable harm. DHS has violated K.T.'s constitutional and statutory rights by: failing to protect her from unnecessary harm and failing to keep her reasonably safe from harm while in government custody; failing to provide her with a living environment that protects her physical, mental and emotional safety and well-being; failing to provide her with services necessary to prevent her from deteriorating or being harmed physically, psychologically or emotionally while in government custody, including the right to safe and secure foster placements, appropriate monitoring and supervision; placing her in emergency shelters or other emergency, temporary placements that are contrary to her individual needs and for extended periods, in violation of any reasonable professional judgment; failing to provide her with appropriate planning and services directed toward ensuring that she can leave foster care and grow up in a permanent family; failing to provide her with a plan or services to enable her to live independently when she turns eighteen; failing to provide her with treatment and care consistent with the purpose of the assumption of custody by DHS; keeping her in DHS custody longer than is necessary to accomplish the purposes of taking her into DHS custody;

failing to provide her care, treatment, and services, determined and provided through the exercise

of accepted, reasonable professional judgment; failing to provide adequate instruction,

supervision, control and discipline of her DHS caseworkers; failing to provide adequate

monitoring of her current status and needs; failing to place her in the least restrictive placement

according to her needs; failing to develop and implement timely written case plans that include

mandated elements; failing to provide appropriate, adequate and timely investigations into

suspected abuse or neglect while she was in DHS custody; failing to adequately screen foster

homes prior to placing her in such homes; subjecting her to state-created dangers in placing her

on unsupervised visits or trial home reunification with family members without taking

reasonable steps and providing necessary supervision to ensure her safety; failing to preserve

family connections and to facilitate visits with her sibling; failing to arrange adequate and basic

educational opportunities; and failing to provide her with foster placements that are receiving

adequate foster care maintenance payments so that they have the capacity to provide for her

essential needs and services.

**VIII.   Causes of Action**

**First Cause of Action**

**(Substantive Due Process Under the Fourteenth Amendment to the United States
Constitution)**

236.   Each and every allegation of the Complaint is incorporated herein as if fully

set forth.

237.   A state assumes an affirmative duty under the Fourteenth Amendment to

the United States Constitution to protect a child from harm when it takes that child into its foster

care custody.

77

238.   The foregoing policies and practices of Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, constitute a failure to meet the affirmative duty to protect from harm and to keep reasonably free from harm all Named Plaintiffs and Plaintiff Children, which is a substantial factor leading to, and proximate cause of, the violation of the constitutionally protected liberty and privacy interests of all Named Plaintiffs and Plaintiff Children.

239.   The foregoing policies and practices of Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, constitute a policy, pattern, custom and/or practice that shocks the conscience, is outside the exercise of any professional judgment and amounts to deliberate indifference to the constitutionally protected rights and liberty and privacy interests of all Named Plaintiffs and Plaintiff Children.  As a result, all Named Plaintiffs and Plaintiff Children have been harmed and are at continuing and imminent risk of harm, and have been deprived of the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

240.   These substantive due process rights include, but are not limited to:  the right to protection from unnecessary harm and to be reasonably safe from harm while in government custody; the right to a living environment that protects Plaintiff Children's physical, mental and emotional safety and well-being; the right to services necessary to prevent Plaintiff Children from deteriorating or being harmed physically, psychologically or otherwise while in government custody, including but not limited to the right to safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring that Plaintiff Children can leave foster care and grow up in a permanent family; the right to treatment and care consistent with the purpose of the assumption of custody by DHS;

78

the right not to be maintained in custody longer than is necessary to accomplish the purposes of taking Plaintiff Children into custody; the right to receive care, treatment and services, determined and provided through the exercise of accepted, reasonable professional judgment; the right to be placed in the least restrictive placement according to Plaintiff Children's needs; the right to appropriate, adequate and timely investigations of allegations of abuse or neglect; the right to adequate instruction, supervision, control and discipline of caseworkers; the right not to be placed in overcrowded or dangerous foster homes or facilities; the right to adequate screening of foster care homes and other placement providers prior to placement; the right to adequate monitoring of the current status and needs of Plaintiff Children; and the right not to be subjected to state-created dangers in the placement of Plaintiff Children still in DHS custody on visits or trial home reunification placements with their biological parents or family members.

**Second Cause of Action**

**(First, Ninth, and Fourteenth Amendments to the United States Constitution)**

241.   Each and every allegation of the Complaint is incorporated as if fully set forth herein.

242.   The foregoing policies and practices of the Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, constitute a failure to exercise an affirmative duty to protect the welfare of all Named Plaintiffs and Plaintiff Children, which failure is a substantial factor leading to, and a proximate cause of, violation of the constitutionally protected liberty interests, privacy interests and associational rights of all of the Named Plaintiffs and Plaintiff Children.

243.   The foregoing policies and practices of the Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, amount to a policy,

79

pattern, custom and/or practice that is outside the exercise of any professional judgment and amounts to deliberate indifference to Plaintiffs' constitutional rights. As a result, Named Plaintiffs and Plaintiff Children are being deprived of their liberty interest, privacy interests and associational rights conferred on them by the First, Ninth, and Fourteenth Amendment to the United States Constitution not to be deprived of a child-parent or a child-sibling family relationship.

**Third Cause of Action**

**(The Federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*)**

244.   Each and every allegation of the Complaint is incorporated herein as if fully set forth.

245.   Under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 621-629(i), 670-679b (collectively, the "Adoption Assistance Act"), states receive certain federal reimbursements so long as they enter into a plan approved by the federal Department of Health and Human Services and comply with its terms. Oklahoma receives federal funding under the Adoption Assistance Act and has submitted and entered into such a plan, which is a legal contract between the federal government and the State, thereby agreeing to provide child welfare services in accordance with the Adoption Assistance Act.

246.   The foregoing policies and practices by Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, constitute a policy, pattern, custom and/or practice of depriving all Named Plaintiffs and Plaintiff Children of rights conferred on them by the Adoption Assistance Act and the regulations promulgated thereunder, 45 C.F.R. §§ 1355–57. These rights include but are not limited to:  the right to timely written

80

case plans containing mandated elements, and to a case review system to ensure the

implementation of these plans; the right to have a petition to terminate parental rights filed, or

have a compelling reason documented why such a petition has not been filed, in accordance with

specified, statutory standards and time frames; the right of Plaintiff Children whose permanency

goal is adoption to planning and services to obtain a permanent placement, including

documentation of the steps taken to secure permanency; the right to services that protect Plaintiff

Children's safety and health; the right to have health and educational records reviewed, updated

and supplied to foster parents or foster care providers with whom the Plaintiff Child is placed at

the time of placement; and the right of Plaintiff Children to live in foster placements that have

the capacity to provide for their essential needs and services by receiving adequate foster care

maintenance payments that cover the actual cost of (and the cost of providing) the Plaintiff

Child's food, clothing, shelter, daily supervision, school supplies, reasonable travel to visitation

with family and other expenses.  42 U.S.C. §§ 622(b)(8)(A)(ii)-(iii), 622(b)(15),

629a(a)(1)(A)(i)-(ii), 629a(a)(7)-(8), 671(a)(1), 671(a)(11), 671(a)(16), 671(a)(22), 672(a)-(c),

675(1), 675(4)(A), 675(5)(A), 675(5)(D)-(E); 45 C.F.R. §§ 1355.20, 1355.25, 1356.21(f)-(g),

1356.21 (i), 1356.21(m), 1357.10(c)(4)-(6).

### Fourth Cause of Action

### (Procedural Due Process Under the Fifth and Fourteenth Amendments to the United States Constitution)

247.   Each and every allegation of the Complaint is incorporated as if fully set

forth herein.

248.   The foregoing policies and practices of Defendants, who directly and

indirectly control and are responsible for the polices and practices of DHS, constitute a failure to

exercise an affirmative duty to protect the welfare of all Named Plaintiffs and Plaintiff Children,

which is a substantial factor leading to, and a proximate cause of, the violation of the constitutionally protected liberty and privacy interests of all of the Named Plaintiffs and Plaintiff Children.

249.   The foregoing policies and practices of the Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, constitute a policy, pattern, custom and/or practice of failing to exercise any reasonable professional judgment and of deliberate indifference to the constitutionally protected liberty and property interests of Named Plaintiffs and Plaintiff Children.  As a result, Named Plaintiffs and Plaintiff Children have been and are being harmed and deprived of both federal and state-created liberty or property rights without due process of law.

250.   The foregoing policies and practices of the Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, have resulted and are continuing to result in deprivations of federal-law entitlements arising from the Adoption Assistance Act and the accompanying regulations promulgated by the United States Department of Health and Human Services, to which Plaintiff Children have a constitutionally protected interest.

251.   The foregoing policies and practices of the Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, have resulted, and are continuing to result, in deprivations of the following state-law entitlements to which each Plaintiff Child has a constitutionally protected interest:

> a.       The entitlements arising from § 7003-5.6 of the Oklahoma Statutes, requiring DHS, *inter alia,* to prepare a written report every six months prior to each permanency hearing on behalf of a child containing the status of the child and the child's plan for permanency;

82

b.    The entitlements arising from § 7006-1.6 of the Oklahoma Statutes, requiring DHS, *inter alia*, to identify those adjudicated deprived children who have been in DHS custody for fifteen of the most recent twenty-two months and provide a list to the district attorney of those cases for which termination of parental rights petitions should be filed;

c.    The entitlements arising from § 404.1 of the Oklahoma Statutes, requiring DHS, *inter alia,* to complete a criminal history records search for any person making application to establish or operate a child care facility prior to the issuance of a license to operate such facility and for any adult who subsequently moves into the private residence and, prior to contracting with a foster family home for placement of any child in the custody of DHS, requiring DHS to complete a foster parent eligibility assessment and a national criminal history records search for any adult residing in the foster family home and for any adult who subsequently moves into the residence;

d.    The entitlements arising from § 7209 of the Oklahoma Statutes, requiring DHS, *inter alia,* not to place a child in an out-of-home placement prior to the completion of a foster parent eligibility assessment, a national criminal history records search and a check of any child abuse registry maintained by a state in which the prospective foster parent or any adult living in the home of the prospective foster parent has resided in the preceding five years;

e.    The entitlements arising from § 7003-8.1 of the Oklahoma Statutes, requiring DHS, *inter alia,* not to approve placement of a child with a prospective foster parent if the prospective foster parent or any other person residing in the home of the prospective foster parent has been convicted of any of the following felony offenses:  (a) within the five-year period preceding the application date, physical assault, battery or a drug-related offense; (b) child abuse or neglect; (c) domestic violence; (d) a crime against a child; or (e) a crime involving violence, including, but not limited to, rape, sexual assault or homicide;

f.    The entitlements arising from §§ 7004-1.1 and 7004-3.1 of the Oklahoma Statutes, requiring DHS, *inter alia*, to assure that children in DHS custody receive educational instruction through enrollment in a public school or an alternative program consistent with the needs and abilities of the child; and

g.    The entitlements arising from § 7003-5.3 of the Oklahoma Statutes, requiring DHS, *inter alia*, to file an individual treatment

83

and service plan with the court within thirty (30) days after a child has been adjudicated deprived.

### Fifth Cause of Action

**(Breach of Federal Contractual Obligations to Third Party Beneficiaries)**

252.   Each and every allegation of the Complaint is incorporated as if fully set forth herein.

253.   Under Titles IV-B and IV-E of the Social Security Act, states receive certain federal monies so long as they enter into plans approved by HHS and comply with their terms.  Oklahoma receives federal funding under Titles IV-B and IV-E of the Social Security Act and has submitted such State Plans to the federal government, which are legal contracts between the federal government and the State, and such plans have been approved.  In these State Plan contracts, the State agrees to provide child welfare, foster care, and adoption services to Plaintiffs in accordance with specific statutes, regulations, and policies and all applicable federal regulations and other official issuances of the United States Department of Health and Human Services.

254.   The foregoing policies and practices of Defendants, who directly and indirectly control and are responsible for the polices and practices of DHS, have breached and continue to breach their obligations under Oklahoma's State Plan contracts, and all Plaintiffs, as the intended direct third-party beneficiaries to these State Plan contracts, are (i) being denied their rights under law to the services and benefits that the State of Oklahoma is obligated to provide to them under such contracts, and (ii) being harmed thereby.

84

## IX.    Prayer for Relief

255.    WHEREFORE, the Plaintiff Children respectfully request that this

Honorable Court:

a.    Assert jurisdiction over this action;

b.    Order that Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

c.    Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

i.    Defendants' violation of Plaintiff Children's rights under the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution;

ii.    Defendants' violation of Plaintiff Children's rights under the First, Ninth, and Fourteenth Amendments to the United States Constitution;

iii.    Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 621 *et seq.*, 670 *et seq.*;

iv.    Defendants' violation of Plaintiff Children's right to procedural due process under the Fifth and Fourteenth Amendments to the United States Constitution; and

v.    Defendants' breach of their contractual obligations to Plaintiff Children under the State of Oklahoma's Title IV-E and Title IV-B state plans;

d.    Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights;

e.    Order appropriate remedial relief tailored to the evidence proven to the Court in order to ensure Defendants' future compliance with their legal obligations to Plaintiff Children;

f.    Award to Plaintiff Children the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and 28 U.S.C. § 1920, and Federal Rules of Civil Procedure 23(e) and (h); and

g.   Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm by Defendants.

DATED:  February 13, 2008

Respectfully Submitted:

R. THOMAS SEYMOUR (Bar No. 8099)
SCOTT A. GRAHAM (Bar No. 19817)
SEYMOUR & GRAHAM, LLP
100 W. Fifth Street, Suite 550
Tulsa, Oklahoma 74103-4288
Telephone:  918-583-5791
Facsimile:  918-583-9251
Email:  Rtseymour1@aol.com

FREDERIC DORWART (Bar No. 2436)
FREDERIC DORWART, LAWYERS
Old City Hall
124 East Fourth Street
Tulsa, Oklahoma 74103-5010
Telephone:  918-583-9922
Facsimile:  918-583-8251
Email:  FDorwart@FDLAW.com

G. MICHAEL LEWIS (Bar No. 5404)
DOERNER, SAUNDERS, DANIEL &
ANDERSON, LLP
320 South Boston Avenue, Suite 500
Tulsa, Oklahoma  74103-3725
Telephone:  918-591-5314
Facsimile:  (918) 925-5314
Email:  mlewis@dsda.com

86

*Bruce Day by Permission, Frederic Dorwart*

BRUCE DAY (Bar No. 2238)
JOE E. EDWARDS (Bar No. 2640)
DAY EDWARDS, PROPESTER & CHRISTENSEN, PC
Suite 2900, Oklahoma Tower
210 Park Avenue
Oklahoma City, OK 73102
Telephone:  (405) 239-2121
Facsimile:  (405) 236-1012
Email:  bruceday@dayedwards.com
          edwards@dayedwards.com

*Marcia Robinson by permission, Frederic Dorwart*

MARCIA ROBINSON LOWRY (*pro hac vice* application
pending)
IRA P. LUSTBADER (*pro hac vice* application pending)
YASMIN GREWAL-KOK (*pro hac vice* application
pending)
JEREMIAH FREI-PEARSON (*pro hac vice* application
pending)
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Telephone:  (212) 683-2210
Facsimile:  (212) 683-4015
Email:  mlowry@childrensrights.org

*Phil A. Geraci by permission Frederic Dorwart*

PHIL A. GERACI (*pro hac vice* application pending)
MARK A. BECKMAN (*pro hac vice* application pending)
R. NADINE FONTAINE (*pro hac vice* application
pending)
CARLY HENEK (*pro hac vice* application pending)
ANDREW BAUER (*pro hac vice* application pending)
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
Telephone:  (212) 836-8000
Facsimile:  (212) 836-7223
Email:  pageraci@kayescholer.com

87