# EXHIBIT B

REVIEW OF THE RESPONSE BY THE OKLAHOMA DEPARTMENT
OF HUMAN SERVICES TO THE SUSPECTED ABUSE AND NEGLECT
OF CHILDREN IN ITS CARE

John Goad, A.M.
Principal Investigator

March 15, 2011

**Table of Contents**

EXECUTIVE SUMMARY ........................................................................................ v

I.  INTRODUCTION ....................................................................................... 1

II.  CHILD WELFARE INVESTIGATION STANDARDS AND REGULATIONS .... 4

    A.  Child Welfare Standards ..................................................................4

    B.  The Regulation of OKDHS Processes ...............................................4

        1.  OKDHS CPS Investigation Regulation ....................................6

        2.  OKDHS OCA Investigation Regulation ...................................8

        3.  OKDHS CPS Assessment Regulation ...................................10

III.  STUDY METHODS ................................................................................. 11

    A.  Sampling Plan and Inclusion and Exclusion Criteria ......................11

    B.  Data Collection and Coding Procedures ........................................12

    C.  The Review Team ..........................................................................13

        1.  Case Review Team ...............................................................13

        2.  Child Fatality Review Team ...................................................13

    D.  Inter-Rater Reliability ....................................................................13

IV.  CPS INVESTIGATION REVIEW .............................................................. 15

    A.  Description of the CPS Investigation Review ...................................15

    B.  Descriptive Information about the CPS Investigations....................16

    C.  Evaluation of the CPS Investigation Process and Related Decision-Making..18

        1.  Were CPS Investigations Conducted in a Timely Manner? ...................19

        2.  Were CPS Investigations Thorough?.....................................23

        3.  Were CPS Investigative Decisions Correct?...........................29

        4.  Were Adequate Protective Actions Taken During CPS Investigations? ...............................................38

    D.  Conclusion: OKDHS CPS Investigations Concerning the Children in Its Care ...............................................39

V.  OCA INVESTIGATION REVIEW ............................................................. 41

    A.  Description of the OCA Investigation Review ..................................42

    B.  Descriptive Information About the OCA Investigations ..................43

    C.  Evaluation of the OCA Investigation Process and Related Decision-Making ...............................................45

        1.  Were OCA Investigations Conducted in a Timely Manner?.................45

2.   Were OCA Investigations Thorough? ................................................49

3.   Were OCA Investigative Decisions Correct? .........................................54

4.   Were Adequate Protective Actions Taken During OCA Investigations? ................................................................................61

D.   Conclusion: OKDHS OCA Investigations Concerning the Children in Its Care .................................................................................................62

VI.   CPS ASSESSMENT REVIEW ................................................................. 64

A.   Description of the CPS Assessment Review .....................................64

B.   Descriptive Information about the CPS Assessments....................65

C.   Evaluation of the CPS Assessment Process and Related Decision-Making....67

1.   Were Decisions To Assign Referrals as CPS Assessments Correct? .....67

2.   Were CPS Assessments Conducted in a Timely Manner? ....................68

3.   Were CPS Assessments Thorough?......................................................70

4.   Making Correct? ...................................................................................74

5.   Were Reasonable Protective Actions Taken During CPS Assessments? ........................................................................................80

D.   Conclusion: OKDHS CPS Assessments Concerning the Children in its Care .................................................................................................80

VII.   SCREEN OUT REVIEW ......................................................................... 82

A.   Description of the Screen Out Review..............................................83

B.   Description of  Screened Out Referrals ............................................83

C.   Evaluation of the Screening Process and Related Decision-Making..............85

1.   Were Agency Records Checked To Identify Any Previous CPS Involvement Concerning the Caregivers Allegedly Responsible for the Maltreatment? ................................................................................86

2.   Was Critical Information Gathered?....................................................86

3.   Was the Screening Decision Correct?..................................................87

D.   Description of the Incorrectly Screened Out Referrals....................88

E.   Conclusions of the Screen Out Review ............................................89

VIII.  CHILD FATALITY REVIEW .................................................................. 91

A.   Overview...............................................................................................91

B.   DS .........................................................................................................91

C.   AD.........................................................................................................96

D.   DM ......................................................................................................100

E.   DJ ........................................................................................................104

F.   RP........................................................................................................109

G.    SW..................................................................................................115

H.    RW .................................................................................................122

I.     NW .................................................................................................129

J.     JT...................................................................................................134

**END NOTES**
**REFERENCES**
**APPENDIX A: INTER-RATER RELIABILITY SCORES**
**APPENDIX B: REVIEWER DATA BASE INSTRUCTIONS**
**APPENDIX C: REVIEW TEAM CURRICULA VITAE**
**APPENDIX D: RETAINER LETTER**

# EXECUTIVE SUMMARY

At the request of attorneys for the plaintiffs in the federal class action litigation *D.G. v. Henry*, I have conducted a research review of the efforts of the Oklahoma Department of Human Services (OKDHS or agency) to protect children in its care and custody after receiving referrals in 2009 alleging that the children had been maltreated. The review evaluates four specific aspects of OKDHS's response:

1. The adequacy of Child Protective Services (CPS) investigations of allegations of abuse and/or neglect of OKDHS wards placed in foster or kinship care and the degree to which attendant decision-making is correct.

2. The adequacy of Office of Client Advocacy (OCA) investigations into allegations of abuse and/or neglect of OKDHS wards placed in residential treatment centers, group homes, shelters, and other congregate care settings and the degree to which attendant decision-making is correct.

3. The adequacy of Child Protective Services assessments of situations in which children in the care of OKDHS have allegedly been maltreated and the degree to which attendant decision-making is correct.

4. The degree to which decisions made at the OKDHS hotline to screen out (i.e., not investigate or assess) referrals alleging maltreatment, child abuse or neglect of children in OKDHS custody are correct.

In addition to this review, I have completed a review of the cases of nine children in OKDHS custody found by OKDHS to have died from child abuse or neglect since January 1, 2007. My conclusions from my review of these tragic deaths serve to illuminate the findings of the research review.

Investigations and screened out referrals were randomly selected for review from lists produced by OKDHS.  The sample sizes are statistically significant – that is, they are large enough to give reasonable confidence that the findings of the review represent the findings that would result if the entire universe of all investigations and all screened out referrals concerning OKDHS wards that occurred in 2009 had been reviewed.  In order to reliably extrapolate my findings to the entire universe of investigations and screen-outs, I used an accepted statistical calculation called a confidence interval. The confidence interval represents the range within which a particular result from my review applies with 95% certainty to the relevant universe. Thus, when I have stated my findings in terms of a range, I have determined that range to be correct with 95% certainty. Different findings have different confidence intervals because the findings take different subsets into account. Each of the confidence intervals used in conjunction with my findings are set forth in the text of this report.

All 2009 CPS assessments involving children in OKDHS care were reviewed.

## CPS Investigations

**Far too many CPS investigations of allegations that children in the custody of OKDHS who are placed in foster and kinship care homes have been abused or neglected by their foster parents lack the appropriate sense of urgency, are not thorough, culminate in unsound decisions, and fail to include appropriate actions to protect vulnerable children.**

- OKDHS CPS investigations are not timely in any important sense.

  - OKDHS takes too long to see many of the children about whom it receives allegations of abuse or neglect. In the sample of OKDHS CPS investigations reviewed, investigators failed to make in-person contact with approximately one in ten alleged victims within a reasonable time after the referral. The failure to make prompt in-person contact leaves foster children in potentially dangerous situations and renders belatedly gathered evidence less credible at best and unavailable at worst.

  - Once begun, far too many investigations include lengthy gaps. One-quarter of OKDHS CPS investigations reviewed included gaps of 30 days or more during which no investigative activity took place. The failure to conduct efficient and timely investigations leaves foster children at risk and in uncertain situations.

  - Far too many investigations take far too long to complete. *On average*, the OKDHS CPS investigations reviewed took more than the 30 days permitted by the agency's own regulations.

- OKDHS CPS investigations are not thorough.

  - OKDHS failed to observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment for almost one in four children in the CPS investigations reviewed in which the allegations called for such observation.

  - OKDHS *frequently* failed to make contact with sources who were likely to have information necessary to making an accurate investigative finding. In the CPS investigations reviewed, 22% percent of such vital contacts were inadequate or never made. The failure to obtain necessary information assures inaccurate and uncertain investigative findings and contributes to the failure to identify and protect hundreds of abused and neglected foster children.

- The quality of decision-making in OKDHS CPS investigations is extremely poor.

  - OKDHS ignored or discounted evidence of abuse and/or neglect of its wards in *nearly half* (47%) of the CPS investigations reviewed in which there was credible evidence of such maltreatment.

  - OKDHS may have failed to identify abuse and/or neglect in 15% of the Unsubstantiated CPS investigations reviewed, because decisions were made with inadequate information.

  - OKDHS did not effectively act to protect many of the children in its care who were subjects of the CPS investigations reviewed. A wholly unacceptable proportion of children (18%) who needed protection during the investigations reviewed did not get it.

- Applying these findings to the universe of 343 CPS investigations concerning OKDHS wards conducted by the agency in 2009:

  - No fewer than 64 (18.6%) and as many as 157 (45.8%) of the CPS investigations conducted in 2009 resulted in flawed findings.

  - Of the 645 OKDHS wards who were the subjects of CPS investigations in 2009, no fewer than 133 (20.6%) and as many as 276 (42.8%) children were affected by these flawed findings.

  - Children were not afforded adequate protection during at least 37 (13%) and as many as 86 (30%) of the CPS investigations concerning OKDHS wards that the agency conducted in 2009, in which such protection was necessary.

These failures mean that OKDHS is not identifying and taking action to protect children in its care, and is not acting to prevent their future maltreatment.

**My review found that untimely and incomplete CPS investigations and the unsound decisions they produce affect a substantial proportion of children in OKDHS care. Such poor practice defeats the purpose of CPS investigation, and places OKDHS outside any reasonable child welfare standard.**

**OCA Investigations**

**OKDHS OCA investigations into abuse and/or neglect allegations concerning children in the agency's custody who are placed in shelters, group homes and residential treatment centers are delayed for shocking periods of time and are superficial, and because of these deficits, result in unsound decisions.**

- OCA investigations are anything but timely.

  - OCA delays seeing many of the children who have allegedly been abused or neglected in these facilities for *appalling* periods of time. Contact was made with alleged victims in a reasonable time in approximately a quarter of the OCA investigations reviewed. For one in three alleged victims, OCA took a month or more to make contact, and it failed to make any in-person contact *at all* with eight children.

  - OCA investigations, in part because of their delayed commencement, drag on for inexcusable periods of time. Approximately half of the OCA investigations reviewed took longer than the 30 days normally permitted by OKDHS regulations for CPS investigations of foster homes. More than one in five of the OCA investigations reviewed took *more than two months* to complete.

- OCA investigations are superficial.

  - OCA almost never checks the CPS backgrounds, and never checks the criminal backgrounds, of its substitute care providers after they have been accused of abusing or neglecting the children with whom the agency has entrusted them. In *only one* of the 41 OCA investigations reviewed is there any evidence that CPS history checks were completed. There was no evidence that the criminal background of the alleged perpetrator was checked in *even one* of the OCA investigations reviewed.

  - OCA does not regularly observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment. Of the 12 children in the OCA investigations reviewed for whom the allegations required observation of some part of the child's body, there was no evidence in four of the cases that any such observation was made. In one other case that required observation, the reviewers were unable to determine whether that step had been taken.

  - OCA *routinely* fails to make contact with sources who are likely to have information necessary to making an accurate investigative finding. In the OCA investigations reviewed, OCA failed to make adequate contact with more than half (55%) of these vital sources of information, including doctors and other medical professionals, involved police officers, other children

placed in the facility, staff members in the facility, the alleged victim(s)' caseworkers, and staff responsible for licensing the facility.

- The quality of decision-making in OKDHS OCA investigations is poor.

  - In almost 5% of the OCA investigations reviewed, the referral was Unsubstantiated or Ruled Out but should have been Substantiated.

  - In 27% of OCA investigations reviewed, so little information was gathered that the OCA finding can only be characterized as not reasonable.

  - OKDHS did not effectively act to protect many of the children in its care who were subjects of the OCA investigations reviewed. There was evidence that such action was taken in only slightly more than a quarter (26%) of the reviewed investigations in which such action was warranted.

- Applying these findings to the universe of 219 OCA investigations concerning OKDHS wards conducted by the agency in 2009:

  - OCA's failure to check the CPS or criminal history of the substitute care providers who have been accused of abusing or neglecting the children in their care affected virtually every one of the 374 OKDHS wards who were the subjects of these investigations, as well as all other children being cared for by these individuals.

  - In no fewer than two and as many as 24 of these investigations, Unsubstantiated findings should have been Substantiated. These errors affected at least two and as many as 24 of the 374 OKDHS wards who were the subjects of these investigations.

  - In no fewer than 32 and as many as 86 of these investigations, OCA failed to gather sufficient information to make a reasonable finding.  This failure affected at least 52 and as many as 119 of the 374 OKDHS wards who were the subjects of these investigations.

  - Altogether, of the 374 OKDHS wards who were the subjects of OCA investigations in 2009, no fewer than 54 (14.4%) and as many as 143 children (38.2%) were affected by flawed findings.

These failures mean that OKDHS is not identifying and taking action to protect its wards who are placed in group homes, shelters, and residential treatment centers, and is not acting to prevent their future maltreatment.

Investigations of allegations of child abuse/neglect involving congregate care facilities can be complex and difficult, and must be conducted with great care. Sadly, my review found that OCA investigations lack any sense of urgency and are haphazard and superficial. Because abusive and neglectful staff in group homes, residential treatment centers, and shelters come into contact with many vulnerable children (including many OKDHS wards), the danger they pose is multiplied. OCA's failure to conduct even marginally adequate child protection investigations for this vulnerable population is far outside any reasonable standard.

## CPS Assessments

**OKDHS CPS assessments are characterized by the same deficiencies as the agency's CPS investigations.**

A CPS assessment is OKDHS' alternative response to a report of abuse or neglect. According to OKDHS policy, "[a]n assessment is conducted when a report meets the abuse or neglect guidelines and does not constitute a serious and immediate safety threat to a child."[1]

- OKDHS CPS assessments are not conducted in a timely way.

  - OKDHS takes too long to make contact with the alleged victims for whom it chooses to conduct CPS assessments. Initial contact with the alleged victims was unreasonably delayed in 18% of the CPS assessments reviewed.

  - OKDHS takes too long to complete many of its CPS assessments concerning its wards. Half of the assessments reviewed lasted more than 30 days.

- OKDHS CPS assessments of allegations that children in the agency's custody have been abused and neglected by their substitute caregivers are not thorough. The agency's failures in this area are consistent with its failures in its CPS investigations.

  - OKDHS failed to observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment for one in four children who were the subjects of the CPS assessments reviewed in which the allegations called for such observation.

  - In the CPS assessments reviewed, OKDHS failed to adequately make contact with a quarter of the sources of information necessary to make accurate findings.

- The quality of decision-making in OKDHS CPS assessments is seriously hampered by the poor quality of information-gathering that characterizes these assessments.

x

- For 48% of the alleged victims in the CPS assessments for whom OKDHS did not substantiate any allegations, too little information was gathered for OKDHS to make a reasonable decision about whether they were abused or neglected.

- In more than half of its CPS assessments, OKDHS made faulty decisions.

**My review found that children in OKDHS care who are the subjects of CPS assessments have about a fifty-fifty chance of being protected by competent practice resulting in sound decisions. This poor practice is especially troubling considering the young age of the children and the serious allegations that characterize CPS assessments.**

## Screened Out Referrals

**OKDHS does not effectively screen referrals alleging that its wards have been abused or neglected by the caregivers with whom the agency has placed them.**

- Far too many referrals concerning OKDHS wards are screened out and not investigated.

  - For 11.8% of the screened out referrals that were reviewed, the correct decision was to screen *in* for CPS investigation.

  - In an additional 9.7% of the screened out referrals reviewed, the screening decision was made with insufficient information *that was critical to the screening decision*.

- Applying these findings to the universe of 464 screen out decisions concerning OKDHS wards that were made in 2009:

  - At least 27 referrals (involving 48 children) and as many as 82 referrals (involving 143 children) that should have been investigated were inappropriately screened out in 2009.

  - At least 22 referrals (involving 39 children) and as many as 68 referrals (involving 118 children) were screened out in 2009 without obtaining critical information.

  - At least 10.8% and as many as 32.3% of the OKDHS wards who were the subjects of screen out decisions in 2009 were affected by flawed decisions. This means that, for at least 87 and as many as 261 children in OKDHS care, inappropriate screening decisions were made – either they were made without gathering enough information or they were simply wrong.

My review found that far too many of the decisions OKDHS made not to investigate referrals alleging the abuse or neglect of its wards were unsound. OKDHS's failure to make appropriate screening decisions endangers not only the children about whom the referrals are made. The failure also endangers other children currently placed in those homes or facilities, as well as the children who may be placed there in the future. This failure affects hundreds of children and falls below any reasonable standard of child protection practice.

---

### Overall Conclusions

Because of its failure to collect important information during its child protection investigations and assessments, and its failure to make reasonable decisions, OKDHS made no fewer than 107 and as many as 276 flawed findings in 2009 after investigating or assessing whether children in its care had been abused or neglected. In that same year, the agency also inappropriately screened out and did not investigate at least 49 and as many as 150 referrals alleging the abuse or neglect of its wards.

This is a total of between 156 and 426 seriously flawed critical decisions about the safety of the very vulnerable children in OKDHS custody.

These unsound findings affected at least 289 and perhaps as many as 695 children in OKDHS custody. All told, OKDHS' bad decision-making affected between 19.2% and 41.3% of the OKDHS wards who were the subjects of investigations or assessments in 2009, and between 10.8% and 32.3% of the OKDHS wards who were the subjects of screened out referrals.

These findings are consistent with those of my 2009 review of OKDHS's response to abuse/neglect allegations concerning the children named as plaintiffs in *D.G. v. Henry*.

In connection with my review of the files pertaining to the nine children in DHS custody who died from child abuse or neglect since January 1, 2007, I conclude that the deaths of five of these children – DS, RP, SW, NW and JT – could have been prevented if DHS had exercised reasonable steps in protecting those children from potential harm.

Failure to protect children in state custody from child abuse and neglect and even death runs counter to the primary purpose of child welfare service which is to keep children safe from harm. Because of OKDHS's many failures to protect its child wards, foster care in Oklahoma is a dangerous place to be.

## I.   __INTRODUCTION__

At the request of attorneys for the plaintiffs in the federal class action litigation *D.G. v. Henry*, I have conducted a research review of the efforts of the Oklahoma Department of Human Services (OKDHS or agency) to protect children in its care and custody after the agency received referrals alleging that the children had been maltreated. More specifically, the review evaluates four aspects of OKDHS's response to child maltreatment referrals received in 2009 concerning its wards:

1. The adequacy of Child Protective Services (CPS) investigations into allegations of the abuse/neglect of OKDHS wards placed in foster or kinship care and the degree to which attendant decision-making is correct.

2. The adequacy of Office of Client Advocacy (OCA) investigations into allegations of the abuse/neglect of OKDHS wards placed in residential treatment centers, group homes, shelters, and other congregate care settings, and the degree to which attendant decision-making is correct.

3. The adequacy of Child Protective Services assessments of situations in which children in the care of OKDHS have allegedly been maltreated and the degree to which attendant decision-making is correct.

4. The degree to which decisions made at the OKDHS hotline to screen out (i.e., not investigate) referrals alleging maltreatment of child abuse/neglect are correct.

In addition to this review, I have completed a review the cases of the nine children who died while in OKDHS custody during 2009 and who were found by OKDHS to have died of child abuse or neglect. The child death review serves to illuminate the findings of this research review. It is set forth in Section VIII of this report.

As a social worker with nearly 40 years of experience working in public child protective services, including direct or administrative responsibility for investigations into allegations of the abuse or neglect of more than one million children, I am well qualified to conduct this evaluation. My curriculum vitae (attached in Appendix C) contains a more detailed description of my qualifications.

I have conducted this review in conjunction with the Juvenile Protective Association (JPA). JPA is one of the oldest and most respected child welfare agencies in the country. Founded in 1901 by social worker and political pioneer Jane Addams, JPA is a private, non-profit agency that works with and on behalf of children and families. Using highly trained professionals, JPA ensures the safety and emotional security of vulnerable children through therapeutic and supportive services and influences public policy through research and education. JPA provided technical support and professional data analysis to this project.

This review follows my review, completed in November 2009, which assessed OKDHS's effort to protect the nine children named as plaintiffs in this litigation following the agency's receipt of reports alleging that the those children had been abused or neglected. The principal findings of that 2009 review were:

- OKDHS's policies and procedures for responding to allegations that children in the agency's custody have been abused and neglected lack definition, specificity, and rigor, and are inadequate.

- OKDHS's screening and investigation of the alleged abuse and neglect of the nine children who were the subjects of the review were seriously flawed.

- OKDHS's response to maltreatment allegations concerning the nine children reviewed revealed a pattern of practice that suggested that all children in the agency's care are in danger.

- It is likely that all children who are placed in the custody of the agency and who are the subjects of maltreatment allegations are at risk of physical and emotional harm.

- It is probable that all children who are placed in the custody of the agency are in danger of being placed with abusive, neglectful, and dangerous caregivers whom OKDHS has failed to identify because of its deficient response to child abuse and neglect referrals.

Portions of the initial review are repeated in this review where they are pertinent.

**The overall findings of this review corroborate the findings of the 2009 review. OKDHS's inability to keep the children in its care safe from child abuse and neglect places it below – in some areas far below – any reasonable child welfare standard.**

- **Referrals alleging that children in the custody of OKDHS have been abused or neglected by the caregivers with whom the agency has placed them are screened out inappropriately and are not investigated.**

- **CPS investigations into allegations that children in the custody of OKDHS have been abused or neglected by the caregivers with whom the agency has placed them lack the appropriate sense of urgency, are not thorough, culminate in unreasonable decision-making, and fail to include appropriate actions to protect vulnerable children.**

- **The quality of OKDHS's OCA investigations of allegations that children in the agency's custody have been abused and neglected by their substitute caregivers is abysmal. OCA investigations are dangerously delayed and superficial, and many decisions about whether children in OKDHS care have been abused or neglected are made with far too little information.**

- **Children in OKDHS care who are the subjects of CPS assessments have about a fifty-fifty chance of being protected by competent assessments resulting in sound decisions.**

Because of its failure to collect important information during its child protection investigations and assessments, and its failure to make reasonable decisions, OKDHS made no fewer than 107 and as many as 276 flawed findings in 2009 after investigating or assessing whether children in its care had been abused or neglected. In that same year, the agency also inappropriately screened out and did not investigate at least 49 and as many as 150 referrals alleging the abuse or neglect of its wards.

This is a total of between 156 and 426 seriously flawed critical decisions about the safety of the very vulnerable children in OKDHS custody.

These unsound findings affected at least 289 and perhaps as many as 695 children in OKDHS custody. All told, OKDHS' bad decision-making affected between 19.2% and 41.3% of the OKDHS wards who were the subjects of investigations or assessments in 2009, and between 10.8% and 32.3% of the OKDHS wards who were the subjects of screened out referrals.

Failure to protect children in state custody from child abuse and neglect runs counter to the primary purpose of child welfare service, which is to keep children safe from harm. Because of OKDHS's many failures to protect its child wards, foster care in Oklahoma is a dangerous place to be.

## II.      CHILD WELFARE INVESTIGATION STANDARDS AND REGULATIONS

It is important that this review be understood in the context of child welfare generally and from the perspective of the child welfare system in Oklahoma.

### A.      Child Welfare Standards

Child welfare is a comparatively new profession. The first real child protection laws were not written until the beginning of the twentieth century. There are, however, two sets of professional standards that are widely used to evaluate the performance of child welfare programs.

The Child Welfare League of America (CWLA) has published its Standards of Excellence. The CWLA standards are a series of publications describing good child welfare policies for each of the various child welfare processes (e.g., agency administration, child protective services, foster care, and kinship care). CWLA has also published Child Maltreatment in Foster Care, which specifically addresses the response to allegations of abuse and neglect in foster care. The Council on Accreditation (COA) accredits public and private agencies that provide mental health and child welfare services. The COA publishes a set of standards specifically for public child welfare agencies, including standards on the response to maltreatment allegations. For a child welfare agency to become accredited, it must comply with these standards.  OKDHS is currently not accredited by COA.

CWLA and COA standards generally describe reasonable practice. Who would suggest that it is reasonable for CPS investigations to be anything but thorough, that it is acceptable for foster parents to have violent criminal backgrounds, or that foster children should be seen any less often than once per month? Child welfare caseloads that exceed the standards are not reasonable because they prevent caseworkers from effectively doing the work necessary to achieve safety, permanency and well-being for the children who depend on them.

Considering the importance of child welfare services to the children who receive them, it is not possible to reasonably conclude that child welfare agencies should be held to any lesser standard than those that have been established by the CWLA and the COA. If airline pilots were held only to standards of mediocrity, no one would choose to fly. The difference is that children have no choice about their involvement with the child welfare system.

### B.      The Regulation of OKDHS Processes

Every state operates a child welfare program, the principal goal of which is to assure the safety, permanency, and well-being of children. In 1997, with the passage of the Adoption and Safe Families Act, Congress established that "the child's health and safety shall be the paramount concern" of state child welfare agencies.[2]

Protecting children taken into state custody is an especially critical responsibility of the child welfare agency. Decisions that children can only be kept safe from serious harm by removing

them from their families' care are extremely difficult. Child welfare professionals involved in making them must weigh the physical and emotional risk of leaving children with abusive or neglectful parents against the profound emotional trauma children inevitably suffer when they are separated from their parents. When children are placed in substitute care, it is at a heavy cost to their psychological well-being. When the state makes the decision that it is the better parent, it has the responsibility to live up to at least the same standard to which we hold biological parents. It must, first and foremost, keep children safe.

To assure a reasonable degree of protection from abuse and neglect for children in state custody, child welfare agencies must perform effectively in several areas:

- Children in care must be visited frequently and purposefully by their caseworkers.

- The foster homes and other settings in which they are placed must be carefully screened and selected.

- Children must be placed in substitute care settings that are realistically equipped to meet their individual needs.

- Foster homes must not be overcrowded.

- Foster parents and other substitute caregivers must receive support from the agency as they fulfill their exceedingly difficult roles.

- When there is reason to believe that there are problems in substitute care settings – including allegations of child abuse and neglect – the agency must respond quickly to accurately evaluate the nature and extent of the problem, and to take action to assure the safety of children who are, or will be, placed in the home.

A reliably effective response to allegations that children have been abused or neglected in its custody is only one aspect of the child welfare agency's ability to assure child safety. It is, however, a critically important component. Such a response requires that the child welfare agency provide its staff with a well articulated understanding of 1) the process for responding to maltreatment reports and 2) the criteria to be used when making decisions.

It is important that child welfare staff generally, and child protective services staff in particular, be guided by sound, well-defined, and prescriptive procedures. It is well documented that the national child welfare work force is neither well experienced nor well trained. It is estimated that, nationally, the annual turnover rate for child welfare workers is between 30% and 40%. The average tenure is less than two years.[3] State child welfare agencies have long had difficulty hiring and retaining qualified workers.[4] In order to fill caseworker positions, child welfare agencies regularly establish low educational and experiential requirements for hire. Without solid procedural guidance, inexperienced caseworkers with limited training are left to use their "professional judgment" as they perform their highly complex function. OKDHS shares these workforce problems. In a self-assessment of the issue, the agency attributed problems with its CPS response to "staff turnover, vacancies and lack of experienced staff."[5]

Given the complexity and the importance of child protective services, a logical response to these workforce problems is the use of highly prescriptive operational procedures. COA requires that organizations develop "[w]ritten instructions that outline the steps for performing a task(s)."[6] Such procedures must tell caseworkers specifically what they must do as they conduct investigations (e.g., who must be contacted and what information must be gathered). Procedures must provide caseworkers with clear decision-making criteria. CWLA standards require that CPS agencies write procedures to assist staff with decision-making.[7] Such decision-making guidance must include reasonably specific definitions of child abuse and neglect (i.e., what must be screened in for investigation) and reasonably specific criteria for investigative outcomes (i.e., what must be substantiated).

1.     **OKDHS CPS Investigation Regulation**

As in other states, Oklahoma statutory law provides broad direction for OKDHS's CPS process. The Oklahoma Children's Code (OS Title 10A) defines child abuse and neglect in very general terms, broadly sets out requirements for response, and establishes "some credible evidence" as the standard for confirming child maltreatment allegations. Most state child welfare agencies supplement child protection laws in order to give front line staff more specific guidance. This is done through administrative rulemaking and by developing operational procedures. In Oklahoma, this guidance is provided by the Oklahoma Administrative Code 340: Chapter 75 – Subchapter 3.

OKDHS's child protective services procedures for the investigation of allegations concerning children in OKDHS custody are sparse, vague, confusing, and insufficiently prescriptive.

- The procedures are formatted in a way that makes it difficult to find all information related to a particular activity. Instead of covering an activity comprehensively in one place, several chapters cover processes that should be combined. Furthermore, each chapter is divided into two parts: the procedure itself and "Instructions to Staff," which are separate footnotes to the procedure. This makes it a near certainty that caseworkers will fail to adhere to a procedure, because the procedural requirements are scattered around the instructional document. This violates CWLA standards that require that procedures "[b]e written in a consistent format."[8]

- Much of the procedure is written as a list of suggestions rather than as a set of requirements. Reference to the subjective use of "good judgment" often replaces, or even overrides, explicit direction.[9] This invites disregard of the procedural requirements.

- Instead of establishing specific criteria, lists of examples are provided as decision-making guides. For example, a report that requires urgent attention is defined as one that "indicates the child is in imminent danger of serious physical injury."[10] This definition is supplemented by a list of 25 examples.[11]

- CWLA standards call for the child welfare agency to clearly define child abuse and neglect.[12] OKDHS's definitions of child abuse and neglect are generic and add little to the legal

definitions found in the statute. What is added is often vague and subjective. For example, a referral to be screened in for investigation is one that is defined as a situation in which "the allegations indicate there is serious and immediate threat of harm to the child." This is followed by a list of 18 examples.[13] This lack of definition may not matter much, however, because most of the procedural "direction" is preceded by the statement, "This *guide* (reviewer's emphasis) is not intended to be all inclusive and does not replace judgment about alleged risk factors."[14] This lack of clear definition is certain to result in inconsistency and error when decisions related to accepting reports for investigation[15] and confirmation of reports are made.[16]

- The requirements for CPS investigation lack rigor. OKDHS procedure states that CPS investigations require contact with 1) the alleged victim(s), 2) sibling(s), 3) person(s) responsible for the child (PRFC(s)), 4) collateral(s) and, if appropriate, 5) professional consultant(s). There is no specific requirement concerning what collateral sources *must* be contacted in any specific situation.[17] The only requirement for professional consultation is a list of situations in which a medical professional is to be contacted.[18] Unfortunately, this is found in a different part of the procedure than the primary sections covering the investigation requirements. This lack of specificity and rigor cannot be expected to lead to thorough CPS investigations and is contrary to CWLA standards that call for procedures that clearly direct staff.[19]

- Decision-making criteria for accepting reports,[20] making investigative determinations,[21] and closing abusive/neglectful foster homes[22] are inadequate. The combination of vague child maltreatment definitions and the lack of specific decision-making criteria is certain to result in inconsistent and erroneous screening decisions and investigative findings. This poor decision-making inevitably results in children being left in dangerous situations and the continued use of dangerous foster homes. This failure violates COA standards requiring that "[s]tandardized decision-making criteria are used, in consultation with supervisory personnel, to determine if the report meets statutory and agency criteria."[23]

- It is important that CPS investigations be commenced quickly. Failure to respond rapidly leaves children in potentially dangerous situations. In addition, delayed response reduces the availability of reliable evidence as memories fade. As the CWLA standards state, "No child in danger should have to wait for services."[24] COA standards call for a response within 72 hours at the latest.[25]  OKDHS regulations define Priority 1 reports as those that indicate that "a child is in imminent danger of serious physical injury."[26] A list of examples along with an exhortation that staff use "good judgment" is provided to further define Priority 1. In Priority 1 investigations, an attempt must be made to see the alleged victim on the same day that the report was made. All other reports are Priority 2. In Priority 2 investigations, an attempt must be made to see the alleged victim within *15 days* from the day that the report was made.[27]

The procedural guidance that the agency provides to casework staff fails to meet any reasonable standard. This failure is likely to result in errors, both in the response to allegations of child abuse and neglect, and in decision-making as referrals are screened and investigative outcomes are determined.

2.      **OKDHS OCA Investigation Regulation**

It is OKDHS's practice that investigations of abuse/neglect allegations concerning OKDHS wards in congregate care facilities (e.g., residential treatment centers, group homes and OKDHS shelters) are not conducted by child welfare staff. Instead, these investigations are conducted by the Office of Client Advocacy. OCA is generally responsible for addressing complaints, grievances, and allegations pertaining to OKDHS services.[28] OCA conducts maltreatment investigations involving children in group care according to its own separate set of procedures found in the Oklahoma Administrative Code 340: Chapter 2 – Subchapter 3.

Most of the problems with the procedures applicable to OKDHS's CPS investigations are even more pronounced in the OCA procedures. The definitions of child abuse/neglect utilized by OCA are somewhat different from those used by the child welfare staff and add little specificity to the statutory definitions.[29] Furthermore, the investigative requirements are even less specific than those guiding OKDHS child welfare investigations.[30] For example, there are almost no specific decision-making requirements. In addition, there are several important problems that specifically apply to the OCA process.

- Investigations of child maltreatment are complex and diverse. In order for sound decisions to be made, investigators must have a working familiarity with a wide variety of subjects, including child development, medical presentations associated with abuse and neglect, proper restraint procedures when children's behavior threatens to harm themselves or others, interviewing techniques for young children and alleged sexual abuse victims, law enforcement agency procedures, court expectations and many others. For this and other reasons, CWLA standards require that CPS investigations be a specialized service.[31] OCA investigators do not specialize in child welfare. They investigate allegations of caretaker maltreatment and misconduct concerning many OKDHS clients, child or adult, who are receiving residential care, vocational services, or child day care.[32] Furthermore, OCA investigators do not receive substantial training in conducting child maltreatment investigations.[33] This lack of specialization dilutes the level of expertise that OCA staff members bring to child abuse/neglect investigations, and increases the likelihood that children will be left, or placed, in dangerous situations.

- OCA procedures setting requirements for the speed with which investigations must be begun are even more lax than those guiding CPS investigators. If a referral is deemed an emergency, OCA procedures require that OCA see to it that someone (not necessarily an OCA investigator) visits the alleged victim within 24 hours.[34] The definition of "emergency" is, "a situation [that] presents a serious risk to the victim." There are no additional criteria;[35] nor do there appear to be any other formal procedural requirements for timely initiation. OCA has instituted a "five day rule" which requires that, in some situations, the alleged victim must be seen within five days of the referral. The "five-day rule" appears to have been established in service of convenience (i.e., to enable OCA investigators to see children in shelters before they are moved) and not as an effort to protect children.[36] CWLA standards call for specific procedures setting out the timeframes for initiation of investigations.[37] A quick response is important in order to assure the safety of children in the facility, to

interview witnesses as soon as possible after an incident while their memories are fresh, and to preserve the integrity of the investigation.

- OCA investigative findings are based on a different, and higher, evidentiary standard than are CPS investigative findings. OCA findings require the "greater weight of the evidence"[38] while the standard for Child Welfare investigations is "some credible evidence."[39] Aside from being illogical and inconsistent with Oklahoma's state statute, this deprives OKDHS wards living in congregate care of the safety net that the lower standard provides to children living in family foster care.

- When OCA receives an abuse/neglect referral, it may conduct either an investigation or require that the facility in which the reported incident occurred conduct an internal investigation and report back to OCA. This process is called a Caretaker Conduct Review (CCR). The criteria for handling a referral as a CCR allow agencies to investigate themselves even when children have been injured.[40] In addition to creating an obvious conflict of interest, this policy is certain to result in staff with even less specialized expertise than OCA investigators becoming responsible for investigations of potential child maltreatment or policy violations that may endanger children.

- OCA is an administrative entity entirely separate from OKDHS Child Welfare. Investigative activities and outcomes are documented on different data systems. While OCA investigators have access to information concerning Child Welfare CPS investigations (maintained on the KIDS data system), Child Welfare staff members, including caseworkers responsible for the alleged victims in OCA investigations, have no access to information in the OCA system.[41]

- Notices of OCA referrals and of the outcomes of OCA investigations are sent by OCA to a state office level OKDHS administrator. There is no requirement that OCA contact a child's caseworker at any point during an investigation. In fact, it is unlikely that OCA will even learn who the child's caseworker is. As Mark Jones, head of OCA, said in his deposition, "we don't know who the caseworker is. And, frankly, we don't care."[42] The alleged victim's caseworker is likely to have important information relevant to the investigation. It is also important that the child's caseworker be immediately aware of the alleged mistreatment of the child so that the caseworker can respond to any related service needs.  Because of the separate data systems, the OKDHS wards found to be abused and neglected by OCA investigations are not included in the abuse in care data provided to the federal government.[43] This means that a greater proportion of children in the care of OKDHS are maltreated by their caregivers than is reported.

Having OCA conduct investigations involving children in congregate care settings, while child welfare staff conduct investigations involving children in foster homes, creates a two-tiered system with unreasonable and dangerous differences in the level of protection OKDHS provides its wards. These differences are based, arbitrarily, on the nature of the child's placement.

Of course, even if a child welfare agency has sound and well articulated policies and procedures, they serve little purpose unless they are consistently adhered to. Enforcing the use of operational procedures is a primary function of agency management.

### 3.      OKDHS CPS Assessment Regulation

During the last several years, many (if not most) states have developed systems of differential response to child maltreatment allegations. Differential response systems are generally designed to have alternatives to CPS investigations. These alternatives are intended to provide a less intrusive and more service-oriented response to low-risk child maltreatment referrals. Referrals involving foster and kinship homes are usually excluded from differential response because such referrals are, by definition, not low risk.

OKDHS has established CPS assessments as its differential response alternative to CPS investigations. According to OKDHS policy, "[a]n assessment is conducted when a report meets the abuse or neglect guidelines and does not constitute a serious and immediate safety threat to a child."[44] OKDHS policy provides some guidelines for deciding whether to track referrals as CPS investigations, track them as CPS assessments, or screen them out. However, the policy specifically lists allegations involving foster and trial adoptive homes as among those situations that require CPS investigation rather than assessment.[45] Thus, the 17 assessments that OKDHS conducted in 2009 in response to referrals involving foster/kinship homes were in direct violation of OKDHS policy.

10

## III.    STUDY METHODS

This cross-sectional case record review was designed to describe the characteristics of referrals alleging child maltreatment in out-of-home care in Oklahoma, to describe the response to these referrals, and to assess whether the decision-making involved in these investigations, assessments and screen outs reflects reasonable professional judgment and falls within minimal practice standards for child protective services.

## A.    Sampling Plan and Inclusion and Exclusion Criteria

OKDHS identified all cases in which, during calendar year 2009, children in its custody were the subjects of:

1.   Child abuse/neglect referrals that were screened out at intake.

2.   Child abuse/neglect referrals that received CPS investigation.

3.   Child abuse/neglect referrals that received OCA investigation.

4.   Child abuse/neglect referrals that received CPS assessment.

These referrals were unduplicated (i.e., referrals alleging the maltreatment of multiple children involved in a single incident or set of circumstances resulting in a single screen out decision, investigation or assessment were combined).

For three of these categories (screen outs, CPS investigations, and OCA investigations), a random sample was identified that was large enough to permit the review results to be generalized to the entire population in that category with a level of reasonable confidence. (Confidence intervals are identified for specific findings as they are relevant in the body of the review).

Random sampling is the most effective way of assuring that a sample is representative of the total population affected by screening decisions, investigations, and assessments completed during the study time period. On this basis, it can be assumed that the findings from this study represent the findings that would have resulted if the entire population of screen outs, CPS investigations and OCA investigations involving alleged victims in out-of-home care in Oklahoma during 2009 had been reviewed.

The samples for these three review categories are as follows:

**Universe/Sample Size**

| Category | Unduplicated Universe (N) | Sample |
|---|---|---|
| **CPS investigations** | | |
| *referrals* | 343 | 84 |
| *OKDHS wards* | 645 (est.) | 158 |
| **OCA investigations** | | |
| *referrals* | 219 | 41 |
| *OKDHS wards* | 374 (est.) | 70 |
| **Screen outs** | | |
| *referrals* | 464 | 93 |
| *OKDHS wards* | 807 (est.) | 162 |

Table III-1

The samples are large enough so that the results of the review can be applied to the universe of all CPS and OCA investigations, and all screened out referrals, concerning OKDHS wards occurring in 2009. For each key finding, a confidence interval can be calculated. The confidence interval is the range of the number of children, investigations, or screened out referrals affected by each key finding.

Because OKDHS identified only 17 CPS assessments in 2009 (involving 33 children in state custody), no sampling was performed and all 17 assessments were reviewed.


**B.      Data Collection and Coding Procedures**

Following an analysis of Oklahoma state laws and of OKDHS policies and procedures, relevant data elements were identified and a coding system was developed for each category of intervention being studied. The data elements were structured into an Access database to capture case-level data, including:

- Background information (e.g., the initials and ages of alleged victims and the type of facility in which the alleged maltreatment allegedly occurred);

- Detailed information about the nature of reported allegations and the role of alleged perpetrators;

- For screen outs, information about the adequacy of the information gathered and whether the screen out decision was correct;

- For investigations and  assessments, information about investigative activities, including reviewers' judgments about the adequacy of those activities;

- For investigations and assessments, information about investigative dispositions, including reviewers' judgments about whether sufficient information was gathered and whether decisions were correct; and

- Information about any actions taken by OKDHS to protect children during and following investigations or assessments, including reviewers' judgments about the adequacy of such actions.

Detailed coding procedures were written to increase inter-rater reliability among the research review team (see Appendix B).

## C.   The Review Team

### 1.   Case Review Team

Two primary coders, John Goad, A.M. and Adele Prass, A.M., reviewed the referrals, investigations, and assessments included in the sample. The reviewers coded and entered all of the data directly into the database. Both reviewers have extensive CPS experience, having worked as caseworkers and administrators in public child welfare agencies for decades.  The principal reviewer, Mr. Goad, is a social worker who has worked in public child welfare for nearly 40 years.  During his career he has been directly or administratively responsible for investigations into the alleged abuse or neglect of more than a million children. Ms. Prass has worked in public child welfare for a similar period of time. She has worked as a CPS caseworker, supervisor, and administrator, and was responsible for the provision of child protective services for a county with a population of 5.5 million people. Richard Thompson, Ph.D., Director of Research at the Juvenile Protective Association, analyzed the data and conducted tests for confidence intervals and inter-rater reliability. Dr. Thompson is an investigator on several federally funded grants on outcomes of child maltreatment and mental health services, and has more than 70 peer-reviewed scientific publications.

### 2.   Child Fatality Review Team

Mr. Goad was the principal reviewer for the child fatality review. One other reviewer, Kathy Glenney, A.M., participated in the review. Ms. Glenney has worked in public child welfare as a caseworker, supervisor, and senior administrator for more than 35 years.

See Appendix C for detailed information about the qualifications of study participants for both reviews.

## D.   Inter-Rater Reliability

Before a complete coding of the screen out, investigation, and assessment samples could be conducted, it was important to establish inter-rater reliability. Inter-rater reliability refers to the

degree to which independent raters agree on the outcome of interest.[46]   Kappa scores were used to represent agreement, because these take into account base rates in calculating agreement. Because the raters could endorse any option for each category of response free-marginal Kappa scores were calculated; this approach is a more accurate estimation of agreement than are fixed marginal Kappas, which can be distorted by base rates of responses.[47]  Kappa scores above .70 are considered to represent good inter-rater reliability.[48]

This procedure established strong inter-rater reliability between the two reviewers. Details about inter-rater reliability are specified in Appendix A to this report. Because the CPS assessment category included only 17 referrals, the principal reviewer reviewed that entire category. For this reason, there was no need to evaluate inter-rater reliability for the review of CPS assessments.

## IV.    CPS INVESTIGATION REVIEW

OKDHS responds to most of the referrals involving children in its care by conducting CPS investigations. The purposes of CPS investigations are:

- to gather evidence about whether the alleged victims identified in the referral – or other children placed in the home or facility – have been abused or neglected; and

- to assess the immediate safety of all involved children and, where necessary, to take action to protect them.

This review was designed to empirically evaluate whether OKDHS's CPS investigations are conducted in compliance with established standards of practice, whether related decision-making is reasonable, and whether OKDHS effectively protects the children in its care after they have been the subject of child abuse/neglect referrals.

## A.        Description of the CPS Investigation Review

OKDHS identified 343 unduplicated CPS investigations that it conducted during 2009 into allegations that children in its custody were abused and/or neglected. From this universe, a random sample of 84 (24.5%) CPS investigations was drawn.  These 84 cases involved 158 wards of OKDHS and 279 specific maltreatment allegations.

Confidence intervals were calculated for key review findings. Confidence intervals make it possible to apply review findings to the universe of study subjects. The confidence interval represents the statistical range within which the reviewers can be 95% certain that a particular finding will fall when applied to the universe of study subjects. Specific confidence intervals are identified in the relevant parts of the review. In applying confidence intervals for child level findings, I assumed that the number of alleged child victims per CPS investigation in the universe of CPS investigations is the same as the number in the sample (1.88). Based on that assumption, I concluded that during 2009, 645 children in the care of OKDHS were alleged to be victims in CPS investigations.

Because the CPS investigation review was conducted by two reviewers, it was important to test the degree to which the reviewers agreed about key questions in the review. To this end, six CPS investigations were reviewed by both reviewers to measure inter-rater reliability. Overall, inter-rater reliability was found to be excellent. The results of specific inter-rater reliability tests are included in Appendix A.

**B.**      **Descriptive Information about the CPS Investigations**

Table IV-1 displays the ages of the 158 children who were alleged victims in the CPS investigations reviewed.

**Age of Alleged Victims in CPS Investigations**

| Age | % (N) |
|-----|-------|
| 0-2 | 20.9% (33) |
| 3-5 | 21.5% (34) |
| 6-8 | 22.2% (35) |
| 9-11 | 15.8% (25) |
| 12-14 | 10.8% (17) |
| 15+ | 8.9% (14) |
| **Total** | **100.0% (158)** |

Table IV-1

As with the screen outs and CPS assessments discussed below, OKDHS wards involved in CPS investigations tended to be young and, therefore, even more vulnerable than other children in state custody. As Table IV-1 indicates, nearly two-thirds of the alleged abuse/neglect victims were under the age of nine.

Table IV-2 shows the placement setting in which the reported child abuse or neglect allegedly took place.

**Type of Placement for CPS Investigations**

| Placement type | % (N) |
|----------------|-------|
| OKDHS kinship care | 46.4% (39) |
| OKDHS foster home | 32.1% (27) |
| Contracted foster home | 13.1% (11) |
| Tribal foster home | 6.0% (5) |
| Tribal kinship care | 2.4% (2) |
| **Total** | **100.0% (84)** |

Table IV-2

All of the children involved in the CPS investigations reviewed were placed in family settings. Almost equal numbers of investigations involved foster homes (51.2%) and kinship placement (48.8%).

**Sources of Reports for CPS Investigations**

| Source | % (N) |
|---|---|
| OKDHS caseworker | 23.8% (20) |
| Professional counselor/social worker | 16.7% (14) |
| School personnel | 16.7% (14) |
| Relative (other than parent) | 7.1% (6) |
| Anonymous | 6.0% (5) |
| Non-custodial parent | 4.8% (4) |
| Neighbor/friend | 3.6% (3) |
| Alleged maltreater | 2.4% (2) |
| Court personnel | 2.4% (2) |
| Alleged victim | 2.4% (2) |
| Contract agency caseworker | 1.2% (1) |
| Law enforcement | 1.2% (1) |
| Health care provider | 1.2% (1) |
| Custodial Parent/Guardian | 1.2% (1) |
| Other | 9.5% (8) |
| **Total** | **100.0% (84)** |

Table IV-3

A substantial majority (at least 63%) of the CPS investigations reviewed were referred by sources who were professionally involved with the alleged victims. The children's caseworkers (OKDHS and contracted) were the largest single source of referrals (25%). Caseworkers are presumably well informed about what constitutes child abuse and neglect and should have reliable information about the situations of the children in their caseloads.

Table IV-4 shows the categories of maltreatment alleged in the investigations reviewed. The number of allegations is larger than the number of CPS investigations reviewed, because in many investigations there are multiple children and for many children there are multiple allegations.

**Allegations Investigated During CPS Investigations**

| Category | % (N) | Specific Type | % (N) |
|---|---|---|---|
| Neglect | 24.4% (68) | Concrete need | 11.5% (32) |
|  |  | Lack of supervision | 9.7% (27) |
|  |  | Medical neglect | 3.2% (9) |
| Physical Abuse | 18.6% (52) | Bruises/welts | 13.3% (37) |
|  |  | Burns | 0.4% (1) |
|  |  | Poisoning | 0.4% (1) |
|  |  | Failure to protect | 4.7% (13) |
| Sexual Abuse | 13.6% (38) | Molestation | 3.2% (9) |
|  |  | Failure to protect | 10.4% (29) |
| Other | 43.4% (121) | Caregiver alcohol/drug | 8.6% (24) |
|  |  | Domestic violence | 2.2% (6) |
|  |  | Poor parenting | 0.7% (2) |
|  |  | Threat of harm | 17.2% (48) |
|  |  | Corporal punishment | 11.1% (31) |
|  |  | Mental injury | 3.6% (10) |
| Total | 100% (279) |  | 100.0% (279) |

Table IV-4

The allegations investigated are divided into broad categories and specific types. In both cases, they are distributed about as one would expect. In addition to abuse and neglect alleged in the initial referrals (237), Table IV-4 also includes allegations that arose during the course of investigations (42). Clearly, it is important that child maltreatment allegations coming to light during CPS investigations be investigated with the same rigor as those contained in the initial referrals.

## C.   Evaluation of the CPS Investigation Process and Related Decision-Making

Once OKDHS determines that there is reasonable cause to suspect that children in its custody have been victims of child abuse or neglect at the hands of their caregivers, the agency must conduct timely and thorough investigations. Based on the evidence gathered, it must make reasonable decisions about whether children in its care have been maltreated. Finally, it must take reasonable actions to assure the safety of its wards both during and following CPS investigations. The evaluation of OKDHS CPS investigations, therefore, focuses on four questions:

- Are CPS investigations conducted in a timely manner?

- Are CPS investigations thorough?

- Are CPS investigative decisions correct?

- Are adequate protective actions taken during CPS investigations?

1.       **Were CPS Investigations Conducted in a Timely Manner?**

Children are best protected when CPS investigations are commenced quickly, investigated without long gaps between investigative activities, and completed within a reasonable period of time.

Delayed initiation of CPS investigations can leave children in potentially dangerous situations. In addition, delayed response reduces the availability of reliable evidence as memories fade. As CWLA standards state, "No child in danger should have to wait for services."[49] COA standards call for a response to alleged child abuse/neglect victims within 72 hours at the latest.[50]

a)       *Priority Codes*

As discussed in Section II, above, OKDHS regulations define Priority 1 reports as those in which there is an allegation that a "child is in imminent danger of serious physical injury."[51] Other reports are Priority 2. In a Priority 2 investigation, an attempt must be made to see the alleged victim within *15 days* from the day that the report was made.[52] This standard is itself unreasonable. A delay of up to 15 days risks leaving children in danger of being harmed.

Priority codes are assigned at the OKDHS Child Abuse and Neglect Hotline. For referrals coded Priority 2, the hotline identifies the number of days within which contact with alleged victims must be attempted. As Table IV-5 indicates, the CPS investigations reviewed were almost equally split between Priority 1 and Priority 2.

**OKDHS Priority Codes**

| Priority | % (N) |
|----------|-------|
| One | 48.8% (41) |
| Two | 51.2% (43) |
| **Total** | **100.0% (84)** |

Table IV-5

Reviewers evaluated whether the priority code designations were reasonable considering the child safety threats suggested by the referral. For all 41 investigations coded Priority 1 reviewers found the priority designation to be reasonable. Because the 15 days allowed for initiation of Priority 2 investigations is unreasonable on its face, reviewers evaluated whether the more specific timeframe identified by the hotline was reasonable. This was evaluated taking into account the child safety threats suggested by the referral and considering the COA requirement that all children assessed as being in imminent danger be seen immediately and all others be seen within 72 hours from the referral.[53] For the 43 CPS investigations coded Priority 2, reviewers found the designated timeframe for initiation to be reasonable for 35, unreasonable for 7, and in one instance there was insufficient information in the referral to make a judgment.

b)       *Delayed Initial Contact with Alleged Victims*

More important than the priority code is the amount of time it actually took OKDHS investigators to make in-person contact with alleged victims. Reviewers evaluated whether the time was reasonable in the context of the safety threat suggested by the referral information. Realistic and unavoidable barriers to making timely contact (e.g., an alleged victim was out of state) were taken into account.

For 14 (8.9%) of the 158 alleged victims, the length of time between the referral and in-person contact by the OKDHS investigator was longer than was reasonable given the nature of the referral. For one alleged victim, there was insufficient information to permit the reviewer to make an evaluation. For the remaining 143 alleged victims, contact was made in a reasonable period of time.

> The therapist of eight-year-old MR reported that MR disclosed to her that his foster mother hit him in the head, back and shoulders with a hanger. The therapist told the hotline worker that MR demonstrated, "a pretty good hit." The child also told his therapist that his foster mother throws shoes at him. The therapist did not know if MR had any marks on him. There were 11 previous referrals concerning the home. At least six of these were investigated and at least one was Substantiated.
>
> The OKDHS investigator did not see MR until five days following the referral. MR repeated that his foster mother hit him with a hanger. He told the investigator that he had no marks, but the investigator never checked. Almost three weeks later, MR told his caseworker that he had not been hit by his foster mother. The referral was Ruled Out. Due to the delay in seeing MR (allowing time for any marks to fade) and the investigator's failure to observe the child's back and shoulders, it is not possible to know what the correct finding should have been. Given MR's consistent statements to his therapist and the investigator, it certainly should not have been Ruled Out simply because he recanted three weeks later. (Referral Number 1251619).

The confidence interval for the finding that 8.9% of the alleged victims were not seen in a reasonable time is ±4.0%. This means that there is a 95% certainty that at least 31 and as many as 83 OKDHS wards who were alleged victims in 2009 CPS investigations were not contacted within a reasonable time period.

While making contact with alleged victims in CPS investigations within a reasonable time 91.1% of the time may seem to be a positive finding, it is not. Because of the potential for harm to alleged victims of child abuse/neglect, timely contact should be universal or nearly so. No one would think a 91.1% rate of providing urgently needed medical care was acceptable. The same should be true for child protection interventions, especially when the interventions involve children in state care. These delays violate CWLA[54] and COA standards.[55]

c)   *Long Gaps in CPS Investigations*

In addition to commencing CPS investigations quickly, it is important that investigations be conducted in orderly way and without lengthy gaps between them. In 21 (25%) of the 84 investigations reviewed there were gaps of more than 30 days during which no investigative activity took place. In one additional investigation the reviewers could not determine whether there were lengthy gaps because file documentation did not include the dates of contact.



Figure IV-1

Using the confidence interval (±8.1%) to apply this finding to all OKDHS wards involved in CPS investigations, this failure affected between 109 and 213 children.

This finding is disturbing and is in violation of COA standards[56] because, during gaps in investigative activity, children may be at an elevated level of risk. This is especially true for OKDHS wards because, as will be seen, the agency did not always take appropriate actions to protect children during investigations.

d)   *Duration of CPS Investigations*

The final issue related to the timeliness of investigations concerns the time from the referral to the completion of the investigation. OKDHS procedure requires that investigations in foster homes be completed within 30 days of the agency's receipt of the referral. In exceptional situations, this timeframe can be extended.[57] These timeframes are reasonable and are in compliance with COA standards.[58]

The duration of each CPS investigation in the sample was measured by counting the number of days between the referral and the last investigative contact, the caseworker's signature certifying

completion, or the supervisor's signature approving the investigation – whichever of these occurred first. On average, OKDHS took 34.8 days to complete CPS investigations involving children in its care. Thirty-seven (44.0%) of the investigations took 31 or more days to complete, and 22 (26.2%) of the investigations took 46 days or more. OKDHS documentation did not include sufficient information to permit reviewers to determine the length of three investigations. Figure IV-2 plots the duration of the investigations.



Figure IV-2

Clearly, OKDHS takes too long to complete a large proportion of its CPS investigations concerning its wards. This violates COA standards that call for CPS investigations to be conducted in a "timely and efficient manner,"[59] and CWLA standards that require that CPS investigations involving alleged victims in foster care be completed "expeditiously."[60] In addition to being inefficient, this failure can leave children and caregivers in limbo and children in danger.

    *e)*       *Conclusion: Are OKDHS CPS Investigations Timely?*

OKDHS CPS investigations into allegations of abuse or neglect involving children in OKDHS custody are not timely in any important sense.

- OKDHS takes too long to see many of the children who have allegedly been abused or neglected.

- Once begun, far too many investigations include lengthy gaps, leaving children at risk and in uncertain situations.

- Far too many investigations take too long to complete.

These failures are in violation of relevant CWLA and COA standards, in some instances they violate OKDHS's own policy, and they place agency functioning below reasonable standards for protecting children.


### 2.    Were CPS Investigations Thorough?

There is important overlap between an evaluation of whether CPS investigations are timely and an evaluation of whether they are thorough. When there are delays in interviewing or observing alleged victims, information is lost and marks and memories fade. Further, information from witnesses becomes less reliable, because of memory issues and because, given time, multiple subjects of the same investigation can concoct similar stories. When CPS investigations are conducted over extended periods, some forms of physical evidence can also be lost.

Together with issues of timeliness, the evaluation of whether CPS investigations are thorough depends on whether important investigative activities are conducted and, if so, whether they are conducted properly.


### a)    CPS Background Checks

One important part of any investigation is background checks. CWLA standards[61] require that CPS investigations should include checks of 1) agency records of prior history of alleged child abuse and neglect and 2) law enforcement records to identify any law enforcement history that may be pertinent to child safety. For the 84 OKDHS CPS investigations reviewed, there is evidence that CPS history checks were completed in all but six instances. Of the 78 investigations for which CPS background checks were completed, some prior CPS history was found for 47 (60.2%) of the OKDHS caregivers.



Figure IV-3

It is not unusual for substitute caregivers to be the subjects of prior CPS referrals. What is important are the outcomes of those referrals. In five (6.0%) of the 84 CPS investigations reviewed, the prior child abuse/neglect allegation(s) against these caregivers had been Substantiated. In 23 additional CPS investigations, prior child abuse/neglect allegations were Unsubstantiated, in another 15 abuse/neglect allegations were Ruled Out and in four CPS investigations, there was insufficient information to make a determination.

The confidence interval for this finding is ±5.9%. This means that at least five and as many as 45 of the CPS investigations conducted in 2009 involved foster homes in which OKDHS knowingly placed children – children whom OKDHS removed from the care of their parents because they were unsafe – with foster caregivers who were abusive and/or neglectful. Placing children with foster parents who have histories of child abuse or neglect violates CWLA standards.[62]

The fact that prior allegations against these caregivers were Unsubstantiated in 23 of the 47 cases is not reassuring. The OKDHS definition of "Unsubstantiated" is "a report in which a child protective services worker, after an investigation, determines there is insufficient evidence to fully determine whether child abuse or neglect has occurred"[63] A finding of Unsubstantiated does not mean that these caregivers were not responsible for child maltreatment. Furthermore, as will be seen later in this section, OKDHS CPS investigations are seriously flawed and many allegations that are found to be Unsubstantiated should be Substantiated. Consequently, it is almost certain that an alarming number of OKDHS wards are placed in homes with dangerous caregivers.

b)      *Criminal Background Checks*

OKDHS CPS investigators rarely complete criminal background checks. In only six (7.1%) of the 84 CPS investigations reviewed were such checks completed.



Figure IV-4

While this does not always violate OKDHS policy, which requires criminal background checks only when the allegations involve domestic violence, significant substance abuse, or sexual abuse, it does violate CWLA standards.[64]

c)      *Necessary Observation of Portions of Alleged Victims' Bodies*

For obvious reasons, it is important that when there are allegations that a child has injuries, marks or other physical signs of child abuse or neglect on his/her body, the relevant parts of the child's body be observed by the CPS investigator or by a medical professional. Such observation is standard CPS practice and is required by OKDHS policy.[65]

Of the 158 children involved in the sample of CPS investigations, the allegations concerning 54 (34.2%) children required observation of some portion of the child's body. For 13 (24.1%) of these 54 children, OKDHS failed to make an observation that may have corroborated or refuted the allegations being investigated. In two (3.7%) additional cases reviewers could not determine whether the children had been adequately observed.



Figure IV-5

In other words, in almost a quarter of the reviewed investigations that required observation of relevant portions of children's bodies, no such observation was made. The confidence interval for this finding was ±9.9%. Applying this to the universe of OKDHS wards who were the subjects of CPS investigations in 2009, no fewer than 31 and as many as 75 alleged victims in OKDHS investigations did not receive necessary observation. This is a strong indication that OKDHS child abuse investigations are not thorough. It is also a violation of OKDHS policy.[66]

    *d)*    *Necessary Investigative Contacts*

One of the most important elements of any CPS investigation is the interviews conducted with subjects other than the alleged victims. CWLA standards include medical professionals, law enforcement officers, teachers, neighbors, relatives, and others among important investigative contacts.[67] While OKDHS policy is not adequately prescriptive, it requires interviews with a number of collateral contacts during CPS investigations.[68]

Although, as a rule, more investigative contacts yield more information and a better basis for decision-making, not every sort of contact is relevant to every investigation (and, of course, it is almost always possible to identify one more contact that might have been useful). For this reason, the reviewers first identified the categories of contacts that were *necessary* to make an investigative finding in each of the CPS investigations in the sample (note that, for a given case, more than one individual in a given category might be identified as necessary contacts). It was then determined for each category of necessary contacts in each case whether the investigator (i) made adequate contact with all individuals in that category ("All Contacted"), (ii) contacted only some individuals *or* contacted all individuals in a category, but did so inadequately ("Some Contacted/Inadequate"), or (iii) made no contact with any members of a category ("None Contacted"). Thus, for example, an investigation that required contact with two mental health professionals in which the investigator only contacted one was categorized as "Some Contacted/

Inadequate." An investigation that required contact with a physician, in which the investigator received only a written report that did not adequately address the issue of maltreatment, but failed to interview the physician would also be categorized as "Some Contacted/Inadequate." On the other hand, an investigation requiring interviews of two alleged perpetrators in which the investigator did, in fact, interview both, would be categorized as "All Contacted."

### Investigative Interviews

| Vital source | Relevant N | All Contacted | Some Contacted / Inadequate | None Contacted |
|---|---|---|---|---|
| Alleged perpetrator | 83 | 84.3% (70) | 13.3% (11) | 2.4% (2) |
| Reporter | 64 | 67.2% (43) | 3.1% (2) | 29.7% (19) |
| Identified witnesses | 16 | 56.3% (9) | 18.8% (3) | 25.0% (4) |
| Additional children in facility | 41 | 87.8% (36) | 2.4% (1) | 9.8% (4) |
| Others in facility | 20 | 80.0% (16) | 5.0% (1) | 15.0% (3) |
| Collateral sources | 37 | 81.1% (30) | 16.2% (6) | 2.7% (1) |
| Other non-professionals | 21 | 95.2% (20) | 4.8% (1) | 0 |
| Home or facility | 72 | 95.8% (69) | 1.4% (1) | 2.8% (2) |
| Alleged victim's OKDHS caseworker | 76 | 90.8% (69) | 2.6% (2) | 6.6% (5) |
| OKDHS caseworker for other children present/involved | 6 | 66.7% (4) | 16.7% (1) | 16.7% (1) |
| Private agency of alleged victim | 9 | 44.4% (4) | 0 | 55.6% (5) |
| Private agency for other children present/involved | 2 | 0 | 0 | 100% (2) |
| Police | 19 | 73.7% (14) | 26.3% (5) | 0 |
| Mental health professionals | 34 | 79.4% (27) | 8.8% (3) | 11.8% (4) |
| Medical professionals | 26 | 46.2% (12) | 15.4% (4) | 38.5% (10) |
| Responsible licensing staff | 78 | 57.7% (45) | 1.3% (1) | 41.0% (32) |
| Other professionals | 20 | 80.0% (16) | 10.0% (2) | 10.0% (2) |
| **Total** | **624** | **77.6% (484)** | **7.1% (44)** | **15.4% (96)** |

Table IV-6

Taken together, the 84 CPS investigations reviewed required contact with *a minimum* of 624 important investigative sources in 17 different categories (Because CPS contact with the alleged victim is analyzed separately, the victim is not included as a category in this table). The reviewers found that OKDHS investigators adequately contacted 484 sources (77.6%), made insufficient contact with 44 sources (7.1%), and made no contact at all with 96 vital sources (15.4%) of information.

As troubling as this overall picture is, several contact categories deserve special note.

- OKDHS investigators failed to make adequate contact with all reporting sources in one-third of the investigations for which contact with the reporter was important. Contact with the

reporting source is a standard element of CPS investigations and is important to clarify and flesh out information reported. This is especially true for professional reporting sources.

- In 16 investigations, witnesses to the maltreatment were identified by the reviewers as being necessary contacts. In seven of these, OKDHS investigators made adequate contact with either none or only some of these witnesses.

- In one-third of the investigations in which OKDHS wards other than the alleged victim were also placed in the home, investigators failed to make adequate contact with the other wards' OKDHS caseworkers. These caseworkers would, presumably, have valuable information about the caregivers, may have information communicated to them by the children for whom they are responsible, and certainly should be made aware of any allegation involving a home in which they have children placed.

- In 14 of the 26 investigations in which information from medical professionals was important to the investigative determination (an astounding 53.8%), OKDHS investigators made contact with either none or only some of the relevant health care providers. Medical information is always extremely important and can be *the most* important information gathered in CPS investigations. OKDHS's failure to reliably collect medical information is inexplicable.

> It was reported that seven-year-old severely autistic and non-verbal BW, placed in a foster home, had a large bruise on his arm, a "huge" bruise on his leg, scratches and bruises across his back, shoulder, and neck, and a bite mark on his arm. He was urine soaked, appeared "drugged up" and seemed to "have had the life sucked out of him."
>
> This referral received almost no investigation. The investigator did not see BW until six days after the referral, by which time no marks were visible (although only a cursory observation was done). According to the foster mother, the injuries occurred in the waiting room of the doctor's office where BW became "irritated." There was no contact with the doctor in whose office the injuries allegedly occurred. The investigator failed to verify the foster mother's account with staff at the doctor's office who were allegedly eyewitnesses. The reporter was not contacted. The bite was not addressed in any way. BW's medication level was completely unaddressed. There was some evidence that some of the marks could have occurred in a previous foster home. This was not addressed. Based on the unverified statement of the foster mother and several OKDHS workers who had no firsthand information, the referral was Ruled Out. (Referral Number 1254419).

> e)   Conclusion: Are OKDHS CPS Investigations Thorough?

OKDHS CPS investigations of allegations that children in the agency's custody have been abused and neglected by their substitute caregivers are not thorough.

- OKDHS does not reliably check the backgrounds of its substitute care providers after they have been accused of abusing or neglecting the children the agency has entrusted them with.

- OKDHS does not routinely observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment.

- OKDHS *frequently* fails to make contact with sources likely to have information *that is necessary to make an accurate investigative finding.*

These failures are in violation of relevant CWLA and COA standards, in some instances they violate OKDHS's own policy, and they place agency functioning below reasonable standards for protecting children.

### 3.    Were CPS Investigative Decisions Correct?

A key measure of whether or not a child welfare agency can keep the children in its care safe is whether it makes reasonable determinations in its CPS investigations concerning its wards. Section 340:75-3-10.2 of the Oklahoma Administrative Code provides the following four potential findings for CPS investigations:

1) **Ruled Out.**  A finding of Ruled Out means a report in which a child protective services worker, after an investigation, determines that no child abuse or neglect has occurred.

2) **Unsubstantiated – Services recommended.**  A finding of Unsubstantiated – Services recommended means a report in which a child protective services worker, after an investigation, determines there is insufficient evidence to fully determine whether child abuse or neglect has occurred, but one in which Oklahoma Department of Human Services (OKDHS) determines the child and family of the child may benefit from prevention and intervention-related services.  Services may be provided either by OKDHS or other community resources or providers.

3) **Substantiated – Services recommended.**  A finding of Substantiated – Services recommended means a report is determined, by a child protective services worker, after an investigation, and based upon some credible evidence, to constitute child abuse or neglect that is of such a nature that OKDHS recommends prevention and intervention-related services for the parents or person(s) responsible for the child (PRFC(s)) and the child, but for which initial court intervention is not required.  Services may be provided by OKDHS or other community resources or providers.

4) **Substantiated – Court intervention recommended.**  A finding of Substantiated – Court intervention recommended means a report that is determined, by a child protective services worker, after an investigation and

based upon some credible evidence, to constitute child abuse or neglect that is of such a nature that OKDHS finds the child's health, safety, or welfare is threatened.[69]

For purpose of this review (including the reviews of OCA investigations and CPS assessments, below), Substantiated – Services recommended and Substantiated – Court intervention recommended are considered as one because this review focuses on children who are already in out-of-home care. Unsubstantiated – Services recommended will be referred to as "Unsubstantiated" and will, where relevant, be separated from Ruled Out because there is a significant difference in the definitions of the two. "Ruled Out" means that OKDHS determines that *no child abuse or neglect has occurred*. "Unsubstantiated" means that *there is insufficient evidence to fully determine whether child abuse or neglect has occurred.*

Making investigations accurate requires two things: 1) thorough investigations that gather all pertinent evidence that is reasonably available, and 2) using that evidence to draw the most reasonable conclusion in conformance with the established definitions. It is important to note that the standard of evidence required to Substantiate OKDHS CPS investigations is "some credible evidence." Laws establishing such low evidentiary burdens for CPS investigations do so to establish the most certain safety net for vulnerable victims.

Inaccurate Unsubstantiated and Ruled Out findings in CPS investigations of allegations of abuse/neglect of children in substitute care are dangerous for two reasons:

1) OKDHS will not act to protect the children who have allegedly been abused or neglected and the other children living in the home or facility now or in the future. Abusive and neglectful caregivers are likely to become more dangerous because they may feel that their actions have been condoned by the child welfare agency, or they may be emboldened by the agency's failure to detect their behavior.

2) OKDHS will not take steps to prevent children placed in the home from being subjected to the same or worse maltreatment. Most often, the appropriate action in these circumstances should be discontinued use of the home. In some cases, well-crafted and carefully monitored plans to correct the condition leading to maltreatment in foster or kinship care homes may be appropriate.

The reviewers examined investigative decision-making from two levels: 1) the investigation level and 2) the level of the individual child in OKDHS custody who is the alleged victim of child abuse or neglect. It is worthwhile to view CPS investigative decision-making from both perspectives because the first represents potentially dangerous foster and kinship homes that OKDHS does or does not identify, and the second represents the number of children who are protected, or not protected, by OKDHS decisions.

*a)      Decision-Making at the Investigation Level*

After conducting CPS investigations OKDHS found at least one child abuse/neglect allegation, involving at least one OKDHS ward, to be Substantiated in 16 (19.0%) of the 84 CPS investigations reviewed. No allegations concerning any of the involved children were found to be Substantiated in the remaining 68 (81.0%) investigations. Of the 84 investigations reviewed, 41 (48.8%) were found Unsubstantiated, and 27 (32.1%) were Ruled Out.



Figure IV-6

At the investigation level:

- Reviewers agreed with the OKDHS Substantiated findings.

- In 14 of the CPS investigations that were either Ruled Out or Unsubstantiated (16.7% of the CPS investigations sample), the reviewers found – based on the evidence gathered by the OKDHS investigator – that the finding should have been Substantiated. Applying the confidence interval (±6.9%) for this finding to the universe, OKDHS made the wrong finding in a minimum of 34 and as many as 81 of its 343 CPS investigations concerning children in its care.

- In an additional 13 CPS investigations (15.5% of the CPS investigations sample), the information gathered was insufficient to permit the reviewers – *or OKDHS* – to identify the correct finding. Reviewers made this determination only when there were additional investigative activities that would likely have yielded information sufficient to make a correct finding. Applying the confidence interval for this finding (±6.7%) to the universe, OKDHS made its investigative determination without having gathered vital *and available* information in at least 30 and as many as 76 of its 343 CPS investigations concerning children in its care.

Combining these two categories, of the 343 CPS investigations concerning children in agency custody in 2009, no fewer than 64 (18.6%) and as many as 157 (45.8%) resulted in flawed findings.



Figure IV-7

Figure IV-8 compares the OKDHS finding with the correct investigation level finding in CPS investigations. For purposes of this comparison, Ruled Out and Unsubstantiated are combined as "Unsubstantiated".



Figure IV-8

   *b)*  *Decision-Making at the Child Level*

The same analysis was completed at the child level. Of 158 children in OKDHS care involved in the CPS investigations that were reviewed:

- 29 (18.4%) children were found by OKDHS to have been abused or neglected by their caregivers.

- For 79 (50%) children, OKDHS found all allegations to be Unsubstantiated.

- For the remaining 50 (31.6%) children, all of the allegations were Ruled Out.



Figure IV-9

At the child level:

- Reviewers agreed with OKDHS's findings that there was credible evidence that 29 children had been abused or neglected.

- The reviewers found that for 26 children whose investigations were either Ruled Out or Unsubstantiated (16.5% of the 158 children in the CPS investigations sample), the correct finding was Substantiated. Applying the confidence interval (±5.6%) for this finding to the universe, OKDHS made the wrong finding for at least 70 and as many as 143 of the 645 OKDHS wards who were subjects of CPS investigations in 2009.

- For 24 children either Ruled Out or Unsubstantiated by OKDHS (15.2% of the 158 children in the CPS investigations sample), the information gathered was insufficient to permit the reviewers – *or OKDHS* – to identify the correct finding. Again, reviewers made this finding only when there were additional investigative activities that would likely have yielded

information sufficient to make a correct finding. Applying the confidence interval for this finding (±5.4%) to the universe, OKDHS made its investigative determination without having gathered vital *available* information for at least 63 and as many as 133 of alleged victims in its 2009 CPS investigations concerning children in its care.

Combining these two categories, of the 645 alleged victims in CPS investigations concerning children in OKDHS custody in 2009, no fewer than 133 (20.6%) and as many as 276 (42.8%) were affected by faulty findings.



Figure IV-10

Figure IV-11 compares the OKDHS finding with the correct child level finding in CPS investigations involving children in its care. For purposes of this comparison, Ruled Out and Unsubstantiated are combined.



Figure IV-11

A mother reported that her daughter (seven-year-old DW) had bruises all over her from a beating by her fictive kin caregiver. There had been a previous referral concerning DW's caregiver whipping her. The prior referral had been screened out, but there was a corrective action plan in place. The investigator verified that DW had marks on her neck and leg. DW consistently said that her caregiver had hit her and caused her to fall over a chair. The child was seen by a physician's assistant who said that the marks were consistent with DW's description of the incident. This was a reasonably thorough investigation. It should have been substantiated, but it was not. (Referral Number 1254957).

Clearly OKDHS's decision-making in its CPS investigations concerning children in the agency's care is dangerously unsound. Comparing the number of abused and neglected wards that OKDHS identified in its investigations (29 children) with the number that should have been identified (55 children) is alarming. Add to this number the 24 children who may have been maltreated but for whom it is not possible to make any reasonable determination because of faulty CPS investigations, and the number of children who were or may have been abused or neglected is nearly *three times* the number identified by OKDHS.



Figure IV-12

*c)*      *The Victims of Poorly Made Investigative Decisions*

This poor decision-making is all the more troubling because the children involved in the CPS investigations that should have been confirmed tended to be young and, therefore, especially vulnerable. Figure IV-13 illustrates the generally young age of the 26 children in the OKDHS CPS investigations reviewed who should have been identified as abuse/neglect victims but were not. Most of the victims whose referrals were inappropriately Unsubstantiated or Ruled Out were under the age of six.



Figure IV-13

36

Table IV-7 displays the type of harm to which the 50 children involved in inappropriately Unsubstantiated or Ruled Out investigations (those that should have been Substantiated and those for whom OKDHS gathered too little information to know) were, or may have been, subjected.

**Allegations For Wrongly Unconfirmed/Insufficient Information: Child Level**

| Category | % (N) | Type | % (N) |
|---|---|---|---|
| **Neglect** | 33.3% (22) | Concrete need | 18.2% (12) |
| | | Lack of supervision | 9.1% (6) |
| | | Medical neglect | 6.1% (4) |
| **Physical Abuse** | 16.7% (11) | Bruises/welts | 15.1% (10) |
| | | Failure to protect | 1.5 % (1) |
| **Sexual Abuse** | 15.1% (10) | Molestation | 1.5% (1) |
| | | Failure to protect | 13.6% (9) |
| **Other** | 34.8% (23) | Threat of harm | 22.7% (15) |
| | | Caregiver substance abuse | 9.1% (6) |
| | | Corporal punishment | 3.0% (2) |
| **Total** | **100% (66)** | | **100% (66)** |

Table IV-7

Children in inappropriately Unsubstantiated or Ruled Out investigations suffered, or may have suffered, serious forms of maltreatment. This is especially true considering their strong tendency to be very young.

> d)       *Conclusion: Are OKDHS Investigative Decisions Flawed?*

The quality of decision-making in OKDHS CPS investigations is extremely poor.

- OKDHS failed to identify child maltreatment in 14 (46.7%) of the 30 CPS investigations reviewed in which there was some credible evidence that children in the agency's care were victims of abuse and/or neglect.

- At the child level, this means that in the CPS investigations reviewed, OKDHS failed to identify 26 (47.3%) of the 55 OKDHS wards who were abused and/or neglected.

- Because investigations were not thorough or timely, OKDHS may have failed to identify abuse/neglect in an additional 13 (15%) CPS investigations reviewed in which decisions were made with inadequate information.

- At the child level, inadequate investigations may have resulted in the failure to identify an additional 24 abused and/or neglected children.

- Applying these findings to the universe of CPS investigations of allegations of maltreatment of OKDHS wards conducted in 2009:

  - Of the 343 CPS investigations concerning OKDHS wards conducted in 2009, no fewer than 64 (18.6%) and as many as 157 (45.8%) resulted in flawed findings.

  - Of the 645 alleged victims in CPS investigations concerning OKDHS wards conducted in 2009, no fewer than 133 (20.6%) and as many as 276 (42.8%) were subjected to faulty findings.

Even in the best case, an enormous proportion of OKDHS's CPS investigative decisions concerning its wards is seriously flawed.

### 4.    Were Adequate Protective Actions Taken During CPS Investigations?

An important aspect of a child welfare agency's ability to protect the children in its care is the adequacy of the agency's actions to protect its wards while a CPS investigation involving them is underway.

Both COA[70]  standards and CWLA guidelines[71] require that the safety of children in the home be assessed at an early in CPS investigations. When potential danger is identified, safety measures must be put in place. For example, children may be temporarily moved until it can be determined whether the home is safe. Of course, because OKDHS routinely delays the initiation of many of its CPS investigations involving the children in its care, it is impossible for the agency to assess the immediate safety of its wards.



Figure IV-14

As is shown in Figure IV-14, reviewers found that child protective actions were unnecessary in 13 (15.5%) of the CPS investigations reviewed. Reviewers determined that children were not adequately protected in 15 (17.9%), adequately protected in 47 (56.0%), and in nine (10.7%), reviewers were not able to make a determination. This means children in 24 investigations (28.6% of all investigations reviewed and 33.8% of those in which children needed protection) were, or may have been, left in dangerous situations because OKDHS did not implement an adequate protective plan while it investigated the children's caregivers.

By applying the relevant confidence interval (±8.3%) to all OKDHS CPS investigations in which agency wards were alleged victims in 2009 and needed protective action, it can be determined that in no fewer than 37 (13%) and in as many as 86 (30%) CPS investigations, children may not have been afforded adequate protection during the investigations.

When a child welfare agency determines that there is reasonable cause to believe that children in its custody have been abused or neglected by their caregivers, it should be obvious that the children's safety may be in jeopardy. OKDHS's failure to respond to such safety threats puts children in danger and violates OKDHS policy[72] and CWLA guidelines.[73]

## D.    Conclusion: OKDHS CPS Investigations Concerning the Children in Its Care

**OKDHS CPS investigations into allegations that children in the agency's custody are abused and neglected are not timely in any important sense.**

- OKDHS takes too long to see many of the children who have allegedly been abused or neglected. OKDHS investigators fail to make in-person contact with approximately one in ten alleged victims within a reasonable time after the referral. This leaves children in potentially dangerous situations and renders belatedly gathered evidence less credible at best and unavailable at worst.

- Once begun, far too many investigations include lengthy gaps. One-quarter of OKDHS CPS investigations include gaps of 30 days or more during which no investigative activity takes place. This leaves hundreds of foster children at risk and in uncertain situations.

- Far too many investigations take far too long to complete. *On average* OKDHS CPS investigations take more than the 30 days permitted by the agency's own regulations. These strung-out investigations leave children at risk, reduce the amount and the quality of available evidence, leave caregivers in uncertain situations, and negatively affect hundreds of children in OKDHS care.

**OKDHS CPS investigations of allegations that children in the agency's custody have been abused and neglected by their substitute caregivers are not thorough.**

- OKDHS does not always check the backgrounds of its substitute care providers after they have been accused of abusing or neglecting the children the agency has entrusted them with. The agency does, for the most part, check accused caregivers for prior CPS history.

Unfortunately, when these checks are done, most (60%) are found to have been the subjects of previous CPS referrals. A disturbing proportion (6.4%) of the caregivers checked *have been previously found abusive or neglectful.* OKDHS almost never checks the criminal backgrounds of accused caregivers.

- OKDHS does not routinely observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment. Almost one of four alleged child victims for whom such observation is necessary is never adequately observed. Failure to complete this obviously important investigative activity affects scores of children, and contributes strongly to the large proportion of uncertain investigative determinations.

- OKDHS *frequently* fails to make contact with sources of information *that is necessary to making an accurate investigative finding.* Twenty-two percent of vital investigative contacts are never made. This failure assures inaccurate and uncertain investigative findings and contributes to the failure to identify and protect hundreds of abused and neglected foster children.

These failures are in violation of relevant CWLA and COA standards, in some instances they violate OKDHS's own policy, and they place agency functioning below reasonable standards for protecting children.

**The quality of decision-making in OKDHS CPS investigations is extremely poor.**

- OKDHS fails to identify child maltreatment in nearly half (47%) of its investigations in which credible evidence was actually found that children in the agency's care were victims of abuse and/or neglect.

- Because investigations are not thorough or timely, OKDHS may fail to identify abuse/neglect in 15% of its Unsubstantiated CPS investigations because decisions are made with inadequate information.

These failures prevent OKDHS from taking action to prevent future maltreatment of children it places in abusive and neglectful homes.

- At the child level, OKDHS fails to identify nearly half (47%) of the OKDHS wards who were actually abused and or neglected.

- Because investigations are not thorough or timely, OKDHS may fail to identify the abuse/neglect of 15% of its wards who are alleged victims in Unsubstantiated CPS investigations because decisions are made with inadequate information.

These failures prevent OKDHS from identifying and taking action to protect children in its care after they have become victims of maltreatment in their foster and kinship care homes.

- Applying confidence intervals for these findings to all children in OKDHS care who were subjects of CPS investigations in 2009:

- Of the 645 alleged victims in CPS investigations concerning children in OKDHS custody in 2009, no fewer than 133 (20.6%) and as many as 276 (42.8%) children were subjected to faulty findings.

- Of the 343 CPS investigations concerning children in agency custody in 2009, no fewer than 64 (18.6%) and as many as 157 (45.8%) resulted in flawed findings.

Even in the best case, an enormous proportion of OKDHS's CPS investigative decisions concerning its wards is seriously flawed. The magnitude of this failure places OKDHS practice outside any reasonable child welfare standard.

**Overall, OKDHS does not effectively act to protect the children in its care who are subjects of CPS investigations.**

- A wholly unacceptable proportion of children (18%) who need protection during investigations do not get it. At minimum, this failure affects scores of children.

**Subjecting children in state custody to risk of child abuse and neglect runs counter to the primary purpose of child welfare service. Because of the many failures of OKDHS's CPS investigations, foster care in Oklahoma is a dangerous place to be.**

## V.  OCA INVESTIGATION REVIEW

In Oklahoma, investigations of alleged abuse/neglect of OKDHS wards in congregate care facilities (e.g., residential treatment centers, group homes and shelters) are not conducted by child welfare staff. Instead, these investigations are conducted by the Office of Client Advocacy. OCA is generally responsible for addressing complaints, grievances, and allegations pertaining to a broad array of OKDHS services.[74]

OCA conducts maltreatment investigations involving children in group care according to its own separate set of procedures (the Oklahoma Administrative Code § 340, Chapter 2, Subchapter 3). These procedures set somewhat different – generally less rigorous – requirements for OCA investigations as compared with the already lax requirements for OKDHS CPS investigations. Most notably, requirements for OCA investigations are more relaxed with regard to:

- requirements for initiating investigations in a timely way;

- the sources of information that must be contacted during OCA investigations;

- the evidentiary standard for substantiation – the "greater weight of the evidence," a standard which provides less protection for children than the "some credible evidence" standard required in CPS investigations; and

- a provision that permits OCA to delegate child maltreatment investigations to the very facilities in which the alleged abuse/neglect occurred.

These and other differences establish what amounts to a two-tiered system for investigating the alleged child abuse and neglect of children in OKDHS care. (See Section II for greater detail about this.)

Despite these differences, for the purpose of this review, OCA investigations will be examined according to the same standards as CPS investigations and CPS assessments. From the child's perspective, maltreatment is maltreatment, whether it occurs in a foster home or a residential treatment center.

## A.    <u>Description of the OCA Investigation Review</u>

OKDHS identified 219 unduplicated 2009 OCA investigations of allegations that children in the care and custody of OKDHS were abused and/or neglected. From this universe, a random sample of 41 OCA investigations (18.7%) was drawn. These 41 investigations involved 70 wards of OKDHS and 83 specific maltreatment allegations.[75]

Of the 41 investigations, 38 were investigated by OCA. Three (involving 11 children and 11 allegations) were handled as Caretaker Conduct Reviews (CCRs) by the agencies in which the alleged maltreatment occurred for investigation. Since OCA has approval responsibility for the CCR process, these internal investigations were considered OCA investigations for the purpose of this review.

When applying confidence intervals for important child level findings, I assumed that the number of alleged child victims per OCA investigation in the universe is the same as the number in the sample (1.71). Based on that assumption, I concluded that during 2009, approximately 374 children in the care of OKDHS were alleged victims in OCA investigations. Specific confidence intervals are identified in the relevant parts of the review.

Because the OCA investigation review was conducted by two reviewers, it was important to test the degree to which the reviewers agreed about key questions in the review. To this end six OCA investigations were reviewed by both reviewers to measure inter-rater reliability. Overall, inter-rater reliability was found to be excellent. The results of specific inter-rater reliability tests are included in Appendix A.

**B.**     **Descriptive Information About the OCA Investigations**

For seven of the 70 alleged victims, OCA documentation did not provide information about the child's age. The 63 children for whom this information was available tended to be much older than the children in the CPS investigation, CPS assessment, and screen-out samples.

**Ages of Alleged Victims in OCA Investigations**

| Age | % (N) |
|------|--------|
| 0-2 | 1.4% (1) |
| 3-5 | 1.4% (1) |
| 6-8 | 4.3% (3) |
| 9-11 | 10.0% (7) |
| 12-14 | 28.6% (20) |
| 15+ | 44.3% (31) |
| Not Provided | 10.0% (7) |
| **Total** | **100.0% (70)** |

Table V-1

One should not assume that these older children are necessarily less vulnerable than younger children would be. Many children in the congregate care settings in which OCA conducts investigations cannot succeed in family settings due to their special needs. These special needs make them more vulnerable than a non-special needs child of the same age.

Most of the alleged victims in the OCA investigations reviewed were placed in residential treatment centers or group homes.

**Type of Placement for OCA Investigations**

| Placement type | % (N) |
|-----------------|--------|
| Residential Treatment Facility | 48.8% (20) |
| Group Home | 36.6% (15) |
| Shelter | 9.8% (4) |
| Other | 4.9% (2) |
| **Total** | **100.0% (41)** |

Table V-2

As with CPS investigations, most (82.9%) reporters of allegations investigated by OCA were professional sources. What distinguishes the sources of reports handled by OCA is the very large proportion made by staff from the facilities in which the maltreatment allegedly took place. The majority (65.9%) of reporters were staff of the facilities.

**Sources of Reports for OCA Investigations**

| Source | OCA-invest % (N) |
|---|---|
| Facility staff | 65.9% (27) |
| Court personnel | 4.9% (2) |
| OKDHS caseworker | 2.4% (1) |
| Contract agency caseworker | 2.4% (1) |
| Law enforcement | 2.4% (1) |
| Health care provider | 2.4% (1) |
| Professional counselor/social worker | 2.4% (1) |
| Non-custodial parent | 2.4% (1) |
| Alleged victim | 2.4% (1) |
| Other | 4.9% (2) |
| Insufficient information | 7.3% (3) |
| **Total** | **100.0% (41)** |

Table V-3

It is notable how rarely children's caseworkers, whether OKDHS or contracted, were reporting sources (only 4.9% of reporters). This is very different from reporting tendencies in the other three reviews. It suggests that caseworkers are less engaged with children who are placed in congregate care settings.

**Allegations Investigated During OCA Investigations**

| Category | % (N) | Specific Type | % (N) |
|---|---|---|---|
| **Neglect** | 49.4% (41) | Concrete need | 1.2% (1) |
| | | Lack of supervision | 44.6% (37) |
| | | Medical neglect | 3.6% (3) |
| **Physical Abuse** | 12.0% (10) | Bruises/welts | 3.6% (3) |
| | | Lacerations/cuts | 3.6% (3) |
| | | Fractures | 1.2% (1) |
| | | Failure to protect | 3.6% (3) |
| **Sexual Abuse** | 20.5% (17) | Intercourse | 1.2% (1) |
| | | Molestation | 7.2% (6) |
| | | Exploitation | 2.4% (2) |
| | | Failure to protect | 9.6% (8) |
| **Other** | 18.1% (15) | Poor parenting | 1.2% (1) |
| | | Threat of harm | 4.8% (4) |
| | | Corporal punishment | 1.2% (1) |
| | | Mental injury | 2.4% (2) |
| | | Other abuse | 8.4% (7) |
| **Total** | 100.0% (83) | | 100.0% (83) |

Table V-4

The allegations investigated by OCA also tend to be different in nature from those investigated or assessed by CPS. By far, the most prevalent allegation was inadequate supervision (44.6%). Otherwise, allegations are spread fairly evenly among the other categories, with sexual abuse making up a slightly larger proportion than in CPS investigations or assessments. Of the 83 allegations, 77 (92.8%) were alleged in the referral and six (7.2%) came to light during the investigation.

## C.    Evaluation of the OCA Investigation Process and Related Decision-Making

As with CPS investigations and assessments, it is important that OCA investigations be conducted in a timely way, that they are thorough, that correct decisions are made as to whether or not children in the agency's care have been maltreated, and that reasonable actions are taken to assure the safety of agency wards both during and following investigation. The evaluation of OKDHS's OCA investigations, therefore, focuses on the same four questions that are addressed in the CPS investigation and assessment reviews:

- Are OCA investigations conducted in a reasonably timely manner?

- Are OCA investigations thorough?

- Is OCA investigative decision-making reasonable?

- Were reasonable protective actions taken during the OCA investigation?

### 1.      Were OCA Investigations Conducted in a Timely Manner?

Timely commencement and efficient and timely completion of child abuse/neglect investigations are essential if children placed in institutional settings are to be effectively protected.

#### a)      *Delayed Initial Contact with Alleged Victims*

As with CPS investigations, delayed initiation of OCA investigations can leave children in potentially dangerous situations. In addition, delayed response reduces the availability of reliable evidence as memories fade. From this point of view, OCA investigations are no different than CPS investigations.

The priority coding that regulates initiation time in CPS investigations and assessments is not applicable to OCA investigations. The amount of time within which alleged victims must be seen is determined only by the "five-day rule." The "five-day rule" does not seem to appear in any policy documents, but is standard OCA practice. Every OCA investigative file reviewed included an e-mail notification, addressed to the assigned OCA investigator and sent on, or very near, the referral date, that identified whether or not the investigation was a priority. The language in nearly all of these notifications is: "The five-day rule does not apply. This is not a priority case because OCA has not been informed that an accused caretaker has been reassigned

or suspended pending our investigation." In addition to the fact that taking five days to initiate a child protection investigation violates any reasonable child protection standard, it is *very* disturbing that the only sense of urgency to see allegedly abused or neglected children seems to derive from concern for the alleged perpetrator and not concern for the safety of the child.

In any event, OCA investigations are rarely initiated within a reasonable period of time. Reviewers found that, in the OCA investigations reviewed, only 17 (24.3%) of the 70 alleged victims were seen by the OCA investigator within a reasonable period, taking into account the child safety threats suggested by the referral and considering the COA requirement that all children assessed as being in imminent danger be seen immediately and that all others be seen within 72 hours from the referral.[76] Eight alleged victims (11.4%), were never seen at all, and OCA took an unreasonable amount of time to see 39 (55.7%) other alleged victims (for two of these, the exact number of days could not be determined). For six children (8.6%), it could not be determined whether they were seen in a reasonable time because OCA's failure to gather important information made it impossible for the reviewers to make an evaluation.



Figure V-1

By applying the confidence interval (±10.5%), it can be determined that OCA failed to make contact within a reasonable time with at least 169 and as many as 248 of the 374 OKDHS wards who were the alleged victims OCA investigations in 2009.

In the investigations reviewed, OCA saw alleged victims in a reasonable time in less than a quarter of its investigations. Unfortunately, the high proportion of OCA investigations in which initiation was delayed is only part of the picture. In a large proportion of the OCA investigations reviewed, the delay to initial contact with the alleged child victims was not just unreasonable, it was *very* unreasonable. Figure V-2 plots the number of days it took OCA to see the 62 alleged victims for whom such information was available.



*excludes children for whom exact number of days could not be determined

Figure V-2

For OKDHS's CPS Priority 2 investigations, the maximum number of days within which alleged victims must be contacted is (an unreasonably long) 15 days. OCA investigators achieved this in only 29% of OCA investigations. In one case the child was not seen for *131 days*. And, as noted, eight children were never seen.

> Four-year-old LB and six-year-old MB told their mother that, while they were placed in a shelter, a staff person took nude pornographic pictures of them. The interviews with the girls were conducted a month after the referral. LB said that she did not like the alleged perpetrator, but would not say why. MB alluded to the alleged perpetrator taking pictures, but was not specific. The interviews with the alleged victims were brief, superficial, and were not always in age-appropriate language. The outcry witness (the girls' mother) was never contacted. The police who investigated were never contacted. No other children at the shelter (past or present) were ever contacted. OCA found the allegation Ruled Out. Because of the delay in interviewing the children, the lack of a competent forensic interview, and because the investigation was not thorough, the correct finding cannot be determined. (Referral Number 22856).

These delays not only violate CWLA[77] and COA standards,[78] they place OKDHS performance far below *any* reasonable child protection standard.

b)      *Duration of OCA Investigations*

OKDHS/OCA procedure requires that investigations be completed within 60 days of the agency's receipt of the referral. In exceptional situations, this timeframe can be extended. These timeframes are not reasonable and do not comply with COA standards.[79]

The duration of each OCA investigation reviewed was measured by counting the number of days between the referral and either the last investigative contact, the OCA worker's signature certifying completion, or the OCA supervisor's signature approving the investigation – whichever occurred first. The average length of OCA investigations was 34 days. The median was *55 days*. Twenty of the 41 OCA investigations (48.8%) exceeded 30 days. Nine investigations (22%) exceeded 60 days, violating even OCA's permissive regulation. One investigation was not completed for *136 days*. Figure V-3 plots the duration of the investigations.



Figure V-3

Clearly, OCA takes too long to complete many of its investigations concerning OKDHS's wards. No doubt, this is due in part to the lengthy delays in commencing them. These delays violate COA standards that call for CPS interventions to be conducted in a "timely and efficient manner."[80] In addition to being inefficient, this failure can leave children and caregivers in limbo and children in danger.

c)      *Conclusion: Are OCA Investigations Timely?*

OCA's investigations are not timely in any important sense.

• OCA delays seeing many children who have allegedly been abused or neglected for appalling periods of time.

- Far too many OCA investigations take far too long to complete.

These failures are in violation of relevant CWLA and COA standards, in many instances they violate OKDHS's own policy, and they place agency functioning below any reasonable standards for protecting children.

### 2.     Were OCA Investigations Thorough?

As in the other reviews, an evaluation of whether OCA investigations are thorough depends on whether important investigative activities are conducted and, if so, whether they are conducted properly. There is important overlap between an evaluation of whether OCA investigations are timely and an evaluation of whether they are thorough. When there are long delays in observing or interviewing alleged victims, information is lost; both marks and memories fade. As has been shown, OCA is extremely slow to begin its investigations and takes far too long to complete them. As a result, it is almost impossible for OCA investigations to be thorough.

### a)     CPS Background Checks

One important set of investigative activities is background checks. CWLA standards for investigations[81] require checks of both 1) agency records of prior history of alleged child abuse and neglect, and 2) law enforcement records to identify any law enforcement history that may be pertinent to child safety. Quite simply, OCA does not conduct background checks. For the 41 OCA investigations reviewed, there is evidence that CPS history checks were completed in *only one* instance.  This nearly complete failure to check CPS histories of alleged perpetrators creates the possibility that a staff person at a facility could amass a history of being accused of abusing and neglecting children that would not be considered in subsequent investigations.



Figure V-4

*b)      Law Enforcement Background Checks*

Similarly, there was no evidence that the criminal background of the alleged perpetrator was checked in even one of the OCA investigations. This omission creates the potential for staff of group homes, residential treatment centers, and shelters to have undetected criminal histories that are 1) themselves suggestive of danger to children and/or 2) relevant to the OCA investigation. Even though such checks are presumably made upon employment, there is no mechanism to discover whether child care staff have engaged in criminal behavior post-hire. This failure violates CWLA standards.[82]

*c)      Observation of Relevant Parts of Alleged Victims' Bodies*

As noted above, when there are allegations that a child has injuries, marks or other physical signs of abuse or neglect on his/her body, it is important that the relevant parts of the child's body be observed by the OCA investigator or by a medical professional in a timely manner. Such observation is standard CPS practice in any state.

Of the 70 children in the OCA investigations reviewed, 12 (17.1%) were the alleged victims of allegations that required observation of some portion of their bodies. For four of these children (33.3% of the children who required observation), OCA failed to make an observation that may have corroborated or refuted allegations being investigated. In one case, reviewers could not determine whether the children had been adequately observed.



Figure V-5

Although the number of relevant investigations reviewed was small, only two-thirds of the children for whom allegations warranted observation were, in fact, observed.

d)      *Necessary Investigative Contacts*

Among the most important elements of any child protection investigation are interviews with subjects other than the alleged victims. OCA procedure provides almost no guidance about what investigative contacts should be made. It simply stipulates that "[t]he investigator interviews or attempts to interview persons known or identified to have information about the referral."[83]

Although, as a rule, more investigative contacts yield more information and a better basis for decision-making, not every sort of contact is relevant to every investigation (and, of course, it is almost always possible to identify one more contact that might have been useful). For this reason, the reviewers first identified the categories of contacts that were *necessary* to make an investigative finding in each of the OCA investigations in the sample. It was then determined for each category of necessary contacts in each case whether the investigator (i) made adequate contact with all individuals in that category ("All Contacted"), (ii) contacted only some individuals *or* contacted all individuals in a category, but did so inadequately ("Some Contacted/Inadequate"), or (iii) made no contact with any members of a category ("None Contacted").

**Investigative Interviews**

| Vital Source | Relevant N | All Contacted | Some Contacted / Inadequate | None Contacted |
|---|---|---|---|---|
| Alleged perpetrator | 42 | 85.7% (36) | 4.8% (2) | 9.5% (4) |
| Reporter | 34 | 70.6% (24) | 0 | 29.4% (10) |
| Identified witnesses | 14 | 78.6% (11) | 21.4% (3) | 0 |
| Additional child(ren) in facility | 31 | 9.7% (3) | 19.4% (6) | 71.0% (22) |
| Others in facility | 29 | 34.5% (10) | 37.9% (11) | 27.6% (8) |
| Collateral source | 2 | 50.0% (1) | 50.0% (1) | 0 |
| Other non-professional | 2 | 50.0% (1) | 0 | 50.0% (1) |
| Home or facility | 31 | 83.9% (26) | 9.7% (3) | 6.5% (2) |
| Alleged victim's OKDHS caseworker | 37 | 13.5% (5) | 2.7% (1) | 83.8% (31) |
| OKDHS caseworker for other child(ren) present/involved | 2 | 0 | 0 | 100% (2) |
| Private agency of alleged victim | 2 | 0 | 0 | 100% (2) |
| Police | 12 | 58.3% (7) | 8.3% (1) | 33.3% (4) |
| Mental health professional | 9 | 22.2% (2) | 33.3% (3) | 44.4% (4) |
| Medical professional | 11 | 45.5% (5) | 18.2% (2) | 36.4% (4) |
| Responsible licensing staff | 39 | 7.7% (3) | 0 | 92.3% (36) |
| Other professional | 3 | 66.7% (2) | 0 | 33.3% (1) |
| **Total** | **300** | **45.3% (136)** | **11.0% (33)** | **43.7% (131)** |

Table V-5

Taken together, the 41 OCA investigations reviewed required contact with *a minimum* of 300 sources of information in 16 different categories (aside from the alleged victim(s)). Of these, OCA investigators actually obtained adequate information from 136 sources (45.3%), made insufficient contact with 33 sources (11.0%), and made no contact with 131 vital sources of information (43.7%).



Figure V-6

In the CPS investigations and assessments reviewed, OKDHS made adequate contact with only about three-quarters of the sources of information vital to making a reasonable finding – a very poor showing. As Figure V-6 illustrates, OCA's performance was far worse. OCA failed to gather adequate information from most necessary investigative contacts (54.7%), and failed to make *any* contact with an astonishing 43.7%.

As shocking as this overall picture is, several contact categories deserve special note.

- Of 31 investigations in which other children (most of whom were OKDHS wards) placed in the facility should have been interviewed, they were sufficiently interviewed in only three cases (9.7%). Other children placed in institutional settings are necessary contacts because 1) they may have direct or "grapevine" information about the reported incident, 2) they can provide information about patterns of practice in the facility (e.g., disciplinary practices and the level of supervision), 3) they may have information about the behavior of specific staff members, and 4) they may have been victimized themselves. In order to assure untainted information, it is not only important to interview children who are placed in the facility at the time of the referral, but it is also good practice to interview children who were previously in the residential treatment center or group home.

- For similar reasons, it is important to interview staff members other than those who were directly involved in the reported incident. OCA did so fully in only 10 of the 29 (34.5%) investigations reviewed in which such interviews were warranted.

- Of the 37 investigations reviewed in which interviews with the alleged victim(s)' caseworker were important, such interviews took place in only five (13.5%) instances. Caseworkers generally have valuable information about the alleged victims, their credibility, and may have information communicated to them by the children for whom they are responsible.

- Similarly, there is evidence that OCA investigators made contact with the staff responsible for licensing the facilities under their investigation in just three (7.7%) of the 39 investigations reviewed in which this would have been important in order to obtain information about any history of previous complaints or issues concerning the institution and the allegedly abusive/neglectful staff member(s). Such contacts would have likely yielded information useful to the investigation.

- In six (54.5%) of the 11 OCA investigations reviewed in which information from medical professionals was important to the investigative determination, OCA investigators made inadequate contact with the relevant health care providers. Medical information is always extremely important and is often *the most* important information gathered in child welfare investigations. OCA's failure to reliably collect medical information is inexplicable.

- Of the 12 OCA investigations reviewed in which the police were involved and should have been interviewed, OCA failed to adequately gather law enforcement information in five (41.7%). The value of police information is obvious.

  *e)      Conclusion: Are OCA Investigations Thorough?*

OCA's investigations of allegations that children in the agency's custody have been abused or neglected by their substitute caregivers are far from thorough.

- Because of lengthy delays in making contact with alleged victims, the amount and value of available evidence is substantially diminished.

- OCA almost never checks the CPS or law enforcement backgrounds of staff in child care institutions after they have been accused of abusing or neglecting the children the agency has entrusted them with.

- OCA does not routinely observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment.

- OCA *routinely* fails to make contact with sources likely to have information *that is necessary to make an accurate investigative finding.*

These failures are in violation of relevant CWLA and COA standards, in some instances they violate OKDHS's own policy, and they place OCA investigations below reasonable standards for child protection investigation.

Ten-year-old EB alleged that while in a short-term residential treatment center, 13-year-old DV anally raped him during the daytime in their room. Shortly after the alleged incident, EB was interviewed by staff from the facility who first had him make a written statement and then got him to recant. The police were notified two days after the outcry and the interview by facility staff. EB gave the police an account that was consistent with his original, very specific, account and with his written statement. The police curtailed their investigation because of the interviews conducted by staff at the facility. EB also gave a credible statement at a forensic interview that was consistent with his other statements.

Facility staff claimed to have been watching EB and DV at the time of the incident, but this was not thoroughly explored. The investigator never spoke with the doctor who examined EB, EB's therapist, or EB's caseworker (even though the caseworker appears to have taken EB to the hospital), all of whom were important sources of information. This is an incomplete investigation which led to an uncertain result. While the primary focus of the investigation was on the supervision of the children, it was important to know whether DV had actually raped EB, in order to protect other children placed with DV and to provide EB with necessary services. (Referral Number 22353).

### 3.    Were OCA Investigative Decisions Correct?

As with CPS investigations and assessments, in OCA investigations, findings are made as to whether children in OKDHS care have been abused or neglected by their caregivers. The potential findings available to OCA are the same as for CPS investigations: Substantiated (as in the other reviews, Substantiated – Court intervention recommended and Substantiated – Services recommended are combined for this review), Unsubstantiated, and Ruled Out. (See Section IV.C.3 for definitions of the potential findings). Although the evidentiary burden for substantiation required by state statute is "some credible evidence" that children have been abused or neglected, OCA policy sets a higher "more likely than not" or preponderance of the evidence standard that is less protective of children.

Inaccurate Unsubstantiated or Ruled Out findings in OCA investigations carry with them the same potential to leave or place children in danger as do inaccurate determinations in CPS investigations:

1)   OKDHS will not act to protect the children who have allegedly been abused or neglected or the other children living in the facility now or in the future. Abusive and neglectful facility staff members are likely to become more dangerous because they may feel that their actions have been condoned by the child welfare agency, or they may be emboldened by the agency's failure to detect their behavior.

2)   The agency will not take steps to correct conditions in the facility (e.g., terminate abusive or neglectful child care staff) and OKDHS wards will be subjected to the likelihood of continued or worse maltreatment.

As in the CPS investigation review, OCA investigative decision-making is examined from two levels: 1) the investigation level and 2) the level of the individual child in OKDHS custody who is the alleged victim of child abuse or neglect. It is worthwhile to view OCA investigative decision-making from both points of view because the first concerns potentially dangerous group homes, shelters and residential treatment centers that OKDHS does, or does not, identify, and the second concerns the number of children who are protected, or not protected, by OCA decisions.

        *a)*     *Decision-Making at the Investigation Level*

At the investigation level, of the 41 OCA investigations reviewed:

- In 11 investigations (26.8%) , OCA confirmed that at least one child was the victim of at least one abuse/neglect allegation.

- OCA Ruled Out all allegations involving all of the children in 29 other investigations (70.7%). OCA found all allegations Unsubstantiated in one investigation (2.4%).



Figure V-7

Somewhat surprisingly, given the higher standard of evidence called for by OCA policy, OCA investigations were more likely to be Substantiated than were CPS investigations or assessments.

At the investigation level:

- Reviewers agreed with OCA Substantiated findings.

- In two OCA investigations reviewed that were either Ruled Out or Unsubstantiated (4.9% of the sample), reviewers found – based on the evidence gathered by the OKDHS investigator – that the finding should have been Substantiated. Applying the confidence interval (±5.4%) to the universe of 219 OCA investigations conducted in 2009 involving OKDHS wards, it can be determined that no fewer than two and as many as 24 Unsubstantiated OCA investigations should have been Substantiated.

- In an additional 11 OCA investigations reviewed that were either Ruled Out or Unsubstantiated (26.8% of the sample), the information gathered was insufficient to permit the reviewers – *or OKDHS* – to identify the correct finding. Reviewers made this determination only when there were additional investigative activities that would likely have yielded information sufficient to make a reasonable finding. Applying the confidence interval (±12.3%) to the universe of 2009 OCA investigations, it can be determined that in no fewer than 32 (14.6%) and in as many as 86 (39.3%) of the 219 OCA investigations, OCA failed to gather sufficient information to make a reasonable finding.

Combining these two categories, of the 219 OCA investigations concerning children in agency custody in 2009, no fewer than 34 and as many as 110 investigations resulted in flawed findings.



Figure V-8

Considering the delays in commencing OCA investigations and their superficial nature, it is not surprising that in 37% of the OCA investigations reviewed, the information gathered was insufficient to make a reasonable finding.

Twelve-year-old RA was pulled ("escorted") from his chair by a group home child welfare worker, allegedly resulting in a fracture to the child's elbow. The child initially said that his arm was injured when the staff person was pulling him from his chair after the child became angry and walked off wanting to be alone. Then he said he fell outside. Then he said his arm was injured when he jerked his arm away from the staff person. These changes in his story suggest that the child may have been trying to please the group home staff. Witnesses corroborate the story about the staff person trying to pull the child from the chair, but it is not possible to determine how the fracture occurred. The investigation was not begun for three weeks. There was no contact with any physician to determine the plausibility of the various stories. It is impossible to determine the correct finding. (Referral Number 23175).

Figure V-9 compares the OCA finding with the correct investigation level finding. For purposes of this comparison, Ruled Out and Unsubstantiated are combined as "Unsubstantiated."



Figure V-9

*b)   Decision-Making at the Child Level*

The same analysis was done at the child level. Of the 70 children in OKDHS care who were involved in the OCA investigations reviewed, OCA determined as follows:

- 30 children (42.9%) were found to have been abused or neglected by their caregivers.

- For one child (1.4%), all allegations were found to be Unsubstantiated.

- For the remaining 39 children (55.7%), all allegations were Ruled Out.



Figure V-10

Again, children in OCA investigations were more likely to be found to have been abused or neglected than in CPS investigations or assessments.

At the child level:

- Reviewers agreed with OCA's findings substantiating that 30 children had been abused or neglected.

- For two children whose OCA investigations were either Ruled Out or Unsubstantiated (2.9% of the children in the OCA investigations sample), reviewers found that the correct finding was Substantiated. Applying the confidence interval (±3.25%) to the universe of 374 alleged child victims involved in 2009 OCA investigations, it can be determined that for no fewer than two and as many as 24 (6.4%) of the 374 alleged victims, OCA Unsubstantiated allegations should have been Substantiated.

- For 16 additional children whose OCA investigations were either Ruled Out or Unsubstantiated (22.9% of the children in the OCA investigations sample), reviewers found that the information gathered was insufficient to permit the reviewers – or OCA – to identify the correct finding. Again, reviewers made this finding only when there were additional investigative activities that would be likely to yield information sufficient to make a reasonable finding. Applying the confidence interval (±8.9%) to the universe of alleged child victims involved in 2009 OCA investigations, it can be determined that for no fewer than 52 (13.9%) and as many as 119 (31.8%) of the 374 alleged victims, OCA failed to gather sufficient information to make a correct finding.

Combining these two categories, of the 374 alleged victims in OCA investigations concerning children in agency custody in 2009, no fewer than 54 (14.4%) and as many as 143 (38.2%) were affected by findings that were not sound.



Figure V-11

Figure V-12 compares the OCA finding with the correct child level finding in OCA investigations involving children in its care. For purposes of this comparison, Ruled Out and Unsubstantiated are combined as "Unsubstantiated."



Figure V-12

c)      *Conclusion: Are OCA Investigative Decisions Flawed?*

OKDHS OCA investigators appear to be more prone to substantiate their investigations than are OKDHS CPS investigators. This willingness to Substantiate affords some level of protection to

the OKDHS wards who are victimized. However, decision-making in OCA investigations is frequently rendered unreliable by OCA's failure to gather the information necessary to make correct decisions. Because of this failure:

- In 7% of the Unsubstantiated OCA investigations reviewed – based on the evidence gathered by the OKDHS investigator – the finding should have been Substantiated.  This means that in the universe, no fewer than two and as many as 24 Unsubstantiated OCA investigations should have been Substantiated.

- At the child level, no fewer than two and as many as 24 children for whom OCA Unsubstantiated all allegations should have been Substantiated.

- In an additional 37% of Unsubstantiated OCA investigations, the information gathered was insufficient to identify the correct finding. In no fewer than 32 and as many as 86 of the universe of 219 OCA investigations concerning OKDHS wards conducted in 2009, OCA failed to gather sufficient information to make a correct finding.

- At the child level, for no fewer than 52 and as many as 119 children, OCA failed to gather sufficient information to make a correct finding.

Combining these two categories, of the 374 alleged victims in OCA investigations concerning children in agency custody in 2009, no fewer than 54 (14.4%), and as many as 143 (38.2%), children were affected by flawed findings.

Seven-month-old MC was admitted to a shelter with a broken arm which was wrapped in an Ace bandage. The bandage came loose and wrapped tightly around MC's neck long enough for her neck to be "severely chaffed & bright red" from rubbing against the bandage. No one noticed that the bandage was wrapped around the baby's neck.

OCA interviewed the child care workers who were responsible for supervising MC. Three weeks after the referral, the overnight child care worker was interviewed by phone.  She claimed that she had changed MC's diaper at about 7:00 or 7:30 am at shift change and that the bandage was in place. Two weeks after the referral, OCA interviewed the child care worker who took over supervision of MC at 7:00 am and who discovered the bandage wrapped around her neck. She said she that did not believe that the baby had been changed as described by the overnight worker because the child seemed dirty. A nurse apparently looked at the child's neck but not until two days after the incident. Since it took OCA nine days to see the baby, no marks were observed. The memory of the witnesses (especially the overnight child care worker as to exactly what happened almost a month previously) cannot be relied upon. OCA did not find neglect. Nevertheless, the fact that the child was placed in such a dangerous situation constitutes neglect. (Referral Number 21637).

### 4.      Were Adequate Protective Actions Taken During OCA Investigations?

As with CPS investigations and assessments, it important that reasonable actions be taken to protect children while OCA investigations involving OKDHS wards are underway. Of course, because of OCA's practice of delaying the initiation of its investigations, often for weeks or even months, any timely action taken to protect OKDHS wards is usually taken by the facilities themselves. In practice, it is disturbing that when a facility takes no action to protect children (i.e., does not reassign or suspend allegedly abusive or neglectful staff members), the investigation is given a low priority pursuant to OCA's "five-day rule," notwithstanding the fact that children may be in danger.

Reviewers found that protective actions were unnecessary in 14 of the OCA investigations reviewed. Of the 27 investigations identified by reviewers as warranting protective measures, reviewers determined that children were adequately protected in seven (25.9%). Children were not adequately protected in 11 (40.7%) investigations, and in nine investigations (33.3%), reviewers were not able to make any determination whether any protective action had been taken.



Figure V-13

Figure V-13 provides information regarding the 27 OCA investigations reviewed that warranted action by OCA to protect the alleged victims. It is alarming that children were adequately protected during only about one-quarter of the OCA investigations in which protective actions were warranted. This violates OKDHS policy[84] and CWLA guidelines.[85]

### D.      Conclusion: OKDHS OCA Investigations Concerning the Children in Its Care

**OCA's investigations are anything but timely.**

- OCA delays seeing many of the children who have allegedly been abused or neglected for *appalling* periods of time. Contact is made with alleged victims in a reasonable time in approximately a quarter of OCA investigations.  For approximately one in three alleged victims, OCA takes a month or more to make contact, if it ever makes contact.  These delays, and OCA's failures to make in-person contact with alleged victims, are extremely dangerous, not only to the hundreds of alleged victims affected, but to all children living in the facilities investigated by OCA.

- OCA investigations, in part because of their delayed commencement, drag on for *inexcusable* periods of time. Approximately half of OCA's investigations exceed the 30 days normally permitted by OKDHS regulations for CPS investigations of foster homes. More than one in five last for more than two months. These strung-out investigations leave children at risk, reduce the amount and the quality of available evidence, leave caregivers in uncertain situations, and negatively affect hundreds of children in OKDHS care.

**OCA's investigations are appallingly inadequate.**

- OCA almost never checks the CPS backgrounds and never checks the criminal backgrounds of its substitute care providers after they have been accused of abusing or neglecting the children the agency has entrusted them with. This failure affects nearly every child that is the subject of an OCA investigation.

- OCA does not regularly observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment. Only one-third of the children for whom allegations warranted observation are observed.

- OCA *routinely* fails to make contact with sources of information that is necessary to make an accurate investigative finding. Most notably, in the sample of OCA investigations reviewed:

  - Staff responsible for licensing the facilities under their investigation were not adequately contacted in more than 92% of OCA investigations in which contact was necessary to make a correct finding.

  - Children other than the alleged victims (most of whom were other OKDHS wards) placed in facilities under investigation were not adequately contacted in more than 90% of OCA investigations in which contact was necessary to making a correct finding.

  - The alleged victims' caseworkers were not adequately contacted in more than 86% of OCA investigations in which contact was important to making a correct finding.

- Facility staff members, other than those who were directly involved in the reported incident, were not adequately contacted in almost 66% of OCA investigations in which contact was important to making a correct finding.

- Doctors and other medical professionals were not adequately contacted in nearly 55% of OCA investigations in which contact was critical to make a correct finding.

- Police were not adequately contacted in nearly 42% of OCA investigations in which contact was necessary to making a correct finding.

This failure affects hundreds of OKDHS wards who are alleged victims in OCA investigations and, most likely, all children for whom all allegations are found Unsubstantiated.

**The quality of decision-making in OKDHS OCA investigations is poor.**

Decision-making in OCA's investigations is *frequently* rendered unreliable by OCA's failure to gather the information necessary to make good decisions possible. This failure is the result of:

- Unconscionable delays in making contact with children in the agency's care who have allegedly been abused and/or neglected, and

- Appallingly superficial OCA investigations once initiated.

As a result of these failures:

- In 7% of the Unsubstantiated or Ruled Out OCA investigations reviewed, the finding should have been Substantiated. This means that in no fewer than two and in as many as 24 Unsubstantiated OCA investigations, child abuse/neglect allegations should have been Substantiated.

- At the child level, for no fewer than two and for as many as 24 children for whom OCA Unsubstantiated all allegations, the finding should have been Substantiated.

- In an additional 37% of the Unsubstantiated or Ruled Out OCA investigations reviewed, the information gathered was insufficient to identify the correct finding. Overall, in no fewer than 32 and in as many as 86 OCA investigations, OCA failed to gather sufficient information to make a correct finding.

- At the child level, for no fewer than 52 and for as many as 119 children, OCA failed to gather sufficient information to make a correct finding.

Combining these categories, of the 374 alleged victims in OCA investigations concerning children in agency custody in 2009, no fewer than 54 (14.4%) and as many as 143 (38.2%) were affected by flawed findings.

**OCA does little to protect the children in its care who are subjects of its investigations.**

- OCA takes action to protect children during its investigations in only slightly more than a quarter (26%) of cases in which such action is warranted.

**Investigations of allegations of child abuse/neglect in congregate care facilities can be complex and difficult, and must be conducted with great care. Sadly, OCA investigations lack any sense of urgency, and are haphazard and superficial. Because abusive and neglectful staff in group homes, residential treatment centers, and shelters come into contact with many vulnerable children (including many OKDHS wards), the danger they pose is multiplied. OCA's failure to conduct even marginally adequate child protection investigations for this vulnerable population is far outside any reasonable standard.**


## VI.   CPS ASSESSMENT REVIEW

As explained above, OKDHS has established CPS assessment as its differential response alternative to CPS investigation. According to OKDHS policy, "[a]n assessment is conducted when a report meets the abuse or neglect guidelines and does not constitute a serious and immediate safety threat to a child."[86] OKDHS policy specifically requires that allegations involving foster and trial adoptive homes be *investigated* rather than assessed.[87] The 17 assessments that OKDHS conducted in 2009 in response to referrals involving foster/kinship homes were in direct violation of this policy.

### A.   Description of the CPS Assessment Review

OKDHS identified 18 cases as CPS assessments conducted in 2009 in response to referrals that children in OKDHS care had been maltreated. Upon review, it was determined that one of these cases was not a CPS assessment, leaving a total of 17 cases for analysis. Since this total was comparatively small, no sampling was necessary and all cases were reviewed. These 17 CPS assessments involved 33 OKDHS wards and included 42 allegations.

The principal reviewer conducted all CPS assessment reviews, so there was no need to test for inter-rater reliability. Because the entire universe of CPS assessments was reviewed, there was no need to calculate confidence intervals. The confidence level is 100%.

**B.**     **Descriptive Information about the CPS Assessments**

Table VI-1 shows the ages of children in the custody of OKDHS who were alleged victims in CPS Assessments.

### Ages of Alleged Victims in CPS Assessments

| Age | % (N) |
|---|---|
| 0-2 | 39.4% (13) |
| 3-5 | 30.3% (10) |
| 6-8 | 3.0% (1) |
| 9-11 | 3.0% (1) |
| 12-14 | 12.1% (4) |
| 15+ | 12.1% (4) |
| **Total** | **100.0% (33)** |

Table VI-1

Surprisingly, the alleged victims involved in the CPS assessments reviewed tended to be substantially younger than the alleged victims in the CPS investigations. In the CPS investigations, 42% of the alleged victims were five years old or younger compared with 70% in the CPS assessments. This was a surprise because it would be expected that OKDHS would conduct the presumably more rigorous investigations when younger, generally more vulnerable, children were involved.

### Type of Placement for CPS Assessments

| Placement type | % (N) |
|---|---|
| OKDHS foster home | 58.8% (10) |
| OKDHS kinship care | 29.4% (5) |
| Contracted foster home | 5.9% (1) |
| Tribal kinship care | 5.9% (1) |
| **Total** | **100.0% (17)** |

Table VI-2

As with the CPS investigations, all of the children involved in the CPS assessments reviewed were placed in family settings. A somewhat larger proportion of the CPS assessments involved foster homes (64.7%) than kinship homes (35.3%).

**Sources of Reports for CPS Assessments**

| Source | % (N) |
|---|---|
| OKDHS caseworker | 17.6% (3) |
| School personnel | 17.6% (3) |
| Alleged maltreater | 17.6% (3) |
| Professional counselor/social worker | 11.8% (2) |
| Contract agency caseworker | 5.9% (1) |
| Court personnel | 5.9% (1) |
| Non-custodial parent | 5.9% (1) |
| Other relative | 5.9% (1) |
| Anonymous | 5.9% (1) |
| Alleged victim | 5.9% (1) |
| **Total** | **100.0% (17)** |

Table VI-3

As in the other reviews, the majority (58.8%) of the referrals in the CPS assessments reviewed came from professional sources.

**Allegations Assessed**

| Type | % (N) | Specific Form | % (N) |
|---|---|---|---|
| **Neglect** | 23.8% (10) | Lack of supervision | 19.0% (8) |
| | | Medical neglect | 4.8% (2) |
| **Physical Abuse** | 14.3% (6) | Bruises/welts | 7.1% (3) |
| | | Lacerations/cuts | 2.4% (1) |
| | | Burns | 2.4% (1) |
| | | Failure to protect | 2.4% (1) |
| **Sexual Abuse** | 14.3% (6) | Failure to protect | 14.3% (6) |
| **Other** | 47.6% (20) | Caregiver alcohol/drug | 2.4% (1) |
| | | Domestic violence | 7.1% (3) |
| | | Caregiver/child conflict | 2.4% (1) |
| | | Threat of harm | 19.0% (8) |
| | | Corporal punishment | 4.8% (2) |
| | | Mental injury | 7.1% (3) |
| | | Other abuse | 4.8% (2) |
| **Total** | **100.0% (42)** | | **100.0% (42)** |

Table VI-4

Like the age of the alleged victims, the nature of the allegations in response to which OKDHS chose to conduct CPS assessments instead of CPS investigations is surprising. One would generally expect that alleged physical or sexual abuse (present in 29% of all allegations) would receive investigations instead of the less-rigorous assessments.

C.        **Evaluation of the CPS Assessment Process and Related Decision-Making**

It is important that OKDHS make correct decisions in assigning maltreatment referrals as CPS assessments. As with CPS and OCA investigations, it is also important that CPS assessments be conducted in a timely way, that they are thorough, that correct decisions are made as to whether or not children in OKDHS care have been maltreated, and that adequate actions are taken to assure the safety of agency wards both during and following CPS assessments. The evaluation of OKDHS CPS assessments, therefore, focuses on five questions:

- Were decisions to assign referrals as CPS assessments correct?
- Were CPS assessments conducted in a timely manner?
- Were CPS assessments thorough?
- Was CPS assessment decision-making correct?
- Were reasonable protective actions taken during CPS assessments?

### 1.        Were Decisions To Assign Referrals as CPS Assessments Correct?

Given the potential danger inherent in maltreatment referrals involving foster and kinship caregivers, it is surprising that any such referrals were assigned as CPS assessments (and indeed, under OKDHS policy they should have been investigated, as explained above). Because it can easily be argued that assigning *any* referrals involving foster children as CPS assessments is unreasonable, the cases were reviewed as if they involved children *not* in state care.

Of the 17 referrals reviewed, 10 (58.8%) suggested safety threats to OKDHS wards that were serious enough to have required CPS investigation, so assigning them as assessment cases was flawed under any circumstances.



Figure VI-1

67

OKDHS's poor decision-making in this area is clearly flawed, and deprives the alleged victims of the protection of CPS investigations.

> A foster care worker noticed a burn on the wrist of one-year-old AB who was placed in kinship care. According to the caregiver, six weeks earlier she forgot to close a child safety gate and the child went into the kitchen, grabbed a coffee pot, and spilled hot coffee on his wrist. The caregiver said that she took the child to the local emergency room. Because the burns were third degree, the local emergency room sent AB to the university children's hospital. The kinship caregiver said that she had been afraid to report the incident to OKDHS.
>
> The assessment included contact with AB (who was not verbal), the kinship foster parents, AB's caseworker, and AB's aunt. The emergency room record from the local hospital was obtained. The record described a small third-degree burn all the way around the wrist. Although emergency room staff noted that the burn was not suspicious for abuse, they could not know whether it was the result of neglect.  It also noted that the child's immunizations were not current. No effort was made to contact the emergency room or children's hospital to discuss the caregiver's statements at the hospitals or the plausibility of whether a spill from a coffee pot could burn the wrist all the way around. (Referral Number 1255786).

## 2.      Were CPS Assessments Conducted in a Timely Manner?

Even if OKDHS made good decisions about whether to conduct CPS assessments rather than investigations, timely commencement and timely and efficient completion of CPS assessments are necessary to protect the alleged victims. Taking into account the relative youth of the children involved, the serious nature of the allegations, and the seemingly arbitrary decisions to assess and not investigate, a timely CPS assessment process is especially important.

### a)      Priority Coding

OKDHS assigns the same priority designations to CPS assessments as it does to CPS investigations. The priority codes carry the same timeframe expectations for initial contact with alleged victims as they do in CPS investigations. Reviewers evaluated whether the priority codes were reasonable considering the child safety threats suggested by the referral.

**Priority Codes**

| Priority | % (N) |
|----------|-------|
| One | 52.9% (9) |
| Two | 47.1% (8) |
| **Total** | **100.0% (17)** |

Table VI-5

All of the nine CPS Assessments coded Priority 1 were reasonable, as were all but two of the eight that were coded Priority 2.

       *b)*     *Initial Contact with Alleged Victims*

As with CPS and OCA investigations, the amount of time it takes the OKDHS investigator to make in-person contact with the alleged victims is more important than the priority code. The reviewer evaluated whether the time taken to make contact with alleged victims was reasonable in the context of the safety threat suggested by the referral information. Realistic and unavoidable barriers to making timely contact were taken into account.

Of the 33 OKDHS wards involved in the CPS assessments reviewed, the reviewer determined that 26 (78.8%) alleged child victims were contacted within a reasonable period of time after receipt of the referral, six (18.2%) were not, and for one (3.0%) there was insufficient information for the reviewer to evaluate.



Figure VI-2

Making reasonably prompt contact with alleged victims in CPS assessments only 78.8% of the time does not represent good practice. Because the alleged victims tend to be very young, the allegations were potentially serious, and the majority of the decisions to assign referrals as CPS assessments were unreasonable, timely contact should have been universal or nearly so. These delays violate CWLA[88] and COA standards.[89]

       *c)*     *Long Gaps During Assessments*

As is true for CPS and OCA investigations, it is important that CPS assessments be conducted in a reasonably concise manner. Activities must be completed in an orderly way and without lengthy gaps between them. Whether OKDHS's CPS assessments included lengthy gaps is difficult to evaluate because the assessment documentation did not always include contact dates. For this reason, in six of the 17 CPS assessments reviewed (35.3%), the reviewer could not determine whether there were lengthy gaps. In two of the CPS assessments reviewed (11.8%), there were gaps of more than 30 days during which no assessment activity took place.

### d)　　Duration of CPS Assessments

The final issue related to the timeliness of CPS assessments is their duration. The duration of each CPS assessment was measured by counting the number of days between the referral and either the last assessment contact, the caseworker's signature certifying completion, or the supervisor's signature approving the assessment – whichever occurred first. On average, OKDHS took 30.6 days to complete CPS assessments involving children in its care. The median duration of CPS assessments was 28 days. OKDHS documentation did not include sufficient information to permit the reviewer to determine the length of one assessment. Eight assessments (50% of the assessments for which duration could be determined) lasted more than 30 days. The lengthiest assessment took 87 days.

### e)　　Conclusion: Are CPS Assessments Conducted in a Timely Way?

OKDHS CPS assessments are not conducted in a timely way.

- Initial contact with alleged victims was delayed beyond a reasonable time in 18% of the CPS assessments reviewed.

- There were lengthy gaps or insufficient documentation in 47% of the assessments reviewed.

- OKDHS takes too long to complete many of its CPS assessments concerning its wards. Fully half of the assessments lasted more than 30 days.

This is particularly concerning since there is little to distinguish the situations that were assigned as CPS assessments from those assigned as CPS investigations. The lack of timely assessments violates COA standards that call for CPS interventions to be conducted in a " timely and efficient manner."[90] In addition to being inefficient, DHS's failure in this area can leave children and caregivers in limbo and children in danger.

### 3.　　Were CPS Assessments Thorough?

As with CPS and OCA investigations, the evaluation of whether CPS assessments are thorough depends on whether important information-gathering activities are conducted and, if so, whether they are conducted properly.

a)      *CPS Background Checks*

There is evidence that CPS history checks were completed in all but one of the 17 CPS assessments reviewed. Of the 16 assessments reviewed for which CPS background checks were completed, some prior CPS history was found for eight (50%) of the accused caregivers.

For one CPS assessment reviewed, a prior child abuse/neglect allegation against the accused caregiver had been Substantiated. This means that OKDHS removed children from the care of their parents because they were unsafe, then knowingly placed them with a foster caregiver who was abusive and/or neglectful and, after receiving an *additional* maltreatment referral, elected to conduct an assessment rather than a CPS investigation.

Three of the eight prior referrals on other accused caregivers were found Unsubstantiated. Because of the OKDHS definition of Unsubstantiated, such a finding does not mean that the caregivers had not been responsible for child maltreatment. Furthermore, as has been seen, OKDHS CPS investigations are seriously flawed and many allegations which are Unsubstantiated in fact should be Substantiated.

b)      *Criminal Background Checks*

As was found with CPS and OCA investigations, the CPS investigators who conducted these assessments rarely completed criminal background checks. In only one of the 17 CPS assessments were such checks completed. While this does not generally violate OKDHS policy, it does violate CWLA standards.[91]

c)      *Observation of Relevant Parts of Children's Bodies*

It is somewhat surprising that referrals tracked as CPS assessments would include allegations that would necessitate observation of portions of alleged victims' bodies to identify the presence or absence of evidence of abuse. For obvious reasons it is important, even in assessments, that when there are allegations that a child has injuries, marks or other physical signs of child abuse or neglect, the relevant parts of the child's body be observed by the CPS investigator or by a medical professional. Such observation is standard CPS practice in any state and is required by OKDHS policy.[92]

Of the 33 alleged victims involved in the CPS assessments reviewed, 20 (60.6%) required observation of some portion of the child's body. The OKDHS investigators failed to adequately observe five children (25%) when it was required. In two cases (10%) the reviewer could not determine whether the children had been adequately observed.



Figure VI-3

As with CPS and OCA investigations, the failure to observe relevant parts of alleged victims' bodies in a quarter of the CPS assessments calling for such observation – either by the CPS investigator or by a healthcare provider – indicates that OKDHS CPS assessments are not thorough.

*d)    Necessary Investigative Contacts*

Although, as a rule, more investigative contacts yield more information and a better basis for decision-making, not every sort of contact is relevant to every investigation (and, of course, it is almost always possible to identify one more contact that might have been useful). For this reason, the reviewers first identified the categories of contacts that were *necessary* to make an investigative finding in each of the CPS assessments in the sample. It was then determined for each category of necessary contacts in each case whether the investigator (i) made adequate contact with all individuals in that category ("All Contacted"), (ii) contacted only some individuals *or* contacted all individuals in a category, but did so inadequately ("Some Contacted/Inadequate"), or (iii) made no contact with any members of a category ("None Contacted").

**Assessment Interviews**

| Potential interviewee | Relevant N | All Contacted | Some Contacted / Inadequate | None Contacted |
|---|---|---|---|---|
| Alleged perpetrator | 17 | 94.1% (16) | 5.9% (1) | 0 |
| Reporter | 13 | 69.2% (9) | 0 | 30.8% (4) |
| Identified witness | 2 | 50.0% (1) | 0 | 50.0% (1) |
| Additional child(ren) in home | 2 | 100% (2) | 0 | 0 |
| Others in home | 6 | 66.7% (4) | 16.7% (1) | 16.7% (1) |
| Collateral source | 1 | 0 | 0 | 100% (1) |
| Other non-professional | 6 | 83.3% (5) | 16.7% (1) | 0 |
| Home | 12 | 100% (12) | 0 | 0 |
| Alleged victim's OKDHS caseworker | 17 | 76.5% (13) | 0 | 23.5% (4) |
| OKDHS caseworker for other child(ren) present/involved | 3 | 100% (3) | 0 | 0 |
| Private agency of other child(ren) present/involved | 1 | 100% (1) | 0 | 0 |
| Police | 2 | 100% (2) | 0 | 0 |
| Mental health professional | 4 | 25.0% (1) | 0 | 75.0% (3) |
| Medical professional | 5 | 0 | 20.0% (1) | 80.0% (4) |
| Other professional | 5 | 60.0% (3) | 40.0% (2) | 0 |
| **Total** | **100% (96)** | **75.0% (72)** | **6.3% (6)** | **18.7% (18)** |

Table VI-6

Taken together, the 17 CPS assessments reviewed required contact with a minimum of 96 sources in 15 different categories in addition to the alleged victims. Of these, OKDHS workers actually received adequate information from 72 sources (75%), made insufficient contact with 6 sources (6.3%), and made no contact at all with 18 (18.7%) vital sources of information. Overall, OKDHS investigators failed to contact important sources of information during CPS assessments at almost exactly the same rates as for CPS investigations.

Similarly, OKDHS workers who conducted the CPS assessments that were reviewed failed to make many of the same important contacts that were not made in their CPS investigations. In particular, they did not make adequate contact with:

- The person who made the referral in 30.8% of assessments for which this contact was important;

- Identified witnesses in 50% of assessments for which this contact was necessary;

- Medical professionals in any of the five assessments in which contact with a physician was vital; or

- Mental health professionals in three of the four assessments where such contact was important.

> A foster mother left a voicemail message saying that DL fell and received a gash on his head that might need stitches. The foster mother left a second message saying that she had taken DL to the hospital and DL was told that he did not need stitches. The hotline worker called the hospital and learned the child had not been brought in. According to the foster parents, when the foster mother took DL to the hospital, someone came out, looked at DL and said he was okay. The child had not actually been seen. No effort to verify this somewhat suspicious and contradictory account was made by DHS. This was a very superficial assessment. (Referral Number 1254261).

### e)    Conclusion: Are CPS Assessments Thorough?

OKDHS CPS assessments of allegations that children in the agency's custody have been abused and neglected by their substitute caregivers are not thorough. The agency's failures in this area are consistent with its failures in its CPS investigations.

- Decisions to conduct CPS assessments instead of CPS investigations are flawed and appear arbitrary.

- OKDHS does not reliably check the backgrounds of its substitute care providers after they have been accused of abusing or neglecting the children the agency has entrusted them with.

- OKDHS does not routinely observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment.

- OKDHS *frequently* fails to make contact with sources likely to have information *that is necessary to make an accurate investigative finding.*

These failures are in violation of relevant CWLA and COA standards, in some instances they violate OKDHS's own policy, and they place agency functioning below reasonable standards for protecting children.

### 4.    Making Correct?

Although OKDHS procedure does not appear to require that CPS assessments result in a finding, each of the assessments reviewed included a finding. The same findings were made, using the same definitions, as in CPS and OCA investigations (see Section IV.C.3). Because the CPS assessments reviewed concerned foster and kinship care homes, the accuracy of these findings is important as a measure of whether or not OKDHS can keep the children in its care safe.

Inaccurate Unsubstantiated or Ruled Out findings in CPS assessments carry with them the same potential to leave or place children in danger as do inaccurate determinations in CPS and OCA investigations:

1)  OKDHS will not act to protect the children who have allegedly been abused or neglected and the other children living in the home or facility now and in the future.

2)  OKDHS will not take steps to prevent children placed in the home from being subjected to the same or worse maltreatment.

Decision-making related to CPS assessments is examined from two levels: 1) the assessment level, and 2) the level of the individual child in OKDHS custody who is the alleged victim of child maltreatment. It is worthwhile to view CPS assessment decision-making from both points of view because the first concerns potentially dangerous foster and kinship homes that OKDHS does, or does not, identify, and the second concerns the number of children who are protected, or not protected, by OKDHS decisions.

   a)      *Assessment Level Findings*

At the level of CPS assessments OKDHS found:

- In one of the 17 CPS assessments (5.9%), OKDHS found at least one child abuse/neglect allegation involving at least one OKDHS ward to be Substantiated.

- In the remaining 16 assessments, OKDHS found no allegations concerning any of the involved children to be Substantiated. One of these was found Unsubstantiated (5.9% of the assessments sample) and 15 were Ruled Out (88.2% of the assessments sample).



Figure VI-4

At the assessment level, the reviewer:

- Agreed with the OKDHS Substantiated finding.

- Found that for one (6.3%) of the 16 assessments which OKDHS found unconfirmed (combining those found to be Ruled Out with those found Unsubstantiated), the correct finding was Substantiated. This was a referral that OKDHS found to be Ruled Out.

- Found that for eight Unsubstantiated assessments (50%) of the 16 assessments which OKDHS found Unsubstantiated or Ruled Out, the information gathered was insufficient to permit the reviewer – *or OKDHS* – to identify the correct finding. The reviewer made this determination only when there were additional information-gathering activities that would have been likely to yield information sufficient to make a reasonable finding.

Figure VI-5 depicts the correct finding for assessments OKDHS found to be Ruled Out or Unsubstantiated.



Figure VI-5

Figure VI-6 compares the OKDHS finding with the correct assessment level finding. For purposes of this comparison, Ruled Out and Unsubstantiated are combined as "Unsubstantiated."



Figure VI-6

b)      *Decision-Making at the Child Level*

The same analysis was performed at the child level. Of 33 children in OKDHS care who were involved in the CPS assessments, OKDHS determined as follows:

• Three children (9.1%) were found to have been abused or neglected by their caregivers.

• For 28 children (84.8%), allegations were Ruled Out.

• For one child (3%), the allegations were found Unsubstantiated.

• The reviewer could not determine the OKDHS finding for one child (3%).



Figure VI-7

At the child level:

- The reviewer agreed with OKDHS's findings that there was credible evidence that three children had been abused or neglected.

- Of the 29 children for whom OKDHS did not substantiate any allegations, the reviewer found that for one (3.4%), the correct finding was Substantiated.

- For 14 (48.3%) of the children for whom OKDHS did not substantiate any allegations, the information gathered was insufficient to permit the reviewer – or OKDHS – to identify the correct finding.



Figure VI-8

Table VI-9 compares the OKDHS finding with the correct child level finding in CPS assessments for the 32 children for whom OKDHS made a discernable finding. For purposes of this comparison, Ruled Out and Unsubstantiated findings are combined as "Unsubstantiated."



Figure VI-9

c)      *Conclusion: Is CPS Assessment Decision-Making Correct?*

The quality of decision-making in OKDHS CPS assessments is seriously hampered by poor information-gathering.

- For one of the OKDHS wards who was subject to a CPS assessment in which OKDHS did not Substantiate any allegations, the correct finding was Substantiated.

- For 14 (48.3%) of the children who were the alleged victims in Unsubstantiated or Ruled Out CPS assessments, too little information was gathered for OKDHS to make a correct decision about whether or not they were abused or neglected. Certainly some of these children were maltreated.

- In more than half (nine of 17) of its CPS assessments, OKDHS made faulty decisions. These nine assessments involved 15 of the 33 children identified as alleged victims in OKDHS CPS Assessments.

> Eight-year-old JB's foster mother was arrested for illegally selling prescription drugs from her home. The foster home had previously burned down (about a year before) under suspicious circumstances. The police, rather adamantly, confirmed that the foster mother was selling drugs from the home. OKDHS found the referral to be Ruled Out. (Referral Number 1266518).

Children in OKDHS care who are the subjects of CPS assessments have about a fifty-fifty chance of being protected by a competent assessment resulting in a sound decision. This poor decision-making is especially troubling considering the young age of the children and the serious allegations that characterize CPS assessments.

### 5. Were Reasonable Protective Actions Taken During CPS Assessments?

As with CPS and OCA investigations, it is important that OKDHS take reasonable actions to protect children while CPS assessments involving its wards are underway.

The reviewer found that such actions were unnecessary in six of the 17 CPS assessments. Of the 11 assessments identified as requiring protective measures, the reviewer determined that children were adequately protected in two (18.2%), not adequately protected in two (18.2%), and in seven (63.6%) the reviewer was not able to make a determination.

This means that at least two and as many as nine of the 33 children involved in these assessments (between 6% and 27%) were left in dangerous situations because OKDHS did not implement adequate protective plans while assessing the children's caregivers. This violates OKDHS policy[93] and CWLA guidelines.[94]

## D. Conclusion: OKDHS CPS Assessments Concerning the Children in its Care

OKDHS's decisions to conduct CPS assessments instead of CPS investigations are not reasonable and appear arbitrary. Most CPS assessments concerning children in OKDHS care involved young children who were the alleged victims of potentially serious maltreatment. Because these referrals all involved foster or kinship homes, they all should have received CPS investigation instead of CPS assessment. Even if they had not involved substitute care situations, most of these referrals (59%) would have warranted CPS investigation rather than assessment.

OKDHS CPS assessments are not conducted in a timely way.

- Initial contact with alleged victims was delayed beyond a reasonable time in 18% of the CPS assessments concerning its wards.

- OKDHS takes too long to complete many of its CPS assessments concerning its wards. Half of the assessments took more than 30 days.

OKDHS CPS assessments of allegations that children in the agency's custody have been abused and neglected by their substitute caregivers are not thorough. The agency's failures in this area are consistent with its failures in its CPS investigations.

- OKDHS did not reliably check the backgrounds of its substitute care providers after they have been accused of abusing or neglecting the children the agency has entrusted them with.

- OKDHS did not routinely observe – or have medical professionals observe – the relevant parts of children's bodies to identify evidence of maltreatment. OKDHS investigators failed to observe one in four children for whom allegations called for observation

- OKDHS *frequently* fails to make contact with sources of information that was necessary to make an accurate assessment finding. OKDHS investigators failed to make one-fourth of the investigative contacts necessary to making a correct finding.

The quality of decision-making in OKDHS CPS assessments is seriously hampered by the same poor quality of information-gathering that characterizes CPS investigations.

- One CPS assessment, involving one child, should have been found Substantiated.

- For 14 (48.3%) of the children who were the alleged victims in Unsubstantiated or Ruled Out CPS assessments, too little information was gathered for OKDHS to make a correct decision about whether or not they were abused or neglected. Certainly some of these children were maltreated.

- In more than half of its CPS assessments, OKDHS made faulty decisions.

**Children in OKDHS care who are the subjects of CPS assessments have about a fifty-fifty chance of being protected by a competent assessment resulting in a sound decision. This poor decision-making is especially troubling considering the young age of the children and the serious allegations that characterize CPS assessments.**

## VII.   SCREEN OUT REVIEW

For obvious reasons, the intake process and the decisions made about referrals alleging the maltreatment of children in state care are critically important. Child welfare workers who receive and evaluate referrals often must make screening decisions with limited information. Nevertheless, it is imperative that as much pertinent information be gathered as is reasonably possible so that the most informed decisions can be made. When important and available information is not obtained, decision-making is likely to be faulty. When referrals are erroneously screened out, children are left in dangerous situations. When the children referred are in substitute care, it is not only the children involved in the referral who are endangered – the safety of other children who are placed in the home or facility and those who may be placed there in the future is also threatened.

It is worthwhile to note recent changes in OKDHS reporting trends. During the most recent four years for which data is available, there has been a pronounced increase in the proportion of referrals made to OKDHS that are screened out and not investigated. Table IV-1 compares the percentage of referrals screened out by OKDHS with the percentage screened out by public child welfare agencies nationally.

### Percentage of Referrals Screened Out

|  | **2006** | **2007** | **2008** | **2009** |
|---|---|---|---|---|
| **% Screened Out (OKDHS)** | 42.5% | 43.0% | 46.8% | 54.2% |
| **% Screened Out (nationally)** | 38.3% | 38.3% | 37.5% | 38.1% |

Table VII-1[95]

This marked increase strongly suggests that OKDHS has withdrawn the protection of CPS investigation from many children – those who are, as well as those who are not, in state care. This may well explain the recent decrease in the rate, reported by OKDHS, at which children have been maltreated while in state care.

## A.   Description of the Screen Out Review

From the unduplicated universe of 464 referrals involving children in state custody that were screened out by OKDHS, 93 were randomly selected to form a 20.0% sample. Nine of the originally selected files were determined to be unsuitable for the review. This was because eight turned out to have been referred to OCA for response, and one contained no information and was marked "conversion file." These nine were replaced by nine other randomly selected files. The 93 referrals reviewed involved 162 children and 208 allegations.

When applying confidence intervals for important child level findings, I assumed that the number of alleged child victims per screened out referral in the universe is the same as the number in the sample (1.74). Based on that assumption, I concluded that, during 2009, approximately 807 children in the care of OKDHS were alleged victims in maltreatment referrals that OKDHS screened out and did not investigate. The specific confidence intervals are identified in the relevant parts of the review.

Because the screen out review was conducted by two reviewers, it was important to test the degree to which the reviewers agreed about key questions in the review. To this end six screened out referrals were reviewed by both reviewers to measure inter-rater reliability. Overall, inter-rater reliability was found to be excellent. The results of specific inter-rater reliability tests for the screen out review are shown in Appendix A.

## B.   Description of  Screened Out Referrals

Table VII-3 shows the ages of the alleged child victims in screened out referrals.

### Ages of Alleged Victims in Screened Out Referrals

| Age | % (N) |
|-----|-------|
| 0-2 | 9.3% (15) |
| 3-5 | 24.1% (39) |
| 6-8 | 25.3% (41) |
| 9-11 | 17.9% (29) |
| 12-14 | 12.3% (20) |
| 15+ | 11.1% (18) |
| **Total** | **100.0% (162)** |

Table VII-2

Most alleged victims (59%) in the screen outs reviewed were less than nine years old. One-third were in the especially vulnerable age group of five or under.

As Table VII-3 shows, nearly all of the children involved in maltreatment referrals screened out by OKDHS were placed in family settings, with 64.5% in foster homes and 32.3% placed in kinship care.

**Type of Placement of Screen Out Cases**:

| Placement type | % (N) |
|---|---|
| OKDHS foster home | 48.4% (45) |
| Contracted foster home | 12.9% (12) |
| Tribal foster home | 3.2% (3) |
| OKDHS kinship care | 30.1% (28) |
| Residential treatment facility | 2.2% (2) |
| Tribal kinship care | 2.2% (2) |
| Group home | 1.1% (1) |
| **Total** | **100.0% (93)** |

Table VII-3

As Table VII-4 indicates, a somewhat surprising proportion (35.5%) of the referrals that were screened out were made by OKDHS caseworkers. One would presume that agency caseworkers would be well-versed about the situations that warrant CPS investigation. A substantial majority of the screened out referrals reviewed (59.2%) came from professional sources. Again, this is surprising, because one would expect that professional sources would be adept at identifying child abuse and neglect, and would therefore be unlikely to have their referrals screened out.

**Reporting Sources of Screened Out Referrals**

| Source | % (N) |
|---|---|
| OKDHS caseworker | 35.5% (33) |
| Relative (other than parent) | 14.0% (13) |
| Professional counselor/social worker | 12.9% (12) |
| Non-custodial parent | 9.7% (9) |
| School personnel | 3.2% (3) |
| Health care provider | 3.2% (3) |
| Neighbor/friend | 3.2% (3) |
| Anonymous | 3.2% (3) |
| Law enforcement | 2.2% (2) |
| Alleged maltreater | 2.2% (2) |
| Contract agency caseworker | 2.2% (2) |
| Custodial parent/guardian | 1.1% (1) |
| Other | 7.5% (7) |
| **Total** | **100.0% (93)** |

Table VII-4

Table VII-5 depicts the broad category as well as the specific nature of the allegations that were screened out in the referrals reviewed.

**Allegations**

| Type | % (N) | Specific form | % (N) |
|---|---|---|---|
| **Neglect** | 36.5% (76) | Concrete need | 11.1% (23) |
| | | Lack of supervision | 19.7% (41) |
| | | Medical neglect | 4.8% (10) |
| | | Educational/truant | 1.0% (2) |
| **Physical Abuse** | 13.9% (29) | Bruises/welts | 6.7% (14) |
| | | Lacerations/cuts | 1.0% (2) |
| | | Burns | 0.5% (1) |
| | | Failure to protect | 5.3% (11) |
| | | Threat of harm | 0.5% (1) |
| **Sexual Abuse** | 7.2% (15) | Exploitation | 1.4% (3) |
| | | Failure to protect | 5.8% (12) |
| **Other** | 42.3% (88) | Caregiver alcohol/drug | 3.4% (7) |
| | | Caregiver mental | 1.4% (3) |
| | | Domestic violence | 3.4% (7) |
| | | Financial issues | 0.5% (1) |
| | | Family Stress | 1.0% (2) |
| | | Child behavior problem | 1.4% (3) |
| | | Caregiver/child conflict | 0.5% (1) |
| | | Poor parenting | 7.2% (15) |
| | | Threat of harm | 9.1% (19) |
| | | Corporal punishment | 11.5% (24) |
| | | Mental injury | 1.4% (3) |
| | | Other abuse | 1.4% (3) |
| **Total** | **100.0% (208)** | | **100.0% (208)** |

Table VII-5

## C.    Evaluation of the Screening Process and Related Decision-Making

Three important components of the overall screening process were evaluated in the screened out referrals reviewed. OKDHS's performance in accomplishing these activities defines its ability to take the initial steps that are necessary to identify and protect children whom the agency may have placed in dangerous living arrangements.

- Were agency records checked to identify any previous CPS involvement concerning the caregivers allegedly responsible for the maltreatment?

- Was critical information gathered?

- Was the screening decision correct?

85

**1.      Were Agency Records Checked To Identify Any Previous CPS Involvement Concerning the Caregivers Allegedly Responsible for the Maltreatment?**

One purpose of maintaining records of CPS history is to establish a registry of individuals who are, because of their child maltreatment history, presumed to be dangerous to children. Such registries are used to prevent dangerous people from being employed in positions that would give them access to children, engaging in volunteer activities with children, or being used as foster parents or kinship care providers. An important and obvious part of the screening process for any maltreatment referral is a review of the state's child welfare records to identify any history of suspected or confirmed child maltreatment by the accused caregiver. Evidence of previous CPS history is an important factor in making screening decisions. This is especially true when the alleged maltreatment has occurred in OKDHS substitute care, because of OKDHS's unusual – and dangerous – practice of continuing to use foster and kinship care parents even after they have been found to be responsible for child abuse and neglect. OKDHS policy requires that such checks be completed at the hotline.[96]

All but six (6.5%) of the 93 screened out referrals included documentation that OKDHS records were checked for previous CPS involvement on the part of caregivers. Although in a significant majority of instances there was evidence that a record check was conducted, it is important that such checks be universal. Failure to complete such data checks violates OKDHS policy.[97]

**2.      Was Critical Information Gathered?**

Child abuse/neglect hotline personnel must make decisions quickly and often with limited information. Nevertheless, hotline workers must ask reporters pertinent questions and, if additional sources of important information are readily available (e.g., by making a quick phone call), hotline workers must contact them. In 9 (9.7%) of the screened out referrals reviewed, hotline workers failed to gather information that was critical to the screening decision. Failure to gather such critical information violates OKDHS procedure[98] and CWLA guidelines for child maltreatment in foster care.[99]

> Seven-year-old GG's caseworker called to report her concern that, according to GG's mother, GG had a black eye. GG's caseworker reported that the foster parent of GG's siblings claimed that the injury was accidental. There was at least one prior referral involving the foster home. About 16 months previously, a referral had been investigated and found Unsubstantiated – Services Recommended. No OKDHS worker saw the child or asked her about the black eye. No one spoke with GG's foster parents. This referral was screened out before adequate information was gathered. (Referral Number 1252361).

### 3.     Was the Screening Decision Correct?

Obviously, the most important of the three components evaluated by the screen out review is whether the screening decision was correct. In the end, the ability of the Oklahoma Child Abuse and Neglect Hotline to fulfill its critical role in protecting children – especially children in OKDHS custody – depends on whether or not it accurately identifies referrals that warrant CPS investigation.

It does not always do so:

- For 11 (11.8%) of the referrals screened out, the correct decision was to screen in for CPS investigation. Applying the confidence interval of ±5.9% to the universe of 464 referrals concerning OKDHS wards that were screened out in 2009, it can be determined that at least 27 referrals (involving 48 alleged victims) and as many as 82 referrals (involving 143 alleged victims) concerning OKDHS wards were erroneously screened out in 2009.

- In nine additional screened out referrals reviewed (9.7%), the screening decision was made without some information *that was critical to the screening decision.* Applying the confidence interval of ±4.9%, it can be determined that failure affected between 22 and 68 referrals involving no fewer than 39 and as many as 118 OKDHS wards whose referrals were screened out in 2009.

Taken together, OKDHS screening decisions involving at least 87 and as many as 261 children in OKDHS care were faulty in 2009 – either they were made without gathering critical information or they were flawed. In the best case, of 807 OKDHS wards whose referrals were screened out in 2009, 10.8% were affected by faulty decisions. In the worst case, 32.3% were so affected. In either case, too many of the decisions OKDHS made in 2009 not to investigate child abuse/neglect referrals about its wards were unsound.



Figure VII-1

In nearly a quarter of the screened out referrals reviewed OKDHS either made, or may have made, an unreasonable decision. This deprives children whose safety has been entrusted to OKDHS of the protection of a CPS investigation. In addition to defeating the primary purpose of the hotline, this violates CWLA guidelines[100] and falls outside any reasonable standard of child welfare performance.

> A relative reported that the foster mother of three-month-old AF, ten-month-old JV, and AG and BG, both four years old, abuses prescription drugs regularly. The reporter had recently seen the foster mother driving the foster children while she was "[a]ll drugged up. Her eyes were glazed over. She could barely keep her eyes open." According to the reporter, this was a common occurrence. The reporter provided *very* specific information; nevertheless, the referral was screened out. It should not have been. (Referral Number 1252354).

### D.    Description of the Incorrectly Screened Out Referrals

The 11 screened out referrals that should have been screened in were examined more closely. These 11 referrals involved 25 children and 34 maltreatment allegations. The children tended to be young and, therefore, more vulnerable. Their ages are provided in Table VII-6.

### Ages of Children in Incorrectly Screened Out Referrals

| Age | % (N) |
|-----|-------|
| 0-2 | 20.0% (5) |
| 3-5 | 24.0% (6) |
| 6-8 | 28.0% (7) |
| 9-11 | 16.0% (4) |
| 12-14 | 8.0% (2) |
| 15+ | 4.0% (1) |
| **Total** | **100.0% (25)** |

Table VII-6

All of the 25 children in the incorrectly screened out referrals were placed in family settings, with seven of the 11 referrals concerning foster homes and four involving kinship placements.

As shown in Table VII-7, the incorrectly screened out referrals were most likely to have been made by professionals (54.6%), with over one-third coming from OKDHS caseworkers, a reporting source that one would presume to be likely to know when children are in danger.

88

**Sources of Reports for Incorrectly Screened Out Cases**

| Source | % (N) |
|---|---|
| OKDHS caseworker | 36.4% (4) |
| Other relative | 27.3% (3) |
| School personnel | 9.1% (1) |
| Non-Custodial parent | 9.1% (1) |
| Professional counselor/social worker | 9.1% (1) |
| Other | 9.1% (1) |
| **Total** | **100.0% (11)** |

Table VII-7

As shown in Table VII-8, the nature of the allegations in the referrals that were incorrectly screened out was similar in proportion to the overall screen out category. Incorrectly screened out referrals were, however, more likely to include physical abuse and less likely to include sexual abuse.

**Allegations in Incorrectly Screened Out Referrals**

| Type | % (N) | Specific Form | % (N) |
|---|---|---|---|
| **Neglect** | 35.3% (12) | Concrete need | 14.7% (5) |
| | | Lack of supervision | 17.6% (6) |
| | | Medical neglect | 2.9% (1) |
| **Physical Abuse** | 14.7% (5) | Bruises/welts | 2.9% (1) |
| | | Burns | 2.9% (1) |
| | | Failure to protect | 8.8% (3) |
| **Other** | 50.0% (17) | Caregiver alcohol/drug | 11.8% (4) |
| | | Poor parenting | 2.9% (1) |
| | | Threat of harm | 20.6% (7) |
| | | Corporal punishment | 14.7% (5) |
| **Total** | **100.0% (34)** | | **100.0% (34)** |

Table VII-8

## E.  Conclusions of the Screen Out Review

Referrals alleging that children in the custody of OKDHS have been abused or neglected by the caregivers with whom the agency has placed them are not screened effectively.

- In 6.5% of the sample of screened out referrals reviewed there was no evidence that OKDHS records were checked for previous CPS involvement on the part of caregivers.

- In 10% of the screened out referrals reviewed, hotline workers failed to gather information that should have been easily available and was likely to have influenced the screening decision.

- For 12% of the screened out referrals reviewed, the correct decision was to screen in for CPS investigation. At least 27 referrals (involving 48 children) and as many as 82 referrals (involving 143 alleged victims) were incorrectly screened out.

- For 10% of the screened out referrals reviewed, the screening decision was made with insufficient information *that was critical to the screening decision.* This failure affected between 22 and 68 referrals, involving no fewer than 39 and as many as 118 OKDHS wards.

**Taken together, OKDHS screening decisions involving at least 87 and as many as 261 children in OKDHS care were faulty – either they were made without gathering enough information or they were simply wrong.**

OKDHS's failure to correctly screen abuse and neglect referrals regarding its wards endangers the children about whom the referrals were made. It is also dangerous to other children placed in the home or facility and to children who may be placed in the setting in the future. This failure is unacceptable and falls below any reasonable standard of child protection practice.

## VIII.   CHILD FATALITY REVIEW

### A.      Overview

As part of my review of the efforts of OKDHS to keep the children in its care safe, I separately evaluated the cases of nine OKDHS wards who the agency found to have died as a result of abuse or neglect since January 1, 2007. Each of these nine children was living in a home about which OKDHS had received at least one prior abuse/neglect referral. Because this review does not focus on a large number of children, the results are not statistically significant, and so the findings cannot be applied to the entire population of children in OKDHS care. Rather, these findings are presented as other examples of OKDHS's failure to take reasonable action to protect the children in its care.

**Conclusion: In connection with my review of the files pertaining to the nine children in OKDHS custody who died from child abuse or neglect since January 1, 2007, I conclude that the deaths of five of these children – DS, RP, SW, NW and JT -- could have been prevented if OKDHS had exercised reasonable steps in protecting those children from harm.**

The child fatality review was conducted by the principal reviewer, John Goad, A.M., and one additional reviewer, Kathy Glenney, A.M. Ms. Glenney has worked in public child welfare as a case worker, supervisor, and senior administrator for more than 35 years. Her curriculum vitae is attached. The process of the child fatality review was straightforward: the case files supplied by the defendants were reviewed and compared with OKDHS regulations and with basic standards of child welfare practice. The case records totaled 40,000 pages. In addition to being voluminous, the records were in no particular order and, notably, lacked any coherent overarching narrative, this made it extremely difficult for the reviewers, and no doubt for OKDHS managers, to figure out what happened with respect to these children.

After summarizing each of the nine case histories, the OKDHS response is compared with OKDHS regulations and with standards of child welfare practice. This analysis highlights only the instances of poor practice related to the safety of children in OKDHS care and only the most serious breaches among those. Although many issues were noted, this review does not attempt to analyze the cases from the perspective of the permanency or well-being of the children involved.

### B.      DS

DS was a five-year-old, male child who was in the custody of OKDHS at the time of his murder.

*Family History*

DS was born on 4/23/02. He was an only child, and for the first 3 years of his life, he lived with his mother (JS), and her grandparents, who had raised her. When he was three, DS and his mother moved in with his mother's boyfriend (MC). MC had three daughters ages four, six, and nine, who were in the private guardianship of the MC's parents, but who visited him on weekends.

In a period of 10 days, OKDHS received referrals that three-year-old DS was the victim of three separate serious injuries:

- On 12/31/05, hospital staff reported that DS had suffered a skull fracture and subdural hematoma. The hospital staff also expressed concern that DS had been to the ER for treatment of three significant head or facial injuries during the preceding year.[101] DS had been admitted to the hospital.[102] According to JS, DS fell while he was in the care of his great-grandparents. JS picked DS up and took him to MC's home that night. DS vomited and, when she bathed him, she noticed a soft spot on the back of his head. He kept vomiting so she took him to the ER. JS described DS as being "very clumsy." When the worker asked DS's great-grandparents what had happened, they told her that DS had slipped, and fallen on the tile floor in the kitchen. DS's maternal great-grandparents denied that JS had been injured while he was in their care. They said he fell on his buttocks but immediately jumped up and was fine.[103]

  DS was never successfully interviewed.[104] There was no interview with the treating physician about whether the explanation of a fall on a tile floor was consistent with the injuries. There was no investigation of the previous injuries to determine if they might have been the result of maltreatment. JS expressed a willingness to accept OKDHS services.[105] On 1/2/06, DS was discharged from the hospital.[106]

- On 1/4/06, school personnel reported that DS had come to school with bruises on the front of his head and a friction-like laceration to his wrist. JS told the school staff that DS had sneaked out of the house and hit his head on the porch railing (CPS referral 1022342).[107] On the day of the referral, the OKDHS investigator made an unsuccessful attempt to see DS. The investigator did not make contact with the child until 1/7/06. On 1/7/06 the investigator observed DS and interviewed JS. JS repeated the vague explanation for JS's injuries that she had given the school staff. No other action was taken.[108]

- On 1/9/06, a referral was made by medical staff. When JS took DS for medical follow-up related to his head injuries, he was observed to have bruising from his testicles to his rectum, and bruising to his penis, thighs and buttocks. DS was admitted to the hospital. The child was

curled up in a fetal position and cried most of the time (CPS referral 1023202).[109] This referral was investigated by OKDHS and the police. During this investigation, JS and MC denied knowing how DS was injured. He had not been in the care of anyone else in the immediate past. JS and MC gave somewhat conflicting accounts of the evening before the genital bruising was observed at the clinic. JS acknowledged that MC had a drug history and a "temper problem."[110] JS failed a polygraph exam concerning whether she knew how DS was injured.[111] The treating physician stated that the bruises were suspicious for abuse.[112]

OKDHS found all three incidents to be Confirmed– Court Intervention Requested.[113] DS was taken into custody by the police. On 1/10/06, an emergency petition was filed in Juvenile Court and OKDHS was awarded custody of DS. A petition to adjudicate DS as deprived was filed on 1/17/06.[114]

### Foster Care History

Upon his release from the hospital on 1/11/06, DS was placed in a shelter. On 1/20/06, he was placed with a maternal aunt where he stayed for the remainder of his time in care.[115]

While DS was in the care of his aunt, he received speech and individual therapy. There were no new CPS referrals. There was a concern that DS's aunt had allowed a boyfriend who had a criminal background to stay overnight. The aunt agreed to a plan of compliance that DS would not be left unsupervised with the aunt's boyfriend.[116]

JS and MC attended anger management and parenting groups, classes for non-offending parents, and family counseling.  MC also received substance abuse evaluation, and family and individual treatment.[117]

On 2/3/06, the Court ruled that the Indian Child Welfare Act (ICWA) applied to DS, and ordered notification to the Cherokee Nation.[118] On 2/25/06, the Cherokee Nation acknowledged possible involvement in the case.[119] Later, in August of 2006, the Court requested that DS be enrolled as a member of the Cherokee Nation. Although the tribe had acknowledged involvement, it had not taken jurisdiction.

Initially the permanency plan was adoption and on 2/3/06, the district attorney amended the petition to request termination of JS's parental rights, based on the shocking and heinous nature of the allegations.[120] However, on 11/30/06, the Court noted that no criminal charges had been filed and that the state had moved to strike its request for termination of the mother's parental rights, as the tribe "does not support termination, but does support adjudication."[121] DS's permanency goal was changed to reunification.

Initially, DS had supervised visitation with JS at the OKDHS office. However, on 5/30/07, a Permanency Plan Review was held. It was noted that JS and MC had completed their service plans and that JS was living with MC. The Court ordered that unsupervised visits occur.[122]

Also on 5/30/07, a transitional visit was held with OKDHS, JS and a provider that was to provide in-home counseling in anticipation of, and after, DS's reunification with JS. The counselor from the provider agency met with the JS again on 6/11/07 and 6/20/07. When it was learned that JS and MC were moving to another county the provider agency terminated its service.[123]

On 7/3/07, based on OKDHS recommendations and tribal concurrence, DS was returned to JS for a trial reunification. He remained in OKDHS custody.[124]

### Trial Reunification

On 7/11/07, an OKDHS caseworker visited DS and JS and noted no injury or concern. On 7/19/07, services from the provider agency were reinstated on the belief that the family had not yet moved.[125] On 7/31/07, after it was learned that the family had, in fact moved, the OKDHS caseworker requested services in the new county, and on 8/8/07, checked on the status of those services. On 8/10/07, the OKDHS caseworker spoke to JS by phone, and made an appointment to see her and DS on 8/14/07.[126] OKDHS's only contacts with the family were one visit eight days after reunification and one phone call more than a month after DS was returned.

On 8/11/07, OKDHS received CPS referral 1125652.  Hospital staff reported that five-year-old DS had suffered major head trauma and multiple bruises. On 8/12/07 it was reported that DS had died as a result of his injuries.[127]

JS told the OKDHS investigator that she had returned from the store and found DS on the floor with his legs in a laundry basket. He was stiff, and his eyes were rolled back. She could not find a heartbeat. MC said that he tried to get DS to help with the lawn while JS was at the store. DS told him that he did not want to, and asked to play with some binoculars. MC told him no and DS went into the house. According to MC, when JS returned from the store, she went to check on him, and came out with DS in her arms. MC could see something was wrong, and called 911.[128] According to the police report, JS said that she thought DS had tried to get the binoculars from the closet and had fallen.[129]

The physician who treated DS stated that his injuries were not consistent with MC's explanation. The medical examiner's report showed that DS had suffered acute bilateral subdural and subarachnoid hemorrhages; retinal hemorrhages; an acute occipital skull fracture; laceration to his scalp; subgaleal hemorrhage; multiple contusions to his forehead, cheek, jaw, neck chin; abrasions to his nose and chin; a contusion to his tongue; bruises to his ribs, shoulder, torso, arm

and leg; and contusions to his colon and pancreas. The cause of death was found to be blunt force head trauma and the manner homicide.[130]

MC was arrested and charged with first degree homicide.

### Analysis

- OKDHS's response to the initial maltreatment allegations in December of 2005 and January of 2006 was unacceptable. The serious nature of the allegations warranted urgent and thorough investigation. Instead, OKDHS allowed DS to be returned to JS and MC without having conducted a sufficient investigation to have any idea how he may have received a skull fracture. Even without the significant history of prior injuries, this would have been highly problematic. Given that this was the *fourth* head injury JS had received in a year, it is inexplicable.

  When OKDHS received a referral that DS had been injured again, only two days after he was released from the hospital for a skull fracture, it took the agency three days to see him.  When the OKDHS investigator did see him, she failed to take any action to protect him. When it was reported two days later that DS had extensive genital bruising, OKDHS failed to conduct any reasonable investigation into the cause. The agency never made any significant inquiry into the many injuries DS suffered before the 12/31/05 referral.

  Although DS was temporarily protected after the police took him into custody, OKDHS's failure to make any reasonable effort to investigate DS's injuries helped set the stage for his reunification.

- Even given the poor quality of its effort to determine who hurt DS, it should have been apparent that no amount of anger management services, parenting classes, and family counseling would have made it safe to return a five-year-old to a caregiver or caregiver(s) who hurt him, or allowed him to be hurt, as badly as he had been before he was removed. DS should *never* have been returned to JS and MC. The decision to return DS to the care of JS and MC violated CWLA standards.[131]

- When children are returned to parents from whom they have been removed for their safety, post-reunification plans must be carefully developed and implemented. In the best of circumstances, reunification is a difficult process, for parents and for children. Careful monitoring should be included as one component of reunification plans. This means frequent visits at the early stages of the reunification to detect signs of abuse or neglect.  One visit and one phone call over the course of five weeks, in what should have been seen as an extremely high-risk reunification, were completely unreasonable.

*Conclusion*

Some of DS's suffering and his death would almost certainly have been prevented by a competent response from OKDHS. Between his second and fourth birthdays, JS suffered lacerations to his head that required stapling (July 2004), facial lacerations and contusions (December of 2004), a head injury and abrasion and swelling of his eye (November of 2005), a cut to his hand and healing abrasions to his back (December of 2005), a skull fracture and subdural hematoma (December 2005), bruises on the front of his head and a friction-like laceration to his wrist (January 2006), bruising from his testicles to his rectum and bruising to his penis, thighs and buttocks (January 2006). OKDHS was aware of each of these injuries (*albeit* the first four only after the fact) and investigated them in a grossly inadequate fashion or not at all. The agency also participated in the unfathomable decision to return DS to his mother and her boyfriend. It failed to implement an even remotely reasonable reunification plan. These errors proved to be literally fatal.

## C.     __AD__

AD was a two-year-old male child who was in the custody of OKDHS at the time of his death.

*Family History*

AD was born on 5/9/05 in Enid, Oklahoma. AD's mother was TSB. At the time of AD's birth his mother was married to TS (they had married when TSB was 14 and TS was 24 years old). TSB and TS had two children: AD's half-brother, SSS, born on 6/6/03 and AD's half-sister, SKS, born on 3/5/01. When AD was born, TSB had been separated from TS for about a year, but they had not divorced. AD's father was another man, JD.[132]

TSB and TS had been involved with OKDHS before AD was born:

- On 4/11/02, OKDHS received CPS referral 785193. This referral alleged that medication TS was taking rendered him unable to care for his then one-year-old daughter, SKS, while TSB worked. TS had a mental health history including a diagnosis of bipolar disorder. OKDHS completed a CPS assessment and provided supportive services.[133]

- On 12/22/04, OKDHS received CPS referral 958106, alleging that TSB smoked marijuana and drank alcohol in the presence of her children, and that TS permitted this. At the time of this referral, TSB had separated from TS and was pregnant with AD by JD. TS (who, as noted, was bipolar and had a history of drug abuse) was the primary caretaker of AD's half-

siblings, three-year-old SKS and 18-month-old SSS. This referral was found Unsubstantiated after a CPS assessment.[134]

- On 3/29/05, three months later, and six weeks before AD's birth, OKDHS received CPS referral 974096. This referral was the mirror image of the previous referral. It alleged that *TS* was neglecting SSS and SKS due to *his* drug abuse. TSB and TS signed a plan that *TSB* would care for the children and TS would not use drugs. The referral was found Not Substantiated - Services Recommended.[135]

TSB had been involved with JD for about a year when AD was born, on 5/9/05, but they did not live together.[136] JD also had significant CPS history, and had been convicted of felony child abuse of the son of a prior girlfriend.[137]Although AD's mother, TSB, appears to have been AD's primary caretaker during the brief time he was in her custody, AD also spent time with JD's mother and with JD.

On 6/21/05, OKDHS received CPS referral 989318. Six-week-old AD had been taken to the Children's Hospital in Oklahoma City where he was found to have suffered a very severe traumatic brain injury. The referral was investigated jointly by OKDHS and the police. To summarize the investigation, JD was caring for AD while the child's mother was at work. He was alone with AD when AD stopped breathing. JD said that he and AD had gone to a store. When they returned home, JD put AD on the couch in his car seat and went to the bathroom for about five minutes. When he came out, AD was blue around his mouth and was not breathing.[138] According to the physicians treating him, AD had suffered an extensive traumatic brain injury, which had occurred minutes before AD stopped breathing.[139] Although there were no external injuries or fractures, there was severe bleeding in his brain. AD's injuries were consistent with his having been shaken very hard.[140] Because AD was alone with JD at the time, it is clear that he was responsible for the injury. He was not, however, charged with any crime in relation to AD's abuse.

At the time of the incident, AD's half-siblings were with their father (TS). Initially, TS did not believe that JD had hurt AD. Eventually, however, TS decided he did not want JD to have contact with SSS and SKS and told OKDHS that he was going to court to get custody. Subsequently, on 8/2/05, OKDHS received CPS referral 996128 alleging that TS was using drugs while caring for SSS and SKS. TS admitted to the allegation and OKDHS found the referral Substantiated. The children, SSS and SKS, were removed from TS's care and placed in the guardianship of TS's parents.[141]

AD's mother never accepted that JD had injured AD.[142] On 6/23/05, the court gave OKDHS emergency temporary custody and on 6/24/05, OKDHS obtained full custody of AD.[143]

On 7/11/05, AD was discharged from the hospital.[144] At discharge, AD's prognosis was poor. He had only brain-stem function and was not capable of any purposeful body movement. He could breathe but could not swallow, suckle, or regulate his body temperature.[145]

### Foster Care History

Upon discharge from the Children's Hospital, AD was placed in the GC foster home. In addition to the foster mother (GC) and the foster father (BC), the household included the foster parents' children (girls five and six and boys four and eight years old).  During AD's placement in the home, other foster children came and went.

GC and BC had been approved as foster parents on 7/18/00. GC was employed as a certified nursing assistant. Neither foster parent was found to have any criminal history. At the time they were approved as foster parents, they had no CPS history.[146] After becoming a foster parent, however, GC was the subject of several child maltreatment allegations.

- On 6/7/02 GC reported to OKDHS that 10- and 11-year-old foster children in her home had removed the panties of some younger girls. OKDHS determined that the foster parents had made a reasonable safety plan to prevent recurrence and screened the referral out.[147]

- On 6/18/04 and 6/23/04, OKDHS received referrals 927315 and 927977 concerning the GC foster home. A 13-year-old former foster son alleged that he had been abused while placed in the GC foster home. GC allegedly hit him with a belt and grabbed him by his arm, leaving bloody scratches. As punishment during the winter she allegedly made him stay outside for as long as two hours wearing shorts and no socks.[148] OKDHS conducted a CPS investigation. The 13-year-old gave a credible account of being hit on the buttocks with a belt and of being locked outside. Some other children placed in the home confirmed occasional incidents of corporal punishment. The foster mother GC acknowledged that she had, on one occasion, swatted the 13-year-old on the buttocks. She also said that she had sent him outside as punishment once. She said that it was not cold at the time and that he was suitably dressed. GC said that she had notified her foster care caseworker of both incidents immediately after they occurred. The caseworker verified this. OKDHS found the referral to be Ruled Out.[149]

- On 3/18/05 OKDHS screened out CPS referral 931447, in which staff at a day care center reported that GC was "cold" and verbally abusive to a two-year-old foster son. The referral was to be addressed "through services."[150]

Although none of these referrals was substantiated, it is clear that there were policy violations related to corporal punishment and sending a child outside as punishment. There is no evidence

that any corrective action was ever taken in response. While AD was placed in the GC home, OKDHS did not receive any CPS referrals or other complaints concerning the home.

While placed in the GC home, AD suffered from seizures, chronic respiratory problems, pneumonia, and various infections. He was fed by feeding tube. He received extensive medical services (including specialized in-home nursing 16 hours per day), physical therapy, and other services. By all accounts, he received sufficient care while in the GC home and medical professionals attributed his survival to the care that GC provided.[151]

JD relinquished his parental rights to AD.[152] TSB retained her rights but visited AD only sporadically. Although the permanency goal was return home, adoption was added as a concurrent goal. TSB began to discuss relinquishing her parental rights, and GC and BC hoped to adopt AD.

In February 2008, AD had severe respiratory problems and, after outpatient treatments failed to help, he was admitted to the local hospital. On 2/4/08, AD was flown from the local hospital to a hospital in Tulsa, where he died the following day.[153] The Medical Examiner found that AD's death was due to respiratory failure and was the result of the brain injury he suffered as an infant. The manner of death was ruled homicide.[154]

*Analysis*

- Given AD's parents' history of child maltreatment, it is possible that OKDHS should never have left AD in their care in the first place. Whether this is the case depends on the details of JD's history of child abuse, about which there is almost no information in the records reviewed. JD's conviction, for felony child abuse, indicates that the incident was probably serious.

- Although, based on the referrals it received about GC, OKDHS had reason to be concerned about her ability to be a foster mother, the record shows that she provided AD with good care.

*Conclusion*

The lack of information regarding JD's history of child abuse makes it impossible to know whether or not AD should have been left in JD's care and thus whether OKDHS should have taken steps that would have prevented AD's death. The care he received after he was placed in OKDHS custody did not play a part in his death.

## D.   DM

DM was a male child who was in OKDHS custody at the time of his death at the age of three months.

### Family History

On 11/8/07, OKDHS received CPS referral 1143243 from a hospital in Lawton, Oklahoma. DM had been born prematurely and was found to have cocaine in his system at birth. DM's mother, LM, also tested positive.[155] DM was in critical condition at birth and was airlifted to Oklahoma University Children's Hospital in Oklahoma City on the same day.[156]

DM's mother told the CPS investigator that she had used cocaine four or five times a month for several years. She said that she had not used the drug for two weeks prior to DM's birth. This was almost certainly untrue as cocaine clears the system quickly and so is not usually detectable even a few days after use. DM had no siblings.[157]

DM was born at 28 weeks gestation and had very significant medical problems, primarily concerning respiration. He was in critical condition and was connected to a ventilator following his birth.[158] OKDHS found the referral concerning DM's prenatal drug exposure to be Substantiated and, on 11/9/08, DM was placed in the custody of OKDHS.[159]

### Foster Care History

DM's mother requested that DM be placed with his maternal grandmother who lived in Tennessee. The maternal grandmother came to Oklahoma when DM was born. She expressed shock when she learned of her daughter's drug use. The OKDHS caseworker made a request for a home study of DM's maternal grandmother through the OKDHS Interstate Compact Office on 11/30/07. The Interstate Compact Office forwarded the request to Tennessee and on 1/2/08 the Tennessee child welfare agency approved the maternal grandmother's home for placement.[160] For reasons not clear in the records reviewed, OKDHS never sent DM to live with his grandmother.

Because his medical problems were serious, DM remained hospitalized until 1/2/08, when he was discharged to the VM foster home.[161] The foster family included the foster mother (VM), the foster father (JM), the foster mother's two daughters (17-year-old ES and 15-year-old SS), and ES's infant son. In addition, three foster children, boys aged seven, two, and one were in the home. The one-year-old had serious medical problems and was hospitalized for part of the time that DM was placed in the home.

100

The VM foster home had been the subject of three Unsubstantiated CPS referrals shortly before DM was placed there.

- On 9/21/07 OKDHS received CPS referral 1133981. This referral was made by a counselor who was providing therapy to the foster mother's 20-year-old daughter who lived in another state. The counselor reported that the 20-year-old disclosed that her 15-year-old sister (SS) had told her that her stepfather (foster father JM) had tried to molest her. The 20-year-old reported that JM had molested her and ES as well.[162] CPS referral 1134044 addressed the same allegation from the perspective of risk to the foster children.

  During the CPS investigation of these referrals, SS and ES denied that JM had ever molested them. The foster mother, VM, denied any knowledge or suspicion that her husband had ever touched any of her daughters sexually. JM was never seen in person. He was interviewed by telephone and denied the allegations. Two important contacts were never made. The OKDHS investigator made two unsuccessful attempts to make telephone contact with the foster mother's 20-year-old daughter who was the outcry witness, and she made only one unsuccessful attempt to telephone the counselor to whom the 20-year-old had disclosed. Despite the fact that important sources were never interviewed, OKDHS found the abuse allegations to be Ruled Out.[163]

  The records reviewed indicate that a law enforcement investigation of the sexual abuse allegation was also initiated; however, there is no indication in the file that the OKDHS investigator attempted to contact the law enforcement investigator. Later, the law enforcement authority (OSI) complained to OKDHS that they received no cooperation from the foster family. OSI expressed concern that the lack of cooperation indicated that the family had something to hide.[164]

- On 11/22/07 OKDHS received CPS referral 1145425 from a health care provider, alleging that a two-year-old foster child in the VM home had broken his arm. The foster mother had told the medical provider that the child had been wrestling with his seven-year-old brother who was also placed in the home.

  This referral was not thoroughly investigated. The foster mother was interviewed on two occasions five days apart and gave very different accounts of the incident. On 11/23/07, she told the OKDHS investigator that she was in the kitchen, heard crying, and ran out to see what had happened. She said that the seven-year-old told her that he had been playing roughly with his two-year-old brother. On 11/28/07, she told a different OKDHS investigator that the boys were wrestling in the living room, and that she never heard any crying. There was no effort to reconcile these conflicting accounts. The seven-year-old reported that the foster mother's 18-year-old daughter was in the room when his brother was hurt. The

daughter was never interviewed. A medical professional from the office where the child was treated called the investigator to complain about the foster father's attitude and lack of knowledge about the incident. There was no other contact with any health care provider involved in the child's treatment. The treating physician should have been contacted to determine whether the explanation for the injury (which appeared to have been based on speculation) was plausible.[165] The foster father was never seen in person. He was interviewed by phone more than a month after the referral. Given these deficiencies in the investigation, it is not possible to know whether OKDHS' decision to find the referral Ruled Out was correct.

During the three months DM was placed in the home, he continued to have serious medical problems and was hospitalized at least once. He had a shunt surgically implanted to drain fluid from his head, was placed on oxygen, and needed to be connected to an apnea monitor when he slept. The apnea monitor identified significant breathing abnormalities when DM slept. According to the apnea monitor provider, the foster family's use of the monitor was inconsistent, and the monitor was not used for a period of at least a week, not long before DM's death.[166]

On 2/23/08, a hospital reported that three-month-old DM had died (CPS referral 1160459). DM's foster mother was reportedly on her way to the hospital to visit another of her foster children when she received a call from her daughter at home who told her that DM was not breathing. The daughter called 911 and DM was taken to the hospital where he was pronounced dead.[167] At the time of DM's death, one of the three foster children remaining in the VM home was hospitalized. The other two were moved to other homes pending the result of the investigation.[168]

During the CPS investigation the foster mother said that on the morning of DM's death, she got up and fed him at 2:00 or 3:00 AM. She stated that she then fell asleep with him on a couch on which her 16-year-old daughter was also sleeping. The foster mother said that she got up and left the house at about 9:00 AM, leaving DM on the couch with the 16-year-old. She said that she did not check on DM before she left. She stated that DM was connected to the apnea monitor. The foster mother said that the apnea monitor was not working properly and that she had complained to the provider about this.[169] This account is somewhat different from the one the foster mother gave to the police on the morning DM was found dead. She had told the police that she and DM had slept in her bedroom and that she did not bring him out to the couch until 7:30 AM.[170]

The foster mother's 18-year-old daughter generally confirmed her mother's account. She stated that she was sleeping on the floor with her own infant on the day DM died. She said that she woke up and that DM and her 16-year-old sister were on the couch. She picked DM up and found him unresponsive. She said that DM was connected to the apnea monitor but that she believed that it was turned off.[171]

Information obtained from the apnea monitor company indicated that the monitor was not in use when DM died, and that the foster family "did poorly at using the monitor." The company had no record of complaints from the foster mother. The monitor was examined after DM's death and was found to be working properly.[172]

Many months after DM's death, the medical examiner found the manner of DM's death to be unknown. DM's medical problems are listed as contributing to his death in the medical examiner's report.[173]

OKDHS found the referral Substantiated for "Neglect – Failure to protect, not related to death." Despite this finding and the fact that the foster mother appears not to have been consistently truthful during the investigation, OKDHS continued to use the foster home for medically complex children. On 4/2/08, before the investigation into DM's death was complete, OKDHS received a referral from hospital staff alleging the medical neglect of a seriously medically compromised child placed in the VM home. This referral was found Unsubstantiated – Services Recommended.[174]

*Analysis*

- It is difficult to understand OKDHS' failure to place DM with his grandmother. The Tennessee child welfare agency had approved her home for DM's care. After DM's placement with VM, there were two young medically complex foster children, two other young foster children, the foster mother's infant grandchild, the foster mother's two daughters and the foster parents living in the home. Certainly, the less chaotic home of DM's grandmother was a better alternative. This is a violation of COA standards that call for kinship placement when feasible and limit the total number of children placed in foster homes to two where any child has therapeutic needs.[175]

- Neither of the CPS investigations that preceded DM's placement in the VM home was thorough. Although the allegations investigated do not appear to be related to the conditions surrounding DM's death, OKDHS failed to gather adequate information to determine whether the VM home was a safe place for children. This violates CWLA standards calling for thorough investigations of abuse and neglect allegations in foster homes.[176]

- Although the medical examiner's finding was inconclusive, and DM's medical problems almost certainly played a part in causing his death, the fact that his apnea monitor was not in use constitutes medical neglect. Had it been in use, DM might well have been saved.

- The fact that DM was left to sleep on a couch where two other people were sleeping is also a likely cause of his death. It is unsafe to allow *healthy* infants to sleep in such conditions. It is more dangerous for medically compromised children such as DM.

- It is concerning that OKDHS continued to use the VM foster home after DM's death. The Substantiated finding of neglect related to the death of a foster child would seem to be good reason to discontinue use of the home. Not only did OKDHS continue to use the home, it continued to place fragile and medically complex infants there. This violates CWLA standards.[177]

### Conclusion

Because the manner of DM's death was not determined, it is not possible to know whether his death was preventable. A leading possibility is that DM died as result of co-sleeping on a couch with two adult-sized individuals. It is not known what sort of information VM and other OKDHS foster parents are given about safe sleeping. No such information was in the "Resource Section" of the case file. Hospitals routinely provide safe sleeping guidance to new mothers as part of the obstetrical discharge process. No responsible professional would ever condone the sleep conditions in which DM died for a normal child, much less a child facing DM's medical challenges.

### E.   DJ

DJ was a twelve-year-old male child who was in the custody of OKDHS when he died.

### Family History

DJ was born on 10/25/95 into a family that had extensive involvement with the child welfare system. His maternal grandmother's (KJ's) history with child welfare extends back to 1975. Her living conditions growing up are described as having been chaotic and impoverished. Her children, including DJ's mother, were repeatedly removed from her care because of extensive abuse and neglect. KJ was psychiatrically hospitalized several times and was diagnosed with schizophrenia.[178]

DJ's mother, OJ, was also diagnosed with schizophrenia. She was drug dependent and sold drugs, was a prostitute, and was described as violent. Like her mother, OJ had an extensive child welfare history. OJ had four older children who had been removed from her custody before DJ was born. Her parental rights to these older children were terminated on 6/5/97.[179]

Sometime in 2001, OJ was incarcerated. Her sentence was approximately two years. DJ and his siblings were left in the care of their maternal grandmother, KJ. In addition to DJ and his three siblings, KJ was caring for her own two children and four other grandchildren whose mother was also incarcerated.[180] On 8/7/01 OKDHS investigated referral 746504 alleging that

the children were abused and neglected by their maternal grandmother. Although the combination of the number of children in KJ's care, her child welfare history, and her history of severe psychiatric disorder should have been sufficient to determine that the children were maltreated and in need of removal, the OKDHS investigator found the referral to be Unsubstantiated – Services Recommended.[181]

OKDHS provided prevention services while the children were with KJ. The case notes from this episode can only be described as hair-raising. The 10 children were totally unsupervised and out of control (e.g. looting houses, sleeping in cars). According to the OKDHS worker, the grandmother "exhibit[ed] extreme paranoia" and was incapable of caring for any children.[182] Finally, on 12/10/01, DJ and his siblings were removed from their grandmother's care and placed in OKDHS custody.[183]

### Foster Care History

DJ displayed symptoms of very severe psychological problems throughout his time in OKDHS custody. He was placed on various psychotropic medications and appears to have received counseling while in custody, although little specific information about this could be located in the records reviewed. He received several psychological evaluations and was periodically placed in inpatient clinical settings because of mental illness. The symptoms of his mental illness – explosive violence, destructive behavior, self-destructive behavior, oppositional behavior, and incontinence – made it very difficult to manage DJ in a family setting.

Initially, DJ was placed in the OKDHS shelter. On 1/14/02, he was moved to the H treatment foster home.[184] He was removed from this therapeutic foster home after less than one month because he set a fire, and the foster mother was afraid to allow him to continue to live in her home. DJ was moved to an inpatient residential treatment center on 2/11/02.[185] During his stay there he was aggressive, oppositional and self-destructive. He made no discernable progress.[186]

On 8/22/02, DJ was placed in the W therapeutic foster home where he would live for more than a year. While placed in the W home, DJ continued to engage in explosive, aggressive, and destructive behavior.[187] He had a short attention span and had uncontrollable outbursts of anger during which he had to be restrained. He bit one teacher and broke another's finger. He attempted to run away from school every day.[188] While in the W therapeutic foster home, DJ's symptoms did not abate.[189] Because of his behavior, psychological testing was done.[190] The psychologist found DJ to be mildly mentally retarded. He described DJ as having "severe emotional and behavioral problems." He recommended that DJ be evaluated by a pediatric neurologist.[191] On 8/13/03, DJ received a genetics evaluation that determined that he was not affected by fetal alcohol syndrome.[192]

While in this therapeutic foster home, DJ was an alleged victim in CPS referral 811187 which was made on 9/12/02. This was the fifth CPS referral concerning the foster home. None of the previous referrals were Substantiated.[193]  In this referral DJ alleged that his 14-year-old brother (placed in the same home) had made him suck his penis.  Because DJ's account was not consistent, and because there was no evidence of inadequate supervision, the referral was appropriately found Unsubstantiated – Services Recommended.

On 10/3/03, DJ was removed from the W therapeutic home because his condition showed no sign of improvement and he was moved to the LG therapeutic foster home. Initially, DJ's behavior improved. However, after five months, the LG foster parents requested DJ's removal because of his combative behavior.[194]

While DJ was placed there, the LG foster home was the subject of CPS referral 889322. This referral, made on 11/4/03, did not directly involved DJ. A 10-year-old male foster child alleged that an 11-year-old male foster child tried to touch him sexually in the presence of the foster father. The investigation found that the boys had been prevented from having anal intercourse because the foster father checked on them while they played in the back yard.  It was found Unsubstantiated – Services Recommended, which was the correct finding.  However, the foster father reported the incident to the case worker from the private agency that operated the therapeutic foster home and she told the foster father that the boys should continue to share a bedroom.  This was dangerous because it created the likelihood that the younger child would be victimized.[195]

On 3/4/04 DJ was returned to the W therapeutic foster home. After about three months, because of DJ's aggressive acting out, he was removed from this home for a second time. On 6/21/04, DJ was returned to the residential treatment center.[196]

On 6/30/04, while DJ was placed in the residential treatment center, OKDHS found the foster mother from the W therapeutic foster home to be Substantiated for inadequate supervision because she had failed to prevent sexual activity between children placed in her home. As a result, the foster home was closed.[197] This precluded DJ's return to the most stable caregiver he had known.

DJ remained at the residential treatment center until 11/9/04 when he was moved to a psychiatric unit. This move was made because of DJ's lack of progress at the residential treatment center.[198] While DJ was in the psychiatric facility, planning for his discharge took place. A specialized foster home was identified and an array of psychiatric, behavioral, and educational services were arranged. The prospective foster parents began pre-placement visits with DJ.[199]

On 5/16/05, DJ was placed in the LW foster home. The LW home was operated by a private agency and was approved by the OKDHS Developmental Disabilities Services Division (DDSD). This approval makes a wider array of supports and services available to the foster parents and to those placed in DDSD homes.

At the time of DJ's placement, the foster family included LW, the foster mother, SW, the foster father, and the foster parents' son who was eight years old.   The foster father was a police officer and the foster mother stayed home.  For some of the time that DJ was in the LW home, his brother, who was eight years old at the time of DJ's placement, was also there.

The LW foster parents had applied to become foster parents on 11/9/99, and[200] they were approved through the DDSD on 5/25/00.[201] The LW foster home had been the subject of one CPS referral before DJ's placement.  On 3/1/04, OKDHS received CPS referral 908155. This referral was made by staff from a high school. The school staff reported that a 19-year-old special education student living in the LW foster home was afraid to go home because his foster mother (LW) was abusing him. The referral source reported that the alleged victim had facial bruising, sore teeth, and lumps on his head. The reporter said that there had been signs that the student had been abused for the previous month. OKDHS screened the referral out because the alleged victim was over the age of 18.[202] While OKDHS had no choice other than to screen the referral out, it should have been addressed as a policy violation. No evidence found in the files revealed that the issue was ever addressed. It is, however, possible that this is because the LW home was approved through DDSD.

While placed in the LW home, DJ exhibited the same, extremely difficult behavior that he had throughout his childhood (e.g., he smeared feces on walls, seriously injured the foster mother, and destroyed household furnishings). While in the home, he received services from DDSD including regular counseling. He continued to take multiple psychotropic medications. For a time, he was excluded from the public school because of his disruptive behavior but received in-home schooling through the school district. DJ's behavior gradually, if sporadically, improved through much of his stay in the LW home.[203]

In late 2007, DJ began to revert to some of his more trying behaviors. Among these was continually urinating in his bed and on the floor in his bedroom. This destroyed the carpet in his room and his mattress. DJ's therapeutic team advised the foster parents to have DJ sleep in a sleeping bag, which could be washed. Also, at the suggestion of the therapeutic team, the carpet was removed from DJ's room and was replaced with linoleum. This was paid for from a trust account that was held for DJ.[204]

On 3/21/08, OKDHS was notified by the police that DJ was dead. According to CPS referral 1165350, the foster parents had purchased a quantity of food for a camping trip. DJ found the

food and binged on it. He ate a sufficient quantity that he was throwing up and his stomach appeared distended.[205] On the same day, OKDHS received a report from a source who had no first-hand knowledge about the incident but who had heard some "chatter." The source alleged that 1) the reason that DJ urinated and defecated in his room was that he was confined and not allowed to leave his room, 2) the reason that DJ engaged in binging behavior was that he was not fed adequately and that he was very thin, 3) that the foster parents had put a tile floor in DJ's room and that DJ had paid for it, and 4) that there may have been a video tape of DJ's death.[206]

DJ's death was investigated by the police as well as by OKDHS.[207] The story that emerged from these investigations is fairly straightforward and is corroborated by the medical examiner's finding. Sometime early in the day on 3/20/08 the family bought food in preparation for a camping trip. DJ found the food and ate a large quantity of it. According to LW, he ate a box of cookies, several bags of chips, several bags of snacks, two tamales, a sandwich, and some candy bars. DJ said that his chest hurt and he vomited. He laid down for much of the day. The foster parents said they did not take DJ to the doctor because he had thrown up, had a bowel movement, and seemed to be feeling better by bed time.

The foster parents had installed a chime in DJ's room so that they would know when he got up. That night, he was up at 2:00 AM, 4:00 AM, and 6:00 AM. Each time the foster father checked on him. At about 8:00 AM, the foster father went to DJ's room to get him up and found him unresponsive. The paramedics were called but DJ was already dead.

The medical examiner found that DJ had aspirated vomit into his lungs and that this was what caused his death.[208] The only other child in the LW home at the time of DJ's death was the foster parents' 11-year-old son.

The OKDHS investigator found the report to be Unsubstantiated – Services Recommended. When the investigation was reviewed at the state level, however, the finding was overturned and, the allegation was found to be Substantiated – Services Recommended.[209] No reason for this change is given in the file. On 8/11/08, the foster parents decided to close their home.[210]

*Analysis*

- Given what OKDHS knew about DJ's family, it should have moved much more quickly to place him in OKDHS care. Failing to do so very likely to have contributed to the depth of his psychiatric problems.

- Before DJ was placed in the LW home, the mental health and other services that were necessary to support his foster care placements were not well coordinated. This may have resulted in unnecessary placement disruptions which certainly exacerbated his mental illness.

- While placed in the LW foster home, DJ experienced more stability and nurturing than he did at any other time. OKDHS's determination that DJ was neglected in the LW home is not reasonable. The referral should have been found Unsubstantiated.

*Conclusion*

Sadly, no child welfare agency can save every child it encounters. DJ was doomed by his intractable psychiatric problems and not by neglect on the part of his foster parents' problems. Nevertheless, OKDHS's oversight of DJ was inadequate in the ways described above.


**F.**    **RP**

RP was a male child who was in the custody of OKDHS at the time of his death at less than eighteen months of age.

### 1. Family History

RP was born on 11/05/06. He had two siblings, AE, born on 2/21/03, and NN, born on 10/10/07. At the time of his birth, RP's parents already had a troubled history. Both parents had themselves been placed in foster care. RP's mother, TE, was eventually adopted, and was sexually abused beginning at age 11 by her adoptive father, who (according to TE) fathered her oldest daughter, AE. RP's father, CN, began drinking at the age of nine, had a serious alcohol abuse problem, and a significant criminal history. There had already been one CPS referral to OKDHS before RP's birth, with AE as the alleged victim. After RP's birth, he was the subject of four referrals to OKDHS, two while in the care of his parents, and two while in foster care.

CPS referral 1141691 was made on 10/31/07 by staff at the hospital where RP's sister, NN, was born and where she remained hospitalized due to prematurity (NN had respiratory problems and would need to be treated with a "breathing machine" after her discharge from the hospital). The reporter stated that the parents would sleep while visiting, leaving four-year-old AE to supervise then one-year-old RP and the infant NN. The hospital room was described as a "pigsty." The referral was accepted for CPS investigation.

During the course of the investigation, the family's home was observed to be very messy and cluttered with clothes, dirty dishes, etc. RP was observed to be "messy, and in need of a bath," and the infant NN had a strong urine odor. RP's father was seen changing NN without wiping her and trying to feed her a cold bottle. At one visit, the mother had a two-inch cut on her face, which she said occurred when she and RP's father were arguing. She reported knocking a beer bottle out of his hand and cutting her face when she then fell on it (the father's version of the

incident was slightly different). Both parents had been drinking. According to the parents, the children were present, but in another room.

The family moved during the investigation, and the OKDHS investigator located them at a relative's home after a few weeks. The investigator noted that the infant did not appear to be gaining weight, was warm to the touch, and was wheezing. The father took her to the doctor who was not concerned about her weight, and prescribed medication for her breathing problem. Relative who were contacted said the mother "was a good mom," but they expressed concern that the cut on her face might be the result of domestic violence. However, they denied firsthand observation of violence between RP's parents.

The investigator failed to address issues related to the four-year-old AE being left to "supervise" the two younger children, dismissing the allegation based solely on the parents' denial. The potential domestic violence was not adequately addressed, despite the availability of eyewitnesses to the incident. The investigation was closed with a finding of Unsubstantiated - Services Recommended, finding there was insufficient evidence to confirm neglect, and recommending that the parents locate their own housing, keep medical appointments for the baby, and receive community services.[211]

On 1/10/08, OKDHS received CPS referral 1152692 alleging that RP and his siblings' safety was threatened by their parents' domestic violence. The reporter stated that the father, CN, had hit the mother, shoved her to the ground and dragged her. RP's father was arrested for domestic assault and public intoxication.

The OKDHS investigator interviewed RP's mother, TE, and observed the children on the day of the referral. TE confirmed that CN had hit, shoved, and dragged her across the ground. She was observed to have a swollen lip, and the police noted that CN was so intoxicated and out of control that they needed to use pepper spray to subdue him. TE told the investigator that she would press charges against CN, and she wanted him to get help. She said that the incident occurred outside, and the children were inside at the time. The mother signed a safety agreement providing that she would not allow CN any contact with the children until he received services for his alcohol problem.

The investigator later apparently received information that CN was out of jail and that the parents and the children were staying in a motel. On 1/22/08, the investigator enlisted the assistance of law enforcement and attempted to locate the family at the motel, but they had left a few days before. Three-month-old NN was found at a relative's home. The relative told the investigator that the parents had left the baby the day before, and that she did not know where they went. The relative's home was in disarray, she had no provisions for the baby, and did not have the breathing machine for the baby's treatments. The police took NN into custody.

Four-year-old AE was located at her school and was taken into custody. While the OKDHS investigator and the police were at the school, TE called. The police told her to bring one-year-old RP to the OKDHS office immediately. When interviewed, RP's mother acknowledged that she had not pressed charges against CN, he had been released from jail, and they were homeless, staying in motels and with relatives. RP was also taken into custody.

The disposition for the investigation was Substantiated – Court Intervention Requested. An emergency petition alleging deprivation was filed and accepted, and the children were placed in a shelter.[212]

### Foster Care History

On 2/26/08, RP and his siblings were placed together in the tribal approved DO foster home (both parents have Indian heritage). In the home were the foster father, the foster mother, DO; their natural daughter, age 14; and three adopted sons, ages 12, 10, and 9.  Four children in tribal custody were also in the home – a brother and sister ages 12 and 9, and two brothers ages 6 and 8. In total the foster parents were caring for 11 children.[213]

There had been one CPS referral concerning the DO foster home before RP was placed there. On 6/21/07, CPS referral 1117067 alleging neglect was made. One of the foster children in the home at that time reportedly had diaper rash. The referral was screened out as not meeting the criteria for child abuse/neglect.[214] This was a reasonable decision.

On 3/24/08, OKDHS received CPS referral 1165795. Hospital staff reported that RP's sibling, AE, had been admitted, and had multiple brain masses. The referral alleged inadequate medical care. AE had only been in the foster home for about a month, and it was confirmed that DO had sought treatment for AE's symptoms on at least one prior occasion. The referral was appropriately screened out. AE died of the multiple brain tumors later that day.[215]

On 6/18/08, CPS referral 1182235 was made by Chickasaw Nation child welfare staff. The tribal caseworker made an unannounced visit and found seven children, all under the age of ten, alone with no adult present. RP and NN reportedly had full diapers. The ten-year-old child who had been left "in charge" by DO was throwing blocks around. The tribal caseworker determined that DO had been gone for at least two hours. The tribal caseworker removed all four children who were in tribal jurisdiction. Inexplicably this referral was screened out by OKDHS as not meeting the criteria for child abuse/neglect, and the situation was treated as a "policy violation."[216]

The information regarding this incident was apparently forwarded to RP's OKDHS caseworker, who then went to the foster home on 6/18/08. She did not remove RP or his sister. Instead, she

completed a safety agreement with the foster parents that the children would not be left with a child "caretaker," and would be adequately supervised at all times.[217]

On 6/27/08, it was reported by at least two sources, including staff from a hospital, that RP had been run over by a neighbor's truck.[218] The reports said that RP's foster father and several of his friends had been by a pond on the foster parent's property, watching several older children swim. The foster father and his friends had been drinking. RP was with them at the pond before he was run over. RP had massive head trauma and was unlikely to survive. The referral was accepted for investigation.[219]

The foster father stated that he had taken all the boys down to the pond to swim but that RP, who was then 20 months old, was not swimming because he did not like the water. They met some of the foster father's friends at the pond. The foster father said that he and his friends had had a few beers, "maybe two" each. He regretted drinking, because alcohol "just screws everything up." One of the foster father's friends left to buy more beer. Shortly after he got back from that errand, he was called home by his wife. When he backed out of the driveway to go home, he ran over RP.[220]

Just before the friend left, the foster father stated that RP was behind him (the foster father) playing. After the friend left, one of the boys said "Dad, RP," and the foster father saw RP lying on the ground where his friend's truck had been. He knew that RP had been badly hurt. The friend in the truck came back; they called 911 but then took RP to the hospital instead of waiting for the ambulance.[221] When asked by the investigator, the foster father said that RP liked to play behind cars; he liked to yell into the tailpipes. He also acknowledged that RP had "gotten away from them before," e.g., at a ballgame the week before.[222]

RP's foster mother was not at the pond when the incident occurred. She had stayed at the house with the girls. She said that one of the boys came running to the house and said RP had been run over. She also said that RP liked to play behind cars and liked to yell into the tailpipes because he liked to hear the echo. She said her husband had been drinking beer, but she was not there so she did not know how much. According to the foster mother, he had not drunk alcohol at all for many years, but started drinking again in 2004.[223]

The foster parents' 14-year-old daughter reported that her parents would leave the children alone with the 10-year-old or the 12-year-old "in charge," and that her father drank beer every day.[224] The foster parents' 13-year-old adopted son said that his mother made him quit his job so he could help with the children, and that his father had "maybe 5-6 beers daily."[225]

According to the sheriff's department, the foster father had DUI's in 1980, 1992 and 1996.[226]

Several of the other foster children, including those that had been removed, were interviewed.

- An adopted son confirmed the younger children were left with the 10- or 12-year-old children in charge while the foster parents were not there.[227]

- An eight-year-old foster son, was at the pond when RP was run over, said that he saw RP lying on the ground  with blood all over. He picked RP up and carried him over to the foster father. The foster father and his friends were drinking beer. The foster son reported that the foster father drank every day, maybe four beers. He said that the foster parents made the children clean up after poker parties, and that they would be up all night cleaning. If they did not clean up, they had to run laps all the way around the house, maybe 50 times, or to the mailbox, which was "far."[228]

- One of the foster children who had been removed stated the foster mother would leave the ten-year-old in charge. The foster father drank "all the time." They had to stay up and clean up after poker parties. He said that RP was always outside without an adult. He and another foster child had to change RP and NN's diapers. "Only the kids did any work."[229]

- A 12-year-old girl who had been in the home since 2007 stated that the foster parents always made her clean the house.[230]

Parents of some of the removed children were also interviewed.

- They had lots of concerns about the foster home, and had made several complaints to their caseworker but she "wouldn't listen."

- When the parents of one of the boys in the home visited for the first time, they noticed that their son's ears were swollen and purple. The foster mother wouldn't let him explain what had happened and called him a little liar.

- Other parents were told by their son that he had to "clean up his own puke" when he got sick.

- One child was not receiving prescribed breathing treatments.

- One child had his finger almost severed; another had a burn from getting his own food off the grill.[231]

The police conducted an investigation into RP's death; no charges were filed. RP's cause of death was head trauma, manner accidental.

The OKDHS investigation was confirmed for neglect on the part of both foster parents, and the worker expressed concern about placing any more OKDHS children in the home due to the

pattern of lack of supervision and the foster father's drinking. The foster home was closed to OKDHS placements on 1/15/09.[232]

*Analysis*

- The DO foster home was unreasonably overcrowded. At the time of RP's placement in the home a total of 11 children resided there. This number of children precludes adequate supervision and creates a significant likelihood of children being assigned unreasonable childcare responsibilities. Such overcrowding violates COA standards that require that the number of children in foster homes not exceed five[233] and CWLA standards that limit the number to four, including the foster parents' own children.[234]

- An ongoing and pervasive pattern of poor supervision in the foster home predated RP's death. The children placed in the home spoke freely about this after RP's death. The foster father's pattern of alcohol use contributed to the inadequate level of supervision. These problems should have been discovered earlier by the children's OKDHS caseworkers. One of the most important functions of a caseworker is to meet regularly with children in foster care and discuss potential safety threats, including the level of supervision they receive. OKDHS' failed to do this in time to save RP violates CWLA[235] and COA[236] standards.

- The CPS referral received on 6/18/08 related to young children being left alone under the "supervision" of a ten-year-old should *never* have been screened out. This referral alleged serious and dangerous neglect. It constituted grounds for removing the young children placed in the home, as the tribal caseworker did with regard to the older children in her jurisdiction. OKDHS' response – a safety agreement in which the negligent foster parents agreed "not to do it again" – was wholly inadequate. OKDHS's failure to respond adequately violates CWLA standards.[237]

*Conclusion*

RP's death was one that OKDHS should have prevented. Had the referral made on 6/18/08 been screened in – as it should have been – and adequately investigated, OKDHS would have known of conditions that required removal of RP and the other young children placed in the DO foster home. This failure is consistent with the findings of my review of OKDHS screened out referrals, above.

G.     **SW**

SW was a female who was in the custody of OKDHS at the time of her death, four days after her second birthday.

*Family History*

SW was born on 6/25/06 in Chickasha, Oklahoma. Her father, RW Sr., had an extensive criminal background including charges related to alcohol, domestic abuse, gun charges, and attempted murder.[238] Her mother, MW, had been abused as a child and had had extensive involvement with OKDHS. She also had a significant history of mental illness. SW had two older brothers, RW Jr. (born 5/24/98) and ZW (born 6/11/01) and an older sister, MW (born 11/12/99). RW Sr. lived in the home sporadically. Issues of domestic violence and alcohol abuse pervaded RW Sr. and MW's marriage.

The family had considerable involvement with OKDHS before SW was born, including the following specific instances:

- On 3/30/00, OKDHS received CPS referral 672602 in which the reporter expressed concern that RW Sr. and MW were themselves "just kids" who were frequently drunk and who neglected their children. This referral was assessed and found Unsubstantiated – Services Recommended.[239]

- On 8/6/01, OKDHS received CPS referral 746279 which alleged domestic violence. It was investigated and found Unsubstantiated – Services Recommended.[240]

- On 12/2/02, OKDHS received CPS referral 825436 which alleged physical abuse. It was reported that RW Jr. had a bruise on his head. During the investigation, RW Jr. said that RW Sr. had pushed him, causing him to hit his head. Other family members said that the bruise was the result of RW Jr. rough-housing with his father. RW Sr. and MW had been separated for about a year at the time of this referral, but RW Sr. visited the home frequently. OKDHS Ruled Out the referral.[241]

- On 3/8/04, OKDHS received CPS referral 909496. This referral alleged that because of her alcohol and drug use, MW had passed out, leaving her children unsupervised. During the investigation, MW admitted that she had taken Xanax with alcohol and had passed out. Although it appears that MW and RW Sr. were still separated at the time, MW claimed that because there were other adults in the home when she passed out, the children were not unsupervised. This referral was Substantiated – Services Recommended.[242]

- On 3/15/04, OKDHS received CPS referral 910777, reporting that MW and RW Sr., who had moved back into the home, were drinking and had gotten into a physical fight in the presence of the children. During the investigation it was noted that MW had significant facial bruising and other injuries. The referral was found Substantiated – Services Recommended. MW obtained a protective order and was referred for domestic violence services.[243]

SW was born on 6/25/06. As an infant she had a number of medical problems, including pneumonia, a staph infection, a "bump on her chest that drained pus," and impetigo.[244]

On 6/30/06, only five days after giving birth to SW, MW was arrested for DUI. This was the subject of CPS referral 1054183. The reporter expressed concern that, because RW Sr. and MW were separated at the time, there would be no one to care for the four children now that MW had been arrested. The OKDHS CPS investigator determined that the children were with relatives at the time of the incident, and that RW Sr. and MW had gone out to "have a good time," when MW was arrested. This referral was found Unsubstantiated – Services Recommended.[245]

On 9/29/06 OKDHS received CPS referral 1070372. ZW's school reported that the child, then five years old, had bruises on his back and had said that his father had kicked him the night before. After first telling a different story, ZW confirmed to the OKDHS investigator that RW Sr. had kicked him. ZW did have two small bruises on his back. At the time of this referral, RW Sr. was not living in the home but was visiting. ZW's siblings RW Jr. and MW were both interviewed. Both children went inside the home and were alone with their mother before being interviewed in front of the home. Both said that RW Sr. had visited the home on the night of the alleged incident. Both children described a domestic violence incident involving their parents; however, both denied that RW Sr. had kicked ZW. RW Sr. and MW, denied that RW Sr. had kicked ZW. OKDHS found the referral Unsubstantiated – Services Recommended.[246]

On 3/30/07 AH, the children's aunt, reported that she was worried about the children because RW Sr. and MW were drunk everyday and drove around with the children while intoxicated (CPS referral 1101135). She also reported that the children missed a lot of school and that there were incidents of domestic violence.[247] OKDHS made one unsuccessful attempt to see the family one week after the referral was received.[248] Then, on 4/20/07, before OKDHS had conducted any substantial investigation of the 3/30/07 referral, the sheriff's police pulled RW Sr. and MW over as they were driving. Both parents were very drunk and belligerent. SW was in the car at time. The other children were with their maternal grandfather who had abused their mother and who had extensive CPS history.

Both parents were arrested and SW was taken into custody by the police. The police placed SW with a maternal uncle.[249] On 4/27/07, OKDHS found the 3/30/07 referral Substantiated – Court Intervention Requested.[250] On 4/23/07 OKDHS obtained a court order for temporary emergency custody of all four children.[251]

*Foster Care History*

On 4/21/07, OKDHS placed SW in the SC foster home.[252] Her three siblings were placed in a different foster home.[253] On 5/11/07, after SW had lived in the SC foster home for about three weeks, she and her three siblings were moved to the kinship care home of their aunt AH.[254] AH was a single parent who cared for three of her own children.[255] In the first few weeks of their placement in the AH kinship care home, ZW and MW were placed in a psychiatric facility for evaluation. The recommendations for both children included placement in highly structured therapeutic foster homes.[256] In spite of this, OKDHS returned both children to the AH kinship care home when they were discharged from the psychiatric facility.

On 7/18/07, a dispositional hearing was held in juvenile court, at which temporary custody of all four children was awarded to OKDHS.[257] At periodic permanency reviews OKDHS recommended and the Court ordered continued placement in substitute care. The permanency goal for all four children was return home.[258] The parents were to receive alcohol assessment and treatment along with parenting training. SW's mother was also to receive domestic violence counseling and psychiatric services. Both parents substantially complied with their plans.[259]

SW and her siblings remained in the AH kinship home for four months. On 9/10/07 all four children were removed from that home after OKDHS received CPS referral 1131392, in which it was alleged that AH was allowing the children to stay with various other relatives. SW was found to have been given back to her parents.[260] All four children were placed in a shelter because OKDHS could not find foster homes.[261] SW remained at the shelter for one week, after which she was placed in the JC foster home for approximately seven months.[262] Her brothers and sister were placed in two different homes.

On 3/18/08, RW, ZW, and MW were moved from their foster homes to the DN foster home.[263] A month later, on 4/22/08, SW was moved to the DN foster home to join her brothers and sister.[264] One other foster child, three-year-old EF (born 1/13/05), was also placed in the DN home. In addition to the five foster children, the foster family included the foster mother DN and the foster father JN. The foster parents' adult daughters TT and SN and their families lived in separate trailers on the same property.[265]

JN and DN had been the subjects of three CPS referrals before OKDHS approved them as foster parents:

- On 5/27/95 OKDHS received a referral alleging child neglect. There is no further information about this referral in the records reviewed.[266] It does not appear that OKDHS was aware of this referral at the time it approved the DN home.

- On 6/26/98, OKDHS received referral 576431. Then 17-year-old TT went to the OKDHS office to report that her mother, DN, had assaulted her, slamming her head against the house, throwing her on the ground, and hitting her three times before her sister (SN) intervened. DN allegedly threatened to burn down the house of the family friend with whom TT had been staying. According to TT, DN tried to run her over with her car. She also alleged that DN "drinks all the time." When she made this report, TT had a cut on her cheek.[267] OKDHS conducted a CPS investigation during which DN admitted that she had thrown her daughter on the ground and hit her, and TT recanted her statement about her mother's drinking. OKDHS Substantiated the investigation and referred the family to counseling.[268]

- On 10/12/04, OKDHS received referral 946720. This referral alleged that SN (then 25 years old) had been arrested for growing marijuana in her home. SN had a four-year-old son who had been placed in the guardianship of his grandparents (JN and DN) because of SN's drug abuse. Apparently, JN and DN let their grandson go back to his mother's home.[269] OKDHS conducted a very superficial CPS assessment, during which the only contacts made were with JN and SN. No formal OKDHS finding for this referral appears in the record.[270]

DN and JN applied to become foster parents and, on 6/13/07, OKDHS began the foster home study process. An OKDHS resource specialist visited the DN home. During the visit, the resource specialist saw that the family had an above-ground swimming pool. In the "Safety Hazards" section of the initial foster home *House Assessment* form completed at the visit, the resource specialist noted that JN and DN "will put up fence around pool."[271] Both foster parents signed this form.[272] In a case note dated 7/9/07, the OKDHS resource specialist documented that she discussed the still-outstanding need for a fence around the pool with the prospective foster parents.[273]

On 6/18/07, an OKDHS *Records Check* form was completed. Both the 6/26/98 and the 10/12/04 referral are noted on this form.[274] On 7/9/07, the resource specialist received approval from OKDHS management to allow approval of the DN home despite the confirmed CPS history. It was also determined that the prospective foster father (JN) had been arrested in 1975 for DUI and transporting open liquor.[275] Neither DN nor JN was found to have had any other criminal history.

OKDHS next sent the DN foster home application to a private contractor for a formal foster home study (in some counties, OKDHS contracts with private agencies for such studies). On 8/9/07, the contractor completed a second foster home *House Assessment* form. In the Safety Hazards section, it is noted that the pool "will be taken down in Sept for the winter & fence will be put up when the pool is put back up."[276] As with the initial *House Assessment* form, both DN and JN signed the form.[277] In the *Resource Family Assessment* date-stamped 9/12/07 – almost

three months after the first visit to the home by the OKDHS resource specialist – it is documented that the foster parents were told there would have to be a fence around the pool before children were placed in the home.[278] Both foster parents signed the *Resource Family Assessment*.[279]

In September of 2007**,** DN and JN completed 21 hours of foster parent training.[280] DN and JN signed foster care contracts on 11/8/07, and their home was officially approved to provide foster care.[281]

From March to June 2008 – the time during which SW and her siblings were placed in the DN home – OKDHS caseworkers made at least monthly visits to the home. No mention of the pool or any other safety issue was made in connection with any of these visits.[282]

On 6/29/08, OKDHS received CPS referral number 1186226, reporting that two-year-old SW had drowned in the pool at the DN foster home. OKDHS caseworkers responded immediately, removing SW's brothers and their foster sister EF from the DN home (SW's sister, MW, had been removed on 5/14/08 and placed in a therapeutic foster home because of her sexual acting out).[283]

Initial investigative interviews of the adults who were present were conducted immediately by the sheriff's police and by OKDHS. Photographs of the scene were also taken. Additional interviews were conducted during the following several weeks. RW Jr. and ZW were forensically interviewed at a child advocacy center on 7/15/08. A very consistent account of SW's death emerged from these interviews.[284]

Two-year-old SW, three-year-old EF, and the foster parents' two grandchildren (TT's children, ages two and four) were playing in a very small inflatable play pool, placed next to a ladder leading to the larger above-ground pool. The larger pool was about four feet deep. DN and her mother were sitting on a porch about 100 to 150 feet from the pool where the children were playing.

RW Jr. and ZW had been sent into the house to bathe before getting into the pool. The foster father JN and his adult daughter TT had pulled a riding mower out of a nearby shed and were working on it. The mower may have obstructed DN's and her mother's view of the pool from the porch. DN went into the house to get a cup of coffee. It is not clear whether she asked her mother to watch the children playing in the small pool. DN heard yelling and came out of the house to see her adult daughter, TT, pulling SW out of the pool. DN gave SW CPR until the paramedics arrived. SW was taken to the hospital where she was pronounced dead.This account is consistent with statements made to the county sheriff's police.[285]

All the adults reported to OKDHS that SW had not been able to climb the ladder to get into the large pool. The foster parents and SW's brothers agreed that the rule was that there had to be an adult present when children were in the pool. Both foster parents acknowledged having had discussions with OKDHS about the pool. The foster father said that he had discussed the pool with the private home-study contractor who "indicated" that a fence should be put around the pool, but that he did not think this was a requirement. They both described a discussion with SW's caseworker during which she said that she thought it would be okay to leave the pool up. DN repeatedly blamed herself for SW's death.[286]

On 6/30/08 the county medical examiner found SW's death to be an accidental drowning.[287] No criminal charges were filed.

As part of the OKDHS investigation, a staffing was held during which OKDHS staff involved with the case explained their involvement. The OKDHS resource specialist who began the foster home approval process said that she had been concerned about the pool and that she had told DN that the pool had to be taken down or a fence put around it and that DN had agreed. The resource specialist acknowledged that at her second visit the pool was still up with no fence. She then sent the application to the contractor who did the actual home study. The resource specialist said that she had spoken with DN about the pool after the contractor had completed the foster home study. DN had said she would take the pool down because the contractor had told her to as well.

At this point, OKDHS was prepared to approve the DN home but was waiting for the results from the criminal background check. OKDHS received these result in November 2007 at which time there was a need for a foster home. A different resource specialist went to the home to complete the foster care contracts. The initial resource specialist did not mention the issue of the pool to the resource specialist who completed the approval process. DN and JN signed foster care contracts on 11/8/07, and children were placed in their home on that day (SW-CPS-00223-24).

SW's caseworker left the agency on or about on 6/16/08. A substitute caseworker visited the DN foster home on 6/25/08. She acknowledged that she had seen the pool, but had not discussed it with the foster parents. The previous caseworker who had resigned was contacted. She said that she had not seen the pool up when she visited the DN home in March, April, or May 2008. During her visit in April, she said that DN told her that she was not going to put the pool up because of RW Jr.'s and ZW's behavior. The caseworker said that she had told DN that not putting the pool up would be unfair to the other children. She said that, instead, she had encouraged DN to use the pool as an incentive for good behavior.[288] This conversation is not mentioned in the case note documenting the visit.[289]

On 9/24/08, OKDHS completed its CPS investigation into SW's drowning. It found the referral to be Substantiated – Services Recommended.[290] The DN foster home was closed on 9/30/08.[291]

*Analysis*

- OKDHS' response to the eight referrals concerning SW's parents before she and her siblings were removed was lackadaisical. Overall the investigations were not thorough and some of the determinations are hard to understand. There is little evidence that OKDHS did much to help SW's parents with the problems that ultimately led to the children's removal from their care. However, given RW Sr.'s and MW's response to OKDHS' more concerted efforts to provide service after the children entered foster care, it is not likely that anything OKDHS might have done would have prevented the children's removal. If anything, a more intensive response may have sped up their removal.

- The decision to approve the DN home in light of the previous CPS history is highly questionable. In particular, the level of violence DN displayed, resulting in the Substantiated 6/26/98 referral, should have precluded approval of the home. The approval of homes with histories of child maltreatment violates CWLA[292] and COA[293] standards. Nevertheless, there was nothing in the records reviewed to suggest that violence played any part in the care SW or the other children received in the DN home. Moreover, the prior referrals had nothing to do with SW's death.

- It is indisputable that OKDHS was well aware of the hazard associated with the pool. The DN home should *never* have been approved without a specific and shared understanding between OKDHS and the foster parents about the pool. The pool should have been removed or a suitably protective fence should have been placed around it. No children should *ever* have been placed in the home before one of these things happened. By failing to ensure that this hazard was either removed or mitigated, OKDHS violated CWLA[294] and COA[295] standards and its own policy.[296]

*Conclusion*

SW's death was preventable. Had OKDHS simply followed its own policy – and common sense – it would have taken action that almost certainly would have kept two-year-old SW from getting into the pool and drowning.

**H.**   **RW**

RW was a male child who was in OKDHS custody when he died five days shy of his fourth birthday.

*Family History*

RW was born on 11/9/04. He had two siblings, a brother, born on 9/5/03, and a sister, born on 2/9/07.  All three children had different fathers.  His mother (TA) and her family had a long history of involvement with OKDHS and TA spent part of her childhood in OKDHS care. TA first became involved with OKDHS as a parent when her first-born child was only two-months-old.

RW's father (JW) lived with RW's mother for approximately the first year of his life. His mother later had a boyfriend, RM, who was the father of RW's younger sister.

Before RW was born, his mother was the subject of CPS referral 893804.  On 11/2/03, TA ran away from foster care and hitchhiked to Wyoming with her two-month-old baby.[297] OKDHS found the referral Substantiated. RW's brother was taken into custody and placed in foster care. He was returned to TA when she turned 18.

RW was the subject of multiple referrals to OKDHS:

- On 6/21/05, OKDHS received CPS referral 989519.  TA and RW's father, JW, had engaged in domestic violence in the presence of RW and his brother.[298] The OKDHS finding was Unsubstantiated - Services Recommended. A worker notified independent living services as both TA and JW were former OKDHS wards, and were eligible for services.[299]

- On 10/23/05, OKDHS received CPS referral 1010793. TA was allegedly in contact with JW; if true, this was in violation of a protective order related to the previous incident of domestic violence. The referral was screened out as information only.[300]

- On 10/26/05, OKDHS received CPS referral 1011476 due to ongoing domestic violence between TA and JW. TA had an order of protection on JW and wasn't supposed to be around, but he was back in the home. The reporter heard TA screaming at the children and  it sounded like she was hitting them.[301] During the investigation, JW was arrested for domestic assault and burglary.[302] RW and his brother were taken into custody on 11/23/05. The children were left with TA under a safety agreement that she would protect the children.[303] The OKDHS finding was Substantiated - Court Intervention requested.[304]

*Initial Foster Care History*

On 11/29/05, the Court granted custody of RW and his brother to OKDHS.[305] On 12/8/05, a deprivation petition was filed on RW and his sibling due to domestic violence.[306] The children remained in the care of their mother.

On 2/10/06, OKDHS received CPS referral 1029296 alleging that TA currently had a party going on in her home. The reporter said someone needed to go to the home right away because marijuana was being smoked in the children's presence. The report also stated that the father (JW) had just gotten out of jail for domestic violence. The referral was accepted for investigation.[307] The OKDHS investigator responded within three hours of the referral. TA was watching a movie with a friend (RM). There was no evidence that a party had occurred. The home was clean and appropriate and the children were asleep in bed. Investigation was found Unsubstantiated - Service Recommended.[308]

On 2/22/06, RW and his brother were adjudicated deprived. Custody remained with OKDHS, placement with TA. The Court ordered OKDHS to assess whether placement with TA should continue.[309] On 2/28/06, the children were removed from TA's care and placed in foster care, because TA had failed to follow through with criminal charges against JW.[310] On 3/22/06, he Court ordered a treatment plan for RW's parents requiring drug assessment, drug treatment if needed, random drug testing, parenting classes, psychological evaluation and follow through with recommendations, and home based services. It also required TA to get a job and maintain a stable home.[311] TA and RW only complied with their treatment plans sporadically. On 8/16/06, OKDHS recommended that visitation cease and a petition for termination of parental rights (TPR) be filed.[312] On 8/23/06, JW's parental rights were voluntarily terminated.[313] On 9/1/06, the DA filed for termination of TA's parental rights.[314]

On 10/11/06, OKDHS reported progress on the part of TA. She had maintained employment and housing, had attended counseling weekly, and had negative drug tests. OKDHS recommended that the TPR hearing be continued for three months to see if TA could maintain her progress.[315] On 10/26/06, the DA filed a motion to dismiss the TPR petition as to TA only.[316]

On 1/17/07, OKDHS reported to the court that TA had made significant progress on her treatment plan. She had completed the substance abuse assessment, had several negative drug tests, completed one parenting class, enrolled in another parenting class, and maintained stable employment and housing. A psychological evaluation was completed which gave a mixed prognosis for TA, and recommended psychotherapy. OKDHS recommended the children remain in custody, but requested leave to begin unsupervised visitation, and leave to place RW back in the home if no issues arose following a period of unsupervised visitation. The court granted unsupervised visits and the permanency goal was changed to return home.[317]

On 2/12/07, OKDHS received CPS referral 1092320. The referral was made because TA had a new baby and an open case with OKDHS. The referral was accepted for investigation.[318] The new baby's father was TA's boyfriend RM who was not living in the home. TA was continuing to adhere to the terms of her treatment plan and was visiting with RW and his brother. OKDHS found the referral Ruled Out.[319]

On 2/21/07, the Court noted the birth of the new child, who was not taken into custody, and that TA, RM (father to baby), and the newborn had moved to another county. The case transfer to the new county was delayed by the loss of some documents and did not occur until 4/10/07.[320]

### *Initial Trial Reunification*

On 5/25/07, OKDHS recommended that TA's children be returned to her as a trial reunification and that RM be allowed to live in the home. RM's background check was clean and TA had completed her treatment plan. Comprehensive Home Based Services (CHBS) had been providing services in the home since 5/9/07. TA had been having unsupervised weekend visits since 5/4/07 and things had gone well. The Court approved both requests.[321]

On 9/4/07, OKDHS received CPS referral 1130379 from the police. They had been called to RW's home the previous day due to the smell of marijuana. The children were present. RM was arrested for possession of a controlled substance.[322] On 9/12/07, while the OKDHS investigator was at the home, the police arrived with a warrant for TA's arrest based on the 9/3/07 incident. The trial reunification was ended for According to the police report, there was a strong odor of marijuana, the home was filthy, smelled of feces, there was trash and clutter all over, and there were no beds and just two mattresses on the floor. The OKDHS finding was Substantiated - Court Intervention Requested.[323]

### *Return to Foster Care*

RW and his brother, the baby taken into custody, and all three children were placed in the home where RW and his brother had previously been placed.[324]On 12/21/07, OKDHS received CPS referral 1150206. This report alleged that RW and his brother and sister had gone on an unsupervised day visit with TA. The apartment was filthy and there was a man in TA's bedroom that had not been cleared to be there on visits. TA asked the reporter not to tell OKDHS about the man. When the children were picked up from the visit, RW had a handprint on his back/buttock. His diaper was soaked and urine was running down his legs. The baby had been sick but TA had taken her to the park. RW's brother said that all they had to eat were apples (the visit was from 9:00 am to 5:00 pm).[325]

The OKDHS investigator found TA's home to be cluttered, but not hazardous. Plenty of food was observed to be available.[326] RW's body was observed and no marks were seen where the handprint allegedly was. RW would only nod in response to questions; he would not talk to the investigator.[327]

According to TA, the person in her bedroom was the boyfriend of one of TA's female friends. The female friend was present while RW and his siblings were visiting, and the boyfriend "was only at the apartment for a few minutes." TA said that she thought the female friend had passed a background check and was allowed to be present during the children's visits. As for the soaked diaper, TA said she had taken RW and his siblings to the park that day. RW was dry when they left the apartment but wet himself while they were at the park; they were coming back to change him when the foster mother arrived. TA denied that she hit her children or that she gave RW any mark on his back.[328]

TA's in-home counselor said the home was typically clean, and that TA did not use discipline as she should, that she would never "get on the kids." She also said that TA usually had food available.[329]

RW was seen by a physician for a child abuse exam at OKDHS's request. According to the medical exam, RW had some scratches on the posterior neck and face.[330] The OKDHS finding was Unsubstantiated - Services Recommended. Unsupervised visits with TA were discontinued.[331]

On 2/22/08, a permanency hearing was held and OKDHS reported to the court that TA had completed two treatment plans, including parenting training, counseling, domestic violence services, and in-home services. However, evidently because of the 12/21/07 referral, the goal was being changed to adoption. It was recommended that a petition for TPR be filed for RW and his brother with regard to TA.[332]

On 5/23/08, OKDHS reported to the Court that the permanency goal had been changed to return home, that the mother had "demonstrated new parenting skills, and maturity," and that RM had also demonstrated more maturity and maintained sobriety. The caseworker recommended unsupervised visits. It was reported to the Court the foster mother was concerned about TA's ability to maintain any progress. The Court approved unsupervised visits at the worker's discretion, pending results of hair follicle drug testing.[333]

On 8/1/08, a court permanency review hearing was held. OKDHS reported that unsupervised visits had begun on 7/7/08. OKDHS recommended trial reunification and placement at home. The court ruled that based on the OKDHS reports, the parents had made significant progress toward reunification, and granted leave to return RW and his siblings to TA.

***Second Trial Home Reunification***

The children were returned to the TA and RM on a trial reunification basis on 8/1/08.[334] In September 2008, the caseworker told TA that her continued counseling and daycare for the children was optional.[335]

On 9/18/08 OKDHS received CPS referral 1217654 in which RW's school reported that RW had a handprint on his face. According to the reporter, nearly four-year-old RW said his five-year-old brother had hit him. The reporter was not certain that this was true. The referral was accepted for investigation.[336]

RW was seen at school by his OKDHS caseworker on the morning that the referral was made. The caseworker noticed RW's "cheeks were red," but did not see bruises, or the reported handprint. RW stated RM threw a shoe at him and that RM "likes to leave bruises on him." When asked what bruises, RW pointed to bruises on his shins. The caseworker's observation was that the bruises on RW's legs appeared to be "play type" bruises. She did not see a distinct handprint or bruises on the face and neck; in fact, she saw nothing "of concern."[337] The OKDHS investigator went to the home later that day and tried to interview RW again. She was unable to, however, because he would run to TA or RM and hide his face in their laps. The investigator observed that RW was playful and "not . . . fearful of either parent."[338]

RW's five-year-old brother said that he had hit RW in the face that morning while TA was at work. The investigator observed that the child had a hard time focusing and would not answer more questions.[339] RW's sister was not interviewed due to her age, but she was observed and no bruises noted.[340]

TA stated that she had left for work at 5:45 AM, and was not there when the alleged incident happened. She stated that the boys fought a lot, and that RW's brother was always picking on him. The investigator noted that TA appeared to be "able to protect her children from . . . abuse or neglect," and that TA told her she would do anything to keep her kids safe.[341]

RM stated that RW said that his brother had hit him on the cheek. The investigator observed that RM "answered worker's questions without hesitation . . . was open with worker, and did not appear to be hiding anything."[342]

The OKDHS caseworker stated that she last saw the family on 8/19/08 and that she had no concerns about the family. She spoke with TA weekly.[343] RW's Head Start teacher who made the report was interviewed. There is no documentation of any discussion about the reported

handprint.[344] The investigator documented a review of the family's child welfare history.[345] The finding was Unsubstantiated – Services Recommended.[346]

On 9/19/08, the OKDHS caseworker documented a home visit in which she talked with RW's brother about being mean to RW. TA said that she was having a hard time getting the kids to "mind," and that sometimes she had to have RM come home from his job, because the kids "mind him real well."[347]

On 9/23/08, RM called the caseworker and said RW had "dark circles under his eyes" when he went to school today because he had just woken up.  It does not appear that consideration was given to why RM would make such a call. Nor does it appear that there was any effort to check on RW.[348]

On 10/7/08, the caseworker spoke with the CHBS worker who provided weekly in-home services to the family. The CHBS worker requested the OKDHS caseworker's approval to reduce her contact with the family to every other week because all goals had been met except improved housing.[349]

On 11/4/08, it was reported by hospital staff that four-year-old RW was brought to the ER, with bruises and abrasions.[350] The story was that the child had fallen against the tub and hit his head. He had multiple bruises and abrasions. RW was airlifted to a university children's hospital where he died.[351]

RW had intracranial hemorrhage, other soft tissue injuries, a depressed parietal skull fracture, bilateral retinal hemorrhages, a penile hematoma, and multiple other bruises and hematomas. The ER doctor found his injuries to be consistent with non-accidental injury.[352] RW's five-year-old brother said that RM threw RW against the floor and the wall, and that RW could not walk or talk. He said that RM was mean and liked to beat kids up and had beat up both boys and called them stupid and ugly. He said TA knew that RM beat them because "she can see all the way from work." He stated that RW said he was hurting on the back of his head, and RM put something cold on it. He then changed his statement, saying that no one had hit RW on the floor. He stated that RW was throwing up during the day. When asked again about RM being "mean," he stated "he beats up RW, mom, and me." Asked if he told the worker, he said he was not "supposed to tell secrets," and that he did not "want to tell things that will get . . . mom . . . into trouble."[353]

RW's brother was re-interviewed by police, and he said that RM made RW dead. RM banged RW on the wall, RW was crying because his stomach hurt, RM banged him on the wall because he was crying, then he went to sleep. RM screamed at him to wake up, but he would not. Then RM put him in the bathtub and put water on him to wake him up. RW's brother demonstrated

with a doll how RW was "banged on the wall." He said TA was at work. His sister was asleep, but then she woke up and tried to come in the bathroom, but RW's brother blocked her out, because "she didn't need to get sick like RW."[354]

TA stated that she brought RW to the ER because he looked like he was going into convulsions. RM told her he had fallen on the bathtub, and hit his head. She had left for work that morning at 5:45 am, and was there until her neighbor came and got her. RM had called the neighbor because of RW getting hurt. When she saw RW, they took him straight to the ER.[355]

RW's Head Start teacher said that she did not know RM was hitting the children. She discussed her previous report of the time RW came in with a handprint on his face and stated that she reported it into OKDHS, but by the time they came, it was gone. They told her she should have taken pictures. RW said his brother did it, but it looked adult size. The boys called RM "daddy" and never acted afraid of him. They would run to him, and he would hug them.[356]

The CHBS worker said she saw TA once a week at a scheduled time.  The home looked "lived in" but never "disgusting." There were no signs of physical abuse or domestic violence. TA and RM were always cooperative with her.[357]

The medical examiner's report stated that RW suffered multiple blunt force traumas. He had a depressed occipital skull fracture, brain contusions, subarachnoid hemorrhage, multiple scalp contusions and subgaleal hematomas, bilateral retinal hemorrhages, and multiple contusions and abrasions on his face, trunk, and extremities. The cause of death was blunt force head trauma, and the manner of death was homicide.[358]

The OKDHS finding was Substantiated - Court Intervention Requested. The trial reunification was ended for RW's brother and sister and they were placed in foster care. TA had a new baby shortly after RW's death, and that child was removed and placed in foster care. RM was charged with first degree homicide.[359]

### *Analysis*

- During the time RW was in foster homes, there is no evidence that he was subjected to unsafe conditions.

- RW was the subject of many maltreatment reports. While it is true that the sheer number of reports is not, in and of itself, conclusive and the allegations reported were, for the most part, relatively low grade in nature, a pattern was detectible. It is clear that each time RW was returned to TA or had unsupervised visits with his mother, concerns for his safety were raised

128

in the form of abuse and neglect referrals to OKDHS. That RW and his siblings were very young should have elevated the level of concern.

- Most of the referrals were adequately investigated and the related findings were reasonable. However, OKDHS's investigation of the report received on 9/18/08, alleging that there was a hand print on RW's face, included some potentially important deficiencies.

  - It is not documented that the reporter was interviewed as to the actual allegation, and what she saw. She later said the handprint appeared adult sized. However, she also said that RW said that his brother had hit him, that the mark had faded by the time the caseworker came to the school the same morning, and that the children seemed to like RM and did not seem fearful of him.

  - The child welfare history (which was extensive) was not reviewed prior to conducting interviews or prior to safety decision-making.

  - Further investigation into RW's statement that RM "liked to put bruises on him" was warranted.

### Conclusion

Many of the most difficult situations confronted by child welfare workers are those that, at least on the surface, appear comparatively benign. Such situations can hide real danger for children. It is impossible to know how things would have ended had the 9/18/08 investigation been handled better.

## I.     <u>NW</u>

NW was a female child who was in OKDHS care when she died at the age of two.

### Family History

NW was born on 12/09/06. Her parents were unmarried, but lived together most of the time. NW had one younger brother who was born on 2/19/08. NW was born healthy, with no medical or developmental problems noted at birth.

OKDHS received CPS referral 1159485 on 2/19/08. It was made by hospital staff reporting that NW's newborn brother tested positive for cocaine at birth and that NW's mother (KW) tested positive for cocaine and marijuana. KW had only one prenatal visit and had tested positive for

drugs at that time. KW told hospital staff that she had not eaten anything for two days prior to delivery. The referral was accepted for investigation.[360] During the investigation:

- One-year-old NW was observed with dirt caked hands and dirty, greasy hair. It was observed that she slept on two couch cushions pushed together. The family's apartment was dirty and not adequate for children. The only clothing found for the children was one jacket.

- KW lived with her boyfriend (AJ) who was the father of both children. KW stated that the night before NW's brother was born, she smoked a cigarette that her friends had put cocaine in without her knowledge. She denied on-going drug use.

- AJ said he was not aware of KW using drugs and denied using drugs himself. A background check revealed that AJ had been charged with distribution of a controlled substance.

OKDHS obtained an emergency warrant for custody of both children. The investigation finding was Substantiated - Court Intervention Requested.[361]

### Foster Care History

NW was placed into foster care on 2/20/08. She was moved to a different home to be placed with her sibling on 2/21/08. On 2/27/08, a petition alleging deprivation was filed, and the children were ruled eligible for tribal enrollment since both parents had Indian heritage. On 4/9/08, the children were adjudicated deprived. The Court ruled that OKDHS had good cause to deviate from placement preferences specified by the Indian Child Welfare Act as there were no relative or tribal homes available.[362]

NW's initial foster care placement was uneventful. She was treated for pertussis but was otherwise healthy. Visitation occurred with her parents approximately bi-weekly. She had a development evaluation in April 2008, and no delays were noted.[363]

### Trial Reunification

KW had entered an in-patient substance abuse program that allowed children and on 7/23/08, NW and her sibling were returned to KW for trial reunification. No problems were noted with NW while in the program. On 9/12/08, KW decided to leave treatment before completing the program, and the children were returned to foster care.[364]

*Return to Foster Care*

NW was placed in a new foster home, separate from her brother. It is not documented why the children were not placed together or returned to the previous foster home.[365] The new foster home had only been licensed a short time, and had only provided foster care to two children for one week. The foster family consisted of the foster mother, foster father and their three children, ages two, five, and nine. NW was the only foster child during the length of her time there.

The approval home study had been completed by a contracted provider, and contained the following information: The foster parents had an older daughter who was not living in the home. She had begun exhibiting problem behaviors when she was an early adolescent (e.g., defiance, lying, skipping school), and had attempted suicide when she was 14-years-old. She was hospitalized psychiatrically and the foster parents planned to have her sent to residential treatment. The child's maternal grandparents disagreed with this and obtained custody. The foster parents had almost no contact with their daughter after that time.[366] The background check reflected no criminal history for the foster mother, but did show felony charges for the foster father for unlawful concealment of and transportation of hazardous waste. The foster father was on probation. The foster father did report the criminal charges on the foster care application.[367]

The foster parents had a CPS history:

- On 11/29/05, OKDHS received CPS referrals 1016809 and 1016847. Both were reported by relatives and concerned the same allegations. According to the referrals, the foster parents' then 14-year-old daughter had overdosed on pills due to ongoing abuse at home and was currently hospitalized. She was not allowed in the home when her mother was not there, and had to remain outside before and after school until her mother got home. She was not allowed to have friends over, or to get calls from them and she was punished if she talked to relatives. Her mother (NW's foster mother) refused to accept her back in the home.

- An OKDHS supervisor spoke to the child's therapist at the hospital, who said her parents were very involved, and he had no concerns about child abuse or neglect. The child was not allowed in the house when her parents were not there because she had a history of skipping school and having friends over. The parents were in the process of arranging for the girl to live with relatives. Based on this information, both referrals were screened out.[368]

- On 12/15/05, OKDHS received CPS referral 1019724 form an anonymous source. The reporter alleged that the foster parents' then-15-year-old daughter told friends at school that she had been raped by her father. Again, the OKDHS supervisor contacted the girl's therapist at the psychiatric facility where she was hospitalized. The therapist stated that the girl had made a sexual abuse allegation against the father at admission, but had immediately recanted

the allegation. He had explored the allegation with all concerned parties, and the decision was made there was no need to report. The report was screened out.[369]

Because NW was placed in a county different from where her caseworker was located, a secondary worker was assigned to see NW monthly. The secondary caseworker made four visits to the foster home. The first was on 10/10/08. The foster mother reported that nearly two-year-old NW had been withdrawn, but was "coming out of her shell." NW appeared clean, healthy, and was walking fine.[370]

On 10/30/08, the primary worker contacted the foster mother to tell her that NW's birth mother, KW, was re-entering treatment, and OKDHS planned to return NW and her brother to KW for trial reunification in a few weeks. The foster mother was unhappy about this, and began calling various OKDHS supervisory staff to voice her concerns. She appeared at a court hearing concerning NW and spoke of problems (e.g., falling down, choking, and eating problems) affecting NW that she had never told the caseworker about.[371]

When the secondary worker visited NW in her foster home in November 2008, the foster mother elaborated on NW's problems. The foster mother said that NW would cry when she heard water running, she could not run or jump, and she would swallow her food in huge chunks. NW appeared exhausted, falling asleep standing up.  Because of the concerns about NW expressed by the foster mother, NW was revaluated by the Oklahoma Sooner Start program.[372]

Beginning in December 2008, Sooner Start made three visits to the foster home to conduct the assessment. NW was assessed as having significant delays in multiple areas. The foster mother told the Sooner Start worker about serious eating and sleeping issues (including that NW was choking, having problems walking and falling down a lot) that had not been described to the OKDHS caseworker.[373]

When the OKDHS worker visited the foster home in December 2008, the foster mother said that things had deteriorated and that NW would not sleep and would cry all night long. The OKDHS caseworker told the foster mother to take NW to the university children's hospital for therapy. The foster mother was reluctant to do this and said she would work with Sooner Start.[374] OKDHS made the decision that NW would remain in the foster home for the time being. The foster mother was told to take her to a doctor.[375]

On 1/15/09, the foster mother took NW to her family pediatrician who observed scratches all over NW. The pediatrician diagnosed them as eczema. Zyrtec medication was prescribed and the foster mother was told to return in two weeks. The pediatrician planned to refer NW to a specialist to evaluate her for possible apnea. The pediatrician questioned why the foster mother hadn't brought in NW sooner since the foster mother had so many issues with her. The foster

mother told the pediatrician that she had trouble getting an appointment and that the office staff was rude. When the pediatrician checked with her office staff, there was no record of the foster mother calling.[376]

The foster mother reported the results of the doctor's visit to the OKDHS caseworker. The secondary caseworker and the Sooner Start worker separately saw NW for the last time on 1/16/09. NW died on 1/20/09.

On 1/20/09, OKDHS received referral 1238340. It was reported that NW was found unresponsive by her foster mother and was pronounced dead at the scene.[377] NW was observed to be on the floor of her foster parent's bedroom, dressed only in a diaper. The medical examiner was at the scene and said there was a scab on the back of NW's head, but no hemorrhaging.[378]

During the investigation the foster mother said that NW had been a "handful" the last few weeks. She was not sleeping, so they were not sleeping. The foster father was out of town. NW and she watched the news, and went to bed about 10:30pm. She put NW in her (the foster mother's) bed. NW was wailing, not just crying, wailing. The foster mother moved her to the port-a-crib but she was still wailing. The foster mother was tired of hearing NW wail and moan, so she went to sleep in the living room. The foster mother woke up about 7:20am.  She went into her room and told NW to wake up. NW did not move. The foster mother went to get her and found that NW was cold. She knew something was wrong and tried to call 911. The call did not go through, so she carried NW to the living room and called from a phone there. The foster mother said that she performed CPR until the EMTs arrived.[379]

The medical examiner found NW's death to be from an unknown cause and an undetermined manner. The report noted that NW's right lung had collapsed and that there was a "chunk of meat-like material" in the stomach, which together suggested the possibility of asphyxia by choking.[380]

The police obtained a second opinion on the case from a well-known pathologist. The second pathologist disagreed that the cause of death was unknown, stating the pancreatic hemorrhage was due to blunt force injury to the abdomen, and the contusions and abrasions of the face and scalp were by definition blunt force injuries – multiple separate recent and remote blunt force injuries of the face and head. He also stated the Oklahoma medical examiner did not interpret the relationship between the scalp contusions and brain injury, which were blunt force injuries to the head and brain.[381]

In his opinion the cause of death was blunt force injuries to the head, abdomen and extremities. He was unable to offer an opinion on manner, whether inflicted or accidental.[382]

At a family meeting on 1/21/09, NW's parents said that when they last saw NW she did not have any of the problems that arose later (crying, falling, trouble eating), and they questioned the care she had been receiving.[383]

The investigation finding was Substantiated. On 1/15/10, the foster mother was arrested and charged with one count of felony child abuse. The foster home was closed.

*Analysis*

- It is virtually certain, given NW's injuries and the circumstance of her death, that she was murdered by her foster mother. It is possible that NW's death was, as the pathologist rendering the second opinion suggested, the result of Munchausen's disorder by proxy, in which caregivers feign symptoms in a child to draw attention to themselves. Although rare, Munchausen's cases do result in child fatalities. Whether or not this is the case, OKDHS was not given any reason to think that the foster mother might kill NW.

- OKDHS was, however, given plenty of reason to think that something was seriously wrong. When the foster mother began describing increasingly alarming symptoms (choking, eating ravenously, falling down, and constant crying), the agency should have urgently seen to it that the child receive a thorough medical examination. This is especially true since none of NW's previous caregivers had noted any similar problems. The foster mother's expressions of concern meant either that NW was seriously ill or there were serious problems with the foster mother. The only way of determining which was a complete medical evaluation. Instead, OKDHS allowed the foster mother to decline appropriate medical services and left her to her own devices.

*Conclusion*

It may not be reasonable to expect that OKDHS caseworkers would have had the prescience to know that NW's foster mother might murder her or the sophistication to recognize an exotic syndrome, such as Munchausen's by proxy, which is more often than not missed by experienced pediatricians. It is not unreasonable, however, to expect that a child welfare agency that has taken a child from her parents because it believes that they cannot keep her safe would assure that she get immediate medical attention when she exhibit alarming symptoms. If OKDHS had done this simple thing, it is likely that NW would be alive today.

## J.   **JT**

JT was a male child who was in OKDHS care when he died at age three.

*Family History*

JT was born on 7/21/06 in Springfield, Missouri. His mother, BI, was 18 when he was born. BI had no child welfare history in Oklahoma.

On 5/7/09, OKDHS received CPS referral 1258533. The referral was made by a staff person from an OKDHS program that provides services for recipients of Temporary Assistance to Needy Families (TANF). The referral was made because JT's mother, BI, was at the program office and was "flipping out." She was crying uncontrollably and making paranoid sounding statements (her mother and aunt were going to hurt her and her child). According to the referral source, BI had exhibited unusual behavior since entering the program. The reporter was concerned that BI might pose a threat to JT. The referral was accepted for investigation.[384]

The OKDHS investigator went to JT's day care center on the day of the referral. He attempted to interview JT but found him not to be very verbal. JT showed the investigator a two inch long scar on his chest. When he asked JT about the scar, the only words from JT that the investigator could understand were "stick" and "Mama."[385] The day care provider was interviewed and said that BI had been picking JT up for about the past week and that she seemed "out of it."[386]

The OKDHS investigator made several unsuccessful attempts to contact BI. Four days after the referral, on 5/11/08, he did see JT's grandmother, SI. SI told the OKDHS investigator that JT had been staying with her for a few months. SI's sister had gone to Missouri to pick JT up because his mother had left him with his father who, in turn, left him with his paternal grandmother. According to SI, JT's paternal grandmother was an alcoholic. SI also told the investigator that BI had a history of drug abuse but that BI had not used in a year.[387]

On 5/12/08, the investigator interviewed BI. She denied recent drug use, saying that she had not used methamphetamines for a year and that she had not used marijuana for a month. She said that she had come to Oklahoma from Missouri to get away from drugs. The investigator described her as "functioning at a low level," disheveled, and missing her teeth (a symptom of methamphetamine usage).[388] At some point, BI denied inflicting the mark that the investigator had seen on JT's chest. She said that he had fallen on a stick while playing.[389]

The investigator also spoke with BI's aunt (DH) on 5/12/09. It was DH's home in which SI, BI, and JT were staying. DH said that she had gone to Missouri to get JT, as SI had reported. She said that she had been caring for him for about two months. She said that SI had allowed BI to move into her (DH's) home without telling DH in advance about a month before. DH said that she did not trust BI because of her history of drug use. There is no documentation that this was explored further.[390]

According to a note in the file, a judge signed a "pick up" order and JT was taken into OKDHS custody on 5/7/09.[391] However, the case file includes an Application for Order to Take Minor Child(ren) into Emergency Custody that is dated 5/12/09.[392] There is also a note, dated 5/12/09, that seems to indicate that JT was picked up by the police and taken to the OKDHS shelter in Oklahoma City on 5/12/09.[393] It is almost certain that JT was taken into custody and placed at the shelter on 5/12/09 (not on 5/7/09).

***Foster Care History***

After JT was placed in the shelter, the OKDHS investigator contacted the Missouri child welfare agency and determined that there had been several child welfare referrals made to the Missouri child welfare agency concerning BI and JT during the time they lived in that state. One of these, involving physical abuse, was investigated and found unsubstantiated. The others, concerning substance abuse, were screened out. The investigator also learned that SI and BI (as a child victim) had "a lot" of CPS history in Missouri. This included reports of substance abuse, sexual abuse, and physical abuse, but, again, no dates or other specifics are documented.[394]

On 5/18/09, BI submitted to a drug test and was found positive for marijuana.[395] On 5/21/09, the investigator contacted JT's putative father who was, presumably, in Missouri. He informed the investigator that he was on probation for burglary and could not care for JT. He also said that BI had used methamphetamines as recently as March 2009 and that he thought she was severely mentally ill.[396]

OKDHS found the referral to be Substantiated – Court Intervention Requested. There was a "Show Cause" hearing on 5/14/09 and JT remained in OKDHS custody.[397]

JT was placed at the OKDHS shelter. OKDHS approved JT's aunt (DH) to provide kinship care. However, on 5/28/09 the agency decided not to place JT with his aunt because his maternal grandmother, SI, who had CPS history in Missouri, lived in her home. The aunt declined to ask SI to leave so that she could care for JT.[398]

During the time JT was placed in the shelter, he was the subject of a number of Shelter Incident Reports. On 5/16/09, he was bitten by one child.[399] On 5/20/09, he engaged in sex play with a second child.[400] On 5/25/09, he was bitten by a third child.[401] On 5/29/09, he hit himself with a toy truck.[402] On 6/1/09, he was bitten by a fourth child.[403] During a visit on 6/8/09, BI and SI noticed a mark on JT's back. The OKDHS caseworker visited him at the shelter the following day and saw that he had a small bite mark on his back.[404] On 6/6/09, another biting incident was documented.[405] On 6/27/09, he hit his head on a door while running.[406]

JT remained at the shelter for just over two months. On 7/16/08, he was placed in the contracted LS foster home.  This was an emergency foster home and, on 7/29/09, he was moved because "the contract ended." On 7/29/09, he was moved to the TC foster home.[407] He remained there for less than a month and was moved on 8/25/09 at the foster parents' request. The foster mother said that JT was throwing fits and she did not know what to do with him.[408]

On 8/25/09, JT was placed in the DO foster home.[409] In addition to three-year-old JT, this foster family included the foster mother (DO), the foster father (GO), their nine-year-old daughter and their seven-year-old son. The DO family completed the application to become foster parents on 6/1/05. Their application indicated that a family member had been charged with a crime and had pled *nolo contendere*.[410] The criminal background check found that the foster father had been arrested for burglary in 1988.[411] The foster mother was found to have no criminal background. The family had no CPS or child welfare history. The first assessment of the home is dated 6/1/05. It notes that the family did not have a swimming pool.[412] No other reassessment indicated that there was a pool at the home until 2009.

On 6/5/05, the first children were placed in the DO home. This was apparently a kinship placement.[413] Overall, these foster parents had cared for nine foster children before JT was placed with them.[414]

In early 2007, it was determined that the foster parents had not completed the required hours of foster parent training.  A written plan of compliance required that they complete the training by 3/31/07. Even though they did not complete the training until 1/29/08, OKDHS continued to use the home.[415] This was the only policy violation or plan of compliance concerning the foster home.

In early 2009, OKDHS conducted its annual reassessment of the DO foster home. As part of the reassessment, on 1/20/09, the house assessment was completed. It noted that there was a pool in the yard. It indicated that child safety would be assured by "high locks and supervision." There was no mention of the pool in the noncompliance section of the form. In the "Comments" section, at the end of the form, it was noted "pool unfenced."[416]

The annual reassessment was completed on 3/31/09.  It indicated, in the "Safety Issues" section, that a safety plan would be created to address the unfenced pool. A pool alarm would be installed and set to alert DO and GO when any door was opened. This would be done before any children were placed in the home. It was noted that no children were placed in the home at the time the reassessment was completed, nor had any been placed in the home for the preceding year.[417] The foster home was approved "as an exception" because there was no security fence around the pool. Instead, an alarm system had been installed.[418]

The OKDHS resource file contains a brochure for Pool Guard which is described as a safety alarm system intended to detect unwanted entry into swimming pools. The front of the brochure says in bold print, "This device is not intended to replace any other safety consideration – i.e., adult supervision, lifeguards, fences, gates, pool covers, locks, etc."[419]

On 9/11/09, about three weeks after JT was placed in the DO home, JT's mother and grandmother (BI and SI) visited him at the OKDHS office. The visit went well.[420] The next day, on 9/12/09, OKDHS received CPS referral 1280879.  JT had been taken to the hospital after a near drowning incident at the DO foster home. He was not expected to live.[421] On 9/14/09, JT was pronounced dead.[422]

JT's drowning was investigated by OKDHS and the police. Although there are some inconsistencies in the foster parents' accounts of NW's drowning, there is nothing to suggest that abuse was involved. According to either of their versions, however, NW's drowning was the result of neglect.

OKDHS found the referral Substantiated.[423] The medical examiner ruled that JT's death was accidental.[424] It does not appear that any arrests were made. On 3/9/10, OKDHS notified the foster parents that their home had been closed due the Substantiated CPS referral.[425]

*Analysis*

- It is unclear that JT should not have been placed with his maternal aunt who was approved as a kinship provider. His aunt had demonstrated that she was concerned about JT and protective of him when she went to Missouri to get him. She enrolled him in day care and seemed to be providing good care. Instead, JT spent two months living in a shelter and then was placed in three foster homes in less than six weeks. OKDHS made the decision that this was in JT's interest because JT's maternal grandmother, who had a CPS history in Missouri, lived in the home with his aunt. This decision cannot be evaluated because almost nothing is known about the nature of the grandmother's CPS history in Missouri. Without specific information about the nature of the maltreatment, when it occurred, and what had happened in the intervening time, OKDHS was not in a position to make the best decision for JT.

- OKDHS should not have approved the DO foster home unless a safety fence was placed around the pool. Believing that a pool alarm was a substitute for a fence was unreasonable. Even the alarm's manufacturer made that clear. This is all the more troubling because, only nine months earlier, two-year-old SW drowned in a pool at her foster home. (*see* above)

*Conclusion*

OKDHS may have missed an opportunity to prevent JT's death when it decided that it was better for him to bounce from placement to placement rather than place him with his aunt. Without information about his family's CPS involvement in Missouri, this cannot be known. The agency certainly missed a chance to save him when it failed to require what should have been obvious, a fence around the swimming pool.

John Goad, A.M.

March 15, 2011

## END NOTES

[1] OAC 340:75-3-7.3

[2] Public Law 105-89, Section 101 (a)(15)(A)

[3] United States General Accounting Office (2003). GAO-03-357 *Child Welfare: HHS Could Play a Greater Role in Helping Child Welfare Agencies Recruit and Retain Staff*. Washington, D.C.

[4] Child Welfare League of America (2002) *Research to Practice Research Roundup: Child Welfare Workforce*, at 1.

[5] Oklahoma Department of Human Services (2007), *Child and Family Service Review: Statewide Assessment*, Oklahoma City, p. 25.

[6] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, Glossary. "Procedures."

[7] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 5.7

[8] Ibid.

[9] www.okdhs.org, OAC 340:75-3-7.1, Instructions to Staff, 1(a); www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff, 1

[10] OAC 340:75-3-7.1(b)(1)

[11] www.okdhs.org, OAC 340:75-3-7.1, Instructions to Staff, 3

[12] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.8

[13] www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff, 4

[14] www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff, 1

[15] OAC 340:75-3-7.3

[16] OAC 340:75-3-10.3

[17] OAC 340:75-3-8

[18] www.okdhs.org, OAC 340:75-3-7.4, Instructions to Staff, 6

[19] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 5.7

[20] www.okdhs.org, OAC 340:75-3-7, Instructions to Staff, 1; OAC 340:75-3-7.1; www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff

[21] www.okdhs.org, OAC 340:75-3-10.3, Instructions to Staff

[22] OAC 340:75-7-94

[23] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 4.04

[24] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.13

[25] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.01

[26] OAC 340:75-3-7.1(b)(1)

[27] OAC 340:75-3-7.1(b)(2)

[28] OAC 340:2-3-1

[29] OAC 340:2-3-2

[30] OAC 340:2-3-36

[31] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 2.2

[32] Jones Deposition Transcript, p. 84

[33] Jones Deposition Transcript, pp. 90-97

[34] www.okdhs.org, OAC 340:2-3-35, Instructions to Staff, 2

[35] Jones Deposition Transcript, p. 150

[36] Jones Deposition Transcript, pp. 172-173

[37] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.13

[38] OAC 340:2-3-36(l)

[39] OS Title 10A, Section 1-1-105, 37(b)

[40] OAC 340:2-3-37

[41] Jones Deposition Transcript, p. 78

[42] Jones Deposition Transcript, pp. 117-118

[43] Jones Deposition Transcript, pp. 197-198

[44] www.okdhs.org, OAC 340:75-3-7.3

[45] www.okdhs.org, OAC 340:75-3-7.3 Instruction to Staff 1(4)(D)

[46] Siegel & Castellan, 1988

[47] Randolph, 2005

[48] Siegel & Castellan, 1988.

[49] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.13

[50] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.01.

[51] OAC 340:75-3-7.1(b)(1)

[52] OAC 340:75-3-7.1(b)(2)

[53] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.01

[54] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.13

[55] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.01

[56] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5

[57] www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff 9-10

[58] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.07

[59] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards,* New York, § PA-CPS 5

[60] Child Welfare League of America (2003) *Best Practice Guidelines: Child Maltreatment in Foster Care,* Washington D.C., p. 41

[61] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families*, Washington D.C., § 1.17

[62] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services*, Washington D.C., § 3.3

[63] OAC 340:75-3-10.2

[64] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families*, Washington D.C., § 1.17

[65] OAC 340:75-3-7.4

[66] OAC 340:75-3-7.4

[67] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.17

[68] OAC 340:75-3-8

[69] OAC 340:75-3-10.2

[70] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5

[71] Child Welfare League of America (2003) *Best Practice Guidelines: Child Maltreatment in Foster Care,* Washington D.C., p. 42

[72] OAC 340:75-3-8.1

[73] Child Welfare League of America (2003) *Best Practice Guidelines: Child Maltreatment in Foster Care,* Washington D.C., p. 42

[74] OAC 340:2-3-1

[75] In addition to written documentation, OCA investigations often include audio recordings of interviews and, occasionally, audio/video recordings of other aspects of investigations. The reviewers found that, overall, OCA written documentation faithfully represented interviews and other aspects of investigations when compared with the recordings. These recordings were reviewed when reviewers identified situations in which doing so would add perspective to the evaluation (e.g., the quality of a sexual abuse interview or the affective nature of a child's statement).

[76] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.01

[77] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.13

[78] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.01

[79] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.07

[80] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5

[81] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.17

[82] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.17

[83] OAC 340:2-3-36

[84] OAC 340:75-3-8.1

[85] Child Welfare League of America (2003) *Best Practice Guidelines: Child Maltreatment in Foster Care,* Washington D.C., p. 42

[86] OAC 340:75-3-7.3

[87] www.okdhs.org, OAC 340:75-3-7.3 Instructions to Staff, 1(4)(D)

[88] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.13

[89] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-CPS 5.01

[91] Child Welfare League of America (1999) *Standards of Excellence for Services for Abused and Neglected Children and Their Families,* Washington D.C., § 1.17

[92] OAC 340:75-3-7.4

[93] OAC 340:75-3-8.1

[94] Child Welfare League of America (2003) *Best Practice Guidelines: Child Maltreatment in Foster Care,* Washington D.C., p 42

[95] U.S. Department of Health and Human Services (2006, 2007, 2008, & 2009) *Child Maltreatment 2006, 2007, 2008, & 2009.* Washington D.C., Tables 2-1

[96] www.okdhs.org, OAC 340:75-3-6, Instructions to Staff, 1(a)(4)(C)

[97] www.okdhs.org, OAC 340:75-3-6, Instructions to Staff, 1(a)(4)(C)

[98] www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff, 6

[99] Child Welfare League of America (2003) *Best Practice Guidelines: Child Maltreatment in Foster Care,* Washington D.C., p 29

[100] Child Welfare League of America (2003) *Best Practice Guidelines: Child Maltreatment in Foster Care,* Washington D.C., p 29

[101] CPS referral 1021766.

[102] DS-KIDS-00559.

[103] DS-KIDS-00565-67,559.

[104] DS-KIDS-00561.

[105] DS-KIDS-00565.

[106] DS-KIDS-00629.

[107] DS-KIDS-00581-83, CPS referral 1022342.

[108] DS-KIDS -00592-96.

[109] DS-KIDS-00623, DS-CPS-00012-13.

[110] DS-KIDS-00629.
[111] DS-KIDS-00645.
[112] DS-KIDS-00651.
[113] DS-CPS-00048.
[114] DS-CPS-00014.
[115] DS-CPS-00013-14.
[116] DS-CPS-00017.
[117] DS-CPS-00015-16.
[118] DS-CPS-00015.
[119] DS-CPS-00015.
[120] DS-CPS-00014-15.
[121] DS-CPS-00016. The meaning of this phrase is not explained in the files.
[122] DS-KIDS-00113.
[123] DS-KIDS-00044-45, 61.
[124] DS-CPS-00017.
[125] DS-KIDS-00068.
[126] DS-CPS-00110.
[127] DS-KIDS-00663-85.
[128] DS-CPS-00056-57.
[129] DS-CPS-00057.
[130] DS-CPS-00066.
[131] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 2.87.
[132] AD-CPS-00464.
[133] AD-CPS-00528, AD-PRI-00718.
[134] AD-PRI-00722-24.
[135] AD-CPS-00528.
[136] AD-CPS-00464.
[137] AD-CPS-00528.
[138] AD-CPS-00462-63, 00477-80.
[139] AD-CPS-00444.
[140] AD-CPS-00425.
[141] AD-PRI-01339-45.
[142] AD-CPS-00440.
[143] AD-CPS-00438-41.
[144] AD-CPS-00466.
[145] AD-CPS-00545.
[146] AD-RF-000134.
[147] AD-RF-00001-07.
[148] AD-RF-00008-16, 00030-38.
[149] AD-RF-000017-29.
[150] AD-RF-000070-75.
[151] AD-RF-00456-58, AD-PRI-00336.
[152] AD-PRI-00633.
[153] AD-PRI-00006, 01093.

[154] AD-PRI-00033.

[155] DM-PRI-00076-90.

[156] DM-PRI-00208.

[157] DM-PRI-00096.

[158] DM-PRI-00095.

[159] DM-PRI-00452.

[160] DM-PRI-00405.

[161] DM-PRI-00381-83.

[162] DM-CPS-000002-12.

[163] DM-CPS-00012-25.

[164] DM-RF-00205.

[165] DM-CPS-00052-66.

[166] DM-RF-00152.

[167] DM-CPS-00082.

[168] DM-CPS-00095.

[169] DM-CPS-00103.

[170] DM-CPS-00109.

[171] DM-CPS-00104.

[172] DM-CPS-00112.

[173] DM-PRI-00147.

[174] DM-CPS-00089-90.

[175] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-FC 6.03 and 6.05.

[176] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 3.31.

[177] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 3.3.

[178] DJ-PRI-00012, 00080, 00132-34.

[179] DJ-PRI-00080.

[180] DJ-PRI-00085, 146.

[181] DJ-PRI-00146-47.

[182] DJ-PRI-00132-133.

[183] DJ-PRI-00147

[184] DJ-PRI-00991-92.

[185] DJ-PRI-00905.

[186] DJ-PRI-00905-20.

[187] DJ-PRI-00078.

[188] DJ-PRI-00018.

[189] DJ-PRI-000881-96.

[190] DJ-PRI-000078.

[191] DJ-PRI-000894, 02819-24.

[192] DJ-PRI-001515.

[193] DJ-PRI-000295-96.

[194] DJ-PRI-000402, 00992.

[195] DJ-PRI-001094-109.

[196] DJ-PRI-000418, 00774.

[197] DJ-PRI-000420-21.

[198] DJ-PRI-000458.

[199] DJ-PRI-000781.

[200] DJ-RF(2)-00013.

[201] DJ-RF(2)-00152.

[202] DJ-CPS-00121-29.

[203] DJ-PRI-00449-50, 00453-54.

[204] DJ-PRI-01313.

[205] DJ-CPS-00110-14.

[206] DJ-RF-00066.

[207] DJ-CPS-00103-06, 00006-26.

[208] DJ-CPS-00087-88.

[209] DJ-CPS-00002.

[210] DJ-RF(2)-00436.

[211] RP-PRI-1090-1122.

[212] RP-PRI-1063-102.

[213] RP-CPS-00108.

[214] RP-PRI-1045.

[215] RP-PRI-1026-32.

[216] RP-PRI-1052-53.

[217] RP-KIDS-00194.

[218] CPS referral 1186073.

[219] RP-PRI-01038, RP-CPS-00010.

[220] RP-CPS-00016-17.

[221] RP-CPS-00021-22.

[222] RP-CPS-00007-37.

[223] RP-CPS-00017-18.

[224] RP-CPS-00020-21.

[225] RP-CPS-00021.

[226] RP-CPS-00023.

[227] RP-CPS-00027.

[228] RP-CPS-00032.

[229] RP-CPS-00032-33.

[230] RP-CPS-00025-26.

[231] RP-CPS-00034-35.

[232] RP-CPS-00142.

[233] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-FC 6.05.

[234] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 2.33.

[235] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 2.55.

[236] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-FC 12.01.

[237] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 3.31.

[238] SW-PRI-02013-19.

[239] SW-PRI-02131-38.

[240] SW-PRI-01953-54.

[241] SW-PRI-02166-67.

[242] SW-PRI-02104-05.

[243] SW-PRI-02089-90.

[244] SW-PRI-00236-45.

[245] SW-PRI-01970-71.

[246] SW-PRI-01952-53.

[247] SW-PRI-00648-49.

[248] SW-PRI-00744.

[249] SW-PRI-00614.

[250] SW-PRI-00739-41.

[251] SW-PRI-00767.

[252] SW-PRI-00691.

[253] SW-PRI-00695-700.

[254] SW-PRI-00663-93.

[255] SW-PRI-01146.

[256] SW-PRI-01224-37, 01146-48.

[257] SW-PRI-00796.

[258] SW-PRI-00799.

[259] SW-PRI-01193-97.

[260] SW-PRI-002280.

[261] SW-PRI-00914.

[262] SW-PRI-00445-47, 00525.

[263] SW-PRI-00466-71.

[264] SW-PRI-00525.

[265] SW-PRI-02211.

[266] SW-RF-00009.

[267] SW-PRI-00002-06.

[268] SW-PRI-00011.

[269] SW-PRI-00017-22.

[270] SW-PRI-00023-25.

[271] SW-RF-00043.

[272] SW-RF-00044.

[273] SW-RF-00233.

[274] SW-RF-00024.

[275] SW-RF-00032.

[276] SW-RF-00047.

[277] SW-CPS-00049.

[278] SW-RF-00073.

[279] SW-RF-00077.

[280] SW-RF-00145-46.

[281] SW-RF-00223-24.
[282] SW-CPS-00026.
[283] SW-CPS-00026.
[284] SW-CPS-00006-27.
[285] SW-CPS-00052, 00055-58.
[286] SW-CPS-00006-27.
[287] SW-CPS-00029.
[288] SW-CPS-00026.
[289] SW-KIDS-00375.
[290] SW-CPS-00008.
[291] SW-RF-00297.
[292] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 3.3.
[293] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-FC 17.06.
[294] Child Welfare League of America (1995) *Standards of Excellence for Family Foster Care Services* Washington D.C., § 3.6.
[295] Council On Accreditation (2008) *Eighth Edition Child Welfare Accreditation Standards*, New York, § PA-FC 17.05.
[296] OAC 340:75-7-18, Instruction to Staff 2(9).
[297] RW-PRI-2951.
[298] RW-PRI-002961.
[299] RW-PRI-002962.
[300] RW-PRI-00416, 07701.
[301] RW-PRI-02982.
[302] RW-PRI-02983.
[303] RW-PRI-02992-93.
[304] RW-PRI-02983.
[305] RW-PRI-00417.
[306] RW-PRI-000016.
[307] RW-PRI-001341, 00417.
[308] RW-PRI-001341, 00417.
[309] RW-PRI-00418.
[310] RW-PRI-01341.
[311] RW-PRI-00418.
[312] RW-PRI-00419-20.
[313] RW-PRI-01343.
[314] RW-PRI-01343.
[315] RW-PRI-00420.
[316] RW-PRI-01344.
[317] RW-PRI-00421-22, 01344.
[318] RW-PRI-03307.
[319] RW-PRI-03313.
[320] RW-PRI-01345-46.
[321] RW-PRI-01346, 00422.

[322] RW-PRI-02999, 00423.
[323] RW-PRI-00424.
[324] RW-PRI-03005, 00423.
[325] RW-PRI-3317-18, 1351.
[326] RW-PRI-03324.
[327] RW-PRI-01351.
[328] RW-PRI-03323-24.
[329] RW-PRI-03326.
[330] RW-PRI-03328.
[331] RW-PRI-03318, 01351-52.
[332] RW-PRI-01352.
[333] RW-PRI-01353-54.
[334] RW-PRI-01354.
[335] RW-KIDS-00620, 00632.
[336] RW-PRI-01359.
[337] RW-PRI-03263.
[338] RW-PRI-03264.
[339] RW-PRI-03263.
[340] RW-PRI-03264.
[341] RW-PRI-03265.
[342] RW-PRI-03265.
[343] RW-PRI-03266.
[344] RW-PRI-03266.
[345] RW-PRI-03267.
[346] RW-PRI-03260.
[347] RW-PRI-07043.
[348] RW-KIDS-00641.
[349] RW-KIDS-00629.
[350] CPS referral 1226721.
[351] RW-KIDS-03243, RW-CPS-00085.
[352] RW-CPS 00102-06.
[353] RW-KIDS-03249.
[354] RW-KIDS-03253-54.
[355] RW-PRI-02025.
[356] RW-PRI-02028.
[357] RW-PRI-02029.
[358] RW-PRI-02032.
[359] PRI 2237-2246.
[360] NW-CPS-00393-400.
[361] NW-CPS-00401-12.
[362] NW-CPS-00024-28.
[363] NW-PRI-01318-26.
[364] NW-CPS-01140-64.
[365] NW-PRI-00575-78.
[366] NW-RF-00212-24.

[367] NW-RF-00225.
[368] NW-PRI-01672-78.
[369] NW-PRI-001664-67.
[370] NW-CPS-00096.
[371] NW-CPS-00094-96.
[372] NW-CPS-00096-97.
[373] NW-CPS-00098.
[374] NW-CPS-00097.
[375] NW-KIDS-00848.
[376] NW-CPS-00057.
[377] NW-CPS-00031.
[378] NW-CPS-00041.
[379] NW-CPS-00041.
[380] NW-CPS-00092.
[381] NW-CPS-00092.
[382] NW-RF-00042-45, NW-CPS-00092.
[383] NW-KIDS-00190.
[384] JT-PRI-00200-16.
[385] JT-PRI-00229.
[386] JT-PRI-00225.
[387] JT-PRI-00231.
[388] JT-PRI-00231-32.
[389] JT-PRI-00219.
[390] JT-PRI-00234.
[391] JT-KIDS-00171.
[392] JT-PRI-00236.
[393] JT-PRI-00229.
[394] JT-PRI-00234.
[395] JT-PRI-00222.
[396] JT-PRI-00221.
[397] JT-PRI-00218-21.
[398] JT-PRI-00336, JT-KIDS-00050.
[399] JT-PRI-00342.
[400] JT-PRI-00344.
[401] JT-PRI-00347.
[402] JT-PRI-00350.
[403] JT-PRI-00353.
[404] JT-PRI-00444-45.
[405] JT-PRI-00361.
[406] JT-PRI-00283.
[407] JT-KIDS-00141.
[408] JT-KIDS-00141; JT-PRI-00291.
[409] JT-KIDS-00141; JT-RF-00271.
[410] JT-RF-00168-69.
[411] JT-RF-00174.

[412] JT-RF-00162-63.
[413] JT-RF-00238.
[414] JT-CPS-00068.
[415] JT-RF-00003-05.
[416] JT-RF-00321-25.
[417] JT-RF-00374-81.
[418] JT-CPS-00068.
[419] JT-RF-00273.
[420] JT-KIDS-00074.
[421] JT-PRI-00026-37.
[422] JT-CPS-00019.
[423] JT-CPS-00014.
[424] JT-CPS-00030.
[425] JT-RF-00907.

# <u>REFERENCES</u>

Child Welfare League of America (2003) <u>Best Practice Guidelines: Child Maltreatment in Foster Care</u>. Washington, D.C.

Child Welfare League of America (1999) <u>Minimum Education Required by State Child Welfare Agencies.</u> Arlington, Virginia.

Child Welfare League of America (1999) <u>Standards of Excellence: Services for Abused or Neglected Children and Their Families.</u> Washington, D.C.

Child Welfare League of America (1995) <u>Standards of Excellence: Family Foster Care Services</u>. Washington, D.C.

Cohen, J. (1960) A coefficient of agreement for nominal scales. <u>Educational and  Psychological Measurement, 20</u>, 37-46.

Council on Accreditation for Children and Family Services (2008) <u>Eighth Edition Child Welfare Accreditation Services.</u> New York.

Gabor, P.A., & Ing, C. (2001). Sampling. In R.M. Grinnell (Ed.). <u>Social work research and evaluation: Quantitative and qualitative approaches</u> (pp.207-223). New York: Peacock.

Randolph, J. J. (2005). Free-marginal multirater kappa: An alternative to Fleiss' fixed-marginal multirater kappa. Paper presented at the Joensuu University Learning and Instruction Symposium 2005, Joensuu, Finland, October 14-15, 2005. (ERIC Document Reproduction Service No. ED490661).

Rubin, A., & Babbie, E. (2001). <u>Research methods for social work, 4th edition</u>. New York: Wadsworth.  <u>Psychological Measurement, 20</u>, 37-46.

Siegel, S., & Castellan. (1988). *Nonparametric statistics for the social sciences* (2nd ed.). New York: McGraw-Hill.

**APPENDIX A**

**Inter-rater Reliability Scores for the CPS Investigation Review**

| Question | Kappa |
|---|---|
| Taking into account the safety threat suggested by the report and any realistic barriers to making contact, was contact achieved within a reasonable amount of time? | 1.00 |
| Was each OKDHS ward/alleged victim who could reasonably be expected to provide information interviewed in sufficient privacy to reasonably permit an untainted interview? | 0.83 |
| Did the reported allegations, or allegations that came to light during the investigation, necessitate observation of the child's body? | 1.00 |
| If "Yes", was the child's body sufficiently observed by the OKDHS investigator or by a medical professional to identify evidence of abuse/neglect? | 1.00 |
| Type(s) of abuse/neglect | 0.92 |
| Specific detail | 0.87 |
| Finding | 0.86 |
| Reasonable finding | 0.86 |
| Was priority designation reasonable? | 1.00 |
| Necessary contacts and activities | 0.95 |
| Completed | 0.87 |
| Is there evidence that, at the conclusion of the investigation, OKDHS took reasonable steps to assure the safety of the wards/alleged victims involved in the investigation? | 1.00 |

**Inter-rater Reliability Scores for the OCA Investigations Review**

| Question | Kappa |
|---|---|
| Taking into account the safety threat suggested by the report and any realistic barriers to making contact, was contact achieved within a reasonable amount of time? | 0.85 |
| Was each OKDHS ward/alleged victim who could reasonably be expected to provide information interviewed in sufficient privacy to reasonably permit an untainted interview? | 0.85 |
| Did the reported allegations, or allegations that came to light during the investigation, necessitate observation of the child's body? | 1.00 |
| If "Yes", was the child's body sufficiently observed by the OKDHS investigator or by a medical professional to identify evidence of CA/N? | 1.00 |
| type(s) of abuse/neglect | 0.93 |
| specific detail | 0.94 |
| Finding | 0.87 |
| Reasonable finding | 1.00 |
| Necessary contacts and activities | 0.89 |
| Completed | 0.83 |
| As documented in the file, the nature of the ongoing caseworker's contact with the child(ren) and/or caregiver(s) | 0.75 |
| Is there evidence that, at the conclusion of the investigation, OKDHS took reasonable steps to assure the safety of the wards/alleged victims involved in the investigation? | 1.00 |

**Inter-rater Reliability Scores for the Screen Out Review**

| Question | Kappa |
|---|---|
| Is there evidence that the hotline worker gathered sufficient information – including, if necessary, making reasonable collateral contacts to obtain critical information – to make a reasonable decision? | 0.85 |
| Was the overall screening decision reasonable? | 1.00 |
| Type of maltreatment | 1.00 |
| Specific form of maltreatment | 0.91 |

# APPENDIX B

## Reviewer Data Base Instructions

What follows are directions for entering information into the *DG v. Henry* Data Base.  If any reviewer becomes uncertain about the manner in which any field should be completed, a discussion including all reviewers must be held immediately to assure that information is entered consistently.

## General Instructions

All responses must be made based strictly on information documented in the file.

Do not enter anything into any field for which there is not clear information in the case file unless there is a "not applicable" or "insufficient information" drop down response.

## SCREEN OUTS

## Case Background Tab

**Referral ID:**  Enter the referral number from the sample list provided.

**Type Action:** Select the "Screen out" from the drop down choices. Note that the type of action selected will determine the portions of the data base that will be relevant and that will be available to the reviewer.

**Reviewer:**  Select the applicable reviewer from the drop down menu.

**Type of Home/facility:**  Select the applicable type of facility from the drop down menu.

**Report Source:**  This is the person who actually calls the report to the Hotline.

**Alleged victims:** Click on button entitled "enter information on a new alleged victim" located above and to the right of the "Alleged victim" field. The "Detail on alleged victims" window will open. In the "Detail on alleged victims" window enter:

> **The child's initials** (unk if the child's name is not known)

> **The child's date of birth.** If the birth date is not known, enter the child's approximate age as identified in file documentation in the "age in years" field. If the victim's birth date is available, skip the "age in years" field.

When information has been entered into all applicable fields in the "Detail on alleged victims" field, click on 'close'. Repeat the process for each OKDHS ward about whom an allegation was made in the report. To edit, delete, or add any information in the "alleged victim" field, double click on the applicable child's initials.

**<u>Allegations-Screen Outs Tab</u>**

**Maltreatment Allegations:** First select an alleged victim from the "victim" drop down at the top of the tab. Both "type" and "detail allegation" must be completed separately for <u>each</u> alleged victim.

Select the "type(s) abuse/neglect" from the drop down menu on the left side of the "Maltreatment Allegations" form. If multiple allegation/issue types are identified in the referral narrative, more than one "type of abuse/neglect" should be selected for each child.

Select the "specific detail" associated with previously selected "types abuse/neglect" from the drop down on the right side of the "Maltreatment Allegations" form. If multiple specific allegation/issue types are identified in the referral narrative, more than one type of abuse/neglect should be selected for each "type(s) abuse/neglect" <u>and</u> for each child.

If the specific allegation/issue officially recorded is not apparent from file documentation, select the allegation(s) from the drop down menu that most closely fit and that are identified in file documentation.

*<u>Repeat this process for each identified alleged victim</u>.*

**The individual(s) allegedly responsible for CA/N were:** Select the role relationship of each alleged perpetrator to the alleged victim(s). Multiple alleged perpetrators may be selected.

**<u>Screen Out Tab</u>**

**Is there evidence that child welfare staff responsible for involved OKDHS wards were notified of the referral information?** Select "yes" or "no" from the drop down menu.

**Is there evidence that staff responsible for approving or licensing the home/facility were notified of the referral information?** Select "yes" or "no" from the drop down menu.

**Is there evidence that the worker receiving the referral checked data systems to identify current/prior OKDHS involvement?** Determine whether there is evidence that the worker receiving the referral checked OKDHS data systems to identify previous OKDHS CPS history in which anyone living in, working in, or otherwise frequenting the home/facility has, or may have been an alleged perpetrator of child maltreatment. Select "yes" or "no" from the drop down menu.

**If the allegation(s) involved domestic violence, significant substance abuse, or sexual abuse, is there evidence that the worker receiving the intake contacted law enforcement to conduct a background check?** Determine whether the worker receiving the referral contacted law enforcement to obtain any police records when the report alleges domestic violence, significant substance abuse, or sexual abuse. Select "yes" or "no" from the drop down menu.

**Is there evidence that the Hotline worker gathered sufficient information – including, if necessary, making reasonable collateral contacts to obtain important information.?** Select "yes" or "no" from the drop down menu. Collateral contacts should be expected <u>only</u> when sources of information important to a screen in/screen out decision are obviously and readily available.

**Was the referral accepted for assessment (as opposed to investigation)?** Select "yes" or "no" from the drop down menu.

**Was the overall screening decision reasonable?** Select "yes", "no", or "insufficient information" from the drop down menu. Do not select "insufficient information" simply because the worker receiving the referral made a screening decision with limited information. Select "insufficient information" <u>only</u> when the reviewer has made a screening decision without gathering information necessary to the screening decision *and* the information was likely to have been readily available (i.e., by asking the reporting source additional questions or by contacting collateral sources that are obviously and readily available and likely to be able to provide the necessary information.

**If "no", write a brief description of the safety threat not adequately addressed.** Self-explanatory. (This field is optional if the same information is covered in the final narrative)

**Narrative/other comments about the case.** Write a brief (i.e., a few sentences) about the referral identifying anything notable about the OKDHS response. Copy the narrative onto a word document.

**Close:** Click on the close button located in the upper right hand corner of the "screen out" tab. Then enter the next referral, click on the "add a record" button at the top center of the "screen out" tab.

## <u>CPS INVESTIGATIONS, OCA INVESTIGATIONS, AND CPS ASSESSMENTS</u>

### <u>Case Background Tab</u>

**Referral ID:** Enter the referral number from the sample list provided.

**Type Action:** Select the "CPS Investigation" from the drop down choices. Note that the type of action selected will determine the portions of the data base that will be relevant and that will be available to the reviewer. ***Note: For OCA investigations that are assigned as CCR's, select OCA CCR.***

      **Was decision to assign as CCR reasonable?** Will appear immediately to the right: Select the applicable reviewer from the drop down menu.

***For CPS Assessments Only* -- Was the Decision to Assign as an Assessment Reasonable?** Select the applicable reviewer from the drop down menu.

**Reviewer:** Select the applicable reviewer from the drop down menu.

**Type of Home/facility:** Select the applicable type of facility from the drop down menu.

**Report Source:** This is the person who actually calls the report to the Hotline or makes an allegation to an OKDHS caseworker.

**Date and time of the referral**: Enter the date and time (e.g., 12/21/09 2:30 pm).

**Date and time of first good faith attempt to make in person contact with any OKDHS ward who was an alleged victim:** Enter the date and time (e.g., 4/1/09 2:30 pm) of the first effort made by the OKDHS investigator to actually see an OKDHS ward who was an alleged victim. Generally, this does not include telephone calls. An exception may be an alleged victim who is out of state or otherwise physically inaccessible to the OKDHS investigator.

**Alleged victims:** Click on button entitled "enter information on a new alleged victim" located above and to the right of the "Alleged victim" field. The "Detail on alleged victims" window will open. Enter information concerning alleged child victims who are wards of OKDHS only. In the "Detail on alleged victims" window enter:

> **The child's initials** (unk if the child's name is not known)

> **The child's date of birth.** If the birth date is not known, enter the child's approximate age as identified in file documentation in the "age in years" field. If the victim's birth date is available, skip the "age in years" field.

> **Date and time of first actual in-person contact:** Record the date and time (2/12/09 11;15 am) that the OKDHS investigator made in-person contact with that alleged victim. If no contact was made during the investigation, leave blank.

> **Taking into account the safety threat suggested by the report and any realistic barriers to making contact, was contact achieved within a reasonable amount of time?** This is a judgment about whether the investigator actually made in person contact with each alleged victim(s) as quickly as is reasonable given the potential level of risk to that alleged victim as suggested by the reported information and given any legitimate barriers to making contact. This is a judgment to be made free of systemic considerations (e. g. procedurally required time frames or high work load). Barriers that should be taken into account include things that are completely out of the control of the investigating agency (e. g. investigative staff went to the home immediately after receiving a report but no one was there and there were not steps that the investigator could reasonably take to locate the children and the OKDHS investigator made a second attempt within a reasonable period considering the safety threat implied by the report)..

**Was each OKDHS ward/alleged victim who could reasonably be expected to provide information interviewed in sufficient privacy to reasonably permit an untainted interview?** Select the applicable drop down. "Not applicable/necessary" is applicable to non-verbal alleged victims.

**Did the reported allegations, or allegations that came to light during the investigation, necessitate observation of the child's body?** Observation of the child's body is necessary when observation is reasonably likely to reveal evidence of C/AN (e.g., bruises or severe untreated diaper rash). Observation by the investigator or a medical professional is included. Select the applicable drop down.

**If "Yes", was the child's body sufficiently observed by the OKDHS investigator or by a medical professional to identify evidence of CA/N?** Select the applicable drop down.

When information has been entered into all applicable fields in the "Detail on alleged victims" field, click on 'close'. *Repeat the process for each OKDHS ward about whom an allegation was made in the report.* To edit, delete, or add any information in the "alleged victim" field, double click on the applicable child's initials.

## Allegations/Investigation Tab

**Victim:** Select a victim from the drop down menu that will display the initials of each alleged victim previously entered in the "Alleged victims" field.

**Maltreatment Allegations field:**

**type(s) of abuse/neglect:** Select a general maltreatment category from the drop down menu on the left side of the "Maltreatment Allegations" form. If multiple allegation/issue types are identified in the referral narrative or from information obtained during the investigation, more than one "type of abuse/neglect" should be selected for each child.

**specific detail:** Select the specific maltreatment associated with previously selected "types abuse/neglect" from the drop down on the right side of the "Maltreatment Allegations" form. If multiple specific allegation/issue types are identified in the referral narrative or from information obtained during the investigation, more than one type of abuse/neglect should be selected for each "type(s) abuse/neglect" and for each child.

*Note:* Include allegations that were not part of the original allegation but about which "reason to believe" arose from information obtained during the investigation.

**Alleged/not alleged:** Indicate whether the allegation was alleged in the report or if it arose from information obtained during the investigation. Select the applicable choice from the drop down menu.

**Finding:** Identify the OKDHS finding from the drop down menu. Select "not investigated" if the investigation did not address the allegation with respect to the identified child.

**Reasonable finding:** Identify the reasonable finding from the choices in the drop down menu. Select Confirmed when the OKDHS established sufficient evidence to meet the "some credible evidence" standard of evidence. Select "Insufficient information" if the investigation did not gather sufficient information to make a finding and additional investigative activities likely to provide sufficient information to make a finding were reasonably available to the OKDHS investigator.

<u>Note:</u> Repeat this process for each OKDHS ward who is identified as an alleged victim and for each allegation.

**The individual(s) allegedly responsible for CA/N were:** Select the role relationship of each alleged perpetrator to the alleged victim(s). Multiple alleged perpetrators may be selected.

**Priority code on report:** Record the priority code the OKDHS Hotline assigned the referral from the drop down menu options. Priority one means the investigation must be initiated immediately/the same day. Priority 2 means the investigation must be initiated within 15 days.

**Was priority designation reasonable?** Considering the safety threat suggested by the report was the assigned priority designation reasonable? *Note:* For priority 2, OKDHS includes the number of days for response. Evaluate whether that timeframe is reasonable. Select the applicable response from the drop down menu.

**Necessary contacts and activities:** From the drop down menu, select all contacts that were made in person or by telephone during the investigation. Do not include unsuccessful attempted contacts.

<u>Also</u>, select contacts that, considering reasonable CPS investigative practice, should have been made but were not. For the purpose of this review, contacts that "should have been made" include those which, had they been made, would have been reasonably likely to have <u>substantially</u> influenced the investigative finding and/or decisions related to the immediate or on-going safety of OKDHS wards.

In general, in addition to the alleged victim(s) (covered elsewhere on the data base), the following contacts should be included in every investigation:

- Reporter
- Alleged perpetrator
- Observe home or facility
- OKDHS or Private agency case manager of the victim
- OKDHS or Private agency case manager for other children (if there are other children placed in the home)
- Staff responsible for approving or licensing homes/facilities

- Police (if involved)
- Additional children in home/facility (if there are other children in the home/facility)
- Treating/examining physician/medical professional (if involved or if should have been involved)
- Behavioral/mental health professionals (if involved with an alleged victim and likely to have information pertaining to the allegations)
- Other residents, staff, others in the home/ facility
- Identified witnesses (when identified)
- Other professional sources who may have information relevant to the allegations (when identified)
- Other non-professional sources who may have information relevant to the allegations (when identified)

**Completed?:** For contact/activities selected (both contact/activities that were made/conducted and those that should have been made), select all, some, or none as applicable. Select "some" when some but not all individuals in a respective category were contacted <u>and</u> contact with those not contacted would have been reasonably likely to have <u>substantially</u> influenced the investigative finding and/or decisions. Also select "some" when some information (e.g., an interview or a police or medical report) was obtained from a source but addition information is <u>necessary</u> from that category of source.

Except in the case of the reporter, do not duplicate entry. For example, if the police actually witnessed maltreatment and were contacted, record **only** that the police were contacted. However, if a school teacher was the reporter and was contacted during the investigation, record that **both** the reporter and school personnel were contacted.  When sources contacted (or sources that were not contacted that reviewers believe should have been) fit more than one category, select the category that is most professionally specific.

**Is there evidence that the 10 day staffing -- including the investigator**, **child's CW worker, CW supervisor, CW field liaison (CWFL), and the foster care or adoption specialist -- was held?** Select applicable response from the drop down menu.

**Did the investigation include gaps of more than 30 days during which no investigative activity took place?** Select applicable response from the drop down menu.

## <u>Background Check Tab</u>

**Is there evidence that, at intake or during the investigation, a background check was conducted to identify previous CPS history involving the home/facility or caregivers allegedly responsible for CA/N?** Select applicable response from the drop down menu.

**If YES, was prior CPS involvement involving the home/facility or caregivers allegedly responsible for CA/N identified?** Select applicable response from the drop down menu.

**Previous maltreatment reports:**

**Date:**  Enter the date(s) of any prior CPS reports identified. If prior reports are identified but no date is provided, enter "unk".

**Finding:** Enter the OKDHS finding from the drop down menu.

**# victims also on this case:** Enter the number of OKDHS wards who were  alleged victims on both the prior report and the report being reviewed.

**# allegations also on this case:** Enter the number maltreatment allegations about which there is "reasonable cause to believe" in both the prior report and the report being reviewed.

**Insufficient information about reports:** If there is not information in the file about prior CPS history identified in background checks, check the box labeled "insufficient information on reports".

<u>Repeat the process for each prior CPS report identified.</u>

**Is there evidence that, at intake or during the investigation, the criminal background of caregivers allegedly responsible for CA/N was explored?** Select applicable response from the drop down menu.

**If YES, did the check reveal a history of violent crime, sex crime, crime against children, drug offenses, or weapons offenses?** Select applicable response from the drop down menu.

**Previous criminal history:**

**Date:** Enter the date of the prior criminal charge(s). If a charge is identified enter an *approximate date <u>if</u> there is information available to make a reasonable estimate. If there* is no date and insufficient information available to make a reasonable estimate, enter unk.

**Charge:** Select category of criminal charge from the drop down menu.

<u>Repeat the process for each prior criminal charge identified.</u>

**<u>Disposition tab</u>**

**Date of last investigative contact**: Enter the date of the last documented investigative contact.

**Date Investigator signed off on the investigation:** Enter the date the investigator signed off on the investigation. If no signature is provided, leave blank.

**Date of final supervisory approval:** Enter the date of final supervisory approval. If this is not documented, leave blank.

**As documented in the file, the nature of the ongoing caseworker's contact with the child(ren) and/or caregiver(s):** If there is <u>specific and substantial</u> information concerning ongoing caseworker contact, select reasonable or inadequate. If there is not specific and substantial information, select insufficient information.

**Is there evidence that, at the conclusion of the investigation, OKDHS took reasonable steps to assure the safety of the wards/alleged victims involved in the investigation:** This is an evaluation as to whether there is documented evidence that OKDHS took reasonable action to protect the wards involved in the report being reviewed during and at the conclusion of the investigation. Select applicable response from the drop down menu.

**Is there evidence that, at the conclusion of the investigation, OKDHS took reasonable steps to assure the safety of OKDHS wards prospectively:** This is a judgment as to whether there is documented evidence that OKDHS took reasonable action to protect the wards who may be placed in the home/facility in the future (eg., was the home closed, was there an adequate corrective action plan, etc.). *Note:* This information may not be available in the investigation file. Select applicable response from the drop down menu.

**Narrative/other comments about the case.** Write a brief (i.e., a few sentences) about the referral identifying anything notable about the OKDHS response. Copy the narrative onto a word document.

# **APPENDIX C**

## **Review Team Curriculum Vitae**

# JOHN GOAD, A.M.

312/543-9450
govertoniv@aol.com

## WORK EXPERIENCE

### Litigation Related Consultation:

- Consultant expert for the plaintiff in federal class action litigation *Kenny A et. al. v. Sonny Perdue* (the state of Georgia). Principal investigator in a research review of child maltreatment referrals diverted from the state child welfare system. May 2010 to Date

- Consultant expert for the plaintiff in federal class action litigation *D.G. vs. Henry* (the state of Oklahoma). Principal investigator in a research review of maltreatment investigations concerning children in the care of the state of Oklahoma. May 2010 to Date

- Consultant expert to lawyers for the plaintiff in *Smith/Cruz vs. Washington DSHS*. June 2010 to October 2010

- Provide expert consultation to the plaintiff in federal class action litigation *Kenny A vs. Perdue* (state of Georgia). Principal investigator in a research review of children diverted from the state child welfare system. May 2010 to November 2010

- Expert witness for the defense (Illinois DCFS) in federal litigation *Hernandez. vs. foster et al.* September 2009 to January 2010

- Provide expert consultation to lawyers for the plaintiffs in federal class action litigation *D.G. vs. Henry* (the state of Oklahoma). Conducted a review of maltreatment allegations concerning named plaintiffs. Principal investigator in research review of child maltreatment in state foster care.  July 2009 to November 2009

- Provide expert consultation to lawyers for the defense in federal litigation *Bernsteil et al. vs. Trinity United Church et al*. July 2009 to Date

- Expert witness for the defense in federal litigation *Legler vs. Erie County PA*. September 2008 to Date

- Expert witness for the plaintiff in federal litigation *Lethbridge vs. Michigan DHS.* October 2008 to Date.

- Expert witness for the plaintiff in federal litigation *Rodwell vs. Michigan DHS.* October 2008 to Date.

- Expert witness for the defense in federal litigation *Legler vs. Erie County PA.* September 2008 to Date

- Expert witness for the plaintiff in class action federal litigation *Dwayne B. vs. Granholm*, *et al.* (the state of Michigan). Conduct a management review of the Michigan Department of Human Services and a review of child fatalities. October 2007 to July 2008

- Expert witness for the plaintiff in state litigation *Ray v. Washington University Children's Hospital.* September 2007 to February 2008

- Expert witness for the defense in federal litigation *Harris v. Lehigh County.* October 2005 to September 2006

- Expert witness for the defense in federal litigation *Tatar v. Armstrong County.*  August 2005 to May 2007

-  Expert witness for the plaintiff in federal class action litigation *Kenny A et al. v. Sonny Perdue* concerning the safety of children in foster care in the Atlanta, Georgia metropolitan area. Principal investigator in two research reviews of child maltreatment in foster care. September 2003 to January 2005

**Direct Consultation:**

- Develop curriculum and conduct training for Clark County, Nevada Division of Child and Family Services staff about child protective services decision making. October 2008

- Consultant to the University of Illinois – Child and Family Research Center. Provide consultation related to child welfare research, evaluation, and assist in developing recommendations to public child welfare agencies. June 2008

- Develop policy and procedure the Child Abuse Hotline, for investigation of child abuse and neglect allegations, for the provision of in-home protective services, and for the provision of foster care services for the Clark County, Nevada Division of Family Services. August 2007 to September 2009

- Develop operational child maltreatment definitions for the Nevada Division of Child and Family Services. February 2007 to March 2008

- Conduct an assessment of decision making at the Clark County, Nevada Division of Family Services Child Abuse Hotline. August 2006 to October 2006

- Provide consultation to the Archdiocese of Chicago concerning the prevention of and response to clergy child abuse. March 2006 to November 2006

- Provide consultation and training concerning child protection to the New Jersey Division of Youth and Family Services. July 2005 to August 2005

- Provide consultation to the Philadelphia Department of Human Services related to the redesign of its Child Protection System. July 2004 to March 2005

- Provide consultation to Family Services of Metro Orlando related to the design of the Child Protection System for the Orlando, Florida metropolitan area. June 2003 to February 2005

**Illinois Department of Children and Family Services:**  January 1975 to April 2003

- <u>Deputy Director, Division of Child Protection.</u> Directed and administered the Illinois child protective services system; managed a staff of approximately 1200 employees, an annual purchase of service budget of approximately $25 million, and grants totaling approximately $20 million.  Oversaw development and statewide implementation of best practice policies for child protective services. Oversaw the design and implementation of the child protection portion of a statewide data system.

  Responsible for public and private sector child protection investigations, in-home protective services, child welfare intake, and the emergency shelter system; work in close collaboration with major legal, medical, law enforcement, and social service agencies and institutions; participate in planning for changes in state legislation and policy related to child welfare; participate on committees, work groups and advisory boards at the local state, and national levels; frequent contact with media; frequent public speaking.  December 2001 to April 2003.

- <u>Associate Deputy Director, Cook County Child Protection.</u>  Directed and administered the Cook County, Illinois child protective services system; developed and implemented strategies that resulted in a fifty-percent decline in repeat child abuse and neglect while reducing the number of children entering substitute care by a factor of four; oversaw the child protection portion of the successful effort to become the only large state child welfare agency to be accredited by the Council on Accreditation in the country; managed a staff of approximately 700 employees and an annual purchase of service budget of approximately $12 million.

Responsible for child protection investigations, in-home protective services, family preservation, family reunification, child welfare intake, and the emergency shelter system; worked in close collaboration with major legal, medical, law enforcement, and social service agencies and institutions; participated in planning for changes in state legislation and policy related to child welfare; participated on committees, work groups and advisory boards at the local, state, and national levels; frequent contact with media; frequent public speaking.  June 1986 to November 2001

- <u>Assistant Child Protection Administrator.</u>  Directed staff of 90 employees engaged in the investigation and assessment of child abuse and neglect reports; responsible for the investigation of all sexual abuse reports in Cook County.  September 1984 to May 1986.

- <u>Child Welfare Supervisor.</u>  Developed and implemented plans for the establishment of specialized units that investigate reports of child sexual abuse, take legal or other action to protect victims from further abuse, and arrange or provide social services as needed. February 1982 to August 1984.

  Developed and implemented plans for the establishment of a unit that reviewed completed child abuse and neglect investigations, assigned them to follow-up teams for service provision, and initiated payment to foster parents and other service providers; acted as the liaison between the investigative and Follow-up divisions in Cook County.  June 1981 to January 1982.

  Supervised nine caseworkers who investigated reports of child abuse and neglect, took necessary protective action, and arranged or provided social services; responsible for the northeast quarter of Chicago.  September 1980 to May 1981.

- <u>Assistant Supervisor.</u>  Monitored five contracts with private social service agencies that provided case management and in-home protective services to abused and neglected children and their families.  July 1979 to August 1980.

- <u>Caseworker.</u>  Investigated reports of child abuse and neglect; took protective action; arranged or provided social services.  December 1978 to June 1979.

  Provided a wide range of social and other services to abused, neglected, dependent, status offending, and delinquent children living in substitute care or with their families in inner city Chicago.  January 1975 to November 1978.

**Illinois Bureau of Employment Security:**  October 1972 to December 1974.

Interviewed and counseled applicants for employment; referred to job vacancies and training programs; ran a highly successful summer employment program for disadvantaged youth.

**United States Naval Air Reserve.**  May 1971 to May 1977 (active duty May 1971 to August 1971).

## OTHER CURRENT PROFESSIONAL ACTIVITIES

### Chicago Children's Advocacy Center

Member: Board of Directors. Oversee the work of the process for the law enforcement/child welfare investigation of all sexual and serious physical child abuse cases in Chicago, Illinois. Chair Program and Strategic Planning Committees.

### Cook County Child Fatality Review Team

Member. Participate in the review of circumstance surrounding the deaths of Cook Count, Illinois children. Make recommendations for systemic change in the child welfare and other systems to prevent future deaths.

## PUBLICATIONS

Goad, J., (Sept 2008). Understanding Roles and Improving Reporting and Response Relationships Across Professional Boundaries. *Pediatrics,* 122: S6 - S9.

Goad, J., (Fall 2010) Child Maltreatment Response: Child Protective Services and Healthcare Provider Relationships. *Illinois Pediatrician*, Volume 27 Number 3 .

## EDUCATION

University of Chicago School of Social Service Administration.  Master of Arts degree in Service Administration (Social Work) June 2001.

Loyola University School of Social Work.  Attended MSW program January 1979 to March 1981.

DePauw University.  Bachelor's of Arts degree in political science.  Graduated May 1971.

# JOHN GOAD, A.M.

312/543-9450
govertoniv@aol.com

## **Testimony List**

- Deposition Testimony – witness for the defense in federal litigation *Tatar v. Armstrong County, PA*.  4-11-07

- Deposition Testimony – witness for the plaintiff in state litigation *Ray v. Washington University Children's Hospital*.  10-29-07

- Deposition Testimony – witness for the plaintiff in class action federal litigation *Dwayne B. vs. Granholm*, *et al.* (the state of Michigan).  4-18-08

- Deposition Testimony – witness for the defense in federal litigation *Hernandez v. Foster, et al.* (Illinois Department of Children and Family Services). 11-16-09

## **Publications**

Goad, J., (Sept 2008). Understanding Roles and Improving Reporting and Response Relationships Across Professional Boundaries. *Pediatrics,* 122: S6 - S9.

Goad, J., (Fall 2010) Child Maltreatment Response: Child Protective Services and Healthcare Provider Relationships. *Illinois Pediatrician*, Volume 27 Number 3.

# RICHARD THOMPSON

Juvenile Protective Association
1707 N Halsted
Chicago, IL 60614

Office:      (312) 698-6932
Fax:        (312)-698-6931
Home:      (312)-951-1960
E-mail:     rthompson@juvenile.org

## RESEARCH INTERESTS:
Mental services use and disparities; maltreatment and associated outcomes for children and youth; community violence and associated outcomes; suicide risk and outcomes.

## ACADEMIC CAREER
**Juvenile Protective Association**
    *Director of Research*                    Feb. 2003 - Present
**University of Illinois at Chicago**
    *Assistant Professor*                     Dec. 2003 - Present
        *Institute for Juvenile Research*
**University of Pennsylvania**
    *Research Associate/Post-doctoral Fellow*  Sept. 1999 – Jan. 2003
        *Department of Psychiatry*
        Advisor: James C. Coyne
**McGill University**
    *Ph.D. Clinical Psychology*               Sept. 1993 – Feb. 2000
        *Department of Psychology*
        Advisor: David C. Zuroff
**Acadia University**
    *B.A Honours (Psychology)*                Sept. 1989 - Apr. 1993
        *Department of Psychology*
        Advisor: Myles Genest

## RECENT/CURRENT RESEARCH GRANTS
**Intention-formation in mental health services for African American youth (5R21MH079836)**
**Sponsor:**     NIMH
**Dates:**       March 11, 2008 – Jan. 31, 2011
**Role:**        PI

**LONGSCAN (Longitudinal Studies of Child Abuse and Neglect): The Capella Project (90CA1747)**
**Sponsor:**     ACYF
**Dates:**       Oct. 1, 2005 – Sept. 30, 2011
**Role:**        PI

**PEER-REVIEWED JOURNAL ARTICLES (69 publications; H-Score 14; 517 citations):**
*In press:*

**Thompson, R.**, Briggs, E.C., & LaTouche, S.A. (in press). Psychology of African American children: Strengths and challenges. In E. Chang & C. Downey (Eds.), *Mental Health Across Racial Groups: Lifespan Perspective*s.

Briggs, E.C., Heilbron, N., **Thompson, R.**, Habib, M., Labruna, V., & Knoverek, A. (in press). Maltreatment and Adolescence. In B.B. Brown, & M. Prinstein (Eds.), *Handbook of Adolescence.* New York: Springer.

**Thompson, R.**, Tabone, J.K., Litrownik, A.J., Briggs, E.C., Hussey, J.M., English, D.J., & Dubowitz, H. (in press). Early adolescent risk behavior outcomes of childhood externalizing behavioral trajectories. *Journal of Early Adolescence.*

Tabone, J.K., Guterman, N., Litrownik, A.J., Dubowitz, H., Isbell, P., English, D.J., Runyan, D.K., & **Thompson, R.** (in press). Developmental trajectories of behavior problems among maltreated children: Heterogeneity during early childhood and ecological predictors. *Journal of Emotional and Behavioral Disorders.*

English, D.J., Graham, J.C., Hussey, J.M., **Thompson, R.,** & Newton, R.R. (in press). Linking family violence exposure to child outcomes: The role of maternal depression. *Journal of Family Violence.*

*2011:*

Lewis, T.L., Kotch, J., Wiley, T.R.A, Litrownik, A.J., English, D.J., **Thompson, R., Z**olotor, A.J., Block, S.D., & Dubowitz, H. (2011). Internalizing problems: A potential pathway from child maltreatment to adolescent smoking. *Journal of Adolescent Health, 48,* 247-252.

*2010:*

**Thompson, R**., & Tabone, J.K. (2010). The impact of early maltreatment on behavioral trajectories. *Child Abuse and Neglect, 34,* 907-916.

**Thompson, R.**, & Whimper, L.A. (2010). Exposure to family violence and reading level of early adolescents. *Journal of Aggression, Maltreatment, and Trauma, 19,* 721-733.

Lewis, T., Kotch, J., **Thompson, R.,** Litrownik, A.J., English, D.J., Proctor, L.J., Runyan, D.K., & Dubowitz, H. (2010). Witnessed violence and youth behavior problems: A multi-informant study. *American Journal of Orthopsychiatry, 80,* 443-450.

Nooner, K.B., Litrownik, A.J., Thompson, R., Margolis, B., English, D.J., Knight, E.D., Everson, M.D., & Roesch, S. (2010). Latent class analysis of new youth self-report measures of physical and sexual abuse. *Child Abuse and Neglect, 34,* 146-154.

Graham, E.C., English, D.J., Litrownik, A.J., **Thompson, R.,** Briggs, E.C., & Bangdiwala, S.I. (2010). Maltreatment chronicity defined with reference to development: Extension of the social adaptation outcomes findings to peer relations. *Journal of Family Violence, 25,* 311-324.

**Thompson, R.,** Litrownik, A.J., Weisbart, C., Kotch, J.B. English, D.J., & Everson, M.D. (2010). Adolescent outcomes associated with early maltreatment and exposure to violence: The role of early suicidal ideation. *International Journal of Child and Adolescent Health, 3*, 55-66.

Yonas, M.A., Lewis, T., Hussey, J.M., **Thompson, R.,** Newton, R., English, D., & Dubowitz, H. (2010). Perceptions of neighborhood collective efficacy moderate the impact of maltreatment on aggression. *Child Maltreatment, 15,* 37-47.

**Thompson, R.**, & Zuroff, D.C. (2010). My future self and me: Depressive styles and future expectations. *Personality and Individual Differences, 48*, 190-195.

Tabone, J.K., **Thompson, R.,** & Wiley, T.R.A. (2010). The impact of early mental health services on child behavioral outcomes: Comparisons between and within trajectory groups. *Children and Youth Services Review, 32*, 292-297.

**2009:**

**Thompson, R.** (2009). The impact of early mental health services on the trajectory of externalizing behavioral problems in a sample of high-risk pre-adolescent children. *Children and Youth Services Review, 31,* 16-22.

**Thompson, R.,** & Wiley, T.R. (2009). Predictors of re-referral to child protective services:  A longitudinal follow-up of an urban cohort maltreated as infants. *Child Maltreatment, 14,* 89-99.

English, D.J., Graham, J.C., Newton, R.R., Lewis, T.L., **Thompson, R.,** Kotch, J.B., & Weisbart, C. (2009). At-risk and maltreated children exposed to intimate partner aggression/violence: What the conflict looks like and its relationship to child outcomes. *Child Maltreatment, 14,* 157-171.

Flaherty, E.G., **Thompson, R.,** Litrownik, A.J., Zolotor, A.J., Dubowitz, H., Runyan, D.K., English, D.J., & Everson, M.D. (2009). Adverse childhood exposures and reported child health at age 12. *Academic Pediatrics, 9,* 150-156.

Black, M.M., Oberlander, S.E., Lewis, T., Knight, E.D., Zolotor, A.J., Litrownik, A.J., **Thompson, R.,** Dubowitz, H., & English, D.E. (2009). Sexual intercourse among adolescents maltreated before age 12: A prospective investigation. *Pediatrics, 124,* 941-949.

**2008:**

Everson, M.D., Smith, J., Hussey, J.M., English, D., Litrownik, A.J., Dubowitz, H., **Thompson, R.,** Knight, E.D., & Runyan, D.K. (2008). Concordance between adolescent reports of childhood abuse and Child Protective Service determinations in an at-risk sample of young adolescents. *Child Maltreatment, 13,* 14-26.

Kotch, J.B., Lewis, T., Hussey, J.M., English, D., **Thompson, R.,** Litrownik, A.J., Runyan, D.K., Bangdiwala, S.I., Margolis, B., & Dubowitz, H. (2008). Importance of early neglect for childhood aggression. *Pediatrics, 121,* 725-731.

Lindsey, M.A., Browne, D.C., **Thompson, R**., Hawley, K.M, Graham, J.C., Weisbart, C., Harrington, D., & Kotch, J.B. (2008). Caregiver mental health, neighborhood, and social network influences on mental health needs among African American children. *Social Work Research, 32,* 79-88.

Weisbart, C.E., **Thompson, R.,** Palaez-Merrick, M., Kim, J., Wike, T., Briggs, E., English, D.J., & Dubowitz, H. (2008). Child and adult victimization: Sequelae for female caregivers of high-risk children. *Child Maltreatment, 13*, 235-244.

**2007:**

Coyne, J.C. & **Thompson, R.** (2007). Posttraumatic stress syndromes: Useful or negative heuristics? *Journal of Anxiety Disorders, 21,* 223-229.

**Thompson, R.** (2007). Mothers' violence victimization and child behavior problems: Examining the link. *American Journal of Orthopsychiatry, 77,* 306-315.

Lewis, T., Leeb, R., Kotch, J., Smith, J., **Thompson, R**., Black, M.M., Pelaez- Merrick, M., Briggs, E., & Coyne-Beasley, T. (2007). Maltreatment history and weapon carrying among early adolescents. *Child Maltreatment, 12,* 259-268.

**Thompson, R.,** Proctor, L.J., Weisbart, C., Lewis, T.L., English, D.J., Hussey, J.M., &  Runyan, D.K. (2007). Children's self-reports about violence exposure: An examination of the Things I Have Seen and Heard scale. *American Journal of Orthopsychiatry, 77,* 454-466.

Cook, J.M., Biyanova, T., **Thompson, R.,** & Coyne, J.C. (2007). Older primary care patients' willingness to consider discontinuation of chronic benzodiazepines. *General Hospital Psychiatry, 29,* 396-401.

Woody, G.E., Kane, V., Lewis, K., & **Thompson, R.** (2007). Premature deaths following discharge from methadone maintenance: A replication. *Journal of Addiction Medicine, 1,* 180-185.

**Thompson, R.,** Lindsey, M.A., English, D.J., Hawley, K.M., Lambert, S., & Browne, D.C., (2007). The influence of family environment on mental health need and service use among vulnerable children. *Child Welfare, 86(5),* 57-74.

**2006:**

Datto, C.J., **Thompson, R.,** Knott, K., & Katz, I.R. (2006). Older adult report of change in depressive symptoms as a treatment decision tool. *Journal of the American Geriatric Society, 54,* 627-631.

**Thompson, R.,** Dubowitz, H., English, D.J., Nooner, K.B., Wike, T., Bangdiwala, S.I., Runyan, D.K., & Briggs, E.C. (2006). Parents' and teachers' concordance with children's self-ratings of suicidality: Findings from a high-risk sample. *Suicide and Life-Threatening Behavior, 36,* 167-181.

**Thompson, R.,** Kane, V., Cook, J., Walker, P., Greenstein, R., & Woody, G.E. (2006). Suicidal ideation in patients receiving treatment for opiate dependence. *Journal of Psychoactive Drugs, 38,* 149-156.

**Thompson, R.,** & May, M.A. (2006). Caregivers' perceptions of child mental health needs and service utilization: An urban 8-year old sample. *Journal of Behavioral Health Services and Research, 33,* 474-482.

Flaherty, E.G., **Thompson, R.,** Litrownik, A.J., Theodore, A., English, D.J., Black, M.M., Wike, T., Whimper, L., Runyan, D.K., & Dubowitz, H. (2006). Effect of early childhood adversity on child health. *Archives of Pediatrics and Adolescent Medicine, 160,* 1232-1238.

**Thompson, R.** (2006). Exploring the link between maternal history of childhood victimization and child risk of maltreatment. *Journal of Trauma Practice, 5(2),* 57-72.

O'Donnell, C., Cook, J.M., **Thompson, R.,** Riley, K., & Neria, Y. (2006). Verbal and physical aggression in World War II former prisoners of war: Role of posttraumatic stress disorder and depression. *Journal of Traumatic Stress, 19,* 859-866.

**2005:**

**Thompson, R.** (2005). The course and correlates of mental health care received by young children: Descriptive data from a longitudinal urban high-risk sample. *Children and Youth Services Review, 27,* 39-50.

**Thompson, R.,** Briggs, E., English, D.J., Dubowitz, H., Lee, L.-C., Brody, K., Everson, M.D., & Hunter, W.M. (2005). Suicidal ideation among maltreated and at-risk 8-year-olds: Findings from the LONGSCAN studies. *Child Maltreatment, 10,* 26-36.

Dubowitz, H., Newton, R.R., Litrownik, A.J., Lewis, T., Briggs, E.C., **Thompson, R.,** English, D., Lee, L.-C., & Feerick, M.M. (2005). Examination of a conceptual model of child neglect. *Child Maltreatment, 10,* 173-189.

English, D.J., **Thompson, R.,** Briggs, E.C., & Graham, J.C. (2005). Toward a definition of neglect in children under four years old. *Child Maltreatment, 10,* 190-206.

**2004:**

**Thompson, R.,** & Zuroff, D.C. (2004). The Levels of Self-Criticism Scale: Comparative self-criticism and internalized self-criticism. *Personality and Individual Differences, 36,* 419-430.

Ruckdeschel, K., **Thompson, R**., Datto, C.J., Streim, J.E., & Katz, I.R. (2004). Using the Minimum Data Set 2.0 mood disturbance items as a self-report screening instrument for depression in nursing home residents. *American Journal of Geriatric Psychiatry, 12*, 43-49.

Cook, J. M., Riggs, D. S., **Thompson, R**., Coyne, J. C., & Sheikh, J. (2004). Post-traumatic stress disorder and current relationship functioning of WWII ex-prisoners of war. *Journal of Family Psychology, 18*, 36-45.

**Thompson, R**., Bogner, H.R., Coyne, J.C., Gallo, J.J., & Eaton, W.W. (2004). Personal characteristics associated with recall of mood disturbances in the 13-year follow-up of the Baltimore Epidemiologic Catchment Area Program. *Acta Psychiatrica Scandinavica, 109*, 345-354.

Coyne, J.C., Palmer, S.C., Shapiro, P.J., **Thompson, R.**, & DeMichele, A. (2004). Psychological distress, depression, and prescriptions for psychotropic medication in a breast cancer waiting room sample. *General Hospital Psychiatry, 26*, 121-128.

Coyne, J.C., **Thompson, R.**, & Whiffen, V. (2004) Is the promissory note of personality as vulnerability to depression in default? Response to Zuroff, Mongrain, and Santor (2004). *Psychological Bulletin, 130*, 512-517.

Oslin, D.W., **Thompson, R.**, Kallan, M.J., TenHave, T., Blow, F.C., Bastani, R., Gould, R.L., Maxwell, A.E., Rosansky, J., Van Stone, W., & Jarvik, L. (2004). Treatment effects from UPBEAT: A randomized trial of care management for behavioral health problems in hospitalized elderly patients. *Journal of Geriatric Psychiatry and Neurology, 17*, 99-104.

Coyne, J.C., **Thompson, R.**, & Pepper, C.M. (2004). The role of life events in depression in primary medical care versus psychiatric settings. *Journal of Affective Disorders, 82*, 353-361.

**2003:**

Coyne, J.C., & **Thompson, R.** (2003). Psychologists entering primary care: Manhattan can not be bought for $24 worth of beads. *Clinical Psychology: Science and Practice, 10*, 102-108.

Datto, C., **Thompson, R**., Horowitz, D., Disbot, M., Bogner, H., & Katz I.R. (2003). Do clinician and patient adherence predict outcome in a Depression Disease Management Program? *Journal of Clinical Outcomes Management, 10*, 79-85.

Datto, C.J., **Thompson, R.,** Horowitz, D., Disbot, M., & Oslin, D.W. (2003). The pilot study of a telephone disease management program for depression. *General Hospital Psychiatry, 25*, 169-177.

Coyne, J.C., & **Thompson, R.** (2003). Refining diathesis-stress models of depression or introducing ptolemaic epicycles?: Commentary on Santor. *Cognitive Behavior Therapy, 32*, 68-74.

Cook, J. M., **Thompson, R.,** Coyne, J. C., & Sheikh, J. (2003). Algorithm versus cut-point derived PTSD in ex-prisoners of war. *Journal of Psychopathology and Behavioral Assessment, 25*, 267-271.

**2002:**

Coyne, J.C., **Thompson, R**., & Palmer, S.C. (2002). Marital quality, coping with conflict, marital complaints, and affection in couples with a depressed wife. *Journal of Family Psychology, 16*, 26-37.

Coyne, J.C., **Thompson, R**., Klinkman, M.S., & Nease, D.E., Jr. (2002). Emotional disorders in primary care. *Journal of Consulting and Clinical Psychology, 70*, 798-809.

Cook, J.M., Pearson, J.L., **Thompson, R.**, Black, B.S., & Rabins, P.V. (2002) Suicidality in older African-Americans: Findings from the EPOCH study. *American Journal of Geriatric Psychiatry, 10*, 437-446.

**Thompson, R**., Katz, I.R., Kane, V.R., & Sayers, S.L. (2002). Cause of death in veterans receiving general medical and mental health care. *Journal of Nervous and Mental Disease, 190*, 789-791.

**Thompson, R**., Kane, V., Sayers, S.L., Brown, G.K., Coyne, J.C., & Katz, I.R. (2002). An assessment of suicide in an urban VA medical center. *Psychiatry: Interpersonal and Biological Processes, 65*, 326-337.

*2001:*

Coyne, J.C., **Thompson, R**., & Racioppo, M.W. (2001). Validity and efficiency of screening for history of depression by self-report. *Psychological Assessment, 13*, 163-170.

*2000:*

Coyne, J.C., **Thompson, R**., Palmer, S.C., Kagee, A., & Maunsell, E. (2000). Should we screen for depression? Caveats and pitfalls. *Applied and Preventive Psychology, 9*, 101-121.

Greaven, S.H., Santor, D., **Thompson, R**., & Zuroff, D.C. (2000). Adolescent self-handicapping, depressive affect, and maternal parenting styles. *Journal of Youth and Adolescence, 29*, 631-636.

*1999:*

**Thompson, R**., & Zuroff, D.C. (1999). Development of self-criticism in adolescent girls: The roles of maternal dissatisfaction, maternal coldness, and insecure attachment. *Journal of Youth and Adolescence, 28*, 197-210.

**Thompson, R**., & Zuroff, D.C. (1999). Dependency, self-criticism, and mothers' responses to adolescent sons' competence and autonomy. *Journal of Youth and Adolescence, 28*, 365-385.

*1998:*

**Thompson, R**., & Zuroff, D.C. (1998). Dependent and self-critical mothers' responses to adolescent autonomy and competence. *Personality and Individual Differences, 24*, 311-324.

**BOOK CHAPTERS (1):**

Briggs, E.C., **Thompson, R.,** Ostrowski, S., & Lekwauwa, R. (2011). Psychological, health, behavioral and economic impact of child maltreatment. In J.W. White, M.P. Koss & A.E. Kazdin (Eds.), *Violence Against Women and Children, Volume 1: Mapping the Terrain* (pp. 77-97). Washington DC: American Psychological Association.

**LETTERS (7):**

**Thompson, R.** (2010). Maltreatment and mental health care: Focusing on neglect. *Psychiatric Services, 61*, 96.

**Thompson, R.** (2006). Understanding mental health services disparities in families involved with child welfare. *American Journal of Public Health, 96*, 1535-1536.

**Thompson, R.** (2004). What can suicide researchers learn from African Americans? *American Journal of Public Health, 94*, 908.

**Thompson, R.**, Henkel, V., & Coyne, J.C. (2004). Suicidal ideation in primary care: Ask a vague question, get a confusing answer. *Psychosomatic Medicine, 66*, 455-456.

Coyne, J.C., Kruus, L., Kagee, A., **Thompson, R**., & Palmer, S.C. (2002). Benign mental health consequences of screening for mutation of BRCA1/BRCA2. *American Journal of Medical Genetics. 107*, 346-347.

Sullivan, P.A., Shapiro, P.J., & **Thompson, R**. (2002). Psychiatric consequences of September 11: Comment. *Journal of the American Medical Association, 288*, 2684.

Coyne, J.C., Palmer, S.C., & **Thompson, R**. (2001). Routine screening entails additional pitfalls. *British Medical Journal, 323*, 167.

**BOOK REVIEWS (2):**

**Thompson, R.** & Wiley, T.R. (2008). Review: Handbook for the Treatment of Abused and Neglected Children. *Journal of Psychological Trauma, 7,* 141-144.

**Thompson, R.** (2006). The effects of intimate partner violence on children. *Journal of Trauma Practice, 5(3),* 79-82.

**PUBLISHED ABSTRACTS (6):**

Kruus, L.K., Kagee, A., Palmer, S.C., **Thompson, R.,** & Coyne, J.C. (2002). Bother due to sexual dysfunction among prostate cancer patients. *Annals of Behavioral Medicine, 24,* (Suppl.), S006.

**Thompson, R.,** Harralson, T., Katz, I.R., & Coyne, J.C. (2002). Perceived social support predicts improvement in behavioral health patients with comorbid arthritis. *Annals of Behavioral Medicine, 24,* (Suppl.), S026.

Kagee, A., Kruus, L.K., Palmer, S.C., **Thompson, R.,** & Coyne, J.C. (2002). Moderate distress among head and neck cancer patients. *Annals of Behavioral Medicine, 24,* (Suppl.), S167.

Kruus, L.K., Kagee, A., Palmer, S.C., **Thompson, R.,** & Coyne, J.C. (2002). Optimism, monitoring, and breast cancer worry among women seeking genetic testing. *Annals of Behavioral Medicine, 24,* (Suppl.), S168.

Palmer, S. C., Racioppo, M., Kagee, A., **Thompson, R**., & Coyne, J. C. (2001). Marital satisfaction in the long-term physical and psychosocial adaptation of women to cancer. *Annals of Behavioral Medicine, 23,* (Suppl.), S079.

**Thompson, R.**, Datto, C.J., Miani, M., & Coyne, J.C. (2000). Barriers to recruitment in clinical trials of telephone disease management for depression. *International Journal of Psychiatry in Medicine, 30*, 401-402.

**DISSERTATION COMMITTEE MEMBERSHIP (3):**

Wiley, Tisha R.A. (2009). The effects of child maltreatment and environmental stability on children's trajectories of aggressive behavior from 4 – 12 years of age. *University of Illinois at Chicago*

McMeel, Lorri S. (2009). An examination of suicidal ideation among youth who encounter child protection services. *University of Illinois at Chicago*

Kim, Jiyoung (2008). Developmental trajectories of externalizing behavior problems among maltreated children. *University of Chicago School of Social Work Administration.*

**Conference Presentations:**

**Thompson, R.,** Runyan, D., Smith, J., & Lewis, T. (Sept., 2010). The relationship between child maltreatment and treatment needs: The issue of gender and suicide risk. Paper presented at the ISPCAN International Congress on Child Abuse and Neglect, Honolulu, Hawaii.

Kotch, J., Black, M., English, D., Litrownik, A., Runyan, D., **Thompson, R.,** Smith, J., Lee, L.-C., Margolis, B., & Taneja, G. (Sept., 2010). The effect of social capital and caregiver social support on aggression and delinquency in maltreated adolescents. Paper presented at the ISPCAN International Congress on Child Abuse and Neglect, Honolulu, Hawaii.

**Thompson, R.** (Aug., 2010). Ethical and professional considerations in trauma psychology: Research. In L.M. Rocchio (Chair), *Ethical and professional considerations in trauma psychology: Psychotherapy, forensics, research.* Symposium conducted at the American Psychological Association annual convention, San Diego, California.

**Thompson, R.**, Wiley, T.R.A., Dancy, B.L., Najdowski, C.J., Wallis, J.R., & Perry, S.P. (August, 2010). *Intentions to seek mental health services in African American families.* Poster session

presented at the American Psychological Association annual convention, San Diego, California.

Tabone, J.K., **Thompson, R**., & Jordan, N. (2010, June). *Children in mental health residential care: Gender differences in strengths related to favorable discharge outcomes.* Poster session presented at Academy Health annual meeting, Chicago, IL.

Black, M.M., Oberlander, S.E., Wang, Y., Lewis, T., Knight, E.D., Zolotor, A.J., Litrownik, A.J., **Thompson, R.,** Dubowitz, H., English, D., & Proctor, L. (2010, May). *Adolescent pregnancy among maltreated youth: A prospective investigation using males and females.* Paper session presented at the annual meeting of the Pediatric Academic Society, Vancouver, Canada.

Wiley, T.R., **Thompson, R.,** Wallis, J.R., Najdowski, C.N., Dancy, B.L., & Perry, S.P. (2010, April). *Effects of depression history on African American mothers' perspectives on mental health services efficacy.* Paper session presented at the Quality of Behavioral Healthcare: A Drive for Change Through Research Conference, Clearwater Beach, Florida.

Wallis, J., **Thompson, R.,** Wiley, T. R., Najdowski, C., & Wallis, J. (2010, April). *What will that be like?: Urban African American youth's expectations of mental health services.* Paper presented at the annual meeting of the Midwestern Psychological Association, Chicago, Illinois.

Wiley, T.R.A. **Thompson, R.,** Najdowski, C.J., Wallis, J., & Dancy, B. (2010, March). *Who I turn to: A qualitative study of self-identified sources of support among urban African American youth.* Presented at the biannual meeting of the Society for Research on Adolescence, Philadelphia, Pennsylvania.

**Thompson, R.**, Wiley, T.R.A., & Dancy, B.L. (August, 2009). *Mental health service use in African American youth: Qualitative findings.* Poster session presented at the American Psychological Association annual convention, Toronto, Ontario, Canada.

Kim, J., **Thompson, R.**, & Litrownik, A.J. (June, 2009). *Heterogeneity in behavior problem trajectories among maltreated children and related ecological factors.* Poster session presented at Academy Health annual meeting, Chicago, IL.

Oberlander, S., Black, M., Lewis, T., Knight, E., Dubowitz, H., English, D., Litrownik, A., **Thompson, R.,** & Zolotor, A. (May, 2009). *A prospective investigation of sexual intercourse among adolescents maltreated as children.* Paper presented at Pediatric Academic Societies annual meeting, Baltimore, MD.

Oberlander, S.E., Black, M.M., Lewis, T.L., Knight, E.D., Dubowitz, H., English, D., **Thompson, R.,** Litrownik, A.J., & Zolotor, A.J. (Apr., 2009). Sexual activity among adolescents with a history of physical abuse and neglect. In D.J. Jones (Chair), *Developmental trajectories of risk and protective factors among high risk youth: Findings from LONGSCAN.* Symposium conducted at the biennial meeting of the Society for Research on Child Development.

Wiley, T.R.A., & **Thompson, R.** (Apr., 2009). Childhood aggression trajectories and delinquent behavior, social isolation, and peer delinquency in early adolescence. In D.J. Jones (Chair), *Developmental trajectories of risk and protective factors among high risk youth: Findings from LONGSCAN.* Symposium conducted at the biennial meeting of the Society for Research on Child Development.

Proctor, L.J., Aarons, G.A., Dubowitz, H., English, D., Hussey, J.M., Lewis, T.L., **Thompson, R.,** Weisbart, C., Litrownik, A.J., & Roesch, S. (Apr., 2009). *Trajectories of maltreatment following early onset: Heterogeneity in risk of subsequent abuse and neglect.* Poster presented at the biennial meeting of the Society for Research on Child Development.

**Thompson, R.,** & Wiley, T.R. (Sept., 2008). *Predictors of re-referral for child maltreatment: An urban sample of children maltreated as infants.* Paper presented at the biannual meeting of the International Society for the Prevention of Child Abuse and Neglect, Hong Kong.

**Thompson, R.** (Mar., 2008). *Mental health utilization in African American youth.* Discussion presented as part of symposium at Society for Research on Adolescence 12th Biennial Meeting, Chicago, IL.

**Thompson, R.** (Feb., 2008). *Family environment's influence on mental health need and service use among vulnerable children.* Paper presented as part of symposium at Child Welfare League of America annual conference, Washington, D.C.

**Thompson, R.,** Kotch, J., Lewis, T., Runyan, D., & Smith, J. (April, 2007). *Listening to children from LONGSCAN: What 12-year olds tell us about witnessing violence.* Paper presented at the 16th National Conference on Child Abuse and Neglect, Portland, Oregon. .

Runyan, D., Kotch, J., Lewis, T., & Smith, J., & **Thompson, R.** (April, 2007). *Listening to Children: What do 12 year olds tell us about their psychological maltreatment?* Paper presented at the 16th National Conference on Child Abuse and Neglect, Portland, Oregon.

**Thompson, R.,** Kotch, J., Lewis, T., Runyan, D., & Smith, J. (Sept., 2006). *Listening to children from LONGSCAN: What 12-year olds tell us about witnessing violence.* Paper presented at the biannual meeting of the International Society for the Prevention of Child Abuse and Neglect, York, United Kingdom.

Runyan, D., Kotch, J., Lewis, T., & Smith, J., & **Thompson, R.** (Sept., 2006). *Listening to Children: What do 12 year olds tell us about their psychological maltreatment?* Paper presented at the biannual meeting of the International Society for the Prevention of Child Abuse and Neglect, York, United Kingdom.

**Thompson, R**., & Grajeda, S. (Aug., 2005). *Services, Treatment Options and Prevention (STOP): The development of an assessment and referral program for young children who sexually abuse other children.* Poster session presented at the annual meeting of the American Psychological Association, Washington, DC.

**Thompson, R**., & May, M.A. (Aug., 2005). *Factors associated with mental health needs and utilization in urban high-risk 8-year olds*. Poster session presented at the annual meeting of the American Psychological Association, Washington, DC.

Runyan, D., Dubowitz, H., English, D., & **Thompson, R.** (Apr., 2005). *Findings from the Consortium of Longitudinal Studies of Child Abuse and Neglect (LONGSCAN): Implications for policy and practice.* Workshop presented at the Fifteenth National Conference on Child Abuse and Neglect, Boston, Mass.

**Thompson, R.** (Aug., 2004). *Mental health care received by young children: Descriptive data from a high-risk sample.*  Paper presented at the joint conference of the Sixth International Looking After Children Conference and the Fifth National Child Welfare Symposium, Ottawa, Canada.

Woody, G.E., Kane, V., Lewis, K., & **Thompson, R.** (Dec., 2003). *Preventable mortality in opiod dependent veterans.* Paper presented at Health Service Research and Development Quality Enhancement Research Initiative Annual Meeting, Washington, D.C.

**Thompson, R.,** Harralson, T., Katz, I.R., & Coyne, J.C. (Apr., 2002). *Perceived social support predicts improvement in behavioral health patients with comorbid arthritis*. Poster session presented at the Society of Behavioral Medicine, Washington, D.C.

Kagee, A., Kruus, L.K., Palmer, S.C., **Thompson, R.,**, & Coyne, J.C. (Apr., 2002). *Moderate distress among head and neck cancer patients*. Poster session presented at the Society of Behavioral Medicine, Washington, D.C.

Kruus, L.K., Kagee, A., Palmer, S.C., **Thompson, R.,** & Coyne, J.C. (Apr., 2002). *Bother due to sexual dysfunction among prostate cancer patients*. Poster session presented at the Society of Behavioral Medicine, Washington, D.C.

Kruus, L.K., Kagee, A., Palmer, S.C., **Thompson, R.,** & Coyne, J.C. (Apr., 2002). *Optimism, monitoring, and breast cancer worry among women seeking genetic testing*. Poster session presented at the Society of Behavioral Medicine, Washington, D.C.

Cook, J.M., **Thompson, R.**, & Sheikh, J.L. (Sept., 2001). *The quality of intimate dyadic relationships between ex-prisoners of war and their significant partners*. Paper presented at the annual meeting of the International Society of Traumatic Stress Studies, Chicago, IL.

**Thompson, R.**, Oslin, D.W., TenHave, T.R., Kallan, M.J., Blow, F.C., Rosansky, J., & Jarvik, L. (Aug., 2001). *Effects of UPBEAT on outcomes of depressed geriatric patients with impaired physical functioning*. Poster session presented at UPBEAT conference, Washington, D.C

Coyne, J.C., **Thompson, R.,** & Gallo, J.J. (May, 2001). *Relapse prevention in primary care: Some flies in the ointment*. Paper presented at NIMH conference, State of the Science of Relapse Prevention in Major Depression, Potomac, MD.

Palmer, S. C., Racioppo, M., Kagee, A., **Thompson, R**., & Coyne, J. C. (March, 2001). *Marital satisfaction in the long-term physical and psychosocial adaptation of women to cancer*. Poster presented at Society of Behavioral Medicine, Seattle, WA.

**Thompson, R.,** Harralson, T., Brody, P., Regenberg, A.R., Purnell, T., Coyne, J.C., Katz, I.R., & Hadley, T. (May, 2000). *Self-perceived health in behavioral managed care patients: Correlates and effects on outcome*. Poster session presented at the American Psychiatric Association, Chicago, IL.

Harralson, T., Brody, P., Coyne, J., Regenberg, A., Katz, I., **Thompson, R**., & Hadley, T. (May, 2000). *Depression and general medical comorbidity in a behavioral health managed care setting*. Poster session presented at the American Psychiatric Association, Chicago, IL.

**Thompson, R.,** & Zuroff, D.C. (Aug, 1999). *Dependency, self-criticism, and parenting: Mothers of adolescent girls*. Poster session presented at the American Psychological Association, Boston, Mass.

**Thompson, R.** & Zuroff, D.C. (Aug, 1996). *Punishing Autonomy and Rewarding Mediocrity: Dependent Mothers' Responses to Their Adolescent Daughters*. Paper presented as part of symposium at American Psychological Association, Toronto, Ontario.

**Thompson, R**. & Genest, M. (June, 1995). *Measurement Issues in Sociotropy and Autonomy*.  Poster session presented at Canadian Psychological Association, Charlottetown, Prince Edward Island.

**OTHER PROFESSIONAL EXPERIENCE**

| | |
|---|---|
| Sept. 1998 – Sept. 1999 | **Clinical Intern** |
| | Allan Memorial Institute |
| | Montreal, Quebec |
| Sept. 1993 – June 1998 | **Teaching Assistant** |
| | McGill University |
| | Montreal, Quebec |

**REVIEW/EDITORIAL EXPERIENCE**

**Member of Editorial Board:**

Child Abuse and Neglect (2010-Current)

Journal of Trauma Practice/ Journal of Psychological Trauma (2003-2008)

**Invited Reviewer for:**

American Journal of Orthopsychiatry

American Journal of Public Health

Anxiety, Stress, and Coping

British Journal of Psychiatry

Child Abuse and Neglect

Children and Youth Services Review

Cognitive Therapy and Research

Education Research and Reviews

International Journal of Geriatric Psychiatry

Journal of Applied Developmental Psychology

Journal of Behavioral Health Services and Research

Journal of Marriage and the Family

Journal of Pediatric Psychology

Medical Science Monitor

Psychiatry Research

Psychosomatic Medicine

**Grant Reviewing for:**

Social Sciences and Humanities Research Council (Canada)

**COURSES ATTENDED**

Training in administration of Structured Clinical Interview for DSM-IV. University of Pennsylvania. Nov., 1999.

American Association of Geriatric Psychiatrists- Summer Research Institute. Cornell University. July, 2000.

University of Pennsylvania School of Medicine Patient Oriented Research Certification Program- Full Review Level. University of Pennsylvania. Nov., 2000.

American Foundation for the Prevention of Suicide- Research Workshop for Junior Investigators. New York. September, 2002.

New Methods for the Analysis of Family and Dyadic Processes Conference. Amherst, Mass. October, 2006.

## CLINICAL CERTIFICATION

Oct. 2003 – current            Licensed Clinical Psychologist
State of Illinois

Sept. 2002 – Oct. 2003         Licensed Clinical Psychologist
State of Pennsylvania

## CLINICAL EXPERIENCE

Sept. 1999 – Jan. 2003         Assessment Duties
Supervisor- Dr. James C. Coyne
Dept. of Psychiatry
University of Pennsylvania Health System
Philadelphia, PA
*SCID interviews of breast and prostate cancer patients, suicide risk assessments of veterans*

Sept. 1998 - Sept. 1999        Cognitive Behavior Therapy Internship
Supervisors- Dr. Debbie Sookman, Dr. Ian Bradley,
Dr. Sylvie Goulet, Dr. David Sinyor.
Cognitive Behavior Therapy Unit
Allan Memorial Institute, Montreal.
*CBT with depression, OCD, panic, and schizophrenia.*

May 1996 - Sept. 1997         Cognitive Behavior Therapy
Supervisor- Dr. Perry Adler
Cognitive Behavior Therapy Unit
Douglas Hospital, Montreal.
*CBT of marital distress anxiety disorders.*

Sept. 1994 - May 1995         Psychotherapy Practicuum
Supervisor - Dr. Z. Pleszewski
Emergency Unit
Douglas Hospital, Montreal
*eclectic outpatient psychotherapy with anxious/depressed patient.*

May 1994 - Aug. 1994         Clinical Practicuum
Primary supervisor - Dr. E. Gutbrodt
Adult Services, Douglas Hospital.
*Psychological assessment of adult population, supportive group therapy with recovering adult population, group interventions with chronic population, individual cognitive/supportive therapy.*

Sept. 1993 - Apr. 1994         Assessment Practicuum
Adult supervisor - Dr. E. Gutbrodt, Douglas Hospital.
Child supervisor - Dr. C. Schopflocher, Montreal Children's Hospital.
*Cognitive and psychological assessment of adults and children. Assessment tools used with adults included WAIS-R, MMPI-2, Rorschach, HTP, Bender-Gestalt.*

**ADELE E. PRASS**
5450 West Leland Avenue
Chicago, Illinois 60630
773.481.4912    aprass@aol.com
Cellular phone: 773.759.4912

## EXPERIENCE

**Community Support Services Inc.**                                    Brookfield, Illinois
(1/08 – 5/08)

**Temporary Intake Coordinator and Consultant**
> Visited families with members suffering from developmental disabilities in order to obtain intake information to qualify them for respite services.
> Provided staff supervision and consultation in Supportive Parenting Program.

**Uhlich Children's Advantage Network**                                    Chicago, Illinois
(Present)

**Consultant to HomeWorks Program and CHA Programs** (8/06 – Present)
- Direct Senior Activities for Service Connector Programs at 3 CHA developments
- Provide training and consultation to HomeWorks Supervisor
- Created Resource Directory for UCAN's CHA programs
- Wrote Procedures for UCAN's HomeWorks, CHA Service Connector and CHA Relocation programs.
- Assisted in preparing programs for accreditation.
- Supervise student interns.

**HomeWorks Supervisor** (12/03 – 8/06)
> Supervise child abuse and neglect prevention program. Oversee case managers, who work with at-risk families, assessing the needs of those families. Program provides community linkage to meet both concrete and clinical needs. Case managers provide in-home services. Cases are accepted from both the Illinois Department of Family Services Division of Child Protection and community sources.
> Manage budget and report quarterly to funding source.
> Sit on various community committees – area of service is essentially Chicago's North Side.

**Clark County Nevada, Independent Consultant**

**Clark County Child Safety Review** (7/06 – 9/06)
> Under direction of project supervisor, reviewed records, interviewed staff and documented information in a review of the Department of Family Services in Las Vegas,

Nevada. Review was in response to recommendations of a blue ribbon panel, following deaths and serious injury to a number of children, for whom the agency was responsible. Reviewed both protective services and follow-up cases and made recommendations to project director regarding improved service delivery.

Reported immediate safety concerns to project director, who, in turn, reported to Clark County Department of Family Services.

**Illinois Department Of Children And Family Services**                    Chicago, Illinois

**Cook County Child Protection Contracts and Resources Manager**    (1997 – 11/03)

Administer $7-10 million in contract and grant monies allocated to fund public and private direct services programs that target families experiencing child abuse and neglect, as well as programs providing adjunct services (e.g. psychotherapeutic counseling, family education, etc.)

Design, develop, and implement a range of programs, contracted by the Department.

Manage two employee teams, whose staff-members monitor performance and provide quality assurance to community-based child protection programs.

**Cook County Family Preservation Administrator**    (1993-1997)

Provided administrative oversight to three teams of caseworkers, who monitored contractor performance and supplied technical assistance to programs under contract with the Department to deliver child protective and intensive family preservation services.

Helped design and write program plan for a project delivering services to families where substance abuse was a recognized problem.

**Team Supervisor**        (1989-1993)

Supervised teams delivering various types of child welfare services, including planning services for families where child abuse and neglect had occurred and children had been removed through juvenile court action.

Supervised a team of master's level staff, who planned for and delivered services to the most seriously emotionally disturbed, severely abused, and medically complex children in Department custody.

Supervised a monitoring team that provided technical assistance to private child welfare agencies delivering family preservation services.

Trained Department and private agency staff in the provision of family preservation services.

**Direct Service Caseworker**    (1974-1989)

Worked with both families and child victims in situations where abuse or neglect occurred, assessed risk, prepared cases for juvenile court in situations where children could not remain safely in their homes.

Managed cases in which children had been found to be delinquent.

Was selected as one of four people to staff Department's only direct service family preservation team.

Trained other staff in the delivery of family preservation services.

**<u>Illinois Department Of Public Aid</u>**
**Caseworker**

**<u>Chicago Board Of Education</u>**
**Substitute Teacher**

## EDUCATION

**University Of Chicago**, Chicago, Illinois  (M.A., Social Services Administration)
**Northern Illinois University**, DeKalb, Illinois  (B.A., English)

REFERENCES AVAILABL

## Resume

Kathy Glenney
2859 N. Lotus
Chicago, Il. 60641
773 685-7891
Kateglenney@comcast.net

**Work Experience**

2010: Consultant / Reviewer. Participated in a review of compliance with class action litigation (Kenny A. v. Perdue). Reviewed child welfare cases and assessed decision making in investigation diversion, use of relative guardianship, and safety resources.

2002-2009:   Illinois Department of Children and Family Services (IDCFS), Regional Administrator, Division of Child Protection. Responsible for administration and oversight of the investigation and in-home child protective service programs for one of six Illinois regions (5000 - 6000 new investigations per year, and 300-400 in-home protective services cases). Direct supervision of child protection managers. Participated in numerous policy and procedural enhancements, including procedures in response to class action litigation, suspected abuse by clergy, and revision of the child safety assessment process. Negotiated local labor management issues. Acted as Department representative in a county-wide Child Death Review Team, which analyzed fatalities with previous department involvement and recommended systemic improvements.

1994-2002  IDCFS, Child Protection Manager. Responsible for the management and oversight of eight to ten teams engaged in conducting investigations or providing in-home child protective services. Direct supervision of eight to ten child protection investigation and in-home protective supervisors. Reviewed, and revised, investigative procedure, assisted in developing policy for the first co-located multi-disciplinary Child Advocacy Center in the county, and acted as subject matter expert in the development and acceptance testing of, the statewide automated child welfare information system (SACWIS).

1988-1994:  IDCFS, Child Protection Supervisor. Responsibilities included direct supervision of 8-10 Child Protection Investigators, with a combined caseload of 150-200 pending investigations. Reviewed work of staff for procedural compliance, quality of assessments, and decision making. Trained new staff. Performed community education activities. Participated as an expert in a long term project in expert systems in decision making in child protection, conducted by Chapin Hall at the University of Chicago.

1976-1988:  IDCFS Caseworker. Conducted investigations of alleged child maltreatment, and/or provided in-home child protective services. Responsible for assessments of safety, risk, and service needs, including removal of children assessed to be unsafe. Provided testimony in Juvenile Court, and ensured service linkage for children assessed to be at risk.

**Education**

1975  B.A. (major psychology), Northern Illinois University.

1997 AM, Social Service Administration, University of Chicago

# **APPENDIX D**

## **Retainer Letter**



Marcia Robinson Lowry
President &
Executive Director

**Board of Directors**

Alan C. Myers
Chair

Robin L. Dahlberg
Treasurer

Anne Strickland Squadron
Secretary

Lynn M. Edens

Richard D. Emery

Lawrence J. Fox

Kim France

Daniel H. Galpern

Mark Lopez

Howard M. Maisel

Melissa G. Salten

Jordan Seaman

June 29, 2010

John Goad
2724 Woodbine Ave.
Evanston, IL 60201

Re:   Expert Retainer Agreement – Abuse In Care Case Record Review

Dear John:

This letter agreement confirms your retention by Plaintiffs as a testifying expert in the *D.G. v. Henry* litigation. By signing and dating this letter, we all indicate our agreement with its terms.

The scope of your work concerns the review and analysis of a statistically significant sample of records maintained by the Oklahoma Department of Human Services (DHS) concerning DHS's response to reports of the alleged abuse and neglect of foster children in DHS custody. The attached proposal sets forth the work that is to be completed in connection with this review. In the event that additional work not included in the attached proposal becomes necessary, you will notify Plaintiffs' counsel immediately.

You agree to submit a full preliminary draft of your expert report to Plaintiffs' counsel by no later than thirty days before the deadline for Plaintiffs' expert reports, and a final expert report to Plaintiffs' counsel by no later than fifteen days before the deadline for Plaintiffs' expert reports. You also agree to be available for deposition and trial, if necessary.

The attached budget sets forth a total amount of $62,000 for the above-described review. You agree to make all best efforts to complete the review, based on the scope described in the attached budget, for this amount. If at any point you anticipate that your total budget will be more than $62,000, you agree to notify Plaintiffs' counsel immediately. You further agree that you will provide Plaintiffs with an update on whether you are on budget upon request. Any time preparing for and attending your deposition and the trial will be billed separately at the rate of $250 per hour.

330 Seventh Avenue, 4th Floor • New York, NY 10001
Tel: 212-683-2210 • Fax: 212-683-4015 • info@childrensrights.org • www.childrensrights.org

If these terms are acceptable, kindly return one of the signed copies of this letter and retain the second copy for your records.

_____
Marcia Robinson Lowry         Date
FOR PLAINTIFFS

_____
John Goad                     Date

6-30-10

2