# EXHIBIT E

# The Oklahoma Department of Human Services Response to Reports of Abuse and Neglect in Foster Care

Case Review of Reports in 2009-2010

Kathryn Simms, M.S.W
June 8, 2011

# Table of Contents

I. EXECUTIVE SUMMARY ................................................................................................. I

II. INTRODUCTION ......................................................................................................... 1

III. REVIEW METHODOLOGY............................................................................................. 1

IV. OKDHS POLICY STANDARDS ....................................................................................... 3

V. SCREENED OUT REPORTS REVIEW - OVERVIEW ................................................................ 4

A. OKDHS Policy and Procedures for Screened-Out Reports .................................................... 4

B. Review Criteria ............................................................................................................ 4

VI. SCREENED OUT REPORT REVIEW - DEMOGRAPHIC DATA ............................................... 5

A. Number of Screened Out Reports.................................................................................... 5

B. Number of Children Per Report ...................................................................................... 5

C.  Allegation Detail......................................................................................................... 6

D. Foster Parent -Child Abuse and Neglect Report History ..................................................... 8

VII. SCREENED OUT REPORT REVIEW - EVALUATION DATA ................................................. 9

A. Initial Intake Activities ................................................................................................. 9

B.  Screening Process.......................................................................................................10

C. Action Taken in Response to Report Information ..............................................................15

VIII. SCREENED OUT REPORT REVIEW - CONCLUSIONS......................................................15

A. Report Demographics and Initial Intake Screening............................................................15

B. Response to Referral ...................................................................................................16

C. Action Taken in Response to Screened Out Reports ..............................................................16

D. Overall Conclusions-Screened Out Reports.........................................................................16

IX. ASSESSMENT REVIEW - OVERVIEW .........................................................17

A. OKDHS Policy and Procedures for Assessments ...................................................................17

B. Review Criteria ..............................................................................................................18

X. ASSESSMENT REVIEW - DEMOGRAPHIC DATA.........................................18

A. Number of Assessments...................................................................................................18

B. Number of Children Per Report ..........................................................................................18

C. Allegation Detail............................................................................................................19

D. Foster Parent -Child Abuse and Neglect Report History.........................................................21

XI. ASSESSMENT REVIEW - EVALUATION DATA ...........................................22

A. Initial Intake Screening Activities.......................................................................................22

B. Response to Referral .......................................................................................................24

C. Outcomes of Assessments ................................................................................................27

XII. ASSESSMENT REVIEW - CONCLUSIONS..................................................28

A. Report Demographics and Initial Intake Screening................................................................28

B. Response to Referral .......................................................................................................29

C. Outcomes of Assessments ................................................................................................29

D. Overall Conclusions for Assessments..................................................................................29

XIII. INVESTIGATION PARTS I AND II REVIEW - OVERVIEW................................30

A. OKDHS Policy and Procedures for Investigations ..................................................................30

B. Review Criteria ..............................................................................................................31

XIV. INVESTIGATION PART I REVIEW - DEMOGRAPHIC DATA...........................31

A. Number of Investigations ................................................................................................31

B. Number of Children Per Referral ......................................................................................31

C. Allegation Detail..............................................................................................................32

D. Foster Parent-Child Abuse and Neglect Report History ....................................................34

## XV. INVESTIGATION PART I REVIEW - EVALUATION DATA....................................................36

A. Initial Intake Screening Activities.....................................................................................36

B. Response to Referral .......................................................................................................39

C. Outcomes of the Investigation.........................................................................................45

## XVII. INVESTIGATION PART I REVIEW -  CONCLUSIONS .......................................................46

A. Report Demographics and Initial Intake Screening Activities.............................................46

B. Response to Referral .......................................................................................................47

C. Outcomes ......................................................................................................................48

D. Overall Conclusions for Investigations..............................................................................48

## XVIII. INVESTIGATION PART II REVIEW - DEMOGRAPHIC DATA .....................................48

A. Number of Investigations.................................................................................................48

B. Number of Children Per Referral ......................................................................................48

C. Allegation Detail..............................................................................................................49

D. Foster Parent -Child Abuse and Neglect Report History....................................................52

## XIX. INVESTIGATION PART II REVIEW - EVALUATION DATA................................................53

A. Priority Decision .............................................................................................................53

B. Response to Referral .......................................................................................................54

C. Outcomes of the Investigation.........................................................................................59

## XX. INVESTIGATION PART II REVIEW - CONCLUSIONS.........................................................59

A. Report Demographics and Initial Intake Screening Activities........................................................................59

B. Response to Referral ....................................................................................................................................60

C. Outcomes .....................................................................................................................................................60

D. Overall Conclusions for Part II Substantiated Investigations......................................................................60

XXI. REFERENCES....................................................................................................................62

XXII. INDEX OF CHARTS, TABLES AND GRAPHS .........................................................63

XXIII. ADDITIONAL DISCLOSURES-FEDERAL RULE 26 ............................................67

XXIV. SIGNATURE PAGE.......................................................................................................68

XXV. APPENDICES...................................................................................................................69

END NOTES ...............................................................................................................................107

## I. Executive Summary

**Overview**

Based upon an agreement with the attorneys defending the Federal class action lawsuit, *D.G. et al. v. Henry, et al.*, Case No. 08-CV-074-GKF-FHM to provide consultation concerning the safety of children in foster care in Oklahoma, I have conducted reviews from case samples of 292 referrals of abuse and neglect concerning 476 children in the custody of the Oklahoma Department of Human Services (OKDHS) and placed in foster care in 2009-2010. There were two different case samples or populations utilized in the review.  The first sample was taken from the Goad Class Sampling Request, a sample which included screened out reports, assessments and investigations regarding children placed in foster homes in 2009. I understand that other experts retained by the defense are examining the sampling and statistical techniques employed by Mr. Goad.  I make no assumptions or findings about the validity or correctness of the sampling or statistical work done by Mr. Goad, leaving that to others. The second population encompasses investigations with at least one substantiated allegation received in 2009 and 2010, that had been reviewed and had concurrence by the Oklahoma Department of Human Services (OKDHS) child welfare programs staff for compliance with OKDHS substantiation policy.

The review was conducted utilizing case review instruments developed by me in consultation with Shannon Rios, PhD, of the OKDHS Office of Planning, Research and Statistics.
The review instruments were developed specifically for each type of review which covered four categories of the OKDHS response to reports of abuse and neglect concerning custody children in foster care:

- Reports that had been taken by OKDHS; determined not to meet the definition of abuse or neglect or not to be within the scope of OKDHS intervention and were screened out .

- Reports that were determined to meet the definition of child abuse and neglect and were assigned as assessments.

- Reports that were determined to meet the definition of abuse and neglect and had been assigned as an investigation.  Separate review instruments were developed for each of the investigation case review samples and are designated as Part I and Part II.

The case review instruments were developed based on the reviewer's experience in maltreatment in foster care, OKDHS policy standards and best practice standards guidance from national child welfare organizations including the Child Welfare League of America (CWLA) and the National Resource Center for Child Protective Services.  Both of these established and nationally recognized child welfare technical assistance experts provide national training and program development assistance to states concerning child welfare practice.  The CWLA publishes standards of excellence that are widely regarded as aspirational standards in the field of child welfare.

The case review data was entered into a data gathering tool known as the Business Enterprise Survey Tool (BEST) and the data was tabulated and finalized from the Microsoft Excel files downloaded from BEST.

The findings of the case review in each of the categories are:

## Screened Out Reports-Conclusions

The overall findings for screened out reports:

- There were 91 reports that were reviewed for the screened out case sample.

- The majority of the screened out reports had allegations of neglect.

- There was no prior history of reports of abuse or neglect in 61% of the foster homes in the screened out reports. Only one of the homes had a prior referral that had been substantiated.

- In the majority of the reports, there was thorough information collection and the intake screening activities were timely.

- In 79% of the reports, the decision to screen-out the report was made correctly.  Even those reports that were incorrectly screened out, action was taken in response to the report.

- Out of 91 screened out reports, 19 of the reports alleged some type of injury and 7 of those required some type of medical evaluation.  All of the children in those reports received medical evaluation even though the report was screened out.

- In 84% of the reports, there was documentation that the screening process was sufficient to address safety threats to the child.

- There was documentation that action was taken in response to the allegations in the screened out reports in 62 out of the 91 reports or 68% of the reports.

The conclusions from the screened out reports indicate that while there were some issues of concern identified,  many of them were mitigated by the action taken by OKDHS following the decision to screen-out the report as indicated in the following:

- Although 21% of the screened out reports should have been assigned for investigation or assessment, there was still documentation that action was taken in response to the report even though it was not done with a structured investigation.

- All children who had injuries alleged in screened out reports received medical evaluation even though the report was screened out.

- Typically screening out a report means that no further action will be taken by the agency since the allegations do not meet the definition of abuse or neglect.  In the screened out reports in this case review, the majority of the reports had documentation that some type of action was taken to address the concerns identified in the screened out report.

- While the number of foster homes with prior reports of abuse or neglect is concerning, only one foster home had a prior report that was substantiated.

***Based upon the action taken by OKDHS in response to the majority of screened out reports, the findings of the screened out case review indicate that there were appropriate and professionally reasonable efforts made by OKDHS staff  to protect the safety of children in foster care who were the subject of a screened out report.***

## Assessments-Conclusions

The overall findings for assessments:

- Only 17 referrals were assigned as assessments in the review sample.

- The majority of the allegations in the 17 referrals were neglect and the most frequent allegations were lack of supervision and threat of harm.

- Information collection during the intake phase was complete and supervisory oversight was documented.

- There was history of prior reports of abuse or neglect in 41% of the foster homes, but none of the homes had a prior referral that had been substantiated.

- Only 22% of the assessments were correctly assigned as assessments.

- Out of the 17 assessments, 11 were initiated the same day as the referral was received or the following day.  There were 4 assessments that were not initiated within the required priority response timeframe (one referral was a Priority I).

- There were safety threats present in 10 of the assessments and there were 4 assessments in which the safety threats were not properly identified.

- The outcome in the majority of the assessments was that the child remained in the home.  In the 3 homes in which concerns were identified, the children were removed.

The conclusions from the assessment case review indicate that there were some concerns that were identified:

- The majority of cases were incorrectly assigned as assessments and safety threats were not identified in over 20% of the cases.

- There were also 20% of the cases that were not initiated within policy timeframes.

***The findings of the assessment review indicate that the appropriate response to address allegations of safety threats was not consistently taken by OKDHS staff.  The review sample was very small so the issues concerning safety threats and response timeframes were noted in only four cases, and in none of those cases were injuries to the child victim alleged or found to have been present during the assessment.***

## Investigation Part I- Conclusions

The overall conclusions for Part I investigations are:

- There were 84 investigations reviewed in the case sample.

- The allegations in the majority of the investigations did not indicate severe safety threats.

- The majority of foster homes had prior history of reports of abuse/neglect but only four homes had prior reports that had been substantiated.
- Good information collection and supervisory oversight of the intake screening process was present in all of the investigations.

- Intake screening activities were sufficient to address safety threats to children in 89% of the investigations.

- The majority of investigations were initiated within two days following the receipt of the report and only 3 investigations out of 84 were not initiated within timeframes required by OKDHS policy.

- A significant majority of the investigations followed the investigation protocol and information collection standards required by OKDHS policy and were in line with national standards for information collection.

- Appropriate action was taken concerning the information collected during the investigation in 93% of the investigations.

- The majority of children remained safely in the foster home or a placement change was made.

The conclusions from the Part I investigation case review indicate the following:

- In the majority of cases, the information collection and intake process were complete and indicated appropriate response to the allegations.

- There were only four homes that had a prior substantiated report of abuse or neglect.

- The majority of investigations were initiated timely and followed the investigation protocol  set forth in OKDHS policy.

- Appropriate action was taken in 93% of the cases and the majority of children were able to be maintained safely in the foster home.

***The findings of the Part I investigation case review indicate that in the majority of cases reviewed, OKDHS staff acted as required by OKDHS policy and appropriately  responded to protect the safety of children in foster care who were the subject of an investigation of abuse or neglect.***

### Investigation Part II- Conclusions

The conclusions for the Part II investigations are:

- There were 102 investigations reviewed in the case review sample.

- The most frequent allegation category in the substantiated investigations was neglect and neglect was the most frequently substantiated type of maltreatment.

- There were very serious allegations in the Part II investigations including 5 substantiations of child sexual abuse and one child fatality.

- The majority of foster homes had prior history of reports of abuse/neglect and six homes had prior reports that had been substantiated.

- There were 13 Priority II referrals that were determined to require a Priority I response.
- The majority of investigations were initiated within two days following the receipt of the report and only one investigation out of 102 was not initiated within timeframes required by policy.

- A significant majority of the investigations followed the investigation protocol and information collection standards required by policy and were in line with national standards for information collection.

- Appropriate action was taken concerning the information collected during the investigation in 94% of the investigations.

- The majority of children were removed from the foster home following the substantiation of the allegations.

- The majority of children who remained in the foster home following the substantiated investigation had previously received good care in the foster home and the allegations were such that the children could remain safely in the home if follow-up services were provided to the foster parents.

The conclusions from the Part II investigation indicate the following:

- While there were very serious allegations in the Part II investigation, the review indicated that that in the majority of cases that staff took appropriate action to address the safety threats once they were identified.

- When the child's safety was at risk, the child was removed from the foster home. Children remained in the home in only 11 out of 102 cases.

***The findings of the Part I investigation case review indicate that in the majority of cases OKDHS staff acted according to OKDHS policy and with the appropriate action necessary to protect the safety of children in foster care who were the subject of a substantiated investigation of abuse or neglect.***

## Overall Case Review-Conclusions

There were concerns noted in the case reviews specifically:

- the history of prior reports regarding the foster parents in the sample;

- the referrals that were assigned as assessments;

- some instances of delayed initiation of assessments or investigations; and

- some cases in which safety threats were not accurately identified.

These concerns, however, did not represent a system wide failure to protect children's safety. While there were some errors in decision-making and there was not timely response in every case, this was clearly not a pattern or evidence of disregard for the safety of children.  The majority of the cases showed that good information was gathered from the reporter and there was effort made to make the best possible decision about assignment and response times.  Once the referral had been assigned, there was clearly an effort made by staff to respond quickly and to gather sufficient information to make decisions.  Children who needed medical treatment were seen by medical personnel in the majority of the cases, information was obtained from critical people, and children who were in unsafe placements were removed from those placements. The majority of the cases reviewed indicated that the actions taken by OKDHS staff were within OKDHS policy guidelines and were appropriate and professionally reasonable responses to protect the safety of the child who was the subject of the report, assessment or investigation.

## II. Introduction

In  August, 2010, I entered into an agreement with the attorneys defending the Federal class action lawsuit, *D.G. et al. v. Henry, et al.*, Case No. 08-CV-074-GKF-FHM to provide consultation concerning child protective services issues, issues of maltreatment of children in care, the safety of children in foster care in Oklahoma, information about and evaluation of other knowledgeable fact and expert witnesses and analysis of the plaintiff's case against the Oklahoma Department of Human Services (OKDHS).  I was asked to provide consultation based upon my years of experience with OKDHS as a Child Welfare Administrator with policy and program development responsibility for programs including Child Protective Services, Family Centered Services, Permanency Planning, Child Welfare Training and for Oklahoma Children's Services, a contracted service intervention program for families.  Since leaving OKDHS in 2007, I have continued work with child welfare programs through work as a consultant. I am currently under contract for consultant services with the National Resource Center for Child Protective Services, a part of the Training and Technical Assistance Network through the Department of Health and Human Services, Children's Bureau and I am under contract with the University of Oklahoma to provide case management consultation groups for child welfare supervisors.

As part of my consultation related to *D.G. v. Henry*, I was asked to conduct a review of abuse and neglect reports regarding children placed in foster care and this report provides the findings of my review.  The review is based on reports of abuse or neglect received during 2009 and 2010. There were two different case samples or populations utilized in the review.  The first sample was taken from the Goad Class sampling request, a sample which included screened out reports, assessments and investigations conducted on behalf of children placed in foster homes in 2009.  The second population encompassed investigations with at least one substantiated allegation received in 2009 and 2010, that had been reviewed and had concurrence by OKDHS child welfare programs staff for compliance with OKDHS substantiation policy.  Those reports from 2009 that were duplicates of the Goad Class sampling request were excluded from the Part II review since they had already been reviewed in Part I.

The combined case samples totaled 292 and concerned a total of 476 children who were children in the custody of OKDHS and alleged child victims in a screened out report, assessment or investigation during 2009 and 2010.

## III. Review Methodology

In order to conduct the reviews, case review instruments were developed with the assistance of Shannon Rios, PhD, of the OKDHS Office of Planning, Research and Statistics for each case sample type:

- Screened out case review instrument -review questions directed at the report demographics and decision-making concerning the screening process and the action taken subsequent to the screened out report.

- Assessment case review instrument- review questions directed at the report demographics, screening decision-making process, adherence to the assessment protocol, safety decisions and the outcome of the assessment.

- Investigation Part I case review instrument- review questions directed at the report demographics, screening decision-making, adherence to the investigation protocol, safety decisions and the outcome of the investigation.

- Investigation Part II case review instrument- review questions were abbreviated versions of the questions covered in the Part I case review instrument and included the report demographics, adherence to the investigation protocol, safety decisions and outcome of the investigation.

The review instruments were developed based on this reviewer's experience reviewing abuse and neglect reports and investigations in out of home care, OKDHS policy concerning abuse and neglect in foster care and best practice standards guidance from national child welfare organizations. Two principle agency resources concerning maltreatment in foster care were utilized. One of the sources, the Child Welfare League of American (CWLA),is the oldest national organization serving vulnerable children, youth, and their families. Through its publications, conferences, and teleconferences, CWLA shares information on emerging trends, specific topics in child welfare practice (family foster care, kinship care, adoption, positive youth development), and Federal and State policies. CWLA publications are utilized by many states, including Oklahoma, as guidance in the development of their policies and procedures concerning child welfare issues.  The principle CWLA resource utilized in this review for the development of the case review instrument and review criteria is the CWLA publication, which is part of the agency's  best practice series  for child welfare programs,  *Best Practice Standards for Child Maltreatment in Foster Care (CWLA 2003).*[1]These "best practice standards" are aspirational goals and are not required of, or imposed upon, members of the CWLA.  Another national source reviewed in the development of the case review instrument is the National Resource Center for Child Protective Services, operated by ACTION for Child Protection, Inc,  as  part of the Training and Technical Assistance Network through the Children's Bureau, Administration for Children and Families (ACF), U.S. Department of Health and Human Services. NRCCPS provides training and technical assistance to build the capacity of State, local, Tribal and other publicly administered or supported child welfare agencies to achieve safety, permanency, and well-being for children and families and is considered a leader in safety decision-making.  Materials and publications developed by NRCCPS and Action for Child Protection, Inc. were reviewed in determining the case review questions and in review findings.

After the questions for the review instruments were developed, the instrument questions were converted for use in the Business Enterprise Survey Tool (BEST), an implementation of ClassApps SelectSurvey.NET Web application software, which is written in C# source code in a .NET 2.0 environment hosted by the OKDHS Data Services Division on a Microsoft Internet Information Server (IIS) platform.  Access to the SelectSurvey.NET Web application is password-protected, and user-response data is sent via https Secure Sockets Later protocol for securely transmitting confidential information via the Internet using encryption.  All data is stored in a password-protected Microsoft SQL Server 2008 database, also hosted by OKDHS Data Services Division.

The reviews were conducted utilizing BEST as the data gathering tool which was accessed through a password protected internet link. The tool included fields for comments and Bates stamp numbers.

Upon entering all the data into the BEST tool, the results were downloaded into Microsoft Excel spreadsheet files that were used as the working documents for the review.  The Excel files containing the data from the BEST tool were reviewed for accuracy, consistency and any incomplete data.  All corrections and adjustments were made in the Excel files, so the Excel files were the source for the final documented data upon which the review findings were based.

As the sole reviewer for all of the case samples, inter-rater reliability tests were not needed.

## IV. OKDHS Policy Standards

The primary responsibility for child welfare services rests with the States, and each State has its own legal and administrative structures and programs that address the needs of children and families. However, States must comply with specific Federal requirements and guidelines in order to be eligible for Federal funding under certain programs including foster care payment assistance, state grant programs and adoption assistance.  There are frequent amendments to Federal policy and regulation so there must be a prompt response at the State level, including enactment of new State legislation, development of revisions of State agency policy and regulations and implementation of new programs. OKDHS has complied with the Federal requirements and guidelines and has continually maintained eligibility for federally funded programs that provide financial assistance to support child welfare programs.

The State statutes governing the OKDHS Child Welfare programs are found in Oklahoma Statutes Title 10 A. Children and Juvenile Code.  As already indicated, many of the statutes concerning child welfare programming have been enacted to meet Federal requirements.

The OKDHS policy, also referred to as permanent rules, is developed in accordance with the Oklahoma Administrative Procedures Act which is found in Title 75, Chapter 8 of Oklahoma Statutes.  The policy has two sections, permanent rules as required by the Administrative Procedures Act to be abbreviated and are not to include procedural steps.  The second section, a more detailed and procedural policy, which is intended to be guidance for staff, is called Instructions to Staff (ITS). Both policy sections were developed to include Federal requirements to maintain Federal funding eligibility, State statutory requirements and best practice standards from entities such as CWLA and organizations affiliated with the Children's Bureau training and technical assistance network.  This union of permanent rules and Instructions to Staff is a professionally sound means of developing and explaining policy for child welfare workers.

The policy utilized in the reviews of the case samples for in this report is Oklahoma Administrative Code (OAC) 340-75-3 (Subchapter 3 is Child Protective Services) Sections 1-13.  The versions utilized were revisions from 6-1-2007 and 6-1-2008. Since policy outlines the required procedures for staff to follow when responding to reports to abuse or neglect, OKDHS policy standards were utilized in determining many of the review findings.  The policy sections that are applicable are discussed in greater detail in the relevant case review section of this report.

Several terms are used repeatedly throughout this document that require definition to provide clarity about the use of the terms in the context of the review.  When the term safety threat is used it is defined as  a set of conditions, actions or situations that have the potential to result in severe harm to a child.  The term safety threats is also referred to as threats of danger[2] or threats to a child's safety[3] in the national sources described above and in all versions of these terms they describe conditions in which there is the potential for severe consequences or harm to the child.  Another term used in this document, failure to protect, is used in reference to both allegations in a report of abuse or neglect or as a  type of substantiated of neglect.  OKDHS policy defines failure to protect as *the person responsible for the child had knowledge or could have predicted that the child would be in a high risk situation or with an individual who had a history of abusive or neglect or violent behavior and the person responsible for*

*the child failed to show regard for the child's need for safety.[4]*  A third term, threat of harm, is defined in OKDHS policy as *the person responsible for the child either intended to act, acted, omitted to act or knew about conditions that placed the child at substantial risk and the intentions, actions, omissions or conditions could have resulted in serious physical injury, sexual abuse or serious neglect.[5]* Both terms, failure to protect and threat of harm, are used in allegations or findings when harm may not have actually occurred.

## V. Screened Out Reports Review - Overview

### A. OKDHS Policy and Procedures for Screened-Out Reports

The Oklahoma Department of Human Services (OKDHS) policy[6]indicates that all reports of abuse or neglect are to be screened to determine whether allegations meet the statutory definition of abuse or neglect and are within the scope of Child Protective Services intervention.  Criteria for screening out reports are provided in OKDHS policy.[7] Further instructions concerning the types of reports that **do meet** the criteria for assignment are found in the same section.[8]  The criteria for screening reports are used in conjunction with the definitions section of policy.[9]  In general, the types of reports that can be screened out include reports:

* *that clearly fall outside the definitions of abuse and neglect per policy[10] including minor injury to a child older than ten years of age with no significant child abuse and neglect history or neglect that poses less risk to an older child;*
* *concerning a child victim over 18;*
* *in which the alleged perpetrator is not a person responsible for a child (PRFC)unless there is failure to  protect by the PRFC ;*
* *in which the child and family's location is unknown; and*
* *that do not indicate abuse or neglect, but might indicate the need for services.*

Specific examples of reports that could be considered for screening out are also found in OKDHS policy[11] and include reports concerning:

* *adolescents with delinquency or truancy issues;*
* *parent-child conflicts in which no abuse or neglect is alleged;*
* *a child who has special needs, but the PRFC has attempted to meet the child's needs; and*
* *general poor parenting practices with a list provided of examples.*

There is a specific example in OKDHS policy[12] of a report that can be screened out concerning corporal punishment by foster or trial adoptive parents.  Screening is allowed if the child is five or older, spanked on the buttocks, with no unreasonable force used and no injuries observed.  OKDHS policy[13] also indicates that when a rules violation has occurred in a foster home and it is not known if there is an injury, then the CW worker immediately interviews and observes the child for any injuries. If there are no injuries or other risk related indicators, then the worker's contact is documented and the report can be screened out and referred to appropriate staff to address the rules violations.

### B. Review Criteria

Screening out reports of abuse or neglect in out of home care is accepted practice within the field of Child Welfare.  According to the CWLA, when a report is filed in behalf of a child in family foster care, the

intake process must distinguish between reports that:

- ✓ do not indicate maltreatment or concerns about standards of care, and require no further services;

- ✓ do not indicate maltreatment or concerns about standards of care, but do identify the need for further services; and

- ✓ do not indicate maltreatment but do raise concerns about standards of care and possible licensing violations.

When the report raises no valid concerns regarding maltreatment, standards of care, or the need for services, the report is screened out, documented, and no further action is taken.[14]

The review concerning screened out reports looked at the demographics of the reports that were screened out,  the intake screening process for documenting the report, the decision-making process used to screen out the report and the outcome or action taken in response to the report that was screened out.  This process of discerning appropriate actions taken when making the decision to screen-out a report are supported in standards for safety intervention as outlined by NRCCPS[15]

## VI. Screened Out Report Review - Demographic Data

### A. Number of Screened Out Reports
The review sample had 91 reports that were screened out. All of the 91 reports were reviewed, so data concerning this review is based on the complete sample.

### B. Number of Children Per Report
Of the 91 reports, 61 reports involved only one child, 23 reports involved 2 children, 5 reports involved 3 children and 2 reports involved 4 children for a total of 130 alleged child victims. The child victim was determined by the child or children being listed as a victim on the case sampling list. The following chart details the number of children per report:

*Chart 1*



## C. Allegation Detail

The allegation detail includes the allegations in the screened out report of abuse or neglect by the overall allegation categories, the individual types of abuse, neglect and sexual abuse and the specifics about any injuries that were alleged.

### 1) Allegation Categories

Neglect represented 60% percent of the allegations in reports that were screened out followed by abuse at 25%, neglect and abuse at 9%, sexual abuse at 5% and 1% had allegations of neglect and sexual abuse.  As indicated by the statistics, a report might include multiple allegations so there could be multiple allegation categories.  The allegation categories are listed according to those allegations listed on the OKDHS Form CWS-KIDS-1 *Referral Information Report* under Section G. Abuse/Neglect Information-Abuse/Neglect Category.  The percentage breakdown is shown on the following chart:

*Chart 2*



### 2) Abuse/Neglect Types

 Within the allegation categories of abuse, neglect or sexual abuse, there were 102 abuse or neglect types that were specified concerning the alleged child victims. There can be more than one abuse or neglect type concerning a child victim.  The most prevalent abuse/neglect allegation type was lack of supervision at 24%, followed by failure to protect at 16% and threat of harm at 11%.  The allegations listed were obtained from Form CWS-KIDS-1 *Referral Information Report,* Section G. Abuse/Neglect Information-Abuse/Neglect Type.  Some reports did not have allegations specifics listed just the overall allegation category.  The abuse/neglect allegation type breakdown is shown on the following table:

**Table 1**
## Abuse/Neglect Allegations by Type

| Abuse/Neglect Type | (N)=102 | Percentage (rounded) |
|---|---|---|
| Lack of Supervision | 24 | 24% |
| Failure to Protect | 17 | 17% |
| Threat of Harm | 11 | 11% |
| Beating/Hitting/Slapping | 9 | 9% |
| Inadequate Physical Care, Shelter or Clothing | 9 | 9% |
| Beating/Hitting -Instrument | 5 | 5% |
| Mental Injury | 5 | 5% |
| Substance Abuse Drug or Alcohol Caretaker | 5 | 5% |
| Age Inappropriate Sexual Behavior | 3 | 3% |
| Failure to Obtain Medical or Psychiatric Care | 3 | 3% |
| Failure to Provide Adequate Nutrition | 2 | 2% |
| Exposure to Domestic Violence | 2 | 2% |
| Exposure to Adult Sexuality | 1 | 1% |
| Sexual Exploitation | 1 | 1% |
| Biting | 1 | 1% |
| Burning | 1 | 1% |
| Unexplained marks and bruises | 1 | 1% |
| Grabbed by arm | 1 | 1% |
| Cigarette Smoking | 1 | 1% |
| Total | 102 | >100% |

*3) Injury Specifics*

Injuries were alleged in 19 of the 91 reports and 7 of those reports required some type of evaluation by a medical professional.  It was documented in all 7 of the reports in which an injury requiring medical attention was alleged, a medical review was obtained even though the report was screened out.  The following details the percentage of reports in which injuries were alleged:

*Chart 3*



Of the 19 reports that alleged injuries, the following lists the specific injury characteristics (there can be more than one injury alleged so total injuries are greater than 19).

*Table 2*
## Injury Characteristics

| Injury | (N)=21 | Percentage |
|---|---|---|
| Bruises/Welts | 8 | 38% |
| Cuts/Punctures/Sores | 5 | 24% |
| Scratches/scrapes | 3 | 14% |
| Black eye | 2 | 9% |
| Bite Marks | 1 | 5% |
| Burn | 1 | 5% |
| BB gunshot wound | 1 | 5% |
| Total | 21 | 100% |

### D. Foster Parent -Child Abuse and Neglect Report History

The review determined that 55 of the foster homes did not have a prior history of abuse or neglect reports, 13 had only prior reports that had been screened out and 23 homes had reports that were assigned or a combination of reports that were assigned and screened out.  The chart below details the breakdown of reports:

*Chart 4*



 Of those 23 foster homes that had prior assigned reports, 13 had only one prior report. The following bar graph details the number of prior assigned reports per the 24 foster homes:

*Bar Graph 1*



While there were prior assigned reports in 23 foster homes, only one had an investigation that had been substantiated.   The rest of the findings were either services recommended or services not needed.

## VII. Screened Out Report Review - Evaluation Data

This section of the review evaluated the screening activities that occurred once the report of abuse or neglect had been received by OKDHS.  The review was divided into three sections based on the stage of response to the report:  1) the initial intake activities, which include taking information from the reporter and documenting the information, 2) the screening activities which include determining the disposition of the report ( how the report will be addressed), the timeliness of the disposition of the report and the accuracy of the decision to screen out the report, and 3) the action taken in response to the screened out report.

### A. Initial Intake Activities

The initial intake activities, as defined in this review, are:

- ✓ documenting  the initial report information; and

- ✓ efforts made to gather sufficient information to make screening decisions.

According to CWLA, the purpose of intake is to gather sufficient information to make a determination as to the most appropriate response and to evaluate the validity of the information reported [16] and a quality intake process is the best assurance of determining the most appropriate response to a report of suspected maltreatment.[17]  Diligent effort was the standard applied for the review of information collection.  For purposes of this review, diligent effort was defined according to OKDHS policy as *gathering information about the details of the alleged abuse or neglect, injuries and risk factors.[18]*

The evaluation of the initial intake screening activities was based on whether there was diligent effort made to obtain sufficient information from the reporter and whether there appeared to be diligent efforts made to gather any additional information so that there was adequate information to make the screening decision.

The review indicated that in 88% of the reports, there was evidence of diligent effort to gather thorough information from the reporter concerning the allegations in the report and there was diligent effort made to gather sufficient information to make the screening decision.  The following chart details the percentage of reports that had documentation of diligent effort to gather thorough information from the reporter and information to make the screening decision:

*Chart 6*



**Diligent Effort-Information and Screening**

12%

88%

- Yes-80
- No-11

## B.  Screening Process

The screening process includes the activities of staff to respond once the report has been received and documented.  This includes the timeliness of the disposition (determining whether the report will be screened out or assigned) of the report, the reasons provided for the screen-out decision, the accuracy of the disposition to screen out the report, the documentation of the screening decision and supervisory approval of the decision, and the sufficiency of the full screening process to address any safety threats to the child.

### 1) Timeliness of Disposition

OKDHS Child Protective Services policy [19] details that reports of abuse or neglect are to be assigned (or a disposition made) the same day as the report is received unless there is a need to gather additional information. The maximum time for assignment of a report is no later than three calendar days. Timeliness of disposition was based on whether the report had a disposition date that was the same as the day the report was received.  The date was obtained from the Form CWS-KIDS-1 *Referral Information Report* block labeled Disposition Date.  According to the review, 70% of the reports had a disposition date that was the same date as the report was received as indicated on the following chart:

*Chart 7*



In addition to the 64 reports that had a disposition day that was the same as the report date, there were 19 reports that had a disposition date that was the next day. The remaining reports had a disposition date that was two days or longer from the day the report was received.  Of note, the majority of the reports that did not have a disposition date until the day after the report was received were reported in the late afternoon making a same day disposition more difficult.  Only 8 reports clearly fell outside reasonable timeframes for making the disposition.  The bar graph below details the number of reports by number of days for disposition:

*Bar Graph 2*

| | Same Day | Next Day | Two Days or Longer |
|---|---|---|---|
| ■ Series1 | 64 | 19 | 8 |

*2) Reasons for Screen Out*

 In the review of the 91 screened out reports, the reason for the screen out decision was typically located in OKDHS Form CWS-KIDS-1 *Referral Information Report*, Section J. Intake Information, in either block Recommendation for Disposition or Screen Out Reason.  This section of the *Referral Information Report* also often provided detail as to the screen out decision including any additional information or comments by the supervisor to provide justification for making the decision to screen out the report. The reason given the majority of the time (43%) was the allegations were not considered to be abuse or

neglect, followed by policy violation as the reason (20%). Those that were referred to the Office of Client Advocacy concerned allegations that occurred in a facility, rather than a family foster home setting.  The Office of Client Advocacy was responsible for making the determination as to whether the allegations met the definition of abuse or neglect.  The following table details the reasons cited in the Referral Information Report:

*Table 3*
## Reasons for Screen-Out

| Reason | (N)=91 | Percentage |
|---|---|---|
| Not Child Abuse/Neglect | 39 | 43% |
| Policy Violation | 18 | 20% |
| Reason Not Specified | 11 | 12% |
| Referred to Client Advocacy | 9 | 10% |
| Duplicate Report | 8 | 9% |
| Already Investigated | 3 | 3% |
| Referred to Tribe | 1 | 1% |
| Home Already Closed | 1 | 1% |
| Allegations concerning wrong home | 1 | 1% |
| Total | 91 | 100% |

*3) Accuracy of Screen Out Disposition*

As indicated in OKDHS policy[20], children placed in care due to abuse or neglect are vulnerable due to their previous victimization and the heightened risk of abuse or neglect that occurs in out of home placement.  As a result a decision to screen out a report concerning a child in out of home care must be made with sufficient information to determine that the allegations are not concerning child abuse or neglect and/or there is information to indicate that the situation has already been addressed by staff who have seen the child.  Using this criteria and the judgment of the reviewer concerning the nature of the allegations, the accuracy of the screen out decision was determined. There were 72 reports that were correctly screened out and 19 reports that should not have been screened out. The chart below details this information:

*Chart 8*



Of those 19 reports that were incorrectly screened out, the report should have been addressed as an assessment or investigation or did not include enough information to make a decision to screen out the report.  The following chart shows what should have been the correct disposition for those 19 reports:

*Chart 9*



 The screen-out reason given for the 19 reports that were incorrectly screened out are detailed in the bar graph below:

*Bar Graph 3*



*4) Documentation of the Screening Decision and Supervisory Approval*
The review in this section determined whether there was documentation of the reason for the screening decision and if there was supervisory approval of the screen out decision.  In all of the 91 reports, there was documentation of supervisory approval.   Out of the 91 reports, 80 reports had a reason specified,

so the justification for screening the report was evident. The following chart shows the number of reports in which the screening decision was documented:

*Chart 10*



5) *Screening Process Sufficient to Assure Safety*

This section of the review evaluated the entire screening process including information collection, timeliness, and decision-making to determine whether it was sufficient to assure safety of the child(ren) named in the reports. According to the National Resource Center for Child Protective Services, screening should include criteria that evaluates whether the child is unsafe and identification of possible safety threats, including those that are present currently and in the future.[21] The criteria used for the findings in this section were the completeness of the information gathered concerning the report allegations, the timeliness of decision-making, the nature of the allegations and potential safety threats in the allegations. In the majority of the reports (84%) the screening process was sufficient to address safety threats to the child.  As shown in the following chart, 15 reports or 16% of the reports were not screened sufficiently to fully address safety threats. Although this number is slightly lower than the number of reports that had an incorrect screening decision (19), the criteria used here were also based on the potential safety threats in the allegations. The following chart shows the percentage of reports in which the screening process was sufficient to address safety threats:

*Chart 11*



**C. Action Taken in Response to Report Information**

In reviewing the reports that were screened out, it was determined that 83 out of the 91 reports needed some type of subsequent action to be taken.  The action necessary frequently involved follow-up by CW staff; either the permanency worker for the child or the Resource Family Specialist to address policy violations with the foster parents.  Since the case sample for screened out reports only included the OKDHS Form CWS-KIDS-1 *Referral Information Report*, complete information about the action taken subsequent to the report was not always available.  While it could not be verified from the information provided that all of the actions had taken place, there were 62 reports that documented appropriate action had already been taken or an appropriate action was recommended such as referring the report information to other CW staff or another entity such as a tribe. The following table details whether there was need for action to be taken and  documentation that action should be taken or was  taken:

*Table 4*

### Action Required and Documented

| Action Should be Taken | N=(91) | Documentation of Appropriate Action | N=(83) |
|---|---|---|---|
| Yes | 83 | Yes | 62 |
| No | 8 | **No** | **21** |
| | | | |
| Total | 91 | Total | 83 |

The following chart details the types of action that were documented:

*Chart 12*



**Type of Documented Action**

- Referred to Permanency or Other CW Staff-39
- Placement Change Made-11
- Referred - Office of Client Advocacy-6
- Child seen by medical personnel-5

63%, 18%, 10%, 1%, 8%

## VIII. Screened Out Report Review - Conclusions

### A. Report Demographics and Initial Intake Screening

The screen-out review of 91 reports representing 130 alleged child victims indicated that the majority of the allegations concerned neglect (60%) and the most frequent allegations were lack of supervision, failure to protect and threat of harm.  Only 19 of the reports alleged some type of injury.  Only 7 of those 19 reports concerned injuries that required medical attention.  There was documentation that all

of the children in the reports that alleged injuries, received medical attention even though the report was screened out.

The history of prior child/abuse reports in the foster homes included in the screen-out review indicated that the majority of the foster homes (61%) had no prior history of reports of abuse or neglect.  While 39% of the foster homes did have a prior history of reports of abuse/neglect which is a high percentage, closer examination found that only one home out of 91 had a prior report of abuse or neglect that was substantiated.

### B. Response to Referral

It was indicated in 88% of the reports, that there was evidence of diligent effort to gather thorough information from the reporter and diligent effort to obtain information to make the screening decision. In general, initial intake screening activities were timely.  Only 8 reports fell outside of reasonable timeframes for making screening decisions.  The decision to screen-out the report was correct in 79% of the reports. Even in those reports that were incorrectly screened out, there was documentation that action was taken in response to the screened out report.  All screened out reports were approved by supervisors and the justification for screening the report was documented in 88% of the reports.

In 84% of the reports, there was documentation that the screening process was sufficient to address safety threats.  Some type of action was needed in 83 of the 91 reports and there was documentation of action taken or recommended in 62 of those reports.  Since the documentation provided for the review was not the complete child welfare case record, action concerning screened out reports may have been located in other case record documentation.

### C. Action Taken in Response to Screened Out Reports

The actions taken in response to the screened out reports included referring the information to the OKDHS CW Permanency worker for the children or other OKDHS CW staff including the Resource Family Specialist for the foster parents; a placement change was made; the child received medical attention; or the matter was referred to the appropriate entity for response such as the Office of Client Advocacy or the Tribe.

### D. Overall Conclusions-Screened Out Reports

- The majority of the screened out reports had allegations of neglect.
- There was no prior history of reports of abuse or neglect in 61% of the foster homes in the screened out reports. Only one of the homes had a prior confirmation.
- In the majority of the reports, there was thorough information collection, and the intake screening activities were timely.
- In 79% of the reports, the decision to screen-out the report was made correctly.  Even in those reports that were incorrectly screened out, action was taken in response to the report.
- Out of 91 screened out reports, 19 of the reports alleged some type of injury and 7 of those required some type of medical evaluation.  All of the children in those reports received medical evaluation even though the report was screened out.
- In 84% of the reports, there was documentation that the screening process was sufficient to address safety threats to the child.
- There was documentation that action was taken in response to the allegations in the screened out report in 62 out of the 91 reports.

## IX. Assessment Review - Overview

### A. OKDHS Policy and Procedures for Assessments

The Oklahoma Department of Human Services (OKDHS) has a differential response system to respond to reports of abuse or neglect.  This means that a report of abuse or neglect can be addressed by one of two possible processes, an assessment (the name of the differential response process in Oklahoma) or an investigation. Differential response systems, according to CWLA,[22] allow for more than one method of initial response to reports of child abuse and neglect and allow agencies to provide services to some cases without a formal determination of abuse or neglect. These differential response systems are used by many states and are called various names including dual track and alternative response.  An assessment is defined, according to OKDHS policy[23] as a *systematic process used by OKDHS to respond to reports of alleged child abuse or neglect that, according to guidelines established by OKDHS, do not constitute a serious and immediate threat to the child's health or safety.* OKDHS policy has guidelines for making a decision as to whether a report should be assigned as investigation or assessment.[24]  The guidelines provide criteria for determining whether an assessment or investigation is the most appropriate for response to reports.  According to the policy, the guidelines are not intended to be all inclusive, are not to replace judgment about risk factors and risk factors are considered first when applying the guidelines.  Examples are provided to give staff a frame of reference for the types of reports that would be appropriate for an assessment or investigation. There are two examples listed in the policy guidelines as to when an assessment rather than an investigation could be used to respond to reports of abuse or neglect in a foster home or trial adoptive home.  The examples are[25]:

- *corporal punishment by a foster parent or trial adoptive parent involving a child four to five years of age.  Corporal punishment includes physical discipline that did not result in injuries of any kind and did not involve unreasonable forced*; or

- *supervision concerns regarding an older school aged child by a foster or trial adoptive parent. This does not include sexual abuse or physical abuse perpetrated by an older child towards any child in the home.*

While policy does not exclude the option of using an assessment response, assessments are generally not conducted on abuse and neglect allegations in foster homes as indicated by the small number of reports in this review sample that were assigned as assessments.

OKDHS policy[26] specifically outlines how staff are to respond to reports of abuse or neglect when a child is placed in a foster or trial adoptive homes including tribal homes. The section indicates that the protocol for response to reports of abuse or neglect is the same as conducting an investigation or assessment in the child's own home.  All referrals of abuse or neglect in foster homes are to be assigned a Priority I unless there is sufficient information to indicate that the safety of the child can be ensured without an immediate response.  In that instance the CW supervisor may assign the report as a Priority II with a time frame of no more than three working days to initiate the assessment.[27]

According to OKDHS policy[28], initial contact is to be made with the family in the home, but the protocol also allows for an appointment to be set to conduct the assessment after assuring safety of the children. The protocol also allows for interviews to be conducted separately or together and does not require collateral contacts unless the family is not forthcoming about information that could place the child at risk. The types of information to be gathered during an assessment are:

✓ *general demographic information concerning the family;*

✓ *family social history;*

✓ *the family's perception of problems in home;*

✓ *specifics that led to referral of abuse or neglect;*

✓ *child and adult  functioning; and*

✓ *parenting both in terms of discipline and general parenting .*

Protocol requirements for assessments include:

✓ *the initial contact is to be made in the home of the foster parent;*

✓ *all children are to be observed and interviewed, if verbal;*

✓ *an appointment can be scheduled for an assessment,*

✓ *it can be determined whether contact with collaterals for supportive info is necessary; and*

✓ *the assessment concludes with a family team meeting.*

## B. Review Criteria

The review concerning assessments looked at the demographics of the reports assigned as assessments, the intake process for assigning and decision-making concerning the type of response to make to the report, the actual response once the assessment was assigned and the outcome for the children at the conclusion of the assessment.  The review of assessments was conducted according to the OKDHS protocol requirements described above and national standards sources including the Child Welfare League of America (CWLA) and the National Resource Center for Child Protective Services (NRCCPS). According to CWLA, an alternative response protocol (the OKDHS assessment process is considered an alternative response) can be used as a response to reports of maltreatment in foster care.[29]

# X. Assessment Review - Demographic Data

## A. Number of Assessments

The review sample had only 18 referrals of abuse or neglect that were assigned as assessments, indicating that assigned referrals of abuse or neglect in foster or trial adoptive homes are typically addressed as investigations.  Of those18 referrals in the sample that were assigned as assessments, one referral concerned a tribal home and the tribe intervened so the referral was not initiated by OKDHS**.** That referral has been excluded and so all data from this review is based on the remaining 17 assessments.

## B. Number of Children Per Report

Of the 17 reports, 14 involved only one child, 2 reports involved 2 children and 1 report involved three children for a total of 21 alleged child victims.   The following chart provides the detail on the alleged child victims per report:

*Chart 13*



## C. Allegation Detail

The allegation detail includes the allegations in the initial report of abuse or neglect by the overall allegation categories, the individual types of abuse, neglect and sexual abuse and the specifics about any injuries that were alleged.

*1) Allegation Categories*

Neglect represented 59% percent of the allegations followed by abuse at 35% and sexual abuse at 7%. The report of alleged sexual abuse was not directly related to the children in the home, it concerned the foster father making suggestive remarks to the biological mother of the children. The allegations listed were obtained from the Form CWS-KIDS-1 *Referral Information Report*, Section G. Abuse/Neglect Information-Abuse/Neglect category.  The breakdown is shown on the following chart:

*Chart 14*

### Allegation Categories

- Abuse-6 — 35%
- Neglect -10 — 59%
- Sexual Abuse-1 — 6%

*2) Abuse/Neglect Types*

Within the allegation categories of abuse, neglect or sexual abuse, there were 19 specific abuse or neglect types concerning the alleged child victims. There can be more than one abuse or neglect type concerning a child victim.  The most prevalent allegation was lack of supervision at 26% followed by threat of harm and beating/hitting/slapping each at 19%. The allegations listed were obtained from Form CWS-KIDS-1 *Referral Information Report*, Section G. Abuse/Neglect Information-Abuse/Neglect type and the Allegation abuse/neglect specifics.  The allegation breakdown is shown on the following chart:

*Table 5*
**Abuse/Neglect Allegations by Type**

| Abuse/Neglect Type | (N)=19 | Percentage |
|---|---|---|
| Lack of Supervision | 5 | 26% |
| Threat of Harm | 3 | 19% |
| Beating/Hitting/Slapping | 3 | 19% |
| Failure to Protect | 2 | 11% |
| Substance Abuse Caretaker | 1 | 5% |
| Mental Injury | 1 | 5% |
| Pushing | 1 | 5% |
| Foster Child Babysitting | 1 | 5% |
| Pulling Hair | 1 | 5% |
| Unexplained marks and bruises | 1 | 5% |
| Total | 19 | 100% |

*3) Injury Specifics*
Injuries were alleged in 6 of the reports and 3 of those reports would have required some type of evaluation by a medical professional.  In all 3 incidents concerning an alleged injury requiring medical attention, a medical review was obtained during the assessment.  The following charts details the percentage of injuries per report:

*Chart 15*



Of the 6 reports that alleged injuries, the following lists the specific injuries detailed in the abuse/neglect report: The following table provides the specific injury characteristics in the 6 reports:

*Table 6*
**Injury Characteristics**

| Injury | (N)=6 | Percentage |
|---|---|---|
| Abrasions/Lacerations/Cuts | 4 | 66% |
| Bruises/Welts | 1 | 17% |
| Burns | 1 | 17% |
| Total | 6 | 100% |

**D. Foster Parent -Child Abuse and Neglect Report History**

The review determined that while 10 of the foster homes did not have a prior history of abuse or neglect reports,  7 homes did have prior reports of abuse or neglect. The following chart details the prior reports of abuse/neglect in foster homes:

*Chart 16*



 Of those who had prior reports, all but two had more than one report. The following bar graph details the number of prior reports concerning the 7 foster homes:

*Bar Graph 4*



While there were prior reports in 7 foster homes, none had referrals that had been substantiated.   Four foster parents had previous referrals with a finding of services recommended, while the rest had reports that were screened out or the finding was services not needed.

## XI. Assessment Review - Evaluation Data

This section of the review evaluated the activities that occurred once the report of abuse or neglect had been received by OKDHS.  The review was divided into two sections based on the stage of response to the report:  1) the intake and screening activities prior to assignment of the report and 2) the activities that occur when the report has been assigned as an assessment.

### A. Initial Intake Screening Activities

The initial intake activities, as defined in this review, are:

- ✓ initial information collection;

- ✓ disposition decisions including assignment and priority;

- ✓ the timeframes for disposition, approval and assignment;

- ✓ the supervisory approval of the initial intake screening  process; and

- ✓ overall screening process addressed child safety.

The evaluation of the initial intake screening activities was based on whether the information gathered was sufficient, whether there appeared to be diligent efforts made to evaluate the safety risks during the decision-making process and whether there was timely processing of the report. The following categories within the initial intake screening activities were evaluated:

*1) Information Collection*

 The review indicated that in all but one report, there was good and thorough information collected from the reporter concerning the allegations in the report.  Diligent effort was the standard applied for information collection.  For purposes of this review, diligent effort was defined as *gathering information about the details of the alleged abuse or neglect, injuries and risk factors* as set forth in OKDHS polic*y.*[30] The following table and chart detail the review findings as to whether diligent effort was made to gather sufficient information and use that information to make screening decisions and priority decisions.

*Table 7*
**Diligent Effort to Gather Information and Make Decisions**

| Diligent Effort | Gather Information (N)= 17 | Screening Decision (N)=17 | Priority Decision (N)=17 |
|---|---|---|---|
| Yes | 16 | 16 | 16 |
| No | 1 | 1 | 1 |
| Total | 17 | 17 | 17 |

*Chart 17*



 2) *Report Acceptance and Disposition*
OKDHS Child Protective Services policy [31] details that reports of abuse or neglect are to be assigned the same day as the report is received unless there is a need to gather additional information.  The maximum time for assignment of a report is no later than three calendar days.  In all but one of the 17 assessments, the reports were accepted and assigned as assessments within policy timeframes.

3) *Priority Assignment*
According to OKDHS Child Protective Services policy [32] both assessments and investigations are to be assigned a priority response time. The majority of the 17 referrals (53%) assigned as assessments were determined to require a Priority I response which is to occur within 24 hours.  The remaining referrals (47%) were assigned a Priority II response which requires a response within 48 hours to 15 calendar days.  The following chart details of the percentage of priority assignments.

*Chart 18*



The review indicated that in all but one of the 17 referrals, the correct priority decision was made.  In that instance the referral was given a Priority II, and the allegations warranted a Priority I response.  Also in all referrals but that one, there was a diligent effort made to review the report information to make the priority decision during the initial assignment of the referral.

*4)  Assignment as an assessment or investigation*
 As indicated in the Assessment Overview, OKDHS policy provides two specific examples of reports of abuse or neglect in foster homes that can be addressed as an assessment rather than an investigation, *corporal punishment of a child four or five years of age  and issues concerning supervision of an older school age child*.  In addition, OKDHS policy[33] does allow for judgment, based on the type and seriousness of the allegations, as to whether the allegations in the report of abuse or neglect would be better addressed as an assessment or investigation. The review of the decision-making concerning assessments was based on whether there appeared to be a serious and immediate threat to the child's health or safety, whether there were injuries or sexual abuse alleged and the age of the child. According to the review, there were four referrals that were correctly assigned as assessments, and the remaining referrals were incorrectly assigned as assessments.   Those that were incorrectly assigned, had allegations that warranted a response as an investigation  rather than as an assessment.  The following chart show the percentage of reports that were correctly assigned as assessment s:

*Chart 19*



*5) Documentation and supervisory approval*
  As required by OKDHS policy[34], decisions about assignment, response either as an assessment or an investigation are to be reviewed and approved by a CW supervisor.  In all of the 17 referrals assigned as assessments the justification for the decision-making decision was documented and approved by a supervisor.

## B.  Response to Referral

The response to the referral includes the activities of staff to respond once the referral has been accepted as an assessment, including the timeliness of the initiation of the assessment, the method and adequacy of the collection of information during the assessment and safety threat identification and decision-making.

*1) Timeliness of Response*
 It was difficult to determine the actual time for the initiation of the assessment because the actual time of the response is not specifically recorded in Form CWS-KIDS-9-A *CPS Family Assessment*.  Timeliness of response was therefore based on the day that the assessment was initiated.  According to the day of the assessment initiation, all but one of the referrals with a Priority I response time [35]were initiated the same day or next day.  The majority of Priority II response times were the next day or within two days following the day the report was received.   All but three Priority II referrals were responded to within Priority II policy timeframes requirements for foster homes.[36]  The following bar graph shows the initiation timeframes by assessment:

*Bar Graph 5*



## 2) Assessment Protocol

This part of the review was conducted based on the protocol for assessments as outlined in OKDHS policy.[37] A protocol for response is important because it can provide the structure necessary to assure that critical information is obtained concerning the child, foster family and the home environment.  A part of the assessment protocol is a family team meeting held at the conclusion of the assessment that allows all members of the family to have input as to the family's needs for any services.  The components of the assessment protocol that were reviewed include:

- ✓ *Was the initial contact with the family in the home*

- ✓ *Were all children observed and were all verbal children interviewed*

- ✓ *Was the assessment conducted at the initial contact with the family or was it necessary to schedule an appointment to conduct the assessment*

- ✓ *Were all persons responsible for the children interviewed*

- ✓ *Was it necessary to obtain supportive information*

- ✓ *Was a family team meeting held at the conclusion of the assessment*

In 88% or 15 of the cases, the children were observed, interviews were held with all verbal children in the home, all persons responsible for the children were interviewed and supportive information was obtained about the family.  In 71% or 12 cases, the initial contact was in the home and in 65% or 11 of the cases, the assessment was held at the initial point of contact. In only 18% or 3 assessments was a family team meeting held at the conclusion of the assessment.  The following table details components of the assessment protocol and whether the steps in the protocol were conducted during the assessment:

*Table 8*
**Assessment Protocol Components Conducted**

| Protocol Components- Conducted by Assessment (N =17) | Yes | % of Total | No | % of Total |
|---|---|---|---|---|
| All children observed | 15 | 88% | 2 | 12% |
| Interviews with all verbal children | 15 | 88% | 2 | 12% |
| Interviews with all persons responsible for the child | 15 | 88% | 2 | 12% |
| Supportive information obtained | 15 | 88% | 2 | 12% |
| Initial Contact in the home | 11 | 65% | 6 | 35% |
| Assessment conducted at initial point of contact | 11 | 65% | 6 | 35% |
| Family Team Meeting Held | 3 | 18% | 14 | 82% |

*3) Information Collection*

This part of the review evaluated whether the information collected during the assessment was thorough and complete and whether the information required by policy was gathered. There was also an evaluation as to whether the information collected supported the decision-making about the outcome of the assessment. Information collection criteria were based on the following components:

- ✓ *General demographic information about the family*

- ✓ *Family Social History*

- ✓ *Family's Perceptions of problems in the home*

- ✓ *Specifics that lead to the referral of abuse or neglect*

- ✓ *Child and adult functioning*

- ✓ *Parenting- general parenting and disciplinary practices*

The following chart details the information collection in each category and whether there was evidence in the assessment review that indicated information had been gathered in each information collection component:

*Table 9*
**Information Collected by Assessment**

| Information Component Collected by Assessment (N=17) | Yes | % of Total | No | % of Total |
|---|---|---|---|---|
| General Demographic Info about the Family | 17 | 100% | 0 | 0% |
| Family Social History | 13 | 76% | 4 | 24% |
| Family Perception of Problems in the Home | 15 | 88% | 2 | 12% |
| Specifics that Lead to Referral of Abuse/Neglect | 16 | 94% | 1 | 6% |
| Child Functioning | 14 | 82% | 3 | 18% |
| Adult Functioning | 13 | 76% | 4 | 24% |
| Parenting-General and Discipline | 15 | 88% | 2 | 12% |

*4) Decision Making and Identification of Safety Threats*

In 10 out of the 17 assessments that were reviewed, safety threats were determined to be present in the home.  In those assessments in which safety threats were present, 6 assessments (60%) properly identified the safety threats. Based on the information collection criteria and the decision-making that resulted from the information that was gathered, there were 14 assessments (82%) in which the information supported the decision-making regarding the findings and action taken on behalf of the child victim(s) in the home. The following table details the safety threat identification and decision-making based on the information that was documented:

*Table 10*
**Identification of Safety Threats and Decision-Making**

| Yes/No | Safety Threats Properly Identified  (N=10) | % of Total | Information Supported Decision-Making (N=17) | % of Total |
|--------|-------------------------------------------|-----------|---------------------------------------------|-----------|
| Yes | 6 | 60% | 14 | 82% |
| No | 4 | 40% | 3 | 18% |
| Total | 10 | 100% | 17 | 100% |

## C. Outcomes of Assessments

In this part of the review, the outcome for the child(ren) and foster family was evaluated.  If safety threats were identified the review determined if services were provided, if a written plan of compliance was developed, and the ultimate outcome for the child after the assessment was completed.   In 5 assessments, it was determined that services would be appropriate for the safety threats that were present in the home.  In only one case, was it clearly documented that services were put in place for the safety threats.  It may be that services were provided but the information about the services was not included in the documentation of the assessment.

Also in reviewing whether there was a written plan of compliance put in place, it was difficult to determine whether a plan had been put in place with the information that was provided for the review. While it may have been located in other casework documentation that was not part of the review, there were 5 assessments that were determined to be appropriate for a written plan of compliance.  Of those, only  one assessment showed documentation that a written plan of compliance was developed.

The outcome for the child(ren) in the majority of the assessments (12 assessments out of 17)  was that they remained in the foster home and the situation was resolved either because abuse or neglect was not found to be an issue in the home or issues were resolved so that the child could safely remain in the foster home.  In  3 assessments, the child(ren) were removed from the foster home and in 2 assessments the foster parents asked that the child(ren) be removed from their home.  The following chart details the outcome for the children by percentage and number:

*Chart 20*



## XII. Assessment Review - Conclusions

### A. Report Demographics and Initial Intake Screening

The assessment review of 17 cases indicated that, in general, the initial intake screening activities were complete and thorough.  With one exception, the report information obtained from the reporter was detailed and provided sufficient information to make both screening and priority decisions.  Also with one exception, assignments were made timely.  All report assignments were approved by supervisors.  Priority determinations were also appropriate with only one exception.

The history of prior child/abuse reports in the foster homes included in the assessment review indicated that 41% of the foster homes had prior history. None of those homes that had prior reports of abuse or had a substantiated report.  Since there was not complete information about the prior history other than the previous findings, the fact that none of the prior referrals had been substantiated indicated that past concerns had been resolved or were not significant enough to discontinue use of the home.

The review findings did indicate a concern with the assignment of the reports as assessments, only four reports were correctly assigned as assessments. As expected, the most frequent issues in the reports of abuse or neglect that were assigned as assessments were lack of supervision and threat of harm.  There were, however, also allegations that involved injuries and actions of the foster parents that posed safety threats to children under the age of three.  Based on the OKDHS policy concerning assessments, 13 reports should have been assigned for investigation rather than assessment.

While national standards indicate that an alternative response approach could be used to address issues of maltreatment in foster homes, [38] the assessment protocol used by OKDHS is not structured in such a way that it is the most effective way to provide the accountability needed for children in custody.  While the assessment process may not have been the most appropriate protocol to use in responding to the allegations concerning foster homes, in general the process did not appear to have increased the safety threats to the children in the sample since the timeframes for response to the referral were the same as in an investigation and the majority of assessments gathered sufficient information to make appropriate decisions about the allegations concerning the foster home.

## B. Response to Referral

Most referrals (11) were responded to the same day or the day following the report.  Four assessments went beyond OKDHS policy timeframes for initiation[39].

In the majority of cases, the assessment protocol was followed except for conducting family team meetings at the conclusion of the assessment.  Since there are other processes for addressing the needs of foster parents, a formal family team meeting was probably not needed.  Issues that needed to be addressed on behalf of the foster family were referred to the Foster Care Resource Specialists.  The majority of the assessments also collected key information during the assessment process.  The two areas that were not quite as complete, the family social history and adult functioning, could have also been due to the assessment process not quite fitting with a foster family.  Typically much more is already known about a foster family through the Resource Family Assessment and the ongoing interaction with the family.

Safety threats were present in only 10 out of the 17 assessments in the review.   In 4 of the 10 assessments that had safety threats, it was determined that the safety threats had not been adequately identified.  In each of those 4 assessments, there was not an obvious safety threat identified, it was just that sufficient information had not been obtained to fully address concerns about possible safety threats.

## C. Outcomes of Assessments

The outcome for the children named in the assessments was that majority of the children remained in the foster home and the conclusion of the assessment was that the child(ren) were safe and there were no continuing concerns in the home.  In those three assessments in which concerns were identified, the children were removed.

## D. Overall Conclusions for Assessments

The overall findings for assessments:

- Only 17 referrals were assigned as investigations in the review sample.
- The majority of the allegations in the 17 referrals were neglect, and the most frequent allegations were lack of supervision and threat of harm.
- Information collection was complete and supervisory oversight was documented.

- There was history of prior reports of abuse or neglect in 41% of the foster homes, but none of the homes had a prior referral that had been substantiated.

- Only 22% of the assessments were correctly assigned as assessments.

- Out of the 17 assessments, 11 were initiated the same day as the referral was received or the following day.  There were 4 assessments that were not initiated within the required priority response timeframe (one referral was a Priority I).

- There were safety threats present in 10 of the assessments and there were 4 assessments in which the safety threats were not properly identified.

- The outcome in the majority of the assessments was that the child remained in the home.  In the 3 homes in which concerns were identified, the children were removed.

## XIII. Investigation Parts I and II Review - Overview

### A. OKDHS Policy and Procedures for Investigations

As indicated in the assessment review, OKDHS policy has guidelines for making a decision as to whether a report should be assigned as investigation or assessment.  According to OKDHS policy[40] an investigation is *defined as an approach used to respond to reports of alleged child abuse and neglect that constitute a serious and immediate threat to a child's health and safety*.  Guidelines in policy[41] further delineate when a report is assigned as an investigation.  According to policy, [42] the guidelines are not intended to be all inclusive, are not to replace judgment about risk factors and risk factors are considered first when applying the guidelines.  Examples are provided to give staff a frame of reference for the types of referrals that would be considered appropriate for assignment as an investigation. Some of the types of referrals that are provided as examples include:

- ✓ *child sexual abuse;*
- ✓ *child fatality;*
- ✓ *children in the custody of OKDHS;*
- ✓ *abuse or neglect in foster or trial adoptive homes;*
- ✓ *abuse or neglect requiring medical evaluation;*
- ✓ *abuse or neglect resulting in serious injury or near death or risk for either of those.*

The examples that are specifically related to allegations concerning children in foster or trial adoptive home placement include:

- ✓ *allegations of a child three years of age or younger who has been physically disciplined by a foster parent;*
- ✓ *a child placed in a foster home exhibiting sexual behavior outside the normal range of development; and*
- ✓ *allegations that children are having sexual contact with other children in the foster home.*

The OKDHS policy protocol for addressing reports regarding foster and trial adoptive homes,[43] also outlines how OKDHS staff are to respond to referrals of abuse or neglect when a child is placed out of home care. The section indicates that the protocol for response to referrals of abuse or neglect in foster or trial adoptive homes is the same as conducting an investigation in the child's own home.  All referrals of abuse or neglect in foster homes are to be assigned a Priority I unless there is sufficient information to indicate that the safety of the child can be ensured without an immediate response.  In that instance the CW supervisor may assign the report as a Priority II with a time frame of no more than three working days to initiate the investigation. [44]

In the OKDHS Child Protective Service investigation protocol,[45] gathering information during the investigation is obtained through face to face contact between the CW worker and the person(s) who can provide information.  Interviews are to be conducted privately and separately whenever possible and family members are to be observed interacting together. A home visit is to made as part of the investigation and the initial contact with the family should be an unannounced visit to the home. The investigation protocol for conducting interviews is to be followed closely and sequentially as follows:

   ✓ *the alleged child victims;*

   ✓ *siblings;*

   ✓ *persons responsible for the child (PRFC);*

   ✓ *collaterals; and*

   ✓ *if appropriate professional consultants .*

When an investigation is completed, a finding is made.  Two of the findings that can be made include substantiated and unsubstantiated-services recommended.  Substantiated, which is also referred to in OKDHS policy as confirmed, means that the allegations have been found, based on credible evidence,  to constitute child abuse or neglect. Unsubstantiated -services recommended means that the allegations in the report are unfounded or there is insufficient information to fully determine whether child abuse or neglect has occurred and the child and family may benefit from prevention or intervention related services. [46]

## B. Review Criteria

The review of investigations was conducted according to the OKDHS policy protocol requirements for investigations described above and national sources regarding information collection and safety decision-making including CWLA and NRCCPS.

## XIV. Investigation Part I Review - Demographic Data

### A. Number of Investigations

The Part I review sample had 84 referrals of abuse or neglect that were assigned as investigations.  In one referral in the sample, Form CWS-KIDS-3 *Report to DA* was not included, however*,* the rest of the documentation that was provided contained sufficient information to conduct most of the review so it was included in the final review sample.

### B. Number of Children Per Referral

Of the 84 referrals that were assigned for investigation, 57 referrals involved only one child, 19 referrals involved 2 children, 5 referrals involved 3 children, 1 referral each involved 4, 5, or 6 children for a total of 125 children in the review sample. The chart below provides the detail on alleged child victims per report:

*Chart 21*



**C. Allegation Detail**

The allegation detail includes the allegations in the initial report of abuse or neglect by the overall allegation categories, the individual types of abuse, neglect and sexual abuse and the specifics about any injuries that were alleged.

*1) Allegation Categories*

The majority of referrals that were assigned for investigation had allegations of neglect at 56%, followed by allegations of abuse at 37% and sexual abuse at 7%. The total number of allegations was 108, so many referrals contained more than one allegation.  The following chart details the percentage of allegations by category:

*Chart 22*



*2) Abuse/Neglect Types*

Within the allegation categories of abuse, neglect or sexual abuse, there were 123 specific abuse or neglect types in the 84 referrals. There can be more than one abuse or neglect type concerning a child victim.  The most prevalent allegation was threat of harm at 19%, followed by failure to protect at 16%, and lack of supervision at 13%.  The allegation breakdown by type is found on the following page:

*Table 11*
## Abuse/Neglect Allegations by Type

| Abuse/Neglect Type | (N)=124 | Percentage (rounded) |
|---|---|---|
| Threat of Harm | 23 | 19% |
| Failure to Protect | 20 | 16% |
| Lack of Supervision | 16 | 13% |
| Beating/Hitting/Slapping | 11 | 9% |
| Inadequate Physical Care/Shelter/Clothing | 8 | 6% |
| Substance Abuse-Alcohol/Drug -Caretaker | 7 | 6% |
| Age Inappropriate Sexual Behavior/Lack of Supervision | 7 | 6% |
| Beating/Hitting-Instrument | 6 | 5% |
| Exposure to Domestic Violence | 5 | 4% |
| Failure to Obtain Medical Attention | 4 | 3% |
| Confinement | 2 | 1% |
| Failure to Protect | 2 | 1% |
| Failure to Provide Adequate Nutrition | 2 | 1% |
| Voyeurism/Exposure to Pornography | 2 | 1% |
| Biting | 1 | 1% |
| Burning/Scalding | 1 | 1% |
| Choking | 1 | 1% |
| Fondling | 1 | 1% |
| Injury from Spanking | 1 | 1% |
| Mental Injury | 1 | 1% |
| Near Death | 1 | 1% |
| Shaking | 1 | 1% |
| Thrown | 1 | 1% |
| Total | 124 | >100% |

*3) Injury Specifics*
Injuries were alleged in 26 of the referrals and 15 of those referrals would have required some type of evaluation by a medical professional.  The following chart details the percentage of the 84 referrals that had injuries alleged:

*Chart 23*



There were 15 of the 26 referrals that had an allegation concerning an injury that required medical attention.  It was documented in 12 of the referrals that medical attention had been obtained during or

prior to the investigation.  The percentage of the 15 referrals in which injuries were alleged and medical attention had been obtained in response to the injuries is shown in the chart below:

*Chart 24*



Of the 26 referrals that alleged injuries, bruises and welts were the most common injury followed by abrasions or cut/lacerations.  The following table lists the specific injuries which were alleged in the abuse/neglect referral:

*Table 12*
### Injury Characteristics

| Injury | (N)=26 | Percentage |
|---|---|---|
| Bruises/Welts | 18 | 69% |
| Abrasions/Lacerations/Cuts | 4 | 15% |
| Bites | 2 | 8% |
| Burns | 1 | 4% |
| Internal Injuries | 1 | 4% |
| Total | 26 | 100% |

## D.  Foster Parent-Child Abuse and Neglect Report History

To obtain the information concerning the number of foster homes that had a history of prior abuse/neglect reports, the number of prior referrals, both screened out and assigned referrals were tabulated by foster home. It was determined that the majority (60%) of the foster homes in the investigation review had prior referrals of abuse or neglect.  Of those foster homes that had prior history,  46 homes or 55% of the homes had referrals that were assigned and 4 homes or 5% had prior referrals that were screened out only. The remaining 34 homes (40%) had no prior referrals of abuse or neglect that were screened out or assigned.  See the chart below details the percentage of foster homes with  prior history of abuse/neglect referrals:

*Chart 25*



Of the 46 foster homes that had prior assigned referrals, 26 foster homes had 1 prior report and 20 had more than 1 report. The following bar graph details the number of prior assigned referrals concerning the 46 foster homes with prior assigned referrals:

*Bar Graph 6*



In those 46 homes that had prior assigned referrals, only 4 homes had a referral that had been substantiated. The remaining homes had previous referrals with findings of services recommended, services not needed or assessment conclusions with no finding. There was one home (which was the home with 6 prior referrals) that had an uncertain finding from 1998.

## XV. Investigation Part I Review - Evaluation Data

This section of the review evaluated activities that occurred once the report of abuse or neglect had been received by OKDHS.  The review was divided into two sections based on the stage of response to the report:  1) the initial intake screening activities, which include the documentation and decision-making concerning the disposition and assignment of the referral and 2) the investigative response to the referral after it was assigned.

### A. Initial Intake Screening Activities
The initial intake activities, as defined in this review, are:

- ✓ initial information collection;

- ✓ disposition decisions including assignment and priority;

- ✓ timeframes for disposition, approval and assignment;

- ✓ the supervisory approval of the initial intake screening  process; and

- ✓ overall screening process addressed child safety.

The evaluation of the initial intake screening activities was therefore based on whether the information gathered was sufficient, whether there appeared to be diligent efforts made to evaluate the safety risks during the decision-making processes, whether there was timely processing of the report, and whether there was documentation that a supervisor had approved the referral. The following categories within the initial intake screening activities were evaluated:

*1) Information Collection*
The review indicated that in all of the referrals there was sufficient information collected from the reporter concerning the allegations in the report.  There was also documentation that indicated diligent effort was made to gather sufficient information to make the disposition decision to assign the child abuse/neglect report as an investigation.

*2) Disposition Decisions*
The disposition decisions include the determination as to whether a referral of abuse or neglect will be assigned, whether it will be addressed as an investigation or assessment and the appropriate priority response. Based on the review of the 84 referrals that were assigned as investigations:

- Assignment as an investigation- All of the 84 referrals that were assigned as investigations were correctly assigned as an investigation.

- Priority decision-making-The majority of referrals (44) that were assigned as investigations, were given a Priority II response time.  The remaining 40 referrals that were assigned as investigations were given a Priority I response time.  The correct priority decision and diligent effort to make the decision was noted in 76 of the 84 referrals.  In the remaining 8 out of 84 referrals, based on the allegations, a Priority I response rather than the Priority II response would have the most appropriate response. It was not clear in those 8 referrals that there had been diligent effort to gather sufficient information to make the priority decision.

The charts below shows the percentage of priority assignments for the 84 referrals assigned as investigations:

*Chart 26*



The percentage of correct priority decisions is provided in the following chart:

*Chart 27*



*3) Timeliness of Acceptance and Approval*

According to OKDHS policy[47], referrals of abuse or neglect are to be accepted, approved and assigned the same day as the referral is received unless there is a need to gather additional information. The maximum time for assignment of a referral is no later than three calendar days. The evaluation of timeliness for acceptance and approval was based on whether the referral had a disposition date that was the same as the day the referral was received. The date was obtained from the CWS-KIDS-1 *Referral Information Report* block labeled Disposition Date. If the investigation initiation date was the same as the report date, this was also considered timely acceptance and approval since there was a same day response by OKDHS. According to the review criteria, 79% of the 84 referrals were accepted and approved within policy timeframes. The following details the percentage of referrals that had time acceptance and approval:

*Chart 28*



The majority of referrals were approved and accepted by the day after the referral was received.  Only one referral was well outside of what would be considered an acceptable time to make the decision to accept and approve the referral. The following bar graph details the number of days that were taken to approve and accept the referral:

*Bar Graph 7*



### 4) Timeliness of Assignment

Assignment timeframes were based on the initiation date of the report since the information that was provided did not include an exact date for assignment.  If the report was initiated by the same day as the disposition date and the disposition date was timely, it was considered a timely assignment.  According to the review, 65 referrals were assigned timely and 19 referrals were not assigned within policy timeframes.  The following chart shows the percentage of timely assignments:

*Chart 29*



### 5) Documentation of Supervisory Approval and the Screening Decision

The review in this section determined whether there was documentation of the reason for the screening decision and if there was supervisory approval of the screen out decision. In all of the 84 referrals, there was documentation of supervisory approval of the screening decision and the justification for the priority and assignment of the referral was documented in all but one of the referrals.

### 6) Screening Process Sufficient to Assure Safety

This section of the review evaluated the entire screening process including information collection, timeliness, priority assignment and decision-making to determine whether the screening process was sufficient to address any safety threats to the child(ren) named in the referrals. The criteria used for the findings in this section were the completeness of the information gathered concerning the report allegations, the timeliness of decision-making and the nature of the allegations and potential safety threats in the allegations. In the majority of the referrals (89%) the screening process was sufficient to address safety threats to the child. The following chart details percentage of those referrals that had sufficient screening process to address safety threats:

*Chart 30*



## B.  Response to Referral

The response to the referral refers to the activities of staff to respond to the referral including the initiation of the investigation and the collection of information during the investigation. According to the Child Welfare League of America (CWLA) the response to a report of abuse or neglect in a foster home

should have the same standards applied that are relevant to all reports of child maltreatment.[48] This is supported by OKDHS policy which also indicates that allegations of abuse or neglect in foster homes are to be addressed in the same manner as allegations in a child's own home.[49]

*1) Timeliness of Response*

According to OKDHS policy[50], the initiation of an investigation is based on the day and time of the attempt to make contact with the alleged child victim. Timeliness of response in this review was based on the day that the investigation was initiated. According to the day of the investigation initiation, all but one of the referrals with a Priority I response time [51] was initiated the same day or within 24 hours of the receipt of the referral. The majority of Priority II response times were the next day or within two days following the day the report was received. All Priority II referrals, except two, were responded to within Priority II policy timeframes. [52] The following bar graph shows the initiation timeframes by investigation:

*Bar Graph 8*



As indicated in the following chart, the majority of referrals assigned for investigation were responded to the same day as the report was received and the majority of all of the referrals were initiated by the second day following the receipt of the report:

*Chart 31*



*2) Investigation Protocol*

This part of the review was conducted based on CWLA standards for conducting investigation of report of maltreatment of children in foster care [53] and the OKDHS protocol for investigations[54]. The OKDHS protocol, which is to be followed closely and sequentially, includes interviews with the alleged victim, siblings, the persons responsible for the child (PRFC), collaterals and, if appropriate, professional consultants. Every attempt is to be made to first conduct interviews privately and separately, family members are to be observed interacting together and when additional info is needed, key people can be interviewed again. A home visit is to be part of the investigation and that contact should be an unannounced visit to the home.

The components of the investigation protocol that were reviewed include:

✓ *Was the initial contact with the alleged child victim face to face.*

✓ *Was a home visit made during the investigation.*

✓ *Were all children observed and attempts made to interview all children who were verbal.*

✓ *Was the alleged perpetrator interviewed.*

✓ *Were other adult members of the household interviewed.*

✓ *Were applicable collaterals interviewed and were additional collateral interviews needed.*

✓ *Were interviews held separately and privately*

In 81% or 68 of the cases, the initial contact was face to face with the child.  Those that were not made face to face were due to the initial failed attempts to make contact with the child victim.  A home visit was made as part of 94% of the investigations or in 79 of the investigations.  All applicable children were observed in 79 or 94% of the investigations. Interviews were held with all verbal children in the home in 81 or 96% of the investigations.  The alleged perpetrator was interviewed in all but2 of the investigations and in households where there was more than one adult member of the household, interviews were held with the other adults in these 48 investigations.  Appropriate collaterals were interviewed in 96% of the investigations.  Additional collaterals were needed in 14% or 12 of the investigations. Interviews were held privately and separately in 91% of the investigations. The following table on the following page details the components of the investigation protocol that were conducted including whether the component was applicable:

*Table 13*
## Investigation Protocol Components Conducted

| Protocol Components- Conducted by Assessment        (N =84) | Yes | % of Total | No | % of Total | N/A | % of Total | Unk | % of Total |
|---|---|---|---|---|---|---|---|---|
| Was the initial contact with the child face to face | 68 | 81% | 16 | 19% | 0 | 0% | 0 | 0% |
| Home visit made as part of investigation | 79 | 94% | 5 | 6% | 0 | 0% | 0 | 0% |
| All children observed | 79 | 94% | 5 | 6% | 0 | 0% | 0 | 0% |
| Interviews held with all verbal children | 81 | 96% | 3 | 4% | 0 | 0% | 0 | 0% |
| Alleged perpetrator interviewed | 82 | 97% | 2 | 3% | 0 | 0% | 0 | 0% |
| Other adults in household interviewed | 48 | 57% | 10 | 13% | 26 | 30% | 0 | 0% |
| Collaterals interviewed | 82 | 97% | 2 | 4% | 0 | 0% | 0 | 0% |
| Other collateral interviews needed | 12 | 14% | 72 | 86% | 0 | 0% | 0 | 0% |
| Interviews held separately and privately | 78 | 91% | 5 | 8% | 0 | 0% | 1* | 1% |

*The investigation did not include Form CWS-KIDS-3 *Report to DA* so this information could not be determined.

*3) Information Collection*
This part of the review evaluated whether the information collected during the investigation was thorough and complete and whether the information was required by policy [55] and good practice in information collection according to Children's Bureau National Resource Center guidance.[56] [57]Information collection criteria were based on the following components:

- ✓ *Extent of the maltreatment*

- ✓ *Nature of the maltreatment*

- ✓ *Child's functioning*

- ✓ *Parenting-general*

- ✓ *Parenting-discipline*

- ✓ *Adult functioning*

Information concerning the alleged child victim's functioning was collected in 83 out of 84 investigations.  In 81 out of the 84 investigations, information concerning the extent of maltreatment, the nature of the maltreatment and parenting in general was obtained.  There was documentation in 71 investigations out of 84 that the discipline practices of the foster parents were discussed.  Information concerning adult functioning was obtained in 75 out of 84 investigations. The table on the following page details the information collection by category and percentage:

*Table 14*
## Information Collected by Investigation

| Information Component Collected by Investigation (N=84) | Yes | % of Total | No | % of Total |
|---|---|---|---|---|
| Extent of the Maltreatment | 81 | 96% | 3 | 4% |
| Nature of the Maltreatment | 81 | 96% | 3 | 4% |
| Child's Functioning | 83 | 98% | 1 | 2% |
| Parenting-General | 81 | 96% | 3 | 4% |
| Parenting-Discipline | 71 | 85% | 13 | 15% |
| Adult Functioning | 75 | 89% | 9 | 11% |

*4) Decision Making and Identification of Safety Threats*
This part of the review evaluated whether the information collected during the investigation accurately identified safety threats and supported the decision-making that led to the outcome of the investigation. In 41 out of the 84 investigations that were reviewed, safety threats were determined to be present in the home.  In those investigations in which safety threats were present, 31 investigations (76%) properly identified the safety threats. Based on the information collection criteria and the decision-making that resulted from the information that was gathered, there were 75 investigations (89%) in which the information supported the decision-making regarding the findings and action taken on behalf of the child victim(s) in the home. The following chart details the safety threat identification and decision-making based on the information that was documented:

*Table 15*
## Identification of Safety Threats and Decision-Making

| Yes/No | Safety Threats Properly Identified  (N=41) | % of Total | Information Supported Decision-Making (N=84) | % of Total |
|---|---|---|---|---|
| Yes | 31 | 76% | 75 | 89% |
| No | 10 | 24% | 9 | 11% |
| Total | 41 | 100% | 84 | 100% |

*5) Action Taken in Response to Investigation*
In this part of the review, the outcome for the child(ren) and foster family was evaluated.  It was determined whether protective action was necessary during the investigation and if it was, was the appropriate action taken. In 26 of the 84 investigations protective action of some type was necessary. In all but one of the investigations, there was documentation that action whether, protective action or another type of action, had been taken.  The following chart details the percentage of investigations that required protective action of some type:

**Chart 32**



In 78 out of the 84 cases, the appropriate action, whether protective action or some other type of response, was taken in response to the information that was obtained during the investigation. The following chart details whether appropriate action was taken in the 84 investigations:

**Chart 33**



*6) Investigation Findings*
The findings of the 84 investigations were that 17 investigations were substantiated and 67 were not substantiated. The following bar graph details the findings per investigation:

*Bar Graph 9*



## Findings of Investigations

| | Unsub-Services Recommended | Services Not Needed | Substantiated | Ruled Out | Failure to Cooperate |
|---|---|---|---|---|---|
| Series1 | 36 | 23 | 17 | 6 | 2 |

*7) Types of Substantiated Abuse or Neglect*

The most frequently substantiated type of abuse or neglect was threat of harm (4 incidents) followed by beating/hitting slapping (3 incidents).  There can be more than one type of abuse or neglect that is substantiated in a single investigation so the types of abuse or neglect exceed the total number of substantiated investigations.  The following table details the specific abuse or neglect types that were substantiated:

*Table 16*
**Substantiated Abuse/Neglect by Type**

| Abuse/Neglect Type | N=(20) | Percentage |
|---|---|---|
| Threat of Harm | 4 | 20% |
| Beating/Hitting/Slapping | 3 | 15% |
| Lack of Supervision | 2 | 10% |
| Exposure to Domestic Violence | 2 | 10% |
| Failure to Protect | 2 | 10% |
| Substance Abuse Drug/Alcohol- PRFC | 2 | 10% |
| Failure to Obtain Medical Attention | 2 | 10% |
| Inadequate or Dangerous Shelter | 1 | 5% |
| Failure to Provide Adequate Nutrition | 1 | 5% |
| Confinement | 1 | 5% |
| Total | 20 | 100% |

## C. Outcomes of the Investigation

In this part of the review, the outcome was evaluated for the child(ren) for whom an investigation was completed.  For those 26 investigations in which it was noted that protective action was needed, the

most frequent action taken was to remove the child from the home.  The following chart details the types of protective action taken when safety threats were identified:

*Chart 34*



Even if the allegations were not substantiated subsequent to an investigation, there could be issues or safety threats that were identified.  For example, a foster parent might not have failed to provide supervision, but the circumstances of the incident indicated that the foster parent was having difficulty with the child and needed services.  The following chart details the types of action that were taken regardless of whether or not the allegations were substantiated.

*Chart 35*



## XVII. Investigation Part I Review -  Conclusions

### A. Report Demographics and Initial Intake Screening Activities

Generally, the referrals that were assigned as investigations included allegations that did not represent physical abuse to the alleged child victims.  Injuries were alleged in 26 out of the 84 investigations, and

of those only 15 required some type of evaluation by a medical professional.  While certainly the overall physical care and well-being of a child in care is very important, and those issues need to be addressed, the majority of the allegations did not indicate severe threats of danger.  Bruises and welts were the most common injury alleged.

The findings concerning the history of prior reports of abuse or neglect in foster homes was similar to other sections of the review.  Over 50% of the homes had a prior report of abuse or neglect, but only four homes had a referral that had been substantiated and most of those homes that had a prior report had only one prior report.

Information collection in the initial referral was excellent. All of the referrals had sufficient information collected from the reporter and there was documentation of diligent effort to make the decision to assign the referral as an investigation.  All of the referrals were correctly assigned as investigations.

Considering that OKDHS policy requires that investigations concerning abuse or neglect in foster care be assigned a Priority I response unless it is documented that the child's safety can be ensured[58], it was unexpected that the majority of investigations were assigned a Priority II response.  Since the majority of Priority II responses were the day following the receipt date of the report, it did not appear to be an unreasonable response time to referrals that had few allegations of injuries.  There were 8 Priority II referrals that were determined to have warranted a Priority I response.

The majority of referrals were accepted and approved within policy timeframes and if there was a delay, the decision was made by the next day in all but one referral.  There were 19 referrals  out of 84 that were not assigned the same day as the report was received.  Even though there were delays in assignment in those referrals, the majority of investigations (85%) were initiated within two days of the receipt of the referral.

The initial intake activities and screening process was sufficient to address safety threats to the child in 89% of the referrals.

## B. Response to Referral

Once the referral was received, the majority of referrals were initiated within the priority timeframes required by OKDHS policy[59].  Only 3 referrals out of 84 were not initiated as required by policy.

The investigation protocol was followed in the majority of the investigations.  Home visits, interviews with all verbal children, observations of all children, interviews with the alleged perpetrators and contact with applicable collaterals occurred in at least 94% all of the investigations.  Additional collaterals contacts were needed in only 14% of the cases.

Information collected during the investigation was also sufficient in the categories of extent of maltreatment, nature of maltreatment, child's functioning and general parenting with over 96% of the investigations indicating that this information had been obtained and documented.  Two categories, parenting-discipline and adult functioning had a slightly lower percentage of information collection (85%-89%), but the majority of the investigation did have information in those two categories.

The review concerning the identification of safety threats indicated that 41 out of the 84 investigations had safety threats present.  Of those 41 investigations with safety threats, there was proper

identification of safety threats in 76% of the investigations.   Further, there was appropriate action taken in 93% of the investigations.

## C. Outcomes

There were confirmations of abuse/neglect in 17 of the investigations.  The types of abuse/neglect that were most frequently substantiated were threat of harm and beating/hitting/slapping.  The action taken in response to the information collected during the investigation  included placement change (31%) and referred for further action such as services or a written plan of compliance (19%).  Children were able to safely remain in the foster home in 43% of the investigations.  Even if the allegations were not substantiated, action was taken in response to issues identified during the investigation.

## D. Overall Conclusions for Investigations

The overall conclusions for investigations are:

- The allegations in the majority of the investigations did not indicate present danger safety threats.
- The majority of foster homes had prior history of reports of abuse/neglect but only four homes had prior reports that had been substantiated.
- Good information collection and supervisory oversight of the intake screening process was present in all of the investigations.
- Intake screening activities were sufficient to address safety threats to children in 89% of the investigations.
- The majority of investigations were initiated within two days following the receipt of the report and only 3 investigations out of 84 were not initiated within timeframes required by policy.
- A significant majority of the investigations followed the investigation protocol and information collection standards required by policy and were in line with national standards for information collection.
- Appropriate action was taken concerning the information collected during the investigation in 93% of the investigations.
- The majority of children remained safely in the foster home or a placement change was made.

# XVIII. Investigation Part II Review - Demographic Data

## A. Number of Investigations

The substantiated investigation review sample had 102 referrals of abuse or neglect.  These 102 referrals encompass the referrals with substantiated abuse or neglect and referral dates in calendar years 2009 and 2010.

## B. Number of Children Per Referral

Of the 102 substantiated investigations, 47 referrals involved only one child, 32 referrals involved 2 children, 11 referrals involved 3 children, 6 referrals involved 4 children, 4 referrals involved 5 children, and 2 referrals involved  6 children for a total of 200 children in the substantiated investigation review sample. The criteria used to determine whether a child was considered a victim in the report was the listing of the child as an alleged child victim in Form CWS-KIDS-1 *Referral Information Report*. The chart below provides the detail on alleged child victims per report:

*Chart 36*



## C. Allegation Detail

The allegation detail includes the allegations in the initial report of abuse or neglect by the overall allegation categories, the individual types of abuse, neglect and sexual abuse and the specifics about any injuries that were alleged.

### 1) Allegation Categories

The majority of referrals that were assigned for investigation had allegations of neglect at 53%, followed by allegations of abuse at 36% and sexual abuse at 11%. The total number of allegations was 131, so many referrals contained more than one allegation.  The following chart details the percentage of allegations by category:                          *Chart 37*



### 2) Abuse/Neglect Types

Within the allegation categories of abuse, neglect or sexual abuse, there were 163 specific abuse or neglect types in the 102 referrals. There can be more than one abuse or neglect type concerning a child victim.  The most prevalent allegation was failure to protect at 16%, followed by threat of harm at 14% and beating/hitting/slapping at 11%.  The allegation breakdown by type is found in the table below:

*Table 17*
## Abuse/Neglect Allegation by Type

| Abuse/Neglect Type | (N)=163 | Percentage (rounded) |
|---|---|---|
| Failure to Protect | 23 | 14% |
| Threat of Harm | 23 | 14% |
| Beating/Hitting/Slapping | 18 | 11% |
| Lack of Supervision | 12 | 7% |
| Beating/Hitting-Instrument | 12 | 7% |
| Unexplained Injuries | 12 | 7% |
| Exposure to Domestic Violence | 7 | 4% |
| Inadequate Physical Care/Shelter | 7 | 4% |
| Age Inappropriate Sexual Behavior | 6 | 2% |
| Failure to Provide Adequate Nutrition | 4 | 2% |
| Sexual Behavior-Lack of Supervision | 4 | 2% |
| Injury from Spanking | 3 | 2% |
| Fondling | 3 | 2% |
| Mental Injury | 3 | 2% |
| Sexual Exploitation | 3 | 2% |
| Substance Abuse Caretaker | 3 | 2% |
| Pinching/Twisting/Gouging | 3 | 2% |
| Confinement | 2 | 1% |
| Choking | 2 | 1% |
| Burning/Severe Sunburn | 2 | 1% |
| Vaginal Penetration-Intercourse/Instrument | 2 | 1% |
| Failure to Obtain Medical Attention | 2 | 1% |
| Suicide Attempt | 1 | 1% |
| Anal Intercourse | 1 | 1% |
| Death | 1 | 1% |
| Failure to Obtain Psychiatric Attention | 1 | 1% |
| Kicking | 1 | 1% |
| Oral/Genital Contact | 1 | 1% |
| Suffocating | 1 | 1% |
| Total | 163 | >100% |

*3) Injury Specifics*

Injuries were alleged in 42 of the referrals and 39 of those referrals would have required some type of evaluation by a medical professional. The following chart details the percentage of the 102 referrals that had injuries alleged:

*Chart 38*



Of the 39 referrals that had an allegation concerning an injury that required medical attention, it was documented in 34 of the referrals that medical attention had been obtained during or prior to the investigation.  The percentage of the 39 referrals in which injuries were alleged and medical attention had been obtained in response to the injuries is shown in the chart below:

*Chart 39*



Of the 42 referrals that alleged injuries, bruises and welts were the most common injury followed by abrasions or cut/lacerations.  There can be more than one type of injury alleged so the total number is greater than 42. The following table lists the specific injuries which were alleged in the abuse/neglect referral:

*Table 18*
## Injury Characteristics

| Injury | (N)=46 | Percentage |
|---|---|---|
| Bruises/Welts | 35 | 76% |
| Abrasions/Lacerations/Cuts | 3 | 7% |
| Burns | 2 | 4% |
| Death | 1 | 2% |
| Broken Arm | 1 | 2% |
| Injury to Ears from Pulling | 1 | 2% |
| Black Eye | 1 | 2% |
| Injury from Spanking | 1 | 2% |
| Diaper Rash with Sores | 1 | 2% |
| Total | 46 | <100% |

**D.  Foster Parent -Child Abuse and Neglect Report History**

To obtain the information concerning the number of foster homes that had a history of prior abuse/neglect reports, the number of prior referrals, both screened out and assigned referrals were tabulated by foster home.  It was determined that 53 out of the 102 foster homes in the substantiated investigation review had prior referrals of abuse or neglect.  Of those foster homes that had prior history, 45 homes or 44% of the homes had referrals that were assigned and 8 homes or 8% had prior referrals that were screened out only. The remaining 49 homes (48%) had no prior referrals of abuse or neglect that were screened out or assigned.  The chart below details the percentage of foster homes with prior history of abuse/neglect referrals:

*Chart 40*



Of the 45 foster homes that had prior assigned referrals, 17 foster homes had one prior report and 28 had more than one report. The following bar graph details the number of referrals concerning the 45 foster homes with prior assigned referrals:

*Bar Graph 10*



In those 45 homes that had prior assigned referrals, 6 homes had a referral that had been substantiated. The remaining homes had previous referrals with findings of services recommended, services not needed, or in the much older referrals, the findings included the category uncertain.

## XIX. Investigation Part II Review - Evaluation Data

This section of the review evaluated activities that occurred once the report of abuse or neglect had been received by OKDHS.  The review was divided into two sections based on the stages of response to the report:  1) the priority decision and 2) the investigative response to the referral after it was assigned.

### A. Priority Decision

In this section of the review the priority decision was evaluated.  It was determined that the majority of referrals were given a Priority I (52%) response time.  The remaining referrals (48%) were given a Priority II response time.  The correct priority decision was noted in 89 of the 102 referrals.  In the remaining 13 out of the 102 referrals, based on the allegations, a Priority I response rather than the Priority II response would have the most appropriate response.

The chart below shows the percentage of priority assignments for the 102 referrals:

*Chart 41*



The percentage of correct priority decisions is provided in the chart below:

*Chart 42*



## B. Response to Referral

The response to the referral refers to the activities of staff to respond to the referral including the initiation of the investigation and the collection of information during the investigation.

### 1) Timeliness of Response

According to OKDHS Policy,[60] the initiation of an investigation is based on the day and time of the attempt to make contact with the alleged child victim. Timeliness of response was based on the day that the investigation was initiated.  According to the day of the investigation initiation, all but two Priority I referrals were initiated the same day as the report was received.  The majority of Priority II response times were the next day or within two days following the day the report was received.   In all but one of the Priority II referrals, the response time was within Priority II policy timeframes[61].  The following bar graph details the initiation timeframes by number of investigations:

*Bar Graph 11*



As indicated in the chart below, the majority of referrals assigned for investigation were responded to on the same day as the report was received and the majority of all of the referrals were initiated by the 2nd day following the receipt of the report:

*Chart 43*

## 2) Investigation Protocol

This part of the review was conducted based on CWLA standards for conducting investigations of reported maltreatment of children in foster care [62] and the OKDHS protocol for investigations [63] The OKDHS protocol, which is to be followed closely and sequentially, includes interviews with the alleged victim, siblings, the persons responsible for the child (PRFC), collaterals and, if appropriate, professional consultants. Every attempt is to be made to first conduct interviews privately and separately, family members are to be observed interacting together and when additional info is needed, key people can be interviewed again. A home visit is to be part of the investigation and that contact should be an unannounced visit to the home.

The components of the investigation protocol that were reviewed include:

- ✓ *Was the initial contact with the alleged child victim face to face.*

- ✓ *Was  a home visit made during the investigation.*

- ✓ *Were all children observed and attempts made to interview all children who were verbal.*

- ✓ *Was the alleged perpetrator interviewed.*

- ✓ *Were other adult members of the household interviewed.*

- ✓ *Were applicable collaterals interviewed and were additional collateral interviews needed.*

- ✓ *Were interviews held separately and privately*

In 92% or 94 of the cases, the initial contact was face to face with the child.  Those that were not made face to face were due to initial failed attempts to make contact with the child victim.  A home visit was made as part of 90% of the investigations or in 92 of the investigations.  All applicable children were observed in 97 or 95% of the investigations. Interviews were held with all verbal children in the home in 97 or 95% of the investigations.  The alleged perpetrator was interviewed in all but 7 of the investigations and in households where there was more than one adult member of the household, interviews were held with the other adults in these 36 investigations.  Appropriate collaterals were interviewed in 90% of the investigations.  Additional collaterals were needed in 27% or 28 of the investigations. Typically those additional interviews should have occurred with CW staff working with the child or foster family.  Interviews were held privately and separately in 84% of the investigations. The following table details the components of the investigation protocol that were conducted including whether the component was applicable:

*Table 19*
## Investigation Protocol  Components Conducted

| Protocol Components- Conducted by Assessment      (N =84) | Yes | % of Total | No | % of Total | N/A | % of Total | Unk | % of Total |
|---|---|---|---|---|---|---|---|---|
| Was the initial contact with the child face to face | 94 | 92% | 7 | 7% | 0 | 0% | 1* | 1% |
| Home visit made as part of investigation | 92 | 90% | 10 | 10% | 0 | 0% | 0 | 0% |
| All children observed | 97 | 95% | 5 | 5% | 0 | 0% | 0 | 0% |
| Interviews held with all verbal children | 97 | 95% | 5 | 5% | 0 | 0% | 0 | 0% |
| Alleged perpetrator interviewed | 95 | 93% | 7 | 7% | 0 | 0% | 0 | 0% |
| Other adults in household interviewed | 36 | 35% | 11 | 11% | 55 | 54% | 0 | 0% |
| Collaterals interviewed | 90 | 88% | 12 | 12% | 0 | 0% | 0 | 0% |
| Other collateral interviews needed | 28 | 27% | 74 | 73% | 0 | 0% | 0 | 0% |
| Interviews held separately and privately | 86 | 84% | 16 | 16% | 0 | 0% | 0 | 0% |

*The investigation did not include this information so could not be determined.

*3) Decision Making and Identification of Safety Threats*
This part of the review evaluated whether the information collected during the investigation accurately identified safety threats and supported the decision-making that led to the  outcome of the

investigation.  In all of the 102 investigations, safety threats were present.  In 93 of  investigations ( 91%) safety threats were properly identified. Based on the information collection criteria and the decision-making that resulted from the information that was gathered, there were 93 investigations (91%) in which the information supported the decision-making regarding the findings and action taken on behalf of the child victim(s) in the home. The following table details the safety threat identification and decision-making based on the information that was documented:

*Table 20*

### Identification of Safety Threats and Decision-Making

| Yes/No | Safety Threats Properly Identified  (N=41) | % of Total | Information Supported Decision-Making (N=84) | % of Total |
|--------|--------------------------------------------|------------|----------------------------------------------|------------|
| Yes    | 93                                         | 91%        | 93                                           | 91%        |
| No     | 9                                          | 9%         | 9                                            | 9%         |
| Total  | 102                                        | 100%       | 102                                          | 100%       |

*4) Action Taken in Response to Investigation*

 In this part of the review, the action taken for the child(ren) in response to the information collected during the investigation was evaluated.  It was determined whether protective action was necessary during the investigation and if so, was the appropriate action taken. In 86 of the 102 investigations, protective action of some type was necessary.  In 96 out of the 102 investigations, the appropriate action (protective action was not always needed) was taken in response to the information that was obtained.  The following chart details whether appropriate action was needed in the 102 investigations:

*Chart 44*



In 96 out of the 102 cases, the appropriate action, whether protective action or some other type of response,  was taken in response to the information that was obtained during the investigation.  The following chart details whether appropriate action was taken in the 102 investigations:

*Chart 45*



*5)Types of  Substantiated Abuse or Neglect-* The most frequently substantiated type of abuse or neglect was threat of harm consisting of 28 incidents followed by failure to protect consisting of 21 incidents. There can be more than one type of abuse or neglect that is substantiated in a single investigation so the types of abuse or neglect exceed the total number of substantiated investigations.  The following table details the specific abuse or neglect types that were substantiated:

*Table 21*
**Substantiated Abuse/Neglect by Type**

| Abuse/Neglect Type | N=(120) | Percentage Rounded |
|---|---|---|
| Threat of Harm | 28 | 23% |
| Failure to Protect | 21 | 17% |
| Beating/Hitting/Slapping | 21 | 17% |
| Beating/Hitting-Instrument | 13 | 11% |
| Sexual Abuse | 5 | 4% |
| Failure to Provide Medical or Psych Care | 4 | 3% |
| Sexual Behavior -Lack of Supervision | 4 | 3% |
| Pinching/Twisting | 4 | 3% |
| Exposure to Domestic Violence | 3 | 3% |
| Choking/Suffocating | 3 | 3% |
| Fondling | 3 | 3% |
| Inadequate or Dangerous Shelter | 2 | 2% |
| Failure to Provide Adequate Nutrition/Care | 2 | 2% |
| Mental Injury | 2 | 2% |
| Substance Abuse-Caretaker | 1 | 1% |
| Kicking | 1 | 1% |
| Failure to Thrive | 1 | 1% |
| Pulling Hair | 1 | 1% |
| Death | 1 | 1% |
| Total | 120 | >100% |

## C. Outcomes of the Investigation

In this part of the review, the outcome for the child(ren) for whom an investigation was completed was evaluated.  In those investigations in which protective action for needed for the child, the most frequent action taken was to make a placement (remove the child from the foster home).  This occurred in 80% of those investigations. For those children who did require protective action, the most frequent action taken (80%) was to make a placement change (remove the child from the home).  In other investigations, the child was already gone prior to the initiation of the investigation so the placement change had already been made.  In 7 investigations, the circumstances in the foster home were such that even though the allegations were substantiated, the care of the children had been generally been good so the foster home was referred to the Resource Family Specialist for further services or a written plan of compliance.  There was one child who died as the result of abuse by the foster parent.  The following chart details the types of action taken:

*Chart 48*



## XX. Investigation Part II Review - Conclusions

### A. Report Demographics and Initial Intake Screening Activities

The allegation category breakdown in the Part II review of the substantiated investigations for 2009-2010 had a similar breakdown in allegation categories to the Part I investigation review.  Neglect was the most prevalent allegation at 53% followed by abuse at 36% and sexual abuse at 11%.  There was also little difference between both investigation reviews as to the most prevalent abuse/neglect types.  Threat of harm, failure to protect, beating/hitting/slapping and lack of supervision were the most frequent types of abuse/neglect alleged in both review samples.  There were serious allegations in the Part II investigation review, including 5 substantiated reports of sexual abuse and one child death.  There were similar percentages between Part I and Part II in terms of investigations in which injuries were alleged, although the Part II sample had approximately10% higher allegation of injuries than were found in the investigations in Part I.

The findings concerning the history of prior reports of abuse or neglect in foster homes were similar to other sections of the review.  Just over 50% of the homes had a prior report of abuse or neglect. There were 2 more homes in the Part II sample for a total of 6 homes, that had a prior referral that had been

substantiated.  More homes in the Part II sample had more than one prior report with 28 homes having two or more prior reports.

Unlike Part I, the majority of referrals in the Part II review sample were given a Priority I response time, but the Priority II referrals represented 48 % of the referrals. There were 13 Priority II referrals that were determined to require a Priority I response.   As in Part I, the majority of Priority II referrals were initiated the day following the receipt date of the report.  It did not appear to be an unreasonable response time to referrals that did not indicate immediate safety threats.  It should also be noted that those investigations that had a longer than two day response time were due to scheduling for forensic interviews and all of the children in those investigations had already been removed from the foster home and did not have current safety threats.

## B. Response to Referral

Once the referral was received, the majority of referrals were initiated within the priority timeframes required by OKDHS policy[64].  Over 60% of the referrals were initiated the same day as the report was received and 90% were initiated within two days following the receipt of the report. Only one referral out of 102 was not initiated as required by policy.

The investigation protocol was followed in the majority of the investigations in the Part II sample.  Home visits, interviews with all verbal children, observations of all children, interviews with the alleged perpetrators and contact with applicable collaterals occurred in 90% or higher of all of the investigations.  Additional collaterals contacts were needed in 27% of the cases and the majority of those were collateral contacts that should have occurred with Child Welfare staff working with the child and foster family.

The review concerning the identification of safety threats indicated that all of the 102 investigations had safety threats present.  There was proper identification of safety threats in 91% of the investigations and appropriate action taken in 91% of the investigations.

## C. Outcomes

The types of abuse/neglect that were most frequently substantiated in the Part II review sample were threat of harm and failure to protect.  In 80% of the Part II investigations, the action taken in response to the findings of the investigation was to make a placement change for the child.  Further action, such as referral back to the child's permanency worker or the Resource Family Specialist for services or a written plan of compliance was recommended in only 7 of the investigations.  Only 10 homes had children who remained in the home following the substantiated investigation.

## D. Overall Conclusions for Part II Substantiated Investigations

The overall conclusions for investigations:

- The most frequent allegation category in the substantiated investigations was neglect and neglect was the most frequently substantiated type.
- The majority of foster homes had prior history of reports of abuse/neglect but only six homes had prior reports that had been substantiated.
- The majority of investigations were initiated within two days following the receipt of the report and only one investigations out of 102 was not initiated within timeframes required by policy.

- A significant majority of the investigations followed the investigation protocol and information collection standards required by policy and were in line with national standards for information collection.
- Appropriate action was taken concerning the information collected during the investigation in 94% of the investigations.
- The majority of children who remained in the foster home following the substantiated investigation had previously received good care in the foster home and the allegations were such that the children could remain safely in the home if follow-up services were provided to the foster parents.

## XXI. References

ACTION for Child Protection *CPS Safety Intervention Systems- Key Concepts.* Accessed at*:* http://www.actionchildprotection.org/safety_intervention/key_concepts.php

Child Welfare League of America (2003). ***Best Practice Standards for Child Maltreatment in Foster Care.*** Washington, DC: Author  Can be accessed  at: http://www.cwla.org/pubs/pubdetails.asp?PUBID=8951

Lund, T. and Renne, J. (2009).  *Child Safety: A Guide for Judges and Attorneys.* Washington DC: Center on Children and Law. Can be accessed at: http://nrccps.org/wp-content/uploads/2010/11/The_Guide.pdf

National Resource Center for Child Protective Services (2007). *Safety Intervention Policy Standards and Agency Self Assessment.* Washington DC: U.S. Department of Health and Human Services, Administration on Children and Families, Administration for Children, Youth, and Families, Children's Bureau, Office on Child Abuse and Neglect.  Can be accessed at: http://nrccps.org/wp-content/uploads/2010/11/Safety_Intervention_Policy_Standards_final_March2007.pdf

## XXII. Index of Charts, Tables and Graphs

## Charts

***Charts-Screened Out Review***

Chart 1- Number of Children Per Report

Chart 2- Allegation Categories

Chart 3- Injuries Alleged

Chart 4- Prior Reports of Abuse/Neglect in Foster Homes

Chart 6- Diligent Effort-Information and Screening

Chart 7-Screening Disposition with Policy Timeframes

Chart 8-Reports Correctly Screened Out

Chart 9- Correct Disposition for Incorrectly Screened Out Reports

Chart 10- Screening Decision Documented

Chart 11-Screening Process Sufficient to Address Safety Threats

Chart 12-Types of Documented Action

***Charts-Assessment Review***

Chart 13-Children Per Report

Chart 14-Allegation Categories

Chart 15- Injuries Alleged

Chart 16- Prior Reports of Abuse/Neglect in Foster Homes

Chart 17- Number of Prior Reports per Foster Home

Chart 18- Priority Assignment

Chart 19 - Correctly Assigned as Assessments

Chart 20-Outcome for Children

***Charts -Investigation Part I Review***

Chart 21- Children Per Report

C hart 22- Allegation Categories

Chart 23- Injuries Alleged

Chart 24-Medical Attention Obtained

Chart 25- Prior Referrals of Abuse/Neglect in Foster Homes

Chart 26-Priority Assignment

Chart 27-Correct Priority Decision Made

Chart 28-Accepted and Approved within Policy Timeframes

Chart 29 -Assigned with Policy Timeframes

Chart 30-Screening Process Sufficient to Address Safety Threats

Chart 31-Investigation Initiation

Chart 32- Protective Action Needed

Chart 33-Appropriate Action Taken

Chart 34-Types of Protective Action Taken

Chart 35-Types of Action Taken

***Charts - Investigation Part II Review***

Chart 37-Children per Review

Chart 38-Allegation Categories

Chart 39- Injuries Alleged

Chart 40-Medical Attention Obtained

Chart 41- Prior Referrals of Abuse/Neglect in Foster Homes

Chart 42- Priority Assignment

Chart 43- Correct Priority Decision Made

Chart 44- Investigation Initiation

Chart 45-Protective Action Needed

Chart 46-Appropriate Action Taken

Chart 47-Types of Action Taken

# Tables

### *Tables-Screened Out Review*

Table 1-Abuse/Neglect Allegations by Type

Table 2-Injury Characteristics

Table 3-Reasons for Screen Out

Table 4- Action Required and Documented

### *Tables-Assessment Review*

Table 5-Abuse/Neglect Allegations by Type

Table 6-Injury Characteristics

Table 7-Diligent Effort to Gather Information

Table 8- Assessment Protocol Components Conducted

Table 9- Information Collected by Assessment

Table 10- Identification of Safety Threats and Decision-Making

Table 11-Abuse/Neglect Allegations by Type

### *Tables -Investigation Part I Review*

Table 12- Injury Characteristics

Table 13- Investigation Protocol Components Conducted

Table 14-Information Collected by Investigation

Table 15- Identification of Safety Threats and Decision-Making

Table 16- Substantiated Abuse/Neglect by Type

### *Tables-Investigation Part II Review*

Table 17-Abuse/Neglect Allegation by Type

Table 18- Injury Characteristics

Table 19- Investigation Protocol Component Conducted

Table 20-Identification of Safety Threats and Decision-Making

Tab le 21-Substantiated Abuse/Neglect by Type

# Bar Graphs

### Bar Graphs-Screened Out Review

Bar Graph 1- Prior Assigned Reports per Foster Home

Bar Graph 2- Report Disposition Timeframes

Bar Graph 3- Screen Out Reasons for Incorrect Dispositions

### Bar Graphs-Assessment Review

Bar Graph 4- Number of Prior Reports per Foster Home

Bar Graph 5- Initiation Timeframes

### Bar Graphs - Investigation Part I Review

Bar Graph 6- Number of Prior Assigned Referrals per Foster Home

Bar Graph 7-Referral Approval and Acceptance Timeframes

Bar Graph 8- Initiation Timeframes

Bar Graph 9-Findings per Investigation

### Bar Graphs-Investigation Part II Review

Bar Graph 10- Number of Prior Assigned Referrals per Foster Home

Bar Graph 11- Initiation Timeframes

## XXIII. Additional Disclosures-Federal Rule 26

## Exhibits

I reserve the right to use as an exhibit at trial any of the charts, graphs, tables or diagrams contained in my report, as well as any item in my considered materials.

## Publications

I have produced documents that are currently posted on the National Resource Center for Child Protective Services website, accessed at http://nrccps.org/:

- Review of Child Fatality and Near Fatality Procedures and Reports (2011)

- Child Fatalities and Critical Incidents Successful Outcomes for CPS Agency Reviews (2009)

- State Liaison Officer and CJA Grantees Newsletters- 2009-2011.

## Previous Expert Testimony

During the previous four years I have testified as an expert at trial or by deposition in the following case:

For the defense in *A.B. vs. The State of Oklahoma, et al* - deposition given February 8, 2011.

## Compensation

As compensation for the work I have performed in this case, I have charged $75.00 per hour.  To the present time, I have been compensated a total of $ 16,484.50 and as of present, I have worked and not billed for $14,325.50.

## XXIV. Signature Page

Kathryn E. Simms, MSW

## XXV. Appendices

**Appendix A- Kathryn Simms Curriculum Vitae**

**Appendix B- Case Review Instrument Questions**

**Appendix C- List of Documents Reviewed**

**Appendix A Curriculum Vitae-Kathryn Simms**

## *Curriculum Vitae*

Kathryn Simms

224 Nature Lane

Edmond, Oklahoma 73034

405 650-0019

Kathy.Simms@att.net

## WORK EXPERIENCE

### *Consultant-Child Welfare-2007-Present*

#### *National Resource Center for Child Protective Services - 2006-Present*
Provide technical assistance nationally to State Child Welfare programs. Provide communication and coordination for the Federal State Liaison Officers and Children's Justice Act Children's Bureau programs. Conduct research on national and state programs related to child abuse and neglect and child fatalities, review policies, procedures and curricula for best practice recommendations and conduct case reviews to determine case practices.

#### *University of Oklahoma - 2009-Present*
Provide Clinical Case Management groups for Child Welfare Supervisors. Provide consultation on specific case scenarios according to the OKDHS Practice Model of service provision.

#### *JBS International -2010-2011*
Review individual unaccompanied child cases in the areas of family reunification and release recommendations for JBS' Unaccompanied Children's Project, U.S. Department of Health and Human Services, Office of Refugee Resettlement, Division of Unaccompanied Children's Services.

#### *Consultant Co-Local Site Leader and Reviewer Children's Bureau - 2007-2010*
Serve as a Child and Family Services reviewer and co-local site leader for the U.S. Department of Health and Human Services, Administration on Children and Families, Children's Bureau.

### *Consultant-Litigation-2010-Present*

#### *Expert Consultant/Witness-*
- For the defense in *D.G. vs. Henry (federal class action lawsuit)* August, 2010-Present
- For the defense in *A.B. vs. The State of Oklahoma, et al* - October, 2010-Present

#### *Expert Review and Consultation-*

For the lawyers for the defense in *D.M.W., a minor, et al. vs. Baptist Healthcare of Oklahoma, Inc*. May, 2010-Present

## *Partner-Q4Group-2009-Present*

Business consultation company that provides environmental assessments and training to improve business productivity and workforce development.

### *Law Firm Client-2010-Present-*
Fellers Snider Blankenship Bailey and Tippens, P.C.

## *Oklahoma Department of Human Services  1976 - 2007*

### *Programs Administrator Protection and Permanency Services Unit - 1999 - 2007*
Designed and provided oversight for program development, negotiated and monitored contracts, provided supervision for twenty staff, developed and administered key aspects of the Oklahoma Program Improvement Plan.  Had direct supervision and responsibility for the following program areas:
- Child Protective Services
- Family Centered Services
- Appeals
- Permanency Planning
- Independent Living
- Oklahoma Children's Services (statewide contract services)
- Child Welfare Training Program

### *Key Achievements:*
- Facilitated and implemented a statewide research project in Oklahoma Children's Services to determine if the SafeCare Model was more effective in addressing neglect.
- Developed and implemented the Appeals process for Oklahoma.
- Prepared an analysis and report for the Commission on Human Services and for statewide presentation on the impact of neglect in Oklahoma.
- Developed an expedited system for payments to youth in independent living programs.

### *Child Protective Services Programs Manager - 1990-1999*
Developed program, policy and procedure for Child Protective Services, which included abuse/neglect in out of home care, child fatality review and statistical reports. Supervised three staff.

### *Key Achievements:*
- Developed and implemented a statewide alternative response system.
- Developed and implemented the safety assessment process and voluntary service agreement.
- Implemented new findings categories and confirmation protocol.
- Extensive training experience.

*Children in Need of Treatment Programs Field Representative -  1989-1990*

Developed policy and program related to children with mental health needs.

Inpatient treatment review committee member.

*Key Achievements:*
- • Implemented new statutory requirements for children with mental health issues.
- • Developed tracking system for children in in-patient and residential care.

*Child Welfare Foster Care Programs Officer - 1983-1989*

Developed policy and procedure concerning foster home care and independent living for youth.

*Key Achievements:*
- • Developed safety protocols in out of home care.
- • Collaborated on the development and implementation of Nova Training for foster parents.
- • Developed program to implement original Federal Independent Living grant funds to state.
- • Developed curriculum and presented training on preventing disruption in out of home care.

*Child Protective Services Worker and Supervisor - 1978-1983*

Responsible for intake, investigation, assessment, and service provision to families as a worker and was a supervisor for a child protective services unit of six staff.

*Own Home Services Worker - 1976-1978*

Provided services to families receiving Aid to Families with Dependent Children.

## EDUCATION

*University of Oklahoma*

Master of Social Work - May, 1980

*University of Oklahoma*

Bachelor of Social Work- May, 1976

## RELEVANT EXPERIENCE

- • Adjunct Professor, University of Oklahoma School of Social Work- 2004-2006
- • Member of the Child Abuse and Neglect Intervention Research Network – San Diego State University - 2003-2007
- • Media Representative for OKDHS Child Welfare for national and local television, radio and print media - 1990-2007

- Federal State Liaison Officer - 1990-2007
- Calm Waters Volunteer Group Facilitator for children experiencing divorce and grief from death - 1999-2005
- Chair of the State Interagency Task Force on Child Abuse Prevention - 2000-2001
- State Child Fatality Review Committee charter member - 1993-2003

## PROFESSIONAL MEMBERSHIPS

- National Association of Social Workers
- American Professional Society on the Abuse of Children

**Appendix B Review Instruments**

**Screen-out Instrument 21SV0032**

Section I - Report Demographics

    1. Family Name:

    2. Bates #/Comments:

    3. Alleged Child Victim Name(s):

        Child 1
        Child 2
        Child 3
        Child 4
        Child 5
        Child 6
        Child 7

4. Bates #/Comments:
5. Referral Number:

    6. Bates #/Comments:

    7. Case Number:

    8. Bates #/Comments:

    9. Referral Synopsis:

    10. Bates #/Comments:

    11. Alleged Abuse/Neglect Category

        Check all that apply

            Abuse
            Neglect
            Sexual Abuse

12. Bates #/Comments:
13. Alleged Abuse/Neglect Type

        Check all that apply

            Abandonment
            Age Inappropriate Sexual Behavior
            Alcohol Abuse - Caretaker
            Anal Penetration through Instrumentation
            Anal Penetration through Intercourse

Beating/Hitting/Slapping
Beating/Hitting-Instrument
Bestiality
Biting
Burning/Scalding
Choking
Confinement
Cutting
Death
Digital Anal Penetration
Digital Vaginal Penetration
Drug Abuse - Caretaker
Educational
Exhibitionism
Exposure to Adult Sexuality
Exposure to Domestic Violence
Failure to Obtain Medical Attention
Failure to Obtain Psychiatric Attention
Failure to Protect
Failure to Provide Adequate Nutrition
Failure to Thrive
Fondling
Hitting
Hitting with Instrument
Inadequate Clothing
Inadequate or Dangerous Shelter
Inadequate Physical Care
Injury from Spanking
Kicking
Lack of Supervision
Mental Injury
Munchausen Syndrome by Proxy
Near Death
Oral/Genital Contact
Pedal(foot) Anal Penetration
Pedal(foot) Vaginal Penetration
Pinching/Twisting/Gouging
Poisoning
Pornography - Exposure
Pornography - Participation
Ritual Abuse
Scalding
Sexual Behavior - Lack of Supervision
Sexual Exploitation
Shaking
Slapping
Substance Abuse - Caretaker
Substance Abuse/Alcohol-Caretaker(PRFC)

Substance Abuse/Drug/Other-Crtkr (PRFC)
Suffocating
Threat of Harm
Thrown
Vaginal Penetration through Instrument
Vaginal Penetration through Intercourse
Voyeurism
Other, please specify

14. Bates #/Comments:

15. Screen-out Reason:

Alleged Perpetrator is not a PRFC
Cannot Locate Family - location unknown
Child 18 or Over
Duplicate Report
I&R
Insufficient Info to Identify Family
Not Child Abuse/Neglect
Other Services
Policy Violation
Referred to Client Advocacy
Referred to Tribe -NO OKDHS Jurisdiction
Other, please specify

16. Bates #/Comments:

17. Injuries Alleged:

Yes

No

18. Bates #/Comments:

19. What type of injury:

Check all that apply.

Abrasions/Lacerations
Asphyxiation
Bite Marks
Brain Damage
Bruises/Welts
Burns/Scalding
Cause of Death Unknown
Cause of Near Death Unknown
Child Born Drug Exposed
Cuts/Punctures
Death
Dismemberment

Drowning
Electrocution
Environmental Drug Exposure
Failure to Thrive
Fetal Alcohol Syndrome
Fractures-Not Skull
Gun Shot Wound(s)
Head Trauma
Hyperthermia/Hypothermia
Internal Injuries
Malnutrition
Medical Condition Untreated
Mental Trauma
Methamphetamine Exposure
Near Death
Near Drowning
None Apparent
Poisoning
Rectal Injury/Irregularities
Retinal Hemorrhage
Sexually Transmitted Diseases
Shaken Baby Syndrome
Skull Fracture
Smoke Inhalation
Sprains/Dislocations
Stab/Knife Wound(s)
Strangulation/Ligature Marks
Subdural Hematoma
Substance Abuse
Suicide
Vaginal Injury/Irregularities
Other, please specify

20. Bates #/Comments:
21. Was medical attention necessary?

Yes

No

22. Bates #/Comments:

23.  Was medical attention obtained?

Yes

No

24. Bates #/Comments:

Section II - Report Timeframes and Priority

25. Date Report Received:

    mm/dd/yyyy

26. Bates #/Comments:

27. Time Report Received:

28. Bates #/Comments:

29. A.M. or P.M.

    A.M.

    P.M.

30. Bates #/Comments:

31. Disposition Date:

    mm/dd/yyyy

32. Bates #/Comments:

33. Disposition/Priority Response

    Screened-out

    Priority 1

    Priority 2

34. Bates #/Comments:

SECTION III - Abuse/Neglect History

35. Did the Resource Family have previous reports of abuse/neglect?

    Yes

    No

36. Bates #/Comments:

37. List dates of previous reports (including screen-outs) and findings:

38. Bates #/Comments:

Section IV - Screening and Assignment

39. Did the report contain the needed information per policy?

    (340:75-3-6, 340:75-3-6.1 & 340:75-3-7.1)

        Yes

No

40. Bates #/Comments:

41. Was diligent effort made to gather sufficient information to make the screening decision?

*Diligent is defined as gathering available information about the reporter, the source of the information, the identity and location of the child and PRFC (foster parent), the nature and seriousness of the alleged abuse and neglect with follow-up questions to clarify any information that may be unclear.*

Yes

No

42. Bates #/Comments:

43. Was the disposition of the report made within policy timeframes?

(340:74-3-6)

Yes

No

44. Bates #/Comments:

45. Was the disposition of the report correct?*

(340:75-3-7.3 ITS (4) and (5))
Yes
No
46. Bates #/Comments:
47. What should it have been assigned as?

(340:75-3-7.3 ITS (4) and (5))

Screen-out
Assessment
Investigation
Policy compliance issue
Other, please specify
48. Bates #/Comments:
49. Was the screening process sufficient to assure safety of the child?

Yes

No

50. Bates #/Comments:

51. Was there action that should have been taken concerning the information in the report?

Yes

No

52. Bates #/Comments:

53. What action was expected?

54. Bates #/Comments:

55. Was this action taken?

Yes

No

56. Bates #/Comments:

57. Was the screening decision documented?

Yes

No

58. Bates #/Comments:

59. Was the screening decision approved by a supervisor?

Yes

No

60. Bates #/Comments:

Section V - Safety Decision-Making & Prot Action

61. Was the foster family given a written plan of compliance?

Yes

No

N/A

62. Bates #/Comments:

Section VI - Action Taken & Outcome for Child

63. Describe the action taken and outcome for the child:

64. Bates #/Comments:

65. Reviewer Name:

First Name

Last Name

66. Date Review Completed:

mm/dd/yyyy

**Assessment Instrument 21SV0036**

Section I - Report Demographics

    1. Family Name:

    2. Bates #/Comments:

    3. Alleged Child Victim Name(s):

          Child 1

          Child 1 ID#

          Child 2

          Child 2 ID#

          Child 3

          Child 3 ID#

          Child 4

          Child 4 ID#

          Child 5

          Child 5 ID#

          Child 6

          Child 6 ID#

          Child 7

          Child 7 ID#

    4. Bates #/Comments:

    5. Referral Number:

    6. Bates #/Comments:

    7. Case Number:

    8. Bates #/Comments:

    9. Referral Synopsis:

    10. Bates #/Comments:

    11. Alleged Abuse/Neglect Category

        Check all that apply

          Abuse

          Neglect

          Sexual Abuse

    12. Bates #/Comments:

    13. Alleged Abuse/Neglect Type

        Check all that apply

          Abandonment

          Age Inappropriate Sexual Behavior

          Alcohol Abuse - Caretaker

          Anal Penetration through Instrumentation

          Anal Penetration through Intercourse

          Beating/Hitting/Slapping

          Beating/Hitting-Instrument

          Bestiality

          Biting

          Burning/Scalding

          Choking

          Confinement

          Cutting

Death
Digital Anal Penetration
Digital Vaginal Penetration
Drug Abuse - Caretaker
Educational
Exhibitionism
Exposure to Adult Sexuality
Exposure to Domestic Violence
Failure to Obtain Medical Attention
Failure to Obtain Psychiatric Attention
Failure to Protect
Failure to Provide Adequate Nutrition
Failure to Thrive
Fondling
Hitting
Hitting with Instrument
Inadequate Clothing
Inadequate or Dangerous Shelter
Inadequate Physical Care
Injury from Spanking
Kicking
Lack of Supervision
Mental Injury
Munchausen Syndrome by Proxy
Near Death
Oral/Genital Contact
Pedal(foot) Anal Penetration
Pedal(foot) Vaginal Penetration
Pinching/Twisting/Gouging
Poisoning
Pornography - Exposure
Pornography - Participation
Ritual Abuse
Scalding
Sexual Behavior - Lack of Supervision
Sexual Exploitation
Shaking
Slapping
Substance Abuse - Caretaker
Substance Abuse/Alcohol-Caretaker(PRFC)
Substance Abuse/Drug/Other-Crtkr (PRFC)
Suffocating
Threat of Harm
Thrown
Vaginal Penetration through Instrument
Vaginal Penetration through Intercourse
Voyeurism
Other, please specify

14. Bates #/Comments:

15. Injuries Alleged:

       Yes

       No

16. Bates #/Comments:

17. What type of injury:

       Check all that apply.

              Abrasions/Lacerations
              Asphyxiation
              Bite Marks
              Brain Damage
              Bruises/Welts
              Burns/Scalding
              Cause of Death Unknown
              Cause of Near Death Unknown
              Child Born Drug Exposed
              Cuts/Punctures
              Death
              Dismemberment
              Drowning
              Electrocution
              Environmental Drug Exposure
              Failure to Thrive
              Fetal Alcohol Syndrome
              Fractures-Not Skull
              Gun Shot Wound(s)
              Head Trauma
              Hyperthermia/Hypothermia
              Internal Injuries
              Malnutrition
              Medical Condition Untreated
              Mental Trauma
              Methamphetamine Exposure
              Near Death
              Near Drowning
              None Apparent
              Poisoning
              Rectal Injury/Irregularities
              Retinal Hemorrhage
              Sexually Transmitted Diseases
              Shaken Baby Syndrome
              Skull Fracture

Smoke Inhalation

Sprains/Dislocations

Stab/Knife Wound(s)

Strangulation/Ligature Marks

Subdural Hematoma

Substance Abuse

Suicide

Vaginal Injury/Irregularities

Other, please specify

18. Bates #/Comments:

19. Was medical attention necessary?

Yes

No

20. Bates #/Comments:

21. Was medical attention obtained?

Yes

No

22. Bates #/Comments:

Section II - Report Timeframes and Priority

23. Date Report Received:

mm/dd/yyyy

24. Bates #/Comments:

25. Time Report Received:

26. Bates #/Comments:

27. A.M. or P.M.

A.M.

P.M.

28. Bates #/Comments:

29. Disposition Date:

mm/dd/yyyy

30. Bates #/Comments:

31. Disposition/Priority Response

Screened-out

Priority 1

Priority 2

32. Bates #/Comments:

33. Date of Assessment Initiation:

mm/dd/yyyy

34. Bates #/Comments:

35. Time of Assessment Initiation:

36. Bates #/Comments:

37. A.M. or P.M.

A.M.

P.M.

38. Bates #/Comments:

39.  Date of Initial Contact with Family:

mm/dd/yyyy

40. Bates #/Comments:

41. Time of Initial Contact with the Family:

42. Bates #/Comments:

43. A.M. or P.M.

A.M.

P.M.

44. Bates #/Comments:

SECTION III - Abuse/Neglect History

45. Did the Resource Family have previous reports of abuse/neglect?

Yes

No

46. Bates #/Comments:

47. List dates of previous reports (including screen-outs) and findings:

48. Bates #/Comments:

Section IV - Screening and Assignment

49.  Did the report contain the needed information per policy?

(340:75-3-6, 340:75-3-6.1 & 340:75-3-7.1)

Yes

No

50. Bates #/Comments:

51. Was diligent effort made to gather sufficient information to make the screening decision?

*Diligent is defined as gathering available information about the reporter, the source of the information, the identity and location of the child and PRFC (foster parent), the nature and seriousness of the alleged abuse and neglect with follow-up questions to clarify any information that may be unclear.*

Yes

No

52. Bates #/Comments:

53. Was diligent effort made to gather sufficient information to make the priority decision?

*Diligent is defined as gathering information about the details of the alleged abuse or neglect, injuries, particularly concerning the risk factors defined (340:75-3-2 ITS (7) & 340:75-3-7.1).*

Yes

No

54. Bates #/Comments:

55. Was the correct priority assigned to the report per policy?

(340:75-3-8.1, ITS 2.(4) & 340:75-3-7.1)

Yes

No

56. Bates #/Comments:

57. Was the report accepted and approved within policy timeframes?

(340:74-3-6)

Yes

No

58. Bates #/Comments:

59. Was the report assigned within policy timeframes?

(340:74-3-6)

Yes

No
60. Bates #/Comments:
61. Was the disposition of the report correct?*
      (340:75-3-7.3 ITS (4) and (5))
          Yes
          No
62. Bates #/Comments:
Section IV - Screening and Assignment
63. What should it have been assigned as?

      (340:75-3-7.3 ITS (4) and (5))
          Screen-out
          Assessment
          Investigation
          Policy compliance issue
          Other, please specify
64. Bates #/Comments:

65. Was the screening process sufficient to assure safety of the child?
      Yes
      No
66. Bates #/Comments:
67. Was the screening decision documented?
      Yes
      No
68. Bates #/Comments:
69. Was the screening decision approved by a supervisor?
      Yes
      No
70. Bates #/Comments:
Section V - Assessment and/or Investigation

71. Was the initial contact with the family in the home?
      Yes
      No
72. Bates #/Comments:
73. Were all children observed?
      Yes
      No
74. Bates #/Comments:
75. Were interviews conducted with all children who were verbal?
      Yes
      No
76. Bates #/Comments:
77. Was the assessment conducted at the initial contact with the family?
      Yes
      No
78. Bates #/Comments:

79. Was it necessary to schedule another time to conduct the assessment?

     Yes

     No

80. Bates #/Comments:

81. Were all persons responsible for the children interviewed?

     Yes

     No

82. Bates #/Comments:

83. Was it necessary to obtain supportive information?

     Yes

     No

84. Bates #/Comments:

85. Was a family meeting held at the conclusion of the assessment?

     Yes

     No

86. Bates #/Comments:

Section VI - Efforts to Gather Sufficient Info

87. General demographic information about the family?

     Yes

     No

88. Bates #/Comments:

89. Family social history?

     Yes

     No

90. Bates #/Comments:

91. Family's perception of any problems in the home?

     Yes

     No

92. Bates #/Comments:

93. Specifics about the incidents that lead to the referral of abuse or neglect:

     Yes

     No

94. Bates #/Comments:

95. Child Functioning?

     Yes

     No

96. Bates #/Comments:

97. Parenting-General?

     Yes

     No

98. Bates #/Comments:

99. Parenting-Discipline?

     Yes

     No

100. Bates #/Comments:

101. Adult Functioning?

       Yes

       No

102. Bates #/Comments:

103. Did information gathered support decision-making?

       Yes

       No

104. Bates #/Comments:

Section VII - Safety Decision-Making & Prot Action

105. Should the assessment have been changed to an investigation?

       Yes

       No

106. Bates #/Comments:

107. Were any safety threats accurately identified?

       Yes

       No

       N/A

108. Bates #/Comments:

109. Were appropriate services offered to the family to address safety threats?

       Yes

       No

       N/A

110. Bates #/Comments:

111. Was the foster family given a written plan of compliance?

       Yes

       No

       N/A

112. Bates #/Comments:

113. What were the conclusions of the assessment?

114. Bates #/Comments:

Section VIII - Action Taken & Outcome for Child

115. Describe the action taken and outcome for the child:

116. Bates #/Comments:

117. Reviewer Name:

       First Name

       Last Name

118. Date Review Completed:

       mm/dd/yyyy

**Investigation Part I Instrument 21SV0035**

Section I - Report Demographics

    1. Family Name:
    2. Bates #/Comments:
    3. Alleged Child Victim Name(s):
           Child 1
           Child 1 ID#
           Child 2
           Child 2 ID#
           Child 3
           Child 3 ID#
           Child 4
           Child 4 ID#
           Child 5
           Child 5 ID#
           Child 6
           Child 6 ID#
           Child 7
           Child 7 ID#
    4. Bates #/Comments:
    5. Referral Number:
    6. Bates #/Comments:
    7. Case Number:
    8. Bates #/Comments:
    9. Referral Synopsis:
    10. Bates #/Comments:
    11. Alleged Abuse/Neglect Category
        Check all that apply
           Abuse
           Neglect
           Sexual Abuse
    12. Bates #/Comments:
    13. Alleged Abuse/Neglect Type
        Check all that apply
           Abandonment
           Age Inappropriate Sexual Behavior
           Alcohol Abuse - Caretaker
           Anal Penetration through Instrumentation
           Anal Penetration through Intercourse
           Beating/Hitting/Slapping
           Beating/Hitting-Instrument
           Bestiality
           Biting
           Burning/Scalding

Choking
Confinement
Cutting
Death
Digital Anal Penetration
Digital Vaginal Penetration
Drug Abuse - Caretaker
Educational
Exhibitionism
Exposure to Adult Sexuality
Exposure to Domestic Violence
Failure to Obtain Medical Attention
Failure to Obtain Psychiatric Attention
Failure to Protect
Failure to Provide Adequate Nutrition
Failure to Thrive
Fondling
Hitting
Hitting with Instrument
Inadequate Clothing
Inadequate or Dangerous Shelter
Inadequate Physical Care
Injury from Spanking
Kicking
Lack of Supervision
Mental Injury
Munchausen Syndrome by Proxy
Near Death
Oral/Genital Contact
Pedal(foot) Anal Penetration
Pedal(foot) Vaginal Penetration
Pinching/Twisting/Gouging
Poisoning
Pornography - Exposure
Pornography - Participation
Ritual Abuse
Scalding
Sexual Behavior - Lack of Supervision
Sexual Exploitation
Shaking
Slapping
Substance Abuse - Caretaker
Substance Abuse/Alcohol-Caretaker(PRFC)
Substance Abuse/Drug/Other-Crtkr (PRFC)
Suffocating
Threat of Harm
Thrown
Vaginal Penetration through Instrument

Vaginal Penetration through Intercourse

Voyeurism

Other, please specify

14. Bates #/Comments:

15. Injuries Alleged:

Yes

No

16. Bates #/Comments:

17. What type of injury:

Check all that apply.

Abrasions/Lacerations

Asphyxiation

Bite Marks

Brain Damage

Bruises/Welts

Burns/Scalding

Cause of Death Unknown

Cause of Near Death Unknown

Child Born Drug Exposed

Cuts/Punctures

Death

Dismemberment

Drowning

Electrocution

Environmental Drug Exposure

Failure to Thrive

Fetal Alcohol Syndrome

Fractures-Not Skull

Gun Shot Wound(s)

Head Trauma

Hyperthermia/Hypothermia

Internal Injuries

Malnutrition

Medical Condition Untreated

Mental Trauma

Methamphetamine Exposure

Near Death

Near Drowning

None Apparent

Poisoning

Rectal Injury/Irregularities

Retinal Hemorrhage

Sexually Transmitted Diseases

Shaken Baby Syndrome

Skull Fracture

Smoke Inhalation

Sprains/Dislocations

Stab/Knife Wound(s)

Strangulation/Ligature Marks
Subdural Hematoma
Substance Abuse
Suicide
Vaginal Injury/Irregularities
Other, please specify

18. Bates #/Comments:

19. Was medical attention necessary?
Yes
No

20. Bates #/Comments:

21. Was medical attention obtained?
Yes
No

22. Bates #/Comments:

Section II - Report Timeframes and Priority

23. Date Report Received:
mm/dd/yyyy

24. Bates #/Comments:

25. Time Report Received:

26. Bates #/Comments:

27. A.M. or P.M.
A.M.
P.M.

28. Bates #/Comments:

29. Disposition Date:
mm/dd/yyyy

30. Bates #/Comments:

31. Disposition/Priority Response
Screened-out
Priority 1
Priority 2

32. Bates #/Comments:

33. Date of Investigation Initiation:
mm/dd/yyyy

34. Bates #/Comments:

35. Time of Investigation Initiation:

36. Bates #/Comments:

37. A.M. or P.M.
A.M.
P.M.

38. Bates #/Comments:

39. Date(s) Child Victim Interviewed/Observed:
Date 1
Date 2
Date 3
Date 4

Date 5

40. Bates #/Comments:

41. Time(s) Child Victim Interviewed/Observed:

Also include A.M. or P.M. on the line

Time 1

Time 2

Time 3

Time 4

Time 5

42. Bates #/Comments:

SECTION III – Abuse/Neglect History

43. Did the Resource Family have previous reports of abuse/neglect?

Yes

No

44. Bates #/Comments:

45. List dates of previous reports (including screen-outs) and findings:

46. Bates #/Comments:

Section IV - Screening and Assignment

47. Did the report contain the needed information per policy?

(340:75-3-6, 340:75-3-6.1 & 340:75-3-7.1)

Yes

No

48. Bates #/Comments:

49. Was diligent effort made to gather sufficient information to make the screening decision?

*Diligent is defined as gathering available information about the reporter, the source of the information, the identity and location of the child and PRFC (foster parent), the nature and seriousness of the alleged abuse and neglect with follow-up questions to clarify any information that may be unclear.*

Yes

No

50. Bates #/Comments:

51. Was diligent effort made to gather sufficient information to make the priority decision?

*Diligent is defined as gathering information about the details of the alleged abuse or neglect, injuries, particularly concerning the risk factors defined (340:75-3-2 ITS (7) & 340:75-3-7.1).*

Yes

No

52. Bates #/Comments:

53. Was the correct priority assigned to the report per policy?

(340:75-3-8.1, ITS 2.(4) & 340:75-3-7.1)

Yes

No

54. Bates #/Comments:

55. Was the report accepted and approved within policy timeframes?

(340:74-3-6)

Yes

No

56. Bates #/Comments:

57.  Was the report assigned within policy timeframes?

(340:74-3-6)

       Yes

       No

58. Bates #/Comments:

59. Was the disposition of the report correct?*

     (340:75-3-7.3 ITS (4) and (5))

       Yes

       No

60. Bates #/Comments:

61. What should it have been assigned as?

     (340:75-3-7.3 ITS (4) and (5))

       Screen-out

       Assessment

       Investigation

       Policy compliance issue

       Other, please specify

62. Bates #/Comments:

63. Was the screening process sufficient to assure safety of the child?

     Yes

     No

64. Bates #/Comments:

65. Was the screening decision documented?

     Yes

     No

66. Bates #/Comments:

67. Was the screening decision approved by a supervisor?

     Yes

     No

68. Bates #/Comments:

69. Was the initial contact with the child victim face to face?

     Yes

     No

70. Bates #/Comments:

71. Was a home visit made during the investigation?

     Yes

     No

72. Bates #/Comments:

73. Were all children observed?

     Yes

     No

74. Bates #/Comments:

75. Were interviews conducted with all children who were verbal?

     Yes

     No

76. Bates #/Comments:

77. Was the alleged perpetrator interviewed?

     Yes

No
78. Bates #/Comments:
79. Were other adult members of the household interviewed?
        Yes
        No
80. Bates #/Comments:
81. Were applicable collaterals interviewed?
        Yes
        No
82. Bates #/Comments:

Section V - Assessment and/or Investigation
83. Were additional collateral interviews needed but not held?
        Yes
        No
84. Bates #/Comments:
85. Were interviews held separately and privately?
        Yes
        No
86. Bates #/Comments:

Section VI - Efforts to Gather Sufficient Info
87. Extent of maltreatment?
        Yes
        No
88. Bates #/Comments:

89. Nature of maltreatment?
        Yes
        No
90. Bates #/Comments:
91. Child Functioning?
        Yes
        No
92. Bates #/Comments:
93. Parenting-General?
        Yes
        No
94. Bates #/Comments:
95. Parenting-Discipline?
        Yes
        No
96. Bates #/Comments:
97. Adult Functioning?
        Yes
        No
98. Bates #/Comments:
99. Did information gathered support decision-making?
        Yes
        No

100. Bates #/Comments:
Section VII - Safety Decision-Making & Prot Action

101. Were any safety threats accurately identified?
　　　Yes
　　　No
　　　N/A
102. Bates #/Comments:
103. Was it necessary to take protective action?
　　　Yes
　　　No

104. Bates #/Comments:
105. Was appropriate action taken?
　　　Yes
　　　No
106. Bates #/Comments:
107. Was maltreatment confirmed/substantiated?
　　　Yes
　　　No
108. Bates #/Comments:
109. What type of maltreatment was confirmed/substantiated:
　　　Check all that apply.
　　　　　Abandonment
　　　　　Age Inappropriate Sexual Behavior
　　　　　Alcohol Abuse - Caretaker
　　　　　Anal Penetration through Instrumentation
　　　　　Anal Penetration through Intercourse
　　　　　Beating/Hitting/Slapping
　　　　　Beating/Hitting-Instrument
　　　　　Bestiality
　　　　　Burning/Scalding
　　　　　Confinement
　　　　　Cutting
　　　　　Digital Anal Penetration
　　　　　Digital Vaginal Penetration
　　　　　Drug Abuse - Caretaker
　　　　　Educational
　　　　　Exhibitionism
　　　　　Exposure to Adult Sexuality
　　　　　Failure to Obtain Medical Attention
　　　　　Failure to Obtain Psychiatric Attention
　　　　　Failure to Provide Adequate Nutrition
　　　　　Failure to Thrive
　　　　　Fondling
　　　　　Inadequate Clothing
　　　　　Inadequate or Dangerous Shelter
　　　　　Inadequate Physical Care

Lack of Supervision
Mental Injury
Munchausen Syndrome by Proxy
Oral/Genital Contact
Poisoning
Ritual Abuse
Scalding
Substance Abuse - Caretaker
Substance Abuse/Alcohol-Caretaker(PRFC)
Substance Abuse/Drug/Other-Crtkr (PRFC)
Other, please specify

110. Bates #/Comments:
111. What was the finding?
Reasonable Parental Discipline Ruled Out
Substantiated - Court Intervention Recommended
Substantiated - Services Recommended
Unable to Locate
Unable/Locate - Insufficient Family Info
Unsubstantiated - Services Recommended
Failure to Cooperate

112. Bates #/Comments:
113. Was the foster family given a written plan of compliance?
Yes
No
N/A

114. Bates #/Comments:
Section VIII - Action Taken & Outcome for Child
115. Describe the action taken and outcome for the child:
116. Bates #/Comments:
117.  Reviewer Name:
First Name
Last Name
118. Date Review Completed:
mm/dd/yyyy

**Investigations Part II Review Instrument 21SV0057**

Section I - Report Demographics
    1. Family Name:
    2. Bates #/Comments:
    3. Alleged Child Victim Name(s):
        Child 1
        Child 1 ID#
        Child 2
        Child 2 ID#
        Child 3
        Child 3 ID#
        Child 4
        Child 4 ID#
        Child 5
        Child 5 ID#
        Child 6
        Child 6 ID#
        Child 7
        Child 7 ID#
    4. Bates #/Comments:
    5. Referral Number:
    6. Bates #/Comments:
    7. Case Number:
    8. Bates #/Comments:
    9. Referral Synopsis:
    10. Bates #/Comments:
    11. Alleged Abuse/Neglect Category
        Check all that apply
        Abuse
        Neglect
        Sexual Abuse

    12. Bates #/Comments:
    13. Alleged Abuse/Neglect Type
        Check all that apply
        Abandonment
        Age Inappropriate Sexual Behavior
        Alcohol Abuse - Caretaker
        Anal Penetration through Instrumentation
        Anal Penetration through Intercourse
        Beating/Hitting/Slapping
        Beating/Hitting-Instrument
        Bestiality
        Biting
        Burning/Scalding
        Choking

Confinement
Cutting
Death
Digital Anal Penetration
Digital Vaginal Penetration
Drug Abuse - Caretaker
Educational
Exhibitionism
Exposure to Adult Sexuality
Exposure to Domestic Violence
Failure to Obtain Medical Attention
Failure to Obtain Psychiatric Attention
Failure to Protect
Failure to Provide Adequate Nutrition
Failure to Thrive
Fondling
Hitting
Hitting with Instrument
Inadequate Clothing
Inadequate or Dangerous Shelter
Inadequate Physical Care
Injury from Spanking
Kicking
Lack of Supervision
Mental Injury
Munchausen Syndrome by Proxy
Near Death
Oral/Genital Contact
Pedal(foot) Anal Penetration
Pedal(foot) Vaginal Penetration
Pinching/Twisting/Gouging
Poisoning
Pornography - Exposure
Pornography - Participation
Ritual Abuse
Scalding
Sexual Behavior - Lack of Supervision
Sexual Exploitation
Shaking
Slapping
Substance Abuse - Caretaker
Substance Abuse/Alcohol-Caretaker(PRFC)
Substance Abuse/Drug/Other-Crtkr (PRFC)
Suffocating
Threat of Harm
Thrown
Vaginal Penetration through Instrument
Vaginal Penetration through Intercourse

       Voyeurism

       Other, please specify

14. Bates #/Comments:

15. Injuries Alleged:

       Yes

       No

16. Bates #/Comments:

17. What type of injury:

       Check all that apply.

       Abrasions/Lacerations

       Asphyxiation

       Bite Marks

       Brain Damage

       Bruises/Welts

       Burns/Scalding

       Cause of Death Unknown

       Cause of Near Death Unknown

       Child Born Drug Exposed

       Cuts/Punctures

       Death

       Dismemberment

       Drowning

       Electrocution

       Environmental Drug Exposure

       Failure to Thrive

       Fetal Alcohol Syndrome

       Fractures-Not Skull

       Gun Shot Wound(s)

       Head Trauma

       Hyperthermia/Hypothermia

       Internal Injuries

       Malnutrition

       Medical Condition Untreated

       Mental Trauma

       Methamphetamine Exposure

       Near Death

       Near Drowning

       None Apparent

       Poisoning

       Rectal Injury/Irregularities

       Retinal Hemorrhage

       Sexually Transmitted Diseases

       Shaken Baby Syndrome

       Skull Fracture

       Smoke Inhalation

       Sprains/Dislocations

Stab/Knife Wound(s)
Strangulation/Ligature Marks
Subdural Hematoma
Substance Abuse
Suicide
Vaginal Injury/Irregularities
Other, please specify
18. Bates #/Comments:
19. Was medical attention necessary?
Yes
No
20. Bates #/Comments:
21. Was medical attention obtained?
Yes
No
22. Bates #/Comments:

Section II - Report Timeframes and Priority
23. Date Report Received:
mm/dd/yyyy
24. Bates #/Comments:
25. Time Report Received:
26. Bates #/Comments:
27.  A.M. or P.M.
A.M.
P.M.
28. Bates #/Comments:
29. Disposition/Priority Response
Screened-out
Priority 1
Priority 2
30. Bates #/Comments:
31. Date of Investigation Initiation:
mm/dd/yyyy
32. Bates #/Comments:
33. Time of Investigation Initiation:
34. Bates #/Comments:
35. A.M. or P.M.
A.M.
P.M.
36. Bates #/Comments:
37. Date(s) Child Victim Interviewed/Observed:
Date 1
Date 2
Date 3
Date 4
Date 5
38. Bates #/Comments:

39. Time(s) Child Victim Interviewed/Observed:
    Also include A.M. or P.M. on the line
        Time 1
        Time 2
        Time 3
        Time 4
        Time 5
40. Bates #/Comments:

SECTION III - Abuse/Neglect History

41. Did the Resource Family have previous reports of abuse/neglect?
    Yes
    No
42. Bates #/Comments:
43. List dates of previous reports (including screen-outs) and findings:
44. Bates #/Comments:


Section IV - Screening and Assignment

45. Was the correct priority assigned to the report per policy?
    (340:75-3-8.1, ITS 2.(4) & 340:75-3-7.1)
        Yes
        No
46. Bates #/Comments:
47. Was the initial contact with the child victim face to face?
    Yes
    No
48. Bates #/Comments:
49. Was a home visit made during the investigation?
    Yes
    No
50. Bates #/Comments:
51. Were all children observed?
    Yes
    No
52. Bates #/Comments:
53. Were interviews conducted with all children who were verbal?
    Yes
    No
54. Bates #/Comments:
55. Was the alleged perpetrator interviewed?
    Yes
    No
56. Bates #/Comments:

57. Were other adult members of the household interviewed?

      Yes

      No

58. Bates #/Comments:

59. Were applicable collaterals interviewed?

      Yes

      No

60. Bates #/Comments:


Section V - Assessment and/or Investigation

61. Were additional collateral interviews needed but not held?

      Yes

      No

62. Bates #/Comments:

63. Were interviews held separately and privately?

      Yes

      No

64. Bates #/Comments:

Section VI - Efforts to Gather Sufficient Info

65. Did information gathered support decision-making?

      Yes

      No

      66. Bates #/Comments:

Section VII - Safety Decision-Making & Prot Action

67. Were any safety threats accurately identified?

      Yes

      No

      N/A

68. Bates #/Comments:

69. Was it necessary to take protective action?

      Yes

      No

70. Bates #/Comments:

71. Was appropriate action taken?

      Yes

      No

72. Bates #/Comments:

73. What type of maltreatment was confirmed/substantiated:

      Check all that apply.

      Abandonment

      Age Inappropriate Sexual Behavior

      Alcohol Abuse - Caretaker

Anal Penetration through Instrumentation

Anal Penetration through Intercourse

Beating/Hitting/Slapping

Beating/Hitting-Instrument

Bestiality

Burning/Scalding

Confinement

Cutting

Digital Anal Penetration

Digital Vaginal Penetration

Drug Abuse - Caretaker

Educational

Exhibitionism

Exposure to Adult Sexuality

Failure to Obtain Medical Attention

Failure to Obtain Psychiatric Attention

Failure to Provide Adequate Nutrition

Failure to Thrive

Fondling

Inadequate Clothing

Inadequate or Dangerous Shelter

Inadequate Physical Care

Lack of Supervision

Mental Injury

Munchausen Syndrome by Proxy

Oral/Genital Contact

Poisoning

Ritual Abuse

Scalding

Substance Abuse - Caretaker

Substance Abuse/Alcohol-Caretaker(PRFC)

Substance Abuse/Drug/Other-Crtkr (PRFC)

Other, please specify

74. Bates #/Comments:

75. What was the finding?

Substantiated - Court Intervention Recommended

Substantiated - Services Recommended

76. Bates #/Comments:

Section VIII - Action Taken & Outcome for Child

77. Describe the action taken and outcome for the child:

78. Bates #/Comments:

79. Reviewer Name:

First Name

Last Name

80. Date Review Completed:

mm/dd/yyyy

**Appendix C-List of Documents Reviewed**

1. Goad Case Sampling List - Cases including OKDHS documents concerning the screen-out, assessment or investigation. Case information also included pictures.  Video files that were provided could not be opened.

2. OKDHS Investigation Records for 2010 Substantiated Investigations for Children in Out of Home Care- Appeals documentation and Investigation documentation.

3. Oklahoma Department of Human Services Policy- OAC 340-75-3, Sections 1-14. Revisions from 3-26-10.

4. Final Report: Oklahoma Child and Family Services Review -dated March, 2008.

5. John Goad Report-Evaluation of the Effort to Assure the Safety of Nine Foster Children dated-November 10, 2009.

6. Expert Witness Report-John Goad -dated March 15, 2011.

7. Deposition- John Goad dated  April 19, 2011 and  April 20, 2011.

8. Expert Witness Report-Center for the Support of Families- Jerry Milner-dated February 17, 2011.

9. Goad Considered Materials.

10. Federal Rules for Expert Witnesses-Westlaw.

11. List of OKDHS Custody Children 2009 with Allegations of Child Abuse and Neglect.

12. Assessment Survey Results Final.xls

13. Investigation I Survey Results Final.xls

14. Investigation II Survey Results Final.xls

15. Screen-out Survey results final.xls

16. Survey links.doc

## End Notes

[1] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington, D.C.

[2] Lund, T. and Renne, J. (2009). *Child Safety*: *A Guide for Judges and Attorneys*. Washington D.C.: Center on Children and the Law. p. 2 and p. 9.

[3] Action for Child Protection (2011) Key Concepts. Accessed at http://www.actionchildprotection.org/safety_intervention/key_concepts.php.

[4] OAC 340:75-3-10.3 Confirmation Protocol (4). (Revision 6-1-08).

[5] OAC 340:75-3-10.3 Confirmation Protocol (12) (Revision 6-1-08).

[6] OAC 340:75-3-7 Screening reports. (Revision 6-1-07).

[7] OAC 340:75-3-7Screening reports ITS 1.(a) (1) -(2) and (b) (1)- (5). (Revisions 6-1-07)

[8] OAC 340:75-3-7Screening reports ITS 1. (a) (3) (Revisions 6-1-07).

[9] OAC 340:75-3-2 Definitions (Revision 6-1-08)

[10] OAC 340:75-3-2 Definitions (Revision 6-1-08)

[11] [11] OAC 340:75-3-7Screening reports ITS 1. (a) (3) (Revisions 6-1-07)

[12] OAC 340:75-3-7 Screening Reports ITS 1. (b) Reports (1)-(5)

[13] OAC 340:75-3-8.1 Protocol for addressing report regarding foster or trial adoptive homes (b) Observation of abuse or neglect in foster or trial adoptive homes ITS (1) (A)-(B). (Revision 6-1-08).

[14] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington, D,C., p. 31.

[15] National Resource Center for Child Protective Services (2007). *Safety Intervention Policy Standards and Agency Self-  Assessment*, Washington D.C. pp.4-5.

[16] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington, D.C., p. 29.

[17] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington, D.C., p. 39.

[18] *OAC 340:75-3-2* Definitions- ITS (7) (Revision 6-1-07)

[19] OAC 340:75-3-6 (f)  Assignment of Reports, (Revision 6-1-08)

[20] OAC 340:75-3-8.1 Protocol for addressing reports regarding foster or trial adoptive homes (a) Purpose in investigations or assessments regarding foster or trial adoptive homes and (b) Observation of abuse or neglect in foster or trial adoptive homes (Revision 6-1-08)

[21] National Resource Center for Child Protective Services (2007). *Safety Intervention Policy Standards and Agency Self-Assessment*, Washington D.C. p.5.

[22] Child Welfare League (2003).*Best Practice Standards for Child Maltreatment in Foster Care, Washington, D.C., p.35.*

[23] OAC 340:75-3-2, Definitions (Revised 6-1-07)

[24] OAC 340:75-3-7.3 Child Protective Services investigation and assessment decision guidelines ITS 1. (1) Factors to consider in conjunction with the guidelines. (Revision 12-1-08).

[25] OAC 340: 75-3-7.3 Child Protective Services Investigation and Assessment Guidelines ITS  1. (5) (J) and (K)(Revision 12-1-08).

[26] OAC 340: 75-3-8.1, Protocol for addressing reports regarding foster and trial adoptive homes, (a) (1).

[27] OAC 340:75-3-8.1 Protocol for addressing reports regarding foster or trial adoptive homes ITS 2. (4) (Revision 6-1-08).

[28] OAC 340:75-3-8.5 Assessment Protocol. (Revision 7-1-07).

[29] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington**,** D.C., p.31

[30] OAC 340:75-3-2 Definitions ITS (7).  (Revision 6-1-08)

[31] OAC 340:75-3-6 Intake process for reports of child abuse or neglect (f) Assignment of Reports, (Revision 6-1-08)

[32] OAC 340: 75-3-7.3 Child Protective Services Investigation and Assessment Guidelines ITS 1. (2) Priority Decisions (Revision 12-1-08).

[33] OAC 340:75-3-7.3 Child Protective Services investigation and assessment decision guidelines ITS 1. (1) Factors to consider in conjunction with the guidelines. (Revision 12-1-08).

[34] OAC 340:75-3-6 Intake Process for reports of child abuse or neglect (f) Assignment of reports. (Revision 6-1-08)

[35] Priority I response time is within 24 hours.

[36] OAC 340: 75-3-7.1  Priority guidelines (e). Revision 6-1-08).Priority II response time Is within 48 hours to fifteen calendar days.

[37] OAC 340:75-3-8.5 Child Protective Services assessment protocol. (Revision 7-1-07)

[38] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington**,** D.C., p.31.

[39] OAC 340:75-3-7.1 Priority guidelines (d)-(e). (Revision 6-1-08).

[40] OAC: 75-3-2 Definitions (6-1-08).

[41] OAC 340:75-3-7.3 Child Protective Services investigation and assessment decision guidelines (Revision (6-1-08)

[42] OAC 340:75-3-7.3 Child Protective Services investigation and assessment decision guidelines ITS 1. (Revision 12-1-08).

[43] OAC 340: 75-3-8.1, Protocol for addressing reports regarding foster and trial adoptive homes (Revision 6-1-08)

[44] OAC 340:75-3-8.1 Protocol for addressing reports regarding foster or trial adoptive homes ITS 2. (4) (Revision 6-1-08)

[45] OAC 340:75-3-8 Child Protective Service investigation protocol (Revision 6-1-08).

[46] OAC 340:75-3-10.2-Findings for Child Protective Services Investigations (2)(Revision 6-1-07).

[47]  OAC 75-3-6 Intake Process for Reports of Abuse or Neglect (f) Assignment timeframes of Reports (Revision 6-1-07).

[48] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington**,** D.C., p. 32.

[49] OAC 75-3-8.1 Foster or trial adoptive home investigative or assessment protocol (d). (Revision 6-1-07).

[50] OAC 340:75-3-2 Definitions Initiating a CPS investigation or assessment. (Revision 6-1-07).

[51] Priority I response time is within 24 hours

[52] Priority II response time Is within 48 hours to fifteen calendar days

[53] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington**,** D.C., p. 32.

[54] OAC 340:75-3-8 Child Protective Service investigation protocol (Revision6-1-08).

[55] OAC 340:75-3-8 Child Protective Service investigation protocol (Revision 6-1-08).

[56] National Resource Center for Child Protective Services (2007). *Safety Intervention Policy Standards and Agency Self-Assessment*, Washington D.C. p.10.

[57] Lund, T. and Renne, J. (2009). *Child Safety*: *A Guide for Judges and Attorneys*. Washington D.C.: Center on Children and the Law. pp. 3-6.

---

[58] OAC 340:75-3-8.1 Protocol for addressing reports regarding foster or trial adoptive homes ITS 2. (4) (Revision 6-1-08).

[59] OAC 340: 75-3-7.1  Priority guidelines (d)- (e). (Revision 6-1-08).

[60] OAC: 75-3-7.1 (d) and ITS 3. Response Criteria (Revision 6-1-08).

[61] OAC 340: 75-3-7.1  Priority guidelines (e). (Revision 6-1-08).Priority II response time Is within 48 hours to fifteen calendar days.

[62] Child Welfare League (2003). *Best Practice Standards for Child Maltreatment in Foster Care*, Washington, D.C., p. 41-53.

[63] OAC 340:75-3-8 Child Protective Service investigation protocol (Revision6-1-08).

[64] OAC 340: 75-3-7.1  Priority guidelines (d)- (e). (Revision 6-1-08).