# EXHIBIT I

**A Rebuttal to the Center for the Support of Families, Inc.'s
Foster Care Case Review of the
Oklahoma Department of Human Services**

**Larry G. Brown, MSW**

**June 15, 2011**

# Table of Contents

Introduction..................................................................................................................................... 3
Summary of Background and Experience ................................................................................... 3
Summary of Opinions .................................................................................................................. 4
Methodology ................................................................................................................................. 5
    The Sample Selected for Review is Biased ............................................................................. 5
    Case Record Review is Insufficient ........................................................................................ 8
    Improper Assumption: If not documented, it did not occur ................................................ 12
Biased Coding and Faulty Analysis ......................................................................................... 16
    Arbitrary Cut-Offs ................................................................................................................. 16
    Overreach of the Findings..................................................................................................... 18
    Lack of "Apples-to-Apples" Comparisons .......................................................................... 34
Quality Assurance Deficits ....................................................................................................... 35
    Lack of Clarity to Reviewers ................................................................................................ 35
    Quality Assurance Process Deficits...................................................................................... 42
Conclusion .................................................................................................................................. 46

Appendix A – Resume ................................................................................................................ 49
Appendix B – Considered Documents....................................................................................... 55
Appendix C – Compensation ..................................................................................................... 58

## Introduction

I was retained by Riggs, Abney, Neal, Turpen, Orbison, & Lewis to provide programmatic consultation in relation to child welfare issues, to examine practices at OKDHS, and to review documents related to the <u>D.G. v. Henry</u> lawsuit.  I have not testified as an expert in any othercourt cases in the last four years.  I reviewed reports and spent three days in Oklahoma in December 2010 interviewing staff from several areas across the Oklahoma Department of Human Services (OKDHS).  The purpose of these interviews was to gather broad contextual information about OKDHS in order to better understand some of the reports I was to review and to assess whether decisions that have been made about service provision in Oklahoma represent reasonable professional judgment.

I was asked to review and comment on several documents generated in the <u>D.G. v. Henry</u> lawsuit.  The following are my comments on the document titled, "Foster Care Case Review of the Oklahoma Department of Human Services" by the Center for the Support of Families, Inc.

## Summary of Background and Experience

I have extensive programmatic and administrative experience in child welfare systems, including reviewing case records.  A summary of my experience follows, and a full resume can be found as Appendix A of this report.

- Thirty-seven year career in residential care facilities, a children's shelter and in public child welfare positions.
- Leadership positions at many levels within public child welfare, including activities related to monitoring, management, and continuous improvement activities.
- Headed the unit that developed monitoring tools in New York State, conducted case reviews, and was the State's lead in conducting joint case reviews with plaintiff's designee in the <u>Marisol v. Giuliani</u> lawsuit.
- National positions of leadership on the Executive Committee and as President of the National Association of Public Child Welfare Administrators.  Co-chair of the Public Policy Committee of the Child Welfare League of America.
- Consulting experience in many jurisdictions, working as a private consultant to the American Public Human Services Association, the National Governors' Association, Casey Family Programs, and the National Resource Center for Child Welfare Data and Technology.
- Collaborative work with national leaders in driving performance in child welfare and juvenile justice systems, including Dr. Fred Wulczyn, (Chapin Hall, University of Chicago), Dr. Barbara Needell (Center for Social Science Research, Berkeley), Shay Bilchik (Center for Juvenile Justice Reform, Georgetown University), Anita Light (APHSA).
- Editor of the *Positioning Public Child Welfare Guidance* of the American Public Human

3

Services Association and the National Association of Public Child Welfare Administrators (www.PPCWG.org).  Also, editor of *Bridging Two Worlds: Youth Involved in the Child Welfare and Juvenile Justice Systems. A Policy Guide for Improving Outcomes*, Georgetown Center for Juvenile Justice Reform, Fall, 2008.

## Summary of Opinions

The methods employed to review a sample of cases and the effort to ascribe meaning to it to represent an objective view of the treatment children receive while in the custody of OKDHS fails.  The results of the review itself and any intention to use it to portray a faithful picture of OKDHS policies and practices should be rejected and set aside.

# Methodology

The report produced by the Center for the Support of Families and overseen by Dr. Jerry Milner is a detailed report.  The presentation is highly professional and the position of Dr. Milner is that this is essentially an exposition of clear fact.  He reinforces this position in his deposition:

> "A[Milner]    Let me clarify that there are very few opinions in here. These are basically the findings of our case review, and we have provided the numbers and the backup documentation in here for those findings.
>
> Q    So -- so it's your position, sir, that your findings aren't a matter of opinion?
>
> A    I believe that there would be very few opinions included in the report. Our effort here was to be as straightforward as possible in presenting the findings of our data collection and data analysis."[1]

In fact, the report is biased and provides an incomplete view of the trajectory of children through the Oklahoma child welfare system.  As such, its findings cannot be seen as neutral and impartial, despite Dr. Milner's assertions that he did not try to reach conclusions, but to merely show the facts.

## The Sample Selected for Review is Biased

The point-in-time analysis that Dr. Milner employed is this review is systematically biased toward long-staying children and the study intentionally removes a whole class of children whose experiences in the Oklahoma child welfare system are different than that of the children studied in this report.  I base these comments on personal knowledge and experience and as a matter of face validity, that is, that even to a layman, the effects of these decisions are obvious.

I will begin with simple bias.  An important metric used to describe child welfare systems is a measure of the average length of stay in care.  In most studies of foster care, the measure of central tendency that is used to describe the average length of stay is the median.  This is the measure that is used in the Federal Children and Family Services Review (CFSR) and in Dr. Milner's study.  A median is an arranging of all the cases on the measure you are interested in, in this case, length of stay, from low to high and determining which case falls exactly in the middle. The basic assumption is that you begin by arranging ALL the cases.  Dr. Milner's study violates that basic assumption in two fundamental ways.  He outright eliminated children whose stay in care is less than 60 days and he computed his measure of length of stay from a point-in-time perspective.  Both of these actions eliminated important information.

---

[1] Milner Deposition at 35, lines 10-21.

Chart 1 demonstrates how Dr. Milner systematically eliminated cases that will have impact on his findings.  Chart 1 is a simple model depicting the placement stays of hypothetical children in the California child welfare system in 2008.  The boundaries of the box represent calendar year 2008, that is, the left side of the chart is anchored on January 1, 2008, and the right side is December 31, 2008.  The horizontal lines represent foster care stays of ten individual, hypothetical children.

Chart 1 – The View Matters[2]



The first line from the top shows the experience of a child who enters sometime shortly after the beginning of the year and whose placement continues past December 31st.  The second line represents the experience of a child who entered sometime into the first half of the year and who experienced a short stay in care and was discharged.  The third represents still another relatively short stay, but longer than the second.  The bottom line shows a child who was in care on the first day of the year and was still in care at the end.

---

[2]Center for Social Services Research, School of Social Welfare, University of California at Berkeley.

If you were interested in talking about the Oklahoma foster care system, it is reasonable to expect that you would talk about the experience of all the children. The vertical line drawn in the center of Chart 1 represents what happens when you select for your review a "point-in-time" view of a foster care system. In this example, half (5) of the children fall out because the point in time survey methodology only considers those children in care on July 1, 2008. You might, by chance, pick up a short-stayer, as in the sixth line down, but the method of selecting the population for the survey systematically excluded all the children who were in care during the year, but who did not happen to be in care on July 1.

Does it matter? Recall that the calculation of a median length of stay in foster care is done by arranging ALL the cases to be measured for the length of stay and finding the middle. As was demonstrated above, if you only use cases that are in care on a particular day, you have biased your calculation because you are more likely to be capturing long-staying children and will have systematically excluded many short-stayers. Furthermore, if you drop off all the cases that were in care for less than 60 days, you move the starting point for the calculation and you make the average length of stay longer. So, for Oklahoma, the study methodology is a set-up. The method used is already biased toward children who stay for a long time because they have a greater chance of being selected due to Dr. Milner's definition of which children will make up his population to be sampled: "…children who had been in OKDHS foster care custody for a minimum of 60 days as of March 1, 2010…[3]". But, even if the point-in-time selection happened to catch a short-stayer, they are eliminated because the child was not in care "a minimum of 60 days."

Dr. Milner is aware that the children with stays of less than 60 days are excluded from his sample as he documents this in his report[4], and yet he maintains that this doesn't affect his findings:

> "Q    Is it your contention, Dr. Miller -- Milner, excuse me, that the median that you reflect here on Page 59 in your report accurately reflects the median length of stay of all children in DHS custody on June 1st, 2010?
>
> A    It represents the median length of stay for children in our sample, and I believe that our sample is statistically representative and can be generalized.
>
> Q    So is the answer to my question yes?"
>
> A    Yes, that's what I believe."[5]

On the face of it, it is hard to understand how a methodology that systematically excludes cases from review can purport to be representative of the system and that the findings from that sample

---

[3]Case Review Report at 13.
[4] Ibid.
[5]Milner Deposition at 364-365.

can be generalized from.  For this report, it is not only the length of stay measure that is biased, but every finding in the report because the experience of a whole class of children is excluded.

## Case Record Review is Insufficient

The method that was used to examine Oklahoma's foster care system is a case record review.  By definition, a records review is only that.  It is an examination of what workers wrote down.  It does not and cannot know whether something that did not get written down ever happened.

Dr. Miller is very aware of the limits of a case review.  In his tenure at the Administration for Children and Families, he directed the federal Child and Family Services Reviews (CFSR).[6] Even a casual look at the instructions issued by the federal government used in their onsite reviews (see Table 1) shows that in all the outcome areas the federal government is interested in -- safety, permanency and well being -- the CFSR instructs the reviewers in every instance to look beyond the case record in order to rate states' conformity with federal standards.[7] This is not only for subjective items like the child and family's involvement in case planning, but even for very technical items such as caseworker visits, interviews are required beyond the examination of the case record.  In fact, in two areas where a deep and careful understanding of an issue is required – preserving connections and the relationship of the child in care with parents – the federal government *does not even believe that the physical case record is helpful* and they do not ask their reviewers to look there for answers.  Dr. Milner acknowledges that one of the reasons he does not go looking for additional data is not that he can't find it, but that it makes his job harder:

> "A   That is a problem with it [interviewing people]. You get a different set of information, but you also have to still make a determination about whether or not something actually happened or not. Simply interviewing somebody doesn't always give a conclusive answer of if something happened, when it happened or how it happened."[8]

But when asked specifically if, in his experience, the search outside the case record itself yielded additional information, Dr. Milner agrees.

> "Q   Okay. Now, based on your experience with CFSR, did you often -- were you often able on those case reviews to ascertain information from interviews that wasn't otherwise clear in the files?
>
> A   We were able to get additional information that we had to weigh against what was in the file.
>
> Q   And did sometimes that supplement documentation that was absent in the files?

---

[6]Case Review Report at 92.
[7]Child and Family Services Reviews, Onsite Review Instrument and Instructions, July 2008.
[8]Milner Deposition at 240, lines 2-7.

**Table 1 – Federal CFSR Instructions for Onsite Reviews**

| Children and Family Services Reviews Onsite Review Instrument and Instructions (July 2008) | | | |
|---|---|---|---|
| | **Federal Instructions for Gathering Data** | | |
| **Area Examined** | ***Review:*** | ***And Also Interview:*** | Page |
| 1. Timeliness of investigations | Case File | Caseworker | 4 |
| 2. Repeat maltreatment | Case File | Caseworker | 7 |
| 3. Children are safely maintained in their homes whenever possible and appropriate | Case File | Caseworker, parent(s) and service providers | 11 |
| 4. Risk Assessment and safety management | Case File | Caseworker, parents(s), child, foster parent(s), service providers, and guardians ad litem | 14 |
| 5. Re-Entry into foster care | Case File **and** Court Orders | Caseworker | 20 |
| 6. Stability of placement | Case File | Caseworkers, foster parent(s), child | 22 |
| 7. Permanency planning goal | Case File | Caseworker and other relevant persons involved in the case, including the child, when age appropriate, parents(s), foster parent(s), service providers, CASA workers, guardian ad litem | 25 |
| 8. Reunification, guardianship or permanent placement with relative | Case File | Caseworker, child, parent(s), foster parent(s), guardian ad litem and service providers | 29 |
| 9. Adoption | Case File | Caseworker, child, foster parent(s), guardian ad litem and service providers | 32 |
| 10. Other planned permanent living arrangements | Case File | Child, caseworker, foster parent(s), relative caregiver(s), ind. living services providers, service providers, and guardian ad litem | 34 |
| 11. Proximity of foster care placement | Case File | Caseworker, parent(s) and foster parent(s) | 38 |
| 12. Sibling placements | Case File | Caseworker, parent(s), foster parent(s) and child | 40 |
| 13. Visiting with parents and siblings in foster care | Case File | Parents(s), child, caseworker, foster parent(s), and service providers | 42 |
| 14. Preserving connections | NA | Caseworker, parent(s), foster parent(s) and child | 45 |
| 15. Relationship of the child in care with parents | NA | Child, parent(s), foster parents(s) and service providers | 49 |
| 16. Needs and services of child, parents, and foster parents | Case File | Caseworker, child, parent(s), foster parent(s), service providers and guardian ad litem | 52 |
| 17. Child and family involvement in case planning | Case File | Caseworker, parent(s), child, foster parent(s) and service providers | 61 |
| 18. Caseworker visits with child | Case File | Caseworker, child, parent(s), foster parent(s), service providers, guardian ad litem, CASA worker | 64 |
| 19. Caseworker visit with parents | Case File | Caseworker, parent(s) and service providers | 67 |
| 20. Educational needs of the child | Case File | Caseworker, child, foster parent(s), parent(s) and service providers | 72 |
| 21. Physical health of the child | Case File | Caseworker, foster parent(s), medical service providers, guardian ad litem and service providers | 76 |
| 22. Mental health and behavioral health of the child | Case File | Caseworker, foster parent(s), parent(s), child, service providers and guardian ad litem | 79 |

A    Sometimes it supplemented it. Sometimes it contradicted it."[9]

Despite knowing that more information might be available elsewhere, Dr. Milner was clear that he wasn't interested in looking further.

"Q    In your case review process in Oklahoma, is it possible that if you had included interviews with the case review -- caseworker or the child or the parents or the foster parents, that you would have been able to answer the question as to whether or not there was parent-child and sibling visitation?

A    I don't know if it would have been possible or not because I don't know what kind of information that they would have provided to me. I understood that the case files that we reviewed were the official documentation, the official record of the caseworkers' activity, and we acted on the assumption that caseworkers were diligent in recording what they had done." [10]

Dr. Milner is ready to proceed, despite all the methodological limitations of this effort.

"Q    How confident are you, Doctor, that you got the information you needed, that is, all the information you needed to reach the findings you made in this report?

A    I'm very confident. I believe that we conducted a very thorough review of each case file, which was followed by a very thorough quality assurance process."[11]

Another indication of why a case record review may well have needed to be supplemented is how hard reviewers had to work to find what they needed.  The "finding" of disarray in the case records[12] led Dr. Milner and his quality assurance reviewers to include a note in the instrument itself cautioning reviewers that placement information, a critical component of the findings of the review, "…may need to be pieced together."[13]This is reinforced when you consider that the lead analyst, Dr. Jacqueline Smollar reached this conclusion: "Unfortunately, the real story about the case notes is their poor quality and how you could not figure out what was going on in a case by reading the case notes."[14]This suggests that this key ingredient may not always be accurate.  I note that inter-rater reliability checks were only conducted on the whole process in the aggregate and that no specific checks were reported that compared this individual element.  The reliability of these data can certainly be questioned, and an external validation, with workers, parents, foster parents or children is crucial to a full understanding.

---

[9] Milner Deposition at 241, lines 6-15.

[10] Milner Deposition at 240, lines 9-22.

[11] Milner Deposition at 243, lines 19-25, at 244, line 1.

[12]Case Review Report at 16-19.

[13] Case Review Report at 164, Grid 5-A.

[14]Memo from Jackie Smollar to Jerry Milner and Stacey Hirsch, January 11, 2011, Milner Considered Documents 125964.

Finally, it is clear that the review was labor-intensive and exceeded all expectation of how long it would take to complete.  The Center for the Support of Families actually went back to plaintiff to request more money.[15]  Yet even with that additional funding, Dr. Milner asserts that: "My company incurred a tremendous loss on the conduct of this case review."[16]  It is possible that a compounding reason for not looking beyond the case record, even if it was obviously needed, was that it wasn't just hard and complicating, but it would take too much time and money.

So, while there are many practical and self-serving reasons why the methodology did not look beyond the case record, there are also many compelling reasons for needing to go beyond it:

- That there was missing and incomplete information is evident.  It is clear on the face of it that the whole story was not in the written record;
- The quality and lack of organization of the records was alleged by the reviewers[17,] screaming for a look beyond the record for additional information; and
- Perhaps most importantly, the court case brought by plaintiff is not an allegation of incomplete documentary practices by OKDHS.  The need to look for the real story is a burden the plaintiff must carry.

This is not just theoretical speculation.  There was actual evidence in the file that a system limit in the KIDS system truncated the text of a report of a hearing.[18]  That means that the beginning of a body of information was there in writing and it was clear that something was missing, but even in that very specific circumstance, the rigidity of the Milner methodology prevailed.  No one asked and no one went to look for the remainder of the message:

"Q    So I guess the answer to my question is, is if you had what appeared to be information that was cut off and character limitations of the KIDS system, you didn't do any follow up to get additional information?...

A    To my knowledge, we did not."[19]

It is troubling that a review that is intended to demonstrate practices of the OKDHS starts by selecting a sample that is biased and then selects a methodology that is guaranteed to not provide all the information that is available.  It is also evident that the scope of the task was underestimated at the start, and that time and finances pressed the review team.

There are very different meanings and radically different strategies for corrective action within a public child welfare system that depend heavily on knowing, for example, whether there is an absence of a service compared to the absence of an action being taken and whether the problem is only that a worker is "not writing it down".  It is certainly an important administrative activity

---

[15]Milner Deposition at 28-30.
[16] Milner Deposition at 31, lines 1-2.
[17]Case Review Report at 16-18.
[18]Case Review Report at 18.
[19] Milner Deposition at 243, lines 12-18.

that protocol be followed, but it is a qualitatively different issue if the work is not being done. The review provides no help in discerning that difference.

### Improper Assumption: If not documented, it did not occur

This is a not a review about what is happening to children.  It is a strict accountability of whether or not the policy-required documentation standards are being adhered to.  In discussing the search for plan information, Dr. Milner testifies:

> "9     Q     This is a survey of documentation of a file and not
> 10    what actually is being provided to the children in
> 11    Oklahoma foster care; correct?
>
> 13    A     *It is a survey of the official working record*
> 14    *of the Oklahoma Department of Human Services, in*
> 15    *which the caseworkers should be documenting what is*
> 16    *actually happening in their work with children and*
> 17    *families.*"[20] [emphasis added]

And that strict, narrowly drawn focus for the case review was not applied just to permanency plans, as in the paragraph above.  The actual provision of services, an important element in this case record review, was afforded the same treatment:

> "24    Q     Okay. Now, it's a similar question I just
> 25    asked you, but is -- does not documenting a service
> 1     mean that the service has not been provided?
>
> 2     A     It means they've not documented it in the
> 3     sources that we're looking at.
>
> 4     Q     But it doesn't necessarily mean or it doesn't
> 5     necessarily mean it's reasonable to conclude that
> 6     the services were not provided; correct?
>
> 7     A     *I think it's reasonable to conclude that the*
> 8     *services were not provided if those are the official*
> 9     *working files, that child's record with the agency.*"[21][emphasis added]

The report ends up measuring the presence of an independent living form ("IL"), and its author is not at all interested in trying to see if youth development work is occurring.  The following exchange underscores that this investigation's search for documentary evidence was limited and

---

[20]Milner Deposition at 464.
[21]Milner Deposition at 464-465.

contrived:

> "3    Q      Okay. So if they didn't have the specific IL
> 4      form, then the reviewers were instructed to ignore
> 5      any other information in the file that relates to –
>
> 6      A      They were instructed not to count case notes
> 7      saying that IL services were being provided as an IL
> 8      Plan. There's an explicit Oklahoma policy and a
> 9      federal policy that requires that children age
> 10     sixteen or older in custody of the agency have an
> 11     explicit IL Plan."
>
> "16    Q      Okay. So were your reviewers instructed to
> 17     look for a -- like a formal IL form or were they
> 18     instructed as to what the elements of an IL Plan
> 19     should be so they could then see if all those
> 20     elements were in the file?
>
> 21     A      I don't know if Oklahoma even has a specific
> 22     independent living form for a plan. They would have
> 23     been looking for the plan itself. So if that is on
> 24     the form or if it's laid out in a—on a piece of
> 25     paper that says IL Plan and we know that that's what
> 1      that is, we would have counted that. I don't know
> 2      if there's a specific form or not."[22]

Dr. Milner's purpose in this investigation, and one that was communicated clearly to his case reviewers and quality assurance team, both in writing and, surely, verbally, is that the review will **not** count something if it is not documented.  But, having acknowledged that, he carries the burden of faithfully reporting that fact.  In short, Dr. Milner's reporting of the facts requires that if you are saying that you could not find it in the record, it needs to be reported that way.  In some places, the findings are carefully reported that way.  For example, in reporting on actions taken by OKDHS, the report states, "This is due to the large percentage of cases in which OKDHS did not take action **or at least no action was reported in the case file**."[23] [emphasis added]  This is an example of an appropriate and transparent method of reporting findings from this type of an investigation.

But it all too many places, the careful caveat, such as in the example above, that should be included is thrown to the wind. Throughout Dr. Milner's report, findings jump over the fact that it is only reporting the **documentation** of an event, And the report's findingsmake, unexplained, the leap of logic that something actually did not occur because it was not found by Dr. Milner's

---

[22]Milner Deposition at 458-9.
[23]Case Review Report at 30.

review team in the case file. An example from the report's Executive Summary is instructive in this regard:

- "In 27 (24.8%) of the 109 cases involving maltreatment reports that were investigated, reviewers reported that **no actions were identified in the case file** [emphasis added] as taking place either during the investigation or after the investigation…"[24]

And yet, later in the report, that important caveat is inexplicably dropped. The following are only a few examples:

"In 31 percent of the cases, the child's caseworker or supervisor did not visit the child…[25]"

This finding is an overreach. The real finding, if the number is accurate, is that in 31% of the cases, it is not known if the visit did not occur or whether the worker did not write it down, but it is stated with certainty that the visit did not occur.

Again:

"There were 26 (6.9%) children in the sample who did not receive all mental health services recommended by a service provider.[26]"

The real finding, however, if the number is accurate, is that for 26 children, it is not known if the service did not occur. But the claim is made with certainty in the report that the service was not received.

Still again, the report states:

"Services were provided to children to address all education-related concerns in only 84 (67.2%) of the 125 cases [where education-related information was recorded as missing], with children in 41 cases (32.8%) not receiving any services…[27]"

And the real finding, however, if the report's data are accurate, is that it is not known if services were provided. Yet it is stated with certainty in the report as a finding.

- "In 12 cases (6.9%), services were offered to caregivers to try and prevent all placement changes experienced by the child."[28]
- "In 29 cases (16.6%), services were offered to caregivers to try and prevent some

---

[24] Case Review Executive Summary, p. 5.
[25] Case Review Report at 71.
[26] Ibid at 72.
[27] Ibid at 73.
[28] Case Review Report at 52.

placement changes experienced by the child but not others."[29]
- "In 133 cases (76.0%), no services were offered to caregivers to try and prevent any of the placement changes experienced by the child."[30]

In all of these so called factual findings, the truth is that due to the review methods employed, they just don't know if services were provided or not. They only *know* that services were not recorded, not that they weren't provided.

These biased results are not just reported in the report's narrative (where a very discerning reader can find references that would help them conclude that this is a documentation issue). These false findings are highlighted in larger, bolded text that is called out in the report. An example:

> *No services to prevent placement changes were offered to foster caretakers in 76 percent of the cases and to children in 72 percent of the cases in situations in which it would have been appropriate to try to prevent the placement disruption.[31]*

The reviewers (and therefore, Dr Milner) don't know if services were offered; they only know that they couldn't find it in the record.

> *Only 4.2 percent of the actions taken by OKDHS in response to child behavior problems involved providing services to the caregiver.[32]*

Again, the finding overreached the data that was collected.

One of the confounding issues with this documentation issue is that the report is inconsistent about it. In some places, the reporting is straightforward and transparent, but in others, and some of the findings deemed most crucial to the case, the conclusions that are drawn are wrong because they are unsupported by their case file investigation. A good example of this practice is found in Section 5 of the report -- Services to Children. That section begins by outlining its key findings.[33] In a series of bullets, the language appropriately clarifies that the discussion is about documentation. The bullets describing their findings include phrases such as "…were documented…", "…did not identify…", "did not have information…", and "…was not included…". But suddenly, in the middle of this listing of key findings, a bullet that speaks to visits, an issue highly important to plaintiff's case, the finding shifts and the ***absence of information in the file*** about a visit becomes: "In 31 percent of the cases, the child's caseworker or superior ***did not visit*** the child…"[34] [emphasis added] This inaccurate finding, which

---

[29] Ibid.
[30] Ibid.
[31] Ibid.
[32] Ibid at 55.
[33] Case Review Report at 68.
[34] Ibid.

fundamentally overreaches the data, is reported three times in the report: in the Executive Summary,[35] in the introduction to Section 5 as a key finding,[36] and in the narrative in a larger and bolded font that is called out in a boxed, highlighted finding.[37]

# Biased Coding and Faulty Analysis

In a number of areas, actions taken during the collection of data resulted in limiting the collection of data by virtue of the way it was collected, or by virtue of the way it was coded in the data collection system.  Both of these actions restricted the amount of information that could be brought to bear on a topic for careful analysis.

## Arbitrary Cut-Offs

Part of a "research design" for an investigation such as this concerns making important decisions in the initial planning stages of the investigation regarding how to capture or collect the information that one intends to analyze.  In this case record review, there were many instances where a hard and fast line was drawn, with a negative finding on one side of the line, and a positive finding on the other.  According to Dr. Milner, much of this was intended to show whether OKDHS complied with regulation or policy, but in other places, it was a judgment that Dr. Milner made to enforce something that he himself considered reasonable.

Where he is searching for a policy compliance finding and, even more so, when he is injecting a personal standard of reasonableness, Dr. Milner missed a fundamental opportunity to provide critical information that would have helped put all of these findings in a context that would inform corrective action and not show compliance with a narrow standard, but inform how close to compliance the results showed.  The arbitrary cutoff dates that were selected and the coding strategy that he chose limited the view of that important contextual data.

For example, knowing whether or not something did or did not occur timely is a very basic finding.  More helpful, however, would be the knowledge of how many of the events were done very early, how many were done just at the wire, and how many happened just over the mark. This is not just quibbling.  If the purpose of the review is to help direct a program toward needed improvement,  then case file review strategies need to collect information that is both helpful to inform action and complete.  A successful strategy to improve a timeliness measure would look very different if you knew that a significant proportion of the event was being completed within a day or two of the standard versus knowing that workers were habitually 60 days beyond a standard.  The first might suggest process improvements; the latter might force a closer look at workload.

---

[35]Case Review Report at 8.
[36]Ibid at 68.
[37]Ibid at 71.

The report's survey design strategy of narrowly constructed dichotomous variables (the survey instrument's "Yes/No answers") to capture the data on timeliness issues limited the ability of the case reviewer to collect useful information that could be analyzed. This is truly a shame, given the effort involved.  However, it also prevented the report from showing the range of error, which is important to know in such investigations.  Any credit or benefit of the doubt is lost, and a late event of *1 day* becomes synonymous with a late event *of 100 days*.

Moreover, in many instances, these cutoffs - which were built into the survey instrument - are either unhelpful or simply arbitrary.  It is important to understand the importance of these Yes/No questions, whether the findings were used in the report or not.  If such data are used in the report, it clearly has the effect of suppressing or distorting information and the findings made with such information.  If not used in the report, it still has an effect because the tone and tenor of the way data are collected sends powerful messages to the reviewers as to what the customer (Dr. Milner) is looking for.  Given the quality assurance process that morphed over time(to be discussed later in this report) and the independent work style of the reviewers, the messages sent by Dr. Milner in his coding instructions for the survey instrument are very important.

An example is found in Question 1.22 of the survey instrument which asked, "Is there documentation in the case file that the whereabouts of the child's mother was known within a week of the child's entry into OKDHS custody?"[38]  When asked how he chose the one week standard, Dr. Milner somewhat cavalierly answered, "It seems to be a reasonable time frame…"[39]

> "2   Q  So if I'm a case reviewer and I see that
> 3       the whereabouts was known within eight days, I don't
> 4       count it under 1.22, do I?
>
> 5       A  No, because they didn't know where she was."[40]

This one week, seven-day standard is not based in regulation or policy, but is Dr. Milner's personal view of what seems appropriate.  It is a hard, bright line that doesn't discriminate at all; it is right or wrong.  As before, the corrective action that would be implied from these findings is different depending on where on the continuum the answers fall.  And the message is reinforced that the reviewers are looking for right and wrong, not just information.

In looking at child behaviors, the reviewers are instructed to note actions that "…were taken by the agency within 60 days of the behavior being identified".[41]  As above, the selection is a hard and fast rule, and not based in anything other than personal preference.  The findings paint the

---

[38] Case Review, p. 110.
[39] Milner Deposition at 413, lines 9-10.
[40] Milner Deposition at 415, lines 2-5.
[41] Case Review Report at 175.

worse case scenario and offer no help as to how one should approach this issueif there is a problem that was identified.

Item 1.29 in the survey instrument has a similar problem and produces a similar outcome. The search is for the due diligence employed for notification of relatives. Again, a strict standard of 30 days is enforced, with no basis for such a standard other than Dr. Milner's personal reasonableness standard.[42] When asked about whether a day over the line would count, he dismisses this by arguing that it probably wouldn't come up by saying: "I just find it difficult to believe that that individual circumstance would arise with enough frequency to be a major factor here."[43] Merely because the chance is remote, in his opinion, does not dismiss the fact that a single day's difference yields a negative finding even when it is not based in a regulatory standard or scientific basis. It would be enormously more helpful to know how many times cases might be *near* the standard. But we cannot tell from this analysis, and Dr. Milner finds OKDHS wanting nevertheless.

Dr. Milner claims that his reviewers would follow the wording of the question, and his description of quality assurance, discussed below, reinforces that view, but he offers that "I find it reasonable to believe that if on the 30th day or on the 31st day there was some substantive effort there, that we would have tried to give credit to the department for making that effort."[44] This conflicting testimony – adhere to the question, but give the benefit of the doubt – seems merely rhetorical and certainly confusing. Given the stridency of the messages about documentary evidence[45], it is reasonable to assume that a clear, inflexible message is sent to reviewers, and the reflection about trying to give credit to the department sounds like revisionist history.

## Overreach of the Findings

As noted above, the use of arbitrary cut-offs limits the amount of information that can be evaluated in the review. Furthermore, decisions about how to code and how to report the data make already flawed data look even worse.

In the instructions for item C.4 in the survey instrument, the reviewer is told: "If there is information in the file but your child is not specified in that information, consider it as missing information. For example, if there is a document that indicates that the caseworker visited "the children" but the document does not specify your child by name or mention your child in any of

---

[42] Milner Deposition at 417, lines 7-10.
[43] Milner Deposition at 418, 10-13.
[44] Milner Deposition at 418-419.
[45] Other examples have been noted. One more is offered here:
  "25    Q        But based on your instructions, even if a
  1        court order would have had all the elements of an
  2        ISP in it, it would not have been counted under 2.1,
  3        would it?

  4        A        I -- according to the instructions, it would
  5        not have…"   Miller Deposition at 428-429.

the summary information about the contact, then this would not be entered as a caseworker visit with the target child."[46]  This is an instance where ambiguity exists, but no benefit of the doubt is extended to OKDHS.  This is a place where the written record may be unclear and asking for clarification would have yielded additional information.  Yet, we cannot know the facts because a clear message of strict adherence to protocol is given to reviewers.

When asked to defend this decision, Dr. Milner is unambiguous that there be no credit given for visitation unless the target child is specifically named:

"Q    Okay. So if we have case file for Johnny Doe –

A    Uh-huh
.
Q    -- for example, and the case file said that the caseworkers visited the children --
A    Uh-huh.

Q    at the home

A    -- Uh-huh, uh-huh. –

Q    but it didn't say Johnny Doe specificallyin the reference –

A    Uh-huh.

Q    -- then that would not be counted as a visit?

A    That's correct, and I believe that's consistent with Oklahoma DHS policy, which addresses what the case notes should include with reference to visits with children.

Q    Did you reference those policies in your report somewhere, sir?

A    I believe that there is a footnote somewhere in the report.

Q    And is that a policy as to whether or not there's a visit or how you properly document a visit?

A    I believe that it's how they properly documented the visit, but since we were reviewing the documentation, we were trying to be consistent with the department's policy and also trying to avoid making the mistake that they visited a child when they really did not visit that child.

Q    Well, if they really did visit the child but didn't document it according to the standard you used and you showed it as a non-visitation, wouldn't that be a mistake also?

---

[46]Case Review Report at 107.

> A    ***It would be a mistake on the part of the worker for not documenting it properly in accordance with the policy.*** [emphasis added]
>
> Q    But it wouldn't be a mistake with regard to your research analysis?
>
> A    We -- it would be consistent with the way we were gathering our information."[47]

Given the strict adherence to this type of protocol, it begs the question of exactly what does "specify your child by name" mean in these instructions?  Would all the reviewers have the same understanding?  One would assume diminutives would work.  Perhaps.  One probably assumes nicknames would work.  Perhaps, if they are known and, certainly, only if they were properly documented.  And what about abbreviations?  Or a birth order reference?  There is no evidence that this level of conversation was had.  The quality assurance check could have dismissed a reference because a Bates number was attached to findings, but, unless the quality assurance check involved a complete review of the record, the process is highly likely to result in the removal of visit information and never adding to it, always moving findings toward the most negative result possible.

In a similar fashion, the coding of the frequency of sibling visitation plans mixes two concepts together and inappropriately treats them as similar.  On Table 30,[48] the coding scheme combines the finding that plans don't specify how often a sibling visit should happen with a situation where there is absolutely no plan.  Those are very different conditions.  On an operational level, it is so clear the corrective action for improving performance here would be very different depending on whether it is a poorly-crafted visiting plan or where there simply isn't one.

In one of the most egregious examples of unfairly characterizing the data ,the report almost always combined cases of alleged maltreatment that are "unsubstantiated with services recommended" along with cases that have been "substantiated".  This is inappropriate and distorts all of the findings regarding maltreatment investigation dispositions, except for the first instance in the body of the report when "unsubstantiated, services recommended" is reported on as a distinct investigative finding.

In table 9, the report appropriately displays the separate categories of findings of formal investigations following reports of maltreatment.  In this table, the category "unsubstantiated, services recommended" makes up just under a third (32.1%) of the findings for all the cases reviewed[49].  In the next paragraph, the following statement appears:

> "***For children in custody of OKDHS, we considered reports of maltreatment while in foster care that resulted in a disposition of "services recommended" to indicate that***

---

[47]Milner Deposition at 407-409.
[48]Case Review Report at 80.
[49]Case Review Report at 29.

*there were concerns about the child's safety or well-being in the current placement.*"[50] [emphasis added]

Dr. Milner defends the decision to group these cases together because he believes it is done that way in the CFSR.[51]  This appears to be a convenient shield when it suits the purpose, but one that is readily cast off in the interests of pursuing what's of interest to his purpose.  (This issue will be returned to when we discuss the number of movements of children.)  There are many reasons why this grouping is inappropriate and, once again, the decision casts OKDHDS in as negative a light as it can.  Characterizing nearly one-third of the findings inappropriately as negative systematically biases the findings of this report against OKDHS.

On the face of it, this grouping is inappropriate.  The legal basis for substantiating a case in Oklahoma is "credible"[52] evidence.  This legal basis is the lowest level of evidence in any child welfare system across the country and means only that a concern has to rise to the level of being believable.  It does not need a "fair preponderance" of the evidence and it is certainly not the "beyond a reasonable doubt" standard for evidence.  What this means is that the bar is very low in order to substantiate, so certainly, some qualitative difference exists between cases where a worker finds credible evidence, that is, at least something that is believable, and those where he/she cannot manage even that.

Dr. Milner asserts: "…services are being recommended as a result of that investigation of alleged maltreatment of the child.  So it's reasonable to expect that the services would be in some way logically connected to the findings of that investigation."[53]  Dr. Milner is correct in that it's connected; he is wrong in the assumption that this makes it a negative finding.

In Oklahoma, as is true everywhere, an investigation opens the door to broad scrutiny and can uncover issues other than child maltreatment.  A child protective investigation should not be narrowly allegation-focused, and Dr. Milner agrees.[54]  Instead, it allows the caseworker to look broadly at a family and gives the worker a mechanism for referring the family on to other types of services.  This is as true for foster families as it is for other families.  There is no absolute requirement that a referral for service *HAS* to indicate a safety or risk concern.  It only reflects that a need was observed and responded to by the worker.  Dr. Milner confirms that something as helpful as food stamps could be a recommended service.[55]  And yet, this finding is counted as a negative throughout the balance of the report and it is grouped with confirmed findings of maltreatment.

As can be seen in many of the examples of an arbitrary cut-off, when the information will be detrimental to the defendant, the definition is strict and the there is little leeway in terms of

---

[50]Case Review Report at 29.

[51]Milner Deposition at 95-96.

[52] Child Maltreatment 2009, Appendix D: State Commentary, p. 189.

[53] Milner Deposition at 508, lines 5-10.

[54] Milner Deposition at 509, lines 3-4.

[55] Milner Deposition at 507, line 18.

looking further, even within the record, for additional information.  But, when the plaintiff needs information in order to make their case, there is much more leeway accorded.  In looking for the permanency plan goal, a critical variable that the analysis uses to cut the data, the search is not limited to the Individual Service Plan (ISP), but the case reviewers are extended permission to search in the case record and the court orders for the goal.[56]  In no place that I could discern was the goal information ever displayed to show the difference between what was found in the ISP vs. what was found elsewhere in the case record.  That datawas certainly used to criticize OKDHS.

When searching for ISP's, the instructions were that it had to be on the ISP form itself, unlike the search for the goal, described above, or the treatment plans that preceded the ISP's:

> "3    Q     Is -- is it possible that there could be elements of
> 4     a service plan in a case file but that particular
> 5     document that discusses that element not be titled a
> 6     service plan?
>
> 7     A     Our understanding was that the service plan
> 8     was titled an ISP, and that's why we looked at that.
>
> 9     Q     Okay. So if there were elements of service
> 10    plans that are in these children's case files that
> 11    are not on a service plan form or labeled as an ISP
> 12    or Individualized Service Plan or service plan, then
> 13    that wouldn't be considered as part of your review;
> 14    correct?
>
> 15    A     If that's the official case plan and we were
> 16    looking for case plan elements, that is what we
> 17    would have looked at. As I said, I believe we also
> 18    considered treatment plans that preceded the ISP
> .
> 19    Q     I apologize. But if it wasn't labeled either
> 20    service plan, ISP, treatment plan, even though it
> 21    may have the same type of information, it wouldn't
> 22    have been counted by your reviewers; correct?
>
> 23    A     I -- that would have been contrary to the
> 24    instructions that we had provided, so it's my belief
> 25    that that's what we would have counted."[57]

Not only does it have to be on the ISP form, it has to be on the *precise* ISP form.  In examining one of the Quality Assurance Tracking Forms for Case number 223, the notation from the quality

---

[56]Milner Deposition at 428-429.
[57]Milner Deposition at 422.

assurance reviewer for whether the ISP contains a description of the placement states: "The first ISP doesn't contain a description of the placement of the child.  The 2nd ISP which is the dispo ISP does, but this question is asking about the first ISP."[58]   And again, here is an example where the information is in the record, but not narrowly in the place where it is expected to be by the case protocol.  The resolution/final decision in this case is "CT 0"[59], meaning that no credit is given.

Where Dr. Milner often uses the CFSR standard as a legitimate guide for how the instrument was constructed, the strategy for counting placements is clearly designed to maximize the number, bolstering plaintiff's case.  He argues, "We were looking at this whole area of movement in foster care from the child's perspective."[60]  But then he includes "respite" placements as one of the settings that he counts.  On two counts, that is untenable and, frankly, insidious.  First, it is clearly a federal position that "respite" services should NOT be counted as a placement.  The federal CFSR Onsite Instrument includes respite care as an exclusion from counting the number of placement settings when looking at placement stability.[61]

But even more cynically, this coding stacks the deck in favor of plaintiff.  It provides ammunition for a finding against Oklahoma *no matter what*.  This is a classic "damned-if-you-do, damned-if-you-don't" situation.  Plaintiff alleges in its Complaint  "[The]Failure to Develop and Maintain a Sufficient Number and Array of Foster Care Placements."[62]   In point of fact, respite care is precisely one of the strategies that States employ to provide support to foster parents:

> "Between 1983 and 1992, the number of foster care children increased about 74 percent while the number of family foster homes declined about 11 percent. A majorreason for the decline in foster homes is the stress involved in caring for foster children -- particularly children with special needs.
>
> Foster care experts and advocates generally agree that provision of respite care for foster parents helps recruit and retain foster parents. For example, a 1992 study sponsored by the Administration for Children and Families (ACF), Department of Health and Human Services (HHS) showed, and several experts have concluded that respite care is one of the top needs of foster parents. Retaining foster parents helps keep foster care children out of "at risk" environments and institutions, as intended by Federal statutes and regulations."[63]

---

[58] Oklahoma Case Review QA Tracking Tool, identified as Milner 048619.

[59] Ibid.

[60] Milner Deposition, p. 468, l 15-16.

[61] Children's Bureau, Child and Family Services Reviews, Onsite Instrument and Instructions, July 2008, p. 22.

[62] D. G. v. Henry, Complaint for Injunctive and Declaratory Relief and Request For Class Action, p. 24.

[63] Department of Health and Human Services, Office Of Inspector General, *Respite Care Services For Foster Parents - Six Case Studies*, August, 1994.

Title IV-B, the government's main prevention funding strategy goes out of its way to identify respite for foster parents as an allowable use of such funds:

> "Sec.431. (1) Family Preservation Services means services for children and families designed to help families (including adoptive and extended families) at risk or in crisis, including:

>> …respite care of children to provide temporary relief for parents and other caregivers (***including foster parents***);" [emphasis added] [64]

So here, Oklahoma's use of a well-recognized strategy designed to maintain foster parents counts against them. Efforts to promote retention of foster parents are punished.

This is not just a theoretical argument. In the instructions to reviewers about providing services to foster parents in order to prevent a move, the example that is provided follows:

> ***"Instructions (5.156): A placement may be said to be in the child's best interest if it meets the child's needs for a safe and stable environment. For example, if the child is placed with a foster parent and is bonded to the foster parent, but the foster parent becomes ill, it may have been appropriate for the agency to provide services to maintain the placement during the illness so she or he could continue to [sic] as a caregiver for the child."*** [65]

It is clear that the bar is very high here. This example injects a lot of hypotheticals into the situation, giving a strong message to the reviewers that they can imagine almost any scenario. Here, if the reviewer determined that a move occurred and that respite should have been provided to avoid it, it is a negative finding. If respite had been provided, it would have been counted as a move -- a negative finding.

Even if the move had been appropriate, a move is a move, and even a "good" move is a negative finding. It didn't really matter because the review was looking for a number. They didn't look any further, and they never asked. In discussing the merits of moving children in order to unite siblings[66], Dr. Milner acknowledges that case circumstances would have to dictate what's appropriate. Asked if the review looked for that:"No, we did not do that level of analysis."[67]

This is not the only area where what seems to be solid practice -- practice that would improve performance in areas where the plaintiff demands improvement -- is punished:

> "13      Q      Okay. So let's use that example. In your
> 14            study, would a move to return home be counted as a

---

[64]Definitions of Child Welfare Activities Allowed Under Title IV-B Subparts 1 and 2, (compiled from the Social Security Act and 45 Code of Federal Regulations), Title IV-B Subpart 1 (Child Welfare Services), Social Security Act, IV-B 1, Section 421

[65]Case Review Report at 168.

[66]Milner Deposition at 395-399.

[67] Milner Deposition at 400, line 10.

15      new placement?

16      A     If they discharged that child from custody at
17      the time they moved, that would not be counted as
18      another placement. If this was simply a trial home
19      visit, yes, we would count that as a placement…"[68]

As with respite care, a trial home visit– ***returning the children to their own home*** -- is a common and expected practice.  OKDHS would be criticized if it sent its custody children home without a trial attempt.  This may be a change in setting, but this is exactly the purpose of permanency planning, to test the waters and to attempt to safely and successfully get the child back home.  In a statement that seems incredible, Dr. Milner stubbornly defends the decision to count trial visits as a placement move:

"2         We did not make distinctions between
3      what kind of a placement it was because in the eyes
4      of the child, the child is being moved, and it's my
5      belief that it wouldn't matter to the child
6      necessarily if they are in something that somebody
7      else considers to be a foster care placement and
8      someone else does not. In a child's eyes, the child
9      is being moved, so we counted those placements."[69]

Again, a change of physical location does occurs in moving children from an out-of-home placement to their own home, certainly, but to a child, this clearly is something other than a placement change.  This is not a placement, nor a placement disruption, nor a cause for a negative finding.  This is what we work for in child welfare.  And yet, it will be a negative finding for OKDHS.  And it was done by Dr. Milner with intent:

"17    Q     Was your method of counting placements for
18     this report different than what the federal
19     definitions are for placement changes?

20    A     Yes, by design. "[70]

Dr. Milner conceded that there might well be some placement changes, on an individual basis, that were beneficial to the child.[71]  Given that he'd already demonstrated that he was not held to the CFSR definitions for constructing the instrument, it is unclear why he would not make the effort to identify beneficial from hurtful moves.  Though he attributes negative meaning to step-

---

[68]Milner Deposition at 470.
[69]Milner Deposition at 127.
[70]Milner Deposition at 471.
[71]Milner Deposition at 477-78.

downs from higher levels of care,[72] he offers no data on moves to kinship homes, placements into family care settings or other beneficial moves that might support long-term permanency for children.

In discussing an alleged lack of documentation, the report states: "Documentation of parent-child and sibling visitation was sporadic and frequently generalized, or completely missing, especially when the visits were supervised by foster parents."[73]  Again, the reference is to documentation that did exist in the file, but the file did not provide sufficient information for the reviewers to use, or it was difficult for reviewers to understand the context.  Given that the goal of OKDHS is to strengthen its use of resource parents, hence, normalize the relationship between the foster and natural parent(s), the Department should get kudos for using foster parents this way, but we might accept that the documentation standard for information from these para-professionals might be of a lower quality.  The point is that SOMETHING was in the record, underscoring that the foster parent visited with the parent AND that they told the worker.  Otherwise, how could even a generalized reference be made in the file?  This would have been the perfect reason to talk with the parent or foster parent for additional information.  And, really, nothing should be done to interfere with the very good practice of normalizing relationships between foster and natural parents.

The survey instrument's method of coding for mental health and dental evaluations is arbitrary and may exclude information that is relevant.  His question for the reviewers:  "…is there documentation in the child's case file that the child was ever formally evaluated for mental illness or developmental disorders?"[74]Dr. Milner is clear in his view that reviewers should be looking for documentation:

> "The agency still has the responsibility, upon taking custody of the child, to do a thorough physical, dental, mental health evaluation to understand the child's current status when the agency takes custody."[75]

He provides the case reviewer no real direction on where to look, and it is possible that the information might not always look like what a lay person thinks it should look like, and might not always be in the places where one might imagine it to be.  For example, would a health screening count as an evaluation?  And would reviewers understand that a health screening contains much more than just physical health information?

The CWLA's guidelines for mental health and substance abuse screening recommends: "Ideally the [mental health] screening should take place as part of a child's health examination upon entry into care and be conducted by a health professional with expertise in the developmental and

---

[72]Case Review Report at 50.

[73]Ibid at 16.

[74] Milner Deposition at 448, lines 9-11.

[75] Milner Deposition at 453, lines 17-21.

mental health and substance use/abuse needs of children in foster care." [76]   Were the case reviewers instructed to look in the health assessment for evidence of a mental health screening or evaluation?

"Federal EPSDT guidelines address mental health screenings as part of overall medical screenings and do not require consultation with recognized mental health organizations."[77]   The question becomes whether the instructions to case reviewers are sufficiently clear to address this issue.  Did the case reviewers limit their search to only mental health professionals?

It is not explicit in the Milner survey instrument documentation for reviewers where to look for this information.  Federal EPDST guidelines, CWLA guidance and American Academy of Child and Adolescent Psychiatry (AACAP) all point to the health *screening* as where these areas are examined upon entry into care.  Is a health screening as opposed to a health evaluation counted?  And, will non-medical reviewers have known to look in the health screening for mental health and other assorted information?

In a related concern, Dr. Milner says that all children should have a mental health examination upon entry into care and that it is irrelevant whether an exam had previously occurred no matter how proximate to the date of entry into care[78]. Dr. Milner maintains that even a comprehensive evaluation, no matter how current, would not satisfy the condition of his review.

Normal practice is for a health screening at the time of entry into foster care.  This health screening includes health, mental health and, normally, dental health screenings.  If a dental exam had been conducted recently, there would be no reason to consider having the child re-examined by a dentist, yet the instrument that collected data for this report requires that a dental exam happen after the child enters care.[79]

In other states, the occurrence of a dental exam before entry satisfies that need.  For example, in Michigan, the state dental policy clearly allows for the use of recent dental examination to substitute for an exam upon entry into care:

"(i) A dental examination within 12 months beforeplacement or a new dental examination shall be completed notmore than 90 calendar days after placement."[80]

And as the American Academy of Pediatric Dentistry recommends, "The most common interval

---

[76]CWLA, Best-Practice Framework for Addressing the Mental Health and Substance Abuse Needs of Children and their Families. January 21, 2003.
[77]Memo from Brian Ritchie, Acting Deputy Inspector General for Evaluation and Inspectionsto Susan Orr and Dennis Smith on July 8, 2003.
[78]Milner Deposition at 449-450.
[79]Case Review Report at 150, Item 4.44.
[80]Auditing Finding from State of Michigan, Department of Human Services' Mark R. Hunter, Licensing Consultant Bureau of Children and Adult Licensing, August 30, 2010.

of examination is 6 months." [81]

In places in the report, data are presented in a way that implies culpability on OKDHS' part.  In a report that Dr. Milner maintains to be "…as straightforward as possible in presenting the findings of our data collection and data analysis,[82] a key finding is that "78% of the alleged perpetrators of maltreatment of children in OKDHS custody were foster parents."[83]  Standing by itself, this finding taints the Department and implies something is wrong.  Dr. Milner, arguably, knows better.  In his report, in the bullet immediately preceding this finding, he reports on the number and percent of children who were subject of a maltreatment allegation and immediately following, in the same sentence, reports what proportion of them were substantiated.  Why doesn't he do the same with foster parents?

> "Q    To be fair, wouldn't you then report right here in the same area of the report the amount of maltreatment percentage that actually occurred by foster parents?
>
> A     If we -- we may have had that information. I'm not sure if we had that information or not, and I'm not certain that we did not report that, but this is what we reported."[84]

The argument is specious.  The allegation data can legitimately be reported as a descriptive statistic, but I believe the burden of full and fair reporting demands that the logical companion piece of data be included.  Whether the reviewers collected that data or not is irrelevant.  It should have been collected; it was knowable, and; it should have been reported by Dr. Milner.  This is an implied, negative finding and should not have been allowed to stand all by itself.

This kind of reporting continues.  In the very next bullet, the report finds that in a quarter of the cases (24.8%) where maltreatment was investigated, no action was taken during or after the investigation other than to report the investigation.[85] (I will set aside, for the moment, the issue that they only know what was reported, not what action was taken.)  Even a layman would ask how many of these investigations were unsubstantiated, for surely, if the allegation is proven false, is there any reason to expect that the Department would do anything other than to investigate?  The statement of the finding is an overstatement by implication and inference.  They investigated maltreatment *allegations*.  This finding should have been reported for substantiated cases only.  It is inappropriate to let that stand by itself.  This is not a "straightforward" reporting of the facts.

Similarly, the report descriptively provides information about the length of time it takes for children to become free for adoption.  If it had been left at just that, it would be hard to object.  However, the data on the longest stayers is further pulled apart following the straightforward

---

[81]Guideline on Periodicity of Examination, Preventive Dental Services, Anticipatory Guidance/Counseling, and Oral Treatment for Infants, Children, and Adolescents, p. 93.

[82] Milner Deposition at 35, lines 18-21.

[83]Case Review Report at 26.

[84] Ibid.

[85] Ibid.

presentation of fact in a table of the report.[86]  There are very common reasons why some children require a long time to be freed for adoption, with court appeals and the refusal of an older child to be considered for adoption among them.  There was no attempt to capture these data:

> "Q     Do you know, for example, how many of the 30 children, where it says 36 months or more on Table 25, objected to being moved towards adoption?
>
> A      No, I do not know." [87]

> "Q      I guess it's fair to say you didn't investigate whether that occurred in these individual cases of the 30 set forth in Table 25?
>
> A      No, we did not look at that."[88]

As this information might be mitigating circumstances that give credit to OKDHS, it is not odd to me that these kinds of data were not collected.  It is another instance where asking questions beyond the case record could have been illuminating.  It is also a reinforcement of Director Hendrick's focus on long-staying cases that moves children who get stuck.  In another "gotcha" example, though, OKDHS would be criticized for long-staying children if they did nothing about them, yet the mix of point-in-time counts and a calculation that would use an exit cohort used in this report disproportionately captures any case that gets "unstuck," punishing OKDHS for having a long-staying case AND for moving that case.

What follows is a rather lengthy quote from Dr. Milner's deposition, but it is important to read it in its entirety for it shows clearly that the review is willing to search for information and then use that data to say more than the data actually says.  Here, the reporting of behavior is used to equate to the emergence of that behavior.  Just as with the documentation fallacy that was addressed earlier, the mere mention of a behavior does not mean that it just suddenly and instantly appeared.

> "A    The only way we would know when it arose is when it ident -- when it was identified, and I can look for the specific data element in here that captures information on when the behavior was identified.
>
> Q    Well, you'll agree with me, sir, though, that just because it's identified does not necessarily correlate when the behavior problem arose?
>
> A    **We would have no way of specifically knowing that**, [emphasis added] but we did know when the agency or the foster caretaker first said this is a behavior problem, and for the percentage of children in our sample whose behaviors were not identified until they had been in care for at least six months, that is a suggestion that either somebody is not monitoring the child's behavior or that the child's behavior arose at that

---

[86]Case Review Report at 66.
[87] Milner Deposition at 383, lines 14-17.
[88] Ibid at 384, lines 13-16.

particular point in time.

Q    But you didn't say that in your report; what you said in your report was that a large percentage of identified behavior problems appear to have arisen during the child's stay in OKDHS custody.

A    And that's our conclusion from the information that we gathered.

Q    Although you can't -- you've even admitted youcan't confirm that?

A    ***We could never confirm what the child might have come into care experiencing***, [emphasis added] but we can confirm, based on our review of the documents in your official case files, that that particular percentage of children's behavior problems were not identified by the agency that has custody of that child until they had custody for at least six months.

Q    Aren't you overstating –

A    No. I'm trying –

Q    -- what you found out, Dr. Milner?...

A    –to be as clear as I can.

Q    I mean, now you're saying that we can tell by the records what was identified by the -- by the agency, but you've already conceded, have you not, sir, that all you did was a record review; you don't know what the agency knew that was beyond the case file; is that correct?...

A    ***I know what is in the case file***, [emphasis added] the official case file which we understood to be the official record of the agency for the children that's in its custody –

Q    Yet you know –

A    -- and if it was documented there -- **if they knew it and they didn't document it, that's another set of issues**. [emphasis added]

Q    So -- so your opinion is that if they knew it and didn't document it, it didn't exist?

A    It was—**all I know is that it was not documented**. [emphasis added]

Q    Doesn't mean it didn't exist; correct?

A    No, it doesn't mean that it didn't exist, but it does mean that they didn't document it and that the next worker who came along would not know that it exists.

Q      Unless they talked to the parent or the caregiver; they might tell them; right?

A      They might possibly tell them." [89]

Even without this above discussion in his deposition, Dr. Milner knew he was on shaky ground with this finding.  Despite prominently highlighting the finding in bold print in the middle of the page:

> ***When compared to children in custody for less than six months, children in custody for more than six months had substantially higher identified incidences of school problems, aggressiveness, sexual acting out, hyperactivity, and unusual or abnormal behaviors.*** [90]

And yet, this finding, which is stated so unambiguously, is immediately preceded by a clear caveat indicating that there is considerably less certainty about this finding:

> "These data suggest that although one-half of the children in the sample may have entered OKDHS custody with behavior problems (although we cannot confirm this), a large percentage of identified behavior problems appear to have arisen during the child's stay in OKDHS custody. The length of time that children remain in OKDHS custody suggests that children's behavior problems may be the result, at least in part, of being in OKDHS custody." [91]

In this exchange, all the problematic elements are present:  the presumption that something doesn't exist if it isn't written down; the clear sense that more information might have been had if they had gone to ask; a stretching of the meaning of the data that was collected; and a highlighting of a dubious finding, but with a less attention attention-seeking disclaimer that presumably demonstrates transparency.

**Permanency Goal Changes**

In examination of goal changes, as with placement counts, it is precisely the number of times the coding of a change occurs that is counted.  It is evident that this decision generates as high a number as possible, obscuring the evidence that would shine a light on what is happening with children in Oklahoma.

> "Q  …the statement is made, the longer the child was in OKDHS custody, the more likely the child was to have multiple goal changes. The reasons for this are not clear. However, it may be that as children are in custody for long periods of time without achieving permanency, they experience multiple goal changes as a result of the agency not establishing appropriate goals and/or a lack of diligent effort to

---

[89]Milner Deposition, pp. 358-360
[90]Case Review Report at 56.
[91] Ibid.

achievepermanency goals that were established early on.

A    Yes.

Q    Is that speculation on your part?

A    I think that's a reasonable conclusion. When we -- when we find that a child has a change from one goal to another goal to another goal, we have to assume that either the goal is not appropriate to begin with for the child or the efforts to achieve the goal are not in place.

Q    So why did you say the reasons for this are not clear?

A    Because –

Q    It's not speculation on your part?

A    Because we did not -- we would have no way necessarily of making a determination about what the specific reason for not achieving a goal was.

Q    At least based on the methods that you performed in the study for this report, you would have no basis to do that?

A    Based on the official file of the child from the department, we would not have been able, I don't believe, with a great deal of accuracy to discern specific reasons for goal changes.

Q    Have you heard of consecutive permanency goals, that concept?

A    Yes.

Q    In tracking consecutive permanency goals, how would a correction be counted –

A    How would –

Q    -- for your study?

A    A correction, could you explain for me what you mean by a correction?

Q    Well, let's first get -- let you try to define this, if you can. What -- how do you interpret a consecutive permanency goal?

A    It means a series. As we use the term in our study, we were referring to a series of goals, one after the other.

Q    Okay, and so how did you tell your case reviewers to count those; every time there's

a change?

A   Every time there would be a change in a goal, we would count that as a change.

Q   What if a worker entered a code and realized it was a wrong code and entered another code; would that be counted as a separate permanency goal change?

A   I don't know how we would know from the record that the worker entered a correct -- an incorrectcode and made that change, but I also cannot imagine that that kind of incorrect data entry would be at such a level of prevalence that it would greatly affect our findings here.

Q   What about a situation where a worker forgot to include a concurrent goal and then updated the goal upon consultation with a supervisor so the goal comes in two weeks after the original goal?

A   That's a change in the goal. If the worker forgot to do something or did not know how to do something or did not know that they should do something, that's a legitimate goal change for a child, and it would affect the length of time that the child spends in foster care."[92]

The, by now, familiar pattern is evidenced in this exchange.  The information that the reviewers can track in recording goal information is anything in the file that was provided them.  That includes information from the electronic record, Oklahoma's KIDS system.  Having been the program director for New York's Statewide Child Welfare Information System, the NY equivalent of KIDS, I know that even as innocent an event as an oversight error can produce a record of a new permanency goal record.  In other words, a worker could enter a return home goal, and then realize that for this child, the intent is to pursue both a return home goal AND an adoption goal.  Of course, a worker could enter a goal, confer with his/her supervisor, and appropriately amend the goal.  To a common sense lay person, this is a one-goal event, but to the case review here, this is a two-goal plan.  Pursuing a concurrent goal is strongly encouraged in many child welfare programs, so this scenario is at least possible.  That situation would count, in the Milner case record review, as one goal for the initial entry (the error) and one goal for the correction.  Again, using a lay person's sense of reasonableness as a test, this seems incredibly strictand also inaccurate.  In the final exchange, above, it is beyond strict; it is punitive.  "If the worker forgot to do something or did not know how to do something or did not know that they should do something," that's just too bad.  Dr. Milner justifies this by saying that it would yield an increased length of time in care.  But the example put to him so clearly could just be an error.  Yet he is OK with inflating the apparent negative finding against OKDHS.

A final point to the above discussion culminated in the following exchange:

"Q   So if it's not in the file, it doesn't exist?

_____

[92] Milner Deposition at 375-378

A    If it's not in the file, we did not count it, we did not capture it, and I think that's very legitimate. There are federal requirements that require child welfare agencies to document in the child's file the permanency goal, along with the steps to achieve the permanency goal, and as you look through our document here, you're going to find situations where we found Oklahoma out of compliance with its own policy in those very areas that you're asking me about."[93]

The Department may well be out of compliance with policy or with documentation, but even that is not known with certainty.  None of Milner's findings, however, end up being conclusive about behavior on the ground by OKDHS.

In example after example, the survey instrument is constructed so that an absolute rule is made as to what allows data to be recorded or not.  This results in both losing potential information that may be useful to OKDHS and permanently biasing the data against OKDHS.  There is nothing in the survey instrument's design, goals or construction that would have precluded a more thoughtful approach.  As it is, the current approach draws a bright line and this serves to exclude relevant information rather than collect all that was available.  All of the above examples show that.  There are more.

**School records**

Again, the bright line of "14 days" was used for information in the file concerning the provision of the child's school records to the foster parent.  In the instances where foster parents may have had the records, but the date wasn't clear, these cases were marked as "can't determine."[94]  And this finding is translated as findings in the report of delays in providing records.[95]  Rather than exclude information about school records because it didn't have a date, the data could be interpreted to really shed light on the real question of interest:  did the foster parent have the records?  There should be an affirmative responsibility on the part of the author to make the distinction clear.  This is interpreted in the report as the reviewers couldn't determine if there were records.  Obviously, there WERE records in some places; only the reviewers couldn't determine the date and time the records were given to the foster parent.  The familiar theme is evident:  the instrument was intended to capture absolute conformance to policy and had little to do with trying to determine if children in Oklahoma were being served.

## Lack of "Apples-to-Apples" Comparisons

Dr. Milner understands that comparisons need to be made between groups that are comparable as he uses the "apples to apples" language in his deposition.[96]  And yet, the report clearly violates

---

[93] Ibid at 378-379
[94] Milner Deposition at 456, 13.
[95] Case Review Report at 10 and 73.
[96] Milner Deposition at 527, line 8.

that standard.  The case has been made earlier about the sample itself not being comparable, but this problem extends to narrative findings as well.

In a case vignette, the argument that is trying to be made is that the child is worse off a year later, with the implication that it is due to OKDHS care.  The comparison is made between a child's adoption profile in the earlier instance and a clinical diagnosis of Post-Traumatic Stress Disorder (PTSD) made a year later.  This comparison of these two items is unconscionable.  Having supervised the adoption function in New York State for many years, it is very clear to me, and I would fully expect it is clear to Dr. Milner given his 37 years of experience in child welfare, that the contents of an adoption profile is a *marketing attempt* to find a home for a child.  While some gentle references are often made to disabilities and other conditions, this is not the place for a full and complete disclosure of all details about a child.  To compare this form of documentation with a clinical diagnosis of PTSD is completely inappropriate.  I do not have access to the diagnostic report that was completed a year later, but, based on my experience, the diagnosis of PTSD in foster children is rarely related to a single event.  Rather, it is the result of an accumulation of stressors over time.  And a clinical record could hardly be more different than an adoption profile.  The comparison would have to be between like documents and an adoption profile and a medical diagnosis report couldn't be more different.  This is clearly stretching to try to make a point.  It is unfair and the finding is invalid.

## Quality Assurance Deficits

It is not clear what level of training was consistently provided, what the fundamental qualifications of the reviewers were, nor is it clear what happened in the evolving quality assurance process that governed the collection of the data that was used for this report.  Standards were not always clarified, and very important decisions were left to the reviewers to decide.  When all was said and done, there can be no certainty of anything except Dr. Milner's assertions that we really just need to trust him.  Following are some examples of particularly troublesome issues.

### Lack of Clarity to Reviewers

The following are some examples where reviewers were given a huge amount of leeway with precious little guidance in order to make decisions that are highlighted boldly in the report.

**Services to Prevent Placement Changes**

> *No services to prevent placement changes were offered to foster caretakers in 76 percent of the cases and to children in 72 percent of the cases in situations in which it would have been appropriate to try to prevent the placement disruption.[97]*

Item 5.157 of the survey instrument used to gather data for the above finding instructs the reviewers to do the following:

> "5.157For the child's most recent placement change before June 1, 2010, is there documentation in the case file that the foster care provider, facility staff member caring for the child, parent (if on a trial reunification placement)and/or the child discussed the possibility of the placement disrupting with the child's Child Welfare worker prior to the disruption?

> **Clarification (5.157): Use "98=NA" for not applicable regardless of the reason the response is NA.**

> 1 = Yes - There is documentation in the case file indicating that the possibility of placement disruption was discussed with the child's Child Welfare worker prior to the disruption
> 2 = No – There is no documentation in the case file indicating that the possibility of placement disruption was discussed with the child's Child Welfare worker prior to the disruption
> 98 = NA, a relative/kinship resource was identified and the child was moved intentionally to a relative/kinship caregiver"[98]

As has been pointed out frequently, this instruction assumes services are not provided because they are not written down. Here, however, it gets even more treacherous. The very subjective decision has to be made by the reviewer as to whether the record indicates if the caregiver SHOULD have been provided some service, and that those same services COULD have prevented disruption. This analysis is done in a vacuum of not knowing what services exist or what services might be available.

The survey question itself prompts the reviewer to look for problems. In the way the question is worded, a change of placement is equated to a disruption. Clearly, the word 'disruption' means that something was interrupted, and Dr. Milner confirms that he defines a disruption as an "unplanned change."[99] So, except for kinship placements, which are coded as '98,' all other placement changes are considered to be *disruptions* in the first instance. A positive something must be found in order for it to be classified as a change. Otherwise, it remains a negative

---

[97]Case Review Report at 52.
[98]Case Review Report at 168.
[99] Case Review Report at 495, line 10.

finding.  Again, the default position is a finding against OKDHS, and we are dependent on the act of a worker writing something down, AND, writing it down in such a way that the unwritten standard being applied will be satisfied.

## Definition of Service Types

One further example of Dr. Milner having a personal standard where we can't be clear how that message was sent and received by the QA staff and the reviewers.  There is a conversation in Milner's deposition about the meaning of the service type "counseling" as a possible response for a service provided which is illustrative of this issue.[100]  Dr. Milner offers a very broad definition of counseling, but under questioning, he maintains that the case reviewers, who "…were not social workers who had worked in the child welfare field,[101]" had a good understanding of what the term "counseling" means.  When asked if casework counseling could have been an acceptable choice, he explained, "There's a difference between providing counseling and just checking in on somebody to ask how it goes."[102]  I would challenge Dr. Milner to find the line that separates that aspect of casework.  An intention by a worker to check regularly on a family member in order to perform a safety check and/or to reinforce an objective the worker is pursuing could easily look like a casual visit, but still fall squarely within a counseling relationship.  I do not believe that a case record is going to be very valuable in providing that level of information to discern the differences and nuances, nor is it credible that the training alluded to by Dr. Milner could have provided a consistent definition.

Dr. Milner, by virtue of his training in social work, should be aware of this counseling concept.  Further, OKDHS Practice Standards recognize the "use of self" as an important construct:

"1. We continually examine our use (misuse) of power, use of self and personal biases

- We must be aware of and recognize how we use the power of the position.
- Our use of team supports the process of examining personal biases and use of self.
- We believe in the importance of hearing all voices—whether we disagree or not.
- We continually assess our personal biases and styles, ensuring that they do not interfere with our ability to partner with families; at the same time we will regularly enter into discussions/mentoring with our supervisor (at all levels) about personal biases and the way they are impacting our work.
- We allow ourselves to imagine and feel the experiences of families as we work to assist them in accomplishing their goals.
- It is critical that families see and believe that we are genuine and that we care."[103]

---

[100] Miller Deposition at pages 500-506.
[101] Milner Deposition at 501, lines 11-12.
[102] Milner Deposition at 503, lines 5-7.
[103]Oklahoma Department of Human Services, *Child Welfare Practice Model Guide*, Version: October 31, 2008 Page 2 .

The "use of self" is a recognized social work principle and it is embedded in OKDHS' practice standards.  Even brief consideration of this concept dispels the notion that the quality or purpose of an interaction can be inferred from the length of that interaction.  Brevity is not equal to unimportance.  The final bullet in the OK Standards  – the proof of genuineness – is a good example.  One of the ways in which workers can demonstrate genuineness and empathy is by showing interest, by routinely checking in.  If done in the service of developing and preserving a relationship, "checking in" is a legitimate and sanctioned social work practice that falls well within the notion of casework counseling.

In a final defense, when asked how the case reviewers know the difference between counseling and just checking in on a client, Dr. Milner responds, "I think common sense has to enter into it at some point."[104] This answer makes clear that there is little expectation that this level of nuance described above could ever be consistently represented in case notes or necessarily identified with certainly by non social work, or other non-clinically trained, case reviewers.

**Safety and Risk**

One of the most difficult issues in child welfare training has been to teach the case worker to be able to distinguish between safety and risk.  A summary slide from a recent presentation by Barry Salovitz, a well-known national expert on child protection, broadly outlines the deep nuance and level of knowledge required to understand the issues of safety and risk.[105]

---

[104] Milner Deposition at 503, lines 18-19.

[105] Barry Salovitz, 2010 Conference on Differential Response in Child Welfare, Casey Family Programs.

# Safety and Risk Fundamentals

Safety is a subset of risk. All safety concerns are risk issues. Not all risk concerns are safety issues.

| RISK is concerned with... | SAFETY is concerned with... |
|---|---|
| Assessing the likelihood of future harm; identifying the nature of the risk/safety issues | Assessing present danger |
| Decision making based on a time continuum | Decision making based on the present to the immediate near future |
| Harm on a severity continuum from mild to serious | Serious harm |
| Safety threat resolution; risk reduction through improved family system functioning; well being | Immediate protection; protective capacities supplementation |

The survey instrument for this report not only muddies these two concepts, but also allows formal or informal risk and safety assessments to be counted.[106]  Dr. Milner concedes that the timing of those assessments is not clarified for the reviewers or quality assurance managers, and it, once again, depends entirely on whether and how well the worker manages his/her documentation.  Given that caseworkers frequently struggle with these two concepts, it is difficult to imagine inter-rater reliability is high on this point.  While some of his reviewers did not have direct experience carrying caseloads, Dr. Milner assures that they were trained, verbally,[107]on these issues and "…would have an understanding of what we were trying to capture here."[108]   Asked specifically if he looked for inter-rater reliability issues between his reviewers who had experience versus those who did not, he answered no.[109]Whether the results of this particular item were used in the report or not, it still emboldens his case reviewers to make very difficult decisions without sufficient information.

**Quality of the Case Files**

In the Milner case review, a section was written commenting on the quality of the case files that

---

[106]Milner Deposition at 514-519.
[107] Ibid at 519, lines 5-10.
[108] Ibid at 518, lines 20-25
[109] Ibid at 518, lines 5-8.

were reviewed.[110]  The question that asks his case file reviewers to determine if data were in a file is, once again, biased against OKDHS and creates misleading results because of the way the data are reported.  The item asks the case file reviewers to:

> "Indicate whether the following information was missing from the file or was difficult to find."

> Reviewers were instructed to "record a '1' if the information WAS in the file and to enter '0' if the information WAS NOT in the file.[111]"

There follows a long list of items to be responded to using this coding scheme.

Even a cursory look at this survey inquiry shows the potential confusion to reviewers.  If something was difficult to find, did the reviewer follow the introductory instruction and record it as "missing or hard to find" or did they record it as "WAS in the file"?  And, given the number of times the condition of the files is mentioned, did the reviewer ever "punish" OKDHS by marking his/her finding a "WAS NOT"?  Dr. Milner was unable to recall how the coding was resolved for this item or how it was trained to in quality assurance.[112]

**Appropriate Placement**

Item 5.155 of the survey instrument collected data on whether services were offered or provided to maintain the placement "…if maintaining the placement was **appropriate**."[113] [emphasis added]  It is not clear at all how this standard of appropriateness was trained to or assured.  For example, the instructions for Item 5.156 point to an example of a caretaker who was ill and that possibly the agency should have given services to so that the foster parent could continue as a caregiver[114].  It is inconceivable that this hypothetical example with so many possible individual circumstances that could make the offer or non-offer of services appropriate or completely inappropriate can serve as a training standard for the reviewers.

When asked if reviewers were free to determine what an adequate check would be, Dr. Milner'sanswer was, "I think my reviewers understood what an adequate check would be."[115]

**Contacts**

In the survey instrument, Grid 2-F, the form that was used to collect information on workers' contacts with foster caregivers, the case file reviewers are asked to report on the reason for the lack of face-to-face contact.  There are 9 reasons provided along with the instruction to select

---

[110]Case Review Report at 16.
[111]Case Review Report at 184.
[112]Milner Deposition at 523-525.
[113]Case Review Report at 168.
[114] Ibid.
[115]Milner Deposition at 492.

only one.  Reason 2 is that the child welfare worker or supervisor left the agency.  Reason 7 is that there is no indication that a visit was arranged.[116]  One can readily imagine a situation where both of those conditions exist.  Which would be coded?

> "16   Q      If more than one reason was indicated in a
> 17      file, which reason was chosen or permitted to be
> 18      entered?
>
> 19   A      I would assume the primary reason. I -- I –
> 20      we don't have any specific instructions about which
> 21      reason to use."[117]

## Best Interests

The same training and quality control issue applies to the determination of a placement that is in the best interests of a child.  The definition offered to reviewers and quality control staff is one that "…meets the child's needs for a safe and stable environment."[118]  When asked, Dr. Milner responded in this respect:

> 14   Q      So you were depending on your case reviewers
> 15      to be able to make those kind of judgments?
>
> 16   A      I was depending upon the case file to provide
> 17      sufficient documentation so that they could make
> 18      that judgment, yes.[119]

## Placement Disruptions

> "16   A      If that [a step down] is the plan for the child and it's
> 17      determined that that is the best interest of the
> 18      child, I would not classify that as a placement
> 19      disruption.
>
> 20   Q      Did you give your case reviewers an
> 21      explanation of that type so they could make those
> 22      interpretations when they reviewed for this data
> 23      item?
>
> 24   A      I do not know specifically. That is probably
> 25      one of the examples that we would have given to

---

[116]Case Review Report at 129.
[117]Milner Deposition at p 440.
[118]Case Review Report at 168.
[119]Milner Deposition at 494.

1       them.

2       Q      Is that written down anywhere, is it, sir?

3       A      No, it's not specifically.

4       Q      It's verbal?

5       A      Verbal.  We went through the entire instrument
6       with our reviewers during the training.

7       Q      Do you have a specific recollection of giving
8       that example to your reviewers during the training?

9       A      No, but it is an example that I would tend to
10     use."[120]

Asked if there was training on planned changes versus disrupted changes, Dr. Milner stated:

"1       A      I don't recall if we specifically addressed
2       that in our training. We went through the items of
3       the instrument. I do not recall specifically what
4       we told them about this particular item."[121]

Further complicating this issue is the fact that the reviews all took place at a distance and reviewers accessed an electronic record on their own computers.  Due to the distance and the lack of any pre-preparation of the files, the reviewers were free to figure out for themself how best to do the work.[122]

## Quality Assurance ProcessDeficits

Many of the coding issues and the instructions in the instrument itself set up many opportunities for error on the reviewers' part.  However, the qualifications of the reviewers themselves also make consistency of response difficult at best, especially when professional judgment is called for.

"23    Q      "…How were your readers trained with regard to
24    what is or what is not significant information?

25    A      I don't recall that we went into great detail

---

[120]Milner Deposition at 497-498.
[121]Milner Deposition at 496.
[122]Miller Deposition at 519-522.

1     over what constitutes significant information…"[123]

Given the great flexibility that this case file review process employed, a great deal depended on the quality control process.  According to Dr. Milner, the process began with general training of the workers.  The early inter-rater reliability work identified areas where there were concerns, and these areas were the subject of several QA sheets, and instructions were hard-coded into the instrument that the reviewers used, presumably so that their attention was drawn to them.

> "9    A    Yes. We had the QA process -- we had the
> 10    initial QA process written down. That QA process
> 11    got expanded as time went on.
>
> 12    Q    SoI—IcangotothatcompletesetofQA
> 13    documents as it got expanded and find in there
> 14    instructions to the QA people that you're going to
> 15    review every case file to make sure the answers were
> 16    correct?
>
> 17    A    No, you're not going to find that instruction
> 18    in the QA -- in the QA document itself. The QA
> 19    document itself we created as we began the review
> 20    process after we completed the pilot review. As we
> 21    got into the review process, we expanded the scope
> 22    of quality assurance. I don't believe that we
> 23    actually expanded that document and wrote that down,
> 24    but the people on my review team who were conducting
> 25    quality assurance reviews, including me, spoke
> 1    together often so that we could identify areas of
> 2    potential problems and know which items we needed to
> 3    focus on in particular, and I do believe that this
> 4    is one of those items where in our very early
> 5    inter-rater reliability reviews, we identified some
> 6    potential for confusion among workers."[124]

During the course of the review, issues arose, discussions were had and decisions were made.  Dr. Milner characterized this process as having a lot of internal discussion among the quality assurance folks, but little of this work was formalized, and Dr. Milner's defense is generally that his readers knew what they were looking for and his reviewers were aware of what to catch.  In short, "trust me" is his response.

It is eminently clear that a dangerous situation was constructed where it became possible that the messages, overt and implied, in the instrument itself and the unrecorded conversations that were

---

[123]Milner Deposition at 424, 425.
[124]Case Review Report at 490-491.

focused on getting the case reviewers to answer in the same way, combined to create risk of a strong bias in this data collection effort.  You can consistently get people to agree on something and still be wrong, that is, "it can be reliable without being valid."[125].  In a biased environment, reviewers can certainly know what is expected of them.

Combining with the environment that was created, the training and experience of the case file reviewers was also an issue.  Dr. Milner relies frequently on the professional experience of his staff, but he himself tells us that their experience is varied.  When asked directly if all of the reviewers were trained and experienced child welfare workers.  His answer: "No, they were not.[126]"

When asked about inter-rater reliability, he identified this particular question [number of placements] as having been problematic in the reliability tests, so quality assurance folks were asked to pay particular attention to it.[127]

Under questioning, he was further asked to clarify what process he believes made the answer to very subjective questions consistent across all his reviewers.  A good example is question 5.155 concerning whether services to maintain the placement were offered or provided.[128]His answer is the partly documented quality assurance process[129].

In discussing how he trained for identification of "SIGNIFICANT"[130] [as emphasized in the instrument] information about the target child:[131]

    "8   Q     Can you testify, sir, that all of your readers
     9         were trained on how to interpret significant
    10         information as that's used in the clarification on
    11         Page 116 of your report?

    12   A     I cannot tell you that we included any
    13         additional criteria for significant in our training,
    14         but I believe our reviewers would understand that
    15         based on the instructions that we gave them.

    16   Q     And what instructions did you give them with
    17         regard –

    18   A     We gave them these instructions here and as we

---

[125]Smollar Deposition at 120, line 12.

[126] Milner Deposition at 483, line 10.

[127] Milner Deposition at 491, lines 5-6, and 486 at lines 18-23.

[128]Case Review Report at 168.

[129]Milner Deposition at 483-486.

[130] Case Review, Item 2.3 Clarification at 116.

[131]Milner Deposition at 424.

19    worked with them through the quality assurance
20    process."[132]

Another example comes from the assumptions about how readers would look to answer questions about whether the worker had contact with foster parents.  The instructions ask for **_explicit_** [as emphasized in the report] documentation.[133]  Milner testified:

"1    … how did you train your reviewers to
2    understand what is explicit documentation? [indicating the worker had contact with foster parents]

3    A    Clear documentation.

4    Q    So you used the cinnamon -- synonym clear when
5    you did your training?

6    A    This was a clarification that we issued
7    afterwards. I would expect any reviewer to know
8    what explicit means."[134]

"16    Q    Did you do any test of your instrument to
17    determine whether or not this -- your reviewers
18    understood what explicit documentation meant?

19    A    Our QA process, I believe, would have
20    identified that if there were problems with workers
21    either recording something as a contact with a
22    foster parent or not recording it when it was one or
23    the other."[135]

Finally, the subjectivity of the quality assurance process was revealed.  After reporting that he could not recall specific written instructions for quality control processes around placements, a critical variable in this report, Dr. Milner states that he recalls discussions to alert the quality assurance reviewers:[136]

"2    Q    And I guess each reviewer then was free to
3    determine what an adequate check would be?

4    A    I think my reviewers understood what an

---

[132]Milner Deposition at 426.
[133]Case Review Report at 129.
[134]Milner Deposition at 438.
[135]Milner Deposition at 438.
[136] Milner Deposition at 491, lines 17-25, at 492, line 1.

5       adequate check would be.

6       Q      And how do you know that, sir?

7       A      Because we were all collaborating together
8       around what we needed to do on this entire review
9       project. We had discussions around the issues
10      there. We were alerted to this, and I believe that
11      my QA reviewers did a very thorough job in checking
12      this"[137].

It's obvious that the quality assurance system had serious flaws.  The process had an original written strategy, albeit even that strategy was sparsely documented.  Over time, areas of concern developed and were discussed among the QA reviewers.  We have no idea what messages, explicit or implied, were transmitted to the reviewers.  The written protocol was not updated[138] and the danger of "group think" became a possibility.  We know there were problems with some items, and we know from Dr. Milner, above, that when there were issues, they were discussed among themselves.  What we can't tell is whether any divergence from the original purpose developed, where readers who, due to inclination or by suggestion, whether implicit or unwitting, move to punish the Department because the files were alleged to be messy or because the leaders were looking for that type of a result.  What we know is that changes to the QA system evolved, but we can't know exactly what the QA process became.  Given the consistent direction of the emphasis for the survey and the survey coding strategies, if the change occurred, it can safely be posited that the change moved against OKDHS.

## Conclusion

The results of this report are invalid; they should be set aside and not relied on.  Under the guise of rigor and fact finding, the work was designed to produce the worst possible findings from the case file review.

The methodology was faulty:

- The case record review process limits the report's findings to an exercise of discovery of how thoroughly and how well workers documented their activities.
- The point-in-time sampling methodology, that is, the decision to select children who were in care on March 1, 2010, biased the results of the entire record as it is predisposed to systematically increase the focus on long-staying children.
- Even when the point-in-time methodology allowed any short-stayers to enter the sample, they were systematically excluded.  The decision to eliminate children who were in care

---

[137]Milner Deposition at 492.
[138] Milner Deposition at 490, lines 17-23.

less than 60 days was arbitrary and eliminates a whole class of children in the care of OKDHS.

The treatment of the data was faulty:

- In the actual data collection survey instrument, decisions were made that systematically biased the findings against OKDHS.
- In the case review data collection survey effort, the messaging contained in the instrument that reviewers used was so strident and biased that a hostile environment to OKDHS was created that reinforced looking for negative findings.

The analysis and reporting of the data overreached the ability of the data to answer what was asked of it.

- In the data analysis, the conclusions drawn overreached the data, further biasing the findings contained in the report.  Improper conclusions and negative inferences taint all of the analysis.

The controls exercised over the review process were faulty.

- The reviewers themselves were of mixed backgrounds in terms of experience and were asked to make judgments that not all of them may have been capable of doing with reliability.  Furthermore, each reviewer was left to his/her own devices to organize and review the cases, leaving it to trust that all had similar work ethics and organizational skills.

- The quality control process was undocumented, evolving and based in a close group of people who may well have reinforced each other to develop a set of findings that constructed a story to support an already determined outcome.

In the end, the case record review does not answer the questions of interest about the care of children in the custody of OKDHS and does not even offer a fair and complete view of the biased sample that the review describes.  This review and all of its findings is tainted and should be set aside.

Any exhibits, graphs or considered materials utilized herein may be used at trial.

All of the opinions expressed in this document are my own.

_Larry G. Brown_                                     _6/14/11_

Larry G. Brown, MSW                                June 14, 2011

# Appendix A – Resume

**LARRY G. BROWN**
1178 Godfrey Lane
Niskayuna, NY  12309

(518) 370-9999 larry.g.brown@gmail.com                    (518) 421-7271 Mobile

Larry Brown, MSW, is a private consultant, working to help public child welfare systems drive performance in service of children and families.  He is the former Executive Deputy Commissioner for the New York State Office of Children and Family Services (OCFS).  He was the Child Welfare Director for New York and served as the SACWIS Program Manager before that.  He has direct experience with CFSR's, using NCANDS and AFCARS data and has used data to drive public policy, inform practice, and support front-line workers.  Larry has an extensive background in child welfare services, child care, adult services and juvenile justice. He has a strong background in policy, research and evaluation.  He works in areas related to child welfare, juvenile justice, executive coaching, data systems/management and systems improvement.

Larry has demonstrated an ability to lead and motivate human services teams.  He is a proven administrator with strong policy, practice and operations credentials.  He has demonstrated an ability to communicate down and across organizations and large systems.  He has served as a highly disciplined manager and is an excellent facilitator and strategic problem-solver.

### *Education*

**Post-M.S.W. graduate courses**
University at Albany, State University of New York, Albany, NY

**Master of Social Work (M.S.W.), 1983**
University at Albany, State University of New York, Albany, NY
     Management Concentration.

**Bachelor of Arts (B.A.), 1974**
Bowdoin College, Brunswick, Maine
     American History

*Employment History*

---

**Consultant, Larry Brown Associates**                    9/2007—Present

A private consultant to government entities, foundations, private agencies and national associations on areas related to child welfare, juvenile justice and human services.   Current engagements include work with APHSA, the National Resource Center for Child Welfare Data and Technology at CWLA, National Governors Association, Casey Family Programs, Los Angeles County,a private multi-service residential and in-home services provider and Riggs, Abney in Tulsa, OK.

**Executive Deputy Commissioner**                    10/2005 – 9/2007
NYS Office of Children and Family Services,
52 Washington St., Rensselaer, NY   12144

Manager for all aspects of a $4.2 billion dollar human services operation including oversight of all policy, administration, operations and program functions for child welfare, juvenile justice, and related family, youth and dependent adult services.  Strong management and consensus-building skills in the state-supervised, county-administered child welfare system and the state-administered juvenile justice system.

**Deputy Commissioner**                    9/2001 – 10/2005
NYS Office of Children and Family Services,
Division of Development and Prevention Services,
52 Washington St., Rensselaer, NY   12144

New York's Deputy Commissioner for Child Welfare, Child Care, Adult Services, and Indian Affairs.  Responsible for oversight of programming in all 57 upstate counties, New York City, and in all voluntary, not-for-profit child care and day care agencies.  Responsible for the direct operations of the State Child Abuse Hotline and the state's adoption services.

**Project Director**                    3/2000 – 8/2001
NYS Office of Children and Family Services CONNECTIONS Project,
40 N. Pearl St., Albany, NY   12243

Program lead for New York's Statewide Automated Child Welfare Information System (SACWIS).Re-established rapport between the Project and users, Legislature, Budget and Federal staff.  Successfully completed a reassessment of the Project and outlined a plan for completing NY's SACWIS Project.

**Director**                    8/1989 – 3/2000
NYS Office of Children and Family Services Bureau of Management
Information and Evaluation Services, 40 N. Pearl St., Albany, NY   12243

Responsible for program monitoring, research and data dissemination related to child welfare services.  Supervision of 18 professional staff.  Unit products include formal research projects,

program evaluation, and short-term requests for information and policy analysis.  Preparation and provision of data and analysis for inter-governmental, media and public use directly and through the Public Information Office.  Formal public dissemination of data in local, state and national forums.Consultant and technical advisor to offices within and outside the Office of Children and Family Services.

**Family & Children Services Specialist II**                    2/1985 – 8/1989
NYS Department of Social Services, Performance Monitoring and
Analysis Unit, Division of Family and Children Services,
40 North Pearl St., Albany, NY  12243

Responsible for support of Regional Office monitoring of local district services provision. Collection and analysis of statewide data to inform policy decisions.Development of services indicators and foster care allocation methodology.

**Program Research Specialist II**                    7/1984 – 2/1985
New York State Department of Social Services, Office of Program
Planning, Analysis and Development, 40 North Pearl Street,
Albany, NY  12243

Responsible for data collection and analysis among the major databases maintained by the Department.  Areas of analysis included Services, Public Assistance Caseload, Social Services Reporting Requirements, Claims and Census.  Projects included an analysis of turnover of PA cases in NYC.

**Project Coordinator**                    11/1983 – 6/1984
New York State Office of Mental Retardation and Developmental
Disabilities, Research Council for Mental Hygiene, 44 Holland Avenue,
Albany, NY  12229

Half-time position (G-22) to coordinate data collection and analysis for the Placement Indicators Project.  Project goal was to identify stresses that lead families to make a placement decision with respect to their disabled family member.

**Consultant**                    5/1983 – 9/1984
Northeast Parent and Child Society, 120 Park Avenue,
Schenectady, NY  12309

Retained as research consultant to evaluate long-term effects of clinical intervention of preventive projects on families with children "at-risk" of out-of-home placement.

**Research Assistant**                    9/1981 – 5/1983
Ringel Institute of Gerontology,
University at Albany, State University of New York,
135 Western Avenue, Albany, NY  12222

Data analysis of adult family foster care setting in the OMH and OMRDD systems.Comparative analyses of both forms and analysis of policy implications for OMH and OMRDD based on findings.  Projects funded by NYS Health Research Council.

**Assistant Director**                                               12/1979 – 8/1981
Parkhurst Parent and Child Center,
210 Union Street, Schenectady, NY  12305

Responsible for program development, financial management, grant-writing, staff supervision and media relations in a non-profit services provider.  Coordinated public fund-raising campaigns and authored proposals accepted for funding by local and State Departments of Social Services and State Office of Mental Health.  Agency expanded from single to multi-program operation during tenure; budget more than doubled.  Supervised both clinical and child care staff.  Board and public relations central to duties.  Assisted in developing and implementing mandated and optional preventive programs.

**Intensive Treatment Center Staff**                       6/1977 – 3/1979
The Devereux Foundation, P.O. Box 1079, Santa Barbara, CA  93001

Responsible for program implementation and supervision of acting-out adolescents in a semi-secure residential facility.Fiscal officer for the unit's finances.  Unit located in a larger facility serving emotionally disabled children and adults.

**Dormitory Director**                                               8/1974 – 5/1977
Buenaventura Academy, 2600 North Ventura Avenue, Ventura, CA

Managed all aspects of a 65-bed unit within a larger residential facility serving emotionally disturbed and developmentally disabled children and adolescents.  Planning and fiscal responsibility for dormitory.Direct supervisory responsibility for thirty-three staff members and for program design and implementation.  Coordinated treatment services as Individual Treatment Plan Coordinator.  Pilot-tested this approach prior to agency-wide implementation.  Served as Primary Counselor prior to promotion to Plan Coordinator, then Director.

## *Professional Activities*

**President**:  National Association of Public Child Welfare Administrators. 2007.

**Co-Chair**:  Child Welfare League of America, National Public Policy Advisory Committee. 2005-07.

## *Publications*

Editor of the *Positioning Public Child Welfare Guidance, 2010,*Washington, DC:American Public Human Services Association and the National Association of Public Child Welfare Administrators (http://www.ppcwg.org).

Author of<u>Bridging Two Worlds: Youth Involved in the Child Welfare and Juvenile Justice Systems. A Policy Guide for Improving Outcomes</u>, Georgetown Center for Juvenile Justice Reform, Fall, 2008.

*Current Clients:(May, 2011)*

**American Public Human Services Association (APHSA)**:  Have worked with APHSA since 2007 in establishing and promoting the State Data Center, a joint partnership with Chapin Hall at the University of Chicago. Currently, approximately 20 states are members of the Data Center.

**Astor Services for Children and Families**, Rhinebeck, NY.  Have worked with Astor since 2007 to develop strategies for facility and program improvement.  Currently focusing on long-term vision for educational attainment for children served in the Bronx.

**Casey Family Programs** (CFP):  Have worked with CFP in several jurisdictions (Los Angeles, Pennsylvania, Nebraska) in long-term efforts to develop performance indicators in order to drive positive change in child welfare systems.  Have also worked on short-term engagements that include large meeting facilitation (Data-driven decision-making, CFSR Reform, and other performance-related topics).

**Council of Family and Child Caring Agencies (COFCCA)**:  Have worked with COFCCA since 2008 and provide quarterly briefings for Executive Directors and special projects focusing on enhancing performance in agencies.  Also facilitate sessions at their annual conference in April.

**National Resource Center for Child Welfare Data and Technology (NRC-CWDT)**.  Housed at the Child Welfare League of America, I have been a Senior Consultant to the NRC-CWDT since 2008.  I have worked with jurisdictions on using data to drive performance in public child welfare systems.  I have worked in Los Angeles, Mississippi, District of Columbia, Michigan, Vermont, and am beginning work in Tennessee.

**New Yorkers for Children**:  Have worked with the NYC Administration for Children's Services to develop better systems for Youth Development and have consulted in managing large-scale system reform.  This contract began in 2008.

**Riggs, Abney, Neal, Turpen, Orbison & Lewis, Inc., Tulsa, OK**.  Hired as a consultant to the law firm that is defending the State of Oklahoma in a child welfare class action lawsuit.  Serve as a content expert to the firm.

**Appendix B – Considered Documents**

American Academy of Pediatric Dentistry, "*Guideline on Periodicity of Examination, Preventive Dental Services, Anticipatory Guidance/Counseling, and Oral Treatment for Infants, Children, and Adolescents.*"Adopted, 1991, Revised, 1992, 1996, 2000, 2003, 2007, 2009.

Center for the Support of Families, Inc., "*Foster Care Case Review of the Oklahoma Department of Human Services,*" February 17, 2011.  Referred to in this document as "Case Review."

Child Welfare League of America, "*Best Practice Framework for Addressing the Mental Health and Substance Abuse Needs of Children and their Families*", January 21, 2003.

D.G. v Henry, "Complaint for Injunctive and Declaratory Relief and Request For Class Action," Children's Rights, Inc.

Hunter, Mark R., Licensing Consultant, Bureau of Children and Adult Licensing, State of Michigan, Department of Human Services, Audit Finding, August 30, 2010.

Milner, Jerry, Transcript of a videotaped deposition of Jerry Milner, D.S.W., D.G. v. Henry, taken on May 19 and 20, 2011, in Tulsa, Oklahoma, Lisa A. Steinmeyer, Certified Shorthand Reporter, Tulsa Freelance Reporter.

Milner Materials 1.pdf

Milner Materials 2.pdf

Milner Materials 3.pdf

Needell, Barbara,Center for Social Services Research, School of Social Welfare, University of California at Berkeley.  "*The View Matters,*"a slide extracted from a presentation titled:"*Making Data Informed Decisions, (Ramblings from the Left Coast).*"  Presented to the Administrative Office of the Pennsylvania Courts' Children's Roundtable Summit, November 21, 2009, available at: http://cssr.berkeley.edu/cwscmsreports/presentations/

Oklahoma Case Review QA Tracking Tool, Case # 223, identified as Milner #048619

Oklahoma Department of Human Services, "*Child Welfare Practice Model Guide*", Version: October 31, 2008.

Ritchie, Brian, Acting Deputy Inspector General for Evaluation and Inspections.  Memo to Susan Orr and Dennis Smith, Subject: ,"*Children s Use of Health Care Services While in Foster Care: Common Themes* " OEI-07-00-00645, July 8, 2003.

Salovitz, Barry, "*Safety and Risk Management – Three Key Case Decisions,*"a presentation to the 2010 Conference on Differential Response in Child Welfare, Casey Family Programs.

Smollar, Jackie, Memo from Jackie Smollar to Jerry Milner and Stacey Hirsch, January 11, 2011, from Milner Considered Documents 125964.

Smollar, Jacqueline, Transcript of a deposition of Dr. Jacqueline Smollar, taken on June 1, 2011 by Colette E. Ross, Arizona Reporting Service, Inc.  Phoenix, AZ.

Social Security Act, IV-B 1, Section 421.

United States Department of Health and Human Services, Children's Bureau, <u>Child Maltreatment 2009</u>, Appendix D: State Commentary, p. 189.

United States Department of Health and Human Services, Children's Bureau, "*Child and Family Services Reviews, Onsite Review Instrument and Instructions,*" July 2008.  Available at http://www.acf.hhs.gov/programs/cb/cwmonitoring/tools_guide/onsitefinal.htm

United States Department of Health and Human Services, Office of Inspector General, "*Respite Care Services for Foster Parents – Six Case Studies,*" August, 1994.

# Appendix C – Compensation

I invoice Riggs, Abney at a rate of $150 per hour for work associated with this case.  In the Miller Rebuttal, I estimated that I had invoiced approximately $27,000 through the end of May. I expect June invoices to run approximately an additional $10,000.  I also anticipate additional billings through trial.