## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| D.G., by Next Friend G. Gail Stricklin; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 08-CV-074-GKF-FHM |
| | ) | |
| C. BRAD HENRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OKDHS' DEFENDANTS COMBINED MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT

**RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS, P.C.**

Robert A. Nance, OBA 6581
E-mail:  rnance@riggsabney.com
Donald M. Bingham, OBA 794
*Email:*  don_bingham@riggsabney.com
Stephanie L. Theban, OBA 10362
Email: stheban@riggsabney.com
502 West Sixth Street, Tulsa, OK 74119
*Tel* (918) 587-3161 / *Fax* (918) 587-9708

*Attorneys for the Defendants Richard L.
DeVaughn, Jay Dee Chase, Steven Dow,
Michael L. Peck, Aneta F. Wilkinson, Rev.
George E. Young, Sr., Linda English Weeks,
Anne M. Roberts, and Howard H. Hendrick*

## **TABLE OF CONTENTS**

STANDARDS FOR SUMMARY JUDGMENT ......................................................1

STATEMENT OF UNDISPUTED FACTS...............................................................1

PROPOSITION I. - **The Plaintiffs Have No Evidence of a Class Wide Violation of the Substantive Due Process Rights of the Class** ..........................13

    A.    The Due Process Clause Protects Against Arbitrary Use of Government Power that Shocks the Conscience............................................13

    B.  Protection of Substantive Due Process is Limited to Liberties Objectively Deeply Rooted in the Nation's History and Tradition or Implicit in the Concept or Ordered Liberty....................................................16

    C.  The Pertinent Substantive Due Process Standard in this Case is a Right to Reasonable Safety in Care.  To Establish a Violation of that Standard, Plaintiff's Must Prove an Abdication of Professional Judgment......................................................................................................18

    D.  Plaintiff's Cannot Prove the OKDHS Commission and Director Hendrick have Arbitrarily Abused Their Power in the Constitutional Sense of Exhibiting Deliberate Indifference to the Reasonable Safety of Children in Foster Care by Abdicating any Professional Judgment. Quite the Contrary, the OKDHS Defendants, and the People They Supervise, Exercise Professional Judgment in the Management of the Foster Care System.......................................................................................21

        1.    "Reasonable Safety" in Care is the Constitutional Requirement, the Absence of Which is Recognized by the Absence of Professional Judgment ....................................................21

        2.  Federal Government Child and Family Service Review (CSFR) Measures and Standards of Private Organizations are not the Benchmark for a Constitutional Claim ...................................22

3.  The Commission and Director Hendrick Have Established Policies and Programs to Exercise Professional Judgment on How to Keep Children Safe .................................................................26

a.  The Practice Standards and Practice Model are based on Professional Judgment, Including Professional Judgment on How to Keep Children Safe. ...............................26

b.  The Commission has Written Key Provisions of the Practice Model, and Legislative Changes into Rules. OKDHS Provides Instructions to Staff to Help Interpret and Apply the Rules.................................................................29

c.   OKDHS Staff Reasonably Meets its Visitation Obligations to Children.  Case Loads are Reasonable and OKDHS is Retaining More Seasoned Workers Despite Having Fewer Children in Care, Recidivism is Down, and Children in Foster Care are Reasonably Safe. ...................31

PROPOSITION II. – **Plaintiffs' Discovery Responses and Expert Reports Provide no Support for their Procedural Due Process Allegations, Particularly as Relates to the Required Elements of Policy, Custom or Practice and Causation**........................................................................35

A.  The Plaintiffs Have no Evidence Supporting their Procedural Due Process Claims.............................................................36

PROPOSITION III. – **The OKDHS Director and Commission, as a Matter of Law, do not Have a Policy, Custom or Practice that Causes a Foster Child to be Deprived of a Constitutional Right to Which he is Entitled**..................................................................................39

PROPOSITION IV. – **Plaintiffs, as a Matter of Law, Have Failed to Establish a Causal Nexus Between a Violation of Their Constitutional Rights and a Policy, Custom or Practice of the Commission and Director of OKDHS** ...............................................................42

PROPOSITION V. – **OKDHS, as a Matter of Law, Does not Maintain a Practice of Violating the Right of Foster Children to Associate with their Parents and Siblings**......................................................................45

CONCLUSION.........................................................................................47

TABLE OF AUTHORITIES

Cases

*Anderson v. Liberty Lobby,*
    477 U.S.252, 249 (1986)……………………………….......    1
*Arledge v. Franklin County,*
    509 F.3d 258, 263 (6th Cir. 2007)…………………………    15, 21
*Badecki v. Barela,*
    146 F.3d 1227, 1230 (10th Cir. 1998)……………………..    16
*Bailey v. Pacheco,*
    108 F.Supp.2d 1214, 1222 (D.N.M. 2000)………………..    20
*Board of County Commissioners v. Brown,*
    520 U.S. 397, 404, (1997)…………………………………    41, 43
*Canton v. Harris,*
    489 U.S. 378, 388-389 (1989)……………………………..    15, 44
*Celotex Corp.v. Catrett,*
    477 U.S. 317, 322 (1986)……………………………….....    1
*Christiansen v. City of Tulsa,*
    332 F.3d 1270, 1281 (10th Cir. 2003)……………………..    15, 16
*Collins v. City of Harker Heights, Texas,* ………………………..    43
    503 U.S. 115, 123 (1992)
Connick v. Thompson,
    ___U.S. ___, 131 S. Ct. 1350 (2011)…………………………    42, 43
*County of Sacramento v. Lewis,*
    523 U.S. 833, 845-46 (1983)……………………………..    13
*Daniels v. Williams,*
    474 U.S. 327, 328…………………………………………    14
*Davidson v. Cannon,*
    474 U.S. 344, 348…………………………………………    14
*DeAnzona v. City and County of Denver,*
    222 F.3d 1229, 1234 (10th Cir. 2000)……………………..    16
*Dodds v. Richardson,*
    614 F.3d 1185, 1202 (10th Cir. 2010)……………………    36, 40
*Estate of Herring v. City of Colorado Springs,*
    233 Fed.Appx. 854, 2007 WL 1454394 (10th Circuit),
    *cert. denied* 552 U.S. 1098 (2008)………………………    46
*Griffen v. Strong,*
    983 F.2d 1544, 1548 (10th Cir. 1993)……………………..    45
*Habecker v. Town of Estes Park, Colorado,*
    518 F.3d 1217, 1225 (10th Cir. 2008)……………………..    43
*Jett v. Dallas Independent School Dist.,*
    491 U.S. 701, 737 (1989)………………………………..    40
*Johnson ex rel. Estate of Cano v. Holmes,*
    377 F.Supp.2d 1051, 1066 (D.N.M. 2004)………………..    16

*Johnson ex rel. Estate of Cano v. Holmes*
    455 F.3d 1133, 1144 (10th Cir. 2006)……………………………..    20

*Lee v. Town of Estes Park, Colo.,*
    820 F.2d 1112, 1116, n. 3 (10th Cir. 1987)…………………………    36, 39
*Los Angeles County, Cal. v. Humphries,*
    131 S.Ct. 447, 454 (November 30, 2010)…………………………    36, 40, 41,
                                                                    43
*Radecki v. Barela,*
    146 F.3d 1227, 1231 (10th Cir. 1998)……………………………..    14, 20, 39
*Reno v. Flores,*
    507 U.S. 292, 302 (1993)…………………………………………    17
*Setliff v. Memorial Hospital of Sheridan County,*
    850 F.2d 1384, 1393 (10th Cir. 1988)……………………………..    44
*Simmons v. City of Philadelphia,*
    947 F.2d 1042 (3d Cir. 1991)……………………………………..    40
*Society for Goodwill to Retarded Children, Inc. v. Cuomo,*
    737 F.2d 1239, 1248 (2d Cir. 1984)………………………………    18, 22
*State Farm v. Holmes Products, Inc.,*
    165 Fed. Appx. 182 (3rd Cir. 2006)………………………………    43
*Truck Insurance Exchange v. Magnetek Incorporated,*
    360 F.3d 1206, 1215 (10th Cir. 2004)……………………………..    44
*Washington v. Glucksberg,*
    521 U.S. 702, 720-21 (1997)……………………………………    17, 23
*Werth v. Makita Elec. Works,*
    950 F.2d 643, 651, n. 9 (10th Cir. 1991)…………………………    43
*Whitley v. New Mexico Children, Youth, and Families Department,*
    184 F.Supp.2d 1146, 1161-62 (D.N.M. 2001)……………………    21
*Williams v. Berney,*
    519 F.3d 1216, 1220-21 (10th Cir. 2008)…………………………    14, 17
*Youngberg v. Romeo,*
    457 U.S. 307 (1982)………………………………………………    19
*Yvonne L., by and Through Lewis v. New Mexico Dept. of
    Human Services,*
    959 F.2d 883 (10th Cir. 1992)……………………………………..    19, 20, 22

## Statutes and Rules

10A O.S. § 1-4-101(A)……………………………………………….    2
10A O.S. §§ 1-4-101(A)(2)(b) ………………………………………    2
10A O.S. § 1-4-102(C)……………………………………………….    2
10A O.S. § 1-4-201(2)………………………………………………..    2
10A O.S. § 1-4-205(C)……………………………………………….    2
10A O.S. § 1-4-206…………………………………………………….    2
10A O.S. § 1-4-601…………………………………………………….    2

10A O.S. § 1-4-703…………………………………………………………… 2
10A O.S. § 1-4-706(A)(4)…………………………………………………… 2
10A O.S. § 1-4-706(B)(2)(a)………………………………………………… 2
10A O.S. § 1-4-707…………………………………………………………… 2
10A O.S. § 1-4-709…………………………………………………………… 2
10A O.S. § 1-4-806…………………………………………………………… 2
10A O.S. § 1-4-811…………………………………………………………… 2
10A O.S. § 1-4-904…………………………………………………………… 2
10A O.S. § 1-34-202………………………………………………………… 2
42 U.S.C. § 1983…………………………………………………….. 13, 15, 20,
                                                                36, 40, 41,
                                                                42, 43, 44,
                                                                45, 46, 47
Fed.R.Civ.P 37(a)(4) …………………………………………………. 38
Fed. R.Civ.P. 56…………………………………………………….. 1

<u>Secondary Sources</u>

Administration for Children & Families (ACF)………………………….. 2, 10, 22,
                                                                30
Administrative Procedures Act……………………………………………… 29
Assessment of Child Safety (AOCS) ……………………………………….. 5, 29, 31
Child Maltreatment 2009, Table 3-18, Ex.18-3…………………………….. 4
Council on Accreditation of Services for Families and Children, Inc.
(COA) ……………………………………………………………………… 7, 8, 9, 11,
                                                                23, 24, 25
CWLA Guidelines for Computing Caseload Standards…………………….. 7, 8, 11, 22,
                                                                23, 24, 25,
                                                                26
http://www.okdhs.org/library/policy/oac340/075/...................................... 29
OAC 340:75-3-10.1………………………………………………………… 30
OAC 340:75-3-10.1(c)(4). ……………………………………………….. 30
OAC 340:75-6-1…………………………………………………………….. 2
OAC 340:75-6-30…………………………………………………………… 5, 47
OAC 340:75-6-48…………………………………………………………… 7, 30
OAC 340:75-7-14………………………………………………………….. 6
OAC 340:75-18-10………………………………………………………….. 2, 30
OKDHS Supervisor's Handbook to Implementing the Practice Standards
and the Practice Model (SH)……………………………………….….. 27, 29
Oklahoma Constitution, Article 25 Section 4…………………………… 26
Oklahoma Department of Human Services Child Welfare Practice Model
Guide (PMG)……………………………………………………………….. 4, 5, 9, 10,
                                                                26, 27, 28,
                                                                29, 30

OKDHS Defendants, through their counsel, Robert A. Nance, Donald M. Bingham and Stephanie L. Theban, respectfully move for summary judgment pursuant to Fed.R.Civ.P. 56 for reasons set forth in the following brief.

## STANDARDS FOR SUMMARY JUDGMENT

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P.56. Defendants are not required to demonstrate that factual support for the Plaintiffs' claims does not exist. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.v. Catrett*, 477 U.S. 317, 322 (1986). "[T]he burden on the moving party may be discharged by 'showing'-that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. The trial judge is not to weigh the evidence but to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby*. 477 U.S.252, 249 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248.

## STATEMENT OF UNDISPUTED FACTS

1. States universally face problems with child welfare worker turnover with rates of 30% and 40% annually, and average tenure of less than two years. Ex.1, Goad Rep., p.5. Ex.6B, Goad dep., p.100, ll.23 to p.101, ll. 5. Factors contributing to turnover are not unique to Oklahoma. Ex.8, Miller dep., p.169, ll. 9-19.

1

2.        The court takes jurisdiction over any child who is or who is alleged to be abused or neglected.  10A O.S. § 1-4-101(A), Ex.20; Ex.14, Resp.1. Courts participate in many decisions regarding abused or neglected children. 10A O.S. §§ 1-4-101(A)(2)(b)1-4-201(2), 1-4-202, 1-4-102(C), 1-4-205(C), 1-4-206, 1-4-601, 1-4-703, 1-4-706(A)(4), 1-4-706(B)(2)(a), 1-4-707, 1-4-709, 1-4-806, § 1-4-811, 1-4-904. Ex.20.

3.        CFSD professional welfare staff consult, and have consulted, with the Commission's policy committee to ensure that newly promulgated rules are professionally sound.  The OKDHS Commission's rules are part of the Oklahoma Administrative Code ("OAC").  OKDHS also provides "Instructions to Staff" for each such rule.  Exhibit 18, ¶ 3.

4.        The guiding principles of planning for children in custody are safety, permanency and well-being.  Services are provided based on the child's individualized needs.  OAC 340:75-6-1.  Ex.21.

5.        The Commission has enacted 340:75-18-10,Child and Family Services Review (Ex.21), that replicates required procedures of the United States Department of Health and Human Services Administration on Children and Families (ACF) and assesses, among other things, outcomes related to safety, permanence, and well-being for children and families.  See OAC 340:75-18-10, Exhibits 21 and 18, ¶ 5.

6.        The Continuous Quality Improvement (CQI) section of the Child and Family Services Division (CFSD) organizes a site review in every county of the State annually.  The CQI unit draws a stratified random sample of children in each county for review.   The review consists of a review of case records and, for some types of cases, interviews with school-age children, parents or other persons responsible for the child (PRFCs), child welfare staff, placement providers and other persons with a significant role in the child's life.  The Oklahoma

version of the federal CFSR reviews far more cases and conducts far more interviews every year than does the federal CFSR once every five years.  The CQI team shares findings of the review with the county director and with the area director of the six OKDHS administrative areas. Aggregate state CFSR data are shared with appropriate officials within the OKDHS to evaluate performance of the child welfare program.  This entire process is an exercise in professional judgment to secure timely data on child welfare practice throughout the state and to share that data with workers and supervisors to improve child welfare practice.  Exhibits 18, ¶ 5 and 18-1.

7.        While the number of children in foster care has dropped dramatically, from over 12,000 at the end of SFY 2007 to approximately 8200 now, the percentage of children with an absence of maltreatment recurrence during a six month period (a federally required reporting measure) has increased from 90.8% in FFY 2005 to 94.1% in FFY 2009.  Similarly, the percentage of children with reentries to foster in less than twelve months after discharge has dropped from 9.3% in FFY 2005 and 2006 to 6.3% in FFY 2010.  These figures indicate that children are being safely returned to their families.  The federal median for this permanency of reunification measure is 15%, while the top 25th percentile is 9.9%.  Oklahoma is well within the top quarter nationally on this measure.  Exhibits 18, ¶ 6, 18-2.

8.        The OKDHS consistently finalizes a high number of adoptions for children in foster care and exceeds the national standard in this area of practice.  During the last 12 years (with one exception) over 1,000 children have achieved permanency every year through adoptions. During SFY 2002, there were 922 children which was the lowest year and during SFY 2010, there were 1,698 children which was the highest year.  Ex.18, ¶ 7.

9.        According to figures computed by the federal government for maltreatment in care by foster parents or institutional staff (excluding cases investigated by the OCA. Oklahoma has

3

had an <u>absence</u> of such maltreatment in excess of 98% from FFY 2005 to the present.  These figures are not the result of sampling, but represent the universe of data reported and collected within the federally approved computer system KIDS.  Ex.18, ¶ 8, Child Maltreatment 2009, Table 3-18, Ex.18-3.   Office of Client Advocacy (OCA) investigations confirmed 154 children in foster care abused or neglected in 2009, seven with injury, and 80 in 2010, 11 with injury.  Most cases were neglect, rather than abuse.  Ex. 30, Lee declaration.

10.        The federal government also analyzes Oklahoma data and reports an "additional safety measure for which no standards are associated" which is the number and percentage of children maltreated by parents when the "report date," not necessarily the date of the maltreatment, falls within the period during which the children are removed to foster care. The "report date" can be different from the maltreatment date, and once children are in care they sometimes disclose maltreatment suffered before they came into foster care. Given the data Oklahoma reports to the federal government, it is impossible to tell how many children were maltreated by their parents *before* entering foster care and how many were maltreated *after* entering foster care.  However, even if <u>all</u> such children reported as abused by their parents were maltreated <u>while</u> in foster care the percentage of children with an <u>absence</u> of maltreatment still exceeds 97% for FFY 2009 and 2010.  Exs. 18, ¶ 9 and 18-2 hereto, p.2, line XI, and fn. 12.

11.        The OKDHS Practice Model in particular is based on a study of best child welfare practices from across the nation, and was developed through a process of consultation with many professionals at the OKDHS, including policy specialists as well as line staff.  A nationally recognized expert coordinated the process.  The Practice Model focuses on the safety of children from receipt of a referral call alleging abuse or neglect of a child through permanency.  The Practice Standards and the Practice model are exercises of professional child welfare judgment.

Ex.18, ¶ 10.  The Practice Model pushes practice toward the most current, evidence based and promising practices that exist in the field today.  Ex.17,  p.30.

12.        The implementation of the Practice Standards and the Practice Model has also been an exercise in professional judgment.  The OKDHS has enlisted the aid of Casey Family Programs to assist in assessing implementation of the Practice Model.  Dr. Sue Steib and Barry Salovitz of Casey Family Programs met with several groups of OKDHS staff to evaluate the use of Assessment of Child Safety (AOCS) and completed an evaluation of the policy, procedures, and training being used.  The aid of Casey Family Programs in this effort is an exercise of professional judgment as a matter of child welfare practice and as a matter of Practice Model Implementation.  Ex.18, ¶ 12 and 18-4.

13.        The OKDHS policies (OAC 340:75-6-30 Child's visitation with parents and siblings), Ex.21, practices, and customs are intended to respect and implement a foster child's right to visit and associate with his or her parents and siblings, under the oversight of Oklahoma judges who have foster children as wards of their courts.  No policy, practice, or custom of OKDHS causes or is intended to cause conduct of OKDHS employees that is specifically directed to parent-child relationships and sibling-to-sibling relationships with the intent to unduly burden those relationships, and instead each is intended to re-establish and maintain such associations if safely possible and subject to court approval.  Such policies also respect and complement the rights and sovereignty of Indian Nations with regard to Native American foster children who are in OKDHS custody.  Ex.18, ¶ 17.

14.    Data regularly kept by OKDHS in the usual course of its business shows the average number of custody children assigned to permanency planning workers has dropped from 19.7 in October 2008 to 16.8 in May, 2011.    As of the May, 2011, Combined Workload Report,

OKDHS permanency planning workers had an average case load of 16.8 children; prevention workers had an average of 11.2 families; protective services workers were responsible for an average of 6.8 new assigned referrals each month, and resource workers were responsible for an average of 23 resource families each.  Ex 15, ¶ 4.

15.    OKDHS has been able to retain more child welfare workers with longer experience.  The following table drawn from data maintained by the OKDHS in the normal course of its business shows the progress:

| 1st of month | Number of workers with less than 2 years experience | Number of workers with greater than 2 years experience | Percentage of workers with greater than 2 years experience |
|---|---|---|---|
| Jul-06 | 463 | 580 | *55.6%* |
| Jul-07 | 434 | 594 | *57.8%* |
| Jul-08 | 476 | 608 | *56.1%* |
| Jul-09 | 457 | 627 | *57.8%* |
| Jul-10 | 325 | 654 | *66.8%* |
| Jun-11 | 349 | 679 | *66.1%* |

Exhibit 15, ¶ 5§**.**

16.    The OKDHS seeks out opportunities to improve its child welfare practice through grants and projects to recruit foster home resources, speed permanency, and help traumatized youth; all are exercise of professional judgment.  Ex. 18, ¶¶ 13,14,15,16.

17.    Foster parents must participate in pre-service and in-service training.  OAC 340:75-7-14.  Ex.21.

18.      The Commission has promulgated, 340:75-6-48, Ex. 21, which provides an OKDHS worker is to visit each foster child a minimum of one time per month, with no less than two visits per quarter in the foster placement. Each child is interviewed, or if an infant observed, alone without the foster parent present at least one time per quarter. This rule is based on statute and professional judgment and good child welfare practice.

19.      OKDHS keeps track of the number of visits, or "contacts" of its workers with foster children. Those statistics for the last year show that over 97% of children in regular foster care placements received the required monthly visit. Between 90% and 96% of children living in their own homes while in foster care jurisdiction received the required visits. Between 96% and 98.6% of children in therapeutic foster care (TFC) placements received the required visits. Of the twenty or fewer children in unpaid relative placements each month, between 90% and 100% received the required visits each month. The visitation rates were between 61% and 75% for children placed in foster care out of state. Children in all other placement types per month received their required visits at least 95% of the time each month. Date regularly kept by OKDHS indicates that, since July, 2000, OKDHS workers have made monthly visits to children in foster care due a visit over 90% of the time. Since January, 2007 data shows OKDHS workers have made more than 95% of monthly visits in all but two months (in which 94.2% and 94.9% of visits were made) . Exs. 15 and 15-1.

20.      Currently no universally accepted formula for computing caseloads exists. CWLA Guidelines for Computing Caseload Standards. Ex.22.

21.      CWLA Standards of Excellence for Child Welfare Services provide goals for the continuing improvement of services for children and families. Ex.23. COA and CWLA standards are not standards that states are held to. Ex.9, Brown dep., p.81, ll. 2-9.

22.        No specific structure is necessary to ensure efficient and satisfactory delivery of child welfare services to children in state custody.  Ex.5, Miller Rep., p.12.

23.        There are problems with the CFSR process.  Ex.6A, Goad dep., p.103, ll. 24 to p.104, ll. 4.

24.        Some COA and CWLA standards regarding staffing and management are "a little bit pie in the sky." Ex.6A, John Goad dep., p.185, ll. 8-12.

25.        Plaintiffs' experts do not agree, without exception, with COA and CWLA standards.  Ex.6A, Goad dep., p.193, ll. 2-6.

26.        Standards should never be final and can always be improved.  Ex.6A, Goad dep., p.205, ll. 12-18.

27.        CWLA and COA are private organizations and do not have the power to make law. Ex.6A, Goad dep., p.208, l. 23 to p.209, ll. 4.

28.        It would be unrealistic to expect to see one hundred percent of children within 72 hours of a report of maltreatmentEx.6B, Goad dep., p.77, ll. 16-19.

29.        Plaintiffs' experts cannot identify a reasonable standard in relation to screenouts and cannot identify a standard that mandates a particular training or supervision style.  Ex.6B, Goad dep., p.94, ll. 6-15. Ex.8, Miller dep., p.168, ll. 8 through p.169, ll.

30.        The goal of CFSRs is to help States improve child welfare services and achieve outcomes focused on child safety and permanency, as well as family and child well-being. Ex.14, Response 22 .

31.        The federal standards changed between round 1 and round 2, in apparent recognition that the standards were not measuring what they were intended to measure.  Ex.9, Brown dep., p.127, ll. 2-6.

32.      It is impossible for any jurisdiction to be in full compliance with the CFSR because the CFSR metrics and the CFSR process are designed for states to fail it.  Its impetus is always to see where the client is and move them forward. Ex.9, Brown dep., p.33, ll. 24 to p.34, ll. 4.

33.      Exercising professional judgment means making decisions that are reasoned, strategic, and intended to solve problems.  Ex.9, Brown dep., p, 53, ll. 16-22.

34.      All COA accredited states failed to achieve substantial conformity on any of the CSFR outcomes.  See Ex. 16, Arnold-Williams declaration, Arnold-Williams Rep., p.32.

35.      OKDHS uses multiple communication modes to communicate policies to the workers, and uses focus groups to hear what needs are. Ex.5, Miller Rep., p.14-15.

36.      OKDHS develops and provides substantial training.  Ex.5, Miller Rep., p.41-43.

37.      DHS developed and began to implement its new Practice Model in 2008.  The Practice Model was implemented statewide in 2010.  Ex.5, Miller Rep., p.43-44.

38.      In July 2009, DHS applied to a federal agency for technical assistance with problems implementing the Practice Model, and to yield better outcomes for children, specifically focusing on improving child welfare supervision quality.  Ex.5, Miller Rep., p.44.

39.      In the late 1990's, or perhaps early 2000, OKDHS with senior staff in Illinois about improving or reforming the Oklahoma system.  Ex.6A, Goad dep., p.178, ll. 23 to p.179, ll. 15.

40.      Oklahoma has contracted with Lori Lutz for several years to provide consultation, assistance in program development, and training in several key areas.  Ex.17, Lutz Affidavit, Lutz Rep.p.4.

9

41.        The absence of maltreatment in care number for 2009 was 99.5%. Ex.6B, Goad dep., p.85, ll. 15-19.

42.        Between 2008 and 2009, the timeliness of response to reports of maltreatment in care improved.  Ex.6B, Goad Dep., p.91, ll. 6-8.

43.        When Miller oversaw the implementation of a practice model, it was modified during the process.  Modification during the process is not unusual. When Miller oversaw the implementation of a practice model, it took two to three years, and then "you monitor" and make modifications.  Ex.8, Miller dep., p.166, ll. 19 to p.167, ll. 6, p.162, ll. 20-24, p.167, ll. 7-12.  To expect that a newly implemented Practice Model would have the ability to significantly change the results of a case review in such a short time period after implementation is not realistic. Ex.16, Arnold-Williams Rep., p.49.

44.        The March 2011 level of staff with greater than 2 years with OKDHS of 67.7 percent is an 11.5% increase over the 2006 level of 55.6% and clearly shows improvement is being made.  Ex.16, Arnold Williams Rep., p.44.

45.        ACF recognizes that the kinds of systemic and practice changes necessary to bring about improvement in particular outcome areas often are time-consuming to implement, and improvements are likely to be incremental rather than dramatic. Ex.16, Robin Arnold Williams Rep., p.48.

46.        Oklahoma achieved substantial conformity on five of seven systemic factors in the last two CFSR rounds.  Ex.16, Arnold-Williams Rep., p.20.

47.        In order to achieve the rating of "substantial conformity," 95% of cases reviewed must achieve a rating of "substantially achieved."  Ex.16, Arnold Williams Rep., p.22.

10

48.        Only one of 52 jurisdictions (50 states plus Puerto Rico and District of Columbia achieved substantial conformity in all six national standards in the last round CFSR. Only one of 52 jurisdictions achieved substantial conformity in 5 of 6 national standards.  See Ex.16, selected pages from Robin Arnold Williams Rep., p.23.

49.        56 % of 52 jurisdictions achieved substantial conformity in 2 or less of the national standards.  Ex.16, Arnold Williams Rep., p.23.

50.        As of April 2011, depending on how COA counted it, either only four state agencies were accredited and seven more were in the process of becoming accredited or seven state agencies were accredited and one more was in the process.  Ex.16, Arnold Williams Rep., p.28-29.

51.        Computing caseloads is an inexact science.    Ex.22, CWLA Guidelines for Computing Caseload Standards.

52.        Plaintiffs' expert designated to provide opinion regarding caseloads cannot identify a caseload number for Oklahoma. Ex.8, Miller dep., p.148, ll. 5-9.

53.        Milner does not know if OKDHS has a systemic practice of assigning excessive caseloads.  Ex.26, Milner depo, p.544, ll. 23 to p.545, l. 1, p.550, ll. 22-24.

54.        Goad did not opine that there was a harmful pattern or practice affecting all children in OKDHS foster care custody. Ex.6A, Goad dep., p.69, ll. 3-7. Dr. Reynolds cannot identify a harmful pattern or practice affecting all children in OKDHS foster care custody.  Ex.7. Reynolds dep., p.89, ll. 12 to p.90, ll. 14.

55.        Dr. Reynolds cannot identify a harmful pattern or practice affecting all children in OKDHS foster care custody. Ex7. Reynolds dep., p.89,ll. 12 to p.90, ll. 14.

56.          Goad cannot identify any child who was harmed as a result of a deficient investigation.  Ex.6A, Goad dep., p.210, ll. 8-17.

57.          Goad cannot identify any child who was hurt physically as a result of not being seen within a reasonable time after a report of maltreatment.  Ex.6A, Goad dep., p.221, ll. 15-24.

58.          Goad cannot identify any child who was physically harmed as a result of professionally unreasonable investigations.  Ex.6A, Goad dep., p.235, ll. 3-21.

59.          Miller cannot point to any evidence that says that there is no communication between CFSD and a caseworker in field operations.  Ex.8, Miller dep., p.65, ll. 7-12.

60.          Oklahoma has a federally approved SACWIS approved system, Ex.8, Miller dep. p.154, ll. 19-24, Ex. 18, Smith declaration..

61.          Plaintiffs declined to identify any children who were harmed by any alleged harmful practice of the Director or Commissioners. Ex.11, Plaintiffs' Responses to Interrogatories regarding Foster Home Resources, Ex.12, Plaintiffs' Reponses to Interrogatories Regarding Alleged Procedural Due Process Violations, Ex.13, Plaintiffs Responses to Interrogatories Directed to the Plaintiff Class.

62.          Hess's review of five children's files cannot conclusively establish overall systemic problems.  Ex.4, Hess Rep., p.108.

63.          Plaintiffs failed to identify any specific process to which Plaintiffs were entitled and which has been denied.  Ex.12, Plaintiffs' Reponses to Interrogatories Regarding Alleged Procedural Due Process Violations.

64.          Plaintiffs can show no policy, custom or practice of the OKDHS Commission or Director of (1) deliberate indifference to harm or serious risk of harm to children in foster care;

or (2) abdication of the duty of professional judgment as regards children's reasonable safety that causes pervasive harm or risk of serious harm to children in foster care.

65.        Plaintiffs have conceded there is no substantive due process right to good caseloads.  Ex. 27, Transcript of Hearing March 26, 2010, 8:13-15.

66.        Plaintiffs have no evidence the Commission or the Director intend to violate any right of family integrity.  Ex. 18, ¶ 17.  Smith affidavit.

**Proposition I: Plaintiffs have no evidence of a class wide violation of the substantive due process rights of the class.**

Based upon the reports of their experts, Plaintiffs have no evidence of a class-wide pattern or practice of the OKDHS Commission or Director—the actual OKDHS Defendants— that causes a class-wide deprivation of substantive due process for class members.  Allegations of violation of some professional standard is not enough to make out a substantive due process violation.  An occasional abandonment of professional judgment by an OKDHS employee, if such ever occurred, is not enough for class-wide injunctive relief.  Plaintiffs cannot carry their actual burden of demonstrating a pervasive policy or practice of the Commission or the Director that misuses government power in such a way that it amounts to an abdication of the use of professional judgment, that shocks the conscience of the Court, and that causes or imminently threatens to cause serious harm to plaintiffs pervasively throughout the class.

**A.   The Due Process Clause protects against arbitrary use of government power that shocks the conscience.**

The touchstone of due process is protection of the individual against arbitrary action of government whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective.  *County of Sacramento v. Lewis,* 523 U.S. 833, 845-46 (1983).  Only the

most egregious official conduct can be said to be "arbitrary in the constitutional sense." *Id.,* 523 U.S. at 846; *Williams v. Berney,* 519 F.3d 1216, 1220-21 (10th Cir. 2008).  For over half a century the Supreme Court has spoken of the cognizable level of executive abuse of power that violates substantive due process as that which shocks the conscience**.**  *Id.*  The constitutional concept of conscience shocking duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability.  *Id.,* 523 U.S. at 848.  The Supreme Court has rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and has held that the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.  *Id.,* 523 U.S. at 848-49, citing *Daniels v. Williams,* 474 U.S. 327, 328 and  *Davidson v. Cannon,* 474 U.S. 344, 348;   *Radecki v. Barela,* 146 F.3d 1227, 1231 (10th Cir. 1998)(the Constitution does not guarantee due care on the part of state officials).

It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level.  *County of Sacramento,* 523 U.S. at 849.  The tortious conduct alleged must do more than show the government actor intentionally or recklessly caused injury to the plaintiff by abusing government power; it must demonstrate a degree of outrageousness and a magnitude of potential for actual harm that is truly conscience shocking.  *Williams v. Berney,* 519 F.3d 1216, 1220-21 (10th Cir. 2008).  What differentiates a constitutional transgression from an ordinary common law tort is a level of executive abuse of power that shocks the conscience and requires a showing that officials are abusing their power or employing it as an instrument of

oppression. *Id.*

The Supreme Court has employed deliberate indifference as a standard of culpability sufficient, in some circumstances, to shock the conscience and to identify a dereliction as reflective of municipal policy and to sustain a claim of municipal liability. *Id.,* 523 U.S. at 850, fn. 10, citing *Canton v. Harris,* 489 U.S. 378, 388-389 (1989). A similar standard should apply here to judge Plaintiffs' claims that the Director and Commissioners have, as policy-makers for OKDHS, caused unconstitutional harm by some policy or practice. In order to show deliberate indifference, the state actor must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also actually draw the inference. *Arledge v. Franklin County,* 509 F.3d 258, 263 (6th Cir. 2007). For liability to attach, plaintiffs must show a wrongful or injurious policy or custom on the part of the actual OKDHS Defendants and a causal link between the policy and the unconstitutional deprivation. *Id.,* 509 F.3d at 264. In another context, the Tenth Circuit remarked that the scienter requirement for a due process violation focused on the deliberateness of the conduct at issue because the Due Process Clause protects against deliberately wrongful government decisions, rather than merely negligent conduct. *Christiansen v. City of Tulsa,* 332 F.3d 1270, 1281 (10th Cir. 2003). Section 1983 liability will not lie absent (1) "an intent to harm" or (2) "an intent to place a person unreasonably at risk of harm." *Id.*[1]

---

[1]    While Plaintiffs mouth the words "deliberate indifference," they still prosecute this case as if it were a negligence case, for which liability could attach for allegedly (1) unilaterally giving up OCA accreditation in 2003; (2) not establishing performance measures for OKDHS performance (such measures exist in the Oklahoma version of the CFSR, discussed below); (3) not reviewing the Director's performance and approving his compensation; (4) Commissioners' not knowing OKDHS did not pass seven measures in the federal CFSR in 2007; (5) Commissioners not receiving and reviewing the 2007 legislative performance audit; and (6)

State actors are generally only liable under the Due Process Clause for their own acts and not for private violence or harm caused by private parties, such as foster parents or others. *Christiansen* 332 F.3d at 1279-80 (10th Cir. 2003); *Badecki v.. Barela,* 146 F.3d 1227, 1230 (10th Cir. 1998).  The "special relationship" and "danger creation" theories are exceptions to that general rule.  *Id.*  However, the "shocks the conscience" standard applies to both of these types of suits.  *Id.*  As regards the OKDHS Commission and Director Hendrick, this is more properly considered a "special relationship" case.  Nevertheless, no liability attaches to the OKDHS Commission or the Director unless some policy or practice for which they are responsible is so arbitrary as to shock the conscience of the Court.  However, even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking. *DeAnzona v. City and County of Denver,* 222 F.3d 1229, 1234 (10th Cir. 2000); *Johnson ex rel. Estate of Cano v. Holmes*, 377 F.Supp.2d 1051, 1066 (D.N.M. 2004)(permitting unreasonable risks to continue is not necessarily conscience shocking).

B. **Protection of substantive due process is limited to liberties objectively deeply rooted in the Nation's history and tradition or implicit in the concept of ordered liberty.**

The Supreme Court has described its method of substantive due process analysis as having two primary features:  first, observing that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in the Nation's

---

Commissioners not knowing various operational data about the child welfare program.  *See,* Dkt. No. 546, Plaintiffs' Response to Motion for Protective Order, pp.2-4 and Ex.A.  Even were they true, these allegations sound in negligence and, individually or in combination, do not amount to an abuse of government power for the purposes of oppression.  Deliberate indifference requires a showing that the official knew of and disregarded an excessive risk of health or safety to the claimant.  *Johnson ex rel. Estate of Cano v. Holmes,* 377 F.Supp.2d 1051, 1066 (D.N.M. 2004).  Plaintiffs simply have no evidence that meets the deliberate indifference standard for the Commission and the Director, the decision makers they actually sued.

history and tradition and implicit in the concept of ordered liberty, such that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997). Second, the Court requires a careful description of the asserted fundamental liberty interest. *Id.,* 521 U.S. at 721. The Nation's history, legal traditions, and practices provide the crucial guideposts for responsible decision making that direct and restrain the exposition of the Due Process Clause, because, in the substantive due process arena, the Fourteenth Amendment forbids the government to infringe fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interests. *Id.* Because extending constitutional protection to an asserted right or liberty interest, courts, to a great extent, place the matter outside the arena of public debate and legislative action. *Id.,* 521 U.S. at 720. Courts must exercise the utmost care when asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of the Court. *Id.* Under this framework, due process protections are accorded primarily to matters relating to marriage, family, procreation, and the right to bodily integrity. *Williams v. Berney,* 519 F.3d 1216, 1220-21 (10th Cir. 2008).

The Court gave these general observations some context in *Reno v. Flores,* 507 U.S. 292, 302 (1993) a case challenging placing foster children in institutions rather than foster family homes. In that case, the Court observed that juveniles, unlike adults are always in some form of custody. *Id.* The Court observed that no court—aside from the courts below in that very case—had ever held that a child has a constitutional right not to be placed in a decent and humane custodial institution, even if a responsible person were willing to undertake temporary legal custody. *Id.,* 507 U.S. at 303. Such a "substantive due process" right could not be considered as so rooted in the traditions and conscience of our people as to be ranked

fundamental. *Id.* If institutional custody (despite the availability of responsible private custodians) is not unconstitutional in itself, it does not become so simply because it is less desirable than some other arrangement for a particular child. *Id.* The "best interests of the child" standard is not an absolute and exclusive constitutional criterion for the government's exercise of custodial responsibilities; instead, it is one of several criteria and, as such, must be reconciled with many other responsibilities.  The "best interests of the child" standard does not constitutionally require government funding at such a level as to provide the best schooling or the best health care available, or to substitute, wherever possible, private nonadoptive custody for institutional care." *Id.* In this connection, Plaintiffs have conceded that there is no substantive due process right to good caseloads. Ex.27, Lowry concession, March 26, 2010 hearing, Tr. 8:11-18.

Minimum standards must be met, and the child's fundamental rights must not be impaired, but the decision to go beyond those requirements or give a child's additional interests priority over other concerns that compete for public funds and administrative attention is a policy judgment rather than a constitutional imperative. *Id.,* 507 U.S. at 304-05.  In a similar vein, the "professional judgment" rule, discussed below, has nothing to do with what course of action would make patients safer, happier, and more productive.  *Society for Good will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1248 (2d Cir. 1984).  The ultimate issue is whether patients' basic liberty interests are being safeguarded, not whether the optimal course of treatment as determined by some experts is being followed.  *Id.*

**C. The pertinent substantive due process standard in this case is a right to reasonable safety in care.  To establish a violation of that standard, plaintiffs must prove an abdication of professional judgment.**

18

As regards the present case, understanding the constitutional standard for substantive due process begins with *Youngberg v. Romeo,* 457 U.S. 307 (1982), in which the Court upheld a limited right of a man committed to a state institution for the mentally handicapped to freedom from physical restraint and habilitation or training.  The Court found that Romeo was entitled to minimally adequate training reasonable in light of his liberty interests in safety and freedom from unreasonable restraints.  *Id.,* 457 U.S. at 322.  In determining what is "reasonable" in any case presenting a claim for training by a State, courts must show deference to the judgment exercised by a qualified professional.  *Id.*  Finding that there is no reason to think judges or juries are better qualified than appropriate professionals in making such decisions, *see Id.,* 457 U.S. at 323, the Court held that a decision made by a professional is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.  *Id.*  Adopting the reasoning of Chief Judge Seitz in the court below, the Court concluded the Constitution only requires that the courts make certain that professional judgment in fact was exercised; it is not appropriate for the courts to specify which of several professionally acceptable choices should have been made.  *Id.,* 457 U.S. at 321.  For example, that two professionals both investigate and disagree about a diagnosis does not prove, in and of itself, that either professional has abandoned her professional judgment. *Johnson ex rel. Estate of Cano v. Holmes,* 455 F.3d 1133, 1144 (10th Cir. 2006).

The Tenth Circuit applied the *Youngberg* standard to children in foster care in *Yvonne L., by and Through Lewis v. New Mexico Dept. of Human Services,* 959 F.2d 883 (10th Cir. 1992). The court in *Yvonne L.* found children in state custody had a constitutional right to be reasonably safe from harm under the standard announced in *Youngberg.  Yvonne L.,* 959 F.2d at 893-94.  If

responsible persons place children in a foster home or institution that they know or suspect to be dangerous to the children they incur liability if the harm occurs.  *Id.,* 959 F.2d at 893.  However, "'[f]ailure to exercise professional judgment' does not mean mere negligence as we understand *Youngberg;* while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally." *Id.,* 959 F.2d at 894.

The Tenth Circuit and district courts in this circuit have applied the *Youngberg/Yvonne L.* standard a number of times.  *Johnson ex rel. Estate of Cano v. Holmes,* 455 F.3d 1133, 1143 (10th Cir. 2006) noted the "failure to exercise professional judgment," standard requires more than mere negligence: it requires an abdication of professional responsibility that must be sufficient to shock the conscience. *Cf.  Radecki v. Barela,* 146 F.3d 1227, 1230-31 (10th Cir. 1998)(conscience-shocking behavior is most likely to be found at the end of the culpability spectrum where there is an intent to do harm that is not justified by any governmental interest). It is indisputable that the substantive due process right under the Fourteenth Amendment that a State owes to children in foster care is the right "to be reasonably safe from harm," *Yvonne L.,* 959 F.2d at 893, not a right to the "exercise of professional judgment." *Bailey v. Pacheco,* 108 F.Supp.2d 1214, 1222 (D.N.M. 2000).  Thus, state officials such as social workers are shielded from liability under 42 U.S.C. § 1983 "unless the defendants showed that they failed to exercise professional judgment," that is, that they abdicated their duty to act professionally, thereby causing the plaintiff's injuries.  *Id.*  As another court held:

> Under *Youngberg* and *Yvonne L.,* the due process issue is not a question of negligence or malpractice; resolution rests on whether there was an abdication of duty, not whether there was a breach of a standard of care.  It is not appropriate for the Court to determine which of several professionally acceptable choices should have been made. *Bailey v. Pacheco,* 108 F.Supp.2d at 1221.  The key question is whether Defendants abdicated their duty to act professionally.

*Whitley v. New Mexico Children, Youth, and Families Department,* 184 F.Supp.2d 1146, 1161-62 (D.N.M. 2001).   Thus, it is not mere breach of some professional duty that imposes liability for violation of substantive due process; it is the *abdication* of the duty to act professionally that violates substantive due process rights.   Abdication means "giving up ... authority ... or trust" or giving up of sovereign power or an evading of responsibility, such as that of a parent.  *Id.,* 184 F.Supp.2d at 1156, fn. 5.  Abdication of the duty to act professionally is a "formidable standard."  *Id.,* 184 F.Supp.2d at 1162.

> D. **Plaintiffs cannot prove the OKDHS Commission and Director Hendrick have arbitrarily abused their power in the constitutional sense of exhibiting deliberate indifference to the reasonable safety of children in foster care by abdicating any professional judgment.  Quite the contrary, the OKDHS Defendants, and the people they supervise, exercise professional judgment in the management of the foster care system.**

Plaintiffs are unable to meet the "formidable standard" of showing an abdication of the duty to act professionally in so arbitrary a fashion as to exhibiting deliberate indifference to the reasonable safety of children in foster care.  As demonstrated above, in order to show deliberate indifference, the state actor must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and must also draw the inference, not to mention the requirement of a causal link to the defendants.  *Arledge v. Franklin County,* 509 F.3d 258, 263-64 (6th Cir. 2007).  In this case, Plaintiffs have to show the members of the Commission were aware of facts supporting an inference of a substantial *systemic* (Plaintiff's word) risk of serious harm, and actually draw the inference that such harm exists, and then ignored it, and then causation of serious harm or a serious risk of such harm.  Plaintiffs cannot make this showing, because it is not true.  None of their experts opine that it is true.

> 1. **"Reasonable safety" in care is the constitutional requirement, the absence**

**of which is recognized by the absence of professional judgment.**

The OKDHS Defendants ask the Court to remember that the substantive due process right at issue—the right that is deeply rooted in the Nation's history and tradition and implicit in the concept of ordered liberty—is one of "reasonable safety" in care. *Yvonne L.,* 959 F.2d at 894. The "professional judgment" rule has nothing to do with what course of action would make patients safer, happier, and more productive. *Society for Good will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1248 (2d Cir. 1984). "Reasonable safety" is the constitutional entitlement, the absence of which must be proven by the absence of professional judgment.

**2.  Federal government Child and Family Service Review (CFSR) measures and standards of private organizations are not the benchmark for a constitutional claim.**

Federal CFSR measures and standards of private organizations do not represent the constitutional standard. For example, as demonstrated below, Plaintiffs' experts refer to CFSR measures as if they were the standard of care in this case. The Plaintiffs also refer to the standards of the Child Welfare League of America (CWLA) as the standard to which OKDHS should be held. *See, e.g.,* Statement of requested relief Dkt. No. 241 p.3.

However, in their responses to requests for admissions the Plaintiffs describe the CFSR measures in terms of means to improve foster care, not constitutional standards:

> **. . . P**laintiffs state that according to the website of the federal Administration for Children & Families ("ACF") the federal Children's Bureau uses the CFSR process to monitor State child welfare services "[i]n order to help States achieve positive outcomes for children and families.". . . Moreover, CFSRs "enable the Chidlren's Bureau to: (1) ensure conformity with Federal child welfare requirements; (2) determine what is actually happening to children and families as they are engaged in child welfare services; and (3) assist States to enhance their capacity to help children and families achieve positive outcomes." . . . "Ultimately, the goal of [CFSRs] is to help States improve child welfare services and achieve" outcomes focused on child safety and permanency, as well as family

and child well-being. *Id.*

Plaintiffs' Supplemental Responses to Requests for Admission served January 18, 2011,

Ex.14 hereto, pp.12-13.

Moreover, the CWLA Standards of Excellence for Family Foster Care Services,

Ex.28 hereto pp.vi-vii, describe the purpose of the CWLA standards as follows:

> CWLA standards are intended to be standards of excellence—goals for the continuing improvement of services for children and their families.  They are not the criteria for CWLA membership, although they do represent those practices considered to be most desirable in providing services to children and families and are used in the development of the standards of the Council on Accreditation of Services for Families and Children, Inc. (COA).

> ***Review of CWLA Standards***

> The Child Welfare League of America continues to review all of its standards at appropriate times.  No standards should be considered final; in one sense, soon after they are issued they are out of date.  Standards must be subject to continual review and revision since knowledge about children, families, communities, human behavior and the treatment of human ills constantly changes…

Continually revised standards simply are not the sort of fundamental principles implicit in

the concept of ordered liberty, such that "neither liberty nor justice would exist if they

were sacrificed."  *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997).   Instead

these standards are intended to promote "best practice," as Plaintiffs admitted:

> **. . .**  Plaintiffs state that according to the CWLA's website, the CWLA's standards have several purposes and goals, including, *inter alia,* to describe and promote best practices in child, youth and family services; to guide agencies in improving services to children, youth and families; to set the context for effective child welfare work; to describe what agencies and workers should strive for in providing services to children, youth and families; to improve service outcomes for children, youth and families; and to promote consistency and standardization of practice. .

Plaintiffs' Supplemental Responses to Requests for Admission served January 18, 2011,

Ex.14 hereto, pp.10-11.

Plaintiffs also seek to make the OKDHS comply with the accreditation standards of the Council on Accreditation (COA).  *See, e.g.,* Statement of requested relief Dkt. No. 421 p.3.  The COA's website describes its vision as follows:

**VISION**

COA envisions excellence in the delivery of human services globally, resulting in the well being of individuals, families, and communities.

**HISTORY AND ACTIVITIES**

. . . .

COA views accreditation as a catalyst for change that builds on an organization's strengths and helps it achieve better results in all areas.  The accreditation process is designed to meet the needs of diverse organizations.  An organization is evaluated against best-practice standards, which are developed using a consensus model with input from a wide range of service providers, funders, experts, policymakers and consumers.

Ex.29 hereto.  Once again, the goal is "best-practice" standards, not fundamental principles implicit in ordered liberty.  In their Request for Admission responses, Plaintiffs described COA standards as follows:

. . . Plaintiffs state that according to the COA's website, COA accreditation "is not an end but a means to an end.  The real endpoint is an agency's enhanced growth and stability, an unwavering commitment to the health, safety, and rights of clients, and measurable results." Further, "[a]t the highest level, a [COA] purpose standard provides that overall aim of the practices in a section of standards. . ."

Plaintiffs' Supplemental Responses to Requests for Admission served January 18, 2011, Ex.14 hereto, pp.11-12.

Clearly, the CFSR measures and standards of the CWLA and COA do not describe rights "deeply rooted in the Nation's history and tradition and implicit in the concept of ordered liberty" that are entitled to substantive due process protection, nor are

24

they intended to prevent abuse of power that shocks the conscience of the Court.   An alleged failure to meet CFSR program improvement measures, or violation of the CWLA and COA standards cannot be used as a breach "standard of care" in the sense used in a negligence theory in this constitutional case.

However, this is the precise approach taken by Plaintiffs.  For example, in her expert report Viola Miller claims that "DHS management is failing to exercise professional judgment" in its management of the foster care system.  Ex. 5, p.1, excerpt from Miller report.   Beyond this conclusory statement, which refers generically to OKDHS "management" but not the actual OKDHS Defendants, Miller refers to CFSR measures[2], unnamed "nationally recognized standards," or CWLA standards[3].  *See, e.g.* Ex.5, excerpts from Miller report, pp.1 ("nationally recognized standards of reasonable child welfare management practice), 4 (reasonable child welfare practice standards), 6

_____

[2]     Plaintiffs' expert John Goad stated that he thought that there were problems with the CFSR.  Only one of 52 jurisdictions (50 states plus Puerto Rico and District of Columbia achieved substantial conformity in all six national standards in the last round CFSR.   Fifty-six percent – over half-- of 52 jurisdictions achieved substantial conformity in 2 or less of the national standards.  Ex.16, Arnold-Williams Rep., p.23.Finally, ACF recognizes that the kinds of systemic and practice changes necessary to bring about improvement in particular outcome areas often are time-consuming to implement, and improvements are likely to be incremental rather than dramatic. Ex.16, Arnold-Williams Rep., p.48.

[3]     However, even Dr. Miller acknowledges that "No specific structure is necessary to ensure efficient and satisfactory delivery of child welfare services to children in state custody." Ex.5, Viola Miller report, p.12.  Another of the Plaintiffs' expert witnesses, John Goad, acknowledges that the CWLA and COA are private organizations and do not have the power to make law. Ex.6, Goad deposition p.208:23-209:4.  Mr. Goad further testified that some of the COA and CWLA standards that have to do with staffing and management are "a little bit pie in the sky." Ex.6, Goad deposition, p.185, ll. 8-12,  and does not agree with all of the COA and CWLA standards, Ex.6, Goad deposition, p.193, ll. 2-6.   Dr. Miller could not point to any specific "national standards" that supported her opinion that a training structure with heavy reliance on ad hoc training by the counties cannot lead to high level supervision.  Ex.8, Miller deposition, p.168, ll. 8 through p.169, ll.

(CFSR "national standards"), 19 (CWLA Standards of Excellence for Management and Governance), 41 (CWLA Standards of Excellence for Adoption Services and for Management and Governance), 56 (CWLA Best Practice Guidelines for Child Maltreatment in Foster Care). Other of Plaintiffs experts make similar statements that miss the constitutional mark.

None of Plaintiffs experts opine that the OKDHS Commission, or Director Hendrick, have *abdicated* the exercise of professional judgment. Arguing about alleged violations of federal system improvement measures or professional standards is beside the constitutional point.

> **3.   The Commission and Director Hendrick have established policies and programs to exercise professional judgment in the administration of the OKDHS foster care system.**

The Oklahoma Constitution provides:

> The Commission shall formulate the policies, and adopt rules and regulations for the effective administration of the duties of the Department. All executive and administrative duties and responsibilities of the Department shall be discharged by the Director, subject to the approval of the Commission.

Oklahoma Constitution, Article 25 Section 4. Statutes reinforce this division of responsibility between the Commission and the Director. Under the leadership of the Commission and the Director, OKDHS has sought professional input on a variety of initiatives in the last ten years to improve child welfare practice and make children in foster care safer.

> **a.   The Practice Standards and Practice Model are based on professional judgment, including professional judgment on how to keep children safe.**

OKDHS retained expert consultants, Lorrie Lutz, representatives of Casey Family Programs, and others to assist in the development and implementation of a set of Practice

Standards and a Practice Model.  The Oklahoma Department of Human Services Child Welfare Practice Model Guide (PMG), Ex.24 hereto, the OKDHS Supervisor's Handbook to Implementing the Practice Standards and the Practice Model (SH), Ex.25 hereto, and the expert report of Lorrie Lutz, sponsored by a declaration (Lutz), Ex. 17 hereto, describe this process.

The OKDHS Practice standards promote a family centered and "evidence based" practice based upon promising practices identified through national learning collaborations.  Ex._24,SH, p.5.  OKDHS implemented the Practice Standards using the Breakthrough Series Collaborative Model adopted by Case Family Programs.  Ex.24, SH p.5, Ex.17, Lutz pp.22-24.  This Model uses a Plan-Do-Study-Act (PDSA) approach to testing the effectiveness of practice changes. Ex.24, SH p.6.  Staff from both the Field Operations Division (FOD) and the Child and Family Services Division (CFSD) attended a series of roll out sessions and the Continuous Quality Improvement (CQI) team from CFSD developed an assessment tool that counties could use to discuss and rate their current practice in each of the seven Practice Standards.  Ex.17 Lutz, p.24.

In late fall of 2007, OKDHS decided to complement the Practice Standards by developing a Practice Model.  Ex.17, Lutz, p.27.  Practice Models are a growing methodology that, among other things, achieve the goals of child safety, stability, permanence and well being through the practice of line workers.  Ex.17, Lutz, p.27.  OKDHS engaged in an extensive process of consultation with a professional workgroup from both CFSD and FOD that studied practice models from other locations, as well as literature in the field.  Ex.17, Lutz,  pp.28-30. This workgroup developed a Practice Model, illustrated in a detailed flowchart (found at Ex.24, PMG pp.6-7 or Ex.24 SH, pp.9-10), that organized the flow of a child welfare case from opening to closure.  Ex.17, Lutz, p.29, SG pp.8-10.  This includes what happens when a complaint call is answered at the central hotline or at a county office, all the way through screening, safety and

risk assessment, safety planning, family functional assessment, case planning, concurrent planning and permanency decisions.  Ex. 24, SH, p.8.  The Practice Model makes clear what workers should do in their work with families and serves as a handbook for workers that develops clarity and consistency in practice across the state, especially in areas where the State did not do well in the CFSR.  Ex.17, Lutz, pp.29-30.  The Practice Model does not replace OKDHS policy, but exists as a companion document that pushes practice toward the most current, evidence based and promising practices that exist in the field today.  Ex.17, Lutz,p.30.  The Practice Standards and Practice Model are exercises of professional child welfare judgment.  Ex.18, ¶ 10, Smith affidavit.

While the Practice Model guides workers throughout the life of a case from intake to permanency, it is vitally concerned with safety assessment and safety planning.  Ex.17, Lutz, pp.31-39.  While the Model, relies on an approach to safety intervention that is least intrusive for families, Ex.17, Lutz,  p.32, it focuses on safety management throughout the life of a child welfare case, emphasizing that safety assessment and safety planning are as critical for intake staff as for permanency workers; child safety is everyone's focus.  Ex.17, Lutz, p.39.  The Practice Model enhances child welfare practice by helping workers understand the difference between present danger to a child, impending danger, and risk of danger.  *Id.*  The Model requires gathering comprehensive information regardless of whether the case is being worked as an "investigation" or an "assessment."  *Id.*  The Model helps workers appropriately apply certain danger threshold criteria in making safety decisions, and supports critical thinking and understanding how safety threats occur in each family as an aid in safety decision making.  *Id.*  The Practice Model covers in-home and out-of-home safety planning in order to manage safety along the life of each case.  *Id.*

OKDHS engaged in a professionally advised, multi-phase, implementation of the Practice Model as a fundamental change in child welfare practice.  Ex.17, Lutz,  pp.62-76.  The Practice Model Guide deals extensively and in detail with safety assessment and decision making, and includes the professionally developed Assessment of Child Safety (AOCS) and safety plan documents, including an example of a completed AOCS to assist staff.  Ex. 24_, PMG pp.18-35, 88-115 (AOCS and Safety Plan documents).  OKDHS developed the Supervisor's Handbook to help supervisors implement the Model, including its safety assessment components.  *See, e.g.,*Ex.24,SH pp.12-15.  The implementation of the Practice Standards and Practice Model are also exercises in professional judgment.  Ex.18, ¶ 11, Smith affidavit.  OKDHS has enlisted Casey Family Programs to assist in assessing the Practice Model.  Ex.18, ¶12 and 18-4 Smith affidavit.

> **b.   The Commission has written key provisions of the Practice Standards, the Practice Model, and legislative changes into rules.  OKDHS provides instructions to staff to help interpret and apply the rules.**

In the discharge of its responsibilities, the Commission promulgates rules under the Administrative Procedures Act.  As part of the implementation of the Practice Model, and following the 2009 revision of the statutes that created a new Title 10A, the Commission promulgated a large number of rules to conform to the new law which included certain recommendations of legislatively hired expert consultants.   Professional Child Welfare staff consulted with the Commission's policy committee to ensure that newly promulgated rules were professionally sound.  Ex.18, ¶ 3, Smith affidavit.  OKDHS also provides "Instructions to Staff" for each such rule.  The entire body of child welfare rules and instructions to staff is available on line at http://www.okdhs.org/library/policy/oac340/075/.  On line, the actual rules, part of the Oklahoma Administrative Code, contain links to the Instructions to Staff to assist workers

seeking additional information about particular aspects of the rule.  Workers, or members of the public, can click on bullet points embedded in the rules to jump to the pertinent Instructions to Staff.  Ex.18 ¶ 3, Smith affidavit.

OAC 340:75-3-10.1, Safety determination and responses**,** provides an example of a Rule, with attendant Instructions to Staff, that embodies the Practice Model's approach to safety assessment and decision making with the legislatively imposed joint response protocol.  That joint response protocol ends the unilateral ability of law enforcement to put a child into emergency custody and requires OKDHS child welfare workers to collaborate with law enforcement officers in making removal decisions.  A child taken into protective custody by law enforcement is not, by virtue of a blanket standing order, considered to be in the emergency custody of OKDHS upon admission of the child to a shelter.  *See,* Ex.21,  340:75-3-10.1(c)(4).

The Commission has also promulgated a rule, 340:75-6-48, Ex.21, that provides an OKDHS worker is to visit each foster child a minimum of one time per month, with no less than two visits per quarter in the foster placement.  Each child is interviewed, or if an infant observed, alone without the foster parent present at least one time per quarter.  This rule is based on statute and professional judgment.  *See,* Ex.18, ¶ 4, Smith affidavit

In addition, the Commission has promulgated a rule¸ 340:75-18-10, Child and Family Services Review, that replicates required procedures of the United States Department of Health and Human Services Administration on Children and Families (ACF) and assesses, among other things, outcomes related to safety, permanence, and well-being by children and families.  *See* OAC 340:75-18-10, Ex.21 hereto.   This review provides both information for management, and a continuing training opportunity for line staff in order to improve child welfare practice.  The Continuous Quality Improvement (CQI) section of the Child and Family Services Division

(CFSD) organizes a site review in every county of the State annually.  The CQI unit draws a stratified random sample of children in each county for review.    The review consists of a review of case records and, for some types of cases, interviews with school-age children, parents or other persons responsible for the child (PRFCs), child welfare staff, placement providers and other persons with a significant role in the child's life.    The Oklahoma version of the CFSR reviews many more cases and interviews many more people in a single year than the federal CFSR does once every five years.  The CQI team shares findings of the review with the county director and with the area director of the six OKDHS administrative areas.  Aggregate state CFSR data are shared with appropriate officials within OKDHS to evaluate performance of the child welfare program.  A copy of the annual state level CFSR report is attached to Ex.18, ¶ 5, Smith Affidavit. This entire process is an exercise in professional judgment to secure timely data on child welfare practice throughout the state.  Ex.18, ¶ 5, Smith affidavit.

> **c.  OKDHS staff reasonably meets its visitation obligations to children.  Case loads are reasonable and OKDHS is retaining more seasoned workers.  Despite having fewer children in care, recidivism is down, and children in foster care are reasonably safe.**

OKDHS keeps track of the number of visits, or "contacts" of its workers with foster children.  Those statistics for the last year show that over 97% of children in regular foster care placements received the required monthly visit.  Ex. 15, ¶ 3 and 15-1, Johnson affidavit and spreadsheet attached.    Between 90% and 96% of children living in their own homes while in foster care jurisdiction received the required visits. Ex. 15, ¶ 3 and 15-1.    Between 96% and 98.6% of children in therapeutic foster care (TFC) placements received the required visits.  Ex. 15, ¶ 3 and 15-1.  Of the twenty or children in unpaid relative placements each month, between 90% and 100% received the required visits each month.  Ex. 15, ¶ 3 and 15-1.  The visitation rates were between 61% and 75% for children placed in foster care out of state.  Ex. 15, ¶ 3 and

15-1.  Children in all other placement types received their required visits at least 95% of the time each month.  Ex. 15, ¶ 3, and 15-1.  Data regularly kept by OKDHS indicates that, since July, 2000, OKDHS workers have made monthly visits to children in foster care due a visit over 90% of the time.  Since January, 2007 data shows OKDHS workers have made more than 95% of monthly visits in all but two months (in which 94.2% and 94.9% of visits were made).  Ex.15, ¶3.

Moreover, data regularly kept by OKDHS in the usual course of its business shows the average number of custody children assigned to permanency planning workers has dropped from 19.7 in October 2008 to 16.8 in May, 2011.  As of the May, 2011, Combined Workload Report, OKDHS permanency planning workers had an average case load of 16.8 children; prevention workers had an average of 11.2 families; protective services workers were responsible for an average of 6.8 new assigned referrals each month, and resource workers were responsible for an average of 23 resource families each. Ex.15, ¶ 4.  In addition, OKDHS  has been able to retain more child welfare workers with longer experience.  The following table drawn from data maintained by the OKDHS in the normal course of its business shows the progress:

| 1st of month | Number of workers with less than 2 years experience | Number of workers with greater than 2 years experience | Percentage of workers with greater than 2 years experience |
|---|---|---|---|
| Jul-06 | 463 | 580 | *55.6%* |
| Jul-07 | 434 | 594 | *57.8%* |
| Jul-08 | 476 | 608 | *56.1%* |
| Jul-09 | 457 | 627 | *57.8%* |
| Jul-10 | 325 | 654 | *66.8%* |
| Jun-11 | 349 | 679 | *66.1%* |

Ex.15, ¶ 5§.

While the number of children in foster care has dropped dramatically, from over 12,000

at the end of SFY 2007 to approximately 8,200 now, the percentage of children with an absence of maltreatment recurrence during a six month period (a federally required reporting measure) has increased from 90.8% in FFY 2005 to 94.2% in FFY 2009.  Ex.18 ¶ 6, Smith affidavit. Similarly, the percentage of children with reentries to foster in less than twelve months after discharge has dropped from 9.3% in FY 2005 and 2006 to 6.3% in FY 2010.  Ex.18, ¶ 6, Smith affidavit.  These figures indicate that children are being safely returned to their families.  Ex. 15, Smith affidavit.  The federal median for this permanency of reunification measure is 15%, while the top 25th percentile is 9.9%.  Ex. 18 ¶ 6 and 18-2, CFSR data profile, p.9 Component IX(b). Oklahoma is well within the top quarter nationally on this measure.  Ex.15, Affidavit of Deborah Smith.

The OKDHS consistently finalizes a high number of adoptions for children in foster care and exceeds the national standard in this area of practice.  During the last 12 years (with one exception) over 1,000 children have achieved permanency every year through adoptions. During SFY 2002, there were 922 children which was the lowest year and during SFY 2010, there were 1,698 children which was the highest year.  Ex.18, Smith affidavit, ¶ 7.

Maltreatment in care can be measured in various ways.  According to figures computed by the federal government for maltreatment in care by foster parents or institutional staff[4] (excluding cases investigated by the OCA), Oklahoma has had an absence of such maltreatment in excess of 98% from FY 2005 to the present.  Child Maltreatment 2009, Table 13-8 Ex. 18, ¶ 8 and 18-3.  The federal government also analyzes Oklahoma data and reports an "additional safety measure for which no standards are associated" which is the number and percentage of children maltreated by parents when the "report date," not necessarily the date of the

---

[4] These figures are not the result of sampling, but represent the universe of data reported and collected within the federally approved computer system KIDS.

maltreatment, falls within the period during which the children are removed to foster care. Oklahoma CFSR Data Profile, June 7, 2011, Ex. 18 and 18-1 hereto, p.2, line XI, and fn. 12. The "report date" can be different from the maltreatment date, and once children are in care they sometimes disclose maltreatment suffered before they came into foster **c**are.  Given the data Oklahoma reports to the federal government, it is impossible to tell how many children were maltreated by their parents *before* entering foster care and how many were maltreated *after* entering foster care.  Ex. 18, ¶ 9, Smith affidavit.  However, even if all such children reported as abused by their parents were maltreated while in foster care the percentage of children with an absence of maltreatment still exceeds 97% for FFYs 2009 and 2010.  Ex.18 ¶ 9, Smith affidavit. Office of Client Advocacy (OCA) investigations confirmed 154 children in foster care abused or neglected in 2009, seven with injury, and  80 in 2010, 11 with injury.  Most cases were neglect, rather than abuse.  Ex. 30, Lee declaration.

The OKDHS seeks out opportunities to improve its child welfare practice.  One of these opportunities is the Bridge to the Future Grant that assists the OKDHS in recruiting foster families.  Another is the Kinship Bridge Grant, resources from which help reduce reliance on shelters and has helped speed children out of the Laura Dester Children's Center in Tulsa and the Pauline E Mayer shelter in Oklahoma City.  Casey Family programs helps OKDHS conduct Permanency Roundtables that help remove barriers to permanency for children.  OKDHS was recently selected as one of three sites in the nation for implementation of the Chadwick Trauma Informed System of child welfare practice that will help develop specialized services for victims of child abuse and domestic violence.   All of these initiatives are exercises of professional judgment.  Ex. 18, ¶¶ 13, 14, 15, 16.

The professionals of the OKDHS always want to make children in care safer**,** but the Due

Process Clause does not guarantee perfect safety.  Instead, it requires "reasonable safety." Even looking beyond the indisputable exercise of professional judgment by the Commission and the Director, these actual performance numbers do not shock the conscience in a constitutional sense and show that children in OKDHS foster care are reasonably safe.

> **Proposition II: Plaintiffs' discovery responses and expert reports provide no support for their procedural due process allegations, particularly as relates to the required elements of policy, custom, or practice and causation.**

In a single paragraph of the Complaint Plaintiffs raise seven separate allegations of deprivations of "state-law entitlements" without due process of law.  Complaint, Dkt. 2, ¶ 251. Plaintiffs do not say whether these entitlements are state created liberty interests or property interests.  In summary due process violations in deprivations of:

a.  Alleged entitlement to a written report to the court every six months before the "permanency hearing;"
b. Alleged entitlement of children in foster care for 15 of the last 22 months to be placed on a list provided District Attorneys for which termination of parental rights should be filed (TPR lists);
c. Alleged entitlement to complete criminal history search on those applying to operate child care facilities or foster homes and other adults residing or moving in before contracting to place a child;
d. Alleged entitlement not to be placed in out of home placement before completion of a foster parent eligibility assessment and certain criminal history checks of prospective foster parents and any adult living in the home;
e. Alleged entitlement not to approve placement of a child with a perspective foster parent if the prospective foster parent or any other person living in the home has been convicted of certain crimes;
f. Alleged entitlement to educational instruction through enrolment in a public school or an alternative program consistent with the needs and abilities of the child;
g. Alleged entitlement to filing an individual treatment and service plan with the juvenile court within 30 days after the child is adjudicated deprived.

Plaintiffs offer no evidence these supposed deprivations were caused by a policy, custom, or practice of the OKDHS Commission or Director.

The Court must consider this brief summary of Plaintiffs' burden in their procedural due

process case against the particulars of the present case.  The defendants in this case are not individual case workers or supervisors; they are the members of the Human Services Commission and the OKDHS Director.  Failings of individual employees of the OKDHS do not impose liability on the agency policymakers by *respondeat superior* because causation is a necessary element of any §1983 claim.  *Lee v. Town of Estes Park, Colo.,* 820 F.2d 1112, 1116, n. 3 (10th Cir. 1987**).**  To prevail in this official capacity action against the members of the Human Services Commission and the OKDHS Director, Plaintiffs are required to identify a 'policy' or 'custom' taken or knowingly permitted  by the OKDHS Defendants with the requisite degree of culpability and must demonstrate a *direct causal link* between the OKDHS policymakers' action and the deprivation of federal rights. *Dodds v. Richardson,* 614 F.3d 1185, 1202 (10th Cir. 2010) (municipal liability case).  The Supreme Court recently made clear that the "policy or custom" requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or equitable.  *Los Angeles County, Cal. v. Humphries,* 131 S.Ct. 447, 454 (November 30, 2010).  Even for prospective relief, OKDHS can only be held responsible for *its own* actions, and not through *respondeat superior* because it employs a constitutional tortfeasor. *Id.,* 131 S.Ct. at 452.

**A. The Plaintiffs have no evidence supporting their procedural due process claims.**

Defendants served interrogatories on the Plaintiffs about each of their procedural due process claims.  *See,* Ex. 12.  Plaintiffs' Responses Regarding Alleged Procedural Due Process Violations.  Significantly, Plaintiffs could identify *no child* known to them at the time they filed their Complaint who had allegedly suffered from *any* of the alleged due process violations.[5]

---

[5]     Plaintiffs admitted the lack of such knowledge for each claim at the following locations in Exhibit __:  Interrogatory No. 3, pp.7-8; Interrogatory No. 19, pp.30-31; Interrogatory No. 35,

Thus, Plaintiffs made these allegations unsupported by evidence of a single child victim.

When asked to identify specific children who were victims of each alleged type of due process deprivation, Plaintiffs' refrain was that such a request "misconstrues Plaintiffs' burden of proof at trial, as much of Plaintiffs' proof will be in the form of testimony and documents that address the aggregate impact of DHS's harmful practices." *See, e.g.,* Ex. 12, Interrogatory No. 3, p.8; Interrogatory No. 20, pp.31-32.  However, Plaintiffs' experts did not establish a procedural due process case by aggregate impact, or otherwise.  No expert opined about facts to establish the existence of constitutionally protected liberty or property interests, deprivation of such interests for specific children or in aggregate, the process that was due, and whether that process was provided or not.  Certainly no expert opined on a policy, custom, or practice of the OKDHS Commission or its Director that caused the alleged due process deprivation.

Plaintiffs often responded to interrogatories about individual children supposedly subject to each type of due process deprivation with non-responsive recitations that answered questions they had rather been asked, rather than forthright answers to questions actually asked.  For example, Interrogatory No. 4 asked Plaintiffs to identify specific members of the Plaintiff class who had been deprived of the alleged entitlement to a written report prepared for the juvenile court every six months before each permanency hearing in the last three years.  Instead of answering that question, Plaintiffs provided a list of children allegedly denied due process because they had "three or more consecutive permanency goals during their time in DHS custody and a meaningful permanency report is not possible with constantly changing permanency goals."  *See,* Exhibit 12, Interrogatory No. 4, pp.8-9.  Plaintiffs used a similar ploy in answering Interrogatory No. 20, which asked for identification of class members deprived of the alleged

pp.56-57; Interrogatory No. 51, pp.73-74; Interrogatory No. 67, pp.86-87; Interrogatory No. 83, pp.102-03; Interrogatory No. 99, pp.117-18.

entitlement of being put on a termination of parental rights list (TPR list) without due process of law. Plaintiffs' answer did not even mention a TPR list, but instead gave a list of children allegedly denied due process because each child "had a single permanency goal of adoption at some time during their most recent episode in DHS custody that took at least 24 months to establish. Given the length of time it took DHS to establish a goal of adoption for these children, timely termination of parental rights was not possible." *See,* Exhibit 12, Interrogatory No. 20, pp.31-32. Though some are less egregious, the other answers were of a similar vein.[6]

Under Fed.R.Civ.P 37(a)(4) an evasive or incomplete disclosure, answer, or response must be treated as a failure to disclose, answer, or respond. Plaintiffs simply failed to support their due process claims with evidence of children deprived of the supposed "entitlements" that were the subject of the claims.

Plaintiffs' failings do not stop there. Defendants asked Plaintiffs to disclose the specifics of the alleged due process violations for each individual child allegedly subjected to them, including date of the deprivation, any harm or prejudice suffered by the child, the process that was due, any process that was provided, and, where applicable, the role of the child's attorney and the district attorney in the supposed deprivation. Although verbose in their answers,

---

[6]     *See,* the following responses in Exhibit 12: Interrogatory No. 36 (about "entitlement" to certain criminal history searches and eligibility assessments) answered regarding four **named plaintiffs** placed in homes "not fully and/or properly assessed or approved," pp.57-58; Interrogatory No. 52 (about "entitlement" to eligibility assessments, criminal history or child abuse registry searches) answered regarding four **named plaintiffs**; Interrogatory No. 84 (about "entitlement" to educational instruction) answered with list of children who allegedly were denied due process "because each child did not receive all of the services necessary to address education-related concerns documented in their case files"; Interrogatory No. 100 (about entitlement to timely filing of an Individual Service Plan (ISP) with juvenile court) answered with list of children allegedly deprived of due process "because each child did not have the appropriateness of his or her permanency plan and the steps taken to achieve the permanency goal documented in his or her service planning documents" pp.118-19.

Plaintiffs gave <u>none</u> of these particulars for <u>any</u> of the children supposedly deprived of due process, and uniformly confused the process due with the substantive entitlement they claimed was lost by answering questions about what process was due by parroting the alleged substantive right they claim was violated.[7]

Further, Plaintiffs uniformly failed to identify any policy, custom, or practice of the OKDHS Defendants (the members of the Commission and the Director), that caused the alleged deprivations of due process.[8]  Further, the Constitution does not guarantee due care on the part of state officials; liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.  *Radecki v. Barela,* 146 F.3d 1227, 1231 (10th Cir. 1998).   Only a policy, custom, or practice with misconduct worse than negligence that caused the alleged deprivation of state created entitlements (if they amounted to protected liberty or property interests) would constitute a due process violation.  Without any evidence of a policy, custom, or practice of the actual OKDHS policymaker Defendants and evidence of causation Plaintiffs cannot make a § 1983 case.  *See,* Proposition III, pp.39-42.  The OKDHS Defendants are entitled to summary judgment on these claims.

**Proposition III: The OKDHS Director and Commission, as a matter of law, do not have a policy, custom, or practice that causes a foster child to be deprived of a Constitutional right to which he is entitled.**

Causation is a necessary element of any §1983 claim.  *Lee v. Town of Estes Park, Colo.,*

---

[7]        *See,*  the following responses in Exhibit 12 :  Interrogatory No. 5, pp.14-20; Interrogatory No. 21, pp.35-41;  Interrogatory No. 37, pp.58-64; Interrogatory No. 53, pp.75-78; Interrogatory No. 69, pp.89-91; Interrogatory No. 85, pp.105-09; Interrogatory No. 101, pp.124-33.

[8]        *See,* the following responses in Exhibit 12:  Interrogatory No. 14, pp.23-24; Interrogatory No. 30, pp.45 (incorporates response to Interrogatory No. 17, which does not mention policy, custom, or practice of Commission or Director);  Interrogatory No. 46, pp.68 (incorporates response to Interrogatory No. 33, which does not address policy, custom, or practice of Commission or Director);  Interrogatory No. 62, pp.82-83 (again incorporating response to Interrogatory No. 33).

820 F.2d 1112, 1116, n. 3 (10th Cir. 1987). To prevail in this official capacity action against the members of the Human Services Commission and the OKDHS Director, Plaintiffs are required to identify a 'policy' or 'custom' taken or knowingly permitted by the OKDHS Defendants with the requisite degree of culpability and must demonstrate a *direct causal link* between the OKDHS policymakers' action and the deprivation of federal rights. *Dodds v. Richardson,* 614 F.3d 1185, 1202 (10th Cir. 2010) (municipal liability case). The Supreme Court recently made clear that the "policy or custom" requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or equitable. *Los Angeles County, Cal. v. Humphries,* 131 S.Ct. 447, 454 (2010). Even for prospective relief, OKDHS can only be held responsible for *its own* actions, and not through *respondeat superior* because it employs a constitutional tortfeasor. *Id.,* 131 S.Ct. at 452.

Once those officials who have the power to make official policy on a particular issue have been identified, the Court must determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur, or by acquiescence in a longstanding practice or custom which constitutes the "standard operating procedure" of the local governmental entity. *Jett v. Dallas Independent School Dist.,*491 U.S. 701, 737 (1989)(emphasis in original). Absent the conscious decision or deliberate indifference of some natural person, a municipality (or the OKDHS), as an abstract entity, cannot be deemed to have engaged in a constitutional violation by virtue of a policy, a custom, or a failure to train. *Simmons v. City of Philadelphia,* 947 F.2d 1042 (3d Cir. 1991). Thus, Plaintiffs must show that natural persons—the members of the Commission or the Director—were deliberately indifferent *themselves* in order to impose liability. An alleged "custom" that has not been formally approved by an appropriate policymakers subjects a governmental entity to liability under § 1983

only if the plaintiff proves acquiescence by the policymakers and that the relevant practice is so widespread as to have "the force of law." *Board of County Commissioners v. Brown*, 520 U.S. 397, 404, (1997).  This they cannot do.

A person acting under color of State law (<u>e.g.</u> a governmental policymakers such as the OKDHS Commission and  Director) has no liability, even for equitable relief under § 1983 unless the plaintiff first establishes that the governmental violation of his or her Constitutional rights was the result of the execution or implementation of a policy, custom, or "practice" of the governmental defendants.  A government "could not be held liable under § 1983 solely because it employed a tortfeasor…" and that the "causation" language of § 1983 "could not be easily read to impose liability vicariously…solely on the basis of existence of an employer-employee relationship with a tortfeasor." *Humphries,* 131 Sup.Ct. at 452.  Under § 1983, a governmental unit cannot be held liable solely for the acts of others, <u>e.g.</u>, solely because it employees a tortfeasor, but the governmental unit "may be held liable when execution of a government's *policy or custom*…inflicts the injury." <u>Id.</u> (<u>emphasis added</u>).

On March 29, 2011, the U.S. Supreme Court in <u>Connick v. Thompson</u>, ___U.S. ___, 131 S. Ct. 1350 (2011) reaffirmed familiar principles that to impose § 1983 liability on a governmental unit, a plaintiff must establish a policy, custom, or practice of the government decisionmakers or policymakers:

> [U]nder § 1983, local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions. Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury. Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials and practices so persistent and widespread as to practically have the force of law.

___U.S. at _____ 131 S.Ct. at 1359 (*emphasis by the Court; citations and internal quotation omitted*).  Because, as demonstrated in this brief, the substantive constitutional law at issue requires deliberate indifference and abdication of professional judgment, even a case based upon a "practice" must be based on a harmful practice policymakers know about and are deliberately indifferent to.

In a concurring opinion, Justice Scalia, joined by Justice Alito, emphasized that public employees making discretionary decisions will inevitably make mistakes and sometimes even violate Constitutional rights of others, but proof of such inevitable human error does not entitle a § 1983 plaintiff to relief against the government itself: "Nevertheless, we do not have *de facto respondeat superior* liability…." ___ U.S. at ____, 131 S. Ct. 1357(Scalia, J., concurring).

Plaintiffs' scatter-shot approach that cobbles together alleged shortcomings of the OKDHS child welfare program, but fails to connect those alleged shortcomings to some policy of the Commission or Director, or some practice known to them and acquiesced in so pervasively as to be equivalent to a formal policy, fails to establish the required policy, custom, or practice. Plaintiffs simply have no evidence that the Commission or the Director created a policy or acquiesced in a practice with the required culpability (deliberate indifference and abdication of professional judgment) that causes harm or great risk of harm to the class as a whole. Defendants are entitled to summary judgment.

> **Proposition IV:  Plaintiffs, as a Matter of Law, Have Failed to Establish a Causal Nexus Between a Violation of Their Constitutional Rights and a Policy, Custom, or Practice of the Commission and Director of OKDHS.**

"[U]nder 42 U.S.C. § 1983, a plaintiff must satisfy a <u>rigorous</u> standard of causation; he must demonstrate a <u>direct</u> causal link between the municipal action and the deprivation of federal rights."  *Connick v. Thompson*, ___U.S.____, 131 S.Ct. 1350, 1368 (2011) (Scalia, J.,

concurring) (emphasis added); (citation and internal quotation marks omitted), quoting *Board of Commissioners of Bryan County v. Brown*, 520 U.S. 397, 404-405 (1997). A governmental entity may be held liable under § 1983 "when execution of a government's policy or custom . . . inflicts the injury." *Los Angeles County, California, v. Humphries*, ____U.S. ____, 131 S.Ct. 447, 452 (2010) (citation omitted).

In discussing the necessity for proof of causation in a § 1983 action, the Tenth Circuit discussed the following:

> Although the 'traceability' of a plaintiff's harm to the defendant's actions need not rise to the level of proximate causation, Article III does require proof of a substantial likelihood that the defendant's conduct caused plaintiff's injury in fact. If speculative inferences are necessary to connect a plaintiff's injury to the challenged action, this burden has not been met. Moreover, where the independent action of some third party not before the court -- rather than that of the defendant -- was the direct cause of the plaintiff's harm, causation may be lacking. That an injury is indirect does not necessarily defeat standing, but it may make it substantially more difficult . . . to establish that, in fact, the asserted injury was the consequence of the defendants' actions.

*Habecker v. Town of Estes Park, Colorado*, 518 F.3d 1217, 1225 (10th Cir. 2008) (emphasis added; citations and internal quotation marks omitted). The U.S. Supreme Court has repeatedly emphasized that the question of whether a § 1983 plaintiff can establish causation should command early attention from the district court:

> Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.

*Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 123 (1992) (emphasis added; citation and internal quotation marks omitted).

Evidence of "mere possibilities" is insufficient "causal supposition." *State Farm v. Holmes Products, Inc.*, 165 Fed. Appx. 182 (3rd Cir. 2006). If causation is to be proven circumstantially, "the circumstances shown must justify an inference of probability as distinguished from mere possibility." *Werth v. Makita Elec. Works*, 950 F.2d 643, 651, n. 9 (10th

Cir. 1991). "It is not sufficient to show a set of circumstances bringing the theory of appellants within the realm of possibilities. . . . The plaintiffs must establish causation beyond mere possibility or speculation." *Truck Insurance Exchange v. Magnetek Incorporated*, 360 F.3d 1206, 1215 (10th Cir. 2004). "We require more than pure speculation to defeat a motion for summary judgment." *Setliff v. Memorial Hospital of Sheridan County*, 850 F.2d 1384, 1393 (10th Cir. 1988).

In the case at bar, Plaintiffs offer evidence that as to certain foster children (whether some of the Named Plaintiffs or other children who were members of Dr. Milner's "sample"), decisions were made by social workers (often reviewed and approved by Oklahoma judges before or after the OKDHS decision was made) which were followed by the child suffering either a physical injury or an alleged mental injury. Plaintiffs have wholly failed to show that a policy, custom, or practice of the OKDHS Commission or Director—the actual OKDHS Defendants and policymakers--was the "direct cause" of any such harm. Instead, Plaintiffs give a few examples of allegedly deficient policies, resources, or training (*e.g.*, an unnecessary move from one residence to another, a period of residency at an emergency shelter that was longer than Children's Rights considers desirable) and then simply argue that an adverse event was caused by <u>OKDHS</u>, without demonstrating a direct causal link to OKDHS policymakers who are the actual defendants. This kind of reasoning overlooks the fact that a causal nexus remains lacking and, even more importantly, there is no direct length between a custom or practice and a *Constitutional* violation (not merely an "adverse life event"). To establish governmental liability under § 1983, the plaintiff must show (1) the existence of a governmental custom or policy, and (2) a direct causal link between the custom or policy and the *Constitutional* violation. *City of*

*Canton v. Harris*, 480 U.S. 378, 385 (1989).    Plaintiffs have no evidence the Commission or the Director *caused or threaten to cause* any constitutional violation.

> **Proposition V: OKDHS, as a matter of law, does not maintain a practice of violating the right of foster children to associate with their parents and siblings.**

 Plaintiffs do not have evidence of a pervasive and persistent practice of OKDHS that unduly burdens a foster child's right to exercise visitation with his parents or siblings.  If a significant percentage of OKDHS foster children may not receive in-person contact with their parents or siblings every month, this does not establish a violation of such rights, let alone establish a "practice" that would justify injunctive relief for the entire class. OKDHS has no intent to burden parent-child relationships and sibling-to-sibling relationships and no policies with that intent. Ex. 18, ¶17.

Oklahoma statues require judges in "deprived child" actions to include in their orders provisions that address placement of siblings together, as well as visitation between foster children and their parents and between siblings who do not reside together.  *See, e.g.,* 10A O.S. § 1-4-707(A)(1)(b)(1) and (A)(2)(a)(3) and (A)(2)(f) and (A)(4)(c)  and (A)(6)(a), (b), and (E); 10A O.S. § 1-4-204(A)(2); 10A O.S. § 1-7-107; 10A O.S. § 1-4-704(C)(3), (E)(9)(g); 10A O.S. § 1-4-813(3)(c), (4)(a);  10A  O.S.  § 1-7-104(A)(5);  10A  O.S.  § 1-4-807(D)(1)(e), (j)(1), (j)(2) [effective November 1, 2011].  A court balances the plaintiff's right to familial association against the relevant interests of the state, considering the "severity of the alleged infringement, the need for the defendant's conduct, and any possible alternatives." *Griffen v. Strong*, 983 F.2d 1544, 1548 (10th Cir. 1993).  The test established in *Griffen* requires the plaintiff to show that the state actor directed his conduct at the familial relationship "with knowledge that the…conduct will adversely affect that relationship." *Griffen*, 983 F.2d at 1548.  In  an  unpublished  opinion

issued after *Griffen*, the Tenth Circuit affirmed summary judgment for the defendants in a § 1983 action, holding that the plaintiffs failed to show that the defendants not only caused interference with a familial relationship but also that the defendants had *directed* their conduct at the relationship, with knowledge that the conduct would adversely affect that relationship.  *Estate of Herring v. City of Colorado Springs*, 233 Fed.Appx. 854, 2007 WL 1454394 (10th Circuit), *cert. denied* 552 U.S. 1098 (2008).  The Court in *Herring* concluded:

> Thus, although plaintiffs are correct that this Circuit acknowledges the Fourteenth Amendment roots of their constitutional claim, our subsequent cases clearly preserve direction and intent as a requirement [*sic*] for stating a cause of action for the violation of the constitutional right to familiar association.  Plaintiffs have not alleged, nor do they attempt to demonstrate, that the officers directed their conduct at plaintiffs' familial association with their father or intended to interfere with it.  Because they have not made the requisite showing, the district court correctly granted summary judgment for defendants.

*Estate of Herring*, 2007 WL 1454394, at **2.

In the instant action, Plaintiffs have no evidence that the OKDHS Defendants directed any specific conduct at the class members' relationships with their parents or siblings or that the OKDHS Defendants had the intent to interfere with those relationships.  To the contrary, the only record evidence is that the OKDHS Defendants have a policy, OAC 340:75-6-30, of regular monthly visitation between a foster child and his or her parent, but have not complied with the policy as to every member of the class.  Without some showing that the OKDHS Defendants had the requisite "direction and intent," Plaintiffs' § 1983 claim that OKDHS has violated, and continues to violate, their rights of familial association fails as a matter of law.

## **CONCLUSION**

After over three years of litigating this case, Plaintiffs have failed to come forward with evidence to support their claims against the actual Defendants in this case – Director Howard Hendrick and the Commissioners of OKDHS.   Plaintiffs have no evidence of a class-wide pattern or practice of the OKDHS Commission or Director that causes a class-wide deprivation of substantive due process for class members, amounts to an abdication of professional judgment, shocks the conscience of the Court, and causes or imminently threatens to cause serious harm to plaintiffs throughout the class. The Plaintiffs have no evidence in support of their procedural due process claims, particularly in regard to proof of a policy, custom, or practice and causation.  The Plaintiffs cannot demonstrate that OKDHS has a practice of violating the right of foster children to associate with their siblings and parents.   Due to the Plaintiffs' failure to produce the required evidence and the lack of genuine disputes as to any material fact, OKDHS Defendants are entitled to judgment as a matter of law.  Therefore, the OKDHS Defendants urge the Court to enter judgment for the Defendants in this matter.

Respectfully submitted,

**RIGGS, ABNEY, NEAL, TURPEN,
ORBISON & LEWIS, P.C.**

 s/Robert A. Nance
Robert A. Nance, OBA 6581
E-mail:  rnance@riggsabney.com
Donald M. Bingham, OBA 794
*Email:*  don_bingham@riggsabney.com
Stephanie L. Theban, OBA 10362
Email: stheban@riggsabney.com
502 West Sixth Street, Tulsa, OK 74119
*Tel* (918) 587-3161 / *Fax* (918) 587-9708
*Attorneys for the Defendants Richard L. DeVaughn,
Jay Dee Chase, Steven Dow, Michael L. Peck,
Aneta F. Wilkinson, Rev. George E. Young, Sr.,
Linda English Weeks, Anne M. Roberts, and
Howard H. Hendrick*

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2011, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Frederic Dorwart
*fdorwart@fdlaw.com*
Paul DeMuro
*pdemuro@fdlaw.com*
**Frederic Dorwart Lawyers**
124 E. 4th Street, Suite 100
Tulsa, OK  74103-5010

Marcia Robinson Lowry
*mlowry@childrensrights.org*
William Kapell
*wkapell@childrensrights.org*
**Children's Rights**
330 Seventh Ave., 4th Floor
New York, NY 10001

Larry Borten
*lborten@childrensrights.org*
Miriam Ingber
*mingber@childrensrights.org*
Patrick S. Almonrode
*palmonrode@childrensrights.org*

s/ Robert A. Nance

48