# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| D.G., by Next Friend G. Gail Stricklin; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 08-CV-074-GKF-FHM |
| | ) | |
| C. BRAD HENRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

## OKDHS DEFENDANT'S MOTION TO EXCLUDE THE TESTIMONY OF JOHN GOAD PURSUANT TO DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC.

---

Robert A. Nance, OBA No. 6581
*E-Mail*:  rnance@riggsabney.com
RIGGS,    ABNEY,    NEAL,    TURPEN,
ORBISON & LEWIS
5801 N. Broadway Extension, Suite 101
Oklahoma City, OK  73118
*Tel* (405) 843-9909 / *Fax* (405) 842-2913
Attorneys for the Defendants Richard L.
DeVaughn, Jay Dee Chase, Steven Dow,
Michael L. Peck, Aneta F. Wilkinson, Rev.
George E. Young, Sr., Linda English
Weeks, Anne M. Roberts, Bob Rawlings,
and Howard H. Hendrick

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITES .................................................................................................. iii

INTRODUCTION................................................................................................................... 1

Plaintiffs cannot provide an adequate foundation for Mr. Goad's opinions........................... 1

The statistical work submitted under Mr. Goad's name is fatally flawed. ............................. 2

Mr. Goad offers no evidence or opinion establishing a policy, custom, or practice of the
Defendants, and does not establish causation........................................................................ 2

OVERVIEW OF PLAINTIFFS' CLAIMS AND BURDEN OF PROOF ............................... 2

LEGAL STANDARD FOR DAUBERT MOTION ................................................................. 3

ARGUMENT AND AUTHORITIES..................................................................................... 7

I.  Goad admits his first report is unscientific and provides no reliable evidence about the
Plaintiff class.......................................................................................................................... 7

II.  Mr. Goad lacks the expertise to opine on statistical conclusions about the population of
children in foster care disclosed in his 2011 Report. The supposed statistician who actually
did the work in the 2011 Report has issued no expert report of his work.............................. 9

III.  The statistical work in Mr. Goad's 2011 report is fatally flawed and unreliable. ........ 14

   A.  The sample drawn for review is unreliable. ................................................................. 14

   B.  Mr. Goad's confidence intervals are unreliable because his sample sizes are too small
   and his reporting of confidence intervals is done for effect and not for scientific accuracy.
   ............................................................................................................................................ 17

   C.  Mr. Goad's inter-rater reliability is unreliable............................................................. 20

   D.  Mr. Goad admits his child fatality review cannot be applied to the entire class.  It is
   also unreliable and irrelevant. ............................................................................................ 21

IV.  Thompson's unexplained work is an insufficient basis for Goad's opinions, mandating
that the Court refuse to allow Goad to testify. ..................................................................... 23

V.  Goad does not establish a violation of a practice or policy by the Defendants and does
not establish causation.......................................................................................................... 23

**CONCLUSION** ....................................................................................................................... 24

**CERTIFICATE OF SERVICE** ............................................................................................ 26

## TABLE OF AUTHORITES

**Cases**

*Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994) .......................................................... 4

*Board of Comm'rs of Bryan Cty. v. Brown,* 520 U.S. 397, 410 (1997) ........................................ 3

*Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011) .................................................................. 2

*Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) ......................................................... 1, 5, 23

*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003)...................................................... 5

*Guzman v. Memorial Hermann Hospital System*, 637 F. Supp. 2d 464, 476 (S.D. Tex. 2009) ... 23

*In re Williams Securities Litigation*, 496 F.Supp.2d 1195, 1230 (N.D. Okla. 2007) ........... 4, 5, 12

*Johnson ex rel. Estate of Cano v. Holmes,* 455 F.3d 1133, 1143 (10th Cir. 2006) ...................... 21

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). ................................................................. 1

*Mehus v. Emporia State University*, 222 F.R.D. 455, 461 (D. Kan. 2004) ..................... 13, 14, 22

*Morning Capital Fund, LLC v. Knight*, 2010 WL 2881529 (10th Cir.) ........................................ 13

*O2 Micro International Limited v. Monolithic Power Systems,* 420 F. Supp. 2d 1070 (N.D. Cal. 2006) ................................................................................................................................ 13

*Palmer v. Asarco Incorp.*, 510 F. Supp. 2d 591, 528 (N.D. Okla. 2007) .................................... 12

*Powerhouse Marks, LLC v. Chi Hsin Impex, Inc.*, 2006 WL 20523 (E.D. Mich.)......................... 7

*Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001)............................ 4

*Reynolds v. Guiliani*, 118 F. Supp. 2d 352, 366 (S.D.N.Y. 2000).................................................. 7

*THOIP v. Walt Disney Co.*, 690 F.Supp.2d 281 (S.D.N.Y. 2010).................................................. 7

*TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993)......................................... 13

*U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) ................................................................ 4

*Valley View Development, Inc. v. U.S. ex rel U.S. Army Corps of Engineers*, 712  F.Supp.2d. 1024, 1047 (N.D. Okla. 2010) ......................................................................................... 4

*Volkswaen AG v. Dorling Kindersley Pub., Inc*., 614 F. Supp. 2d 793, 805 (E.D. Mich. 2009).... 6

*Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 571 (2003) ........................................... 4

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) ................................................................................................................................................. 4

## Statutes

42 U.S.C. § 1983 ................................................................................................................... 2, 3, 22

## Other Authorities

The Manual for Complex Litigation, 4th, § 11.493 .................................................................... 6, 7

## Rules

Fed. R. Ev. 702 .......................................................................................................................... 25

OKDHS Defendants respectfully move the Court for an order excluding the testimony of John Goad as unreliable under Federal Rule of Evidence 702 and irrelevant under Rule 402.  See *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

## INTRODUCTION

**Plaintiffs cannot provide an adequate foundation for Mr. Goad's opinions.**

Mr. Goad is a social worker retired from the Illinois Department of Children and Family Services who is offering opinions on Child Protective Services (CPS) of the OKDHS.  Mr. Goad has provided two reports in this case.  In the first report served on November 10, 2009, Mr. Goad reviewed records of the nine named plaintiffs.  Mr. Goad served a second report on March 15, 2011, which purported to be a scientifically based, statistically sound, review of CPS practice by the OKDHS.

Both Mr. Goad and the Plaintiffs concede that Mr. Goad is not an expert in statistics.  Mr. Goad did neither the statistical work involved in drawing a sample of cases to review, nor the statistical work analyzing the results of the review which purported to draw conclusions about the population of children in foster care based upon review of a sample of those children.  Mr. Goad does not know how to do the statistical work and does not understand the statistical work that was done.  Mr. Goad hired Dr. Richard Thompson to do that work.  However, Dr. Thompson provided no report in this case, and thus cannot provide the foundation for his own work appearing in Mr. Goad's report.  Consequently, Plaintiffs cannot establish the necessary foundation for Mr. Goad's work.

**The statistical work submitted under Mr. Goad's name is fatally flawed.**

In addition, *whoever* did the statistical work for Mr. Goad did that work so poorly as to make Mr. Goad's work and opinions about children in foster care unreliable and an untrustworthy basis to draw inferences about the conditions of children in the Plaintiff class.

**Mr. Goad offers no evidence or opinion establishing a policy, custom, or practice of the Defendants, and does not establish causation.**

Mr. Goad's opinions, even if they were reliable, fail to establish any causal link between the actions of the actual OKDHS Defendants (the Commission and the Director) and a constitutional violation suffered by the Plaintiff class.

### OVERVIEW OF PLAINTIFFS' CLAIMS AND BURDEN OF PROOF

In determining whether Goad's testimony would be relevant to the issues before the Court, it is helpful to review briefly the claims made by the Plaintiff class.  The Plaintiffs sue under 42 U.S.C. § 1983 and assert that the OKDHS Commission and Director have violated the substantive and procedural due process rights of the Plaintiff class by promulgating and executing policies, or knowingly acquiescing in widespread practices, which amount to the abdication of professional judgment that shocks the Court's conscience and causes harm or the unreasonable risk of harm to children in OKDHS custody.

Plaintiffs have the burden of proving that the alleged constitutional violations result from some policy, custom, or practice of the OKDHS Commission or the Director.  "A municipality or other local government may be liable under this section if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson,* 131 S.Ct. 1350, 1359 (2011).  "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury."  *Id.* "Official municipal policy includes the decisions of a government's

lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Id.* "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."…Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Id.* at 1359-60.

Plaintiffs' burden at trial will be to demonstrate that the OKDHS Commission and Director have patterns, practices and policies which, in an institutional manner, inflict unreasonable harm upon the children in OKDHS custody.  The Plaintiffs' burden will also be to demonstrate that the OKDHS Defendants have failed to exercise professional judgment or have been deliberately indifferent to the potential harm caused by these alleged policies, patterns, and practices.  "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id*. at 1360. (quoting *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997).   In addition, to obtain a remedy from a governmental entity under 42 U.S.C. § 1983, a plaintiff must satisfy a "rigorous" standard of causation, *Bryan Cty.,* 520 U.S., at 405, he must "demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* at 1368.

### LEGAL STANDARD FOR DAUBERT MOTION

Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness ***qualified as an expert by knowledge, skill, experience, training, or education***, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. (emphasis added).

Thus, "Fed. R. Evid. 702 imposes on the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n. 4 (10th Cir. 2001). "When faced with a *Daubert* objection to proposed expert testimony, the court must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *In re Williams Securities Litigation*, 496 F.Supp.2d 1195, 1230 (N.D. Okla. 2007). Even in a bench trial, the *Daubert* standards governing the admissibility of expert testimony must still be met. *Valley View Development, Inc. v. U.S. ex rel U.S. Army Corps of Engineers*, 712 F.Supp.2d. 1024, 1047 (N.D. Okla. 2010).

As an initial matter, the court must determine that the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *Id.* While many Ph.D.s are qualified as experts, it is important for the court to delineate exactly what discipline their expertise lies in. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111, (1995). *See also, Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) ("To begin with, we agree with the district court that Dr. Curtis . . . easily qualifies as an expert under Federal Rule of Evidence 702. The real question is, ***what is he an expert about***?") (emphasis added); *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 571 (2003), *rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005). This very court when examining an expert's qualifications stated:

> *Ralston* and like cases establish that the qualification of the proposed expert is to be assessed only after the specific matters he proposes to address have been identified. The controlling Tenth Circuit cases, exemplified by *Ralston*, establish that ***the expert's qualifications must be both (i) adequate in a general,***

4

*qualitative sense (i.e., "knowledge, skill, experience, training or education" as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert*.

*In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1232 & 1245 (N.D. Okla. 2007) (Emphasis added).

Next, the court must ensure that the scientific testimony being offered is "not only relevant, but reliable." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).[1] "To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge . . . ." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003). The Supreme Court has explained that the term "scientific" "implies a grounding in the methods and procedures of science." *Daubert*, 509 U.S. at 590. Likewise, it has explained that the term "knowledge" "connotes more than subjective belief or unsupported speculation." *Id.* Thus, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation -- *i.e.,* 'good grounds,' based on what is known." *Id.*

The Supreme Court has set forth four non-exclusive factors that a court may consider in making its reliability determination: (1) whether the theory or technique can be (and has been) tested, *Id.* at 593; (2) whether the theory or technique has been subjected to peer review and publication, *Id.*; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation, *Id.* at 594; and (4) whether the theory or technique has general acceptance in the scientific community, *Id.* The inquiry is "a flexible one." *Id.*; *see also id.* at 593, ("[m]any factors will bear on the inquiry, and we do not presume to set

---

[1]     The Supreme Court held in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), that the gatekeeping function set out in *Daubert* applies not only to expert testimony based on scientific knowledge, but also expert testimony based upon technical or other specialized knowledge -- *i.e.,* it applies to all expert testimony.

out a definitive checklist or test"); *Dodge*, 328 F.3d at 1222 ("the list is not exclusive").   "The focus [of the inquiry]. . . must be solely on principles and methodologies, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

To be relevant, the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  This consideration has been described as one of "fit."  *See Daubert*, 509 U.S. at 591.   "'Fit' is not always obvious, and scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Id.*

In sum, "[t]he objective of [the gatekeeping] requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

Finally, the party proffering the expert scientific testimony bears the burden of establishing admissibility under the Federal Rules of Evidence and *Daubert*.  *See Ralston*, 275 F.3d at 970 fn. 4.  This is particularly true regarding survey evidence.  As will be discussed below, the type of study conducted by Mr. Goad is a survey design. The Manual for Complex Litigation, 4th, § 11.493 explains that, "Failure to follow basic survey fairness will result in exclusion of the information, including not allowing experts to refer to it."  (citing *Volkswaen AG v. Dorling Kindersley Pub., Inc*., 614 F. Supp. 2d 793, 805 (E.D. Mich. 2009).  An even higher standard is applied where a survey is offered to prove the truth of some features of the larger population:

When a sample is drawn for the purpose of generating data about a population to be offered for its truth… "[t]he methods used must conform to generally recognized statistical standards.  Relevant factors include whether:

the population was properly chosen and defined;

the sample chosen was representative of that population;

the data gathered was accurately reported; and

the data was analyzed in accordance with accepted statistical principles.

*Reynolds v. Guiliani*, 118 F. Supp. 2d 352, 366 (S.D.N.Y. 2000) (cited in Manual for Complex Litigation, 4th, § 11.493). The sampling in *Reynolds* was similar to that performed by Mr. Goad. The plaintiffs there sued alleging that policies and practices of the city had prevented eligible members of the class from receiving food stamps. A sample of 597 applications was drawn from a population of over 13,000 names in a review data base. In considering whether the survey follows basic survey fairness, the Court can consider whether the survey was conducted by persons aware of its purpose in litigation. *Powerhouse Marks, LLC v. Chi Hsin Impex, Inc.*, 2006 WL 20523 (E.D. Mich.). In assessing the validity and reliability of a survey conducted by an expert, a court should consider, in addition to the items listed above, whether the questions were leading and suggestive, whether the data gathered were accurately reported and whether the persons conducting the survey were recognized experts. *THOIP v. Walt Disney Co.*, 690 F.Supp.2d 281 (S.D.N.Y. 2010). In the Goad sample the Court should consider whether the population was properly chosen and defined, whether the sample chosen was representative of the population, whether there is evidence that the data gathered was accurately reported, whether the data was analyzed in accordance with accepted statistical principles and whether the persons conducting the survey were expert in the field of survey and data analysis.

## ARGUMENT AND AUTHORITIES

**I. Goad admits his first report is unscientific and provides no reliable evidence about the Plaintiff class.**

7

Mr. Goad served a report on September 10, 2009 regarding his review of 43 CPS referrals on the nine named plaintiffs in this case.  Ex. 1 (2009 Report).  In that report, Mr. Goad tried to have it both ways.  Part of his "overall conclusions" in bolded bullets were:

> It is likely that all children who are placed in the custody of the agency and who are subjects of child maltreatment allegations are at risk of physical and emotional harm.

> It is probable that all children who are placed in the custody of the agency are in danger of being placed with abusive, neglectful, and dangerous caregivers whom OKDHS has failed to identify because of its deficient response to child abuse and neglect referrals.

Ex. 1, 2009 Report, p. 1.  Those words were doubtless for the press.  Farther back in the report, and not highlighted, Mr. Goad also wrote:

> Because of the small number of referrals considered and because the referrals were not chosen randomly, the review does not purport to be statistically significant.

Ex. 1, 2009 Report, p. 4.  Immediately after admitting the sample (of named plaintiffs chosen by Children's Rights in this case) he reviewed was too small, was not chosen randomly, and was not statistically significant, Mr. Goad opined that his 2009 review served as "exploratory research" to determine if a scientifically designed evaluation "would be likely to reveal statistically significant evidence" that abuse and neglect investigations are—or are not—adequate to provide reasonable protection to children in care.  Ex. 1, 2009 Report, p. 4.  It is clear Mr. Goad believed his unscientific "exploratory research" would confirm Plaintiffs' allegations.  Not surprisingly, given Mr. Goad's biases, Mr. Goad claimed his supposedly scientific review in 2011 corroborated the unscientific findings of the 2009 review.  *See,* Ex. 3, 2011 Report, p. 2.

In his deposition Mr. Goad reluctantly conceded that his 2009 Report was not scientific, and that the nine named Plaintiffs were not representative of children in foster care.  Ex. 2, Goad deposition transcript (Goad Tr.) Vol. 1, pp. 66:12-67:4.  Consequently, the Court should not

accept any testimony regarding matters encompassed by the 2009 Report because that report is admittedly unreliable.

**II.  Mr. Goad lacks the expertise to opine on statistical conclusions about the population of children in foster care disclosed in his 2011 Report. The supposed statistician who actually did the work in the 2011 Report has issued no expert report of his work.**

Mr. Goad's 2011 Report, *see,* Exhibit 3, March 15, 2011 Report (2011 Report), purports to be a scientifically conducted, statistically based, report in which Mr. Goad opines on various supposed aspects of the experience of all children in foster care.  Mr. Goad claims to have conducted a review of a valid sample of CPS investigation reports for the foster care population. Mr. Goad and two other reviewers looked at (1) a sample of three different types of maltreatment reports; (2) all CPS assessment reports, and (3) files of nine child fatality reviews.  The results of the review of investigations and assessments were recorded with a computerized instrument, and the data produced was analyzed by people who have not disclosed expert reports in this matter. Those people, led by Dr. Richard Thompson, actually chose the sample to be reviewed and did certain statistical analyses which supposedly tell that percentages of the children in the foster care population had certain bad experiences, within certain "confidence intervals" *See,* Ex. 3, 2011 Report, pp. 11-15.

Mr. Goad did not write the section of his report that purports to establish the scientific validity of his review. Dr. Thompson actually authored parts of Mr. Goad's report, including Section III on Study Methods, page 11 to the top of page 13 dealing with the sampling plan, samples size, and the universe.  Mr. Goad edited it and almost understood all of what Dr. Thompson was saying.  Ex. 2, Goad Tr. Vol. 1, p. 121:13-24.  Dr. Thompson also authored the section in Mr. Goad's report about inter-rater reliability.  Ex. 2, Goad Tr. Vol. 1, p. 122:15-17.

Dr. Thompson analyzed the data and constructed the tables showing the numbers and percentages of things found in the report. Ex. 2, Goad Tr. Vol. 1, pp. 128:20-129:22.

Mr. Goad's testimony at his deposition made clear that he is not a statistical expert, a fact Children's Rights openly admitted. Ex. 2, Goad Tr. Vol. 2, p. 26:21-24. He demonstrated his lack of expertise in statistics by his inability to answer questions about basic statistical principles and methodology. For example, Mr. Goad is not entirely sure how Thompson did the sampling, but knows computer programs can be used to draw a sample. Ex. 2, Goad Tr. Vol. 1, pp. 108:14-109:10. Mr. Goad told Dr. Thompson the sample size should be around 10% of the universe, but Mr. Goad does not know how the sample was drawn. Ex. 2, Goad Tr. Vol. 1, pp. 109:11-113:7. Mr. Goad did not know the statistical method of calculating the minimum sample size necessary to estimate the population portion, nor does he know if there is more than one statistical method for calculating the sample size required to estimate the population proportion. Ex. 2, Goad Tr. Vol. 2, pp. 70:20-71:8.

Mr. Goad did not know the meaning of "sampling frame." Ex. 2, Goad Tr. Vol. 2, p. 28:15-20. Mr. Goad did not reference a sample size calculation in his report although he talked with Dr. Thompson about it. Ex. 4, Barclay Report, p. 5; Ex. 2, Goad Tr. Vol. 2, p. 71:10-16. Mr. Goad did not know the meaning of "independent samples from a population." Ex. 2, Goad Tr. Vol. 2, p. 68:21-69:1.

While claiming that his work is a cross sectional case review, Mr. Goad testified that the cross sectional case record review was one thing he did not understand and would have a hard time talking about. Ex. 2, Goad Tr. Vol. 1, p. 122:2-17. Mr. Goad could not define a cross sectional case review and testified, "[b]ut you got me with the one thing that I don't really know

what that means, I have to be honest." Ex. 2, Goad Tr. Vol. 1,  Pp. 121: 14-25, 122:13-25 and 123: 1-8.

Mr. Goad testified that from the random samples in four categories, Dr. Thompson took a smaller random sample in "some magical way" and each file was reviewed by Adele Prass and Mr. Goad.  Dr. Thompson then compared their findings to determine if they were asked the same question they would come up with the same answers, which was inter-rater reliability.  Ex. 2, Goad Tr. Vol. 1, pp. 154:19-155:14.   Mr. Goad could not have done the Kappa scores that Dr. Thompson did on the issue of inter-rater reliability.  Ex. 2, Goad Tr. Vol. 1, pp. 156:12-17.

Once review of the files was complete, Mr. Goad notified Dr. Thompson who took the data out of a database and put it into SPSS files.   Dr. Thompson analyzed the data and constructed the tables showing the numbers and percentages of things found in the report.  Ex. 2, Goad Tr. Vol. 1, pp. 128:20-129:22.   Mr. Goad admitted he could not have constructed the data base built by a woman named Jan Stempel.  Ex. 2, Goad Tr. Vol. 1, pp. 117:24-118:4.  Mr. Goad assumed Dr. Thompson put together the information in the spreadsheets in his considered materials.  Mr. Goad did not prepare the spreadsheets because he hired Dr. Thompson to do them.  Mr. Goad did not know what Dr. Thompson did with the spreadsheets, but guessed they played a part in creating the tables used to write the report.  Ex. 2, Goad Tr. Vol. 1, pp. 248:4-249:1.  Mr. Goad thinks his considered materials include the final database, but does not know what form it is in.  Mr. Goad thought Dr. Thompson forwarded it to him, but it was in a form he could not open.  It was definitely not an Excel spreadsheet, because Mr. Goad can open those.  Ex. 2, Goad Tr. Vol. 1, pp. 165:3-166:1.  Dr. Thompson forwarded to Mr. Goad by e-mail numerous documents and data.  Mr. Goad could not open the e-mail attachments and simply forwarded them to Children's Rights without knowing what they were.  Mr. Goad testified in his

deposition, he has not seen all the material Dr. Thompson produced and did not really know what the email attachments contained. Ex. 2, Goad Tr. Vol. 1, pp. 114:19 – 116:4.

Dr. Thompson did a calculation to come up with the confidence intervals and gave Mr. Goad an electronic document that said certain percentages of things were the intervals.  Mr. Goad then took the confidence interval numbers and applied them to the universe to come up with the numbers of children in a particular category.  Mr. Goad is not conversant with the calculation Dr. Thompson did to get the confidence intervals.  Ex. 2, Goad Tr. Vol. 1, pp. 140:3-142:18.   Mr. Goad did not know the particular statistical method used by Dr. Thompson to calculate the confidence intervals.  Ex. 2, Goad Tr. Vol. 2, p. 16:19-23.

This court has recognized the necessity that an expert's proposed testimony be within the confines of the expert's expertise.  *In re Williams Securities Litigation*, 496 F.Supp.2d 1195, 1232. (N.D. Okla., 2007).  Mr. Goad's admissions show he has inadequate statistical expertise to analyze the data generated by his review of OKDHS records and that he relied upon others for the statistical foundation for his review.  Neither Dr. Thompson nor anyone working for him submitted an expert report in this matter.  Failure to fairly disclose in the expert report specific opinions or the bases for the expert's opinions may result in exclusion of those opinions.  *Palmer v. Asarco Incorp.*, 510 F. Supp. 2d 591, 528 (N.D. Okla. 2007); *Simpson v. Saks Fifth Avenue*, 2008 WL 3388739 at *8 (N.D. Okla.).  Neither Mr. Goad's report nor his deposition testimony discloses the statistical procedures used to either draw his sample or to make inferences from the sample to the entire population of children in foster care.

The court must determine that the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion.  *Valley View Development, Inc.,* 712  F.Supp.2d 1024, 1047 (N.D.Okla.2010).   "Expert opinions may be based on education, training and

experience, combined with reliance on reports, depositions or other information related to the particular circumstances, but *an expert must explain factually why and how he reached his conclusions.*"   *Mehus v. Emporia State University*, 222 F.R.D. 455, 461 (D. Kan. 2004) (emphasis added).   An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert.   *Morning Capital Fund, LLC v. Knight*, 2010 WL 2881529 (10th Cir.).   "[A]n expert may not adopt another's data without verifying the validity and reliability of that data, [but] Rule 703 allows an expert to rely on facts or data relied upon by experts in the particular field in forming opinions or inferences upon the subject; an expert is not required to testify only upon data the expert has personally gathered or tested*."   O2 Micro International Limited v. Monolithic Power Systems,* 420 F. Supp. 2d 1070 (N.D. Cal. 2006).   In *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), the court found that an expert who adopted the projections of another expert did not reasonably rely on those projections when he knew little or nothing at all about the expert and the record did not reveal what efforts the expert independently made to corroborate the projections.   However, Mr. Goad could not verify the validity or reliability of Thompson's statistical work because Goad does not know how to do that work himself.   Because Goad trusted Thompson, Goad expects the court to trust Thompson as well.

One of OKDHS Defendants' experts, Andrew Barclay concluded that Mr. Goad was not qualified to determine the sample size, determine the measures, oversee the calculations, or interpret the results in his study.   Ex. 4, Barclay Report, p. 12.

Mr. Goad simply is not qualified by "knowledge, skill, experience, training or education" to render the statistically based opinions in his report.   "The proponent of expert testimony must show 'a grounding in the methods and procedures of science which must be based on actual

knowledge and not subjective belief or unaccepted speculation.'" *Mehus v. Emporia State University*, 222 F.R.D. 455, 458 (D. Kansas 2004).  Mr. Goad could not, and did not, do his own statistical work, and could not and did not verify Dr. Thompson's work.  The Court should entertain no testimony from Mr. Goad about the supposed experiences of all children in foster care as set forth in his 2011 Report.

**III.  The statistical work in Mr. Goad's 2011 report is fatally flawed and unreliable.**

**A.  The sample drawn for review is unreliable.**

Mr. Goad's sample of children is extremely suspect.  OKDHS Defendants' expert Andrew Barclay compared the data provided to Mr. Goad by OKDHS with the data Mr. Goad claimed was used to draw the samples he reviewed.  *See,* Ex. 4, Barclay Report, pp. 1-3.  OKDHS provided Mr. Goad with a spreadsheet of CPS referrals containing 420 referrals (reports of alleged abuse or neglect), but Mr. Goad reported drawing his sample from only 343 referrals.  *Compare,* Ex. 4, Barclay Report, pp. 1-3 with Ex. 3, p. 12, Table III-1.  Mr. Goad offers no explanation of where or why 77 referrals went missing.  When analyzing data it is important to identify any observations deleted from the universe and to provide the reader with the rules that necessitated the deletions and evidence of any bias that the deletions may have injected.  Ex. 4, Barclay Report, p. 2.  Mr. Barclay reported that non-statisticians sometimes "cleanse" missing data and outliers before analysis, but that the missing data is <u>not</u> often "missing at random," and any assumption that fields missing from referral reports are missing at random should be tested.  Because Mr. Goad testified that he did not understand the term "sampling frame," it is very difficult to inquire into matters as complex as missing observations.  Ex. 4, Barclay Report p. 3.  A sampling frame that is missing observations from the universe without justification and

without testing for bias cannot claim to be representative of the universe.  Ex. 4, Barclay Report, p. 3.

A "simple random sample" is a statistical term meaning observations were selected at random and all observations had equal probability of being selected in the sample.  Ex. 4, Barclay report, p. 4.  If Mr. Goad's helpers selected the sample from a sampling frame of 343 out of 420 observations in the universe, then the 77 excluded observations had <u>zero probability</u> of being selected in the sample.  Goad's sample of 84 investigated referrals <u>cannot</u> be a simple random sample of the universe of 420 investigated referrals. *Id.*  Mr. Goad conceded that, "If it was not a random sample, then the sample would not be valid.  If there were some selection in picking the cases, it would measure something different than what we were trying to measure."  Ex. 4, Barclay Report, p. 5, citing Ex. 2, Goad Tr. Vol. 2, pg 72:12-20.

Mr. Goad confuses things further by switching his "units of observation."  Mr. Goad changed his frame of analysis from referrals to wards (children) mid way through the analysis.  Mr. Goad had Dr. Thompson draw a sample of referrals ("cases," or reports of alleged abuse or neglect).  Ex. 4, Barclay Report, p. 4, citing Goad Tr. Vol. 2, pg 64:1-7.  Within his defective sample of <u>referrals</u>, Mr. Goad then began counting <u>children as his unit of observation</u>.  However, because each referral can contain more than one child, the number of children in referrals is highly correlated rather than independent (uncorrelated), as is assumed for statistical samples.  Ex. 4, Barclay Report, p. 4.  A simple random sample (even if Goad's sample were such) from a highly correlated population will have an "effective sample size" that is less than the number of samples. *Id.*

Further, the experience of children within referrals are not "independent" because some maltreatment may occur more often than others when it is attributed to all members of a group,

such as a sibling group.  Ex. 6, Fluke Report, p. 7.[2]  Thus, certain maltreatment allegations may have been counted multiple times.  *Id.*  In Mr. Goad's sample, we have up to six wards in a referral, and 40% of the referrals involve more than one child.  Ex. 4, Barclay Report, p. 7.  For example, in Mr. Goad's data, thirty-five of the 41 investigated referrals that involved more than one child had the same contact date for all the children (meaning all those children were seen at the same time).  *Id.*  So the effective sample size of 84 for this particular statistic is not reasonable and, after correcting for some of the correlation, Mr. Goad would probably find fewer children were not contacted within a reasonable time. *Id.*

Moreover, Mr. Goad did not reference a sample size calculation in any of his material.[3]  Ex. 4, Barclay Report, p. 5.  A careful sample size calculation affects the adequacy of Mr. Goad's confidence intervals.  As an example of this, Andrew Barclay used Dr. Milner's own line sample size calculator on Mr. Goad's conclusion that fifteen (8.9%) of 158 wards were not contacted timely.  Dr. Thompson, speaking through Mr. Goad, concluded that the true population confidence interval was 8.9% ± 4.0%.  Ex. 4, Barclay Report, p. 5-6.  The online sample size calculator used by Dr. Milner required a sample size of 311 to achieve that precision, rather than 158 as used by Mr. Goad.  *Id.*   Further, because Mr. Goad's practice of counting children, who are often correlated within referrals, he would have to increase the sample size above 311 to

---

[2]     Dr. Fluke has been retained as an OKDHS Defendants' expert.

[3]     Mr. Goad testified that a samples size of 10% is normally accepted for a universe of this size.  Ex. 2, Goad Tr. Vol. 1, 112:7-113:7.  However, there is no such rule of thumb.  A 10% sample size can be far more or far less that what would actually be needed required for commonly accepted precision intervals.  Ex. 5, Sawilowsky Report, p. 13.  Remarkably, rather than counting the number of children in the population he studied, Mr. Goad *estimated* the number based on the average numbers of children in the sub-samples he studied.  Even if children, rather than referrals, were the units of observation, Mr. Goad got the size of the population wrong.  Ex. 4, Barclay Report, p. 3.  It appears Mr. Goad used his flawed sample to estimate the number of children in the population.

maintain the plus or minus 4.0% interval with a 95% confidence level. Ex. 4, Barclay Report, p. 6. Thus, Mr. Goad's sample size of 158 wards is too small to achieve the precision he reports.

Furthermore, Goad's study is a cross-sectional sample (drawn from population at a specific point in time) rather than a longitudinal (continuous observation over a period of time). With a cross-sectional study Goad cannot make a determination about outcomes (for instance as re-occurrence of abuse or improved mental health or permanent placement) of the children from the events described by Goad. The study is flawed since all of Goad's findings regard compliance with policy or national outcomes. A longitudinal study could have revealed difference in actual outcomes due to differences in how policy and standards were applied. Ex. 6, Fluke Report pg. 8.

**B. Mr. Goad's confidence intervals are unreliable because his sample sizes are too small and his reporting of confidence intervals is done for effect and not for scientific accuracy.**

The confidence intervals reported by Mr. Goad were improperly done. Mr. Goad presents the results of Dr. Thompson's evaluation of his data in terms of "confidence intervals," which he defines as follows:

> The confidence interval represents the range within which a particular result from my review applies with 95% certainty to the relevant universe. Thus, when I have stated my findings in terms of a range, I have determined that range to be correct with 95% certainty. Different findings have different confidence intervals because the findings take different subsets into account.

Ex. 3, 2011 report, p. v.[4] However, there is insufficient information in Mr. Goad's report and deposition to determine what procedure Dr. Thompson used to establish confidence intervals.

[4] Mr. Goad tried to establish a 95% certainty by allowing his precision ranges to float, a flawed methodology that is contrary to the scientific method of stating an *a priori* objective standard on which study results are to be interpreted. Ex. 5, Sawilowsky Report,, p. 10.

Ex. 5, Sawilowsky Report, p. 10.[5]  The confidence intervals throughout the report could not have been obtained by either of the two standard methods. *Id.*

Andrew Barclay states that statisticians generally select a sample size to get fairly precise estimates (within ± 3-5%) of all proportions in a study with a 95% or better confidence level, and the combination of a point estimate and a precision allows a reader to judge both the magnitude and the quality of the estimate.  Ex. 4, Barclay Report, p. 6.  Dr. Shlomo Sawilowsky also believes that Mr. Goad selected too small a sample to achieve the claimed confidence levels.  Ex. 5, Sawilowsky Report, pp. 10-11.  Dr. Sawilowsky demonstrated that, contrary to Mr. Goad's assumption that he achieved a 95% confidence level and a precision level of ± 3.25% with a sample of 70 from a universe of 374 OCA reports, he actually achieved only a 45% confidence level.  *Id.,* Sawilowsky Report, pp. 10-11.  To achieve an *a priori* target of a precision of either 3.25% or 5% with 95% confidence, Mr. Goad systematically understated the needed sample size. Dr. Sawilowsky used the sample size calculator supposedly used by Plaintiffs' expert Dr. Milner to arrive at the following required sample sizes:

---

[5] Dr. Sawilowsky has been retained as an OKDHS Defendants' expert.

Table 1. Sample Sizes Needed For Mr. Goad's Best Precision Interval
and Other Expert Plaintiff's Precision Level

| Goad's Page # | Category | Precision Level (±)% | Unduplicated Universe (N) Estimated | Goad's Sample Size | Goad's Best Precision ±3.25% Sample Size Needed | Milner/ Smollar ±5% Sample Size Needed |
|---|---|---|---|---|---|---|
| 20 | CPS | 4 | 645 | 158 | 378 | 241 |
| 21 | CPS | 8.1 | 645 | 158 | 378 | 241 |
| 24 | CPS | 5.9 | 645 | 158 | 378 | 241 |
| 26 | CPS | 9.9 | 645 | 158 | 378 | 241 |
| 31 | CPS | 6.9 | 645 | 158 | 378 | 241 |
| 31 | CPS | 6.7 | 645 | 158 | 378 | 241 |
| 33 | CPS | 5.6 | 645 | 158 | 378 | 241 |
| 34 | CPS | 5.4 | 645 | 158 | 378 | 241 |
| 39 | CPS | 8.3 | 645 | 158 | 378 | 241 |
| 46 | OCA | 10.5 | 374 | 70 | 265 | 190 |
| 56 | OCA | 5.4 | 374 | 70 | 265 | 190 |
| 56 | OCA | 12.3 | 374 | 70 | 265 | 190 |
| 58 | OCA | 3.25 | 374 | 70 | 265 | 190 |
| 58 | OCA | 8.9 | 374 | 70 | 265 | 190 |
| 87 | SO | 5.9 | 807 | 162 | 428 | 260 |
| 87 | SO | 4.9 | 807 | 162 | 428 | 260 |

Ex. 5, Sawilowsky Report, p. 12.  This table compares Mr. Goad's *estimate* of the universe with

his sample size and then the actual sample size to achieve either a ± 3.25% or 5% precision.  *Id.*

Mr. Goad's sample sizes are significantly smaller than necessary to achieve *a priori* precision

levels, so Mr. Goad allows his standard to float willy-nilly, including one with an incredibly

uninterpretable ± 12.3%, which is a 24.6% spread.  *Id.,* pp. 10, 12.  Mr. Goad's work was

destined to be unreliable and inaccurate.  *Id.*  The estimates and confidence intervals involving

counts of wards in Mr. Goad's report are flawed, invalid, and cannot be used to draw inferences,

even with a proper universe and a simple random sample of sufficient size to give better

precision.  Ex. 4, Barclay Report, p. 8.

Mr. Goad's large confidence intervals lack precision and could have the consequence of

exaggerating negative findings.  Ex. 6, Fluke Report, p. 15.  Arbitrarily creating poorly formed

intervals, resulting from inadequate samples sizes, permitted Mr. Goad to systematically create wide intervals for shock effect.  Ex. 5, Sawilowsky Report, p. 14.

### C.  Mr. Goad's inter-rater reliability is unreliable.

Mr. Goad described the inter-rater reliability process to be based on three coders:  Mr. Goad, Ms. Prass and Ms. Glenney.  Ex. 5, Sawilowsky Report, p. 16.  Mr. Goad told Ms. Prass that the client was Children's Rights and the job involved a lawsuit.  Ex. 2, Goad Tr. Vol. 1, p. 153:25-154:8.  Mr. Goad was obviously aware of the lawsuit because he had already issued his 2009 opinion, so he should have recused himself as a member of the team to conduct the coding.  Ex. 5, Sawilowsky Report, p. 16.  Mr. Goad could not mask the purpose of the coding from himself or Ms. Prass, as is required in a legitimate inter-rater reliability study to avoid bias.  *Id.*  To avoid bias, Mr. Goad should have conducted a blind review where the case reviewers were not aware of the nature of the circumstances resulting in the selection of samples.  Ex. 6, Fluke Report. p. 8.  Further, the six cases used (by Dr. Thompson) to obtain inter-rater reliability is too small a number, and the six cases reviewed could have been extremely easy to obtain agreement about.  Ex. 6, Fluke Report, p. 9.  If so, the analysis would miss important problems in interoperating more ambiguous records.  *Id.*  There is considerable improvement when the numbers tested reach around 30.  *Id.*  Consequently, because the number of cases reviewed was too small, and at least two of the reviewers knew the review was for a lawsuit for Children's Rights, the finding of inter-rater reliability (by Thompson, not by Mr. Goad) is unreliable.

Mr. Goad's inter-rater reliability test is itself unreliable.  Mr. Goad had already done a report in this case in 2009 in which he committed himself to sensational conclusions about the safety of children in OKDHS foster care.  Mr. Goad told Ms. Prass, his other case reviewer, that the client was Children's Rights and the survey was being done for a lawsuit.  Then, Dr.

Thompson compared Mr. Goad's and Ms. Prass's reading of only six cases (rather than a more serious sample of 30) in order to sign off on their inter-rater reliability. Because inter-rater reliability was not established, the Court cannot be sure that Mr. Goad and Ms. Prass were gathering data on a consistent basis for analysis by Dr. Thompson.

> **D.  Mr. Goad admits his child fatality review cannot be applied to the entire class.  It is also unreliable and irrelevant.**

Mr. Goad and Kathy Glenney reviewed the records of children who died in OKDHS custody since January 1, 2007.  Mr. Goad admits the results of this review are not statistically significant and cannot be applied to the entire population of children in OKDHS care because of the small number of cases available for review.  Ex. 3, 2011 Report, p. 91.  Nevertheless Mr. Goad presents his review as "examples of OKDHS's failure to take reasonable action" to protect children.  *Id.*  Mr. Goad's admission that his fatality review cannot be applied to the entire population alone renders it unreliable and irrelevant for any understanding of conditions faced by the Plaintiff class.

The review suffers from two other legal impediments to relevancy.  First, the review measured child welfare practice against OKDHS regulations and "basic standards of child welfare practice."  *Id.*  Thus, Mr. Goad assumes a negligence analysis in which practice is judged for violation of some standard of care.  Mr. Goad does not judge child welfare practice against the proper constitutional standard of *abdication* of professional judgment.  The constitutional "failure to exercise professional judgment," standard requires more than mere negligence: it requires an abdication of professional responsibility that must be sufficient to shock the conscience.  *See, e.g., Johnson ex rel. Estate of Cano v. Holmes,* 455 F.3d 1133, 1143 (10th Cir. 2006).  Second, Mr. Goad reports his interpretation of events without providing the required causal nexus linking those events to some policy, custom, or practice of the OKDHS

Commission or the Director.   Mr. Goad simply reports his take on the facts untethered to §

1983's requirements that Plaintiffs prove policy, custom, or practice and causation.   Thus, Mr.

Goad's review offers nothing of value that is helpful to the trier of fact in deciding the issues

before the Court.

The fatality review also suffers from methodological failings that render it unreliable.

Dr. John Fluke reports that the analysis is not amenable to scientifically based conclusions, nor

does it even provide a predicate for rebuttal.   Ex. 6, Fluke Report, p. 19.   Child fatality cases are

not comparable to other cases because they contain more thorough "after the fact" information.

*Id.*   Mr. Goad did not use the proper design, which is *prospective*, where the case preceding the

fatality is read along with a sample of non-fatality cases without knowing the outcome.   This

proper design allows for a meaningful comparison to the general CPS population and predictions

do not have the advantage of hindsight.   *Id.*   When the reader knows the outcome of the case it is

easy for the reader to conclude what the reader already wants to conclude.   This confirmatory

bias is well documented across a wide variety of situations, and applies to Mr. Goad's method of

case reading as a whole.   *Id.*

"The proponent of expert testimony must show 'a grounding in the methods and

procedures of science which must be based on actual knowledge and not subjective belief or

unaccepted speculation.'"   *Mehus v. Emporia State University*, 222 F.R.D. 455, 458 (D. Kansas

2004).   Based on Mr. Goad's own admission, his fatality review is not applicable to the

population of children in OKDHS custody and the methodological problems infecting the

review, it is not grounded in the methods and procedures of science and must be rejected.

**IV.  Thompson's unexplained work is an insufficient basis for Goad's opinions, mandating that the Court refuse to allow Goad to testify.**

The plaintiffs will likely argue that an expert may offer opinions, including those that are not based on first-hand knowledge or observation.  *Daubert v. Merrill Dow. Pharms., Inc*., 509 U.S. 579, 591 (1993).   While it is true that "[s]uch a witness need not have observed or participated in the gathering of the data underlying his opinion," *Guzman v. Memorial Hermann Hospital System*, 637 F. Supp. 2d 464, 476 (S.D. Tex. 2009), experts are not free to base their opinions upon data about which they have no personal knowledge.   "Rather, the personal knowledge requirement hinges on whether the expert personally analyzed the data that was made known to him and formed an expert opinion based upon his own assessment of the data within his area of expertise."  *Guzman*, 637 F. Supp. 2d at 476 (internal quotes and citations omitted). Goad performed no analysis of the data upon which he purports to rely in forming his opinion, and admitted he was unable to analyze the data he and his helpers generated.    Since Goad did not personally analyze any data relating to his review of OKDHS records, does not know how to analyze that data, and Thompson will not testify about his own review of the data, Goad should not be permitted to render any opinion purporting to generalize from his own review findings to the population of children in OKDHS foster care.  He has no scientific or factual basis for such testimony; therefore such testimony should be excluded.

**V.  Goad does not establish a violation of a practice or policy by the Defendants and does not establish causation**

Plaintiffs have the burden of proving what Mr. Goad fails to address:  whether the actual Defendants have any policy, practice, or custom which results in a constitutional violation.  Mr. Goad has opinions merely about certain alleged aspects of CPS practices of the OKDHS, but in no way ties those aspects to any policy, procedure, or practice of the Defendants in this case.

Mr. Goad's reports ignore Plaintiffs' actual burden, and seem to assume that it is enough to show occasional violations of certain standards, (largely standards advocated of professional groups) by workers of the OKDHS.  It is not.  What is more, Mr. Goad reluctantly admitted his report identified no actual children in foster care who were harmed by the alleged CPS shortcomings of the OKDHS.  Ex. 2, Goad Tr. Vol. 1, 210:7-17.    Because Mr. Goad failed to connect his results—unreliable as they are—with any policy, practice, or custom of the actual Defendants, his opinions are not relevant or helpful to the Court in deciding the issues before it.

## CONCLUSION

Mr. Goad's work is unreliable and should not be received by the Court. Mr. Goad's survey is fatally flawed.  His sample of children is extremely suspect.  He has not explained why 77 of 420 referrals were excluded from the population from which he drew his sample.  Also, the sample he analyzed contained 23 children not in the population from which his sample was drawn.  The size of the sample is too small to support the confidence intervals he reports.

Mr. Goad's inter-rater reliability test is itself unreliable.  Mr. Goad had already done a report in this case in 2009 in which he committed himself to sensational conclusions about the safety of children in OKDHS foster care.  Mr. Goad told Ms. Prass, his other case reviewer, that the client was Children's Rights and the survey was being done for a lawsuit.  Then, Dr. Thompson compared Mr. Goad's and Ms. Prass's reading of only six cases (rather than a more serious sample of 30) in order to sign off on their inter-rater reliability.  Because inter-rater reliability was not established, the Court cannot be sure that Mr. Goad and Ms. Prass were gathering data on a consistent basis for analysis by Dr. Thompson.

Then the statistical work done by Dr. Thompson for Mr. Goad is shot through with methodological problems.  Mr. Goad changed his frame of analysis from referrals to wards

(children) mid way through the analysis.  Because children within referrals are correlated and not independent, Mr. Goad's effective sample size became even smaller.  The confidence intervals reported by Mr. Goad were improperly done.  Rather than using the accepted scientific method of defining *a priori* the confidence level and precision to be achieved, Mr. Goad's inadequate sample size required him to let his precision levels float willy-nilly, which certainly is not proper or recognized statistical technique.

All of the errors set forth herein demonstrate that Mr. Goad's work is unreliable and he cannot make any trustworthy inferences about the safety of children in care.  Mr. Goad has admitted that neither his 2009 report nor his 2011 fatality review is statistically significant, and the Court should reject both.

Based upon the arguments and authorities cited herein, Defendants urge the Court to exclude the testimony of Mr. Goad at trial because he is not an "expert" in the appropriate field, his work does not meet the standards of reliability required by Fed. R. Ev. 702, and *Daubert* and its progeny, and fails to establish causation.

Respectfully Submitted,

**RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS, P.C.**

By:     /s/Robert A. Nance
         Robert A. Nance, OBA No. 6581
         *E-Mail*: rnance@riggsabney.com
         5801 N. Broadway Extension, Suite 101
         Oklahoma City, OK  73118
         *Tel* (405) 843-9909 / *Fax* (405) 842-2913
         Attorneys for the Defendants Richard L. DeVaughn, Jay Dee Chase, Steven Dow, Michael L. Peck, Aneta F. Wilkinson, Rev. George E. Young, Sr., Linda English Weeks, Anne M. Roberts, Bob Rawlings, and Howard H. Hendrick

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st day of August, 2011, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Frederic Dorwart
fdorwart@fdlaw.com
Paul DeMuro
pdemuro@fdlaw.com
**Frederic Dorwart Lawyers**
124 E. 4th Street, Suite 100
Tulsa, OK 74103-5010

Marcia Robinson Lowry
mlowry@chidlrensrights.org
William Kapell
wkapell@childrensrights.org
**Children's Rights**
330 Seventh Ave., 4th Floor
New York, NY 10001

Larry Borten
lborten@childrensrights.org
Miriam Ingber
mingber@chidlrensrights.org
Patrick S. Almonrode
palmonrode@childrensrights.org

    /s/Robert A. Nance