UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| D.G., by Next Friend G. Gail Stricklin, *et al.*, ) <br> for themselves and those similarly situated, ) <br> ) <br> Plaintiffs, ) <br> v. ) <br> ) <br> C. BRAD HENRY, in his official capacity ) <br> as Governor of the State of Oklahoma, *et al.*, ) <br> ) <br> Defendants. ) | Class Action <br> Civil Action No. 08-CV-074-GKF-FHM |

### PLAINTIFFS' *DAUBERT* MOTION TO EXCLUDE IN PART THE TESTIMONY OF THREE OF DEFENDANTS' EXPERT WITNESSES

The Plaintiff class ("Plaintiff Children" or "Plaintiffs") respectfully petitions the Court to exclude the expert reports and testimony of Dr. John Fluke, Dr. Donald Baumann and Mr. Andrew Barclay, three of Defendants' proposed expert witnesses, as they relate to the September 30, 2009 and February 25, 2010 reports of Dr. Peg McCartt Hess and the November 10, 2009 report of Mr. John Goad. These reports are based entirely on qualitative research. The opinions of Defendants' purported experts on these reports do not satisfy the standards of admissibility set forth in Fed. R. Evid. 702 and the *Daubert/Kumho Tire* line of cases because those individuals are not qualified to opine on qualitative research.

### BRIEF IN SUPPORT OF MOTION

#### Preliminary Statement

Fed. R. Evid. 702 and unambiguous case law require experts to be qualified by "knowledge, skill, experience, training, or education" in each specific area about which they plan to offer opinions. Here, Dr. Fluke, Dr. Baumann and Mr. Barclay admit that they (i) are not experts in qualitative research, (ii) do not know what standards are used to evaluate qualitative research and (iii) have minimal, if any, experience evaluating qualitative research. Despite these

unequivocal admissions, they have taken it upon themselves to opine on three of Plaintiffs' expert reports that are based entirely on qualitative research. In doing so, they have clearly over-reached and their reports and any proposed testimony on the Hess and Goad Reports must be excluded.

## Statement of the Facts

**I.   Qualitative Research**

Social science research is often conceptualized as being either qualitative or quantitative.[1] Allen Rubin & Earl Babbie, *Research Methods for Social Work* 44-45 (4th ed. 2001), attached as Ex. B.

Qualitative research looks at phenomena as they occur in their natural setting and the way these phenomena interact with each other. It is used to "describe individuals and events in [their] natural settings." Michael J. Holosko, *An Overview of Qualitative Research Methods*, *in The Handbook of Social Work Research Methods* 343 (Bruce Thyer ed., 2nd ed. 2010), attached as Ex. C. Qualitative research gathers data through the use of historical records, observations, historical and secondary accounts of occurrences, in-depth interviews and focus groups. The case study is one of its main methods. *Id*. The current leading scholars in the field include Norman K. Denzin, Yvonna S. Lincoln and Egon G. Guba.[2]

---

[1] There are now, however, attempts to synthesize these two approaches into what are called "mixed method" studies. John W. Creswell & Vicki L. Plano Clark, *Designing and Conducting Mixed Methods Research* 1-17 (2nd ed. 2011), attached as Ex. A.

[2] Denzin's published works include: *Interpretive Ethnography: Ethnographic Practices for the 21st Century*, *The Research Act: A Theoretical Introduction to Sociological Methods*, and *Interpretive Interactionism*. He also edits the journals *Sociological Quarterly*, *Qualitative Inquiry*, *Cultural Studies*, and *Studies in Symbolic Interaction*. Guba's published works include *Effective Evaluation*, *Naturalistic Inquiry* and *Fourth Generation Evaluation*. He also edited *The Paradigm Dialogue*. Lincoln's published works include *Handbook of Qualitative Research*. She

In contrast, quantitative studies are designed to provide information that describes conditions, makes comparisons between groups, predicts relationships between variables and/or demonstrates causal relationships. It is used to "explore, describe, test, or assess phenomena." *Id.* at 343. Quantitative research gathers data through methods that include structured questionnaires and interviews, surveys, available data (e.g., using existing quantitative data available through the census or management information systems), standardized instruments (e.g., scales that measure abstract constructs like depression or anxiety) and experiments. Ex. C.

Both qualitative and quantitative methods are equally valid ways of conducting research and are seen as complementary to each other. Ex. B at 44-45; *Social Work Research and Evaluation* 20-21 (Richard M. Grinnell & Yvonne A. Unrau eds., 9th ed. 2011), attached as Ex. D. Nonetheless, these two methods derive from different traditions in the philosophy of science and therefore use different methodologies. Egon G. Guba, *The Alternative Paradigm Dialog*, *in The Paradigm Dialog* 27 (Guba ed., 1990), attached as Ex. E; Yvonna S. Lincoln & Egon G. Guba, *Paradigmatic Controversies, Contradictions, and Emerging Confluences*, *in Handbook of Qualitative Research* 163-88 (Norman K. Denzin & Yvonna S. Lincoln eds., 2nd ed. 2000), attached as Ex. F. Because of this, the quality of studies in each of these traditions is evaluated using different criteria.

In qualitative studies, the quality of the study is evaluated based on criteria including (i) credibility (testing the interpretation drawn from the data with members of the group from whom data was collected, or "member checks"); (ii) transferability (the degree of similarity between two contexts); (iii) dependability (the consistency of the data as well as the ability to understand,

---

also edited the works *Organizational Theory and Inquiry* and *Representation and the Text*; she edits the journal *Qualitative Inquiry*.

track and explain inconsistencies that are present in it); and (iv) confirmability (the ability to certify that the data collected is correct/accurate).  Egon G. Guba, *Criteria for Assessing the Trustworthiness of Naturalistic Inquiries*, 29 ERIC/ECTJ Annual Review Paper 75 (1981), attached as Ex. G.  To meet these criteria, qualitative researchers use a variety of methods to ensure that their results are valid, including: (i) auditing of citations by a third party; (ii) maintenance of working documents, including detailed notes; (iii) triangulation, including across different sources of information, geography and time; and (iv) thick description, i.e. detailed quotations and many citations so the reader can easily see how the researchers reached their conclusions.  Cynthia S. Franklin, et al., *Reliability and Validity in Qualitative Research*, *in The Handbook of Social Work Research Methods* 355-73 (Bruce Thyer ed., 2nd ed. 2010), attached as Ex. H.

Very different criteria are used to evaluate quantitative studies, including objectivity (of the researcher), the internal and external validity of the design (whether causal inferences or generalizations to a larger population can be made) and the reliability and validity of the measures used (whether the measure yields consistent results when applied and whether it appropriately captures the construct of interest).  Donald T. Campbell & Julian C. Stanley, *Experimental and Quasi-Experimental Designs for Research* 1-34 (1963), attached as Ex. I; Thomas D. Cook & Donald T. Campbell, *Quasi-Experimentation: Design & Analysis Issues for Field Setting* 37-94 (1979), attached as Ex. J; William R. Shadish, et al., *Experimental and Quasi-Experimental Designs for Generalized Causal Inference* 33-102 (2002), attached as Ex. K.

## II.   The Hess Reports

On September 30, 2009, Plaintiffs served an expert report written by Dr. Peg McCartt Hess titled "*D.G. et al. v. Henry et al.* Review of Named Plaintiffs' Case Files" (the "Hess

Report," attached hereto as Ex. L). On February 25, 2010, Plaintiffs served a supplemental report by Dr. Hess, titled "*D.G. et al. v. Henry et al.* Review of Named Plaintiffs' Case Files: Supplemental Report" (the "Hess Supplemental Report," attached hereto as Ex. M; together, the "Hess Reports").

Dr. Hess has an M.A. and a Ph.D. in social work. From 1977 to 2005, she was a professor of social work at universities across the United States. Ex. L at 150. Her final appointment was as a tenured Professor and Director of Doctoral Studies at the University of South Carolina. *Id.* Dr. Hess has taught classes on, among other topics, social work practice and qualitative research methods. *Id.* at 158; Ex. N, Hess Dep., at 108:3-109:8. Dr. Hess has published numerous books, monographs, journal articles and book chapters on social work and has served as a reviewer for a number of important child welfare journals. Ex. L at 151-156, 161. Throughout her career, Dr. Hess has received grants and conducted research on topics that include, among many others, supervision in child welfare, child welfare training and permanency. *Id.* at 156-157. She has also consulted with a number of state child welfare agencies. *Id.* at 159-160.

The Hess Reports review Oklahoma Department of Human Services ("DHS") practice in the cases of seven children who are Named Plaintiffs in this action, from the time they entered custody until the date this lawsuit was filed.[3] Ex. L at 1; Ex. M at 1. The purpose of Dr. Hess's analysis was to determine the efforts that were made by DHS to ensure the children's safety, permanency and well-being. *Id.* The Hess Reports include (i) a case summary on each child that describes their experiences while in DHS custody, (ii) a casework analysis on each child that

---

[3] The Hess Report discusses the cases of five Named Plaintiffs – J.B., A.P., J.A., J.P. and R.J. Ex. L at 1. The Hess Supplemental Report discusses the cases of two additional Named Plaintiffs – G.C. and K.T. Ex. M at 1.

5

evaluates the quality of the child welfare practice in the context of DHS policy and reasonable practice standards and (iii) common findings prevalent in all seven cases that "are suggestive of systemic deficiencies and persistent preventable failures" by DHS. *Id.*

In order to conduct her analysis, Dr. Hess reviewed, among other things, the DHS case files for each child; emails of the children's DHS workers and supervisors; relevant DHS policies; and academic literature on foster care and child welfare practices, appropriate services for children in foster care and child development. *Id.* In total, Dr. Hess reviewed more than 50 boxes of documents as part of her review. Ex. N at 128:12-25.

After she completed her analysis, Dr. Hess concluded that "[a]lthough the review of seven children's files cannot conclusively establish overall systemic problems, there are striking similarities in the children's case records and experiences in DHS custody that appear to indicate systemic deficiencies and persistent preventable failures." Ex. M at 75. Dr. Hess went on to state as follows:

> Several themes can be identified, all of which point toward the agency's complete failure to meet the most basic standards of oversight for children in state custody and its serious difficulties in meeting its own minimal standards and requirements for protecting children from harm while in DHS custody. . . . [T]he deficiencies and preventable failures revealed by the seven children's files have inevitably endangered children and resulted in substantial preventable harms.

*Id*.

As Dr. Hess explained during her deposition, while her review focused on seven of the Named Plaintiffs, she also had information about many other children in DHS custody: "[T]hese children had siblings. There were other children in these placements, other children in these shelters. The workers serving these children were serving other children. So there was a lot of data available in looking at these seven children's files about other children in the system." Ex. N at 104:1-8. Dr. Hess explained further that "[t]he understanding of the system's problems is

6

not based on the children's problems . . . It's based on the data concerning the decisions and actions of those personnel who were involved in carrying out DHS policies and practices and serving those children." *Id.* at 106:15-21.

The work done by Dr. Hess in order to prepare her two reports was qualitative research, specifically multiple case studies. *Id.* at 60:8-9. She used many of the methods typically used by qualitative researchers to ensure the quality of her work, including (i) auditing by a third party; (ii) maintenance of working documents; (iii) triangulation; and (iv) dense description. *Id.* at 60:6-62:12, 65:6-20, 123:10-129:19, 133:9-135:19. Dr. Hess described the advantages of qualitative research in the context of her analysis as follows:

> [T]he advantage of the qualitative study that I have done with the named plaintiffs is it allowed me to look at process, you know, what happens over time, who did what, what did they say about their motivations, what was clear about what people understood about policy, so that you can look at decision making and the process of decision making in a qualitative study because of the very nature of the data you're looking at . . . .

*Id.* at 134:18-135:1.

Dr. Hess is an expert in qualitative research. As she explained at her deposition: "I have been extensively trained and applied that training as a qualitative research, so I drew very heavily on that field of practice." *Id.* at 123:14-17. She has regularly conducted qualitative research, published articles and books based on qualitative research, and has taught classes in qualitative research methodology. Ex. L at 150-163. Defendants' experts, however, as they freely admit, have no expertise in qualitative research.

### III.  The Goad Report

On November 10, 2009, Plaintiffs served Defendants with an expert report written by Mr. John Goad, titled "Oklahoma Department of Human Services: An Evaluation of the Effort to Assure the Safety of Nine Foster Children" (the "Goad Report," attached hereto as Ex. O).

Mr. Goad has an M.A. in social work. Ex. O at App. C. For 28 years, from 1975 to 2003, Mr. Goad was employed by the Illinois Department of Children and Family Services, beginning as a caseworker and ending as the Deputy Director of the Division of Child Protection. *Id.* In his final position, he was responsible for directing and administering the Illinois child protective services division, including management of approximately 1200 employees and $45 million in a service budget and grants. *Id.* Since his retirement from the Illinois Department of Children and Family Services, Mr. Goad has worked extensively as a consultant, focusing primarily on child protection. He has consulted for, among others, the Philadelphia Department of Human Services, the New Jersey Division of Youth and Family Services, the Archdiocese of Chicago and the Nevada Division of Child and Family Services. *Id.*

The purpose of Mr. Goad's analysis was to assess DHS's efforts to protect the nine Named Plaintiffs after the agency received 43 reports alleging that these children had been abused or neglected. He evaluated whether DHS's policies and practices are such that the Named Plaintiffs – as well as other children in DHS care – are likely to be protected from child abuse and neglect while they are in the agency's custody. *Id.* at 1, 3. In order to conduct his analysis, Mr. Goad reviewed the relevant files for the 43 referrals, transcripts of several DHS managers' depositions and applicable DHS policies and procedures. *Id.* at 4-6. Like Dr. Hess's work, Mr. Goad conducted a case study analysis and his report was based entirely on qualitative research.

In his report, Mr. Goad opined that DHS's policies and procedures for responding to allegations of abuse and neglect are seriously flawed and that DHS's response to the allegations of abuse and neglect of the nine Named Plaintiffs suggests a pattern of practice that puts all children in the agency's care in danger. *Id.* at 3. In Mr. Goad's words, "[i]t is likely that all

8

children who are placed in the custody of the agency and who are subjects of child maltreatment allegations are at risk of physical and emotional harm" and "[i]t is probable that all children who are placed in the custody of the agency are in danger of being placed with abusive, neglectful, and dangerous caregivers whom OKDHS has failed to identify because of its deficient response to child abuse and neglect referrals." *Id.* Mr. Goad stated that there was an "urgent need for a scientifically designed research review to evaluate the danger in which OKDHS places children." *Id.* at 4. Mr. Goad later conducted such a review. *See* "Review of the Response by the Oklahoma Department of Human Services to the Suspected Abuse and Neglect of Children in its Care," attached hereto as Ex. P.

## IV.    Defendants' Rebuttals of the Hess and Goad Reports

On June 9, 2011 and June 15, 2011, Defendants served Plaintiffs with 14 reports by 10 retained experts and disclosed 10 additional non-retained experts. Only two of these reports contain any opinions on the Hess and Goad Reports. Specifically, a June 9, 2011 report titled "D.G. vs Henry Consolidated Rebuttals of Expert Witness Reports by Peg McCartt Hess, John Goad, and Viola Miller," written jointly by Drs. Fluke and Baumann (the "Fluke/Baumann Report," attached hereto as Ex. Q) discusses the Hess and Goad Reports; and a June 9, 2011 report by Mr. Barclay, titled "Critique of 'D.G. et al. v. Henry et al. Review of Named Plaintiffs' Case Files' Dated September 30, 2009, and 'D.G. et al. v. Henry et al. Review of Named Plaintiffs' Case Files Supplemental Report' Dated February 25, 2010, authored by Peg McCartt Hess, PHD, ACSW," discusses the Hess Report (the "Barclay Report," attached hereto as Ex. R).[4]

---

[4] The Fluke/Baumann Report also contains opinions about two of Plaintiffs' other expert reports, Mr. Goad's second report and Dr. Viola Miller's report. Drs. Fluke and Baumann also wrote a

9

Drs. Fluke and Baumann's rebuttal of the Hess Reports is four pages long and focuses almost entirely on a criticism of its purported lack of internal and external validity. Ex. Q at 2-5. The Fluke/Baumann Report contains only a single substantive paragraph on the Goad Report, in which they opine that the Goad Report "raises the same issues regarding internal and external validity" as the Hess Report. *Id.* at 6-7. Dr. Fluke has a Ph.D. in Organizational Decision Science and currently works for the American Humane Association as the Vice President and Founding Director of the Child Protective Services Research Center. *Id.* at App. A. The focus of his child welfare research includes disproportionality in the child welfare system, analysis of abuse and neglect data, decision-making and workload studies.[5] *Id.*

The Barclay Report, which is only four pages long, focuses entirely on the Hess Reports and makes no mention of the Goad Report. In his report, Mr. Barclay concedes that "case studies [are] valuable tools" and "I am impressed by the literature and results coming from the field of qualitative research." Ex. R at 2. He also admits "I am not an expert in qualitative research." *Id.* Mr. Barclay's background is in engineering and biostatistics, and his child

---

second report, served on June 15, 2011, that focuses on Plaintiff's expert Dr. Jerry Milner. Mr. Barclay also wrote two other reports. One, served on June 9, 2011, focuses on Mr. Goad's second report and the second, served on June 15, 2011, focuses on Dr. Milner's report. Only Dr. Fluke, Dr. Baumann and Mr. Barclay's critiques of the Hess Reports and November 10, 2009 Goad Report are the subject of this Motion.

[5] In his deposition, the transcript of which is attached hereto as Ex. S, Dr. Baumann testified that he had no involvement in critiquing the Hess and Goad Reports and did not even thoroughly examine or review those reports; those sections of the Fluke/Baumann Report were entirely the responsibility of Dr. Fluke. Ex. S at 28:16-24, 230:16-19. Dr. Baumann also admitted that he lacked the necessary qualifications to give opinions regarding qualitative research, explaining that he is "not a qualitative researcher" and is only "sort of" qualified to critique qualitative research "[t]o some degree." *Id.* at 230:1-12. Because Dr. Baumann was clearly not responsible for the critique of the Hess and Goad Reports, his qualification to do so will not be analyzed in detail and any attempt by Dr. Baumann to testify about the Hess and Goad Reports should not be permitted.

welfare work has focused primarily on statistical analyses, data consulting and software development. *Id.* at A-1-A-5.

The curriculum vitae and admissions of Dr. Fluke and Mr. Barclay, discussed in more detail below, make it clear that they are not qualified to opine on qualitative research, and thus their opinions on the Hess and Goad Reports should be excluded.

## Argument

### I. Experts Must Be Qualified in the Specific Area About Which They Plan To Testify

The admissibility of expert opinion testimony is governed by Fed. R. Evid. 702, which states that an expert must be qualified by "knowledge, skill, experience, training, or education" in order to opine. Fed. R. Evid. 702. This principle is well established in case law. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Skycam, Inc. v. Bennett*, No. 09-CV-294-GKF-FHM, 2011 WL 2551188, at *2 (N.D. Okla. June 27, 2011). The Supreme Court has made clear that expert testimony must be excluded unless it is both reliable and relevant. *Kumho Tire*, 526 U.S. at 141; *Daubert*, 509 U.S. at 597.

Trial judges have a "gatekeeper" function under Fed. R. Evid. 702. *Skycam*, 2011 WL 2551188 at *2. This gatekeeper function requires the trial court to first determine whether a proposed expert is qualified based on his "knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702; *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). Only if this first requirement is satisfied does the court go on to determine whether the expert's opinions are reliable enough to be admitted. *Id.*

Courts routinely exclude the testimony of witnesses who, like Dr. Fluke and Mr. Barclay, attempt to give opinions outside their areas of expertise. Under *Daubert* and Fed. R. Evid. 702,

"the question before the trial court [is] specific, not general. The trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the [trier of fact] 'in deciding the particular issues in the case.'" *Kumho Tire*, 526 U.S. at 156 (quoting 4 J. McLaughlin, Weinstein's Federal Evidence ¶ 702.05[1], at 702–33 (2d ed.1998)); *see also Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001); *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.1994).

In *Ralston*, the Tenth Circuit excluded an expert's testimony where she admitted that she was "not an expert" on the specific subject at issue and conceded at her deposition that she "knew little-if anything-about the subject." *Ralston*, 275 F.3d at 969. *Ralston* also made clear that an expert's *general* credentials may be impressive, but that is not enough – the expert must be qualified in the *particular* area at issue in the case. *Id.* at 970 ("[M]erely possessing a medical degree is not sufficient to permit a physician to testify concerning any medical-related issue."); *see also U.S. v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir. 2009) (stating that an expert's testimony was properly excluded when his credentials and methodology were not shown to apply to the case at hand); *In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1245 (N.D. Okla. 2007) (excluding an expert's testimony where he "clearly possess[ed] the *general* qualifications required to perform a discounted cash flow analysis, [but did] not possess the industry-specific expertise necessary to make the numerous judgments which had to be made") (emphasis in original).

Defendants bear the burden of proving by a preponderance of the evidence that the proffered testimony is sufficiently reliable to justify its admission. *Daubert*, 509 U.S. at 592 n.10; *see also Ralston,* 275 F.3d at 970 n.4. Here, Defendants cannot satisfy this burden, and any

opinions from Dr. Fluke, Dr. Baumann, and Mr. Barclay about the Hess and Goad Reports should be excluded.

**II.    Dr. Fluke Is Not Qualified To Give Opinions About Qualitative Research**

As discussed above, Dr. Fluke has a Ph.D. in Organizational Decision Science and his work on child welfare has focused on disproportionality in the child welfare system, statistical analyses of abuse and neglect data, workload studies and decision-making. Ex. P at App. A. Although Dr. Fluke has been involved in qualitative research, the last time he conducted qualitative research was four years ago and "it's not necessarily something that I would tend to focus on professionally." Ex. T, Fluke Dep., at 14:3-6, 14:25-15:16.

>    Dr. Fluke admits that he is not an expert in critiquing qualitative research:
>
>    Q:   Are you familiar with the different methods that are used to critique qualitative data in contrast to the methods used to critique quantitative data?
>    A:   It's probably not an area that I would consider myself to be particularly proficient in, no.
>    Q:   So you don't consider yourself an expert in the methods used to critique qualitative data?
>    A:   I wouldn't consider myself to be particularly proficient in that area.

*Id.* at 23:8-18.

Dr. Fluke acknowledged that the main criteria he used to evaluate the Hess Reports were internal and external validity, but when asked if he was familiar with any literature supporting the use of those criteria to evaluate qualitative research stated "I would say that that's not an area of literature that I'm extremely familiar with, no." *Id.* at 24:2-20. As discussed above, these criteria are only applicable to quantitative research, not qualitative research. Further, the only literature Dr. Fluke cites to in his discussion of the Hess and Goad Reports is a work by Donald Campbell and Julian Stanley, two scholars who are experts in quantitative – not qualitative – research. Ex. Q at 2. Dr. Fluke was not familiar with the leading scholars in the field of

qualitative research, including Egon Guba, Yvonna Lincoln and Norman Denzin. Ex. T at 24:21-25:4.

Further, Dr. Fluke could not describe any criteria that are typically used to evaluate and critique qualitative research and could not define those criteria when prompted:

> Q: What criteria are typically used to critique and evaluate qualitative research?
> A: That's a very good question. I'm not sure that I would be able to answer that.
> Q: Are you familiar with the criteria – criteria of credibility, transferability, dependability and confirmability?
> A: I am not familiar with those terms in that context.
> Q: So you couldn't define any of those terms for me?
> A: I could not.
> Q: Are you familiar with the terms meaning and context, "recurrent patterning" and "saturation" as those terms apply to qualitative research?
> A: Those would not be terms that I would be familiar with.
> Q: So I'm assuming you cannot define them for me?
> A: I would not be able to do that, no.
> Q: What about dense description?
> A: I don't have any knowledge as to what that particular term refers to.

*Id.* at 25:13-26:11. As discussed above, these concepts are elementary and central to the evaluation of qualitative research.

Given Dr. Fluke's admitted lack of expertise in and knowledge of the proper methods of critiquing qualitative research, his testimony on the Hess and Goad Reports should be excluded.

### III.    Mr. Barclay Is Not Qualified To Give Opinions About Qualitative Research

As discussed above, Mr. Barclay's background is in biostatistics and engineering, and his career in child welfare has been focused on statistical analyses, data consulting and software development. Ex. R at A-1-A-5. Mr. Barclay baldly admitted that he has no experience conducing qualitative research and that he is not an expert in qualitative research. *Id.* at 2; Ex. U, Barclay Dep., at 178:1-7.

14

When Mr. Barclay was specifically asked about his experience critiquing qualitative research, he admitted it was non-existent:

Q: Have you ever critiqued a journal article based on qualitative research?
A: No, I have not.
Q: Have you ever been asked to do so?
A: No, I have not.
Q: Have you ever evaluated a grant proposal based on qualitative research?
. . .
A: No, I have not.
Q: Have you ever been asked to do so?
A: I have not.
Q: Have you ever critiqued a dissertation proposal based on qualitative research?
A: I have not.
Q: Have you ever been asked to do so?
A: No, I have not.

Ex. U at 177:8-25.

Mr. Barclay acknowledged that he does not know any of the criteria that are used to evaluate qualitative research, and also admitted that he does not understand the concepts of credibility, transferability or triangulation as they relate to qualitative research. *Id.* at 178:21-181:21. As discussed above, each of these is a core concept in the field of qualitative research, which any person minimally familiar with qualitative research should recognize and understand.

Given Mr. Barclay's unequivocal admission that he is not an expert in qualitative research and his clear lack of knowledge on the subject, his testimony on the Hess and Goad Reports should be excluded.

## **Conclusion**

For the foregoing reasons, Plaintiffs respectfully request that this Motion be granted and that the Court exclude from trial the opinions of Dr. Fluke, Dr. Baumann, and Mr. Barclay regarding the Hess and Goad Reports.

Dated:  August 1, 2011

                          RESPECTFULLY SUBMITTED:

/s/ Frederic Dorwart
FREDERIC DORWART (Bar No. 2436)
*(signed by Filing attorney with permission)*
/s/ Paul DeMuro
PAUL DEMURO (Bar No. 17605)
*(signed by Filing attorney with permission)*
FREDERIC DORWART, LAWYERS
124 East Fourth Street
Tulsa, Oklahoma 74103-5010
Telephone:  918-583-9922
Facsimile:  918-583-8251
Email:  FDorwart@fdlaw.com
       PDemuro@fdlaw.com

/s/ R. Thomas Seymour
R. THOMAS SEYMOUR (Bar No. 8099)
*(signed by Filing attorney with permission)*
/s/ Scott A. Graham
SCOTT A. GRAHAM (Bar No. 19817)
*(signed by Filing attorney with permission)*
SEYMOUR & GRAHAM, LLP
100 W. Fifth Street, Suite 550
Tulsa, Oklahoma 74103-4288
Telephone:  918-583-5791
Facsimile:  918-583-9251
Email:  Rtseymour1@aol.com

/s/ Marcia Robinson Lowry
MARCIA ROBINSON LOWRY *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Ira P. Lustbader
IRA P. LUSTBADER  *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ William Kapell
WILLIAM KAPELL *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Yasmin Grewal-Kok
YASMIN GREWAL-KOK *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Patrick S. Almonrode

16

PATRICK S. ALMONRODE (*pro hac vice*)
*(signed by Filing attorney with permission)*
/s/ Miriam F. Ingber
MIRIAM F. INGBER (*pro hac vice*)
/s/ Laurence Drew Borten
LAURENCE DREW BORTEN (*pro hac vice*)
*(signed by Filing attorney with permission)*
/s/ Jason Moff
JASON MOFF (*pro hac vice*)
*(signed by Filing attorney with permission)*
/s/ Philip G. Barber
PHILIP G. BARBER (*pro hac vice*)
*(signed by Filing attorney with permission)*
/s/ Susan Lambiase
SUSAN LAMBIASE (*pro hac vice*)
*(signed by Filing attorney with permission)*
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Telephone:  (212) 683-2210
Facsimile:  (212) 683-4015
Email:  mlowry@childrensrights.org

/s/ Phillip A. Geraci
PHILLIP A. GERACI (*pro hac vice*)
*(signed by Filing attorney with permission)*
/s/ Angela Vicari
ANGELA VICARI (*pro hac vice*)
*(signed by Filing attorney with permission)*
/s/ John Cahalan
JOHN CAHALAN (*pro hac vice*)
*(signed by Filing attorney with permission)*
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
Telephone:  (212) 836-8000
Email:  pageraci@kayescholer.com

**CERTIFICATE OF SERVICE**

   I hereby certify that on the 1st day of August, 2011, I served the foregoing document by electronic transmission upon the following persons:

DONALD M. BINGHAM
DONNA MARIE DE SIMONE
HOLLY HILLERMAN
KRISTOPHER EDWARD KOEPSEL
JOHN PATRICK MENSCHING
DAVID PAGE
STEPHANIE THEBAN
Riggs, Abney, Neal, Turpen,
Orbison & Lewis, PC
502 West Sixth Street
Tulsa, OK 74119-1010
don_bingham@riggsabney.com
ddesimone@riggsabney.com
hhillerman@riggsabney.com
kkoepsel@riggsabney.com
pmensching@riggsabney.com
dpage@riggsabney.com
stheban@riggsabney.com

ROBERT A. NANCE
MELVIN C. HALL
THOMAS ASKEW
SHARON GENTRY
Riggs, Abney, Neal, Turpen,
Orbison & Lewis, PC
5801 N Broadway , Suite 101
Oklahoma City, OK 73118-7489
rnance@riggsabney.com
mhall@riggsabney.com
taskew@riggsabney.com
sgentry@riggsabney.com

JOSEPH W. STREALY
RICHARD W. FREEMAN, JR.
RICHARD A. RESETARITZ
Department of Human Services
P.O. Box 53025
Oklahoma City, OK 73152-3025
joseph.strealy@okdhs.org
richard.freeman@okdhs.org

richard.resetaritz@okdhs.org

CATHERINE ANN O'LEARY
Department of Human Services
Tulsa District Child Support Enforcement
P.O. Box 3643
Tulsa, OK 74101
catherine.oleary@okdhs.org

SCOTT D. BOUGHTON
Assistant Attorney General
Oklahoma Attorney General's Office
Litigation Division
313 N.E. 21st Street
Oklahoma City, OK 73105
scott.boughton@oag.ok.gov

/s/ Miriam F. Ingber
MIRIAM F. INGBER