# EXHIBIT L

# <u>D.G. et al. v. Henry et al.</u>

# Review of Named Plaintiffs' Case Files

Peg McCartt Hess, PhD, ACSW

September 30, 2009

# TABLE OF CONTENTS

Introduction....................1

Executive Summary....................3

JB

Case Summary....................13

Casework Analysis....................24

AP

Case Summary....................31

Casework Analysis....................41

JA

Case Summary....................48

Casework Analysis....................58

JP

Case Summary....................66

Casework Analysis....................80

RJ

Case Summary....................90

Casework Analysis....................100

DHS Systemic Deficiencies and Failures Suggested by Review of the Named Plaintiffs' Files....................108

Endnotes....................123

Appendix A. *Curriculum Vitae* for Peg McCartt Hess....................149

# INTRODUCTION

This report reviews Oklahoma Department of Human Services (DHS) practice in the cases of five children – JB, AP, JA, JP, and RJ – during their time in DHS custody up to 2/13/08, the date the named plaintiffs' complaint was filed. The purpose of this review has been to determine the efforts that were made by DHS to ensure these children's safety, well-being, and permanency. All five children are named plaintiffs in the federal class action lawsuit *D.G. et al v. Henry et al.* For each child, the report includes (1) a Case Summary and (2) a Casework Analysis that evaluates the quality of case practice in light of DHS agency policy and reasonable practice standards. This report also includes common findings prevalent in all five children's cases. These common findings are suggestive of systemic deficiencies and persistent preventable failures.

At the request of plaintiffs' counsel, the author of this report reviewed the DHS case files for each child, emails of the children's DHS workers and supervisors that were produced by defendants' counsel, transcripts of DHS worker and supervisor depositions that were taken in conjunction with the lawsuit, and summaries of the children's DHS case files prepared by plaintiffs' counsel. Also reviewed were DHS Child Welfare policies which are available on the DHS website.[1]

The author also reviewed the professional literature to identify current research on foster care and child welfare practices, appropriate services for children in foster care, and child development. Information from the literature is cited in the report where relevant.

The reviewer and author of this report is Peg McCartt Hess. The author is an independent child welfare consultant, currently affiliated as Senior Consultant with the

National Resource Center on Family-Centered Practice and Permanency Planning. The author most recently was Professor at the University of South Carolina College of Social Work and Columbia University School of Social Work. A current copy of the author's curriculum vitae is attached to this report as Appendix A.

All opinions, conclusions, and observations expressed by the author are based on the information available at the time of this review, a review of professional literature, and the author's professional knowledge and expertise. The author reserves the right to supplement and/or modify the conclusions in this report should new and/or different information become available, or upon further request for evaluation by plaintiffs' counsel.

# EXECUTIVE SUMMARY

This report reviews Oklahoma Department of Human Services (DHS) practice in the cases of five children during their time in DHS custody up to 2/13/08, the date the named plaintiffs' complaint was filed, in order to determine the efforts that were made by DHS to ensure these children's safety, well-being, and permanency. This summary highlights the findings for each child whose case file was reviewed. This summary also provides the salient conclusions of the DHS Systemic Deficiencies and Failures Suggested by Review of the Named Plaintiffs' Files.

## JB

*"The patient [one-year old JB] originally came into the hospital on 11/02/07 with a history of being burnt, a very cloudy history. The patient was somehow placed into a hot bath tub burning both the right and left foot, the left more so than the right, to a second degree level. This all happened while [sic] Department of Human Services custody. The patient was admitted to Children's Hospital at that point."*[2]

~ JB's hospital discharge summary

JB entered custody when he was [redacted] days old. As of 2/13/08, JB had spent his entire life of 483 days – one year, seventeen weeks – in DHS custody. DHS has subjected JB to:

- ***second and first degree burns on both feet and legs – very serious injuries caused by both the neglect of an inadequately trained and inexperienced DHS shelter worker and the very poor risk management practices of the DHS shelter that employed her – and a large circular unexplained bruise on his upper thigh that was never investigated.*** These fully preventable injuries not only caused excruciating physical pain and suffering to JB, they were followed by a second shelter placement in which he was subjected to further neglect and inadequate care that resulted in dehydration. He was subsequently hospitalized for an additional 13 days, and a split thickness skin graft was performed on his left foot.

- ***DHS workers' failure to determine the safety of placing JB with his mother on a Trial Reunification, and their subsequent abandonment of four-month-old***

***JB during the first five months of this Trial Reunification.*** For two eight-week periods, JB's DHS worker failed to provide any face-to-face contact with the infant to ensure his needs were met and his safety intact. For at least ten days during this placement, JB's DHS worker did not even know his whereabouts.

- ***DHS workers' failures to take actions required by DHS policy to protect JB while he was placed with his mother.*** Observable indicators of risk for harm to JB increased while he was placed in his mother's home, *e.g.*, his mother's positive test for marijuana and her failure to complete required urinalyses (UAs), and the possible presence of his father who had repeatedly physically and sexually abused JB's siblings and who was subject to a no-contact order. However, JB's worker failed to make unannounced face-to-face contact and/or to increase the frequency of contact with JB in this placement, notify the court of safety concerns, make a referral for an investigation, and/or have face-to-face contact with JB's siblings privately to discuss safety concerns. Instead, JB's DHS workers and supervisors repeatedly recommended to the court that JB remain in this placement.

- ***DHS workers' repeated failures to make any effort to place one-year-old JB in a family foster home***. JB was instead subjected to two shelter placements, one for nine days and the second for two days, in violation of DHS policy at the time which required shelter stays for children under five years old to be limited to a maximum of 24 hours.

- ***a placement change on average every 120 days***. Both an inexcusably premature and therefore unsuccessful Trial Reunification and a lack of emergency foster family placement for JB contributed to an unacceptable level of placement instability. Frequent placement changes inevitably negatively affect an infant's developing capacity for attachment and close relationships.[3]

- ***a dysfunctional level of discontinuity of DHS workers and supervisors assigned to JB.*** During his one year and seventeen weeks in DHS custody, JB was assigned 13 workers and 13 supervisors.

## AP

"[[redacted] *– AP's* [redacted]*] has been doing this to [three-year-old AP] every night according to what [AP] told me . . . I have literally seen a change in [AP's] whole personality since we have had them in separate beds . . .[ AP] was being hurt by [*[redacted]*] every night, and that has to stop."*[4]

~ [redacted] in AP's fifth placement

AP entered DHS custody when she was two years old. As of 2/13/08, AP had spent 568 days – a little over 18 months – in DHS custody. DHS has subjected AP to:

- ***three placements in the first four days after her emergency placement in DHS custody due to abandonment and endangerment by her mother; AP's third placement was a dangerous Trial Reunification with her father during which DHS received four referrals of child abuse/neglect and other reports of concern***. Prior to placing AP with her father, DHS failed to assess his mental health, stability, and ability to protect AP from her mother. During the Trial Reunification, AP was alleged to have been sexually abused, kicked in the stomach by her father, and cared for by her eleven-year-old stepsister. Despite a no-contact order resulting from her mother's previous abandonment of AP and her arrest and incarceration for child endangerment, AP's father permitted her mother to provide 24-hour care for AP.

- ***lack of supervision by caregivers in two different placements that resulted in daily sexual violation of AP by*** [redacted]. In AP's fifth placement, a kinship foster home, DHS received a referral alleging Neglect – Sexual Behaviors – Lack of Supervision. AP reported being violated sexually *every night* by [redacted] who slept with her. In her sixth placement, DHS yet again received allegations of Neglect – Sexual Behaviors – Lack of Supervision of AP, who reported being touched sexually by [redacted].

- ***DHS workers' failure to explore whether AP had been harmed in her fourth placement***. DHS received a referral alleging Physical Abuse – Hitting by AP's foster mother in her fourth placement immediately after AP was moved to her fifth placement. Two months later, this foster parent signed a Written Plan of Compliance that addressed her admitted spanking with hand and board, washing children's mouths out with soap, and screaming at children.

- ***seven placements in two counties – a change on average every 81 days***. DHS placement of very young AP in seven placements in less than 19 months subjected AP to serious caregiver discontinuity. Caregiver discontinuity is a predictably harmful experience for young children who are very vulnerable to caregiver changes while they are developing the capacity for attachment with adults.

- ***abandonment by the DHS workers to whom she was assigned.*** DHS workers failed to comply with a court order that DHS make unannounced face-to-face contacts with AP in her father's home to determine whether AP was being left in the care of her mother, against whom there was a no-contact order. In multiple placements, despite observed and increasing risks of harm to AP, her DHS workers failed to provide increased face-to-face contact with AP and to meet with her privately. During fewer than 19 months in custody, DHS assigned 27 workers and 23 supervisors to AP.

- ***DHS workers' failure to provide systematic assessment of her placement and treatment needs when she entered DHS custody or at any time in the period under review.*** AP's history before entering custody included inadequate physical care, intoxicated caregivers, lack of supervision, and the trauma of abandonment. However, until AP had been in custody for more than a year, DHS staff failed even to consider assessing her needs for counseling or play therapy and placing her separately from [redacted]. AP's case file contains no evidence that DHS recognized that her vulnerable age placed her at high risk for the life-threatening consequences of abuse and/or neglect.

## <u>JA</u>

*"This 5 year old has been in 2 shelters and is on his way to the 3rd. We really need to find him a placement."*[5]

~ DHS Foster Care Group Supervisor

JA entered DHS custody when he was four years old. As of 2/13/08, JA had spent 427 days – fourteen months – in DHS custody. DHS has subjected JA to:

- ***ten placements in less than ten months – a placement change on average every 53 days.*** JA's time in DHS custody can only be characterized as a period of excessive placement instability and caregiver discontinuity. JA's numerous placement changes while in custody also resulted in educational instability: he attended kindergarten in at least three different schools.

- ***five different shelter/emergency placements in five counties for more than one-third of his time in DHS custody.*** DHS inexcusably violated its own agency policy concerning the length of shelter placements for JA, whose first shelter placement lasted seven days. JA was also placed in three additional shelter placements, each in a different county, lasting a total of at least 82 consecutive days. DHS also placed JA in an emergency foster home for 29 days.

- ***DHS workers' failure to provide face-to-face contact when concerns about his safety increased due to his threats to harm himself.*** After the disruption of a kinship placement, being subjected to six placements in eight months, having had no contact with DHS staff for six weeks while in one shelter and none with his parents while placed in another, JA's behavior began to indicate a significant emotional and behavioral deterioration. When five-year-old JA threatened to run away from his shelter placement and repeatedly made threats to harm himself by jumping out of a van or window "to go to heaven," his DHS worker failed to increase the frequency of face-to-face contact to monitor his safety and/or to

meet with him privately. JA's worker also failed *even to consider* a psychological evaluation of his severe behavioral deterioration and extreme emotional distress.

- ***DHS workers' failure to place him in a timely manner in accordance with his permanency plan.*** Due to the number of moves to which JA had been subjected in DHS custody, several of which the court had not been notified, JA's judge ruled that DHS had not made reasonable efforts to finalize JA's permanency plan.

- ***abandonment in multiple placements for extensive periods of time by DHS workers to whom he was assigned.*** DHS staff failed to have any face-to-face contact with JA in his placements for as long as six weeks. DHS workers also failed to inform JA in advance about any of the six placement changes he was subjected to during a four-month period in 2007.

- ***DHS workers' failure to provide systematic assessment of his placement, treatment, and educational needs or his placement's capacity to meet his needs.*** To illustrate, prior to JA's placement in a kinship home with [redacted], DHS workers failed to explore the impact that the [redacted]'s serious eight-year estrangement from JA's [redacted] would have on JA and on placement stability. DHS also failed to explore JA's [redacted]'s and [redacted]'s willingness to be a permanency option for JA should he become free for adoption. Had DHS discussed these issues and made plans to address them prior to JA's placement, the placement might not have disrupted in five months; had such a discussion occurred, DHS might also have decided to place JA in a more stable situation.

- ***unreasonably high DHS worker discontinuity***. During his 21 months in DHS custody, JA was assigned to 13 workers and 12 supervisors.

## JP

*"He needs to be somewhere safe."*[6]

~ JP's [redacted]

JP entered custody when he was six years old. As of 2/13/08, JP had spent 630 days – one year, nine months – in DHS custody. DHS has subjected JP to:

- ***severe physical abuse and neglect while in DHS custody***. DHS received six referrals of maltreatment of six-year-old JP in three different therapeutic foster homes. DHS had information *prior to JP's placement* in these homes that the caregivers were either fully inexperienced, had difficulties in prior placements, and/or had prior maltreatment referrals as a foster caregivers. The foster mother

in JP's tenth placement repeatedly twisted his arms and hit him on the back of his head, and held his arms back and stepped on his back. In another home, he was slapped, hit in the mouth, and beaten with a belt that left a bruise the size of a grapefruit with a belt mark in the middle and multiple bruises on his arms and thighs. In two of his placements, JP's foster mothers routinely failed to assure that an approved adult supervised JP, leaving their children in charge of six-year-old JP. None of these children had been approved by DHS or the private agency contracted to provide care. JP was also continually subjected to threats, rejection, and belittling statements by foster parents and their children.

- ***remaining in three placements after indicators of risk of maltreatment were documented and/or referrals of child abuse/neglect had been made.*** In three placements, DHS required JP to remain from six weeks to five months after indicators of risk of harm were documented and/or referrals of abuse and neglect had been received by DHS. DHS also required JP to remain in placements in which the foster caregivers blatantly and with documented DHS knowledge failed to comply with DHS policies concerning discipline and supervision of children in custody.

- ***abandonment in his placements by the DHS workers to whom he was assigned.*** During the first six months of his twelfth placement, JP's DHS worker made *only one* face-to-face contact with seven-year-old JP although: the foster mother had *no experience* as a foster caregiver; three weeks after placement, JP was locked in a room by the foster mother's son; and JP's [redacted] made *three referrals* of Failure to Protect and Lack of Supervision by this same foster mother.

- ***DHS workers' consistent failure to have private face-to-face contact with him concerning his requests to be moved from placements and other placement difficulties.*** Although JP repeatedly asked to be removed from several placements, all of which maltreated JP, his requests were either ignored or denied by his DHS workers. His allegations, however, consistently proved to be true.

- ***12 placements in four counties – a change on average every 53 days.*** Eight of JP's 12 placements were unplanned and short-term, ranging in length from two to eleven days. Each unplanned, short-term placement predictably required yet another placement change. Even if JP's needs had been met and he had been safe in all 12 placements, which was far from the case, the sheer number of separations and losses associated with 12 changes from one home and family to another would be devastating to a young boy's well-being and development.

- ***DHS workers' failure to provide systematic assessment of his placement, treatment, and educational needs upon entering DHS custody or at any time in the period under review.*** DHS consistently failed to assess and match JP's needs with the caregivers' capacity to meet his needs. When recommendations were made, *e.g.*, by the shelter psychologist when JP entered custody, by doctors

monitoring his medication, and by a psychologist who conducted an evaluation, DHS failed to follow them.

- ***an unimaginably high level of DHS worker discontinuity.*** DHS assigned 30 workers and 29 supervisors to JP during his 21 months in DHS custody.

## RJ

*"If you don't beat them down they will run all over you."*[7]

~ RJ's foster parent

RJ first entered DHS custody at age three in 1999; he remained in custody for 609 days (20 months) and was subjected to seven placements. RJ re-entered DHS custody in 2004, when he was eight years old and, as of 2/13/08, he had spent a total of six years in care. DHS has subjected RJ to:

- ***physical abuse and neglect while in custody.*** RJ was placed in a foster home for nine months where he was routinely "whupped," "hit with tree switches" and "spank[ed]"[8] by his foster parents, who also consented for school officials to spank him. These foster parents limited the amount of food RJ was permitted to eat, failed to provide RJ with clean clothes of the right size, and kept a dirty and cluttered home. They also prevented RJ from receiving required counseling for the duration of the placement and failed to complete a Written Plan of Compliance addressing RJ's physical abuse and neglect. RJ was later placed in a home that had been placed by DHS on 90-day probation for Confirmed Lack of Supervision prior to RJ's placement. This home had at least four prior referrals of maltreatment.

- ***DHS workers' and supervisors' failure to read his DHS case file, which documented his first stay in custody (20 months), including his placements, diagnoses, and treatment.*** When RJ re-entered DHS custody, he brought an eight-year history of traumatic victimization and instability, a history that included seven prior placements while in DHS custody. Had DHS acted on the basic casework principle and agency requirement that a child's file be read when an investigation is initiated and had that information been used in subsequent DHS decision-making about RJ's placement, RJ could have been protected from the next four years and four months of placement instability, emotional trauma, and victimization during his second episode in DHS custody.

- ***126 days in five shelter placements.*** The Laura Dester Emergency Shelter, where RJ was placed three times, was consistently overcrowded, with a daily census on

at least one day of *almost double* the legal shelter capacity. DHS placement of RJ in five shelter placements subjected him to a very large number of caregiver changes. By definition, shelters provide care with rotating shifts of caregivers; therefore, RJ most likely had very limited, if any, continuous individual attention and only superficial relationships with caregivers while placed in these shelters.

- ***ten placements – a change on average every 120 days.*** DHS subjected RJ to an unacceptably high level of placement instability and caregiver discontinuity. He was also required to change schools at least eight times due to placement instability.

- ***a very high level of discontinuity of DHS workers and supervisors.*** During RJ's most recent stay in DHS custody, 23 DHS staff members were assigned to him as workers and 18 as supervisors.

## DHS Systemic Deficiencies and Failures Suggested by Review of the Named Plaintiffs' Files

DHS policy mandates that "Safety drives all case planning decisions."[9] This mandate has served as a touchstone in the author's review of DHS workers' and supervisors' decisions and actions on behalf of the named plaintiffs whose cases were reviewed. It is both sobering and extremely alarming to see the degree to which DHS has consistently fallen short of this standard. The striking similarities in the five children's files and experiences in custody appear to suggest seven systemic deficiencies and persistent preventable failures. These include:

- DHS failure to monitor and evaluate safety of children's placements during those placements;

- DHS failure to monitor and evaluate safety in children's placements, including Trial Reunification placements, *prior* to the child's placement;

- DHS' drastic shortage of placements for children in DHS custody;

- DHS failure to provide basic matching between the placement, treatment, and educational needs of children in DHS custody and the placements' willingness and ability to meet those needs;

- DHS failure to document accurate information regarding children's safety and to present critical safety information to the court and other DHS staff;

- Discontinuity of DHS workers and supervisors serving children and consistent absence of supervisory monitoring of worker accountability; and

- DHS failure to provide basic permanency planning services.

Due to these systemic deficiencies and failures suggested by review of the case files, these five children consistently experienced:

- Neglect, physical abuse, and sexual abuse while in DHS custody;

- Deprivation of continuous caregivers due to an unconscionably high level of placement changes;

- Lengthy, often repeated placements in overcrowded and poorly supervised shelters;

- Superficial relationships with DHS workers, leading to lack of disclosure and inevitably increased risk of harm; and

- Harmful deterioration in well-being and development due to lack of necessary services, including assessments, psychological evaluations, speech therapy, and special education.

It is critical to remember that the focus of this review is five children who entered DHS custody as a newborn (JB), two-year old (AP), four-year old (JA), six-year old (JP), and an eight-year old (RJ) who was re-entering custody, having previously entered custody as a three-year-old. These vulnerable children suffered harm in their dangerous DHS placements and in their abandonment by DHS workers and supervisors both prior to, during, and following their maltreatment in their placements. The children had been told that these placements would keep them safe. However, for none of these five children was that the case. When attempting to describe the children's harm and

suffering, the words that come to mind are incomprehensible, unimaginable, outrageous, and immoral.

DHS perhaps could not have prevented the maltreatment to which these children were subjected prior to entering the agency's custody. But these five young children's tragic and painful stories, told in the pages of their DHS case files about their stays in DHS custody, need not have been written. These tragic stories were wholly preventable.

# JB CASE SUMMARY

**DOB: [redacted]**
**Entered DHS custody: [redacted]/06, age [redacted] days**
**Time in DHS custody as of 2/13/08: 483 days (1 year, 4 months)**
**Time in shelter/emergency placements: 11 days**
**Time in hospital due to confirmed neglect while in DHS custody: 16 days**
**Number of placements as of 2/13/08: 4, a move on average every 121 days**
**Total DHS workers assigned: 13**
**Total DHS supervisors assigned: 13**

*"The patient [one-year-old JB] originally came into the hospital on 11/02/07 with a history of being burnt, a very cloudy history. The patient was somehow placed into a hot bath tub burning both the right and left foot, the left more so than the right, to a second degree level. This all happened while [sic] Department of Human Services custody. The patient was admitted to Children's Hospital at that point."*[10]

~ JB's hospital discharge summary

**Placement in DHS custody**

JB was born in [redacted], Oklahoma on [redacted].[11] Two days later, DHS initiated an investigation (10/19/06).[12] At that time the family had three children in DHS custody due to physical abuse, domestic violence, threat of harm, allegations of sexual abuse by the father, and failure to protect by the mother.[13] DHS found it "contrary to the health, safety and welfare of the newborn child to remain in the home."[14] The investigation outcome was Confirm – Court Intervention Requested.[15] JB was placed in DHS custody on [redacted]/06.[16] The file also documents that when JB's mother was four months pregnant with him, she tested positive for amphetamines and cocaine,[17] and that JB's father repeatedly beat her during the pregnancy.[18]

**Parents' history: drug abuse, physical and sexual abuse, and failure to protect**

JB was his mother's seventh child.[19] His parents' and siblings' histories are relevant to the decisions made by DHS to place four-month-old JB in his mother's home for a Trial Reunification[20] and recommend that he remain there for eight months.[21]

***Severe abuse and failure to protect.*** When JB was born, his siblings had been in custody for five months.[22] [redacted] (three years old), [redacted] (two years old), and [redacted] (one year old) were placed following a 911 call from [redacted]; [redacted] and [redacted] had disclosed sexual abuse by their father, and their mother had also observed bruises on the children.[23] In physical exams, bruises were found on all three children.[24] [redacted] told the doctor his father

spanked them "with a belt on their butts;"[25] he later reported his father "used to beat him with a belt so bad that he couldn't walk."[26]

***Siblings disclosed additional sexual abuse allegations.*** Shortly after [redacted]'s placement in DHS custody (five months before JB entered DHS custody), two-year-old [redacted] disclosed that her father touched her "with his fingers," "sometimes at bedtime and sometimes when she got in trouble;" she stated her mother "would be watching daddy do this."[27] She also disclosed that he "would stick his peepee in my peepee"[28] and that her father "ties her up."[29] Three-year-old [redacted] disclosed that his father used "his dick to spank me."[30] DHS received a referral on 6/26/06 that included these allegations.[31] In a forensic interview[32] [redacted] repeated the allegations, including that her mother was at home when her father molested her.[33] [redacted] and [redacted] were examined at a children's hospital; the clinical evaluation "found history to be consistent with sexual abuse."[34] JB's mother stated she did not know what was going on and was never present in the home when this occurred.[35] She did report that her husband abused her repeatedly,[36] and her children were exposed to that abuse.[37] JB's father denied all allegations,[38] but was later incarcerated for four months on two counts of child abuse.[39] DHS requested the petition be amended to include the 6/26/06 sexual abuse allegations and submitted an addendum to the Report to District Attorney.[40] DHS did not include information about the new allegations in the initial DHS Individual Services Plan (ISP), although it was completed after the 6/26/06 referral.[41]

***JB's other siblings.*** In 2002, JB's parents relinquished their rights to a fifth child who was born drug exposed;[42] she was adopted by her [redacted].[43] A sixth child died of SIDS as an infant;[44] a seventh was born in 1993.[45]

**[redacted]06 – 2/20/07: JB's first placement**

After his birth, JB was moved from the hospital to a regular foster home in Oklahoma County,[46] where he remained for four months. The foster parents reported no problems with him.[47] JB was adjudicated Deprived on 12/7/06; the treatment plan for his family was adopted for JB as well.[48] A DHS worker did not visit JB within two weeks of placement as required by DHS policy;[49] after that he had monthly face-to-face contact with a DHS worker while in this placement.[50] Case notes state that JB saw his mother weekly;[51] however, weekly visits were not documented. Visits were documented on 11/8/06 and 12/6/06 (mother, JB, and siblings), and on 1/3/07, 2/7/07, and 2/14/07 (mother and JB).[52] JB was to have no contact with his father.[53]

**2/20/07 – 10/25/07: JB's second placement – an unmonitored eight-month Trial Reunification with mother**

A child may be placed in a Trial Reunification with a parent(s) while remaining in DHS custody.[54] DHS placed JB in his mother's home in a Trial Reunification on 2/20/07.[55] He was four months old. Prior to the placement change, JB's foster mother advised his worker that her family was going out of town on 2/19/07 and wondered if JB could be moved to his mother's home prior to their departure.[56] The worker said she

would visit JB's mother's home and staff the decision to place JB there with the Assistant District Attorney and Public Defender.[57]

In the DHS Progress Report for a 3/8/07 court review, DHS recommended that JB remain with his mother, [redacted] and [redacted] also be placed in her home,[58] and [redacted] remain in therapeutic foster care (TFC).[59] The court ordered JB's mother to allow no contact between her children and her husband,[60] who had been released from jail.[61]

***JB's maltreatment in the Trial Reunification placement.*** JB remained in the Trial Reunification placement in DHS custody for eight months. On 10/25/07, the judge ordered JB and his siblings removed.[62] JB was one year and [redacted] days old. After the children were removed from the placement in their mother's house, [redacted] and [redacted] reported maltreatment by both parents during the Trial Reunification. They "reported [JB's father] resided in the home with them" during the Trial Reunification, which was against court orders and contrary to the mother's statements.[63] [redacted] and [redacted] disclosed that JB's mother locked them and JB in the closet because she was angry with them.[64] The siblings also reported their parents were "mean and beat their butts" and would "lock them outside of the trailer at night and they would cry to come in and they were made to stay and play in the trailer park."[65] [redacted] disclosed that during the Trial Reunification his father hit him and his mother in the face.[66] Pre-verbal JB could not express a placement preference;[67] however, his siblings stated they never wanted to live with their parents again.[68]

***Prior to Trial Reunification, JB's worker did not follow DHS policy regarding reunification and assessment of risk.*** Instructions to DHS staff state that "making plans for treatment and reunification"[69] is a key case decision point for assessing risk to a child; DHS policy requires workers to take steps to determine the feasibility of a safe Trial Reunification placement.[70] These steps include addressing thirteen significant questions regarding the remaining potential for risk of harm to a child if placed with a parent(s);[71] three of these have particular relevance for assessing the risk for harm to JB in his mother's home. These include: (1) Has parent-child visitation increased in length and frequency in order for the child and caseworker to observe changes in the parent(s)? (2) Is the non-offending parent [JB's mother] able to protect the child [from JB's father]? (3) Are there community services, schools, child care centers, neighbors, or relatives who have the knowledge and willingness to report if the situation warrants?[72] JB's DHS worker did not take steps to address these questions prior to planning for placement or to placing JB in his mother's home.

DHS policy requires that "Successful unsupervised all day, overnight, and weekend visits are completed prior to planning for the child's return home."[73] Such visits permit the DHS worker to observe whether changes in the parent(s) have resolved the conditions that made the parent(s)' home unsafe for the child. Frequent, *i.e.*, weekly, visits did not occur prior to planning JB's return home. He had only two visits with his mother that were spaced a week apart; these were the visits immediately prior to the Trial Reunification (on 2/7/07 and 2/14/07); DHS scheduled all other pre-placement visits monthly. JB's DHS worker also did not schedule planned overnight visits or visits more than 24 hours in length prior to placing JB with his mother.

Agency policy as cited above also requires an assessment of the non-offending parent's ability to protect a child from the abusing parent prior to planning for the child's return home. Immediately after JB's placement with his mother, his father was released from jail. As discussed below, DHS took no steps to determine whether JB's mother was willing and able to protect JB from his father after JB was placed in the home, including monitoring the placement.

The answer to the third risk assessment question above was that JB had no family members, neighbors, or service providers with the knowledge and willingness to report maltreatment while he was placed in his mother's home if the situation warranted; the lack of social support for JB placed particular importance on DHS arranging supportive home-based services to prepare for trial reunification. As discussed below, the worker also did not take this step to decrease the risk of harm to JB.

***DHS did not monitor JB's needs and safety in the Trial Reunification as required.*** During the first eight weeks of four-month-old JB's placement in his mother's home, DHS did not have *any* face-to-face contact with the infant to ensure his needs were met and his safety intact.[74] DHS made only two face-to-face contacts with JB during the first five months of the Trial Reunification, on 4/17/07[75] and 5/31/07; the 5/31 contact form states only the contact date[76] – the DHS worker did not document any other information as required.[77] A DHS Progress Report for a 6/14/07 court review[78] states that JB's mother moved to the [redacted]'s home, but failed to contact the worker when she moved.[79] The mother reported "she had only been in the [new] home 10 days when worker last contacted her face to face on 5/31."[80] *Therefore, for at least 10 days, the DHS worker did not know seven-month-old JB's whereabouts.*

In addition, DHS did not evaluate the safety of the [redacted]'s home[81] prior to JB's move or during JB's stay there. Subsequent to the 5/31/07 visit, no face-to-face contact was made by a DHS worker to monitor JB's needs and safety in the placement for an additional two months[82] or "within the two weeks prior to each scheduled court hearing . . . to obtain updated information to provide to the court" as required by DHS policy.[83] In order to "evaluate the interactions, conditions, and services the child is receiving,"[84] DHS workers are required to have face-to-face contact with a child placed in his or her own home monthly at a minimum, and to have increased contact during "times of change and stress."[85] The DHS staff member who made the 7/31/07 contact is not listed as a primary or secondary worker or a supervisor on the listing of DHS staff assigned to JB's case;[86] it appears she had not had contact with JB or the family previously. The DHS staff member who made face-to-face contact to monitor JB's safety and well-being on 10/16/07 is also not listed as a primary or secondary worker or supervisor.[87]

***DHS worker did not arrange home-based services for JB and his family; judge ruled DHS failed to make reasonable efforts for permanency for JB.*** DHS policy states that the DHS worker ensures that support services are provided in preparation for reunification, including in-home services.[88] Such services, referred to as Comprehensive

Home-Based Services (CHBS),[89] address the conditions that place children at risk of harm in the home as well as monitor children's status and safety.[90] The assigned CHBS contract case manager (CCM) is to have "face-to-face, private contact with the child in the home per contract specifications."[91] Two weeks after JB's Trial Reunification began, a CHBS worker asked whether CHBS services were needed,[92] and the DHS worker responded that they were.[93] However, when the DHS worker repeatedly did not respond to CHBS requests for necessary referral information,[94] CHBS closed the service request (6/13/07).[95] No CHBS services were provided before the request was closed.

Because DHS had not arranged for home-based services to JB and his family, the judge ruled in an 8/16/07 court hearing that DHS failed to make reasonable efforts to finalize JB's permanency plan.[96] A document states CHBS had been "discussed in March [2007] as *prerequisite* to children being placed in [JB's mother's] home" (emphasis added).[97] The court subsequently ordered DHS to arrange CHBS for JB's family; however, the DHS worker did not refer JB's family for services for 30 days (until 9/18/07).[98] CHBS initiated services to JB's family on 9/25/07. Because DHS did not forward required paperwork, CHBS could not initiate supportive services and monitor JB's placement until seven months after JB's placement with his mother began.[99]

***CHBS reported "people" in JB's mother's home; DHS worker did not determine whether JB's father was in the home.*** A 10/16/07 contact reports that the CHBS worker "arrived an hour early and [JB's mother] had *people* in the home and she shut her bedroom door. Her [redacted] is in the home *every time* CHBS case manager comes to the home (emphasis added)."[100] The DHS worker called JB's mother, who said her [redacted] was in the home; the worker advised her that no one was to be present but the mother and children when CHBS was in the home.[101] The DHS worker did not specifically ask JB's mother about other "people" being in the home and also took *none* of the steps required or recommended by DHS policy when there are safety concerns or concerns regarding access to a child by the perpetrator. These include making more frequent and/or unannounced face-to-face visits with the child in the placement, particularly when there are safety concerns and/or concerns regarding access by the perpetrator;[102] meeting privately with children;[103] notifying the court of safety concerns;[104] and, if abuse or neglect is suspected, making a referral for an investigation.[105] JB's mother called the worker's supervisor and asserted "she could have her family in her home whenever she chose and DHS wasn't going to advise her who she could have in her home or when they could be in her home."[106] The file indicates no follow-up by DHS to this statement.

***Although indicators of increasing risk were present, DHS recommended continued placement of JB in mother's home.*** DHS instructions to staff concerning evaluation of non-perpetrating parents' protection of a child from the perpetrator emphasize the issues of substance abuse, which may prevent the non-perpetrating parent from protecting a child, and domestic violence, which may increase a parent's inability to protect a child due to her own fear of the perpetrating parent.[107] A DHS worker is expected to monitor parents' behaviors that are likely to decrease their ability to protect a child, such as a parent's failure to comply with urinalyses (UAs), possibly indicating substance use, and contact with a violent partner. The DHS Progress Report prepared for

a 6/14/07 court review states JB's mother failed to participate in random UAs as required,[108] preventing DHS from monitoring her drug use. Still DHS recommended that JB remain in the Trial Reunification placement.[109]

On 8/16/07, JB's parents were present at a court hearing; both had tested positive for marijuana.[110] JB, still in his mother's home, was then ten months old. The judge stated "if she [JB's mother] used again he will throw her in the county jail and terminate her parental rights;"[111] the judge also ordered her to test weekly for drugs.[112] The DHS Progress Report for a 9/20/07 court review stated JB's mother had had contact with her husband "approximately a week or so ago,"[113] increasing the possibility of domestic violence recurring as well as the possibility of harm to JB by his father. Again, DHS recommended JB remain in the home.[114] The DHS Progress Report for a 10/25/07 court review states JB's mother again failed to keep a drug screening appointment.[115] Despite the mother's continuing failure to permit DHS to monitor her drug use and a positive drug test, DHS appears to recommend that JB remain in her custody. The statement of the agency's recommendation is not complete: "2) [[redacted]] remain in his current place, [[redacted]], [[redacted]], and [JB] 3)..."[116]

***Incomplete documentation of safety-related information by DHS worker.*** On 9/18/07, JB's DHS worker's supervisor informed the worker that she would not approve a DHS Progress Report until the worker provided essential information concerning JB's safety in his placement.[117] That information included: CHBS referral status; whether and when JB's mother had contact with his father; the condition of the mother's home; the status of a safety plan and several referrals; and drug test results.[118] The day after the worker received the supervisor's request, a contact form contains worker comments related to JB's safety in the home. The comments appear to be notes made prior to a telephone call. The incomplete comments do not state that the safety-related content in the notes was discussed with JB's mother, or, if it was discussed, the nature of JB's mother's responses:

> Contact [JB's mother] and advise her of course we had no idea her [redacted] was living with her in the home, and we need information on the [redacted], ask her if there is somewhere the [redacted] can stay temporarily. We need have [sic] the [redacted] sign the background check. Let [JB's mother] know at this time it is not appropriate for the [redacted] to stay in the home with the children. Provide a safety plan and address [JB's mother] will not allow [JB's father] [sic] have any contact with the children, and agree to have the [redacted] live somewhere else while we obtain the background check and KIDS check on the [redacted] as well. Have [JB's mother] sign a safety plan. [JB's mother] will not allow the children to see the dad since we haven't had any contact with the dad . . . [JB's mother] contacted worker and reported she and JB have [comment not completed].[119]

***JB removed from placement.*** At JB's 10/25/07 permanency review,[120] JB's mother was served a contempt citation because she refused "to obey the lawful orders of this Court," "the particulars . . . being that she continued to consume marijuana."[121] The

judge ordered JB and his siblings placed together in the Pauline E. Mayer (PEM) shelter.[122]

**10/25/07 – 11/20/07: JB suffered severe burns in his third placement-- PEM Shelter**

***DHS did not adhere to policy regarding shelter stays for children under 5.*** JB, [redacted], and [redacted] were admitted to the PEM shelter the day of the court review.[123] DHS policy at the time required that shelter stays for children under five must be limited to 24 hours.[124] Despite this mandate, one-year-old JB was initially placed in the shelter for nine days.[125] JB's DHS worker failed to make face-to-face contact with JB as required "within 24 hours of his entry into the shelter and minimum of once weekly" during his shelter stay.[126] No problems for JB were noted in the PEMS Daily Log through the morning of JB's ninth day in the shelter.[127]

***DHS shelter worker neglected JB, causing severe second degree burns.*** On 11/2/07, JB was admitted to the Oklahoma University Medical Center. Hospital documents state:

> The patient originally came into the hospital on 11/02/07 with a history of being burnt, a very cloudy history. The patient was somehow placed into a hot bath tub burning both the right and left foot, the left more so than the right, to a second degree level. This all happened while [sic] Department of Human Services custody. The patient was admitted to Children's Hospital at that point.[128]

A doctor said JB arrived ". . . with second degree burns to his left foot (both dorsal aspect and sole of foot) and first degree burns to the anterior part of his left leg. [JB] also had first degree burns to the lower part of his right leg and foot. The leg burns extended to about mid-calf on both legs."[129] A hospital document states "it was determined the left wound was severe enough that it would need a split thickness skin graft in order to have adequate tissue covering and healing."[130] When JB was discharged from the hospital three days later, a DHS staff member's contact documents that:

> . . . the nurse on duty showed [the DHS worker transporting JB back to the shelter placement] a bruise on [JB's] upper left thigh. It appeared to be about two or three days old. The nurse said when [JB] arrived it was there and looked to have been fresh. The bruise was rather large and held a circular pattern.[131]

Neither the DHS staff member nor the nurse made a child abuse referral concerning the bruise. The staff member states that the nurse "also reported to me that she had to give the child a good wash up because he was very dirty."[132]As described below, the shelter worker reported that she fully bathed JB prior to his being burned.

***DHS Office of Client Advocacy (OCA) investigated cause of JB's injuries.*** The OCA investigated an allegation of abuse, neglect, or maltreatment of JB by the DHS

shelter worker who bathed him. The DHS shelter worker reported[133] that she filled the sink with water for JB's bath and checked the water, which, according to her statement, was not hot. When the sink was full, she turned off the water, washed JB's entire body and feet, and drained the water from the sink. The DHS shelter worker then turned the water back on, using the faucet sprayer to wash JB's hair. She reported that JB tried to get out of the sink and grabbed and turned the hot water handle. She stated she did not feel the water get hot. When the shelter worker released the sprayer, the water came out of the facet spout directly onto JB's left foot. According to the DHS worker, that was "the only water she did not feel." She noticed JB's left foot appeared to be "extremely wrinkled." When JB "grabbed at his foot the skin pulled right off."[134] The worker stated that she had given baths four to five times per week and was unaware of any hot water tank problems. However, she acknowledged that the water in the kitchen "would get hot."[135]

OCA interviewed shelter staff and others and reviewed shelter incident reports and other documents.[136] One staff member stated that when she saw JB after he was burned he was "crying loud. [JB's] left foot skin was completely hanging of [sic] his foot and his foot was blood shot red and dripping wet liquid; his right foot was blistered. I instructed [two staff members] to keep his fingers and foot separate from each other."[137] Initially staff members were confused about the nature of JB's injuries because the worker who had bathed JB insisted the injury "could not be a burn because the water was not hot."[138]

An Oklahoma City Police Department Crime Report documents that a child abuse report concerning JB's burns was made on 11/21/07 by a [redacted] – more than two weeks after JB's injuries occurred – and that the reporter "had photographs of [victim's] injuries, but were [sic] unable to give them to me at this time."[139]

***Inconsistencies in reported information***. The DHS shelter worker's report is inconsistent with statements made by the hospital nurse when JB was initially discharged. The DHS shelter worker did not mention JB having a large bruise on his upper thigh or report actions that could have caused a bruise. In addition, a child whose entire body, feet, and hair had been fully washed would not have been "very dirty" upon hospital admission. The investigation report does not refer to these factual inconsistencies; OCA may not have had this information when conducting its investigation.

***DHS had not addressed scalding hot water in its shelter***. During the investigation, several DHS staff reported that the water was very hot in the south room of the PEM shelter in which JB was bathed. One stated that "the hot water tends to run rather hot and it must be adjusted/tested for bathing time and also for kitchen duties."[140] Another stated that, "each staff member is responsible for adjusting the water temperature for baths. [Staff] emphasized that attention must be paid to the temperature as 'the water can get hot.'"[141] Yet another reported "there were occasions when the water ran hot and it needed to be adjusted accordingly."[142] The Child Care Supervisor reported that she checked the water after JB was on his way to the hospital and that it was "scalding hot."[143] Several days later (11/5/07), a Maintenance Technician found the south room

water temperature to be over 125 degrees; he stated that water will scald at 125 degrees and that the temperature should be between 110 and 113 degrees for children and persons with disabilities.[144]

***Investigation outcome.*** The OCA investigation found "[N]eglect with injury by [DHS shelter worker] is confirmed,"[145] but that additional investigation regarding possible criminal prosecution did not appear indicated.[146] The report states that:

> . . . there is sufficient evidence to confirm neglect by [DHS shelter worker]. The staff interviewed [sic] confirmed that the hot water at the facility had been running very hot and required extra attention . . . [W]hile the water temperature setting and the use of the sprayer contributed to [JB] sustaining burns, [DHS shelter worker] was ultimately responsible for his safety and it was her duty to appropriately supervise him throughout the bathing process. If [JB] turned on the hot water faucet during the bath, it was [DHS shelter worker's] responsibility to immediately turn the faucet off and to prevent him from doing this again. The greater weight of the evidence indicates that [DHS shelter worker] failed to appropriately supervise Resident [JB] and the water temperature during his bath.[147]

***OCA concerns regarding DHS shelter risk management practices.*** The investigation report states that the PEM Shelter is a DHS-operated placement facility.[148] In the report, the OCA specifically highlighted the following concerns:[149]

> 1. Staff members said there is no training regarding the bathing of children, primarily infants and toddlers. Staff does this based on personal experience(s).
>
> 2. The set temperature of the water heater may have been too high based on more than one staff member noting the difficulties of adjusting water temperature in both the bathing areas and the kitchen. This concern had not been addressed by facility management or checked for resolution prior to incident.
>
> 3. The Annex facility does not have a monthly check to ensure the temperature setting remains constant.
>
> 4. Staff were not aware that when the faucet sprayer is used, the water from the faucet spout does not remain the same temperature as that dispensed through the sprayer. Diversion of water to the sprayer might increase the temperature of the water through the faucet spout.
>
> 5. After transporting [JB] to the emergency room, [DHS shelter worker] did not remain at the hospital to provide information to hospital staff about the incident.

A memo to the DCFS Director from the I/C Programs Administrator dated 1/29/08 states, "Anti-scald devices have been installed on the tubs and sinks since the incident."[150] In response "to [OCA] areas of concern" it states:

1. We have arranged to get training tapes from Licensing on bathing. I had assumed that people did not need training to avoid scalding water.

2. The set temperature of the water heater was on medium.

3. The temperature does not fluctuate.

4. [DHS shelter worker] needed to leave the premises. She was suspended. Other Annex staff was available to hospital personnel.[151]

The Program Administrator states the DHS shelter worker, a probationary employee, was immediately terminated, as "her account of the incident was not satisfactory"[152] and "not truthful. She tried to blame the baby's own actions as the cause for his burns and stated she checked the water and it was not that hot."[153]

***After two additional nights in the PEM shelter, JB re-admitted to hospital due to dehydration.*** Recognizing the need for special care for children who have been hospitalized, DHS policy states: "Priority for placement into EFC [Emergency Foster Care] is given to children discharged from hospitals."[154] Despite this policy, one-year old JB was discharged from the hospital to the same shelter on 11/5/07, and prescribed Tylenol with codeine for pain.[155] The following day he was taken for wound care[156] and returned to the shelter; when he was taken for wound care the next day (11/7/07) he was re-admitted to the hospital.[157] With JB's two-day shelter stay, DHS again violated its policy at the time for length of stay in a shelter for children under 5. At re-admission, JB:

> . . . was found to be very dehydrated, very agitated, not having drank or eaten normal amounts of fluid or food in days and so the patient was readmitted for hydration and nutrition purposes along with allowing our Physical Therapy/Wound Care technicians to fully treat the wounds.[158]

On 11/8/07, JB's mother reported that his foot was severely infected and he might lose his toes or foot.[159] The next day the hospital placed a PICC line in JB because he was not getting enough nutrition due to his burns.[160] On 11/12/07, a split thickness skin graft was performed on his left foot.[161] Eight days later (11/20/07), JB was discharged and required to return to the hospital daily for dressing changes.[162]

**11/20/07 – 2/13/08: JB's fourth placement**

JB was discharged from the hospital on 11/20/07[163] and placed with his brother [redacted] in a home in Oklahoma County that was to be dual-certified, *i.e.* Regular and Therapeutic Foster Care (RFC/TFC).[164] The home was certified for TFC on 3/23/07.[165] The foster mother was a Licensed Practical Nurse.[166]

***DHS delayed dual certification of home and foster care payments for JB for three months.*** A Foster Home Addendum signed by the foster parents 11/20/07,[167] the date of JB's placement, states they applied to be dually certified in order to accept JB, who was in regular foster care.[168] Dual certification (TFC/RFC) of the home was not completed until 2/12/08 – 12 weeks after JB's placement in the home. As of 2/13/08,

DHS had not yet provided payment to JB's foster family.[169] Foster parents are eligible for Difficulty of Care (DOC) payment when a child's extraordinary needs create additional expense to their caregivers, such as the frequent transportation required for JB's medical care.[170] Numerous delays concerning dual certification and payment were documented.[171]

***DHS provided only two face-to-face contacts with JB in almost three months.*** DHS did not have face-to-face contact with JB within the first two weeks of this placement as required by DHS policy.[172] For the 85 days between his placement in the home and 2/13/08 (the date the named plaintiffs' complaint was filed), the DHS worker had only two face-to-face contacts with JB (12/14/07, 1/3/08).[173] During the first visit, JB's foster father reported he was "doing well in the home."[174] For the second, the DHS worker recorded only the contact date, violating DHS policy regarding documentation.[175] JB's siblings visited JB and [redacted] at the foster home;[176] the worker documented no specific visit information. JB did not visit his mother between 11/20/07 and 2/13/08.

**JB's Permanency status as of 2/13/08**

The DHS Progress Report prepared for a 12/20/07 court review states JB's parents had not contacted the worker since the last court hearing.[177] DHS recommended that JB and his siblings remain in DHS custody and their parents' rights be terminated.[178] The report identifies Adoption as the Permanency Plan for JB.[179] No promising adoptive resource had been identified for JB as of 2/13/08.

**Continuity of DHS workers/supervisors assigned to JB**

Tables identifying the DHS primary and secondary workers assigned to each named plaintiff child, the workers' supervisors, and the beginning and end dates of the assignments were provided to plaintiffs' counsel by defendants' counsel.[180] The assignments are for both multiple subsequent and multiple non-sequential periods of time for any given DHS worker or supervisor with no explanation as to the rationale for the changes. In some instances the same individual is listed as both the supervisor and either the primary or secondary worker.

According to these rules, during the period under review, JB was assigned six primary workers with six supervisors and seven secondary workers with seven supervisors. Therefore, JB was served by a total of 13 workers and 13 supervisors during his one year, seventeen week stay under review.[181] As documented above, other DHS staff members also were involved in transporting JB when his placements changed and for medical care; aides also carried responsibilities for JB's services.

A list of assigned workers was also found in JB's case files in a Case Summary section.[182] When this list and the staffing tables described above were compared, numerous inconsistencies were found that could not be explained.

## JB CASEWORK ANALYSIS

### DHS Failures to Protect JB from Harm While in DHS Custody

When DHS determines that a child cannot safely remain in his or her own home, the agency is required to provide for the child's protection and welfare by taking legal and physical custody of the child and placing the child in an appropriate setting.[183] In taking this action, DHS accepts the critical responsibility of functioning as the child's parent or caregiver and providing protection and care at a level fully adequate to meet the child's basic and individual special needs.[184] DHS policy outlines requirements that assist "in selecting the best home for children placed in foster family care."[185] When the agency fails to assure that its placement settings meet state requirements and maintain adequate standards of protection and care, vulnerable children are inevitably harmed.

DHS policy also mandates that "Safety drives all case planning decisions,"[186] and that "Generally a higher level of scrutiny is required when making decisions regarding the safety of children in OKDHS custody."[187] However, safety clearly did not "drive" DHS decisions regarding the infant JB's placement services during the one year and seventeen weeks under review. Not only did DHS fail to give "a higher level of scrutiny"[188] to decisions regarding JB, but the agency also consistently failed to meet even its own minimum standards for protecting children in DHS custody, including policies concerning risk assessment, face-to-face-monitoring of children's safety and well-being, and actions required to protect children when indicators of potential harm are observed.

The preventable harms to which JB was subjected occurred under the auspices of child protection, but were caused by DHS' consistent and pervasive failure to adhere to its own mandate that "Safety drives all case planning decisions"[189] for JB.

## I. DHS failed to monitor and evaluate safety and risk of harm to JB prior to and during his placements

For more than *one-half* of the one year, seventeen week period reviewed for JB, DHS housed JB in placements where he was severely neglected and maltreated.

***A. DHS failed to assess his mother's readiness to safely care for him.*** Instructions to DHS staff state that a key point for assessing risk to a child occurs "when making plans for treatment and reunification."[190] DHS policy requires that specific steps must be taken to determine the safety and feasibility of a Trial Reunification placement.[191] The DHS worker's decision to place JB in his mother's home appears to have been based primarily, and perhaps wholly, upon the foster mother's request that JB be returned home prior to the date of a family vacation. The placement of four-month-old JB with his mother without a thorough risk assessment and determination of her readiness to safely provide JB's daily care is illustrative of the agency's numerous failures to assure that "safety drives all case planning decisions."[192] In responding to the foster mother's request, JB's worker placed him with his mother *prior* to having taken the steps required by DHS to assess risk and prepare children and families for a safe family reunification. JB's worker should have delayed the placement change in order to provide overnight and weekend visits as required prior to Trial Reunification,[193] fully assess the mother's ability and willingness to protect JB from contact with his father, and arrange for home-based services to support and monitor the placement.

Had JB's worker complied with agency policy and prepared carefully for this critical transition, it is highly likely that DHS would have either (1) delayed the placement change until a thorough risk assessment had been completed and services were in place to protect JB in his mother's home; or (2) concluded that reunification could not occur safely and subsequently changed JB's permanency plan. Either outcome would more likely than not have protected JB.

***B. DHS failed to monitor four-month-old JB's safety during the Trial Reunification placement.*** The DHS workers assigned to monitor JB's safety and well-being while he was in DHS custody placed in a Trial Reunification with his mother failed to do so for extensive periods of time. For two eight-week periods during the first five months of the Trial Reunification, DHS workers failed to provide *any* face-to-face contact with JB to ensure that his needs were met and his safety intact. As a consequence, DHS abandoned JB to the care of his mother, who less than one year previously had failed to protect JB's siblings from sexual and physical abuse by their father. As an infant, JB could neither call for help nor run from harm. In addition, during the first eight weeks of JB's placement with his mother, JB's whereabouts were unknown to DHS for at least 10 days.

DHS staff failed to take actions to determine whether JB's father had access to JB while JB was placed in his mother's home. And JB's DHS worker failed to complete paperwork necessary to initiate home-based services (CHBS) *for seven of the eight months* JB was placed at home. When home-based services began during the eighth month of the placement, CHBS staff quickly reported to DHS that other "people" were in JB's home.[194] Had DHS completed the paperwork for these services before or at the time

of JB's placement, the presence of others in the mother's home, particularly the children's father for whom there was a no contact order and whose presence in the home constituted a major risk factor for harm to JB, could much more quickly have been detected and addressed, thus protecting JB.

***C. DHS failed to take any action to protect JB as his mother's behaviors deteriorated.*** Throughout the Trial Reunification placement, JB's mother failed to comply with the court-ordered treatment plan in various ways.[195] JB's worker consistently failed to assess the safety risks to JB associated with his mother's non-compliance. As observable indicators of risk for harm to JB increased, his worker failed as required to increase the frequency of contact with JB and his mother,[196] notify the court of safety concerns,[197] make a referral for an investigation,[198] and/or have face-to-face contact with JB's siblings privately to explore their safety and care in their mother's home.[199] Although JB was non-verbal, no attempt was made by the DHS worker to have face-to-face contact with JB's siblings privately at any point during the eight-month placement. Thus their voices were silenced by the inhibiting presence of their mother during the few contacts that DHS workers made. Despite the increasing number of observable risk factors in this placement, JB's worker and supervisor failed to take protective action, instead consistently recommending that JB stay placed with his mother.

## II. DHS failed to protect JB from maltreatment due to its overuse of shelter placements and lack of available emergency foster family home placements

***A. DHS twice failed to make any effort to place JB in a family foster home.*** It is difficult to comprehend the physical harm and emotional trauma that one-year-old JB incurred by being subjected to: severe burns, excruciating pain, dehydration, surgery, an unexplained large circular bruise on his thigh and dehydration; the subsequent frightening

confusion and chaos among staff in the shelter following his injuries; and constant change in his daily caregivers, all of whom were strangers, as he was moved back and forth from the shelter to the hospital. At a time when JB greatly needed the comfort, familiarity, and security of a family placement, DHS instead subjected him to two shelter placements and thus to caregiver discontinuity as well.

When JB was removed from his mother's home following the failed Trial Reunification, his DHS worker failed to make *any* effort to place JB and his siblings in a regular or emergency family foster care home. Then, following his initial hospitalization for severe burns received in the PEM shelter, JB's DHS worker again failed to make *any* effort to locate a family placement with caregivers prepared to meet his medical needs. This occurred despite the explicit DHS policy giving priority to emergency foster home placements for children discharged from hospitals.[200] Instead, JB's DHS worker returned him to the same shelter, a decision that resulted almost immediately in him becoming dehydrated and returning to the hospital.

***B. Overuse of temporary shelter placements.*** The overuse of temporary shelter placements by definition subjects infants and children to placement instability and caregiver discontinuity. Caregiver discontinuity subjects children to repeated separations, affecting their ability to form healthy emotional attachments and to trust adults.

DHS placement of one-year-old JB in a shelter for nine days, rather than for the maximum of 24 hours then permitted, also subjected him to severe neglect, physical injuries, and emotional trauma. This occurred not only at the hands of the inexperienced, poorly trained DHS shelter worker who bathed him,[201] but also of the DHS shelter management.[202] Prior to and during JB's placement at the shelter, managers failed to

address unsafe facility conditions, placing JB and all infants and children who were and had been placed at the shelter at risk of severe burns. The agency's failure to take basic preventive measures in a DHS-operated facility was a serious breach of risk management principles.

## III. DHS subjected JB to discontinuity of workers and supervisors and consistent absence of supervisory monitoring of worker accountability

During the one year, seventeen week stay in custody reviewed for JB, he was subjected to a dysfunctional level of discontinuity of DHS workers and supervisors. According to DHS staffing information provided to plaintiffs' counsel by defendants' counsel,[203] as of 2/13/08, 13 DHS staff members were assigned to JB as either primary or secondary workers, and 13 supervisors were assigned to guide and support JB's workers and hold them accountable in their case decisions and activities. Frequent changes in children's workers results in inadequate documentation and transfer of critical case information; inaccurate time for reviewing records and becoming familiar with children's histories; and time periods, often lengthy, in which *no* services are provided to children, families, or foster caregivers. All of these problems were evident throughout JB's stay in custody.

*Only rarely* was a supervisor's intervention on behalf of JB documented in his file, such as when a supervisor required JB's worker to include additional information regarding JB's safety in a DHS Progress Report. Despite this limited intervention, no supervisor ensured that the documentation in JB's file was complete, correct, and timely – in other words, reliable. Without reliable information, agency staff cannot make informed practice decisions regarding a child's safety, well-being, and permanency.

JB's file also fails to contain evidence of regular, ongoing supervision of JB's DHS workers. The lack of JB's workers' accountability is seen in their pervasive failures to make required face-to-face contact to monitor JB's safety and well-being in placement; to be attentive to risks of harm to JB in his placements; and to follow through on critical assessments, service referrals, and case documentation for JB as required. This very troublesome lack of accountability of both JB's workers and supervisors further compounded the dangerous environment within which JB was placed while in DHS custody.

**Conclusion**

It is important to remember that the focus of this review is a newborn and his protection in DHS custody during his first year and seventeen weeks of life. During this period, JB was subjected to experiences that must have been terrifying to him and beyond his developmental ability to understand or cope with. He was subjected to severe neglect, physical injury, hospitalization, and multiple caregiver changes while in DHS custody. It is also important to remember that what can be found in JB's case record are only the *reported* and *documented* harms; in many ways the greatest harm to which DHS subjected JB was his workers' failure to make regular face-to-face contact with him in his placements and to directly observe and monitor what he was experiencing. Because of DHS staff failures to monitor JB's placements as required during the first year and seventeen weeks of his life, the full nature and extent of his maltreatment will never be known.

# AP CASE SUMMARY

**DOB: [redacted]**
**Entered DHS custody: [redacted]/06, age 2 years, 6 months**
**Time in DHS custody as of 2/13/08: 568 days (1 year, 6 months, 23 days)**
**Time in shelter/emergency placements: 161 days**
**Number of placements as of 2/13/08: 7, a move on average every 81 days**
**Total DHS workers assigned: 27**
**Total DHS supervisors assigned: 23**

"*[[redacted] – AP's [redacted]] has been doing this to [three-year-old AP] every night according to what [AP] told me . . . I have literally seen a change in [AP's] whole personality since we have had them in separate beds . . .[AP] was being hurt by [[redacted]] every night, and that has to stop.*"[204]

~ [redacted] in AP's fifth placement

**Placement in DHS custody**

AP was born in [redacted], Oklahoma on [redacted].[205] On 7/22/06 DHS received a referral from the [redacted].[206] Two-year-old AP had been found abandoned; her mother and [redacted] were "found stoned and intoxicated and could not care for the child."[207] They left AP with friends in the trailer park, and the friends then left AP on the porch of someone they didn't know in the same trailer park and drove away.[208] A friend of the family reported AP was "dirty, her clothes were on backwards, and she had no underpants on;"[209] a neighbor cleaned and fed AP "who was very guarded and held her private area."[210] AP did not appear sufficiently verbal to interview.[211] The allegations were Neglect – Substance Abuse/Drug/Other-Caretaker, Substance Abuse/Alcohol-Caretaker, and Threat of Harm by AP's mother and [redacted]; the findings were Confirm-Court Intervention Requested.[212]

AP's mother did not take responsibility for abandoning AP.[213] She was arrested for child endangerment;[214] AP's [redacted] was taken by ambulance to a hospital rehabilitation unit.[215] AP was removed from the home[216] and placed in DHS custody.[217] She was adjudicated Deprived on 10/5/06.[218]

A physical exam was completed on AP two days after the incident.[219] No indication of physical or sexual abuse was found; however, the doctor stated that AP was "very fearful and may have been traumatized."[220] AP's father reported that he and AP's mother had separated a week prior, and she was staying with her mother.[221] He stated AP's mother's behavior had "gone downhill' since AP's [redacted] was released from jail, where she had been incarcerated for substance abuse.[222] AP's father

signed a "safety agreement" that he would "not allow the mother to return to the home or visit the children until she has completed a plan to determine her ability to provide for the children's safety and welfare."[223]

**Prior referrals**

When AP was eight days old, DHS received a referral from [redacted] that both she and her mother tested positive for marijuana at AP's birth.[224] Neglect – Threat of Harm, Substance Abuse/Drug/Other Caretaker, and Failure to Protect were alleged; the findings were "Services Recommended."[225] Preventive services were offered.[226]

DHS received a second referral on 6/28/05 alleging Neglect – Substance Abuse/Drug/Other-Caretaker, Lack of Supervision, and Threat of Harm by AP's mother to four children – [redacted] (twelve years old), [redacted] (nine years old), [redacted] (three years old), and AP (almost eighteen months old) – and Failure to Protect all four children by AP's father.[227] The anonymous reporter stated that AP's mother was at AP's [redacted]'s home "passed out in the car;" the children were unsupervised.[228] Although interview dates and times of all children are recorded, no further information was documented; the findings information is blank.[229] DHS failed to complete the investigation.

**[redacted]06 – 7/24/06: AP's first placement**

AP was first placed for two days in a regular foster home in [redacted] County.[230] On 3/7/06 this foster home reported a grievance about their DHS worker. In response to this grievance, the DHS county director responded that "disrespectful statements will stop; open, direct, honest and respectful communication will occur."[231] No information is available regarding AP's experience in this placement.

**7/24/06 – 7/25/06: AP's second placement**

AP was subsequently placed for one day at another regular foster home in [redacted] County.[232] An assessment of the home completed on 4/11/07 states there had been no rule violations, referrals, or Written Plans of Compliance during this period.[233] The assessment states that the foster parents feel that "lack of respect [by DHS] and not getting their needs met is still a problem that many foster homes have."[234] No information is available regarding AP's experience in this placement.

**7/25/06 – 3/12/07: AP's third placement – a dangerous eight-month Trial Reunification with her father**

AP was placed in a Trial Reunification on 7/25/06; her [redacted] was placed in DHS custody the same day and remained in her father's home.[235] A Family Assessment 10/3/06 states that AP's mother had a history of depression and "possible bipolar," and was scheduled to enter an inpatient facility to stabilize her conditions after leaving jail.[236] The 10/3/06 Initial DHS Individualized Service Plan (ISP) recommends that AP and [redacted]

remain in DHS custody, placed with their father.[237] The plan states that AP's mother will obtain a substance abuse assessment, submit to random urinalyses (UAs), obtain a psychological evaluation, complete parenting classes, and only leave the children with responsible individuals whom she knows well.[238] When the ISP was completed, AP's mother was in the county jail due to charges related to the 7/22/06 investigation.[239] No treatment plan was provided for AP's father in the initial DHS ISP.

***Four CA/N Referrals and other reports of concern received by DHS during the Trial Reunification.*** On 8/16/06 DHS received a referral alleging sexual abuse.[240] The reporter stated that AP and [redacted] visited their [redacted]'s house, and when they were bathed [redacted]'s "vaginal area was very red and swollen and sore." [redacted] stated that she sleeps with no clothes on with her dad and AP sleeps downstairs.[241] The referral disposition was "Screen Out" "Link to an Existing Case," with screen out reason "Not Child Abuse/Neglect" "No allegations of sexual abuse."[242] The worker noted there was an "Open case" with these children.[243]

***Disposition of second referral: "Screen Out."*** DHS received a second referral on 11/22/06 from a [redacted] who reported that a client reported maltreatment of the P children; the client stated she had reported this to DHS.[244] The client told the [redacted] that AP's father kicked AP in the stomach, the mother has substance abuse issues, and the "11-year old [AP's stepsister] takes care of the children."[245] The disposition was "Screen Out" "Link to an Existing Case," with screen out reason "Not Child Abuse/Neglect" and "not enough information."[246]

***Judge ordered unannounced visits to father's home.*** In a dispositional hearing on 11/29/06, AP's judge ordered that: DHS conduct unannounced visits to AP's father's house; only DHS-approved caregivers provide care for AP; and AP's mother only sees her children in supervised visits.[247] Handwritten notes on the worker's ISP indicate AP's mother was aware of the order.[248] However, none of the subsequent visits by the DHS worker were unannounced other than the visit on 3/12/07 to respond to a CA/N referral.[249]

***Third referral, "Services Not Needed."***[250] DHS received a third referral on 12/6/06 from a [redacted] reporting AP had a broken femur and alleging possible abuse/neglect. AP's [redacted] had been at the home in another room and reported AP was running and slipped.[251] AP was admitted to the hospital. All family members were interviewed; based on x-rays, it was determined that the fracture could have happened as reported by AP and her [redacted].[252] X-rays showed no other fractures or concerns.[253]

***AP's parents violate no contact order.*** On 2/5/07 AP's mother disclosed that she had visited AP and [redacted] without DHS knowledge or supervision; AP's DHS worker planned to speak with AP's father and inform him she would put this information in the court report.[254] AP's worker neither made a referral nor took any other protective actions.

***DHS did not comply with court order or take other protective actions.*** Subsequent to AP's mother's disclosure in early February that she was having contact with AP and [redacted], AP's DHS worker took no protective actions, such as make unannounced visits as ordered by the court,[255] increase contact frequency,[256] or meet with AP and [redacted] each face-to-face privately.[257] Despite the court order that unannounced visits were to be made, the unannounced visit made in response to a CA/N report to the worker on 3/12/07 is the *only* unannounced visit made by AP's DHS worker during the eight-month Trial Reunification.[258] On 2/5/07[259] and again on 3/13/07,[260] the day following the girls' removal from their father's home, the primary worker asked the secondary worker if he had been making unannounced visits to the home. The secondary worker reported he had visited sometimes unannounced, but no one was home, so he called and went out again the next day.[261]

***Fourth referral was "Confirm[ed] – Court Intervention Requested."***[262] Slightly more than a month later (3/12/07), DHS received a fourth referral from [redacted] stating it had been reported to her that AP's mother stayed at the father's home frequently despite the court order that the mother's contact with her children be supervised by DHS.[263] The reporter also stated that the girls were unsupervised while the father slept, they always had head lice, and the father took [redacted] out of preschool because he did not want to wake her up every morning.[264] An additional reported concern was that [redacted] "did sexual things" to someone's children "that were more than curiosity."[265]

AP's DHS worker made an unannounced visit and found AP's mother on the couch holding AP with [redacted] sitting beside her; the worker consulted the Assistant District Attorney (ADA) who advised that if the mother was there or staying there, AP and [redacted] should be moved immediately.[266] Both girls disclosed that their mother did sleep there; both were removed by AP's DHS worker and placed in a regular foster home.[267] Their father admitted that he had allowed AP's mother to stay at his home for the weekend; a babysitter also reported that AP's mother had watched the girls two days in the past week.[268] The following day, AP's father stated to a DHS staff member that his wife had power over him, and that she knew how to manipulate him and make him feel guilty.[269] Allegations of Neglect – Lack of Supervision, Inadequate Physical Care, and Threat of Harm were alleged concerning AP's father and Neglect – Failure to Protect by both parents.[270]

During the almost eight months that AP was placed in a Trial Reunification in her father's home, AP's DHS worker made eight face-to-face contacts with AP in her placement.[271] The contact comment for the 9/30/06 visit states "See addendum for detail;" however, no addendum was found.[272] In the 8/25/06 visit, [redacted] mentioned sleeping with her father; the worker explored good-touch bad-touch and [redacted] replied, "Nobody is touching me but my daddy gives me hugs."[273] The worker did not meet with [redacted] privately. After a face-to-face contact on 1/25/07, the worker commented that "[t]he girls [AP and [redacted] are protected and safe living with him."[274]

**3/12/07 – 4/23/07: AP's fourth placement received a physical abuse referral immediately after AP was removed from the home**

Subsequent to DHS removal of AP from her Trial Reunification placement with her father, AP and [redacted] were placed in a regular foster home in [redacted] County for 72 days.[275] DHS had received a referral on this foster home six months previously (9/23/06) alleging Neglect – Failure to Obtain Medical Attention; the disposition was "Screen Out" "Link to an Existing Case" and "refer to resource unit for follow up as policy violation," "Services Not Needed."[276] The resource unit followed up on 10/13/06 and the foster parent signed a "Safety Plan."[277]

***Physical abuse referral.*** Immediately after AP and [redacted] were moved from this placement to their fifth placement, DHS received a referral on this fourth placement, alleging the foster mother had "swatted" a child who still remained in the home.[278] When interviewed, the child stated that "she never had any bruises from being spanked . . . when she and the other children in the home get spanked . . . sometimes [foster mother] will use a belt or a board but no one has injuries."[279] The foster mother acknowledged she "was very upset and frustrated and lost her temper a little."[280] The disposition of the allegation of "Abuse" "Hitting" was "Screen Out" "Link to an Existing Case" "Not Child Abuse/Neglect."[281] More than six weeks later (6/8/07), DHS staff members met with this foster mother to review allegations and concerns regarding spanking with hand and board, washing children's mouths out with soap, inadequate clothing, head lice, and screaming at children.[282] She acknowledged all had occurred except for head lice and inadequate clothing and agreed to complete a Written Plan of Compliance.[283] DHS policy requires that Plans of Compliance be completed within two weeks after a referral is "Screened Out."[284] DHS did not explore the degree to which AP had been subjected to these violations of placement policy while in the home.

The DHS Progress Report prepared for the 3/16/07 court review included treatment plan requirements for AP's father, including completing a parenting program.[285]

**4/23/07 – 6/26/07: AP was sexually abused in her fifth placement**

A kinship placement was approved for AP and [redacted];[286] they were placed with their [redacted] in [redacted] County[287] where they remained for just over two months. While in this placement, it was learned that the girls frequently slept at their [redacted]' home.[288]

***AP sexually violated by*** [redacted] ***every night.*** This placement disrupted due to [redacted]'s sexual behaviors with AP and the [redacted]'s children, reported on 6/11/07: "[[redacted]] had placed her fingers into [AP's] vagina, and had also touched [[redacted] [redacted]'s] children inappropriately. It was reported that [[redacted]] placed a popsicle stick into [[redacted] [redacted]'s [redacted]'s] vagina."[289] When the kinship foster mother first asked [redacted] if anyone had ever done this to her, i.e., placed fingers or objects inside her, [redacted] said, "I not know his

name."[290] However, in a subsequent conversation, [redacted] denied that anyone had ever touched her in a sexual nature.[291] Subsequent interviews and conversations clarified that [redacted] was sexually acting out with AP every night and had previously inappropriately touched additional children in the P extended family.[292] AP's [redacted] reported that when she told [redacted] she "could not do that" AP stated, "no, no more."[293] Neglect – Sexual Behavior – Lack of Supervision by the kinship foster parent was alleged; AP and [redacted] were listed as victims.[294] The finding was "Services Recommended."[295] Recommendations included counseling for AP and [redacted]; physical exams for both as soon as possible; that AP and [redacted] sleep in separate beds and rooms and receive appropriate supervision at all times; and that a DHS Resource Specialist provide any needed follow-up.[296]

During the investigation, three-year-old AP refused to talk with the investigating worker.[297] The [redacted] reported her two biological children had begun to "explore with each other later" and she had wondered why; she stated her son had complained "that his peepee hurt," and her daughter said, "her tootie hurt."[298] Her son also had begun wetting his pants. The [redacted] took her children for a medical exam; her daughter was diagnosed with a yeast infection and redness; her son had no visible signs of trauma or medical conditions.[299] She failed to take AP and [redacted] for an exam.

***DHS had serious difficulties in finding another placement for AP.*** The kinship foster parents requested that AP and [redacted] be moved: "I have to protect my own children and [[redacted]] has been hurting them and [AP] I know that some of it is normal and just 'kid play,' but [[redacted]] has been doing this to [AP] every night according to what [AP] told me."[300] The kinship foster mother offered to continue to provide a placement for AP, stating that "I have literally seen a change in her whole personality since we have had them in separate beds . . . [AP] was being hurt by [[redacted]] every night, and that has to stop. In addition, [[redacted]] needs some professional help."[301] After the [redacted] and [redacted] requested that AP and her [redacted] be moved, the [redacted] also refused placement.[302] A DHS worker wrote "[redacted] County does not have a placement for these children. Does [redacted] County have any placements for the girls?"[303]

During this placement, AP's kinship foster parent stated that AP acted out when returned to her day care after visiting with both of her parents: "She tries to run out, bites, and cries a lot. The daycare said yesterday that if she did not stop (she tried to bite owner), that they would have to quit keeping her . . . the other day [the kinship foster mother] had to lean over and hold AP while she cried and thrashed about in her bed until she went to sleep."[304] AP's DHS worker made face-to-face contact with AP in her placement twice in over two months.[305]

**6/26/07 – 9/5/07: DHS received a referral alleging Neglect – Sexual Behavior – Lack of Supervision in AP's sixth placement**

DHS subsequently placed AP and [redacted] together in their sixth placement since entering DHS custody less than one year previously. According to the DHS

Progress Report prepared for the 9/25/07 court review, this [redacted] County foster home disrupted due to [redacted]'s aggressive and threatening behaviors toward the foster mother.[306] The DHS worker reported offering additional services to the foster parents to maintain the placement, but the parents decided the children should be moved.[307] The worker reports that [redacted] was "gate kept" for Therapeutic Foster Care (TFC), but a placement had not yet been identified.[308]

***DHS received referral alleging Neglect – Sexual Behavior – Lack of Supervision.*** Important information missing from the DHS Progress Report for the 9/25/07 court review is that on 7/13/07 DHS received a referral alleging Neglect – Sexual Behavior – Lack of Supervision of AP by the [redacted].[309] The Incident Description states the [redacted] reported that:

> [AP] came to her and said "[[redacted]] touching me" and something about her fingers in her. Rp [reporter] states that when [[redacted]] was asked if she touched [redacted] she said no . . . [[redacted]] said she was touching herself. Rp asked [AP] if she touched down there and she said no. Rp states that she named off mommy, daddy etc. and then she said she didn't remember the name of who did it. Rp states that [AP's DHS worker] told her not to allow the children to sleep together.[310]

The disposition of the referral was "Screen Out" "Link to a New Closed Case."[311] The Worker's Recommendation states, "[s]afety plan in place for foster mother not to leave children alone at any time. Permanency worker to also talk with foster mother and ensure youngest child is being moved out of her [foster parent's] bedroom. Will be referred to foster care and permanency worker for follow up."[312]

***DHS staff member did not complete Written Plan of Compliance as directed.*** A 7/18/07 email from the DHS County Director clarified that, "[DHS staff name]: need to do a written plan of compliance. The policy says within 2 weeks after it is screened out as a referral."[313] According to a document dated 10/23/07 in the foster parents' file, *no* written plan of compliance was completed.[314] The document states:

> FOSTER HOME CLOSURE ASSESSMENT. The home of [foster parents' names] has been a kinship foster home in [redacted] County from November 2005 to September 2007. The [foster parents] have cared for seven children. *There was no written plan of compliance.* The [foster parents] have decided to become therapeutic foster parents.[315] (emphasis added)

Another document in the foster parents' file states that the home was closed because "[foster parents] have made the decision to become therapeutic foster parents."[316]

***AP and [redacted] report fear of spanking by [redacted].*** During this placement (7/25/07), a DHS staff member told AP and [redacted] that "their [redacted] wanted to take them camping and I got a strange response. [redacted] looked kind of sick.(?)

[sic] I ask [sic] her didn't she want to go and she said no because they will spank us. I told them that I would tell you and you would tell them that they could not spank them. I ask [sic] them if that was the only reason they didn't want to go and they said yes."[317] No follow-up to this email concerning [redacted] with whom AP routinely stayed while in a prior placement was documented.

Three DHS worker face-to-face contacts were made with AP in this placement over 72 days; the third visit was made in response to a call from the foster mother that HP was out of control and requesting [redacted]'s removal.[318] The foster parents reported that the parents were not coming on a regular basis for visitations.[319]

**9/5/07 – 2/13/08: AP's seventh placement**

DHS placed AP in a respite home in [redacted] County as an emergency foster care placement while they sought a regular foster home.[320] The home remained an emergency placement, and was still uncertified as of 2/13/08.[321] AP's primary worker states, ". . . so far we cannot find a home for [AP]. ( That surprises me as she is so young, I thought teenagers were hard to place..she is only 3 [sic throughout]!!!"[322]

***Judge ordered AP placed separately from*** [redacted]. At the court hearing on 9/25/07 AP's judge ordered that the two girls be separated.[323] AP's primary DHS worker wrote: "I will need a regular foster home for [AP] age 3 and a TFC home for [[redacted]] age 5 ASAP. It is important that the new TFC home be knowledgeable of the fact that [[redacted]] has had allegations of her sexually acting out against [redacted] and other children."[324] [redacted] was placed in a TFC home on 10/5/07.[325]

***AP's father alleged his*** [redacted] ***molested*** [redacted]. While AP was in this seventh placement, her father contacted DHS on 10/8/07 "concerned about his children. He said . . . his [redacted] told him that [redacted] had molested her when she was little. [AP's father] said he asked [redacted] if he molested [redacted]."[326] [redacted] responded by calling AP's mother names.[327] "[AP's father] said [redacted] is an alcoholic/drunk . . . He's ([redacted]) the one that is the molester . . . [AP's father] said that he and his wife are fearful that the [redacted] may have touched [[redacted].]"[328] When AP's father was asked why he didn't tell DHS this prior to allowing [redacted] to go to the [redacted]'s home, he said he "only learned of this recently."[329]

***Foster parents wrote AP's judge requesting AP be placed with them.*** The foster parents in AP's seventh placement offered to keep AP and [redacted] as a "non-relative, non-paid placement." They stated they were pursuing certification and had provided respite for DHS parents and for another agency.[330] The parents stated "we feel another move would be therapeutically detrimental to [AP] especially after the separation of her [redacted][;]" they also offered to take [redacted] into their home when she was able to step down from TFC.[331] As of 2/13/08, AP was still placed in this home; certification had not yet been approved.[332]

As of 2/13/08, DHS had made at least three face-to-face contacts with AP in her seventh placement in over four months.[333] She had weekly visits with her parents as well as weekly visits with her sister.[334]

***Assistant District Attorney (ADA) raised concerns about AP's DHS worker's decisions and actions.*** On 10/11/07 an email was sent to AP's primary worker (who was then transferred to another county), and copied to others, including the [redacted] County DHS Director. The same email was re-sent 11/7/07.[335] The email addressed "some concerns and issues that have arisen recently"[336] about the DHS worker's service to AP:

> This case was filed on July 28, 2006 and the dispo was held on 11-29-06 as to the mother. As part of her ISP, she was to "obtain a psychological evaluation, and will follow all recommendations." Per your report for the hearing on 9-25-07, wherein you attached the psych evaluation for the mother from Dr. [name] dated 9-11-07, your recommendation was in part "DHS requests that [AP's parents] be allowed to have visitation with their children supervised by the DHS case manager and, when deemed appropriate by the Department, that visitation be allowed to be supervised by the current placement provider." It said nothing regarding the safety of the children, the needed treatment of the mother in light of the actual results of the psych evaluation and in fact you noted as to current situations "A psychological evaluation was completed by Dr. [name]. [AP's mother] was given a diagnosis of BPD Type I, Depressed . . . The psychological evaluation recommends intensive counseling, which the mother has not initiated," which minimized the actual results of the actual evaluation and mis-stated the results. . . . Further "This person is in crisis and needs immediate psychiatric attention, possible hospitalization. . . . She is currently calling for help and will need intervention." Finally, "She needs extensive therapy, extended stay . . . Prognosis is Poor at this time." As you will recall we had a lengthy hearing and all were concerned that you did not assist this mother in getting the immediate assistance she was recommended to either of the facilities Dr. [name] noted. In fact, the testimony from you was that you advised the mother to go to . . . another location NOT listed in the psych eval, in effect advising the mother to NOT follow the recommendations of her ISP[337] (emphasis in original).

In the 9/25/07 dispositional review, the judge ruled that reasonable efforts had been made to finalize the permanency plan, "but the worker has not made good decisions."[338]

The DHS worker whose decisions and actions are described in this email was assigned as AP's primary worker on 8/16/07; another primary worker was assigned on 10/16/07, five days after the ADA's email was originally sent.[339] AP's record contains no information concerning the re-assignment of AP's case on 10/16/07.

**AP's permanency status as of 2/13/08**

On 1/22/08, AP's primary DHS worker wrote AP's secondary worker that AP's parents were not reunifying and that termination had been filed with the court.[340] The email continues, "I think that the conditions have not changed. [AP's father] is very verbally abusive to his wife, and I cannot see these kids going back to this. The oldest child, [redacted] is in therapeutic foster care, and AP is not . . . I have not had this case very long, I inherited it from another case worker."[341]

DHS recommended that AP remain in her seventh placement, and that [redacted] be moved to that placement "when the dual certification has been completed."[342] On 2/12/08, AP's primary DHS worker described a court order "that [redacted] will be slowly reunited with [redacted]" in AP's seventh placement.[343] "The slow transition for now will be overnight weekends with [this placement] until the [foster parents] are done and certified with Human Skills and Resources." The worker asked another DHS staff member to work out the transition beginning the coming weekend.[344]

The 2/12/08 DHS Progress Report identifies Adoption as the Permanency plan for AP and states "Efforts to Reunite Failed."[345] The report also states that the "conditions that brought the children into custody have not changed."[346] No prospective adoptive resource had been identified as of 2/13/08.

**Continuity of DHS workers/supervisors assigned to AP**

According to staffing tables provided to plaintiffs' counsel by DHS defendants' counsel, as of 2/13/08, AP had been assigned 20 primary workers with 16 supervisors and 7 secondary workers with 7 supervisors.[347] Therefore, AP was served by a total of 27 workers and 23 supervisors during her almost 19 months in DHS custody. Other unnamed DHS staff members assisted with family visits and other services to AP. Eight of the 16 primary supervisors and 11 of the 20 primary workers assigned to AP left DHS by the end of 2008.

A list of assigned workers was also found in AP's case files in a Case Summary section.[348] When this list and the staffing tables described above were compared, numerous inconsistencies were identified that could not be explained.[349]

# AP CASEWORK ANALYSIS

## DHS Failures to Protect AP from Harm While in DHS Custody

DHS policy repeatedly stresses that "The safety needs of children three years and younger are given the greatest consideration as these children are the most at risk for life-threatening consequences of abuse or neglect."[350]

AP first came to the attention of DHS at the age of eight days due to a positive test for marijuana at her birth reported by a [redacted]. Although services were recommended, the file gives no indication that any effort was made by DHS at that time to engage the family in services to protect AP from further harm. DHS received a second referral on 6/28/05 alleging that one-year-old AP was with her mother who was "passed out in the car" and was unsupervised.[351] DHS failed to even complete this investigation and no protective action was taken. Subsequently, DHS received a third referral on 7/22/06: two-year old AP was abandoned first by her stoned and intoxicated mother and [redacted], who left her with friends, and then by the friends, who left AP on the porch of strangers. When she was found, AP was dirty, her clothes were on backwards, and she had no underpants on; she was very guarded and held her private area. Her mother and [redacted] not only failed to protect her, they subjected her to mental injury in leaving her, only to be abandoned again with strangers.[352] DHS only then placed AP in protective custody.

**I. DHS failed to protect AP from serious repeated maltreatment due to its failure to monitor and evaluate safety and risk of harm to AP, both prior to and during her placements**

***A. DHS failures to protect AP from maltreatment were continual and preventable.*** It was as if DHS staff members were unable to connect the dots. From

7/25/06, at which time the County Sheriff's Office found AP with her clothes on backwards and no underpants on, to the 8/16/06 referral of sexual abuse that documented that [redacted]'s "vaginal area was very red and swollen and sore,"[353] to the information shared on 8/25/06 that AP slept with her father, to the 3/12/07 allegation that [redacted] "did sexual things" to someone's children "that were more than curiosity,"[354] to the disclosures almost one year after AP's entry into DHS custody that she and two other children were regularly, even daily, being sexually violated by [redacted] – it was increasingly evident that two-year-old AP and four-year-old [redacted] had been exposed to a sexualized environment and to sexual abuse that was persistently affecting their relationship with each other in ways that were traumatic and harmful to AP. Yet DHS failed to protect AP by placing the two [redacted] separately, and short of that, by ensuring that her foster parents were informed of the risks to AP and were willing and able to supervise the [redacted] to the extent required to protect AP from [redacted]'s sexual acting out. It did not seem to occur to DHS staff that the most certain way in which to protect AP would be not only to have her sleep in a separate bed, but to sleep in a separate placement. The judge eventually ordered that AP and [redacted] be placed separately.

Similarly, prior to placing AP in a Trial Reunification with her father, DHS failed to assess her father's mental health, stability, and willingness and ability to protect his children from their mother's endangerment. DHS failed to assess AP's father's readiness to safely care for AP, [redacted], and her stepsisters prior to placing AP back in her father's home. DHS also failed to assess whether home-based services were needed to support the father in his care of the four children; and DHS workers failed, as required by DHS policy, to monitor AP's well-being and safety while placed in Trial Reunification.

The file contains serious concerns about AP's DHS worker, including the ADA's 10/11/07 statement that the worker's recommendation "said nothing regarding the safety of the children,"[355] and AP's judge's ruling in the 9/25/07 dispositional review that "[AP's] worker has not made good decisions."[356]

***B. DHS failed to meet its own minimum requirements for monitoring whether AP's needs were met and her safety intact in her placements.*** DHS policy provides a continuum of interventions for DHS workers' use in monitoring whether children's needs are met and their safety intact in their placements. Policy not only requires face-to-face contact with children in their placements within two weeks of a child's placement and at monthly intervals throughout the placement, it also requires that workers be "alert to indicators that a child is at risk of abuse or neglect."[357] As observable indicators of risk for harm to AP increased, workers were required to increase the frequency of contact with AP and her placement caregivers,[358] including her father; have face-to-face contact with AP, [redacted], and other children in the home privately to explore AP's safety and treatment in the placement;[359] and notify the court of safety concerns[360] and/or make a referral for an investigation.[361] Instead, AP's DHS workers not only failed to take initiative to increase protective monitoring of AP in her placements as indicated, but also failed to adhere to AP's judge's specific order to make unannounced visits to AP's father's home to determine whether AP's needs were being met, her safety intact, and her parents in compliance with the order for no contact between AP and her mother.

***C. DHS failed to ensure that an "evaluation and response"[362] to referrals occurred as required.*** While AP was in DHS custody, DHS received seven referrals in four different placements of maltreatment by caregivers of AP and/or other children in

the home. For four of these, the disposition was "Screen Out." DHS practices concerning the four screened out referrals fully undermine the agency's directive to give "the greatest consideration"[363] to the safety needs of children three years and younger. DHS staff are directed that "Great care is taken in making screening decisions. The Child Welfare (CW) supervisor considers the potential risk factors described by the reporter and the age and vulnerability of the child;"[364] the policy directive also stresses that "Even when the report does not have clear-cut allegations of abuse or neglect these factors are considered in making screening decisions."[365] The directive further emphasizes that "Reports regarding children three years of age and younger are screened with extreme caution due to the vulnerability of this age group to serious and life-threatening consequences resulting from abuse or neglect."[366]

When DHS screens out a referral of child abuse/neglect, it appears from AP's file that DHS does not conduct private interviews with the victim(s) and alleged perpetrator(s); in addition, collateral interviews are not conducted. When an allegation is made by a child three years or younger, the sometimes extensive information collected from multiple in-home and collateral interviews can be essential in identifying what harm actually is occurring and by whom. Without these interviews, recommendations made either for Safety Plans or Written Plans of Compliance may be only partially or not at all relevant to the actual issues underlying the protection of the child. In AP's case, a more serious concern is that DHS workers failed to develop safety plans and Written Plans of Compliance in a timely way and/or to monitor their implementation; and DHS even failed to develop a written plan of compliance in direct violation of a county director's directive.

***D. DHS failed to fully assess AP's placement and treatment needs and the level of care required to meet her needs, thus placing her at risk of harm.*** AP's history of victimization and emotional trauma, such as the trauma associated with abandonment and exposure to substance abusing caregivers, warranted an assessment of her needs for counseling/play therapy and her need to be placed separately from [redacted]. DHS failed to consider these needs until AP had been placed for more than one year. Even though [redacted], [redacted], received a full psychological evaluation to identify her needs,[367] AP was only provided counseling; *her file contains no psychological evaluation.* It appears that an interest in understanding [redacted]'s placement and treatment needs as a perpetrator overshadowed AP's placement and treatment needs as a very young and vulnerable victim.

**II. DHS failed to protect AP from harm caused by placement instability**

The descriptions of DHS workers' consistent and serious difficulties in locating placements for AP underscore the agency's lack of placements. As discussed previously, DHS workers repeatedly failed to assess whether AP's needs were best served by placing her with [redacted]; their placement together resulted not only in ongoing serious harm to AP, but it also negatively affected the stability of several of AP's placements. It is sobering, however, that DHS staff expressed little if any concern about the predictable harmful impact of frequent placement changes on AP's emotional development. The agency may not have provided sufficient training to staff about the destructive impact of multiple placement changes and discontinuity of caregivers on children, particularly on children three years and under.

**III. DHS subjected AP to Discontinuity of DHS workers and supervisors and consistent absence of supervisory monitoring of worker accountability**

During the almost nineteen months in custody reviewed for AP, she was subjected to an extremely high level of discontinuity of DHS workers and supervisors. According to DHS staffing information provided by defendant's counsel to plaintiffs' counsel[368] as of 2/13/08, 27 DHS staff members were assigned to AP as either primary or secondary workers, and 23 supervisors were assigned to provide direction on workers' case decisions and activities and to hold them accountable to comply with agency policy and practice standards. Having such an extremely large number of DHS staff involved in serving one child for a period of less than nineteen months resulted in numerous difficulties for DHS workers who frequently noted the "newness" of AP's case to them. Several clearly had had insufficient time to become familiar with the case, and others apparently were not informed about relevant agency policies and procedures and the importance of complying with court orders regarding monitoring children's safety in their placements.

AP's file also fails to contain evidence of regular on-going supervision of DHS workers. The lack of AP's workers' accountability is seen in their extensive failures to make informed decisions about the nature and frequency of face-to-face contact necessary to monitor children's safety and well-being in placement as well as about when it would be important to meet with AP and [redacted] privately about screened out allegations of maltreatment in care. Lack of accountability is also seen in DHS workers' failures to follow-through on recommendations in screened out referrals and in poor DHS worker practice, such as that described by the ADA and the judge assigned to AP's case. Another observed area of lack of accountability is the provision to the court of erroneous,

incomplete, and misleading information, such as the omission of a child abuse/neglect referral during the time period addressed in one of AP's Progress Reports. The serious persistent lack of accountability of both DHS workers and supervisors with regard to assessing AP's placement and treatment needs, making efforts to enhance placement stability, and following through on investigators' recommendations placed young AP at continual risk to multiple harms while in custody as well as directly subjected her to preventable harms.

**Conclusion**

It is difficult to imagine being AP. From before her birth, her mother's neglect of her needs was a negative factor in the quality of her life. The two referrals of maltreatment made prior to AP's entry into custody give us a glimpse of the impact that drug use and lack of supervision and protection must have had on her security and sense of well-being from very early on. However, the description of AP doubly abandoned by her family and her family's friends, dirty, with her clothes on backwards and no underpants provokes a strong protective response. Unfortunately, DHS repeatedly failed to provide a strong protective response. Instead, the agency's dangerous inadequacy to provide protection, even to children three years and younger, mirrors AP's parents' inability to meet her needs. AP's losses are great – loss of family, loss of security, loss of hope for permanent caregivers that she loves and trusts, and, loss of ability to sleep without worrying about experiencing harm.

## JA CASE SUMMARY

**DOB: [redacted]**
**Entered DHS custody: [redacted]06, age 4 years, 9 months**
**Time in DHS custody as of 2/13/08: 427 days (1 year, 2 months)**
**Time in shelter/emergency placements: 115 days**
**Number of placements as of 2/13/08: 10, a move on average every 43 days**
**Total DHS workers assigned: 13**
**Total DHS supervisors assigned: 12**

*"This 5 year old has been in 2 shelters and is on his way to the 3rd. We really need to find him a placement."*[369]

~ DHS Foster Care Group Supervisor

**Placement in DHS custody**

JA was born in [redacted], Oklahoma on [redacted].[370] At his birth, JA and his mother tested positive for marijuana.[371] JA was his mother's third child testing positive for drugs at birth.[372] DHS received a referral while JA and his mother were in the hospital,[373] but before DHS took physical custody of JA, he and his mother were discharged.[374] The parents gave false contact information to the hospital and to DHS; neither JA nor his parents could be located.[375] A Protective Services Alert was issued for Oklahoma later that month.[376]

When JA was four years old, JA's mother prematurely gave birth to a fourth child in Texas (12/11/06); the child died 12 hours later.[377] JA's mother tested positive for marijuana at the time of the birth.[378] When Texas Child Protective Services (CPS) staff searched the family's history, they found the Oklahoma 2002 Protective Services Alert and contacted DHS.[379] Texas CPS stated, "when the hospital staff informed [JA's mother] that CPS was going to be notified [the mother] made the stated [sic] that she would have [JA] hidden away. [Texas CPS] . . . is concerned about [JA's] welfare in the care of his parents."[380] JA was reported to be in Oklahoma with a family member.[381] A new pick-up order was issued[382] and, on 12/14/06, JA was found at his [redacted]'s home in Oklahoma County and taken into emergency custody.[383] In the investigation, JA's parents were identified as non-protecting; lacking parenting skills, including supervision; having criminal, violent, or bizarre behavior; and having diagnosed mental illness (both reported being bipolar and depressed).[384] The investigation finding was Confirm-Court Intervention Requested.[385]

***Legal status of JA's parents and other siblings.*** The file contains contradictory information about JA's parents' legal relationship with his older siblings. A DHS Report

to District Attorney (12/19/06) states JA's parents' parental rights to two children were terminated in 2000 due to failure to correct their substance abuse.[386] A DHS Individualized Service Plan (ISP) states that both JA's mother and father relinquished their rights to other children[387] after DHS filed a termination of parental rights petition (TPR).

**[redacted]06 – 1/19/07: JA first placed in a shelter and then in an emergency foster care home**

***Length of JA's first placement violated DHS policy.*** Four-year-old JA was placed at the Pauline E. Mayer (PEM) Shelter in Oklahoma County on [redacted]06.[388] DHS policy at the time required shelter stays for children under five be limited to 24 hours.[389] DHS placed JA in the shelter for seven days.[390] He had an upper respiratory infection and outdated medication, and reportedly had asthma.[391] JA's file documents new prescriptions[392]and a shelter health screen states JA would be monitored for asthma.[393] Staff entries regarding JA's behavior were consistently positive, *e.g.*, "He is a well behaved little boy."[394] Staff also noted JA's repeated crying and wanting to go home.[395] While at the shelter, JA had one visit from a DHS worker[396] and one visit with his parents.[397]

***Second placement in an emergency foster care home.*** On 12/21/06, JA was moved to an Emergency Foster Care (EFC) home[398] in [redacted] County where he was placed until 1/19/07.[399] Stays in EFC are limited by policy to 30 days.[400] The most recent re-assessment of the EFC home indicated no compliance concerns.[401] EFC agency notes state JA adjusted to the placement and appeared "shy but [is] talkative."[402] While in EFC, JA did not have a visit with either brother; he had three visits with his parents.[403] He cried after his first two visits with his parents while in this placement (12/23/06, 12/26/06) and urinated in his sleep after the first; he "vomited on the way home and at the dinner table" after his third visit (1/5/07).[404] Notes state JA "throws a fit if he is not able to get what he wants."[405] The EFC discharge states, "JA is a very well behaved child."[406]

***DHS did not make required contacts to monitor JA's placement.*** During the month JA was placed in EFC, the DHS worker did not make face-to-face contact with JA or the placement caregivers. EFC agency notes state the worker was a "no show" on forms dated 1/5/07 and 1/10/07.[407]

**1/19/07 – 6/8/07: JA's third placement was "doomed . . . from the start"[408]**

On 1/19/07, JA was moved to his [redacted]'s [redacted]'s home in [redacted] County,[409] his third placement in thirty-six days. At the request of his kinship foster father, JA was moved from this placement almost five months later (6/8/07).[410] A DHS worker emailed another worker that the placement was "doomed . . . from the start because of the family friction, problems."[411] DHS had information about lack of contact and tension between JA's [redacted] and his [redacted] prior to placing JA and to approving the home;[412] however, this was not explored by DHS prior to the placement. In addition, DHS workers did not take any steps to address the family friction when the foster parents

complained about being harassed by JA's parents.

The results of Background and Records Checks (1/4/07)[413] for the kinship home were not available for more than a month after JA was placed there;[414] for more than nine weeks after he was placed in the home, the placement was not approved for kinship care.[415] During the five-month placement, a DHS worker did not provide face-to-face contacts with JA as required to monitor JA's well-being and safety in the placement; two different workers provided a total of four face-to-face contacts.[416]

***Prior to placing JA in the kinship home, DHS did not address JA's [redacted]'s estrangement from JA's [redacted].*** In the Initial Kinship Placement Agreement and other documents, JA's [redacted] and [redacted] indicated that they had not talked with JA's [redacted] in eight years and did not want him in their home; they would permit JA to visit with [redacted] outside their home.[417] DHS staff did not explore with JA's [redacted] and [redacted] whether these tensions might present a problem for JA's emotional well-being in the home and, if so, whether JA should be placed in the home; if JA was placed in the home, how would the problem be handled? In addition, when applying, JA's [redacted] wrote that she was interested in caring for her [redacted] only temporarily, "until he reunites w/ his parents."[418] DHS did not explore prior to JA's placement or in the family assessment whether the kinship foster parents would be interested and willing to be a permanency option for JA should his parents' rights be terminated.[419] This important placement planning issue was not discussed until after JA was in the home six weeks, and then only in response to a question from the kinship foster mother.[420]

***DHS did not provide JA's medical information for six weeks.*** Because DHS did not provide the kinship caregivers JA's Medicaid number and shot record documents until six weeks after his placement,[421] they were unable to take JA to the dentist and enroll him in pre-kindergarten.[422] Had JA had an asthma attack or other medical emergency, his kinship parents could not have given this required information[423] to medical providers.

***Kinship foster parents complained about JA's parents' harassment.*** In a March face-to-face contact with a new secondary worker, the kinship foster mother described deep frustration about JA's telephone visits with his parents two to three times a week.[424] She said the parents were very demanding of her and her husband, and that she was "pretty much sick of it."[425] The worker stated that if the parents kept harassing her, she should report this to the primary worker and "the phone contact can be stopped."[426] The secondary worker did not communicate this complaint to the primary worker, and DHS staff did not offer any support or assistance to the kinship foster parents to address this serious problem.

In the DHS worker's March contact, the kinship foster mother also indicated she believed that termination of parental rights would be filed for JA; the worker explored the possibility of "this being a long-term placement for JA."[427] JA's kinship foster mother stated she didn't feel this would be best since they already had five children, and she couldn't "see JA's parents ever leaving she [sic] and her husband alone."[428] JA's kinship

foster father confirmed this, stating that the feasibility of their being a long-term placement for JA was "not good."[429]

***Kinship foster parents consistently reported JA was "doing well" in their home.*** In February, the kinship foster parents reported JA was "doing well in the placement."[430] They said he missed his mother and often talked about her.[431] In March, the kinship foster mother commented that after initially being "clingy," "overall JA has adjusted fine to this placement;" [432] in April, she reported JA was "very attached" to her children and had "age typical and appropriate behavior."[433] On 5/7/07, she stated JA "continues to do well in this placement, and in fact, his behavior is good/better than before . . . he does well at home w/her children."[434]

***Placement disrupted.*** Despite these consistently positive reports, at the end of May, JA's kinship foster father requested counseling for JA, saying he was "antagonizing his 5 children,"[435] *e.g.*, he "makes noises" when the children attempt to talk with each other.[436] He also asked that JA be moved. A DHS worker who had had face-to-face contact with the kinship foster mother stated, "the fp's have never given me any indication that JA needs counseling. I don't think that I've even discussed this with them?"[437] A DHS worker wrote that JA's kinship foster father was "just grasping for an excuse" to have JA moved. [438] Several days later, the kinship foster father demanded JA be moved immediately.[439] The kinship parents agreed to keep JA until another foster home could be located; however, "foster care was unable to locate any placements."[440] No efforts to do so were documented in the file. JA was placed in a shelter 6/8/07.[441] The kinship home was closed the same day.[442]

Other than a referral for counseling for JA, made at the kinship foster father's request,[443] DHS made no effort to prevent the placement disruption. No face-to-face contact was scheduled to discuss the kinship parents' concerns. DHS also had not developed a contingency plan for JA's placement due to the serious frustrations with JA's parents identified by the kinship foster mother two months before the disruption occurred.

***DHS did not provide required family visiting.*** According to JA's DHS Individual Services Plan (ISP), during this five-month placement, JA was "having supervised visits with his parents every other week."[444] The file, however, documents only three visits during this placement.[445] A fourth visit was scheduled,[446] but there is no documentation that it occurred. Therefore JA was, on average, visiting his parents every other month, not every other week. During this placement, DHS scheduled no visits between JA and one brother; the kinship foster parents reported JA visited with his brother who lived with the kinship father's mother.[447] The file contains no information about these visits.

**6/8/07 – 8/27/07: Placements four, five, and six – three shelters in three counties**

JA's fourth placement (6/8/07) was his second shelter stay and the first of three consecutive shelter placements in *three* counties: [redacted], [redacted], and [redacted]. JA was placed in these three shelters for at least 82 days.

***JA's fourth placement – 43 days in the* [redacted] *County shelter (6/8/07 – 7/20/07).***[448] A worker reported: "The shelter requested JA be moved . . . after [a] placement was not found [by DHS] within thirty days. DHS continued to try and locate a foster home; however, a home could not be found. DHS also looked into kinship foster homes; however there were no appropriate kinships available."[449]

***DHS did not make timely efforts to locate a foster family for JA.*** Although the worker stated DHS tried to locate a foster home during this shelter placement in [redacted] County, the only documented efforts during this period include submission of a Foster Home Placement Request on 7/5/07,[450] almost *one month* after JA's placement in the shelter, and two worker emails (7/18/07, 7/24/07) sent to the Foster Care Group requesting a placement.[451] The first email was written two days before JA was moved to another shelter in [redacted] County, and the second on the last day of that placement. Denial of a relative home based upon the relative's health status was also reported.[452]

***DHS did not monitor JA's placement as required.*** During JA's 43-day [redacted] County shelter placement, no DHS worker had face-to-face contact with JA. Thus for six weeks, five-year-old JA was abandoned by DHS in his placement. An unidentified DHS staff member then moved JA to another shelter in [redacted] County. JA had two visits with his parents during this period.[453]

***JA's fifth and sixth shelter placements.*** The [redacted] County shelter limited JA's stay to four days because JA "was an 'out of county' child. DHS was still unable to locate a regular or kinship foster home for JA."[454] An email states "This 5 year old has been in 2 shelters and is on his way to the 3rd. We really need to find him a placement."[455]

On 7/24/07, a temporary worker whom JA had never met moved him to the [redacted] County shelter; he remained there for at least thirty-five days.[456] The worker stated JA did fine until he arrived at the new placement. He then began "screaming and crying and he laid in [sic] the floor and stated 'I want to go home.'"[457]

***JA's behavior deteriorated.*** JA's file documents that his behavior in the kinship foster home had been consistently good;[458] staff at the [redacted] County shelter where he had been placed for six weeks in June/July "bragged" to his worker how "good JA's behavior was."[459] And JA's DHS worker had informed the foster care supervisor that JA "doesn't have any unusual behaviors."[460]

When a different DHS worker, another stranger to JA, visited the [redacted] County shelter on 8/3/07, JA refused to speak to her.[461] Shelter staff reported there had been "no major problems;" however, they also reported JA had thrown one temper tantrum the previous week and cussed at a shelter staff member and called her names.[462] On 8/17/07, a worker visited the shelter[463] and noted JA was dressed in "an old shirt that was too big and had holes in it, and an old [noted elsewhere as too small[464]] pair of tennis shoes . . . JA is also in need of a hair cut."[465]

***Five-year-old JA threatened to run away from the shelter.*** Between 8/9/07 and 8/24/07, JA was transported from the youth shelter to a school for morning kindergarten. On 8/24/07, a DHS aide, also a stranger to JA and at least the third different DHS staff member to have face-to-face contact with him in a month, picked up JA at kindergarten to take him back to the shelter placement. She reported:

> On the ride home [JA] said that that [the shelter] was not his home and he was going to run away. He said his mother told him that he could come home in 10 days. He did not like the shelter and he was going to get out soon. I tried to console him and told him that we sould [sic] take very good care of him while he was with us and that no one would hurt him or forget about him. He seemed a little consoled but he is really missing his mother. I told the worker at the shelter and she said she would watch him closely.[466]

***DHS did not take steps to address JA's threat to run away.*** Neither this aide nor any other DHS staff member provided *any follow-up* to JA's threat to run away from the shelter. Since the aide had never met JA, she may have been unaware that his threat signaled an increasing deterioration in JA's emotional well-being. However, a five-year-old boy's threat to run away is a risk to his physical safety and indicates severe distress. The aide should have reported this conversation to JA's primary worker, and increased contact with JA due to safety concerns should have been made as required by policy.[467]

***DHS did not assess or address JA's behavioral deterioration and emotional distress.*** There is no documentation that at any time during the 82 days in which JA was moved from one shelter to another that any DHS staff member considered a psychological evaluation of the emotional impact on five-year-old JA of his move from his kinship placement, separation from his parents, being subjected to six placements in less than eight months, and having no contact with DHS staff for 43 days while in the [redacted] County shelter.

JA also experienced no contact with his parents and siblings during his third consecutive shelter placement. Although the DHS worker's report of the 8/17/07 contact in the [redacted] County Shelter states that "Shelster [sic] Staff do not report any problems after visitation,"[468] the file contains *no record of any visits* between JA and his parents during this placement. DHS also did not provide visits for JA with either brother.

**8/27/07 – 10/8/07: JA subjected to four additional placements in less than 6 weeks**

***JA's discharge from shelter to foster home delayed by internal DHS problem.*** A letter to JA's judge indicates that JA was moved to a foster home on 8/27/07;[469] however, emails document that on 9/7/07 a worker was still "unable to place JA in the [new foster home] as they are not listed as a foster home."[470] Three days later, a different DHS worker emailed, "The placement screen for JA can be updated now."[471] Thus it is not clear when the placement was changed.

***JA was the first foster child placed in his seventh placement.***[472] Following his stay at the [redacted] County shelter, JA was placed in a newly approved regular foster home in Oklahoma County.[473] The resource family assessment had been completed 7/9/07;[474] the date the home was licensed was not found in the file. DHS moved JA from this placement after 37 days (10/3/07)[475] at the foster parents' request "due to [JA's] aggression and not following redirection."[476] In addition, on 9/16/07 they advised JA's primary worker that they had "decided not to foster any more."[477] JA's DHS worker stated, "I am afraid I may have a blown placement and that is the last thing I want."[478]

***JA's dangerous behaviors continued to escalate.*** By mid-September, JA's foster mother reported he had severe temper tantrums, threw things, and refused to go to day care after school; she inquired whether counseling might be appropriate.[479] When the foster mother asked JA why he refused to go to day care, "he reported he was scared."[480] Neither JA's foster mother nor his DHS worker explored why, of what, or of whom JA was scared. A referral was made for counseling,[481] but the therapist had no contact with JA.

***JA threatened to harm himself.*** Prior to JA's move from this placement, the foster mother reported he was "Hit [sic] and kicking on the van [from the elementary school where he was enrolled in kindergarten[482]] to day care and trying to jump out . . . JA says he is going to heaven. I will see my mother when I go to heaven."[483] His DHS primary worker stated, "Recently [JA] was talking about jumping out the window so he could go to heaven to see his mother. He had a visit with her three weeks ago and she is not dead. Mother told him his baby brother died and went to heaven."[484]

***Worker did not ensure JA received therapy.*** A document dated 9/28/07 states JA received therapy "in the foster home for the last two weeks."[485] However, a 9/25/07 email to the therapist asks, "Will you please advise me when you can start counseling for this child?"[486] The therapist replied she told the foster mother to "get JA to a psychiatrist as soon as possible. I have given her the telephone number."[487] On 10/1/07, the foster mother reported the therapist did not see JA and had stated she "didn't see a need to visit JA if he was leaving [the placement]."[488] This was the second time JA had been referred for, but did not receive, counseling due to being moved.[489]

***JA's eighth placement disrupted in less than 24 hours.*** On 10/3/07, JA's DHS primary worker moved JA from his seventh placement and took him to [redacted] for evaluation for placement in a behavioral center. The evaluator concluded JA didn't meet the criteria for acute care and their residential treatment center had too many older children.[490] A fax "received 10/4/07" states "staffed with Dr. [name] who said to have him assessed for inpatient."[491] It is not clear when or by whom this was written. The worker was informed by a provider they could not find a place and to call back tomorrow: "There are only 2 or 3 places which take 5 year olds."[492] Although a placement was found in Oklahoma County,[493] the next morning the foster parent in that placement asked that JA be moved immediately.[494] She reported JA refused to get dressed; attempted to hit, kick, and bite her; and had to be restrained.[495]

***Ninth placement: 72-hour crisis intervention service.*** Following JA's second placement disruption in two days, a DHS worker's email states, "No shelter will take him and he went to a[n] [emergency foster] home last night and they . . . couldn't deal with him . . . we need a TFC home today as there is no place to put him."[496] DHS placed JA at an Intensive Treatment Services (ITS) in [redacted] County;[497] ITS is a contracted eight-bed program that provides 72-hour crisis intervention services for children in custody to prevent inpatient admission.[498] Permission was received from state DHS for an age five and under exception to place JA there that day (10/4/07).[499] DHS staff emails questioned a planned short-term placement: "[T]he quicker we can get him into a TFC home the better;"[500] "ITS is only 3 days and we are going into the weekend . . . this is still an emergency."[501] On 10/8/07, ITS inquired about a discharge plan.[502] The worker advised that DHS state office was involved in planning.[503] A 10/8/07 email chain documents that DHS state office requested a TFC family willing to accept JA that same day.[504] Also on 10/8/07, ITS staff reported an agency had a home for JA and had been unable to reach the DHS worker to get information to arrange the placement.[505]

***Six placements in four months: three shelters, two foster homes, and one TFC home.*** On 10/9/07,[506] JA was placed in a TFC home in [redacted] County.[507] During the four months following the disruption of JA's kinship placement on 6/8/07 and his placement in TFC on 10/9/07, DHS placed five-year-old JA in six placements. During those four months, DHS provided JA only three visits with his parents[508] and none with his brothers. DHS provided face-to-face contact with JA, but contacts were made by at least seven, and possibly as many as nine, *different* DHS staff – four workers, one of whom was a temp; three DHS aides; and two unidentified DHS staff who moved him from one placement to another. Due to these placement changes, DHS required that JA attend kindergarten in three different schools.[509]

**Judge's ruling that reasonable efforts not made by DHS**

In a permanency review hearing for JA on 9/4/07,[510] the judge ruled that reasonable efforts had *not* been made to finalize JA's permanency plan and place JA in a timely manner in accordance with it, noting DHS placement of JA in shelters with no notice of change of placements forwarded to the court. The judge ordered DHS to report on the number of moves JA had been subjected to and why DHS had not placed JA in a foster home earlier.[511] In an email regarding the judge's request, the DHS Foster Care Supervisor stated, "Basically it's because we have a shortage of foster home resources and had no opening to offer him to. Additionally, he was in a different shelter and I'm sure that contributed to his length of stay as well."[512] This statement was included in the worker's report[513] which was faxed to the judge on 9/7/07; the report, however, did not address all of JA's placements and reasons for changes.[514] According to an email, "due to this not being completed the judge made a finding of 'Reasonable Efforts Not Made.'"[515] JA's case was re-assigned on 11/9/07.[516] His new worker submitted a report to the court[517] outlining JA's placements through 1/8/08.

**10/9/07 – 2/13/08: In less than 10 months in custody, DHS placed JA in ten placements in eight counties**

JA remained in the TFC placement as of 2/13/08, the date the named plaintiffs' complaint was filed. Certified as TFC parents only one month prior to JA's placement,[518] the home was selected because there "were no other TFC children in the home and JA will be the youngest child in the home."[519] DHS state office approved an exception for TFC placement of a child 5 and under.[520]

An undated multiaxial assessment gave JA's Primary ICD-9 Diagnosis as "312.9 – Unspecified disturbance of conduct," with "Axis II ICD-9 Diagnosis: V71.09 – Observation of other suspected mental condition."[521] During the evaluation, JA "talked about hitting himself, dying and jumping out of windows (from the fifth floor)."[522]

***Worker change and internal DHS confusion delayed parent-child visits.*** As stated above, DHS assigned a new primary worker to JA in November.[523] On 12/17/07, the new worker emailed: "I just got this case from [previous worker] and had to do a lot of extra work on this and reports and do visits which had not been done."[524] On 12/3/07, the previous worker emailed the new worker that the TFC foster mother said JA was requesting visits with his parents.[525] The same day the new worker wrote: "I understand you are the secondary worker . . . for JA who is in your county. His mother informed me today a visit has not been set up since the end of October. Please let me know if there is a problem? . . . it was my understanding that you did the visits?"[526] He responded, "Yes, I am the secondary and I do visit the child in the home. [A]ny visitation . . . between parents and child . . . must come from the primary worker, who needs to let me know what kind of visitation arrangement I do need to make, and plus, the foster parents need to be informed about this as well."[527] Due to the worker's confusion, DHS did not provide any visits to JA and his family between 10/30/07[528] and 12/7/07.[529] On 12/26/07, JA visited with his parents in their home for the first time since entering DHS custody.[530] Another family visit occurred 1/22/08.[531]

***After almost a year in custody, DHS had not provided a psychological evaluation for JA.*** JA's 11/9/07 Master Treatment Plan, developed by the TFC agency, identifies his treatment goals as reducing aggressive responses and processing separation from his biological family. Planned services for JA included individual therapy, family therapy with the foster family, and group rehabilitation, each for two hours per month.[532] Despite the TFC services planned, the foster mother stated she was "still trying to get JA evaluated by a psychologist."[533] Since his entry into custody – almost one year – DHS had not obtained a psychological evaluation to identify JA's placement, treatment, and educational needs.

January 2008 staffing notes state JA's "mood has been fluctuating significantly since the placement of [a] younger child. He appears to be concerned about his own placement. He did state that he had a dream about someone coming and taking him away from [TFC foster mother]."[534] During this four-month period (10/9/07 – 2/13/08), JA

visited with his parents three times; DHS did not schedule visits with either brother. A DHS worker visited JA in the placement four times.[535]

**JA's permanency status as of 2/13/08**

JA entered custody based on allegations of neglect, substance abuse of caretakers, and threat of harm by his parents.[536] The Initial DHS Individualized Service Plan (ISP)[537] was created 3/6/07 with reunification as JA's permanency plan. It required JA's mother to complete a psychological evaluation and a parenting class; obtain stable, verifiable income; initiate individual and substance abuse counseling; develop a relapse plan; and submit to random urinalyses (UAs) as requested by DHS or the court. JA's father was required to complete parenting classes; obtain/maintain stable, verifiable income; participate in individual and substance abuse counseling; maintain safe, stable home; develop a relapse plan; and submit to random UAs as requested by DHS or the court.[538]

***DHS did not schedule mother's psychological evaluation for seven months.*** Despite requirements in the initial ISP and court orders for psychological evaluations for JA's mother,[539] JA's DHS worker failed to schedule a psychological evaluation for JA's mother until October 2007.[540] The 12/18/07 ISP stated she had completed an evaluation 12/7/07, but the report would not be sent until DHS paid the psychologist.[541] JA's prior worker wrote on 12/4/07 that the psychologist's office had not received a voucher to pay for JA's mother's psychological exam.[542] The psychologist had refused to conduct the exam unless he had the voucher prior to the exam because DHS owed him so many vouchers.[543] A 12/18/07 email acknowledges ". . . [DHS is] making mistakes on our end which is [sic] delaying payments getting made . . . [judge] has ordered someone from Finance . . . to explain to the court why [psychologist] is not getting paid timely."[544] DHS review of late payments to the psychologist to whom JA's mother was referred found that the psychologist had not been paid by DHS for "at least 28 outstanding authorizations."[545]

***Parents' progress documented, but serious previously unidentified concerns remain.*** The ISP prepared for a 12/18/07 court review states "DHS believes that [JA's parents] have made significant progress on their court ordered ISP; however, DHS is concerned about the parents being prescribed heavy narcotics."[546] Both parents had "tested positive for Benzoids due [sic] being prescribed Xanax."[547] An ISP completed before 2/13/08 states that due to "the amount of medication prescribed to [JA's parents], the multiple positive UA's over the past month, and the results of [JA's mother's] psychological evaluation, DHS is very concerned about reunifying [JA] with his parents at this time."[548] Because DHS did not schedule JA's mother's psychological evaluation for seven months, her service needs had not been fully and accurately identified for service planning. Her diagnoses included: Cannabis Dependence, Methamphetamine Dependence, Alcohol Dependence, Nicotine Dependence, Depressive Disorder, Anxiety Disorder, History of PTSD, and Intermittent Displosive Disorder.[549] Despite the continuing risks identified, DHS requested that JA's parents begin unsupervised visits with close monitoring by DHS and CHBS (home-based services). Reunification remained JA's permanent plan.[550]

**Continuity of DHS workers/supervisors assigned to JA**

According to staffing tables provided to plaintiffs' counsel by defendants' counsel,[551] JA was assigned six primary workers with five supervisors and seven secondary workers with seven supervisors. Therefore, JA was served by a total of 13 workers and 12 supervisors during his one year and two month stay under review. As documented above, between the disruption of JA's kinship placement on 6/8/07 and his placement in TFC on 10/9/07, a four-month period, JA had face-to-face contact with at least seven, and possibly as many as nine, *different* DHS staff – four workers, one of whom was a temp; three DHS aides; and two unidentified DHS staff who moved him from one placement to another.

A list of assigned workers was also found in JA's case file in a Case Summary.[552] When this list and the staffing tables described above were compared, some inconsistencies were identified which could not be explained.

## JA CASEWORK ANALYSIS

### DHS Failures to Protect JA from Harm While in DHS Custody

DHS policy defines the mission of the emergency shelter system operated by DHS as "the provision of an emergency response for children in crisis due to removal from their home following allegations of abuse or neglect or as a temporary respite for children in DHS custody whose placement is disrupted."[553] It is the intent of shelter care that "children move into safe, appropriate placements as soon as possible."[554] To emphasize this expectation, DHS policy establishes limits for children's placement in shelters. At the time of JA's two shelter placements, children younger than five were permitted to remain in shelter care no more than 24 hours.[555]

DHS policy also requires that children's DHS workers provide support as children adjust to the shelter placement and experience "the trauma of being removed from familiar surroundings," support that is "vital to the child's emotional well-being, future growth, and development."[556] To ensure that workers are available to children to provide

this support, DHS policy requires that the initial face-to-face contact with the child's DHS worker "takes place within 24 hours of notice that the child has been admitted to the shelter."[557] Policy additionally requires that ongoing monitoring of children's well-being and safety in a shelter placement occur by specifying that the child's DHS worker should have weekly face-to-face contact with the child.[558] "While visiting the child, the worker addresses the child's concerns, apprises the child of upcoming events such as placements, court hearing dates and outcomes, and visits with family."[559] The child's worker then conveys the worker's perceptions of the child's adjustment to the shelter social worker.[560]

The child's DHS worker is also required to initiate the process of locating a placement for the child and facilitating the child's timely discharge from the shelter into a placement that will be able to meet the child's needs, such as family reunification, a kinship placement, or other out-of-home care placement.[561] DHS policy provides the framework for a "mutual assessment process that assists in selecting the best home for children placed in foster family care."[562] Policy further states that ensuring the "effective and appropriate use of foster families to serve the best interests of the children" requires "cooperation between Child Welfare (CW) workers and foster families."[563]

## I. DHS failed to protect JA from harm caused by placement instability due to its overuse of shelters and emergency placements and its failure to take steps to prevent placement disruption

***A. DHS workers failed to make serious efforts to identify a foster family placement for JA.*** DHS workers documented that they had made efforts to locate a foster family placement for JA when his kinship placement disrupted, when he was placed in three subsequent shelter placements, and for several months following. However, his workers failed to do so. Only three requests for foster family placements for JA were

made during a period of almost three months; DHS also failed to make these few requests in a timely way, instead making them after JA had been placed for a month in the first of three subsequent shelters.

***B. DHS workers consistently overused shelters and emergency placements, resulting in harm to JA due to placement instability and caregiver discontinuity.*** In the months under review, DHS placed JA in four shelter placements, an EFC placement, and a crisis intervention placement for a total of 115 days. Shelters are staffed by shifts of multiple caregivers; this caregiving structure significantly increases children's experience of caregiver discontinuity. Thus children already experiencing significant separation anxiety from parents and others to whom they are attached, such as JA, are subjected to care by strangers and caregivers who not only come and go, but may change daily. Subjecting young children, such as five-year-old JA, to such instability inevitably negatively affects their emotional well-being and development as well as exacerbates their already intense grief at the loss of family and home.

***C. DHS workers failed to make any effort to prevent placement disruption.*** Although DHS workers had been able to locate a kinship placement for JA, ample information was available to DHS staff in the kinship parents' application and other written materials identifying significant estrangement between JA's [redacted] and the kinship father. Prior to the placement, DHS staff failed to explore whether these family tensions might present problems were JA to be placed in their home and, if so, to discuss how the problems might be prevented or addressed. DHS workers were aware of these tensions and later stated the placement was "doomed . . . from the start."[564] Two months after JA was placed in the home, the kinship foster mother reported being "pretty much

sick of"[565] the demands of JA's parents on her and on her husband. The DHS secondary worker to whom this was reported failed to address this potential threat to placement stability and to report the problem to JA's primary worker. *No* efforts, such as increased face-to-face contacts or other services, were made to provide support to the kinship foster parents subsequent to that conversation. Two months later, the kinship father abruptly requested that JA be moved; again DHS workers failed to make any effort, such as a face-to-face contact with the foster parents, to determine whether supportive services or other interventions could prevent the disruption and allow JA's placement to continue. As a direct consequence, JA was placed in three different shelters following this placement disruption. When DHS removed JA from this kinship placement, JA lost an important connection with his [redacted] and their children.

**II. DHS failed to protect JA from emotional trauma and behavioral deterioration due to its failure to monitor and evaluate his needs, well-being, safety, and risk of harm**

***A. The extent of DHS workers' failures to address JA's emotional trauma is almost unimaginable.*** The file documents a significant emotional and behavioral deterioration in JA beginning in late July 2007 and continuing through November 2007. This deterioration most likely was symptomatic of the emotional trauma JA was experiencing due to his separation from his family, the disruption of his kinship placement, and his subsequent placement in three different shelters for at least 82 consecutive days, where DHS failed to ensure regular family visiting and provide the required face-to-face contact.

To illustrate, prior to August 2007, JA had been observed to be "doing well" and having "age typical and appropriate behavior."[566] However, by mid-August, JA had

temper tantrums, cussed at shelter staff, and threatened to run away from the shelter. By mid-September, JA refused to go to day care, assaulted his peers, tried to jump out of the school van, and threatened to jump out of windows to go to heaven. In October, JA physically hit, kicked, and bit caregivers; threatened to harm himself; talked about dying; and had to be physically restrained.

Despite the rapidly escalating deterioration of JA's behaviors and emotional well-being, his DHS worker failed to make a face-to-face contact to explore his threat to run away, refer JA for counseling and/or for a psychological evaluation, and/or take any other protective actions. No DHS staff member documented concern about the likely negative impact on JA of the disruption of his kinship placement, the subsequent 82-day shelter placements, being subjected to six placements in less than eight months, and having had no contact with DHS staff for 43 days while in one shelter and no contact with his parents while placed in another. DHS failed to carry out their responsibility to provide the assessment and other services necessary to protect JA from harming himself and others and to prevent further emotional and behavioral deterioration.

***B. DHS repeatedly failed to meet its own minimum requirements for monitoring whether JA's needs were met and his safety intact in his placements.*** For lengthy periods, DHS failed to provide face-to-face contact with JA in his placements as required. When contact was provided, it was provided by an unpredictable succession of DHS staff, including a temporary worker, DHS aides, and unnamed DHS staff. DHS workers failed to make private face-to-face contact with JA as his stress increased or to increase the frequency of face-to-face contact with JA to explore his distress and provide information and services to decrease his isolation.

***C. DHS failed to assess JA's placement, treatment, and educational needs and the placement and services required to meet his needs, thus placing him at risk of harm.*** As of November 2007, DHS had failed to arrange a psychological evaluation for JA to assess his psychological, cognitive, and social needs and functioning. He had been in DHS custody for almost one year. Thus, decisions had been made about JA's placement and services without the benefit of a systematic evaluation of his needs. Immediate attention by DHS to thoroughly assess JA's needs when he entered custody would have been a basic step to assuring that his needs were met and his safety intact while in DHS custody.

***D. DHS consistently failed to ensure that JA's placements would not place him at risk of harm.*** JA was placed with his [redacted] in a kinship foster placement without the results of either the Background and Records Checks, which were not available for more than a month after JA was placed, or the placement approval, which was provided only after JA had been in the home for nine weeks. He was placed in shelters four times, facilities that by definition provide constantly changing caregivers and limited services. He also was placed in a newly approved regular foster family home in August 2007; JA, who was by that time having serious behavioral difficulties, was the first foster child placed in the home. This home was not sufficiently experienced to care for JA and the placement disrupted within 37 days. The foster parents decided not only to ask for JA to be removed, but also not to foster again. DHS without a doubt placed JA in the settings that were available, rather than matching his needs at a point in time with a placement that had the capacity and structure to meet his needs.

## III. DHS subjected JA to discontinuity of DHS workers and supervisors and consistent absence of supervisory monitoring of worker accountability

During JA's fourteen months in DHS custody, he was subjected to an extremely high level of discontinuity of DHS workers and supervisors. According to staffing information provided by defendants' counsel to plaintiffs' counsel,[567] as of 2/13/08, 13 DHS staff members were assigned to JA as either primary or secondary workers, and 12 supervisors were assigned to provide oversight of workers' activities and hold them accountable to comply with agency policy and standards. As noted in JA's review, during a four-month period of time, the five-year-old was subjected to face-to-face contact with at least seven and possibly as many as nine different DHS staff members. Having such an extremely large number of adults, many of whom were strangers to JA, involved in serving one child inevitably resulted in lack of essential communication between staff, lack of staff familiarity with current case information, and extreme discomfort for JA, who refused to even talk with one DHS worker who visited his placement. Even an adult would have difficulty disclosing his or her needs and problems to 5-7 different adults during a four-month period; for five-year-old JA, it must have been very confusing and unhelpful.

JA's file also fails to document regular on-going supervision of JA's DHS workers. The lack of JA's worker accountability is observed in their extensive failures to make serious efforts to locate family foster homes for JA; make efforts to prevent disruption of his kinship placement; assure that delays in services did not occur, such as the seven-month delay in referring his mother for a psychological evaluation and failure to refer JA for a psychological evaluation for almost one year; plan and implement family visits; and ensure that information provided to the court in progress reports and other

documents was accurate, particularly regarding the frequency of family visits. The serious, persistent lack of accountability of both DHS workers and supervisors with regard to assessing JA's needs, making genuine efforts to enhance placement stability, ensuring that he had frequent contact with his parents and siblings, and providing continuity of worker contact subjected five-year-old JA to ongoing trauma and deterioration in his emotional well-being instead of the security, daily care, supportive resources, and protection he deserved.

**Conclusion**

Changes in placement typically create severe disruption in children's lives. JA was required to re-adjust to ten different placements in fourteen months. The repeated loss of caregivers caused by each placement change creates intense feelings in children, such as JA, of rejection, grief, and confusion, and may create fear of emotional closeness and complicate a child's capacity to form future attachments.[568] Had DHS provided JA a foster family placement that could meet his needs and provide stability rather than immense discontinuity in JA's relationships with adults and other family members, JA might have experienced security rather than rage, fear, anxiety, and depression. Had DHS provided JA with one or even two workers with whom he could have had a predictable, trusting relationship, workers who would have made consistent efforts to fully assess and understand his needs and provide a placement that met those needs, the life-altering destructive consequences of DHS all-encompassing failure to protect JA almost certainly could have been prevented.

## JP CASE SUMMARY

**DOB: [redacted]**
**Entered DHS custody: [redacted]/06, age 6**
**Time in DHS custody as of 2/13/08: 649 days (1 year, 9 months)**
**Time in shelter/emergency placements: 54 days**
**Number of placements as of 2/13/08: 12, a move on average every 53 days**
**Total DHS workers assigned: 30**
**Total DHS supervisors assigned: 29**

*"He needs to be somewhere safe."*[569]

~ JP's [redacted]

**Placement in DHS custody**

JP was born on [redacted][570] in [redacted] County, Texas.[571] In September 2005,[572] JP's mother was incarcerated in Texas and left her children in [redacted]'s custody in Oklahoma.[573] Since that time, JP's [redacted] had cared for him and his siblings as well as her own three children.[574]

At the age of six, JP was placed in emergency custody [redacted]06)[575] in Oklahoma with two siblings and three [redacted] due to physical abuse of his seven-year-old brother [redacted] by his [redacted] [redacted].[576] [redacted] had bruises on his face, torso, and arm, and disclosed that he was beaten with a belt.[577] The children's [redacted] admitted to doing so.[578] The allegations were "Physical abuse of the children by the [redacted] [redacted]. Abandonment by the biological mother and putative fathers,"[579] the finding was Confirmed – Court Intervention Requested.[580] JP was placed in the Pauline E. Mayer (PEM) Shelter in Oklahoma County,[581] and an emergency custody hearing was held 5/8/06.[582] JP was adjudicated deprived 5/12/06.[583] JP's third sibling was by that time living in Texas with [redacted].[584]

DHS had received two previous referrals regarding JP's [redacted] [redacted]. The first was received 1/9/06.[585] A single mother, the [redacted] said that her [redacted]'s [redacted] had behavioral problems, and she couldn't care for them financially;[586] she asked her TANF worker to "Get the kids out. [sic] Don't want to hurt them."[587] Allegations included Neglect – Threat of Harm and Neglect – Abandonment; the referral was "Screened Out" and "linked with an existing case."[588] DHS received the second referral 1/27/06;[589] it also made allegations regarding JP's mother and [redacted] The [redacted] told the worker that, "what she meant by 'I don't want to hurt them,' was that she did not want to split them up."[590] DHS was unable to locate the children's fathers.[591] The DHS worker staffed the case with the Assistant District Attorney, who advised that JP's mother's children could not be

placed in custody unless all were placed, so all remained in the [redacted]'s custody.[592] The finding was "Confirmed – Services Recommended."[593]

**JP's parents' histories**

JP's parents had confirmed child maltreatment histories in Texas. When his parents married (1998), JP's mother became a stepmother to two children.[594] She reported she spanked her stepson, leaving bruises; she was charged with Injury to a Child[595] and placed on deferred adjudication.[596] In 2004, JP's mother moved to Oklahoma to be near her [redacted], violated her probation, and pled guilty to abuse of a child.[597]

On 4/29/05,[598] after JP's mother moved to Oklahoma but prior to her incarceration, DHS received an allegation that she physically abused five-year-old JP and his three siblings. The children lived with her in a motel and reported being hit with a belt.[599] [redacted] stated his father was "in jail for hurting a little girl."[600] The investigation finding was "Services Recommended."[601] The worker planned home-based services, but JP's mother moved and could not be located.[602]

Following JP's entry into DHS custody in May 2006, a DHS worker spoke with JP's mother; she was still incarcerated with a projected release in June 2007.[603] She reported that JP's father was a sex offender. A DHS worker located him on the New Mexico Sex Offender Website; he had been convicted in 1999 of indecency with a child, second degree.[604]

**[redacted]06 – 5/15/06: JP's first placement – PEM shelter**

JP was placed for eleven days in the PEM shelter in Oklahoma County.[605] When admitted ([redacted]06), his right arm was in a cast.[606] Although JP's file later documents he had been seen in the emergency room 4/18/06 for a closed fracture of lower end of radius with ulna,[607] DHS did not ask any questions about the cause of the injury when JP entered custody. JP's [redacted] stated he had ADHD but no medication had been prescribed.[608] Shelter staff notes state JP was "very hyper" and "needed lots of redirection."[609] He hit peers and staff with his cast,[610] and didn't listen to staff.[611] JP was moved out of his brother's room due to concerns about his hitting [redacted] with his cast.[612] On 5/14/06, JP "attempted to climb over brick wall to leave;" the log states "see incident report," but none was found.[613] A shelter psychologist involved in JP's Shelter Treatment Plan observed JP to be "hyperactive" and recommended counseling.[614]

On 5/10/06, a DHS worker took JP to have his cast removed;[615] she noted that during the trip JP asked to call his [redacted] five times within three hours.[616] He was not permitted to call her. DHS worker contact with JP was also documented on 5/12/06.[617]

**5/15/06 – 5/23/06: JP's second placement disrupted in ten days**

On 5/15/06, DHS moved JP to a regular foster home in Oklahoma County;[618] the home had been approved only five days prior to his placement (5/10/06),[619] and the

placement disrupted in ten days.[620] The foster mother's father had molested her older sisters and videotaped her in the shower; he was currently under investigation for child pornography.[621] Also, her mother's boyfriend had physically assaulted her.[622] The foster mother had met twice with a therapist for major depressive disorder prior to the home's approval.[623] The therapist's reference states, "I can neither recommend or not recommend for foster parent as I have not observed this client with children."[624]

***Foster mother requests counseling for JP.*** Despite JP's numerous behavior problems in the shelter, DHS did not identify any behaviors or emotional problems as applicable for JP on the Child Needs Information List[625] or refer JP for counseling as recommended. The day after JP's placement, a DHS foster care worker assigned to the home emailed JP's DHS worker that the foster mother was trying to reach him.[626] A second email to JP's worker stated that the foster mother wanted counseling for JP and [redacted] due to anger issues.[627] The foster mother did not ask that JP and [redacted] be moved. A third email from the same foster care worker states: "I understand that you are the new worker for the [P] children . . . Can you please get some services in that home ASAP so that we can avoid a placement disruption . . . She said that she wants to put them in counseling ASAP. So please once again can you get them some services ASAP."[628] JP's worker replied: "I have been in training for the last three days. I was given the case while in training and have already removed the children from [foster mother's] home."[629] He stated that JP and his brother were being staffed with the Area Resource Coordinator (ARC) regarding placement in a Therapeutic Foster Care (TFC) home.[630] JP's DHS worker had no face-to-face contact with JP or the foster family during the placement and made no effort to prevent the placement disruption.

**5/23/06 – 5/25/06: JP's third placement had an extensive history of referrals**

DHS moved JP to another DHS foster home in Oklahoma County on 5/23/06, where he remained for only two days. No information was found regarding his placement in this home. The exit reason given was "placement temporary, unable to care for child."[631] DHS had received 31 referrals on the home between 5/28/97 and 3/08/05. Findings were 6 Services Recommended (5 lack of supervision, 1 physical abuse); 3 Uncertain (2 physical abuse, 1 failure to protect); 7 Services Not Needed; and 15 Screened Out.[632]

**5/25/06 – 11/29/06: JP placed with a TFC contract agency and moved five times in six months**

On 5/24/06, TFC was authorized for JP;[633] the following day DHS moved him to his fourth placement in 20 days.[634] TFC had been recommended because JP was destructive to property and aggressive with foster parents and siblings.[635] According to DHS policy, TFC serves children who respond to close relationships within a family setting; require more intensive behavioral health services than available in regular foster family settings; and do not require 24-hour awake supervision.[636] However, JP's fourth placement disrupted on 9/2/06[637] due to the TFC parents' inability to manage his behaviors. JP was subsequently subjected to six additional placement changes by the end

of November. In one of these, JP was moved due to closure of the home; the TFC parents were unable to provide care.[638] The explanation for JP's move from the first TFC contract agency to a different TFC contract agency on 11/29/06 was that the "[contract agency] closed home and had no other appropriate home for [JP] with agency."[639]

During this six-month period, JP was not only placed in two TFC homes supervised by the first TFC contract agency, but also was moved repeatedly to other homes for emergency respite due to the TFC parents' inability to meet his needs. Respite is intended to provide a "planned reprieve" from care for foster caregivers, and "includes a defined frame for the length of stay and an identified date for the child's return to the TFC parent with whom the child is placed."[640] However, in only one instance did JP return from respite care to the home in which he was placed; therefore functionally, JP's respite placements were temporary emergency foster care placements. The following sections provide additional detail about JP's fourth through tenth placements.

***5/25/06 – 9/2/06: JP's fourth placement.*** DHS placed JP in an experienced TFC home in [redacted] County.[641] Less than four months later, the placement disrupted.[642]

The TFC agency provided individual therapy and psychotropic medication to JP and therapy with the TFC family.[643] On 6/20/06, JP's DHS worker made a face-to-face contact at the placement, stating, "Foster parents said that [[redacted]] and [JP] are real loving boys that at a moments notice would turn to be the meanest boys you ever [sic] seen."[644] In late July 2006, a note on a medication authorization form states, "[JP's] Behavior has had no improvements. Moving meds to AM and increasing Trazadone."[645] JP still has "frequent, unprovoked outbursts of aggression;" his TFC mother reported that, "after working through a rage, JP will sometimes cry for his mother."[646]

***Experienced TFC parents cannot "handle" JP, advocate for inpatient treatment.*** Two months after placement, JP's worker was informed that the TFC parents were "not able to handle him."[647] Afraid JP would hurt other children, the TFC parents advocated for inpatient treatment; they also believed JP and [redacted] should be separated.[648] DHS gave permission for JP to be moved to unplanned respite care in [redacted] County,[649] where he remained for five days.[650] While in this home, JP tried to choke another foster child.[651] On 7/31/06, the TFC parents asked DHS to "keep another home in mind in case they are no longer able to handle them."[652] Still DHS had not referred JP for a psychological evaluation.

***Visit between JP's father and JP and [redacted].*** Two weeks after JP was returned from respite to the TFC parents' home,[653] JP and [redacted] visited with their biological father.[654] They had not seen him since they were infants.[655] The father told the boys he wanted them to live with him.[656] JP's TFC mother reported the visit went very well; however, the next morning JP defecated in the backyard.[657] The same day JP reported having seen his "dad stab someone with a knife."[658] Problems were reported for JP with bed-wetting, a "gag reflex,"[659] "extreme anger outbursts," "fighting everyday at school," and "vomiting out meds (Big Pills)."[660] Medication changes were again made.[661]

***TFC parents gave notice; JP moved to placements five and six.*** JP started first grade on 8/17/06[662] and had trouble almost daily.[663] Two weeks later (9/2/06), JP's TFC mother reported that he had hit his teacher the day before and was physically aggressive toward other children in the home.[664] A Critical Incident Report[665] states the TFC parents gave two weeks notice.[666] JP was moved the same day to his fifth placement, an emergency respite home in [redacted] County.[667] Two days later (9/4/06), the agency again moved JP[668] because the respite foster parents had an emergency.[669] JP remained in this [redacted] County home – his sixth placement – from 9/4/06 to 9/19/06.[670] A letter dated 9/6/06 states the medication provider diagnosed JP with Oppositional Defiant Disorder and Mood Disorder not otherwise specified and recommended an Individualized Education Program (IEP).[671]

***JP's placement status changed.*** DHS changed JP's status in this home from respite to TFC on 9/19/06.[672] This placement – his seventh – disrupted after 74 days. This home had been certified seven months previously (2/13/06)[673] and provided care for two TFC children. One had been moved at the TFC parents' request;[674] the TFC mother allegedly inappropriately disciplined the second.[675]

***Abuse of JP by TFC mother alleged.*** Two weeks after JP's status in the home was changed to TFC placement (10/4/06), JP's [redacted] reported that JP had been spanked by the TFC parents and didn't want to live there anymore.[676] Although the referral form states the reporter alleged "Abuse" "Hitting,"[677] DHS screened out the referral "because no CA/N [child abuse/neglect] allegations made. Spanking in a foster home is a compliance issue."[678] The DHS investigator informed the TFC agency that the DHS state office told her "to deal with this matter on an internal investigation level."[679] The agency agreed;[680] however, JP's file contains no information regarding the internal investigation.

DHS continued to place JP in this home. Beginning in mid-October, the TFC father sat in school with JP, helping him attend school half a day without disrupting the class.[681] JP's teacher stated that JP and the foster father had "a really close bond."[682]

***TFC mother shamed and rejected JP in his classroom; home closed.*** A Bio-psycho Social Assessment states that JP's "foster mom made a scene at the school in front of [JP] and screamed at [JP] and demanded he be removed from her home."[683] On 11/15/06,[684] the TFC parents entered JP's classroom to pick him up from school:

> The foster mother yelled, 'What are you doing with that [lunchbox]?' [JP] exclaimed, 'It's mine. I was just trying to fix it.' Foster mother yanked it out of his hand and stormed out of the room saying for everyone to hear, 'I just don't want him in my house,' and slammed the door behind her. This was done so everyone in the class could hear and see it. [JP] then crawled under his table and just sobbed. School teacher said that it is the first time that [JP] has ever cried in school.[685]

JP "then said that he does not want to live there anymore;" according to the teacher there were "things going on in the home that [DHS was] unaware of."[686]

The home was closed the next day "by mutual agreement" of the foster father and TFC agency.[687] A letter states, "[foster parents] were not [sic] any formal written plan of compliance during certification with [agency] . . . the family was overwhelmed and stressed; therefore [agency] mutually agreed with [foster father's] decision to close their home."[688]

***DHS placed JP in placements eight through ten in a six-week period.*** DHS moved JP to emergency respite care with another TFC home in [redacted] County – his eighth placement.[689] The TFC agency gave notice to DHS to discharge JP[690] due to "No avail home."[691] DHS then moved JP to a [redacted] County respite home – his ninth placement. On 11/29/06, DHS moved JP to his tenth placement – an Oklahoma County home with a different TFC agency.[692]

***Results of psychological evaluation.*** Despite JP's continuing severe behavioral problems four months after entering DHS custody, DHS did not refer him for a psychological evaluation to determine the placement and treatment level required for his and others' physical safety and his emotional well-being.[693] When he was evaluated on 9/26/06, JP was in the first grade.[694] The evaluation found JP functioning cognitively in the average range.[695] "Emotionally he appears to be a child whose initial response to a new situation is violence and aggression . . . When he feels more emotionally comfortable, he has better skills for managing his emotions."[696] Recommendations included: focusing on "help[ing] him feel safe in unknown or unusual situations" and "appropriate methods for processing and expressing his feelings;" evaluating JP for articulation and language problems; and placing JP in as non-stimulating a school environment as possible because "the stimulation contributes to anxiety and impulsive, and aggressive behaviors."[697] Diagnostic Impressions were that JP was experiencing Post Traumatic Stress Disorder; Relation Problem; Attention Deficit, Hyperactive Disorder, Combined Type; and Abuse of a Child.[698]

***Written psychological evaluation was not available for IEP planning for JP.*** While placed with the first contract agency, JP attended first grade in two schools due to placement changes.[699] Although JP experienced serious difficulties, the principal in the second school believed JP's problems were emotional, not cognitive.[700] She planned to do an IEP and place JP in a small special education class;[701] however, IEP planning was not possible without JP's written psychological evaluation. In mid-October the evaluation still had not been written; therefore, the school could not place JP in an appropriate classroom.

**11/29/06 – 2/13/08: JP's tenth and twelfth placements were closed due to failure to provide safe care to JP**

Despite the TFC agency's statement that JP's previous TFC placement was "overwhelmed and stressed" and must be closed, the DHS Change in Placement form blames the placement change on JP: "JP blew his placement at the [first TFC agency] and [second TFC agency] accepted him into their foster care program."[702] JP's Child

Placement History records an initial placement 11/29/06 with the second TFC contractor and an exit date of 3/14/08,[703]one month after the named plaintiff's' complaint was filed. Four TFC agency homes are listed – JP's tenth, eleventh, twelfth, and thirteenth placements.[704] The thirteenth placement occurred after 2/13/08.

***Tenth placement closed due to physical abuse of JP in placement.*** On 11/29/06, JP was placed[705] with a TFC foster mother with "extensive experience in addressing issues similar to JP's."[706] JP asked to be moved from the home five days after he had been placed there.[707] After JP had been in the home for five months, JP's [redacted] reported the TFC mother and her teenage daughter pinned and twisted JP's arms behind his back and hit him on the back of the head and stepped on his back.[708] The investigation found "Services Recommended;"[709] JP remained in the home for another five and one-half months. A second report of physical abuse of JP was "Confirmed – Services Recommended;"[710] the TFC agency closed the home.[711] Other allegations included that the TFC mother's daughters and a boyfriend primarily provided JP's care and failed to give him his medication as required.[712] The TFC agency informed DHS Licensure that the home was closed because, "At best circumstantial evidence supports a failure to protect on the part of the foster parent; at worst, physical abuse of a child . . . [TFC agency] cannot recommend [TFC mother] for the placement of OKDHS children or for service to any other agency providing foster care services."[713]

***Previous history of DHS concerns with this placement.*** Prior to JP's placement in this home, DHS had identified several concerns. A [redacted] in the home had made allegations 7/10/00 of "Abuse" "Other;" the referral disposition was "Screen Out" "Not Child Abuse/Neglect;" no other information is provided.[714] A Written Plan of Compliance 5/13/05 states the home had an allegation due to Lack of Supervision.[715] The TFC mother also failed to comply with training and was monitored to ensure compliance.[716]

***Within five days of his placement in the home, JP requested a placement change.*** JP's DHS worker moved him to this TFC home where he was placed separately from his sibling [redacted].[717] Five days after the placement, the TFC mother called JP's DHS worker, stating JP insisted she call and ask that he be moved; she felt JP did not like the house rules and wanted to leave.[718] She also expressed concern that JP might not be on the right level of medication;[719] the worker advised her to see JP's doctor about the medication. JP's DHS worker did not speak with JP.[720]

More than two weeks after JP requested a placement change (12/20/06), his worker made face-to-face contact with JP and his TFC mother in his placement.[721] The worker "spoke to [JP] about making this placement work because it was hard to find placements for children who have anger problems. Worker spoke to him about this because [JP,] out of the blue goes around telling people that they cannot spank him."[722] The worker reported the TFC mother had not taken JP back to the doctor "because she discovered that [JP's] misbehavior was only a game that he played. He acted no difference [sic] after taking medication than before taking it."[723] JP was attending school all day "because the foster mother and the school came to an understanding of how to

handle [JP] . . . [JP] learned that there were other consequences that could be levied against him other than spanking."[724] The worker neither inquired what "other consequences" were being used nor met privately with JP to follow-up on the six-year-old's request for a placement change two weeks previously.

***JP repeatedly reported his foster brother was mean to him and "they" did not want him in the home.***[725] His therapist noted JP "appears to be sad a lot and states that no one likes him and they do not want him there. JP is very sensitive to how others perceive him, [sic] it has been reported that a previous foster mom made a scene at school by yelling at JP and saying she wanted him out of her house."[726]

***DHS provided no sibling visits for three months.*** After placing JP separately from his brothers, DHS provided no sibling visits until after a visitation schedule was developed in February.[727] On 4/24/07, JP had a therapeutic visit with both brothers.[728]

***First allegation of physical abuse of JP by TFC mother and her daughter.*** On 3/14/07, the DHS worker visited JP in the placement; when he arrived the foster mother was "scolding [JP] for being kicked out of school today" for aggressive behaviors.[729] There is no indication that the worker met with JP privately. A 4/30/07 comment states JP's TFC mother reported JP's "behavior can be controlled if you are consistent and firm;" the worker "observed [JP] being very polite and answering questions from his foster mother with 'Yes or No mam [sic].'"[730] On 5/4/07, JP's TFC therapist reported to JP's DHS worker that JP reported physical abuse by his TFC mother and her daughter.[731] The therapist stated that JP got into trouble at school; the school called her because JP pleaded that they call her rather than his TFC mother.[732] JP disclosed that when he got into trouble, the TFC mother and her teenage daughter "pin his arms behind his back and hit him on the back of the head."[733] Contrary to agency policy, which requires that investigations be initiated by an "unannounced home visit,"[734] [redacted] called the TFC mother and also called in a referral.[735] An investigation of "Abuse" "Beating" was initiated.[736] When interviewed, JP stated he didn't like his foster home because:

> . . . when he gets in trouble they are mean to [JP]. He stated his foster mother told him no [sic] to tell that they hold his arms back and step on his back, he stated he can't tell anymore to worker because they will be mean to him . . . He asked the worker not to tell them because they will be mean to him. He stated he was being bad in the classroom hitting people because they made fun of him. He stated the Teacher called his foster mom and he got in trouble . . . He stated [TFC mother's daughter] slapped him on the neck. He stated [TFC mother] knows [her daughter] hits but she doesn't care.[737]

The TFC mother denied the allegation, stating JP "has a history of not telling the truth."[738] A second child in the home, a child previously placed in the home, and the TFC mother's daughter also denied the allegations.[739] JP's [redacted] stated that he had not spoken to JP about the allegations, "But I do know [JP] and he is a problem child. I personally do not believe the allegations, but I cannot be sure of the 18 year old

daughter's behavior . . . I believe the home to be a very strict and structured home, and I believe that [JP] needs to stay there."[740]

***Safety plan recommended by investigating worker; DHS did not follow policy regarding the plan.*** The investigation finding was "Services Recommended."[741] The investigating worker recommended a safety plan that the TFC parent "continues to comply with DHS rules of not spanking or improperly restraining her foster children. Worker will forward the final report to the Foster Care Unit for their final determination as they deem necessary to ensure [JP] and all children are safe living with [TFC mother.]"[742] In July, August, and September 2007, JP's DHS worker reported face-to-face contact in JP's placement.[743] In none of the visits did the worker discuss the safety plan with the TFC mother or meet with JP privately to ensure that the TFC mother was complying with the safety plan. In June, the worker failed to have face-to-face contact with JP.[744] The June, July, August, and September 2007 TFC Monthly Foster Home Visit forms and JP's 6/27/07 TFC treatment plan do not refer to the safety plan recommended by the investigating worker.[745]

***Questions raised with DHS state office regarding TFC mother's 18-year-old daughter providing JP's care.*** On 7/19/07, JP's DHS worker emailed the DHS state office to inquire if there was a problem with a TFC mother's 18-year-old daughter taking care of a TFC child before school, transporting him to school, picking him up after school, and caring for him until the mother comes home.[746] DHS state office responded that there was not a problem if the agency had provided training to the daughter and documented that she had been assessed and approved to provide this care.[747] A handwritten note by the TFC mother stated that her daughters "can always pick up [her biological son] when I'm not available;" however there is no indication in the TFC parents' file[748] that any of her three daughters was trained, assessed, and/or approved to provide care to JP.

***For four months, JP's TFC parent failed to comply with documentation requirements.*** A TFC agency letter to the TFC mother 9/12/07 states she failed to turn in JP's May through August documentation, including weekly, behavioral, and financial logs, and medical history; the agency requested the documents by 9/17/07.[749] The TFC mother acknowledged non-compliance regarding her paperwork,[750] but the logs and documents were not found in JP's file.

***A second allegation – physical abuse, neglect, and medical neglect of JP by TFC mother.*** On 10/10/07,[751] JP reported to his [redacted] that his TFC mother disciplined him with a pink belt with the buckle still on; he had bruises on his right arm, a six-inch circular bruise "the size of a grapefruit" on his right thigh, and other bruises.[752] His therapist took pictures with JP's teacher as a witness.[753] The reporter also stated that JP said his TFC mother's daughter and her boyfriend gave him medication and drove him to school.[754] JP's teacher reported that JP was not getting his proper medication and that was why he was acting out at school.[755]

The referral allegations were "Abuse," "Kicking," and "Neglect" "Inadequate Physical Care;" the TFC mother denied whipping JP with the belt.[756] JP stated he was "not hit or kicked just whipped with the pink belt. He stated this was not the first time he had been whipped since he has been placed in the home."[757] The other TFC child in the home refused to be interviewed.[758] DHS made no attempts to interview any of the TFC mother's daughters as required by policy.[759]

***DHS required that JP remain in home an additional night despite continued risk of harm and available respite care.*** JP's therapist attempted to contact JP's DHS worker, but was informed he was no longer in that department; she informed a DHS supervisor that a respite home had been located for JP that night.[760] The supervisor stated that JP and the second TFC child in the home would not be removed until the next day; no rationale for this decision was given.[761] DHS required JP to remain an additional night in the home after he had disclosed the physical abuse. The next day, JP was picked up at school and taken for a physical exam.[762]

***Investigation findings.*** JP's file documents multiple DHS delays in completing the 10/10/07 investigation.[763] An 11/26/07 email documents that, as of that date, the investigation was not closed and there was not yet a District Attorney report.[764] On 12/19/07, the investigating worker emailed a supervisor, stating: "This was my second investigation regarding [JP]. I believe he is a truthful kid. I honestly don't think he knows how to lie. I'm happy he's out [sic] the home. I'm sure he's much happier . . . It was confirmed services recommended."[765] The investigation was closed 12/27/07.[766]

***TFC agency closed TFC home.*** A memo 10/15/07 to DHS Licensure states the TFC agency closed the home because, "At best circumstantial evidence supports a failure to protect on the part of the foster parent; at worst, physical abuse of a child . . . [TFC agency] cannot recommend [TFC mother] for the placement of OKDHS children or for service to any other agency providing foster care services."[767] No reason was given for JP's move on the DHS Change in Placement form;[768] the abuse of JP and closing of the home were not acknowledged.

***JP's eleventh placement.*** On 10/11/07, JP was placed in emergency foster care in a respite home in Oklahoma County with the same agency.[769] Four months later, a letter to the foster mother requested that she send daily logs regarding JP's placement to the agency; no other information about JP's placement in the home was found.[770]

***JP's twelfth placement closed due to maltreatment of JP in the home.*** On 10/16/07, DHS moved JP to his twelfth placement, a TFC home in Oklahoma County certified *only one day prior to JP's placement*.[771] The TFC parent was a single mother of five, ages 10-20.[772] The home assessment states: "Any child placed in this home will receive more than adequate nurturing and protection by this closely knit family."[773] When asked what would be hardest about being a foster family, the youngest son's response included "picking on each other;" he stated his biggest problem "is getting picked on" but "did not give any information regarding the person or people who pick on him."[774] The person completing the home assessment did not inquire about his responses.

Within three weeks of JP's placement, difficulties between JP and the biological children were reported; ultimately JP's [redacted] made three referrals of Neglect – Failure to Protect and Lack of Supervision by the TFC mother.[775] DHS, however, continued to place JP in the home for several more months until 3/3/08.[776] Three weeks after JP was moved, the TFC agency closed the home due to a negative reference from school personnel who witnessed maltreatment of JP by the TFC mother's daughter; school personnel refused to recommend the home as a placement for any DHS custody children.[777]

***For almost the first four months of JP's twelfth placement, DHS abandoned JP.*** JP's DHS worker made only one face-to-face contact to monitor seven-year-old JP's well-being and safety as required in the first six months of the placement. *No DHS worker made any face-to-face contact with JP and his TFC mother in the placement for 106 days – 15 weeks after his placement –* [778]despite the TFC mother's total lack of experience; the immediate and ongoing serious difficulties in the placement; and JP's documented needs and behaviors, history of maltreatment, and frequent placement changes while in custody.

On 1/30/08, a new worker made a face-to-face contact with JP in the home.[779] In this initial contact, the DHS worker did not discuss JP's allegations of the TFC mother's children's mistreatment of JP[780] that are described below. The TFC mother stated JP needed a new psychological evaluation and needed to be on an IEP to assist with his educational needs.[781] Following the 1/30/08 contact, JP went *nine more weeks* without a second face-to-face contact in the placement by *any* DHS worker.

***Three weeks after JP's placement, TFC mother's son locked JP in a room.*** An 11/8/07 Incident/Accident Report completed by JP's TFC mother states JP "was arguing with [TFC mother's youngest son] over game. Started yelling and screaming. Was asked to go to his room. He repeatedly screamed and yelled. Also kicked the dresser and broke the window out."[782] The Incident Report also states, "Doctored the cut on his hand."[783] JP's TFC therapist's 11/8/07 progress note reports that JP "had a cut on his hand and he stated that he hit a glass pane in a door when the son of the [foster parent] locked him in the room. *I had spoken to [foster parent] previously and she told me about the cut but did not say that [JP] had been locked in a room by the other child* (emphasis added)." [784] The therapist notes that an incident report was faxed, but she had not yet been told who the new DHS caseworker would be for JP since the change in worker 10/10/07.[785]

JP's therapist's notes state repeatedly either that JP reported that the children in his foster home were mean to him and he had problems with the TFC parent's son and/or that the therapist discussed with the TFC mother the need to protect JP from mistreatment by her children.[786] In mid-January 2008, the therapist reported JP was able to "id/process that he provokes the foster parent's children by calling them name [sic] and then has the consequences of the children being angry with him and saying they do not want him in the home."[787] She noted, "The foster parent has been reminded that this is inappropriate for children to say these things to [JP.]"[788]

***JP visited with his mother.*** On 11/29/07, JP met with his brother and mother. The note states "[JP] was excited but did not recognize bio mom when we first arrived."[789] A Court Appointed Special Advocate (CASA)[790] described the visit, also observed by the children's therapists, noting, "The visit seemed to prompt many memories (some of which were quite unpleasant), especially from [JP]." The CASA further notes the children's "behaviors deteriorated markedly"[791] after the visit.

***Referral of Neglect -- Failure to Protect and Lack of Supervision of JP by TFC mother.*** On 1/29/08, a referral was received from JP's [redacted] alleging Neglect – Failure to Protect and Lack of Supervision by the TFC mother.[792] The report was "Screened Out" and "linked to a new closed case."[793] Despite the [redacted]'s referral and ongoing difficulties reported by JP in this placement, the DHS Court Report for the 1/31/08 hearing states "[JP] is well adjusted in TFC with no concerns." [794]

***DHS failed to inform JP/TFC mother that JP's visit with his mother was cancelled.*** An Incident/Accident Report states that "JP had a very disruptive week after he was told he would be picked up by a DHS worker and that did not happen and no one called foster parent or therapist."[795] On 2/8/08, JP's therapist emailed his worker that JP had had a "terrible week" and she believed:

> . . . part of the problem is that he was told he would be picked up for court and to visit with his mom. No one showed up or has even called to let us know what happened. This child is very close to blowing his placement, this did not help. He has numerous melt downs at school and home . . . I need to get your fax number to send in an incident report. Please send your phone number also. Please give me a call in regard to this matter.[796]

The worker responded, "The court did not want to proceed with the visitation and felt like it would be more appropriate the following month."[797] She did not address why DHS did not notify the foster mother so JP could be informed of the visit change.

***Two additional allegations of maltreatment in the placement.*** On 2/11/08, an email to JP's DHS worker reports:[798] on 2/8/08 JP was having a "terrible day at school," was taken to the office, and sent home for a half day. While he was angry he said that he had "been choked out [sic] besides it didn't matter;" the [redacted] observed small marks on his neck. When the librarian asked JP about the marks, he told her he made them himself. The principal questioned the TFC mother about the marks; she said he made them himself. The same day, JP's CASA emailed the DHS worker that JP's [redacted] had major concerns about JP's foster home: "I think he may be being left with TFC mother's children most of the time."[799] A second referral (2/12/08) was also "Screened Out." The caller stated that "the foster mom is always gone and her children abuse him."[800] The caller also stated that the report had been made before, but had been screened out.

On 2/13/08, JP's [redacted] called JP's CASA[801] stating concern because "[JP] ran and hid again today" when it was time to go home with the TFC mother's

daughter. JP reported to the [redacted] that the TFC mother's children were mean to him, had beaten him, and were never punished, but he was. The [redacted] also reported that no one from DHS had ever talked with her following the first abuse referral she made. The CASA stated "perhaps [JP] needs a more stable placement."[802]

DHS received a third referral regarding JP from his [redacted] on 2/13/08 alleging Neglect – Lack of Supervision and Failure to Protect by his TFC mother; that "[f]oster mother is leaving the 17 year old in charge of caring for the foster child."[803] This referral was also "Screened Out" and "linked to a new closed case."[804] A DHS Referral Acceptance Snapshot documents that JP "stated one of the children in the home hit him in the mouth," and he did not want to remain in the home.[805] It further states:

> The reporter states that yesterday after school [JP] was hiding and wandering the halls of the school. [JP] told the reporter he did not want to go back to the foster home. The reporter states when [JP] was found he was walked to the [sic] where the foster mother's 17 year old daughter [name] was waiting to pick him up. When [JP] saw [TFC mother's daughter] he bolted. [TFC mother's daughter] grabbed [JP] by his coat. [JP] wiggled out of his coat and started to run. [TFC mother's daughter] grabbed [JP] by his shirt and started to pull at him to get him to the car. The reporter is concerned about the way [TFC mother's daughter] handled [JP]. The reporter has been told by [JP] that the foster mother is not at home a lot of the time and [her daughter] is in charge when she is not at home. The reporter states [JP] has a bruised lip. [JP] stated he bites his lip when he is nervous. [JP] also stated he was hit by one of the foster mother's children in the home. . . The caller states that this had been reported before but screened out. Caller is very concerned about this because this child just runs from the teachers because he does not want to go home . . . Since he has gone to this foster home his behavior has deteriorated . . . Since he was abused in his last foster home this needs to be checked out. He needs to be somewhere safe.[806]

The referral was staffed with a DHS staff member who advised: "This can be screened out as a policy violation and addressed by fp worker or tfc."[807] There is no documentation that the foster parent's worker or the TFC agency addressed the allegations.

***JP's TFC mother gave 14-day notice.*** That same morning (2/13/08), an email[808] reports JP's TFC mother gave notice to terminate the placement, stating JP needed more counseling than he was getting. The TFC mother's Request for Removal states: "[JP] thinks it's okay for him to hit the other kids, but not okay for them to hit him back. [JP] has a lot of anger built up and I feel he's a time bomb waiting to explode."[809] Despite the numerous unresolved difficulties in the placement, DHS placed JP there until 3/3/08, after the filing of the named plaintiffs' complaint.[810] JP learned he would be moved to another placement from "the youngest bio child in the home,"[811] rather than from his DHS worker, TFC mother, or TFC therapist.

***Three weeks after JP was moved, TFC agency closed TFC mother's home.*** A 3/24/08 memo from the TFC contract agency to DHS Licensure states that the home was:

> . . . being closed as a result of a negative reference from public school personnel for the biological children in the home. [TFC agency] cannot meet contractual requirements if reference cannot be secured for each biological child in the home. [redacted] witnessed [TFC mother's daughter] pulling a former foster child down the hallway at school by his shirt collar. The same [redacted] reported that [TFC mother's daughter] had picked the foster child up from school in the family car and that the child had not wanted to leave the premises with [the foster mother's daughter]. School personnel refused to recommend the [TFC] home as a placement for DHS custody children. Absent the references for all school age children in the home [TFC agency] Risk Management Committee recommends closure of the [TFC] home as a placement for TFC children. This home is not recommended for the placement of any DHS custody children.[812]

**JP's permanency status as of 2/13/08**

JP's father's parental rights were terminated 12/14/06.[813] In an adoption criteria staffing 1/30/07, those present decided to request separation of siblings for adoption.[814] JP's DHS worker did not make the request until 8/3/07;[815] it was not approved until 12/21/07,[816] almost one year after the decision was made. His mother was incarcerated in [redacted], Texas, and up for parole with a projected release date of 4/29/07.[817] She was permitted a visit on 11/29/07; [818] a second visit was cancelled by the court.[819] In a Pre-Trial Termination hearing on 1/31/08, DHS recommended that JP's mother's rights be terminated "based on abandonment and past history of abuse and neglect."[820] No options for adoption had been identified.

**Continuity of DHS workers/supervisors assigned to JP**

According to DHS staffing tables provided to plaintiffs' counsel by defendants' counsel,[821] as of 2/13/08, JP had been assigned 16 primary workers with 15 supervisors and 14 secondary workers with 14 supervisors. Therefore, JP was served by a total of 30 workers and 29 supervisors during his one year, nine month stay in DHS custody under review. As documented above, other unnamed DHS staff members transported JP when his placements changed, and DHS aides also carried responsibilities for JP's services.

A list of assigned workers was also found in JP's case file in a Case Summary section.[822] When this list and the staffing tables described above were compared, numerous inconsistencies were identified that could not be explained.

# JP CASEWORK ANALYSIS

## DHS Failures to Protect JP from Harm While in DHS Custody

DHS policy states, "Children who are in the care or custody of Oklahoma Department of Human Services (OKDHS) require ongoing protection from subsequent abuse or neglect while in . . . placement."[823] Policy further states that "Children placed in care due to abuse or neglect are vulnerable due to: (A) their previous victimization; and (B) the heightened risk of abuse or neglect that occurs in an out-of-home placement."[824] Therefore, DHS child welfare staff members are responsible to "be alert to indicators that a child is at risk of abuse or neglect or has been abused or neglected in his or her out-of-home placement."[825] When there is "an observation or report of abuse or neglect or potential for abuse or neglect of a child in a foster . . . home," DHS policy mandates that an "evaluation and response must occur."[826] There is no doubt that DHS' "ongoing protection from subsequent abuse or neglect while in . . . placement" [827] of JP was wholly deficient.

**I. DHS failed to protect JP from serious repeated maltreatment due to its failure to monitor and evaluate safety and risk of harm to JP, both prior to and during his placements**

***A. The extent of DHS failures to protect JP from maltreatment is almost incomprehensible.*** While in his seventh, tenth, and twelfth placements, JP's caregivers and their children beat him and restrained him in a physically assaultive manner; routinely failed to ensure that he was supervised by an approved adult; denied him prescribed medication; and subjected him to emotional abuse and mental injury. In all three of these placements, one of which had been certified *only one day prior to JP's placement*, the TFC caregivers' lack of experience, prior placement history of DHS

concerns with supervision and maltreatment and/or documented indicators of risk of harm in the home would have justified placement of JP in another setting. Once a decision had been made to place JP in the home, these characteristics would have fully justified – even required – very frequent monitoring of JP's placement and other protective interventions by DHS.

Although JP asked his DHS worker, school personnel, and a TFC therapist to be moved from several placements, his requests were either ignored or denied by DHS. Agency policy states that when a child "asks to be moved from the foster home" it is "good cause" for interviewing the child privately in the placement.[828] JP's DHS workers without exception failed to interview JP privately about his concerns with his placements. Yet consistently JP's allegations regarding his maltreatment in DHS custody proved to be true. A DHS worker who investigated two referrals alleging physical abuse by one of JP's TFC mothers stated: "I believe he is a truthful kid. I honestly don't think he knows how to lie. I'm happy he's out [sic] the home."[829]

***B. DHS failed to meet its own minimum requirements for monitoring whether JP's needs were met and his safety intact in his placements.*** Despite JP's repeated truthful allegations, his DHS workers failed to be "alert to indicators that a child is at risk of abuse or neglect," [830] either because they failed to have *private* face-to-face contact with JP so he could freely disclose his experiences and concerns; and/or failed to have face-to-face contact with JP *at all;* and/or were not sufficiently trained to identify and address indicators of risk of maltreatment. The DHS workers assigned to monitor JP's safety failed repeatedly to make the minimum required face-to-face contact with JP, to be alert to indicators that JP was at risk, and to observe the potential for maltreatment. To

illustrate, in his twelfth placement, JP experienced a *total lack* of face-to-face contact with his DHS worker for the first fifteen weeks of his placement – almost four months. In fact, *DHS made only one face-to-face contact with JP in the first six months of his twelfth placement.* These failures constitute abandonment of JP by DHS in this home. They are particularly egregious given that 1) two of JP's eleven previous placements had been closed due to the caregivers' documented inability to provide safe care; 2) the TFC mother in the twelfth placement had a *total lack of experience* as a foster caregiver; 3) three weeks after placement, JP was locked in a room by the TFC mother's son; and 4) three referrals of Failure to Protect and Lack of Supervision by this same TFC mother were made by JP's [redacted]. The harm JP was subjected to in this home was confirmed when three weeks after JP was removed from the home, it was closed by the TFC agency.

***C. DHS failed to ensure that an "evaluation and response"[831] to referrals occurred as required.*** DHS received six referrals of maltreatment of JP in three different TFC placements. In the first, a referral was made alleging JP had been spanked by the TFC parents; the referral form stated alleged "Abuse" "Hitting."[832] It was "Screened Out," stating that "spanking" was a compliance issue.[833] The TFC agency was required by DHS to conduct an internal investigation of the allegations, but failed to do so. JP remained in this home for another six weeks, at which time the home was closed when the TFC mother subjected JP to mental injury by publicly humiliating him in his classroom, stating she did not want JP in her home.

Three referrals of maltreatment of JP were made on a second TFC home; all alleged Lack of Supervision and Failure to Protect. The reporters alleged that the TFC mother was always gone and her children abused JP; that JP was frightened of the TFC

mother's daughter who picked him up from school; and that JP reported one of the TFC mother's children had hit him in the mouth. All three referrals were screened out with no documented follow-up by either DHS or the TFC agency, and no DHS staff member met privately with JP to discuss the allegations or his safety in the home. Due to the lack of safety JP experienced in this home, it was closed subsequent to JP's removal.

DHS received two referrals of maltreatment of JP on a third TFC home, both alleging physical abuse by the TFC mother; the first also alleged physical abuse by her daughter, and the second also alleged inadequate supervision. In the first, the finding was "Services Recommended." The investigation worker recommended the development of a Safety Plan with the foster parent; however, both DHS and the TFC agency failed to follow through. *Despite the lack of a plan to protect JP, DHS kept him in the home for five additional months.* The finding in the second investigation was "Confirmed-Services Recommended" to allegations of physical abuse, neglect, and medical neglect of JP by the same TFC mother. Although JP was removed and the home closed, the DHS investigating worker failed to even attempt to interview all those alleged to be providing JP's daily care to determine the specific nature and extent of the maltreatment suffered by JP in this TFC placement.[834]

The practices found DHS' response to these six referrals of JP are of grave concern. First, a decision to "Screen Out" an allegation by definition precludes an investigator's private interview with the alleged victim and other foster children in the home. Therefore, when allegations were "Screened Out," no DHS staff member met privately with JP to discuss his safety and treatment in the placement. To facilitate children's comfort and provide an environment in which a child will "feel secure enough

to discuss abuse issues" and prevent additional participants from interfering with the interview, "most authors recommend that children be interviewed alone."[835] Children's initial disclosure of harm rarely occurs without privacy in the conversation. Given the insufficient monitoring of JP's placements and routine failure of DHS workers to have any contact with JP in private, DHS consistently failed to provide JP a safe opportunity to discuss his maltreatment by his foster parents, *i.e.*, to disclose information his foster parent(s) had forbidden him to discuss with DHS.

Second, when allegations have been "Screened Out," the agency's other ongoing failures leave children without recourse and at even greater risk due to their having made allegations against their foster caregivers. In each of the three placements on which referrals were made, DHS required JP to remain in the home, even though DHS workers failed in every instance to follow-up to ensure that the recommended "internal investigation," "safety plan," or other protective options were implemented. For example, agency policy states that when an investigation occurs regarding a foster child and the "child's safety can be reasonably ensured," the child may remain in the home.[836] A safety plan must be discussed and agreed to by the foster parent and relevant DHS workers, and must be documented in the child's case record and the foster home resource record.[837] DHS did not document that a safety plan was discussed and/or agreed to by those required and did not document the safety plan in the JP's and the TFC mother's files as required.

Third, in each of these three homes, information was available to DHS staff *prior to JP's placement* that indicated the caregivers were either fully inexperienced, had difficulties in prior placements, and/or had prior maltreatment referrals as a TFC

caregiver. Having such information prior to JP's placement indicated that, if a placement with the home were made, very frequent monitoring of the placement would be necessary to ensure JP's safety and well-being. In each case, JP bore the brunt of DHS workers' superficial placement assessments and failure to monitor placements as required, thoroughly investigate the allegations of harm to JP, and follow-through on required steps to protect him when allegations were "Screened Out."

***D. DHS failed to fully assess JP's placement, treatment, and educational needs and the level of care required to meet his needs.*** Had DHS ensured that a psychological evaluation been completed early in JP's stay in custody rather than after four months, when he had already been subjected to multiple placement changes and placement caregivers' inability to meet his needs, the evaluation findings could have guided placement planning and avoided the unacceptable instability of JP's placements.

Six-year old JP entered custody with a known history of frequent family moves and instability, neglect, physical abuse, abandonment, and exposure to family and other violence – severe and extensive "previous victimization."[838] Immediate attention by DHS to thoroughly assess JP's needs when he entered custody and determine the level of placement required to meet his needs was clearly required. DHS failed to do so.

***E. DHS consistently failed to ensure that JP's placements were able to meet his needs, thus placing him at risk of harm.*** DHS failed to conduct the basic protective function of matching JP with caregivers who had the capacity to meet his needs. This failure was not a matter of the degree of DHS effort; rather it appears that placement selection occurred solely based on the availability of placement beds or slots.

When children are placed in settings that cannot meet their particular needs, as was done by DHS with JP, troublesome behaviors typically escalate, anxiety increases, and educational performance deteriorates. Inadequately trained, inexperienced, or frustrated caregivers may resort to destructive interactions with the child, including abusive and neglectful behaviors. In such instances the placement very often disrupts and the child is subjected to placement changes(s) and additional separations. JP's experiences in DHS custody illustrate the critical importance of matching children with placements that have the capacity to meet their needs, which DHS completely failed to do for JP.

A knowledgeable assessment of many of JP's twelve placements would have determined that the placement either should not have been permitted to provide care to *any* child in custody or should not have been selected to provide care to JP. To illustrate, three of JP's foster caregivers had documented histories of neglect and/or abuse as foster caregivers; in one of JP's placements, both parents had serious histories of having been neglected and abused and had not received therapy to resolve personal issues that would likely complicate their capacity to care safely for abused and neglected children. Caregivers in two of JP's placements had *no experience* in caring for TFC children with needs similar to JP's and in fact *had never cared for a foster child before*. In another home, JP was the third child placed in the home, yet serious problems had been already been documented with the prior two. In several homes, either derogatory comments about JP and/or blatant failure to comply with agency policies, including policies regarding documentation, discipline and supervision of children in custody were observed while JP was placed in the home. Basic monitoring would, at a minimum as required by DHS

policy, have warranted increased frequency of face-to-face contact by DHS in the home and face-to-face private contact with JP to explore whether he was safe in the placement.[839]

## II. DHS failed to protect JP from harm caused by placement instability due to its overuse of respite homes as emergency foster care placements

Eight of JP's twelve placements were unplanned, made hurriedly and in a crisis. In all but one instance, respite homes were not used for respite for JP's caregivers, but as emergency foster care placements from which JP was moved to a new placement within two to 11 days. DHS frequently moved JP to placements that were known to be temporary and short-term, thus subjecting him to inexcusable placement instability. Because of DHS' failure to conduct the basic process of matching JP's needs with the placement's capacity to meet his needs, his placements ultimately disrupted. DHS then resorted to overusing emergency placements, which resulted in a harmful level of placement instability and an exceptionally high level of caregiver discontinuity for JP.

Placement instability has been associated with negative outcomes in children's ability to form positive connections with people, overall educational achievement, and mental health needs.[840] A 2007 study found placement instability resulted in a 36% to 63% increased risk of behavioral problems compared with children who achieved any stability in foster care."[841] The multiple other DHS failures described above, combined with the agency's overuse of respite homes as emergency foster care placements, produce a harmful history of abuse and a placement change for JP on average every 53 days.

## III. DHS subjected JP to discontinuity of DHS workers and supervisors and consistent absence of supervisory monitoring of worker accountability

During the twenty one months in custody reviewed, JP was subjected to a grossly dysfunctional level of discontinuity of DHS workers and supervisors. According to staffing information provided by the defendants' counsel to the plaintiffs' counsel, as of 2/13/08,[842] 30 DHS staff members were assigned to JP as either primary or secondary workers, and 29 supervisors were assigned to guide and support JP's workers and hold them accountable. Such an extremely large number of staff in less than two years of placement services predictably results in confusion regarding critical case information; insufficient time for newly assigned staff to become familiar with the case; and time periods, very lengthy in JP's case, in which *no* services are provided to children, families, or foster caregivers. All of these problems were evident throughout JP's stay in custody.

The review of JP's file indicates that no DHS supervisor ensured that JP's workers' documentation was complete, correct, and timely – in other words, reliable. And no supervisor ensured that the rationale for case decisions regarding JP was documented. Without reliable information and the rationale that informed critical case decisions, agency staff cannot make informed practice decisions regarding a child's safety, well-being, and permanency.

JP's file also fails to contain evidence of regular on-going supervision of JP's workers. The lack of JP's workers' accountability is seen in their extensive failures to carefully screen and match placements with JP's needs; make required face-to-face contact to monitor JP's safety and well-being in placement; meet with JP privately about his multiple allegations of maltreatment in care; respond to risks of harm to JP in his placements; follow-through on recommendations in screened out referrals; and complete

investigations and case documentation as required by DHS policy. The serious, persistent lack of accountability of JP's DHS workers and supervisors further compounded the dangerous environment within which JP was placed while in custody.

**Conclusion**

Not only did DHS fail to provide JP the minimum level of care, protection, and service while in custody that would have ensured his safety and well-being and moved him toward permanency, *DHS also directly subjected JP to multiple, serious, repeated and preventable maltreatment and other harms.* DHS policy states that one of the fundamental rights and responsibilities guiding child welfare services is that, "Children's health and safety are paramount considerations in all placement and permanency planning decisions."[843] During 21 months of JP's life, DHS had the responsibility and mandate to ensure that JP was protected and his needs met. Instead, DHS repeatedly subjected him not only to serious harm, but also to wholly preventable harm.

# RJ CASE SUMMARY

**DOB: [redacted]**
**Entered DHS custody: [redacted]99, age 3**
**Re-entered DHS custody: [redacted]04, age 8**
**Time in most recent DHS custody episode as of 2/13/08: 1,491 days (4 years, 4 months)**
**Number of placements in most recent DHS custody episode as of 2/13/08: 10, a move on average every 120 days**
**Time in shelter/emergency placements during most recent DHS custody episode: 158 days**
**Total DHS workers assigned in most recent DHS custody episode: 23**
**Total DHS supervisors assigned in most recent DHS custody episode: 18**

*"If you don't beat them down they will run all over you"* [844]

~ RJ's foster parent

**RJ's re-entry into DHS custody [redacted]04**

RJ was born on [redacted] in [redacted], Oklahoma.[845] He first entered DHS custody at age three and remained in custody 609 days. At the age of eight ([redacted]04), he re-entered the custody of DHS due to alleged sexual abuse of his sisters by his stepfather and failure to protect by his mother.[846] RJ's mother denied having knowledge of the abuse.[847] The investigation finding was Confirm - Court Intervention Requested;[848] immediate Termination of Parental Rights was requested "[d]ue to the shocking and heinous allegations and history with this family."[849] RJ was placed in the Laura Dester Emergency Shelter (LDES).[850]

**Family history**

***Prior to the 10/13/04 investigation, three abuse/neglect referrals had been "Confirmed."*** The first (9/22/97) alleged RJ's three sisters, ages 3-7, were "raped by mom's boyfriend;"[851] allegations of Sexual Abuse and Vaginal Penetration by the boyfriend and Failure to Protect by RJ's mother were Confirmed.[852] The children remained in their mother's custody. In the second referral (1/28/98), RJ's [redacted] was absent from school and then reported "bleeding in the private area."[853] After an investigation was initiated, the family moved to a [redacted] shelter,[854] appearing to "have fled the state to avoid DHS and law enforcement involvement."[855] Failure to Protect/Failure to Provide Medical Attention were Confirmed for RJ's mother.[856] A worker recommended when the family returned to [redacted], "SERIOUS CONSIDERATION SHOULD BE GIVEN TO TAKING FURTHER COURT ACTION (emphasis in original)."[857]

RJ was three years old when the third referral was received.[858] Allegations were initially made 9/12/99 to [redacted], Tennessee police[859] stating RJ's stepfather acted "real crazy and deranged;" he repeatedly abused the children in front of each other for 24-48 hours and would not allow RJ's mother and six children (infant to 10-year-old) to leave.[860] When an investigation was initiated, the family moved to [redacted].[861] On 10/5/99, DHS received this third referral[862] alleging Mental Injury, Oral/Genital Contact, Vaginal Penetration Through Intercourse, Fondling, Digital Vaginal Penetration, Exposure to Adult Sexuality, and Exhibitionism by RJ's stepfather, and Failure to Protect by RJ's mother.[863] The stepfather "forced the girls and RJ to bathe with him, during which [stepfather] forced [[redacted]] to perform fellatio on RJ."[864] For two years,[865] RJ's mother had allowed the stepfather in the home with full knowledge of the sexual abuse;[866] she moved between two states to avoid placement of the children.[867] On [redacted]/99, RJ and his siblings were placed in DHS custody. In November 1999, RJ's mother gave birth.[868] The newborn had signs of drug withdrawal[869] and was placed in DHS custody.[870]

**[redacted]99 – 6/21/02: RJ's first stay in custody – seven placements in twenty months;[871] two closed due to safety concerns**

In his first stay in DHS custody, DHS changed three-year-old RJ's placement on average every 87 days. Two placements were closed after RJ was moved due to serious safety concerns.[872] DHS placed RJ with his mother for Trial Reunification on 5/25/02 and closed the case 28 days later.[873]

***RJ's first, second, third, and fourth placements.*** DHS initially placed three-year-old RJ for 32 subsequent days at a shelter in Oklahoma County and two emergency foster care (EFC) homes in Oklahoma and [redacted] Counties.[874] DHS then placed RJ for three months in a Tulsa County foster home that was closed when RJ was moved.[875] Five children had previously been placed there. Two children were removed for "allegations of abuse;" another two for "reunification;" and no reason was given for the fifth.[876] A performance evaluation dated 1/20/00 states the foster mother "does not fully understand the extent of her responsibility as a foster parent. She is often uncooperative and does not follow through when she is asked to fulfill certain requirements for the safety of children in her home."[877]

RJ's fourth placement's annual assessment listed 13 "Certification Concerns," many specifically related to RJ's protection,[878] including failing to: permit a worker to visit the placement to monitor RJ's safety and well-being, place a baby monitor as required by DHS in RJ's room which he shared with the foster mother's seven-year-old biological son, and take RJ for a physical.[879] The foster mother refused to correct compliance concerns to protect RJ, stating on 1/31/00: "I'm doing this [foster care] for my [son]. He needs a playmate. I need a [foster] kid who doesn't need anything – that's what I always said and you guys wouldn't listen."[880] She requested the same day that RJ be moved[881] and later stated to RJ in front of his teacher: "I told you that if you acted up I was going to take you back, and now you're going back."[882] She continued, "He's just a

foster child, and I have my own life to deal with so somebody else will have to deal with it now."[883]

***Fifth placement closed due to safety concerns.*** DHS subsequently moved RJ to a fifth placement, another home from which he was later moved due to concerns for his safety and the closure of the placement.[884] While in the placement, RJ was sexually "perpetrated on" by another foster child; no abuse/neglect referral was made.[885] This Tulsa County placement also had numerous policy violations, alleged domestic violence, nineteen moves by the foster parents in four years, dishonesty, and possible felony charges.[886] On or about 8/22/00, a juvenile court judge determined that RJ and [redacted], RJ's brother, should not continue to be placed in the home due to allegations of welfare fraud and concerns that two children were living in the home without either the knowledge or approval of DHS.[887] The DHS decision to close the home was appealed, and sustained 3/13/01 due to the foster parents' failure to comply with foster care policies that related to the reasons the children were removed.[888]

***RJ's sixth and seventh placements.*** RJ's sixth placement, a regular foster home in Tulsa County, lasted five weeks.[889] DHS then placed RJ (10/13/00) in Therapeutic Foster Care (TFC).[890] While in his seventh placement, an assessment was completed 1/29/01 (age five) that found difficulties in memory, reasoning, and academic skills, including receptive language.[891] RJ was diagnosed with Reactive Attachment Disorder, Depressive Disorder, and Attention Deficit/Hyperactive Disorder (11/13/00).[892]

***Trial Reunification and case closing.*** The DHS worker's perceptions of RJ's mother around the time of his initial removal from home included that she was "developmentally delayed. [The mother] is very cooperative and understands what is occurring, but worker thinks she may have difficulties processing ideas. She has a very flat affect and seems to just 'Go along' with everything."[893] As of 4/30/01, RJ's mother had completed a psychological evaluation (not found in his file), Substance Abuse Assessment/Counseling, and Non-offender Sexual Abuse Training; maintained stable employment and housing; and visited with the children.[894] After a home visit seven months prior to his return home, RJ disclosed his mother whipped a sibling with a belt; a referral was screened out as "Not Child Abuse/Neglect."[895] On 3/19/02, DHS and RJ's TFC therapist recommended that he be returned to his mother's home at the end of the school year.[896] He remained in TFC until his Trial Reunification began 5/25/02;[897] DHS closed his case 6/21/02.[898] Between RJ's return to his mother's custody and his re-entry into DHS custody in 2004, his mother failed to protect him as documented in the petition filed 10/20/04.[899]

**[redacted]/04 – 2/13/08: RJ's second stay in custody – ten placements as of 2/13/08**

RJ remained in his mother's custody for two years and 22 days; he and his siblings re-entered DHS custody on [redacted]/04 as described earlier in this report. DHS subjected RJ to ten placements from his re-entry into DHS custody until the filing of the named plaintiffs' complaint (2/13/08), a period of four years and four months. These included six placements in shelters; a placement in a home that was on 90-day probation

by DHS for lack of supervision and another in which he was physically abused and neglected and which was subsequently closed; one TFC placement; and one group home placement. His file documents at least eight school transfers due to placement changes.[900] The file indicates that RJ's DHS workers did not review RJ's previously identified placement needs and diagnoses as documented during his first stay in custody.

**[redacted]/04 – 12/10/04: RJ's first placement – 58 days in the Laura Dester Emergency Shelter**

At the age of eight, RJ re-entered DHS custody due to alleged sexual abuse of his sisters by his mother's new husband and failure to protect by his mother.[901] DHS initially placed RJ for 58 consecutive days at the LDES in Tulsa County.[902] DHS policy permits placement of children six years of age and older in shelters no longer than 30 consecutive days.[903] Policy states that "[i]f an extended stay is required, the child's length of stay in the shelter does not exceed 60 days."[904]

The specified license capacity of the LDES is 50 children, according to DHS policy.[905] The morning after RJ's placement in LDES ([redacted]/04), an email states: "We have 40 children on our shelter census this morning. We have 15 children on our Little House [for infants and toddlers] census of which 5 children are under the age of six;" those children included RJ and his five siblings.[906] By 10/26/04, an email states: "We are at a critical level regarding the number of children in the shelter . . . We have 51 children on our shelter census this morning. We have 22 children on our Little House census of which 8 children are under the age of six."[907] On 10/28/04, the shelter had "55 children on our shelter census this morning. We have 20 children on our Little House census of which 5 children are under the age of six. . . . We are still way over capacity . . . Supervisors need to be staffing these children and working with foster care on placement issues. Visits and attendance at shelter staffings are mandatory . . . Please remember children in the shelter are to be visited weekly."[908] The following day (11/2/04), the shelter census email states: "We have 63 children on our shelter census this morning. We have 25 children on our Little House census of which 7 children are under the age of six."[909]

Throughout RJ's 58-day placement at LDES, email alerts documented not only dangerous shelter over-crowding, but also excessive length of shelter stay, *e.g.*, "We have many children who are over 30 days," including 159, 90, 76, 71, 68, 61, 54 days, and, for RJ and [redacted], 48 days as of 12/1/04.[910] Workers with children in the shelter were not making weekly visits to keep "these children connected to someone until they are placed in a family-like setting."[911]

Shelter staffing notes state RJ had a moderate expressive and receptive language delay and mild articulation delay, and was on medication for ADHD.[912] Shelter staff frequently documented behavioral problems, *e.g.*, "written up for inappropriate behavior," "requires constant attention to focus his energy," "bed early for being disruptive."[913] Incident reports state that RJ "assaulted [a] child," was "disruptive . . . defiant," and was placed on 24-hour restriction several times and on seven-day restriction

at least once.[914] RJ saw a therapist; when or how often was not documented.[915] A contact comment states RJ's therapist was not able to meet with him because RJ was receiving tutoring.[916]

During RJ's 58-day LDES placement, a DHS worker only had face-to-face contact with him on 11/17/04.[917] Two shelter staffings of RJ and his siblings were held on 12/9/04 and 12/2/04; no DHS worker was present at either as required.[918]

**12/10/04 – 4/19/05: RJ's second placement – a foster home on 90-day probation due to Confirmed Lack of Supervision**[919]

***Three days prior to RJ's second placement, DHS put the home into which he was to be placed on 90-day probation.***[920] The foster mother had left the children at home alone "with no safety plan" and alone in the car while she shopped.[921] A Written Plan of Compliance required that a detailed supervision plan would be discussed, as well as other issues raised by the children, including "lack of hygeine [sic] products, clothing, and [foster mother's] manner of disciplining the children."[922] A discussion was documented.[923] DHS placed RJ in this Tulsa County home for slightly more than four months.

Not only was the home on probation at the time of RJ's placement, DHS had previously received at least four referrals of child maltreatment on the home:

- 9/23/04[924] – Alleged Lack of Supervision, Confirmed – Services Recommended. Written Plan of Compliance developed.[925]
- 11/3/03[926] – Lack of Supervision; child injured another child. Screened Out; "referred to foster care." Not addressed by foster care.
- 1/2/02[927] – Abuse – Other (Spanking); Neglect - Failure to Obtain Medical Attention. Children allege foster mother spanking them. Earaches not treated. Screened Out; "Not Child Abuse/Neglect." "Forward to foster care." Not addressed by foster care.
- 3/1/01[928] – Alleged Lack of Supervision; five children sexually acted out in home, admitted behavior. Children removed; finding Services Not Needed. Written Plan of Compliance developed.[929]

Although the circumstances and timing of RJ's removal from this placement are somewhat unclear, between 3/15/05 and 3/22/05, RJ's foster mother and therapist attempted repeatedly to reach RJ's DHS worker and supervisor to discuss an "ongoing emergency" in the foster home.[930] On 3/24/05, the foster parent told RJ's therapist "she was on her way to drop the boys off at the shelter."[931] However, four days later (3/28/05), the foster parent brought the boys to the office and asked that they be removed for stealing from her purse.[932] RJ's Child Placement History states, "foster parent brought child to the shelter" on 4/20/05.[933] A shelter document states RJ was placed in the shelter 4/19/05; the reason noted was "return from foster care."[934]

While in this regular foster home for more than four months, RJ's DHS worker had at least three face-to-face contacts with him;[935] however, the worker did not meet privately with RJ. The therapist's assessment states[936] RJ met criteria for Oppositional Defiant Disorder (ODD), Reactive Attachment Disorder (RAD), and sexual abuse of child as well as neglect, and RJ had extremely poor life skills. The foster parent stated she wanted more support when having a crisis, such as a contact person when her DHS worker was out.[937] A case note states RJ visited siblings; no specifics were documented.[938]

**4/19/05 – 5/6/05: RJ's third placement – Laura Dester Emergency Shelter**

DHS again placed RJ at the LDES in Tulsa County, this time for 17 days. While RJ was placed at this shelter, the census reached 81 children – 31 children over the licensed capacity – with 35 on the Little House census, 20 under the age of six.[939] A shelter staffing of RJ was held 4/25/05; no DHS worker was present as required.[940] Staff stated RJ had receptive and expressive language delays and was seen for ADHD medication.[941] His immunization status was unknown.[942] He was observed by a therapist to have flat affect and poor eye contact; "he does not know why he is here."[943] His treatment goals/actions included speech and language therapy[944] and individual and group therapy.[945]

**5/6/05 – 2/9/06: RJ was physically abused and neglected in his fourth placement**

***RJ removed from fourth placement after nine months due to physical abuse and neglect.***[946] On 5/6/05, RJ and [redacted] were placed with two siblings from another family in a regular foster home in [redacted] County.[947] The family assessment had been approved *only one day prior* to RJ's placement (5/5/05).[948] According to the foster mother, they had previously been TFC parents;[949] however, the foster father said[950] that these four children were "the only foster children they [had] had in their home." RJ was removed from the placement after nine months due to allegations of physical abuse by both foster parents.[951] The investigation finding was Services Recommended.[952] A Plan of Compliance identified the concerns as:

> Spanking and/or switching DHS custody children as well as consenting for school officials to spank DHS custody children; limiting the amount of food children given at meals (no seconds); having DHS custody child sleep on a cot, not given his own bed; children's clothing seen to be not clean and inadequate for their needs; condition of the home observed to be dirty or cluttered.[953]

The home was closed effective 5/5/06[954] because the foster parents failed to meet with DHS concerning the Written Plan of Compliance.

***Over nine months, numerous requests to move RJ and [redacted] had been made by foster parent and DHS worker.*** The foster mother in RJ's fourth placement did not transport children, contributing to problems in arranging visits for RJ and [redacted]:

> There has [sic] been extensive requests for the [J] boys to be moved. [Foster mother] has requested it every time I talk to her. I don't know if she asks the secondary or not. But there are 7 children in the family, all but [[redacted]] and [RJ] are placed in Tulsa Co. The other siblings have visitations set up and get to see each other, but the boys frequently get left out b/c [foster mother] won't transport and because the visitations happen on Saturdays and Sundays. That is why I wanted the boys to be moved.[955]

***Foster parents did not keep RJ's counseling appointments for seven months – Violation of Rules filed.***[956] On 5/20/05, a referral was made for RJ and [redacted] for counseling.[957] At the end of June, RJ had an initial intake visit for therapy,[958] but nothing further was done.[959] In September, therapy sessions were reportedly "temporarily put on hold" due to scheduling issues.[960] In November, RJ still did not have a therapy schedule;[961] neither DHS nor the foster parent had assured that he was provided any counseling. On 12/9/05, a worker contacted the counseling agency[962] and was told four calls had been made and messages left with the foster mother; she neither replied nor made contact with the agency.[963] DHS staff filed a Report of Violation of Rules concerning her failure to follow through on counseling for RJ and [redacted] for seven months.[964] The foster mother then agreed to take the children for counseling.[965]

When the foster mother kept the intake appointment for RJ and [redacted] she was "totally unprepared and uninterested in getting any help for the boys."[966] She was not forthcoming with information, *e.g.*, behaviors, grades, school information, and focused only on how often appointments would be.[967] On 2/8/06, the therapist met privately with RJ, [redacted], and a third child placed in the home; each disclosed being regularly spanked with tree switches by the foster mother and being hit by the foster father with "whatever he has in his hand."[968]

***Referral investigated regarding hitting/whooping/spanking in placement.*** The next day a [redacted] observed linear marks on the children's backs; the foster mother admitted hitting the children with a switch.[969] The specialist interviewed each child; he described RJ's speech as difficult to understand and had to ask RJ to repeat himself.[970] RJ disclosed that he didn't like living in this home, didn't like getting spankings, and had been hit everywhere, leaving red marks.[971] RJ stated the switches were in the front seat of the car, by the foster mother's chair, in the kitchen, and on the porch.[972] He reported he and others got "whupped" that morning because their room was dirty.[973]

Consistent with RJ's report, the worker observed a switch next to the chair, "approximately 2.5-3 ft long with the end of the switch broken off."[974] The foster mother admitted "she did indeed spank the children because sometimes they needed it. [She] stated that 'if you don't beat them down they will run all over you.'"[975] She said RJ and [redacted] were "just defiant" and she had to "make them mind."[976]

A DHS worker removed RJ and [redacted] from the placement the same day.[977] The boys said they wanted to be in a new home with people who "didn't get drunk or yell cuss words at them [like their father] or hit them [like their father and the foster parents];" they also asked if they could get seconds where they were going, stating the foster mother called them a "greedy mutt" when they asked for seconds.[978] When the worker got the children's belongings, she reported the clothing had a "strong odor like sweat or body odor;"[979] the children's shoes were worn and too small.[980]

While in this placement, a DHS worker made face-to-face contact with RJ eight times;[981] however, there is no indication that prior to the 2/8/05 investigation any DHS worker met with RJ privately. RJ had "some contact" with his [redacted],[982] a visit with his sisters,[983] and attended a "family reunion" where he visited a second time with his sisters.[984]

**2/9/06 – 3/6/06: RJ's fifth placement – [redacted] Emergency Shelter**

RJ was placed with [redacted] for 25 days at a [redacted] County emergency shelter.[985] On 2/27/06, a child welfare specialist emailed RJ's worker that the shelter director "wanted the [J] boys moved out of the shelter by this Friday . . . because the boys have been in this shelter for over 14 days and the shelter director needs some beds open for the surrounding counties."[986] RJ was not provided counseling during this placement.[987] On 2/26/06, RJ's worker emailed another worker explaining her perspective about what constitutes a "contact with a child in placement:" "[the contact] has to be at placement provider. you [sic] picked them up from one and took them to another. that [sic] counts technically." This comment appears to apply to the worker's move of RJ from his fourth placement to this shelter. A DHS worker made face-to-face contact with RJ on 3/1/06 and told him that he and [redacted] would be moved from the shelter in a few days.[988]

**3/6/06 – 3/14/06: RJ's sixth placement – [redacted] Shelter**

DHS moved RJ to an [redacted] County shelter where he remained nine days;[989] the reason given for his move from this shelter was discharged to a less restrictive environment.

An email chain 3/9/06 – 3/13/06 documents the decision-making concerning RJ's next placement:[990]

> [DHS staff]: [DHS staff] said you had a couple of boys who needed a foster home. I've got a foster home that needs a couple of boys . . .
>
> [RJ's worker]: . . . Can I place one boy in the home? Or does it have to be both of them?
>
> [DHS staff]: *if you only have one send one anything to keep the little guys out of*

*our shelter count.*

[RJ's worker]: i am sending both of them to [home that "needs a couple of boys"]. [Foster mother] said she didnt mind [RJ] being short term (emphasis added, sic throughout).[991]

**3/14/06 – 3/30/06: RJ's seventh placement**

According to the emails above, DHS planned RJ's seventh placement in Tulsa County as short-term. However, RJ's Placement History states the provider requested a change of placement due to problem behavior.[992] RJ physically assaulted a younger boy in the home[993] and was described as not doing well in this 16-day placement.[994] RJ's DHS worker reported RJ would be staffed for TFC;[995] they were waiting for psychological evaluation results.[996]

**3/30/06 – 4/17/06: RJ's eighth placement – Laura Dester Emergency Shelter again**

After only 16 days in a foster home, RJ was again placed at the overcrowded LDES in Tulsa County. On 4/10/06, 51 children were on the shelter census, with 16 children under six;[997] on 4/17/06, 52 children were on the shelter census, with 13 children under six.[998] A LDES staffing for RJ was held on 4/10/06; no DHS worker was present as required.[999]

Shelter staff reported few behavior problems for RJ during this 17-day placement:[1000] RJ "is controlling anger well and interacting well with others."[1001] In contrast, a DHS worker states 4/14/06 that RJ and [redacted] were "not doing well at the shelter;" they were "aggressive, loud, unable to redirect, increasing oppositional defiance."[1002] A speech and language evaluation was conducted for RJ and "severe language impairment" was found.[1003] Speech therapy one to two hours weekly with review of progress at six months was recommended.[1004] This was at least the fourth placement in which either speech and language difficulties were identified for RJ and/or speech therapy was recommended, but not provided. RJ was approved for[1005] and transferred to a TFC placement.[1006]

**4/17/06 – 6/3/07: RJ's ninth placement – TFC**

RJ was placed in a TFC home in Oklahoma County without [redacted]. [redacted] was told that "there were no openings for 2 boys" and "their combined behavior was not appropriate."[1007] A month after the placement change (5/16/06), RJ's worker stated "RJ is doing satisfactorily in placement. There are huge issues that are being worked on in the home . . . RJ continues to be defiant and insolent."[1008] RJ received therapy with the TFC agency and was "having issues" (unexplained) with his leg.[1009] A 6/29/06 TFC agency court report states, "RJ needs intense psychotherapy to address deap [sic] seated issues of neglect, abandonment, and rejection."[1010] RJ was scheduled for a psychological evaluation on 7/6/06.

A brief summary provided to RJ's treatment team on 8/3/06 states RJ has "several factors that would put him at risk for an attachment disorders [sic];"[1011] it also states RJ has a weakness in his leg that "he said stems from being tied up by a stepfather or father, however he has not given names or other types of abuse."[1012] In a 10/5/06 psychological evaluation, the psychologist noted that RJ's speech was "obviously poor and this examiner had some difficulty understanding [RJ]'s communication . . . He was very child-like in his communication and overall behavior patterns. In addition to his speech difficulties, his language skills appear to be very underdeveloped."[1013] Consistent with these observations, the 8/19/06 TFC agency court report recommends that RJ receive services to "address speech impediment and increasing sexually acting out behaviors."[1014]

A 5/18/07 email states, "[RJ] (dob [redacted]) is currently in TFC and is on the verge of disrupting placement. He has been in his current home over a year. He has problems with aggressive behavior towards younger children and attempts to manipulate them. He is passive aggressive when it comes to following directions. He lies and takes little responsibility for his behavior."[1015] RJ's DHS worker's comments also indicate that RJ was not making progress and that "he displays too many behaviors that could make him susceptible to a predator and too many habits that would be considered grooming."[1016] ("Grooming" can be part of the process of sexual victimization whereby various mechanisms are used to engage and manipulate a potential victim, such as showing unusual interest, devoting time and attention, engaging in sexualized conversation, giving gifts and special privileges, and coercion.[1017]) RJ's discharge summary from the TFC agency states that he "was a continuos [sic] behavior problem in school and [TFC mother] was in constant contact with his teachers. Consequences did not seem to matter to [RJ]. He could verbalize what he should do and needed to do, however, his behavior continued to decline. [RJ] had a tendency to associate with children younger than himself."[1018]

During this placement, RJ visited with his siblings and mother. However, DHS worker comments from contacts with RJ state there has been no visiting due to "no case aides being available" as of 12/28/06.[1019]

**5/23/07 – 2/13/08: RJ's tenth placement – Group Home**

RJ's Placement History states he was moved from the TFC home because the placement could not meet his behavioral treatment needs; he was then placed in a group home in Tulsa County, where he remained when the named plaintiff's complaint was filed.[1020] His DHS worker comments "[RJ] is doing well. He is getting along with staff and peers. He is becoming a little more oppositional to the demands and the rules in the placement. The staff feels that he is becoming more comfortable and the traits that landed him on this level are coming out. Staff has started to watch him closer."[1021]

RJ's 12/22/07 group home treatment plan states the following goals/discharge criteria: "Resident will display improved compliance with rules, no significant aggression and ability to accept redirection without incident. He will evidence ability and willingness to succeed at a lesser level of care. Likely will be transition [sic] to foster

care or adoption should progress continue."[1022] The plan does not state what his progress has been or when the staff anticipates RJ will meet these goals.

On 12/4/07, a DHS worker's comment states: "[RJ] has decided he would like to be adopted and be in a family home. Worker asked if he could do well in a home, since he came from a home to the [group home]. [RJ] said yes he could."[1023]

**RJ's Permanency Status as of 2/13/08**

RJ's mother relinquished her parental rights 9/28/06,[1024] and his father's parental rights were terminated 1/9/07.[1025] A DHS court report signed 2/13/08 states RJ's permanency plan was Adoption Preparation/Adoption.[1026] However, the report states "he starts to regress to worse behaviors when discussion of discharge and adoption starts, and his therapist is working on these responses."[1027]

**Continuity of DHS workers/supervisors assigned to RJ**

According to DHS staffing tables provided to plaintiffs' counsel by defendants' counsel, as of 2/13/08, during RJ's second stay in DHS custody, he was assigned 12 primary workers with 8 supervisors and 11 secondary workers with 10 supervisors. Therefore RJ was served by a total of 23 workers and 18 supervisors during his second stay in DHS custody. As documented above, other persons also were involved in transporting RJ when his placements changed and aides also carried responsibilities for placement services.

A list of assigned workers was also found in RJ's case file in a Case Summary section.[1028] When this list and the staffing tables described above were compared, numerous inconsistencies were identified that cannot be explained.

## RJ CASEWORK ANALYSIS

### DHS Failures to Protect RJ from Harm While in DHS Custody

DHS consistently failed to protect RJ beginning with his initial DHS contact in 1997, through his first placement in DHS custody at the age of three in 1999 and subsequent unsuccessful return to his mother's home, and throughout his most recent stay in DHS custody. In RJ's most recent four year and four month stay in DHS custody, DHS consistently demonstrated disregard for RJ's emotional, physical, social, and cognitive development in its decisions, its actions, and its inactions regarding RJ's placements,

treatment, and other services. DHS' extensive placement of RJ in three different shelters in three counties for at least 126 days is indicative of the agency's disregard for RJ's needs.

## I. DHS failed to protect RJ from repeated maltreatment due to DHS failure to monitor and evaluate safety and risk of harm to RJ, both prior to and during his placements

***A. DHS failures to protect RJ from maltreatment are inexcusable.*** Numerous problems were identified throughout RJ's fourth placement, a regular foster home for which the family assessment had been approved only one day prior to RJ's placement. Although RJ was referred for counseling almost immediately after being placed in the home, his foster mother prevented RJ from meeting alone with a [redacted] for more than seven months. When he and two other children placed in the home were finally able to meet separately with a [redacted], all three disclosed that the foster mother regularly spanked them with tree switches and the foster father hit them routinely with whatever he had in his hand. The foster mother admitted to hitting the children with switches, and RJ disclosed that he had been hit everywhere, leaving red marks. The finding of the investigation was "Services Recommended," and a Written Plan of Compliance identified as serious concerns not only the physical abuse of RJ, but also limiting RJ's food, providing dirty clothing that was also too small, and living in a dirty, cluttered home. Because the foster parents failed to meet with DHS concerning the plan of compliance, the home was closed.

Although RJ's DHS worker made face-to-face contact with RJ as required, no DHS staff member met privately with RJ throughout the entire placement. Given the many difficulties in this placement, such meetings were essential, particularly given DHS

failures to ensure that RJ was receiving the counseling DHS had determined that RJ needed. Regular, private face-to-face contact with RJ more likely than not would have yielded an earlier disclosure by RJ of the routine physical abuse and neglect to which he was subjected in this placement and thus would have prevented this extended placement in which he was habitually maltreated.

***B. DHS failed to meet its own minimum requirements for monitoring whether RJ's needs were met and his safety intact in his placements.*** RJ's DHS workers failed to meet with RJ within 24 hours of each of his shelter placements, as well as weekly in any of his three LDES placements as required by DHS policy.[1029] They also failed to attend, as required, his LDES staffings. RJ's second placement, a regular foster home, had been placed on 90-day probation for Lack of Supervision only three days prior to RJ's placement in the home. Although RJ's worker made face-to-face contact with RJ in the placement, the worker failed to meet with RJ privately even once to explore his safety in his placement. Private meetings with RJ would have been warranted to ensure that this foster home was complying with its Written Plan of Compliance, which addressed not only the issue of lack of supervision, but also the lack of hygiene products and clothing and the foster mother's manner of disciplining the children. By failing to provide RJ an opportunity to speak privately with his worker about his treatment and safety in the home, RJ was inevitably inhibited by the foster parent's presence when face-to-face contact did occur.

***C. DHS workers consistently failed to ensure that RJ's placements were even minimally prepared to meet his needs.*** RJ's file documents that each of the three times that RJ was placed in the LDES, the shelter was critically overcrowded. Still, RJ's DHS

worker not only placed him in the shelter each time, with full knowledge of the risks of harm to all children in the shelter due to insufficient staff supervision, but also failed to make the required face-to-face contact with RJ while he was placed there to monitor his safety and well-being.

In RJ's second placement, information was available to RJ's DHS worker that the home had previously received at least four referrals of child maltreatment in the home. Three of these had been allegations of Lack of Supervision, and in two of the three instances a Written Plan of Compliance had been developed. RJ's worker failed to fully assess the degree to which RJ could be safe in a home that not only had a history of lack of supervision, but also was on 90-day probation.

Although RJ had been repeatedly referred to speech therapy that had never been provided and for counseling to address his history of severe victimization, DHS kept RJ in his fourth placement, where his foster parents refused to provide transportation and scheduling of counseling for RJ for more than seven months. This predictably resulted in RJ's failure to receive needed services throughout this placement.

Therefore, RJ's DHS workers failed to conduct the basic protective function of matching RJ with facilities and foster family caregivers that had the capacity to meet his needs. It appears that throughout RJ's six-year period in DHS custody, DHS workers based the selection of his placements solely on the availability of placement beds or slots.

A knowledgeable assessment of the ten placements in which RJ was placed would have determined that the placements either should not have been permitted to provide care to *any* child in custody or should not have been selected to provide care to RJ. Therefore, DHS workers' basic monitoring of RJ in his placements would, at a minimum

as required by DHS policy, have warranted increased frequency of face-to-face contact by DHS in the home and face-to-face private contact with RJ to explore whether his needs were met and he was safe in the placement.[1030]

## II. DHS failed to protect RJ from harm caused by placement instability

Six of RJ's ten placements were unplanned, made hurriedly, and in a crisis. DHS frequently moved RJ to new placements that were known to be temporary and short-term, thus subjecting him to inexcusable placement instability. Because of DHS failures to conduct the basic process of matching RJ's needs with the placement's capacity to meet his needs, his placements by definition required another subsequent placement or ultimately disrupted. DHS resorted five times to placing RJ in emergency shelters, resulting in a harmful level of placement instability and a risk of neglect and abuse. The multiple other DHS failures described above, combined with the agency's overuse of shelter placements, produce a harmful history of abuse and a placement change for RJ on average every 120 days.

## III. DHS subjected RJ to discontinuity of DHS workers and supervisors and consistent absence of supervisory monitoring of worker accountability

During the six years following RJ's re-entry into DHS custody, RJ was subjected to a high level of discontinuity of workers and supervisors. According to staffing information provided by defendant's counsel to plaintiffs' counsel,[1031] as of 2/13/08, 23 DHS staff members were assigned to RJ as either primary or secondary workers, and 18 DHS supervisors were assigned to guide and support RJ's workers and hold them accountable.

The review of RJ's file indicates that no DHS supervisor ensured that RJ's workers' documentation was complete, correct, and timely. And no supervisor ensured

that the rationale for case decisions regarding RJ was documented, such as the rationale for placing him five times in shelters. Without reliable information concerning the rationale upon which prior case decisions were based, agency staff cannot make informed future practice decisions regarding a child's safety, well-being, and permanency.

RJ's file also fails to contain evidence of regular on-going supervision of RJ's workers. The lack of RJ's workers' accountability is seen in their extensive failures to carefully match placements with RJ's needs; locate family foster homes in a timely manner to prevent the repeated and lengthy use of shelter placements; meet with RJ regularly and privately; and complete RJ's case documentation as required by DHS policy. The serious, persistent lack of accountability of RJ's DHS workers and supervisors inevitably contributed to their unacceptable overuse of shelter placements and inability to identity and address risk factors in the foster home where RJ was repeatedly neglected and abused.

**Conclusion**

DHS has failed to protect RJ since his first contact with the agency in 1997. His initial entry into DHS custody at the age of three in 1999 was based upon confirmed allegations that RJ's stepfather repeatedly abused RJ's siblings in front of each other for 24-48 hours, including forcing RJ to bathe with him and RJ's sisters, and forcing one of RJ's [redacted] to perform fellatio on RJ. In his initial stay in custody, DHS placed RJ in seven placements in 20 months. He was subjected to maltreatment in at least two placements. RJ was diagnosed with Reactive Attachment Disorder, Depressive Disorder, and Attention Deficit/Hyperactive Disorder while in Therapeutic Foster Care (TFC).

When DHS placed RJ in his mother's home for a Trial Reunification, DHS failed to monitor his safety in her home before closing the case.

Thus, when RJ re-entered DHS custody at the age of eight, he brought an eight-year history of traumatic victimization and family instability. In his prior stay in DHS custody, he had required TFC and group home placements to meet his needs and address his mental health problems. Despite the information available in RJ's file, including family history, prior investigations, placement history, and previous diagnoses and treatment history, RJ's case file indicates that his DHS workers did not review RJ's previously identified and documented placement needs and diagnoses prior to and during his first stay in custody. Instead, DHS placed RJ for fifty-eight days in an overcrowded shelter and failed to provide him face-to-face contact with his DHS worker as required; moved him to a home on 90-day probation due to Confirmed Lack of Supervision; re-placed him again in a shelter with a daily census *almost double* its legal capacity of fifty; and moved him to a home in which he was denied counseling for more than seven months, routinely switched by his foster mother with a tree branch, and spanked by his foster father with whatever he had in his hand. His subsequent four placements included another shelter placement, foster home, TFC, and a group home.

Had RJ's DHS workers read his file, documenting his life-long traumatic family situation and ongoing victimization, his DHS worker could have located a placement that would meet his placement, treatment, and educational needs. Had DHS acted on this basic casework principle and agency requirement,[1032] that the child's file be read when the case is assigned, RJ could have been protected from the 2,189 additional days of

placement instability, emotional trauma, and victimization that DHS instead subjected RJ to while in DHS custody.

As of 2/13/08, RJ remained placed in a group home, very ambivalent about adoption due to his painfully dissatisfying experiences with families – his own and those under whose care he was placed by DHS.

## DHS Systemic Deficiencies and Failures Suggested by Review of the Named Plaintiffs' Files

JB, AP, JA, JP, and RJ are named plaintiff children who were removed from their own homes due to maltreatment by their caregivers and placed by court order in Oklahoma Department of Human Services' (DHS) custody. Although the review of five children's files cannot conclusively establish overall systemic problems, there are striking similarities in the children's case records and experiences in DHS custody that appear to indicate systemic deficiencies and persistent preventable failures.

Several themes can be identified, all of which point toward the agency's serious difficulties in meeting its own minimal standards and requirements for protecting children from harm while in DHS custody. Although DHS policy mandates that "Safety drives all case planning decisions,"[1033] it is apparent from the review of these children's files that, due to DHS deficiencies and failures, this policy was not followed. Unfortunately for the foster children who have been and continue to be in DHS custody, the deficiencies and preventable failures revealed by the five children's files have inevitably endangered children and resulted in substantial preventable harms. Seven systemic deficiencies and failures suggested by the files reviewed are described below, followed by identification of the resultant irreparable and preventable harms to children documented throughout this report.

**1) DHS failure to monitor and evaluate safety of children's placements *during those placements*.** This review found an unconscionably high level of abuse and neglect of named plaintiff children while in custody. Four named plaintiffs were subjected to: neglect in a shelter that caused first and second degree burns (JB); neglectful lack of supervision that resulted in daily sexual violations by [redacted] in two

different placements (AP); severe physical abuse, dangerous lack of supervision, failure to provide medical care, emotional abuse, and mental injury (JP); and chronic physical abuse, limits in food provided, and other neglect (RJ). These children were also required to remain in homes known by DHS to be maltreating them for extended periods of time; in JP's case, for as long as five months.

This very high level of maltreatment was found to be associated with DHS workers' failure to provide the minimum required monitoring of whether foster children's "needs are met and [their] safety . . . intact" as a matter of day-to-day practice.[1034] DHS workers routinely:

- failed to make basic face-to-face contacts with children in foster family and therapeutic foster care homes, including kinship care homes. DHS policy requires that face-to-face contacts be made "within the first two weeks of each placement and a minimum of once every calendar month thereafter."[1035] For children in custody but placed in their own home, DHS policy requires a "face-to-face private contact with the child a minimum of once every calendar month."[1036] *DHS workers instead abandoned children in their placements.* To illustrate, during the first five months of four-month-old JB's Trial Reunification placement, JB's DHS worker had made only two face-to-face contacts with the infant in his placement; for a period of at least ten days, JB's DHS worker did not even know his whereabouts. Similarly, JP's DHS worker made *only one* face-to-face contact with seven-year old JP in his placement during the first *six months* of his twelfth placement, a placement on which DHS received three referrals of abuse or neglect.

- failed to make "face-to-face contact with the child at the shelter within 24 hours of the child's entry into the shelter and a minimum of once weekly while the child remains in the shelter."[1037] During RJ's fifty-eight-day placement in the Laura Dester Emergency Shelter, his DHS worker made *only one* face-to-face contact with RJ.

- failed to make "at least three successful unannounced contacts per year"[1038] with children in their placements to monitor their safety and well-being. In *none* of the five children's cases were three unannounced contacts per year made by DHS workers.

- failed to "increase [face-to-face contacts] in times of change and stress"[1039] and, "[i]f there is good cause [such as if the child asks to be moved from the foster

home[1040]] to believe that a child needs to be interviewed privately during a contact in the foster home," to interview the child "outside the foster parent's presence."[1041] It appears that DHS workers and supervisors failed to comprehend and act on the basic child protective services principle that children feel more secure disclosing their personal safety and other concerns *in private* to a trusted person.[1042]

- failed to increase the frequency of face-to-face contact with the child in the placement when there is "any type of safety concern, history of environmental neglect, concerns regarding access by the perpetrator, the age of the child, or an order of the court."[1043] DHS workers consistently failed to make *any* increased face-to-face private contact with children who were in dangerous situations, such as when five-year-old JA threatened to run away from his shelter placement and repeatedly made threats to harm himself, and when six-year-old JP asked several times to be moved from a placement due to his foster mother's physical abuse and dangerous lack of supervision which was later confirmed by DHS.

- failed to make referrals of abuse or neglect and/or immediately remove a child from the placement when a DHS worker directly observes "indicators of abuse or neglect of a child in a foster . . . home."[1044] Only rarely did the five named plaintiff children's workers or supervisors take either action when there were clear indicators of maltreatment.

- failed to ensure that an "evaluation and response" occurred when there was "an observation or report of abuse or neglect or potential for abuse or neglect of a child in a foster . . . home." [1045] These failures are particularly troublesome when a DHS investigating worker "screens out" a referral for abuse or neglect in a child's placement, meaning that no investigation of the referral is made and no interviews are conducted with alleged child victims, other children in the placement, the perpetrator(s), or relevant others. DHS workers very frequently, perhaps too frequently, "screened out" referrals of abuse or neglect of the named plaintiff children while in custody; however, in doing so, they permitted the child to remain in the placement and recommended or required a "response"[1046] on which DHS never followed through. Such responses included an internal contract agency investigation of the alleged abuse or neglect and/or the development and implementation of a Safety Plan and/or a Written Plan of Compliance. Such plans are designed to protect the child who remains in a placement from further harm and are signed by the placement caregiver(s).[1047] The five children's files consistently failed to contain documentation of *any follow-through* concerning these recommended/required responses.

- failed to provide Comprehensive Home-Based Services (CHBS) to children in Trial Reunification placements. Such services provide frequent face-to-face private contact with the child in the placement by the CHBS case manager.[1048] In JB's and AP's Trial Reunification placements, their DHS workers failed to

provide home-based services either at all (AP) or for the majority of the placement period (JB).

**2) DHS failure to monitor and evaluate safety in children's placements, including Trial Reunification placements, *prior to the child's placement.*** Too often, the named plaintiff children's placements were not safe for any child in DHS custody or could be safe only under specified conditions, such as with very extensive monitoring to address risk factors already known to DHS. These included placements that had documented histories of neglect and/or abuse and/or of failing to comply with applicable Oklahoma statutes and DHS rules and policies, and placements in which the persons applying to become foster caregivers had extensive and serious histories of having been neglected and/or abused themselves or had other personal experiences that could predictably complicate their capacity to care safely for abused and neglected children in DHS custody. Despite these known histories, DHS allowed these placements to be used for the named plaintiff children, without adequate – let alone extensive – monitoring of the children's safety while in the placements.

**3) DHS' drastic shortage of placements for children in DHS custody**. Due to the agency's extreme placement shortage, including both an insufficient number and range of placements for children in custody, DHS routinely and knowingly placed the five named plaintiff children in dangerous and inappropriate placements. These included:

- foster family and kinship placements for which background checks of all persons in the home (including the parents' biological children), training of caregivers, and/or family assessments had not been completed prior to the child's placement; thus, the named plaintiff children were habitually placed in homes that had not yet been approved and/or certified.

- critically overcrowded emergency shelters and placements, in violation of DHS' own policies. Four of the five named plaintiffs were repeatedly placed in shelters for periods of time that greatly exceeded the time limits permitted by agency

policy. For example, RJ was placed in five shelter placements in three different counties for a total of 126 days, and JA was placed in four shelters in four different counties for a total of 89 days, 82 of these consecutive. Moreover, documents in RJ's file state that the Laura Dester shelter, in which he was placed three times, had daily census counts far surpassing the legal capacity and had children with stays of up to 159 days.[1049] Shelter reports found in JP's case file document the Pauline E. Mayer shelter was also routinely over capacity, with children placed for up to 107 days, often without *any* visitation by their DHS worker.[1050]

- emergency and temporary placements, *e.g.*, Emergency Foster Care (EFC) and respite placements that, by definition, require at least one additional placement change in a specific short period of time and therefore increase discontinuity in children's caregivers.

**4) DHS failure to provide basic matching between the placement, treatment, and educational needs of children in DHS custody and the placements' willingness and ability to meet those needs.** The named plaintiff children's files document that DHS staff *rarely* made *any* effort to match a child's needs with foster caregivers' or facilities' capacity to meet those needs. As stated in DHS policy, DHS workers are required "to determine whether a placement is an appropriate placement for a child in OKDHS custody."[1051] Almost without exception, DHS placement decisions were based instead on hurried efforts to locate any available bed or slot in a home or facility.

As would be predicted, this approach to selecting children's placements resulted in an uncontrollably high level of placement disruptions. The number and average frequency of the five named plaintiff's placement changes while in DHS custody were: JP, 12 placements with a move every 53 days; JA, 10 placements with a move every 43 days; RJ, 10 placements with a move every 120 days; AP, 7 placements with a move every 81 days; and JB, 4 placements with a move every 121 days.

**5) DHS failure to document accurate information regarding children's safety and to present critical safety information to the court and other DHS staff.** Each time DHS workers failed to provide complete and accurate documentation of critical safety information to all persons involved in decision-making regarding the named plaintiff children's placements and services, they jeopardized the child's safety and well-being. For example, a change of placement form provided to JP's judge did not include information known to DHS that the placement change was made due to allegations of maltreatment in the home; JA's judge ruled that DHS failed to make reasonable efforts to finalize JA's permanency plan and place JA in a timely manner due to the agency's failure to provide JA's numerous placement change forms to the court; and DHS progress reports prepared for AP's court reviews failed to contain information regarding allegations of maltreatment by her sister in the placement.

**6) Discontinuity of DHS workers and supervisors serving children and consistent absence of supervisory monitoring of worker accountability.** The five children experienced a succession of workers as if the workers were coming and going through a revolving door. As of the date the named plaintiffs' complaint was filed (2/13/08), the five children were assigned a total of 106 DHS workers during their time in custody and a total of 95 assigned supervisors. The total number of DHS workers assigned to each child ranged from 13 to 30; the total number of DHS supervisors assigned to each child ranged from 12 to 29. The children were often moved from one placement to another by strangers – DHS staff members whom the children had never met and never saw again. Face-to-face contacts with children, caregivers, and children's parents were made by multiple DHS workers and other DHS staff.

This review found numerous problems associated with DHS staffing patterns. Frequent changes in DHS workers inevitably endangered these five children while in DHS custody. Such changes created confusion regarding which DHS staff member had authority and was responsible for decisions regarding the child. They resulted in superficial, erroneous, and often no communication; lengthy delays in services and information transfer; and serious errors in responses to children's needs for protection and other services. The staffing system used by DHS is not clear with regard to case transfer and assignment; accountability of workers and supervisors for required contacts to children in their placements and planning parent-child visits; and accountability for intra-agency, DHS-court, and inter-agency communication regarding concerns about a child's safety and well-being and coordination of children's placement services.

As discussed in each child's case analysis, the children's case files also fail to document regular, ongoing supervision of DHS workers. A lack of DHS workers' accountability is evident in the workers' extensive failures to carefully screen and match placements with children's needs; make required face-to-face contacts to monitor children's safety and well-being in placement; meet privately with children about requests for placement changes and their treatment in particular placements; respond to observable indicators of harm or of risks of harm to children in their placements; follow-through on recommended and/or required follow-up when referrals were screened out; and complete investigations and case documentation as required by DHS policy. The serious, persistent lack of accountability of DHS workers and supervisors further compounded the dangerous agency environment within which these five children were placed while in state custody.

**7) DHS failure to provide basic permanency planning services.** DHS policy states that, "[t]he purpose of permanency planning is to ensure the child has a plan that addresses the child's immediate and long-term needs for safety, wellbeing, and permanency."[1052] Pike et. al. (1977) clarify the meaning of permanence for children in custody: "Permanence describes intent. A permanent home is not one that is guaranteed to last forever, but one that is intended to exist indefinitely. When the expectation of permanence is lacking, a child experiences doubt, uncertainty, and hesitancy. Permanency planning means . . . keeping alive a plan for permanency (emphasis in original)."[1053] Pike et. al. also stress that in achieving permanency for children, the public agency social worker has "the central and indispensable role of coordinating the activities of [foster parents, parents, and others involved in the child's daily care] and service agencies."[1054]

In the five named plaintiffs' cases, DHS workers failed to keep alive a plan for permanency as well as to apply permanency planning principles in their practice. For example, permanency planning requires completing an immediate assessment of the conditions that required a child's removal from the home, conditions that must therefore be resolved for a child to be safely reunited with his or her family.[1055] DHS workers often failed to complete critical aspects of parents' assessments, particularly parents' psychological evaluations, for a year or more, if at all. These preventable delays precluded the development of treatment plans grounded in the reality of all of the conditions that contributed to a child's placement.

## Harms to Children in DHS Custody

The systemic deficiencies and failures suggested by the review of the five named plaintiff children described above are widely recognized to inevitably result in damage to children. These harms include:

**1) Neglect, physical abuse, and sexual abuse while in DHS custody.** The trauma children suffer as a result of being maltreated by their caregivers and placed in protective custody is exacerbated if, while in custody, they are placed with families, facilities, and/or Trial Reunifications in which they are subsequently maltreated. As detailed in this report, the trauma of repeated maltreatment while in DHS custody was experienced by four of the named plaintiffs whose cases were reviewed.

Guterman and Taylor (2005) provide an extensive review of the problems associated with child maltreatment, including developmental, medical, cognitive and language deficits, and emotional problems; they describe the emotional problems as "increased anxiety, depression, post-traumatic stress, low self-esteem, suicidal ideation and behavior, and problems with self-regulation of emotions."[1056] They stress that children who are maltreated are at "heightened risk for developing multiple sociobehavioral problems, including difficulties with social relationships and developing trust and attachments . . . increased aggression, and externalizing behavior."[1057] As adults, maltreated children are also more likely to be involved in criminal activities.[1058] The case files of JB, AP, JP, and RJ document, without a doubt, the destructive life-altering consequences of the traumatic maltreatment to which they were subjected while in DHS custody.

**2) Deprivation of continuous caregivers due to an unconscionably high level of placement changes.** The frequent, poorly managed, and often avoidable movement of the five named plaintiff children from one home or facility to another invariably inflicted severe emotional harm on these children. It is widely recognized that a fundamental principle underlying permanency planning practice and policy is that "all children need a stable and continuous relationship with a nurturing person or persons, in order to develop physically, socially, and emotionally, intellectually, and morally."[1059] Typically, parent-child attachments are formed through an ongoing process between children and their primary caregiver(s).[1060] Insufficient continuity, mutuality, and stability in caregiver-child relationships interfere with the development of the children's capacity for healthy attachment.

Changes in children's placements while in custody create discontinuity in caregivers and thus severe disruptions in infants' and children's lives. Placement changes by definition interfere with continuity, mutuality, and stability in children's relationships with their caregivers. When placement changes are numerous and frequent, such as those experienced by the five named plaintiff children, they create an intolerable level of caregiver discontinuity, accompanied by chronic grief, development regression, and other developmental and emotional problems. Bowlby (1969, 1973 and 1980)[1061] and Goldstein, Freud, and Solnit (1973)[1062] warn about the negative and often long-lasting consequences of separating children from their caregivers. As a consequence of placement instability and caregiver discontinuity, a foster child's already damaged trust in adults to provide care and protection is further betrayed and the child's fragile ability to form attachments and relationships further deteriorates.

Research has confirmed that placement instability, such as that experienced by all five children whose placement experiences are reviewed in this report, is associated with negative outcomes in children's ability to form positive connections with people, overall educational achievement, and mental health needs.[1063] A recent study also found "placement instability, independent of a child's problems at entry into care, can influence well-being for children in out-of-home care . . . those children who failed to achieve placement stability were estimated to have a 36% to 63% increased risk of behavioral problems compared with children who achieved any stability in foster care."[1064] With each placement change, these negative consequences were consistently found and observed to escalate in the five named plaintiff children.

**3) Lengthy, often repeated placements in overcrowded and poorly supervised shelters.** Children experiencing lengthy and/or repeated placements in crowded and poorly supervised shelters also by definition experience caregiver discontinuity. Shelters provide day-to-day care to children by rotating staff members who have limited time and attention for individual children; shelter staff also may not have sufficient training to respond appropriately to maltreated children's needs. DHS policy requires limits on the length of shelter placements for foster children because lengthy and repeated placement in shelters is always harmful to infants and children.

**4) Superficial relationships with DHS workers, leading to lack of disclosure and inevitably increased risk of harm.** In addition to the harm of service discontinuity associated with frequent changes in workers assigned to children, these changes also greatly undermine the development of relationships between children and their workers. Each change in the worker or other staff member who maintains face-to-face contact with

the child interrupts the relationship that the child is developing with their previously assigned worker and negatively affects the degree of disclosure and accuracy of information achieved in worker-child conversations. When the safety and well-being of children in care are monitored either sequentially or concurrently by numerous workers and other staff with multiple levels of authority and varied degrees of training and experience, the information derived from workers' face-to-face contacts with children is likely to be very limited. Under such conditions, the agency's ability to protect children in custody is predictably greatly undermined.

For example, children tire of telling their stories over and over to strangers, and thus, over time, may cease to answer a second, or third, or fourth worker's questions. A relationship between children in custody and their workers is necessary for children to feel sufficiently safe with the worker to disclose difficulties they are experiencing in placement, including maltreatment. JB, AP, JA, JP, and RJ almost without exception disclosed their mistreatment and maltreatment in custody to someone other than their DHS workers. In many instances, this may have occurred because their workers failed to make the required contact that would have permitted disclosure. Without counselors and teachers, the five children would have had no one to tell.

**5) Harmful deterioration in well-being and development due to lack of necessary services, including assessments, psychological evaluations, speech therapy, and special education.** DHS consistently either delayed in providing services to JB, AP, JA, JP, and RJ or failed to provide services that had been recommended, often repeatedly. A careful reading of the children's detailed placement experiences reveals deterioration in their educational performance, troublesome behaviors, and emotional distress. DHS

failure to provide them consistent counseling, timely psychological evaluations, assessments of their cognitive abilities and educational needs, as well as other needed services, such as speech therapy, contributed to increasingly negative short- and long-term outcomes rather than to their recovery and healing from the trauma each had experienced prior to entering DHS custody, and unfortunately, from the trauma each experienced while in DHS custody.

**Conclusion**

It is critical to remember that the focus of this review is five children who entered DHS custody as a newborn (JB), two-year-old (AP), four-year-old (JA), six-year-old (JP), and an eight-year-old (RJ) who was re-entering custody, having previously entered custody as a three-year-old. These vulnerable children suffered harm in their dangerous DHS placements and in their abandonment by DHS workers and supervisors both prior to, during, and following their maltreatment in their placements. The children had been told that these placements would keep them safe. However, for none of these five children was that the case. When attempting to describe the children's harm and suffering, the words that come to mind are incomprehensible, unimaginable, outrageous, and immoral.

Had DHS provided the children with family placements that met their needs and provided stability rather than disruptions that caused immense discontinuity in their relationships with caregivers and others, the children could have experienced security rather than anxiety, fear, rage, and depression. Had DHS provided each child with one or even two workers, rather than an endless succession of strangers, with whom the child could have had a predictable, trusting relationship and who would have been consistently

available, fully assessed the child's needs, and provided placements with the capacity to meet those needs, the life-altering destructive consequences of DHS' all-encompassing failure to protect these five children almost certainly could have been prevented.

DHS perhaps could not have prevented the maltreatment to which these children were subjected prior to entering the agency's custody. But these five young children's tragic and painful stories, told in the pages of their DHS case files about their stays in DHS custody, need not have been written. These tragic stories were wholly preventable.

Peg McCartt Hess, Ph.D., A.C.S.W.
Independent Child Welfare Consultant

September 30, 2009

## Endnotes

[1] These policies might vary slightly from the time the five children came into DHS custody.
[2] JB-PMS II 00106
[3] D'Andrade, A. (2005). Placement stability in foster care. In G. Mallon & P. Hess (Eds.), *Child welfare for the 21st century: A handbook of practices, policies, and programs*, pp. 608-22. New York: Columbia University Press, pp. 609-10.
[4] AP-KIDS 00854
[5] JA-OPPC 00052
[6] JP-KIDS-4-00236
[7] RJ-KIDS 02736
[8] RJ-KIDS 02571-606
[9] OAC 340:75-3-1(b)
[10] JB-PMS II 00106
[11] JB-OPPC 00654, 00158
[12] JB-OPPC 01280, 01291
[13] JB-OPPC 00158
[14] Ibid.
[15] JB-OPPC 01295, 01297
[16] JB-OPPC 01297, 00156
[17] JB-KIDS 00783
[18] JB-OPPC 00946
[19] JB-KIDS 01153; JB-OPPC 01296; JB-JCF 00331
[20] JB-JCF 00554
[21] JB-JCF 00485; JB-JCF 00417; JB-JCF 00525
[22] JB-KIDS 01057; JB-KIDS 01081; JB-KIDS 01103
[23] JB-KIDS 01135, 01566; JB-OPPC 00880
[24] JB-KIDS 01530; JB-OPPC 00844-76
[25] Ibid.
[26] JB-KIDS 01638
[27] JB-KIDS 01536
[28] JB-OPPC 01315
[29] JB-KIDS 01582
[30] JB-OPPC 01315
[31] JB-KIDS 01542-47
[32] JB-KIDS 01550; JB-OPPC 00747-63
[33] Ibid.
[34] JB-KIDS 01912; JB-OPPC 00230, 00250
[35] JB-KIDS 01566; JB-KIDS 01814
[36] JB-KIDS 01135
[37] JB-KIDS 01923
[38] JB-KIDS 01570
[39] JB-JCF 00511
[40] JB-OPPC 00267

---

[41] JB-JCF 00071-80
[42] JB-KIDS 01441; JB-KIDS 01455; JB-KIDS 00015
[43] JB-KIDS 00778
[44] JB-KIDS 01153
[45] JB-JCF 00194-7; www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, (1)(b)(9)
[46] JB-OPPC 00654; JB-JCF 00585; JB-[redacted] CW 00003-04
[47] JB-[redacted] CW 00436
[48] JB-JCF 00220-21
[49] OAC 340: 75-6-48 (a)(1)
[50] JB-KIDS 00626, 00629, 00971
[51] JB-KIDS 00971; JB-KIDS 00786
[52] JB-KIDS 00135-38
[53] JB-JCF Docket 2 - 00002-03; JB-JCF 00215-16
[54] www.okdhs.org, OAC 340:75-6-31, Instructions to Staff, 3(c)
[55] JB-JCF 00554; JB-KIDS 00608, 00599; JB-OPPC 00654
[56] JB-KIDS 00614
[57] Ibid.
[58] JB-JCF 00525
[59] JB-JCF 00417
[60] JB-JCF 00216
[61] JB-JCF 00511
[62] JB-JCF 00207
[63] JB-KIDS 01702
[64] Ibid.
[65] Ibid.
[66] JB-JCF 00257
[67] JB-KIDS 01702
[68] Ibid.
[69] www.okdhs.org, OAC 340:75-3-2, Instructions to Staff, 6(9)
[70] www.okdhs.org, OAC 340: 75-6-31, Instructions to Staff, 2
[71] www.okdhs.org, OAC 340:75-6-31, Instructions to Staff, 2(1)-(13)
[72] Ibid.
[73] OAC 340:75-6-30 (d)(3)(B)
[74] JB-KIDS 01774, 00572, 00569
[75] JB-KIDS 01774
[76] JB-KIDS 00569, 01774
[77] www.okdhs.org, OAC 340:75-6-40.6, Instructions to Staff, 2
[78] JB-JCF 00484-95
[79] JB-JCF 00494
[80] JB-JCF 00494
[81] JB-JCF 00486
[82] JB-KIDS 00986
[83] OAC 340: 75-6-48 (c)(3)
[84] OAC 340: 75-6-48 (a)
[85] OAC 340: 75-6-48 (a)(8)(A)

---

[86] JB-KIDS 00986; Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[87] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[88] OAC 340:75-6-31 (e)(4)(C)
[89] OAC 340: 75-6-48.(b) (1)
[90] OAC 340: 75-6-48.(b)(1); *see also* Pecora, P., Kirk, R., Reed-AshcraftK.. (2001). "Family-Centered Services." In Walton, E. and P. Sandau-Beckler, (Eds.), *Balancing Family-Centered Services and Child Wellbeing*, (p. 5). New York: Columbia University Press.
[91] OAC 340:75-6-48 (b)(1)
[92] JB-OPPC 00030
[93] JB-OPPC 00031
[94] JB-OPPC 00140-41
[95] JB-OPPC 00140
[96] JB-OPPC00388
[97] JB-OPPC 00390
[98] JB-OPPC 00456
[99] JB-OPPC 00458
[100] JB-KIDS 00482
[101] JB-JCF 00419-20
[102] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff 4
[103] www.okdhs.org, OAC 340: 75-6-48, Instructions to Staff 2(a)
[104] www.okdhs.org, OCA 340:75-6-31.3, Instructions to Staff, (1)(f)(4); www.okdhs.org, OCA 340.75-6-31, Instructions to Staff, 3(e)
[105] www.okdhs.org, OCA 340.75.6.31, Instructions to Staff 3(e)(1)
[106] JB-JCF 00420
[107] www.okdhs.org, OAC 340:75-3-10.1, Instructions to Staff, 4(2)(C), (G)
[108] JB-JCF 00485
[109] Ibid.
[110] JB-KIDS 00551; JB-OPPC 00440
[111] Ibid.
[112] JB-OPPC 00440
[113] JB-JCF 00135
[114] JB-JCF 00132-42
[115] JB-KIDS 01721, 01728
[116] JB-KIDS 01719
[117] JB-OPPC 00063, 00452
[118] Ibid.
[119] JB-KIDS 00503
[120] JB-JCF 00207
[121] JB-JCF 00428-29
[122] JB-JCF 00207
[123] JB-PMS II 00057-58
[124] OAC 340:75-10-9 (b)(1) [as of 2/13/2008]

125 JB-PMS II 00097-105
126 OAC 340:75-6-48 (a)(2)
127 JB-PMS II 00097-105
128 JB-PMS II 00106
129 JB-PMS II 00010
130 JB-PMS II 00107
131 JB-KIDS 00998
132 Ibid.
133 JB-PMS II 00006
134 JB-PMS II 00015
135 JB-PMS II 00016
136 JB-PMS II 00005, 00008
137 JB-PMS II 00029
138 JB-PMS II 00014
139 JB-OPPC 00315
140 JB-PMS II 00012
141 JB-PMS II 00011
142 JB-PMS II 00010
143 JB-PMS II 00007
144 JB-PMS II 00009-10
145 JB-PMS II 00005
146 JB-PMS II 00004
147 JB-PMS II 00007-08
148 JB-PMS II 00006
149 JB-PMS II 00008
150 JB-PMS II 00002
151 Ibid.
152 Ibid.
153 JB-PMS II 00018
154 OAC 340:75-7-262 (b)(2)
155 JB-KIDS 00446
156 JB-KIDS 00216
157 JB-PMS II 00106; JB-OPPC 00025
158 Ibid.
159 JB-KIDS 00428
160 JB-KIDS 00413
161 JB-PMS II 00107
162 JB-OPPC 00077
163 JB-KIDS 00374
164 JB-OPPC 00090; JB-[redacted] CW 00261-63
165 JB-[redacted] CW 00142
166 JB-[redacted] CW 00105-18
167 JB-[redacted] CW 00264-66
168 JB-[redacted] CW 00264
169 JB-KIDS-4-00064

[170] OAC 340:75-7-52 (b)
[171] JB-KIDS 00287, 00293, 00296, 00299, 00326, 00359; JB-OPPC 00015, 00017, 00019-20;, JB-[redacted] CW 00100-03, 00127-31, 00271
[172] OAC 340:75-6-48 (a)(1)
[173] JB-KIDS 00269, 00344, 01710
[174] JB-KIDS 00344
[175] JB-KIDS 01710, 00269; www.okdhs.org, OAC 340:75-6-40.6, Instructions to Staff, 2
[176] Ibid.
[177] JB-KIDS 01713, 01716
[178] JB-KIDS 01701
[179] JB-KIDS 01700
[180] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[181] These numbers represent a counting of sequential assignments to the same worker as one worker, but non-sequential assignments as two workers.
[182] JB-KIDS 5 00001-12
[183] OAC 340:75-1-2 (b)
[184] OAC 340:75-1-2 (b)
[185] OAC 340:75-7-12 (b)
[186] OAC 340:75-3-1 (b)
[187] www.okdhs.org, OAC 340: 75-3-8.1, Instructions to Staff, 2
[188] OAC 340: 75-3-8.1
[189] OAC 340:75-3-1 (b)
[190] OAC 340:75-3-2.6 6(9)
[191] www.okdhs.org, OAC 340: 75-6-31, Instructions to Staff, 2
[192] OAC 340:75-3-1(b)
[193] OAC 340:75-6-30 (d)(3)(B)
[194] JB-KIDS 00482
[195] JB-JCF 00494; JB-KIDS 01791, 00551; JB-OPPC 00440
[196] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
[197] OCA 340:75-6-31.3 1 (b), (f)(4)
[198] www.okdhs.org, OAC 340:75-6-31, Instructions to Staff, 3(e)(1)
[199] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 2(a)
[200] OAC 340:75-7-262 (b)(2)
[201] JB-PMS II 00007-08
[202] JB-PMS II 00008
[203] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[204] AP-KIDS 00854
[205] AP-OPPC 00182
[206] AP-KIDS 00593
[207] Ibid.
[208] AP-KIDS 00613
[209] AP-KIDS 00615
[210] AP-KIDS 00593

[211] AP-KIDS 00595
[212] AP-KIDS 00577, 00586-87
[213] AP-KIDS 00606
[214] AP-JCF 00001
[215] AP-KIDS 00611
[216] AP-OPPC 00644
[217] AP-KIDS 00415
[218] AP-JCF 00041
[219] AP-KIDS 00617
[220] Ibid.
[221] AP-KIDS 00607
[222] Ibid.
[223] AP-KIDS 00608
[224] AP-KIDS 00500, 00502-3, 00505-6
[225] AP-KIDS 00500, 00505-6
[226] AP-KIDS 00511
[227] AP-KIDS 00540-65
[228] AP-KIDS 00642
[229] AP-KIDS 00540, 00558-64
[230] AP-KIDS 00418
[231] AP-KIDS 2 00030
[232] AP-KIDS 00415
[233] AP-KIDS 2 00015
[234] AP-KIDS 2 00014
[235] AP-OPPC 00614
[236] AP-OPPC 00422
[237] AP-OPPC 00094
[238] AP-OPPC 00095
[239] AP-OPPC 00094
[240] AP-KIDS 00619-29
[241] AP-KIDS 00621
[242] AP-KIDS 00619
[243] Ibid.
[244] AP-KIDS 00630-32
[245] AP-KIDS 00632
[246] AP-KIDS 00630
[247] AP-JCF 00031
[248] AP-OPPC 00444
[249] AP-KIDS 00694, 00696
[250] AP-KIDS 00642
[251] AP-OPPC 00515
[252] AP-KIDS 00678
[253] Ibid.
[254] AP-KIDS 7 00046
[255] AP-JCF 00031

[256] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
[257] www.okdhs.org, OAC 340:75-6-31, Instructions to Staff, 3(e)(1)
[258] AP-KIDS 00694, 00696
[259] [redacted]000033
[260] AP-KIDS 00366
[261] Ibid.
[262] AP-KIDS 00680
[263] AP-KIDS 00680-82
[264] AP-KIDS 00682
[265] Ibid.
[266] AP-KIDS 00694, 00696
[267] Ibid.
[268] AP-KIDS 00932
[269] AP-KIDS 00264
[270] AP-KIDS 00687-91
[271] AP-KIDS 7 00022, 00025, 00031, 00040, 00043, 00049, 00052; AP-KIDS 00135
[272] AP-KIDS 00135
[273] AP-KIDS 7 00025
[274] AP-KIDS 7 00043
[275] AP-JCF 00047; AP-KIDS 00415
[276] AP-[redacted] CW 00300-09
[277] AP-KIDS 2 00100
[278] AP-[redacted] CW 00158
[279] Ibid.
[280] Ibid.
[281] AP-[redacted] CW 00162
[282] AP-KIDS 2 00103
[283] Ibid.
[284] [redacted]0000029
[285] AP-JCF 00051-2
[286] AP-KIDS 00258
[287] AP-JCF 00075
[288] AP-KIDS 01028
[289] AP-KIDS 00820
[290] AP-KIDS 00339
[291] AP-KIDS 00820
[292] AP-KIDS 00850-4; AP-KIDS 01020-1
[293] AP-[redacted] FH 00009
[294] AP-KIDS 00812-9
[295] AP-KIDS 00807
[296] AP-KIDS 01021
[297] AP-KIDS 00824-5
[298] AP-KIDS 00828
[299] Ibid.
[300] AP-KIDS 00854

301 Ibid.
302 AP-KIDS 01030; AP-KIDS 7 00145
303 AP-KIDS 7 00145
304 [redacted]0000010
305 AP-KIDS 00240, 00177; AP-KIDS 7 00130
306 AP-KIDS 00948-50
307 AP-KIDS 00950
308 Ibid.
309 AP-KIDS 00901-6
310 AP-[redacted] FH 00005
311 AP-KIDS 00901
312 Ibid.
313 AP-OPPC 0966
314 AP-[redacted] CW 00444
315 Ibid.
316 AP-[redacted] CW 00443
317 [redacted]0000035
318 AP-KIDS 00219, 00306, 00297
319 AP-KIDS 00220
320 AP-KIDS 00416
321 AP-OPPC 00020
322 AP-OPPC 00783
323 [redacted]000010
324 Ibid.
325 AP-KIDS 00231
326 AP-KIDS 00228
327 Ibid.
328 Ibid.
329 Ibid.
330 AP-[redacted] CW 00321
331 Ibid.
332 AP-OPPC 00019
333 AP-KIDS 7 00262, 00286, 00295; AP-KIDS 00204, 00207, 00213
334 AP-KIDS 00204
335 [redacted]000020
336 Ibid.
337 Ibid.
338 AP-JCF 00093
339 Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
340 [redacted]000169
341 Ibid.
342 AP-OPPC 00019
343 Arch-[redacted]000004
344 Ibid.

345 AP-OPPC 00018-19
346 AP-OPPC 00019
347 Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
348 AP-KIDS 5 00002-13
349 Ibid.
350 COA 340:75-3-1(b)
351 AP-KIDS 00642
352 COA 340:75-3-2
353 AP-KIDS 00621
354 AP-KIDS 00682
355 [redacted]000020
356 AP-JCF 00093
357 OAC 340:75-3-8.1(b)
358 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
359 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4; www.okdhs.org OAC 340:75-6-48, Instructions to Staff, 2(a); www.okdhs.org, OAC 340:75-6-31, Instructions to Staff, 3(e), www.okdhs.org, OAC 340:75-6.31, Instructions to Staff, 3(e)(1)
360 www.okdhs.org, OAC 340:75-6-31.3, Instructions to Staff, 1 (f)(4); www.okdhs.org, OCA 340:75-6-31, Instructions to Staff, 3(e)(1)
361 www.okdhs.org, OCA 340:75-6-31, Instructions to Staff, 3 (e)(1)
362 OAC 340:75-3-8.1 (a)
363 COA 340:75-3-1 (b)
364 www.okdhs.org, OAC 240:75-3-7, Instructions to Staff, 1(a)
365 www.okdhs.org, OAC 340:75-3-7, Instructions to Staff, (1) (a)(1)(A), (B)
366 www.okdhs.org, OAC 340:75-3-7, Instructions to Staff, (1) (a)(A), (B)
367 AP-JCF 00143-48; AP-JCF 00105-110
368 Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
369 JA-OPPC 00052
370 JA-OPPC 00740; JA-KIDS 00832, 00480
371 JA-KIDS 00001-02, 00840, 00834
372 JA-KIDS 00842
373 JA-KIDS 00196, 00834-35
374 JA-KIDS 00835
375 JA-KIDS 00002, 00844-46, 00896, 00947-48, 00950
376 JA-KIDS 00002, 00060, 00066
377 JA-OPPC 00391, 00611
378 JA-OPPC 00380
379 JA-KIDS 00953
380 Ibid.
381 Ibid.
382 JA-KIDS 00894
383 JA-JCF 00014-15, 00017; JA-KIDS 00203, 00844; JA-OPPC 00639, 00654
384 JA-OPPC 00200-06

---

385 JA-KIDS 00848
386 JA-OPPC 00627, JA-KIDS 00952
387 JA-OPPC 00380-81
388 JA-KIDS 00646
389 OAC 340:75-10-9 (b)(1) [as of 2/13/08]
390 JA-KIDS 00646; JA-PMS 00002-03
391 JA-PMS 00004
392 JA-PMS 00015, 00017
393 JA-PMS 00016
394 JA-PMS 00025
395 JA-PMS 00027, 00025
396 JA-PMS 00032
397 JA-KIDS 00147
398 JA-[redacted]0003-08
399 JA-[redacted]0009
400 OAC 340:75-7-262 [as of 2/13/08]
401 JA-[redacted]0474-87
402 JA-[redacted] 0035
403 JA-[redacted] 0037, 0035
404 Ibid.
405 Ibid.
406 JA-OPPC 00078
407 JA-[redacted] 0038, 0040
408 JA-OPPC 00060
409 JA-[redacted] CW 00066, JA-[redacted] 0034
410 JA-OPPC 00058
411 JA-OPPC 00060
412 JA [redacted] CW 00042, 00068
413 JA-[redacted] CW 00012, 00014, 00016, 00019, 00024, 00028
414 JA-[redacted] CW 00018, 00023
415 JA-[redacted] CW 00084
416 JA-KIDS 00165-66, 00168-69, 00180-81, 00418
417 JA [redacted] CW 00042, 00068
418 JA-[redacted] CW 00134
419 JA-[redacted] CW 00066-78
420 JA-KIDS 00181
421 JA-KIDS 00174
422 JA-[redacted] CW 00076; [redacted] 000421
423 OAC 340:75-7-37 (1)(P), (2)(G)
424 JA-KIDS 00180-81
425 JA-KIDS 00181
426 Ibid.
427 Ibid.
428 Ibid.
429 JA-KIDS 00171

---

[430] JA-KIDS 00418
[431] JA-[redacted] CW 00073
[432] JA-KIDS 00180
[433] JA-KIDS 00168
[434] JA-KIDS 00165
[435] JA-OPPC 00060
[436] Ibid.
[437] JA-OPPC 00061
[438] JA-OPPC 00060
[439] JA-JCF 00258; JA-OPPC 00501
[440] Ibid.
[441] JA-OPPC 00058
[442] JA-[redacted] CW 00002, 00188
[443] JA-OPPC 00060-61
[444] JA-OPPC 00344
[445] JA-KIDS 00149-50
[446] JA-JCF 00119
[447] JA-[redacted] CW 00073, 00076
[448] JA-KIDS 00646
[449] JA-JCF 00258; JA OPPC 00501
[450] JA-OPPC 00879
[451] JA-OPPC 00052, 00055; [redacted] 000425
[452] JA-OPPC 00057
[453] JA-KIDS 00150-51
[454] JA-JCF 00257
[455] JA-OPPC 00052
[456] JA-JCF 00258; JA-OPPC 00501, JA-KIDS 00394
[457] JA-KIDS 00394
[458] JA-KIDS 00165, 00168, 00180, 00418
[459] JA-OPPC 00052
[460] Ibid.
[461] JA-KIDS 00508
[462] Ibid.
[463] JA-KIDS 00505
[464] JA-OPPC 00025
[465] JA-KIDS 00505
[466] JA-KIDS 00511
[467] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
[468] JA-KIDS 00505
[469] JA-JCF 00258; JA-OPPC 00501
[470] JA-OPPC 00021
[471] JA-OPPC 00020
[472] JA-OPPC 00019
[473] JA-JCF 00258; JA-OPPC 00501; JA-KIDS 00647

474 JA-[redacted] CW 00284
475 JA-KIDS 00647; JA-OPPC 00016
476 JA-OPPC 00016
477 JA-KIDS 00358
478 JA-OPPC 00104
479 [redacted] 00348
480 JA-KIDS 00379
481 [redacted] 000348
482 JA-[redacted] 2 00021
483 JA-KIDS 00364
484 JA-OPPC 00282
485 Ibid.
486 JA-OPPC 00105
487 Ibid.
488 JA-KIDS 00361
489 JA-OPPC 00059-61
490 JA-KIDS 00352
491 JA-OPPC 00282
492 JA-KIDS 00352
493 JA-KIDS 00648
494 JA-KIDS 00349
495 Ibid.
496 JA-OPPC 00014
497 JA-OPPC 00014-15
498 OAC 340:75-11-230 (c)(3)
499 JA-OPPC 00014-15, 00011
500 JA-OPPC 00014
501 JA-OPPC 00011
502 JA-KIDS 00343
503 Ibid.
504 JA-OPPC 00039-40
505 JA-KIDS 00340
506 JA-[redacted] 1 00213, JA-[redacted] 2 00068, 00033, 00110
507 JA-KIDS 00917-19
508 JA-KIDS 00150-52
509 JA-KIDS 00550, JA [redacted] 2 00106, 00021
510 JA-JCF 00006-07
511 Ibid.
512 JA-OPPC 00022
513 JA-OPPC 00806
514 JA-OPPC 00805
515 [redacted] 000171
516 Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell

---

[517] JA-JCF 00258-59, JA-OPPC 00501-02
[518] JA-[redacted] 1 00007, 00009
[519] JA-[redacted] 1 00202
[520] [redacted] 000009
[521] JA-[redacted] 2 00043
[522] Ibid.
[523] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[524] JA-OPPC 01000
[525] [redacted] 000142
[526] Arch-[redacted] 000003, JA-OPPC 01011
[527] Ibid.
[528] JA-KIDS 00152
[529] JA-KIDS 00499
[530] JA-KIDS 00472
[531] JA-KIDS 00481
[532] JA-[redacted] 2 000123-28
[533] JA-KIDS 00475
[534] JA-[redacted] 2 00174
[535] JA-KIDS 00469, 00472, 00475, 00478
[536] JA-OPPC 00380, JA-JCF 00141
[537] JA-OPPC 00380-88
[538] Ibid.
[539] JA-KIDS 00742, JA-OPPC 00382
[540] JA-JCF 00173
[541] JA-JCF 00172-73
[542] [redacted] 000309, [redacted] 000238
[543] Ibid.
[544] Ibid.
[545] [redacted] 000066
[546] JA-JCF 00172
[547] Ibid.
[548] JA-JCF 00024
[549] JA-KIDS 00042
[550] JA-JCF 00023
[551] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[552] JA-KIDS-5-00002-10
[553] www.okdhs.org, OAC 340:75-10-8, Instructions to Staff, 1
[554] OAC 340:75-10-9 (b)
[555] OAC 340:75-10-9 (b)(1) [as of 2/13/08]
[556] OAC 340:75-10-10 (3)
[557] www.okdhs.org, OAC 340:75-10-10, Instructions to Staff, 1
[558] www.okdhs.org, OAC 340: 75-10-10, Instructions to Staff, 4
[559] Ibid.

[560] Ibid.
[561] www.okdhs.org, OAC 340:75-10-10, Instructions to Staff, 8.
[562] OAC 340:75-7-12 (b)(1)-(37)
[563] OAC 340:75-7-41 (a)
[564] JA-OPPC 00060
[565] JA-KIDS 00181
[566] JA-KIDS 00165, 00168, 00180, 00418; JA-OPPC 00052
[567] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[568] D'Andrade, A. (2005). Placement stability in foster care. In G. Mallon & P. Hess (Eds.), *Child welfare for the 21st century: A handbook of practices, policies, and programs*, pp. 608-622. New York: Columbia University Press.; Bowlby, J. (1988) *A secure base: Parent-child attachment and healthy human behavior*. London: Basic Books.
[569] JP-KIDS-4-00236
[570] JP-OPPC 01247
[571] JP-KIDS-4-00198
[572] JP-KIDS 01931
[573] JP-KIDS 01937
[574] JP-KIDS 01797
[575] JP-JCF 00236
[576] JP-KIDS 01943, 01907
[577] Ibid.
[578] JP-KIDS 01929
[579] JP-KIDS 02305
[580] JP-KIDS 02307
[581] JP-PMS 00004
[582] JP-JCF 00033
[583] JP-JCF 00318-20
[584] JP-KIDS 01939
[585] JP-KIDS 01794, 01797
[586] JP-KIDS 01888
[587] JP-KIDS 01797
[588] JP-KIDS 00755
[589] JP-KIDS 02287-89
[590] JP-KIDS 002289
[591] JP-KIDS 01829, 01894
[592] Ibid.
[593] JP-KIDS 02289
[594] JP-KIDS-4-00205
[595] JP-KIDS 01939, 01673
[596] JP-KIDS-4-00205
[597] JP-KIDS-4-00205-06
[598] JP-KIDS 01752
[599] JP-KIDS 1744-52

600 JP-KIDS 01756
601 JP-KIDS 01742-71
602 JP-KIDS 02304
603 JP-KIDS 01937
604 JP-KIDS 02312
605 JP-JCF 00308
606 JP-PMS 00052-53
607 JP-[redacted]-4 00145
608 JP-PMS 00039
609 JP-PMS 00050
610 JP-PMS 00042-43, 00045
611 JP-PMS 00042
612 JP-PMS 00060
613 JP-PMS 00041
614 JP-PMS 00059
615 JP-PMS 00089, 00093
616 JP-PMS 00089
617 JP-PMS 00087
618 JP-JCF 00308; JP-KIDS-4-00218
619 JP-[redacted] CW 00003
620 JP-JCF 00303
621 JP-[redacted] CW 00036
622 JP-[redacted] CW 00037, 00039
623 JP-[redacted] CW 00009, 00037
624 JP-[redacted] CW 00011
625 JP-[redacted] CW 00193
626 [redacted]00000533
627 JP-KIDS 01387
628 [redacted]0000070
629 Ibid.
630 Ibid.
631 JP-KIDS-4-00219
632 JP-[redacted] CW 00370, 00374, 00437-44, 00446, 00493, 00503-09, 00510-17, 00519, 00529-31, 00500, 00612-14; JP-KIDS 2-00319
633 JP-[redacted] 3 00018
634 JP-JCF 00303; JP-[redacted] 3 00099
635 JP-[redacted] 3 00100
636 OAC 340:75-8-1 (a)(1)-(3)
637 JP-[redacted] 3 00357-58
638 JP-[redacted] 2 00006-07; JP-KIDS 01219
639 JP-KIDS-4-00220
640 OAC 340:75-8-11 (b)
641 JP-JCF 00303; JP-[redacted] 3 00129-134-; JP-[redacted] 1 00267; JP-[redacted] 1 00002
642 JP-[redacted] 3 00357-58
643 JP-[redacted] 3 00345, 00383-84; JP [redacted] 3-00203-04

---

644 JP-KIDS 01369
645 JP-[redacted] 3 00203-04
646 JP-[redacted] 3 00339, 00382
647 JP-KIDS 01327
648 Ibid.; also JP-[redacted] 3 00336
649 JP-KIDS 01327
650 JP-[redacted] 3 00064
651 JP-[redacted] 3 00068-69
652 JP-[redacted] 3 00334
653 This move was not counted as a placement change because JP was returned to the TFC home where he had been previously placed.
654 JP-KIDS 01306
655 JP-KIDS 01306; JP-[redacted] 4 00329
656 Ibid.
657 JP-[redacted] 3 00377
658 JP-[redacted] 3 00376
659 JP-[redacted] 3 00375
660 JP-[redacted] 3 00186
661 Ibid.
662 JP-[redacted] 3 00157
663 JP-[redacted] 3 00328
664 JP-[redacted] 3 00358
665 JP-[redacted] 3 00357-58
666 Ibid.
667 Ibid.
668 JP-[redacted] 3 00044
669 JP-[redacted] 3 00358
670 JP-[redacted] 3 00049
671 JP-[redacted] 3 00230
672 JP-JCF 00255; JP-[redacted] 3 00034, 00047
673 JP-[redacted] 2 00001
674 JP-[redacted] 2 00007
675 JP-[redacted] 2 00220
676 JP-KIDS 01997-2003; JP-[redacted] 3 00310
677 JP-KIDS 02000
678 JP-KIDS 01998
679 JP-[redacted] 3 00310
680 Ibid.
681 JP-KIDS 01234; JP-[redacted] 3 00300
682 JP-KIDS 01219
683 JP-[redacted] 4 00229
684 JP-KIDS 01219
685 Ibid.
686 Ibid.
687 JP-[redacted] 2 00006

688 JP-[redacted] 2 00007
689 JP-[redacted] 3 00040
690 JP-[redacted] 3 00039
691 Ibid.
692 JP-[redacted] 3 00005; JP-KIDS 01214
693 JP-[redacted] 3 00234
694 Ibid.
695 JP-[redacted] 3 00237
696 Ibid.
697 JP-[redacted] 3 00239
698 JP-[redacted] 3 00239
699 JP-[redacted] 3 00226; JP-KIDS 01291
700 JP-KIDS 01264
701 JP-KIDS 01255, 01264
702 JP-JCF 00187
703 JP-KIDS-4-00220
704 Ibid.
705 JP-JCF 00187
706 JP-[redacted] 1 00445
707 JP-KIDS 01201
708 JP-KIDS 01033; JP-OPPC 01494; JP-[redacted] 4 00212, 00395; JP-KIDS 02317
709 JP-KIDS 7 02671; JP-KIDS 02317
710 JP-KIDS 02128
711 JP-[redacted] 1 00092
712 JP-KIDS 7 02720
713 JP-[redacted] 1 00092
714 JP-KIDS 7 02666-70
715 JP-[redacted] 1 00271
716 Ibid.
717 JP-KIDS 01204, 01579
718 JP-KIDS 01201
719 Ibid.
720 Ibid.
721 JP-KIDS 01180
722 Ibid.
723 Ibid.
724 Ibid.
725 JP-[redacted] 4 00416, 00418, 00423, 00349
726 JP-[redacted] 4 00423
727 JP-KIDS 01132
728 JP-KIDS 01045
729 JP-KIDS 01093
730 JP-KIDS 01048
731 JP-KIDS 01033
732 Ibid.

---

[733] Ibid.; also JP-OPPC 01494; JP-[redacted] 4 00395
[734] OAC 340:75-3-8.6 (e)
[735] JP-KIDS 01033
[736] JP-KIDS 7 02671-716
[737] JP-KIDS 7 02683
[738] JP-KIDS 7 02697
[739] JP-KIDS 7 02685, 02687, 02711
[740] JP-KIDS 7 02705
[741] JP-KIDS 7 02671; JP-KIDS 02317
[742] JP-KIDS 7 02680
[743] JP-KIDS 00871, 00895, 00913, 01429
[744] [redacted]000003
[745] JP-OPPC 00581-88, JP-[redacted] 1 00425-29
[746] [redacted]0000111
[747] Ibid.
[748] JP-[redacted] 1 00001-898
[749] JP-[redacted] 1 00333
[750] JP-[redacted] 1 00332
[751] JP-KIDS 7 02717-50
[752] JP-KIDS 00826; JP-KIDS 7 02750; JP-KIDS 7 02721; JP-[redacted] 4 00390
[753] JP-[redacted] 4 00206, 00390
[754] JP-KIDS 7 02720
[755] JP-KIDS 7 02721
[756] JP-KIDS 7 02725, 02734
[757] JP-KIDS 02331
[758] Ibid.
[759] www.okdhs.org, OAC 340: 76-3-8.1, Instructions to Staff, 3(1)(A), (B)
[760] JP-[redacted] 4 00406
[761] Ibid.
[762] JP-[redacted] 4 00405
[763] [redacted]000008-9; [redacted]000011-12; [redacted]000021; [redacted]000024; [redacted]000031-32
[764] [redacted]000094
[765] [redacted]000046
[766] JP-KIDS 02128
[767] JP-[redacted] 1 00092
[768] JP-JCF 00049
[769] JP-[redacted] 3 00214
[770] JP-[redacted] 4 00193
[771] JP-[redacted] 3 00109; JP-[redacted] 4 00206-07
[772] JP-[redacted] 3 00013-16
[773] JP-[redacted] 3 00121
[774] JP-[redacted] 3 00096
[775] JP-KIDS 02240-46, 002206-15, 02268-84
[776] JP-[redacted] 4 00619

777 JP-[redacted] 3 00135-36
778 JP-KIDS 01447
779 Ibid.
780 Ibid.
781 Ibid.
782 JP-OPPC 01593-95
783 JP-OPPC 01594
784 JP-[redacted] 4 00342
785 Ibid.
786 JP-[redacted] 4 00401, 403, 442-43
787 JP-[redacted] 4 00400
788 Ibid.
789 JP-[redacted] 4 00443
790 JP-JCF 00038-39
791 Ibid.
792 JP-KIDS 02206-16
793 JP-KIDS 02206
794 JP-KIDS 00129
795 JP-[redacted] 4 00366
796 [redacted] 000211
797 JP-[redacted] 4 00589
798 JP-OPPC 00155
799 [redacted] 000208
800 JP-KIDS 02268-84
801 [redacted] 000207
802 Ibid.
803 JP-KIDS-4 00240
804 JP-KIDS-4 02240-44
805 JP-KIDS-4-00241
806 JP-KIDS-4-00236
807 JP-KIDS-4-00244
808 [redacted] 000206
809 JP-[redacted] 3 00282
810 JP-[redacted] 4 00619
811 JP-[redacted] 4 00592
812 JP-[redacted] 3 00135-36
813 JP-JCF 00019; JP-OPPC 00383
814 JP-OPPC 00960
815 JP-OPPC 00077
816 JP-KIDS 01402
817 JP-KIDS 00072
818 JP-[redacted] 4 00443
819 [redacted] 000211
820 JP-KIDS 00127

[821] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[822] JP-KIDS-5 00002-09
[823] OAC 340:75-3-8.1(a)
[824] Ibid
[825] OAC 340:75-3-8.1(b)
[826] OAC 340:75-3-8.1(a)
[827] OAC 340:75-3-8.1(a)
[828] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 2(a)(1)(B); OAC 340:75-6-48
[829] [redacted]000046
[830] OAC 340:75-3-8.1(b)
[831] OAC 340:75-3-8.1(a)
[832] JP-KIDS 01997-02003; JP-[redacted] 3 00310
[833] JP-KIDS 01998
[834] www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff, 3
[835] Poole, D. & Lamb, M. (1998). *Investigative interviews of children. A guide for helping professionals*. Washington, DC: American Psychological Association, 117-199.
[836] www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff, (5)(2)(A), (B)
[837] Ibid
[838] OAC 340:75-3-8.1(b)
[839] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
[840] D'Andrade, A. (2005). Placement stability in foster care. In G. Mallon & P. Hess (Eds.), *Child welfare for the 21st century: A handbook of practices, policies, and programs*, pp. 608-622. New York: Columbia University Press.
[841] Rubin, D., O'Reilly, A. Luan, X., & Localio, A. (2007). The impact of placement stability on behavioral well-being for children in foster care. *Pediatrics, 119*, 336-344 (p. 342)
[842] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[843] OAC 340:75-1-2.b(7)
[844] RJ-KIDS 02736
[845] RJ-KIDS 02608; RJ-JCF 2004 00272
[846] RJ-CLF 00140-56; RJ-OPPC 00118, 00125
[847] RJ-CLF 00153
[848] RJ-CLF 00144
[849] RJ-CLF 00143
[850] RJ-JCF 2004 00310; RJ-LDES 1 00002
[851] RJ-KIDS 01831-37
[852] RJ-OPPC 01262
[853] RJ-KIDS 01878-84
[854] RJ-OPPC 01326
[855] Ibid.
[856] RJ-OPPC 01262
[857] RJ-OPPC 01326

---

[858] RJ-KIDS 02666-68
[859] RJ-OPPC 01497-99; RJ-KIDS 02684
[860] RJ-KIDS 02684
[861] RJ-KIDS 02687
[862] RJ-KIDS 02666-91
[863] RJ-OPPC 01401-29
[864] RJ-OPPC 01422, 01424; RJ JCF 1999 00114
[865] RJ-KIDS 02666
[866] RJ-OPPC 01426
[867] RJ-KIDS 01929
[868] RJ-KIDS 02054-79
[869] RJ-KIDS 02066
[870] RJ-KIDS 02068
[871] RJ-KIDS-4-00381-85; RJ-[redacted] 1-01287; RJ-OPPC 00632-34
[872] RJ-[redacted] 00175; RJ [redacted] Co 00001
[873] RJ-KIDS-4-00385
[874] RJ-KIDS-4-00381-82; RJ-[redacted] 1-01287; RJ-OPPC 00632
[875] RJ-[redacted] 00175
[876] RJ-[redacted] 00156-57
[877] RJ-[redacted] 00192
[878] RJ-[redacted] 00196-98
[879] RJ-[redacted] 00196-97
[880] RJ-[redacted] 00158
[881] RJ-[redacted] 00159
[882] RJ-[redacted] 00126
[883] Ibid.
[884] RJ [redacted] 00001, 00003
[885] RJ-KIDS 00254
[886] RJ-[redacted] CW 00042
[887] RJ [redacted] 00001, 00003
[888] RJ [redacted] 00001
[889] RJ-KIDS-4-00384
[890] RJ-KIDS-4-00385
[891] RJ-[redacted] 2 00078, 00085
[892] RJ-[redacted] 2 00011-12
[893] RJ-OPPC 01092
[894] RJ-JCF 1999 00015
[895] RJ-KIDS 02080-85
[896] RJ-JCF 1999 00166
[897] RJ-KIDS-4-00385
[898] RJ-JCF 1999 Docket 1-00004
[899] RJ-JCF 2004 00291-93
[900] RJ-OPPC 00142, 01058, 00752; RJ-KIDS 00003, 00352, 00679, 00982, 01138
[901] RJ-CLF 00140-56; RJ-OPPC 00118
[902] RJ-KIDS-4-00385

903 OAC 340:75-10-9 (b)(2)
904 Ibid.
905 OAC 340:75-10-9 (b)
906 Arch-[redacted]000805
907 Arch-[redacted]000801
908 Arch-[redacted]001285
909 Arch-[redacted]000799
910 Arch-[redacted]000797
911 Arch-[redacted]000804-05
912 RJ-KIDS 00724
913 RJ-LDES 1 00048-49, 00058
914 RJ-LDES 1 00052, 00072, 00076-80,
915 RJ-LDES 1 00087, 00091, 00094
916 RJ-JCF 2004 00214
917 RJ-KIDS 00679
918 RJ-KIDS 00518, 00521
919 RJ-[redacted] CW 00277-78
920 Ibid.
921 RJ-[redacted] CW 00291
922 RJ-[redacted] CW 00277
923 RJ-[redacted] CW 00278
924 RJ-[redacted] CW 00290-97
925 RJ-[redacted] CW 00277
926 RJ-[redacted] CW 00300-09
927 RJ-[redacted] CW 00329-42
928 RJ-[redacted] CW 00344-54
929 RJ-[redacted] CW 00318-20
930 RJ-[redacted] CW 00522
931 Ibid.
932 RJ-KIDS 2 00754, RJ-[redacted] CW 00587
933 RJ-KIDS-4-00386
934 RJ-OPPC 00673
935 RJ-KIDS 00688, 00700, 00706; RJ-JCF 2004 00221, 00223, 00227
936 RJ-[redacted] CW 00522-23
937 Ibid.
938 RJ-JCF 2004 00223; RJ-KIDS 00700
939 [redacted]000245
940 RJ-KIDS 00527
941 RJ-KIDS 00527; RJ-JCF 2004 00228
942 RJ-LDES 2 00027
943 RJ-LDES 2 00032
944 RJ-LDES 2 00035
945 RJ-LDES 2 00036
946 RJ-KIDS 02571-606
947 RJ-[redacted] CW 00172

948 RJ-[redacted] CW 00026
949 RJ-KIDS 02590
950 RJ-KIDS 02592
951 RJ-KIDS 02571-606
952 RJ-KIDS 02571-606; RJ [redacted] FH 00015
953 RJ [redacted] CW 00003
954 RJ-[redacted] CW 00002
955 Arc[redacted]000003
956 RJ-[redacted] CW 00020
957 RJ-KIDS 00325
958 RJ-KIDS 01111
959 RJ-KIDS 01108
960 RJ-KIDS 01105
961 RJ-KIDS 01102, 01096
962 RJ-KIDS 00361
963 Ibid.
964 RJ-KIDS 00364
965 RJ-[redacted] CW 00020
966 RJ-KIDS 00358
967 Ibid.
968 RJ-KIDS 00349
969 RJ-KIDS 7 00683
970 RJ-KIDS 00347
971 Ibid.
972 Ibid.
973 Ibid.
974 RJ-KIDS 02736
975 Ibid.
976 RJ-KIDS 00340
977 RJ-KIDS 00334
978 Ibid.
979 RJ-KIDS 02504
980 RJ-KIDS 02505
981 RJ-KIDS 00370, 01096, 01102, 01105, 01108, 01111, 01114, 01117
982 RJ-KIDS 01111, 01114
983 RJ-KIDS 01108
984 RJ-KIDS 01096
985 RJ-KIDS-4-00387
986 Arc[redacted]000026
987 RJ-KIDS 00454
988 RJ-KIDS 00451
989 RJ-KIDS-4- 00388
990 Arc[redacted]000027
991 Ibid
992 RJ-KIDS-4-00388

---

993 RJ-KIDS 00991
994 Ibid.
995 Ibid.
996 Ibid.
997 Arch-[redacted]000706
998 Arch-[redacted]000705
999 RJ-KIDS 00715
1000 RJ-LDES 3 00034-57
1001 RJ-LDES 3 00044
1002 RJ-KIDS 00982
1003 RJ-KIDS 00715
1004 RJ-LDES 3 00058-59
1005 RJ-KIDS 00982
1006 RJ-KIDS-4- 00389
1007 RJ-KIDS 00979
1008 RJ-KIDS 00964
1009 Ibid.
1010 RJ-JCF 2004 00132
1011 RJ-OPPC 00771
1012 Ibid.
1013 RJ-[redacted]0015
1014 RJ-JCF 2004 00116
1015 RJ-[redacted]0507
1016 RJ-KIDS 00877, 00871
1017 American Prosecutors Research Institute. (2004). *Investigation and prosecution of child abuse,* 3rd ed. Thousand Oaks, CA: Sage, p. 9; Shoop, R. (2004). *Sexual exploitation in schools*. Thousand Oaks, CA: Corwin Press, pp. 25-26.
1018 RJ-[redacted]0533
1019 RJ-KIDS 00892
1020 RJ-KIDS-4-00389
1021 RJ-KIDS 00763
1022 RJ-[redacted]0043
1023 RJ-KIDS 00748
1024 RJ-KIDS 01301
1025 RJ-KIDS 01340
1026 RJ-CLF 00004
1027 Ibid.
1028 RJ-KIDS-4-00001-17
1029 OAC 340:75-6-48 (a)(2)
1030 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
1031 Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
1032 www.okdhs.org, OAC 340:75-6-40.3, Instructions to Staff, 1; www.okdhs.org, OAC 340:75-3-6, Instructions to Staff, 4(2)(B)
1033 OAC 340:75-3-1 (b)

1034 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 1 (b)(9)
1035 OAC 340:75-6-48 (a)(1)(A)
1036 OAC 340:75-6-48 (a)(8)
1037 OAC 340:75-6-48 (a)(2)
1038 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 2(d)
1039 OAC 340:75-6-48 (a)(1)(C)
1040 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 2(a)(1)(B)
1041 OAC 340:75-6-48 (a)(1)(D)
1042 Poole, D. & Lamb, M. (1998). *Investigative interviews of children. A guide for helping professionals*. Washington, DC: American Psychological Association, pp. 117-99.
1043 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
1044 www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff, 1(1),(2)
1045 OAC 340:75-3-8.1 (a)(2)
1046 OAC 340:75-3-8.1 (a)(2)
1047 www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff, 5(2)(A),(B), 8(5)
1048 OAC 340:75-6-48 (b)(1)
1049 Arch-[redacted]000797
1050 [redacted]0000002, [redacted]0000036-37
1051 OAC 340:75-6-85 (b)
1052 OAC 340:75-6-31 (a)(2)
1053 Pike, V., Downs, S., Emlen, A., Downs, G., & Case, D. (1977). *Permanent planning for children in foster care: A handbook for social workers*. Washington, DC: U.S. Department of Health, Education, and Welfare, p. 1.
1054 Ibid., p. 6.
1055 Barbell, K. & Freundlich, M. (2005). Foster care today: Overview of family foster care. In Mallon, G. & P. Hess (Eds.), *Child welfare for the 21st century: A handbook of practices, policies, and programs*, pp. 504-17. New York: Columbia University Press; Fiermonte, C. & Renne, J. (2002). *Making it permanent. Reasonable efforts to finalize permanency plans for foster children.* Washington, DC: American Bar Association; Maluccio, A., Fine, E., & Olmstead, K. (1986). *Permanency planning for children: Concepts and methods*. London: Tavistock; Pike, V., Downs, S., Emlen, A., Downs, G., & Case, D. (1977). *Permanent planning for children in foster care: A handbook for social workers*. Washington, DC: U.S. Department of Health, Education, and Welfare; Pine, B., Warsh, R., & Maluccio, A. (1993). *Together again: Family reunification infoster care*. Washington, DC: Child Welfare League of America.
1056 Guterman, N. & Taylor, C. (2005). Prevention of physical child abuse and neglect. In Mallon, G. & P. Hess (Eds.), *Child welfare for the 21st century. A handbook of practices, policies, and programs*. NY: Columbia University Press, pp. 270-89.
1057 Ibid., p. 271.
1058 Ibid.
1059 Hess, P. (1982). Parent-child attachment concept: Crucial for permanency planning. *Social Caseworker*, 63(1), 46-53.
1060 Bowlby, J. (1969, 1973, 1980). *Attachment and loss: Volumes I-III*. New York: Basic Books.

[1061] Ibid.

[1062] Goldstein, J., Freud, A., and Solnit. A. (1973). *Beyond the best interests of the child.* New York: The Free Press.

[1063] D'Andrade, A. (2005). Placement stability in foster care. In Mallon, G. & P. Hess (Eds.), *Child welfare for the 21st century: A handbook of practices, policies, and programs*, pp. 608-22. New York: Columbia University Press.

[1064] Rubin, D., O'Reilly, A. Luan, X., & Localio, A. (2007). The impact of placement stability on behavioral well-being for children in foster care. *Pediatrics, 119*, (336-344). Elk Grove Village, IL: American Academy of Pediatrics. p. 342.

# Appendix A

# Curriculum Vitae of Peg McCartt Hess

# Appendix A

# Curriculum Vitae of Peg McCartt Hess

# CURRICULUM VITAE

**PEG McCARTT HESS**
**8500 Cambridge Woods Lane**
**Knoxville, TN 37923**
**(865) 851-8312**
***peghess07@comcast.net***

## EDUCATION

1987 Ph.D., University of Illinois at Urbana-Champaign, School of Social Work
Dissertation: *What caseworkers consider in developing visiting plans for children in foster care*

1970 M.A., University of Chicago, School of Social Service Administration, with honors

1968 B.A., Duke University

## ACADEMIC APPOINTMENTS

2003-2005 University of South Carolina - Columbia, College of Social Work: *Professor and Director of Doctoral Studies, 2003-2004; tenured 2003; on leave 2004-2005*

2001-2005 University of South Carolina - Columbia, Institute for Families in Society: *Research Professor* and *Associate Director for Research and Scholarship,*
*2001- 2003; Faculty Affiliate 2003-2005*

2001-2002 University of South Carolina - Columbia, College of Education: *Adjunct Professor*

1992-2003 Columbia University School of Social Work: *Associate Dean, 1994-2001, and Professor, 1998-2003; Associate Professor, 1992-1998; tenured, 1994*

1994-2003 Faculty, Columbia University Graduate School of Arts and Sciences

1981-1992 Indiana University School of Social Work: *Associate Professor, 1988-1992; tenured 1987; Assistant Professor 1982-87; Teacher Practitioner, 1981-82*

1979-1981 University of Tennessee School of Social Work, Memphis: *Assistant Professor*

1977-1979 University of Alabama School of Social Work: *Assistant Professor, 1978-1979; Faculty Field Instructor (Internship Instructor), 1977-1978*

1974-1977 University of Chicago, School of Social Service Administration: *Internship Instructor*

## PUBLICATIONS

### Books and Monographs

Hess, P., Kanak, S., & Atkins, J. (2009). *Building a model and framework for child welfare supervision.* New York, NY: Hunter College School of Social Work, National Resource Center for Family-Centered Practice & Permanency Planning; and Portland, ME: University of Southern Maine, Edmund S. Muskie School of Public Service, Institute for Child and Family Policy, National Child Welfare Resource Center for Organizational Improvement.

Motes, P. & Hess, P. (2007). (Eds.) *Collaborating with community-based organizations through consultation and technical assistance*. New York: Columbia University Press.

Mallon, G. & Hess, P. (2005). (Eds.) *Child welfare for the 21st century. A Handbook of practices, policies, and programs*. New York: Columbia University Press. Selected as *Choice* Outstanding Academic Title 2006, Association of College & Research Libraries.

Hess, P., McGowan, B., & Botsko, M. (2003). *Nurturing the one, supporting the many: The Center for Family Life in Sunset Park, Brooklyn.* Columbia University Press.

Hess, P. & Mullen, E. (1995). (Eds.) *Practitioner-researcher partnerships: Building knowledge from, in, and for practice*. Washington, DC: NASW Press.

Hess, P. & Folaron, G. (1993). *The Professional Review Action Group (PRAG) model: A user's guide*. Washington, D. C.: Child Welfare League of America, 1993.

Hess, P. & Proch, K. (1993). *Contact: Managing visits to children looked after away from home--a guide to practice*. Anglicized version of *Family visiting in out-of-home care*, (1988). London, England: British Agencies for Adoption & Fostering.

Hess, P. & Proch, K. (1988). *Family visiting in out-of-home care: A practical guide*. Washington, D.C.: Child Welfare League of America, Inc.

### Journal Articles

Pope, H., Wakins, K., Evans, A., & Hess, P. (2006.) The perception of depression in long-term care residents: A qualitative study using residential journaling. *Journal of Applied Geronology, 25,* 153-172.

Magen, R., Conroy, K., Hess, P., Panciera, A., & Simon, B. (2001). Identifying domestic violence in child abuse and neglect investigations. *Journal of Interpersonal Violence*, *16*, 580-601.

Hess, P., McGowan, B., & Botsko, M. (2000). A preventive services model for preserving and supporting families over time. *Child Welfare*, *79*, featured article, 227-265.

Jackson, H., Hess, P., & Van Dalen, A. (1995). Preadolescent suicide: How to ask and how to respond. *Families in Society*, *76*, 267-279.

Hess, P. (1993). Supporting foster families in their support of families. *Journal of Emotional and Behavioral Problems*, *2*, 24-27.

Folaron, G. and Hess, P. (1993). Placement considerations for children of mixed African-American and Caucasian parentage. *Child Welfare*, *72*, 113-125.

Hess, P., Folaron, G., & Jefferson, A. (1992). Effectiveness of family reunification services: An innovative evaluation model. *Social Work*, *37*, 304-311.

Reprinted as Chapter 28, J. Tropman, J. Erlich, & J. Rothman (1995). *Tactics and techniques of community intervention*, 3rd ed. Itasca, IL: F.E. Peacock, 308-320.

Hess, P., Mintun, G., Moehlman, A., & Pitts, G. (1992). The Family Connection Center: An innovative visiting program. *Child Welfare*, *71*, 77-88.

Hess, P. & Folaron, G. (1991). Ambivalences: A challenge to permanency for children. *Child Welfare*, *70*, featured article, 403-424.

Wasson, D. & Hess, P. (1989). Foster parents as child welfare educators. *Public Welfare*, *47*, 16-22.

Hairston, C. & Hess, P. (1989). Family ties: Maintaining child-parent bonds is important. *Corrections Today*, *51*, 102-106.

Hess, P. (1988). Case and context: Determinants of planned visit frequency. *Child Welfare*, *67*, 311-326.

Hess, P. (1987). Parental visiting of children in foster care: Current knowledge and a research agenda. *Children and Youth Services Review*, *9*, 29-50.

Proch, K. & Hess, P. (1987). Parent-child visiting policies of voluntary agencies. *Children and Youth Services Review*, *9*, 17-28.

Hess, P. (1986). Promoting access to access with divorcing parents. *Social Casework, 67*, 594-604.

Hess, P. & Proch, K. (1986). How the states regulate parent-child visiting. *Public Welfare, 44*, 12-17, 46.

Hess, P. & Williams, L. (1982). Group orientation for parents of children in foster care: An innovative program. *Child Welfare, 61*, 456-466.

Hess, P. (1982). Parent-child attachment concept: Crucial for permanency planning. *Social Casework, 63*, 594-604.

Hess, P. & Howard, T. (1981). An ecological model for assessing psycho-social difficulties in children. *Child Welfare, 60,* 499-518. Featured article.

**Book Chapters**

Hess, P. & Feldman, N. (2008). Values and ethics in social work practice with lesbian, gay, bisexual, and transgender people. In G. Mallon (Ed.) *Social work practice with lesbian, gay, bisexual, and transgender people*, 2nd Ed., 25-39. New York: Routledge.

Hess, P. & Billingsley, A. (2007). Cultural competence: At the heart of capacity building. In P. Motes & P. Hess (Eds.) *Collaborating with community-based organizations through consultation and technical assistance*, 54-80. New York: Columbia University Press.

Hess, P. (2005). Visits: Critical to the well-being and permanency of children and youth in care. In G. Mallon & P. Hess (Eds.) *Child welfare for the 21st century. A handbook of practices, policies, and programs*, 548-557. New York: Columbia University Press.

Hess, H. & Hess, P. (2005). Termination in context. In B. Compton, B. Galaway, & B. Cournoyer (Eds.) *Social work processes.* Dorsey Press, 7th Ed. (also in previous editions: 1984, 1989, 1994, 1999).

Hess, P. & Hess, H. (2001). Parenting in European American/White families. In N. Webb (Ed.) *Culturally diverse parent-child and family relationships: Challenges and guidelines for social workers and other practitioners,* 307-333. New York: Columbia University Press.

Hess, P. (2000). The history and evolution of supervised visitation. In A. Reiniger, (Ed.) *The professionals' handbook on providing supervised visitation,* 11-30. New York: The New York Society for the Prevention of Cruelty to Children.

Hess, P. & Hess, H. (1998). Values and ethics in social work practice with lesbian and gay

persons. In G. Mallon (Ed.) *Foundations of social work practice with lesbian and gay persons,* 31-45. Haworth Press.

Hess, P., McGowan, B., & Meyer, C. (1996). Practitioners' perspectives on family and child services. In A. Kahn & S. Kamerman (Eds.) *Children and their families in big cities,* 121-137. New York: Columbia University School of Social Work.

Hess, P. (1995). Reflecting in and on practice: A role for practitioners in knowledge building. In P. Hess & E. Mullen (Eds.) *Practitioner-researcher partnerships: Building knowledge from, in, and for practice*, 56-82. Washington, DC: NASW Press.

Hess, P. & Mullen, E. (1995). Bridging the gap: Collaborative considerations in practitioner-researcher knowledge-building partnerships. In P. Hess & E. Mullen (Eds.), *Practitioner-researcher partnerships: Building knowledge from, in, and for practice*, 1-30. Washington, DC: NASW Press.

Mullen, E. & Hess, P. (1995). Toward practice knowledge development. In P. Hess & E. Mullen (Eds.), *Practitioner-researcher partnerships: Building knowledge from, in, and for practice*, 264-271. Washington, DC: NASW Press.

Hess, P. & Jackson, H. (1995). Practice with and on behalf of families. In C. Meyer & M. Mattaini (Eds.) *The foundations of social work practice.* Washington, DC: NASW Press.

Hess, P. & Proch, P. (1993). Visiting: The heart of reunification. In B. Pine, R. Warsh, & A. Maluccio (Eds.) *Together again: Family reunification in foster care,* 119-139. Washington, DC: Child Welfare League of America.

Hess, P. (1984). Supervision. In K. Blumenthal & A. Weinberg (Eds.), *Establishing parent involvement in foster care agencies,* 117-145. New York, NY: Child Welfare League of America.

Hess, P. (1980). Permanency as an issue for children. In R. Patton (Ed.), *Readings in family health*, 240-246. Lexington, MA: Ginn Publishing Co, 240-246.

**Other Publications, Including Expert, Research, and Policy Reports and Training Manuals**

Hess, P. (2009). *No questions asked: A review of services provided to C. Miles by the Alaska Department of Health and Social Services*. Knoxville, TN: author.

Hess, P. (2008). *"The way life was" – A decade of waiting for protection and permanence: A review of services provided to A. Drones by the Alaska Department of Health and Social Services.* Knoxville, TN: author.

Hess, P. (2007). *What might have been: A review of services provided to A.J. and D.D. by the Alaska Department of Health and Social Services*. Knoxville, TN: author.

Hess, P. (2006). *Custody, but no care: A review of children's experiences in MDHS custody*. New York, NY: Children's Rights.

Hess, P. (2004). *An updated review of case files of foster children in Fulton and DeKalb Counties, Georgia*. New York, NY: Children's Rights.

Hess, P. (2003). *A review of case files of foster children in Fulton and DeKalb Counties, Georgia*. New York, NY: Children's Rights.

Hess, P. (2003). *Visiting between children in care and their families: A look at current policy*. New York, NY: National Resource Center for Foster Care & Permanency Planning, Hunter College School of Social Work.

Hess, P. (1999). (Ed.) *Enhancing visiting services: Standards, leadership, organization, and collaboration*. Philadelphia: Commonwealth of Pennsylvania Dept of Public Welfare.

Hess, P., McGowan, B., & Botsko, M. (1997). *The Center for Family Life in Sunset Park: Greater than the sum of its parts*. Baltimore, MD: Annie E. Casey Foundation.

Anderson, G., Dane, B., Dore, M. & P. Hess. (1993). *Consultants' report on the shared 30-day evaluation process*. New York, N.Y.: Wilder Settlement Panel.

Hess, P. (1993). Reunification in the context of permanency planning. *International Reunification Symposium*. L. Abramczyk & J. Ross, Eds. Columbia, SC: University of South Carolina College of Social Work 1993, 60-69.

Hess, P. & Folaron, G. (1992). *Disrupted reunification: 62 families' experiences*. Professional Review Action Group Project, Indianapolis: Indiana University School of Social Work with the Family and Social Services Adm., Div. of Family and Children.

Hess, P., Folaron, G., & Jefferson, A. (1989, 1990, 1991). *The impact of caseload size and caseworker/supervisor turnover on foster care reentry*. Periodic reports of the Professional Review Action Group Project, Indianapolis: Indiana University School of Social Work with the Indiana Department of Public Welfare.

Hess, P. (1990). Visiting: The heart of reunification. *Reconnections: Program, practice, and training in family reunification conference proceedings*. B.Pine, R. Krieger, & A. Maluccio, Eds. West Hartford, CT: University of Connecticut School of Social Work.

Hess, P., Folaron, G., & Jefferson, A. (1989). *The impact of policy on foster care reentry*.

Second Interim Report of the Professional Review and Action Group Project, Indianapolis: Indiana University School of SW with the Indiana Dept of Public Welfare.

Hess, P. (1985). Protecting the family for the child. *Permanency Report*, 3.

Hess, P., Graham, C., & Marcum, M.. (1984, 1985). *Continuum of care child welfare training for new workers. Trainers' guide; Practice handbook; and Resource materials.* Indianapolis: Indiana University School of Social Work with the Indiana State DPW.

Compton, B. & Hess, P., with Graham, C. (1983, 1986 revised ed.) *Providing family-centered pre-placement preventive services: A handbook.* Indiana State Dept. of Public Welfare.

Hess, P. & Kapoor, J. (1986). *Indiana's continuum of care child welfare training project: Evaluation of 1984-85 project activities.* Indianapolis: Indiana University School of Social Work with the Indiana Department of Public Welfare.

Hess, P. & Chandler, N. (1982). *Decision-making in permanency planning: The impact of attitudes and values.* Knoxville: University of Tennessee School of Social Work, Office of Continuing Social Work Education.

Hess, P. (1982). *Working with birth and foster parents.* Trainer/Trainee manuals. Knoxville: University of Tennessee School of Social Work, Office of Continuing SW Education.

Hess, P. & Hicks, J. (1981). Community professionals join the team: A team approach to permanent plans for children. *Tennessee Record, 94* (April).

Hess, P. (1979). *The multi-focus model for social work practice: Its evolution and application in field education.* Tuscaloosa: University of Alabama School of Social Work.

## RESEARCH AND TRAINING GRANTS AND PROJECTS

*Project Co-Director. (2008 - 2009).* Developing a Framework to Support Effective Supervision in Child Welfare. Joint project funded and sponsored by The National Resource Center for Family-Centered Practice and Permanency Planning and the National Resource Center for Organizational Improvement.

*Principal Investigator. (2006-2008).* Identifying Conceptual Models of Programs for Parent-Child Visiting. Funded by the National Resource Center for Foster Care and Permanency Planning at the Hunter College School of Social Work.

*Principal Investigator*. (2001-2003). An Initiative to Enhance Policies, Programs, and Practices Related to Visiting of Children in Care. Funded by the National Resource Center for Foster Care and Permanency Planning at the Hunter College School of Social Work.

*Co-Principal Investigator*. (2002-2003). The Relationship Between Childhood Sexual Abuse and Adult Sexual Assault. With Vicki Flerx. Funded by the University of South Carolina Office of Research Support Programs.

*Co-Investigator*. (2001). Uncertain Progress. With Andrew Billingsley, John Stewart, & Arlene Andrews. Funded by University of South Carolina Office of Research Support Programs.

*Co-Principal Investigator* (With B. McGowan, Co-PI) (1993-1997). Evaluation of the Center for Family Life in Sunset Park. Funded by the Annie E. Casey Foundation.

*Consultant* to Co-Investigators R. Magen and K. Conroy, with B. Simon (1993-1995). Zone C Pilot Study, "Identification of Woman Abuse in Families with Allegations of Child Abuse or Neglect." Developed a battered woman assessment tool for public agency child protective service workers' use and a guide for in-depth interviews of staff. Support by the Center for the Study of Social Work Practice.

*Co-Investigator* (With H. Jackson, PI; Dr. R. Nuttall, Co-Investigator; & A.van Dalen, Clinical Investigator) (1992-1995). "Prevalence and Correlates of Suicidal Ideation and Behaviors in Preadolescents: Exploratory Study of a Clinical Population" and "The Effectiveness of a Suicide Training Program on Staff Identification of Suicidality in a Clinical Population of Preadolescents." Center for the Study of Social Work Practice.

*Director and Principal Investigator* (1988-1992). Demonstration/Research Project Funded by the U.S. Department of Health and Human Services: Maximizing Reunification in Foster Care Through Professional Review Action Groups in Indiana. A collaborative project, Indiana University School of Social Work and Indiana Dept. of Public Welfare.

*Director* (1983-1989). Continuum of Care Child Welfare Training Program, Indiana University School of Social Work. Funded by Indiana Dept. of Public Welfare to complete a needs assessment, develop curricula, implement, and evaluate statewide training programs for child welfare staff and foster parents.

*Director* (1986). Preventing Child Abuse in Licensed Foster Family Placement Training Project, Indiana University School of Social Work. Funded IN Dept. of Human Services.

*Director* (1982-1983). Permanency Planning Training Project. Funded by the Lake County (Gary, IN.) Department of Public Welfare.

## SOCIAL WORK EDUCATION

### Courses Taught

Qualitative research methods
Monitoring and evaluating clinical practice (developed and taught)
Social service delivery systems: Child and family welfare
Foundations of social work practice
Advocacy in social work practice
Direct social work practice
Advanced clinical practice with families with children
Social work practice with children (developed and taught)
Values and ethics in social work practice (developed and taught)
Addressing ethical dilemmas in advanced clinical practice (developed and taught)
Generalist social work practice (BSW)
Principles of field instruction (developed and taught)

### Dissertation Committee and Research Practicum Supervision

*Columbia University School of Social Work:*
Committee Chair: Nancy Feldman "Growing up performed" PhD granted, dissertation with distinction May 2001.
Committee member: Murray Nossel "Time as an object in social work practice" Ph.D. granted, dissertation with distinction May 2001.
Jeanne Finch "A study of drug involved mothers" DSW granted May 2000
Mary Banach "Decision-making in child welfare" DSW granted May 1995
Research Practicum supervision:
Michael Powell (1996-1997); Ernst VanBergijk (1996-1997)

## LEGISLATIVE/LEGAL TESTIMONY AND CONSULTATION

Expert testimony, C. M. v. The State of Alaska, Department of Health and Social Services, Office of Children's Services. Anchorage, AK April 30, May 1, 1009 (trial); Knoxville, TN, February 10, 2009 (deposition).
Expert testimony, A. D. v. The State of Alaska, Department of Health and Social Services, Office of Children's Services. Anchorage, AK, September 18, 2008 (deposition).
Expert testimony, A.J. and D.D. v. The State of Alaska, Department of Health and Social Services, Office of Children's Services, and Alternatives. Anchorage, AK, January 2008 (trial), June 28, 2007 (deposition)
Expert testimony, Olivia Y. v. Barbour (U.S. District Court, Southern District of Mississippi), Jackson, MS. April 7, 2006 (deposition)
Expert testimony, Kenny A. v. Perdue (U.S. District Court, Northern District of Georgia), Atlanta, GA. January 28, 2004 (deposition)

Prepared for expert testimony, Michael H. v. Giuliani (Superior Court, NY County), The Legal Aid Society, New York City, 1994-1996

Expert testimony, P.M., et al, vs. Jeff Richardson, et al. (class action by wards of the Marion County office, the Division of Family and Children) United States District Court for Southern District of Indiana, Indianapolis Div., May 20, 1992.

Consultation, Indiana Legislative Services Agency and members of the Indiana General Assembly, re: Senate Bill 243 (Child protective services and child welfare caseworker caseload standards), 1990-1991; Senate Bill 238 (Child protective services and child welfare caseworker caseload standards), 1989-90; House Bill 1035 (establishing Commission on Abused and Neglected Children), 1991-92.

Testimony before the Indiana Commission on Abused and Neglected Children, June, 1992.

Testimony re: House Bill 1035, Indiana House of Representatives, Committee on Family and Children, January 10, 1992.

Testimony re: Senate Bill 243, Indiana Senate Finance Committee, Budget Subcommittee, March 25, 1991. Testimony re: Senate Bill 243, Indiana Senate Health and Human Services Committee, February 8, 1991.

Testimony re: Senate Bill 238, Senate Finance Committee, Budget Subcommittee, Feb.1990.

Testimony re: Senate Bill 238, Indiana Senate Health and Human Services Committee, January 12, 1990.

Testimony re: HB1800 (Budget), Indiana House Ways and Means Committee, 1991.

**SELECTED CHILD WELFARE CURRICULUM DEVELOPMENT, TRAINING, AND CONSULTATION**

2001-current National Resource Center for Family-Centered Practice and Permanency Planning, New York, New York. Senior Consultant.

2006-2007 Casey Family Programs, Washington, DC. Consultant.

2005 Tennessee Department of Children's Services, Nashville, TN. Consultant.

2003-2004 Consultant, Northwest Crescent Child Development and Family Services Center, Greenville, SC.

2001-2002 The Duke Endowment Children and Families Community Partnership Initiative. Consultant, Northwest Crescent Center and Davidson Partnership.

1997-2000 Commonwealth of Pennsylvania, Department of Public Welfare: "Developing Visiting Policies and Practices to Promote Family Reunification." Program and policy consultation, curriculum development, staff development and training.

1984-1995 California State U., Fresno, School of Health & Social Work, Child Welfare Training. California Child Protective Services Emergency Response Curriculum

& Basic Curriculum for Child Welfare Services. Curriculum Development Team and Trainer of Trainers. Funded U.S. Dept. Health and Human Services.

1993 Consultant case reviewer. Survey of the Quality of the Child Welfare Administration's Shared 30-Day Child Evaluation Process. New York City Human Resources Administration, Child Welfare Administration, American Civil Liberties Union (ACLU), and Wilder Settlement Panel.

1989-1993 The Center for the Study of Child Welfare, the University of Connecticut School of Social Work. Consultation to A. Maluccio, R. Warsh, and B. Pine re: family reunification training curricula and multiple project publications.

1983-1991 Indiana State Department of Public Welfare. 1988-1991: "Fosterparentscope, A Preservice Curriculum" and "Fosterparentscope, An Inservice Curriculum." With Daniel Wasson, curriculum development and instruction, two 40 hour courses to over 350 caseworkers/supervisors, foster parents, and others. 1983-1989: "The Continuum of Care." Curriculum development and instruction, 34 hour course to over 700 child welfare workers and supervisors.

1980-1982 Tennessee State Department of Human Services with University of Tennessee Office of Continuing Social Work Education. "Working with Birth and Foster Parents;" "Decision-Making in Permanency Planning: The Impact of Attitudes and Values;" "Team Decision-Making." Curriculum development and testing.

1979-1981 University of South Carolina College of Social Work and South Carolina Dept. of Social Services. Curriculum development and staff training.

**PROFESSIONAL PRACTICE**

1984-1992 Children's Bureau of Indianapolis. Supervision, child welfare clinical and program consultation, and staff development

1977-1992 Multiple child welfare and family services agencies in Alabama, Tennessee, and Indiana. Supervision of BSW and MSW interns

1987-1991 Visiting Nurse Association of Indianapolis. Child welfare clinical and program consultation, supervision, and staff development

1972-1977 Lutheran Welfare Services of Illinois (Chicago): Supervisor/Clinical social worker, Family Services, 1974-1977; Social work supervisor, Headstart/Day Care Services, 1972-1974

1975-1977 Independent social work practice, Lake Forest, Illinois

1970-1972 Special Education Dist, of Lake County, Illinois. School social worker (K-12)

**PROFESSIONAL PUBLICATIONS, REVIEWER**

Editorial Review Board, *Child Welfare*, 1984-1996, 1998-current
Editorial Review Board, *Children and Youth Services Review*, 1987-2004
Consulting Editor, *Journal of Social Work Education*, 1997-2005
Faculty Editorial Committee, *Columbia University Press*, 2001-2003
Consulting Editor, *Marriage and Family Review*, *24*, Special Issue: The Methods and Methodologies of Qualitative Family Research, 1996
Editorial Review Board, *Community Alternatives: International Journal of Family Care*, 1992-1996

**SELECTED ACADEMIC AND PROFESSIONAL PRESENTATIONS**

"Supporting Effective Child Welfare Supervision." New Strategies for Changing Times, 2009 Meeting for Agencies and Courts, Co-sponsor U. S. Children's Bureau. With S. Kanak, and C. Collins-Carmargo. Arlington, VA, August 2009
"Supporting Effective Child Welfare Supervision #1: A Framework." Teleconference co-sponsored by National Resource Center for Family-Centered Practice and Permanency Planning and National Child Welfare Resource Center for Organizational Improvement. With S. Kanak, J. Atkins, and C. Collins. May 28.
"Visits: Critical to the Well-Being and Permanency of Children and Youth in Care." Webcast, National Resource Center for Family Centered Practice and Permanency Planning, with Gary Mallon, New York City, May 2008
"Permanency Planning and Family Centered Practice." Family Centered Practice: A Conference and 30th Anniversary Celebration, Iowa City, Iowa, April 2008
"Quality Visits Between Children and Care and Their Parents." North Dakota Children and Family Services Conference, Bismarck, July 2007
"Enhancing Child and Family Visiting." New Jersey and The Child and Family Services Review: Looking to the Future. New Jersey Court Improvement Committee, NJ, January 2004.
"Visiting Between Children in Care and Their Families: A Look at Current Policy" U.S.Dept. of HHS, ACYF, Permanency Partnership Forum VII, Washington, DC, May 2003
"Best Practices in Family Support: One Agency's Experience." Institute for Families in Society - USC. Tenth Anniversary Lecture Series, Columbia, SC, November 2002
"Using Qualitative Methods in Evaluation." Annual Conference of the Duke Endowment Children and Families Community Partnership Initiative, Charlotte, NC, October 2001
"Parent-Child Visiting: Essential to Permanency Planning." Prevent Child Abuse South Carolina Annual Conference, Columbia, SC, September, 2001
"Embarking on a Successful Research Career." Advancing Your Career Through Empowerment Mentoring, Women's Studies Program, University of SC, Columbia, SC, Sept. 2001.
"Becoming a Professional." Commencement speech, University of Illinois Urbana-Champaign, School of Social Work. May 1999

"Self Awareness for Multicultural Practice." Faculty Development Institute, CSWE Annual Program Meeting. With C. Franks, E. Sheiman, K. Walters, and D. Wheeler. San Francisco, CA, 1999

"Evaluation Grants Program Roundtable." Convened by the Harvard Family Research Project and Annie E. Casey Foundation, Chicago, 1998

"Why Is Visiting Important? What Research Tells Us." Keynote, Commonwealth of Pennsylvania Department of Public Welfare Placement Review Initiative, 1997

"Court Ordered Supervised Visitation: Documenting an Unmet Need." Association of the Bar of the City of New York, Committee on Family Court and Family Law, 1994

"Reunification in the Context of Permanency Planning." National Child Welfare Resource Center for Management and Administration, with A. Jefferson, 1994

"Regulatory Issues in Implementing 1993 Family Preservation and Family Support Legislation: Family Reunification and After Care." U. S. Department of Health and Human Services, Administration for CYFamilies staff. Washington, D.C., 1993

"Achieving Family Preservation Through Reunification." Family Preservation in Pennsylvania: Changing How We See Families Invitational Conference, Harrisburg: Nov. 4, 1993

"Challenges in Successfully Achieving Family Reunification." The Law Enforcement Child Abuse Project, Philadelphia, 1993

"Child Abuse Recognition and Intervention." Keynote address, Columbia University School of Social Work Maternal and Child Health Training Project, 1993

"Reunification in the Context of Permanency Planning." International Reunification Symposium, Charleston, S.C., 1992

"Evaluating Effectiveness of Family Reunification Services." With G. Folaron and R. Kinnear. 5th Annual National Association for Family-Based Services Empowering Families Conference, St. Louis, MO, 1991

"The Challenges of Permanency." Ohio Assoc.of Child Caring Agencies, Columbus, 1991

"Exploring Permanency Options with Ambivalent Parents." With G. Folaron, A. Jefferson, and R. Kinnear. CWLA Southern Regional Conference, Louisville, KY, 1991

"Placement Decisions: Teaching Effectiveness in Child Welfare Practice and Policy." With G. Folaron. CSWE Annual Program Meeting, New Orleans, 1991

"Effectiveness of Family Reunification Services: An Innovative Evaluative Model." With G. Folaron and A. Jefferson. NASW 1990 Annual Conference, Boston, 1990

"Home on Trial Breakdowns: An Exploration of Causes and Remedies." British Agencies for Adoption and Fostering, London, England: June 27 and 28, 1990

"Maintaining Contact: Partnership in Practice." British Agencies for Adoption and Fostering, Regent's College, London, England: June 26, 1990

## PROFESSIONAL ORGANIZATIONS AND SELECTED COMMUNITY SERVICE ACTIVITIES

The Children's Advocacy Center, Sullivan County, TN. board member, 2004-2007; Executive Committee Member 2006-2007

Wellmont Hospice, 2004-2006 volunteer bereavement counselor

National Association of Social Workers, 1970-current
Supervised Visitation Network, 1992-2002
The Society for Social Work and Research, 1997-2003
New York City National Association of Social Workers (NASW) School Social Work Curriculum Development Task Force. CUSSW representative, September, 1992-1995
Columbia University Rape Crisis Center, Volunteer Supervisor, Fall 1992-1994
Coalition for Children's Access to Parents, Founding Board Member, Indiana, 1989-1994
Indiana Chapter for the Prevention of Child Abuse, Executive Com.of the Board 1991-1992

**PROFESSIONAL CERTIFICATION**

NASW, Academy of Certified Social Workers (ACSW) (entry date 1975)