# EXHIBIT M

# D.G. et al. v. Henry et al.

# Review of
# Named Plaintiffs' Case Files

## *Supplemental Report*

Peg McCartt Hess, PhD, ACSW

February 25, 2010

# TABLE OF CONTENTS

Introduction ........ 1

Executive Summary ........ 3

GC

Case Summary ........ 10

Casework Analysis ........ 27

KT

Case Summary ........ 47

Casework Analysis ........ 61

DHS Systemic Deficiencies and Failures Suggested by Review of the Seven Named Plaintiffs' Files ........ 75

Endnotes ........ 94

Appendix A. *Curriculum Vitae* for Peg McCartt Hess ........ 112

# INTRODUCTION

This is a supplemental report to D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files* (September 30, 2009), completed at the request of plaintiffs' counsel. This report reviews Oklahoma Department of Human Services (DHS) practice in the cases of two children – GC and KT – during their time in DHS custody up to 2/13/08, the date the named plaintiffs' complaint was filed. The purpose of this review has been to determine the efforts that were made by DHS to ensure these two children's safety, well-being, and permanency. Both children are named plaintiffs in the federal class action lawsuit *D.G. et al v. Henry et al.* For each child, the report includes (1) a Case Summary and (2) a Casework Analysis that evaluates the quality of case practice in light of DHS agency policy and reasonable practice standards. This report also includes common findings prevalent in all seven named plaintiff children's cases (JB, AP, JA, JP, RJ, GC, and KT). These common findings are suggestive of systemic deficiencies and persistent preventable failures.

Following the same procedures that guided the review of the five named plaintiff children's cases in the September 2009 report, the author of this supplemental report reviewed the DHS case files for these two additional named plaintiffs, emails of the children's DHS workers and supervisors that were produced by defendants' counsel, and summaries of the children's DHS case files prepared by plaintiffs' counsel. Also reviewed were DHS Child Welfare policies, which are available on the DHS website.[1]

The author also reviewed the professional literature to identify current research on foster care and child welfare practices, appropriate services for children in foster care, and child development. Information from the literature is cited in the report where relevant.

The reviewer and author of this report is Peg McCartt Hess. The author is an independent child welfare consultant, currently affiliated as Senior Consultant with the National Resource Center on Family-Centered Practice and Permanency Planning. The author most recently was Professor at the University of South Carolina College of Social Work and Columbia University School of Social Work. A current copy of the author's curriculum vitae is attached to this report as Appendix A.

All opinions, conclusions, and observations expressed by the author are based on the information available at the time of this review, a review of professional literature, and the author's professional knowledge and expertise. The author reserves the right to supplement and/or modify the conclusions in this report should new and/or different information become available, or upon further request for evaluation by plaintiffs' counsel.

# EXECUTIVE SUMMARY

This report reviews Oklahoma Department of Human Services (DHS) practice in the cases of two children who are named plaintiffs in the federal class action lawsuit *D.G. et al. v. Henry et al.* – GC and KT – during their time in DHS custody up to 2/13/08, the date the named plaintiffs' complaint was filed. The purpose of this review has been to determine the efforts that were made by DHS to ensure these children's safety, well-being, and permanency. This summary highlights the findings for the two children whose case files were reviewed and supplements the findings previously reported in D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files* (September 30, 2009), which reviewed five named plaintiff children's case files (JB, AP, JA, JP, and RJ). This summary also provides the salient conclusions of the DHS Systemic Deficiencies and Failures Suggested by Review of the Seven Named Plaintiffs' Files.

## GC

*"[GC] states she became very depressed . . . . [she] began cutting herself in order to 'release the pain.' . . . [GC] states the blood represents pain and she is releasing that from her body . . . she has been in numerous foster homes and shelters and experienced physical, sexual, and emotional abuse in many of the foster homes."*[2]

~ Psychiatric evaluation of GC

GC entered custody when she was nine years old. As of 2/13/08, GC had spent 1,554 days – four years and three months – in DHS custody. DHS has subjected GC to:

- ***repeated neglect and physical, sexual, and emotional abuse in her placements. For three-quarters of the 1,554 days under review, GC was placed in settings in which she was maltreated.*** DHS received at least 16 child abuse/neglect allegations regarding GC's placements while she was living in the homes. Of these, DHS designated only seven as formal abuse/neglect "referrals," three of which DHS Screened Out and did not investigate. DHS failed to even designate as formal "referrals" more than half of the 16 allegations against GC's caregivers, a potentially life-threatening and irresponsible ongoing agency practice which precluded investigation of any of these allegations. DHS subjected GC to placements in which she was repeatedly neglected and/or abused due to

DHS extensive failures to evaluate and respond to reports alleging maltreatment of GC; total disregard of previously documented lack of safety of placements; and failures to meet the agency's own minimum requirements for monitoring GC's safety while in its custody.

- ***placement in a shelter upon her entry into DHS custody, even though GC had been sexually abused by her stepfather the night before; she remained in this shelter for 35 days in violation of DHS policy, with no privacy and constantly changing shelter caregivers.*** DHS found it satisfactory to place GC in two additional shelter placements during times of emotional trauma: her 9th placement, following premature discharge from her first psychiatric placement, and her 16th placement, following GC's removal without notice from her second pre-adoptive placement.

- ***DHS failure to refer GC for Therapeutic Foster Care (TFC) as urged by the DHS shelter social worker in her first placement because of GC's behavior; DHS instead placed GC in unqualified and/or unprepared placements in which she was repeatedly beaten, exposed to domestic violence, neglected, and abandoned by her caregivers.*** Only after GC had been hospitalized for acute psychiatric care following a failed, unsafe Trial Reunification with her biological mother did DHS concede GC's need for a TFC placement – *two years* after TFC had been recommended by the DHS shelter social worker.

- ***repeated severe emotional trauma directly triggered by DHS ill-advised interventions as well as its failures to intervene, frequently in direct violation of agency policy.*** Prior to GC's first psychiatric hospitalization, she was beaten by kinship caregivers and abandoned by her mother during an unsafe Trial Reunification. Prior to her second hospitalization, GC was subjected to recurring sexual abuse and age-inappropriate sexual activity in a TFC placement, and to neglect and physical abuse during unmonitored weekend visits with relatives that were required by DHS. Between GC's second and third psychiatric placements, DHS subjected her to two pre-adoptive placement disruptions, abandonment without DHS contact in a shelter, and seven placement moves.

- ***placements or extensive weekend visits with three pre-adoptive families <u>before</u> DHS had completed required assessments to ensure that the family was qualified and prepared to care for and protect GC.*** GC was removed from one pre-adoptive placement because an adoption home assessment, completed two weeks *after* GC had been placed in the home, revealed sexual abuse by the prospective adoptive father, which he admitted.

- ***DHS failure to refer GC for psychological and/or psychiatric evaluations for two full years after her entry into custody despite her history of serious sexual abuse and self-harm behaviors while in custody.*** Such evaluations were necessary to ensure that GC's placements met her needs and protected her from maltreatment and self-harm, and that her need for mental health treatment was met consistently and at the required frequency. As a result of this DHS failure, GC was subjected to unsuccessful, harmful placements

and inadequate treatment, which contributed to a deterioration in her mental health and several psychiatric hospitalizations.

- ***a placement change on average every 86 days.*** DHS subjected GC to very high placement instability and caregiver discontinuity due to its lack of a range of available placements and placement planning; overuse of emergency/shelter placements; and failure to match GC's needs with the placement's capacity to meet her needs. These failures caused inevitable placement disruptions and subsequent placement changes for GC.

- ***DHS failure to recommend termination of GC's mother's parental rights, place GC in an approved adoptive home, and renew GC's relationship with her siblings.*** As of 2/13/08, DHS had placed permanency for GC on hold.

- ***an extraordinarily high degree of discontinuity of workers and supervisors assigned to GC.*** DHS assigned GC 55 workers and 44 supervisors during her time in custody under review – *a new worker more often than once a month.*

## KT

*"[KT's] anger is clearly related to abandonment issues. She has been abandoned by every adult in her life . . . . When she was removed from the [Therapeutic Foster Care parents'] home in October of 2002 . . . psychologically [KT] was abandoned again. Again she felt abandoned when her foster parents admitted her to [this hospital] . . . . She is a sad, lonely, depressed, angry child who expresses her anger and frustration in explosive episodes in which she can be destructive to property and to herself . . . . She has been abandoned so many times that she fears being left alone again."*[3]

~ Psychological evaluation completed during KT's 16th placement, after six years in DHS custody

KT entered custody when she was five years old. As of 2/13/08, KT had spent 3,929 days – ten years and nine months – in DHS custody. DHS has subjected KT to:

- ***28 placements and, when moves to respite care placements are included, at least 81 placement changes during her time in DHS custody under review – a move on average every 49 days.*** In her first 15 months in custody, DHS moved KT on average every 30 days. During the time under review, KT was placed with *26 different families*, many of whom provided one or more of KT's 53 respite care placements ranging in length from one to ten days. In addition, DHS placed KT in *11* different facilities: four shelters, one for a period of 46 days, in serious violation of DHS policy; five psychiatric facilities; and two group homes.

- ***placement twice with her* [redacted]*, whose home had not been approved by DHS, who admitted to beating KT, and who permitted KT's father, who had neglected and abused KT, to live in the home***. DHS kept KT in this home for a total of more than nine months, although it knew that KT's [redacted] violated DHS policies regarding physical discipline and sleeping arrangements, and it received two child abuse/neglect referrals against the [redacted] while KT was in the home.

- ***incomplete investigations and assessments by DHS of KT's needs in order to determine appropriate placement and treatment for her***. A DHS investigative report stated KT's sexually acting out behavior appeared to have been ignored by DHS when she first entered custody and that the behavior had been constant over her stay in custody. Yet DHS failed to identify KT's sexual abuse and did not bring it to the court's attention until *16 months after* she entered custody. In addition, KT was in custody for *two years* before DHS referred her for complete psychological and/or psychiatric evaluations despite KT's serious, symptomatic behaviors: within two weeks of entering custody KT stated she wanted to kill herself; within five weeks, KT exhibited self-abusive behavior; within four months, while with a DHS worker, KT ran off, out of control.

- ***six different placements over a period of more than five years in a single TFC home that, according to DHS documentation, initially and then continually failed to protect KT from injuring herself and others, failed to provide the consistency required for KT's safety and well-being, and failed to follow recommendations regarding KT's behavior management and therapy***. DHS repeatedly documented KT's suicidal and homicidal threats, self-abuse, physical assault of the TFC parents, and serious damage to property while in this TFC home. DHS workers expressed alarm that police were regularly called to intervene to protect KT and the TFC family, yet DHS rarely took *any* action to address the unsafe situation. DHS repeatedly documented that the TFC parents could not control KT's behaviors sufficiently to ensure safety in the home – *yet DHS continued to place and keep her in this home.*

- ***waiting for a group home placement for almost five months because DHS had no such placement available***. While KT waited for this placement, DHS placed her in a TFC home previously documented to be unsafe, two psychiatric facilities, and two shelters, one for 5 days and the second for 20. Four months after DHS finally placed KT in a group home, a psychological evaluation recommended that KT receive therapy and meet with a psychiatrist; the group home failed to provide this level of care. After KT had been in this facility 14 months, a higher level of care was recommended for KT. Instead, DHS moved KT to another group home with the *same insufficient level of supervision and treatment*. The explanation given was that DHS would keep KT at the same level of care and "see how she does."[4] She remained in this placement as of 2/13/08.

- ***waiting for adoption for more than seven years – and still waiting***. Even though as of 5/20/00 KT was legally free for adoption, DHS had not yet identified a prospective adoptive family for her by 2/13/08. In 2003, a family with whom KT was placed and where she was thriving wanted to adopt her; however, they requested that KT be moved

from their home due to the length of time DHS was taking to make a decision regarding KT's adoption. DHS also repeatedly placed KT for three years in a TFC home that had decided not to adopt her, contributing to the agency's failure to achieve permanency for KT.

- ***a staggering degree of discontinuity of workers and supervisors assigned to KT.*** DHS assigned KT 97 workers and 88 supervisors during her time in custody under review – a new worker on average every 39 days.

## DHS Systemic Deficiencies and Failures Suggested by Review of the Seven Named Plaintiffs' Files

DHS policy mandates that "Safety drives all case planning decisions."[5] This mandate has served as a touchstone in the author's review of DHS workers' and supervisors' decisions and actions on behalf of the seven children whose cases were reviewed in the initial and supplemental *Review of Named Plaintiffs' Case Files*. It is both sobering and extremely alarming to see the degree to which DHS has consistently fallen short of this standard. It is of significant concern that *nothing* in the seven children's files suggests that DHS practice in these cases was unique or in any way different from that with other children in custody served by the named plaintiffs' DHS workers and supervisors.

Although the review of seven children's files cannot conclusively establish overall systemic problems, there are striking similarities in the children's case records and experiences in DHS custody that appear to suggest systemic deficiencies and persistent preventable failures. These include:

- DHS failure to monitor and evaluate safety of children's placements during those placements;
- DHS failure to monitor and evaluate safety in children's placements, including Trial Reunification placements, *prior* to the child's placement;
- DHS' drastic shortage of placements for children in DHS custody;

- DHS failure to provide basic matching between the placement, treatment, and educational needs of children in DHS custody and the placements' willingness and ability to meet those needs;

- DHS failure to document accurate information regarding children's safety and to present critical safety information to the court and other DHS staff;

- DHS failure to ensure that complete expert assessments of children's needs are conducted at the time of entry and throughout their stay in custody and that the recommendations made in these assessments are followed in DHS case decisions;

- Discontinuity of DHS workers and supervisors serving children and consistent absence of supervisory monitoring of worker accountability, indicating a severely overburdened workforce; and

- DHS failure to provide basic permanency planning services.

Due to these systemic deficiencies and failures suggested by review of the case files, these seven children consistently experienced:

- Neglect, physical abuse, and sexual abuse while in DHS custody;

- Deprivation of continuous caregivers due to an unconscionably high level of placement changes;

- Lengthy, often repeated placements in overcrowded and poorly supervised shelters;

- Superficial relationships with DHS workers, leading to lack of disclosure and inevitably increased risk of harm; and

- Harmful deterioration in well-being and development due to lack of necessary services, including assessments, psychological evaluations, speech therapy, and special education.

It is critical to remember that the focus of the initial review was five young children who entered DHS custody as a newborn (JB), two-year-old (AP), four-year-old (JA), six-year-old (JP), and eight-year-old who re-entered custody after having first entered custody as a three-year-old (RJ). The focus of the supplemental review was two vulnerable children who entered DHS custody as a five-year-old (KT) and nine-year-old (GC). All seven of these children suffered

harm in their dangerous DHS placements and in their abandonment by DHS workers and supervisors prior to, during, and following their maltreatment in their placements. The purpose of these placements was to keep the children safe. However, for none of the children in either the initial or the supplemental review was that the case. When attempting to describe the children's harm and suffering, the words that come to mind are incomprehensible, unimaginable, outrageous, and immoral.

DHS perhaps could not have prevented the maltreatment to which these children were subjected prior to entering the agency's custody. But these seven children's tragic and painful stories, told in the pages of their DHS case files about their stays in DHS custody, need not have been written. These tragic stories were wholly preventable.

# GC CASE SUMMARY

**DOB: [redacted]**
**Entered DHS custody: [redacted]/03, age 9 years**
**Time in DHS custody as of 2/13/08: 1,554 days (4 years, 3 months)**
**Time in shelter/emergency placements: 44 days**
**Time in psychiatric hospitalizations: 102 days**
**Number of placements as of 2/13/08: 18, a move on average every 86 days**
**Total DHS workers assigned: 55**
**Total DHS supervisors assigned: 44**

"[*GC*] *states she became very depressed . . . [she] began cutting herself in order to 'release the pain' . . . [GC] states the blood represents pain and she is releasing that from her body . . . she has been in numerous foster homes and shelters and experienced physical, sexual, and emotional abuse in many of the foster homes.*"[6]

~ Psychiatric evaluation of GC

**Placement in DHS custody**

GC was born in [redacted], Oklahoma on [redacted].[7] On [redacted]/03, GC's [redacted] reported to DHS[8] that nine-year-old GC disclosed her father (later identified as stepfather) had "touched her in her private area,"[9] "just like adults do."[10] The stepfather threatened GC that "if she told anyone . . . she would have to live some where else."[11] GC and her nine-year-old stepsister [redacted] both alleged the stepfather had also abused [redacted],[12] sexually abusing each girl in the other's presence.[13] GC reported the last time it happened "was last night."[14] GC and six siblings[15] were taken into protective custody that evening.[16] GC later disclosed that her stepfather beat her and her siblings "with a hanger and a water hose,"[17] and his friends also raped her.[18]

GC reported that her stepfather "forced himself upon her, 'stuff started coming out. Daddy [stepfather] threw away [GC's] panties that had blood all over it' . . . [GC] reported that the natural mother once found her naked with the step father [name] and told her she would make her go to court and explain what happened."[19] Despite having observed the abuse, GC's mother took no action[20] and denied knowing about the abuse.[21] However, GC's mother did report GC's biological father had had "sexual relations" with GC when she was eight months old; the mother had not seen him since.[22]

Medical evaluations found GC's inner and outer labia and vaginal opening red and swollen and found the presence of seminal fluid.[23] GC and her siblings were found to suffer from "severe medical neglect."[24] GC reported she "was made to sleep on sheets that the dog urinated on . . . and sleep on the floor."[25] The allegations of sexual abuse and neglect were Confirmed and

Court Intervention Requested.[26] Due to these offenses, GC's stepfather was charged with first-degree rape and forcible sodomy[27] and received two life sentences plus 170 years in prison.[28]

**DHS had received 16 child abuse/neglect referrals related to GC since infancy**

Prior to GC's placement in DHS custody in 2003, DHS received 16 referrals of child abuse/neglect of GC by her caregivers. Of these 16 referrals, DHS did not investigate ten: five were "Screened Out"[29] and five were "Unable to Locate."[30] Four were found "Rule Out;"[31] one "Services Not Needed;"[32] and one "Confirmed."[33]

***GC was six weeks old when DHS received the first referral.*** DHS received an allegation 7/7/94,[34] but the investigation report contains no information about the alleged abuse, perpetrator, or investigation;[35] the finding was "Rule Out."[36] Other documents state a therapist observed "blister type marks" on GC's head; GC's mother left GC with the mother's 14-year-old [redacted] who was "not capable of caring for the baby."[37]

When GC was two, DHS received three neglect referrals. Neglect-Lack of Supervision and Neglect-Failure to Protect from exposure to freezing/heat were alleged 6/4/96; GC had blisters on her shoulder and red skin on her torso.[38] An ER physician concluded the blisters "could be caused from a sunburn but was unlikely."[39] However, the DHS worker believed GC was sunburned and found "Rule Out."[40] Three weeks later (6/24/96), [redacted] reported twice finding GC in a pool with no supervision.[41] The finding was "Rule Out."[42] On 9/10/96, GC's [redacted] alleged Educational Neglect; DHS Screened Out the referral, Linked to an Existing Case, reason: "Not Child Abuse/Neglect."[43]

***DHS Confirmed sexual abuse (Oral/Genital Contact, Mental Trauma) of three-year-old GC by 13-year-old [redacted].***[44] DHS received a referral 7/11/97 that a 13-year-old male living with GC and her mother sexually abused GC. The male was interviewed, arrested, and placed in a secure facility.[45] DHS did not document the extent of the abuse. DHS "offered family focus services *if needed* for [GC's mother] and her three-year-old child [GC]"[46] (emphasis added). No services are documented. DHS received and Screened Out two additional referrals concerning this 13-year-old male: a referral 10/23/97 that he had been sexually abused and beaten by [redacted];[47] and a 10/29/97 referral that he was involved with anal sex.[48] In none of these reports did DHS identify the need for a safety plan to protect GC from contact with this 13-year-old and [redacted].

During this time period, DHS also received a referral alleging GC's mother's boyfriend beat GC and, due to domestic violence, GC's mother was afraid to call police (10/13/97).[49] Finding was "Rule Out;"[50] DHS did not interview the alleged perpetrator.[51]

***DHS did not investigate five referrals of child abuse/neglect of GC due to "Unable to Locate" family.*** DHS received referrals on 4/14/98;[52] 7/29/98;[53] 5/21/99;[54] 8/25/00;[55] and 2/6/03.[56] Allegations included Neglect-Failure to Protect;[57] Neglect-Substance Abuse-Caretaker;[58] Neglect-Failure to Provide Adequate Nutrition, Neglect-Malnutrition, Neglect-Inadequate Physical Care, Neglect-Failure to Obtain Medical Attention;[59] Neglect-Inadequate

Physical Care and Substance Abuse/Alcohol-Caretaker;[60] Sexual Abuse-Exposure to Adult Sexuality;[61] and Abuse-Hitting with Instrument and Mental Injury.[62]

***DHS received three additional referrals within the ten months prior to GC's placement in custody.*** [redacted] reported the children were cared for by GC's mother's husband (GC's stepfather), who had attempted suicide "a few weeks ago."[63] The referral (2/25/03)[64] was Screened Out, Linked to an Existing Case, reason: "Other."[65] On 6/16/03, DHS received a referral that GC's family was living in a car;[66] the reporter stated the family stayed with him after GC's stepfather attempted suicide by hanging himself in front of the children in December 2002. The stepfather spent a few days at an Oklahoma City hospital.[67] DHS did not investigate; allegations were "Screened Out," "Linked to an Existing Case," reason: "Other."[68] Three months later (9/30/03), DHS received allegations that GC's family lived at a motel and nine-year-old GC was supervising her siblings.[69] The DHS worker concluded the children were "okay" and found "Services Not Needed."[70]

**[redacted]/03 – 12/11/03: GC's first placement in an emergency shelter violated DHS policy**

When DHS removed GC from her mother and stepfather, the agency placed her in the Laura Dester Shelter in Tulsa County. GC remained there for 35 days, in violation of DHS policy[71] which permits children six years of age and older to be placed no longer than 30 days in a shelter.[72]

***Counseling and Therapeutic Foster Care (TFC) recommended for GC while in this placement.*** The DHS shelter social worker (12/10/03) recommended that GC receive counseling for her sexual abuse issues and be referred for TFC.[73] DHS did not follow the social worker's recommendation that GC be referred for TFC. Specific information concerning GC's sexual acting out and counseling needs is documented in a Shelter Incident Report (11/12/03): "[GC] had taken off her panties and was making 'humping' motions in the bed . . . [GC] told [child] to do 'some humping' . . . Counseling Needed!! for these children."[74] Unsigned notes state GC needs "treatment for alleged sexual abuse by stepfather. Reportedly [GC] and siblings are sexually reactive. . . . Attachment sx [sic]: Indiscriminately affection [sic] with strangers – poor personal space, tells victimization story inappropriately."[75]

During this 35-day placement, GC had one visit with her mother (11/25/03) and a DHS social worker transported GC to evaluations.[76] During this time period, a court document (12/4/03) states GC's mother was on the tribal roll and GC was an enrolled member of the Citizen Potawatomi Nation.[77]

**12/11/03 – 12/23/03: DHS placed GC in a foster home in which it had previously determined no foster children should be placed**

GC was then placed for 12 days in a regular foster home in Tulsa County[78] despite the home's history of confirmed child abuse/neglect and lack of safety.[79] Neither the foster parents' nor GC's files[80] contain information about the placement other than the dates.[81] In 1989, DHS had Confirmed the first referral received on this home.[82] *"It was agreed [by DHS and foster*

*parents] that [DHS] would place no other foster children with them*"[83] due to confirmed physical abuse by the foster father[84] (emphasis added).

**12/23/03 – 1/19/05: GC's third placement in 47 days disrupted due to alleged physical abuse by caregiver**

In late 2003, DHS moved GC and four of her siblings to a kinship placement ([redacted]) in [redacted] County.[85] Thirteen months later, DHS removed them due to physical abuse and neglect allegations against GC's caregivers.[86] Although an email refers to the kinship parents' "original application,"[87] GC's file contains no resource family application, initial home study, or re-assessment. The file includes child abuse/neglect referrals made against the [redacted]'s home in 1993, 1994, and 1995[88] and a protective order between the [redacted] and [redacted] filed 9/13/01. Another protective order was filed 1/14/05, five days before GC's removal from this home.[89]

***Physical abuse alleged in this placement, but DHS did not designate allegations as formal abuse/neglect referrals.*** On 1/5/05, [redacted] requested an investigation into GC's mother's allegations against her [redacted], the kinship provider.[90] DHS Tulsa supported an investigation,[91] but these allegations were not designated as a referral; no child abuse/neglect referral can be found in the files. DHS continued to place the children in the home. A week later (1/12/05), GC's mother alleged the kinship mother was abusing GC,[92] but once again DHS did not designate these allegations as a referral.

***Kinship mother "at a breaking point;" DHS had no other placement for GC.*** On 1/13/05, the kinship mother reported she was "at the breaking point being home 24 hours a day with 6 children"[93] and requested their removal. However, DHS had no placements in shelters or foster homes for the children: "they were all full."[94] DHS requested homes from Creek Nation; none were available.[95] The next day DHS received a referral[96] that the kinship mother had beaten the children "numerous times with a leather strap."[97] DHS did not investigate; the referral was "Screened Out."[98] A 1/18/05 contact documents allegations that the kinship mother "whipped the children with wooden spoons," failed to take GC to counseling, and hung "out at bars,"[99] but DHS did not designate the allegations as a referral.

Six days after the kinship parents requested the children's removal (1/19/05), DHS received an additional referral[100] that GC's kinship mother beat the children with a strap and used alcohol, and the [redacted] made threats against each other.[101] The DHS worker reported being "unable to confirm" the allegations, finding "Services Recommended."[102] The DHS [redacted] County Director requested that the DHS Area Director move the children that day; eight shelters could not take the children due to being at capacity or to age restrictions.[103] DHS placed GC and three siblings in a [redacted] County home, a fourth elsewhere.[104] Subsequent to GC's removal, GC disclosed (2/28/05) her [redacted] had whipped all the children with a leather strap.[105]

***DHS court report states: "The emotional scars to these children may take a life time for recovery."***[106] An addendum to GC's 1/12/05 court report states, with regard to the children's removal from the kinship home, a "crisis move was finally made due to the chaos and charges of

abuse. The children were separated, withdrawn from school and all therapy activities . . . and suffered great emotional distress."[107]

***During this 13-month placement, DHS workers had no private contact with GC despite twelve worker contacts in the home.***[108] The Visit Log also lists 11 visits between GC's mother and the children during this placement, less than one per month.[109]

***After 14 months in DHS custody, GC's mental health treatment needs had not been assessed or met.*** When removed from this placement, GC had not yet been referred for a psychological and/or psychiatric evaluation. Although DHS made counseling referrals for GC, the agency had not ensured that her caregivers kept appointments. An 11/17/04 case note states GC missed counseling due to conflicts at school;[110] on 1/18/05, it was reported GC was not being taken to counseling by the kinship mother.[111]

**1/19/05 – 6/10/05: Within a two week period, DHS moved GC to fourth, fifth, and sixth placements**

***DHS placed GC twice – her fourth and sixth placements – in a foster home with nine prior referrals of child abuse/neglect.***[112] After removing GC from the kinship home, DHS placed her for one day in a [redacted] County foster home.[113] Prior allegations included Lack of Supervision contributing to child-on-child sexual activity, Failure to Protect, Sexual Exploitation, and Exposure to Adult Sexuality.[114] DHS Screened Out six referrals; three were investigated and found "Services Not Needed."[115]

***DHS moved GC to the [redacted] County youth shelter for 12 days and then returned her to the prior placement.*** On 2/1/05 a DHS case aide[116] returned GC to the [redacted] County home in which she previously had been placed. GC was placed there for approximately four months.[117]

***DHS initiated, and then suspended, unsupervised weekend (including overnight) visits between GC and her biological mother.*** At a 3/30/05 hearing, the court ordered GC's mother to move to her [redacted]'s home "to transition the children to the [natural mother's] home."[118] In April, DHS began weekend visits between GC and her mother.[119] Four weeks later, a DHS supervisor suspended the visits[120] because GC's mother reportedly left GC's siblings with the kinship caregiver from whom DHS had previously removed GC and her siblings and spent the night with GC at the mother's boyfriend's house.[121] DHS told GC's foster mother to call the police if GC's mother showed up at the foster home.[122] DHS also received reports that GC's mother's boyfriend refused to complete background checks; although GC's mother denied she was involved with him, "she is still driving [his] car."[123] No referral concerning these reports was made. Despite GC's mother's alleged failure to protect GC during visits, in less than two weeks, DHS resumed weekly visits with "new rules."[124] The same day that DHS resumed the mother's visits (5/18/05), GC's mother requested that visits be decreased to bi-weekly; the worker said visits must continue because reunification was occurring.[125]

While ten-year-old GC was in this placement, DHS workers had no private contact with her during four visits to the home over a period of four months.[126] GC's biological father's

parental rights were terminated 2/11/05.[127] On 2/16/05, four of GC's siblings were returned to their mother's custody, and their case was closed.[128]

***After DHS removed GC from this placement, the home was closed***[129] ***due to Confirmed Sexual Abuse by the foster father.***[130] Six weeks (7/25/05) after DHS removed GC from the home, DHS received allegations including Exhibitionism, Sexual Abuse/Other, Vaginal Penetration, Failure to Protect, and Threat of Harm on this home. The referral does not list GC as a victim.[131] DHS policy requires that "other children previously living in the home who were abused or may have been aware of abuse" should be interviewed in such an investigation.[132] Despite GC's recent placement in the home, the worker did not interview her. DHS made no effort to determine whether GC was aware of and/or may have been exposed to the sexual abuse. The home was closed effective 11/23/05.[133]

**6/10/05 – 11/20/05: GC's seventh placement – a dangerous five-month Trial Reunification with mother**

***Successful visits between GC and her mother had not been completed and a requested therapist recommendation was not received prior to placing GC on Trial Reunification.*** DHS policy states when a safe Trial Reunification placement has been found to be feasible,[134] children may be placed with their parent(s) while remaining in DHS custody.[135] Such a determination requires that "[s]uccessful unsupervised all day, overnight, and weekend visits are completed prior to planning for the child's return home."[136] Such visits permit DHS staff to assess whether the conditions that made the parent's home unsafe for the child have changed. DHS policy also states that one indicator of the need to expedite a concurrent permanency plan for a child (*i.e.*, an alternative permanency plan should safe reunification not be possible) is when "[i]ndications of maltreatment during unsupervised visitations are reported."[137]

The DHS court report for a 3/30/05 review requested GC's "therapist make a recommendation as to GC's emotional state and ability to be reunified with her natural mother."[138] GC's file contains no recommendation regarding her ability to be reunified. On 6/10/05, 23 days after DHS resumed the suspended visits,[139] DHS placed GC in a Trial Reunification with her mother, who lived in GC's [redacted]'s home in [redacted] County. This 23-day period permitted only three weekend visits prior to GC's return home. During the weekend visits in this brief period, DHS took none of the actions required by policy to assess and monitor children's safety,[140] *e.g.*, unannounced and more frequent DHS worker visits to the home and private contact with children.

***GC had already been placed with her mother for more than two months when the Comprehensive Home Based Services (CHBS) intake with the family occurred.***[141] DHS policy states that support services for Trial Reunification, including Comprehensive Home-Based Services (CHBS), should be provided[142] to monitor children's status and safety in the home.[143] A court report (7/27/05) states DHS would place CHBS in GC's home to assist GC's mother and [redacted].[144] DHS delayed in referring CHBS to GC's family. In addition, the provision of "face-to-face, private contact with the child[ren] in the home" is defined by DHS policy as a required component of CHBS.[145] Although the CHBS Case Manager informed GC's mother and [redacted]

[redacted] that she needed to "see the children every visit,"[146] case notes do not document that she had private contact with GC.

***DHS received allegations that GC's mother had abandoned her***. DHS received two child abuse/neglect referrals[147] as well as two allegations not designated by DHS as referrals and not investigated[148] while GC was placed with her mother. On 8/26/05 [redacted] alleged[149] that during a visit to the mother's/[redacted]'s home, the [redacted] reported that the mother came and went from the home, but was there "on Wednesday when the case worker comes to the home."[150] DHS did not investigate this allegation;[151] it was Screened Out, Linked to an Existing Case, reason: "Other."[152]

***A DHS worker stated new allegations 10/6/05 were "alarming;"[153] however, no child abuse/neglect referral or investigation found in file***. A Tulsa County DHS worker documented that another of GC's [redacted] disclosed GC's mother had moved to [redacted] with her boyfriend, leaving the children with the [redacted].[154] She also reported that GC's mother took GC to the boyfriend's house on weekends.[155] The worker receiving the report requested that another DHS worker visit the home and "get back with me."[156] For two weeks (until 10/18/05), neither DHS worker followed up regarding the allegations.[157] When contacted, GC's mother and [redacted] denied all allegations.[158]

***DHS worker had no private contact with GC during Trial Reunification placement.*** At a 7/15/05 visit to GC's home, a newly assigned DHS worker reported the home was in chaos and GC's mother stated this was normal. The worker told GC's mother that the children could stay in the bedroom and watch television "during worker visit."[159] Worker comments from subsequent visits (8/17/05,[160] 9/20/05,[161] 10/18/05,[162] and 11/14/05[163]) similarly report GC and other children were sent to another room during the worker's visit, despite DHS policy requiring face-to-face contacts with the children.[164]

***During the five-month Trial Reunification, GC did not receive counseling "at least twice a week"[165] as recommended.*** Two weeks after placement with her mother (6/28/05), GC was seen for a limited evaluation.[166] She completed a BASC (Behavior Assessment System for Children) and a "quick IQ test;" the evaluator recommended that GC be seen for counseling more than twice weekly.[167] No documentation was found in the file that GC was seen for counseling even once a week while placed with her mother. Information regarding counseling frequency was based on self-reports by GC's [redacted] and mother; no report was found regarding the counseling focus. CHBS service reports rarely reported GC's counseling attendance.[168]

***Allegations also made regarding GC's abusive behaviors towards siblings***. Between 9/16/05 and 10/13/05, GC's [redacted] informed the DHS worker that GC was "doing much better and they are not seeing any of the behaviors that was [sic] displayed previously (burning brothers with a hot wire coat hanger that had been heated by a cigarette lighter)."[169] Previously, the family had not reported these abusive behaviors. No child abuse/neglect referral was made at the time. On 11/19/05 DHS received a referral alleging GC physically abused her brothers and had previously burned her brothers with matches and cigarette lighters and GC's mother and [redacted] failed to supervise the children.[170] DHS did not investigate the referral.[171]

**11/19/05 – 12/15/05: GC's eighth placement – psychiatric hospitalization**

***Psychiatric hospital staff states at intake: "[GC] not getting needed therapy."***[172] On 11/19/05 GC was hospitalized for psychiatric assessment and treatment and placed on "aggressive and suicide precautions."[173] Staff recommended GC participate in a 30-day program that might be extended.[174] Her symptoms were found to be "rather significant," and her prognosis "guarded."[175] At intake, GC's mother reported that in addition to confirmed sexual abuse by GC's stepfather and physical abuse by her [redacted], GC's [redacted] also physically abused her and had attempted suicide.[176] GC's mother subsequently placed GC in psychiatric care where the psychiatric facility staff informed GC's mother that GC had failed to get the therapy she needed during the Trial Reunification placement.[177]

An initial evaluation[178] states GC was "motivated for treatment"; she was admitted for evaluation of: "posttraumatic stress and disruptive behavior" and scheduled to attend individual, group, and family therapy.[179] A 12/2/05 evaluation states "[i]npatient treatment is the least restrictive alternative that meets the needs of the child."[180] Due to "petition filed untimely,"[181] GC was prematurely released to DHS after 26 days (12/15/05).

***GC reported her brothers "[look] just like [her stepfather] and bring back rage."*** At intake, GC's mother reported GC had been "quite abusive" to her brothers prior to hospitalization, ramming their heads into the wall, knocking them off chairs,[182] and burning them with heated coat hangers and branding them. She stated GC "held a brother down and held a lighter to his foot, creating a blister."[183] In a subsequent conversation with a DHS worker, GC stated she was "going to talk with her [natural mother] regarding her situation and her inability to look at the boys as they [look] just like [her stepfather] and bring back rage to her."[184]

***GC fearful of talking with DHS worker.*** On 11/22/05, GC's primary DHS worker visited GC at the hospital.[185] She had had no face-to-face contact with GC since the Trial Reunification began almost six months previously.[186] The worker's contact states that GC was "fearful of talking with the DHS/CW worker. Puppets were used for the talking."[187]

***Hospital staff stressed placing GC in a "safe place."*** GC's discharge plan stated that she and her mother "appeared not to have worked on the past issues of the patient being sexually abused. They were encouraged to do this . . . The need for placement in a safe place was emphasized. The possibility of placement in a therapeutic foster care home was reviewed as was the importance of the sexual abuse as a subject."[188]

**12/15/05 – 12/21/05: DHS placed GC in a shelter after she was discharged from the hospital**

Upon discharge from psychiatric treatment, DHS placed GC at the [redacted] County shelter for six days.[189] The file contained no information about the placement other than that it was a temporary placement, unable to care for child.[190]

**12/21/05 – 2/20/07: GC's tenth placement was an experienced TFC home that repeatedly failed to supervise and protect her**

***TFC mother's history included six years of sexual molestation by relatives.*** Following GC's discharge from her second shelter placement, DHS placed 12-year-old GC in a TFC agency home in [redacted] County 12/21/05.[191] The home study was completed only a month previously;[192] in it the TFC mother reported that three male relatives had molested her between ages 6 to 11.[193] She stated very little counseling was provided.[194] GC was the first foster child placed in the home and the only child in the home for almost two months.[195] GC remained in the home for 14 months, when she was again hospitalized for psychiatric treatment, having disclosed to [redacted] that "she would rather be dead than alive."[196]

***The foster father's [redacted] had sex with another foster child while GC was placed in the home;***[197] ***agency safety plan was to have GC placed in respite care when son visited.***[198] The TFC parents' failure to adequately supervise and protect a 13-year-old foster child placed in their home from having sexual intercourse several times with [redacted] (referral on 5/23/06) resulted in the girl's pregnancy.[199] A DHS worker stated the girl was sexually active when she entered custody: "her parents were prostituting her out."[200] The TFC father asked [redacted] to lie about having had sex in the home; he was concerned "that they might not be able to be foster parents anymore because of this."[201] The TFC parents asked that the girl be removed from their home when she tore a door off the hinges.[202]

The TFC agency developed two Plans of Improvement with the home. The 6/15/06 Plan states that the issues of concern "are policy violations and failure to protect. [TFC parents] did not notify [the TFC agency] that [redacted] would be staying in the home for the weekend."[203] The TFC agency required the TFC parents to have additional training regarding sexual abuse and placed them on six-month probation; subsequently the TFC agency extended the probation for a 12-month period (through 6/14/07).[204]

***GC was "forced to do sexual acts" in a "three-way" with a 12-year-old foster child and TFC mother's [redacted].*** GC and [redacted] reported the foster child threatened to hurt them if they told anyone.[205] A 9/21/06 referral found that the TFC parents failed to supervise and protect GC;[206] services were recommended.[207] An investigation document states GC would be safe because the TFC parents removed the perpetrating child from the home.[208]

A DHS worker emailed GC's DHS primary worker regarding the referral, stating: "I feel that too many things have happened at that foster home. I am wondering if [TFC parents] can handel [sic] TFC children. They had problems in the past with our custody children, and now this . . . maybe [GC] should be moved soon from the [name] home, and have that home evaluated for foster care."[209] No consideration of this worker's recommendation is documented in the file and no clarification was found concerning the caregivers' "problems in the past with our custody children."

***GC involved in sexual activity with a 14-year-old foster child in the home.*** A 2/28/07 referral found that the TFC parents failed to adequately supervise and protect GC and another

foster child in their home from Sexual Abuse – Age Inappropriate Sexual Behavior.[210] The 14-year-old alleged that GC sexually molested her;[211] GC reported that "it was actually [other child] who initiated the touching, and it happened everyday."[212] A TFC case note 1/3/07 states the other foster child was verbally and physically aggressive toward GC and admitted to being jealous of GC.[213] An investigation document states the sexual touching "appeared to be a combined decision between the two [girls]."[214] DHS documented in the investigation report that the safety plan would be to protect GC by making her the only foster child in the home.[215] An investigation found "Services Not Needed" since the other foster child was removed from the home.[216]

***DHS required GC to have weekend visits with relatives interested in adopting her, but with whom she did not feel safe.***[217] GC's biological mother consistently stated she was unwilling to relinquish her parental rights to GC unless [redacted] and [redacted] could adopt GC.[218] They applied 9/1/06[219] to have GC placed in their home and to adopt her.[220] Both a pre-resource contact[221] and house assessment completed 9/1/06[222] describe extensive safety hazards at their home, including trash and dirty diapers in the front yard, dog feces in the living room, and exposed wires. In an unannounced visit 9/20/06, a DHS worker found some improvement.[223] Between an unidentified date in September 2006 and mid-February 2007,[224] DHS required GC to have overnight visits with these relatives. DHS had not approved them as resource and/or adoptive parents when visits began or at any time throughout the five months in which GC's weekend visits with the [redacted]'s family occurred.

***GC reported being neglected and abused during weekend (including overnight) visits with [redacted]'s family.*** On 9/29/06, GC reported to her TFC mother and therapist that she was "cold and hungry" at her [redacted]'s house; she was also afraid she was "going to be asked to leave her current foster home to move in with her [redacted]."[225] On 10/27/06, GC reported to her TFC mother and therapist "there was no heat in her [redacted] and [redacted] [sic] home and therefore [GC] had to sleep in the [redacted] and [redacted] [sic] bed with them."[226] Although it was stated in court (12/13/06) that a neglect referral had been made against the [redacted] and [redacted],[227] none was found in the file. On 2/20/07, GC told [redacted] "she does not feel safe with her [redacted] and [redacted] when she visits them on the weekend;" they wrestle with her, causing bruises, and require her to pick up dog poop on the floor that they have left for her to clean up.[228] DHS did not recommend denial of the family's home study until 2/27/07.[229]

The TFC therapist documented concern that the TFC parents permitted GC to visit the [redacted] and [redacted] without informing her prior to visits[230] so she could obtain required DHS approval, including visits on 10/13/06–10/15/06,[231] 10/19/06–10/22/06,[232] 12/22/06–12/24/06,[233] 12/29/06–1/1/07,[234] 1/5/07–1/7/07,[235] 1/12/07–1/14/07,[236] and 2/9/07–2/11/07.[237] DHS policy requires that a child is not allowed "any overnight visitation without the prior planning and documented written approval of the child's CW county of jurisdiction and county of placement workers."[238]

***Newly assigned Court Appointed Special Advocate (CASA) for GC raises serious concerns about missing information in GC's case file.*** GC's newly assigned (1/11/06) CASA requested a staffing with GC's DHS worker because the files were "woefully inadequate; the last court report I have is from 8/05. I realize you also were just handed this case, but I would desperately like to sit down with you to go over what new information you have I'm lacking."[239] GC's TFC therapist

stated (1/24/06) that the TFC agency had not been provided any records of GC's previous therapy or any other appropriate records, such as GC's birth certificate or medical card.[240]

In her 5/16/06 report to the court, GC's CASA raised concerns about the instability of GC's scheduled services and the contacts with her mother. She recommended that GC have a set schedule for individual and group therapy at least twice a month: "This should be something [GC] can *depend* on, week in and out"[241] (emphasis in original). The CASA also recommended:

> . . . we should strive for more permanency of workers assigned to this case. This goes for CASA, DHS, [TFC agency], etc. or any other agency who has immediate bearing on [GC's] welfare. Since this CASA worker has been on the case (5 months) we've gong [sic] through: 3 Tulsa DHS workers, 3 [TFC agency] counselors (one of which was not licensed) and 2 [redacted] County DHS workers.[242]

**2/20/07 – 4/6/07: GC is admitted to an acute psychiatric hospital**

On 2/20/07, GC disclosed to [redacted] "she would rather be dead than alive"[243] and made deep self-inflicted wounds with an eraser.[244] GC was experiencing flashbacks of the face of her stepfather who sexually abused her.[245] GC's DHS worker and TFC therapist took her to a psychiatric hospital in [redacted]; the initial treatment focus included Depression and Post Traumatic Stress Disorder (PTSD).[246] GC was placed there for 45 days.[247]

***GC had returned from a three-day visit with her [redacted]'s family ten days prior to her hospitalization***.[248] GC reported feeling increasingly helpless, hopeless, and suicidal and had trouble sleeping and concentrating.[249] The admitting evaluation states she required 24-hour medical supervision at the residential level of care; "any lesser level of care could result in the patient becoming a danger to self and/or others."[250] Her Master Plan listed diagnoses of Major Depression; PTSD; Victim of Abuse, Physical and Sexual.[251] In addition to flashbacks of her stepfather, GC heard "her brothers screaming out to her, who were physically abused in the past."[252] GC also reported depression about ending the relationship with her [redacted]'s family.[253] An "Integrated Assessment"[254] states the following: recently GC became physically aggressive with peers, which was entirely out of character. It started after she began visiting her [redacted] and [redacted] on weekends. Ten days previously, GC had disclosed a large bruise on her thigh. Initially she lied, saying she fell. She admitted it was from "horse-play" at her [redacted]'s and acknowledged that she was uncomfortable and felt it was too rough.

***GC re-admitted immediately upon discharge due to violent and suicidal thoughts***. A week after GC was admitted to the hospital, her DHS worker presented a court order for her discharge; GC was discharged with the plan to be evaluated for re-admission.[255] At discharge GC's mental status included auditory hallucinations (*i.e.*, hearing her brothers screaming out to her), "seeing her hands dripping in blood, [and] having thoughts of killing her peers" in the facility.[256] She also reported flashbacks of her stepfather's attempt to hang himself, depression, and suicidal thoughts.[257] As a result, GC was immediately re-admitted to the acute level of care, "presenting with severe and gross psychotic behavior and thoughts. The thought pattern was disjointed . . . but totally psychotic in nature."[258] Another report stated GC was "seeing a suicidal

patient hanging. She stated that was similar to what she saw when she was five years old, when the police came and her father attempted to hang himself as they arrived."[259] GC said, "With [the] childhood I've had it's hard to trust people."[260]

***GC reported being molested by a male patient in the facility; no investigation was conducted.*** On 3/16/07 GC reported "a peer touched her chest and near her 'privates' and threatened to harm her if she told.'"[261] An email states [redacted] reported that a male peer touched GC's chest and thigh which brought back memories of her abuse; GC had filed a grievance form.[262] A facility manager and Office of Client Advocacy (OCA) representative were notified and were to investigate further.[263]

GC's CASA and TFC mother expressed concern that this facility was not safe and had not investigated the perpetration.[264] In a report filed with the court 4/4/07, GC's TFC therapist recommended that she return to the previous TFC placement,[265] stating GC had regressed since the hospitalization: "[a] report has been made that the client [GC] has been molested in the facility. The client has developed self-harm behaviors while inpatient at [facility], including cutting . . . [and has] digressed rather than improved . . . it appears that the client will benefit from being removed from this facility."[266]

**4/6/07 – 8/17/07: DHS returned GC to prior TFC home that had failed to protect her from abuse**

***Upon discharge from psychiatric placement, GC was returned to the previous TFC placement[267] that continued to be on probation for failure to protect.***[268] A Placement Worksheet states GC "will be at this home permanently. Foster family is planning on adopting her."[269] However, less than four months later, this placement disrupted when the TFC parents, now identified by DHS as pre-adoptive parents, gave notice, requesting that GC be removed.[270] They had decided not to adopt GC.[271]

***GC articulated the experience that prompted her deterioration as being asked to lie by [redacted] and [redacted].*** A July 2007 court report from GC's TFC therapist states GC had told her therapist that the last visit she had with her [redacted] and [redacted] led to her second hospitalization.[272] GC's brothers had attended that visit, and GC told her therapist:

> . . . seeing her brothers did not cause her to act out, it was being told by her [redacted] and [redacted] to lie about seeing her brothers and then being threatened with separation if she told anyone. In [GC's] words 'That's what [my stepfather] did . . . He would tell me not to tell what he was doing and if I did I would get in trouble. So when [redacted] [name] and [redacted] [name] told me I couldn't tell anybody that my brothers were here or I would get in trouble it reminded me of the same thing [stepfather] did to me.[273]

GC further stated to the therapist, "I really wish someone would listen to me and let me see [my brothers] on a regular basis. I'm afraid they will forget about me or think I am some awful horrible person." GC's therapist reported, "[GC] sees her brothers in her life. She believes she

has a chance in life now and as far as a family goes it involves her brothers and the [pre-adoptive TFC family.][274]

***The DHS report for July 2007 court review recommended termination of GC's mother's parental rights.***[275] The DHS report states "[GC] is ready for permanency in her life and has asked to come to Court on 7/18/07 to tell the Judge and her mother that she would like for her mother's rights to be terminated so that she can be adopted by her foster family. [GC]'s foster parents [names] have told the DHS worker that they are eager to begin the adoption process once GC is legally available."[276]

***Three weeks later, without notice, GC's TFC/pre-adoptive parents stated they "cannot put GC's needs first" and would not adopt her.*** The TFC parents gave 14-day notice for GC's removal from their home.[277] The reason given for GC's move was "foster parents moving out of state."[278] In the August 2007 court report, GC's CASA reported that GC's TFC mother told the CASA 8/6/07 that "after a lot of soul searching they wanted to adopt GC for the wrong reasons, and weren't sure they could provide her safety and security."[279] The TFC mother explained she was preparing to testify in her own abuse trial set for later in the fall. She had not previously acknowledged her feelings about the trial and reported PTSD and anxiety attacks. She told the CASA "since her own future was uncertain, she did not want to fail [GC] because she may not be able to meet [GC]'s needs emotionally; she feels she is unable to meet her own needs at this time."[280] An undated memo from a TFC supervisor states: "[TFC mother] stated that after long thought and dealing with her own sexual abuse, she felt like their home was not the best place for GC to deal with her sexual issues. [TFC mother] also stated that she was moving back to the East Coast to be closer to her biological daughter and her family."[281]

GC's foster parents informed GC on 8/6/07 that they "could not adopt her right now: the foster mother is afraid her issues will cause her to put [GC] second. [GC] told her foster mother she understood why they changed their minds."[282]

**8/17/07 – 9/20/07: GC's 13th placement was a TFC home that failed to notify DHS of GC's self-harm behaviors**

Eleven days after GC's TFC parents informed her that they would not adopt her, DHS placed GC in Tulsa County with the same TFC contract agency.[283] Despite the decision by the previous TFC parents and DHS, documented in an investigation report, that GC would be placed alone in a home for her safety and protection,[284] the new home had four girls, including two foster children.[285] The placement disrupted in 34 days when the TFC parents requested GC's removal.[286]

***Within four days of the placement, TFC mother aware GC was self-cutting; failed to notify DHS and TFC agency.*** On 8/21/07, GC gave the DHS worker a poem "about [GC]'s feelings toward [prior TFC mother] after she was told that she would not be adopted by the [name] family. [GC] wrote about wanting to die and then changing her mind."[287] GC insinuated she had cut herself; when asked, she showed the worker her arm[288] with five to six inch horizontal cuts.[289] The worker discussed protocol with the TFC mother and set up an emergency session with GC's therapist to develop a safety plan.[290]

***TFC mother alleged GC made sexual advances to other girls in the home.*** In an unannounced visit on 9/18/07, a DHS worker met with GC alone to inform her that DHS was moving her due to allegations she had made sexual advances to girls in the placement.[291] An email states "[GC] is being moved due to sexually inappropriate comments to younger female child in the home and the foster parents are concerned that she may act out sexually if she stayed in the home."[292] GC denied the allegations, stating "her foster mother told her that DHS wanted her to move and was not honest that the foster mother was the one who made the request for [GC] to be moved."[293] A child abuse/neglect referral was not made; no others in the home were interviewed.

***While GC was in this placement, another couple expressed interest in adopting GC.*** When, on 9/18/07, a DHS worker inquired if GC still wanted her mother's rights terminated, GC replied, "[Y]es. My mom doesn't want me, but she doesn't want anyone else to have me."[294] GC commented about "just wanting to belong somewhere, but she wasn't sure where that would be."[295] GC told her TFC mother and CASA that she wanted to be adopted; she didn't want to move anymore.[296] A married couple that GC had known for two years expressed interest in adopting her. The wife was adopted and wanted to "give GC the safety, security, and permanency of a home and family."[297] The couple applied on 8/11/07 to become both a foster and an adoptive home,[298] checking "no" to the question "[H]ave you or any household member been investigated for child physical abuse, sexual abuse, or neglect?"[299]

Although it is not clear when GC was first informed that this couple had applied to become a potential adoptive family for her, GC initiated contact with them.[300] GC told her CASA she might be allowed to visit the prospective adoptive parents soon.[301]

***Despite numerous psychological challenges facing GC, neither DHS nor the TFC agency ensured that GC was participating in therapy.*** In mid-September (9/19/07), a CASA court report states that GC had not had weekly therapy since the last week in July 2007, almost six weeks prior. GC met with one TFC therapist in September and another in the following week; the CASA requested that GC "resume weekly counseling and benefit from having the same therapist each visit."[302]

**9/20/07 – 11/13/07: GC's 14th placement in a TFC home that was unprepared and unable to meet GC's needs**

Due to the uninvestigated allegations that GC had made sexual advances toward girls in the prior placement, DHS moved 13-year-old GC to another home with the same TFC agency. This [redacted] County placement disrupted in less than eight weeks, resulting in the fourth placement change for GC in less than a year. The TFC parent "did not want to keep [GC] [beyond 11/15/07] because of being to [sic] fearful of her cutting herself."[303]

***TFC parents received no information prior to the placement about GC's previous self-harming behavior and suicidal feelings.***[304] The TFC therapist noted (9/25/07) GC was "anxious, still settling in."[305] Notes state: "Foster parents stated [GC] was doing well and had not had any behavior problems. She had stated she was suicidal which alarmed the foster parents. However, they have calmed down and will keep extra supervision on her. They are upset that they were not

told about this beforehand."[306] On 10/23/07, GC cut herself and immediately told the TFC mother.[307] GC's therapist felt this was a "cry for help" rather than a suicide attempt, and therefore GC was not eligible for inpatient treatment; the DHS worker stated the TFC mother was "freaked out" but worked to meet GC's needs.[308] A safety plan was discussed and signed.[309] On 11/6/07, the DHS worker told the TFC mother: "GC is not the type of kid who makes it a practice to cut on herself, and feels this is probably the only time [GC] will present in this way."[310] There was no discussion of a psychiatric evaluation to determine the current level of risk for GC to harm herself or others and to identify current treatment needs.

***GC's needs for therapy were not being met with current TFC agency.*** A 9/25/07 email from a DHS supervisor states: "How difficult would it be to get GC moved from [current TFC agency] to another TFC agency? She is not getting the therapy that she needs with this agency."[311] The same day GC's attorney raised similar concerns with GC's DHS worker and her supervisor:

> Please tell me ASAP that [GC] has a therapist she is working with in OKC. If you can't confirm that quickly, I feel that I must bring a motion before the court to get [GC] out of [current TFC agency]. I know you and [supervisor] are doing everything within your power to see that she gets the care she needs, but [TFC agency] has done very little to help her during one of the most trying times I can think of for this kid since she came into custody. If the Department won't hold [TFC agency's] feet to the fire, I'll try to get [the judge] to do it.[312]

**11/13/07 – 11/27/07: GC's 15th placement disrupted when adoptive home assessment, completed after GC was placed in the home, revealed previous sexual abuse by pre-adoptive father**

***DHS placed GC in a "trial adoptive placement"[313] without completion and final approval of the adoptive home assessment.*** On 11/13/07, DHS placed GC in the home of the married couple who had previously expressed an interest in adopting her. The CASA reported (11/19/07) GC was "flourishing" in the home: "I have never seen her so happy – even with the [TFC parents who had planned to adopt her]."[314] As of 11/20/07, the adoptive home study, which had been contracted out,[315] had not been completed.[316] None of the references had been contacted.[317] Without notice, DHS removed GC from the home two weeks later (11/27/07); according to an 11/28/07 email, sexual allegations against [the pre-adoptive father] were made by [redacted] contacted as part of the adoptive study.[318] He admitted "he molested his one [redacted] during a period when he was drinking and using drugs" and stated he "was no longer that person."[319]

**11/27/07 – 11/30/07: GC is placed in Laura Dester Shelter**

Following her removal from the trial adoptive placement without any notice or preparation, DHS placed GC at the Tulsa County shelter for three days; no problems were noted in staff entries.[320] No DHS workers visited;[321] all calls were to be monitored,[322] but none were documented. GC was "discharged to less restrictive placement."[323]

**11/30/07 – 1/13/08: GC's counseling needs still unmet in her 17th placement**

***"[GC] asks why can't she go home with MOM??"***[324] DHC moved GC from the shelter to a Tulsa County TFC home[325] with another TFC agency.[326] GC repeatedly stated she would be going home to her prior pre-adoptive family.[327] She didn't understand why she was removed and why she could not return or visit them.[328] A contact 12/17/07 states GC "misses her [prior pre-adoptive mother] . . . Worker explained she does not know what the problem is, but will promise to advise her once the worker knows. [GC] appeared satisfied with the answer."[329] On 12/21/07, GC stated she was "just waiting to go back to her adoptive parents. When worker asked her more about this she stated that her adoptive parents just had to fill out some paperwork then she could live with them and be adopted."[330] When the worker inquired about family visits, GC stated she was not permitted to see her mother or other biological family members and "she is fine with that because 'she doesn't care about them at all, they never believed her . . . they don't want her but they don't want anyone else to have her either.'"[331] GC's Initial TFC Treatment Plan states GC did not understand why she had been removed from the prior pre-adoptive family, but she believed that she would be going home to them after the new year.[332]

***GC's needs for counseling still unmet.*** On 12/21/07, GC reported to her DHS worker that "she does see a counselor but she has only seen her twice since she has been here [placement] and doesn't remember her name."[333] Two weeks later (1/12/08), an incident report from the TFC parent states: "[GC] made self-inflicted cuts on her arm. She came to me about 6:00 pm and told me about it. I took her to the ER and the [sic] evaluated her and sent her to [psychiatric facility] to be properly evaluated."[334] GC was found to be "a danger to self and/or others" and hospitalized at the acute level of care.[335]

**1/13/08 – 2/13/08: GC was again admitted to an acute psychiatric hospital – her eighth placement change in less than one year**

On 1/13/08, 14-year-old GC was admitted to a psychiatric facility in Tulsa County,[336] where she remained when the named plaintiffs' complaint was filed on 2/13/08. According to a DHS worker, in addition to the deep emotional distress she experienced following the most recent pre-adoptive home disruption, several incidents in the TFC placement contributed to GC's self-harm.[337] When a non-TFC-approved sitter stayed with GC while her TFC mother shopped with another child, GC called the TFC mother saying she was upset due to some conversations she had had that week; the TFC mother "told her to take her medicine and go to bed."[338] In addition, the TFC mother had given GC a razor to shave her legs and failed to take the razor back; GC self-cut with this razor.[339] An email from GC's attorney asks: "how does this home remain approved as a foster home, particularly as a therapeutic foster home, with these kinds of major gaffs [sic]?"[340]

Another factor contributing to GC's hospitalization was her hearing about a friend being raped.[341] She reported at admission: "This conversation triggered memories of her past . . . [GC] began cutting herself in order to 'release the pain' . . . She states the blood represents pain and she is releasing that from her body."[342] She stated that she most often cuts "when people talk about rape or when they talk about my Mom."[343]

GC's Individual Plan of Care (2/6/08) identified her significant emotional problems, including Mood Instability (*i.e.*, sad affect, occasional suicidal thoughts, cutting, and flashbacks of sexual abuse) and Grief and Loss (*i.e.*, limited ability to deal with a significant history of sexual abuse by stepfather, father in prison for drug charges, stepfather in prison for life for sexual abuse, DHS in process of termination of mother's rights, failure to have contact with mother and siblings, and a series of numerous failed placements).[344]

***The reasons behind GC's self-cutting were finally examined with her.*** As hospital notes describe, GC's explanations about her self-injury behaviors included that: she sometimes could not explain where her injuries come from; no one could hurt her more than she hurts herself; she often self injures as a way to punish herself and to show others how bad she feels; self injury helps her control her mind when it is racing; she often believes that if she does not self injure she will explode; self injury helps [her] feel in control; immediately after she self injures she usually feels better and the amount of pain she feels is usually none; cutting is her primary means of self injury.[345]

***Hospital recommendation: "It is therefore critical that [GC] is correctly diagnosed and treated at this time in her life.***"[346] A 2/13/08 report to the court states that, while in the hospital, GC would be evaluated weekly; participate in individual, family, and group therapy; and participate in a weekly group for self-injurious behavior led by a specialist.[347] This report identified GC's Axis I Diagnoses as Reactive Attachment Disorder, Post Traumatic Stress Disorder, and History of Sexual Abuse.[348] The hospital recommendations included "further inpatient treatment so that her self injury and attachment issues can be explored. It is felt that these issues may well be the basis for many of [GC]'s current thoughts, feelings, and behaviors and for her previous hospitalizations and numerous failed placements . . . It is therefore recommended that [GC] remain at a residential level of care since it is the least restrictive level of care to meet her needs at this time."[349]

***DHS worker clarified GC would not be adopted by prior pre-adoptive parents.*** On 1/17/08, GC's DHS worker informed GC that "the family that was trying to adopt her was not approved . . . the potential adoptive father had some things in his past that he did not share with DHS and was denied because of them."[350] GC was upset and cried, saying, "I knew this was going to happen."[351] The DHS worker stated DHS would continue to work with GC to find an adoptive home.[352] GC stated she wanted to go back to her previous TFC home; the DHS worker suggested a group home until GC could be placed with an adoptive family.[353]

**GC's permanency status as of 2/13/08**

The DHS report for the dispositional hearing 2/18/04 identified GC's permanency plan as reunification/adoption.[354] At the time of her first permanency hearing, GC was placed in TFC after experiencing an unsuccessful Trial Reunification during which her mother abandoned GC to the care of her [redacted].[355] On 2/11/05, GC's father's parental rights were terminated.[356] The DHS report for a 12/5/07 court review recommended that GC's mother's parental rights be terminated "due to conditions not being corrected, and the natural mother not completing the court ordered treatment plan in a timely fashion."[357] At that time the permanency plan for GC was adoption.[358]

Despite the fact that GC's mother's rights had not been terminated, DHS placed GC with two prospective adoptive families and required that GC have weekend visits for five months with a third, even though DHS had not completed an adoption home assessment for any of the three families. As of 2/13/08, GC's mother's rights had not yet been terminated. Plans for terminating the mother's rights, placing GC in an approved adoptive home, and renewing her relationship with her siblings appeared to be on hold.

**Continuity of DHS workers/supervisors assigned to GC**

Tables identifying the DHS primary and secondary workers assigned to each named plaintiff child, the workers' supervisors, and the beginning and end dates of the assignments were provided to plaintiffs' counsel by defendants' counsel.[359] The assignments are for both multiple subsequent and multiple non-sequential periods of time for any given DHS worker or supervisor with no explanation as to the rationale for the changes. In some instances the same individual is listed as both the supervisor and either the primary or secondary worker.

According to these tables, during the period under review, GC was assigned 25 primary workers with 17 supervisors and 30 secondary workers with 27 supervisors. Therefore, GC was served by a total of 55 workers and 44 supervisors during her four year, three month stay in custody. Other unnamed DHS staff members assisted with family visits and other services to GC.

A list of assigned workers was also found in GC's case file in a Case Summary.[360] When this list and the staffing tables described above were compared, numerous inconsistencies were found that could not be explained. [361]

## GC CASEWORK ANALYSIS

### DHS Failures to Protect GC from Harm While in DHS Custody

When it is not safe to maintain and protect a child from abuse and neglect in his or her own home, Oklahoma Department of Human Services (DHS) Child Welfare (CW) is to "provide a placement that meets the child's needs and arrange an alternative permanent placement as appropriate."[362] DHS policy outlines the minimum standards for selecting and monitoring placements that meet a child's needs for safety and well-being; the agency's ultimate goal for the child remains finding a permanent home either with the child's family or with an alternative home, such as through adoption.

Because individual children's placement needs vary, a continuum of placement options that have been approved by the required assessment process and are qualified and prepared to meet children's diverse needs must be available when a child first enters care. Many children with histories of extensive abuse and/or neglect require immediate treatment to address these issues so that they can heal and thrive. DHS policy mandates that children's placements be made in the "least restrictive or most home-like setting that will meet the child's needs and provide for the child's safety."[363] To meet children's varying needs, available placements necessarily range from a child's own family and/or relatives on one end of the continuum to secure 24/7 residential/inpatient treatment facilities on the other.

DHS policy specifies staff responsibilities and procedures to guide them in maintaining a focus on children's health and safety as they make day-to-day decisions regarding placements and service plans for children in custody. It states that the "fundamental rights and responsibilities that guide CW services" include that children's "health and safety are paramount considerations in all placement and permanency planning decisions."[364] From GC's entry into DHS custody through the end of the period under review (2/13/08), DHS consistently failed to meet the agency's primary responsibility to her, *i.e.*, that GC's health and safety remained central in all placement and permanency planning decisions. Throughout the entire period under review, DHS failed to select placements for GC that even minimally met her individual needs for safety and well-being. As a result, her placements predictably disrupted, often immediately, resulting in unrelenting placement changes – 18 placements during the review period. *Moreover, for three-quarters of the 1,554 days under review, DHS placed GC in foster homes and facilities in which she was neglected and physically, sexually, and emotionally abused.*

Because placements range in the degree of services, resources, and support they provide to caregivers and foster children, DHS policy provides mechanisms for determining and accessing the level of services foster children need. GC was placed for approximately one-half of the period under review in Therapeutic Foster Care (TFC), defined by DHS as "residential behavioral management services provided in a specialized foster care setting"[365] for children who: have special psychological, behavioral, social, and emotional needs; respond to relationships in a family setting; and require more intensive services than are found in kinship, regular, and emergency foster care.[366] DHS policy specifies that children who are "actively suicidal or homicidal"[367] or who require "24-awake supervision or . . . pose[] a danger in a family setting"[368] are not appropriate for TFC placement.

DHS policy identifies the therapeutic and other services required of TFC agencies, including minimum time devoted to various treatment modalities,[369] and identifies services that may be accessed to augment required TFC services, including services "provided to a child in TFC by a psychiatrist or licensed PhD psychologist in private practice."[370] In requesting such services, DHS requires workers to consider the child's behaviors and specialized treatment needs, *e.g.*, sexual perpetration, crises requiring on-site response, and progress on the child's TFC treatment plan.[371]

DHS policy also requires continual evaluation of the "TFC parent's ability to provide TFC services and meet the needs of children receiving residential behavior management services."[372] DHS workers' mandated responsibilities for children in TFC include communicating and coordinating with all agency workers and service providers; maintaining face-to-face contact with the child consistent with DHS requirements; and arranging family visits.[373]

DHS continually endangered GC as well as other children in her TFC placements by failing to follow its own placement policies. Without exception, DHS workers failed to ensure ongoing assessment of GC's need for psychological and/or psychiatric treatment by a private practitioner(s) and to provide ongoing monitoring, at the necessary level of vigilance, of GC's continued safety in each TFC placement and her continued placement appropriateness.

**I. DHS failed to protect GC from serious, repeated harm due to its failure to monitor and evaluate safety and risk of harm to GC, both prior to and during her placements**

***A. DHS failed to fully assess GC's needs and services; when assessments were made, DHS failed to monitor follow-through of the recommendations, thus placing GC at continual risk of serious harm.*** GC entered DHS custody with a history of acute, severe, and chronic "previous victimization."[374] GC was subjected to relentless brutal sexual assault, emotional trauma, and dangerous and unstable living conditions. At eight months, GC was sexually molested by her biological father. At age three, she was sexually molested by [redacted]. From ages five through nine, GC was repeatedly raped and sodomized by her stepfather, raped by his friends, and forced to watch the sexual abuse of her stepsister. GC's stepfather threatened that if she disclosed the abuse she would have to live somewhere else. Although GC's mother was aware of her daughter's abuse, she failed to protect her. As a consequence, GC's emotional, social, physical, and educational needs had been severely neglected throughout her first nine years.

DHS missed numerous opportunities to intervene to protect GC during her first nine years. DHS staff Screened Out, and therefore failed to investigate, almost one-third of the child abuse referrals received concerning GC prior to her entry into custody. These referrals included allegations that GC had been sexually abused; exposed to domestic violence; neglected through

inadequate supervision, nutrition and physical care; exposed to caregivers' substance abuse, adult sexuality, and a suicide attempt; and repeatedly endured mental injury.

GC's history prior to entering custody warranted assessment for a higher level of placement services and protection than could be provided in kinship, regular, or emergency foster care. The serious, symptomatic behaviors observed during GC's first placement, *e.g.*, sexual perpetration of other children and indiscriminate affection with strangers, clearly established an urgent need for complete psychological and psychiatric evaluations and for subsequent placement and treatment as recommended by expert evaluations. However, upon GC's entry into custody, DHS failed to ask a core assessment question: *What was necessary to support GC's recovery from trauma and prevent further psychological and behavioral deterioration?* Without expert evaluations, DHS staff could not fully assess GC's psychosocial functioning and mental health, placement, educational, and social needs and answer this core assessment question. For more than *two full years*, DHS failed to ask this core assessment question and ensure that adequate expert evaluations provided the necessary answers. Due to this failure, GC was subjected to unsuccessful, harmful placements and inconsistent and inadequate mental health treatment during her time in custody.

DHS not only failed to refer GC for a TFC placement as urged by the DHS shelter social worker at the time of her first placement, DHS *instead* placed GC in unqualified and/or unprepared multiple consecutive placements in which she was beaten, neglected, sexually abused, and abandoned by her caregivers. In its failure to assess and then meet GC's needs in its placement selections, DHS undermined her recovery from prior trauma while simultaneously subjecting her to additional traumas – maltreatment in her placements, ever-changing caregivers,

and abandonment by caregivers and agency staff – continually exacerbating her emotional and behavioral deterioration.

On 6/28/05, a counseling agency conducted a very limited evaluation of GC and a "quick IQ test." Based on GC's history and this assessment, the evaluator concluded that the *minimum* counseling needed by GC would be twice weekly, [375] but recommended that she be seen more often than that.[376] Following this evaluation, however, GC received counseling less than once a week, if that often. During her Trial Reunification with her mother, family members alleged that GC was burning her brothers with a hot wire coat hanger that had been heated by a cigarette lighter.[377] DHS took no actions to have these behaviors assessed, and GC and all in her home remained at constant risk of harm.

Fewer than five months later (11/19/05), GC's mother admitted GC to a psychiatric hospital where she was evaluated for Post Traumatic Stress Disorder and disruptive behavior.[378] The discharge summary stressed the necessity of GC and her mother to work together therapeutically on the issues of GC's sexual abuse, a goal that was never achieved. Staff also emphasized GC's need for "placement in a safe place" and possible placement in a TFC home.[379] Prior to GC's hospitalization, DHS staff had failed to assess and address GC's needs; only after GC was hospitalized did DHS authorize her for TFC placement – *two years* after a referral for TFC had been initially recommended by the DHS shelter social worker.[380]

GC's TFC treatment plan included individual, family, and group treatment. However, from the beginning of GC's placement with her first TFC agency – her tenth placement – DHS staff and GC's CASA continually raised serious concerns about the inconsistency of GC's treatment services. For example, GC's CASA stated: "if we can't get a regular schedule with her therapist on a regular day and time, there may need to be changes in her placement."[381] Concerns

and complaints were documented throughout the two-year period in which GC was placed with this TFC agency.[382] GC's attorney criticized the TFC agency's placement services to GC, stating it "has done very little to help her during one of the most trying times I can think of for this kid since she came into custody." The attorney stressed, "If the Department won't hold [TFC agency's] feet to the fire, I'll try to get [judge] to do it."[383]

DHS also received three child abuse/neglect referrals on GC's first TFC home. The investigation for each referral documented that the TFC parents failed to supervise and protect both biological and foster children in their home from sexual abuse and age-inappropriate sexual activity. When each referral was investigated, DHS failed to re-assess GC's placement and treatment needs in light of the investigation findings, *i.e.*, to re-assess whether GC's safety and well-being needs could be addressed in the home, whether GC continued to meet TFC placement criteria, and whether GC needed psychological and/or psychiatric services to augment the required TFC services.

In addition, while in this TFC home, GC was required by DHS to begin overnight visits with [redacted] and [redacted] who wanted to adopt her. When these weekend visits began, DHS had not approved the relatives as resource and/or adoptive parents and failed to do so for the entire five-month period during which these weekend visits took place. After visits, GC reported that she felt unsafe in the home and described neglect, abuse, and placement policy violations. DHS staff, however, failed to monitor the visits, *e.g.*, make unannounced visits to the home, have private face-to-face contact with GC during visits, and assess the impact of the visits on GC's safety and well-being. Ten days after what was to be her last visit with this family, GC was hospitalized for suicidal ideation, depression, flashbacks of earlier sexual abuse and other

traumas, and self-harm (cutting). It was evident that the unsafe and unmonitored frequent contact with this family substantially contributed to GC's emotional and behavioral deterioration.

When GC was discharged from psychiatric treatment in April 2007, DHS returned her to her previous TFC home although the caregivers remained on probation with a now documented history of failure to supervise and protect GC from sexual abuse and age-inappropriate sexual behavior with other children. Throughout this placement, which was GC's 12th, as well as throughout every subsequent non-psychiatric placement, DHS consistently failed to refer GC for expert evaluations to provide information concerning her current mental health status and placement and treatment needs, including when her:

- 12th placement disrupted due to the TFC parents' decision not to adopt GC and to move to another area;
- 13th placement disrupted in 34 days when GC self-harmed by cutting herself and allegedly made sexual advances to other girls in the home;
- 14th placement disrupted in 52 days when the TFC parents requested her removal because GC cut herself and reported being suicidal; and
- 15th placement, a trial adoptive placement, disrupted in only 14 days, and DHS placed emotionally overwhelmed GC for three days in an emergency shelter, where she was abandoned by DHS workers without contact as required within 24 hours of the shelter placement.[384]

When GC was subsequently hospitalized for the third time at the acute level of psychiatric care, in January 2008, her treatment goals included developing healthy ways to meet her needs, dealing with depression without self-harm, and addressing issues related to her family and abuse. An Adolescent Residential Unit therapist emphasized: "Of particular concern is GC's belief that she is somehow at fault for this abuse."

On 2/13/08, a hospital report to the court recommended further inpatient treatment so GC's "self injury and attachment issues can be explored . . . these issues may well be the basis

for many of GC's current thoughts, feelings, and behaviors, and for her previous hospitalizations and numerous failed placements."[385] The report stresses: "*It is therefore critical that GC is correctly diagnosed and treated at this time in her life*"[386] (emphasis added). Continued residential level of care was recommended as "the least restrictive care that could meet her needs."[387] In other words, after four years and three months in DHS custody, time had run out for DHS to get it right for GC.

While in DHS custody, the diagnosis most consistently assigned to GC was Post Traumatic Stress Disorder (PTSD). Professional literatures states that "PTSD may begin within hours or days of the stressor, but it may be delayed for months or years . . . Many patients with PTSD develop frank major depression, other anxiety disorders, alcohol and drug abuse, anger and irritability, and poor impulse control."[388] Mental health literature clarifies that the disorder "may be especially severe or long lasting when the stressor is of human design (*e.g.*, torture, rape) . . . Symptom reactivation may occur in response to reminders of the original trauma, life stressors, or new traumatic events."[389] The course of PTSD is that:

> . . . the person [may] experience dissociative states that last from a few seconds to several hours, or even days, during which components of the event are relived and the person behaves as though experiencing the events at that moment. These episodes, often referred to as "flashbacks," are typically brief but can be associated with prolonged distress and heightened arousal. Intense psychological distress or physiological reactivity often occurs when the person is exposed to triggering events that resemble or symbolize an aspect of the traumatic event.[390]

GC began cutting herself in DHS custody as she experienced placement experiences that were beyond her ability to cope. During her third hospitalization, GC reported that she "began cutting herself in order to 'release the pain' . . . [GC] states the blood represents pain and she is releasing that from her body."[391] The professional literature confirms that self-harming behavior is an attempt to maintain a certain amount of control and to self-soothe.[392] However, a danger

connected with self-injury is its tendency to become an addictive behavior that is difficult to stop even when the individual wants to.[393]

GC was also diagnosed with Reactive Attachment Disorder three times while in DHS custody: in her first placement, upon admission to TFC two years later, and in her third hospitalization. Professional experts state:

> Childhood trauma contributes to the initiation of self-destructive behavior, *but lack of secure attachments help maintain it.* Patients who repetitively attempt suicide or engage in chronic self-cutting are prone to react to current stresses as a return of childhood trauma, neglect, and abandonment. Experiences related to interpersonal safety, anger, and emotional needs may precipitate dissociative episodes and self-destructive behavior[394] (emphasis added).

Thus, according to these experts in self-injury, by subjecting GC to placement and caregiver changes on average every 86 days, DHS further undermined her capacity for secure attachments and most likely helped maintain her self-destructive behavior.

There is little to no evidence in GC's file that DHS and TFC staff and caregivers understood these disorders, although they are found very frequently in children who have experienced acute and chronic abuse and neglect. For example, apparently intending to reassure a TFC parent, one DHS worker misleadingly stated, "[GC] is not the type of kid who makes it a practice to cut on herself, and feels this is probably the only time [GC] will present in this way."[395] Moreover, caregivers in GC's TFC placements failed to demonstrate the knowledge necessary to provide appropriate behavioral management and daily care for a child diagnosed with these disorders. GC's flashbacks concerned her memories of being raped, her memory of seeing her stepfather hanging when he attempted suicide, and her brothers' severe distress when physically abused, but the flashbacks identified in her file were triggered primarily by *DHS-induced* emotional trauma. DHS decisions repeatedly resulted in triggering events for GC,

greatly exacerbating her psychological distress and undermining her ability to progress in her coping abilities.

***B. DHS staff consistently failed to ensure GC's placements were even minimally qualified and/or prepared to meet her needs and keep her safe.*** GC's file rarely provides a rationale for placement decisions. It is evident, however, that the placements selected by DHS for GC were unprepared to meet GC's specific needs and keep her safety intact and/or were dangerously unqualified to care for *any* child in custody.

DHS began its "care" of nine-year-old GC by placing her in a shelter for 35 days, grossly failing to meet her needs. Immediately upon GC's entry into custody, a medical exam found seminal fluid and confirmed the horror that GC had, in fact, been raped "last night" as she reported.[396] By design, shelters provide day-to-day care by rotating staff for groups of individuals, thus leaving limited time and attention for individual children. Children are afforded little, if any, privacy. Given both the acute and chronic nature of GC's victimization as well as the dual emotional traumas of disclosing years of sexual abuse and being removed from her family and placed in a strange environment, GC needed caregivers who could devote attention and skill to providing her with nurturing physical care, close supervision, and emotional support. GC's file abundantly documents the unacceptable lack of placement options for children in DHS custody. Nonetheless, it is difficult to believe that DHS staff could not have located an appropriate placement for GC immediately upon her entry into custody. It is further appalling that DHS found it satisfactory to place GC in two additional shelter placements during times of emotional trauma, *i.e.*, when she was discharged prematurely from her first psychiatric hospitalization,[397] and when her second pre-adoptive placement disrupted.[398]

On numerous occasions, DHS placement decisions for GC demonstrated disregard for the previously documented incapacity of potential settings to meet GC's needs and protect her. GC's second placement was a home in which DHS had previously recommended that no foster children be placed. GC's third placement was with her [redacted] and [redacted], despite child abuse/neglect referrals and other materials in GC's file which describe the [redacted]'s violent history and very irresponsible parenting. While in this placement, GC was beaten repeatedly and exposed to domestic violence. GC's fourth and sixth placements were in a home with nine prior child abuse/neglect referrals and, six weeks after DHS moved GC from this placement, DHS received a tenth referral alleging Exhibitionism and Sexual Abuse. DHS Confirmed these allegations and closed the home.

The most dangerously unqualified and unprepared placement in which DHS placed GC was a Trial Reunification with her mother. In violation of agency policy, risk was not assessed prior to placing GC with her mother, and GC and her family were not prepared for a safe reunification. Policy requires that "successful" overnight and weekend visits be completed prior to even planning for Trial Reunification.[399] DHS suspension of GC's mother's weekend visiting privileges with GC indicated that the visits were not successful. DHS then *fully precluded* the documentation of safe parenting that is required prior to Trial Reunification by rapidly resuming these visits. DHS' rushed timetable for GC's Trial Reunification permitted neither an investigation of the allegations about her mother's failure to protect GC during visits, or active DHS monitoring and assessment of risk. DHS failure to adhere to policy in planning GC's placement with her mother resulted in a damaging and unsuccessful Trial Reunification for GC.

DHS staff also failed GC when placing her with a TFC mother who was a victim of childhood sexual molestation and had received little if any counseling to address her experiences.

Moreover, GC was the first child placed in this inexperienced TFC home. The TFC mother and her husband consistently failed to supervise and protect both their biological and foster children in the home from recurring sexual activity and abuse. That DHS workers and their supervisors would place GC, with her extensive history of sexual victimization and related needs, with a TFC mother who acknowledged her own unresolved sexual victimization, cannot be justified. That a second foster child, known by DHS to be sexually active, having been prostituted by her parents, was placed with GC in this same unprepared home, was abhorrent. DHS placement of both of these foster children in this placement demonstrates, beyond any doubt, DHS workers' and supervisors' lack of knowledge about sexually abused children and their placement needs, as well as the dangerous placement decisions made by DHS due to the shortage of foster homes. DHS then failed to rectify its egregious placement errors by continuing to place GC in this home not only after one but after *three* referrals and investigations that documented the caregivers' repeated failures to protect GC and other children from sexual activity and sexual abuse in the home.

DHS continued to fail to ensure that GC's subsequent placements were even minimally prepared to meet her needs. Although DHS had documented in an investigation report its decision to place GC as the *only* foster child in a home in order to protect her from sexual abuse and age-inappropriate sexual behavior with other children, DHS then placed GC in a home with four other girls. The TFC mother requested GC's removal, alleging that GC made sexual advances to the other girls. Caregivers in GC's next TFC placement reported that DHS did not disclose, as required, GC's history of suicidal feelings and self-harming behaviors;[400] when she exhibited these behaviors in the home, they requested her removal. This DHS failure caused yet another preventable placement disruption for GC.

Again in violation of agency policy, GC was placed with or had extensive weekend visits with three pre-adoptive families before DHS staff had completed required assessments to ensure that the families were prepared to meet GC's needs. In the first, DHS identified a TFC foster home as a prospective adoptive home for GC without completing the formal assessment as required of the TFC parents' willingness and ability to adopt and care for GC permanently. Ultimately, these parents were neither willing nor able to adopt GC and requested that she be moved from their home. In the second, the home of GC's [redacted] and [redacted], DHS initiated frequent weekend visits with GC even though the agency had failed to complete the required home studies for kinship and adoptive placement. GC consistently reported feeling unsafe in the home – cold, hungry, and bruised. Her maltreatment during five months of weekend visits in this home, which was neither approved nor monitored by DHS, was yet another DHS-induced emotional trauma for GC, one that significantly contributed to a second psychiatric hospitalization. In the third, DHS failed yet again to complete the required adoptive assessment prior to placing GC with the family. When DHS received an adoption study reference alleging prior sexual molestation by the potential pre-adoptive father of his [redacted], GC was removed from the home. The foster father admitted the allegations were true. GC experienced acute distress after this removal. Due to yet another DHS-induced emotional trauma, GC was hospitalized for the third time for psychiatric care.

Over and over again, DHS failed to conduct the basic protective functions of assessing caregivers' capacities and matching GC with placements and caregivers qualified to meet her needs. When children are placed in settings that cannot meet their individual needs, as was done by DHS with GC, troublesome behaviors associated with prior victimization often escalate and mental health problems intensify; children may act in ways that are harmful to themselves and/or

others. GC's placement experiences while in DHS custody illustrate the destructive consequences of failing to match children with appropriate placements and caregivers. Had DHS staff members made knowledgeable assessments of the non-psychiatric placements in which the agency placed GC, they would have determined that *not one* of the placements was satisfactory, either because the placement caregivers were not minimally prepared to provide care to a child like GC, given her history and complex needs, or because the placement was not minimally qualified to provide care to *any* child in custody.

***C. DHS failed to meet its own minimum requirements for placement monitoring.*** DHS policy outlines a continuum of interventions to monitor whether foster children's needs are met and their safety intact. Policy not only requires face-to-face contact with foster children by a DHS worker within 24 hours of a shelter placement and within two weeks of a child's foster home placement, it also requires face-to-face contact at monthly intervals throughout the placement, that at least "every third contact attempted is unannounced," and that workers make "at least three successful unannounced contacts per year."[401] When indicators of risk of abuse and neglect to GC were observed, DHS policy required workers to increase the frequency of contact with GC and her placement caregivers;[402] have private face-to-face contact with GC and other children in the home;[403] notify the court of safety concerns;[404] and/or make a referral for an investigation.[405] GC's workers repeatedly failed to observe indicators of her risk of abuse or neglect[406] due to their failures to have: *private* face-to-face contact with GC to facilitate disclosure of her concerns; sufficient training to identify indicators of risk of harm; and/or required unannounced and frequent placement visits. Thus, DHS workers consistently failed to increase protective monitoring of GC in her placements when it was necessary.

***D. DHS failed to ensure that an "evaluation and response"[407] to referrals occurred as required.*** Agency policy requires that, when there is "an observation or report of abuse or neglect or potential for abuse or neglect of a child in a foster or trial adoptive home," an "evaluation and response must occur."[408] DHS received at least 16 child abuse/neglect allegations regarding GC's placements while she was living in the homes. Of these, only seven were specifically designated by DHS as formal abuse/neglect referrals, three of which were Screened Out and not investigated.[409]

DHS frequent "Screening Out" of referrals of alleged maltreatment of GC while in custody is of grave concern. First, by intent and design a decision to "Screen Out" an allegation precludes an investigator's private interviews with the alleged victim, others in the home, and collateral contacts. When referrals were Screened Out, no DHS worker was required to meet privately with GC or others to discuss her placement safety and well-being. For example, after GC had been placed with her mother, a [redacted] alleged that GC's [redacted], with whom GC and her mother lived, reported GC's mother came and went from the home but was always present on the day that the DHS worker visited the home. This was the first indication that GC's mother was not living with GC and therefore failing to comply with court-ordered placement conditions. Had DHS investigated rather than Screened Out the referral, information could have become available to assist DHS staff in determining whether protective actions should have been taken, such as GC's removal from the home. DHS decisions to Screen Out referrals carried a particularly great risk for GC given the routine failure of DHS workers to have any private contact with the child.

Of at least as serious a concern as the frequent Screening Out of referrals is the DHS practice of failing to even designate child abuse/neglect allegations as formal referrals. DHS staff

failed to designate more than half of the previously identified 16 child abuse/neglect allegations regarding GC's placements as formal referrals, precluding formal investigation of the allegations. This dangerous practice prevented DHS from having current, accurate information on which to base decisions about protective actions. Thus, the history of formal referrals in GC's file grossly under-represents the actual instances of alleged child abuse/neglect of GC while she was in DHS custody.

In addition, while GC was in her 11th placement, a psychiatric facility, she reported being molested by a male living in the facility and filed a grievance. However, no investigation was conducted by the facility or OCA. Although DHS was not directly responsible for investigating this report, DHS took no action to ensure that an investigation did occur and that the facility took appropriate protective measures for GC.

DHS failure to ensure an "evaluation and response" to allegations of child abuse/neglect concerning GC and her placements resulted in GC's continued placement in settings where she was in fact at great risk for harm and point to a potentially life-threatening and irresponsible ongoing agency practice.

## II. DHS failed to protect GC from harm caused by placement instability due to its failure to take steps to prevent placement disruption

As described in detail above, at least 13 of GC's 18 placements were made without prior planning and/or despite previously documented information that the placement was not even minimally qualified and/or prepared to meet GC's needs. Due to DHS failures to conduct the basic process of matching GC's needs with the placement's capacity to meet her needs, her placements inevitably disrupted and then required another placement. This resulted in placement changes for GC, on average, every 86 days. The widely recognized harmful consequences of

placement instability are described in D.G. et al. v. Henry et al. *Review of Named Plaintiff's Case Files* (September 30, 2009).[410]

### III. DHS subjected GC to discontinuity of DHS workers and supervisors and consistent absence of supervisory monitoring of worker accountability

While placed in DHS custody, GC was subjected not only to extreme maltreatment, placement instability, and caregiver discontinuity, but also to a very high level of discontinuity of DHS workers and supervisors. According to DHS staffing information provided by the defendant's counsel to the plaintiffs' counsel,[411] during GC's four years and three months in custody, 55 DHS staff members were assigned to GC as either primary or secondary workers. On average, GC was assigned a new worker more often than once a month – a staggering degree of worker discontinuity. DHS assigned 44 supervisors to oversee and support these workers and hold them accountable.

The review of GC's file indicates that no DHS supervisor ensured that GC's workers' documentation was complete, correct, and timely. And no supervisor ensured that the rationale for case decisions regarding GC was documented, such as the rationale for continuing to place GC in a TFC home on 12-month probation, a home that was investigated three times for failing to protect GC and other children in the home from sexual abuse and sexual behaviors. Without reliable information concerning the rationale upon which case decisions have been based, agency staff cannot make informed future decisions regarding a child's safety, well-being, and permanency.

GC's file also fails to contain evidence of regular ongoing supervision of GC's workers. The lack of GC's workers' accountability is seen in their extensive failures to carefully match placements with GC's needs and meet with GC privately concerning her placement experiences. The serious, persistent lack of accountability also inevitably contributed to GC's workers'

failures to ensure that psychological and/or psychiatric evaluations were completed at the time of her placement in DHS custody, and that GC received consistent mental health therapy, so her placement and treatment needs could be identified and met.

**Conclusion**

Tragically, DHS decisions and actions concerning GC's placements and care replicated GC's mother's failures to protect GC from neglect, physical and sexual abuse, betrayal, emotional trauma, and constantly changing and unsafe living conditions. Immediately upon GC's entry into custody, DHS failure to refer her for psychological and psychiatric evaluations set in motion subsequent DHS decisions and actions based on incomplete and inaccurate information about her needs. During the period under review, DHS failed to ensure that GC's placements met her needs for physical and emotional safety, stability in caregivers, skillful behavioral management and parenting, and appropriate mental health treatment.

Again and again, DHS failures to ensure that GC's individual needs were met significantly undermined GC's ability to even begin to heal and recover from her traumatic first nine years. Both DHS ill-advised interventions and its failures to intervene, very frequently in direct violation of agency policy, compounded the destructiveness of GC's experiences in custody. The consequences of DHS failures directly triggered severe emotional traumas that resulted in three psychiatric hospitalizations for GC. Prior to GC's first psychiatric hospitalization, she was beaten by kinship caregivers and abandoned by her mother during a Trial Reunification. Prior to her second hospitalization, GC was subjected to recurring sexual abuse and age-inappropriate sexual activity in a TFC placement and to neglect and physical abuse during unmonitored weekend visits with relatives. During the 11 months between GC's second and third psychiatric hospitalizations, GC experienced emotional abandonment, two pre-

adoptive placement disruptions, and excessive placement moves. All of these traumatic experiences were preventable.

GC's harmful day-to-day experiences in DHS custody again and again overwhelmed her ability to cope and held her captive in a world filled with pain, betrayal, and abandonment, not only from her past, but also from the ongoing maltreatment and trauma caused by the decisions made for GC by DHS. The story told in GC's DHS file is a sobering and haunting tragedy made all the more troubling by the fact that the neglect and physical, sexual, and emotional abuse to which DHS subjected GC were wholly preventable.

# KT CASE SUMMARY

**DOB: [redacted]**
**Entered DHS custody: [redacted]/97, age 5 years, 6 months**
**Time in DHS custody as of 2/13/08: 3,929 days (10 years, 9 months, 3 days)**
**Time in shelter/emergency placements: 195 days**
**Time in psychiatric placements: 87 days**
**Number of placements as of 2/13/08: 28, a move on average every 140 days**
**Number of placements including respite care: 81, a move on average every 49 days**
**Total DHS workers assigned: 97**
**Total DHS supervisors assigned: 88**

*"[KT's] anger is clearly related to abandonment issues. She has been abandoned by every adult in her life . . . . When she was removed from the [Therapeutic Foster Care parents'] home in October of 2002 . . . psychologically [KT] was abandoned again. Again she felt abandoned when her foster parents admitted her to [this hospital] . . . . She is a sad, lonely, depressed, angry child who expresses her anger and frustration in explosive episodes in which she can be destructive to property and to herself . . . . She has been abandoned so many times that she fears being left alone again."*[412]

~ Psychological evaluation completed during KT's 16th placement, after six years in DHS custody

**Placement in DHS custody**

KT was born in [redacted], Oklahoma on [redacted].[413] When KT was five years old ([redacted]/97), DHS received a report from [redacted] that KT and her brother [redacted] had numerous cuts, scrapes, and bruises and black eyes[414] and were "absolutely filthy/nasty."[415] KT had what appeared to be "part of a palm [hand] print" on one cheek and a large blister on her head that her father said had been there for four months.[416] [redacted]'s forehead was almost entirely bruised and he had several infected ticks on his body;[417] KT and [redacted] were "wild . . . out of control . . . screamed and hollered."[418]

Subsequently, a CPS worker and the police visited KT's home, which they reported was "filthy" with no gas and only two light bulbs.[419] Police found that the children's conditions warranted placement in protective custody; they were immediately placed in DHS custody on [redacted]/97.[420] KT and [redacted] were taken to a children's hospital, where the doctor filed a child abuse report on both children.[421] They were then placed at the Pauline E. Mayer Shelter (PEMS) on [redacted]/97 at 4:20 a.m.[422] The [redacted] Police filed charges of child abuse on the parents due to the children's statements that their mother "abuses them when she is in the home" and their "father abuses them all the time."[423] DHS Confirmed[424] the allegations against KT's father, including Abuse-Beating, Neglect-Inadequate Physical Care and Neglect-Failure to Obtain

Medical Attention.[425] The worker noted, "it appears the unexplained bruising of the children and the hair loss [documented in prior referrals] has been an on going problem since December of 1995."[426]

The investigation report states KT's mother wanted the children placed with her.[427] She had been out of the home for two years and in jail for the most recent two months due to parole violations related to three felony convictions.[428] The worker concluded KT's mother was not capable of providing, and had failed to provide, for her children's care and welfare.[429]

**DHS had received at least six child abuse/neglect referrals in the two years prior to KT's entry into custody**

DHS received at least six child abuse/neglect referrals on KT's parents between May 1995 and April 1997.[430] The first (5/16/95), when KT was three years old, alleged Neglect-Inadequate Physical Care of KT and [redacted] by both parents; DHS Screened Out the referral and it was not investigated.[431] Seven months later (12/7/95), DHS received a report of Abuse and Neglect-Inadequate Physical Care against KT's father; KT's mother was identified as absent.[432] KT's father allegedly raised his hand to hit KT; both children had "hair pulled out of the scalp."[433] KT refused to speak with the worker alone; the finding was Rule Out with the father referred to a parents' assistance center.[434] Within a week (12/12/95), [redacted] alleged physical abuse of [redacted] because his injuries were inconsistent with his father's statements.[435] [redacted] had fingerprints on his back, bumps and abrasions on his head, and lacerations on his face and lip.[436] KT consistently said [redacted] "got hurt," but provided no other information.[437] These allegations were found Uncertain.[438]

Fewer than two months later (2/8/96), a report of a filthy home and failure to feed and care for KT and [redacted] was received by DHS; it was investigated and found Ruled Out.[439] The worker found no neglect and reported the home was "sanitary."[440] On 4/21/97, a report of Abuse-Beating was made; it was investigated and found Uncertain.[441] A DHS worker observed that the top of KT's skull was inflamed and there appeared "to be a pus filled blister, oval . . . 3 inches by 4 inches and one half inch high on the verge of busting [sic]."[442] Her father reported this was a skin infection and KT had seen a doctor.[443] A Report to the District Attorney (DA) regarding the 4/21/97 referral states that DHS received "a second referral" on 4/28/97 and the [redacted] police removed the children.[444] There is no other information regarding this referral and KT's reported entry into custody prior to [redacted]/97.

**[redacted]/97 – 1/5/98: DHS placed KT in eight placements in her first seven months in custody**

***DHS placed KT in an unapproved home and then a home with a delayed home assessment and policy violations.*** KT was first placed in PEMS on [redacted]/97;[445] she was discharged to an Emergency Foster Care (EFC) home at 6:20 p.m. the same day.[446] The placement in EFC was made even though the home had not yet been approved by DHS.[447] A letter dated 7/24/97 from DHS to the contract agency, more than two months after KT's placement, states DHS approved the home as of that date and children should not be placed in the home prior to receipt of the approval letter.[448] Within three days of placement in this home, a child abuse/neglect report was made ([redacted]/97); DHS Confirmed the EFC parents' neglect and lack of supervision

that permitted a three-year-old foster child to be bitten on the face by the family's dog.[449] DHS subsequently removed the child.[450] KT remained in the home.

On 6/4/97,[451] DHS placed KT in her third placement, a kinship home with her [redacted];[452] the assessment of the home was not completed until almost a month after placement.[453] In addition, DHS received a letter dated 7/3/97 from a contract agency stating that the home violated DHS sleeping arrangement and discipline policies; the [redacted] had asked [redacted] in front of contract agency staff, "Do you want me to have Sissy get the belt?"[454] No DHS follow-up regarding the violations was documented. Within four months (10/7/97), five-year-old KT was returned to PEMS, her fourth placement, by the [redacted], who said she could no longer handle the children; KT's father also had moved into the [redacted]'s home.[455] KT was discharged from PEMS the same day (10/7/97) and placed with another EFC family.[456]

KT entered her sixth placement, an EFC home, on 11/18/97[457] and was moved less than six weeks later (12/26/97) to her seventh placement, a different EFC home, because she kicked a two-year-old boy in his privates,[458] attempted to run away to see her father, and left school and had to be escorted back by the EFC mother.[459] Ten days later, DHS placed KT in her eighth placement (1/5/98) at the request of her EFC parents, who stated she was out of control and physically assaulted children in the home.[460]

***Five-year-old KT stated she wanted to kill herself; DHS took no protective action.*** Numerous serious, symptomatic behaviors were observed following KT's placement in DHS custody. In KT's second placement, the EFC mother reported (5/22/97) that KT stated, crying, that she wanted to "just kill myself."[461] The EFC mother also reported KT was sneaking food and had to be reassured "she could have anything she wanted to eat anytime."[462] An agency staffing form states KT needed counseling.[463] While in her third placement (6/16/97), a DHS worker noted that "KT's self-abusive behavior, i.e., hitting herself, has subsided."[464] However, no mention is made of an evaluation of KT or of counseling. Three months later (9/17/97), a DHS worker commented that KT pulled away from the worker and ran off, out of control; later, in the car, KT unlocked the door and the worker held the electronic switch down to keep her from doing it again.[465] Almost six months after KT entered DHS custody (10/31/97), the EFC worker asked to be kept informed of the DHS worker's progress in getting KT play therapy or counseling.[466] By the time KT moved into her eighth placement, DHS had not yet referred her for a psychological and/or psychiatric evaluation, provided counseling, or assessed whether a therapeutic placement was necessary.

**1/5/98 – 8/3/98: DHS returned KT to unapproved prior kinship placement then placed her in two shelters, one for 46 days**

***KT's "butt" was "whipped" in kinship home for exhibiting behaviors of a sexually abused child.*** A 1/5/98 contact states KT and [redacted] were placed for a second time with their [redacted] at the [redacted]'s request and seemed happy to reunite with her.[467] No concern was raised by DHS about the policy violations in the home reported during KT's prior placement there.[468]

More than four months later, a 5/20/98 email between DHS staff states: "We can not approve [[redacted]] for foster care . . . We also strongly recommend that these children be moved . . . To continue to leave these kids in this home . . . could lead to abuse of one of the children or a breakdown for the foster mother."[469] An undated document by an unidentified worker recommends that KT and her brother be moved from the kinship placement, noting that the sleeping arrangements were marginal; KT and [redacted] were exhibiting behaviors of children who have been sexually abused and were beyond the [redacted]'s control.[470] KT's [redacted] stated to the worker she had "whipped both their butts" because she caught [redacted] on top of KT "5 or 6 times."[471] The [redacted]'s doctor also recommended the children's removal.[472] Dated 5/7/98, the doctor's report states: "I do not feel that it is in the best interest of [[redacted]] or her two [redacted] for her to have foster care. They need some intensive psychological support that [[redacted]] is unable to give."[473]

***DHS Screened Out two child abuse/neglect referrals against KT's kinship caregiver.*** In the first referral (5/15/98), [redacted] reported the [redacted] grew impatient with the DHS worker's repeated cancellations to have a cast removed from KT's arm "so finally she did it herself."[474] KT's arm had become painful after the cast was removed.[475] Neglect-Failure to Obtain Medical Attention was Screened Out and not investigated.[476] The second referral was made by [redacted], alleging emotional abuse and lack of supervision of KT by the [redacted] and that KT's [redacted] admitted she knew not to spank KT and [redacted], but did so anyway.[477] KT told the [redacted] that her [redacted] spanked [redacted] "real hard."[478] The referral was Screened Out and "referred back to tx. [DHS treatment worker] for the appropriate action. these [sic] appear to be placement issues."[479] No action was taken by DHS.

***KT moved to two shelter placements; the second violated DHS policy.*** Despite the risk of abuse to KT identified in the 5/20/98 email, more than three weeks passed before DHS moved KT from this home to a shelter in Oklahoma County (6/11/98).[480] Seven days later, DHS placed six-year-old KT at PEMS for 46 days.[481] The length of this shelter placement was in serious violation of DHS policy, which permits children six years of age and older to be placed no longer than 30 days in a shelter.[482]

During KT's first 15 months in custody, DHS moved six-year-old KT through ten placements; a new placement, on average, every 40 days.

**8/3/98 – 9/18/00: KT's 11th placement included nine respite care placements with nine different families**

***Allegations of sexual abuse of KT due to her behaviors after visits with father.*** KT was moved to a TFC home in [redacted] County where she remained for slightly more than two years. KT's mother had relinquished her parental rights on 3/23/98.[483] The permanency goal had been reunification of KT with one of her parents.[484] The goal remained reunification with KT's father; DHS provided unsupervised visits between KT and her father.[485]

On 9/16/98, a referral alleged KT might have been exposed to adult sexuality; it was found "Uncertain." [486] After a recent visit with her father, KT had a nightmare; according to KT's TFC mother, KT had a stuffed animal between her legs and was saying "no no daddy, no

more."[487] The TFC foster mother also stated KT was found with a play blow dryer between her legs and had advanced knowledge of sexual language.[488] The referral report states:

> . . . [t]hese behaviors appear to of [sic] have been ignored in the early stages when the child first entered into custody. The child's sexual acting out behavior appears to have been constant over her entire stay in custody and only now has been brought to the court's attention.[489]

Neither KT nor [redacted] disclosed information other than that their [redacted] was "mean" and hit them.[490] KT's father believed [redacted] had molested KT and reported that [redacted] had molested him from ages 8 to 14.[491] He also reported that KT's mother talked about her sexual behavior as a prostitute in front of KT.[492]

DHS continued to work toward reunification with KT's father, who was to have a safety plan with regard to the [redacted] during KT's unsupervised visits.[493] On 11/6/98, several allegations were made by [redacted], including that during a visit the [redacted] fondled KT and there was no food.[494] KT would not answer questions, and the investigator noted, "she appear[ed] to have been threatened not to tell about what occurred on the visit."[495] The referral was found "Uncertain."[496] A subsequent allegation 3/9/99 that KT's father molested [redacted] was Confirmed.[497] The Report to District Attorney (DA) for this referral states:

> It appears the children's disclosures and ongoing behavioral problems have not been reviewed by the 7 [DHS] treatment staff and 4 [DHS] treatment supervisors assigned to this case since their removal. It does not appear that [father] has ever been held accountable for his actions which has [sic] caused these children [sic] behavioral problems. It does not appear that the case has ever addressed the sexual abuse which continues to be an underlying unresolved issue that the children must continue to deal with.[498]

DHS then required KT's visits with her father to be supervised until he submitted to a psychological evaluation and the results were known.[499] The file contains no documentation of this psychological evaluation.

***Psychological report for KT, completed after she had been in custody for two years, recommended KT's father's parental rights be terminated and concluded KT was "severely emotionally disturbed."***[500] The report states both [redacted] and KT disclosed in interviews that their dad "behaved with sexual impropriety with each of them."[501] It describes that KT had drawn "a heart around her pubic area. When [TFC mother] attempted to wash it off, [KT] resisted and screamed, 'My Daddy loves me.'"[502] KT told the psychologist that her father had done to her what her brother showed with the dolls: "It only happened one time. I cried; it hurt. I said, 'No Daddy, no!' He stopped."[503] The psychologist concluded that KT "will continue to need access to specialized services for quite some time"[504] and recommended KT not be returned to her father.[505] On 6/20/00, KT's father relinquished his parental rights to KT and her brother.[506]

***Respite care during this placement in nine different homes.*** DHS policy states respite care is "a planned reprieve for the TFC parent with whom a child is placed" and is "provided in

the home of a TFC parent."[507] While in this TFC placement, KT was placed in respite care for nine periods ranging from one to six nights with nine different TFC homes.[508]

Prior to KT's removal from this TFC home, the TFC agency re-assessment of the family stated there were concerns that the family had not followed through on recommendations from the TFC therapist and recommended that the home remain TFC certified "*under close supervision*"[509] (emphasis added). The reason for KT's placement change documented by DHS was "placement cannot meet child's behavioral treatment needs."[510]

**9/18/00 – 10/4/02: KT's 12th placement included at least 22 respite/therapeutic leave placements**

***Little progress reported for KT***. DHS moved KT to another TFC home, KT's 12th placement, where she remained for approximately two years. The 2000 home study update states nine-year-old KT had the emotional maturity of a five-year-old: "KT is very hateful and abusive when she does not get her own way."[511] The 2001 home study update states KT "has many difficult behavior problems such as lying, stealing, hitting, kicking, and sexualized behavior;" the [TFC parents] have found some methods to contain these behaviors, "but for the most part, her behaviors are not contained."[512] A psychiatrist treating KT stated (9/11/01) KT "is a very angry and oppositional child who does not respond well to change and stress. She has tendencies toward aggression and she is very demanding of time and attention from her caretakers."[513]

While KT was in this home, her TFC foster mother wrote a poem that provides insights into KT's behavior (9/01). Excerpts include (emphasis in original):

Little girl of nine, running to and fro,
    What makes you so restless; does anyone know?
What makes you so strong-willed and precocious?
    What makes you so stubborn and anxious?

What? Little girl of nine, what did you say?
    About the day your mommy went away?
She was doing laundry, and Daddy got mad,
    And things got scary—what a fight they had!
You and baby brother huddled on the floor,
    When Daddy angry and screaming threw Mommy out the door.

You cried for her, *"Mommy, please don't go away.*
    *Please Mommy, come back and stay."*
*"But mommy didn't come back and my brother clung to me,*
    *So I had to be his mommy, even though I was only three.*
*And then Daddy did things daddies shouldn't do*
    *to a little girl of three and a little boy of two.*
*And sometimes he left us all alone,*
    *and sometimes we'd run away from home,*
*And sometimes we were hungry and cold;*

*Life was hard for two little kids not very old.*
*That was a long time ago,*
*But I still miss my mommy and daddy so,*
*And I wish my brother lived with me—*
*You know, I've been his mommy since I was three!"*

Little girl of nine, I understand better now why you struggle so,
And why you kick and scream and sometimes yell "NO!"
I understand better the hurt you carry inside,
That often comes out as anger as your pain you try to hide.[514]

A progress report for KT 2/28/02 identifies her Axis I diagnoses as Reactive Attachment Disorder, Attention Deficit Disorder (ADD), and Oppositional Defiant Disorder (ODD).[515] The report states KT "continues to live under the negative working model of reactive attachment disorder, believing that she is no good and no caregivers of her can be good. . . . [KT] has to be supervised all of the time."[516]

***KT and [redacted] visited, engaged in sexual behavior; sibling therapy not provided due to distance between their placements.*** On 9/11/01, the psychiatrist treating KT recommended it was not in the best interest of either child to reunite KT and [redacted] in the same foster or adoptive home.[517] She agreed "that the children should have the opportunity to remain in contact and have visitation with other from time to time . . . but to place them in the same living situation would put both them [sic] in a situation which would likely result in their deterioration and failure of the placement."[518]

A 1/14/02 letter from psychologists at [redacted] to DHS states that when KT and [redacted] visited together "it was suspected that they had engaged in sexual behavior;" they were to be seen in therapy together to improve their behavior and determine whether they could be placed together in an adoptive home.[519] The letter states that due to the distance between the placements and to scheduling issues, the recommended therapy would be not be provided since infrequent sessions would not reach the intended goal.[520] The letter concludes, "[w]e do feel strongly that sibling work [for KT and [redacted]] is needed with special attention to boundaries."[521] Notes from a staffing on 3/12/02 involving KT's and [redacted]'s TFC parents and TFC therapists, DHS workers, and other DHS staff recognize the physical and emotional exhaustion of KT's and [redacted]'s TFC parents from caring for them; the notes state neither placement could handle both KT and [redacted] in the home.[522] However, increased face-to-face contact between the siblings was recommended.[523]

***Concerns raised about KT's TFC placement.*** On 1/7/02, a DHS worker expressed concern about the placement in KT's TFC home of a teenage boy who had sexually offended; no one responded to that concern. A follow-up email stated there was no immediate risk, but there was "the potential harm from the foster mom losing control of situations and not being able to deal with both foster children simultaneously."[524] While waiting for the door to be opened at a placement visit on 3/4/02, the same DHS worker heard screaming, slamming, and the TFC mother state, "do you want me to get the belt" and "what kind of home is this anyhow."[525] The TFC mother denied she had or would use a belt, and the TFC father stated it was just a stressful

period; the DHS worker did not meet privately with KT or make a child abuse/neglect referral.[526] The worker was concerned about "the inappropriate coping skills being used by the foster parents when they do intervene. They will not admit that there are any problems and minimize events, rather than acknowledging that something is wrong and asking for assistance."[527] The worker also emphasized her concern about the level of stress in the home, but noted this TFC home was "one of the best that I have seen."[528] The TFC therapist and supervisor identified concerns that the TFC parents failed to follow the therapist's suggestions and were not consistent with KT.[529] As of April 2002, KT's TFC father had 24 outstanding training hours and was noncompliant with the 2001 required training.[530]

Although KT's 8/14/01 treatment plan states she would stay in this home until adoption,[531] she was removed 10/4/02 at the TFC parents' request due to the TFC mother's health problems, KT's physical aggression, and the toll KT's placement was taking on the family – "everying [sic] was a power struggle."[532] During this placement, KT was placed in respite care and therapeutic leave 22 times for periods of one to four days with four different TFC homes.[533]

**10/4/02 – 3/24/03: KT's 13th placement disrupted due to TFC parents' frustration at the length of time taken to determine KT's permanency plan**

After moving KT from her 12th placement at the TFC parents' request, DHS placed KT in another TFC home. Although the DHS Systems of Care Coordinator and TFC agency reported that KT's behavior improved in this TFC placement,[534] the placement disrupted after five months.[535] The family had become interested in adopting KT; the "[f]irst and foremost" reason for the disruption was the TFC parents' "frustration at the length of time it has taken for a decision to be made regarding permanency for [KT and [redacted]]. They have stated that it feels (to them) like being in the middle of a custody battle with the [prior TFC parents] and [another TFC family that provided respite care for KT]."[536]

***Differences regarding reunification of KT with brother.*** Despite the earlier conclusion in a DHS staffing on 3/12/02 that neither KT's nor [redacted]'s placements could handle both in the same home,[537] a 1/15/03 letter from the DHS Systems of Care Coordinator states, "we believe the courts [sic] decision to explore the possibility of the children being placed in the same home, sometime in the future, was a wise one."[538] The letter also states that reunifying KT and [redacted] will "undoubtedly take time, understanding and a true desire from all person's [sic] involved, to allow this to ever become a reality. It is our opinion that all parties . . . will need to agree to work towards this goal in order to successfully accomplish it."[539]

Prior to KT's move to her 14th placement, the TFC agency recommended two placement options: returning KT to the TFC parents from her 12th placement (recommended by TFC placement agency as the least difficult psychologically for KT) or placing KT with her brother in another TFC home,[540] the option selected by DHS.[541] This placement required a TFC agency change and a change in KT's therapist.[542] KT had been previously placed in this home for ten days for respite care.[543]

**3/24/03 – 4/14/03: KT's 14th placement in TFC home with [redacted] disrupted in three weeks**

DHS placed KT in a TFC home with her brother.[544] The TFC parents requested that KT be removed due to KT's not obeying re-directions, screaming, and having temper outbursts.[545]

**4/14/03 – 4/10/06: KT's 15th through 23rd placements included four psychiatric placements**

***KT's first psychiatric placement.*** For her 15th placement, DHS placed KT in the same TFC home in which she had been placed previously for two years (her 12th placement). This family continued to consider adopting KT.[546] A DHS report to the court for a 6/12/03 permanency hearing states 11-year-old KT had a "great deal of difficulty re-adjusting" to this TFC home, with several incidents involving "minor injuries to herself and her caregivers."[547] Between 4/19/03 and 5/21/03, the TFC mother completed eight incident reports documenting KT's "physical aggression toward self [and] toward others."[548] KT was then (5/22/03) hospitalized for the first time for psychiatric care for 20 days.[549] When admitted for treatment, KT's reason for admission included her physical aggression toward her TFC parents, homicidal threats toward her TFC parents ("I wish you were dead" and "If you don't do what I want I will hurt you!"[550]), statements that "I hate myself, I wish I could die," and self-abuse.[551] A psychological evaluation completed during the hospitalization states:

> [KT's] anger is clearly related to abandonment issues. She has been abandoned by every adult in her life . . . and now the separation from her brother, [[redacted]]. When she was removed from the [foster parents'] home in October of 2002 [her 12th placement] . . . psychologically [KT] was abandoned again. Again she felt abandoned when her foster parents admitted her to [this hospital] . . . . She is a sad, lonely, depressed, angry child who expresses her anger and frustration in explosive episodes in which she can be destructive to property and to herself . . . . She has been abandoned so many times that she fears being left alone again.[552]

***KT's second psychiatric placement.*** After KT was discharged from the psychiatric placement on 6/11/03,[553] DHS returned her to the same TFC home. Within six weeks of her return (7/26/03), KT played with matches, starting a grass fire that required fire department intervention.[554] No child abuse/neglect referral was made regarding the TFC parents' failure to adequately supervise and protect KT. During this three-month TFC placement, KT was placed in respite care four times.[555] KT's TFC mother reported to a DHS worker that KT had put her arm in a door and slammed the door on herself, broken a car windshield and two windows in the home, pulled the phone out of the wall when they called 911, and pulled a knife on them. The worker stressed, "I have never seen more patience by any family . . . . Foster family tried to deal with her behaviors but they were getting no place."[556] A child abuse/neglect referral was not made, and the DHS worker took no other action to intervene regarding the serious safety concerns in KT's placement. In a subsequent call, the TFC mother stated they had decided not to adopt KT.[557] KT's TFC therapist and the therapist's supervisor noted 9/4/03: "Foster parents think she needs a higher level of care, but not inpatient. [KT] is too young for a group home."[558] Eleven-year-old KT was placed for the second time in an acute psychiatric placement on 9/10/03, where she remained for 30 days.

A report to the court 9/11/03 from KT's TFC agency states, "This environment is dangerous for [TFC mother], and is not helpful or healthy for [KT]. . . . Returning to the former foster home will likely cause a return to past behaviors in [KT]."[559] A Grand Staffing for KT on 11/3/03 recommended that: "Due to the severity of [KT's] behaviors and her severe Reactive Attachment Disorder, termination of foster placement with the [prior TFC parents] is recommended. . . . It is also recommended that [KT] not be placed with her biological brother due to the aggressive nature of both children."[560] KT remained on "close observation for sexually acting out" throughout the psychiatric placement.[561] A letter to the court dated 12/16/03 from the hospital states, "Due to her demonstrable mental illness, [KT] would be considered a child in need of mental health treatment, who requires 24-hour medical supervision. Therefore, a residential treatment facility appears to be an appropriate placement for [KT] at this time."[562]

A court-ordered psychological evaluation was completed 11/17/03 to determine KT's placement needs.[563] This report recommended returning KT to the same TFC parents, rather than a residential treatment facility, on a "six month trial basis;" not to do so, the psychologist stated, "will condemn her to a life without a family."[564] The psychologist also recommended weekly Attachment Therapy sessions with the TFC parents and that KT be discharged as soon as therapy could be arranged and safety measures put into place.[565] On 12/19/03, the court returned KT to the TFC parents with whom she had been placed prior to the hospitalization[566] and ordered that KT receive therapy from a Reactive Attachment Disorder specialist.[567]

***DHS repeatedly placed KT in same TFC home, even though major violence continued.*** The Reactive Attachment Disorder specialist reported three major incidents of violence by KT on 1/21/04, 2/13/04, and 2/22/04.[568] Despite the specialist's written report of these incidents to DHS and statement that "there is a strong risk that [KT] will seriously injure [the TFC mother],"[569] no child abuse/neglect referral was made and DHS took no other actions to protect KT from harming the TFC mother and/or herself. Another assault by KT on the TFC mother resulted in KT's placement in an acute psychiatric placement for three days (2/24/04 – 2/27/04;[570] KT's 20th placement and third psychiatric placement); DHS then returned her to the same TFC home.[571] A 2/19/04 email from a DHS worker to a TFC staff member states: "I don't think that any of us knows how often [KT] 'goes off'. We only know what is reported, and I think there are things going on that are minimized."[572] In a 3/1/04 court report, KT's TFC therapist states KT "has the very real potential for harming herself or others. [She] does not generally meet criteria for Acute care, because she does not state an *intent* to harm herself or others. . . . but it is a real possibility . . . when she is in one of her rages. . . . If [KT] is going to be successful in the [TFC home], the level of intervention must be increased"[573] (emphasis in original). During this time (12/19/03 – 11/17/05), KT was placed in respite care 16 times for periods of one to six days with five different families.[574]

A 6/10/04 report from the TFC contract agency states the parenting philosophies of DHS and the TFC parents differed. The TFC parents' approach, *i.e.*, to provide "love and acceptance," would take longer to reach KT, but "there is some evidence that love based approaches do work if the right balance of love and limits can be achieved."[575] According to this report, DHS would prefer the use of more behavior modification with KT and "more direct confrontation to address her significant behaviors and teach her more appropriate behaviors."[576] The report states that "if DHS insists on that approach, careful consideration should be given to selecting a placement that

could provide for the safety of all concerned parties."[577] A 9/15/04 court report by the TFC therapist states KT "depends on those around her to keep her safe since she does not have the ability to keep herself safe."[578] An 11/12/04 assessment states KT had not made progress with her TFC treatment plan goals and objectives[579] and identified concerns "regarding the safety and well being of [KT's] foster mother" due to KT's physical aggression toward her.[580]

***Referrals received on TFC home on 6/1/05 and 10/22/05.*** The first referral alleged the TFC mother "attempted to discipline [KT] by placing a drop of dish soap on a towell [sic]" and placing it in KT's mouth. KT bit the TFC mother, who then pinched KT to get her to release her bite, causing a bruise.[581] Both the DHS investigating and treatment workers stated the TFC family was unable to provide the level of care KT needed;[582] the treatment worker stated KT's "going off" places KT and the family "in a perilous situation."[583] The finding was Services Recommended with the DHS treatment worker's recommendations to be followed.[584] Both TFC parents stated that if things did not improve in the following year, KT would be asked to leave the home.[585] An email states that as a result of this referral an assessment was to be completed of the TFC mother's ability to safely parent children with severe emotional and behavioral problems;[586] however, no such assessment was found in the file. The second referral[587] alleged the TFC mother "popped" another TFC child in the mouth; the report states, "[a] corrective action plan was instituted that night" and the child removed.[588] The referral was Screened Out and "entered for record."[589]

***TFC agency and Review Board recommended KT's removal from TFC home.*** On 9/19/05, the TFC program manager and therapist noted that KT's TFC mother was willing to consider a higher level of care for KT "provided" the family would continue to have contact with KT.[590] An email to DHS staff from the TFC agency placement coordinator states the current TFC parents had withdrawn their interest in adopting KT, and at this time were "not able to control [KT's] behaviors suffienctly [sic] to ensure safety in the home. I feel that it is in [KT's] best interest to be placed in a group home. She needs a higher level of care where she can learn to express her anger through non-violent means."[591] A memo 11/29/05 states KT was approved 11/17/05 for acute level of care due to "her high level of aggression." [592] It also reports KT's therapist, TFC parents, and primary and secondary DHS workers agreed it was time to move KT to a higher level of care; she was placed on the list for a group home.[593] The TFC agency home assessment 12/22/05 states that the relationship between the TFC parents and KT "is not healthy . . . there are concerns for the safety of the foster parents . . . as [KT] is physically and verbally aggressive with her foster parents (even during family sessions)."[594] Similarly, the Post Adjudication Review Board noted 11/3/05, "[KT's] foster parents do have affection for her, but can't handle her;"[595]the Board recommended, "It's past time to move [KT.]"[596]

***DHS returned KT to same TFC home after her fourth psychiatric hospitalization***. On 11/7/05, the TFC mother requested that KT be moved, stating, "As much as we love her and as much as it hurts, my husband and I realize that we are not capable of giving her the twenty-four/seven supervision that she needs."[597] She stated they had hoped to keep KT until a group home had been found and "remain a 'family' contact for KT."[598] Ten days later (11/17/05), DHS again placed KT for inpatient psychiatric care.[599] On 12/15/05, the TFC parents requested that KT be returned to their home when discharged;[600] on 12/21/05, DHS placed KT back in their home.[601]

***Disagreement concerning KT's discharge to the same TFC home.*** An email 12/19/05 states KT was being discharged from the hospital and no beds were available in the group home; the hospital "would not keep KT any longer."[602] The TFC agency placement coordinator "had concerns that the dynamics in the home would be the same as before," however, the hospital written report stated KT had been "an absolute angel" and needed to go back to the same TFC home. The TFC coordinator said, "[t]heir written report trumps my gut feelings."[603] Emails document strong disagreement between KT's secondary DHS worker and a supervisor concerning KT's return to the same TFC home. On 12/21/05, KT's secondary worker wrote: "I thought [KT] was going to a group home. There is no way, in my opinion, [KT] can be safely maintained in this foster home any longer. . . . It appears that we are accomodating [sic] the foster parents, because the needs of the child are not being met."[604] The DHS supervisor's reply the same day stated:

> I feel we had ample reason to place this child back in this home. This in no way precludes her from the group home waiting list and we are still planning a grand staffing to plan for these children's future. It would seem prudent to assist other OKDHS team members in maintaining this child until a more viable placement can be secured. I can assure you, this placement had absolutely nothing to do with the foster parents [sic] needs. *Unfortunately our placement options are at times limited*[605] (emphasis added).

KT's secondary worker subsequently reiterated her concerns: "[KT] places herself and the foster parents in danger, and the foster parents have admitted they cannot physically control her. The foster parents have called police on numerous occasions to come and help subdue her when they cannot. . . . My concern is for the safety of everyone in the home."[606] Several days later, the TFC placement coordinator wrote to the DHS secondary worker that she shared her "concerns for the safety in this home. [DHS supervisor] has outlined to you the reasons he feels this is the 'best' placement option for [KT] at this time. I take that to mean the best of the options available to us."[607] She continued, "[KT] no longer meets criteria for inpatient care, and no group home beds are available. . . . It did not seem appropriate to place a child with a history of violence in a shelter when there is a family, with court ordered contact with that child, who was petitioning to have her back."[608]

**4/10/06 – 7/7/07: DHS placed KT in her fifth psychiatric placement followed by two shelter placements and a group home placement**

***On 4/10/06, DHS placed KT in a psychiatric placement in*** [redacted][609] and moved her four days later (4/14/06) to a shelter in [redacted], her 25th placement.[610] DHS then placed KT in another shelter on 4/18/06, where she remained for 20 days.[611] Shelter incident reports describe KT's physically aggressive behavior, *e.g.*, hitting and kicking others and the walls and throwing things.[612]

***On 5/8/06, after being on a waiting list for almost five months, KT was placed in a group home where she did not receive recommended psychiatric services or follow-up for Developmental Disabilities Services Division (DDSD) services.*** Three months after placement in the group home, KT wrapped a shoelace around her throat and tightened it; she was placed on

self-harm procedures.[613] She was observed to have behaviors that were dangerous to herself on at least 30 other occasions and dangerous to others on at least 37 other occasions.[614] A psychological evaluation 9/12/06[615] by a masters-level psychologist recommended that KT be seen by a psychiatrist to monitor her medication and also meet with a licensed therapist.[616] The group home reviews state that individual treatment plans must be approved by one of a list of professionals, including a licensed clinical psychologist or licensed physician or psychiatrist;[617] KT's treatment plans were approved by a Ph.D.-level "psychologist consultant."[618] However, two forms state "unknown" at the question "When was your last psychiatrist appointment?";[619] there is no documentation that KT was seen by a Ph.D.-level psychologist or psychiatrist in this placement. Group treatment appeared to be the only therapy available.

The 9/12/06 psychological evaluation also states that KT's diagnosis of Mental Retardation "suggests she may benefit from referral for DDSD services."[620] Almost a year later (6/29/07), a court report states the DHS worker had not received the 9/12/06 psychological evaluation from the group home.[621] When the evaluation was received, the worker determined that KT would qualify for DDSD services.[622] However, a 1/14/08 email states KT was being scheduled for a psychological evaluation for DDSD qualification – almost 1½ years after DDSD services were first recommended for her.[623]

***Group home recommended KT needed a higher level of care,* i.e., *more staff supervision and more intensive therapy than this placement provided*.** KT was found sexually acting out with her teddy bear at least twice while in this placement,[624] and she continued to bite peers and staff and physically assault walls and furniture.[625] KT's group home group therapist recommended 3/5/07 that KT be transferred to an E-level facility: "[KT] is in need of more staff supervision than is provided by our contract with DHS to ensure her safety. She is also in need of more intensive therapy than is provided by a D+ facility. At this time I submit that [KT] be transferred to an E-level facility."[626] KT expressed interest in trying "something else."[627] KT's treatment plan review 6/2/07 states that KT assaulted and spit at peers and attempted to break windows; she continued to ignore boundaries and constantly tried to hug staff.[628] In the area of Basic Living Skills Redevelopment, the review states, "[KT] has the ability to learn new skills," but "continues to be led by the mood she is in."[629]

Less than six months prior to her discharge from this placement, KT wrote her treatment goals on a client questionnaire: "Do not bite. Do not hate any Body. do not slap anybody . . . To lean how to talk out my feelings [sic throughout]."[630]

**7/7/07 – 2/13/08: DHS placed KT in her 28th placement, another group home**

***DHS placed KT in another D-level group home rather than a higher level of care.***[631] No rationale was given: "[W]e have agreed trying another level D [group home] would be to her benefit, rather than sending her to a level E facility. . . . I would like to move her to the new place and see how she does."[632] The quarterly court report 9/28/07 lists KT's Axis I diagnoses as Dysthmic Disorder, Oppositional-Defiant Disorder, and Attention-Deficit Hyperactivity Disorder.[633] Reactive Attachment Disorder, her primary diagnosis throughout her stay in custody, is not listed. The report states group treatment activities addressed independent living

skills, family and peer issues, and coping skills;[634] it projects the length of KT's stay in the group home as six to nine months.[635]

DHS had 13 face-to-face contacts with KT in 2007.[636] The group home progress report states KT had telephone contact with her [redacted] and previous TFC parents, but no other information was given.[637] A report for the 9/4/07 permanency review states KT lost her [redacted]'s phone number and "forgets" to call her brother.[638] A 1/29/08 email states the DHS worker was concerned about court-ordered monthly sibling visits; KT and [redacted] visited after a court hearing on 1/25/08 and "all they did was fight with one another. . . . [KT] bit [[redacted]] on the top of the head, choked him, and broke his glasses during the visit."[639] The worker stated it was not appropriate for the children to visit: "The separation of siblings was approved [by DHS] on April 25, 2005."[640]

**KT's permanency status as of 2/13/08**

When initially placed in DHS custody, KT's permanency plan was reunification with one of her parents.[641] KT's father visited her frequently; her mother did not contact DHS regarding visits for two months after KT was placed in DHS custody.[642] Mental health services progress notes from 1/15/98–9/21/98 state KT "[e]xperienced pathological care, severe neglect though most of her life. . . . Neither parent demonstrates effective parenting and child does not respond to parental interventions."[643] KT's mother relinquished her parental rights 3/23/98.[644]

In September 1998, allegations were made that KT might have been exposed to adult sexuality during unsupervised visits with her father;[645] a DHS investigating worker stated that KT's sexualized behaviors appeared to have been "ignored in the early stages when the child first entered into custody. The child's sexual acting out behavior appears to have been constant over her entire stay in custody and only now has been brought to the court's attention."[646] A subsequent allegation 3/9/99 that KT's father molested [redacted] was Confirmed.[647] DHS continued to require KT to have visits, now supervised, with her father.[648] The DHS court report for 5/13/99 states that although both children said they wanted to live with their father, when reunification was discussed, KT assumed "the fetal position."[649] On 6/20/00, KT's father relinquished his parental rights to KT and her brother.[650]

Although several families expressed interest in adopting KT and/or [redacted] in 2002 and 2003, DHS delayed its decision regarding whether the siblings should be adopted together until April 2005. As of 2/13/08, DHS had not identified a prospective adoptive home for KT. She remained placed in a group home facility.

**Continuity of DHS workers/supervisors assigned to KT**

According to staffing information provided by defendants' counsel to plaintiffs' counsel, as of 2/13/08, KT had been assigned 58 primary workers with 53 supervisors and 39 secondary workers with 35 supervisors.[651] Therefore, KT was served by a total of 97 workers and 88 supervisors during her almost 11 years in DHS custody. Four of the primary supervisors and 25 of the primary workers assigned to KT left DHS by the end of 2008.

A list of assigned workers was also found in KT's case files in a Case Summary section.[652] When this list and the staffing tables described above were compared, numerous inconsistencies were identified that could not be explained.

## KT CASEWORK ANALYSIS

### DHS Failures to Protect KT from Harm While in DHS Custody

Oklahoma Department of Human Services (DHS) policy states that "[s]afety drives *all* case planning decisions"[653] (emphasis added). According to DHS policy, safety "means freedom from serious danger due to abuse or neglect in the near or foreseeable future. The CW worker considers the risk factors within the child's home and family."[654] Risk factors mean "the circumstances that affect the child's safety."[655] For KT, risk factors included factors that could lead to others neglecting and/or abusing her, KT harming herself, and KT harming others while in custody. KT's impulsive aggressive behavior, self-abuse, and threats to harm herself and others always carried the risk that KT herself would also be seriously harmed.

To ensure that placement decisions are driven by safety, DHS policy prohibits the use of TFC placements for children who consistently present a danger to themselves and to others in the home: "A child . . . who poses a danger in a family setting is not appropriate for TFC placement."[656] Therefore, DHS was in violation of its own policy in continually placing KT, a child who consistently posed a danger in family settings, in TFC homes.

Unfortunately for KT, DHS consistently failed to ensure that all case planning decisions regarding her placements and services were driven by safety. For more than a decade in DHS custody, KT was not provided freedom from these serious dangers and was subjected to irreparable harm. In some instances, prior to placing KT, DHS failed to complete the assessment required to determine whether the placement would be free from abuse or neglect in the near or

foreseeable future. In many other instances, DHS had itself already documented that the circumstances into which it was placing KT had previously been dangerous for her and thus could reasonably be predicted to be dangerous for KT in the future.

**I. DHS failed to protect KT from serious repeated harm due to its failure to monitor and evaluate safety and risk of harm to KT, both prior to and during her placements**

***A. DHS failed to fully assess KT's needs and services; when assessments were made, DHS failed to monitor follow-through on and/or ignored the recommendations, thus placing KT at continual risk of serious harm.*** The nature of KT's victimization prior to and at the time of her entry into custody warranted a formal and thorough assessment to determine whether she might require a higher level of placement services and protection than could be provided in kinship, regular, or emergency foster care. However, DHS failed to make such an assessment. In addition, when combined with KT's victimization history, the serious, symptomatic behaviors that were observed very early in KT's stay in DHS custody established an urgent need for complete psychological and psychiatric evaluations and for subsequent placement and treatment as recommended by these expert evaluations. Within two weeks of placement, KT's EFC mother reported five-year-old KT wanted to kill herself; within five weeks of placement, a DHS worker noted that KT's self-abusive behavior, hitting herself, which no one had addressed, had subsided; three months later, while with a DHS worker, KT ran off, out of control. KT was later moved because she kicked a two-year-old boy in his privates,[657] attempted to run away to see her father, and left school and had to be escorted back by the EFC mother.[658] She was subsequently moved again due to her out-of-control behavior and physical assaults of other children in a placement.[659]

Despite these behaviors, DHS failed to refer KT for complete expert evaluations for *two years*; without such an evaluation DHS staff could not fully assess KT's psychosocial

functioning and mental health, placement, educational, and social needs. DHS therefore placed her in multiple settings in which she was harmed and in which she harmed others and/or herself. It should be noted, however, that even when such evaluations were completed, DHS continued to place KT in settings that were known to be unsafe for her and failed to meet her needs.

DHS also failed to thoroughly assess and address the nature and source of KT's sexual abuse. Sixteen months after KT's entry into DHS custody, the investigative report for allegations that KT had been exposed to adult sexuality during unsupervised visits with her father states that KT's sexually acting out behavior appeared to have been ignored when she first entered custody and that this behavior had been constant over her stay in custody; yet this behavior "only now has been brought to the court's attention."[660] Despite KT's cries in her sleep of "no no daddy, no more" as she held a stuffed animal between her legs, KT was required by DHS to continue unsupervised visits with her father.[661] Even when allegations of KT's father's sexual abuse of her brother were confirmed by DHS 22 months after KT entered custody, DHS required KT to continue visits with her father, now supervised.[662] There was ample information in the file at the time for DHS to have concluded that these visits were unsafe and traumatic for KT; the continued visits with her father more likely than not also delayed KT's full disclosure of her father's sexual abuse of her. The Report to the DA confirming KT's father's sexual abuse of her brother documents that the children's disclosures and ongoing behavioral problems had not been reviewed by the seven DHS workers and four DHS supervisors previously assigned to the case – *11 DHS staff members*.[663] The report further states: "It does not appear that the case has *ever* addressed the sexual abuse which continues to be an underlying unresolved issue that the children must continue to deal with"[664] (emphasis added).

KT's file also documents that as of 2/13/08, DHS had failed to follow through on a recommendation made in a 5/8/06 psychological evaluation that she be referred for Developmental Disabilities Services Division (DDSD) services.

***B. DHS consistently failed to ensure that KT's placements would not place her at risk of harm and placed KT in placements known to be unsafe for her.*** DHS subjected KT to 28 placements during the period under review. DHS placed KT in three homes (her second, third, and eighth placements) without having approved the placement and/or completed the home assessment required by policy to determine whether the placement would be safe. After removing KT from a home that had not been approved by DHS prior to KT's placement, DHS moved her to a kinship home without having completed a home assessment and in which KT's kinship caregiver violated placement policies regarding sleeping arrangements and discipline. A few months later, DHS placed KT back in this same kinship home although DHS never approved this home for placement. In this home, KT's kinship caregiver failed to supervise KT and protect her from multiple incidents in which KT's [redacted] initiated sexual activity with her; she also admitted to whipping KT repeatedly. Yet DHS kept KT in this dangerous placement for more than five months until it finally decided it could not approve the home.

The well-documented DHS practice of continually placing KT in settings known to be unsafe for her is almost incomprehensible. DHS placed KT in the same TFC foster home for six placements (placements 12, 15, 17, 19, 21, and 23) over a period of more than five years. KT's TFC therapist reported to the court that KT "depends on those around her to keep her safe since she does not have the ability to keep herself safe."[665] But, beginning with KT's first placement in this TFC home, DHS consistently documented the failures of the TFC foster parents to: protect KT from injuring herself and others; provide the structure and consistency required for KT's

safety and well-being; follow the TFC therapist's recommendations regarding the TFC parents' management of KT's behavior; and participate in court-ordered attachment therapy with KT. DHS documented KT's physical aggression, homicidal threats against her TFC parents, suicidal statements, self-abuse, breaking windows in the home and the car, pulling the phone out of the wall, and physically assaulting the TFC parents. DHS workers expressed concern that the police were being called regularly to the TFC home to intervene to protect KT and the family from KT's behaviors that endangered herself and others. A DHS worker acknowledged, "I don't think any of us knows how often [KT] 'goes off.' We only know what is reported, and I think there are things going on that are minimized."[666] *Yet DHS rarely took any action to address the ongoing volatile and unsafe situation.*

DHS exploited the TFC parents' affection for KT by repeatedly returning her to their home, even though DHS was fully informed that the TFC parents could not keep her safe and DHS must have been aware that each placement would end in disruption. During KT's fifth placement with this TFC family, DHS received two referrals alleging physical abuse by the TFC mother. Both the DHS investigating and treatment workers concluded the TFC home was unable to provide the level of care needed by KT; the treatment worker stated the family was "in a perilous situation."[667] Following the investigation, DHS stated that an "assessment of this foster mother's ability to safely parent children with severe emotional and behavioral problems must be completed;"[668] however, DHS failed to complete such an assessment and KT remained in the home, unprotected from harming herself and others. Although the second referral was Screened Out, DHS removed another foster child from the home, implicitly acknowledging the home's lack of safety. DHS, the TFC agency, and the TFC parents themselves repeatedly stated that the

TFC parents were unable to control KT's behaviors sufficiently to ensure safety in the home – *yet in this home she remained.*

Although DHS finally approved KT for a higher level of care 11/7/05, she was placed on the waiting list for a group home because of DHS' lack of placements to meet children's diverse and changing needs. While KT remained on this waiting list *for five months*, DHS placed her in inpatient psychiatric care and then returned her to the same unsafe TFC home where she had been previously placed. The file documents internal DHS disagreement concerning KT's continued placement in this TFC home. One worker emailed a supervisor that KT could not be safely maintained in the home and that her needs were not being met.[669] The supervisor replied, "Unfortunately our placement options are at times limited,"[670] implicitly acknowledging that the placement was not a safe one for KT, but also that DHS had *no* safe placement available for her. When the TFC home disrupted yet again, KT was placed in a crisis unit for psychiatric care – her fifth psychiatric placement – and then in two consecutive shelters.

***C. DHS failed to ensure that an "evaluation and response"[671] to referrals occurred as required.*** While KT was in DHS custody, in addition to the referrals received during KT's 11th placement, alleging that KT and her brother had been exposed to adult sexuality and/or sexually abused during visits with their father, DHS received six referrals of alleged child abuse/neglect against KT's placement caregivers in four different placements. Half of these referrals were Screened Out and not investigated; one was Confirmed, another found Services Recommended, and another Services Not Needed.

The first referral, received against KT's EFC home within four days of KT's entry into custody, alleged neglect and lack of supervision that permitted another foster child to be bitten on the face by the family's dog; this was Confirmed and the victim was removed from the

home.[672] DHS continued KT's placement in the home. DHS also received two referrals against KT's [redacted] while KT was in the kinship home. The first alleged that the [redacted] took off KT's cast and KT's arm then became painful. This was Screened Out and not investigated.[673] The second alleged emotional abuse and lack of supervision by the [redacted], and spanking by the [redacted] and KT's [redacted]; it was also Screened Out.[674] Although the second referral was referred to DHS treatment workers for appropriate action, no action or follow up is documented.

Referrals were also received 6/1/05 and 10/22/05 against the TFC home in which KT was placed six times. The first alleged the TFC mother pinched KT to release KT's biting of her, leaving a bruise;[675] this was found Services Recommended.[676] An assessment of the TFC caregiver's ability to safely parent children with severe emotional and behavioral problems was to be completed,[677] but no such assessment was found in the file. The second referral alleged KT's TFC caregiver hit another foster child in the home; an unspecified corrective action plan was instituted "that night" and the child was removed.[678] The referral was Screened Out,[679] and KT remained in the home.

The decision to "Screen Out" half of the referrals of alleged maltreatment of KT while in custody is of serious concern. "Screening Out" an allegation precludes an investigator's private interviews with the alleged victim, others in the home, and collateral contacts. When referrals were Screened Out, no DHS worker was required to meet privately with KT or others to discuss her placement safety and well-being. For example, during KT's placement with her [redacted], had DHS investigated rather than Screened Out either of the two referrals received, information could have become available to assist DHS staff in assessing and addressing the nature and degree of KT and [redacted]'s age-inappropriate sexual behaviors and activity that was occurring in the

placement. Other information could also have become available to DHS, such as information relevant to determining the accuracy of the allegations of emotional abuse and spanking against the [redacted], and whether and what protective actions should have been taken, such as KT's removal from this kinship home more quickly.

In addition, DHS continually failed to even designate as formal abuse/neglect referrals allegations it received regarding KT's violent behaviors and harm to herself and others and her foster parents' failures to supervise and protect her.[680] This is at least as serious a concern as the agency's frequent Screening Out of referrals. DHS workers' failures to designate numerous allegations as referrals precluded formal investigation of the allegations and also prevented the allegations from being identified in KT's file as referrals. Thus, the history of referrals concerning KT while she was in DHS custody grossly under-represents the actual instances of alleged child abuse/neglect of KT.

## II. DHS failed to protect KT from harm caused by placement instability due to its lack of placement settings that could meet her needs, its overuse of respite care and shelters, and its failure to take steps to prevent placement disruption

***A. DHS consistently overused shelters and respite care placements for KT and placed her in settings that failed to meet her needs, resulting in harm to KT due to placement instability and caregiver discontinuity.*** It is widely recognized that a fundamental principle underlying child welfare practice and policy is that "all children need a stable and continuous relationship with a nurturing person or persons, in order to develop physically, socially, and emotionally, intellectually, and morally."[681] When placement changes are numerous and frequent, such as those experienced by KT, they create an intolerable level of caregiver discontinuity. The many consequences of placement instability and caregiver discontinuity include that a foster child's trust in adults to provide care and protection, already damaged by the

child's prior victimization, is further betrayed, and the child's fragile ability to form attachments and relationships further deteriorates. Other widely recognized harmful consequences of placement instability are described in D.G. et al. v. Henry et al. *Review of Named Plaintiff's Case Files* (September 30, 2009).[682]

In KT's slightly more than ten years in DHS custody in the period under review, DHS placed her in 28 different placements. Totally obscured – invisible – in these 28 placements is an alarming fact: KT was placed with *26 different families* when respite care placements are included. Twenty-six different families – with different parents and different children; different houses and different bedrooms. Many of these families provided one or more of KT's *53* respite care placements that ranged in length from one to ten days.

Although respite care provides essential relief for exhausted foster caregivers, the use of very frequent, often lengthy respite care, and the use of a different respite care family in as many as *nine consecutive respite placements*, as was done with KT, was without question an unnecessary stress for her. This DHS practice demonstrated poor and harmful placement planning for a child with a well-documented fragile ability to form attachments. KT's incredibly frequent placement changes, including moves to respite care, inevitably significantly contributed to her ongoing emotional and behavioral deterioration throughout the period under review. In addition, the extent of respite care required to maintain KT's TFC placements underlines KT's need to have been placed by DHS at a higher level of care in order to assess her status and needs, provide needed mental health treatment, and stabilize her. DHS failures to do so also contributed to her deterioration in custody.

In addition to family placements, KT was placed in *11* different facilities: four different shelters, one three times; five different psychiatric treatment facilities; and two different group

homes. When documented moves to respite placements are included, after entering DHS custody at age five with a history of victimization and family instability, *DHS subjected KT to placements in 37 different environments and to at least 81 placement changes during the period under review.*

One of KT's psychological evaluations states that her anger was "clearly related to abandonment issues. She has been abandoned by every adult in her life."[683] The report concludes: "[KT] expresses her anger and frustration in explosive episodes in which she can be destructive to property and to herself . . . . She has been abandoned so many times that she fears being left alone again."[684] There was no safe person for KT – no parent or grandparent with whom she could stay, no foster caregiver who wouldn't abandon her, no DHS worker who wouldn't move her. Through its placement practices, DHS not only prevented KT's recovery from the victimization and trauma she experienced prior to entering custody, but also taught KT that this is a world in which anyone who comes to see you may be taking you away and giving you to strangers. It is a lesson this child, particularly vulnerable due to her diagnosed Reactive Attachment Disorder, is unlikely to forget or recover from. *No child should be subjected to this unconscionable degree of family and environmental instability.*

KT was finally placed in a group home after being on a waiting list for almost five months. In this group home she was repeatedly observed to have self-harming behaviors. After four months, recommendations were made based on a psychological evaluation that KT receive therapy and meet with a psychiatrist; the group home failed to provide this level of care. Information in the file documents only group treatment, much of which was focused on social interaction and failed to address KT's significant mental health needs. Therefore, although DHS had placed KT in a more restricted setting, the particular placement selected for KT failed to

meet her needs. Her physical aggression with peers, staff, and the physical environment continued.

After KT had been placed in this facility for 14 months, the therapist recommended a higher level of care for KT. DHS provided no rationale for its decision to move KT to another group home that provided the *same level of supervision and treatment,* a level insufficient to protect KT and others placed with her. The only explanation given for this unsafe placement was that DHS would keep KT at the same level of care and "see how she does."[685] She remained in this placement on 2/13/08.

***B. DHS workers failed to make any effort to prevent placement disruption.*** The majority of KT's placement changes were caused by DHS decisions to place her in settings: 1) where the length of the placement was dictated by the time-limited nature of the placement and a subsequent placement change was automatically required, such as EFC, shelter, and inpatient psychiatric placements; 2) for which DHS had failed to assess, as required, the placement's capacity to protect KT and meet her needs prior to placing KT; and/or 3) without matching the placement's capacity to meet her needs. One placement change, however, stands out because the placement appeared to be a very good one for KT and disrupted without *any* effort by DHS to prevent the disruption. This is a particularly meaningful failure as not only was KT improving both in this TFC home and at school, but also, the caregivers in this home were very interested in adopting KT.

KT had been successfully placed in this TFC home (her 13th placement) for five months when the placement disrupted.[686] At that time (late 2002 – early 2003), the family was one of three who had expressed interest in adopting KT. The "[f]irst and foremost" reason for the placement disruption was the TFC parents' "frustration at the length of time it has taken for a

decision to be made regarding permanency for [KT and [redacted]]. They have stated that it feels (to them) like being in the middle of a custody battle with the [prior TFC parents] and [another TFC family that provided respite care for KT]."[687] DHS had delayed in reaching a decision as to whether KT was available for adoption only with her brother or alone, and would continue to delay in making this decision until 2005.[688] When this TFC family asked that KT be removed, *DHS took no action to attempt to prevent the placement disruption.*

Despite a psychiatrist's and a staffing recommendation that it was not in the best interest of either child to reunite KT and [redacted] in the same foster or adoptive home,[689] DHS then moved KT to the home in which [redacted] was placed, one of the three homes interested in adopting KT. This placement disrupted in three weeks. DHS then moved KT to the third potential adoptive home, a TFC home in which she had been previously placed; this home was known to be unable to safely care for her, but DHS would place KT there unsuccessfully *six times*.

## III. DHS subjected KT to discontinuity of DHS workers and supervisors and consistent absence of supervisory monitoring of worker accountability

While placed in DHS custody, KT was subjected not only to extreme placement instability and caregiver discontinuity, but also to an extraordinarily high level of DHS worker and supervisor discontinuity. According to DHS staffing information provided by the defendants' counsel to the plaintiffs' counsel,[690] as of 2/13/08, KT had been assigned 58 primary workers with 53 supervisors and 39 secondary workers with 35 supervisors. Therefore, KT was served by a total of 97 workers and 88 supervisors during the period under review. *On average, KT was subjected to a new DHS worker every 39 days – a staggering degree of worker discontinuity.*

KT's file fails to contain evidence of regular, ongoing supervision of KT's workers. The serious, persistent lack of accountability of KT's DHS workers and supervisors inevitably

contributed to KT's workers' failures to ensure that psychological and/or psychiatric evaluations were completed at the time of her placement in DHS custody so that her placement and treatment needs could be identified and met, and that the recommendations in subsequent evaluations were followed. The lack of workers' accountability is also seen in their failures to ensure that KT was safe in her placements. The file contains DHS workers' concerns about displeasing the judge; however, neither workers nor supervisors expressed concern about their consistently poor practices and failures to adhere to agency policy and their associated unacceptable performance.

The review of KT's file indicates that no DHS supervisor ensured that KT's workers' documentation was complete, correct, and timely. And no supervisor ensured that the rationale for placement decisions regarding KT were documented, such as the rationale for placing KT for the second time with her [redacted] in an unsafe kinship placement. While in this home for the second time, KT was subjected to her [redacted]'s sexual activity with her and whipped repeatedly in violation of DHS discipline policy.

**Conclusion**

KT's ability to survive over a decade of maltreatment, harm to herself and others, and inappropriate and inadequate placements and services provided to her by DHS while she was in its custody is a testimony to KT's resilience. KT's file, however, is an unequivocably strong indictment of DHS' consistently dangerous and harmful practices over a very lengthy period of time. DHS not only failed to assess KT's placement and mental health treatment needs in the first two years of her stay in custody, it also failed, as explicitly stated in her file by DHS staff, to assess and address the nature and extent of her victimization either prior to, at the time of, or following her placement in custody. DHS also continually placed KT in settings that had not been assessed as required; were known by DHS to be unsafe for KT; violated agency policy;

and/or consistently failed to follow TFC agency recommendations and court orders regarding KT's behavioral management and treatment. In addition, DHS failed to provide the required evaluation of and response to allegations of child abuse/neglect of KT while she was in custody. Moreover, DHS placed KT in placements contrary to explicit recommendations by experts and/or placements that could not provide the specific level of care required for KT's safety and mental health treatment.

As a consequence of these DHS failures, KT was physically abused and exposed to and participated in age-inappropriate sexual activity. Due to her caregivers' lack of supervision and failure to protect, KT continually harmed herself and others. Moreover, DHS failed to plan and implement actions and services to achieve permanency for KT. When documented moves to respite care placements are included, DHS subjected KT to at least 81 placement changes between her entry into DHS custody at the age of five, and 2/13/08, when she was 16 years old. This is an unconscionably high level of placement instability and caregiver discontinuity.

Over and over and over again, DHS failed to make case planning decisions driven by concern for KT's safety. As a result, KT was prevented from experiencing "freedom from serious danger due to abuse or neglect,"[691] positive well-being, and the security associated with permanency. Because "not to decide is to decide,"[692] DHS abdicated its legally mandated responsibility through its extensive delays and other well-documented inexcusable failures to protect and serve KT.

## DHS Systemic Deficiencies and Failures Suggested by Review of the Seven Named Plaintiffs' Files

JB, AP, JA, JP, RJ, GC, and KT are named plaintiff children who were removed from their own homes due to maltreatment by their caregivers and placed by court order in Oklahoma Department of Human Services' custody. Although the review of seven children's files cannot conclusively establish overall systemic problems, there are striking similarities in the children's case records and experiences in DHS custody that appear to indicate systemic deficiencies and persistent preventable failures. Moreover, it is of significant concern that *nothing* in the seven children's files suggests that DHS practice in these cases was unique or in any way different from that with other children in custody served by the named plaintiffs' DHS workers and supervisors.

Several themes can be identified, all of which point toward the agency's complete failure to meet the most basic standards of oversight for children in state custody and its serious difficulties in meeting its own minimal standards and requirements for protecting children from harm while in DHS custody. Although DHS policy mandates that "Safety drives all case planning decisions,"[693] it is apparent from the review of these children's files that, due to DHS deficiencies and failures, this policy was not followed. Unfortunately for the foster children who have been and continue to be in DHS custody, the deficiencies and preventable failures revealed by the seven children's files have inevitably endangered children and resulted in substantial preventable harms. Eight systemic deficiencies and failures suggested by the files reviewed are described below, followed by identification of the resultant irreparable and preventable harms to children documented throughout this report.

**1) DHS failure to monitor and evaluate safety of children's placements *during those placements*.** This review found an unconscionably high level of abuse and neglect of named

plaintiff children while in custody. Six named plaintiffs were subjected to: neglect in a shelter that caused first and second degree burns (JB); neglectful lack of supervision that resulted in daily sexual violations by [redacted] in two different placements (AP); severe physical abuse, dangerous lack of supervision, failure to provide medical care, emotional abuse, and mental injury (JP); chronic physical abuse, limits in food provided, and other neglect (RJ); abandonment by her biological mother during an unsafe Trial Reunification, frequent beating and exposure to domestic violence, and recurring sexual abuse and lack of protection from age-inappropriate sexual activity with both [redacted] and foster children in a TFC home (GC); and lack of supervision, failure to protect, and sexual abuse during family visits, repeated beatings in a kinship placement, and placement six times over a five-year period in a TFC home where lack of supervision and failure to protect resulted in the child harming herself and others (KT). These children were also required to remain in homes known by DHS to be neglecting and/or abusing them for extended periods of time; in JP's case, for as long as five months, and in GC's case, for 14 months.

This very high level of maltreatment was found to be associated with DHS workers' failure to provide the minimum required monitoring of whether foster children's "needs are met and [their] safety . . . intact" as a matter of day-to-day practice.[694] DHS workers routinely:

- failed to make basic face-to-face contacts with children in foster family and therapeutic foster care homes, including kinship care homes. DHS policy requires that face-to-face contacts be made "within the first two weeks of each placement and a minimum of once every calendar month thereafter."[695] For children in custody but placed in their own home, DHS policy requires a "face-to-face private contact with the child a minimum of once every calendar month."[696] *DHS workers instead routinely abandoned children in their placements.* To illustrate, during the first five months of four-month-old JB's Trial Reunification placement, JB's DHS worker had made only two face-to-face contacts with the infant in his placement; for a period of at least ten days, JB's DHS worker did not even know his whereabouts. Similarly, JP's DHS worker made *only one* face-to-face contact with seven-year-old JP in his placement during the first *six months* of his 12th placement, a placement on which DHS received three referrals of abuse or neglect. When

GC's primary DHS worker visited GC at her first psychiatric placement, she was fearful of talking with the DHS worker with whom she had had no face-to-face contact for almost six months.

- failed to make "face-to-face contact with the child at the shelter within 24 hours of the child's entry into the shelter and a minimum of once weekly while the child remains in the shelter."[697] During RJ's 58-day placement in the Laura Dester Emergency Shelter, his DHS worker made *only one* face-to-face contact with RJ.

- failed to make "at least three successful unannounced contacts per year"[698] with children in their placements to monitor their safety and well-being. In *none* of the seven children's cases were three unannounced contacts per year made by DHS workers.

- failed to "increase [face-to-face contacts] in times of change and stress"[699] and, "[i]f there is good cause [such as if the child asks to be moved from the foster home[700]] to believe that a child needs to be interviewed privately during a contact in the foster home," to interview the child "outside the foster parent's presence."[701] It appears that DHS workers and supervisors failed to comprehend and act on the basic child protective services principle that children feel more secure disclosing their personal safety and other concerns *in private* to a trusted person.[702]

- failed to increase the frequency of face-to-face contact with the child in the placement when there is "any type of safety concern, history of environmental neglect, concerns regarding access by the perpetrator, the age of the child, or an order of the court."[703] DHS workers consistently failed to make *any* increased face-to-face private contact with children who were in dangerous situations, such as when five-year-old JA threatened to run away from his shelter placement and repeatedly made threats to harm himself, and when six-year-old JP asked several times to be moved from a placement due to his foster mother's physical abuse and dangerous lack of supervision which was later confirmed by DHS.

- failed to make referrals of abuse or neglect and/or immediately remove a child from the placement when a DHS worker directly observes "indicators of abuse or neglect of a child in a foster . . . home."[704] Only rarely did the seven named plaintiff children's workers or supervisors take either action when there were clear indicators of maltreatment.

- failed, when child abuse/neglect referrals were received and investigated, to remove children from placements that were found to be unsafe, such as when DHS continued to place GC in a TFC home not only after one, but after *three* referrals and investigations documented the caregivers' repeated failures to protect GC and other children from sexual activity and sexual abuse in the home. Similarly, DHS required JP to remain in a TFC home for *five months* after DHS investigated and documented physical abuse of JP in the home.

- failed to ensure that an "evaluation and response" occurred for abuse/neglect referrals.[705] These failures are particularly troublesome when a DHS investigating worker "screens out" a referral for abuse or neglect in a child's placement, meaning that no investigation of the referral is made and no interviews are conducted with alleged child victims, other children in the placement, the perpetrator(s), or relevant others. DHS workers very frequently, perhaps too frequently, "screened out" referrals of abuse or neglect of the named plaintiff children while in custody; however, in doing so, they permitted the child to remain in the placement and recommended or required a "response"[706] on which DHS never followed through. Such responses included an internal contract agency investigation of the alleged abuse or neglect and/or the development and implementation of a Safety Plan and/or a Written Plan of Compliance. Such plans are designed to protect the child who remains in a placement from further harm and are signed by the placement caregiver(s).[707] The seven children's files consistently failed to contain documentation of *any follow-through* concerning these recommended/required responses.

- failed repeatedly to even designate abuse/neglect allegations received as formal "referrals," thus completely precluding DHS investigation. For example, DHS received at least 16 child abuse/neglect allegations concerning GC's placement caregivers; more than half were not designated by DHS as "referrals" and therefore were not investigated. Numerous allegations of KT harming herself and injuring others were made to DHS; however, only rarely were such reports by DHS designated as referrals for investigation.

- failed to provide Comprehensive Home-Based Services (CHBS) to children in Trial Reunification placements. Such services provide frequent face-to-face private contact with the child in the placement by the CHBS case manager.[708] In JB's, AP's, and GC's Trial Reunification placements, their DHS workers failed to provide home-based services either at all (AP) or for the majority of the placement period (JB and GC).

**2) DHS failure to monitor and evaluate safety in children's placements, including Trial Reunification placements, *prior to the child's placement*.** Too often, the named plaintiff children's placements were not safe for any child in DHS custody or could be safe only under specified conditions, such as with very extensive monitoring to address risk factors already known to DHS. These included placements that had documented histories of neglect and/or abuse and/or of failing to comply with applicable Oklahoma statutes and DHS rules and policies, and placements in which the persons applying to become foster caregivers had extensive and serious histories of having been neglected and/or abused themselves or had other personal experiences that could predictably complicate their capacity to care safely for abused and

neglected children in DHS custody. Despite these known histories, DHS allowed these placements to be used for the named plaintiff children and other foster children, without adequate – let alone extensive – monitoring of the children's safety while in the placements.

To illustrate, *three* of JP's foster caregivers had documented histories of neglect and/or abuse as foster caregivers before DHS placed JP in their homes and, prior to placing RJ in one of his placements, information was available to DHS that the placement had previously received at least four referrals of child maltreatment and was on 90-day probation due to Confirmed Lack of Supervision. DHS placed GC in one home in which DHS had previously recommended that no foster children be placed and in another home with nine prior referrals of abuse/neglect. In addition, DHS placed JB, AP, and GC in dangerous and inappropriate Trial Reunifications without having taken the required steps to determine the safety and feasibility of the placements. As a result, all three children were abused and/or neglected in the placements.

**3) DHS' drastic shortage of placements for children in DHS custody**. The case files of the seven children reviewed contain many references to DHS' systemic shortage of foster homes. For example, DHS placed JA in three consecutive shelter placements in three counties for at least 82 days in 2007 because, as his DHS workers documented, no foster homes or kinship homes were available. When the judge subsequently ordered DHS to report on the number of moves JA had been subjected to and why DHS had not placed JA in a foster home earlier, DHS replied: "Basically it's because we have a shortage of foster home resources and had no opening to offer him to."[709] Similarly, DHS required GC to remain in a chaotic, dangerous placement even after the placement had requested GC's removal and DHS had received two referrals alleging physical abuse of GC in the home because DHS did not have even one shelter or foster home placement to move her: "they were all full."[710]

Due to the agency's extreme placement shortage, including both an insufficient number and range of placements for children in custody, DHS routinely and knowingly placed the seven named plaintiff children in dangerous and inappropriate placements. These included:

- foster family and kinship placements for which background checks of all persons in the home (including the parents' biological children), training of caregivers, and/or family assessments had not been completed prior to the child's placement; thus, the named plaintiff children were habitually placed in homes that had not yet been approved and/or certified.

- critically overcrowded emergency shelters and placements, in violation of DHS' own policies. Six of the seven named plaintiffs were repeatedly placed in shelters for periods of time that greatly exceeded the time limits permitted by agency policy. For example, JA was placed in four shelters in four different counties for a total of 89 days, 82 of these consecutive; RJ was placed in five shelter placements in three different counties for a total of 126 days; and KT was placed in six shelter placements for a total of 79 days. Moreover, documents in RJ's file state that the Laura Dester Emergency Shelter, in which he was placed three times, had daily census counts far surpassing the legal capacity and had children with stays of up to 159 days.[711] Shelter reports found in JP's case file document the Pauline E. Mayer Shelter was also routinely over capacity, with children placed for up to 107 days, often without *any* visitation by their DHS worker.[712]

- emergency and temporary placements, *e.g.*, Emergency Foster Care (EFC) and respite care placements that, by definition, require at least one additional placement change in a specific short period of time and therefore increase discontinuity in children's caregivers. KT was placed in four EFC placements for a total of 116 days and at least *53* respite care placements ranging in length from one to ten days.

Due to the drastic shortage of placements for children in DHS custody, children were also required to wait for the availability of an appropriate placement. KT was required to wait for a group home placement for *almost five months* because DHS had no such placement available. While KT waited for this placement, DHS placed her in a TFC home previously documented to be unsafe, two psychiatric facilities, and two shelters, one for 5 days and the second for 20.

**4) DHS failure to provide basic matching between the placement, treatment, and educational needs of children in DHS custody and the placements' willingness and ability to meet those needs**. The named plaintiff children's files document that DHS staff rarely made

*any* effort to match a child's needs with foster caregivers' or facilities' capacity to meet those needs. As stated in DHS policy, DHS workers are required "to determine whether a placement is an appropriate placement for a child in OKDHS custody."[713] Almost without exception, DHS placement decisions were based instead on hurried efforts to locate any available bed or slot in a home or facility.

As would be predicted, this approach to selecting children's placements resulted in an uncontrollably high level of placement disruptions. The number and average frequency of the seven named plaintiff's placement changes while in DHS custody were: JB, 4 placements with a move every 121 days; AP, 7 placements with a move every 81 days; JA, 10 placements with a move every 43 days; JP, 12 placements with a move every 53 days; RJ, 10 placements with a move every 120 days; GC, 18 placements with a move every 86 days; and KT, 28 placements with a move every 140 days. In her first 15 months in custody, DHS moved KT every 30 days. When moves to respite care placements are included, the number of placements for KT was 81, with a move every 49 days.

**5) DHS failure to document accurate information regarding children's safety and to present critical safety information to the court and other DHS staff.** Each time DHS workers failed to provide complete and accurate documentation of critical safety information to all persons involved in decision-making regarding the named plaintiff children's placements and services, they jeopardized the child's safety and well-being. For example, a change of placement form provided to JP's judge did not include information known to DHS that the placement change was made due to allegations of maltreatment in the home; JA's judge ruled that DHS failed to make reasonable efforts to finalize JA's permanency plan and place JA in a timely manner due to the agency's failure to provide JA's numerous placement change forms to the

court; DHS progress reports prepared for AP's court reviews failed to contain information regarding allegations of maltreatment by [redacted] in the placement; and DHS failed to identify KT's sexual abuse and did not bring it to the court's attention until 16 months after she entered custody.

**6) DHS failure to ensure that complete expert assessments of children's needs are conducted at the time of entry and throughout their stay in custody and that the recommendations made in these assessments are followed in DHS case decisions.** Without expert evaluations, DHS staff cannot fully assess the psychosocial functioning and health, mental health, placement, educational, and social needs of children in custody. When DHS workers fail to ensure that thorough evaluations are completed in a timely way, they inevitably rely on outdated, incomplete, and inadequate information in their decision-making regarding children's placements and other services. This results in unsuccessful, harmful placements, inconsistent and inadequate mental health treatment, and educational difficulties for children.

DHS failed to carry out its responsibility to provide an assessment of JA at the time of his placement; such an evaluation would have provided recommendations to assist DHS staff in developing his placement and treatment plans. Failing that, at a minimum, DHS should have ensured that JA was provided a complete psychological and/or psychiatric evaluation when his behaviors first begin to deteriorate in custody. JA's file documents his significant and rapid emotional and behavioral deterioration after his first six months in DHS custody, beginning in late July 2007. By mid-August, five-year-old JA, who previously had been described as "doing well"[714] and having "age typical and appropriate behavior,"[715] threatened to run away from the shelter, had temper tantrums, and cussed at shelter staff. By mid-September, JA tried to jump out of the school van so he could "go to heaven to see his mother."[716] In October, JA threatened to

harm himself; talked about dying; and had to be physically restrained. However, as of November 2007, DHS had failed to arrange a psychological and/or psychiatric evaluation for JA to assess his psychological, cognitive, and social needs and functioning. He had been in DHS custody for almost one year. Without such an evaluation, DHS staff members were unable to ensure an appropriate placement and treatment for JA that would protect him from harming himself and others, prevent his further emotional and behavioral deterioration, and support his stabilization.

Similarly, DHS failed to ensure that a psychological evaluation was completed early in JP's stay in custody. Had an evaluation of JP's needs been completed when he entered DHS custody rather than after four months, when DHS had already subjected JP to multiple placement changes and placement caregivers' inability to meet his needs, the evaluation findings could have guided placement planning. DHS would then have likely been able to avoid the unacceptable instability of JP's placements and his deterioration. DHS also failed to refer GC for psychological and/or psychiatric evaluations upon her entry into custody and throughout the entire four-year period under review, despite her history of serious sexual abuse and self-harm behaviors while in custody. As a result, GC was subjected to unsuccessful, harmful placements and inadequate treatment, which contributed to a deterioration in her mental health and several psychiatric hospitalizations.

By consistently failing to ensure the timely and thorough assessment of children's needs upon their entry into custody and throughout their stays in custody, DHS workers not only undermined children's recovery from prior trauma associated with their victimization, they also undermined DHS' ability to make appropriate placement matches and ensure that children's mental health and other services were appropriate and met children's needs. Moreover, this DHS failure undermined placement caregivers' ability to appropriately manage foster children's

behaviors and hindered the efforts of those serving children in other capacities, such as therapists, special education coordinators and speech therapists, to identify services that would meet children's special needs.

**7) Discontinuity of DHS workers and supervisors serving children and consistent absence of supervisory monitoring of worker accountability, indicating a severely overburdened workforce.** The seven children experienced a succession of workers as if the workers were coming and going through a revolving door. As of the date the named plaintiffs' complaint was filed (2/13/08), the seven children were assigned a total of 258 DHS workers and 227 DHS supervisors during their time in custody. The total number of DHS workers assigned to each child ranged from 13 to 97; the total number of DHS supervisors assigned to each child ranged from 12 to 88. The children were often moved from one placement to another by strangers – DHS staff members whom the children had never met and never saw again. When face-to-face contacts with children, caregivers, and children's parents occurred, they were made by multiple DHS workers and other DHS staff. This, and the extraordinarily high level of worker and supervisor turnover, point to a severely overburdened workforce.

This review found numerous problems associated with DHS staffing patterns. Frequent changes in DHS workers inevitably endangered these seven children while in DHS custody. Such changes created confusion regarding which DHS staff member had authority and was responsible for decisions regarding the child. They resulted in superficial, erroneous, and often no communication; lengthy delays in services and information transfer; and serious errors in responses to children's needs for protection and other services. High worker turnover also contributes to insufficient worker training and experience, another very serious problem identified throughout the children's case files. This review documents insufficient worker

training regarding *all* aspects of their roles and responsibilities in caring for the foster children assigned to them. In addition, the staffing system used by DHS is not clear with regard to case transfer and assignment; accountability of workers and supervisors for required contacts to children in their placements and planning parent-child visits; and accountability for intra-agency, DHS-court, and inter-agency communication regarding concerns about a child's safety and well-being and coordination of children's placement services.

As discussed in each child's case analysis, the children's case files also fail to document regular, ongoing supervision of DHS workers. A lack of DHS workers' accountability is evident in the workers' extensive failures to carefully screen and match placements with children's needs; make required face-to-face contacts to monitor children's safety and well-being in placement; meet privately with children about requests for placement changes and their treatment in particular placements; respond to observable indicators of harm or of risks of harm to children in their placements; follow through on recommended and/or required follow-up when referrals were screened out; designate allegations received by DHS workers about children's placement caregivers as formal abuse/neglect "referrals;" and complete investigations and case documentation as required by DHS policy. The serious, persistent lack of accountability of DHS workers and supervisors further compounded the dangerous agency environment within which these seven children were placed while in state custody.

**8) DHS failure to provide basic permanency planning services.** DHS policy states that, "[t]he purpose of permanency planning is to ensure the child has a plan that addresses the child's immediate and long-term needs for safety, wellbeing, and permanency."[717] Pike et. al. (1977) clarify the meaning of permanence for children in custody: "*Permanence* describes *intent*. A permanent home is not one that is guaranteed to last forever, but one that is *intended* to exist

indefinitely. When the expectation of permanence is lacking, a child experiences doubt, uncertainty, and hesitancy. Permanency planning means . . . keeping alive a plan for permanency"[718] (emphasis in original). Pike et. al. also stress that in achieving permanency for children, the public agency social worker has "the central and indispensable role of coordinating the activities of [foster parents, parents, and others involved in the child's daily care] and service agencies."[719]

In the seven named plaintiffs' cases, DHS workers often failed to keep alive a plan for permanency or apply even the most basic permanency planning principles in their practice. For example, DHS workers:

- consistently failed to complete critical aspects of parents' assessments, particularly parents' psychological evaluations, for a year or more, if at all. Permanency planning requires completing an *immediate* assessment of the conditions that required a child's removal from the home, conditions that must therefore be resolved for a child to be safely reunited with his or her family.[720] These preventable delays in accurate assessment of parents' problems precluded the development of treatment plans grounded in the reality of all of the conditions that contributed to a child's placement.

- failed to make timely decisions regarding children's permanency. For example, a family with whom KT was placed and thriving wanted to adopt her; however, they requested that KT be moved from their home due to the length of time DHS was taking to make a decision regarding KT's adoption. Even though as of 5/20/00 KT was legally free for adoption, DHS had not yet identified a prospective adoptive family for her as of 2/13/08.

- failed to follow agency requirements regarding the completion of assessments of prospective adoptive homes prior to placing the child. To illustrate, GC was placed or required to have extensive weekend visits with three pre-adoptive families *before* DHS had completed required assessments to ensure that the family was qualified and prepared to care for and protect GC. She was removed from one pre-adoptive placement after two weeks because an adoptive home assessment, completed after DHS had placed GC in the home, revealed sexual abuse by the prospective adoptive father, which he then admitted. Consequently, GC suffered the serious emotional impact of the adoption disruption, subsequent placement changes, and further delays in achieving permanency.

- failed to consider the impact of placing children in families that were not willing or able to provide a permanent home for the child. For example, DHS placed JA in a kinship home although it was aware of existing tensions and knew that the placement was "doomed . . . from the start."[721] Likewise, DHS continued to place KT for *three years* in

a TFC home that had decided not to adopt her, contributing to the agency's failure to achieve permanency for KT.

## Harms to Children in DHS Custody

The systemic deficiencies and failures suggested by the review of the seven named plaintiff children's files are widely recognized to inevitably result in damage to children. These harms include:

**1) Neglect, physical abuse, and sexual abuse while in DHS custody.** The trauma children suffer as a result of being maltreated by their caregivers and placed in protective custody is exacerbated if, while in custody, they are placed with families, facilities, and/or Trial Reunifications in which they are subsequently maltreated. As detailed in this report, the trauma of repeated child abuse and/or neglect while in DHS custody was experienced by six of the named plaintiffs whose cases were reviewed.

Guterman and Taylor (2005) provide an extensive review of the problems associated with child maltreatment, including developmental, medical, cognitive and language deficits, and emotional problems; they describe the emotional problems as "increased anxiety, depression, post-traumatic stress, low self-esteem, suicidal ideation and behavior, and problems with self-regulation of emotions."[722] They stress that children who are maltreated are at "heightened risk for developing multiple sociobehavioral problems, including difficulties with social relationships and developing trust and attachments . . . increased aggression, and externalizing behavior."[723] As adults, maltreated children are also more likely to be involved in criminal activities.[724] The case files of JB, AP, JP, RJ, GC, and KT document, without a doubt, the destructive life-altering consequences of the traumatic maltreatment to which they were subjected while in DHS custody.

**2) Deprivation of continuous caregivers due to an unconscionably high level of placement changes.** The frequent, poorly managed, and often avoidable movement of the seven named plaintiff children from one home or facility to another invariably inflicted severe emotional harm on these children. It is widely recognized that a fundamental principle underlying permanency planning practice and policy is that "all children need a stable and continuous relationship with a nurturing person or persons, in order to develop physically, socially, and emotionally, intellectually, and morally."[725] Typically, parent-child attachments are formed through an ongoing process between children and their primary caregiver(s).[726] Insufficient continuity, mutuality, and stability in caregiver-child relationships interfere with the development of the children's capacity for healthy attachment.

Changes in children's placements while in custody create discontinuity in caregivers and thus severe disruptions in infants' and children's lives. Placement changes by definition interfere with continuity, mutuality, and stability in children's relationships with their caregivers. When placement changes are numerous and frequent, such as those experienced by all seven named plaintiff children, they create an intolerable level of caregiver discontinuity, accompanied by chronic grief, development regression, and other developmental and emotional problems. Bowlby (1969, 1973 and 1980)[727] and Goldstein, Freud, and Solnit (1973)[728] warn about the negative and often long-lasting consequences of separating children from their caregivers. As a consequence of placement instability and caregiver discontinuity, a foster child's already damaged trust in adults to provide care and protection is further betrayed and the child's fragile ability to form attachments and relationships further deteriorates.

Research has confirmed that placement instability, such as that experienced by all seven children whose placement experiences are reviewed in this report, is associated with negative

outcomes in children's ability to form positive connections with people, overall educational achievement, and mental health needs.[729] A recent study also found "placement instability, independent of a child's problems at entry into care, can influence well-being for children in out-of-home care . . . those children who failed to achieve placement stability were estimated to have a 36% to 63% increased risk of behavioral problems compared with children who achieved any stability in foster care."[730] With each placement change, these negative consequences were consistently found and observed to escalate in the seven named plaintiff children.

**3) Lengthy, often repeated placements in overcrowded and poorly supervised shelters.** Children experiencing lengthy and/or repeated placements in crowded and poorly supervised shelters also by definition experience caregiver discontinuity. Shelters provide day-to-day care to children by rotating staff members who have limited time and attention for individual children; shelter staff also may not have sufficient training to respond appropriately to maltreated children's needs. DHS policy requires limits on the length of shelter placements for foster children because lengthy and repeated placement in shelters is always harmful to infants and children.

**4) Superficial relationships with DHS workers, leading to lack of disclosure and inevitably increased risk of harm.** In addition to the harm of service discontinuity associated with frequent changes in workers assigned to children, these changes also greatly undermine the development of relationships between children and their workers. Each change in the worker or other staff member who maintains face-to-face contact with the child interrupts the relationship that the child is developing with their previously assigned worker and negatively affects the degree of disclosure and accuracy of information achieved in worker-child conversations. When the safety and well-being of children in care are monitored either sequentially or concurrently by

numerous workers and other staff with multiple levels of authority and varied degrees of training and experience, the information derived from workers' face-to-face contacts with children is likely to be very limited. Under such conditions, the agency's ability to protect children in custody is predictably greatly undermined.

For example, children tire of telling their stories over and over to strangers, and thus, over time, may cease to answer a second, or third, or fourth worker's questions. A relationship between children in custody and their workers is necessary for children to feel sufficiently safe with the worker to disclose difficulties they are experiencing in placement, including maltreatment. JB, AP, JA, JP, RJ, GC, and KT almost without exception disclosed their mistreatment and maltreatment in custody to someone other than their DHS workers. In many instances, this may have occurred because their workers failed to make the required contact that would have permitted disclosure. Without counselors and teachers, the children would have had no one to tell.

**5) Harmful deterioration in well-being and development due to lack of necessary services, including assessments, psychological evaluations, speech therapy, and special education**. DHS consistently either delayed in providing services to JB, AP, JA, JP, RJ, GC, and KT or failed to provide services that had been recommended, often repeatedly. A careful reading of the children's detailed placement experiences reveals deterioration in their educational performance, troublesome behaviors, and emotional distress. DHS failure to provide them consistent counseling, timely psychological evaluations, assessments of their cognitive abilities and educational needs, as well as other needed services, such as speech therapy, contributed to increasingly negative short- and long-term outcomes rather than to their recovery and healing

from the trauma each had experienced prior to entering DHS custody, and unfortunately, from the trauma each experienced while in DHS custody.

**Conclusion**

It is critical to remember that the focus of the initial review was five young children who entered DHS custody as a newborn (JB), two-year-old (AP), four-year-old (JA), six-year-old (JP), and eight-year-old who re-entered custody after having first entered custody as a three-year-old (RJ). The focus of the supplemental review was two vulnerable children who entered DHS custody as a five-year-old (KT) and nine-year-old (GC). All seven of these children suffered harm in their dangerous DHS placements and in their abandonment by DHS workers and supervisors prior to, during, and following their maltreatment in their placements. The purpose of these placements was to keep the children safe. However, for none of the children in either the initial or the supplemental review was that the case. When attempting to describe the children's harm and suffering, the words that come to mind are incomprehensible, unimaginable, outrageous, and immoral.

Had DHS provided the children with safe and monitored family placements that met their needs and provided stability, rather than disruptions that caused immense discontinuity in their relationships with caregivers and others, the children could have experienced security rather than anxiety, fear, rage, and depression. Had DHS provided each child with one or even two workers, rather than an endless succession of strangers, with whom the child could have had a predictable, trusting relationship and who would have been consistently available, fully assessed the child's needs, and provided placements with the capacity to meet those needs, the life-altering

destructive consequences of DHS' all-encompassing failure to protect these seven children almost certainly could have been prevented.

DHS perhaps could not have prevented the maltreatment to which these children were subjected prior to entering the agency's custody. But these seven children's tragic and painful stories, told in the pages of their DHS case files about their stays in DHS custody, need not have been written. These tragic stories were wholly preventable.

Peg McCartt Hess, Ph.D., A.C.S.W.
Independent Child Welfare Consultant

February 25, 2010

## Endnotes

---

[1] These policies might vary slightly from the time the two children came into DHS custody.
[2] GC-[redacted]2 00495
[3] KT-[redacted]7 00670-671
[4] [redacted]000043
[5] OAC 340:75-3-1 (b)
[6] GC-[redacted]2 00495
[7] GC-JCF 1 00184
[8] GC-KIDS 01774-1854, 01777
[9] GC-KIDS 01778
[10] GC-KIDS 01851
[11] GC-KIDS 02528
[12] GC-KIDS 01778, 01784
[13] GC-KIDS 01804, 01806
[14] GC-KIDS 02430
[15] GC-[redacted] 00337; GC-KIDS 02445
[16] GC-KIDS 01779
[17] [redacted]000155
[18] GC-[redacted]2 00495
[19] GC-JCF 1 00017
[20] Ibid.
[21] GC-KIDS 02539
[22] GC-KIDS 01839
[23] GC-JCF 1 00017
[24] GC-JCF 1 00285
[25] GC-OPPC 02427
[26] GC-KIDS 01774
[27] GC-KIDS 01851
[28]GC-JCF 1 00526
[29] GC-KIDS 00300-304, 02003-2013, 02015-2023, 01661-1675, 01678-1695
[30] GC-KIDS 02025-2049, 01575-1588, 01589-1603, 00305-336, 01618-1660; GC [redacted] 1 00006-13
[31] GC-KIDS 01509-1512, 01513-1531, 01532-1547, 01548-1574
[32] GC-KIDS 01697-1734
[33] GC-KIDS 01987-2002
[34] GC-KIDS 01512
[35] GC-KIDS 01509-1512
[36] GC-KIDS 01509
[37] GC-OPPC 00580
[38] GC-KIDS 01513-1531
[39] GC-KIDS 01530
[40] GC-KIDS 01513
[41] GC-KIDS 01532-1547
[42] Ibid.

---

[43] GC-KIDS 00300
[44] GC-KIDS 01987-2002
[45] GC-KIDS 02001
[46] GC-KIDS 01996
[47] GC-KIDS 02003-2013
[48] GC-KIDS 02015-2023
[49] GC-KIDS 01548, 01556
[50] GC-KIDS 01548
[51] GC-KIDS 01548-1574
[52] GC-KIDS 02025-2049
[53] GC-KIDS 01575-1588
[54] GC-KIDS 01589-1617
[55] GC-KIDS 00305-336; GC [redacted] 1 00014-26
[56] GC-KIDS 01618-1660
[57] GC-KIDS 01584
[58] GC-KIDS 01597, 01599, 01601
[59] GC [redacted] 1 00019-23
[60] GC-KIDS 01626, 01629, 01631
[61] GC-KIDS 01597, 01599, 01601
[62] GC-KIDS 01627, 01630, 01632
[63] GC-KIDS 01663
[64] GC-KIDS 01661-1676
[65] GC-KIDS 01661
[66] GC-KIDS 01678-1695
[67] GC-KIDS 01681
[68] GC-KIDS 01678
[69] GC-KIDS 01697-1734
[70] GC-KIDS 01697, 01718
[71] GC-LDES 1 00001-70
[72] OAC 340:75-7-262 [as of 2/13/08]
[73] GC-LDES 1 00067
[74] GC-LDES 1 00053
[75] GC-LDES 1 00063
[76] GC-LDES 1 00070
[77] GC-JCF 1 00268-269
[78] GC-KIDS 00214
[79] GC [redacted] 1 00005; GC-KIDS 00214
[80] GC-KIDS 2 00119-122
[81] GC-[redacted] CW 00001-496
[82] GC-[redacted] CW 00171, 00459-461
[83] GC-[redacted] CW 00171
[84] GC-[redacted] CW 00173
[85] GC KIDS 00214
[86] GC-KIDS 00214, 01855-1868, 02133-2181
[87] GC-[redacted] CW 00174

---

88 GC-OPPC 00698-700, 00610-611, 00590-593, 00580
89 GC [redacted] CW 00120
90 GC-KIDS 00810
91 Ibid.
92 GC-OPPC 01008
93 GC-KIDS 7 00586
94 GC-KIDS 00927
95 GC-KIDS 7 00592
96 GC-KIDS 01855-1868
97 GC-KIDS 01857
98 GC-KIDS 01855
99 GC-KIDS 00903
100 GC-KIDS 02133-2181
101 GC-KIDS 02149
102 GC-KIDS 02133, 02181
103 GC-KIDS 00798
104 GC-OPPC 02113
105 GC-OPPC 01902
106 GC-JCF 1 00530
107 GC-OPPC 01008
108 GC-KIDS 00429, 01054, 00858, 00852, 00849, 00846, 00843, 00837, 00834, 00831, 00828, 00558
109 GC-KIDS 00339-345
110 GC-KIDS 00831
111 GC-KIDS 00903
112 GC-[redacted] CW 00003, 00064, 00396
113 GC-[redacted] 1 00005; GC-KIDS 00214
114 GC-[redacted] CW 00003, 00064, 00396
115 GC-[redacted] CW 00064
116 GC-KIDS 00489
117 GC KIDS 00215
118 GC-KIDS 00741
119 GC-KIDS 00735
120 GC-KIDS 00729, 00732
121 GC-JCF 1 00499
122 GC-KIDS 00732
123 GC-JCF 1 00500
124 GC-KIDS 00480
125 GC-KIDS 00477
126 GC-KIDS 7 00486, 00864-865, 00867-868, 01008-1009
127 GC-JCF 1 00008-9
128 GC-OPPC 00132, 00227, 00308
129 GC-[redacted] CW 00003
130 Ibid.
131 GC-KIDS 00215; GC [redacted] CW 00481

---

[132] www.okdhs.org, OAC 340: 75-3-8.1, Instructions to Staff 3(1)(B)
[133] GC-[redacted] CW 00003
[134] www.okdhs.org, OAC 340: 75-6-31, Instructions to Staff 2
[135] Hess, P. (2009) D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* p. 14
[136] Hess, P. (2009) D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* p. 15
[137] OAC 340:75-6-31 (h)(3)
[138] GC-JCF 1 00576-580
[139] GC KIDS 00215, 00477
[140] www.okdhs.org, OAC 340: 75-6-48, Instructions to Staff 2, 4
[141] GC-KIDS 00984
[142] Hess, P. (2009) D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* pp. 18-19
[143] Hess, P. (2009) D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* pp. 18-19
[144] GC-KIDS 00106
[145] Hess, P. (2009) D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* p. 17
[146] GC-KIDS 7 02114
[147] GC-KIDS 01870-1883, 01885-1897
[148] GC-KIDS 00717; GC-OPPC 02366
[149] GC-KIDS 01870-1883
[150] GC-KIDS 01872
[151] GC-KIDS 01870
[152] Ibid.
[153] GC-KIDS 00717
[154] Ibid.
[155] Ibid.
[156] Ibid.
[157] GC-KIDS 00978-979
[158] Ibid.
[159] GC-OPPC 02358
[160] GC-KIDS 00984
[161] GC-OPPC 02364-2366
[162] GC-KIDS 00978
[163] GC-KIDS 7 00964-965
[164] OAC 340:75-6-48 (a)(8)
[165] GC-KIDS 00358; GC-OPPC 02356
[166] Ibid.
[167] Ibid.
[168] GC-KIDS 7 02116, 02118
[169] GC-OPPC 02366
[170] GC-KIDS 01885-1897
[171] GC-KIDS 01885
[172] GC-KIDS 7 00970
[173] GC-JCF 2 00014
[174] Ibid.
[175] Ibid.
[176] GC-JCF 2 00012

---

177 GC-KIDS 7 00970
178 GC-JCF 2 00011-14
179 GC-JCF 2 00014
180 GC-JCF 2 00006
181 GC-JCF 2 00003, 00004; GC-JCF 7 00003
182 GC-JCF 2 00012
183 Ibid.
184 GC-KIDS 00681
185 GC KIDS 00684
186 Ibid.
187 Ibid.
188 GC-OPPC 02304-2305
189 GC-KIDS 00215; GC [redacted] 1 00005
190 GC-KIDS 00215
191 Ibid.
192 GC-[redacted] 1 00111-24
193 GC-[redacted] 1 00114, 00115
194 GC-[redacted] 1 00168
195 Placed alone in home until GC-KIDS 02305
196 GC-JCF 9 00010
197 [redacted] 000020; GC KIDS 02295
198 Ibid.
199 GC-KIDS 02286-2324
200 GC-[redacted] 00091
201 GC-[redacted] 00077
202 GC-KIDS 02305; GC-[redacted] 00075
203 GC-[redacted] 1 00234
204 GC [redacted] 1 00227-228, 00234-235
205 GC-KIDS 02350
206 GC-KIDS 02336-2365
207 GC-KIDS 02336
208 GC-[redacted] 00051
209 GC-OPPC 01424
210 GC-KIDS 02366-2399
211 Ibid.
212 GC-KIDS 02399
213 GC-[redacted] 4 00432
214 GC-[redacted] 00016
215 GC-[redacted] 00019
216 GC-[redacted] 00003
217 GC-[redacted] CW 00271
218 GC-[redacted] CW 00147
219 GC-[redacted] CW 00004-5, 00011-14
220 GC-[redacted] CW 00001, 00141
221 GC-[redacted] CW 00141

222 GC-[redacted] CW 00059-60
223 GC-[redacted] CW 00144
224 GC-[redacted] CW 00038
225 GC-[redacted] 4 00440
226 GC-[redacted] 4 00438
227 GC-[redacted] 4 00516
228 GC-[redacted] CW 00271
229 Ibid.
230 GC-[redacted] 4 00077
231 GC-[redacted] 4 00094
232 GC-[redacted] 4 00081
233 GC-[redacted] 4 00914
234 GC-[redacted] 4 00913
235 GC-[redacted] 4 00912
236 GC-[redacted] 4 00911
237 GC-[redacted] 4 00058
238 OAC 340:75-8-6 (12)(A)
239 GC-KIDS 00546
240 GC-KIDS 00531
241 GC-JCF 1 00468
242 Ibid.
243 GC-JCF 9 00010
244 GC-[redacted] 1 10005
245 GC-[redacted] 1 10006
246 GC-[redacted] 1 10009
247 GC-KIDS 00216
248 GC-[redacted] 4 00058
249 GC-[redacted] 1 00016
250 GC-[redacted] 1 00018
251 GC-[redacted] 1 00023
252 GC-JCF 00009-10
253 GC-[redacted] 1 00016
254 GC-[redacted] 1 00126
255 GC-[redacted] 1 00082
256 Ibid.
257 Ibid.
258 GC-[redacted] 1 00120
259 GC-[redacted] 4 00371
260 GC-[redacted] 1 00161
261 [redacted] 000180; GC-[redacted] 1 00393
262 [redacted] 000180
263 GC-[redacted] 1 00393
264 GC-JCF 9 00026
265 GC-JCF 9 00023-24
266 GC-JCF 9 00023

267 GC-KIDS 00216; [redacted]00191
268 GC-[redacted] 1 00227-228
269 [redacted]000238
270 GC-JCF 1 00341; GC-[redacted] 4 00957
271 Ibid.
272 GC-JCF 1 00351
273 Ibid.
274 Ibid.
275 GC-KIDS 00096
276 Ibid.
277 GC-[redacted] 4 00528
278 GC-[redacted] 4 00957
279 GC-JCF 1 00341
280 Ibid.
281 GC [redacted] 4 00528
282 GC-JCF 1 00340
283 GC-[redacted] 2 00019-22
284 GC-[redacted] 00010
285 GC-JCF 1 00335
286 [redacted]000236
287 GC-KIDS 00379
288 Ibid.
289 Ibid.
290 GC-KIDS 00376, 00379
291 GC KIDS 00376
292 [redacted]000236
293 GC-KIDS 00376
294 Ibid.
295 Ibid.
296 GC-JCF 1 00326
297 Ibid.
298 GC-[redacted] CW 00082-85
299 GC-[redacted] CW 00084
300 GC-JCF 1 00326
301 Ibid.
302 GC-JCF 1 00334-337; GC KIDS 00337
303 GC-[redacted] 4 00410
304 GC-[redacted] 4 00414
305 Ibid.
306 Ibid.
307 [redacted]000138
308 Ibid.
309 GC [redacted] 4 00410
310 GC-KIDS 01051
311 [redacted]000259

312 [redacted]000257
313 GC-KIDS 01018
314 [redacted]000248
315 GC-[redacted] CW 00210
316 GC-[redacted] CW 00209
317 GC-[redacted] CW 00208
318 [redacted]000251
319 Ibid.
320 GC-LDES 2 00001-25
321 GC-LDES 2 00013
322 GC-LDES 2 00011
323 GC-KIDS 00216
324 GC-KIDS 01045
325 GC-[redacted] 2 00001
326 GC-[redacted] 1 00032
327 GC-[redacted] 2 00008
328 GC-[redacted] 2 00008, 00025, 00031
329 GC-KIDS 01045
330 GC-KIDS 01096
331 Ibid.
332 GC [redacted] 2 00008
333 GC-KIDS 01096
334 GC [redacted] 2 00017
335 GC [redacted] 2 00495-499, 498
336 GC-[redacted] 2 00004
337 [redacted]000182
338 Ibid.
339 Ibid.
340 [redacted]000264
341 GC-[redacted] 2 00007
342 GC-[redacted] 2 00495
343 GC-[redacted] 2 00031
344 GC-[redacted] 2 00032
345 GC-[redacted] 2 00417-418
346 GC-[redacted] 2 00538
347 Ibid.
348 GC-[redacted] 2 00537
349 GC-[redacted] 2 00537-539
350 GC-[redacted] 2 00430
351 Ibid.
352 Ibid.
353 Ibid.
354 GC-JCF 1 00202
355 GC-JCF 1 00472-475
356 GC-JCF 1 00008-9

---

[357] GC-[redacted] 00011
[358] GC-[redacted] 00013
[359] Worker assignment chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[360] GC-KIDS-5 00019-39
[361] Ibid.
[362] OAC 340:75-1-2 (b)
[363] OAC 340:75-6-85 (i)
[364] OAC 340:75-1-2 (b)(7)
[365] OAC 340:75-8-1 (c)(3)
[366] OAC 340:75-8-1 (c)(3)(A)-(D)
[367] OAC 75-8-9 (a)(5)
[368] OAC 75-8-9 (c)
[369] OAC: 75-8-7 (b)
[370] www.okdhs.org, OAC 340: 75-8-7, Instructions to Staff 1(1)
[371] www.okdhs.org, OAC 340:75-8-7, Instructions to Staff 1.2(A)-(D)
[372] OAC 340:75-8-8 (a)(4)
[373] www.okdhs.org, OAC 340:75-8-13, Instructions to Staff 2.2, 2.11, 2.17
[374] OAC 340:75-3-8.1 (b)
[375] GC-KIDS 00358; GC-OPPC 02356
[376] Ibid.
[377] GC-OPPC 02366
[378] GC-JCF 2 00014
[379] GC-OPPC 02304-2305
[380] GC [redacted] 4 00155
[381] GC-KIDS 00495
[382] [redacted] 000263; [redacted] 000158; GC-OPPC 01424; GC-JCF 1 00468
[383] [redacted] 000257
[384] OAC 340:75-6-48 (a)(2)
[385] GC-[redacted] 2 00538
[386] Ibid.
[387] GC-[redacted] 2 00539
[388] Andreasen, N. & Black, D. (2001). *Introductory Textbook of Psychiatry (3rd Edition)*. American Psychiatric Publishing, Inc: Arlington, VA, p. 339.
[389] *American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, (DSM IV) Text Revision*. (2000). American Psychiatric Association: Washington, DC, p. 464.
[390] Ibid.
[391] GC-[redacted] 2 00495
[392] Cornell Research Program on Self-Injurious Behavior in Adolescents and Young Adults. *What do we know about self-injury?* Cornell University Life Development Center. http://www.crpsib.com/whatissi.asp, p. 3. Retrieved 2/17/2010.
[393] Ibid., pp. 3-4; Cutter, D., Jaffe J., & Segal, J.(2008). *Cutting and Self-Injury.* http://www.helpguide.org/mental/self_injury.htm, pp. 3-4. Retrieved 2/17/2010.
[394] van der Kolk, B., Perry J., & Herman, J. (1992). Childhood origins of self-destructive behavior. *American Journal of Psychiatry*, *149* (9): 1280-1281.

[395] GC-KIDS 01051
[396] GC-JCF 1 00017
[397] GC-JCF 2 00003, 00004; GC-JCF 7 00003
[398] GC-[redacted] 4 00528
[399] Hess, P. (2009) D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* p.15
[400] OAC 340:75-8-11 (c)(1); www.okdhs.org, OAC 340:75-8-13, Instructions to Staff 2.4
[401] www.okdhs.org, OAC 340: 75-6-48, Instructions to Staff (2)(d)
[402] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff 4
[403] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff 4; www.okdhs.org, OAC 340:75-6-48, Instructions to Staff 2(a)
[404] OCA 340:75-6-31.3 1 (b), (f)(4)
[405] www.okdhs.org, OAC 340:75-6-85.1, Instructions to Staff 1
[406] Ibid.
[407] OAC 340:75-3-8.1 (a)(2)
[408] Ibid.
[409] See pp. 13, 16, 18, 19, 21, *supra.*
[410] Hess, P. (2009). D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* pp. 87, 117-118
[411] Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
[412] KT-Shadow 7 00670-671
[413] KT-[redacted] 00257
[414] KT-KIDS 02350
[415] KT-KIDS 02349
[416] Ibid.
[417] KT-OPPC 04063
[418] KT-KIDS 02349
[419] KT-KIDS 04023; KT-OPPC 04063
[420] KT-KIDS 04077
[421] KT-OPPC 04063
[422] KT-KIDS 02369; KT-PMS I 00102-104
[423] KT-OPPC 04063
[424] KT-KIDS 02346
[425] KT-KIDS 02354-2357
[426] KT-OPPC 04063
[427] KT-KIDS 02365
[428] KT-KIDS 02349, 02365
[429] KT-KIDS 02366
[430] KT-KIDS 02271-2277, 02278-2301, 02302-2322, 00479-501, 02323-2345
[431] KT-KIDS 02271-2277
[432] KT-KIDS 02278-2301
[433] KT-KIDS 02286
[434] KT-KIDS 02278, 04050
[435] KT-KIDS 02309-2322
[436] KT-KIDS 02305

---

437 KT-KIDS 04056
438 KT-KIDS 02309-2322
439 KT-KIDS 00479-501
440 KT-KIDS 00493-494
441 KT-KIDS 02323-2345
442 KT-KIDS 02339
443 Ibid.
444 KT-KIDS 02332-2341
445 KT-PMS I 000102-104
446 KT-PMS I 00137
447 KT-[redacted] 00047
448 Ibid.
449 KT-KIDS 04078-4088
450 KT-KIDS 04083
451 KT-[redacted] 00038
452 KT-OPPC 05427
453 KT-[redacted] CW 00571-580
454 KT-[redacted] CW 00567
455 KT-PMS I 00079
456 KT-OPPC 05409
457 KT-OPPC 02206
458 KT-OPPC 04244
459 KT-OPPC 02229
460 KT-OPPC 04250
461 KT-OPPC 05424
462 Ibid.
463 KT-OPPC 05426
464 KT-KIDS 7 00168
465 KT-KIDS 00545
466 KT-OPPC 02210
467 KT-KIDS 7 00407
468 KT-[redacted] CW 00567
469 KT-[redacted] CW 00484-487
470 KT-[redacted] CW 00514-515
471 KT-[redacted] CW 00514
472 Ibid.
473 KT-[redacted] CW 00507
474 KT-KIDS 02377
475 Ibid.
476 KT-KIDS 02375-2385
477 KT-KIDS 02389
478 Ibid.
479 KT-KIDS 02387
480 KT-PMS I 00154
481 KT-KIDS 01704

---

482 OAC 340:75-10-9 (b)(2)
483 KT-JCF 00202
484 KT-KIDS 00322
485 KT-JCF 00353-355, 00321-322
486 KT-KIDS 02415-2442
487 KT-KIDS 02418
488 Ibid.
489 KT-KIDS 02430
490 KT-KIDS 02429, 02431
491 KT-KIDS 02433
492 Ibid.
493 KT-KIDS 02441
494 KT-KIDS 02451-2469
495 KT-KIDS 02467
496 KT-KIDS 02451
497 KT-KIDS 02495-2574
498 KT-KIDS 7 03073
499 KT-KIDS 02512
500 KT-JCF 00217, 00215
501 KT-JCF 00216
502 KT-JCF 00215
503 KT-JCF 00216
504 Ibid.
505 KT-JCF 00217
506 KT-JCF 00118-121
507 OAC 340: 75-8-11 (b), (b)(1)
508 KT-[redacted] 7 00038; KT-OPPC 04691
509 KT-[redacted] 1 00056
510 KT-[redacted] 1 00015
511 KT-[redacted] 2 00130
512 KT-[redacted] 2 00118
513 KT-OPPC 01789
514 KT-[redacted] 7 00845
515 KT-OPPC 01737
516 Ibid.
517 KT-OPPC 01789
518 Ibid.
519 KT-OPPC 01701
520 KT-OPPC 01701-1702
521 Ibid.
522 KT-[redacted] 7 00672-673
523 KT-[redacted] 7 00674
524 KT-OPPC 00002
525 KT-OPPC 03744; KT-[redacted] 7 00399
526 KT-OPPC 03744

[527] KT-OPPC 03744
[528] KT-OPPC 03747
[529] KT-[redacted] 7 00395, 00397
[530] KT-[redacted] 2 00502
[531] KT-OPPC 01661
[532] KT-OPPC 03149
[533] KT [redacted] 7 00038-40; KT-OPPC 01638, 01640-1641
[534] KT-OPPC 00368, 00372
[535] KT-[redacted] 7 00040
[536] KT-OPPC 00497
[537] KT-[redacted] 7 00673
[538] KT-OPPC 00367-368
[539] KT-OPPC 00368
[540] KT-OPPC 00497-498
[541] KT-[redacted] 3 00178
[542] KT-OPPC 00498
[543] KT-[redacted] 7 00840
[544] KT-OPPC 00698
[545] KT-OPPC 02485
[546] KT-JCF 00791-792
[547] KT-OPPC 00264
[548] KT-[redacted] 7 02456, 02461, 02465, 02469, 02471, 02473, 02475, 02477
[549] KT-OPPC 00264
[550] KT-[redacted] 00274
[551] KT-[redacted] 00020
[552] KT-[redacted] 7 00670-671
[553] KT-OPPC 00264
[554] KT-[redacted] 7 02483
[555] KT-[redacted] 7 00041
[556] KT-OPPC 02723
[557] Ibid.
[558] KT-[redacted] 7 00391
[559] KT-OPPC 02902
[560] KT-OPPC 02745
[561] KT-[redacted] 00036
[562] KT-[redacted] 00647
[563] KT-[redacted] 7 00195
[564] KT-[redacted] 7 00199
[565] Ibid.
[566] KT-OPPC 01438, 01479
[567] KT-[redacted] 2 00096
[568] KT-OPPC 00863-864
[569] KT-OPPC 00865; KT-[redacted] 7 00955-957
[570] KT-OPPC 01539
[571] KT-OPPC 00861

572 KT-[redacted]7 00814
573 KT-OPPC 00862
574 KT-[redacted]7 00042
575 KT-OPPC 02275
576 Ibid.
577 Ibid.
578 KT-[redacted]7 00930
579 KT-[redacted]2 00081
580 KT-[redacted]2 00082
581 KT-KIDS 04244-4247
582 KT-KIDS 04249
583 Ibid.
584 KT-KIDS 04245
585 KT-KIDS 04248-4249
586 KT-[redacted]2 00599
587 KT-KIDS 04009-4018
588 KT-KIDS 04013
589 KT-KIDS 04017
590 KT-[redacted]7 00625
591 KT-[redacted]7 00807
592 KT-[redacted]7 00797
593 Ibid.
594 KT-[redacted]2 00069
595 KT-OPPC 05240
596 Ibid.
597 KT-OPPC 01199
598 Ibid.
599 KT-OPPC 00084
600 KT-OPPC 00070
601 KT-[redacted]2 00801
602 KT-[redacted]7 00788
603 Ibid.
604 Ibid.
605 KT-[redacted]7 00787-788
606 KT-[redacted]7 00787
607 KT-[redacted]7 00790
608 Ibid.
609 KT-KIDS 01350, 00236
610 KT-KIDS 00236
611 KT-[redacted]1 00077
612 KT-[redacted]1 00038-42, 00044-47
613 KT-OPPC 02932
614 KT-[redacted]2 00414-540
615 KT-[redacted]00015-22
616 KT-[redacted]00021

---

617 For example, KT-[redacted] 2 00229
618 KT-[redacted] 2 00289, 00330, 00366, 00392
619 KT-[redacted] 2 00270, 00615
620 KT-[redacted] 00021
621 KT-KIDS 00314
622 Ibid.
623 KT-OPPC 00116
624 KT-[redacted] 2 00250, 00522, 00531
625 KT-[redacted] CW 00076
626 KT-[redacted] CW 00045
627 [redacted] 000043
628 KT-[redacted] CW 00046, 00050
629 KT-[redacted] CW 00053-54
630 KT-[redacted] 2 00317
631 [redacted] 000043
632 Ibid.
633 KT-[redacted] 00473
634 KT-[redacted] 00474
635 Ibid.
636 KT-KIDS 01004, 01007, 01022, 01025, 01037, 01040, 01128, 01137, 01140, 01143, 01146, 01149, 01542
637 KT-[redacted] 00474
638 KT-KIDS 7 02974
639 [redacted] 000062
640 Ibid.
641 KT-KIDS 00322
642 Ibid.
643 KT-OPPC 05288
644 KT-JCF 00202
645 KT-KIDS 02415-2442
646 KT-KIDS 02430
647 KT-KIDS 02495-2473
648 KT-KIDS 02512
649 KT-JCF 00202
650 KT-JCF 00118-121
651 Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
652 KT-KIDS 5 00002-30
653 OAC 340: 75-3-1 (b)
654 OAC 340: 75-3-2
655 Ibid.
656 OAC 340: 75-8-9 (c)
657 KT-OPPC 04244
658 KT-OPPC 02229
659 KT-OPPC 04250

660 KT-KIDS 02430
661 KT-KIDS 02418, 02439, 02441
662 KT-KIDS 02512
663 KT-KIDS 7 - 03073
664 Ibid.
665 KT-[redacted] 7 00930
666 KT-[redacted] 7 00814
667 KT-KIDS 04249
668 KT-[redacted] 2 00599
669 KT-[redacted] 7 00787-788
670 Ibid.
671 OAC 340:75-3-8.1 (a)(2)
672 KT-KIDS 04078-4088
673 KT-KIDS 02375-2385
674 KT-KIDS 02387, 02389
675 KT-KIDS 04244-4245
676 KT-KIDS 04245
677 KT-[redacted] 2 00599
678 KT-KIDS 04013
679 KT-KIDS 04017
680 See, for example, KT-[redacted] 7 00955-957, 02456, 02461, 02465, 02469, 02471, 02473, 02475, 02477, 02483; KT-OPPC 00865
681 Hess, P. (1982). Parent-child attachment concept: Crucial for permanency planning. *Social Caseworker*, 63(1), 46-53.
682 Hess, P. (2009) D.G. et al. v. Henry et al. *Review of Named Plaintiffs' Case Files,* pp. 87, 117-118
683 KT-[redacted] 7 00670
684 KT-[redacted] 7 00671
685 [redacted]000043
686 KT-[redacted] 7 00040
687 KT-OPPC 00497
688 [redacted]000062
689 KT-OPPC 01789; KT-[redacted] 7 00672-673
690 Worker Assignment Chart – attachment to Don Bingham's January 3, 2009 email to William Kapell
691 OAC 340:75-3-2
692 Cox, Harvey, quoted in *Peter's Quotations* by L. Peter, p. 297 (1977); quotation from *On Not Leaving It to the Sane*, p. viii (1967).
693 OAC 340:75-3-1 (b)
694 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 1(b)(9)
695 OAC 340:75-6-48 (a)(1)(A)
696 OAC 340:75-6-48 (a)(8)
697 OAC 340:75-6-48 (a)(2)
698 www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 2(d)
699 OAC 340:75-6-48 (a)(1)(C)

[700] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 2(a)(1)(B)
[701] OAC 340:75-6-48 (a)(1)(D)
[702] Poole, D. & Lamb, M. (1998). *Investigative interviews of children. A guide for helping professionals*. Washington, DC: American Psychological Association, pp. 117-199.
[703] www.okdhs.org, OAC 340:75-6-48, Instructions to Staff, 4
[704] www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff, 1(1),(2)
[705] OAC 340:75-3-8.1 (a)(2)
[706] Ibid.
[707] www.okdhs.org, OAC 340:75-3-8.1, Instructions to Staff, 5(2)(A),(B), 8(5)
[708] OAC 340:75-6-48 (b)(1)
[709] JA-OPPC 00022
[710] GC-KIDS 00927
[711] [redacted]000797
[712] [redacted]0000002, [redacted]0000036-37
[713] OAC 340:75-6-85 (b)
[714] JA-KIDS 00418
[715] JA-KIDS 00168
[716] JA-OPPC 00282
[717] OAC 340:75-6-31 (a)(2)
[718] Pike, V., Downs, S., Emlen, A., Downs, G., & Case, D. (1977). *Permanent planning for children in foster care: A handbook for social workers*. Washington, DC: U.S. Department of Health, Education, and Welfare, p. 1.
[719] Ibid., p. 6.
[720] Barbell, K. & Freundlich, M. (2005). Foster care today: Overview of family foster care. In Mallon, G. & P. Hess (Eds.), *Child welfare for the 21st century: A handbook of practices, policies, and programs*, pp. 504-17. New York: Columbia University Press; Fiermonte, C. & Renne, J. (2002). *Making it permanent. Reasonable efforts to finalize permanency plans for foster children.* Washington, DC: American Bar Association; Maluccio, A., Fine, E., & Olmstead, K. (1986). *Permanency planning for children: Concepts and methods*. London: Tavistock; Pike, V., Downs, S., Emlen, A., Downs, G., & Case, D. (1977). *Permanent planning for children in foster care: A handbook for social workers*. Washington, DC: U.S. Department of Health, Education, and Welfare; Pine, B., Warsh, R., & Maluccio, A. (1993). *Together again: Family reunification in foster care*. Washington, DC: Child Welfare League of America.
[721] JA-OPPC 00060
[722] Guterman, N. & Taylor, C. (2005). Prevention of physical child abuse and neglect. In Mallon, G. & P. Hess (Eds.), *Child welfare for the 21st century. A handbook of practices, policies, and programs*. NY: Columbia University Press, pp. 270-289.
[723] Ibid., p. 271.
[724] Ibid.
[725] Hess, P. (1982). Parent-child attachment concept: Crucial for permanency planning. *Social Caseworker*, 63(1), 46-53.
[726] Bowlby, J. (1969, 1973, 1980). *Attachment and loss: Volumes I-III.* New York: Basic Books.
[727] Ibid.
[728] Goldstein, J., Freud, A., and Solnit. A. (1973). *Beyond the best interests of the child.* New

York: The Free Press.

729 D'Andrade, A. (2005). Placement stability in foster care. In Mallon, G. & P. Hess (Eds.), *Child welfare for the 21st century: A handbook of practices, policies, and programs*, pp. 608-622. New York: Columbia University Press.

730 Rubin, D., O'Reilly, A. Luan, X., & Localio, A. (2007). The impact of placement stability on behavioral well-being for children in foster care. *Pediatrics, 119*, (336-344). Elk Grove Village, IL: American Academy of Pediatrics. p. 342.

# Appendix A

# *Curriculum Vitae* of Peg McCartt Hess

# CURRICULUM VITAE

**PEG McCARTT HESS**
**8500 Cambridge Woods Lane**
**Knoxville, TN 37923**
**(865) 851-8312**
***peghess07@comcast.net***

## EDUCATION

1987 Ph.D., University of Illinois at Urbana-Champaign, School of Social Work
Dissertation: *What caseworkers consider in developing visiting plans for children in foster care*

1970 M.A., University of Chicago, School of Social Service Administration, with honors

1968 B.A., Duke University

## ACADEMIC APPOINTMENTS

2003-2005 University of South Carolina - Columbia, College of Social Work: *Professor and Director of Doctoral Studies, 2003-2004; tenured 2003; on leave 2004-2005*

2001-2005 University of South Carolina - Columbia, Institute for Families in Society: *Research Professor* and *Associate Director for Research and Scholarship, 2001-2003; Faculty Affiliate 2003-2005*

2001-2002 University of South Carolina - Columbia, College of Education: *Adjunct Professor*

1992-2003 Columbia University School of Social Work: *Associate Dean, 1994-2001, and Professor, 1998-2003; Associate Professor, 1992-1998; tenured, 1994*

1994-2003 Faculty, Columbia University Graduate School of Arts and Sciences

1981-1992 Indiana University School of Social Work: *Associate Professor, 1988-1992; tenured 1987; Assistant Professor 1982-87; Teacher Practitioner, 1981-82*

1979-1981 University of Tennessee School of Social Work, Memphis: *Assistant Professor*

1977-1979 University of Alabama School of Social Work: *Assistant Professor, 1978-1979; Faculty Field Instructor (Internship Instructor), 1977-1978*

1974-1977 University of Chicago, School of Social Service Administration: *Internship Instructor*

**PUBLICATIONS**

**Books and Monographs**

Hess, P., Kanak, S., & Atkins, J. (2009). *Building a model and framework for child welfare supervision*. New York, NY: Hunter College School of Social Work, National Resource Center for Family-Centered Practice & Permanency Planning; and Portland, ME: University of Southern Maine, Edmund S. Muskie School of Public Service, Institute for Child and Family Policy, National Child Welfare Resource Center for Organizational Improvement.

Motes, P. & Hess, P. (2007). (Eds.) *Collaborating with community-based organizations through consultation and technical assistance*. New York: Columbia University Press.

Mallon, G. & Hess, P. (2005). (Eds.) *Child welfare for the 21st century. A Handbook of practices, policies, and programs*. New York: Columbia University Press. Selected as *Choice* Outstanding Academic Title 2006, Association of College & Research Libraries.

Hess, P., McGowan, B., & Botsko, M. (2003). *Nurturing the one, supporting the many: The Center for Family Life in Sunset Park, Brooklyn*. Columbia University Press.

Hess, P. & Mullen, E. (1995). (Eds.) *Practitioner-researcher partnerships: Building knowledge from, in, and for practice*. Washington, DC: NASW Press.

Hess, P. & Folaron, G. (1993). *The Professional Review Action Group (PRAG) model: A user's guide*. Washington, D. C.: Child Welfare League of America, 1993.

Hess, P. & Proch, K. (1993). *Contact: Managing visits to children looked after away from home--a guide to practice*. Anglicized version of *Family visiting in out-of-home care,* (1988). London, England: British Agencies for Adoption & Fostering.

Hess, P. & Proch, K. (1988). *Family visiting in out-of-home care: A practical guide*. Washington, D.C.: Child Welfare League of America, Inc.

**Journal Articles**

Pope, H., Wakins, K., Evans, A., & Hess, P. (2006.) The perception of depression in long-term care residents: A qualitative study using residential journaling. *Journal of Applied Geronology*, *25*, 153-172.

Magen, R., Conroy, K., Hess, P., Panciera, A., & Simon, B. (2001). Identifying domestic violence in child abuse and neglect investigations. *Journal of Interpersonal Violence*, *16,* 580-601.

Hess, P., McGowan, B., & Botsko, M. (2000). A preventive services model for preserving and supporting families over time. *Child Welfare*, *79*, featured article, 227-265.

Jackson, H., Hess, P., & Van Dalen, A. (1995). Preadolescent suicide: How to ask and how to respond. *Families in Society*, *76*, 267-279.

Hess, P. (1993). Supporting foster families in their support of families. *Journal of Emotional and Behavioral Problems*, *2*, 24-27.

Folaron, G. and Hess, P. (1993). Placement considerations for children of mixed African-American and Caucasian parentage. *Child Welfare*, *72*, 113-125.

Hess, P., Folaron, G., & Jefferson, A. (1992). Effectiveness of family reunification services: An innovative evaluation model. *Social Work*, *37*, 304-311.

Reprinted as Chapter 28, J. Tropman, J. Erlich, & J. Rothman (1995). *Tactics and techniques of community intervention*, 3rd ed. Itasca, IL: F.E. Peacock, 308-320.

Hess, P., Mintun, G., Moehlman, A., & Pitts, G. (1992). The Family Connection Center: An innovative visiting program. *Child Welfare*, *71*, 77-88.

Hess, P. & Folaron, G. (1991). Ambivalences: A challenge to permanency for children. *Child Welfare*, *70*, featured article, 403-424.

Wasson, D. & Hess, P. (1989). Foster parents as child welfare educators. *Public Welfare*, *47*, 16-22.

Hairston, C. & Hess, P. (1989). Family ties: Maintaining child-parent bonds is important. *Corrections Today*, *51*, 102-106.

Hess, P. (1988). Case and context: Determinants of planned visit frequency. *Child Welfare*, *67*, 311-326.

Hess, P. (1987). Parental visiting of children in foster care: Current knowledge and a research agenda. *Children and Youth Services Review*, *9*, 29-50.

Proch, K. & Hess, P. (1987). Parent-child visiting policies of voluntary agencies. *Children and Youth Services Review*, *9*, 17-28.

Hess, P. (1986). Promoting access to access with divorcing parents. *Social Casework*, *67*, 594-604.

Hess, P. & Proch, K. (1986). How the states regulate parent-child visiting. *Public Welfare*, *44*, 12-17, 46.

Hess, P. & Williams, L. (1982). Group orientation for parents of children in foster care: An innovative program. *Child Welfare*, *61*, 456-466.

Hess, P. (1982). Parent-child attachment concept: Crucial for permanency planning. *Social Casework, 63,* 594-604.

Hess, P. & Howard, T. (1981). An ecological model for assessing psycho-social difficulties in children. *Child Welfare, 60,* 499-518. Featured article.

**Book Chapters**

Hess, P. & Feldman, N. (2008). Values and ethics in social work practice with lesbian, gay, bisexual, and transgender people. In G. Mallon (Ed.) *Social work practice with lesbian, gay, bisexual, and transgender people*, 2nd Ed., 25-39. New York: Routledge.

Hess, P. & Billingsley, A. (2007). Cultural competence: At the heart of capacity building. In P. Motes & P. Hess (Eds.*) Collaborating with community-based organizations through consultation and technical assistance,* 54-80. New York: Columbia University Press.

Hess, P. (2005). Visits: Critical to the well-being and permanency of children and youth in care. In G. Mallon & P. Hess (Eds.) *Child welfare for the 21st century. A handbook of practices, policies, and programs*, 548-557. New York: Columbia University Press.

Hess, H. & Hess, P. (2005). Termination in context. In B. Compton, B. Galaway, & B. Cournoyer (Eds.) *Social work processes.* Dorsey Press, 7th Ed. (also in previous editions: 1984, 1989, 1994, 1999).

Hess, P. & Hess, H. (2001). Parenting in European American/White families. In N. Webb (Ed.) *Culturally diverse parent-child and family relationships: Challenges and guidelines for social workers and other practitioners,* 307-333. New York: Columbia University Press.

Hess, P. (2000). The history and evolution of supervised visitation. In A. Reiniger, (Ed.) *The professionals' handbook on providing supervised visitation,* 11-30. New York: The New York Society for the Prevention of Cruelty to Children.

Hess, P. & Hess, H. (1998). Values and ethics in social work practice with lesbian and gay persons. In G. Mallon (Ed.) *Foundations of social work practice with lesbian and gay persons,* 31-45. Haworth Press.

Hess, P., McGowan, B., & Meyer, C. (1996). Practitioners' perspectives on family and child services. In A. Kahn & S. Kamerman (Eds.) *Children and their families in big cities*, 121-137. New York: Columbia University School of Social Work.

Hess, P. (1995). Reflecting in and on practice: A role for practitioners in knowledge building. In P. Hess & E. Mullen (Eds.) *Practitioner-researcher partnerships: Building knowledge from, in, and for practice*, 56-82. Washington, DC: NASW Press.

Hess, P. & Mullen, E. (1995). Bridging the gap: Collaborative considerations in practitioner-researcher knowledge-building partnerships. In P. Hess & E. Mullen (Eds.), *Practitioner-*

*researcher partnerships: Building knowledge from, in, and for practice*, 1-30. Washington, DC: NASW Press.

Mullen, E. & Hess, P. (1995). Toward practice knowledge development. In P. Hess & E. Mullen (Eds.), *Practitioner-researcher partnerships: Building knowledge from, in,and for practice*, 264-271. Washington, DC: NASW Press.

Hess, P. & Jackson, H. (1995). Practice with and on behalf of families. In C. Meyer & M. Mattaini (Eds.) *The foundations of social work practice.* Washington, DC: NASW Press.

Hess, P. & Proch, P. (1993). Visiting: The heart of reunification. In B. Pine, R. Warsh, & A. Maluccio (Eds.) *Together again: Family reunification in foster care,* 119-139. Washington, DC: Child Welfare League of America.

Hess, P. (1984). Supervision. In K. Blumenthal & A. Weinberg (Eds.), *Establishing parent involvement in foster care agencies*, 117-145. New York, NY: Child Welfare League of America.

Hess, P. (1980). Permanency as an issue for children. In R. Patton (Ed.), *Readings in family health*, 240-246. Lexington, MA: Ginn Publishing Co, 240-246.

**Other Publications, Including Expert, Research, and Policy Reports and Training Manuals**

Hess, P. (2009). *No questions asked: A review of services provided to C. Miles by the Alaska Department of Health and Social Services*. Knoxville, TN: author.

Hess, P. (2008). *"The way life was" – A decade of waiting for protection and permanence: A review of services provided to A. Drones by the Alaska Department of Health and Social Services.* Knoxville, TN: author.

Hess, P. (2007). *What might have been: A review of services provided to A.J. and D.D. by the Alaska Department of Health and Social Services*. Knoxville, TN: author.

Hess, P. (2006). *Custody, but no care: A review of children's experiences in MDHS custody*. New York, NY: Children's Rights.

Hess, P. (2004). *An updated review of case files of foster children in Fulton and DeKalb Counties, Georgia*. New York, NY: Children's Rights.

Hess, P. (2003). *A review of case files of foster children in Fulton and DeKalb Counties, Georgia*. New York, NY: Children's Rights.

Hess, P. (2003). *Visiting between children in care and their families: A look at current policy*. New York, NY: National Resource Center for Foster Care & Permanency Planning, Hunter College School of Social Work.

Hess, P. (1999). (Ed.) *Enhancing visiting services: Standards, leadership, organization, and collaboration*. Philadelphia: Commonwealth of Pennsylvania Dept of Public Welfare.

Hess, P., McGowan, B., & Botsko, M. (1997). *The Center for Family Life in Sunset Park: Greater than the sum of its parts*. Baltimore, MD: Annie E. Casey Foundation.

Anderson, G., Dane, B., Dore, M. & P. Hess. (1993). *Consultants' report on the shared 30-day evaluation process*. New York, N.Y.: Wilder Settlement Panel.

Hess, P. (1993). Reunification in the context of permanency planning. *International Reunification Symposium*. L. Abramczyk & J. Ross, Eds. Columbia, SC: University of South Carolina College of Social Work 1993, 60-69.

Hess, P. & Folaron, G. (1992). *Disrupted reunification: 62 families' experiences*. Professional Review Action Group Project, Indianapolis: Indiana University School of Social Work with the Family and Social Services Adm., Div. of Family and Children.

Hess, P., Folaron, G., & Jefferson, A. (1989, 1990, 1991). *The impact of caseload size and caseworker/supervisor turnover on foster care reentry*. Periodic reports of the Professional Review Action Group Project, Indianapolis: Indiana University School of Social Work with the Indiana Department of Public Welfare.

Hess, P. (1990). Visiting: The heart of reunification. *Reconnections: Program, practice, and training in family reunification conference proceedings*. B.Pine, R. Krieger, & A. Maluccio, Eds. West Hartford, CT: University of Connecticut School of Social Work.

Hess, P., Folaron, G., & Jefferson, A. (1989). *The impact of policy on foster care reentry*. Second Interim Report of the Professional Review and Action Group Project, Indianapolis: Indiana University School of SW with the Indiana Dept of Public Welfare.

Hess, P. (1985). Protecting the family for the child. *Permanency Report*, 3.

Hess, P., Graham, C., & Marcum, M.. (1984, 1985). *Continuum of care child welfare training for new workers. Trainers' guide; Practice handbook; and Resource materials*. Indianapolis: Indiana University School of Social Work with the Indiana State DPW.

Compton, B. & Hess, P., with Graham, C. (1983, 1986 revised ed.) *Providing family-centered pre-placement preventive services: A handbook*. Indiana State Dept. of Public Welfare.

Hess, P. & Kapoor, J. (1986). *Indiana's continuum of care child welfare training project: Evaluation of 1984-85 project activities*. Indianapolis: Indiana University School of Social Work with the Indiana Department of Public Welfare.

Hess, P. & Chandler, N. (1982). *Decision-making in permanency planning: The impact of attitudes and values*. Knoxville: University of Tennessee School of Social Work, Office of Continuing Social Work Education.

Hess, P. (1982). *Working with birth and foster parents*. Trainer/Trainee manuals. Knoxville: University of Tennessee School of Social Work, Office of Continuing SW Education.

Hess, P. & Hicks, J. (1981). Community professionals join the team: A team approach to permanent plans for children. *Tennessee Record*, *94* (April).

Hess, P. (1979). *The multi-focus model for social work practice: Its evolution and application in field education*. Tuscaloosa: University of Alabama School of Social Work.

**RESEARCH AND TRAINING GRANTS AND PROJECTS**

*Project Co-Director*. *(2008 - 2009).* Developing a Framework to Support Effective Supervision in Child Welfare. Joint project funded and sponsored by The National Resource Center for Family-Centered Practice and Permanency Planning and the National Resource Center for Organizational Improvement.

*Principal Investigator. (2006-2008).* Identifying Conceptual Models of Programs for Parent-Child Visiting. Funded by the National Resource Center for Foster Care and Permanency Planning at the Hunter College School of Social Work.

*Principal Investigator*. (2001-2003). An Initiative to Enhance Policies, Programs, and Practices Related to Visiting of Children in Care. Funded by the National Resource Center for Foster Care and Permanency Planning at the Hunter College School of Social Work.

*Co-Principal Investigator*. (2002-2003). The Relationship Between Childhood Sexual Abuse and Adult Sexual Assault. With Vicki Flerx. Funded by the University of South Carolina Office of Research Support Programs.

*Co-Investigator*. (2001). Uncertain Progress. With Andrew Billingsley, John Stewart, & Arlene Andrews. Funded by University of South Carolina Office of Research Support Programs.

*Co-Principal Investigator* (With B. McGowan, Co-PI) (1993-1997). Evaluation of the Center for Family Life in Sunset Park. Funded by the Annie E. Casey Foundation.

*Consultant* to Co-Investigators R. Magen and K. Conroy, with B. Simon (1993-1995). Zone C Pilot Study, “Identification of Woman Abuse in Families with Allegations of Child Abuse or Neglect.” Developed a battered woman assessment tool for public agency child protective service workers’ use and a guide for in-depth interviews of staff. Support by the Center for the Study of Social Work Practice.

*Co-Investigator* (With H. Jackson, PI; Dr. R. Nuttall, Co-Investigator; & A.van Dalen, Clinical Investigator) (1992-1995). "Prevalence and Correlates of Suicidal Ideation and Behaviors in Preadolescents: Exploratory Study of a Clinical Population" and "The Effectiveness of a Suicide Training Program on Staff Identification of Suicidality in a Clinical Population of Preadolescents." Center for the Study of Social Work Practice.

*Director and Principal Investigator* (1988-1992). Demonstration/Research Project Funded by the U.S. Department of Health and Human Services: Maximizing Reunification in Foster Care Through Professional Review Action Groups in Indiana. A collaborative project, Indiana University School of Social Work and Indiana Dept. of Public Welfare.

*Director* (1983-1989). Continuum of Care Child Welfare Training Program, Indiana University School of Social Work. Funded by Indiana Dept. of Public Welfare to complete a needs assessment, develop curricula, implement, and evaluate statewide training programs for child welfare staff and foster parents.

*Director* (1986). Preventing Child Abuse in Licensed Foster Family Placement Training Project, Indiana University School of Social Work. Funded IN Dept. of Human Services.

*Director* (1982-1983). Permanency Planning Training Project. Funded by the Lake County (Gary, IN.) Department of Public Welfare.

## SOCIAL WORK EDUCATION

### Courses Taught

Qualitative research methods
Monitoring and evaluating clinical practice (developed and taught)
Social service delivery systems: Child and family welfare
Foundations of social work practice
Advocacy in social work practice
Direct social work practice
Advanced clinical practice with families with children
Social work practice with children (developed and taught)
Values and ethics in social work practice (developed and taught)
Addressing ethical dilemmas in advanced clinical practice (developed and taught)
Generalist social work practice (BSW)
Principles of field instruction (developed and taught)

### Dissertation Committee and Research Practicum Supervision

*Columbia University School of Social Work:*

Committee Chair: Nancy Feldman "Growing up performed" PhD granted, dissertation with distinction May 2001.

Committee member: Murray Nossel "Time as an object in social work practice" Ph.D. granted, dissertation with distinction May 2001.
Jeanne Finch "A study of drug involved mothers" DSW granted May 2000
Mary Banach "Decision-making in child welfare" DSW granted May 1995

Research Practicum supervision:
Michael Powell (1996-1997); Ernst VanBergijk (1996-1997)

**LEGISLATIVE/LEGAL TESTIMONY AND CONSULTATION**

Expert testimony, C. M. v. The State of Alaska, Department of Health and Social Services, Office of Children's Services. Anchorage, AK April 30, May 1, 1009 (trial); Knoxville, TN, February 10, 2009 (deposition).
Expert testimony, A. D. v. The State of Alaska, Department of Health and Social Services, Office of Children's Services. Anchorage, AK, September 18, 2008 (deposition).
Expert testimony, A.J. and D.D. v. The State of Alaska, Department of Health and Social Services, Office of Children's Services, and Alternatives. Anchorage, AK, January 2008 (trial), June 28, 2007 (deposition)
Expert testimony, Olivia Y. v. Barbour (U.S. District Court, Southern District of Mississippi), Jackson, MS. April 7, 2006 (deposition)
Expert testimony, Kenny A. v. Perdue (U.S. District Court, Northern District of Georgia), Atlanta, GA. January 28, 2004 (deposition)
Prepared for expert testimony, Michael H. v. Giuliani (Superior Court, NY County), The Legal Aid Society, New York City, 1994-1996
Expert testimony, P.M., et al, vs. Jeff Richardson, et al. (class action by wards of the Marion County office, the Division of Family and Children) United States District Court for Southern District of Indiana, Indianapolis Div., May 20, 1992.
Consultation, Indiana Legislative Services Agency and members of the Indiana General Assembly, re: Senate Bill 243 (Child protective services and child welfare caseworker caseload standards), 1990-1991; Senate Bill 238 (Child protective services and child welfare caseworker caseload standards), 1989-90; House Bill 1035 (establishing Commission on Abused and Neglected Children), 1991-92.
Testimony before the Indiana Commission on Abused and Neglected Children, June, 1992.
Testimony re: House Bill 1035, Indiana House of Representatives, Committee on Family and Children, January 10, 1992.
Testimony re: Senate Bill 243, Indiana Senate Finance Committee, Budget Subcommittee, March 25, 1991. Testimony re: Senate Bill 243, Indiana Senate Health and Human Services Committee, February 8, 1991.
Testimony re: Senate Bill 238, Senate Finance Committee, Budget Subcommittee, Feb.1990.
Testimony re: Senate Bill 238, Indiana Senate Health and Human Services Committee, January 12, 1990.
Testimony re: HB1800 (Budget), Indiana House Ways and Means Committee, 1991.

**SELECTED CHILD WELFARE CURRICULUM DEVELOPMENT, TRAINING, AND CONSULTATION**

2001-current National Resource Center for Family-Centered Practice and Permanency Planning, New York, New York. Senior Consultant.

2006-2007 Casey Family Programs, Washington, DC. Consultant.
2005 Tennessee Department of Children's Services, Nashville, TN. Consultant.

2003-2004 Consultant, Northwest Crescent Child Development and Family Services Center, Greenville, SC.

| | |
|---|---|
| 2001-2002 | The Duke Endowment Children and Families Community Partnership Initiative. Consultant, Northwest Crescent Center and Davidson Partnership. |
| 1997-2000 | Commonwealth of Pennsylvania, Department of Public Welfare: "Developing Visiting Policies and Practices to Promote Family Reunification." Program and policy consultation, curriculum development, staff development and training. |
| 1984-1995 | California State U., Fresno, School of Health & Social Work, Child Welfare Training. California Child Protective Services Emergency Response Curriculum & Basic Curriculum for Child Welfare Services. Curriculum Development Team and Trainer of Trainers. Funded U.S. Dept. Health and Human Services. |
| 1993 | Consultant case reviewer. Survey of the Quality of the Child Welfare Administration's Shared 30-Day Child Evaluation Process. New York City Human Resources Administration, Child Welfare Administration, American Civil Liberties Union (ACLU), and Wilder Settlement Panel. |
| 1989-1993 | The Center for the Study of Child Welfare, the University of Connecticut School of Social Work. Consultation to A. Maluccio, R. Warsh, and B. Pine re: family reunification training curricula and multiple project publications. |
| 1983-1991 | Indiana State Department of Public Welfare. 1988-1991: "Fosterparentscope, A Preservice Curriculum" and "Fosterparentscope, An Inservice Curriculum." With Daniel Wasson, curriculum development and instruction, two 40 hour courses to over 350 caseworkers/supervisors, foster parents, and others. 1983-1989: "The Continuum of Care." Curriculum development and instruction, 34 hour course to over 700 child welfare workers and supervisors. |
| 1980-1982 | Tennessee State Department of Human Services with University of Tennessee Office of Continuing Social Work Education. "Working with Birth and Foster Parents;" "Decision-Making in Permanency Planning: The Impact of Attitudes and Values;" "Team Decision-Making." Curriculum development and testing. |
| 1979-1981 | University of South Carolina College of Social Work and South Carolina Dept. of Social Services. Curriculum development and staff training. |

**PROFESSIONAL PRACTICE**

| | |
|---|---|
| 1984-1992 | Children's Bureau of Indianapolis. Supervision, child welfare clinical and program consultation, and staff development |
| 1977-1992 | Multiple child welfare and family services agencies in Alabama, Tennessee, and Indiana. Supervision of BSW and MSW interns |
| 1987-1991 | Visiting Nurse Association of Indianapolis. Child welfare clinical and program consultation, supervision, and staff development |

1972-1977 Lutheran Welfare Services of Illinois (Chicago): Supervisor/Clinical social worker, Family Services, 1974-1977; Social work supervisor, Headstart/Day Care Services, 1972-1974

1975-1977 Independent social work practice, Lake Forest, Illinois

1970-1972 Special Education Dist, of Lake County, Illinois. School social worker (K-12)

**PROFESSIONAL PUBLICATIONS, REVIEWER**

Editorial Review Board, *Child Welfare*, 1984-1996, 1998-current
Editorial Review Board, *Children and Youth Services Review*, 1987-2004
Consulting Editor, *Journal of Social Work Education*, 1997-2005
Faculty Editorial Committee, *Columbia University Press*, 2001-2003
Consulting Editor, *Marriage and Family Review*, *24*, Special Issue: The Methods and Methodologies of Qualitative Family Research, 1996
Editorial Review Board, *Community Alternatives: International Journal of Family Care,* 1992-1996

**SELECTED ACADEMIC AND PROFESSIONAL PRESENTATIONS**

"Supporting Effective Child Welfare Supervision." New Strategies for Changing Times, 2009 Meeting for Agencies and Courts, Co-sponsor U. S. Children's Bureau. With S. Kanak, and C. Collins-Carmargo. Arlington, VA, August 2009
"Supporting Effective Child Welfare Supervision #1: A Framework." Teleconference co-sponsored by National Resource Center for Family-Centered Practice and Permanency Planning and National Child Welfare Resource Center for Organizational Improvement. With S. Kanak, J. Atkins, and C. Collins. May 28.
"Visits: Critical to the Well-Being and Permanency of Children and Youth in Care." Webcast, National Resource Center for Family Centered Practice and Permanency Planning, with Gary Mallon, New York City, May 2008
"Permanency Planning and Family Centered Practice." Family Centered Practice: A Conference and 30th Anniversary Celebration, Iowa City, Iowa, April 2008
"Quality Visits Between Children and Care and Their Parents." North Dakota Children and Family Services Conference, Bismarck, July 2007
"Enhancing Child and Family Visiting." New Jersey and The Child and Family Services Review: Looking to the Future. New Jersey Court Improvement Committee, NJ, January 2004.
"Visiting Between Children in Care and Their Families: A Look at Current Policy" U.S.Dept. of HHS, ACYF, Permanency Partnership Forum VII, Washington, DC, May 2003
"Best Practices in Family Support: One Agency's Experience." Institute for Families in Society - USC. Tenth Anniversary Lecture Series, Columbia, SC, November 2002
"Using Qualitative Methods in Evaluation." Annual Conference of the Duke Endowment Children and Families Community Partnership Initiative, Charlotte, NC, October 2001
"Parent-Child Visiting: Essential to Permanency Planning." Prevent Child Abuse South Carolina Annual Conference, Columbia, SC, September, 2001

"Embarking on a Successful Research Career." Advancing Your Career Through Empowerment Mentoring, Women's Studies Program, University of SC, Columbia, SC, Sept. 2001.

"Becoming a Professional." Commencement speech, University of Illinois Urbana-Champaign, School of Social Work. May 1999

"Self Awareness for Multicultural Practice." Faculty Development Institute, CSWE Annual Program Meeting. With C. Franks, E. Sheiman, K. Walters, and D. Wheeler. San Francisco, CA, 1999

"Evaluation Grants Program Roundtable." Convened by the Harvard Family Research Project and Annie E. Casey Foundation, Chicago, 1998

"Why Is Visiting Important? What Research Tells Us." Keynote, Commonwealth of Pennsylvania Department of Public Welfare Placement Review Initiative, 1997

"Court Ordered Supervised Visitation: Documenting an Unmet Need." Association of the Bar of the City of New York, Committee on Family Court and Family Law, 1994

"Reunification in the Context of Permanency Planning." National Child Welfare Resource Center for Management and Administration, with A. Jefferson, 1994

"Regulatory Issues in Implementing 1993 Family Preservation and Family Support Legislation: Family Reunification and After Care." U. S. Department of Health and Human Services, Administration for CYFamilies staff. Washington, D.C., 1993

"Achieving Family Preservation Through Reunification." Family Preservation in Pennsylvania: Changing How We See Families Invitational Conference, Harrisburg: Nov. 4, 1993

"Challenges in Successfully Achieving Family Reunification." The Law Enforcement Child Abuse Project, Philadelphia, 1993

"Child Abuse Recognition and Intervention." Keynote address, Columbia University School of Social Work Maternal and Child Health Training Project, 1993

"Reunification in the Context of Permanency Planning." International Reunification Symposium, Charleston, S.C., 1992

"Evaluating Effectiveness of Family Reunification Services." With G. Folaron and R. Kinnear. 5th Annual National Association for Family-Based Services Empowering Families Conference, St. Louis, MO, 1991

"The Challenges of Permanency." Ohio Assoc.of Child Caring Agencies, Columbus, 1991

"Exploring Permanency Options with Ambivalent Parents." With G. Folaron, A. Jefferson, and R. Kinnear. CWLA Southern Regional Conference, Louisville, KY, 1991

"Placement Decisions: Teaching Effectiveness in Child Welfare Practice and Policy." With G. Folaron. CSWE Annual Program Meeting, New Orleans, 1991

"Effectiveness of Family Reunification Services: An Innovative Evaluative Model." With G. Folaron and A. Jefferson. NASW 1990 Annual Conference, Boston, 1990

"Home on Trial Breakdowns: An Exploration of Causes and Remedies." British Agencies for Adoption and Fostering, London, England: June 27 and 28, 1990

"Maintaining Contact: Partnership in Practice." British Agencies for Adoption and Fostering, Regent's College, London, England: June 26, 1990

## PROFESSIONAL ORGANIZATIONS AND SELECTED COMMUNITY SERVICE ACTIVITIES

The Children's Advocacy Center, Sullivan County, TN. board member, 2004-2007; Executive Committee Member 2006-2007

Wellmont Hospice, 2004-2006 volunteer bereavement counselor
National Association of Social Workers, 1970-current
Supervised Visitation Network, 1992-2002
The Society for Social Work and Research, 1997-2003
New York City National Association of Social Workers (NASW) School Social Work Curriculum Development Task Force. CUSSW representative, September, 1992-1995
Columbia University Rape Crisis Center, Volunteer Supervisor, Fall 1992-1994
Coalition for Children's Access to Parents, Founding Board Member, Indiana, 1989-1994
Indiana Chapter for the Prevention of Child Abuse, Executive Com.of the Board 1991-1992

**PROFESSIONAL CERTIFICATION**

NASW, Academy of Certified Social Workers (ACSW) (entry date 1975)