# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OKLAHOMA

D. G., by Next Friend )
G. Gail Stricklin, et al, )
for themselves and those )
similarly situated, )
)
Plaintiffs, )
) Class Action
vs. )No. 08-CV-074-GKF-FHM
)
C. BRAD HENRY, in his )
official capacity as Governor)
of the State of Oklahoma, )
et al, )
)
Defendants. )

- - - - - - - - - - - - - - - - - - - - - - - - - -

THE DEPOSITION OF PEG HESS, PhD, produced as a witness on behalf of the Defendants in the above styled and numbered cause, taken on the 9th day of May, 2011, in the City of Tulsa, County of Tulsa, State of Oklahoma, before me, Lisa A. Steinmeyer, a Certified Shorthand Reporter, duly certified under and by virtue of the laws of the State of Oklahoma.



A P P E A R A N C E S

FOR THE PLAINTIFFS: Mr. Paul Demuro
Attorney at Law
124 West 4th Street
Suite 100
Tulsa, OK 74103

FOR THE DEFENDANTS: Mr. Donald Bingham
Mr. Kris Koepsel
Attorneys at Law
502 West 6th Street
Tulsa, OK 74119
-and-
Mr. Richard Resetaritz
Attorney at Law
P. O. Box 53025
Oklahoma City, OK 73152



I N D E X


| W I T N E S S | P A G E |
|---|---|
| PEG HESS, PhD | |
| Direct Examination by Mr. Bingham | 4 |
| Cross Examination by Mr. Demuro | 121 |
| Redirect Examination by Mr. Bingham | 129 |
| Signature Page | 137 |
| Reporter's Certificate | 138 |




(Whereupon, the deposition began at 9:29 a.m.)

PEG HESS, PhD,

having first been duly sworn to testify the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. BINGHAM:

Q Dr. Hess, would you state your full name, please? 09:29AM
A Peg Hess. My legal name is Mary Margaret Hess.
Q Okay.
A Please call me Peg.
Q Well, I appreciate that offer, but I think the 09:29AM rules might require me to address you by your title, and I'm comfortable with that unless you prefer something like Professor or Doctor, either one.
A Peg is good for me. Whatever you choose will work. 09:29AM
Q I just don't think we're allowed to address witness by first names, but thank you very much for your courtesy. You still live at 8500 Cambridge Woods Lane in Knoxville?
A I do. 09:30AM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 5

Q Okay, Doctor, I assume that you have been deposed before?
A Been what?
Q Deposed before.
A Yes. 09:30AM
Q About how many times would you say you've been deposed, again just a rough estimate?
A About six.
Q Mostly with regard to child welfare?
A Uh-huh, all of them. 09:30AM
Q And as you know from having been in depositions, for the benefit of our reporter, we'll both try to avoid saying uh-huh or huh-uh, and we'll try to articulate a yes or no, even though we'll be communicating well I'm sure. Also as we proceed 09:30AM today, if -- I think the acoustics in this room are just fine, but if you don't hear my question completely or you have my problems hearing it, please let me know and I'll be glad to turn up the volume a little bit and make myself heard. All 09:31AM right?
A All right.
Q Also, if I ask you a question and you just flat don't understand it, would you tell me I'm sorry, I don't understand your question? 09:31AM

Page 6

A I will.
Q All right, and if I ask you a question that you think is an unfair question or a trick question, would you tell me I think that's an unfair or trick question? 09:31AM
A You can count on it.
Q And as you know, as it is in most depositions, any time you want to take a break, just let us know and we'll take a break, and you don't have to explain it or justify it. 09:31AM
A Okay.
Q Also, the only exception being if there's a question pending, obviously we would like to have your answer and then we'll immediately take a break. Okay? 09:31AM
A Sure.
Q You understand that Mr. Koepsel and I, my colleague sitting here next to me, represent the officials of the Oklahoma Department of Human Services and the Oklahoma Human Services Commission, 09:32AM who are the named defendants in this particular lawsuit. You understand that?
A Yes.
Q And Mr. Demuro represents the Children's Rights and the named plaintiffs and the class that 09:32AM

Page 7

has been certified in this lawsuit. You understand that?
A Uh-huh.
Q I noticed that at least from your CV, and if at any time you need to refer to your CV, please 09:32AM feel free to do so because I'm using the one you provided to us in this case. I believe that at least the theme or maybe the actual title of your PhD dissertation was, quote, What Caseworkers Consider in Developing Visiting Plans For Children 09:32AM in Foster Care. Was that the title or subject of your dissertation?
A Yes, it was.
Q And do you still have a copy of that dissertation? 09:32AM
A Not on hand but, yes, I do.
Q Not with you today.
A Yes, I do.
Q Your master's degree was in what area?
A Social work. The school in Chicago is called 09:33AM the School of Social Service Administration, but in truth, most of the students are not studying administration.
Q All right. Is your MA in social work much different than an MSW? 09:33AM

Page 8

A No. It's exactly the same.
Q All right, and your PhD is in social work?
A Social work.
Q Thank you. I'm not going to ask you about all your publications, but the last publication and most 09:34AM recent, excuse me, that I find listed, and I'll ask you if it is in fact the most recent that you've done is a publication titled, quote, Building a Model and Framework For Child Welfare Supervision --
A Right. 09:34AM
Q -- with a couple of other co-authors. Is that your most recent publication?
A It is the most recent. I'm currently working on a new edition of the Child Welfare for the 21st Century textbook under a contract with Columbia 09:34AM Press but it's not published yet.
Q Okay, and I believe your co-authors in the Building the Model and Framework publication were someone whose last name is spelled K-A-N-A-K?
A Susan Kanak and Julie Atkins. 09:35AM
Q I'm sorry. Go ahead.
A Julie Atkins.
Q And where is Ms. or Dr. Kanak?
A She's in Portland, Maine. Actually she has left that position, but that's where she was when 09:35AM

Page 9

that work was done.
Q Who was she last affiliated with that you knew of?
A With the National Resource Center there, the Resource Center For Organizational Improvement. 09:35AM
It's a federally funded child welfare resource center.
Q And that's headquartered in Oregon?
A In Portland, Maine.
Q Okay, but you don't know where she might be 09:35AM
working now or if she's working for an organization?
A I don't.
Q And where is Ms. or Dr. Atkins?
A She is still with the National Resource Center for Organizational Improvement. 09:36AM
Q All right, and the National Resource Center for Family Centered Practice and Permanency Planning is actually located at or affiliated with Hunter College?
A In New York City, uh-huh. 09:36AM
Q Hunter College there?
A Yes.
Q And because it's listed under publication, I'm not sure whether it is a co-publisher or what, but what affiliation or service have you had with the 09:36AM

Page 10

Edmund S. Muskie School of Public Service at University of Southern Maine?
A This work was written through a contract from the United States Department of Child Welfare. The federal government gave a grant to Hunter College's 09:37AM
Resource Center and the Organizational Improvement Resource Center, which is based at the Muskie School of Public Service. So my relationship was not directly through the School of Public Service but with Hunter College, and Susan and Julie's 09:37AM
associations were with the School of Public Service, so we were each employed for a resource center that was sponsored and funded by those two organizations.
Q All right. Have there been any later editions of Building a Model and Framework since its first 09:38AM
publication in 2009?
A No.
Q Can you give me -- and I'm not looking for exquisite detail here but kind of a chronological overview of work that you have done for or with the 09:38AM
Child Welfare League of America. I see a couple of publications, but any other activities you --
A Right. The Child Welfare League of America, as I'm sure you're aware, has a lot of different divisions, and the work that I have done has 09:39AM

Page 11

primarily been with its publications office. They publish a monthly professional journal, which is considered to be the leading child welfare journal, Child Welfare, and I have been a peer reviewer for that journal for many, many years, and then took a 09:39AM
break and am now currently reviewing for that journal again. I've also published in that journal and had -- I was very pleased that I think it's three of the different articles that I published in that journal were designated as feature articles, 09:39AM
which meant that the peer reviewers and the editors of the journal decided that they were each long, double length articles, were each sufficiently significant to have them be featured articles, so they were -- the first one was the 1981 Model For 09:40AM
Assessing Psychosocial Difficulties in Children, which was a new way of looking at children's problems in context of their families and communities, that kind of thing. The second one was Ambivalences: A Challenge to Permanency for 09:40AM
Children, which is much too long to explain.
Q I'm sorry.
MR. BINGHAM: Off the record.
(Whereupon, a discussion was held off the Record.)

Page 12

Q Please continue, Doctor.
A Sure. That article is reports of findings of an extensive study that I conducted in Indiana of the Marion County child welfare system and the surrounding counties, and what we studied were the 09:41AM
situations of children who had been in foster care, returned home and then came back into foster care, and it was a federally funded study. We were asked to use a particular model called the Professional Review and Action Model where you study a situation, 09:41AM
make an assessment of what reforms are needed to improve it because this is an outcome that's not desirable and then take some steps to help people understand the problem and the options for change, and one of the major findings that we had in that 09:41AM
study was related to ambivalence, that the parents of almost all those children were very ambivalent about being parents. They wanted to be parents, they wanted those kids, but they didn't want to do what they needed to do to be parents. The 09:42AM
caseworkers, the supervisors and the judges -- and the model was such that we read the children's entire case records but we also interviewed the children, the caseworkers, the supervisors, the juvenile court judges, the community practitioners, 09:42AM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 13

people who had been involved in the decision for the child to go home, and in order to understand what all went into that decision and why that decision had resulted in a failure essentially where the child often very quickly came back into foster care, and what we found was that everybody had mixed feelings about it. The judges could be quite articulate in talking about the fact that they felt the parents should do what they were required to do, but on the other hand, it's very hard to terminate a parent's rights, so they wanted to give them one more chance. So they would say I gave them too many chances and I probably shouldn't have agreed to this child going home.

So it was really an article about decision making and about the values and attitudes that we hold that often are very powerful but subtle in our decision making and how that affects child welfare practice, and then the third feature article is the study of an agency in Brooklyn, New York, was a three-year study that I co-directed, of an agency that is recognized to have a very successful, effective social work practice, and it was really a pleasure to be able to study good practice and learn a lot about what makes for good practice, and so

Page 14

that article reported our major findings in that study, and then we also published a book based on those findings.

Q And --

A So those are three of the publications I've done with child welfare. My dissertation -- I rewrote my dissertation and Child Welfare published it as a monograph on parent-child visiting, and it is still one of their best selling monographs, not perhaps so much to my credit, but the fact that people are not -- have never done enough with visiting. It's a very, very important intervention in child welfare, that people often overlook its importance. So I've had a relationship with them as a peer reviewer and published articles and also published other things. They published from the Indiana study a monograph on the Professional Review and Action Model, which is framework for reviewing practice failures.

Q If I have this right, what publication, if any, resulted from your studying and analysis of the Brooklyn agency?

A Of the which?

Q Of the agency you said was doing well.

A Oh, in Brooklyn, The Center For Family Life.

Page 15

Let's see, under books and monographs, Nurturing the One, Supporting the Many is a book that reports the findings of that study, which was a multi-method study that we conducted over three years. This particular agency is community-based and has many different kinds of programs for children and families. So it was a study of the entire agency. We also published a final report of that study, which is listed under reports. On page -- my pages could be different because it depends on which version you've got, but it's under Other Publications. It's McGowan and Botsko, 1997, The Center For Family Life in Sunset Park: Greater Than the Sum of Its Parts, and I believe those are the two major publications that came from that.

There also were several PPS documentaries about that agency. In the course of our study, we were able to work out for one of the doctoral students, who we were supervising, who was a research assistant to work with some people. He was a video person. So a lot of people learned about that agency in a lot of different ways.

Q Your book or monograph about The Center For Family Life in Sunset Park, Brooklyn was published in about 2003?

Page 16

A Uh-huh.

Q I'm sorry. I have to ask you to answer yes or no, please, just for the reporter's sake.

A I have to look. It was 2003.

Q Thank you. Have any follow-up studies or analyses been done to see how the agency has been performing since 2003?

A I'm not -- not by me.

Q Do you know of any --

A The agency itself collects a lot of evaluative data about its own practice and does a progress report every year that's a very extensive self-evaluation, but I'm not aware of people external to the agency who have done any follow-up.

Q Have you done any consulting with cities, counties or states on visitation policies and practices for children in custody or in foster care?

A Extensively, yes.

Q Can you tell me about that, please, again, generally?

A Yeah. I have -- because of the writing I have done, I have studied policies and practice in visiting programs in a number of different studies. As those findings have been published, I have had requests for -- for example, the state of

Page 17

Pennsylvania's child welfare division asked me to consult with them for about a three-year period to meet with a work group -- it was a statewide work group of directors and other agency staff -- to examine the problems that they had in visiting in 09:49AM the state of Pennsylvania and how to improve it and to work with them on establishing policies and protocols, to provide training to staff and training to foster parents. So over a three-year period I was involved in a lot of different kinds of 09:49AM activities with that. I have provided -- I developed curriculum and provided training on parent-child visiting for both foster parents and agency staff caseworkers, supervisors and directors, and offered that training initially in the state of 09:49AM Tennessee a very long time ago and since then California and Ohio and New York, different -- a lot of different states over the years.

Q Have you ever been asked to evaluate, study or analyze the visitation, and by visitation, I mean 09:50AM between -- I'll let you define it otherwise if you like -- visitation of foster children with their parents and siblings. Have you ever been asked to do that type of evaluation or analysis with respect to Oklahoma's child welfare system? 09:50AM

Page 18

A No.

Q Under book chapters, and we probably have the same CV but if we don't, you'll recognize the reference. The first one listed is a 2008 publication apparently co-authored by you and 09:51AM someone named Feldman?

A Yes, Nancy Feldman.

Q Would that be --there's a Nancy Feldman in Tulsa. Any --

A No. This Nancy is in New York City. 09:51AM

Q All right. With whom is she affiliated or do you know?

A Pardon?

Q I'm sorry. Ms. or Dr. Feldman, with whom is she affiliated? 09:51AM

A She is currently with Hunter College, School of Social Work in New York.

Q Now, if I have this right, what you and Dr. Feldman wrote was a chapter, not the entire book?

A Yes. 09:52AM

Q Okay. This is -- the name of the book as a whole is Values and Ethics in Social Work Practice With Lesbians, Gay, Bisexual and Transgender people?

A That's the name of the chapter.

Q That's the name of the chapter? 09:52AM

Page 19

A Practice with Lesbian, Gay, Bisexual and Transgender People is the name of the book, and it was the second edition of that book.

Q Got that backwards. Do you know if there has been an edition since the 2008 edition? 09:52AM

A No, there has not.

Q And was that -- was your work and that of your co-author the result of a grant or who funded your work on this chapter?

A It was not funded. 09:52AM

Q Were you compensated at all?

A No.

Q How did you get involved in that project?

A I have developed -- in several different schools of social work developed and taught courses 09:53AM in social work values and ethics. It's a particular interest that I've had, and in my teaching had become aware, again, of how people's values and attitudes affected their practice with these populations, often negatively, and so when Dr. 09:53AM Mallon was working on this text, he asked if I would be willing to try to pull together a chapter that explored that.

Q I see another -- I think it's another publication, looks like it. It may be the same 09:54AM

Page 20

chapter or content in the -- another book that Dr. Mallon was the editor of, Foundations of Social Work Practice with Lesbian and Gay Persons. It lists another person named Hess as co-author; is that correct? 09:54AM

A Yes, it does. That's my husband, Howard Hess. It was a first edition.

Q Okay, and is Dr. Hess affiliated with any particular organization or academia?

A He's currently an Episcopal priest. At that 09:55AM time he was a professor at Fordham University in New York City, School of Social Service.

Q Has your husband had any input on any of the work you've done in your Oklahoma project as far as studying the named plaintiffs or any of the work 09:55AM you've done for Children's Rights?

A No.

Q Under other publications I see listed first a 2009 publication. I believe it's entitled, quote, No Questions Asked: A Review of Services Provided 09:56AM to C. Miles, M-I-L-E-S, by the Alaska Department of Health and Social Services. What was that engagement?

A I was asked by the attorney for C. Miles, the plaintiff, to review the entire case record of the 09:56AM

Page 21

services provided by DHS to him as a foster child and to evaluate the quality of those services, and so that report was addressing that question.
Q Was this a suit brought by or on behalf of C. Miles only or was -- were there other plaintiffs; 09:57AM was it a class action?
A C. Miles only.
Q All right, and I don't need to know the details, but was this a suit alleging that C. Miles was a foster child who suffered some harm while in 09:57AM the care of the department?
A Yes.
Q Was it a death case?
A No, it was not a death case.
Q Did you ever give a deposition in that case? 09:57AM
A Yes.
Q Did you testify in court in addition to the deposition in that case?
A Yes.
Q Was there a trial? 09:57AM
A Yes, uh-huh, jury trial.
Q How did that jury trial come out, if you remember?
A For the plaintiff and damages were awarded. The damages were divided, and the attorney requested 09:58AM

Page 22

the judge that the case be reopened and heard, which after about two years he agreed to do on the issue of the damages, and so it's now under negotiation between the Alaska Department of Health and Social Services and the people who brought the case. 09:58AM
Q I don't see the name of the attorney who retained you in that case.
A Christine Schleuss, and that's S-C-H-L-E-U-S-S. She's in Anchorage.
Q Dr. Hess, can you just give me an 09:58AM approximation how much total you've been paid in connection with the C. Miles case ballpark?
A Maybe -- between 30 and 40,000 because of the additional piece of the trial.
Q Next publication, 2008, is a Review of Service 09:59AM Provided to A. Drones, D-R-O-N-E-S. Was that a separate suit from that of C. Miles?
A Yes, it was.
Q All right. Also an injury-type suit?
A Yes. 10:00AM
Q Was that litigated in Alaska?
A Yes, uh-huh.
Q Were you retained by an attorney representing A. Drones?
A Yes. 10:00AM

Page 23

Q Was it also Miss Schleuss?
A Yes, it was.
Q Did you give a deposition in that case?
A Yes, I did.
Q Okay. Did you testify in court also? 10:00AM
A No.
Q Was the case settled?
A Yes.
Q All right. Can you give me an approximation of how much you were paid total in connection with 10:00AM the A. Drones case?
A I would say between 25 and 30,000.
Q Next one I see is a 2007 report concerning children referred to by their initials, A.J. and D.D., another Alaska case. Were you retained -- 10:01AM were -- was that a combined case of A.J. and D.D.?
A It was two foster children, not siblings, who had been placed in the same home when a child was killed. It was brought by several people on their behalf with the same attorney, Christine Schleuss. 10:01AM
Q So was it A.J. or D.D. or yet a third child that died?
A The third child had died.
Q But a suit was filed on behalf of A.J. and D.D.? 10:01AM

Page 24

A Yes.
Q And did you give a deposition in that case?
A Yes.
Q And did you testify in trial?
A I did. 10:02AM
Q And what was the outcome of that trial?
A Well, I can't assert causality, but after the first half of my testimony, they settled it. So it was under negotiation when the trial had begun.
Q And how much total would you approximate that 10:02AM you were paid in connection with your services in the case of A.J. and D.D.?
A I would say between 30 and 40,000.
Q I assure you we're not going over every single publication, but I have certain ones I want to ask 10:03AM you about, and the next one listed on my version here, a 2000 publication, Custody But No Care: A Review of Children's Experiences in MDHD custody. First of all, what is MDHD?
A Mississippi Department of Human Services. 10:03AM
Q And did this publication arise out of some litigation in Mississippi over Mississippi's foster care system?
A Yes. It was a class action suit brought by Children's Rights and others in the state of 10:03AM

Mississippi.
Q And this publication that's listed, is it something that was actually published by Children's Rights as publisher?
A Yes, uh-huh. 10:04AM
Q Okay, and approximately how much total were you paid in connection with all your services in the Mississippi litigation, estimated, please?
A I would say about 40,000. It was worked on -- about half of the work was done on-site in 10:04AM Mississippi in nine counties. So it was a considerable amount of time collecting data as well as writing.
Q Now, was that paid to you by Children's Rights? 10:04AM
A Yes. Well, and the other -- the attorney firms that they were -- that also were involved in the case.
Q All right, and did you give a deposition in that case? 10:05AM
A Yes.
Q And did you testify at a trial in that case?
A No.
Q Next item is An Updated Review of Case Files of Foster Children in Fulton and DeKalb, 10:05AM



D-E-K-A-L-B, if I'm pronouncing that, DeKalb Counties, Georgia, a Children's Rights publication. Is this particular publication an outgrowth of your work in the Children's Rights action filed on foster care in those counties? 10:05AM
A Yes, uh-huh.
Q And, again, how much approximately total were you paid for your services in connection with that particular litigation in those counties in Georgia?
A It's a little harder to estimate. We did 10:05AM actually three on-site case record reviews because of delays in that case. So it was over a couple of years. I would say between 80 and 90,000 for the entire period of time.
Q I should ask you if -- are you still -- are 10:06AM you doing any work in connection with any child welfare situation in Alaska still?
A I have agreed to do an additional case there, to serve as an expert. I have not done any work, seen the records. I don't even know that -- I don't 10:06AM know what the status is, but I haven't done any work.
Q Who has retained you to --
A Christine Schleuss.
Q Do you believe it's going to be a child who is 10:07AM



involved in the foster care or child welfare system in Alaska?
A Yes.
Q All right. Do you know if that, as best you understand it, is going to be an individual case or 10:07AM class action?
A Yes, individual case.
Q All right. Anything else in Alaska that's pending or that you're currently doing?
A No. 10:07AM
Q How about Mississippi?
A No.
Q How about either of these counties in Georgia?
A No.
Q Are you currently involved or about to become 10:07AM involved in any state's services to anyone in connection with a state, city or county's child welfare system other than Oklahoma?
A You mean in a legal suit?
Q Yes. 10:08AM
A Yes. I'm involved in a suit brought by nine plaintiffs against the City of New York.
Q Do you know when that suit started?
A I started work on it a little over a year ago, so it would have been the spring of 2010. 10:08AM



Q Just to make sure because there has been some prior litigation with the City of New York involving its child welfare system, do you know the name of this case or the style of it or any of the plaintiffs' names? 10:08AM
A I know the plaintiffs' initials.
Q If you could give me the plaintiffs' initials, if that's a matter of public record. If you don't remember --
A Off the top of my head, I can't even do that. 10:08AM There are a lot with the last initial of W. The person who contacted me about that case is Howard Talenfeld who is in Florida, and the children, who are now mostly young adults, reside in Florida, and I think the name of the case is one of the children, 10:09AM et al, versus the City of New York.
Q And you think it was probably filed last year, that being 2010?
A Might have been filed in 2009 because I started working on it fairly early in 2010. 10:09AM
Q All right. Could you spell Talenfeld for me?
A Uh-huh, T-A-L-E-N-F-E-L-D.
Q Do you know where in Florida his office is?
A I do, but I don't recall.
Q That's fine. Do you know any other lawyers in 10:10AM





6a10039e-2c58-433e-aba0-4c0e1b27422d

the case?
A Ted Babbitt, and I believe that's B-A-B-B-I-T-T. He's with another firm also in Florida. And Marcia Lowry.
Q So is Children's Rights involved in this City 10:10AM of New York litigation that you just talked about?
A No. She is as co-counsel but not Children's Rights as an organization.
Q Any other lawyers in that case that you know of besides the one you named? 10:10AM
A Sherem Rothenberg. I think it's S-H-E-R-E-M, R-O-T-H-E-N, and I don't know whether it's B-E or B-U-R-G, and there are other attorneys in Florida. I do not recall their names.
Q Have you given a deposition in that case? 10:11AM
A No.
Q Do you know if you're scheduled?
A I will be in July giving one.
Q Do you know any of the lawyers defending the City of New York in that case? 10:11AM
A I don't recall who they are.
Q Okay. Other than this City of New York litigation that you just finished telling me about, any other current situations, that is, legal situations, where you are providing services or 10:11AM



assistance?
A No.
Q So, again, to recap, right now it's Oklahoma and City of New York?
A Yes, with a pending Alaska. 10:11AM
Q And the one case from the attorney that you told us about in Alaska?
A Right.
Q Okay. Do you believe that you will be doing any services in the state of or with regard to the 10:12AM state of Massachusetts?
A No.
Q Do you have any reason to believe you will be involved in litigation that was just filed in the state of Texas? 10:12AM
A No.
Q Are there any other lawsuits or legal situations in which you provided services to Children's Rights or to attorneys who were working with Children's Rights other than Oklahoma and the 10:12AM other cases we've already talked about?
A No.
Q Have you ever been on the payroll of Children's Rights, either as an employee or independent contractor? 10:13AM



A I've been paid by them but not on -- not as a staff person, as a consultant.
Q All right, and when you say consultant, only in connection with the litigation you told me about?
A Yes. 10:13AM
Q Or for any other consultant?
A Not for any other consultant, only for them.
Q As I understand it, there are at least a couple, if not more, organizations and foundations bearing the surname of Casey, either as a family or 10:13AM certain members of the Casey family. Can you tell me just off the top of your head which ones you're aware of?
A I'm aware of two. Annie E. is the Casey Foundation that is on the East Coast, and the Study 10:14AM of The Center of Family Life that I directed with Brenda McGowan, they funded that study, and it was funded in an unusual way. They funded the agency, The Center For Family Life, and then the agency selected the research team and paid us a consulting 10:14AM fee. So during that period of time I was involved in other activities with Annie E. Casey because they would convene research teams together for meetings, et cetera. The other Casey, which I don't remember the name, the one that's in Seattle, I have -- I 10:15AM



don't remember where it would be on my vitae, but I was invited several years ago to come to Seattle for a week of meetings where they invited people with expertise in different areas to consult with the State of Washington's child welfare public agency 10:15AM staff. That's the only contact I've had with them.
Q Would that be the Casey Family Foundation perhaps?
A I think so, probably.
Q You mentioned other activities other than the 10:15AM study of the Brooklyn agency. What other activities; can you give me descriptions generally of the other activities that you did for or with the Annie E. Casey Foundation?
A Not -- no others. 10:15AM
Q As to being asked to come out, what did you do, again, for the Casey Family Foundation? I'm trying to understand. Did you actually study all or part of the child welfare system or foster care in the state of Washington or did you teach, learn, 10:16AM speak, all the above; what did you do for them?
A I did not. I did not study. I reviewed some documents that they had previously developed. I think there was a work group that Casey had convened. The work group was studying some of the 10:16AM

Page 33

problems in the state, and they had generated some documents, which I reviewed. I don't recall the nature of those documents, and I and the others who were invited to attend -- I would say the majority of us had had some involvement with parent-child visiting, foster children and visits with their parents. That was the general area they were trying to improve. There were professionals there from New York City, who had developed policies and programs, that they shared information about, and so it was like a brainstorming session I would say. 10:16AM 10:17AM
Q Would it be fair to say, and you'll tell me if it isn't, would it be fair to say that probably the focus of your services when you went out there was on visitation practices and policies in the state of Washington? 10:17AM
A Yes, uh-huh.
Q All right, and did you issue any type of report or were you part of the creation of any report as a result of your work out there? 10:17AM
A No.
Q About what year was that approximately?
A It was 2006-2007. So it was probably late 2006 and early 2007. It wasn't a very long period of time. 10:18AM

Page 34

Q And is that the last service or professional contact that you've had with the Casey Family Foundation, the Seattle-based organization?
A Yes, it is.
Q Have you -- I know you have practical social work experience. Have you ever headed up a child welfare agency, and by that I mean been the head of a city, county or state child welfare operation? 10:18AM
A No.
Q What are your -- what is your training and education in the area of statistics? 10:18AM
A In my master's program, I had a course on research, which included statistics, research design and statistics. In my PhD program, I had I believe it was two semesters of statistics, applied statistics. 10:19AM
Q Any other training or education in the field of statistics?
A No.
Q I'm not going to ask you any more questions about that because I don't want to try to pronounce that word. 10:19AM
A Thank you.
Q Do you have any training or education in the law? 10:20AM

Page 35

A No.
Q Do you have any training or education in psychology?
A Yes, in that when you work on degrees in an MSW, you study psychology. I also had psychology courses in my undergraduate coursework. 10:20AM
Q Any other courses or training other than those in psychology?
A Well, in my PhD program, in order to write a dissertation on visiting, I had to do a lot of research on parent-child attachment, separation and loss. So I had the opportunity to select that topic in courses as the social sciences area that I would focus on and study and write about. 10:21AM
Q Do you have a degree in psychology? 10:21AM
A No.
Q Do you have any professional licenses in any states or any jurisdictions?
A No, no. I have the ACSW, which is not the same. 10:21AM
Q I'm talking about governmental-issued licenses. Do you have any?
A No, I do not.
Q Have you had in the past?
A No, I have not. 10:22AM

Page 36

Q Have you ever been an adoptive parent or foster parent, and I'm not going to get into your personal life, but I need to ask you that.
A No, I have not. Can I clarify something?
Q Yes. 10:22AM
A During the period of time that I was providing direct services to children and families and groups, states were not licensing social workers. So that's a fairly recent development in my work. Since then has been -- hasn't involved direct services to clients. 10:23AM
Q I mentioned an earlier lawsuit against the City of New York, and under -- in your CV under legislative/legal testimony and consultation, it's on my Page 159 if that helps, I see an entry that says, quote, prepared for expert testimony, Michael H. versus Giuliani, Superior Court, New York County, The Legal Aid Society, New York City, 1994 through 1996. Are you with me on that? 10:23AM
A I didn't hear the last part of the question. 10:23AM
Q Are you reading along with me?
A Yes, I am. I have you.
Q All right, thank you. Who engaged you or retained you to prepare for expert testimony in the case of Michael H. versus Giuliani? 10:24AM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 37

A The Legal Aid Society asked me to prepare in the event that that case went to trial based on -- because I had just moved to New York City. It was based on the work I had done in Indiana, the study of failed reunifications, a large proportion of 10:24AM which focused on issues such as the impact of high caseloads on caseworkers' decisions and practice, and that was the issue, caseload size and other system's issues, that they were preparing me to testify about. They were informing me of issues in 10:24AM that system and exploring what my opinions would be based on the research I had done. It did not -- I did not give a deposition or do anything other than meet with one attorney.
Q So, again, I'm going to take that to mean that 10:25AM you did not create or issue a report in connection with that?
A No, I did not.
Q Next entry I have is that you gave some expert testimony in the case of P.M., et al, versus Jeff 10:25AM Richardson, a class action by children who were wards of the Marion, M-A-R-I-O-N, County office in Indiana in 1992.
A I gave a deposition.
Q Did you testify in court? 10:26AM

Page 38

A No.
Q And what did you do -- first of all, who retained or engaged you in this class action in the federal court there in Indianapolis?
A It was either The Legal Aid Society or it was 10:26AM the -- the name was something like that, and the -- one of the attorneys had requested that I do that, and I was called to court to give -- called to give the deposition.
Q Do you know or have a belief as to what 10:26AM happened; what was the outcome in that class action in federal court in Indianapolis?
A It was settled.
MR. DEMURO: Can we go off the record a second? 10:27AM
(Following a short recess at 10:27 a.m., proceedings continued on the Record at 10:39 a.m.)
Q Doctor, I apologize if this repeats an earlier question, but just to try to close the chapter here, 10:39AM have you worked or prepared to work in connection with any other child welfare litigation in any state, county or city other than the ones that we've talked about here today?
A No, I have not. 10:40AM

Page 39

Q Thank you. This is probably a subset of the same question, but I want to clarify this. Have you ever testified on behalf of a governmental unit in one of these cases?
A On behalf -- 10:40AM
Q Of a governmental unit, a defendant in one of these child welfare cases.
A No.
Q On Page 159 of your CV under the heading Selected Child Welfare Curriculum Development 10:41AM Training and Consultation, the second entry I see under that heading is 2006-2007 Casey Family Programs, Washington, D.C., consultant. Can you --
A That's the meeting I was -- they're based in Washington, but the work, the actual meeting I 10:41AM attended was in Seattle.
Q Thank you, but no other consulting services besides going out there to Seattle on that occasion?
A No, no other ones.
Q Thank you. And can you give me a general 10:41AM description of your consultancy services for the Tennessee Department of Children's Services in 2005?
A Yes. The child welfare division was studying problems it was having in east Tennessee, in the eastern part of the state, in part because it's so 10:42AM

Page 40

rural, regarding parent-child visiting, and so they asked me to meet with them and try to understand some of the options that they might have to improve those services.
Q Do you know if Tennessee was involved in 10:42AM litigation at that time in 2005?
A Tennessee has been -- I'm not sure if it still is, it may have ended, but they have been under, I guess, court supervision from a class action suit that they would have been in during that period of 10:42AM time.
Q Do you remember who first contacted you about doing that work in Tennessee?
A Someone from the child welfare director's office in Nashville. 10:42AM
Q On the next page, 160, the first full entry I see says 1993 is as a consultant case reviewer?
A Right.
Q And is this a joint project sponsored? I've seen several entities in here. Who engaged or 10:43AM retained you to do the case review that you did in 1993?
A My recollection is that I was retained by the Wilder Settlement Panel, and those other entities were connected with that in ways that I don't 10:43AM

Page 41

recall. I and three other faculty members from New York City Schools of Social Work were asked to review children's case records to see if the City was in compliance with the agreement that the Wilder Settlement Panel was monitoring. 10:44AM
Q So you were attempting to determine whether or not the City of New York was in compliance with some type of court settlement?
A Right.
Q All right, and was the American Civil 10:44AM Liberties Union involved in that litigation somehow?
A I really don't know.
Q Do you know why you listed them then on your CV?
A Whatever I had that I worked from when I did 10:44AM my vitae listed in this way, so --
Q All right. Have you ever rendered any services, either for compensation or pro bono, for the American Civil Liberties Union, Children's Rights Project or similar arm of the ACLU? 10:45AM
A No.
Q Do you remember about when you first met Marcia Lowry?
A It would have been after I had begun the work on the class action suit in Georgia. I don't 10:45AM

Page 42

specifically remember when, but it would have been early during that period.
Q Okay. Have you been -- received any money or other valuable consideration from Children's Rights or lawyers working with Children's Rights other than 10:46AM in connection with the litigation services that you've already described to me?
A No.
Q Have you ever made any donations or contributions, either money or in kind, to 10:46AM Children's Rights?
A No.
Q Has your husband?
A No.
Q Have you ever been to an event sponsored at 10:46AM least in part by Children's Rights?
A While I was doing the case record review study in Mississippi, I was invited to go to a reception by the firm there in Jackson that was for child welfare advocates, and there were Children's Rights 10:47AM attorneys there. I actually don't know who really sponsored it, but I did attend it. There are no other events that I've been to.
Q Ever been to a dinner or fundraiser sponsored by Children's Rights? 10:47AM

Page 43

A No.
Q On Page 161 of your CV under Professional Publications Reviewer heading, do you still serve on the editorial review board of the publication, Child Welfare? 10:47AM
A Yes, I do.
Q And what is in general your function as a member of the editorial review board for Child Welfare?
A I review on average a manuscript a month 10:48AM that's been submitted by a potential -- by an author that wants that published in Child Welfare. Using the criteria that they have for publication, I write a very brief recommendation about whether or not the article should be published and what changes might 10:48AM need to be made, which I forward back to the publishing office, and then they take it from there.
Q Is the publication, Child Welfare, is that affiliated with the Child Welfare League of America?
A Yes. 10:48AM
Q So that is more or less the official publication of that organization?
A Yes.
Q Thank you.
A It's one of them. 10:48AM

Page 44

Q I'm sorry?
A It's one of them.
Q All right. What are other publications of the Child Welfare League of America or are they listed on the website of the Child Welfare League of 10:48AM America?
A They are listed there.
Q All right. The next entry just below that says that you were a member of the editorial review board for Children and Youth Services Review from 10:49AM 1987 through 2004. First of all, who publishes the Children and Youth Services Review?
A I'm not sure; I'm not sure. I'd have to go look.
Q Is it still being published? 10:49AM
A Yes, it is.
Q Next entry is consulting editor, Journal of Social Work Education. Is there a university that publishes that or who publishes that journal?
A The National Council on Social Work Education, 10:49AM which is an accrediting body for schools of social work.
Q National Council on Social Work Education?
A Uh-huh.
Q Is that correct? 10:49AM

Page 45

A Publishes that journal and publishes the accrediting standards for schools of social work.
Q Have you studied the role of courts and their interrelationship with child welfare systems?
A Not specifically, no. 10:50AM
Q Have you made any attempts to understand the Oklahoma court system as it pertains to what we call deprived children, that is, children who are in the custody of Oklahoma DHS as a result of abuse or neglect? 10:50AM
A I've certainly reviewed the policies and procedures about those relationships and what's expected of department employees with regard to information to the courts and those things.
Q So just to clarify, so you studied DHS 10:51AM policies that talk about the DHS role in the courts?
A Yes.
Q All right. Have you studied any legal documents about the Oklahoma court system and its handling of deprived children? 10:51AM
A No.
Q Have you reviewed any parts of Oklahoma statutes Title 10, which is the children's code?
A Right. Only as they are referred to in the policies as the source for many of the policies. 10:51AM

Page 46

Q If a particular section of Title 10 was referred to but not set forth verbatim in a DHS policy that you read, did you go look at the actual text of the cited part of Title 10?
A No. 10:52AM
Q Have you talked to any Oklahoma judges?
A No.
Q Mr. Kapell of Children's Rights sent me an e-mail, and he gave me a number on how much compensation you've received in connection with your 10:52AM services here on the Oklahoma case to some date. I think probably it was current to the date of his e-mail, but maybe you can update me. Do you have an estimate of -- I won't ask you how much you've collected so far because you might have some 10:53AM outstanding bills, but can you estimate how much you've billed thus far in connection with your services on the Oklahoma case and studying Oklahoma?
A It's partialized. On these two reports, the report and the supplemental report, it's 10:53AM approximately 65,000.
Q Is that total for both of those?
A Uh-huh, yes.
Q What about, was there a separate charge for the affidavit that you did? 10:53AM

Page 47

A Yes, there was.
Q And how much was that?
A I think it was 6,000.
Q And did you sign a contract with either a law firm or with Children's Rights regarding your 10:53AM compensation?
A No.
Q Then can you tell me what were the oral terms of your engagement as far as compensation?
A They were a set amount per day of work, which 10:53AM was approximately seven hours of $600, and then $150 an hour for deposition and testimony preparation and work.
Q I realize you may not have billed yet in connection with your travel and/or prep time and the 10:54AM giving of the time here today for this deposition, but have you billed for -- setting that aside for a moment, have you billed for anything other than the original and supplemental report and the affidavit? You've already given me the totals on those. 10:54AM
A I've billed also for a very brief report that the -- my understanding is that the judge requested or was requested by the court regarding which documents out of the children's case files would be referenced in the report, which would be used in the 10:55AM

Page 48

report. My memory is that I did that work prior to the affidavit.
Q I believe you provided -- I know we have a preliminary list of materials you considered, I believe. I can pull it out. That's what the title 10:55AM is. Is that the one you're referring to?
A Yes.
Q Do you remember about how much you billed for that project?
A I don't. It was more than the affidavit. 10:55AM Maybe -- I don't know. Maybe around 10,000. Turned out to be a very labor intensive task.
Q Okay. Again, setting aside what you may ultimately bill in connection with today's deposition, you've billed an amount for the two 10:56AM reports; you've billed an amount for the affidavit; you've billed an amount for the review and the resulting report in connection with materials that you considered. Any other billings that you've made to either Children's Rights or to a law firm in 10:56AM connection with the Oklahoma litigation?
A No.
Q What is your -- is there any writing -- I asked if there was a contract. Is there any writing that reflects the terms of engagement, the terms 10:56AM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 49

under which you were hired and retained beyond compensation, what you were to do. It might also include compensation. Is there an e-mail, a letter, something you might not consider a contract but --
A I think primarily my invoices, which -- no. 10:57AM My invoices would be the only documents I'm aware of.
Q Okay, and do you keep copies of those invoices in your office?
A Yes. 10:57AM
Q Are they electronically stored or paper; do you remember?
A Probably some of both, but they're all electronically stored.
Q Okay. What have you done to prepare for the 10:57AM deposition today?
A I have reviewed the original report and the supplemental report and the affidavit. I have reviewed Dr. Milner's report of his study findings. I skimmed through policies. I didn't -- I skimmed 10:58AM through the policies, major policies. I met with Paul Demuro and Yasmin Grewal-Kok week before last.
Q I'm sorry?
A I met with Paul Demuro and Yasmin Grewal-Kok week before last week. 10:58AM

Page 50

Q I'm sorry. I didn't understand the last part of that.
A For about four to five hours, and I met briefly with Paul yesterday afternoon.
Q Where did you meet with Paul and Yasmin? 10:58AM
A In the Children's Rights offices in a conference room.
Q Was anyone else present besides Paul and Yasmin?
A There was someone there who was observing. I 10:59AM don't recall her name, and Kelley Fong, who is a paralegal, was in and out as we requested documents or things.
Q Okay. Did you request -- excuse me. Did you review any documents during that session in New York 10:59AM with Paul and Yasmin other than what you've told me about?
A No. Well, actually I guess you could say we reviewed -- I had provided to Children's Rights documents that I used in the preparation of the 10:59AM report, the actual documents, my notes on the documents, my notes. I think we did maybe briefly review a few of those, a handful of those.
Q Can you explain to me what you mean by my notes on the documents? 11:00AM

Page 51

A Well, in the course of my review of the children's case files, I've reviewed, as you know, thousands of documents, both documents that are on CDs and hard copy of documents, and part of the process of my data collection and analysis is, as 11:00AM I'm looking at documents, to highlight things that are relevant to make notes, for example, a child's placement history, which is usually found somewhere in the file. Information I find in other places in the file that's not listed on that placement 11:00AM history, I will add that to the placement history so that that document becomes more accurate in terms of the total file document. That's part of my process of data collection and analysis. So I retain all of that as part of the protocol for this kind of 11:01AM review.
Q Okay. Sounds like, and you tell me if I'm wrong here, that as you're reviewing documents, you make handwritten notes; is that correct?
A Yes. 11:01AM
Q And the handwritten notes are at least sometimes, maybe always -- you're going to tell me -- made on the actual documents that you're reviewing?
A The majority of the time. 11:01AM

Page 52

Q Okay, and the non-majority, the other handwritten notations, are they just made on a pad; are they put on a laptop; how do you memorialize or preserve those notes?
A Primarily on a legal pad, just paper. 11:01AM
Q All right, and have you retained, first of all, the records on which you've made handwritten notations?
A Yes, and I have provided those to Children's Rights. 11:02AM
Q All right, but you have a set or --
A No, I do not have a set. I gave them the originals.
Q All right, and what about the -- I'll call them note pads or pads on which you made the 11:02AM handwritten notations?
A I provided those as well.
Q And did you retain copies of any of those?
A No.
Q Who was it that first contacted you about 11:02AM Oklahoma's foster care system?
A Ira Lustbader.
Q He's an attorney with Children's Rights?
A Yes.
Q Can you give me about when this was, not a 11:03AM



6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 53

date but, you know, year, time of year, anything like that?
A It would have been I would say early in 2008. It was after the complaint had been filed.
Q And what did he tell you initially? 11:03AM
A Pardon?
Q What did he tell you initially?
A He told me that they had filed the complaint, that they were interested in my conducting the case record review, which is the large review of the case 11:04AM records of the random sample of children or a review of the plaintiffs' files, and at that point the timetable for the case and work related to it was unclear, and would I be interested, available to do one or the other, and I said as best I knew at that 11:04AM time, yes.
Q Did you make a decision initially then which one you would do?
A No.
Q And do you remember then when you finally did 11:04AM make that decision or was that decision taken away from you; did it continue to be your call or --
A Well, ultimately they asked me to do the plaintiff review. I don't know what factors were in their decision to ask me to do that, but that's what 11:05AM

Page 54

they asked me to do, and I said I would do that.
Q Did they ever again ask you to consider doing the larger statistical analysis of the larger group of children than just the named plaintiffs?
A Yes, they did. 11:05AM
Q And what was your response to that?
A Initially it was yes and then it was no.
Q Why the latter?
A The amount of time that would have been involved in travel. 11:05AM
Q And as to then the named plaintiffs, what was your understanding of what you were being asked to do and what you agreed to do?
A I was asked to review the entire collection of documents related to the services provided to the 11:06AM main plaintiffs, the named plaintiffs, and evaluate the quality of those services and to examine the effort that was made to provide the children with safety, wellbeing and permanency.
Q And that's what you agreed to do? 11:06AM
A That's what I agreed to do.
Q And that was the scope of the engagement that you were asked to undertake and did accept?
A Yes, and in addition to that, they asked me to identify, as I could, systemic problems and to give 11:06AM

Page 55

my professional opinions about the harm -- what harm, if any, I saw that the children had sustained while they were in custody.
Q Anything else you were asked to do that you agreed to do? 11:07AM
A No.
Q When you said you were requested to -- I'm not trying to put words in your mouth. I'll try to either repeat it or paraphrase it. When you were asked, to the extent that you could, to evaluate 11:07AM systemic problems, what did you -- what do you mean or what do you think they meant by if you could, why that qualifier?
MR. DEMURO: Object to the form.
Q I'll just ask -- if I may, I'll reask the 11:08AM question. Counsel made an objection. Why did you in describing that use the phrase if I could or to the extent I could? Please go ahead.
A Because when you begin a study, you cannot assume what you may or may not find. 11:08AM
Q All right. So you did not assume in the beginning that you would be able to form an opinion or conclusion about systemic problems from the study of the nine named plaintiffs?
A I did not assume that I -- that I could in the 11:08AM

Page 56

sense of I did not know what they might be. I assumed that there might be problems, but I didn't know what they might be and the extent of them.
Q When you say you assumed there might be, you, I'm sure, considered possibly there might not be? 11:09AM
A That there might not be.
Q Do you remember how early on you read the complaint in this case?
A I don't recall specifically. I would have read it -- needed to read it to prepare the 11:09AM affidavit. I don't recall if I had read it prior to that.
Q Okay. Why did you review the complaint? Were you asked to; did you ask to do it?
A Well, specifically I don't recall. I know I 11:09AM always ask to review the complaint.
Q Okay, all right.
A If they hadn't provided it for me to read, I would have asked for it.
Q Thank you. Did you ask to review a copy of 11:10AM the DHS answer to the complaint?
A No.
Q Did anyone at Children's Rights or any other law firm affiliated with the plaintiffs in this case ask you to review the DHS answer in this case? 11:10AM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 57

A No.
Q Did you -- are you aware that DHS filed not only an original answer but an amended answer?
A I honestly don't recall. I did -- I was aware of some of the steps in the legal process, but I don't recall specifically. 11:10AM
Q So you haven't looked at any part of either the original or the amended answer filed in this case by DHS?
A No. 11:11AM
Q Why didn't you ask to read a copy of the answer?
A Because as it became clear what my focus was to be, as a researcher I knew that my primary source of data would be the children's case records. Any information I would rely on and need, other than policies, would be in the children's case records, including the e-mails. 11:11AM
Q Why did you think it was important to read the complaint? 11:11AM
A Well, it helps me understand what the basis of entering into the suit -- what people have been informed and do believe has occurred and what is the basis of the suit, and part of that actually is related to my expertise. I have been asked -- I 11:12AM

Page 58

couldn't recall the specifics, but I have been asked to serve as an expert in cases that when I understood the complaint and the issues, I declined because they didn't fit with what I considered to be my area of expertise. 11:12AM
Q Do you think, in fairness, you ought to have read the answer filed by Oklahoma DHS to the complaint that you did review?
A No.
Q Have you read any deposition transcripts in this case? 11:13AM
A A few. Not many.
Q Can you tell me which individuals' depositions you did review?
A The only ones that I read, and I didn't read many mostly because I wasn't finding that helpful to read them, were caseworkers, depositions of caseworkers. Children's Rights sent them to me, so I read a couple. 11:13AM
Q Could you have read more than a couple? 11:13AM
A Could I have?
Q Yes.
A Yes.
Q In terms of number?
A I don't recall how many they sent. It was 11:13AM

Page 59

fewer than ten. I could have read all of them.
Q In other words, you read all the ones they sent you, whatever that number was; is that correct?
A Pardon?
Q Did you read all the ones they sent you, whatever that number might be? 11:14AM
A No. I read one or two of the ones they sent me, and then I decided it was not useful, so I didn't read the others.
Q Do you remember why you decided it was not going to be useful to read the remaining social worker depositions? 11:14AM
A The primary reason was that a particular caseworker, I immediately recognized the name. She had been involved in at least one of the children's cases. She -- her work was not of good quality, and as I read the deposition, I realized that she was being quite deceptive in the testimony that she gave, and because I was so familiar with her work in at least one or more of the cases that were the plaintiffs, I felt that that was information I didn't want to be influenced by. So I didn't want to have that information about anybody else. It's that simple. 11:14AM 11:15AM
Q Are you saying you assumed that the other 11:15AM

Page 60

social workers would be deceptive?
A I had no idea.
Q Why didn't you read them to find out?
A Well, I don't know how much -- I don't know how much you are aware of the methods of qualitative research. There are really two huge types of research, quantitative research and qualitative research. Qualitative research, which is the kind of work that I did for this case record review and for much of the research that I have done and published, has some very clear standards, and one of the concerns that an investigator and others always have about qualitative research is the bias, if it's present, of the researcher, and that the findings are based on the data. That's very, very important, and so when I am involved in the process with myself or with a colleague of conducting a qualitative study, I am very alert, which is part of my professional discipline as a social worker, and as a researcher, I am very alert for my own attitudes, assumptions and biases, and I felt that reading those other depositions, whatever they might say, was information that was not included in the children's case files, and so I decided not to become further aware of it or rely on it. 11:15AM 11:16AM 11:16AM 11:17AM 11:17AM

Page 61

Q Let me ask you, so your opinion that the one caseworker was deceptive in her deposition, that didn't affect your decision to not read the remaining ones?
A I don't understand your question. 11:17AM
Q Yes. Well, if I paraphrase, and tell me if I'm wrong here, you're saying that because the remaining deposition transcripts of social workers were not a part of the case histories and case files that you were reviewing, that that's the reason you 11:18AM didn't go ahead and read them; is that the only reason you didn't go ahead and read them?
A No. I previously said that I was concerned about her representation of her own work and the difference between that and what I had -- the 11:18AM documentation I had seen in the children's case files, and I felt that that was not part -- the purpose of my review, to make a determination about any of that, about her deception or her honesty. I could and did report in this report her and others 11:19AM -- whether their work met policy and good professional standards as I came across that data.
Q You believe she was deceptive in her deposition?
A That is my observation, yes. 11:19AM

Page 62

Q What's the name of this caseworker?
A Frona Musgrove.
Q So your belief that she was deceptive in her deposition, what role, if any, did that conclusion play in your decision not to read the remaining 11:19AM social worker deposition transcripts?
A I don't know how to explain it any better than I have. I felt that that information, which I think of as data, that data, that information that was in their deposition, was not data that would be helpful 11:20AM to me in achieving the purposes of this qualitative study that I had been asked to do.
Q Then why did you read any of the deposition transcripts?
A I think probably that hadn't occurred to me. 11:20AM
Q You said you read one other transcript besides Miss Musgrove's deposition transcript. Do you remember who that social worker was?
A No, I don't.
Q Did you consider his or her testimony to be 11:20AM deceptive in that transcript?
A It wasn't -- I didn't have information to consider that. It was not a worker whose name I recognized from having read the children's records.
Q Was it -- do you remember if it was a male or 11:21AM

Page 63

female?
A I'm sorry, I don't.
Q Do you remember anything about the substance or content of that testimony?
A No. 11:21AM
Q Were you concerned after being -- after reading Miss Musgrove's deposition transcript that you might not be able to read the remaining deposition transcripts of social workers that had been provided to you with the level of objectivity 11:21AM and fairness that you believed should be a part of reviewing it?
A No, I wasn't concerned about that.
Q Did any individual or individuals assist you in any aspect of your work in the Oklahoma 11:22AM litigation other than, let's say, the attorneys assisted you in some sense, but other than lawyers involved with the case?
A I have to think a minute. There is a step that I have requested when I have done reports like 11:22AM this of asking that someone else review the documents and check my citations to be sure that they're accurate and that another person who would look at this document would see what I saw. So it's a fact-checking step, and there were I believe two 11:23AM

Page 64

paralegals who did do that on the report, in the supplemental report.
Q Okay.
A Paralegals for Children's Rights, employees of Children's Rights. 11:23AM
Q Can you tell me their names, please?
A Kelley Fong and the name of the other one, her first name is Mavis. I don't recall her last name.
Q And were there any recorded, and by recorded I mean either paper or electronic recorded 11:23AM communications between you and Kelly or you and Mavis concerning their role in doing the fact checking and what you've described?
A There are notes that I made, which I have provided to Children's Rights. Where something was 11:24AM not clear to them, they forwarded to me the documents they wanted me to look at so we could discuss those documents, and I retained those documents and my notes on them and gave them to Children's Rights. I do not know what records they 11:24AM kept.
Q Okay. So you did not retain any copies of the notes that you turned over to Children's Rights that you just described?
A No, I did not. 11:24AM

Page 65

Q Anyone else --
A And I might add --
Q Yes, go ahead.
A -- other than this is legal work where I assume that may occur in other -- I don't really 11:24AM know, but in qualitative research, one of the protocols that is suggested to increase the confirmability, the trustworthiness, the reliability and validity of the findings, is to have what is called an audit of at least some of the documents 11:25AM that the investigator saw and made notes on and worked with, and so it's a way to confirm that what -- to address the issue of bias, any concern about bias that these -- the facts that are in the first part of each of those children's -- the report 11:25AM about each of the children have been reviewed and checked by a second person, so that the reader -- from my point of view, the reader cannot have a concern that I have been sloppy or careless in the work I've done. 11:26AM
Q And that's what Kelly and Mavis were doing?
A Yes.
Q Other than Kelly and Mavis, anyone else assist you in any way in the services that you provided with regard to the Oklahoma litigation? 11:26AM

Page 66

A No.
Q Did you have secretarial or clerical help during this?
A I did not.
Q What voluntary organizations are you a member 11:26AM of?
A I'm sorry?
Q What voluntary organizations are you a member of currently?
A Voluntary organizations? 11:27AM
Q Whether they are related to child welfare or your work or not.
A I'm a member of the National Association of Social Workers. I'm not sure exactly what you're asking. I'm a member of a church, you know. 11:27AM
Q I'm not interested in --
A But in terms of professional organizations, currently that is the only voluntary one I'm a member of.
Q Any political or advocacy organizations? 11:28AM
A No.
Q Have you been in the last ten years -- I'm not interested in asking about your church or faith, but any organizations that you've been a member of in the last ten years that you're not currently a 11:28AM

Page 67

member of?
A What comes to mind, which I couldn't -- I don't know how specific I could be, and I'm not now, are environmental, like wilderness, Sierra Club, organizations that lobby around the environment. 11:28AM
Q Okay. Have you ever been a part of or assisted in any way in any environmental-related litigation?
A Litigation, no.
Q Have you ever given any presentations about 11:29AM environmental issues?
A No.
Q Any other -- we've covered environmental. Can you think of any other organizations that --
A I was going to say, I grew up in the Smoky 11:29AM Mountains, so that's something I care about. Have I -- I'm sorry. I interrupted you.
Q Any other organizations, besides environmental groups, that you've been a member of in the last ten years that you no longer belong to? 11:29AM
A Not that are not noted on my vitae. I mean, there are boards that I've served on that was certainly voluntary, but they're on my vitae.
Q When you first read the complaint, specifically with regard to the allegations 11:29AM

Page 68

contained in the complaint as to the nine named plaintiffs, what was your human response to that?
A I would say sadness and compassion, which I must say I experience in all of the litigation I've worked in. Compassion for the various parties. You 11:30AM know, I have trained literally probably thousands of child welfare workers in the past forty years and supervised them and had them come and talk with me about whether or not they would leave their positions because of how difficult the work was, and 11:31AM so when I read a child's record or a complaint or a newspaper article, I think part of what I bring to it, which functionally becomes expertise but it's very human, is a sense of how difficult it is for everybody involved. You know, everybody has a story 11:31AM to tell. So I'm aware of the complexity and that this has got to be hard not only for the children but for the people who are involved in serving them, if what I'm reading is accurate, which in a complaint -- certainly some of the facts in a 11:31AM complaint may be not fully -- may not be the whole picture.
Q Was part of your human reaction that it just seemed, on reading that, that these children had been let down by a system? 11:32AM

Page 69

MR. DEMURO: Object to the form of the question.
Q Was that part of your human response?
MR. DEMURO: Her human response?
MR. BINGHAM: Yes, human response. 11:32AM
MR. DEMURO: Object to the form.
A I don't recall specifically, but I imagine I reflected that they seemed to have been not served well.
Q Having read the complaint and events that were 11:32AM alleged in there up to the date of its filing, were you concerned, from a human standpoint, about the future of these nine named plaintiffs?
A I don't recall that I specifically focused on that. I don't recall that. 11:33AM
Q Would you at some point in your evaluation have become concerned that if changes weren't made, that these children would continue to suffer or even get worse; was that a feeling that you had at any point? 11:33AM
A I'm not sure I understand your question. Could you try it another way?
Q Sure. Did you believe that at the time you were preparing your original report, for example, that those five children needed to be better served 11:33AM

Page 70

or they would continue to be at risk or continue to suffer harm?
A Yes. I think that was repeatedly very apparent, that they would continue to be at risk, they and others placed with them. 11:34AM
Q And if the things that you read in the complaint were true, that would be true not only of the five but the nine; would that be fair to say?
MR. DEMURO: Object to the form of the question. 11:34AM
A Again, I'm not understanding your question. I think -- I don't know how -- I don't understand the question.
Q Let me go on. Do you have any information about how these nine named plaintiffs were selected 11:34AM to be plaintiffs?
A Some, and it's more about process than the specifics of these nine children. I'm aware from conversations about each of the times that I was retained by Children's Rights about the process that 11:35AM they use in assessing whether filing a complaint and what would be the nature of the problems, et cetera, making that assessment and coming to that determination and the process of talking with people in the state, professionals in the state, et cetera, 11:35AM

Page 71

and that the plaintiffs are selected from among the group of children's cases that they have been informed about in that assessment process and that they are believed by the Children's Rights attorneys and others that they have talked with about the 11:36AM problems that are perceived to be in the state to be representative of those types of problems, and then there are steps of securing, I guess, permission or willingness for the child to become a named plaintiff. I don't know specifically about these 11:36AM children and the process.
Q Well, in terms of process then that has gone on in other states, do you know how it's determined by Children's Rights that the particular children that are selected, that they are, quote, 11:36AM representative of many other children in that state?
MR. DEMURO: Object to the form of the question. I'm also going to object on the grounds that it seems to me the question is invading this new privilege that the rule has created between 11:37AM communications between counsel and expert. Quite frankly, I'm not really familiar with that since it's such a new privilege, so I'm not going to instruct her not to answer because I'm having a difficult time understanding what the contours of 11:37AM

Page 72

that privilege is myself. I just don't want to waive it. So I'm not going to instruct her not to answer. I just want to raise the issue and see how it goes as we go along.
MR. BINGHAM: And I will acknowledge that 11:37AM your decision to not instruct the witness under these circumstances is not a waiver of your objection or the privilege, if it exists.
MR. DEMURO: I appreciate that.
MR. BINGHAM: And it may very well exist. 11:37AM This is an area that we're all learning in.
Q Let me try to rephrase it and then Mr. Demuro will need to make the same objection, but I'll try to make my initial question clearer. In being told about the process, the results of the selection of 11:37AM certain children and not others, were you told -- and being told that these -- the ones that are selected are, in the opinion of the Children's Rights, children whose situations or problems are representative of a larger group in whatever 11:38AM jurisdiction; were you told anything about how that belief was formed that they were representative, what process was involved in making that determination?
A No. 11:38AM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 73

MR. DEMURO: Same objection, but go ahead.
MR. BINGHAM: Yes.
A And I think I would like to add that this -- the Oklahoma case is the only case where I have read more than one or two plaintiffs' case records. In both Georgia and Mississippi, I did not do a review of the plaintiffs' case records, although we used one or two of their cases or portions of their cases to pilot the protocol that we used in the case record review. So I was familiar with one or two children's case records, portions of it. So this is the only instance where I've read all of the plaintiffs' records. 11:38AM 11:39AM
Q Okay. Would the time that you spent reviewing each named plaintiff's records be broken down by each named plaintiff in your invoices or would it be just reviewed named plaintiffs; do you remember? 11:39AM
A No, they were not broken down.
Q Okay. You did not eventually issue a report on two of the named plaintiffs, D.G. and C.S. Did you review any records, documents or receive any information on either of those two children? 11:39AM
A I had begun to review documents for one of them, and I can't recall whether it was C.S. or -- what was the other one -- D.G. I don't recall which 11:40AM

Page 74

one it was. It was some time ago, but before I had gone too far, I was informed that they were no longer in the class.
Q And I realize you don't remember whether it was C.S. or D.G. Whichever of those two it was, do you remember what records you had reviewed prior to finding that out? 11:40AM
A Not specifically.
Q You would -- do you know if you reviewed the complaint? 11:41AM
A When I read the complaint, it included all of them.
Q Yes, but I mean before you were told that these two were no longer part of the class?
A Yes, because I had written the affidavit. In terms of sequence, I'm certain I had read the complaint before I worked on the affidavit. 11:41AM
Q All right, and you prepared and submitted the affidavit before you were told these two particular children are no longer part of the class; is that accurate or not? 11:41AM
A Yes, I believe so.
Q Any other records you can think of that you reviewed, other than the ones you've told me about, in connection with either D.G. or C.S.? 11:41AM

Page 75

A No.
Q What were you told about the children no longer being part of the class?
A About the children --
Q About D.G. and C.S. no longer being part of the class. 11:41AM
MR. DEMURO: Told by whom, if I might, so I can understand whether or not there's an objection.
MR. BINGHAM: Sure.
Q Who informed you that C.S. and D.G. were no longer part of the class? 11:42AM
A It would have either been Ira Lustbader or Yasmin Grewal-Kok.
Q And what did they tell you about these two children no longer being a member of the class? 11:42AM
MR. DEMURO: I'm going to object. I do think this is a privileged communication under the new rule. Quite frankly, I don't like the new rule, but I feel compelled to object, and because it doesn't seem to me to fall under any of the exceptions of the communications between counsel and expert because it's no longer part of her reports and, therefore, is not a basis of her report, so it's not a fact that she relied -- an attorney conveying a fact upon which she relied to do her 11:42AM 11:43AM

Page 76

reports. I do think this is privileged, but I hate making that next step and instructing the witness not to answer, Don, so I'm going to let her go forward, but I do think we're getting close to that area. I think we're in that area, but I'm just grappling with the extent of that privilege. So there we go. 11:43AM
MR. BINGHAM: Well, again, your decision under the circumstances not to instruct her not to answer the question doesn't constitute a waiver of your privilege in our view. I appreciate your comments. 11:43AM
MR. DEMURO: So you can go ahead and answer, if you remember the question.
A Well, I remember that it was factual, and what I recall is only one, and I don't recall which one, I believe had been adopted. That's what I recall. 11:43AM
Q Anything else that you can remember about -- and I'm going to let Mr. Demuro interpose his objection here in a minute. Anything else you can remember about what either Ira or Yasmin told you about these two children no longer being a member of the class? 11:44AM
MR. DEMURO: Same objection.
A I don't recall anything else. 11:44AM



6a10039e-2c58-433e-aba0-4c0e1b27422d

Q Okay. When they told you this, did they -- again, there needs to be another objection here, but did they tell you that you were not to complete any work on either of these two children?
A Yes, and I remember wishing they had told me that sooner. Yes, they said there was no need to do any further work on those two children. 11:44AM
MR. DEMURO: Could we go off the record?
(Following a lunch recess at 11:44 a.m., proceedings continued on the Record at 12:42 p.m.)
Q Dr. Hess, earlier we talked about or you told me about some work that you had done in I believe it was in Indiana about reentry into foster care and interviewing judges involved in that process, and do I remember correctly that even the judges would second guess themselves in some instances to say, well, you know, I wish I hadn't made the decision I did; did that ever occur in your interviews with the judges? 12:42PM 12:42PM
A I wouldn't say they used those words, but they certainly reflected that they could have done something differently.
Q In hindsight?
A Uh-huh. 12:42PM



Q Is that correct?
A Uh-huh.
Q If you could just say yes for the reporter.
A Yes.
Q That's all I was looking for. Do you know of any analysis that's been done by anybody of judges' performance in handling deprived child cases in any jurisdiction? 12:43PM
A Nothing specifically comes to mind, but I know that the Juvenile Court Judges Association has a journal, and so I'm sure that there are such things, but I don't know specifically. 12:43PM
Q Okay. Where is your deposition scheduled for July of this year in that City of New York case; where is it going to occur; do you know? 12:43PM
A In New York City.
Q In a law office or some other place?
A I don't know.
Q All right. Do you know how Oklahoma DHS -- if it has a definition of caseload. I'm going to let you tell me your definition if you want to, but I'm just asking you right now about, do you know if DHS has a definition of caseload? 12:44PM
A No.
Q Okay. Do you know if CWLA, Child Welfare 12:44PM



League of America, has a definition of caseload?
A Yes, it does.
Q Can you tell me either exactly or in substance what that definition is?
A Well, CWLA's definition of preferred caseload size would be -- I'm trying to recall. Can I look at my notes? 12:44PM
Q Sure.
A I can't remember. 12 to 15 children in foster care, in a foster care unit. 12:45PM
Q And let me back up a step. What -- that's the number. What is the definition of the term caseload as it's used by CWLA if you know or if you could even tell me the substance of it?
A It's the number of children assigned in coordination of the case activities. 12:46PM
Q To a single worker?
A Uh-huh.
Q Would you answer --
A To a single worker. 12:46PM
Q Thank you. What do you mean by that worker is -- you may not have used the word responsible for but --
A Coordination?
Q Yes. 12:46PM



A That that worker would coordinate the services, be responsible to meet with the child and the foster parents and report to the court about the child's progress or lack thereof.
Q And do permanency planning? 12:46PM
A Yes, do permanency planning.
Q And investigate any complaints about maltreatment in that foster care placement for that child, for a child on his or her caseload?
A I don't recall specifically whether they include that in that caseload or in any investigative caseload. 12:47PM
Q Okay, and then you did tell us the number. How does CWLA, if you know, determine that number, that ratio, if you know? 12:47PM
A I don't know.
Q I apologize to you because this may duplicate what I've already asked you. Did you give a deposition in the Kenny A. case in Georgia?
A Yes, I did. 12:48PM
Q Okay, but that case was settled and did not go to trial; is that correct?
A Yes, that's correct.
Q And did you submit one or more reports to the court in the Georgia case? 12:48PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 81

A Yes, I did.
Q Do you remember how many?
A Two, I believe.
Q And were those reports system-wide, on particular children, both; can you tell me, again 12:48PM without getting into particulars, the general content of the two reports?
A They both reported findings regarding children's experience while in custody.
Q Excuse me. I need to interrupt you. 12:49PM Particular children or --
A It was -- they were particular children, but they were -- it was over -- I think approximately 300 children was a random stratified sample that was drawn from the population of children in custody. 12:49PM
Q All right. Please continue. Thank you.
A The report included findings in terms of their specific experiences in care.
Q Of the sample children?
A The sample children. 12:50PM
Q Thank you.
A And the problems in the system identified based on their experiences.
Q Okay. Is that one of the reports you just described to me and then you can describe the other 12:50PM

Page 82

one or did you give me a description that pretty well covers both of them?
A That pretty well covers both of them.
Q Thank you. Did you -- had you heard anything or did you know anything, either one, about Frona 12:50PM Musgrove before you read her deposition transcript?
A I had not heard anything about her, no.
Q Did you have any information about her at all?
A I had information from at least one child's case file where she was functioning as the 12:51PM caseworker, child's caseworker.
Q Had you had any conversations with anyone about Frona Musgrove before you read her deposition transcript?
A No. 12:51PM
Q Have you ever had any conversation -- excuse me, any communication, oral or written, with any of the adults who are the next friends for the named plaintiffs in this case?
A No. 12:51PM
Q When you described the assistance given you by Kelley Fong, and I'm sorry, I used to know Mavis' last name, and I'm sorry, I can't recall it right now, but the two women who were paralegals at Children's Rights, was it your understanding that 12:52PM

Page 83

when they did what you described and provided the services to you that they described, that they were giving you their own independent input so to speak or were they merely conveying some input to you from somebody else, like lawyers at Children's Rights or 12:52PM someone else; in other words, what was your understanding of --
A Is your question were they speaking for themselves or for someone else?
Q Well, you spoke, for example, about fact 12:52PM checking. Was it your understanding that if Kelley Fong wanted to discuss a particular point that needed to be clarified on a fact that she had identified that point or she was communicating to you that somebody else had and it needed to be 12:52PM clarified?
A That she had identified that point.
Q Same with Mavis?
A Yes.
Q So they were not mere conduits for either 12:53PM concerns or input that was coming from another source?
A No.
Q Okay. Do you know what R.A., what his situation is today? 12:53PM

Page 84

A No.
Q Do you know what G.C.'s situation is today?
A No.
Q You mentioned that you were told that either D.G. or C.S. had been adopted. Do you know where 12:53PM the other of those two is today?
A No. I'm sorry, did you say R.A.?
Q R.A. I'm sorry. I meant J.A.
A J.A.
Q Would your answer be the same? I'm sorry. 12:54PM
A Yes, it would be the same.
Q Thank you. Doctor, I don't think I asked you this precise question. I apologize if I did, but when you were told that either D.G. or C.S. had been adopted, did you ask what happened to the other of 12:55PM those two?
A I don't recall.
Q Would you look at your report dated September 30, 2009, the introduction, please? I will ask you questions, and some of these are -- maybe all of 12:55PM them will seem dumb or equally dumb as the questions I've already asked you, but we have to make a record on certain things that are obvious to everyone in the room, so I'll apologize in advance, but this particular report, you're with me, is the one dated 12:56PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 85

September 30, 2009, and we're looking at the introduction; is that correct?
A Yes.
Q And this particular report with that date, September 30, 2009, concerns the cases of five children and only those five children, J.B., A.P., J.A., J.P. and R.J.; is that correct? 12:56PM
A Yes.
Q That first paragraph of the introduction, reads as follows: Quote, these common findings are suggestive of systemic deficiencies and persistent preventable failures, period, end quote. Did I read that sentence correctly? 12:56PM
A Yes.
Q By using the phrase suggestive of, did you mean some degree of certainty less than very clear? 12:57PM
MR. DEMURO: Object to the form of the question.
A And by very clear -- I'm not sure what you're asking me. 12:57PM
Q Was your statement here, that there are systemic deficiencies and persistent preventable failures, very clear from the common findings or something less than very clear?
MR. DEMURO: Object to the form. 12:58PM

Page 86

A Very clear.
Q I'm sorry?
A Very clear.
Q Then why did you use the word suggestive of, the phrase suggestive of? Strike that. Let me ask you, does the phrase suggestive of indicate an absolute certainty on your part? 12:58PM
A Based on the data in the report, yes.
Q And the data in your report?
A In my report. 12:59PM
Q So the data from the five children made you absolutely certain of systemic deficiencies and persistent preventable failures?
A The data in this report pulled from the children's case files and the findings based on that data are consistent with these specific deficiencies and preventable failures. 01:00PM
Q All right. Thank you. Would you turn to Page 2? You are still a tenured professor at University of South Carolina? 01:00PM
A No.
Q Did you resign from faculty?
A Yes, I did.
Q About when was that?
A Several years ago. 01:00PM

Page 87

Q Can you give me an idea of several?
A In 2005.
Q Was it in any way requested or suggested or required of you that you resign?
A No. I moved from South Carolina to Tennessee. 01:01PM
Q Okay, and other than being compensated for your time spent in the kinds of -- rendering the kinds of services that you've already talked about, what are your current sources of income? I'm not going to delve into your tax returns, and I don't want to know about your husband's income, but what are the sources of income you have other than being paid for the services you've rendered and you've described for us here today in litigation-related matters? 01:01PM 01:01PM
A Well, it would vary. If we were to look at the last five years, it would vary by year, but it includes the legal work we've talked about, royalties from book publication from Columbia University Press and income from the National Resource Center for Permanency Planning where I have done a number of studies and projects, such as the supervision work that we discussed earlier today. 01:02PM
Q Okay. On that last source, was any of that income derived in, say, 2010? 01:02PM

Page 88

A Let me just double-check that. Not in 2010, but it would include 2009.
Q Okay. Any for 2011 from that source?
A No.
Q Okay. For 2011, and I realize we're just into now the second week in May, but any source of income in 2011 other than litigation-related work and royalties? 01:02PM
A And royalties?
Q Yes. 01:03PM
A No. Those two.
Q And just for 2010, and that's the last year I'm going to go back, anything in specifically 2010 other than litigation-related services and royalties for 2010? 01:03PM
A There was some income from the National Resource Center for Permanency Planning related to the work on the supervision publication and the dissemination of that work.
Q If I asked you the same questions about your use of the phrase is suggestive of as it appears in other parts of your reports, would your answers be the same as when I asked you the first time just a few minutes ago, that -- 01:03PM
A It would depend on the sentence that the 01:04PM

Page 89

phrase was in.
Q Okay. Would you look on Page 3, which is the first page of the executive summary? The first full paragraph, last line reads, quote, this summary also provides the salient conclusions of the DHS systemic deficiencies and failures suggested by review of the named plaintiffs' files, period, end quote. Did I read that sentence correctly? 01:05PM
A Yes, you did.
Q If I asked you the same questions about your use of the phrase suggested by as used in this sentence, would your answers be the same as the discussion we had earlier on the earlier use of it or would it be different? 01:05PM
A Based upon, suggested by. 01:05PM
Q I'm sorry?
A So the conclusions are the deficiencies and failures suggested by, indicated by, based upon.
Q Consistent with?
A Consistent with. 01:06PM
Q Would you look on Page 11 of the September 30, 2009, report, and the last paragraph on Page 11, and the last paragraph on Page 11 that I'm looking at begins with the wording it is critical to remember; is that right? 01:06PM

Page 90

A I'm with you.
Q Okay. Thank you. Would you look at the last sentence? It's actually a partial sentence, and I'm going to continue reading over onto Page 12, but the last partial sentence at the bottom of Page 11 says, quote, when attempting to describe the children's harm and suffering, the words that come to mind are incomprehensible, unimaginable, outrageous and immoral, period, end quote. Did I read that sentence correctly as it appears on Pages 11 and 12? 01:06PM 01:07PM
A Yes.
Q And why did you use the word immoral in your, quote, attempt to describe the children's harm and suffering?
A I used that word because the responsibility of the agency to protect these children is not only legal, but that legal responsibility is derived from our social agreement that morally we have a responsibility as a society to protect children who can't protect themselves. 01:07PM 01:08PM
Q And if their harm and suffering is immoral, does that necessarily implicate that some human beings have been immoral towards these children causing their suffering?
A That as a collective in the system, the human 01:08PM

Page 91

beings have been.
Q Have any individuals been immoral in the cases of these seven children?
A That's possible, but the selection of the word is in reference to the responsibility of the agency, so it's a collective of individuals. 01:08PM
Q Well, so it is possible that some individuals -- since the agency can only act through individuals, it's not only possible, it's probable that some individuals of that agency have acted immorally; is that fair? 01:09PM
A That wasn't the -- that's not what I was intending to convey.
Q Would that similarly be true in your choice of using the term outrageous, which appears just before immoral, kind of a collective outrageousness? 01:10PM
A The words were selected with regard to the harm and suffering the children experienced as a consequence of the service or lack of service they received from a public agency that was legally responsible for their protection. 01:10PM
Q Are you saying then that no individual employed by or associated with the agency acted in an outrageous manner towards these children?
A I'm not saying that. 01:11PM

Page 92

Q Can you identify any individual who acted outrageously towards these children, any of these children?
A If we were to take each of these children and look at decisions made or when events occurred without decisions being made, there would have been individual workers or supervisors or others who would have been involved in that. It would in many, many instances when we looked at that be difficult to understand how they could have acted in the way they did because it doesn't seem professionally wise. It often would not even appear to follow common sense and so in that regard, one could say that it would seem outrageous. It certainly might, from an individual, be difficult to comprehend how they could have reached the judgment that they reached and taken the actions that they took. 01:11PM 01:11PM 01:12PM
Q But as we sit here today, you cannot identify any particular individual employed by or associated with DHS whose conduct towards any of these children you would characterize as outrageous? 01:12PM
A I would not specifically identify people. I was not asked to do that. I think that there is extensive data in this report and detail about the decisions and the actions or the lack of decisions 01:12PM



6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 93

and actions by caseworkers, supervisors and others where individual people stand behind the phrase social worker. That's inevitable, but that was not what I was asked to do, to identify people who had used -- specifically used poor judgment or made 01:13PM decisions without necessary information or failed to carry out their responsibilities of their position.
Q Move to strike the non-responsive portion of that answer. Well, can you identify any individuals employed by or associated with DHS whose conduct you 01:13PM would characterize as immoral towards any of these seven children?
A The answer would be the same.
Q Are you familiar with the term primary worker or primary assignment as used by Oklahoma DHS? 01:14PM
A Yes.
Q Okay, and what is your understanding of the Oklahoma definition of primary worker or primary assignment or both?
A The primary worker is the worker in the county 01:14PM where the child was brought into custody legally, and that worker is responsible to the court for court reports and for information going to the court for that child.
Q All right. Can you tell me your understanding 01:15PM

Page 94

of the Oklahoma use or definition of the term secondary worker or secondary assignment?
A A secondary worker is a worker in a county where a child has been physically placed, where the child's placement is located. 01:15PM
Q Okay. Do you know the responsibilities of such a secondary worker in Oklahoma?
A They include maintaining face-to-face contact with the child, being informed of the child's services, the child's whereabouts and the child's 01:16PM safety and monitoring the child's safety and wellbeing and their -- their safety and wellbeing.
Q Okay. Any distinction in your mind, as Oklahoma uses the phrases, between primary worker and primary assignment? 01:16PM
A Not that I'm aware of.
Q Okay. Any distinction in your mind between, as Oklahoma uses the terms, secondary worker and secondary assignment?
A Well, as my earlier answers would indicate, 01:16PM there are some distinctions based on their responsibilities. Beyond that, I'm not aware of other differences.
Q Distinctions between or among whom?
A Between a primary worker's responsibilities 01:17PM

Page 95

and a secondary worker's responsibilities, some distinctions.
Q Yes, and actually my question was, is it your understanding that there's any distinction between -- not between primary and secondary, but my 01:17PM question is, and I'll try to ask this slowly and maybe in a better way. In your mind is there any distinction between secondary worker and secondary assignment?
A I'm not aware of one. There may be one. 01:17PM
Q Would you look at Page 65, please, of your September 30, 2009 report? On Page 65 that I'm looking at, it has a conclusion, and the first sentence in the conclusion begins with the sentence, quote, changes in placement typically create severe 01:18PM disruption in children's lives, period, end quote. Are we on the same page?
A We are.
Q And did I read that sentence correctly?
A Yes. 01:18PM
Q Did you use the word typically in the sentence to mean always?
A Almost always or usually, yes.
Q But sometimes not; is that correct?
A It would be very rare for it not to, so I 01:18PM

Page 96

would say always.
Q And what is the source of your using typically to mean all but in the rare occasion that this creates severe disruption?
A Well, certainly my own experience in the field 01:19PM and observations. There also is research and social science knowledge about the effects of change in living location on children.
Q Can you give me the two leading publications that would substantiate what you just said? I 01:19PM wouldn't limit you to two, but can you give me at least two?
A The primary source there would be the work of John Bowlby, who has published extensively about the effects of separation on children, separation from 01:20PM their caregivers in many different kinds of situations and the range of effects that that would have.
Q When you say range of effects --
A Emotional, educational, their ability to 01:20PM trust, their cognitive development.
Q And the degree of disruption has a range?
A The degree of disruption could range, but there would be disruption.
Q Yes. 01:20PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 97

A There is a citation to -- you asked me for two.
Q Sure.
A Leading. There is -- it's Footnote 1063 to D'Andrade, a book chapter on Placement Stability in Foster Care, and in that book chapter, she has reviewed extensive studies of the disruption, the types of disruption and harm that changes in placement cause for foster children. So there's ample studies and research that she has summarized in that book chapter. 01:21PM 01:21PM
Q Did you tell me you were working on a new edition of this same book?
A Yes.
Q Okay. Do you know about when your target date is for publication of the new edition? 01:21PM
A It will be in 2012.
Q Is that one of the books that you received royalties from the sales?
A Yes. 01:22PM
Q Any other books?
A There are two other books. The royalties from all three are really small. The community -- the book about The Center For Family Life, I receive royalties for, and the book I co-edited with 01:22PM

Page 98

Patricia Motes, the 2007 book, Collaborating With Community-Based Organizations.
Q The royalties then would be a very small percentage of your annual income?
A Yes. 01:22PM
Q Thank you. Would you look on Page 108 of the 2009 report that you authored? The Page 108 I'm looking at is entitled DHS Systemic Deficiencies and Failures Suggested By Review of the Named Plaintiffs' Files. Are we on the same page? 01:23PM
A Yes.
Q The first sentence refers to J.B., A.P., J.A., J.P. and R.J.; is that correct?
A Yes.
Q And the second sentence reads as follows, quote, although the review of five children's files cannot conclusively establish overall systemic problems, there are striking similarities in the children's case records and experiences in DHS custody that appear to indicate systemic deficiencies and persistent preventable failures, period, end quote. Did I read that sentence correctly? 01:24PM 01:24PM
A Yes, you did.
Q Any reason why you used the phrase that appear 01:24PM

Page 99

to indicate in the sentence I just read rather than suggests?
A No, and it could read that are consistent with.
Q Would you turn to Page 1 of your report dated February 25, 2010? I believe we can refer to that as the supplemental report, and it's probably entitled that, but it's the report you submitted dated February 25, 2010, and I'm looking at Page 1, which is entitled Introduction. Are we on the same page? 01:25PM 01:25PM
A Yes.
Q This -- may I refer to this report as the supplemental report or your supplemental report?
A Certainly. 01:25PM
Q This supplemental report does an analysis of additional case files for two children that were -- whose case files were not reviewed in the first report; is that correct?
A That's correct. 01:25PM
Q And the two additional children whose case files are reviewed and evaluated in the supplemental report are G.C. and K.T.; is that correct?
A Correct.
Q And this report conducts that review and makes 01:26PM

Page 100

that evaluation based on information of facts and events and circumstances up to February 13 of 2008; is that correct?
A Yes.
Q Would you look at Page 2, the next page, please, last paragraph? The last sentence of the last paragraph on Page 2 says, quote, the author reserves the right to supplement and/or modify the conclusions in this report should new and/or different information become available or upon further request for evaluation by plaintiffs' counsel, period, end quote. Did I read that sentence correctly? 01:26PM 01:27PM
A Yes.
Q And I believe, if not verbatim, a very similar statement appears in your original report? 01:27PM
A Yes.
Q Did you ever become aware of new and/or different information becoming available that's not set forth in either report? 01:27PM
A Not as of this date, no.
Q Okay. Have you been requested to do further evaluation beyond the second report on any of the named plaintiffs by plaintiffs' counsel?
A No. 01:27PM

Page 101

Q Would you turn to Page 8 of the supplemental report, please? The last partial sentence on Page 8 begins, quote, all seven of these children suffered harm in their dangerous DHS placements and in their abandonment by DHS workers and supervisors prior to, 01:28PM during and following their maltreatment in their placements, period. Did I read that sentence as it appears on Pages 8 and 9 correctly?
A Yes, you did.
Q The final sentence on that, quote, when 01:29PM attempting to describe the children's harm and suffering, the words that come to mind are incomprehensible, unimaginable, outrageous and immoral, period, end quote. Did I read that sentence correctly? 01:29PM
A Yes, you did.
Q This is the same sentence, I believe, that was in your original report and now appears on Page 9 of your supplemental; is that correct?
A Yes, that's correct. 01:29PM
Q Do you believe any DHS policymakers have been immoral?
A My answer would be the same as I gave you earlier. My answer was that -- my intention was not to identify specific individuals within DHS who were 01:29PM

Page 102

immoral. The statement is about an agency and its legal responsibility, which is based on a social understanding of a moral responsibility.
Q Would you turn to Page 75 of your supplemental report, please? 01:30PM
MR. BINGHAM: And we can take a break any time you want to or we're not quite at an hour.
MR. DEMURO: No. We're fine. Thank you for asking.
Q Dr. Hess, any time you want to take a break, 01:30PM we can take a break. Are you with me on Page 75, which is entitled DHS Systemic Deficiencies and Failures Suggested By a Review of the Seven Named Plaintiffs' Files. Are you with me?
A I am with you. 01:30PM
Q All right. The second sentence in the first paragraph on Page 75 reads, quote, although the review of seven children's files cannot conclusively establish overall systemic problems, there are striking similarities in the children's case records 01:31PM and experiences in DHS custody that appear to indicate systemic deficiencies and persistent preventable failures, period, end quote. Did I read that sentence correctly?
A Yes, you did. 01:31PM

Page 103

Q What does the phrase appear to indicate mean as you used it in this sentence?
A Are consistent with.
Q Would you look at the next sentence with -- did you finish your answer? I'm sorry. 01:31PM
A Pardon?
Q Did you finish your answer?
A Yes, I did.
Q I didn't want to cut you off. Would you look at the next sentence, please? 01:31PM
A Yes.
Q Moreover, it is of significant concern that nothing -- the word nothing is emphasized in italics -- in the seven children's files suggests that DHS practice in these cases was unique or in any way 01:32PM different from that with other children in custody served by the named plaintiffs' DHS workers and supervisors, period, end quote. Did I read that sentence correctly?
A Yes, you did. 01:32PM
Q When you wrote this, did you know what DHS practice was in the cases of other children in custody?
A I have a very good -- a fair amount of good information about that, yes, based on the review of 01:32PM

Page 104

these seven children's files. You have to remember that there were -- these children had siblings. There were other children in these placements, other children in these shelters. The workers serving these children were serving other children. So 01:33PM there was a lot of data available in looking at these seven children's files about other children in the system.
Q If the -- if I were -- this is a hypothetical, and so I'm going to ask you about something that has 01:33PM not occurred but under certain circumstances we're permitted to ask hypothetical questions. Mr. Demuro may have an objection to this, and if so, we'll go from there, but if Oklahoma DHS selected seven -- if you didn't know about these seven named plaintiffs 01:34PM and if Oklahoma DHS hired you as a consultant and they selected seven case files in which the children did not have significant problems while in care and achieved permanency within an acceptable time period, would you -- do you believe you would 01:34PM conclude that the facts appear to indicate that there are no problems in the DHS system?
MR. DEMURO: Object to the form, improper hypothetical, but you can go ahead and answer.
Q Would you be able to give an opinion? 01:34PM

Page 105

MR. DEMURO: Same objection.
A It was a long question. I'm trying to think.
Q Sure, sure. Take your time.
A Based on the data in these children's case
files, if DHS presented me with seven other 01:35PM
children's case files, to read the entire case file,
and I did so, and the children had had better
outcomes, my conclusion would still be that based on
the data I have seen in these files, I would also
see in those files systemic problems and 01:35PM
deficiencies similar to these.
Q I appreciate your answer. I don't believe it
addressed the question I asked you, but let me try
to ask the same question again. Would you feel
comfortable, as a scientist, if you were in a 01:36PM
situation where you did not know about these named
plaintiffs, you knew nothing about them, and DHS
gave you seven case histories of children selected
not randomly but selected by DHS, and those case
files showed few or very few problems of the 01:36PM
children while they were in care and they achieved
permanency within an acceptable time period, would
you be scientifically comfortable saying my
conclusion is that these case files appear to
indicate that DHS has few, if any, problems, 01:36PM

Page 106

systemic problems?
MR. DEMURO: Object to the form,
hypothetical. Please answer.
A I would be comfortable to say that based on
what I saw in these files, I do not believe that is 01:36PM
what I would see, but if I saw case files that had
no delays of workers seeing children where the
children were interviewed in private consistently by
their caseworkers, where the placements were -- had
been carefully assessed before children were placed, 01:37PM
if I did not see system's problems, I would
certainly feel comfortable to say that. There's --
I'm not sure whether we are working on the same
assumption on that or not, so I want to clarify
this. The understanding of the system's problems is 01:37PM
not based on the children's problems, the fact that
the children had problems, which they did have many
problems. It's based on the data concerning the
decisions and actions of those personnel who were
involved in carrying out DHS policies and practices 01:38PM
and serving those children. So the review, as you
look at the seven children, the data, if you were to
take any page in this report and look at it, the
data is about the context of those seven children,
the situations they were in, the amount of contact 01:38PM

Page 107

people had with them, the decisions people made
without -- you know, all that surrounded them, it
was the data about which -- conclusions about
system's deficiencies is made, not the fact that the
children had problems. Is that distinction clear? 01:38PM
Q I'm not sure it matters whether it's clear to
me or not. I would move to strike the
non-responsive portions of her answers, and not all
of her answer was unresponsive, but there were some
unresponsive portions, and I would move to strike
those, but we can go on from there unless you'd like
to add anything.
A No.
Q If you would look at -- it's really Page 120
of your supplemental report, but it's a page in your 01:39PM
CV.
A I'm not sure I have that version. Let me make
sure I have that version of my CV. I don't.
MR. BINGHAM: Okay. I'm going to hand you,
Mr. Demuro, what I'll represent to you is the 01:40PM
complete supplemental report dated February 25,
2010, and I'm going to direct you to Page 120, and
you may actually want to take that clip off if you
want to look at it separate.
Q Under Social Work Education and Courses 01:40PM

Page 108

Taught, are you with me?
A Yes.
Q It says here that you have taught qualitative
research methods; is that correct?
A Yes. 01:41PM
Q Do you remember what textbooks you have used
in teaching that course?
A I have used The Research Act by Norm Denzin.
Q I'm sorry. One more time.
A The Research Act by Norm Denzin. 01:41PM
Q Can you spell the last name, please?
A D-E-N-Z-I-N.
Q Thank you.
A And I have used a text co-edited by him. I
can't remember the co-editor's name but it's a more 01:41PM
recent text on qualitative research that's quite
extensive that he and another professor edited, and
then there would be other readings by people like
Glaser and Strauss on Grounded Theory. There would
be other readings but those texts. 01:42PM
Q Have you taught a course in here Advocacy in
Social Work Practice?
A Uh-huh, yes, I have.
Q And what -- without going into the detail of
the curriculum of that course, what is being taught 01:42PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 109

in a course entitled -- that you're teaching in Advocacy in Social Work Practice?
A Learning to identify situations in which the social worker would become an advocate with a client about, for example, services that the client was 01:42PM eligible for that were not being provided, either with the client or on the client's behalf and learning skills in doing that.
Q Can you give me the name of a textbook or textbooks that you used in teaching that course? 01:43PM
A I can see it. It's green. It will come back to me, and if it doesn't, I can get that for you.
Q All right. If you'll provide it to the attorneys, we would appreciate it. You can -- if you think of it, send it to Mr. Demuro. 01:43PM
A Brager. His last name is Brager, B-R-A-G-E-R. I don't recall his first name.
Q Okay. That's good enough. Have you ever filed a lawsuit of any kind?
A Yes. 01:44PM
Q Can you tell me about that?
A My husband and I and our son were involved in an accident in a rented boat.
Q Okay. I'll stop you there unless you just want to tell me about it. 01:44PM

Page 110

A No. That's --
Q Any other lawsuits in which you've been a plaintiff?
A No.
Q Have you ever been sued in any lawsuit? 01:44PM
A Yes.
Q Can you tell me about that, please?
A We sold a home in Tuscaloosa, Alabama, where the people who bought it sued the real estate company that represented us and us because they felt 01:44PM the square footage of the house was misrepresented.
Q Any other lawsuits in which you've been sued?
A No.
Q Thank you. Would you look at Page 123 of that CV on the supplemental report, the section entitled 01:45PM Selective and Academic Professional Presentations?
A Yes.
Q You said -- this presentation that you gave, New Strategies For Changing Times, in August of 2009 in Arlington, did you give a written presentation at 01:45PM that or read from a written presentation?
A Not a written paper. There were handouts, which were excerpts from the publication that Susan Kanak and Julie and I had authored, and we had talked about. 01:46PM

Page 111

Q The next one, and we're not going over every single one, but the next one is Supporting Effective Child Welfare Supervision No. 1: A Framework, a teleconference. Did you have a written or some type of visual presentation that you either disseminated 01:46PM or read from at that presentation?
A It was the same. The answer would be the same.
Q Okay. I have May 28th on my page but it doesn't have a year. 01:46PM
A Yes, May 28th. I don't have the year there as well.
Q Do you remember; 2008 or 2009, somewhere in there?
A I believe it would have been 2009. 01:47PM
Q We won't hold you to that. If you'll skip down two to the one in Iowa City, Iowa, did you give a written presentation or have any written material that you used in that presentation other than perhaps excerpts from your book? 01:47PM
A No.
MR. BINGHAM: I'd like to take a short break and we're close to finishing.
(Following a short recess at 1:47 p.m., proceedings continued on the Record at 1:59 p.m.) 01:59PM

Page 112

Q Dr. Hess, have you had any communication with Dr. Eugene Reynolds, a Tulsa psychologist?
A No.
Q Has anyone made you aware of any opinions, findings or testimony that he has with regard to any 02:00PM of these named plaintiffs?
A Not that I recall.
Q Have you -- you might have answered this, although we may have limited it to DHS employees or whatever, but have you read any transcript or any 02:00PM summary of the transcript of John Goad in this case?
A No.
Q Has anyone orally indicated to you the content of any testimony or opinions that he has reached in this case? 02:00PM
A No.
Q Have you communicated with Dr. Milner about this case?
A Early after Dr. Miller (sic) was retained --
Q Excuse me. Are we talking about Dr. Miller or 02:01PM Milner?
A Milner. I'm sorry.
Q That's okay. I might ask you about Dr. Miller also, but Gerald Milner --
A We'll stick to Milner. Soon after he was 02:01PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 113

retained, we had a telephone conversation about the
steps that I had taken to set up the review in
Mississippi, and he asked for my permission to use
the protocol that we had used and adapted in the
Oklahoma review, which I gave, and that's been the 02:02PM
extent of our communications.
Q Just that one discussion?
A Uh-huh.
Q Is that correct?
A Uh-huh. 02:02PM
Q Would you say yes?
A Yes.
Q Okay. Just again for the reporter's sake.
MR. DEMURO: Remember, the reporter can't
take down nods or non-verbal forms of communication. 02:02PM
A Yes.
Q And was that a telephone conversation?
A Yes, it was.
Q About how long would you say that discussion
lasted over the telephone? 02:02PM
A Might have been 45 minutes.
Q Okay, and did Dr. Milner tell you that he had
never done this particular type of project or
sampling analysis before?
A I don't recall. 02:03PM

Page 114

Q Do you remember what you sent him other than
maybe what you've told us already, if anything?
A Actually I didn't send him anything because he
could get the protocol from Children's Rights.
Q All right. So you simply gave your permission 02:03PM
to use it?
A I think, yes.
Q Did you discuss with him how to use that
protocol or sampling tool?
A Not in detail. I really don't recall. 02:03PM
Q What kinds of questions -- realize I'm not
asking you what he asked you verbatim, but what
kinds of questions was he asking you in terms of the
work you've done in Mississippi?
A There were practical questions, how many 02:03PM
reviewers had I hired, where did I advertise for the
reviewers, whether I was on site during the review
most of the time, questions like that.
Q Okay. After that telephone conversation, have
you had any communication, oral or in writing, with 02:04PM
Dr. Milner?
A No.
Q Has anyone communicated to you any messages
from him as an intermediary?
A No. 02:04PM

Page 115

Q Have you been -- have you had any
communication, either oral or written, with anyone
who was assisting him in his efforts here in
Oklahoma?
A I had a telephone call from someone who had 02:04PM
questions about how I located things in the case
files. They were I think piloting the protocol and
were having a difficult time finding documents in
the case files.
Q Okay. Do you remember the name of that person 02:05PM
per chance?
A I'm sorry, I don't.
Q Do you remember if the caller was male or
female?
A Male. 02:05PM
Q Do you recall thinking that it was somebody
who was employed by Children's Rights or somebody
who was employed separately by Dr. Milner?
A I don't know; I don't know.
Q All right. About how long did that telephone 02:05PM
conversation last roughly?
A Ten minutes.
Q Did you send the caller anything or point them
towards anything, materials?
A No. 02:05PM

Page 116

Q All right. How did that conversation end in
terms of was there anything left to be done on your
part?
A No, there wasn't anything left to be done.
Q What recommendations, suggestions or 02:06PM
information did you give them about how to find
things in the case files?
A I told them that the particular files, the
juvenile court file, the kids' files, the OPPC files
tended to have somewhat different kinds of documents 02:06PM
in them, and so they could try to sort that out, but
that in general, that was a major problem for me and
had accounted really for why there needed to be a
supplemental report was the amount of time it took
to find things in the files, find documents in the 02:06PM
files.
Q So you didn't have any great solutions for
that problem?
A I did not.
Q All right. Any other subject or topic that 02:06PM
came up during that particular telephone
conversation?
A No.
Q And since that particular telephone
conversation, you haven't had any communication, 02:06PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 117

oral or written, with anyone else who was working with or assisting Dr. Milner other than folks at Children's Rights?
A No, but I'm thinking you're asking me that -- I mentioned in preparing for this deposition that I had read his report. 02:07PM
Q Yes.
A And I guess now that I think about, the question you asked me earlier in terms of whether I had any new information, certainly that would -- could be categorized as new information. 02:07PM
Q Okay. There was information about things that occurred after the date of your last report in Dr. Milner's report?
A Yes, uh-huh. 02:07PM
Q Anything else that's occurred to you during the day where you thought of something that you want to add to or supplement or change an earlier answer that you gave?
A No. 02:07PM
Q Have you done any work in the Michigan case?
A Michigan case?
Q Yes.
A No.
Q Have you rendered any services or been 02:08PM

Page 118

approached to render any services either by an organization, Children's Rights or another child advocacy group or by a governmental entity to provide consultative services in connection with the implementation and enforcement of a consent decree that's already in place? 02:08PM
A No.
Q Have you reviewed any consent decrees in other jurisdictions, anywhere?
A I reviewed Tennessee's at some point, and I have reviewed the negotiated settlements in the Mississippi case, but that's all. 02:08PM
Q For what purpose were you reviewing those?
A Well, in the Mississippi case, it was provided on my request. I was very interested to know what had been -- what came out of that process. 02:09PM
The Tennessee report, I don't recall why I had read it.
Q Okay. Any other jurisdictions, state, county or city, consent decrees or settlements that you've reviewed other than the ones you've already told us? 02:09PM
A No.
MR. BINGHAM: One moment, please.
(Whereupon, a discussion was held off the Record.) 02:11PM

Page 119

Q Do you have any information from any source about any particular child in the Oklahoma class other than these nine named plaintiffs?
A No. Would you ask me that question again?
Q Yes. Do you have information about any particular children in the class other than the nine named plaintiffs? And I just thought you've already mentioned some, like siblings and other kids in foster care. 02:11PM
A That's what I was just thinking. 02:12PM
Q Well, let me put it this way. I think I can clarify it. Do you have any information from any source about any children other than in the case files that you reviewed?
A No. 02:12PM
Q All right. What effective steps can a state take to recruit more qualified foster parents for foster families?
MR. DEMURO: Object to the extent it's outside the area of her called upon expertise in this report, not her area of expertise but the subject matter of her report, but you can answer if you can. 02:12PM
A It's very difficult, very, very difficult. One of the strategies that -- and off the top of my 02:13PM

Page 120

head, I don't remember where I heard about this, but a state was using to recruit for more roles because the role of 24 hour seven day a week care is so difficult, particularly for families where both -- if there are two parents in the family where both are employed, it's so difficult and a change from prior practice. To recruit for foster parents, for learning to supervise visits or provide after-school care or provide care in a more delimited way, and they were having -- I wish I could remember where that was -- some success with that. The studies of failure to retain foster parents consistently indicate that the main reason foster parents discontinue foster parenting is lack of support from the agency that has recruited them once they have children, and so I think the efforts to support the foster parents that an agency currently has are at least if not more important than the efforts they're making to recruit new ones because the turnover there is certainly almost equal to that of other caseworkers and other staff. 02:13PM 02:13PM 02:14PM 02:14PM
Q Move to strike the non-responsive portion of that answer. Dr. Hess, any other strategies for recruitment of new, qualified foster parents other than the strategy that you've said has been tried 02:15PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 121

with some success there?
A No.
MR. DEMURO: Object to the form of the question as calling for testimony outside the topic for which this expert was designated and the scope 02:15PM of her report.
Q Subject to Paul's okay, was your answer no?
A No.
Q Your answer was no; is that correct?
A Yes, my answer was no. 02:15PM
Q Thank you.
MR. BINGHAM: I have no additional questions.
CROSS EXAMINATION
BY MR. DEMURO: 02:15PM
Q I have a couple of questions. I want to make sure the Record is clear, Dr. Hess, on a point or two. Mr. Bingham asked you questions about whether you had information about other children in DHS care, and I want to make sure the Record is clear. 02:15PM In reviewing the records of the named plaintiffs that you reviewed, did you learn information about other children in DHS care?
A Yes.
Q And how so? 02:16PM

Page 122

A Because in reviewing the plaintiffs' experiences and services, it was necessary to look at any information that was available about their placements, for example, and the seven plaintiffs had a total of almost 150 placements. So that meant 02:16PM that there were situations in their case records where other children in custody, siblings and non-siblings and foster parents' biological children, where their treatment and care was also described, and in many of the referrals those 02:17PM children were identified as alleged to have been maltreated. So many of the children I would not necessarily know their names. For example, in -- I believe it was R.J. who was placed in a number of shelters where the capacity -- where the number of 02:17PM children in the shelter at the same time that he was there was twice as many as was legally allowed, and so even though I did not specifically know the experiences of those children, I was aware that 60 children were placed in a facility that was not 02:17PM staffed for half of those children.
Q Could you turn to Page 108 in your first report, the September 30, 2009 report? I'd like to ask just a few questions about your conclusions on Page 108, that there are similarities in the 02:18PM

Page 123

children's case records and experiences in DHS custody that appeared to indicate systemic deficiencies and persistent preventable failures. Do you see that?
A Yes. 02:18PM
Q Mr. Bingham asked some questions about that, and I want to follow up. What fields of study and/or fields of science, if any, did you bring to bear in order to render that conclusion?
A Well, certainly the broad field of child 02:18PM welfare and child welfare policy, program and practices, and in order to conduct this study, the field of research, which includes both quantitative and qualitative research, and I have been extensively trained and applied that training as a 02:19PM qualitative researcher, so I drew very heavily on that field of practice.
Q And what methods did you employ to make yourself comfortable in either one of those two fields of study that you've identified to assure 02:19PM yourself that the conclusion that you have here on Page 108 about systemic deficiency is a reliable conclusion?
A Okay. Let's take child welfare first. When there is an increasing amount of research in the 02:19PM

Page 124

field about system's problems in child welfare, it's very broadly documented, and about the various causes of those problems and the various harms that result to children in custody from those problems, so I certainly drew on the current knowledge that's 02:20PM available in the field of child welfare about good permanency planning practices, good placement practices and the research about what the effects are on children relating to multiple moves while in placement. So there's a whole body of research and 02:20PM literature. Much of the literature is actually prescriptive in that it may not be reporting research study but it is describing a program with good practices.
Q Let me focus on the part that I think Mr. 02:20PM Bingham was asking questions about. How can you be comfortable making a conclusion about systemic failures when you've looked at only five case files -- excuse me, seven case files?
A Well, in quantitative research, there are a 02:21PM set of rules about random sample selections, statistical analyses. There's a set of rules and protocols, which lead us to believe that a study has reliable and valid findings.
In qualitative research, which has long been 02:21PM





6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 125

used in the social sciences, there are also protocols and practices that are standard.

Q Did you use those standard protocols and practices --

A Yes, I did. 02:21PM

Q -- with respect to your report?

A Yes.

MR. BINGHAM: Object to the form. Go ahead.

Q And please describe those. 02:21PM

A Well, I can give you several examples. I mentioned earlier about the fact checking. There is a method, an off-team method, that was initially described by -- I believe his name is Halpern, who actually in his doctoral dissertation described a 02:22PM method for confirming the conclusions of a qualitative study by looking at the data collection, the data analysis, the notes, the summaries, various materials used by the investigator to reach those conclusions and -- 02:22PM

Q And have you already talked about that fact-checking process?

A I talked about one part of it, which was someone looking at the documents and concluding that they see the same facts that I saw, but in addition 02:22PM

Page 126

to that, a qualitative researcher is expected to maintain written notes, to maintain notes, for example, on documents, to maintain any working documents they might develop in order to organize the information and to maintain records about the -- 02:23PM in qualitative research, one is looking for themes and categories. So, for example, the findings related to the systemic deficiencies are each a category, and there's subinformation and data in each of those categories. So that being -- having 02:23PM your working materials available for an audit is a standard that one follows so that your data can be examined and your conclusions be confirmed independent by someone else.

Q Okay. 02:23PM

A Another very important part of the protocol is called triangulation, which the texts say -- Norm Denzin first had this idea that if you -- as you're -- for example, if I'm reading a child's case record and I find that there's an allegation that 02:24PM the foster parent whipped this child every day and I see that in a contact, then I want to look for another source of data that would have that same information. So I would look for whether I see that same information in a referral. Was there a 02:24PM

Page 127

referral made? Do I see that in an ISP or in a court report? So looking for -- in an e-mail. One of the things that was very interesting in these children's files is that there are probably thousands, but certainly hundreds of e-mails, which 02:24PM is a very informal kind of document. People don't necessarily follow the rules in an e-mail that they would follow in a court report. So there are sources of data that you triangulate, which would mean to compare and contrast several sources of data 02:25PM to confirm that what you're saying in this one is accurate, that you can see it in other places.

Another way you triangulate or compare and contrast is situations at different points in time, and when you look at these 150 placements that these 02:25PM seven children had, they occurred over a number of years in quite a large number of counties with different caseworkers, different supervisors, different foster homes, and so in each of those situations, you gain information not just about J.A. 02:25PM but about the county that J.A. is placed in, the workers that were involved with J.A. at that point in time and then in the subsequent placements. So inevitably you have an enormous amount of factual data about how the system does or does not follow 02:26PM

Page 128

policies.

Q Let me stop you there. I want to make sure. I think you are about -- what you are talking about. When you said inevitably, I think you said one has an enormous amount of data. Are you speaking about 02:26PM the data that you reviewed in this case?

A Yes. I'm saying it is predictable, which is part of why there are rules about looking at the data. If you are looking at large data sets, lots of documents, it's predictable that you will have a 02:26PM lot of data.

Q Approximately how many pages of documents did you look at in preparation for your report?

A I don't know, but I know that I have between 50 and 60 document boxes at my home containing 02:27PM Oklahoma documents, and I have forwarded five or six boxes of documents that I had notes on and had used for the -- to confirm. Anybody could look at those and confirm what I've done that I forwarded to Children's Rights. 02:27PM

Q And those 50 or 60 boxes, are those all the case files?

A It's all the information that was given to me of the case files, also some management information system reports. 02:27PM



6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 129

Q Okay, and in addition to fact checking or auditing and triangulation, are there any other qualitative research techniques that you brought to bear on this project to make sure that your conclusion regarding systemic deficiencies is 02:27PM something we can rely on?
A Yes, and particularly regarding harm. One of the ways of triangulating your findings is to compare what you're finding to established research and theory and particularly the harms associated 02:28PM with multiple caregivers related to multiple placements. In comparing that theory and research to what I could see as described of the children's deterioration and behavioral reactions as they continued to be repeatedly placed, there was very 02:28PM strong consistency, which is a theoretical triangulation, that you are using what's available in the social sciences to understand and make sense of what the data says is happening.
MR. BINGHAM: Move to strike the 02:28PM non-responsive portion of the answer.
MR. DEMURO: I don't have any other questions.
REDIRECT EXAMINATION
BY MR. BINGHAM: 02:29PM

Page 130

Q I do have some more, Dr. Hess. When you said -- you gave the example of one of the named plaintiffs being in a shelter that was twice the limit, its population was twice what the maximum was that was established by some legal standard, and I 02:29PM believe you said that this shelter in this instance was not staffed for that larger number. Do you know what steps, if any, the shelter took on that occasion to bring in additional employees or volunteers to take care of those extra children? 02:29PM
A What I know is based on e-mails in the child's record, which called for staff to move children out of the shelters. That was the only intervention that the system was describing in those e-mails. If there were other steps taken, they were not 02:30PM identified in those e-mails.
Q Okay. So you don't know one way or the other about bringing in additional personnel?
A That's right.
Q All right. I'd like you to acknowledge 02:30PM something, and if you don't want to acknowledge it, you don't have to, but I believe you corrected Mr. Demuro that you were basing your expression of your opinion about systemic deficiencies and persistent preventable issues on seven children, but you 02:30PM

Page 131

reached that conclusion based on your study of five children in the first report; isn't that right?
A Yes, that's accurate.
Q So five was sufficient for you to be comfortable to say there was systemic deficiencies? 02:30PM
A For the reasons I just explained in terms of the data available, yes.
Q All right. Have you ever seen an analysis done of a statewide foster care system that relied on the study of as few as seven children's case 02:31PM histories; ever seen that in any jurisdiction?
A Not that I recall, other than other named plaintiff reports.
Q Was that -- did those reports opine about system-wide failures? 02:31PM
A Yes.
Q Who wrote them?
A I can't -- off the top of my head I can't give you the names, but I could find them for you.
Q Okay. In Mississippi, were you in charge of 02:31PM the sampling analysis down there?
A I worked in Mississippi with Dr. Peter Jones, who is with Temple University. He drew the sample and worked with me on the research design regarding sampling and directed the data, the statistical data 02:31PM

Page 132

analysis.
Q Okay. What was the number of children in the sample used in Mississippi by Children's Rights?
A Pardon?
Q What was the number of the children in the 02:32PM sample used by you and Dr. Jones in the Children's Rights lawsuit in Mississippi; 300 plus?
A It was right at -- I think it was right under 300.
Q Okay. Did you and Dr. Jones consider that the 02:32PM minimum number necessary to have a statistically significant result?
A We considered it the accurate number necessary to fulfill the stratification and have various cells full enough to do the kind of statistical analyses 02:32PM we wanted to do.
Q Okay. Did you do so-called qualitative research with fewer than 300 children in that case to reach conclusions about the existence or non-existence of systemic deficiencies? 02:33PM
A That research was not qualitative and --
Q In Mississippi?
A In Mississippi. The study that I directed there was a quantitative study, and so that I can be clear about how I'm using these words, a 02:33PM



6a10039e-2c58-433e-aba0-4c0e1b27422d

Page 133

quantitative study typically asks the question how many. You know, it's about numbers, how many of the population can we predict to have had this experience based on the data that we have, and that's why we're so careful about the randomness of 02:33PM the sample and the size of the sample, so that we can follow the mathematical rules about the statistical analysis.

In a qualitative study, there's a very highly respected field, some field in qualitative research 02:33PM called case study research, which is used a great deal in educational settings where there will be a case study of a school or of a district or of a state, and using the principles that I've described, there have been many studies that would study one 02:34PM and by looking at a number of different areas be able to come up with conclusions that are credible because --

Q About how much more than the one?

A About much more than the one because the care 02:34PM with which the data are triangulated, confirmed, analyzed, reveals many other factors than just the experience of the one.

Q Let me ask you this: You were comfortable expressing an opinion that the nine children's case 02:34PM

Page 134

histories were suggestive of or appeared to indicate systemic deficiencies based on your study of five case histories. Would you have been comfortable reaching that conclusion if you had only studied three of them? 02:35PM

A I don't know.

Q How about three of these five?

A I think it's possible, but that's -- it's not possible to know without knowing which three and what, you know, what information is available in 02:35PM those three. Can I make another point about an earlier question?

Q Certainly.

A When a scientist or researcher talks about methods of research, it's important to recognize 02:36PM that quantitative and qualitative, though different, it's not one is better or worse, but they're typically complementary, and the advantage of the qualitative study that I have done with the named plaintiffs is it allowed me to look at process, you 02:36PM know, what happens over time, who did what, what did they say about their motivations, what was clear about what people understood about policy, so that you can look at decision making and the process of decision making in a qualitative study because of 02:36PM

Page 135

the very nature of the data you're looking at, and so very often when there is a large study of some problem conducted, there would be both a quantitative study that would show how many of the people on the medication got better compared to the 02:37PM controls, which is your quantitative information, how many, and you're careful about your sample. There also would be qualitative studies of the individual people and maybe a small number of those individual people where you would understand how 02:37PM they took the medicine, how they lived their lives, what other factors were involved in that process so we can understand what we're finding, and as I read Dr. Milner's report, I can see how these two studies fit together in that same way because his 02:37PM statistically significant quantitative findings are absolutely consistent with the findings that I have reported here based on qualitative data, but I think if a reader --

MR. DEMURO: Is there a question pending? 02:37PM

A No.

MR. DEMURO: I didn't mean to cut you off. Finish your thought, but the last time I checked, there wasn't a question pending. Go ahead.

MR. BINGHAM: She asked me if she could 02:38PM

Page 136

make a statement.

A Well, going back to something you asked about and try to fill it in a little bit more.

MR. DEMURO: My preference would be that we just wait for questions and answers. 02:38PM

MR. BINGHAM: Well, the witness having begun this, I think I'm entitled to have her finish.

MR. DEMURO: I agree, Don. So, please, finish your thought.

A The analysis conducted of the qualitative 02:38PM data, because one can look at process and decision making, yields answers to the questions of why and how certain outcomes were found. So the different kinds of methods yield different kinds of outcomes.

MR. BINGHAM: I have no additional 02:39PM questions.

MR. DEMURO: I don't either. We'll read and sign.

(Whereupon, the deposition was concluded at 2:39 p.m.)





6a10039e-2c58-433e-aba0-4c0e1b27422d

SIGNATURE PAGE

I, Peg Hess, PhD, do hereby certify that the foregoing deposition was presented to me by Lisa A. Steinmeyer as a true and correct transcript of the proceedings in the above styled and numbered cause, and I now sign the same as true and correct.

WITNESS my hand this __________ day of ____________________, 2011.

____________________________
PEG HESS, PhD

SUBSCRIBED AND SWORN TO before me this __________ day of ____________________, 2011.

_____________________________
Notary Public

My Commission Expires:
_____________________



C E R T I F I C A T E

STATE OF OKLAHOMA )
) ss.
COUNTY OF TULSA )

I, Lisa A. Steinmeyer, Certified Shorthand Reporter within and for Tulsa County, State of Oklahoma, do hereby certify that the above named witness was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the case aforesaid, and that I reported in stenograph her deposition; that my stenograph notes were thereafter transcribed and reduced to typewritten form under my supervision, as the same appears herein.

I further certify that the foregoing 137 pages contain a full, true and correct transcript of the deposition taken at such time and place.

I further certify that I am not attorney for or relative to either of said parties, or otherwise interested in the event of said action.

WITNESS MY HAND AND SEAL this 10th day of May, 2011.

_____________________________
LISA A. STEINMEYER, CRR
CSR No. 386



CORRECTIONS TO THE DEPOSITION OF
PEG HESS, PhD

PAGE AND LINE NUMBER CORRECTION





6a10039e-2c58-433e-aba0-4c0e1b27422d