# EXHIBIT O

# Oklahoma Department of Human Services:

## An Evaluation of the Effort to Assure the Safety of Nine Foster Children

**John Goad, A. M.**

**November 10, 2009**

# TABLE OF CONTENTS


Executive Summary ..... 1

I. Introduction ..... 3

II. The Review ..... 4

III. The OKDHS CPS Investigation Process ..... 6

IV. Analysis ..... 12

A. Screening Decisions ..... 13

B. Deficient Investigations ..... 14

Failure to Make Important Investigative Contacts ..... 14

Delayed Initiation of Investigations ..... 16

Long Gaps in Investigations ..... 17

C. Unreasonable Investigative Determinations ..... 17

D. Unreasonably Unilateral Investigations ..... 19

V. Conclusion ..... 20

Endnotes ..... 21

Appendix A: OKDHS Investigations into the Abuse/Neglect of Named Plaintiffs

RJ ..... 1

JP ..... 5

JA ..... 10

GC ..... 10

AP ..... 14

JB ..... 18

KT ..... 19

CS ..... 27

DG ..... 30

Endnotes ..... 32

Appendix B: Summary of J. Goad Referral Findings

Appendix C: *Curriculum Vitae* of John Goad, A. M.

## Executive Summary

At the request of attorneys for the Named Plaintiffs in the federal litigation *D.G. v. Henry,* an assessment of the Oklahoma Department of Human Services' (OKDHS or agency) effort to protect nine children in its care and custody after the agency received 43 reports alleging that the children had been abused or neglected has been conducted. In addition to reviewing OKDHS' documentation of its response to the referrals, relevant OKDHS policies and procedures were examined.

The purposes of the review are to evaluate whether or not OKDHS' response to these 43 referrals suggests that 1) all children in OKDHS care are at risk of being harmed and 2) a system-wide research review of a scientifically selected sample of the OKDHS response to reports of maltreatment involving its wards is necessary.

**The overall conclusions of the review are:**

- **OKDHS' policies and procedures for responding to allegations that children in the agency's custody have been abused and neglected lack definition, specificity, rigor, and are inadequate.**

- **OKDHS' screening and investigation of the alleged abuse and neglect of the Named Plaintiff children who are the subjects of this review were seriously flawed.**

- **OKDHS' response to maltreatment allegations concerning the nine children reviewed reveal a pattern of practice that suggest that all children in the agency's care are in danger.**

- **It is likely that all children who are placed in the custody of the agency and who are subjects of child maltreatment allegations are at risk of physical and emotional harm.**

- **It is probable that all children who are placed in the custody of the agency are in danger of being placed with abusive, neglectful, and dangerous caregivers whom OKDHS has failed to identify because of its deficient response to child abuse and neglect referrals.**

**These conclusions – in combination with federal government data showing that children in OKDHS' care are more likely to be abused and neglected than are children in the care of almost any other state – make the urgent need for a scientifically designed research review to evaluate the danger in which OKDHS places children eminently clear.**

More specifically, the findings of the review include:

**Unreasonable Screening Decisions:** Many decisions about whether to screen referrals out from investigation were arbitrary and, at times, unrelated to the child safety threats suggested by the

referrals. Consequently, situations in which children may have been abused, neglected, and are in danger were not investigated. In addition to leaving the involved children at risk, this failure perpetuates OKDHS' continued use of potentially abusive foster parents.

**Seriously Flawed Investigations:** Many investigations were seriously deficient. Important deficiencies included:

- OKDHS investigations often failed to include important contacts such as doctors and police who were, or should have been, involved in the cases.

- OKDHS' ability to protect the children in its care suffers from a pronounced separation of functions. Neither child welfare workers responsible for individual children, nor resource specialists responsible for specific foster homes and kinship care providers, had any involvement in the majority of OKDHS' investigations.

- There were far too many unreasonable delays in initiating investigations. Such delays risk leaving abused and neglected children in unsafe situations and damage the integrity of investigations.

- There were often *very* long periods – often extending for months – when investigations seem to have been put aside and during which no Child Protective Services (CPS) activity took place. Again, such delays risk leaving abused and neglected children in unsafe situations and damage the integrity of investigations.

**Unreasonable Investigative Findings:** Investigative determinations were inconsistent, often inaccurate, and many investigative determinations were made without sufficient information to make them. As a result, situations in which children may have been abused, neglected, and in danger were not identified. In addition to leaving the involved children at risk, this failure perpetuates OKDHS' continued use of potentially abusive foster parents.

**Unreasonably Unilateral Investigations:** There was no formal interaction between OKDHS and other agencies (e.g., multidisciplinary teams, medical consultation, child advocacy centers, and law enforcement agencies) during investigations. Typically, allegations of sexual abuse and very serious physical abuse (e.g., burns and bone fractures) benefit from a multidisciplinary approach. None of the OKDHS investigations – including allegations that children were burned, suffered fractures of their skulls or other bones, or were sexually abused – included much communication, much less collaboration, of a multidisciplinary nature.

The results of this initial review are clear. OKDHS policies and procedures do not guide child protection activities in such a way that sound CPS decisions can be expected. The cases reviewed provide eloquent testimony to this. OKDHS' response to maltreatment allegations concerning the Named Plaintiff children reveals a pattern of practice that suggests that all children in the agency's care are in danger. These conclusions, together with data reported by OKDHS to the federal government – data that in fact understates the danger in which OKDHS places the children in its care – make the urgent need for a thorough review obvious.

# Oklahoma Department of Human Services: An Evaluation of the Effort to Assure the Safety of Nine Foster Children

## I. Introduction

Attorneys for the Named Plaintiffs in the federal litigation *D.G. v. Henry* have retained me to conduct an assessment of the Oklahoma Department of Human Services' (OKDHS) response to referrals alleging the maltreatment of children named as plaintiffs while they were in the custody of OKDHS. More specifically, I have been asked to evaluate whether OKDHS' response to these referrals demonstrates that the agency's policies and practices are such that the children named as plaintiffs – or other children in OKDHS' care – are likely to be effectively protected from child abuse and neglect while they are in the agency's custody.

As a social worker with more than 35 years of experience working in public child protective services, including direct or administrative responsibility for investigations into allegations of the abuse or neglect of more than a million children, I believe that I am well qualified to conduct this assessment. See my curriculum vitae (attached as Appendix C) for a more detailed description of my qualifications.

**The overall conclusions of the review are:**

- **OKDHS' policies and procedures for responding to allegations that children in the agency's custody have been abused and neglected lack definition, specificity, rigor, and are inadequate.**

- **OKDHS' screening and investigation of the alleged abuse and neglect of the nine children who are the subjects of this review were seriously flawed.**

- **OKDHS' response to maltreatment allegations concerning the nine children reviewed reveals a pattern of practice that suggest that all children in the agency's care are in danger.**

- **It is likely that all children who are placed in the custody of the agency and who are subjects of child maltreatment allegations are at risk of physical and emotional harm.**

- **It is probable that all children who are placed in the custody of the agency are in danger of being placed with abusive, neglectful, and dangerous caregivers whom OKDHS has failed to identify because of its deficient response to child abuse and neglect referrals.**

**These conclusions – in combination with federal government data showing that children in OKDHS' care are more likely to be abused and neglected than are children in the care of**

**almost any other state – make the urgent need for a scientifically designed research review to evaluate the danger in which OKDHS places children eminently clear.**

## II. The Review

This assessment is based entirely on a review of documents. Oklahoma child welfare policies found at the OKDHS website (http://www.okdhs.org/library/policy/oac340/075/) were reviewed. The transcripts of depositions of several key members of OKDHS management were reviewed. Case file material documenting OKDHS' response to 43 referrals alleging maltreatment involving nine children who are, or have been, named as plaintiffs in the litigation was reviewed.

Because of the small number of referrals considered, and because the referrals were not chosen randomly, the review does not purport to be statistically significant. It does, however, serve as exploratory research intended to determine whether a scientifically designed evaluation would be likely to reveal statistically significant evidence that investigations of the alleged abuse and neglect of children in OKDHS care are – or are not – adequate to provide them with a reasonable degree of protection. A detailed summary and brief analysis of each of the 43 referrals reviewed can be found in Appendix A.

The following documents were reviewed:

- OS Title 10 - Chapter 71 – The Oklahoma Child Abuse Reporting and Prevention Act
- OCA 340: Chapter 75. Child Welfare - Subchapter 1 General Provisions
- OCA 340: Chapter 75. Child Welfare - Subchapter 3 Child Protective Services
- OCA 340: Chapter 75. Child Welfare - Subchapter 7 Foster Home Care
- OCA 340: Chapter 2. Administrative Components - Subchapter 3 Office of Client Advocacy
- [redacted] August 5, 2009 deposition transcript
- [redacted] September 16, 2009 deposition transcript
- [redacted] September 23, 2009 deposition transcript
- Case material documenting CPS referrals and investigations concerning RJ
  Bates Ranges: RJ-KIDS 02080-02094, 02316-02502, 02571-02606
  RJ-[redacted] FH 00001-00049
  RJ-[redacted] CW 00009-00019
  RJ-[redacted] FH 00001-00084

OCA-Refs-00074-00075
OCA-RJ-00258-00262

- Case material documenting CPS referrals and investigations concerning JP
  Bates Ranges: JP-[redacted] 3 00310
  JP-KIDS 00085-00100, 00710-00789, 01794-01956, 01998-02077, 02082-02161, 02206-02216, 02240-02247, 02250-02284, 02287-02334, 02371-02392
  JP-KIDS-4-00235-00244
  JP-OPPC 00155, 00175
  JP-OPPC-2-02206-02216
  OCA-JP-00001-00066, 00199-00209
  OCA-Refs-00164-00168

- Case material documenting CPS referrals and investigations concerning JA
  Bates Ranges: JA-KIDS-4-00228-00242

- Case material documenting CPS referrals and investigations concerning GC
  Bates Ranges: GC-[redacted] II 00001-00032
  GC-KIDS 01855-01883, 02133-02181, 02286-02399, 02641-02651
  GC-[redacted] 00001-00102
  OCA-GC-00001-00026, 00220-00228

- Case material documenting CPS referrals and investigations concerning AP
  Bates Ranges: AP-KIDS 00011-00026, 00619-00628, 00630-00640, 00642-00705, 00807-00864, 00901-00907, 00967-00980, 01002-01017, 01019-01032, 01046-01059
  AP-OPPC 00509-00610
  AP-[redacted] FH 00001-00056
  AP-[redacted] FH 00001-00011

- Case material documenting CPS referrals and investigations concerning JB
  Bates Ranges: OCA-Inv-00724-00737
  OCA-JB-00001-00150, 00197-00199
  OCA-Refs 00111-00119

- Case material documenting CPS referrals and investigations concerning KT
  Bates Ranges: KT-KIDS 02080-02094, 02316-02502, 02571-02606
  KT-OPPC 05244-05262
  OCA-KT-00001-00018, 00072-00076

- Case material documenting CPS referrals and investigations concerning CS
  Bates Ranges: CS-[redacted] FH 00001-00035

CS-KIDS 00557-00573, 00802-00911, 01147-01182, 01217-01254
CS-OPPC 00729-00753, 00818-00830
CS-[redacted] FH 00001-00129

- Case material documenting CPS referrals and investigations concerning DG
  Bates Ranges: DG-KIDS 00170-00218
  DG-OPPC 00010-00018, 00020-00027, 00046-00056
  OCA-DG-00001-00068

## III. The OKDHS CPS Investigation Process

Every state operates a child welfare program. The principal goals of each of these programs are to assure the safety, permanency, and well-being of children. In 1997, with the passage of the Adoption and Safe Families Act, Congress established that "the child's health and safety shall be the paramount concern" of state child welfare agencies.[1]

Protecting children taken into state custody is an especially critical responsibility of the child welfare agency. Decisions that children can only be kept safe from serious harm by removing them from their families' care are extremely difficult. Child welfare professionals involved in making them must weigh the physical and emotional risk of leaving children with abusive or neglectful parents against the profound emotional trauma children inevitably suffer when they are separated from their parents. When children are placed in substitute care, it is at a heavy cost to their psychological well-being. Having made the decision that it is the better parent, the state has the responsibility to live up to at least the same standard to which we hold biological parents. It must, first and foremost, keep children safe.

Recognizing this, the Administration for Children and Families (ACF) of the U.S. Department of Health and Human Services has set a national standard for the proportion of children in substitute care who are abused or neglected. OKDHS has consistently failed to meet this standard. Moreover, only two states perform more poorly than Oklahoma in protecting its foster children from child abuse and neglect.[2] Children in the care of Oklahoma's child welfare agency are more likely to suffer abuse or neglect than are children in almost any other state.

To assure a reasonable degree of protection from abuse and neglect for children in state custody, child welfare agencies must perform effectively in several areas:

- Children in care must be visited frequently and purposefully by their caseworkers.

- The foster homes and other settings in which they are placed must be carefully screened and selected.

- Children must be placed in substitute care settings that are realistically equipped to meet their individual needs.

- Foster homes must not be overcrowded.

- Foster parents and other substitute caregivers must receive support from the agency as they fulfill their exceedingly difficult roles.

- When there is reason to believe that there are problems in substitute care settings – including allegations of child abuse and neglect – the agency must respond quickly to accurately assess the nature and extent of the problem, and to take action to assure the safety of children who are, or will be, placed in the home.

A reliably effective response to allegations that children have been abused or neglected in its custody is only one aspect of the child welfare agency's ability to assure child safety. It is, however, a critically important component. Such a response requires that the child welfare agency provide its staff with a well articulated understanding of 1) the process for responding to maltreatment reports and 2) the criteria to be used when making decisions.

It is important that child welfare staff generally, and child protective services staff in particular, be guided by sound, well defined, and prescriptive procedures. It is well documented that the national child welfare work force is neither well experienced nor well trained. It is estimated that, nationally, the annual turnover rate for child welfare workers is between 30% and 40%. The average tenure is less than two years.[3] Most states have difficulty finding a sufficient number of caseworkers who have social work degrees or front-line supervisors who have advanced degrees.[4] In order to fill caseworker positions, child welfare agencies regularly establish minimal educational and experiential requirements for hire. Without solid procedural guidance, inexperienced caseworkers with limited training are left to use their "professional judgment" as they perform their highly complex function. OKDHS shares these workforce problems. In a self-assessment of the issue, the agency attributes problems with its CPS response to "staff turnover, vacancies and lack of experienced staff."[5]

Given the complexity and the importance of child protective services, a logical response to these workforce problems is the use of highly prescriptive operational procedures. The Council on Accreditation (COA) requires that organizations develop "written instructions that outline the steps for performing a task(s)."[6] Such procedures must tell caseworkers specifically what they must do as they conduct investigations (i.e., who must be contacted and what information must be gathered). Procedures must provide caseworkers with clear decision-making criteria. Child Welfare League of America (CWLA) standards require that CPS agencies write procedures to assist staff with decision-making.[7] Such decision-making guidance must include reasonably specific definitions of child abuse and neglect (i.e., what must be screened in for investigation) and reasonably specific criteria for investigative outcomes (i.e., what must be substantiated).

As in other states, Oklahoma statute provides broad direction for OKDHS' CPS process. The Oklahoma Child Abuse Reporting and Prevention Act (OS Title 10 - Chapter 71) defines child abuse and neglect in very general terms, broadly sets out requirements for response, and establishes "some credible evidence" as the standard for confirming child maltreatment

allegations. Most state child welfare agencies supplement child protection laws in order to give front line staff much more specific guidance. This is done through administrative rulemaking and by developing operational procedures. In Oklahoma, this guidance is provided by the Oklahoma Administrative Code 340: Chapter 75 – Subchapter 3.

OKDHS' Child Protective Services (CPS) procedures applicable to investigation of children in OKDHS custody are sparse, vague, confusing, and lacking in prescription.

- The procedures are formatted in such a way that it is unlikely that caseworkers will find all information related to a particular activity. Instead of covering an activity comprehensively in one part of the procedure, several chapters cover processes that should be combined. Furthermore, each chapter is divided into two parts: the procedure itself and "Instructions to Staff," which are separate footnotes to the procedure. If one wanted to be certain that caseworkers would fail to adhere to a procedure, one would scatter procedural requirements around the instructional document. This violates CWLA standards that require that procedures "be written in a consistent format."[8]

- Much of the procedure is written as a list of suggestions rather than as a set of requirements. Reference to the subjective use of "good judgment" often replaces, or even overrides, explicit direction.[9] This invites disregard of procedural requirements. As [redacted], the [redacted], suggests in her deposition, the "policy is a guide."[10]

  Moreover, instead of establishing specific criteria, lists of examples are provided as decision making guides. For example, the definition of a report that requires urgent attention is a report that "indicates the child is in imminent danger of serious physical injury."[11] This definition is supplemented by a list of 25 examples.[12]

- CWLA standards call for the child welfare agency to clearly define child abuse and neglect.[13] OKDHS' definitions of child abuse and neglect are generic and add little to the legal definitions found in the statute. What is added is often vague, subjective, and even contradictory. For example, a referral to be screened in for investigation is one that is defined as a situation that "constitutes a serious and immediate threat to the child's health or safety." This is followed by a list of 18 examples.[14] One of the examples of a case that must be screened in is a child in OKDHS custody. In contradiction to this, the same chapter includes "corporal punishment by a foster parent or trial adoptive parent involving a child four to five years of age" in a list of examples to be screened out. These distinctions may not matter much, however, because most of the procedural "direction" is preceded by the statement, "This *guide* (reviewer's emphasis) is not intended to be all inclusive and does not replace judgment about alleged risk factors."[15] This lack of clear definition is certain to result in inconsistency and error when decisions related to accepting reports for investigation[16] and confirmation of reports are made.[17]

- The requirements for CPS investigation lack rigor. OKDHS procedure states that CPS investigations require contact with 1) the alleged victim(s), 2) sibling(s), 3) person(s)

responsible for the child (PRFC (s)) including the custodial and noncustodial parent(s), 4) collateral(s) and, if appropriate, 5) professional consultant(s). There is no specific requirement concerning what collateral sources *must* be contacted in any specific situation.[18] The only requirement for professional consultation is a list of situations in which a medical professional is to be contacted.[19] Unfortunately, this is found in a part of the procedure other than the one primarily covering the investigation requirements. This lack of specificity and rigor cannot be expected to lead to thorough CPS investigations and is contrary to CWLA requirements that call for procedures that clearly direct staff.[20]

- It is important that CPS investigations be commenced quickly. Failure to respond rapidly leaves children in potentially dangerous situations. In addition, delayed response reduces the availability of reliable evidence as memories fade. As the CWLA standards state, "No child in danger should have to wait for services."[21] COA standards call for a response within 72 hours at the latest.[22]

  OKDHS regulation defines priority 1 investigations as being those in which, "a child is in imminent danger of serious physical injury."[23] A list of examples along with an exhortation that staff use "good judgment" is provided to further define priority 1. In priority 1 investigations, an attempt must be made to see the alleged victim on the same day that the report was made. Other reports are priority 2. In priority 2 investigations, an attempt must be made to see the alleged victim within *15 days* from the day that the report was made.[24] A delay of more than one day, much less 15 days, risks leaving children in danger of being harmed.

- Decision-making criteria for accepting reports,[25] making investigative determinations,[26] and closing abusive/neglectful foster homes[27] are inadequate. The combination of vague child maltreatment definitions and the lack of specific decision-making criteria is certain to result in inconsistent and erroneous screening decisions and investigative findings. This poor decision-making inevitably results in children being left in dangerous situations and the continued use of dangerous foster homes. This failure violates COA standards requiring that "standardized decision-making criteria are used, in consultation with supervisory personnel, to determine if the report meets statutory and agency criteria."[28]

The procedural guidance that the agency provides to casework staff fails to meet any reasonable standard. This failure is likely to result in errors in the response to allegations of child abuse and neglect and in decision-making as referrals are screened and investigative outcomes are determined.

It is OKDHS' practice that investigations of abuse/neglect of OKDHS wards that allegedly occur in congregate care facilities (e.g., residential treatment centers, OKDHS shelters, etc.) are not conducted by child welfare staff. Instead, these investigations are conducted by the Office of Client Advocacy (OCA). OCA is generally responsible for addressing complaints, grievances, and allegations pertaining to OKDHS services.[29] OCA conducts maltreatment investigations involving children in group care according to its own separate set of procedures (the Oklahoma Administrative Code 340: Chapter 2 – Subchapter 3).

Most of the problems with the procedures applicable to OKDHS' child welfare CPS investigations are even more pronounced in the OCA procedures. The definitions of child abuse/neglect utilized by OCA are somewhat different from those used by the child welfare staff and add little specificity to the statutory definitions.[30] Furthermore, the investigative requirements are even less specific than those guiding child welfare investigations.[31] For example, there are almost no specific decision-making requirements. In addition, there are several important problems that specifically apply to the OCA process.

- Investigations of child maltreatment are complex and diverse. In order that sound decisions are made, investigators must have a working familiarity with a wide variety of subjects including child development, medical presentations associated with abuse and neglect, proper restraint procedures when children's behavior threatens to harm themselves or others, interviewing techniques for young children and alleged sexual abuse victims, law enforcement agency procedures, court expectations and many others. For this and other reasons, CWLA standards require that CPS investigations be a specialized service.[32]

  OCA investigators are not specialized. They investigate allegations of caretaker maltreatment and misconduct concerning many OKDHS clients, child or adult, who are receiving residential care, vocational services, or child day care.[33] Furthermore, OCA investigators do not receive substantial training in conducting child maltreatment investigations.[34] This lack of specialization dilutes the level of expertise that OCA staff members bring to child abuse/neglect investigations. It increases the likelihood that children will be left, or placed, in dangerous situations.

- OCA procedures setting requirements for the speed with which investigations must be begun are even more lax than those guiding CPS investigators. If a referral is deemed an emergency, OCA procedures require that OCA see to it that someone (not necessarily an OCA investigator) visits the alleged victim within 24 hours.[35] The definition of "emergency" is, "a situation [that] presents a serious risk to the victim." There are no additional criteria.[36] Other than the requirement that OCA investigations be completed within 60 days from the referral, there do not appear to be any formal procedural requirements for timely initiation. OCA has instituted a "five day rule" which requires that, in some situations, the alleged victim must be seen within five days of the referral. The "five day rule" appears to have been established in service of convenience (i.e., to enable OCA investigators to see children in shelters before they are moved somewhere else) and not as an effort to protect children.[37] CWLA standards call for specific procedures setting out the timeframes for initiation.[38] A quick response is important in order to assure the safety of children in the facility, to interview witnesses as soon as is possible after an incident, and to preserve the integrity of the investigation.

- OCA investigative findings are based on a different, and higher, evidentiary standard than are Child Welfare investigative findings. OCA findings require a preponderance of the evidence[39] while the standard for Child Welfare investigations is "some credible evidence."[40] Aside from being illogical, this deprives OKDHS wards living in congregate care of the safety net that the lower standard provides all other children.

- When OCA receives an abuse/neglect referral it may conduct an investigation or require that the facility in which the reported incident occurred conduct an internal investigation and report back to OCA. This process is the Caretaker Conduct Review (CCR). The criteria for handling a referral as a CCR allow agencies to investigate themselves even when children have been injured.[41] In addition to creating an obvious conflict of interest, this policy is certain to result in staff even less specialized than OCA investigators becoming responsible for potential child maltreatment investigations or for policy violations that may endanger children.

- OCA is set up as an administrative entity entirely separate from OKDHS Child Welfare. Investigative activities and outcomes are documented on different data systems. While OCA investigators have access to information concerning Child Welfare CPS investigations (maintained on the KIDS data system), Child Welfare staff members, including caseworkers responsible for the alleged victims in OCA investigations, have no access to information from the OCA system.[42]

  Notices of an OCA referral and notice of the outcome of the OCA investigation are sent by OCA to a state office level OKDHS administrator. There is no requirement that OCA contact the child's caseworker in any way during the investigation. In fact, it is unlikely that OCA will even learn who the child's caseworker is. As [redacted], [redacted], said in his deposition, "we don't know who the caseworker is. And, frankly, we don't care."[43] The alleged victim's caseworker is likely to have important information relevant to the investigation. It is also important that the child's caseworker be immediately aware of the alleged mistreatment of the child so that the caseworker can respond to any related service needs.

- Because of the separate data systems, the OKDHS wards found to be abused and neglected by OCA investigations do not appear to be included in the abuse in care data provided to the federal government.[44] This means that OKDHS' *very* poor showing in federal data is actually understated. It means that children in the care of OKDHS are maltreated by their caregivers even more frequently than is depicted by the statistics that show the agency ranking in the bottom three among the states.

This process for conducting investigations creates a two-tier system for protecting children in OKDHS care. As a result, there are unreasonable and dangerous differences in the level of protection OKDHS provides its wards. This difference is based, arbitrarily, on the nature of the child's placement.

Of course, even if a child welfare agency has sound and well articulated policies and procedures, unless they are consistently adhered to, they serve little purpose. Enforcing the use of operational procedures is a primary function of agency management.

## IV. Analysis

This analysis is based on my review of 43 referrals alleging the abuse or neglect of nine children who were in the care of OKDHS at the time of the referrals. A detailed summary and brief analysis of each of the 43 referrals reviewed can be found in Appendix A.

In the 43 referrals reviewed, the OKDHS response to allegations of child abuse and neglect concerning children in substitute care, the screening and investigative processes, as well as the related decisions, were inconsistent and unreliable. More specifically:

- Many decisions about whether to screen referrals out from investigation were arbitrary and, at times, unrelated to the child safety threats suggested by the referrals. Consequently, situations in which children may have been abused, neglected, and in danger were not investigated. In addition to leaving the involved children at risk, this failure perpetuates OKDHS' continued use of potentially abusive foster parents.

- Many investigations were seriously deficient:

  - Investigations often failed to include important contacts including doctors and police who were, or should have been, involved in the cases. This is especially true of investigations conducted by OCA.

  - OKDHS' ability to protect the children in its care suffers from a pronounced separation of functions. Neither child welfare workers responsible for individual children nor resource specialists responsible for foster homes and kinship care providers had any involvement in the majority of OKDHS' investigations. In OCA investigations, there was no involvement whatsoever with child welfare staff.

  - There were unreasonable delays in initiating far too many investigations. Such delays risk leaving abused and neglected children in unsafe situations and damage the integrity of investigations.

  - There were often *very* long periods – often extending for months – when investigations seem to have been put aside and during which no CPS activity took place. Again, such delays risk leaving abused and neglected children in unsafe situations and damage the integrity of investigations.

- Investigative determinations were inconsistent, often inaccurate, and many investigative determinations were made without sufficient information to make them.

- There was no formal interaction between OKDHS and other agencies (e.g., multidisciplinary teams, child advocacy centers, and law enforcement agencies) during investigations. Typically, allegations of sexual abuse and very serious physical abuse (e.g., burns and bone fractures) benefit from a multidisciplinary approach. None of the OKDHS investigations – including allegations that children were burned, suffered fractures of their skulls or other

bones, or were sexually abused – included much communication, much less collaboration, of a multidisciplinary nature.

### A. Screening Decisions

A total of 55 referrals were reviewed. In four instances, OKDHS received two referrals about the same situation nearly concurrently and linked the referrals to a single investigation. For the purpose of this analysis, each of these pairs of referrals is treated as one. Three referrals (and attendant investigations) involved different children with the same or similar names as the subject children. These cases are excluded from the analysis. Three subject children were alleged victims in five additional referrals (and attendant investigations) that took place before the children were placed in OKDHS' custody. While information from these documents illuminated the narrative about these children, the referrals and investigations were not included in the analysis. The universe of referrals considered is, therefore, 43.

Of the 43 referrals, 16 were screened out. All of the referrals that were screened in warranted investigation. The table below depicts the quality of OKDHS' decision making in the determinations to screen out 16 referrals. The rationale for placing referrals in their respective categories can be found in the narrative description of each referral in Appendix A. An itemization of the screened out referrals placed in each category can be found in Appendix B.

**OKDHS Screen out Decisions**

| | **Number** | **Percent of 16** |
|---|---|---|
| **Screen-out Good Practice** | 6 | 37.5 |
| **Screen-out Insufficient Info** | 4 | 25 |
| **Screen-out Poor Practice** | 6 | 37.5 |

Table 1

As can be seen in Table 1, judgments made to screen referrals out were sound in only slightly more than one-third of the referrals that were screened out. At least six, and as many as ten, situations should have been investigated. This result is not surprising considering the lack of specificity in OKDHS' definitions of child maltreatment. Failure to establish a system that reliably identifies situations requiring CPS investigation violates COA standards.[45]

EXAMPLE:

Over the course of two days, OKDHS received a series of referrals from [redacted] at seven-year-old JP's [redacted]. They reported that JP runs away from teachers because he is afraid to go to his foster home, that JP has had scratches, that his foster mother is always gone, and that her teenage children abuse him. At the end of the previous school day, JP hid to

avoid being returned to his foster home. When he was located, he was taken to the foster mother's seventeen-year-old daughter who had come to pick him up. When he saw her, JP bolted. She grabbed him and dragged him to her car in a manner that caused the reporter concern. JP had a bruised lip.[46]

[redacted] sent an e-mail recounting a recent incident in which JP said that he had been "choked out" apparently in his foster home. He had marks on both sides of his neck. Over time, he provided various other explanations for the marks, including some that were not plausible. When asked, the foster mother said that he inflicted the marks on himself.[47]

The referrals were screened out.

### B. Deficient Investigations

After screening 16 referrals out, OKDHS screened 27 in for CPS investigation. Of the 27 screened in, 22 involved subject children directly. In the remaining five, the alleged victims were children placed in the same foster or kinship care homes concurrently with subject children. Six of the 27 investigations were handled by OCA.

*Failure to Make Important Investigative Contacts*: One important measure of a CPS investigation is whether or not important contacts are made. CWLA standards[48] and OKDHS regulations[49] require that every CPS investigation include contact and interviews (if subjects are verbal) with:

- The alleged victim(s),
- All sibling(s) and other children living in the home,
- The person(s) responsible for the child (PRFC(s)), including the custodial and noncustodial parent(s),
- The alleged perpetrator, and
- Professional and other collateral contacts.

Among the most important aspects of conducting an effective CPS investigation is identifying appropriate collateral contacts. Medical, law enforcement, educational, human services, and other professionals are often able to contribute critically important information to the investigation. Non-professionals, such as friends, neighbors, and relatives, can also be important sources.

Of the 27 investigations, one included no information about the investigative process. Of the 26 that remain, all but seven (73%) failed to make an important investigative contact. The contacts that were missed are itemized as follows.

**Investigative Contacts Not Made**

| Contact | Number | Percent (of 26) |
|---|---|---|
| | | |
| Medical Professional | 10 | 38.5% |
| All Kids in Home | 9 | 34.5% |
| Law Enforcement | 6 | 23.1% |
| Obviously Needed 2nd Interview With Alleged Victim | 6 | 23.1% |
| Other Important Collateral | 5 | 19.2% |
| All Adults in Home | 2 | 7.7% |

Table 2

It is clear in OKDHS' procedures that all children and adults living in the home must be contacted. The frequent failure to do so is evidence that the procedures are not followed. This may be because they are viewed as being a "guide" rather than being mandatory.[50] It is not surprising that OKDHS investigators failed to identify important collaterals in light of the imprecise guidance given them. It is very disturbing that, in a substantial proportion of investigations that involved – or should have involved – medical and law enforcement intervention, investigators failed to make relevant contacts.

EXAMPLE:

[redacted] reported that nearly three-year-old AP had been diagnosed with a spiral fracture to her leg. It was reported that she was injured while in the care of her [redacted] who was babysitting while her father was at work.[51] At the time of the referral, AP was in OKDHS custody and was in the care of her father as a trial reunification.[52] The referral was screened in for investigation. The "investigation":

- Failed to make any effort to interview AP.
- Failed to make any effort to interview AP's 4 ½ year old sister.
- Failed to contact any of the OKDHS workers who were involved with the family.
- Failed to attempt to verify any statements made by the father (e.g., that he actually was at work when AP was hurt).
- Included no background check of the [redacted].
- Included a two month long gap in the investigation.
- Left the children in danger during the two month long gap in CPS activity, during which the girls were left unprotected, with caregivers who may have seriously abused one of them.
- Reached a determination based primarily on a consultation with a nurse practitioner. This consultation did not occur until two months *following* AP's discharge from the safety of the hospital.
- Failed to notify the police of the serious and suspicious injury suffered by AP.

OKDHS found the referral to be Unconfirmed despite the somewhat implausible explanation for AP's spiral fracture. A more thorough investigation may have had a different result.

In addition to the contacts required for every CPS investigation, OKDHS policy[53] requires that, when conducting investigations in foster and kinship care homes, investigations must include contact with the child's caseworker and staff responsible for licensing/approving the home. This contact is important because: 1) child welfare staff who have, or should have, regular contact with children and substitute caregivers are potentially valuable sources of information and 2) child welfare staff responsible for involved children and caregivers need timely access to information about investigations related to their responsibilities so that they can effectively respond to any issues that are raised.

In 16 (or 61.5%) of the 26 investigations, the files reviewed contain no indication that the child's caseworker was contacted. Contact with the resource specialist was not applicable in nine of the 26 investigations because they either took place in group settings for which resource specialists are not responsible, or in the homes of the children's biological parents (i.e., trial reunification). The files fail to evidence any contact with the resource specialist in 11 of the 17 investigations in which such contact should have been made (64.7%).

*Delayed Initiation of Investigations:* For reasons that are obvious, it is important that CPS investigations be commenced quickly. Failure to respond quickly leaves children in potentially dangerous situations. Delayed response also reduces the availability of reliable evidence as memories fade. COA standards call for a response in no more than 72 hours.[54]

**Days to Initiation**

| Days to Initiation | Number of Investigations | Percent (of 25) |
|---|---|---|
| | | |
| **0-1** | 14 | 56% |
| **2-3** | 3 | 12% |
| **4-5** | 3 | 12% |
| **6-9** | 2 | 8% |
| **10-15** | 1 | 4% |
| **More than 15** | 2 | 8% |

Table 3

OKDHS files contain information about how quickly 25 of the investigations were initiated. As Table 3 shows, many were initiated quickly. Fourteen (56%) were begun the same day or the day following the referral. Others, however, were not commenced within a reasonable time. In eight of the 25 investigations (32%), the initiation timeframe violated COA standards, taking four days or more to initiate. One OCA investigation involving a child with a fractured skull was not commenced for *37* days.

EXAMPLE:

OKDHS received a referral that one-month-old DG, a resident at the Pauline E. Mayer Shelter, suffered a skull fracture. Purportedly, DG was dropped by a staff member during a fire drill.[55] Because the incident occurred in a shelter, OCA was responsible for the investigation. OCA determined that the investigation "is not a priority case because OCA has not been informed that an accused caretaker has been reassigned or suspended pending our investigation."[56] This means that the staff responsible for DG's suspicious skull fracture continued to have access to vulnerable children at the shelter. OCA did not begin any investigation until *37 days* after its receipt of the referral.

The entire investigation consisted of interviewing the child care worker responsible for DG's fractured skull, another child care worker who was present, and the shelter's physician who treated DG. OCA found the referral to be Unconfirmed despite the highly suspicious nature of DG's injury.

*Long Gaps in Investigations:* It is important that CPS investigations be completed in as concise a way as is reasonably possible. Child welfare agencies are able to protect children, provide services, resolve policy violations, and support providers more effectively when CPS investigations reach timely conclusions. It is a serious problem, therefore, that six investigations (an astounding 23% of those reviewed) included gaps of between one and four months during which there was no CPS activity. In some of these investigations children were in the care of the alleged perpetrator and were in danger. In all of them, the quality of the information gathered was diminished by the delay.

EXAMPLE:

OKDHS received a referral after seven-year-old JP complained that his treatment foster mother twisted his arms and hit him in the head. He complained that he did not like the foster home because they were mean to him.[57] Because of serious deficiencies in the investigation, including a *2 ½ month* long gap in the investigation after JP confirmed the allegation to the OKDHS investigator, it is impossible to know whether the unconfirmed finding was correct or not.

Five months later, [redacted] reported that JP, who continued in placement at the same foster home, had belt-like marks on his arm and leg and had a grapefruit-sized bruise and a belt-like mark on his thigh. JP said that he had been beaten with a belt.[58] OKDHS investigated and confirmed that JP's foster mother had abused him. This second investigation included a two-month gap.

### C. Unreasonable Investigative Determinations

One of the most important functions of any child protection system is the identification of children who have been abused and neglected. This will never be an exact science. Recognizing that some amount of judgment will always be a part of making CPS determinations, thorough investigations coupled with clear and specific substantiation criteria can result in consistently

sound decision making. In the 27 investigations reviewed, OKDHS did not exemplify consistently sound decisions.

**OKDHS Investigative Determinations**

| | Number | Percent (of 27) |
|---|---|---|
| | | |
| **Reasonable** | 13 | 48.1% |
| **Insufficient Information** | 10 | 37.0% |
| **Not Reasonable** | 4 | 14.8% |

Table 4

Most determinations about whether the children in OKDHS custody had been abused or neglected (51.9%) were either unreasonable or were made without conducting a thorough enough investigation to make a determination. Because of the vague maltreatment definitions and non-specific investigation requirements OKDHS provides its front line staff, this is not surprising. It is, however, dangerous to children. Inaccurately confirmed investigations can cause children needless disruption as they may be unnecessarily removed from their caregivers. In addition, the agency can be deprived of scarce substitute care resources. Inaccurately unconfirmed investigations can leave children in unsafe placements and permit continued use of dangerous caregivers. Considering the narrative descriptions of the 27 investigations (see Appendix A) and the information in Table 4, OKDHS' decision-making can best be described as being essentially random.

EXAMPLE:

OKDHS received a referral alleging that ten-year-old RJ and three other foster children were beaten with a switch by their foster parents.[59] All four of the foster children, who were dirty and shabbily dressed, confirmed that the foster parents regularly hit them with a switch from a tree. Three of the children, including RJ, had marks that resulted from the beatings. The children said that they would be hit on all parts of their bodies. One of the children had a mark on his neck.[60]

After interviewing the children, the worker went to the foster home to interview the foster mother. The home was in disarray. The foster mother acknowledged that she did hit the children saying that, "if you don't beat them down, they will run all over you." The worker observed the switch, which was 2 ½ to 3 feet long.[61] Inexplicably, OKDHS found the referral Unconfirmed.

EXAMPLE:

OKDHS received a referral alleging that KT's foster parents were neglectful because their family cocker spaniel bit a three-year-old foster child in the face.[62] Despite the facts that:

- The family had had the dog for five years, had cared for hundreds of foster children during that time, and the dog had never bitten anyone before,

- The child's injuries were minor,
- The foster mother promptly obtained medical care for the child,
- The dog's shots were up to date, and
- The foster mother reported the incident to animal control,

Surprisingly, OKDHS found the allegation Confirmed.

It is instructive to consider OKDHS' investigative determinations by finding.

**Investigative Determinations by Finding**

| **Finding** | **Number** | **Percent (of 27)** |
|---|---|---|
| | | |
| **Confirmed – Reasonable** | 4 | 14.8% |
| **Confirmed – Insufficient Information** | 0 | 0% |
| **Confirmed – Not Reasonable** | 1 | 3.7% |
| **Not Confirmed – Reasonable** | 9 | 33.3% |
| **Not Confirmed – Insufficient Information** | 10 | 37.0% |
| **Not Confirmed – Not Reasonable** | 3 | 11.1% |

Table 5

Table 5 assesses the adequacy of OKDHS' decisions about whether or not children had been abused or neglected by finding. An itemization of investigative findings placed in each category can be found in Appendix B. OKDHS found five of the 27 investigations (18.5%) to be Confirmed.

It is alarming, however, that over one-third of the investigations were found to be Unconfirmed when insufficient information had been gathered to make any finding. It is equally worrisome that 3 of the 22 Unconfirmed investigations (13.6%) should have been substantiated. In most of the investigations (14 or 52%) OKDHS either reached the wrong finding or made a finding without sufficient information. Thirteen, or 59% of the unconfirmed investigations, were Unconfirmed without basis.

### D. Unreasonably Unilateral Investigations

The use of child advocacy centers, joint investigations with law enforcement, and other multidisciplinary investigation processes are, increasingly, the standard for investigation of sexual and serious physical abuse. These processes have the advantages of maximizing the amount and quality of the information available for making decisions and minimizing the disruption and trauma to children and others involved in investigations. CWLA encourages such collaboration[63] as do COA Standards.[64] Although in Oklahoma, leadership for multidisciplinary investigation is the responsibility of county district attorneys, OKDHS policy includes an entire section on their use.[65] Despite the fact that nearly half of the investigations in this review involved very serious physical abuse (two skull fractures, a spiral fracture of a femur, and a very

serious burn) or sexual abuse (nine investigations), not one benefitted from a multidisciplinary approach.

Not only did OKDHS fail to collaborate with other agencies, its investigators rarely had meaningful contact with professionals who would be part of a multidisciplinary team. As can be seen from Table 2, medical professionals were not adequately consulted in more than one-third of the investigations. Similarly, law enforcement officers who were, or should have been, involved in nearly a quarter of the cases were not contacted. This unilateral approach to CPS investigations is dangerous to children. When information is freely shared, the basis for sound decision-making is enhanced. Decisions made in a vacuum are far more likely to be flawed than are those made with the benefit of a variety of perspectives and expertise.

## V. Conclusion

The results of this initial review are clear. OKDHS policies and procedures do not guide child protection activities in such a way that sound CPS decisions can be expected. The cases reviewed provide eloquent testimony to this. OKDHS' response to maltreatment allegations concerning the nine children reviewed reveals a pattern of practice that suggests that all children in the agency's care are in danger. These conclusions, together with data reported by OKDHS to the federal government – data that in fact understates the danger in which OKDHS places the children in its care – make the urgent need for a thorough review obvious.

---

John Goad, A. M.

**Endnotes**

---

[1] Public Law 105-89, Section 101 (a)(15)(A)
[2] United States Department of Health and Human Services, Administration on Children Youth and Families, Children's Bureau (2009). *Child Maltreatment: 2007*. Table 3-17. Washington, D.C.
[3] United States General Accounting Office (2003). GAO-03-357 *Child Welfare: HHS Could Play a Greater Role in Helping Child Welfare Agencies Recruit and Retain Staff.* Washington, D.C.
[4] Child Welfare League of America (1999) *Minimum Education Required by State Child Welfare Agencies,* Arlington, Virginia.
[5] Oklahoma Department of Human Services (2007), *Child and Family Service Review: Statewide Assessment*, Oklahoma City, p. 25.
[6] Council On Accreditation (2006) *Eighth Edition Child Welfare Accreditation Standards*, New York, Glossary. "Procedures."
[7] Child Welfare League of America (1999) *Standards of Excellence for Abused and Neglected Children and Their Families* Washington D.C., §5.7.
[8] Ibid.
[9] OAC 340:75-3-7.1; www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff, 1
[10] [redacted] Deposition Transcript, p. 129
[11] OAC 340:75-3-7.1(d)
[12] www.okdhs.org, OAC 340:75-3-7.1, Instructions to Staff, 4
[13] Child Welfare League of America (1999) *Standards of Excellence for Abused and Neglected Children and Their Families* Washington D.C., §1.8.
[14] www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff, 4
[15] www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff, 1
[16] OAC 340:75-3-7.3
[17] OAC 340:75-3-10.3
[18] OAC 340:75-3-8; OAC 340:75-3-8.2
[19] OAC 340:75-3-8.6
[20] Child Welfare League of America (1999) *Standards of Excellence for Abused and Neglected Children and Their Families* Washington D.C., § 5.7
[21] Ibid., §1.13.
[22] Council On Accreditation (2006) *Eighth Edition Child Welfare Accreditation Standards*, New York, §PA-CPS 5.01.
[23] OAC 340:75-3-7.1(d)
[24] OAC 340:75-3-7.1(e)
[25] www.okdhs.org, OAC 340:75-3-7, Instructions to Staff, 1; OAC 340:75-3-7.1; www.okdhs.org, OAC 340:75-3-7.3, Instructions to Staff
[26] www.okdhs.org, OAC 340:75-3-10.3, Instructions to Staff
[27] OAC 340:75-7-94
[28] Council On Accreditation (2006) *Eighth Edition Child Welfare Accreditation Standards*, New York, §PA-CPS 4.04
[29] OAC 340:2-3-1

---

[30] OAC 340:2-3-2
[31] OAC 340:2-3-36
[32] Child Welfare League of America (1999) *Standards of Excellence for Abused and Neglected Children and Their Families* Washington D.C., §2.2.
[33] [redacted] Deposition Transcript, p. 84
[34] Deposition Transcript, pp. 90-97
[35] www.okdhs.org, OAC 340:2-3-35, Instructions to Staff, 2
[36] [redacted] Deposition Transcript, p. 150
[37] Deposition Transcript, pp. 172-173
[38] Child Welfare League of America (1999) *Standards of Excellence for Abused and Neglected Children and Their Families* Washington D.C., §1.13.
[39] OAC 340:2-3-36
[40] OS Title 10 - Chapter 71, Section 7102, B 14, 15
[41] OAC 340:2-3-37
[42] [redacted] Deposition Transcript, p. 78
[43] Deposition Transcript, pp. 117-118
[44] Deposition Transcript, pp. 197-198
[45] Council On Accreditation (2006) *Eighth Edition Child Welfare Accreditation Standards*, New York, §PA-CPS 4.04.
[46] JP-KIDS-4-00235-00237; JP-KIDS 02268, 02273
[47] JP-OPPC 00155
[48] Child Welfare League of America (1999) *Standards of Excellence for Abused and Neglected Children and Their Families* Washington D.C., §1.14.
[49] OAC 340:75-3-8(c)
[50] See page 8, *supra*.
[51] AP-KIDS 00644-00645
[52] AP-OPPC 00509
[53] OAC 340:75-3-8.1
[54] Council On Accreditation (2006) *Eighth Edition Child Welfare Accreditation Standards*, New York, §PA-CPS 5.01.
[55] OCA-DG-00025
[56] OCA-DG-00028
[57] JP-KIDS 02090
[58] JP-KIDS 02128-02131
[59] RJ-KIDS 02580
[60] RJ-KIDS 02582-02588
[61] RJ-KIDS 02590
[62] KT-KIDS 02996
[63] Child Welfare League of America (2003) *Best Practice Guidelines for Child Maltreatment in Foster Care*, Washington D.C.
[64] Council On Accreditation (2006) *Eighth Edition Child Welfare Accreditation Standards*, New York, §PA-CPS 5.03.
[65] OAC 340:75-3-8.4

# Appendix A

# OKDHS Investigations into the Abuse/Neglect of Named Plaintiffs

**OKDHS Investigations into the Abuse/Neglect of Named Plaintiffs**

The major part of this review is an assessment of OKDHS' response to referrals that were made because the referent believed that there was reason to believe that one of nine children in OKDHS custody had been abused or neglected by those assigned to protect them. The evaluation is based solely on the review of OKDHS' documentation of its response to the referrals. Little or no information about actions OKDHS took in response to the referrals or resultant investigations was reviewed. No ongoing case file documentation was reviewed. What follows, therefore, has the quality of a series of snapshots of the situations in which the involved children were placed.

**RJ**

RJ was born on [redacted]. After being placed in the custody of OKDHS, he was placed in the [redacted] foster home. During the time RJ was placed in the home, the foster mother's nieces, who had been placed in her guardianship, were also in the home. OKDHS investigated two reports alleging that the foster mother's nieces (ages eleven and twelve at the time of the reports) had been abused by the foster mother.

Referral Number [redacted]

This referral was received by OKDHS on 4-18-00 at 2:30 p.m.[1] The reporter is identified as being a "private individual."[2] The exact nature of her relationship to the subjects of the report is not clear. She reported that one of the foster mother's nieces wrote a note alleging that the foster mother was physically abusing them. It was noted that the girls were living in an OKDHS foster home. There were seven children, including RJ, living in the home at the time of the report.[3]

According to OKDHS documentation, the investigation was initiated on 4-21-00 at 12:30 p.m. (three days after the referral) when the investigator unsuccessfully attempted face-to-face contact with the alleged victims.[4] After two additional failed attempts, both girls were interviewed at their school on 4-27-00. They both denied the alleged abuse, denied writing the letter in which abuse was alleged, said they liked living with their aunt, and attributed the allegations to their mother.[5]

After 4-27-00, no significant investigative activity occurred for four months until 8-30-00, when the investigator interviewed the foster mother who denied abusing her nieces. She attributed the allegations to the girls' mother.[6] On 8-31-00, the investigator saw then 4 ½ year old RJ.[7] She was not able to interview him, however, because she found him to have a serious speech delay. She documented that RJ did respond to the foster mother's questions. Also on 8-31-00, the investigator documented seeing two other children living in the home.[8] Aside from the fact that she contacted the children, the only other information documented is that one child was nine months old and the other was twenty months old. This is despite the fact that one of the children was born on [redacted].[9]

On 8-31-00, the investigator spoke with an OKDHS caseworker who did not currently have any children in the [redacted] foster home. The caseworker had no concerns that the foster mother was abusive.[10] Finally, on 8-31-00, the investigator talked to RJ's caseworker's supervisor who "did not have complete information related to the details of the foster home." The supervisor said that there had never been concerns about abuse and reported that RJ and his siblings had been removed from the home "due to a change of placement."[11]

The investigative finding was Not Confirmed – Services Not Needed.[12]

This investigation was very poorly conducted. Among its deficiencies:

- No children, including the alleged victims, living in the home were seen until nine days following the referral.
- There was a *four month* gap between contact with the alleged victims and the remainder of the investigation, including contact with OKDHS wards placed in the home.
- There was no contact with two foster children ([redacted] and [redacted]) who were in the home, one of whom was five years old and who may have been an important source of information.
- There was no contact with the foster father.
- There was no contact with the reporter or any effort to track down the note that was the source of the allegation.
- There was no contact with any disinterested witness.
- There was no contact with the foster care worker.
- There was no meaningful contact with the permanency planning workers for any of the children placed in the [redacted] foster home.

It is not uncommon for children in substitute care to feel ambivalence about their substitute caregivers. When they make allegations that they have been maltreated by their caregiver – or when they recant them – it is important that sufficient objective information is obtained before drawing any conclusions. While it is most likely that the alleged victims in this instance were not abused in the [redacted] home, the investigation failed to collect evidence that was available and would have been important to the determination.

Referral Number [redacted]

On 10-6-00, [redacted] reported that the two girls who were the alleged victims in the previous investigation had gone to the office at the apartment complex in which the [redacted] foster home is located. They were crying and saying that they did not want to return to their aunt's home.[13] According to the *Report to the District Attorney*, RJ was still placed in the home at the time of this referral.[14] The girls were placed in an OKDHS shelter.[15]

The alleged victims were interviewed on the day of the referral. The twelve-year-old spoke somewhat negatively about her aunt and said that she wanted to live with her mother. Although she described her aunt as making statements about her mother that were inappropriate, she did

not describe any incidents of abuse or neglect.[16] Her eleven-year-old sister denied abuse and said she wanted to go wherever her sister went.[17]

Three days later, on 10-9-00, the investigator visited the foster mother, who denied any maltreatment.[18] On 10-9-00, the investigator also spoke with a friend of the foster mother, who provided a positive character reference[19] and reviewed a letter from the woman from the housing complex, who confirmed that the girls came to her crying, saying that they did not want to return to their guardian.[20] Finally, the investigator saw the girls' mother, who said the foster mother was playing "head games."[21]

The investigative finding was Not Confirmed – Services Recommended. The girls were returned to their aunt. Counseling was recommended for the girls.[22]

There were several serious deficiencies in this investigation. They include:

- There was no contact with any of the foster children living in the home.
- There was no contact with any child welfare worker for any of the foster children or with the resource specialist responsible for the home.
- There was no contact with the police officer who responded to the situation.

Despite these deficiencies, the finding was most likely correct and the recommendation for counseling was appropriate.

Referral Number [redacted]

On 10-18-01, [redacted] reported that during a visit with his mother, RJ saw his mother hit his four-year-old brother, who had been returned to her from foster care, with a belt. RJ's brother screamed so much that RJ did not look to see if his brother had been injured.[23] This referral was screened out and linked to an existing case.[24] This referral should have been screened in. The facts that 1) the alleged victim is only four, 2) he was allegedly hit with an object hard enough to cause him to scream, and 3) he had been placed in foster care and returned to his mother describe a significant child safety threat warranting a CPS investigation.

Referral Number [redacted]

On 2-8-06, [redacted] contacted an OKDHS child welfare worker saying that foster children placed in the [redacted] foster home were hit with switches and with the hands by their foster parents. In addition to ten-year-old RJ, three other OKDHS wards (a nine-year-old boy, a ten-year-old boy, and a seven-year-old girl) were placed in the home at the time of the report.[25]

On 2-9-06, an OKDHS child welfare worker, in the company of the resource specialist, interviewed all four of the foster children who were placed in the [redacted] foster home at their school. The children were dirty and shabbily dressed. Each child confirmed that the foster parents regularly hit them with a switch from a tree. The child welfare worker observed that three of the

children, including RJ, had marks that had resulted from the beatings. The children said that they were hit on all parts of their bodies. One of the children had a mark on his neck. The children said that they did not like living in the [redacted] foster home.[26]

After interviewing the children, the child welfare worker went to the [redacted] home to interview the foster mother. The child welfare worker noted that the home was in disarray. The foster mother acknowledged that she did hit the children, saying that "if you don't beat them down, they will run all over you." The child welfare worker observed the switch, which was "approximately 2.5-3 ft long." The foster mother said that she did not know whether she had ever been told not to hit the foster children. She agreed not to hit the children anymore and signed a written plan of compliance to that effect.[27]

The file contains a *Report of Violation of Rules in an OKDHS Resource Home* recommending that children not be placed in the home pending completion of the investigation.[28] At some point following these interviews, the child welfare worker was instructed by supervisory staff to remove the children from the [redacted] home.[29] The children were described as being overjoyed to be leaving the home and as literally running to the car to get away.[30]

Apparently the children were taken to a clinic where they were examined by a nurse practitioner. Staff from the clinic stated that they were not trained in child abuse and could not render any opinion about the source of the marks on the children. This clinic visit is documented only in a case summary.[31] There is no corresponding case note or report from the clinic.

After 2-9-06, the investigation was taken over by an OKDHS CPS investigator. On 2-16-06 she re-interviewed the foster mother who denied ever hitting the children. She said that if they had marks, they were from playing or fighting.[32] She interviewed the foster father, who denied that the children were ever hit.[33]

On 2-17-06, she interviewed the child welfare worker who conducted the first portion of the investigation. The child welfare worker provided a specific account of the interviews she had conducted and described the children's reaction to being removed from the home.[34] The investigator contacted a school staff member who reported that one of the children said that he was hit in the foster home.[35] She contacted two friends of the foster mother, neither of whom provided any useful information.[36]

Finally, on 2-21-06, the investigator contacted the resource specialist, who described the interviews conducted by the child welfare worker on 2-9-06.[37]

The investigative finding was Not Confirmed – Services Recommended. According to the CPS investigator's summary, the allegations were not confirmed "[b]ased on the facts that the scars on the children cannot be proven attributed to the switching."[38]

Although the medical provider who examined the children should have been contacted, OKDHS staff gathered sufficient information to make a reasonable finding. The decision to find the

allegations unconfirmed is incomprehensible. The finding was made by an investigator who did not interview any of the involved children and was made in apparent disregard of the substantial information gathered by the child welfare worker.

Because the *Report of Violation of Rules in an OKDHS Resource Home* recommended that children not be placed in the home until the investigation was complete, and because the allegations were not confirmed, one must worry that the foster home was not closed. One must also worry that the foster parents regularly, and, apparently openly, beat the children without any OKDHS worker becoming aware of it.

**JP**

JP is a male who was born on [redacted].

Prior to his being placed in state care, there were three reports concerning the care that JP and his siblings received from [redacted]. On 1-9-06, [redacted] reported that the children were in the care of [redacted] because their mother was in jail. [redacted] related that JP's [redacted] was "crying in [her] office" and could not care for the children.[39] This referral ([redacted]) was screened out.[40] On 1-27-06, [redacted] reported that the [redacted] was unable to care for the children and had said, "Get these kids out. Don't want to hurt them."[41] This referral ([redacted]) was accepted for investigation. During this investigation, which included a month-long gap in activity, OKDHS appears to have done nothing to assist the children's [redacted] with their care, leaving them in a dangerous situation.[42] On 5-5-06, the police took JP and his two brothers into custody because JP's [redacted] beat JP's seven-year-old brother (Referral Numbers [redacted] and [redacted]).[43] This removal may have been avoided had OKDHS responded to the [redacted]'s pleas for help.

Referral Number [redacted]

This referral was made by [redacted] on 10-4-06.[44] At the time of the referral, JP was placed in the [redacted] treatment foster home, which was managed by a private agency. He told [redacted] that he was spanked by his foster parents and that he did not want to stay in the home.[45] This referral was screened out because it did not include any allegation of child abuse or neglect. It was referred to the private agency as a compliance issue.[46] There is no evidence of any exploration of what JP meant by "spanking," so it is not possible to determine whether screening the referral out was appropriate. Relying on the private agency to explore the issue in its own home is a highly questionable practice.

Referral Number [redacted]

This referral was made on 2-23-07 and appears to refer to the 5-5-06 incident that resulted in JP's placement in OKDHS care.[47] It was appropriately screened out.

Referral Number [redacted]

On 5-4-07, [redacted] reported that then seven-year-old JP complained that his treatment foster mother ([redacted]) twisted his arms and hit him in the head. He complained that he did not like the [redacted] foster home because they were mean to him.[48]

On the day of the referral, the investigator attempted to see JP at his school but went to the wrong school.[49]

Three days later, on 5-7-07, the investigator interviewed JP at school. JP stated that he did not like the [redacted] home because they are mean to him and because they hate him. He said that they hold his arms back and step on his back, and that the foster parents' seventeen-year-old daughter hits him. He expressed fear that the investigator would tell the foster parents what he had said and that they would be mean to him.[50]

Following the interview with JP, no investigative activity took place for *2 ½ months*. During this time, a different investigator appears to have been assigned. On 7-21-07, a male fifteen-year-old foster child, the foster parents' seventeen-year-old daughter, and the treatment foster mother were interviewed. They all denied any abuse or corporal punishment.[51]

On 7-22-07, the investigator interviewed JP's counselor from the private foster care agency. The counselor was aware of the allegations. She said that JP does lie but that she was not sure that he had lied in this instance. During the nearly three months since the referral, he had not recanted.[52]

On 7-23-07, the investigator spoke with a friend of the foster mother who provided a positive character reference.[53] Also on 7-23-07, the worker received an e-mail from JP's OKDHS child welfare worker. The child welfare worker described the [redacted] foster home as being very strict. He indicated that he did not believe the allegations, but that he could not be sure about the foster parents' daughter's behavior. The child welfare worker indicated that the assistant district attorney wanted the investigator to interview children who had previously been placed in the MT foster home.[54]

On 7-24-07, the investigator received an e-mail from the private agency liaison, who was not aware of any issues with the [redacted] home.[55]

On 7-31-07, the investigator interviewed a fifteen-year-old boy who had been placed in the [redacted] treatment home. He denied corporal punishment by the foster mother but said that her daughter had made him do squats. No information was provided about the squats (i.e., the number of squats he was made to do or the period of time he was made to do them).[56]

The investigative finding was Not Confirmed – Services Recommended.[57] The investigator recommended a "safety plan" requiring that the foster mother continue to follow OKDHS rules.[58]

Because of serious deficiencies in the investigation, it is impossible to know whether the unconfirmed finding was correct or not. The deficiencies include:

- The 2 ½ month gap tainted the credibility of the investigation.
- Given his reticence during the first interview, JP should have been interviewed a second time. This is especially important because the investigator who recommended that the referral be determined Unconfirmed had never spoken with JP.
- Although JP's child welfare worker sent an e-mail to the investigator, an interview should have been conducted, especially as the child welfare worker had reservations about the home.
- There was no exploration of JP's statements that the foster family hated him and was mean to him.
- More than one child previously placed in the home should have been interviewed.

In addition to the investigative issues, any safety plan simply requiring compliance with the rules is ridiculous.

<u>Referral Number</u> [redacted]

On 10-10-07, [redacted] reported that JP had belt-like marks on his arm and leg and had a grapefruit-sized bruise and a belt-like mark on his thigh. JP, who continued in placement at the [redacted] treatment foster home, said that he had been hit with a pink belt. JP also stated that the foster mother's teenage daughter gave JP his medication and that the daughter's boyfriend drove JP to school. This report was screened in for investigation.[59]

On the same day, the investigator interviewed JP as he was being removed from the home. He said that his foster mother beat him with a belt because he had failed to clean his room. He said that he had been whipped in the foster home previously. JP was taken to the hospital for examination and the police were notified of the incident. The other child placed in the home, a fifteen-year-old boy, was also interviewed but had nothing to say.[60]

On 10-11-07, the investigator interviewed JP's therapist, [redacted]. The investigator spoke with a child welfare supervisor (apparently the supervisor responsible for JP's case).[61]

Nearly two months following the report, on 12-8-07, the foster mother was interviewed. She had multiple implausible explanations for the marks on JP and denied abusing him.[62]

On 12-20-07, an e-mail "interview" was conducted with a child welfare worker (possibly the fifteen-year-old foster child's worker) who said that she had never been in the foster home.[63]

The investigative finding was Confirmed – Services Recommended.[64]

While this finding is clearly appropriate, there were important problems with the investigation. These include:

- There was no exploration of the cause of the grapefruit-sized bruise on JP's thigh.
- There was no exploration of the foster mother's daughter or the daughter's boyfriend's responsibility for caring for JP.
- The foster mother's daughter was never even interviewed. This would have been important because she, as well as the foster mother, may have been responsible for the abuse and neglect of JP.
- There was a gap of more than two months in the investigation.
- There was no contact with any resource specialist.
- There was no contact with the medical provider who examined JP.
- There was no follow-up with law enforcement.

Referral Number [redacted]

On 1-29-08, OKDHS received a referral alleging that the [redacted] treatment foster home had failed to protect JP. This referral was screened out. The Referral Synopsis portion of the *Referral Information Form* is blank, so no additional information about this referral is available.[65]

Referral Number [redacted]

On 2-12-08, a private individual, [redacted] reported that JP runs away from teachers because he doesn't want to go home to his foster home. She has seen scratches on him in the past. The foster mother is always gone and her teenage children abuse JP. JP has made statements to this effect. Since being placed in the [redacted] treatment foster home, his behavior has deteriorated. She said that this had been reported before but that the referral was screened out.[66]

This referral was screened out because it was a duplicate of [redacted], which reportedly was assigned as a priority 1 investigation.[67] Unfortunately, [redacted] was not assigned as an investigation at all. It was screened out. (See below.)

Referral Number [redacted]

On 2-13-08, [redacted] called to report an incident involving then-seven-year-old JP, who remained in placement in the [redacted] foster home. At the end of the previous school day, JP hid to avoid being returned to his foster home. When he was located, he was taken to the foster mother's seventeen-year-old daughter who had come to pick him up. When he saw her, he bolted. She grabbed him and dragged him to her car in a manner that caused the reporter concern. JP had a bruised lip.[68]

Associated with this referral is an e-mail dated 2-11-08 from [redacted]. The e-mail recounts a recent incident in which JP said that he had been "choked out" in his foster home. He had faint marks on both sides of his neck. Over time, he provided various other explanations for the marks, including some that were not plausible. When asked, the foster mother said that he inflicted the marks on himself.[69]

This referral was screened out. It was determined that either the child welfare worker or the private agency responsible for the home was supposed to address the issues.[70]

This referral *clearly* should have been screened in for investigation. Considering the level and consistency of fear JP expressed at returning to the home, the observed treatment he received from the foster mother's daughter, the evident poor level of supervision provided at this treatment foster home, the frightening statements he made about being choked, and the rather implausible explanation the foster mother gave for the marks on his neck, the situation obviously warranted CPS investigation.

OCA Referral [redacted]

On 4-22-08, JP, who was now eight years old and a resident at the [redacted] psychiatric facility, alleged that, while he was being restrained, a staff member ran his knuckles over JP's back. JP had bruises on his back, allegedly as a result of the incident.[71] Because [redacted] is a group care facility, OCA was responsible for the investigation. OCA determined that the "five day rule" for beginning the investigation was not applicable. It was determined that this was not a priority investigation because the accused caretaker had not been reassigned or suspended (i.e., he continued to have access to children at the facility).[72]

On 5-2-08, the OCA investigator interviewed JP. JP said that while he was being restrained, the staff person who was restraining him ran knuckles over his spine "like 5 times." According to JP, the staff person was angry during restraint.[73] A licensed practical nurse who observed a portion of the restraint was interviewed and said that she had seen nothing inappropriate.[74] The medical director said that medication JP was on may have made him susceptible to bruising.[75] A registered nurse who examined JP after the restraint said that he had quarter-sized bruises in a "T" shape on his back and a bump on the back-side of his head.[76] The nurse's documentation of her examination of JP noted that JP did not know that there were bruises on his back. He told her that the staff member who restrained him vigorously rubbed his knuckles up and down his back and across his shoulders. He said that his head was hit on the floor.[77] The staff person who restrained JP denied rubbing his knuckles across JP's back.[78] A video recording of the restraint was observed. The restraint appeared to have been done correctly but, because of JP's position, the staff person's hand was not visible behind JP's back.[79]

The investigative finding was not confirmed.[80] Problems with the investigation include:

- The investigator failed to interview any other residents at the facility. Other residents would have been valuable sources of information because they would be in a position to report any statements JP may have made following the incident. These statements could establish whether or not his statements were consistent. Also, interviews with other residents could identify a pattern of behavior on the part of the alleged perpetrator or more generally at the facility.
- There was a ten-day delay between the incident and the initiation of the investigation. This was highly problematic because it reduced the likelihood of accurate reports from witnesses

and, more importantly, because the delay in identifying abusive or neglectful staff created the potential for leaving children with dangerous caregivers.

- JP's child welfare worker was never contacted.

It is almost certain that the staff person did, in fact, abuse JP. His statement was consistent with the bruises on his back. Aside from the staff person's denial, there was no evidence that contradicted JP's statement and no other explanation for the bruises. Even using OCA's greater weight of the evidence standard instead of the standard required by Oklahoma law, the referral should have been confirmed.

**JA**

JA was born on [redacted].

Referral Number [redacted]

On 6-23-08, [redacted] reported that JA accidentally broke his arm while playing on a teeter totter. She gave a specific and plausible account of the incident and details about the medical care she obtained for JA. JA's child welfare worker was notified.[81] The referral was screened out because there was no allegation of maltreatment.[82]

This was the appropriate determination.

**GC**

GC is a female child who was born on [redacted].

Referral Number [redacted]

On 1-14-05, OKDHS received a report from [redacted] alleging that GC's [redacted], who was providing kinship care to GC and her siblings, regularly beat the children with a leather strap and "[made] the children scream." She said that she had not noticed marks on the children and that the last incident that she was aware of was more than a month before the referral.[83]

This referral was screened out.[84] It should have been screened in. At a minimum, the children's child welfare worker should have made an immediate visit to determine whether there was reason to believe that the children were being hit with a leather strap, in which case, a CPS investigation was warranted.

Referral Number [redacted]

On 1-19-05, it was reported that GC's [redacted]/kinship caregiver hit the children with a strap leaving bruises. GC's five-year-old brother had received a bloody nose. The [redacted] was

allegedly drinking and "running around." GC's [redacted] were breaking up and the [redacted] threatened to kill "everybody at DHS."[85]

On 1-19-05, the OKDHS investigator saw ten-year-old GC and her [redacted] younger brothers at an OKDHS office. GC told the investigator that she and her brothers were in state care because her stepfather molested her. She said that things were fine with her [redacted] (who was, in fact, her [redacted]'s stepmother). She said that her [redacted] was "mean" and that he hits the children with a leather strap. She heard her [redacted] threaten to kill her [redacted]. Her [redacted] only hits them when they are bad. Her [redacted] has been out a couple of times and has "had to get a room" because she had been drinking.[86] The investigator expressed doubt that GC was being entirely forthcoming during her interview because GC did not want to be moved.[87] Three of GC's brothers were verbal enough to be interviewed. Each indicated that the children were hit with a strap.[88] Following these interviews the children were removed from their [redacted]' home.

On 1-21-05, the [redacted]'s ten-year-old daughter was interviewed. She denied that there was any corporal punishment in the home, denied being aware of her mother's drinking excessively, and denied knowing about any threats between her parents.[89] The investigator believed that she was hesitant to speak freely.[90]

On 1-24-05, GC's [redacted] was interviewed. She admitted only that she "lightly swatted" the children on their bottoms. She expressed her opinion that the allegations were part of a family feud concerning custody of the children.[91] Also on 1-24-05, a friend of the [redacted] was interviewed. She said that she had never seen the [redacted] spank any of the children. She said that she did hear the [redacted] threaten the [redacted].[92]

On 2-1-05, GC's [redacted] was interviewed. He said that the [redacted] hit the older children with a strap. He was not in a position to care for the children and did not think that the grandmother should get them either.[93] Also on 2-1-05, a [redacted] was interviewed. She reported that she had witnessed the [redacted] beating the children with a strap for "any little thing."[94]

The investigative finding was Not Confirmed because of the "contradictary [sic] statements by children and between foster parents."[95] The investigator failed to thoroughly explore the details of the situation when conducting interviews (e.g., who hit the children, how often, on what part(s) of the body). Nevertheless, this referral should have been confirmed. GC and her brothers confirmed that they were hit with a strap while in the kinship care home. GC's statement was slightly equivocal with regard to her [redacted], but the investigator found her statement to be motivated by her desire to stay in the home. There was clearly credible evidence that the children had been maltreated.

Referral Number [redacted]

On 8-26-05, OKDHS received a referral from [redacted] expressing concern that GC and her siblings were with an [redacted] and that their mother, who was evidentially not permitted to live with the children, was in and out of the home.[96] This referral is so poorly documented that OKDHS' decision to screen it out cannot be assessed.

Referral Numbers [redacted] and [redacted]

On 5-23-06, OKDHS received a report that that a thirteen-year-old girl who had previously been in the [redacted] foster home, where GC was placed, had become pregnant. She identified the foster father's fifteen-year-old son, who was visiting the home, as a sex partner.[97]

The investigation included a forensic interview of the thirteen-year-old girl[98] and interviews with relevant subjects including the alleged victim's and GC's caseworkers.[99] The foster father's son admitted that he did have sex with the alleged victim. It does not appear that the foster parents were neglectful.

The investigative finding was Not Confirmed,[100] which was appropriate. A referral three months later with the same allegations was linked to the earlier referral and screened out.

Referral Number [redacted]

On 9-21-06, [redacted][101] reported that a twelve-year-old girl placed in the home fondled GC and the foster parents' twelve-year-old daughter and forced them to make out with her.[102]

On the same day that the referral was received, the OKDHS investigator interviewed GC. She confirmed the allegations and reported that, as soon as they learned of the allegations from their daughter, the foster parents separated the girls.[103] The foster parents and their daughter were also interviewed on 9-21-06 and gave accounts of the incident that were consistent with GC's. The foster parents both said that they had no idea about the sexual activity and that the day after they were told about it, they took the girl who allegedly instigated it back to the foster care agency.[104]

On 9-22-06, the girl who allegedly instigated the sexual activity was interviewed. She said that the sexual activity was between the other girls and that she thought the foster mother was aware of it.[105] The new foster mother for the girl who allegedly instigated the sexual activity was given information about the allegations and informed that she should supervise the girl closely.[106]

On 10-11-06, two caseworkers from the private agency that supervised the [redacted] foster home were interviewed. No problems with the foster home were reported. According to one of them, staff from their agency visited the home weekly.[107]

The investigative finding was Not Confirmed – Services Recommended,[108] which was appropriate.

Although two staff members from the private agency responsible for the foster home were contacted, there is no evidence that the OKDHS child welfare worker for either of the foster children was contacted.

Referral Number [redacted]

The only information made available about this referral is included on the Intake Information section of the *Referral Information Report* documenting Referral Number 1095636 (see below). It involved lack of supervision on the part of the foster parent(s) and the investigative finding was Not Confirmed – Services Recommended.[109]

Referral Number [redacted]

On 2-28-07, [redacted] reported that GC (who at the time was psychiatrically hospitalized) had fondled a fourteen-year-old girl who was also placed in the [redacted] foster home.[110]

After unsuccessfully attempting to visit the fourteen-year-old girl with her child welfare worker on 3-2-07, the alleged victim was interviewed on 3-5-07. She said that GC fondled her about twice per week for about two months. She said that GC threatened to stab her if she told and, because she was afraid, she didn't tell her foster parents. She and GC shared a room.[111]

On 3-5-07, the foster mother was interviewed. She said that she was not aware of the sexual activity until the fourteen-year-old told her about it. She had spoken by telephone with GC about it. GC told her that the sexual activity was by mutual consent. The foster mother appeared to be very suspicious of the fourteen-year-old girl's story.[112]

On 4-2-07, the foster father was interviewed. He gave a similar account to that of the foster mother. He said that the foster care agency had devised a "safety plan" to be implemented after GC's discharge from the hospital. According to the plan, GC and the fourteen-year-old girl would continue to share a bedroom but would not go to bed at the same time.[113] The fourteen-year-old foster child's child welfare worker was contacted by phone. He confirmed that he was working on a safety plan.[114]

On 4-3-07, GC was interviewed at the psychiatric hospital where she was receiving treatment. She acknowledged sexual activity but said the other child instigated it. She said that her foster parents were not aware.[115] Also on 4-3-07, the caseworker from the private foster care agency gave a positive report about the foster home, saying that she believed that the foster parents could keep both girls safe in their home. She informed the investigator that, following discharge, the plan was for GC to return to the home.[116] On 4-6-07, GC's primary child welfare worker sent the investigator an e-mail which stated that GC would be protected in the [redacted] foster home

because, following discharge from the hospital, GC would be the only foster child placed in the home.[117] The investigative finding was Not Confirmed – Services Not Needed.[118]

Finding the failure to protect allegation against the foster parents Not Confirmed was appropriate. The investigation was reasonably thorough, especially with regard to communicating with child welfare workers and staff from the private foster care agency. There were, however, deficiencies.

- The investigator failed to have any contact with staff from the psychiatric hospital where GC was receiving treatment.
- There was confusion among OKDHS workers about whether the fourteen-year-old would or would not remain in the home.
- The "safety plan" in which the girls share a bedroom but go to bed at different times in the evening is completely unrealistic. It is naïve to think that a sexually aggressive child will not pose a threat to another child sleeping in the same room.

<u>OCA Referrals [redacted], [redacted], and [redacted]</u>

On 3-30-07, while she was psychiatrically hospitalized at [redacted], [redacted] reported 1) that GC told her that a therapist at [redacted] had repeatedly threatened GC that she would be moved to a group home instead of returning to the [redacted] foster home after discharge, 2) that GC was allowed access to plastic from a deodorant container and had cut herself with it, and 3) that she said that a boy had touched her chest.[119]

Because [redacted] is a psychiatric facility, OCA was responsible for responding. OCA sent the referral to [redacted] to be handled as a Caretaker Conduct Review (CCR) to be conducted by the facility. The facility responded by providing minimal information concerning the CCR and about actions taken. The "investigation" appeared to consist of reviewing records. It is, of course, not likely that staff members would document their own misconduct. There is no evidence that GC was ever interviewed about the allegations.[120]

**<u>AP</u>**

AP was born on [redacted].

<u>Referral Number [redacted]</u>

On 8-16-06, OKDHS received a referral from [redacted] alleging that his adult daughter found AP and AP's 4 ½ year old sister being cared for by an inappropriate caretaker. The woman who was caring for the girls was described as having drug problems and as not being a proper person to care for children. The girls were dirty, so the reporter's daughter washed them. She found AP's sister's vaginal area to be very red, swollen, and painful. AP's sister said that she slept with no clothes on with her father.[121] AP and her sister were in OKDHS custody at the time of the referral.[122]

The referral was screened out. This situation warranted a CPS investigation. The child's vaginal irritation, the child's statement that she sleeps naked and alone with her father, the father's extensive history with OKDHS,[123] and the allegation that the girls had been left by their father with an inappropriate caregiver certainly establish reasonable cause to believe that one or both of the girls had been maltreated.

<u>Referral Number</u> [redacted]

On 12-6-06, [redacted] reported that nearly three-year-old AP had been diagnosed with a spiral fracture to her leg. It was reported that she was injured while in the care of her [redacted] who was babysitting while her father was at work. AP was admitted to the hospital.[124] At the time of the referral, AP was in OKDHS custody and was in the care of her father as a trial reunification.[125] The referral was screened in for investigation.

The following day, on 12-7-06, the investigator went to the hospital and observed AP. No interview is documented.[126] Although AP's 4 ½ year old sister was observed, no effort to interview her was documented.[127] AP's father was interviewed. He said that AP's [redacted] was visiting from Texas. The father's wife (AP's mother) did not live in the home because there was a court order that did not permit her to have contact with the children because she was the subject of a child endangerment charge. The father stated that, at the time AP was injured, he had gone to work, leaving the girls with the [redacted]. After receiving a call that AP had been hurt, he went home and took to AP to the hospital. According to the father, the [redacted] said that the injury occurred while she washed dishes and the girls were playing tug of war.[128] The [redacted] was interviewed and provided a statement consistent with the father's.[129]

On 12-8-06, AP was discharged from the hospital to her father's care.[130] The [redacted] remained in the home until February 2007.[131] No provision for assuring AP's safety is noted.

Two months after the report and AP's discharge to her father, on 2-9-07, the investigator consulted with a nurse practitioner from [redacted] who reviewed AP's x-rays. The OKDHS investigator documented the nurse's opinion that AP's fracture, "possibly could have happened as it was reported by the child's [redacted]."[132]

The investigative finding was Not Confirmed – Services Not Needed.[133] In the *Report to the District Attorney*, the investigator wrote, "[redacted] medical professionals reviewed the x-rays from the hospital, at the request of DHS investigator, and concluded that the fracture is a probable accident."[134]

It would be unusual for a spiral femur fracture to occur as was reported by the [redacted]. It is, however, possible that AP was injured accidentally. Unfortunately, the OKDHS investigation was *far* too superficial to permit any reasonable conclusion. Among OKDHS' failures were:

- There was no effort to interview the alleged victim.
- There was no effort to interview the alleged victim's sister.

- There was no contact with any of the OKDHS workers who were involved with the family.
- There was no attempt to verify any statements made by the father (e.g., that he actually was at work when AP was hurt).
- No background check of the [redacted] was conducted.
- There was a two month long gap in the investigation.
- During the two month long gap, the girls were left with caregivers who may have seriously abused one of them with no safety plan.
- The primary basis for the finding was a consultation with a nurse practitioner. This consultation did not occur until two months following AP's discharge from the safety of the hospital.
- Because of the serious injury suffered by AP law enforcement referral was warranted. None was made.

Referral Number [redacted]

On 11-22-06, OKDHS received a referral from [redacted] reporting that her client (anonymous) told her that AP's father had kicked AP in the stomach and that AP and her sister were left in the care of an eleven-year-old. AP and her sister continued to be in OKDHS custody and placed with their father at the time of the referral. The report was screened out because the reporter had too little information (when the kicking occurred, whether there were injuries, and whether the father kicked AP in anger or as part of a punishment).[135] It is hard to imagine a situation in which a father kicked a two-year-old child that would not constitute child abuse or neglect. The referral should have been screened in.

Referral Number [redacted]

On 3-12-07, [redacted] reported that AP and her sister were in OKDHS custody and living with their father. Their mother was staying in the home in violation of a court order that OKDHS supervise any visitation between the girls and their mother. The children had head lice and were not supervised. AP's [redacted] "did sexual things" to a relative's children while [redacted] were staying with the relative.[136] The report was screened in for investigation.

Several hours after the report, two OKDHS investigators went to the home. They found AP and her sister in the care of their mother. Both girls indicated that their mother slept in the home. Both girls were removed and placed in foster care.[137] When interviewed on 3-26-07, the father acknowledged that the mother had been in the home.[138] AP's mother admitted that she had been there when she was interviewed on 4-17-07.[139]

The investigative finding was Confirmed – Court Intervention Requested.[140] The children were moved to the [redacted] kinship care home.[141]

The investigation into AP's mother's presence in the home was straightforward and its outcome obvious. However, OKDHS totally disregarded the information concerning AP's [redacted]'s sexual

acting out behavior. By itself, the information in the referral is not alarming. Considered in combination with the information from the referral screened out several months earlier ([redacted]) that AP's sister's vaginal area was very red, swollen, and painful and that she reported sleeping with no clothes on with her father, it should have been investigated from the point of view that AP's sister may have been sexually abused. Even though the girls were removed from their father's care, understanding the cause of AP's [redacted]'s behavior was important. Such an understanding was relevant to decisions about potential reunification and treatment for AP's sister.

Referral Number [redacted]

On 6-11-07, [redacted] reported that AP's [redacted] put her fingers in AP's vagina and that she touched the [redacted]'s three-year-old [redacted] in a sexual way. According to one of the [redacted], AP's [redacted] put a Popsicle in [redacted]'s vagina. AP told her [redacted] that [redacted] had touched her sexually when they were with their father.[142] The referral was screened in for investigation.[143]

On 6-12-07, the investigator went to the [redacted] kinship care home and interviewed AP and her sister. AP would not talk to the investigator and only shook her head. AP's sister said that no one had given her a "bad touch." She said that she usually sleeps at "[redacted]."[144] While at the home, AP's [redacted] was interviewed. She said the girls usually sleep at her parents' (the girls' [redacted]) home. She reported that she noticed [redacted] had begun to "explore with each other" and had wondered why. Also, her son had begun wetting his pants. Both children complained of genital pain. She had taken them to the doctor and found that her daughter had a yeast infection and a reddened vaginal area.[145] AP's [redacted] was interviewed and acknowledged that the girls live primarily with her. The reported incident occurred in her home. She provided a detailed description of what had happened. Since the incident, the [redacted] sleep separately.[146] AP's [redacted]'s three-year-old twins were interviewed. Neither child would respond to any questions.[147]

Also on 6-12-07, AP's OKDHS primary and secondary child welfare workers were interviewed. They were not aware that the children were essentially living with their [redacted] and not with their [redacted] with whom they were placed. Plans for obtaining counseling and medical exams for AP and her sister were discussed. Both girls were referred for counseling the same day.[148] The resource specialist for the [redacted] kinship care home was contacted. She was in the process of addressing issues concerning AP and her sister's placement.[149]

On 6-12-07, and again on 6-14-07, AP's father was contacted by telephone. He remembered the incident in which AP's [redacted] touched the children of a relative who was babysitting for them. He denied knowing about any other instances in which AP's [redacted] had behaved in a sexual manner. He suggested that the children's [redacted] made the allegations up in order to "make things difficult for him."[150] AP's mother was interviewed by telephone and denied having any information concerning [redacted]' sexual behavior.[151]

After receiving the opinion of a physician who seems to have training in diagnosing sexual abuse, it was decided, appropriately, that sexual abuse examinations should not be obtained.[152] The children were removed from their kinship care placement.

The investigative finding was Not Confirmed – Services Recommended.[153] Because the case history provides a significant level of suspicion that AP's sister may have been sexually abused by her father, OKDHS should have pursued the possibility of sexual abuse more assertively. The allegation should have been referred to law enforcement and a forensic interview should have been conducted with AP's sister. Had these things been done, it is possible that information may have been developed that would have been important to service provision and permanency planning for AP and her sister.

The fact that AP and her sister were living in a home other than the one that OKDHS had approved for the placement is seriously problematic. That this was the case and no one at OKDHS knew about it calls into question the level of contact the child welfare worker had with the children. It also means that they were living in a home that had not been subjected to the scrutiny required by OAC 340:75-7-24 before kinship care homes are approved for placement.

Otherwise, the investigation was reasonably thorough and concise. The investigator collaborated with AP's child welfare workers and the resource specialist. Given the ages of the children, ongoing psychotherapy was the best approach to understanding AP's [redacted]'s behavior.

Referral Number 1120416

On 7-13-07, [redacted] reported that AP says that [redacted] is touching her and "something about her fingers in her." When questioned by the foster mother, AP's [redacted] denied touching AP. A "psych" evaluation had been arranged. The foster mother had been told that [redacted] should not sleep together and said that they do not.[154]

That this referral was screened out was appropriate in light of the recent, though inadequate, investigation.

**JB**

JB is a male born on [redacted].

OCA Referral [redacted]

On 11-5-07, [redacted] reported that thirteen-month-old JB, a resident at the Pauline E. Mayer Shelter, suffered severe burns to his feet and lower leg while being bathed by a direct care specialist at the shelter. The incident occurred on 11-2-07.[155] Because the Pauline E. Mayer Shelter is a congregate care facility, OCA was responsible for investigating the incident. The direct care specialist who was bathing JB was placed on suspension on 11-2-07 and terminated on 11-8-07 because of the incident. She was a probationary employee.[156]

On 11-9-07, several shelter staff members were interviewed. None were present when JB was burned. They all reported a commotion and then seeing the direct care specialist who was bathing JB holding him. JB was screaming and skin seemed to be coming off of his foot.[157]

On 11-15-07, the physician who treated JB at Children's Hospital was interviewed. She said that JB arrived at the hospital with second degree burns to his left foot (dorsal and sole) and first degree burns to his right leg and foot. The burns extended to about mid-calf on both legs. She did not believe that the explanation for the burns – that JB was being bathed – was consistent with the burns. She told the OCA investigator that she could not "prove" this, however, because she did not know what the temperature of the water was.[158]

On 11-26-07, the maintenance technician was interviewed. He had checked the water temperature on 11-5-07 and found it to be more than 125 degrees. He reduced the temperature to 113 degrees. No regular checks of water temperature had been made.[159]

On 11-28-07, a detective from the Oklahoma City Police Department was interviewed. He stated that he believed that the direct care specialist was negligent but that the incident did not rise to the level of criminal prosecution. In a subsequent interview on 11-30-07, the detective stated that the direct care specialist's statement was consistent with those made by other shelter staff. He stated that he believed her description of the incident to be plausible. Finally, in an interview on 12-28-07, the detective informed the OCA investigator that he had staffed the situation with the Child Protection Committee and that a physician found the direct care specialist's explanation to be plausible.[160]

The investigative finding was confirmed for neglect.[161] Despite the statements from the police and the consulting physician that the direct care specialist's explanation was plausible, the burns to JB's feet remain suspicious. Nevertheless, the direct care specialist was terminated.

**KT**

KT is a female child who was born on [redacted].

Referral Number [redacted]

On 5-12-97, while KT was placed in the [redacted] foster home, a three-year-old child also placed in the home was bitten by the foster family's dog.[162]

On 5-13-97, KT's foster mother was interviewed. She related that she was out of home at the time of the incident. She said that, normally, the dog stayed in the yard and was tied up when children are outside. On the day of the incident, the three-year-old snuck out the door to the backyard while the foster father was preparing dinner. The child hit the dog with a stick and the dog bit the child. The foster mother took the child for medical treatment (a tetanus shot and antibiotic cream) the following day. She had been a foster parent for three years and had had

"hundreds" of foster children. She had had the dog for five years and it had never bitten anyone. The dog was up to date on its shots. She reported the incident to animal control.[163]

On 5-14-97, the investigator contacted the private agency social worker responsible for the [redacted] foster home. She related that the incident occurred on 5-3-97 and that the foster mother contacted her about it on that day. She described the foster parents as being "very good." They had had numerous children without similar problems.[164]

On 5-16-97, the investigator appears to have had a conversation with the new foster parent of the child who had been bitten. The alleged victim had been moved to a foster home in a different county. According to the case note documenting this contact, the dog, a cocker spaniel, bit the child when the child hit it with a stick. The dog's shots were up to date. The child received medical attention and his injuries were nearly healed.[165]

On 5-16-97, the investigator met with KT's child welfare worker and informed her about the allegation in KT's foster home.[166]

On 5-19-97, the investigator spoke with the alleged victim's child welfare worker [redacted]. She had never been in home or seen the dog. She expressed the opinion that the foster parents were neglectful and that the dog should be removed.[167]

On 5-20-97, KT[168] and another five-year-old child placed in the home[169] were interviewed. Both appeared to be fine and neither expressed any fear of the dog. The foster father was interviewed and gave the same account, as did the foster mother. He described the dog as being gentle.[170] The investigator observed the dog and noted that the dog seemed old and friendly.[171]

On 5-20-97, the investigator spoke with the alleged victim's new foster mother by phone. She said that the child was doing well and that his injury had healed well.[172]

The investigative finding was Confirmed (neglect) and the investigator recommended that the foster parents build a fence for the dog and install higher locks on the door to prevent children from reaching them.[173]

Overall, this was a fairly thorough investigation. It is problematic that the private agency social worker was aware of the incident on 5-3-97 but that there was no report until ten days later. The investigator should have contacted medical personnel who treated the child and verified that the incident was reported to animal control. The finding is surprising. In the absence of the foster parents having any reason to believe that their dog might bite a child, it is hard to understand why they were found to be neglectful. The incident should not have been confirmed.

Referral Number [redacted]

On 5-15-98, [redacted] reported that KT's [redacted], who was providing kinship care ([redacted] kinship care home), removed a cast from KT's arm rather than having it removed by a doctor.

When [redacted] called the [redacted]'s home, an unknown male said that the reason that KT's [redacted] removed the cast was that KT's child welfare worker kept cancelling appointments.[174]

This referral was screened out after verifying that KT's arm was in a splint and not a cast. Verification was made with a social worker from "CHO."[175] Assuming that "CHO" refers to Children's Hospital, this was appropriate.

Referral Number [redacted]

On 5-27-98, [redacted] reported that KT's kinship caregiver ([redacted] kinship care home) admitted that, although she knew that it was not permitted, she spanked KT and her brother. KT told her therapist that her [redacted], who lived in the home, had "spanked" her five-year-old brother "real hard" the previous weekend. The [redacted] had been accused of sexually and physically abusing his siblings when they were children.[176]

This referral was screened out because the allegations "appear to be placement issues."[177] There was no exploration on the part of OKDHS to determine exactly what "spanking" entailed and there was no effort to explore whether the [redacted]'s presence constituted a safety threat to the children. Because too little information was gathered at intake, it is impossible to determine whether the referral warranted investigation.

Referral Numbers [redacted] and [redacted]

These referrals were both received on 9-16-98. At 6:36 p.m., [redacted] reported that KT's foster mother ([redacted] foster home) told him that nearly seven-year-old KT and her brother "regressed" following a visit with their father that took place on 8-25-98. KT had a nightmare and the foster mother found her with a stuffed animal between her legs, saying, "no daddy, no more." Also, KT was found with a toy blow dryer between her legs, having drawn a heart around her genital area. Both children seemed to have an inappropriate knowledge of sexual language. Both children appeared fearful.[178] For some reason, the same information was reported again on 9-16-98 at 6:45 p.m. using another referral number.[179] It appears that these allegations were discussed at a court hearing.[180] The referral was screened in for investigation using the second number, [redacted].[181]

On 9-18-98, the investigator contacted KT's therapist, who provided background information including the fact that KT and her brother had been in seven foster homes and several shelters. She acknowledged knowing about KT's "masturbating problems" since she had worked with the children.[182]

On 10-6-98, twenty days after the referral, the investigator attempted to interview KT. KT was not willing to provide much information to the investigator, saying, "I'm not talking to that man. He will take me away again." Apparently, the same investigator had previously removed KT. She said that her [redacted] "is mean" and that he hit KT and her brother (see referral number

[redacted]). No useful information concerning her potential sexual abuse was obtained.[183] The investigator noted that,

> if the sexual abuse did occur it is going to be very difficult to get any real evidence now after the child has been in 7 FH placement [sic] and several shelters. These behaviors appear to . . . have been ignored in the early stages when the child first entered into custody. The child's sexual acting out behavior appears to have been constant over her entire stay in custody . . . .[184]

KT's brother provided little information, saying only that his uncle was mean.[185]

Also on 10-6-98, KT's foster mother was interviewed. She said that she was told about KT's sexual behavior when KT was first placed in her home. In addition to the information contained in the report, she said that KT acted in a seductive manner around her husband and was masturbating with a Barbie doll.[186]

On 10-20-98, KT's father was interviewed. He said that he believed that [redacted] molested KT because [redacted] molested and physically abused him and [redacted] when they were children. He also said that KT's mother was a prostitute and that she had sex in KT's presence. He denied abusing KT. He said that when KT was placed with her [redacted] (the [redacted] kinship care home), KT's [redacted] was also living in the home.[187]

On 10-28-98, the investigator received a copy of KT's therapist's court report. The therapist recommended that KT and her brother continue family therapy with their father and that overnight visits be increased.[188]

The investigative finding was Uncertain.[189] There is currently no provision in Oklahoma law or in OKDHS regulations for such a finding. Based on her extremely sexualized behavior, it is clear that KT was almost certainly sexually abused. A medical evaluation should have been conducted both for forensic and health care purposes. Given the incredible number of placements this child had experienced, determining who abused her would be difficult. OKDHS seems to have disregarded the possibility that KT's father abused her. Her father and [redacted] are the most obvious potential perpetrators. Although a forensic interview should have been conducted, the best hope for identifying the cause of KT's sexualized behavior was long-term psychotherapy.

Because of the uncertainty, the recommendations for continued family therapy and increased unsupervised contact with her father – who very well may have molested KT – were dangerous.

<u>Referral Numbers [redacted] and [redacted]</u>

On 11-6-98, [redacted] reported that following a weekend visit with KT's father, KT's four-year-old brother said that their [redacted] had fondled KT. KT also told [redacted] that her [redacted] fondled her. This referral was screened in for investigation.[190] Three days later, on 11-9-98, OKDHS received a referral from [redacted] who reported that KT and her brother

were having unsupervised weekend visits with their father. They reported to [redacted] and others that during the visits 1) there was no food in the house and they had to go to their [redacted]'s home to eat, 2) their mother, whose parental rights had been relinquished, had visited them at their father's home, and 3) that they were exposed to their father having sex with his girlfriend. The [redacted] said that the children's behavior deteriorated following the visits. This referral was linked to the previous referral (referral number [redacted]).[191]

On 11-10-98, KT's five-year-old brother was interviewed. He reported that his father and his father's girlfriend were there and were in bed naked "sexin." He said that his [redacted] was there and that he was touching KT "on her privates." He said his father and [redacted] got into a fight. He appeared to be confused about when this happened.[192] KT was interviewed. She was not willing to provide much useful information. When asked about her [redacted] she said he was a bad man and mean. She said she did not see him during the visit.[193]

Also on 11-10-98, [redacted] who made the report expressed concern about KT and her brother's next scheduled visit with their father. She believed that KT was told not to talk about being touched by her [redacted] or about her father having sex with his girlfriend.[194]

On 11-18-98, information about the sexual abuse allegation was given to the Oklahoma City Police.[195]

On 12-1-98, KT's father was interviewed. He said they went to his mother's house but didn't eat there. He acknowledged that KT's [redacted] came over but said he and the children left as soon as he appeared. He denied that KT's mother was there.[196]

On 12-14-98, KT's father's girlfriend was interviewed and denied ever having sex in front of the children.[197]

On 12-17-98, the investigator re-contacted [redacted], who said there was "uncertainty" about whether anything happened during the weekend visit.[198]

The investigative finding was "rul[ed] out" with the exception of the allegation concerning KT's having been exposed to sexual activity, for which the finding was Uncertain.[199] Major flaws in this investigation include:

- The investigation was strung out over a period of about six weeks.
- OKDHS failed to conduct a forensic interview.
- KT should have been re-interviewed after a single interview failed to engage her.
- KT's [redacted], and alleged perpetrator, was never interviewed.
- There was no follow-up with the police,
- KT's [redacted], who could have verified KT's father's account, was never interviewed.

Referral Number [redacted]

On 12-5-02, OKDHS received a referral from [redacted].[200] Although the *Referral Synopsis* contains no description of the allegation,[201] it appears that [redacted] reported that eleven-year-old KT said that her foster mother ([redacted] foster home) hit her, threw her down, and put her hand over KT's mouth so that KT could not breathe.[202]

On 12-5-02, KT was interviewed at school. At first KT said that her foster mother hit her, held her hand over KT's mouth so that she could not breathe, and threatened to drag her down the stairs if she didn't get out of bed. During the interview, however, she said that what really happened was that she didn't want to get up, take her medication, or go to school. She said her foster mother never hit her or pushed her down. She did not hold her hand over KT's mouth but did make sure that KT took her medication.[203]

On 12-12-02, KT's foster mother described KT as being out of control and as having serious psychiatric problems. She told the investigator that on the day of the incident, she was having a hard time getting KT up and giving her her medication. She said that she did not ever hit KT or push her down.[204] The foster father was interviewed but provided no useful additional information.[205]

On 2-19-03, the investigator interviewed a child welfare worker who said that he had worked with the foster family for 15 years. He spoke very highly of the foster parents, describing them as "A+ foster parents."[206]

On 2-20-03, the investigator interviewed a child welfare worker who said that he had no concerns about the foster parents and that they were great foster parents.[207]

On 2-24-03, KT's therapist was contacted. She said that she had "absolutely no concerns" about the foster parents and that they had done a spectacular job with KT.[208]

The investigative finding was Not Confirmed – No Services Recommended,[209] which was appropriate. The investigation was reasonably thorough. There was, however, a two month gap between investigative contacts.

Referral Number [redacted]

On 6-1-05, OKDHS received a referral from [redacted] alleging that thirteen-year-old KT was pinched, resulting in bruising.[210] She was described as having a quarter-sized bruise on the base of her neck, a horizontal bruise on her upper left arm, and various other bruises on her left arm.[211]

On 6-1-05, the OKDHS investigator went to KT's foster home ([redacted] foster home). KT was not home. A male living in the home (age and relationship to the family are not documented) who was present at the time of the reported incident was interviewed. He said that KT had cussed at

the foster mother, the foster mother tried to wash KT's mouth out with soap, and KT bit the foster mother. He said that it took quite a while to get KT off of the foster mother.[212] The foster mother was interviewed and said that KT had gone into a rage and began using profanity. She took a washcloth, put a drop of dish soap on it, and attempted to wash KT's mouth out. KT bit her finger and wouldn't let go. Getting her to open her mouth required some force and KT's neck was bruised.[213] The investigator noted that the foster mother appeared unable to provide for KT's needs.[214] The foster father repeated the foster mother's description of the incident.[215]

Also on 6-1-05, KT's treatment worker [redacted] met with the investigator. She expressed concern about the foster parents' inability to care for KT. She said that there had been numerous incidents in which KT "'[went] off,' placing herself and the family in a perilous situation."[216]

After two failed attempts on 6-1-05, KT was interviewed on 6-2-05.[217] She said that the bruises on her arms were from falling from monkey bars. She said she got the bruise on her neck when her foster mother pinched her. When asked why the foster mother pinched her, KT said that her foster mother was trying to wash her mouth out with soap because KT had cussed at her. KT reported that she bit her foster mother.[218] The foster mother's daughter (age unknown) was interviewed. She was not present at the time of the incident and provided no additional information.[219]

The investigation was Not Confirmed – Services Recommended.[220] This finding is marginal but not unreasonable. The foster mother's actions (washing KT's mouth out with soap) would be inappropriate in any circumstance. KT's apparent psychiatric problems and the fact that KT was in a rage at the time of the incident only increase the level of impropriety to the margins of maltreatment. No contact was made with KT's child welfare worker or with the resource specialist. Because of the foster mother's inappropriate actions and because of her obvious inability to care for KT, this was an especially important deficiency. KT's placement in the home should have been reevaluated and she probably should have been moved to a more suitable home.

<u>Referral Number</u> [redacted]

On 10-22-05, OKDHS received a referral from [redacted] alleging that KT's foster mother ([redacted] foster home) admitted that she "popped" another child (nineteen-year-old male) in the mouth because he told someone to "fu off." No injuries were reported to have resulted. The alleged victim became violent and had to be removed from the home.[221]

The referral was screened out.[222] Because the alleged victim was nearly twenty and was no longer a child, the decision to screen the referral out was appropriate. The incident did, however, call for a response from OKDHS because it is grossly inappropriate for a foster mother to "pop" a foster child in the mouth, regardless of the child's age. In addition, there is no indication that any of KT's caseworkers were notified of the incident. Such notification would have been

important because the incident is further indication of the [redacted] foster parents' inability to care for difficult children, such as KT.

OCA Referral [redacted]

On 9-28-06, [redacted] from the [redacted] Group Home reported that a teaching assistant slapped KT and another girl on the hand and shoulder. The teaching assistant is described by the administrator as being "loud and kind of mean."[223] Because the [redacted] Group Home is a group care facility, response to the referral was the responsibility of OCA.

OCA's response to the referral was to return it to the facility to be investigated internally as a Caretaker Conduct Review (CCR). According to the group home's response to the CCR, KT and the other alleged victim were interviewed on 9-29-06. Both girls said that the teaching assistant lightly slapped them on the hand. On the same day the teaching assistant denied hitting the girls. On 10-1-06 and 10-2-06, two mental health technicians said that they had never seen the teaching assistant touch the girls in any way. The CCR finding was Not Confirmed. Staff were counseled not to touch the residents.[224]

While the alleged incident did not rise to the level of abuse, if it happened, it would be highly inappropriate and would violate OKDHS regulations forbidding corporal punishment.[225] It is impossible to evaluate the incident because of the limited nature of the investigation. The alleged victims should have been asked whether the teaching assistant had hit students at other times and other students should have been interviewed. Without more information about whether the incident occurred and, if it did, how often, it was impossible for the group home (or OCA) to determine the appropriate response.

OCA Referral [redacted]

On 5-18-07, KT, who continued in placement at the [redacted] Group Home, reported that there were cockroaches and dead flies in the food provided by the group home and that spiders bite the residents.[226] Again, the referral was assigned to OCA and OCA responded by sending it back to the group home for a CCR.

On 5-22-07, the OKDHS liaison to the group home interviewed KT and looked at the marks on her arms and legs. KT said that she had never seen bugs in the food but had heard peers talking about them. According to the report from the group home, the OKDHS liaison concluded that the marks on KT's arms and legs were mosquito bites that KT had scratched and not spider bites. KT agreed that they were mosquito bites. The group home's program director reported that the facility is sprayed by an exterminator once or twice per month and had invoices to verify this.[227]

The CCR Finding was Conduct Not Confirmed,[228] which was appropriate.

CS

CS is a female child who was born on [redacted].[229] Shortly after she was born, she was taken into OKDHS custody because she tested positive for illegal drugs at birth and because her parents had an extensive history of child maltreatment.[230]

Referral Number [redacted]

On 7-21-07, OKDHS received a report from [redacted] that CS, who was placed in the home of her twenty-year-old [redacted] ([redacted] kinship care home), had been admitted with a skull fracture. The family's explanation for the fracture was that CS had rolled off an adult-sized bed and fallen to a carpeted floor.[231]

On 7-21-07, CS was observed in the hospital. Her [redacted]'s girlfriend was bottle feeding her at the time.[232] CS's [redacted]'s 32-year-old live-in girlfriend was interviewed. She said that she was alone with CS when CS was injured. She said that she had put CS on a full size bed and went to fix her a bottle. When she returned, she found CS on the floor. Because CS appeared to be having seizures and went limp, she called a friend who drove her and CS to the fire department. She was transported to the hospital by ambulance.[233]

On 7-25-07, CS's [redacted] was interviewed. He related that he was at a softball tournament when CS's skull was fractured. He said that his girlfriend was CS's primary caregiver. He said that CS could roll over and that it was a common practice for CS to be left alone on the bed.[234] The investigator noted that there was no crib and that CS slept in a playpen.[235] CS's [redacted]'s girlfriend was interviewed a second time and gave essentially the same account that she did on 7-21-07.[236] A friend of the [redacted] and his girlfriend was interviewed and said that both provided good care to CS.[237]

On 7-30-07, a police officer contacted the OKDHS investigator to say that he had been assigned to investigate.[238] Also on 7-30-07, the investigator documented reading from the medical record that CS had bilateral retinal hemorrhages and that there was suspicion that CS' injuries were non-accidental.[239]

On 8-15-07, the investigator spoke with CS's child welfare worker. The child welfare worker stated that he had never met either CS's [redacted] or his girlfriend. CS had been discharged from the hospital and was living in a different kinship care placement.[240] The worker spoke with the previous child welfare worker assigned to CS's case. She had made one visit to the kinship care placement and found it to be neat and clean.[241]

A copy of the police investigation and medical records are included in the case record. The police report contains the information from the police interview with medical personnel that indicates that CS may not have a skull fracture but did suffer a subdural hematoma.[242]

The investigative finding was Confirmed – Services Recommended.[243] CS was not returned to the [redacted] kinship care home. While the investigation was successful in the important sense that it prevented CS from returning to her obviously dangerous placement, neither the OKDHS nor the police investigation was sufficient to determine what had happened to CS. The OKDHS investigator never discussed CS's injuries with a physician. Had there been an interview or consultation with a physician knowledgeable about abusive head injuries, it would have almost certainly been determined that CS was a victim of shaken baby syndrome. Although CS was protected, it is cause for great concern that OKDHS CPS investigation procedures do not require such information gathering.

<u>Referral Numbers [redacted] and [redacted]</u>

On 11-30-07, [redacted] reported that a respite foster mother brought nine-month-old CS to his office because she had been coughing all night. He diagnosed CS with a viral respiratory infection and eczema. He reported concern about the care CS received in her foster home (the [redacted] foster home). Because of her condition, [redacted] stated that he thought CS should not return to the home.[244] On the same day, CS's respite foster mother reported the same information. In addition, she reported that she had picked CS up from the [redacted] foster home the previous day. CS had a double ear infection requiring antibiotics. She was so congested that she needed to be suctioned and given saline breathing treatments. When the respite foster mother picked her up, [redacted] said that she just hadn't gotten around to taking CS to the doctor.[245] The referrals were screened in using the referral number [redacted].

Two previous investigations of the [redacted] home were noted, one on 5-12-04 (services not needed) and one on 5-24-06 (services recommended).[246]

Four days after the referral, on 12-4-07, CS was observed at the respite foster home. The respite foster mother showed the investigator pictures of CS when she arrived at her home. There is no description of the pictures, nor are they included in the file.[247] The respite foster mother said that she was very concerned about the care CS had received in the [redacted] home. She said that when CS came to her home CS had bleeding sores, scaly skin, pus coming out of her ear, and was unable to breathe when lying down.[248]

The OKDHS investigator went to the [redacted] foster home where, in addition to CS, two foster children and an adoptive child were placed. He observed a thirteen-year-old brain damaged foster child who had bite marks on his hand and arm. The investigator was told that the bites were self-inflicted.[249] A fifteen-month-old foster child was observed and noted to have a diaper rash and a small bruise under his eye.[250] The six-year-old adoptive daughter of the foster mother was interviewed. She said that she felt safe in the home.[251]

CS's foster mother ([redacted]) was interviewed. She reported that she contacted a doctor to discuss CS's skin condition and her cough. The doctor told her that she did not need to bring CS in and that she should give her Tylenol. It appears that CS had not been to the doctor while in the [redacted] home.[252]

On 12-6-07, the doctor that CS's foster mother called was contacted. He said that the foster mother had called him about CS and that he had advised her as she reported. There is no evidence that the physician was asked what he had been told about CS's condition.[253] The thirteen-year-old foster child's teacher was contacted. She said that she had no concerns about the care provided by the foster parents.[254]

The investigative finding was Not Confirmed.[255] Because the OKDHS investigator never spoke with [redacted] who made the referral and treated CS while she was in the care of the respite foster mother, it is impossible to know what symptoms were present when CS left the [redacted] foster home. Furthermore, the investigator did not ask the doctor whom CS's foster mother ([redacted]) called exactly what he was told when he advised the foster mother that she did not need to bring CS in. In addition, the investigation should have included an assessment of the medical care the other children in the [redacted] foster home had received. Because of these failures, it is not possible to determine what finding was appropriate. Furthermore, no child welfare worker for CS, or any of the other children placed in the [redacted] home, was ever contacted, nor was the resource specialist responsible for the home. Because of the previous referrals concerning the [redacted] home, it would have been very important to interview the resource specialist as part of the investigation.

Referral Number [redacted]

On 12-5-07, [redacted] reported that CS was living with her mother at a women's and children's center as part of a trial reunification. The trial reunification had been terminated on 11-7-07 due to CS's mother's neglectful behavior. CS's mother allegedly: 1) allowed CS to become dehydrated to the point that she suffered seizures and required hospital treatment 2) failed to follow medical direction after the hospital treatment, and 3) left CS in a stroller for an entire day, failing to feed her. Following termination of the trial reunification, CS's foster mother took CS to a doctor who said that she behaved as if she had been smothered. CS "would throw a fit" when anyone wiped her nose. The referral was screened in for investigation.[256]

After a failed attempt on 12-11-07, the investigator saw CS at her foster home on 1-9-08.[257] She had a rash but, otherwise, seemed fine. The foster mother told her that the rash and CS's other medical issues had been treated by a pediatrician.[258] The investigator spoke with CS's child welfare worker [redacted]. She said that CS was placed in a respite foster home, that CS's mother had left the women's and children's center, and that she did not know where CS's mother lived.[259] The investigator spoke with the OKDHS liaison to the drug court who reported that CS's mother had failed to comply with her treatment plan.[260]

On 1-9-08, the investigator met with CS's mother who denied the allegations, saying that everyone was against her. She identified CS's father and said that she has no contact with him.[261]

The investigative finding was Not Confirmed – Services Recommended.[262] It is difficult to understand what purpose this "investigation" served. Little effort was made to determine whether the allegations were true. There was no contact with medical staff from the hospital where CS

was taken after she became dehydrated, the physician who said that he thought she had been smothered, staff members from the women's and children's center where CS was allegedly neglected, or the foster mother where CS was placed immediately after the trial reunification was ended. It cannot be determined what the appropriate finding should have been.

DG

DG is a male child who was born on [redacted].[263] Shortly after he was born, he was taken into OKDHS custody because of his mother's history of drug use and because two children had previously been removed from her care.[264]

Referral Number [redacted]

On 9-3-07, OKDHS received a call from [redacted] at the hospital where DG was born. [redacted] complained that DG had been discharged and the hospital needed a worker to pick him up.[265]

The referral was screened out, which was appropriate.[266]

OCA Referral [redacted]

On 9-28-07, OKDHS received a referral from [redacted] that one-month-old DG, a resident at the Pauline E. Mayer Shelter, was dropped by a child care worker during a fire drill. DG suffered a skull fracture, "consistent with a short fall."[267] Because the incident occurred in a shelter, OCA was responsible for the investigation.

OCA determined that the investigation "is not a priority case because OCA has not been informed that an accused caretaker has been reassigned or suspended pending our investigation." The "five day" rule for initiating investigations was also waived.[268]

On 11-5-07, more than a month after the referral, the OCA investigator initiated the investigation by interviewing a child care worker who was present when DG's skull was fractured. She reported that the facility was having a fire drill and that, in an effort to get the children out of the building, another child care worker attempted to remove DG from a baby bouncer while holding another baby. The child care worker lost her balance and fell from a squatting position, dropping DG on the floor. DG cried, but there were no visible injuries. A physician was contacted and DG was examined at the shelter later in the day.[269]

The OCA investigator then interviewed the child care worker who purportedly dropped DG. She related that she was holding DG and then picked up another child. As she was standing up, she lost her balance but caught herself. DG fell. She reported that DG was examined on the day of the incident and again the following day after swelling was noted.[270] Amazingly, after x-rays were ordered at DG's second examination, the child care worker who purportedly dropped DG was assigned to take him to the hospital.[271]

On 11-15-07, the physician who examined DG was interviewed. She reported that when she examined DG at the shelter on the day of the incident, she noted no swelling or external injuries. She instructed staff to watch for swelling or vomiting. The following day, because swelling to both sides of DG's head had been noted, she ordered x-rays which revealed a fractured skull.[272] In her medical note dated 9-27-07, the physician described DG's fall as having been approximately 18 to 24 inches onto a carpeted floor.[273] On 9-28-07, after the x-ray was taken, she wrote in a note that DG had bilateral skull fractures. The physician described the injury as a "commonly seen fracture" and consistent with a short fall.[274]

OCA's investigative finding was Abuse Not Confirmed.[275] OCA documented concern that the Mayer Shelter had no procedures for evacuating residents.[276]

It is appalling that the initiation of this investigation was delayed for more than a month, the more so because there is no evidence that any consideration was given to the possibility that DG's skull fracture was not an accident. No safety plan or protective measure was put into place to assure the safety of the child residents pending completion of the investigation. Ironically, OCA did not see the investigation as a priority *because* no staff person had been reassigned. Aside from the obvious child safety concerns raised by the delay, it seriously compromised the quality and integrity of the investigation because witness memories fade and subjects of the investigation have the opportunity to "get their stories straight."

Considering the serious injury sustained by DG, and the potential for putting residents in a very dangerous situation, one would expect a thorough and objective investigation. Instead, the investigation was incredibly superficial. It consisted entirely of interviews – interviews that yielded somewhat inconsistent accounts – of two child care workers who were involved in the incident and an interview with a physician who appears to be the Mayer Shelter's house pediatrician. A far more thorough investigation should have been conducted.

- The nature of the situation warranted a police investigation. There is no evidence that a law enforcement referral was made.
- Other staff from the shelter should have been interviewed in an effort to corroborate or refute the involved subjects' accounts, to determine whether either had made consistent or contradictory statements following the incident, and to gauge their frame of mind on the day DG's skull was fractured.
- To have relied on the medical opinion of a physician who obviously has a relationship to the Mayer Shelter and, undoubtedly, with the involved child care staff, is very poor investigative practice. A medical opinion from an objective physician having specialized knowledge of abusive head injuries should have been obtained. Anyone – physician or not – who has substantial training and experience in investigating child abuse would be *very* suspicious of a fall of less than two feet to a carpeted floor as the explanation for a *bilateral* skull fracture to a one-month-old. A bilateral skull fracture would require blows to both sides of the head and would not be expected to result from the sort of fall that was described. The skull of a one-month-old infant is soft and, therefore, fracturing it requires a more substantial trauma than a short fall to a carpeted floor.

**Endnotes**

[1] RJ-KIDS 02316
[2] RJ-KIDS 02318
[3] RJ-KIDS 02329
[4] RJ-KIDS 02331-02334
[5] RJ-KIDS 02341, 02343
[6] RJ-KIDS 02454
[7] RJ-KIDS 02379
[8] RJ-KIDS 02374-02384
[9] RJ-KIDS 02329
[10] RJ-KIDS 02460
[11] RJ-KIDS 02464
[12] RJ-KIDS 02316
[13] RJ-KIDS 02470, 02472, 02498
[14] RJ-KIDS 02486
[15] RJ-KIDS 02473
[16] RJ-KIDS 02488
[17] RJ-KIDS 02490
[18] RJ-KIDS 02492
[19] RJ-KIDS 02496
[20] RJ-KIDS 02498
[21] RJ-KIDS 02500
[22] RJ-[redacted] FH 00007
[23] RJ-KIDS 02080-02082
[24] RJ-KIDS 02080
[25] RJ-KIDS 02573, 02580
[26] RJ-KIDS 02582-02588
[27] RJ-KIDS 02590
[28] RJ-[redacted] FH 00023
[29] Ibid.
[30] RJ-[redacted] CW 00010, RJ-KIDS 02602
[31] RJ-[redacted] CW 00010
[32] RJ-KIDS 02594
[33] RJ-KIDS 02592
[34] RJ-KIDS 02602
[35] RJ-KIDS 02596
[36] RJ-KIDS 02598, 02600
[37] RJ-KIDS 02604
[38] RJ-[redacted] CW 00010
[39] JP-KIDS 00757-00760
[40] JP-KIDS 00755
[41] JP-KIDS 01794-01797

---

[42] JP-KIDS 02287-02304
[43] JP-KIDS 01904-01907
[44] JP-KIDS 01998-01999
[45] JP-[redacted] 3 00310
[46] JP-KIDS 01998; JP-[redacted] 3 00310
[47] JP-KIDS 01945-01947
[48] JP-KIDS 02082, 02085, 02090
[49] JP-KIDS 02092
[50] JP-KIDS 02094
[51] JP-KIDS 02096, 02098, 02108
[52] JP-KIDS 02110
[53] JP-KIDS 02112
[54] JP-KIDS 02116
[55] JP-KIDS 02114
[56] JP-KIDS 02122
[57] JP-KIDS 02091, 02317
[58] JP-KIDS 02091
[59] JP-KIDS 02128-31
[60] JP-KIDS 02331
[61] JP-KIDS 02232-02233
[62] JP-KIDS 02332
[63] JP-KIDS 02334
[64] JP-KIDS 02128
[65] JP-KIDS 02206-02216
[66] JP-KIDS 02268, 02273
[67] JP-KIDS 02283
[68] JP-KIDS-4-00235-00237
[69] JP-OPPC 00155
[70] JP-OPPC 00175
[71] OCA-JP 00053-00054
[72] OCA-JP-00056
[73] OCA-JP-00005
[74] Ibid.
[75] OCA-JP-00006
[76] OCA-JP-00006-00007
[77] OCA-JP-00040
[78] OCA-JP-00007
[79] OCA-JP-00054
[80] OCA-JP-00002
[81] JA-KIDS-4-00228-00229
[82] JA-KIDS-4-00242
[83] GC-KIDS 01855-01857

---

[84] GC-KIDS 01855
[85] GC-[redacted] II 00001-00008
[86] GC-KIDS 02151
[87] GC-KIDS 02152
[88] GC-KIDS 02155-59
[89] GC-KIDS 02165
[90] GC-KIDS 02171
[91] GC-KIDS 02173
[92] GC-KIDS 02177
[93] GC-KIDS 02175
[94] GC-KIDS 02179
[95] GC-KIDS 02181
[96] GC-KIDS 01872
[97] GC-KIDS 02286, 02295
[98] GC-KIDS 02299
[99] GC-KIDS 02301-02323, 02642
[100] GC-KIDS 02642
[101] GC-KIDS 02336-02338
[102] GC-KIDS 02339
[103] GC-KIDS 02350
[104] GC-KIDS 02354-02358
[105] GC-KIDS 02352
[106] GC-KIDS 02360
[107] GC-KIDS 02362-02364
[108] GC-KIDS 02336
[109] GC-[redacted] 00031
[110] GC-[redacted] 00020, 00023, 00024, 00033
[111] GC-[redacted] 00006
[112] GC-[redacted] 00007-00008
[113] GC-[redacted] 00008
[114] GC-[redacted] 00009
[115] GC-[redacted] 00006-00007
[116] GC-[redacted] 00009
[117] GC-[redacted] 00019
[118] GC-[redacted] 00003
[119] OCA-GC-00221-00228
[120] OCA-GC-00001-00003, 00011-00013, 00015, 00017
[121] AP-KIDS 00621
[122] AP-KIDS 00619-00621
[123] AP-OPPC 00549
[124] AP-KIDS 00642-00645
[125] AP-OPPC 00509

---

[126] AP-KIDS 00658
[127] AP-KIDS 00660
[128] AP-KIDS 00672
[129] AP-KIDS 00676
[130] AP-OPPC 00555-00556
[131] AP-KIDS 01016
[132] AP-OPPC 00544
[133] AP-KIDS 01003
[134] Ibid.
[135] AP-KIDS 00630-00632
[136] AP-KIDS 00680-00682
[137] AP-KIDS 00694-00696
[138] AP-KIDS 00700
[139] AP-KIDS 00702
[140] AP-KIDS 00680
[141] AP-KIDS 01012
[142] AP-[redacted] FH 00024, 00028-00029
[143] AP-KIDS 00807
[144] AP-KIDS 00822-00824
[145] AP-KIDS 00828
[146] AP-KIDS 00832
[147] AP-KIDS 00838-00840
[148] AP-KIDS 00842-00848
[149] AP-KIDS 00844
[150] AP-KIDS 00850
[151] AP-KIDS 00852
[152] AP-KIDS 00860
[153] AP-KIDS 01047
[154] AP-[redacted] FH 00001-00005
[155] OCA-JB 00001-00002
[156] OCA-JB 00016
[157] OCA-JB 00007-00011
[158] OCA-JB 00007-00008
[159] OCA-JB 00006
[160] OCA-JB 00010
[161] OCA-JB 00001
[162] KT-KIDS 02996
[163] KT-KIDS 03012
[164] KT-KIDS 03032
[165] KT-KIDS 02998
[166] KT-KIDS 03026
[167] KT-KIDS 03018

[168] KT-KIDS 03002
[169] KT-KIDS 03004
[170] KT-KIDS 03014
[171] KT-KIDS 03020
[172] KT-KIDS 03022
[173] KT-KIDS 04079
[174] KT-KIDS 02375-02377
[175] KT-KIDS 02375
[176] KT-KIDS 02387-02389
[177] KT-KIDS 02387
[178] KT-KIDS 02443-02445
[179] KT-KIDS 02418
[180] KT-KIDS 02435
[181] KT-KIDS 02415
[182] KT-KIDS 02437
[183] KT-KIDS 02429
[184] KT-KIDS 02430
[185] KT-KIDS 02431
[186] KT-KIDS 02435
[187] KT-KIDS 02433
[188] KT-KIDS 02439
[189] KT-KIDS 04147
[190] KT-KIDS 02451-02454
[191] KT-KIDS 02482-02484
[192] KT-KIDS 02468
[193] KT-KIDS 02466
[194] KT-KIDS 02472
[195] KT-KIDS 02474
[196] KT-KIDS 02470
[197] KT-KIDS 02476
[198] KT-KIDS 02478
[199] KT-OPPC 05245
[200] KT-KIDS 03746-03748
[201] KT-KIDS 03752
[202] KT-KIDS 03754-03764
[203] KT-KIDS 03754
[204] KT-KIDS 03756
[205] KT-KIDS 03758
[206] KT-KIDS 03760
[207] KT-KIDS 03762
[208] KT-KIDS 03764
[209] KT-KIDS 03746

---

[210] KT-KIDS 03937, 03942
[211] KT-KIDS 03938
[212] KT-KIDS 03950
[213] KT-KIDS 03952
[214] KT-KIDS 03953
[215] KT-KIDS 03954
[216] KT-KIDS 03958
[217] KT-KIDS 03946-03948
[218] KT-KIDS 03948
[219] KT-KIDS 03956
[220] KT-KIDS 04245
[221] KT-KIDS 04009, 04012-04013
[222] KT-KIDS 04017
[223] OCA-KT-00372-00374
[224] OCA-KT-00012-00013
[225] OAC 340:75-12-12
[226] OCA-KT-00074-00075
[227] OCA-KT-00003
[228] OCA-KT-00002
[229] CS was named as a plaintiff in this suit but, because she has been adopted, she is no longer a party to the litigation. Nevertheless, her case serves as an example of OKDHS' failure to protect the children in its care.
[230] CS-OPPC 00731
[231] CS-KIDS 01226
[232] CS-KIDS 01228
[233] CS-KIDS 01232
[234] CS-KIDS 01238
[235] CS-KIDS 01239
[236] CS-KIDS 01240
[237] CS-KIDS 01242
[238] CS-KIDS 01244
[239] CS-KIDS 01246
[240] CS-KIDS 01248
[241] CS-KIDS 01250
[242] CS-[redacted] FH 00044
[243] CS-KIDS 01217
[244] CS-KIDS 01147-01150
[245] CS-[redacted] FH 00027
[246] CS-[redacted] FH 00006
[247] CS-KIDS 01166
[248] CS-KIDS 01178
[249] CS-KIDS 01162

---

[250] CS-KIDS 01164
[251] CS-KIDS 01168
[252] CS-KIDS 01170
[253] CS-KIDS 01174
[254] CS-KIDS 01176
[255] CS-[redacted] FH 00007
[256] CS-KIDS 00887-00889
[257] CS-KIDS 00899-00901
[258] CS-KIDS 00901
[259] CS-KIDS 00907
[260] CS-KIDS 000909
[261] CS-KIDS 00903-00905
[262] CS-OPPC 00559
[263] DG was named as a plaintiff but, because he has been adopted, he is no longer a party to the litigation. Despite this, his case remains as an example of OKDHS' failure to protect the children in its care.
[264] DG-OPPC 00047
[265] DG-KIDS 00211
[266] DG-KIDS 00209
[267] OCA-DG-00024-00025
[268] OCA-DG-00028
[269] OCA-DG-00004
[270] OCA-DG-00005
[271] OCA-DG-00014-00015
[272] OCA-DG-00005
[273] OCA-DG-00010
[274] OCA-DG-00012
[275] OCA-DG-00001
[276] OCA-DG-00003

# Appendix B

# Summary of J. Goad Referral Findings

**Summary of J. Goad Referral Findings**

| Named Plaintiff | Referral Number | DHS Determination | Finding |
|---|---|---|---|
| RJ | [redacted] | Unconfirmed | Insufficient Information |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Screen Out | Unreasonable |
| | [redacted] | Unconfirmed | Unreasonable |
| | | | |
| JP | [redacted] | Screen Out | Insufficient Information |
| | [redacted] | Screen Out | Reasonable |
| | [redacted] | Unconfirmed | Insufficient Information |
| | [redacted] | Confirmed | Reasonable |
| | [redacted] | Screen Out | Insufficient Information |
| | [redacted] | Screen Out | Unreasonable |
| | [redacted] | Screen Out | Unreasonable |
| | [redacted] | Unconfirmed | Unreasonable |
| | | | |
| JA | [redacted] | Screen Out | Reasonable |
| | | | |
| GC | [redacted] | Screen Out | Unreasonable |
| | [redacted] | Unconfirmed | Unreasonable |
| | [redacted] | Screen Out | Insufficient Information |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Unconfirmed | Insufficient Information |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Unconfirmed | Insufficient Information |
| | | | |
| AP | [redacted] | Unconfirmed | Insufficient Information |
| | [redacted] | Screen Out | Unreasonable |
| | [redacted] | Screen Out | Unreasonable |
| | [redacted] | Confirmed | Reasonable |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Screen Out | Reasonable |
| | | | |
| JB | [redacted] | Confirmed | Reasonable |

| Named Plaintiff | Referral Number | DHS Determination | Finding |
|---|---|---|---|
| KT | [redacted] | Confirmed | Unreasonable |
| | [redacted] | Screen Out | Reasonable |
| | [redacted] | Screen Out | Insufficient Information |
| | [redacted] | Unconfirmed | Insufficient Information |
| | [redacted] | Unconfirmed | Insufficient Information |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Screen Out | Reasonable |
| | [redacted] | Unconfirmed | Reasonable |
| | [redacted] | Unconfirmed | Reasonable |
| | | | |
| CS | [redacted] | Confirmed | Reasonable |
| | [redacted] | Unconfirmed | Insufficient Information |
| | [redacted] | Unconfirmed | Insufficient Information |
| | | | |
| DG | [redacted] | Screen Out | Reasonable |
| | [redacted] | Unconfirmed | Insufficient Information |

# Appendix C

# *Curriculum Vitae* of John Goad, A. M.

**JOHN GOAD, A.M.**

312/543-9450
govertoniv@aol.com

**WORK EXPERIENCE**

**Independent Contractor**: May 2003 – Date

- Expert Witness for the defense in federal litigation *Hernandez vs. Foster.* August 2009 to Date
- Develop curriculum and conduct training for Clark County, Nevada Division of Child and Family Services staff about child protective services decision making. October 2008
- Expert witness for the plaintiff in federal litigation *Lethbridge vs. Michigan DHS.* October 2008 to Date.
- Expert witness for the plaintiff in federal litigation *Rodwell vs. Michigan DHS.* October 2008 to Date.
- Expert witness for the defense in federal litigation *Legler vs. Erie County PA*. September 2008 to Date
- Consultant to the University of Illinois – Child and Family Research Center. Provide consultation related to child welfare research, evaluation, and assist in developing recommendations to public child welfare agencies. June 2008
- Expert witness for the plaintiff in class action federal litigation *Dwayne B. vs. Granholm*, *et al.* (the state of Michigan). Conduct a management review of the Michigan Department of Human Services and a review of child fatalities. October 2007 to July 2008
- Develop policy and procedure the Child Abuse Hotline, for investigation of child abuse and neglect allegations, for the provision of in-home protective services, and for the provision of foster care services for the Clark County, Nevada Division of Family Services. August 2007 to September 2009
- Develop operational child maltreatment definitions for the Nevada Division of Child and Family Services. February 2007 to March 2008
- Conduct an assessment of decision making at the Clark County, Nevada Division of Family Services Child Abuse Hotline. August 2006 to October 2006
- Expert witness for the plaintiff in state litigation Ray v. Washington University Children's Hospital. September 2007 to February 2008
- Expert witness for the defense in federal litigation Harris v. Lehigh County. October 2005 to September 2006
- Expert witness for the defense in federal litigation Tatar v. Armstrong County. August 2005 to May 2007
- Provide consultation to the Archdiocese of Chicago concerning the prevention of and response to clergy child abuse. March 2006 to November 2006

- Provide consultation and training concerning child protection to the New Jersey Division of Youth and Family Services. July 2005 to August 2005

- Provide consultation to the Philadelphia Department of Human Services related to the redesign of its Child Protection System. July 2004 to March 2005

**Juvenile Protective Association:** May 2003 to December 2004

- Provide consultation to Family Services of Metro Orlando related to the design of the Child Protection System for the Orlando, Florida metropolitan area.

- Act as an expert witness for the plaintiff in federal class action litigation concerning the safety of children in foster care in the Atlanta, Georgia metropolitan area. Principal investigator in two research reviews of child maltreatment in foster care.

**Illinois Department of Children and Family Services:** January 1975 to April 2003

- <u>Deputy Director, Division of Child Protection.</u> Direct and administer the Illinois child protective services system; manage a staff of approximately 1200 employees, a purchase of service budget of approximately $25 million, and grants totaling approximately $20 million. Responsible for public and private sector child protection investigations, in-home protective services, child welfare intake, and the emergency shelter system; work in close collaboration with major legal, medical, law enforcement, and social service agencies and institutions; participate in planning for changes in state legislation and policy related to child welfare; participate on committees, work groups and advisory boards at the local state, and national levels; frequent contact with media; frequent public speaking. December 2001 to April 2003.

- <u>Associate Deputy Director, Cook County Child Protection.</u> Direct and administer the Cook County, Illinois child protective services system; manage a staff of approximately 700 employees and a purchase of service budget of approximately $12 million. Responsible for child protection investigations, in-home protective services, family preservation, family reunification, child welfare intake, and the emergency shelter system; work in close collaboration with major legal, medical, law enforcement, and social service agencies and institutions; participate in planning for changes in state legislation and policy related to child welfare; participate on committees, work groups and advisory boards at the local, state, and national levels; frequent contact with media; frequent public speaking. June 1986 to November 2001

- <u>Assistant Child Protection Administrator.</u> Directed staff of 90 employees engaged in the investigation and assessment of child abuse and neglect reports; responsible for the investigation of all sexual abuse reports in Cook County. September 1984 to May 1986.

- <u>Child Welfare Supervisor.</u> Developed and implemented plans for the establishment of specialized units that investigate reports of child sexual abuse, take legal or other action to protect victims from further abuse, and arrange or provide social services as needed. February 1982 to August 1984.
  Developed and implemented plans for the establishment of a unit that reviewed completed child abuse and neglect investigations, assigned them to follow-up teams for service provision, and initiated payment to foster parents and other service providers; acted as the liaison between the investigative and Follow-up divisions in Cook County. June 1981 to January 1982.
  Supervised nine caseworkers who investigated reports of child abuse and neglect, took necessary protective action, and arranged or provided social services; responsible for the northeast quarter of Chicago. September 1980 to May 1981.

- Assistant Supervisor. Monitored five contracts with private social service agencies that provided case management and in-home protective services to abused and neglected children and their families. July 1979 to August 1980.

- Caseworker. Investigated reports of child abuse and neglect; took protective action; arranged or provided social services. December 1978 to June 1979.

  Provided a wide range of social and other services to abused, neglected, dependent, status offending, and delinquent children living in substitute care or with their families in inner city Chicago. January 1975 to November 1978.

**Illinois Bureau of Employment Security:** October 1972 to December 1974.

Interviewed and counseled applicants for employment; referred to job vacancies and training programs; ran a highly successful summer employment program for disadvantaged youth.

**United States Naval Air Reserve.** May 1971 to May 1977 (active duty May 1971 to August 1971).

## OTHER CURRENT PROFESSIONAL ACTIVITIES

**Chicago Children's Advocacy Center**

Member: Board of Directors. Oversee the work of the process for the law enforcement/child welfare investigation of all sexual and serious physical child abuse cases in Chicago, Illinois. Chair Program and Strategic Planning Committees.

**Cook County Child Fatality Review Team**

Member. Participate in the review of circumstance surrounding the deaths of Cook Count, Illinois children. Make recommendations for systemic change in the child welfare and other systems to prevent future deaths.

## EDUCATION

University of Chicago School of Social Service Administration. Master of Arts degree in Service Administration (Social Work) June 2001.

Loyola University School of Social Work. Attended MSW program January 1979 to March 1981.

DePauw University. Bachelor's of Arts degree in political science. Graduated May 1971.