# EXHIBIT R

# Critique of
# "D.G. ET AL. V. HENRY ET AL. REVIEW OF NAMED PLAINTIFFS' CASE FILES"

# Dated September 30, 2009, and
# "D.G. et al. v. Henry et al. Review of Named Plaintiffs' Case Files Supplemental Report"
# Dated February 25, 2010,
# authored by
# Peg McCartt Hess, PHD, ACSW

# Expert for the Plaintiffs
# Case 4:08-cv-00074-GKF-FHM

Submitted by
Andrew Barclay
June 9, 2011

## Introduction

I have been retained by counsel for the OK DHS Defendants to consult and to review Plaintiffs' expert witness reports and depositions and to offer fact and expert testimony on behalf of the OK DHS Defendants. In completing this engagement I have reviewed the expert reports of Dr. Peg McCartt Hess, as well as her depositions. I have reviewed other materials referenced in my report or provided in my considered materials. I will opine separately on the expert report of Dr. Jerry Milner in a report to be issued on June 15, 2011.

I am a biostatistician and an engineer. I have worked in the field of child welfare for 13 years. I maintain child welfare outcomes statistics for the 12 states that participate in the Fostering Court Improvement project (FCI). I am a funder, a co-founder, and the statistician for the project. The FCI statistics are used to train juvenile court judges, attorneys, and other stakeholders in the interpretation and tracking of their local outcomes. I train, analyze data, and write software in the child welfare field full-time. I also founded and chair the Barton Child Law and Policy Center at the Emory University School of Law. I previously worked part-time building statistical modeling software for major drug manufacturers' new drugs. Prior to that, I worked for 15 years in medical imaging research (PET, SPECT, and MRI).

My educational and professional background, including my publications, is set forth in Appendix A to this report.

## Summary

Dr. Hess has performed reviews of Oklahoma Department of Human Services (OK DHS) practice in the cases of seven of the named plaintiff children in this case to determine the efforts that were made by OK DHS to ensure these children's safety, well-being, and permanency. Beyond this, Dr. Hess "… also provides the salient conclusions of the DHS Systemic Deficiencies and Failures Suggested by Review of the Named Plaintiffs' Files."[1] In my opinion, Dr. Hess oversteps and overreaches beyond her data with respect to her conclusions "of the DHS Systemic Deficiencies and Failures" based on the information in her review.

## Suggestions of striking similarities that appear to indicate …

Toward the ends of both reports, in a section titled "DHS Systemic Deficiencies and Failures Suggested by Review of the Seven Named Plaintiffs' Files", Dr. Hess states: "Although the review of seven children's files cannot conclusively establish overall systemic problems, there are striking similarities in the children's case records and experiences in DHS custody that appear to indicate systemic deficiencies and persistent preventable failures."[2] [3] I think this is the closest Dr. Hess comes, in her report, to drawing a conclusion from her case file review regarding OK DHS systemic deficiencies and failures.

---

[1] Hess PM (2009). "D.G. ET AL. V. HENRY ET AL. REVIEW OF NAMED PLAINTIFFS' CASE FILES", p 3.
[2] Hess 2009, p 108.
[3] Hess PM (2010). D.G. et al. v. Henry et al. Review of Named Plaintiffs' Case Files Supplemental Report, p 75.

Having crafted many public comments on child deaths and child welfare system failures, it pains me to admit it, but I am a frequent user of phrases like "striking similarities" and "appear to indicate." Dr. Hess wants to offer the reader firm conclusions outside her sample, but she knows that her data cannot support them. I view case studies as valuable tools. I use them to learn and to generate hypotheses that can be tested using quantitative methods. As frustrating as it is, I too avoid drawing any conclusions beyond the individual cases in the case study.

## Qualitative Research

Nowhere in the 223 pages of Dr. Hess's two reports does she describe her work as science, scientific, research, a research review, or even a case study. Nowhere does Dr. Hess share with the reader any research question, or mention formal methods, or her methodology. There is never any mention of "qualitative research" in the text or description of this work as "qualitative research", until Dr. Hess's deposition.

I am impressed by the literature and results coming from the field of qualitative research. I am not an expert in qualitative research, but I find the pairing of qualitative and quantitative research exciting and potent. In reporting from any field of research, I think it is common practice to identify that you are doing research and to offer as much information about your methods and methodologies as feasible. In reviewing some of the literature on the design and sampling methods of qualitative research, I find that clear exposition of research methods is especially important in qualitative research, because, as in any relatively young area, there has been some confusion regarding methodologies and terminology.[4] [5] [6] [7] [8]

I do not think the reader was given any indication in Dr. Hess's two reports that she was employing formal qualitative research methods. I think descriptions of these methods, or at least mention of some keywords, would have strengthened and should have been included in both reports. As it stands, Dr. Hess's methods were partially disclosed only in deposition.

### Sampling

I collaborated with Children's Rights in the selection of named plaintiffs for the *Kenny A v. Perdue* child welfare class action lawsuit in Georgia's Fulton and DeKalb Counties, so I know firsthand that a great deal of care, legal experience, and effort went into the selection of the named plaintiffs. The selections were not at all random. I know nothing of how the

---

[4] Coyne, I. (1997). Sampling in qualitative research. Purposeful and theoretical sampling; merging or clear boundaries?. Journal of Advanced Nursing, 26(3), 623-630.

[5] Brink, P. J. (May 1987). On Reliability and Validity In Qualitative Research. Western Journal of Nursing Research. p. 157.

[6] Brink, P. J. (1993, August). Editorial Reliability/Validity Issues. Western Journal of Nursing Research. p. 401.

[7] Wright HK (Nov 2006). Are we (t)here yet? Qualitative research in education's profuse and contested present. International Journal of Qualitative Studies in Education, 19(6), 793-802.

[8] Williams EN, Morrow SL (July 2009). Achieving trustworthiness in qualitative research: A pan-paradigmatic perspective. Psychotherapy Research, 19(4 & 5), 576-582.

named plaintiffs were selected in this case, but I have been given no reason to think the methods were very different from those in Georgia. In my opinion, the named plaintiffs in Georgia had some of the worst outcomes among the children in Georgia's foster care system.

I think that I track Georgia's child welfare outcomes, and particularly the negative outcomes, more closely than anyone. In my opinion, the *Kenny A* case in Georgia was brought during the lowest point in the arc of the Georgia child welfare system's performance. In my opinion, even during Georgia's low point, the named plaintiffs in the case were not representative of the large class of foster children in Georgia. For example, at the time the *Kenny A* suit was filed, Georgia was removing over 10,000 children annually from their homes and most of them were spending less than 1 month in foster care. Most of those children had only 1 placement setting during their very short (and very unnecessary) stays in foster care. Those were not the experiences of any of the named plaintiffs in Georgia.

Dr. Hess does not claim that the children in her study are representative of the class in this case. From my reading of the literature, it appears that qualitative researchers seldom seek or claim a representative sample. That is by design, since qualitative research is often used to understand causal pathways, rather than merely documenting their numeric effects. As Jackson (2007) puts it: "By design, the qualitative researcher will get much more information about a phenomenon, realizing that the major drawback will be that the results will not be generalizable to a population because very few participants participate in studies offering so much depth of detail."[9]

In this exchange Dr. Hess makes it clear that her conclusions would be different with a different sample:

> *Q: "... [if] DHS gave you seven case histories of children selected not randomly but selected by DHS, and those case files showed few or very few problems of the children while they were in care and they achieved permanency within an acceptable time period, would you be scientifically comfortable saying my conclusion is that these case files appear to indicate that DHS has few, if any, problems, systemic problems?"*
>
> *A: "I would be comfortable to say that based on what I saw in these files, I do not believe that is what I would see, but if I saw case files that had no delays of workers seeing children where the children were interviewed in private consistently by their caseworkers, where the placements were -- had been carefully assessed before children were placed, if I did not see system's problems, I would certainly feel comfortable to say that. ..."*[10]

---

[9] Jackson II, Ronald L., Drummond, Darlene K. and Camara, Sakile(2007) 'What Is Qualitative Research?', Qualitative Research Reports in Communication, 8: 1, 21-28.
[10] Deposition of Peg Hess, PhD, 5/9/2011, condensed transcript, p 105.

**Certainty**

At deposition, in answer to the question "Let me ask you, does the phrase suggestive of indicate an absolute certainty on your part?" Dr. Hess answered: "Based on the data in the report, yes."[11] In my opinion, Dr. Hess went too far here by moving from "suggestive of" to "absolute certainty." In my opinion absolute (or any other form of) certainty requires stronger levels of evidence than Dr. Hess's review provided us. I agree with Dr. Hess's report that "…the review of seven children's files cannot conclusively establish overall systemic problems", and I find Dr. Hess's statement of absolute certainty at odds with her report. It is too great a leap to attain absolute certainty about the thousands of children in the class of this case from the observations gleaned from 5 (or 7) case file reviews, however unbiased, rigorous, technically proficient, and well reported.

In answer to the next question "So the data from the five children made you absolutely certain of systemic deficiencies and persistent preventable failures?" Dr. Hess answered: "The data in this report pulled from the children's case files and the findings based on that data are consistent with these specific deficiencies and preventable failures." Dr. Hess did not answer the question. Not answering that second question regarding certainty suggests to me that Dr. Hess was unwilling to reaffirm her previous stance of absolute certainty. Dr. Hess reverted to the weaker term, "consistent with", used previously in her deposition as synonymous with "suggestive of." I too am a frequent user of those terms, usually to avoid asserting causal inference from correlated findings.

## Conclusion

In my opinion, Dr. Hess's review lacked a sufficient representative sample to draw conclusions about the class in this case, the treatment by OK DHS of children outside of her small sample, or the operations of the OK DHS. Dr. Hess failed to document any of her qualitative research methods or the transferability of her findings beyond the experiences of these seven cases, and I find no persuasive evidence or logic in her report or deposition that her findings are transferable beyond the seven cases she reviewed.

I reserve the right to use as an exhibit at trial my report and any item in my considered materials. Publications I have authored in the last ten years are listed on my resume in Appendix A. During the previous four years I have not testified as an expert at trial or by deposition. As compensation for the work I have performed in this case, I will charge $180 per hour. As of June 9, 2011 I have not yet invoiced or been paid. I have expended 160 hours for a total of $28,800 compensation.



Andrew B. Barclay
June 9, 2011

[11] Deposition of Peg Hess, PhD, 5/9/2011, condensed transcript, p 86.

# Appendix A

## Resume of Andrew Barclay, MSEE, MSME as of June, 2011

Andy@FosteringCourtImprovement.org
512 Saint Charles Ave NE, Atlanta, GA 30308
404-875-6820

I am a biostatistician and an engineer. I have worked in the field of child welfare for 13 years. I maintain child welfare outcomes statistics for the 12 states that participate in the Fostering Court Improvement project (FCI). I am a funder, a co-founder, and the statistician for the project. The FCI statistics are used to train juvenile court judges, attorneys, and other stakeholders in the interpretation and tracking of their local outcomes. I train, analyze data, and write software in the child welfare field full-time. I also founded and chair the Barton Child Law and Policy Center at the Emory University School of Law. I previously worked part-time building statistical modeling software for major drug manufacturers' new drugs. Prior to that, I worked for 15 years in medical imaging research (PET, SPECT, and MRI).

## Education / Training

**Emory University Rollins School of Public Health, Atlanta, GA**
Biostatistics, All But Dissertation, 1998-

**Georgia Institute of Technology, Atlanta, GA**
Electrical Engineering, Master of Science, 1992

**Stanford University, Palo Alto, CA**
Mechanical Engineering, Master of Science, 1985

**Tulane University, New Orleans, LA**
Mechanical Engineering, Bachelor of Science, 1982

## Employment and Professional Experience

### Child Welfare Data Consulting

Recent Projects:

- Expert Witness for Riggs, Abney, Neal, Turpen, Orbison, & Lewis P.C. representing the Oklahoma Department of Human Services in D.G. v. Henry federal class action lawsuit, Tulsa, OK. 8/2010 to present

- Data Consultant and Software Developer for the Independent Verification Agent under contract to the University of North Carolina in the L.J. v. Massinga federal class action lawsuit, Baltimore, MD. 1/2010 to present
- Visiting Statistician in the Permanency Innovations Initiative, University of Illinois Jane Addams College of Social Work, under contract from the Illinois Department of Children and Family Services, Chicago, IL. 5/2011 to present
- Data Consultant and Software Developer for Casey Family Programs, Seattle, WA. 4/2011 to present
- Training and Data Consultation on the federal Child and Family Services Review for Children's Rights, Inc., New York, NY. 4/2011
- Reviewer, *Preliminary Protective Hearing (PPH) Benchcard Study* for the National Council of Juvenile and Family Court Judges, Reno, NV. 1/2011

Ongoing and Past Projects:

- Statistician (unpaid) to the Fostering Court Improvement project. Develop, field-test, and train juvenile court judges, attorneys, and other stakeholders in 12 states on the use of over 150 child welfare outcome statistics. 8/2005 to present
- Consultant (unpaid) to the Georgia Supreme Court Committee on Justice for Children. 1998 to present
- Consultant (unpaid) to Georgia's state Office of the Child Advocate. 11/2000 to 10/2010
- Academic Consultant and Software Developer, University of Illinois Jane Addams College of Social Work, Urbana, IL. 2/2007 to 7/2009
- Technical Lead (unpaid), Data Analysis Team, Georgia's Child and Family Services Review. 11/2000 to 8/2004

## Prior Work Experience

Consulting:

- Statistical Software Consultant, building markov and monte-carlo simulators from clinical trials data to demonstrate side-effects and cost-effectiveness of new drugs to government and managed care regulators for Pfizer, Wyeth, Forrest, Amgen, Astellas, Genentech and others. Policy Analysis, Inc., Boston, MA. 3/2002 to 12/2009
- Web-based MCMC Influenza Simulator for Thomson's Physicians World. 11/2002 to 9/2003
- Software Architecture Consulting on Java and Web Technologies to GE, Siemens, Hitachi, Adac and other medical imaging manufacturers. 1996 to 1997

Employment:

- ORISE Fellowship with the Centers for Disease Control and Prevention's National Center for Environmental Health. 2002 to 2004
  - Development of spatial-statistical software tools for field epidemiologists
- Research Scientist with the Cardiothoracic Research Lab, Emory University School of Medicine, Atlanta, GA. 1992 to 1996
  - PET/SPECT/MRI, Medical Imaging and Digital Signal Processing Research, High Performance Computing, Telemedicine, Software Engineer, Software Architect
- Research & Development Engineer with Digital Design, Inc., Paris, France. 1989 to 1992
  - SPECT, Medical Imaging, Satellite Imaging, Digital Signal Processing, Software Engineer
- Research Engineer, Positron Emission Tomography, Sloan-Kettering Cancer Research Institute, New York, NY. 1986 to 1988
  - PET Technologist, Medical Imaging, Software Engineer
- Research Assistant, Department of Mechanical Engineering, Tulane University, New Orleans, LA. 1982 to 1984
  - Design, Project Management, Robotics, Software Engineer

## Honors

- $1 Million Java Cup International Programming Competition, 1st Place, Individual, Unlimited, "Volume Slicer Applet". 1996
- Emory University Humanitarian Award. 2004
- Thirteen other public service awards for volunteer work. 1996 to present
- Advisory Board Chair, Barton Child Law and Policy Center at Emory University School of Law. 2000 to present
- Board Member, Georgia Governor's Office for Children and Families, appointed by Georgia's Governor. 2004 to present
- Board Member, Georgia Technology Authority, appointed by Georgia's Chief Justice. 2001 to 2005
- Full Tuition Scholarship and Stipend, Emory University Rollins School of Public Health Department of Biostatistics. 1997 to 2001
- Lincoln Foundation Design Competition, Bronze Medal, "Heavy Truck Air Suspension Design". 1985

## Publications

Child Welfare:

- C Church, A Barclay, "Getting to Ground Truth: The Child Welfare Doppler Radar," University of Minnesota Center for Advanced Studies in Child Welfare, CW360, p 34, Spring 2011.
- Locker, Beth, and Andrew Barclay. "Measuring the next 30 years." University of Michigan Journal of Law Reform 41.1 (2007): 269-280.

Selected Child Welfare Conference Presentations:

- Andy Barclay, *Georgia's CFSR Experience*, Casey Family Programs Meeting on Optimizing Child Welfare System and CFSR Performance, 2/8/2011.
- Andrew Barclay, Isabel Blanco, Christopher Church, *The Child and Family Services Review: A Lens to Examine Georgia's Changing Child Welfare Environment*, http://www.youtube.com/watch?v=q_jjYPxdawc, Georgia Child Welfare Legal Academy, Emory University School of Law, 10/8/2010.
- Andy Barclay, *National Perspective on Georgia's Child Welfare Outcomes*, National Governor's Association Georgia Mini-Institute, 6/23/2010.
- Donald Duquette, Andrew Barclay, *Protecting Children and Protecting Liberty: Improving Decision-Making in Removing Children in CPS Cases*, 17th National Conference on Child Abuse and Neglect, 4/2/2009.
- Andy Barclay, *Ground Truth: Using Data to Explore What's Really Happening at the Local Level*, Fulton County Justice for Children Summit, 9/19/2008.
- Andy Barclay, *"Children Safe in Permanent Families" A Dependency Court Bottom Line*, 31st National Juvenile and Family Law Conference, National Association of Counsel for Children, 8/4/2008.
- Andy Barclay, *Illinois NCANDS & AFCARS Child Welfare Measures for Courts*, UIUC Children and Family Research Center Retreat, 5/10/2007.
- Judge Nancy Salyers, Andrew Barclay, *Data: Telling a Story … A Walk Through Meaningful Data Analysis*, Fostering Court Improvement, A Data Workshop for Decision Makers, 12/7/2006.
- Andy Barclay, *Engaging Court Stakeholders in Using Child Welfare Outcome Measures*, Casey Family Programs, Putting Data to Work, 10/17/2006.
- Andy Barclay, *Using AFCARS Data in Courts*, National Resource Center on Child Welfare Data and Technology Conference, 7/22/2005.
- … and over 130 presentations to local juvenile court stakeholders.

Biostatistics:

- Waller, L.A., and Barclay, A.B. (2003). "Agile" GIS: Building application-specific spatial analytic software from freely available software tools. Chance, 16, 39-44.

Medical Imaging:

- EVR Di Bella, GT Gullberg, AB Barclay, RL Eisner, "Circumferential Profiles for Region-based Analysis of Dynamic SPECT Data", IEEE Medical Img. Conf. Proceedings, 1997.
- EVR Di Bella, GT Gullberg, AB Barclay, RL Eisner, " Automated region selection for analysis of dynamic cardiac SPECT data", IEEE Trans. Nucl. Sci., vol. 44, no. 3, pp. 1355-1361, June 1997.
- EVR Di Bella, AB Barclay, RL Eisner, RW Schafer, "Comparison of rotation based projectors for iterative reconstruction algorithms," IEEE Trans. Nucl. Sci., vol. 43, no. 6, pp. 3370-3376, December 1996.
- EVR Di Bella, RL Eisner, AB Barclay, RE Patterson, DJ Nowak, "Attenuation artifacts in SPECT: Effect of "wrap around" lung in 180 degree cardiac studies," J. Nucl. Med., vol. 37, pp. 1891-1896, November 1996.
- EVR Di Bella, GT Gullberg, AB Barclay, RL Eisner, "Automated Region Selection for Analysis of Dynamic Cardiac SPECT Data," IEEE Medical Imaging Conference, October, 1996.
- EVR Di Bella, RL Eisner, LS Schmarkey, AB Barclay, RE Patterson, DJ Nowak, DS Lalush, BMW Tsui, "Heterogeneity of SPECT bull's eyes in normal dogs: Comparison of attenuation compensation algorithms," IEEE Trans. Nucl. Sci., vol. 42, no. 4, pp. 1290-1296, August 1995.
- AB Barclay, RL Eisner, EVR Di Bella, "Construction of a thorax model database from clinical PET attenuation scans," SNM 42nd Annual Meeting, June 1995.
- TH Chu, AB Barclay, RE Patterson, RL Eisner, "Software validation and quality assurance for a new program to evaluate SPECT myocardial perfusion images," SNM 42nd Annual Meeting, June 1995.
- EVR Di Bella, RL Eisner, AB Barclay, RE Patterson, "Attenuation artifacts in SPECT: Effect of "wrap around" lung in 180 degree cardiac studies," SNM 42nd Annual Meeting, June 1995.
- KB Churchwell, WC Pilcher, RL Eisner, AB Barclay, RE Patterson, "Quantitative analysis of positron emission tomography: the "women's test" for coronary artery disease," SNM 42nd Annual Meeting, June 1995.
- EVR Di Bella, RL Eisner, AB Barclay, RE Patterson, "An evaluation of the iterative chang algorithm in large females," SNM 42nd Annual Meeting, June 1995.
- KB Churchwell, WC Pilcher, RL Eisner, TH Chu, AB Barclay, J Streeter, S Schmarkey, C Eaves, P Morrison, RE Patterson, "Accuracy of PET rubidium myocardial perfusion imaging to diagnose coronary disease: new software for objective quantitative analysis," SNM 41st Annual Meeting, June 1994.
- AB Barclay, TH Chu, RE Patterson, RL Eisner, "A nuclear medicine network for remote viewing and distributed processing," SNM 40th Annual Meeting, June 1993.