# EXHIBIT S

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

1) D.G., by Next Friend G. Gail Stricklin, et al., for themselves and those similarly situated,

Plaintiffs,

vs. No. 08-CV-074-GKF-FHM

1) C. BRAD HENRY, in his official capacity as Governor of the State of Oklahoma, et al.,

Defendants.

VIDEOTAPE DEPOSITION OF DONALD BAUMANN
TAKEN ON BEHALF OF THE PLAINTIFFS
ON JULY 13, 2011 AT 8:38 AM
IN TULSA, OKLAHOMA

APPEARANCES

On behalf of the PLAINTIFFS:
Miriam Ingber
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, NY 10001
212.683.2210
mingber@childrensrights.org

VIDEOTAPED BY: Gabriel Pack

REPORTED BY: Jody Graham, CSR, RPR, RMR, CRR

APPEARANCES (Continued)

On behalf of the DEFENDANTS:
David Page
RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS
502 West 6th Street
Tulsa, OK 74119
918.587.3161
dpage@riggsabney.com



INDEX


| | Page |
|---|---|
| DONALD BAUMANN | 4 |
| Direct Examination by Ms. Ingber | 4 |
| Cross Examination by Mr. Page | 337 |


EXHIBITS


| Exhibit | Description | Page |
|---|---|---|
| 776 | Report of Dr. Milner | 42 |
| 780 | Report of J. Fluke and D. Baumann dated 6-9-11 | 7 |
| 781 | Report of J. Fluke and D. Baumann dated 6-15-11 | 7 |
| 782 | 10A Okl.St.Ann. 1-6-101, 10A Okl.St.Ann. 1-6-108 and OAC 340:75-1-26 | 45 |
| 783 | Website Article titled "Internal Validity" | 155 |
| 784 | Article titled "Threats to Validity of Research Design" | 156 |
| 785 | Article titled "Placement Stability in Child Welfare Services" | 181 |
| 786 | Article titled "Placement Stability - A Review of the Literature" | 182 |
| 787 | Report of Mr. Goad dated 3-15-11 | 238 |
| 788 | Article titled "The Ties that Bind II" by D. Webster, et al. | 245 |
| 789 | Article titled "The Decision-Making Ecology" | 289 |


STIPULATIONS

It is stipulated that the deposition of DONALD BAUMANN may be taken pursuant to agreement and Federal Rules of Civil Procedure on JULY 13, 2011, before Jody Graham, CSR, RPR, RMR, CRR.



VIDEOGRAPHER: This is the videotape deposition of Donald Baumann in the matter of D.G. versus C. Brad Henry. This deposition is being held at 502 West Sixth Street in Tulsa, Oklahoma on July 13th, 2011. We are on the record at 8:38 a.m. Will Counsel, please, state their appearances for the record?

MS. INGBER: Miriam Ingber from Children's Rights for the plaintiffs.

MR. PAGE: David Page for the defendants.

VIDEOGRAPHER: The court reporter will now swear in the witness.

MR. PAGE: Ms. Ingber, could we just agree that the deposition objections will be reserved except as to form today?

MS. INGBER: Yes.

MR. PAGE: Thank you.

DONALD BAUMANN,

being first duly sworn, was examined and testified as follows, to wit:

DIRECT EXAMINATION

BY MS. INGBER:

**Q Good morning, Dr. Baumann.**

A Hello.

**Q Thank you for coming today. You understand that you're here today to give sworn testimony in this matter; right?**



A Uh-huh.

**Q And that your deposition is being taken under oath as if it was in court?**

A Yes.

**Q Is there any reason at all that you feel you can't testify fully and accurately today?**

A No.

**Q Have you ever been deposed before?**

A No.

**Q Okay. I want to go through some of the basic ground rules so today can go as smoothly as possible. The most important thing is for you to make -- for us to be communicating well. So I want to make sure you understand my questions and that I understand your answers and that you're answering the questions that I've asked. So if at any point you don't understand a question, you want me to repeat something, please, let me know and I -- and I will be able to clarify; okay?**

A Uh-huh.

**Q That brings up the next thing. In normal conversation we do a lot of uh-huh, huh-uh. But because this is on the record with a court reporter,**

it's important to answer verbally so that the record can be clear.
A Okay. Is okay okay?
Q Okay is perfect.
A Okay.
Q This is not an endurance test. If you want to take a break at any time, please, let me know and we'll do so. But it would be best if you answer any pending questions before we take a break; okay?
A (Nodding head.)
Q Yes?
A Uh-huh. Yes.
Q There we go. This is just a practice round. I'm sure that there will be objections from your counsel, Mr. Page, today. Unless he specifically instructs you not to answer, however, you should go ahead and answer my questions; okay?
A Yes.
Q All right. So you have never been deposed before. Have you ever been retained as an expert witness? I know you have not in the last four years.
A No.
Q So never in your entire career?



A No.
Q Have you ever testified at trial?
A No.
Q What did you do to prepare for your deposition today?
A Reread our reports and reread the Goad report and the Milner report and looked at a -- a deposition by -- trying to remember his name. He's from New York. Larry Brown, I think his name is.
Q So you read the transcript from the Larry Brown deposition?
A Yeah.
Q Did you do anything else to prepare?
A No.
Q Did you meet with your counsel?
A Did day before yesterday.
Q For how long?
A Couple hours.
Q I am going to mark as Exhibit 780 and Exhibit 781 your reports. One is dated June 9th, 2011. That will be Exhibit 780. And one is marked June 15th, 2011. That will be Exhibit 781.
MS. INGBER: Can we go off the record just for one second.
VIDEOGRAPHER: We're off the record. Time



is 8:41.
(A recess was taken from 8:41 AM to 8:41 AM.)
MS. INGBER: Okay. We can go back on the record.
VIDEOGRAPHER: We're back on the record. Time is 8:41 a.m.
Q (BY MS. INGBER) Can you just briefly look at the documents I handed you and make sure those are, in fact, the two expert reports you prepared in this case?
A They are.
Q They are. I see that you have your own copies of those reports. You can feel free to use those or the ones that I handed to you.
A I am -- these will work fine.
Q Whatever you prefer. It's fine with me. Are all of the opinions that you plan to testify about at trial contained in those two reports?
A Yes.
Q What was your major in your undergraduate degree?
A Psychology.
Q And you got your M.A. and your Ph.D. in social psychology; correct?



A Correct.
Q What was the focus of your graduate studies?
A There were several. One was experimental social psychology and the area was altruism. And the other was applied social psychology. And there are various areas including mental health, the police. Trying to remember. One was a substance-abuse program I was in -- or not in, but worked in. I had internships every year in graduate school, and so I did various things.
Q So when you said one was in altruism, was that your M.A.?
A I think my M.A., the subject of my master's thesis was attributions among substance abusers.
Q Okay. So would it be fair to say that up through the end of your graduate studies, you didn't have a focus on social work or child welfare?
A No. Decision making probably would -- if you were to call it one thing, you'd call it "decision making" probably.
Q And you're currently an instructor at Saint Edwards University; right?
A Uh-huh.

Q Since when?
A Well, ten years earlier would be about 19 -- I'm sorry. Maybe 2001. Or 2.
Q Okay. So approximately a decade?
A Yeah.
Q Do you teach any classes -- well, strike that.
What classes have you taught since you've been at Saint Edwards?
A Research methods, abnormal psychology, social psychology, developmental psychology.
Q Do you teach any classes on social work?
A No.
Q On child welfare?
A No.
Q And you're currently a senior research fellow at the American Humane Association; correct?
A Correct.
Q When did you become a research fellow there?
A After retiring from the state where I worked for 20 years in social welfare.
Q So in 2010; is that right?
A October of last year, yeah. Start of November.



Q Can you briefly describe your responsibilities at AHA, which I'm just going to use to refer to the American Humane Association.
A I really don't have any. They nominated me as a research fellow, and so far this has been the only thing I've done. Though -- though I have a past relationship with them as part of a number of research projects and I've done -- coauthored articles with members of their staff.
Q But since you've actually became a senior research fellow at the American Humane Association, this is the only project you've worked on?
A Yes. Aside from articles.
Q Aside from articles that you worked jointly with people who work there?
A Yeah.
Q Okay. From 1991 to 2010, you worked at the Texas Department of Family and Protective Services in program evaluation and research; correct?
A Right.
Q Can you just briefly describe for me the function of program evaluation and research?
A We probably handled three levels of projects. One level were -- was what would be



considered long-term research projects, and they would last anywhere from three years to ongoing like things. So part of that would be development of measurement systems like risk assessment; evaluating large scale interventions that the department had, like family-group decision making would be one.
So those -- those would last years. And then there would be a second level of projects that would last maybe a year or less. I'd say, like, a year to -- two years to less than a year which would be more narrowly focused. Having typically to do with interventions and other kinds of things that came up.
And a third level would be things they needed done immediately so that you would respond to requests for data or requests for analyses, interpretation of things and so forth.
Q Do you know whether the child welfare program area at the Oklahoma Department of Human Services has a similar program evaluation and research function within it?
A I don't.
Q From your resume or your CV, I'm sorry, it said -- and I'll just quote from it -- that the types of analyses you conducted included



"descriptive work, multiple regression, logistic regression, neural network, structure modeling and multi-level modeling." Can you explain to me what you mean there by "descriptive work"?
A Descriptive analyses primarily have to do with variability in data and averages in data. Like means, medians, modes. What the distributions look like and so forth. So you -- you're basically describing something statistically, but not making any inferences about it. It would be similar to a survey. For example, if you looked at a survey and you wanted to know how many respondents said yes or no to a question, be something like that.
Q So it would be fair to say that descriptive work simply describes something, whatever -- a phenomenon, whatever that is, but does not attempt to draw -- draw conclusions about cause and effect relationships?
A Right.
Q In contrast, for example, to an experiment which involves an intervention and trying to see if an intervention has a certain effect?
A Yes. There's a middle ground, too. There's a middle ground where you are drawing inferences about cause and effect from modeling --

Q Understood.
A -- data or --
Q Understood.
A And so forth.
Q Right. And an experiment would be just one type of cause and effect?
A Well, if you had a range, you would go from descriptive to an experiment; and then the middle ground would be quasi experiments.
Q Understood. Do you consider yourself to be an expert in statistics?
A I don't know many people that would say they're an expert in statistics, but I would give it maybe. I mean, I really -- it's -- it's a very, very complex subject. And so I would say I'm good at it; but to say I'm an expert, I don't know.
Q What's the basis for you being, quote unquote, good at statistics?
A Having done it for 30 years. Having worked with students on it and so forth.
Q Have you ever taught any classes on statistics?
A No.
Q You're not a member of the American Fellow --



A No.
Q You're not a fellow in the American Academy of Statistics or anything like that?
A No.
Q Do you consider yourself to be an expert in quantitative social science research methodology?
A Yes.
Q What about in qualitative social science research methodology?
A I'd say no.
Q No, you're not an expert in qualitative social science research methodology?
A No.
Q Do you consider yourself to be an expert in child welfare practice?
A No.
Q In social work practice?
A No.
Q How did you come to be retained by DHS in this matter?
A American Humane called and asked if I wanted to do it.
Q So the contact to you came through the American Humane Association?
A Yes.



Q When was that?
A Two months ago, perhaps. Maybe three.
Q So that would be March or -- April or May of 2011?
A Yeah. I'm trying to think back. Maybe March, I'm thinking.
Q Approximately March, 2011. And can you describe that conversation? Who was it with and what was the content of that?
A I believe John Fluke called me up and asked me whether I wanted to provide -- to review a couple of reports, and that was pretty much it.
Q And how did he describe the project to you?
A I really -- I don't really -- really recall the conversation other than he asked me if I wanted to do it. I asked him what it was about. He said that the State of Oklahoma was being sued by, I think, Children's Rights and if -- whether or not I wanted to read a couple of reports that were -- that -- that had come about as part of that lawsuit and provide some feedback on them. That's what -- and that resulted in these reports.
Q Did you ever have contact with anyone but Dr. Fluke in connection with your retention here?



A No.
Q So you never had contacts with anyone at DHS or with any lawyers for DHS?
A No.
Q Were any limits put on your analysis in terms of time, expenses, otherwise subject matter, what you could look at?
A I was provided the information that I read. I was provided with the reports and some depositions. I think I read John Goad's deposition and Milner's deposition and both Goad's and Milner's reports.
Q So would it be fair to say that the only materials you considered for your part of this analysis were Mr. Goad and Dr. Milner's reports and deposition?
MR. PAGE: Object to the form.
Q (BY MS. INGBER) You can answer.
A Try it again.
Q Would it be fair to say that the only materials you considered for your role in this analysis were the depositions of Mr. Goad and Dr. Milner and their reports?
MR. PAGE: Object to the form.
Q (BY MS. INGBER) You can still answer.

A No. I also read the deposition of -- I'm trying to remember his name. He's from New York.
**Q That was Mr. Brown.**
A Mr. Brown.
**Q But that was in preparation for your deposition.**
A Right.
**Q Not before you wrote the reports; correct?**
A Yeah. I read those two. I didn't read Hess, and I didn't read Miller.
**Q Did you read the deposition of Jaqueline Smollar, Dr. Smollar?**
A Just in passing. I didn't read it thoroughly.
**Q So you skimmed that?**
A I skimmed that one, yeah.
**Q Aside from the depositions and reports that we've discussed, did you look at anything else when you were working on your report?**
A I looked at literature. I looked up some literature on sample sizes needed for reliability. Probably relooked at stuff I had taught about Campbell and Stanley. I think pretty much that's what I'm remembering anyway.
**Q What research on sample sizes did you look**



**at? And if you can show me where in your report it's referred to either in the list of references or in the footnotes.**
A For the sample size?
**Q Yeah.**
A Oh, gosh.
**Q There's a list of references at the end of both reports.**
A Yeah. You have to wait a second. "Gwet -- Gwet Handbook of Inter-rater Reliability." A chapter on how many people -- how many things need to be read by two people in order to achieve reliability.
**Q At some point did anyone tell you that you needed to provide the materials that you considered?**
A No.
**Q No one ever told you that?**
A No.
**Q Are you aware that plaintiffs have not been provided with the "Handbook of Inter-rater Reliability" or any part of it?**
MR. PAGE: Object to the form.
THE WITNESS: No.
**Q (BY MS. INGBER) Do you have a copy of that book?**



A No.
**Q You don't have a copy of the book that you looked at as part of --**
A I looked online.
**Q You looked at the "Handbook of Inter-rater Reliability" --**
A I looked at the chapter by Gwet in the handbook online.
**Q Did you print out that chapter?**
A No.
**Q Did you ever provide it to anybody?**
A Well, I did. I did. I sent it to John Fluke.
**Q You sent it to John Fluke?**
A I sent the reference to John Fluke.
**Q But you didn't send the chapter itself to John Fluke?**
A I don't think so.
**Q Did you send it to anyone else?**
A I think I did send the chapter, actually, yeah, yeah.
**Q Okay. And you said you also looked at some materials that you taught on Campbell and Stanley. On your list of references there's a reference to "Campbell and Stanley Experimental and**



**Quasi-Experimental Designs for Research," which I understand is a relatively short book, from 1963.**
A It is.
**Q When you said you looked at materials that you taught on Campbell and Stanley, did you look at anything other than that 1963 book?**
A No. There are -- there are other books beyond that, but they pretty much restate what they stated in the '63 book. Cook and Campbell's an example.
**Q Yes. I've looked at that recently. But you didn't look at -- when you said materials you taught, you were speaking only of that book?**
A Yes.
**Q Were you provided with any facts or assumptions by Mr. Fluke or anyone else in order for you to do your analysis?**
A As -- give me an example.
**Q So an assumption would be assume that Mr. Goad did not utilize a sampling statistician. Any information, any facts. Or DHS has available to it the following data. That would be a fact.**
A I don't think so. And I -- I don't understand the question very well. I --
**Q Let me -- let me rephrase it. What**

**information were you provided in order for you to do your report? Were you simply given these two depositions and three -- sorry, three depositions and two reports and told to review them?**
A Uh-huh.
**Q Yes?**
A Yeah.
**Q Did you conduct a case-record review or any case studies as part of your analysis?**
A No.
**Q Did you attempt to replicate the analysis of any of the reports that -- that you saw or that are referenced in your report?**
A No. And the -- in the Milner report, John Fluke did run some analyses on data that are contained in there. I didn't run them, though.
**Q You personally did not run any analyses?**
A No.
**Q What analyses did Dr. Fluke run? I understand from his report that he ran an entry cohort analysis for four years.**
A Correct.
**Q But that's on different -- that wasn't an attempt to replicate. That was a new analysis; correct?**



A Right.
**Q Did he run any attempts to replicate?**
A No.
**Q And you didn't either?**
A Oh, I don't know if John did. I don't think so, but I didn't.
**Q Perfect. Did you use any of the expert's data to do any analysis of your own?**
A No.
**Q So would it be fair to say that what you did is you basically critiqued the methodologies of Dr. Milner and Mr. Goad?**
A Correct.
**Q Based on their depositions and on their reports?**
A Correct.
**Q Is there anything else you did other than that?**
A No.
**Q Did you look at the complaint or the answer?**
A I didn't --
**Q The complaint or the answer. They're legal documents in this case.**
A No. No.



**Q You didn't look at any legal documents from this case. Would that be fair to say?**
A Correct.
**Q Did you look at any children's case files?**
A No.
**Q None at all?**
A No.
**Q Did you ever ask for those?**
A No.
**Q Did you review any DHS policy?**
A No. Not -- I shouldn't say that. I -- when I was reading the reports, it did talk about policy and procedures.
**Q Uh-huh.**
A But I didn't review it directly, no.
**Q So you read them if they were referred to in --**
A Uh-huh.
**Q -- Dr. Milner and Mr. Goad's report?**
A Right.
**Q Did you communicate with anyone aside from Dr. Fluke about your analysis or your report?**
A With David.
**Q Did you -- do you have any research assistants?**



A No.
**Q Did you communicate with someone named Needell?**
A Who?
**Q Needell? On your -- in your June 15th report on page 11, it refers to personal communications with Needell.**
A I think that's John's reference.
**Q That's John's. So you did not have any communications?**
A Yeah. I think it's Barbara Needell. She's at UC Berkeley, I think. And I think he communicated with her.
**Q Do you know whether that communication was over E-mail or verbally?**
A I don't know.
**Q Did you have any nonverbal, so E-mail, letter, anything in writing, any communications with Dr. Fluke or anybody else in connection with your analysis or your report?**
A I looked through my E-mail; and from what I could gather, our E-mails were primarily sending documents back and forth between he and I and with David.
**Q But you did have E-mails where documents**

**were sent back and forth?**

A Yeah. But we didn't really describe what we were doing in -- in E-mails. I mean, the -- I didn't write long E-mails to him describing what I was going to write about.

**Q Understood. But you did have E-mail communication about your report with Dr. Fluke?**

MR. PAGE: Object to the form.

THE WITNESS: No. What I did is we sent documents back and forth.

**Q (BY MS. INGBER) Over E-mail?**

A Yeah.

**Q In connection with the report and analysis?**

A Right. But I -- there was no content other than, "Here are the documents."

Q Did you have any conversations with any of the other experts retained or employed by DHS in this case?

A No.

**Q So were you ever told to provide copies of any of your materials that you considered to Counsel?**

A No. At least I assumed that they're available online, most of them anyway, if not all.



Or, you know, through libraries. I didn't --

**Q But you didn't actually provide copies of all of the materials that you personal considered, the literature or anything else to Counsel?**

A No, no.

**Q Before this report, did you have any prior involvement with DHS?**

A Oklahoma DHS?

**Q Yes.**

A No.

**Q From my reading of the appendix C --**

A Which report?

**Q This is in the June 9th report and then appendix A in the June 15th report, it gives the hours that you worked.**

A Okay.

**Q And my understanding is that before the first report which covered Dr. Hess, Mr. Goad, Dr. Miller and Doctor -- it says "Milner," but -- and Dr. Milner, I guess, you had spent 13 and a half hours as of June 7, 2011.**

A If it says so, yeah.

**Q And then by the time it was June 15th, you had spent a total of 42 hours so an additional 28 and a half hours since June 7th, in those eight**



**days. Does that sound right to you?**

A Yes.

**Q So you spent a total of 42 hours on these reports. But only 13 and a half hours before the -- your June 9th report was completed; is that right?**

A Uh-huh.

**Q Yes?**

A Yes.

**Q So what did you do in that 13 and a half hours before your report on Mr. Goad, Dr. Hess and Dr. Miller was completed?**

A Read the report and wrote up a part of the response to the report. And then John Fluke integrated it with his. And they -- as I said earlier, mine was just on -- on John Goad.

**Q So you had nothing to do with Dr. Hess or Dr. Miller?**

A No. I looked them over briefly, but I didn't really review them.

**Q When you say you looked them over briefly, so you read their reports and --**

A I -- I knew there were -- yeah. They were sent to me, and I looked them over; but I -- I wasn't responding to them. John did that.

**Q And then you spent those additional 28 and**



**a half hours, would it be correct to say, doing the same thing for Dr. Milner's report?**

A Correct.

**Q Who wrote the first draft of the June 9th report?**

A Pardon?

**Q Who wrote the first draft of the June 9th report?**

A I'm not sure I understand the question. I wrote part of it, and John wrote part of it.

**Q So every word of that first draft was written by either you or Dr. Fluke?**

A Yeah. Yes.

**Q What part of it did you write?**

A My parts had to do with validity, both instrumentation validity and internal and external validity. And I might have made some other comments, but I -- I -- we would have to be more specific before I could answer that. But that was the main -- the main thing I responded to.

**Q So the sections on instrument, internal and external validity?**

A Uh-huh.

**Q And that -- yes?**

A Yes.

Q I'm sorry. I just --

A Yes. There are different forms of validity, and I -- maybe we could use the term "instrumentation" to refer to types of validity contained in developing a case reading tool or any other kind of tool to --

Q Understood. So when you say "different types," are you referring to phase, construct, criteria and --

A That's -- that's -- those are the kinds of validity that have to do with developing instruments. And then internal and external validity have to do with the former, inferring cause and effect, and the latter, referring to generalize ability.

Q Understood. And we'll get into that in significant detail later on. But I'll refer to it as you suggested as "instrumentation."

A It would be a way to tell the difference.

Q Yes. I understood. So your primary role for both responding to Dr. Milner and Mr. Goad was discussing instrumentation and internal and external validity?

A Primarily.

Q What other comments did you make aside



from those topics?

A I was aware and -- of -- in Dr. Milner's report of the problem of cross-sectional sampling. So, though, I didn't write that part, it was clear to me that he had done cross-sectional sampling and shouldn't have.

I was also aware that in John Goad's report that he was sampling multiple kids within a case and drawing both -- both of those -- in both of those instances trying to generalize to the population as a whole. Right now I can't recall. If we get more specific, it might come to me.

Q Sure. And when you say you were aware of those things, did that awareness translate to any contribution to the reports themselves?

A Well, certainly I -- it did because I -- I wrote because of those kinds of problems that you couldn't basically draw conclusions about the population.

Q That would be an external validity issue?

A Yes.

Q And did you discuss those -- your concerns with anyone?

A John Fluke and I talked about them.

Q So you talked about those verbally?



A Yes.

Q Who provided comments on your reports?

A I think we went over the reports with David on the phone.

Q How many times?

A I'm remembering once each. I think when -- after we sent it, we got on the phone and sort of went through it, talked about it.

Q I understand that you don't consider yourself to be an expert on child welfare; right?

A No.

Q Do you have any basis for having an opinion on whether child welfare systems need to be assessed in accordance with specific objective measures based on your experiences in Texas?

A I would say yes.

Q So let me just make sure I'm clear. So would you agree that in assessing whether a professional judgment has been exercised in a child welfare system, it's important to assess that system in accordance with specific objective measures?

A Yes. That's what I do.

Q That's what you did at -- in Texas; right?

A That's what I did, that and -- yes, and other places, too.



Q And would you agree that those objective measures should include both process measures and outcome measures?

A Yes.

Q Why is that important?

A Outcome measures are important so you -- so you can tell whether or not, let's say, a decision was correct or not. Process measures are important because you can describe why that's important, how -- how things happen, how -- how decisions are made. So you can sort of know whether a decision is correct or not. And you can also know what the process is that's involved in the decision making.

Q Would you agree that if the process by which important decisions in child welfare are made is not done properly, that that could lead to poor outcomes?

A Yes.

Q What objective performance measures do you consider to be important in the field of child welfare?

A Probably recurrence of child maltreatment would be important. I would say that achieving permanency is important for children.

Page 34

**Q Timely achievement of permanency?**
A I'm not sure whether -- the states vary on what that standard is. CFSR has a standard for it.
**Q And I understand.**
MR. PAGE: Counsel, I believe you're interrupting the witness' answer.
MS. INGBER: I want to have a clarification, David; but thank you for your comment.
MR. PAGE: Well, what you're going to do is you're going to allow the witness to finish his answer. You've done it for about an hour now. And so --
MS. INGBER: It hasn't been anywhere close to an hour. It's only been about 35 minutes.
MR. PAGE: Okay. It seems like an hour sitting over here from my spot.
MS. INGBER: Uh-huh.
MR. PAGE: So for the last 35 minutes, you've been interrupting him; and I would appreciate you to allow Mr. Baumann to finish his answer before you ask the next question.
MS. INGBER: Thanks for your comments, David.
**Q (BY MS. INGBER) Would you agree -- I**

Page 35

**don't want to get into specific -- specific ways of measuring timeliness. I understand the states and the federal government and everyone has their opinion on how to measure timeliness. I just want to understand when you said that an important measure is achieving permanence, whether you would agree that however timeliness is defined, it's important to achieve permanence in a timely way?**
A Sure.
**Q Anything other than recurrence and achieving permanence in a timely way?**
A Yeah. But -- yes. There are other outcomes that are important depending upon what decision point you're talking about. You -- you could sometimes use re-referrals as a criterion. Depends on the question. Different questions have different outcomes, and different decision points have different outcomes.
An example would be re-referral would be important at intake. At investigation substantiation would be important. The decision to remove a child or not remove a child perhaps recurrence would be important. And in the foster care system, permanency's important, depending upon what kind of exit you're talking about.

Page 36

**Q I'm just going to go through a list of measures, some of which are process measures and some of which are outcome measures. And I just want to get your view, based on your experiences, about whether those are important measures when you're talking about measuring the performance of a child welfare system. Does that make sense?**
A Yes.
**Q Are caseloads an important measure?**
A There's debate about that. I would say relatively.
**Q Relatively, yes?**
A Relatively, yeah.
**Q What about maltreatment in care?**
A Yes.
**Q What about visitation between workers and children?**
A That one's unclear. There's not a lot of evidence that says it helps one way or the other. But you would suspect that if they didn't ever visit a child, that would not be good.
**Q So it is important to monitor how frequently workers are visiting children?**
A Yes.
**Q What about visits between children and**

Page 37

**their families?**
A That's debatable.
**Q When you say "debatable," are you basing that on whether there is cause and effect evidence in the literature to support the use of that measure?**
A Yes. And I think people disagree on whether visitation with the -- the parents when a child is in care and the parents' rights have been terminated is useful or not. I don't -- I don't know. I'm not -- like I said, I -- I'm a methodologies. I didn't know whether or not that's correct or not. I've -- I've just heard it debated.
**Q I'm not -- I'm not speaking specifically about visitation after TPR, after termination of parental rights. I'm speaking about visitation before that between children and their families.**
A Yes.
**Q That's an important measure?**
A A process measure, yeah.
**Q An important process measure; right. What about the timeliness of investigations and assessments? Is that an important process measure?**
A Yes.
**Q What about placement stability, however**

Page 38

**that's defined? Is that an important measure?**
A I'm -- it's not clear what you're asking. When you said "however that's defined," I think that's problematic. And I did write that part in one of these reports. Some placement moves are good and some are bad.
**Q Uh-huh.**
A And so it depends on how you define a placement move.
**Q Understood that it depends on your definition. And I -- and I understand the criticism in your report on that. But some moves are bad; right?**
A Yes.
**Q And some level of moving is bad for children regardless of whether every -- each independent move is okay?**
A I don't know if -- it's a compound question. I'm not sure I can answer it that way. As I said, some moves are good and some are bad. And if you're going to look at it from a scientific perspective, you have to divide the two so you can determine what is detrimental to a child.
**Q Okay. We'll get back to that later. What about the use of shelters? Is that an important**

Page 39

**measure?**
A Yes.
**Q What about length of stay? Again, I understand --**
A Yes.
**Q Yes; okay. What about caseworker turnover?**
A Yes.
**Q What about the level at which siblings are placed together?**
A Yes, but in all those cases, it depends. You can't always place siblings together because homes won't always take them together.
**Q Right. Of course. Would you say that a state can be exercising professional judgment if it doesn't set any objective performance measures for itself?**
A Say it again.
**Q Can a state be exercising professional judgment in the way that it operates its child welfare system if the state does not even set objective performance measures for itself?**
MR. PAGE: Object to the form.
THE WITNESS: I'm not sure I really understand the question. I'm not even sure I could

Page 40

answer it. You're sort of asking me about states' policies and procedures. I'm not an expert in that.
**Q (BY MS. INGBER) Well, that's actually not what I'm asking so thank you for telling me what the lack of clarity was. My question to you is: We've now talked about some objective performance measures, both process and outcome, that you agreed it was important to be monitoring; right?**
A Uh-huh.
**Q Yes?**
A Yes. And -- yes, but I'm answering from a research standpoint. That's what you'd want to know about in order to determine whether outcomes were better or worse for kids.
**Q And is it important for the state to know whether outcomes are better or worse for kids by monitoring those same measures?**
A Yes. As long as they do it properly.
**Q Right. They, of course, have to be careful in the way that they measure them; right?**
A Yes.
**Q But they should be measuring something, some performance measures.**
A Yes.
**Q Your report doesn't include any opinions**

Page 41

**about whether Oklahoma is exercising professional judgment in its obligations to the children in care; right?**
A No.
**Q Do you know how Oklahoma is performing on the objective measures we discussed previously or any others?**
A Only from what I read in the reports.
**Q Do you know whether Oklahoma has established a set of objective measures that it requires itself to meet?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know. I -- it -- are you asking whether they are being asked by the federal government to comply with the CFSR, or are you asking whether or not they have developed performance standards themselves?
**Q (BY MS. INGBER) The latter.**
A I don't know.
**Q So you just don't have any opinions on whether they're doing that adequately? You just don't even know if they're doing it?**
A No.
**Q Let's introduce Dr. Milner's report.**
MS. INGBER: Off the record for a second.

VIDEOGRAPHER: Off the record. Time is 9:17 a.m.

(Discussion off the record.)

Q (BY MS. INGBER) So this is a document that's previously been marked as Exhibit 776. We don't have the official copy, but I'm not going to remark it.

A Okay.

MR. PAGE: You're not going to mark the document that you're showing to the witness you're going to ask him to testify to?

MS. INGBER: That's right.

**Q (BY MS. INGBER) Can you take a look at that briefly and tell me if you have any doubts -- it has been marked. He's looking at marked Exhibit 776. It doesn't have a sticker on it because we have not been provided with the final versions of those, yet, by the court reporter. It is a marked exhibit, and it's marked as Exhibit 776.**

MR. PAGE: But for the record the documents in front of this witness has not been marked; is that correct?

MS. INGBER: That is right.

**Q (BY MS. INGBER) Is this Dr. Milner's report to the best of your recollection?**



A Looks like it.

**Q At any point you have any doubts about what that is, you just let me know. Would you agree that Dr. Milner's report makes it clear that he's reporting on what's documented in children's case files?**

A Yes.

**Q That's the basis of his report; right?**

A He's doing case reading, yes.

**Q Have you ever done a case reading or been responsible in part for a case reading?**

A Yes.

**Q When?**

A Different case readings took place while I was at DHS in Texas at different times. The latest one was probably a year ago. Maybe a little longer.

**Q Can you briefly describe that project?**

A The department was interested in reviewing cases for safety, child safety and risk and policy and procedures. They developed a case-reading tool much like probably Dr. Milner did and other states do. I did some analyses on that, looking for content validity and things and -- the sort. And predictive validity. And reported back to the department.



**Q Do you know whether that case review was based only on the case files?**

A The -- there are -- there are two kinds of case files in Texas. One is a written record and the other electronic.

**Q Uh-huh.**

A And to tell you the truth, when the readers were reading the cases, I don't know if they were accessing the written records that were not electronic or not.

**Q But at the very least they were not accessing anything outside of the electronic and possibly also the written records?**

A No.

**Q So it sounds like you've been involved in case reviews that are based solely on the case file or part of it? And not on any other information, for example, interviews or any other source of information?**

A As a --

MR. PAGE: Object to the form.

THE WITNESS: I was an analyst on it looking at the results of what they did. They possibly interviewed caseworkers, as well. They talked to some national experts, too. I think they



probably did it -- in the last one I did a combination of interviewing people and talking with experts and recording data from the case files, either electronic or written or both.

**Q (BY MS. INGBER) When you say interviewing the people, interviewing caseworkers?**

A Yes.

**Q Have you ever been involved in a case review that did not involve interviewing caseworkers?**

A I'm not sure. I'm trying to think back. The latest one was, like I said, about a year ago. Yes.

**Q Does -- are you aware of whether Oklahoma law and policy requires caseworkers to document what happens to a child in the child's records?**

A That's pretty broad. You mean to document what about a child?

**Q Well, why don't we look at Oklahoma's policies on this; and you can see what I'm talking about.**

**I'm going to mark as Exhibit 782 -- this is three documents altogether. Two sections from the Oklahoma child welfare statute or "Children and Juvenile Code." And then one section from DHS**

Page 46

policy on child welfare records.
And let's look first at the statute section which is 1-6-108, which is --
A Where would that be? This?
Q Uh-huh. Where it says, "Court and agency records required to be maintained pursuant to law regarding deprived children shall be maintained by the quarter agency until otherwise provided by law." Do you see that?
A Uh-huh.
Q Okay. The next section is the definitions section. That's 1-6-101. Do you see that?
A This here?
Q That's right. That's the one you're looking at. And if you'll look at Section 3 of the definitions there, it defines what an agency record is. "Means records prepared, obtained, or maintained by a public or private agency with regard to a child who is or has been under its care, custody or supervision or to a family member or other person living in the home of such child and shall include, but not be limited to," and then it goes on to give some detail?
A I see.
Q You see that.

Page 47

A Uh-huh.
Q So it's giving a description of what Oklahoma law requires.
MR. PAGE: Object to the form.
Q (BY MS. INGBER) Would you agree? That this is the --
MR. PAGE: Object to the form.
Q (BY MS. INGBER) You can still answer the question. Would you agree that this statute applies to the question of: What is required to be in a child's record according to Oklahoma statute?
MR. PAGE: Same objection.
MS. INGBER: Can you, please, let me finish my question before you make your objection instead of interrupting me. That would be really appreciated. You can answer.
MR. PAGE: Dr. Baumann, just make sure you take some time so I can continue to object to these improper questions; okay? So I object to the form, this whole line of questioning concerning Oklahoma law.
THE WITNESS: I don't -- I really don't know anything about Oklahoma law.
Q (BY MS. INGBER) But you can read it here, and you can see what it says; right?

Page 48

A Well, there's probably lots of laws in Oklahoma. Are you saying -- I mean, I don't know.
Q Well, do you agree that this reads that what shall be included in the record for children who are in custody "shall include, but not be limited to" -- I'm just asking you whether this is what the text says -- "any study, plan, recommendation, assessment, or report made or authorized to be made by such agency for the purpose of determining or describing the history, diagnosis, custody, condition, care or treatment of such child or safety analysis records that have been prepared and obtained in response to a report of alleged child abuse or neglect and include assessment reports and reports to the district attorney with all supporting documentation attached and any addendums." Did I read that correctly?
MR. PAGE: Object to the form.
THE WITNESS: Yes, you read it correctly. If that's what the law says, that's what it says.
Q (BY MS. INGBER) Okay. And we'll look next at the policy section, 340:75-1.
A Is that in here?
Q That's right. Yeah. Policy on child welfare records. And if you look at the

Page 49

"instructions to staff." That's the bold part at the bottom half of the page.
A Uh-huh.
Q And 1(b) gives a description of what the purpose of a child welfare case record is and it describes what it "serves as."
MR. PAGE: Object to the form.
Q (BY MS. INGBER) Do you see that? And you can feel free to read as much of this section as you want.
A Well, I'm not expert in law, nor am I an expert in policy. So I'm not really clear on what you're asking me to answer to. If you're just asking: Is this the policy of the State of Oklahoma and if that's -- if this is the policy? Then it is.
Q I asked you originally whether Oklahoma law and policy -- whether you knew whether Oklahoma law and policy requires caseworkers to fully and accurately document what happens to the children in their custody in the child's records. And you said that that was too broad. And I wanted to give you some context for what is actually in Oklahoma law and policy.
A Okay.
Q And I'll ask you the same question now.

**Q Do you know whether Oklahoma law and policy requires caseworkers to fully and accurately document what happens to a child in that child's records?**
MR. PAGE: Object to the form.
THE WITNESS: It -- again, the question's really broad. If it's specific to what it says here that needs to be in the case record, then yes.
**Q (BY MS. INGBER) Do you know whether professional standards require the documentation of important events and -- well, let me phrase it another way. Do you know whether professional practice requires caseworkers to document what happens to a child in the child's records?**
MR. PAGE: Object to the form.
THE WITNESS: I don't understand what you mean by "professional standards."
Q (BY MS. INGBER) You don't know what a professional standard is?
A I know there are CWLA standards and those -- those kind of things. That -- is that what you're referring to?
**Q I don't want to speak specifically to any one agency, CWLA, COA or anyone else. Whether child welfare standards best -- well, not even best practice -- reasonable practice requires**



**documentation of what happens to the child in the child's file.**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) You may not know. You may not be an expert, and you're welcome to say that?**
A I'm -- I'm not. I know of -- that standards exist. I know that there's no evidence for them.
**Q When you say, "There's no evidence for them," you're saying that -- would it be your assumption that doesn't matter at all whether they document anything in the case file? Is that what you're trying to say?**
A No. I'm saying that people create standards and that, to my knowledge, there's not been any studies to suggest that the standards are good or bad.
**Q Do you think it would be ethical to do a study where you had a control group of children who had things written in their case files and another group of children who didn't have things accurately written in their case file and figured out what happened to those two groups? Would that be ethical?**



A You're -- you're asking me to speculate about what?
**Q Is that ethical? Would that be ethical to do?**
A To?
**Q To do that kind of controlled study that you're referring to to decide whether there's evidence for whether it's important to have information in children's official child welfare files?**
A I wouldn't do the study that way.
**Q Okay. Well, how would you do that study?**
A I would probably record what was in the degree to which there's information in the case files and correlate that with some outcome. I wouldn't do it where you had nothing in a case file as opposed to something. That would be kind of a blunt kind of instrument to be using. Research terms.
**Q And so you would record what was in the child's case file. How would you know what was missing from the child's case file?**
A I assume you would look at things like this and see what was supposed to be there.
**Q How would you measure what's happening to**



**a child if you don't rely on what's written in their record?**
A Well, an example would be there are a number of things that aren't in their record that would be recorded electronically in a -- in a data system. Recurrence would be one.
**Q Isn't that part of their electronic record?**
A It's an electronic record -- if you mean by "electronic" --
**Q Yeah.**
A When you say "case file," you're -- I'm assuming you mean electronic and written both?
**Q Yes. Yes.**
A So state -- state your question again.
**Q So how would you propose measuring what is happening to a child without relying exclusively on what's in their record, either electronic or paper?**
A You could survey the parents, interview them. I've done that.
**Q Would that be reliable?**
A Depends on whether two people agreed or not on the answers.
**Q There would be some problems with that methodology, wouldn't there?**

A There's problems with all methodologies.
Q There are problems with all methodologies; right?
A Sure.
Q Every methodology has its strengths and weaknesses; right?
A Yes. Some are better than others.
Q Understood. I want to draw you to page 3 of your June 15th report, and I'm going to be speaking now only about your June 15th report.
A Let me get to it.
Q At least for a little while.
A Page 3.
Q Yes.
A And this is the Milner one?
Q Yes. And in this report there is a statement sort of in the middle of that full paragraph that reads, "To draw valid scientifically sound conclusions regarding the experiences, i.e., the experiences of children in care, a longitudinal study of incidents is minimally required." That's an opinion that you would agree with; right?
A I agree with, yeah.
Q What do you mean by "longitudinal study of incidents"?



A Typically it means entry cohorts where you're looking at event histories over time.
Q In your opinion -- is it your opinion, then, that it is impossible to draw any valid scientifically sound conclusions about the experiences of children in foster care without an entry cohort analysis?
A Yes.
Q That's your opinion? That's impossible?
A Yes.
Q Do all child welfare researchers use entry cohorts to do their research?
A We're trying to get them to do it.
Q But they don't all do it?
A No. Some are bad at it.
Q Some are bad at what?
A Research.
Q So you think that every researcher who has ever done a nonentry cohort analysis of -- in child welfare is bad at research?
A I think they've drawn improper conclusions.
Q So you -- you -- you believe that?
A I -- I don't believe it. It's true.
Q It's your opinion that it's true?



A No. It's true.
Q Okay.
A It's demonstrably true.
Q Do other professionals disagree with that conclusion?
A Not really, no.
Q You don't --
A Not that I know of.
Q You don't know of a single person who's an expert in research methodology who would disagree with your conclusion that every single nonentry cohort study in child welfare is untrue and invalid?
A Personally, no.
Q Are you aware that that strain of thought is out there in the world, whether or not you personally know it?
A Sure. I think people continue to do cross-sectional studies of children in foster care and overrepresent bad things that happen to kids, yeah. They do it. Do they know that they're -- some know, probably. Do it anyway. Some probably don't know.
Q But some are aware of those potential flaws, and they do it anyways?
A Perhaps, yeah.



Q And why do you think that is? Why do people continue to do that type of research?
A It's easier --
MR. PAGE: Object to the form.
THE WITNESS: I don't know.
Q (BY MS. INGBER) You don't have any idea?
A It would be speculative. Could be a lot of -- lot of reasons. Could be more convenient than taking the long way. It could be that they don't care. Could be a lot of reasons. I don't know. I don't know their motives.
Q Don't all entry cohort studies suffer from threats to internal validity?
A Say that again.
Q Don't all nonexperimental longitudinal studies suffer from threats to internal validity?
A Less so than cross-sectional.
Q That wasn't my question. My question is whether nonexperimental longitudinal studies suffer from threats to internal validity.
MR. PAGE: Object to the form.
THE WITNESS: Yes.
Q (BY MS. INGBER) I understand that you have a very strong preference against point-in-time studies. But you would agree, would you not, that

**there are other experts in the field who don't share that opinion?**
A I don't know.
**Q You testified earlier that you're aware that people continue to do it.**
A Yes. I -- yes.
**Q If DHS is not using longitudinal studies of incidents to evaluate its own child welfare system, is it your position that they can't draw any valued conclusions about the experiences of children in care?**
A I don't think they can, no.
**Q Is every single piece of research that you've done throughout your career an entry cohort analysis?**
A No. When I've done studies of investigations, I've done it cross-sectionally; but almost all -- since I became aware of longitudinal studies, which is a number of years ago, that's pretty much what I've done. I was trying to remember if I'd done one in foster care lately that way. I do not. No, I've done longitudinal stuff.
**Q I understand that you have a number of criticisms of Dr. Milner's methodology including this cross-sectional point that we've been**



**discussing. Is it your opinion that his findings aren't descriptive of the experience of the group of children who were in care for 60 days or more on March 1st, 2010? Of that specific group that he drew a sample from.**
A I'm -- I'm not sure of the question again. Say it again.
**Q Are you saying that his findings are not descriptive of the experiences of the group of children who were in care for 60 days or more on March, 2010?**
A That's a -- I don't understand the term "descriptive." The -- the problem I have with the cross-sectional nature of the study is that you can't make inferences to the population of kids in care. When you say they're "not descriptive" -- you can describe things by variability, means and so forth and so on; but you can be wrong.
**Q That's not my question. Would you agree that Dr. Milner's study is a descriptive one?**
MR. PAGE: Object to the form.
THE WITNESS: No, I don't think it is because he's making inferences.
**Q (BY MS. INGBER) There's a difference between making inferences and trying to prove cause**



**and effect; right?**
A An inference about cause and effect is what he's trying to do.
**Q But he was doing that using literature; correct? There was no analysis that he did in an effort to prove cause and effect; right?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) And I'll set aside that he did a few chi-square analyses in a very limited way in his report. Setting aside those few analyses that he did, is there any part of his instrument or his analysis that was an attempt to prove cause and effect?**
MR. PAGE: Object to the form.
THE WITNESS: I think yes.
**Q (BY MS. INGBER) What's the basis of that?**
A Well, he's inferring from his sample to the population of kids.
**Q About cause and effect?**
A Can we be specific here? The number of moves that children have are considered bad; right? In his report. That seems to me to be an inference. In other words, I don't regard his report as simply being descriptive. I think he's analyzing case



records in order to infer that either things are bad or good, depending upon what he's looking at.
**Q Does Dr. Milner use any inferential statistics to prove cause and effect in his report?**
A You don't have to do inferential statistics --
**Q That's not my question. My question is: Does he use inferential statistics in his report?**
A He does non-parametric tests of chi-squares.
**Q Setting aside the nonparametric tests of chi-squares which are done in a few instances, are there any -- is there any other use of inferential statistics --**
A No.
**Q Let me finish my question, please. In order to prove cause and effect.**
MR. PAGE: I would suggest that the witness would allow you to finish your questions as long as you allow him to finish his answers.
MS. INGBER: I would ask you to limit your statements to object to the form. Thank you.
**Q (BY MS. INGBER) Let me go back to my question. Setting aside the nonparametric tests of chi-square which are done in a few instances, was**

**there any other use of inferential statistics in Dr. Milner's report?**

A No.

**Q Are inferential statistics what's used to attempt to prove a cause-and-effect relationship?**

A No.

**Q So what's used?**

A It's used -- sometimes people make inferences without any statistics at all.

**Q But that's not part of their statistical analysis. That's simply an inference based on literature. That's what Dr. Milner did.**

A Well, we have --

MR. PAGE: Object to the form.

THE WITNESS: I'm -- I'm really -- I think what you're trying to say is that you're wondering whether or not you can make inferences about cause and effect without the use of inferential statistics. And my answer is, yes, you can. It doesn't mean you're right in doing it, but you can do it.

**Q (BY MS. INGBER) Would you agree that the child welfare literature has established that certain events cause harm to kids?**

MR. PAGE: Object to the form.



THE WITNESS: I don't -- certain events?

**Q (BY MS. INGBER) So, for example, let's look at Dr. Milner's report. And let's look specifically at the section on, since you raised it, "placement stability."**

**A Where do we want to go?**

**Q That would be on -- starting on page 37.**

A Okay.

**Q And I'll just read the first line of this. "We reviewed eight studies of the effects of placement moves and placement disruptions on children in foster care. The majority of the studies fond that frequent placement changes result in negative consequences for children." I want to stop there.**

A Okay.

**Q So Dr. Milner here, would you agree, is referring to studies done by other researchers that are about the question of the effect of placement moves on children?**

MR. PAGE: Object to the form.

THE WITNESS: Uh-huh.

**Q (BY MS. INGBER) Is that right?**

A He's referring to eight studies where they found placement moves to have negative effects on



kids.

**Q Right. He did not himself do that research; right?**

A Right.

**Q And I understand you to say that he's inferring from his findings about the number of placement moves and the existence of this literature, that there might be some bad consequences to the kids in DHS custody from the number of placement moves; right?**

A Yes. And it depends on the kind of move.

**Q I understand. And we'll get to that point later. I'm not asking you to agree with what he did. I just want to make sure that we're understanding what he did in the same way.**

A Yeah.

**Q He did not himself try to prove that these placements moves cause those negative effects to kids?**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) He's simply inferring from the research that might happen.**

MR. PAGE: Object to the form.

THE WITNESS: I think he's inferring from the literature and from his data that placement



moves are bad.

**Q (BY MS. INGBER) Right. I agree that that's what he's doing. His data describes the number of placement moves.**

A It does.

**Q So in that sense his study is descriptive?**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) I understand his report has some inferences based on his description. I completely agree with you there. I just want to make sure that we're understanding the same thing. His analysis was descriptive, and then his report has inferences based on those descriptions.**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Do you disagree with that?**

A It's kind of a compound question.

**Q Do you want me to rephrase it? Do you not understand it?**

A Let's -- and I'm just looking at "placement stability" for a second. On page 5.

**Q Yes.**

A First bullet, bottom page.

**Q Yeah.**

A Only 30 percent of the 374 children in the

sample had been in a single stable placement. I read that as being bad.
**Q You understand he's -- his language suggests that that might be bad.**
A Yeah.
**Q I completely agree with you.**
A Okay.
**Q But what he's really doing here. Let's take away the "only." What he's doing is he's describing the percentage of children that had a single stable placement.**
MR. PAGE: Object to the form.
THE WITNESS: No, he's not. No, he's not. He's saying "only 30 percent," meaning that's bad.
**Q (BY MS. INGBER) I want you to ignore the word "only."**
**A I don't want to.**
**Q Okay. I just want to get an acknowledgment from you that -- I understand there's language in here that you don't agree with. I understand you don't agree with his methodology. What his instrument did was draw -- was draw data out of the case files and then they describe that data. That's fundamentally what he did; right?**
MR. PAGE: Object to the form.



THE WITNESS: I think he did that and made inferences from his -- if you want to call it "descriptive study," fine. But it still has inferences.
**Q (BY MS. INGBER) That's exactly where I wanted to get to. I would agree with you that he made inferences from his descriptive study.**
A Okay.
**Q But that's what it was. It was a descriptive study with inferences? Not a study that was intended to prove cause and effect.**
MR. PAGE: Object to the form.
THE WITNESS: I think once you start making inferences, you are talking about cause and effect.
**Q (BY MS. INGBER) You're inferring cause and effect. You're not trying to prove it. You're suggesting -- may be is another way to put it -- cause and effect.**
MR. PAGE: Object to the form.
THE WITNESS: I think an inference is an -- an attempt to prove cause and effect. It's -- it's an inference about cause and effect. And I think you're -- what you're saying is that if you statistically want to make an inference, you're not



necessarily proving it. You're stating something within some acceptable standard about proof. Like a significance level or an effect size, something like that. I think people draw inferences without that.
**Q (BY MS. INGBER) Understood. Let me ask it this way. When he has tables that set out "X number of kids had this many placement moves, X number of kids had substantiated incidents of maltreatment."**
**A Those are descriptive tables.**
**Q Those are descriptive tables; right?**
A Yes, uh-huh.
**Q There's a lot of other language and discussion of literature that surrounds that.**
A Uh-huh.
**Q We can -- we can agree on that 100 percent. But those tables and those statements of fact based on what he found from the case files, those are descriptive?**
MR. PAGE: Object to the form.
THE WITNESS: They are descriptive, but to call them "facts" probably isn't accurate because of the nature of the sample he took.
**Q (BY MS. INGBER) Okay. I understand your -- he believes that they're facts. They're**



**facts that he found in the files, but you're going to disagree that they're representative. Okay.**
A Yeah, I do disagree that they're representative.
**Q I understand, and I'm not going to try to talk you out of that. I don't know that I could. We talked about entry cohorts; correct? Earlier?**
A Uh-huh.
**Q Yes?**
A (Nodding head.)
Q What children did the entry cohort include?
A Say it again.
**Q What children are included in an entry cohort for a specific time period?**
A Children that enter in a particular year. So you'll start at a given point in time and follow them.
**Q What children are excluded from that entry cohort?**
A They're kids who are in care at that point in time; but usually you try and capture those, as well. So you can do an entry cohort, say, kids in 2009 and we're going to track them to now. And you can pick up kids that also are in care as of that

date in 2009, too.
**Q You're now talking about a combination of a point-in-time and entry cohort analysis?**
A Now, you're tracking -- you're actually doing entry cohorts and cohorts of kids who are already in care and following them along, as well. So they're both longitudinal. It's just you're trying to track both the kids that enter anew and the kids that are already in care.
**Q I want to speak only about entry cohort analysis.**
A Okay.
**Q What children are excluded from an entry cohort analysis?**
A As I said, the kids who are already in care.
**Q So any child who did not enter in that year?**
A Yes. They'll be in there. They just -- their history prior to that, unless you pick that up, won't be there.
**Q Why would you pick that up? My understanding is that entry cohort includes all children who enter care in a specific period of time.**



A Yes.
**Q And that entry cohort's going to exclude any child who did not enter care in that period of time.**
A Typically if that's all you're doing, yes.
**Q So it's not going to represent every child who's in foster care. It's going to represent those children who are in foster care who entered in that period of time that you selected; right?**
A Uh-huh, uh-huh, uh-huh, yes.
**Q How would you design a longitudinal case-review study that would address the concerns identified in this case and that would meet the time frames of the court, which allowed for a year from when discovery opened, which is when reports could begin to be done, and when the report was due in March, 2011, and, three, capture the experience of long stayers?**
MR. PAGE: Object to the form.
THE WITNESS: Take them a piece at a time. So start with the first one.
**Q (BY MS. INGBER) So number one. I want -- I want a study that will do three things. Will address the concerns identified in this case, which had to do with the sufficiency of the way DHS**



**was providing services to children in its care, number one. Number two, you get a year to do the whole thing from the day you start to ask for the case files to the day your report is due. You have a year and a month. Three, would capture the experience of long stayers, as well.**
A The last part.
**Q Capture the experience of children who had been in care for a relatively long period of time.**
A I would start with an earlier cohort and follow them to the present. So I would do an earlier date-in-time sequence than was done. So you might start in 2009 and follow forward. Or 2008. I'm unsure what the dates are here, but I would start a couple years earlier and follow those.
**Q Uh-huh.**
A And I'd also pick up the kids who are in care, as well, and follow those.
**Q So you would do two different groups?**
A Well, they would be all part of one group that you would follow. So you're going to get the entry cohorts. Let's -- let's just say 2008. We're going to run till 2010.
**Q Uh-huh.**
A That would be the entry cohort. And then



I would pick up the long-term kids as well and follow those.
**Q Let's talk about your 2008 entry cohort. That entry cohort is going to -- let's say you have picked them up 2008, January 1st, 2008, you have basically until December, 2010 to finish reviewing those case files.**
A Uh-huh.
**Q So at very most you're going to capture two years that those children -- of those children's experiences; is that right?**
A Uh-huh. Yes. And it depends on the analysis you do in the end, as well. I wouldn't simply case read it. I would read the cases for process measures, but I'd also look at the -- the outcomes of the kids, too, using survival analysis. Because what that lets you do is estimate what would have happened to the kids who haven't left care.
**Q What if the distribution is skewed so that your survival analysis is not picking up the experiences of the extreme kids?**
A Skewed in what way?
**Q So that, for example, while the median child may exit in one year, the last child isn't going to exit for ten years.**

Page 74

A There's a debate right -- currently in the literature about proportional hazards, is what you're talking about, I think. And it depends on what you choose as a denominator when you do it. If you're just going to look at reunification, for example, you can treat all the other kids as censored, if you will.
So you've got kids who exit to reunification and kids who haven't exited yet. What complicates it is if you start looking at multiple exits, reunification, kinship care, adoption and so forth. And probably your tenure example might be adoption cases. And there's a debate in the literature on how to go about doing that.
**Q So there's methodological issues with that type of survival analysis that you're talking about and a debate about the best way to do it?**
A That's not quite right. There's no debate about the value of doing survival analysis. That's the proper way to go about looking at exits from care. There's a debate about how you treat the censored observations, depending upon look -- whether you're looking at multiple exits or not. Does that make sense?
**Q So it's not a --**

Page 75

A So in other words there's not -- there's no debate about the value of survival analysis, per se. There's some debate about how you treat multiple exits. How you do that analysis.
**Q So reasonable experts will disagree about the methodology of doing that?**
MR. PAGE: Object to the form.
THE WITNESS: That's -- no, they wouldn't disagree about using survival analysis. They would perhaps disagree upon -- about how you treat multiple exits.
**Q (BY MS. INGBER) Right. They would disagree about how you would go about doing your survival analysis, the best way to do it.**
MR. PAGE: Object to the form.
THE WITNESS: No. They wouldn't disagree about using survival analysis.
**Q (BY MS. INGBER) That's not what I said. I said I understand they won't disagree about doing survival analysis, but they would disagree about the methodology you should use when you're doing that survival analysis.**
A Depending upon what you're doing.
**Q Right. Do you know whether the federal government allows survival analysis to be done as**

Page 76

**part of the federal CFSR?**
A That's debatable right now.
**Q It's being debated; but as of right now, they don't allow that to be done?**
A Well, they're -- we're hoping that will get changed.
**Q But as of right now, that hasn't been?**
A No, they didn't. And most researchers in the country objected to the methodology they're using.
**Q Most, but not all.**
A I don't know anybody that didn't.
**Q You don't personally know anybody?**
A No, I don't. All the researchers I know strongly argued against their current methodology. They did it out of convenience, is what I understand. The one they've got. Which is cross-sectional.
**Q They just used a mixture of cross-sectional, longitudinal in the federal measures; right?**
A I'm not an expert in the CFSR. Well, if you think of time in care, the way they do time in care, it's cross-sectional.
**Q You don't really know.**

Page 77

A I'm thinking through their measures. Some are an attempt to get at longitudinal measures, yeah.
**Q So they use a mixture? Yes?**
A Yes, uh-huh. There's sort of a middle ground there.
**Q I didn't ask a question.**
A Okay.
MR. PAGE: He's finishing his question -- response to your last answer.
MS. INGBER: I asked him a yes or no question. He finished it when he said yes.
**Q (BY MS. INGBER) Is a point-in-time methodology able to answer questions about the experiences of children who are in foster care on a given day?**
MR. PAGE: Object to the form.
THE WITNESS: No.
**Q (BY MS. INGBER) You don't think that it can give any -- any answers to any questions about a population of children who are in foster care on a specific day. If I want to know -- let me strike that.**
**If I want to know for all kids who are in care today and I have a question about them, you're**

**saying a point-in-time analysis can give me no insight into that whatsoever?**

A Can give you demographics. Fixed characteristics can be assessed with a point-in-time study because they don't change with history. Event analyses you can't answer anything with a cross-sectional study.

**Q Why is that?**

A It's because events affect people over time. Kids, too.

**Q So you're saying that every single point-in-time research study ever done in child welfare is unable to give any information whatsoever?**

A Didn't say that.

**Q So explain what you're saying because I just asked you if it can give you any information about those kids, and you said no.**

A It can. It can. No, I said it can give you demographic data, fixed characteristics. So if I wanted to know how many females are in care as opposed to males are in care, I can assess that cross-sectionally. Because that -- your events that happen to you don't affect your gender.

**Q Let me ask it this way. Setting aside**



**those demographic characteristics, is every single research study that's been done in child welfare that was point-in-time unable to give any information about non-demographic characteristics?**

A Yes, they can't give information cross-sectionally on event histories. So in other words if -- the assumption is that time in care has -- has -- things happen to children as they move through care in time. Most people think that those things are bad. Often bad.

If you cross-sectionally sample kids in care, what you're doing is overrepresenting the kids who have longer stays in care by definition; and as a result, all the outcomes and events associated with that child are overrepresented.

**Q So you reject all of that research that's been done?**

A Yes.

**Q Was some of it done by established and well-respected child welfare researchers?**

A I don't know.

**Q Has some of it influenced the field?**

A I don't know.

**Q But you reject it all?**

A I reject it because it's wrong.



**Q It's wrong in your opinion, and you reject it. I understand.**

**I just want to look briefly at Dr. Milner's findings on "visits by caseworkers." Which I believe is on page 71.**

A Just a second.

**Q Sure. Do you believe that a caseworker is more likely to miss a visit with a child who's been in care for longer? Is that something that's correlated with length of stay?**

A Let me see if I understand what you're saying. Are you saying that the longer the child's in care, the more likely they are to miss a visit?

**Q Yes. The more likely a caseworker is to visit -- is to not visit a kid who has been in care for two years or a kid who has been in care for one year.**

MR. PAGE: Object to the form.

THE WITNESS: Well, you'll have more visits with a child the longer they are in care.

**Q (BY MS. INGBER) Right.**

A If you're thinking about the likelihood of missing a visit increases with more time in care, probably.

**Q On a cumulative --**



A Probably.

**Q A cumulative sense I understand it.**

A Probably. I mean, that's what I'd predict.

**Q Right. But for any given visit. So setting aside the cumulative effect that over time there's more likely to be one missed visit. But for any given visit, do you think that's correlated with length of stay, the likelihood of it being missed?**

A I don't understand the question, I guess.

**Q Okay. Well, Dr. Milner here said -- is looking at the reasons children were not seen and the number of children not seen.**

A So we're looking at table 28?

**Q Yeah. And that's for a specific time period, a single-year time period.**

A Okay.

**Q Do you think that result is affected by your -- the oversampling of long stayers? In a set one-year time period, this is the reasons given where children are not seen.**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) And I'll also point to his conclusion that in 31 percent of the cases, the child's caseworker did not visit the child at least**

Page 82

once monthly while the child was in custody during the prior 12 months.
MR. PAGE: Object to the form.
THE WITNESS: Yeah. There's -- there's a couple of questions in that. First, I'm not sure what you want to know about the table; and, secondly, what you want to know about 31 percent of the cases. If you could break them into two questions.
Q (BY MS. INGBER) Sure. I'm happy to do that. Let's focus on the -- the bolding --
A The bullets?
Q Yes.
A The N31?
Q The N31. I understand that you have a problem with drawing conclusions. And I'll actually quote you. You state that, "Point-in-time methodology is problematic with respect to all findings that have to do with length of time in care.
A Uh-huh.
Q And I'm trying to understand whether you think that this finding that in 31 percent of the cases in the last 12 months, the child's caseworker or supervisor did not visit the child at least

Page 83

monthly, whether that has to do with length of time in care.
A It does.
Q In what way?
A The percent's going to be higher because the kids are -- have longer time in care. So that likelihood of missing a visit's higher.
Q The likelihood of them missing a visit during 12-month -- a specific 12-month period is higher?
A Sure. Sure.
Q Why is that? Why would it -- why would it be higher, the likelihood of missing a visit in a specific 12-month period for cases in care four years versus a case in care one month?
A Oh, I see what you're -- I see what you're saying. I see what you're saying. So if I get this right -- give me a minute to think about it. So I'm thinking about -- so if we had two kind of kids. If I'm getting your question right.
Q Uh-huh.
A So we had a kid that's entered and started at day one and we look out a year in 12 months and you've got a kid that's been in care longer; right?
Q Uh-huh.

Page 84

A And look out 12 months.
Q You would have to basically hypothesize that the kid who has been in care longer, there's more likelihood to miss a visit.
A I got your question.
Q And I'm asking whether you think that that's --
A I don't know. I really don't.
Q You don't know. There's not -- right. So this particular thing is affected in a different way, this result, than something, for example, like his actual finding on lengths of stay, which is very directly affected by what you view as the oversampling of length -- of -- of long -- let me finish my question before you --
MR. PAGE: You cut improper off, Miriam.
Q (BY MS. INGBER) Of long --
MR. PAGE: What's good for the goose is good for the gander.
MS. INGBER: I did not cut him off.
MR. PAGE: You cut him off.
Q (BY MS. INGBER) Let me say this. If you ever think that I've cut you off and you have more to add, please, feel free to just let me know and I'm happy to let you finish.

Page 85

MR. PAGE: Yeah, I think you should do that, Dr. Baumann.
Q (BY MS. INGBER) Please, feel free, Dr. Baumann, to do that. I want to go back to my question. You would agree that it's your opinion that his findings on lengths of stay are directly affected by the fact that you view long stayers as being overrepresented; right?
A Yes. I think most of the -- most the data that I was looking at are affected by kids who are in care longer, that the outcomes or consequences of that are greater. This is not necessarily an outcome you're talking about here. You're talking about a process measure; right? This is a process measure. I would -- I would submit that some process measures are probably affected and some not. Certainly the outcome measures are affected.
Q But you never made that distinction in your report and you never explained that, in fact, some of these process measures are possibly less affected by the oversampling of long stayers?
A I just don't know.
Q But you don't have any reason to think that they are?
A I would think if -- it depends on how you

think of what's a process and what's an outcome. Stability of placements is an example of one that could be either. I mean, the idea being that less stable placements result in thing X. Like less likelihood -- let's say child well-being is affected by more placement moves; okay. In that sense that's a process measure. And that's affected by time in care.

Some people think of placement stability as an outcome in and of itself. So that more -- but in either case, whether it's a process measure or an outcome measure, it's affected by time in care. Right?

**Q I don't think that really answered my question. My question was: However you define process and outcome -- and I understand that there can be some debate about that -- there are certain measures and certain findings in Dr. Milner's report that have less, possibly no -- that are -- I'm sorry that --**

A I would say yeah, that some of the process measure --

**Q Can I just finish my question just so it's clear?**

A Sure. Sure thing.



**Q That there are -- some of his findings are less or possibly not at all affected by the oversampling of long stayers.**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Is that correct?**

A Well, there's two parts to it. I would say less. I don't know about none.

**Q Okay. You don't draw that distinction in your report anywhere?**

A No.

**Q Why not?**

A I don't know.

**Q Would it have been more transparent to say that some his findings -- that there's, in fact, a different effect because of the criticism that you raised than on other findings?**

A I don't know. We'd have -- we'd have to do the analyses and see, wouldn't we?

**Q But you didn't do those analyses?**

A I don't think you can tell from this which are affected and which are not unless you did a model that included process measures and outcome measures to determine which are affected and which are not. It seems to me you could do the study where you did -- took a cross-sectional sample and



you did a -- entry cohorts and test the difference between the two.

**Q You didn't do that?**

A No. Wasn't asked to.

**Q In your table 1 on page 13 -- that's the entry cohort lengths-of-stay analysis that you and Dr. Fluke conducted.**

A Well, actually Dr. Fluke did; but go ahead.

**Q Do you know anything about how he did that?**

A No. I know what he did, but not directly in great detail.

**Q Have you -- you've done --**

A Where -- what page are you on?

**Q I'm sorry. It's table 1, which is actually on page 14. I apologize.**

A No. All I -- all I really saw was this, the tables.

**Q You've done entry cohort analysis before; right?**

A Yes.

**Q Do you usually separate out and separately report on the children who have not reached the end point yet?**



A Say it again.

**Q So, for example, if I'm doing a length-of-stay entry cohort analysis --**

A Uh-huh.

**Q -- and only two years have passed, some those kids are still in care. Is it generally that you would separate out this is the length of stay for all the kids who have exited and these are the number of children who are still in care?**

MR. PAGE: Object to the form.

THE WITNESS: I'm not sure if I understand the question, but if he's doing a median length of stay using survival analysis, you typically wouldn't separate them.

**Q (BY MS. INGBER) You wouldn't separate them?**

A No. What I'd do is look at median -- median stay. In other words, your survival analysis gives you a table; and in the table it will show you month by month time in care. And you -- if you look at the middle one, that's the median.

**Q I understand what the median is. But you're saying that it's not standard practice in entry cohort analysis to report on children who have not yet reached the end point?**

A Say it again.
**Q You're saying that, in your view, it's not standard practice when doing entry cohort analysis to report on the children who have not yet reached the end point?**
A Typically you -- your survival analysis takes that into account. I mean, in other words, I -- and I'm not sure of the question. When you -- when you do a survival analysis, you're using all the kids; and some of the kids will have exited and some will have not.
In other words, it's giving you a median length of stay based on the kids who have exited and it does -- basically makes it an inference, statistical inferences about the kids who haven't left yet. So your median is an estimate. It's a statistical estimate.
**Q So it's not an actual median. It's some kind of statistical estimate.**
A It's a -- yeah, it is.
**Q Is it taking into account the possibility that the distribution is skewed?**
A Typically they are, yeah.
**Q Does that analysis take --**
A Well, it's a nonparametric test so it's --



it's -- it does take into account that. That's -- the distribution for these kinds of things -- that's why I use nonparametric tests because they're not normal distributions.
**Q Do you know whether this analysis was based on DHS's SACWIS data?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know.
**Q (BY MS. INGBER) Dr. Fluke would know that?**
A Yeah.
**Q What would you do if you were a researcher and you were trying to do a lengths-of-stay analysis based on SACWIS data and you learned that two-thirds of the time the date of entry was different in case files from what's in the SACWIS data?**
A So I'm going to -- I'm -- I'm pulling SACWIS data, and two-thirds of the time --
**Q And someone goes and looks at the case files and says, "Whoa. Two-thirds of the time the entry date that's in the SACWIS data is in conflict with -- in the actual case files on the documents there, all of the documents there.**
A Would be a lot of calling of caseworkers to find out what the real date was I guess.



**Q So that would be a problem?**
MR. PAGE: Object to the form.
THE WITNESS: It would be -- it would be a problem you would have to figure out a way to resolve.
**Q (BY MS. INGBER) What would you generally consider to be more reliable, a date entered into the SACWIS system or something that's documented, for example, on a court report or a placement history in a case file?**
A I don't know.
MR. PAGE: Object to the form.
THE WITNESS: I don't know. The most reliable data I know in -- in states systems are financial data. And so when kids enter care -- I guess what I would do is look at the financial records. Because when kids enter care, somebody's getting paid; and they pretty much would object to not being paid from the time the kid went to the foster home or went to the congregate care facility.
And so that's how I would do it. And I would say that that's probably your best measure, probably better than what's in the electronic record and probably better than what's in the case file because payment data are pretty good.



**Q (BY MS. INGBER) Do you know whether kinship parents are always paid immediately upon taking a child?**
A No. They are paid later, but -- but they certainly know when they took the child.
**Q Right. But that's not based on financial data. That's based on other data; right?**
A Well, if -- if you're in a facility and you take a child, you know the date they entered the facility because you record it because you want to be paid for it whether it's a foster home or otherwise. And so if the state were to pay you less than that due, you'd probably complain and get the record fixed.
**Q I'm not talking about facilities or foster homes. I'm talking about kinship families which can take children before they've had their complete check done and they can't get paid until --**
A Well, some -- I don't know because some states pay kin care -- pay for kin care, and some don't. You know what I mean? Like Texas, for example, does a one-time payment for kin care. You know, and they -- they give them, like, I think, 1,000 bucks or something like that. And then they give them next year, like, 500.

Other states pay them like you do adopt -- adoptions, where they get a stipend. Some pay less than adoptions. Some pay the same. And I don't know what Oklahoma does. But I -- but I'm just saying that the best source of -- the best source for data on time in care probably comes from financial records because it's the most accurate.

**Q Have you made any effort to look into Oklahoma's financial records and see what information is there?**

A Nope.

**Q So this is just your hypothesis, that the most accurate information would be in the financial records?**

A That's -- yes.

**Q You say on page 4 of your report that, "The sample size in Dr. Milner's report may be adequate for estimating the population as a whole from which it was drawn." Are you basically saying here that a sample of this size, 374 out of 6,701 is sufficiently large to generalize to the population as a whole? I want to set aside all of your other criticisms about long stayers and just focus on sample size.**

MR. PAGE: Object to the form.



THE WITNESS: It's -- the sample size is adequate. It's -- it's for -- overall, for trying to achieve a 95 percent confidence interval plus or minus 5 in limits, the 374 is correct. Whether those -- that applies to individual items as a matter of how many people are being -- are answering a -- how many people -- how many things they read in a case, if it's less than 374, then the confidence interval's going to be larger.

**Q (BY MS. INGBER) And would it be fair --**

A But -- but in order to -- there's a second part to that. And that's -- it's an adequate sample size. It's inadequate because of its nature, of its cross-sectional nature, which we've already talked about.

**Q Which we've already talked about. And I do want to try to focus on your criticisms one by one.**

A Sure.

**Q So we've discussed cross-sectional. And I understand that you want to add as a caveat to every sentence, "But this isn't adequate because it is a cross-sectional." But lets just set that aside as an issue we've discussed and focus on the specific additional points that you make if you -- if you**



**wouldn't mind.**

A Okay.

**Q And so I understood you to say that that's an adequate sample size when you're looking at the whole sample. But if, for example, there was only data in 350 -- so that was the denominator -- that that would have an effect on the confidence interval?**

A Yeah, it would.

**Q It would. And depending on how far away you got from 374, that would depend on the side of the effect?**

A Right. It would -- it would -- basically the -- the general rule would be fewer means your confidence limits would grow. Not your -- necessarily your confidence, your 95 percent confidence band, but your interval, like plus or minus five, plus or minus eight and -- like in Goad's report. He reports those.

**Q But if you went from 374 to 373, that would have a very small effect.**

A Right.

**Q Whereas if you went from 374 to 50, that would have a very large effect?**

A Right. Yeah.



**Q Did you actually do any of these analyses on any of what I'll call the subgroup findings that Dr. Milner had to see the actual effect on the confidence intervals?**

A I think I did one or two. A little -- yeah. But I don't remember -- I didn't do most of them. I think I did one or two.

**Q And what were the results of that?**

A The intervals grew with less in -- in the group.

**Q Do you know which ones you did?**

A No. I don't really remember.

**Q Did you do that in writing?**

A Pardon?

**Q Did you do that in writing or in Excel or in something?**

A I think I used the same thing he -- he used, the sample size calculator.

**Q On page 4 of your report you say that Dr. Milner -- I'm sorry. I will just quote this to you so I don't waste time looking for it. And tell me if you think that you disagree with this. That, "Dr. Milner should have stratified by the characteristics of the children and the outcomes being reviewed." Was that one of your opinions in**

Page 98

**this report?**

A Yeah. I think it would have helped.

**Q What specific characteristics and outcomes should he have stratified on?**

A You might want to stratify on -- I think he did permanency goals.

**Q He didn't. He stratified only based on congregate care.**

A Yeah, he did. But you might want to look at -- make -- to make sure you captured all the outcomes, you might want to stratify on that.

**Q So that would be the one thing that you would have stratified on?**

A Well, I -- amongst others.

**Q What are the others?**

A Might want to make sure that you had enough moves, both positive and negative.

**Q How would you go about stratifying based on number of moves before the case-record review?**

A Well, you'd look at how many moves you had; and you'd figure out how many you need -- needed to sample in order to get them.

**Q Do you know whether he had access to that data before he pulled a sample?**

A I don't know.

Page 99

**Q You would have to have access --**

A Well, he had to -- he had to have access to it because he reported on number of moves.

**Q Based on the case-file review.**

A Oh, you mean, like, draw it down from the electronic records? I don't know.

**Q You don't know? But it's not your position that he should have stratified based on every characteristic and every outcome?**

A No. I think you -- you try and figure out what was important. The reason I think for that is that -- what I was saying in -- in this particular section is that if you -- if you knew that there were certain kind of characteristics that you wanted to look at and you were going to do sort of an entry cohort, you might want to ensure that you had enough of them to look at. So if moves were important to you --

**Q Uh-huh.**

A -- which it seems like it was to him -- you'd want to make sure you had enough both positive and negative moves to do an analysis that didn't have huge confidence limits. You know what I mean? Intervals. So let's say 374 is what you need. You would have to figure out how many you'd need for the

Page 100

number of moves that were available to you to make sure that you didn't have huge confidence bands where the results wouldn't have much meaning.

**Q So correct me if I'm wrong. My understanding is that usually people stratify when they expect that an outcome is going to vary based on that certain characteristic and they want to make sure that they have a sufficient representative of all of --**

A Yeah. They want to get enough.

**Q Right.**

A It's important, and you want enough. Pretty much.

**Q Right. It's important, and you want -- right. And you want to make sure that you're going to be -- have enough of each of those different groups.**

A Right, right.

**Q Do you think there is any theoretical basis here to think that the outcomes he was looking at would vary depending on any specific characteristic?**

A Well, they varied by time in care. That's more than theoretical, but --

**Q Okay. So length of stay. Any others?**

Page 101

A Well, I'm -- I'm not sure I get the question. I'll try and answer it if -- if I -- if I understand it. The things that matter, it seems to me, are -- are things that are affected by time in care, events that happen to kids over time. And you're especially interested in events that are negative over time. And you're wanting to make sure you control for that by entry cohort and you're wanting to make sure you represent enough of those things so you can adequately draw an inference from them.

**Q I want to set aside the entry cohort issue. You keep on going back to it.**

A Well, I -- I don't understand the question, then.

**Q Okay. Okay. I'm talking about stratification, not entry cohort analysis --**

A Okay.

**Q -- and the difference between that and point-in-time analysis. Do you disagree with me that researchers generally stratify when they expect an outcome to vary based on a certain characteristic so they stratify based on that characteristic?**

A Yes.

**Q That's right.**

A I agree.
**Q You agree. Okay. What characteristics would you think the outcomes here would vary on and therefore you might want to stratify based on those characteristics?**
MR. PAGE: Object to the form.
THE WITNESS: Well, you've got to find variability across a lot of characteristics that are not fixed. As I said, placement moves would vary. Types of placements would vary. I'm thinking reentry would vary. Exit types would vary.
**Q (BY MS. INGBER) So you think you should stratify along all four of those?**
A I would -- I would make sure I had enough -- enough in the sample -- you wouldn't need to stratify if you had enough of them.
**Q Right. That's kind of what I'm getting at. As long as you have enough of them, the -- you don't need to stratify up front.**
A If you've got enough of them, no.
**Q And would you agree that experts in research can differ on what characteristics to stratify on, whether to stratify along those characteristics?**
MR. PAGE: Object to the form.



THE WITNESS: I wouldn't call that necessarily a disagreement. I think you have to know what the question -- the research question is to begin with. And most researchers, if you knew the question to start with, what people wanted to know, could figure out what were the important characteristics to stratify on. I don't think there would be a lot of debate. There might be some slight disagreements, but not a whole lot.
**Q (BY MS. INGBER) But you think every researcher would stratify in exactly the same way when posed with the same research question?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know.
**Q (BY MS. INGBER) Not necessarily?**
A I don't know.
**Q You don't know. Okay. You said on page 4 -- and this is in the middle of the "sample size" paragraph. "It would have been much more meaningful to show percentages in the sample in comparison to the population for parts one through seven." I don't understand what you're saying there. Can you explain it to me?**
A Yeah. Yeah. I need to find Appendix E. Where's -- where's E here? Let me find E in this



thing here. It's probably going to take me a minute. Hang on. So give you all a break. I don't -- I've got to find where one of them is, let alone -- this is C. So E must be further back.
**Q E's after the instrument. It's the very end. E's on page 186.**
A One -- say it again.
**Q 186.**
A Thanks. Yeah. It seemed to me that -- that case-plan goal was probably not as important as some other kinds of things that he could have stratified on to make sure he had enough of them.
**Q Well, here he's not stratifying. He's simply showing --**
A Well --
**Q -- comparing his sample to the population; right?**
A Yeah. I mean, like, in other words, if you're looking at proportions and, like, a case-plan goal, those change and they're often simultaneous, as well.
**Q Uh-huh.**
A And I -- I didn't find the table terribly informative. What I would have put in the table -- what I'm saying is what I would have put in the



table are some outcomes in proportion -- in relation to the population.
**Q And you're talking about -- when you say "population," Dr. Milner's population. Or are you talking about the population of all children in foster care at some specific time?**
A Yeah. Whether your -- I would have not have done it in comparison -- in a cross-sectional way, but let's just say we're going to compare something in a population to a sample.
**Q Uh-huh.**
A I didn't find the case-plan goal as meaningful as some other measures like child maltreatment, like exits, like placements, so forth.
**Q Understood. And when you say "sample in comparison to the population," what population are you talking about? The population of kids in foster care --**
A Kids in foster care, yeah.
**Q -- or Dr. Milner's population that he draw his sample from?**
A I was talking about the population of kids in foster care.
**Q In Oklahoma?**
A Relative to a sample in Oklahoma.

**Q And to do that you would have had to find some external source for the data on that population of kids in foster care in Oklahoma?**
A Well, you --
MR. PAGE: Object to the form.
THE WITNESS: You could infer it from your sample. I mean, in other words -- yeah, I guess -- okay. Sure. You would have to have somebody draw down data so you'd know the population of kids and you'd know the -- that kind of information, yes.
**Q (BY MS. INGBER) And that would require someone to draw down that data for you?**
A Or you'd do it yourself, yeah.
**Q If you don't have access to the DHS's system, how would you draw down data on the outcomes for the entire population.**
MR. PAGE: Object to the form.
THE WITNESS: You would ask for it.
**Q (BY MS. INGBER) Oh, you would -- you would have to ask the others -- you would have to ask for that data from someone. It's not something that he would necessarily have that access to.**
A You know, I don't know how he did his -- what he had access to and what he didn't. But you would need the data to do it.



**Q Understood.**
MR. PAGE: Is it time for a break?
MS. INGBER: If you want to take one.
MR. PAGE: Yeah. I'd like to take a short break.
VIDEOGRAPHER: We're now off the videotape record. Time is 10:23 a.m.
(A recess was taken from 10:23 AM to 10:34 AM.)
VIDEOGRAPHER: We're now back on the videotape record. The time is 10:34.
**Q (BY MS. INGBER) I just want to draw your attention to the comment at the bottom of page 4, very last line. "Additionally, the sample size is not sufficient to prevent large confidence intervals on some items." Do you see that?**
A Uh-huh.
**Q Yes?**
A Yes.
**Q That's the same issue we were talking about earlier; correct?**
A Yes.
**Q About how if -- if Dr. Milner did subgroup analyses, that would affect the confidence interval?**
A Yes.



**Q And then you use on page 5 just an example. "For example, if 12 percent of the time the children in the sample were substantiated for maltreatment" -- which is actually one of Dr. Milner's conclusions -- "and the confidence interval around that finding was 10 percent, one could conclude that as much as 22 percent of the time children could have been substantiated for maltreatment." Is that example, like, simply a hypothetical or --**
A It's a hypothetical.
**Q So you didn't actually calculate the 10 percent of --**
A No. No.
**Q Okay. Couldn't a large confidence interval also make a finding look better? For example, if it's 12 percent and the confidence interval is 10 percent, it would range from 2 to 22 percent; right?**
A Correct.
**Q So it actually has -- not just exaggerating it, which is what you say here, it could also underestimate it if there's a large confidence interval.**
A It can do both, yeah.



(Discussion off the record.)
Q (BY MS. INGBER) In the next section of your report beginning on page 5, you criticize the 60-day criteria used by Milner and describe it as a "bias." Is that an accurate description?
A John Fluke wrote this, and so -- show me where you want -- what you want me to attend to.
**Q Sure. Just from the very beginning. I mean, really, if you -- if you feel the need, you can read this whole section from page 5 to page 6.**
A I think the point that is being made is there's no rationale really for -- there's no reason it would be 60-day -- a 60-day criteria I think is what he's saying.
**Q That's what Dr. Fluke is saying?**
A Yes.
**Q Do you agree with Dr. Fluke's point?**
A Yes.
**Q So since your name is on this report and you agree with it, that's essentially your opinion, as well?**
A Yes.
**Q Are you aware that Dr. Milner and Dr. Smollar, in fact, gave a number of rationales for their decision to exclude children in care for less**

**than 60 days?**

MR. PAGE: Object to the form.

THE WITNESS: I -- I'm saying it's arbitrary.

**Q (BY MS. INGBER) In your view, it's arbitrary. I understand that. But you're aware that they had a -- a number of rationales for doing so?**

MR. PAGE: Object to the form.

THE WITNESS: I believe they did.

**Q (BY MS. INGBER) And you just simply disagree with those rationales?**

A Yes.

**Q So when you said earlier that you don't think there was any rationale, what you really meant is there's no rationale that you agree with for excluding those children?**

MR. PAGE: Object to the form.

MS. INGBER: If you can, please, let me finish my questions before you put your objections on the record, that would be great. Would you like me to ask that again?

THE WITNESS: Yes, please.

**Q (BY MS. INGBER) I said earlier you said that you didn't think there was any rationale for**



**the 60-day exclusion. Is what you really mean that there's no rationale that you agree with for the 60-day exclusion?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know. I'm just saying it seems you could have 60, you could have 30. I don't know why you wouldn't just start at day one.

**Q (BY MS. INGBER) Well, let's go through the reasons that they gave for why they didn't start at day one. One reason given by Dr. Smollar was that the children who are in care for very, very short periods of time, 60 days or less in this case, have different experiences than children who are in care for longer. Do you disagree with that?**

MR. PAGE: Object to the form.

THE WITNESS: That seems the point we're making with cohort analysis is that they do have different experiences from day one to day whatever, you know. And so it would seem to me you'd want to take into account all those experiences.

**Q (BY MS. INGBER) And didn't they take into account all of those experiences for the children that they -- whose case files they reviewed?**



A They didn't do it properly.

**Q That's not my question. For the children whose case files they reviewed, did they leave out information about those children's first 60 days in care?**

A I don't know.

**Q Assuming that they did not, would that not, in fact, be taking into account those children's entire experiences?**

A Would you reread the rationale?

**Q Sure. Dr. Smollar gave as a rationale that children who are in care for very short periods of time often have different experiences than those who are in care for longer.**

A So is the idea, then, that -- I'm sorry to answer it with a question. But just to be clear. The idea is that they want to take into account kids with longer times in care?

**Q I believe that the purpose was to exclude children who came into care and, for example, maybe shouldn't have been in care and thus were sent home very quickly. And that the experience of a child with that type of experience is very different than a child who's in care really for a significant period of time.**



A I guess I disagree with that because seems to me they've had experiences during those 60 days in care.

**Q So you disagree with it, but you would agree that's a rationale?**

A Well, anything's a rationale.

**Q Okay. Is it invalid to exclude children who haven't experienced many of the events being reviewed? For example, permanency plans.**

A I don't understand that one either.

**Q So as Dr. Smollar explained, according to DHS policy, permanency plans don't even have to be completed for at least 30 days. Family assessments don't have to be completed for at least 60 days.**

A I see.

**Q So one of the reasons they excluded those children is because they wanted to make sure that they could get information about all of the important events that they were looking into and they would not expect to find those events in the files of children who had been in care for very short periods of time.**

A Is that --

MR. PAGE: Object to the form. Doctor, you -- please, give me a chance. That was a long

Page 114

question --
THE WITNESS: Sorry.
MR. PAGE: -- and I don't want to interrupt Miriam here. So give me a chance to make an objection before you answer, please.
MS. INGBER: Sure.
MR. PAGE: Thank you.
THE WITNESS: Yeah. Say it more slowly.
**Q (BY MS. INGBER) Sure. One of the reasons that they excluded those children is because they wanted to make sure that they could get information about all of the important events that they were looking into. And some of those events for example, permanency plans, family assessments are examples, don't even occur until a certain minimum number of days in custody.**
MR. PAGE: Same objection.
THE WITNESS: What's the question?
**Q (BY MS. INGBER) Do you think that's an invalid reason to exclude those children?**
A Yes.
**Q Why?**
A Lots of their -- lots of the case records were missing, as I recall. I don't know why you -- again, why you wouldn't include kids who are

Page 115

entering care because they've had -- they, too, have history.
**Q There's a difference between, for example, an individualized service plan that's missing when it's required to be in the file and an individualized service plan that's missing before the time that it's required to be in the file; correct?**
A I understand. I know you're wanting me to speculate, and I don't know. I just would not have -- as I said, wouldn't have had the 60-day criteria.
**Q I understand that you wouldn't have. Do you think reasonable people could disagree about the value of that 60-day criteria?**
A I've never heard of one actually, anybody doing a 60-day criteria.
**Q Are you familiar with the 1978 study conducted by Fanshel and Shinn?**
A No.
**Q Are you aware of whether it's influenced the field and is considered to be a seminal work in the field?**
A I don't know.
**Q Do you know that it had a 90-day**

Page 116

**exclusion?**
A No.
**Q So, in fact, just because you don't do it and you don't agree doesn't mean that it's not something that's done in the field?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know.
**Q (BY MS. INGBER) You just don't know?**
A Uh-huh.
MR. PAGE: Can we take a break off the record, please.
VIDEOGRAPHER: I'll be --
MS. INGBER: I will say we're off the record since it's my deposition.
MR. PAGE: No. Alls -- okay. That's fine. You want to order lunch, you can. You don't have to order lunch.
MS. INGBER: I don't want to order lunch.
MR. PAGE: Good. Let's -- if the court reporter would like to have lunch and the videographer would like to have lunch, I've got menus in. Since Ms. Miriam doesn't want one, we won't order one for her. I'm happy to do that for the court reporter and the videographer.
And since it's quarter to 11:00, we need

Page 117

to order lunch now or in the next couple of minutes or you won't have a chance to get it. So are you going to prevent these folks from having lunch?
MS. INGBER: Obviously not, David.
MR. PAGE: So are you going to allow them --
MS. INGBER: I said "off the record" before; and I'm happy to have them order lunch, David.
MR. PAGE: So can we take a break now so they can do that?
MS. INGBER: Yes, we can.
MR. PAGE: Thank you.
VIDEOGRAPHER: We're off the videotape record. Time is 10:43 a.m.
(A recess was taken from 10:43 AM to 10:44 AM.)
VIDEOGRAPHER: We're now back on the videotaped record. Time is 10:44 a.m.
**Q (BY MS. INGBER) In your report on Dr. Goad's analysis -- and you can look at that if you want. But I'll tell that you on page 9 you state that, "There is considerable improvement in the inter-rater reliability process if the number of cases reviewed reaches around 30."**

**A Yes.**
**Q Do you remember that statement?**
A Yes.
**Q And Dr. Milner, in fact, inter-rater reviewed over 30 cases; correct?**
A Yes. It wasn't clear how he did it. But, yes.
**Q So according to your own statement that would lead to considerable improvement in the process?**
A I'm not sure of the question.
**Q You stated in your June 9th report on Dr. -- Mr. Goad and others that, "There's considerable improvement in the inter-rater reliability process if the number of cases reviewed reaches around 30." That statement applies to the fact that Dr. Milner, in fact, reviewed more than 30 cases?**
A He did.
**Q On page 7 of your report, the one --**
A Which one?
**Q The June 15th report.**
A Which page?
**Q Page 7.**
A Okay.
**Q There's a statement in there about the**



**internal validity of the review process. What --**
A Direct me to where.
**Q Sure. Let me see if I can find it.**
A Oh, it's at the top.
**Q Yeah. It's at the very top.**
A Uh-huh.
**Q "Ideally the raters would not have known the purpose of the study and would have relied on blind reviewers to ensure the validity of the process." Yes?**
A Yes. John wrote that, but I can address it I think.
**Q My understanding of internal validity, which is limited, is that it relates to when you're trying to decide cause and effect within the sample itself. How is it related to whether or not inter-rater reliability is -- uses blind reviewers or otherwise? I'm just not sure I understand the reference to internal validity in this context.**
A I think it's two thoughts. John wrote this, but there -- let's address it in -- in parts, if you will. What I didn't understand is how he went about achieving inter-rater reliability, whether the -- and I tried to get at it in the report; and I looked at the depositions, as well, to



try and understand it.
What was confusing to me -- and this is the first part of the sentence -- was whether they trained and then came to agreement and then by virtue of coming to agreement, that constituted inter-rater reliability; or whether they trained, then figured out how to come to agreement and then went back and redid inter-rater reliability in a subsequent sample.
And if the latter is how you're supposed to do it, the former, you're going to get a lot of agreement because you come to agreement. You're not supposed to do it that way. I couldn't understand which he did. That's for starters.
**Q Okay. I guess all I'm trying to understand is what internal validity has to do with in this sentence, the raters being blind. How is that related to the concept of internal validity, which I understand is related to research design factors that allow you to discuss --**
A I don't know. I didn't write that -- I didn't write the sentence so I don't know.
**Q So you don't understand what he's referring to here.**
A I could speculate. But I don't want to.



You might want to ask John.
**Q Okay. So it sounds like you don't really have a strong sense of what's in that sentence either?**
A My -- my opinion was with regard to how they did inter-rater reliability.
**Q Okay.**
A And I don't know from what he said.
**Q This report on page 7 goes on to say that if inter-rater reliability was conducted after training, that could indicate a degree of success with respect to training. And I wasn't clear whether you were trying to say that it's preferable or not preferable to conduct inter-rater reliability after training.**
A Preferable.
**Q To conduct it after training?**
A Yes.
**Q So it's preferable to first train your reviewers and then do inter-rater reliability?**
A Yes.
**Q So if, in fact, that's what Dr. Milner did, that would be, in your view, the right way to do it?**
A Yes.

**Q You then go on to say that -- and this is in that first full paragraph on page 7 -- "the rather high rate of agreement for such a complex instrument leads one to believe that the inter-rater reliability results were inflated."**

**In that sentence are you trying to accuse Dr. Milner of lying or misleading about his results?**

A No. I'm -- I'm wondering how in such a complex case analysis you get such a high rate of agreement. And I was speculating about how that might have happened. And one thought I had was perhaps when they were rating -- doing inter-rater reliability, they were including agreements about what wasn't in the case record.

And if that was the case, that's a pretty easy decision to make relative to an adequacy kind of decision or a decision-making decision. Are you saying that was the decision adequate, was there this or that? In other words, I could -- anybody could tell if the piece of -- like the case plan isn't there, you know.

And so I just wondered if that's how they achieved such a high rate, having done inter-rater reliability studies with people reading case records. And that's just really high. So I -- I



wondered.

**Q Okay. So this isn't an accusation about his integrity?**

A No.

**Q It's simply you saying this seems high to me and here are a couple of hypotheses about why that might have happened.**

A Yeah. That's all.

**Q Okay. Looking at Dr. Milner's instrument or based on your recollection of it, aren't the vast majority of the items in that instrument related to facts?**

MR. PAGE: Object to the form.

THE WITNESS: There are -- there are some facts in there. And there are -- are items in there about things that are missing and probably some other things that are more difficult to figure out.

**Q (BY MS. INGBER) In contrast to Dr. Goad's instruments where were some judgments that had to be made --**

A Lots more judgments in Dr. Goad's.

**Q In Dr. Goads. Dr. Milner's, you would agree, the vast majority of these items were facts.**

**What's the date of this? Was this in the file?**

MR. PAGE: Object to the form.



THE WITNESS: Relative to -- just a second. We need to find it, I guess.

**Q (BY MS. INGBER) Sure. It's beginning on page --**

A I've got the wrong thing. Hold on.

**Q Beginning on page 107 is the instrument.**

A Oh, got to get this one --

**Q That's 107 of Dr. Milner's report.**

A Yeah. I'm -- I'm getting there.

**Q That was just for the record.**

A So is the question: Is it more fact based than Goad's?

**Q No. I don't want to compare this to Mr. Goad's, which was just a different project entirely. I want to ask you: Objectively speaking, are the vast majority of the questions in this instrument fact questions?**

MR. PAGE: Object to the form.

REPORTER: I didn't get the answer.

MS. INGBER: I didn't either. Did you give an answer to that question?

THE WITNESS: No.

**Q (BY MS. INGBER) And we can turn to any page that you want and we can kind of go through some examples.**



A I'm -- I'm looking. Yeah, I'm looking right now. I'm not sure because they're -- if it's a fact that the caseworker interpreted a particular thing in a particular way, yes. If you are assuming that -- I mean, you're sort of filtering the information through a caseworker who's seen an event and interpreting the event and then calling in the end somebody reading about the event a fact. And so in -- in one sense, no. In another sense, yes.

**Q But I understand that there's the question of objective truth and what does truth mean and all those difficult questions. What I'm asking is whether when -- and I'm just turning to a random page here. On page 150. Question 4.46. Which reads, "For the child's most recent entry into OKDHS custody is there documentation in the child's case file that a dental provider ever diagnosed the child as having dental problems. Yes, no."**

**A That's a fact.**

**Q That's a fact. That doesn't require judgment on the part of the reviewer?**

A I agree that it doesn't.

**Q And so even if what you're getting is something that's filtered through the mind or the opinions of the caseworker, that doesn't require the**

**reviewer to make judgment calls for the vast majority of the questions in this instrument.**

MR. PAGE: Object to the form.

THE WITNESS: I don't know.

**Q (BY MS. INGBER) You don't know because you haven't had time to look through this, or you don't know --**

A I'm looking -- I'm looking at a page now that is what the caseworker recorded on page 114.

**Q Sure.**

A And --

**Q Right. This is based on what the caseworker recorded. I understand. But the reviewer isn't making a judgment call about whether -- what the caseworker recorded. They're simply documenting what the caseworker recorded.**

A Yes.

**Q So in that sense they're not -- the reviewers themselves are not making judgments even though the caseworker might have. Would you agree with that?**

A Okay. Yes.

**Q Do you generally see higher inter-rater reliability when there's these types of factual questions versus judgment calls that the reviewer**



**has to make?**

A Yes, I do.

**Q On page 7 as one of your hypotheses for why these results, as you described, may have been inflated is that it is likely that "the case readers who are better at interpreting information in the case record rated the cases for inter-rater reliability." And then you go on to say, "This is likely from the information provided in the deposition."**

**A It's -- yes. It -- what I gathered was they had their better readers do the inter-rater reliability. That's what I gathered.**

**Q To do the second level. But they were reviewing the -- they were reviewing the instruments for every single reviewer in the case; right?**

A Right. As I understood it, they used -- and I could be wrong. But I -- what I was trying to figure out is who did the inter-rater reliability. And as I understood it, the better readers, the people more adept at it did the --

**Q Were the second person to review that file?**

A Yeah. That that's how they calculated their inter-rater reliability, I thought.



**Q I understand. I understand what you're saying.**

**Just say I'm a terrible reviewer and I make a ton of mistakes. I'm just really bad at my job. And you are a really good reviewer, and you are the one that's brought in to do a complete review and then look at the differences. Does it matter if that second person is one of the better ones if they're reviewing the work of every single person? Wouldn't there be a lot of disagreements between the better people and the worse people?**

MR. PAGE: Object to the form.

THE WITNESS: There's -- I'm -- I'm -- which question do you --

**Q (BY MS. INGBER) Let me -- let me restate it. I understand if you only do inter-rater reliability and you compare your two best people every single time, that that's going to lead to inflated results. But if your better person reviews the work of every person on the team, wouldn't you expect to see different levels of agreement depending on whether the person whose work they're reviewing is a good reviewer or a bad reviewer?**

A You would have lower inter-rater reliability if you looked at a good person and a bad



person if that's your question.

**Q Right. So just because you had the better people do the inter-rater reliability reviews, wouldn't affect the level of agreement as long as every single person was involved in the process?**

MR. PAGE: Object to the form.

THE WITNESS: As I understood it, there were two. That's my only point, was that the two that were doing it were the better -- better at it. That's all.

**Q (BY MS. INGBER) Did you understand that those two reviewers who you classify as "better" review the -- a case -- at least one case, usually two or three by every single person who did a review?**

A So what you're saying is the good reviewer -- you have -- you and I are both good reviewers and we're reviewing their cases.

**Q Yes.**

A And so you and I are now going to rate the cases that have already been rated?

**Q Yes. I mean, that's how you do inter-rater review; right? Two people review the same case, and then they look and see how much agreement?**

A Well, what I got confused -- what I got confused about was them coming to agreement about something, which isn't what you're supposed to do. In -- in other words, it with would be a second level of review -- the way you would want to do it, is you and I would look at a -- each look at the same case; and we would then rate the case and not come to an agreement. We would just rate it. And then somebody else would calculate the result.

**Q If, in fact, that's what Dr. Milner did -- and I believe it is what he did -- would you agree that's the right way to do it?**

A If that's what he did. I couldn't tell.

**Q You couldn't tell. But assuming my representation to you is correct -- I understand you have no idea if that's, in fact, what he did -- that would be the correct way to do it?**

A That would be the correct way. And then in addition if we were really good at it, we would -- the -- the results wouldn't reflect what all those reviewers were doing. It would just reflect that you and I are good at it. And that's -- you would get a high rate of agreement.

**Q You also say on this page that, "Another possibility would be that when these readers**



**disagreed, they would discuss the case, come to an agreement when they could and then re-rate the case," and then use those resolved --**

A Right. And I -- and that -- that would be another possibility for how come you get high agreement.

**Q If I told you that those inter-rater reliability rates were established on the original ratings, not on the resolved ratings, that point wouldn't be applicable?**

MR. PAGE: Object to the form.

THE WITNESS: I guess.

**Q (BY MS. INGBER) Assuming that's true?**

A I don't know. I could --

**Q You don't know?**

A I don't know.

**Q I totally understand. You couldn't figure that out from the documents you looked at. But assuming that to be true, then that wouldn't be an issue?**

MR. PAGE: Object to the form.

THE WITNESS: If you have two raters rating a case, which it looks like they did -- I guess I would have all the raters rating the case and figure out what inter-rater reliability was



independent of coming to agreement is what I'm saying.

**Q (BY MS. INGBER) Okay.**

A And I -- and I couldn't tell if that's what he did or not.

**Q I also take it that you made this point both verbally and also in the report that you think missing information or agreement about whether something was missing should have been excluded. Isn't it possible that any highly disorganized, incredibly lengthy file readers could disagree about whether they could find something in that file?**

A There's less -- in my experience, there's less disagreement about that than narrative information.

**Q Okay. What if I represented to you that the area where there was actually the least agreement was about the existence of missing information?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know. I haven't seen it. I don't know.

**Q (BY MS. INGBER) Okay. Could that reflect in this case the state of the files?**

A I don't know what you mean.



**Q If, in fact -- and I'm not asking you to agree with me. I'm just asking to you assume that, in fact, in this review the highest level of disagreement was on whether something was, in fact, missing from the file.**

A Yeah. I don't know. I didn't -- they didn't present it.

**Q I'm telling you to assume that's true. I'm just telling you to assume that that's true. Then this -- then this isn't applicable here? It would actually reflect something else?**

MR. PAGE: Object to the form.

THE WITNESS: I guess.

**Q (BY MS. INGBER) And if they had, in fact, excluded that missing information, it would have actually made their inter-rater reliability agreement look better, not worse?**

MR. PAGE: Object to the form.

THE WITNESS: That's a lot of assumptions. I don't know.

**Q (BY MS. INGBER) I'm asking you a hypothetical. If hypothetically --**

A I don't know. I don't know. I mean --

**Q I'm going to ask you just a hypothetical question.**

A If you show me the data, I could tell you.
**Q Well, the data was provided to defendants; and obviously it's not something that you looked at, but it was provided. If, in fact, the highest level of inter-rater reliability agreement -- sorry. The lowest level of inter-rater reliability agreement was on missing information, would the exclusion of those from the inter-rater reliability calculations have made it look better?**
MR. PAGE: Object to the form.
THE WITNESS: Yes, if you took out a -- something that people had less agreement on and excluded it from the analyses, then you would end up with higher inter-rater reliability.
**Q (BY MS. INGBER) There's also a footnote 4 on page 7 about how Cohen's kappa coefficient is generally considered the preferred measure for inter-rater reliability agreement. Would you agree that that's the preferred measure?**
A Uh-huh.
**Q Yes, you do?**
A Yes.
**Q Are you aware that there are researchers like John Uebersax who disagree about the need for chance corrected agreement?**



A No.
**Q You're not familiar with that work?**
A No.
**Q So you think there's complete agreement in the field about the need to use chance corrected agreement?**
A That's what I think, yeah. Did you say complete or --
**Q Yeah. Whether all reasonable --**
A No. Not all agree. Most statisticians disagree about lots of things.
**Q And this is one of those things they disagree about?**
A Sounds like it, from what you said. At least somebody disagrees.
**Q On page 8 there's a discussion about how it would have been preferable to have blind reviewers. Do you see that point?**
A Where are you at?
**Q Sorry, page 8. There's that full paragraph in the middle.**
A Okay.
**Q How "the raters knew the purpose of the review they were conducting for Dr. Milner's report"?**



A Yes. I wrote that.
**Q And then it goes on to say, "When the reviewer knows the desired outcome of the review, it is quite easy for the reader to conclude (verify) what the reader already wants to conclude." Did you consider those three articles, Friedrich, Nickerson and Wason, are those materials that you considered when you were writing this paragraph?**
A I knew of them, yeah.
**Q Are these child welfare articles?**
A They're psychological ones. They're out of the psyche literature. I mean, confirmatory bias has been around for a long time. Probably even before psyche.
**Q And do you think that the reviewers here falsified, misstated, purposely withheld any information from the files?**
A No. I don't think that's what the confirmatory bias is about. In fact, that's what Nickerson points out, is that he -- what he -- what he discusses in his article is more like less overt or covert kinds of bias, but more one that -- that one does less consciously.
**Q Is this type of confirmatory bias less likely to affect studies with -- of an instrument**



**that involves extracting factual information like this one?**
A It's more likely with less factual information, yes.
**Q So this type of bias is less likely to affect a study of this type?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know if that's a conclusion I would draw, but the more subjective the kinds of questions they're trying to answer, the more the confirmatory bias is present.
**Q (BY MS. INGBER) How realistic is it in this type of applied evaluative research to have a large team of reviewers be completely blind to who their employer is?**
A In this case not very realistic.
**Q So that's sort of an ideal world type of thing, but not really practical in this situation?**
MR. PAGE: Object to the form.
THE WITNESS: I've done it.
**Q (BY MS. INGBER) You've done it. Do you always do it?**
A No.
**Q Were you -- when Dr. Fluke called you up and told you about this, did he tell you who you**

were working for?
A Yeah.
Q So that same type of confirmatory bias would apply equally to your work?
A It can.
Q Let's talk about instrument validity, which I believe your discussion of instrument validity begins on page 8 to 9.
A Yes.
Q This is a section you wrote; right?
A Yes.
Q Do you agree that this instrument of Dr. Milner's does not attempt to measure an abstract construct? Like depression, intelligence.
A I guess I think of most things as containing abstract constructs.
Q So the existence or nonexistence of an individualized service plan is an abstract construct?
A The items within -- just a second. What page is the instrument on? Let's -- let's just take that -- here's what I'm -- let me just say it. It seems to me the categories within the instrument are abstract constructs, and the items that are trying to make -- within that category are trying to



measure that construct.
Q So you're saying that the concept of maltreatment is abstract, which --
A Yeah. And then you have a bunch of questions about maltreatment and those are the content related to that construct.
Q But the questions themselves in the instrument -- for example, "Is there documentation in the case file that there was a substantiated allegation of maltreatment while in care?" That's not an abstract construct, "Is there documentation in the case file of a substantiated allegation?"
MR. PAGE: Object to the form.
THE WITNESS: Those are -- those are measures of a construct.
Q (BY MS. INGBER) But that is not itself an abstract construct, whether something exists in a case file. How -- "give me the dates of when the child first entered care." That's not an abstract construct?
A No. Those are measures of a construct.
Q But it's not an abstract construct?
A No.
Q "List all the dates when the child moved placements." That's not an abstract construct.



MR. PAGE: Object to the form.
THE WITNESS: I'm trying to find that -- I try -- well, I'll just repeat what I said. As I see it, the things they're trying to get at categorically are the abstract constructs. And the items they're using to assess that are the content of the construct or measures of the construct.
Q (BY MS. INGBER) Okay. Let me ask -- I'm just going to pick a random page, and I'm going to ask you one of the items. This is item 2.4 from page 116. "Does the case file include at least one ISP progress report that was completed during the child's most recent entry into custody? Yes or no?"
Is that question trying to measure an abstract construct?
A As I said, the items themselves are measures of a construct.
Q Is that question abstract, or is that just a factual question?
A It's factual. It's a measure of the construct.
Q But it's a factual question?
A Yes.
Q You reviewed this instrument, didn't you?
A I looked at it, yeah.



Q And with respect to face validity, do you have any question about whether it was capturing what it was attempting to capture?
A I don't know.
Q So you made no assessment of whether face validity's an issue here?
A No.
Q So that was just a hypothetical that there may not be face validity, but you don't have an opinion one way or the other about it?
A I think face validity's a matter of opinion. I think the other forms of validity are not.
Q With respect to content validity, is it correct to say that content validity has to do with whether the information that's being collected is drawn from a pool representative measures appropriate to the question in hand?
A Yeah. Did you ask -- did you ask the right and enough questions to represent the construct that you have in mind?
Q So, for example, if you're trying to investigate the question of maltreatment, did you ask the right questions to get an answer about maltreatment?

A Yes.
**Q Do you have any doubt that the content of this instrument covers all of the areas that one would expect from a review of this type?**
A I don't have any idea because no tests were conducted.
**Q What tests would you conduct for content validity in this type of instrument?**
A Principal component analysis to see if the -- or to see if the items cohered. You could do it that way. You know what I mean? Like you could see what the loadings were on the items in relation to the construct. If you did it open-ended, hypothetically without presuming that you knew the constructs to start with, you could see how they're related across the constructs.
So, say, you had seven constructs and you had -- oh, let's say 100 items, you could see if they loaded up the way the instrument suggested they would load.
**Q What areas were excluded here?**
A Pardon?
**Q What areas were excluded here that made it invalid in terms of content validity?**
MR. PAGE: Object to the form.



THE WITNESS: You can't know.
**Q (BY MS. INGBER) You didn't do any analysis to try to figure that out?**
A No.
**Q So you don't --**
A Nobody did any analysis to figure that out.
**Q Including you.**
A Correct.
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Don't you usually use criterion and construct validity when you have a standardized test that's attempting to measure an abstract construct in order to determine whether those standardized tests are measures of the construct they're attempting to measure?**
**Just as an example, you would kind of look at the SAT. The SAT is trying to measure whether someone's going to do well in college. So you look to see whether, in fact, people who do well on the SAT do well in college.**
MR. PAGE: Object to the form.
THE WITNESS: Hypothetically, yeah.
**Q (BY MS. INGBER) But that's usually what criterion and construct validity are used for?**



A They're used for all kinds of things including case reading.
**Q Really?**
A Yes.
**Q You think that criterion and construct validity are used for case readings that are attempting to describe facts?**
A I think you could tell -- you should be able to see two things with the case reading. One is do the -- and this would be content validity. Do the items within the constructs --
**Q I'm not talking about content validity.**
A You're talking about --
**Q I'm only talking about criterion and construct validity right now.**
A Well, construct validity is the big category of which everything else is a -- is a subset. So let's talk about criterion validity. You could ask the question: Do the categories -- the items load into the categories, and then do the categories predict something? That would be criterion validity.
So, for example, following a policy and procedures, for example, does that predict something in the future?



**Q Was Dr. Milner trying to determine whether anything was predicting something in the future in his review?**
A Well, if you wanted to know if the instrument was valid, you would.
**Q How do you assess construct validity when no abstract construct is being measured?**
A I don't think -- I think abstract concepts are being measured here.
**Q You think that his specific questions --**
A No.
**Q -- are measuring abstract constructs?**
A I think, again, the constructs are the areas that he's measuring. The items are the content of the areas he's trying to measure. You could try and predict item by item, but it would be far more useful to predict with the constructs.
**Q So explain for the -- what you call the abstract construct of child maltreatment. What would you be predicting?**
A Recurrence.
**Q Did Dr. Milner attempt to predict reoccurrence?**
A No.
**Q So how would he have done what you call**

**construct validity, criterion validity or predictive validity when that's not what he was trying to do in his study?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know what he was trying to do in his study. All I'm saying is if you're building an instrument of any kind, you would want to ensure yourself that the items in the instrument represented the content you were trying to get and that you could predict something.

**Q (BY MS. INGBER) Do all research studies have to predict something?**

A Some do; some don't. Depends on the research study.

**Q Right. So if you have a descriptive study, that's's not predicting anything. If you have a --**

A If you want to know if your instrument's valid, whatever that instrument is, there are rules that you follow in order to find out.

**Q So you think that all reasonable experts would agree that you need to establish whether there's concurrent predictive and construct validity for an instrument in a descriptive study?**

A I would do it.



**Q Explain to me exactly how you would do it. How you would -- how you would attempt to determine criterion construct and predictive -- criterion and construct validity on Milner's instruments. How would you go about doing that?**

A I would do principal component analysis across the areas.

**Q That has to do with content validity as you said earlier.**

A Right. Did you say "content"?

**Q I didn't. I said "criterion" and "construct."**

**A Well, criterion's a subset of construct.**

**Q How would you --**

A The whole thing's construct validity. Includes even reliability.

**Q How would you establish criterion validity?**

A Predict something in the future, like maltreatment. Take the maltreatment category, look at the -- say that loading -- not the loadings, but the igon value on the -- on that particular construct and see if it forecasts something. Like -- like recurrence.

**Q So that -- so that would be if you wanted**



**to see whether your instrument was accurately capturing whether something could predict something else?**

A Yeah.

**Q What if you didn't care if your instrument was capturing whether something could predict something else, you simply wanted an instrument that was going to describe how many kids had substantiated maltreatment? Do you then need to figure out whether, in fact, that predicts whether there's recurrence?**

A I think so.

**Q Why?**

A Because you'd know your instrument's valid.

**Q Isn't your instrument valid to the extent that it's stating the percentage of kids who had substantiated maltreatment? Isn't that fact in and of itself important whether or not it predicts recurrence?**

MR. PAGE: Object to the form.

THE WITNESS: I'm not sure I understand the -- is -- let's choose another example that's easier than that one.

**Q (BY MS. INGBER) I want to stick with the**



**example we are on since it's one that you brought up.**

A Okay.

**Q You're the one who brought this up initially. And I want to ask this: Do you think the prevalency of maltreatment in foster care in and of itself is an important fact?**

A Yes.

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Isn't it because those kids who actually have been maltreated have been harmed while in foster care?**

A Yes.

**Q So whether or not that incidence of maltreatment then predicts recurrence or something else in the future, does it really matter when all you want to do is figure out what the prevalence is of kids who have been maltreated?**

A If that's all you wanted to know, no, you wouldn't need to do it.

**Q So if Dr. Milner said, "All I wanted to know here was just on the question of maltreatment, the percentage of kids who were actually maltreated. I don't care whether that leads to other outcomes or other harms or anything else. That's all I care**

about, is describing that fact." Then this is irrelevant?
A Right. But he didn't -- he wanted to know more than that.
Q And he made inferences based on literature to do that?
A Well, he made inferences based on his stuff, too.
Q What inferences did he make on his stuff?
A Back to the earlier point where he says, "Only 30 percent of the kids." That's an inference.
Q What is that inferring?
A That it's too few.
Q Understood. Do you agree that the study wasn't trying to prove causation -- trying to prove causation?
A I think it was in a larger sense.
Q Maybe he was inferring causation, but he wasn't trying to prove it through any analysis that he did, setting aside the chi-square.
MR. PAGE: Object to the form.
Q (BY MS. INGBER) And I'm happy to --
A I don't know how you're using the term "prove."
Q Okay. I'm going to read you some excerpts



from Dr. Milner's and Dr. Smollar's depositions because maybe that will help clarify this. Let's start with Dr. Smollar's deposition. This is page 12 of her deposition.
A I don't have it.
Q I'll just read it to you.
A Okay.
Q You can take my word that it's correct. If you want to look over my shoulder, I'm happy to. "In this case the work that I did was -- this was the descriptive study primarily. It is a study that I say that I would refer to as answering the what. What does X look like in Oklahoma based on the case reviews that were being reviewed -- the cases that were being reviewed? So I would describe that as a "what study."
A Uh-huh.
And let me go on to read from page 112 of her deposition. "The study is not about the why. It is about the what." I'm sorry. That was from page 114. And then page 112, "The study does not evaluate the effectiveness of the program. The study just describes these children's experiences while they were in foster care. It does not evaluate effectiveness."That's from Dr. Smollar's



deposition which I know you've read when you were preparing your report.
And then Dr. Milner in his deposition on page 2 of 3 has similar statements about what the purpose was of his own work. "This was simply a descriptive study. It described what's in the case files of the children in custody of OKDHS." That's page 203.
Page 207, "It's very important to remember with those kinds of questions that many of these questions" -- the one at hand was about what distributable variables are -- "would refer to a far more complex experimental research design that we conducted here. We had no hypotheses. We were not seeking any particular interpretation of treatment. We were simply doing a description of the information that was in the files."
Do you understand what Dr. Milner and Dr. Smollar are saying when they're saying --
THE WITNESS: Yes.
MR. PAGE: Object to the form. Let me -- let me make the objections, please. Object to the form of this line of questioning.
Q (BY MS. INGBER) Do you understand what they're saying when they say this is a what study,



not a why study?
MR. PAGE: Object to the form.
THE WITNESS: I disagree.
Q (BY MS. INGBER) You think this is -- so even though that's how they describe their work, you think they're wrong about what their work is?
A I think there are inferences here that have to do with causality.
Q Inferences based on the research? The child welfare literature?
A No. Inferences in the document about what's good and what's bad.
Q Okay. But you don't think that -- that when they say, "What we did was a descriptive study," you don't think that's accurate? You think they're just not getting it?
A I think the case review is more than a descriptive study.
Q Is internal validity applicable to studies that don't attempt to determine cause and effect?
A Say it again.
Q Is internal validity applicable when you have a study that's not attempting to determine cause and effect?
A I think it is trying to determine cause

Page 154

and effect.

**Q That's not my question. If it wasn't attempting to determine cause and effect, is internal validity applicable?**

A I don't know of studies that do that.

**Q You don't think any study -- there's any studies in the whole world out there that aren't attempting to determine cause and effect?**

A I don't think this one is.

**Q But you think there are those studies out there that are descriptive?**

A Sure.

**Q For example, a survey?**

A Sure.

**Q Would internal validity be applicable to a survey? Or --**

A Instrument validity is.

**Q That's not my question. Is internal validity applicable to a survey or another study that's attempting to describe something?**

MR. PAGE: Object to the form.

THE WITNESS: Depends on what you're doing with a survey -- with the survey. In other words, survey's a methodology that could be used to do a lot of things with.

Page 155

**Q (BY MS. INGBER) Let's say a descriptive survey.**

MR. PAGE: Object to the form.

THE WITNESS: Again, it depends on whether you're going to use the survey data to do something else with.

**Q (BY MS. INGBER) I'm going to mark as Exhibit 783 -- this is one of the documents that you cite to in your report. It's a website actually. It says from this website, "Internal validity is only relevant in studies that try to establish a causal relationship. It's not relevant in most observational or descriptional studies." Do you see that?**

A Uh-huh.

**Q Do you agree with that?**

A Depends on what they're going to do with the observations. It's entirely dependent upon what the data are going to be used for.

**Q So are you saying you disagree with the source that --**

A Survey --

**Q Let me finish my question.**

A Sure.

**Q Are you saying you disagree with the**

Page 156

**source that you cited in your own report?**

MR. PAGE: Object to the form. Argumentative.

THE WITNESS: What I'm saying is that it depends on what you're going to do with the survey results. Surveys are -- are method for gathering data. What you do with the data in the end's different than the method of gathering information. Sometimes you make inferences from them, and sometimes you don't.

**Q (BY MS. INGBER) I'm going to give you --**

A And in this -- in this case I think they're making inferences from it.

(Exhibit 784.)

Q I'm going to show you another document that you relied on in your report. This is by you and Ohlund from 2010. And in this sort of at the bottom of the first page, they say, "Internal validity refers specifically to whether an experimental -- experimental treatment/condition makes a difference or not, and whether there's sufficient evidence to support the claim." Do you see that?

A Yes.

**Q Do you disagree with that?**

Page 157

MR. PAGE: Object to the form.

THE WITNESS: I don't disagree with it. I want to say something more. Again, it depends on what you're trying to make an inference about. In this instance you're wanting to make an inference about whether the -- the State of Oklahoma is doing a bad or a good job.

**Q (BY MS. INGBER) How would Milner have gone about determining internal validity? Let's just pick one of his findings to -- sort of at random, and you can tell me how you think he should have gone about doing it. So one of his conclusions is page 7. Just picking one at random.**

A Where are we at here?

**Q Page 7 of his report, yeah. And let's look at the second bullet point from the top. "Among the first four placement settings for children in the sample there were 243 placements with relatives. Of those placements, 131 disrupted and the children were moved to another placement."**

**What is the cause and what is the effect here and how would you determine internal validity?**

A Well, he doesn't say. But I'm assuming that the fact that they're -- half of them disrupted you would probably want to know why. Wouldn't you?

Page 158

**Q What if Milner doesn't want to know why? What if he simply wants to report the fact that half of them disrupted?**
A Well, I think he's reporting the fact so that somebody can make an inference about disruptions because most people think of them as bad. It depends on how -- how and why they disrupted.
**Q So you can't tell me for this finding what the cause and what the effect is and how you would determine internal validity for that finding?**
MR. PAGE: Object to the form.
THE WITNESS: You mean if I were to -- you want me to speculate about if I were to conduct this study?
**Q (BY MS. INGBER) No. I want you to say how would Milner have determined internal validity for this result?**
A He didn't.
**Q Right. How could he have? Tell me how he could have.**
A Looked at the consequence to the children who disrupted and not. Looked at the reason for the disruption.
**Q That would have been if he wanted to know**

Page 159

**the reasons and the consequences; right?**
A I would think he would want to.
**Q Well, he said that he didn't. He said that what he wanted was simply to describe the experiences of children in custody.**
MR. PAGE: Object to the --
**Q (BY MS. INGBER) But you're saying that's not what he should have wanted to do?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Is that what you're saying?**
MR. PAGE: Objection.
THE WITNESS: No, huh-uh. I'm saying that -- that somebody will make an inference about these disruptions in the end. That number. And he's not testing whether that's a good or bad thing. That's what internal validity's about.
**Q (BY MS. INGBER) Do you think all research that doesn't try to prove cause and effect is unimportant?**
MR. PAGE: Object to the form.
THE WITNESS: No.
**Q (BY MS. INGBER) So give me an example of when you think descriptive research has value.**
A You go online and you look up something

Page 160

and do some research online and find an answer to a question. That's a form of research. It's not empirical. But it's a form of research.
**Q You did descriptive research when you were in Texas; right? It says on your resume that you did, your CV.**
A Uh-huh.
**Q Did you --**
A Yes.
**Q Did you determine internal validity when you did descriptive research?**
A Sometimes.
**Q Not always?**
A No.
**Q So you don't always have to determine internal validity for descriptive research?**
A Depends on your -- depends on what somebody's going to do with the information you're giving them. If -- if they were going to make inferences about it, I did. I tried to work out a methodological solution that would allow them to have greater certainty about the inferences they're going to make.
**Q Hypothetically if the only purpose of this research was to describe what happened to kids in**

Page 161

**care, that's it, just want to describe, they had X number of placement moves, they had X amount of maltreatment, they had X length of stays, they exited to the following types of placements. That's it. That's all you want to do. You want to have a study that says, "This is the state of the universe for these kids. This is what happened to them." Can you imagine that type of study?**
A Of course. But I don't think that's what they're doing here.
**Q That's not my point. I understand you disagree with them about what they did and you think that you understand better than them what they did. Assuming that's all they did, what is truly a descriptive study, can you determine internal validity for such a study?**
MR. PAGE: Object to the form.
THE WITNESS: I don't understand.
**Q (BY MS. INGBER) If all you do is a descriptive study that describes the experiences of kids in foster care, how do you determine internal validity? You're not trying to say this proves -- causes anything, this is -- I'm inferring anything about this. Just describing.**
MR. PAGE: Object to the form.

Page 162

THE WITNESS: I think if you're doing a descriptive study that's going to be used to make an inference --

**Q (BY MS. INGBER) That's not my hypothetical. My hypothetical is you're not using it to make any inferences, you're just describing, how do you determine internal validity?**

A I don't think you are just describing. Again, I don't think that's what's happening here.

**Q I'm asking you to assume hypothetically that there's a hypothetical study out there in the universe that simply describes the experiences of kids in foster care. For that hypothetical study how would you determine internal validity?**

A I don't think you've got one like that in -- in foster care.

**Q There's no descriptive studies in foster care?**

A I think people call them descriptive, but I think people make inferences about them. Can we -- you can think -- think up one that -- that -- where there's nothing going to be inferred at all.

**Q And so that you think you would have to go and do some studies of cause and effect for every single one of those child welfare studies to make**

Page 163

**them valid?**

MR. PAGE: Object to the form. Argumentative.

THE WITNESS: I don't know.

**Q (BY MS. INGBER) You have a very short section on page 17 of your report on external validity. It's just a short paragraph.**

A This -- this one?

**Q Your June 9th report -- June 15th report. I apologize.**

A Wait a minute. I've got to get it. What page?

**Q Page 17. Is that paragraph just simply a summary of arguments you made elsewhere in this report?**

A I believe so.

**Q Okay. In your conclusions about child maltreatment.**

A Eighteen?

**Q You are probably there quicker than me. Let me check. Yes. That's right. You say that he was wrong for "equating investigations with a finding of unsubstantiated services recommended as substantiated maltreatment." Right? That's a criticism you have?**

Page 164

A Yes.

**Q I want to ask you to turn to page 29 of Milner's report. And specifically to table 9.**

A Page what?

**Q Twenty-nine. Does that table improperly equate unsubstantiated with services recommended and findings of substantiated?**

A Say that again.

**Q In this table is Dr. Milner improperly equating a finding of unsubstantiated with services recommended and a finding of substantiated?**

A Yes, he's combining unsubstantiated services recommended. And --

**Q With what?**

A He's combining the two things, unsubstantiated and services recommended.

**Q Do you know that in DHS policy that's a single finding, that's not two findings?**

A Well, it's an unclear measure, then. It's a compound measure.

**Q In DHS policy there are four possible findings for investigations. The four that are listed here.**

A Okay. Well, you can't know much from it, then.

Page 165

**Q So DHS -- the way DHS sets out its findings is not good. Is that what you're saying?**

A No. I'm saying it's a compound -- it's got two -- two features to it.

**Q What -- be specific, please. What has two features?**

A Unsubstantiated is one thing. Services recommended is another.

**Q Do you know what the DHS --**

A Do they have -- do they have an unsubstantiated only?

**Q Ruled out, no maltreatment occurred. That's right above it.**

A That's different, as I understand it, from unsubstantiated.

**Q What does "ruled out" mean in DHS policy?**

A Means no maltreatment occurred.

**Q What does "unsubstantiated" mean?**

A I think it means something different to them if I'm recalling correctly.

**Q What does it mean?**

A I really can't remember from reading it, but -- and I think it was in Goad's report, which we might have to turn to if you want. As I recall, it means something different than ruled out.

Page 166

**Q I'll tell you that it means there wasn't enough evidence.**
A It's like an I don't know.
**Q It's an I don't know. So there's a I know nothing happened, I don't know whether something happened.**
A Yeah.
**Q And then substantiated is I know something happened and you can do --**
A Yeah.
**Q -- a couple of different things?**
A Yeah.
**Q How is that -- you said that that was unclear. How -- or that's combining two things. How is that combining two things? I know, I don't know. I know something happened, I don't know if anything happened. I don't know.**
MR. PAGE: Object to the form.
MS. INGBER: Explain how that's confusing.
MR. PAGE: Same objection.
THE WITNESS: It seems that having an "I don't know" category, unsubstantiated along with service recommended is two things, not one. Because you can recommend services for a lot of reasons different than "I don't know."

Page 167

Q (BY MS. INGBER) Okay. If you had been designing the study and those are the findings that DHS had, those are all of DHS's possible findings; okay. How would you have gone about figuring out whether -- what the findings were for formal investigations other than counting what DHS themselves said were the findings?
A I would probably look at the types of services that were recommended and perhaps exclude those that weren't -- that weren't -- that would have been separate or different than those that would go along with the concept of I don't know.
**Q So you would have subdivided that unsubstantiated category into two subcategories and made a judgment call about where things should have gone?**
A Uh-huh.
**Q Yes, that's what you would have done?**
A Yes.
**Q Okay. But your report specifically says that Milner improperly equated unsubstantiated with services recommended with findings of substantiated. That's what your report says. How in this table is Milner equating the finding of unsubstantiated services recommended and the finding of**

Page 168

**substantiated? Doesn't he break them out in this table?**
MR. PAGE: Object to the form.
THE WITNESS: Which part are you talking about?
**Q (BY MS. INGBER) Page 18. "From the perspective of Dr. Milner's instrument" --**
A Okay.
**Q -- "and instructions to his case reviewers for identifying child maltreatment, equating investigations with a finding of unsubstantiated with services recommended and substantiated maltreatment can't be supported from the information presented in the analysis of Dr. Milner's report or any study of which we are aware."**
**And I'm asking you to show me where in table 9 he, in fact, equated those two things.**
MR. PAGE: Object to the form.
THE WITNESS: He -- he didn't in table 9.
**Q (BY MS. INGBER) Okay. So he was transparent, at least in this part of his report, and divided those two things up?**
A Yes. They're divided there.
**Q Okay. So it's not entirely true to say that from the perspective of his instrument and**

Page 169

**instructions to his case reviewers, he equated those things. That's an overstatement.**
A I don't know.
**Q So tell me then if that's not an overstatement where, in fact, he did -- he did that throughout his report.**
A Well, John wrote this; and I -- I presume we could go looking if you want.
**Q Okay. Well, why don't we look actually at the instrument itself. Let's look at page 179 to 180. If you look at page 179, grid 6c.**
A What am I looking for?
**Q Grid 6c.**
A Say it again.
**Q Grid 6c. Page 179.**
A And where am I looking on?
**Q I'm just going to describe it. It's about allegations of a maltreatment while in OKDHS custody. There's a column for allegation dates, for what the allegations were --**
A Yeah.
**Q -- for who the alleged perpetrator was, the date. And then the column that I'm most interested in is the finding. It says "key 3." And it -- you have to go to key 3 which is on line --**

Page 170

the next page. Page 180.
A Uh-huh.
Q And it gives a list of what you can put in there. "Ruled out."
A Uh-huh.
Q "Unsubstantiated services recommended. Substantiated services recommended. Substantiated court intervention recommended." And there's a fifth one here, "Reasonable exercise of parental discipline."
A Okay.
Q In your report you say, "From the perspective of Dr. Milner's instrument and instructions to his case reviewers for identifying child maltreatment, equating investigations with a finding of unsubstantiated with services recommended as substantiated maltreatment can't be supported." And I'm asking you to show me where in this instrument in it's key --
A I don't see it in the instrument. I think you're going to have to ask John because he wrote the --
Q Okay.
A -- the section.
Q So from your review of this, you don't see

Page 171

where he got that from?
MR. PAGE: Object to the form.
THE WITNESS: I don't know.
Q (BY MS. INGBER) This section also says on page 19 in sort of the -- it's a small paragraph right above the "placement stability" section.
A Uh-huh.
Q "The meaning of 'no actions taken' because they were not reported in the files of 24.8 percent of the cases (also likely inflated for because of selection bias) is unclear. This could be due to the high level of missing information."
And I'm not sure I understand this because if you look at page 30 of Dr. Milner's report there's a table, table 10 that describes the types of DHS actions taken during and after investigations. Do you see that?
A Uh-huh.
Q So when this report -- your report says, "The meaning of 'no actions taken' is unclear," how is it unclear when there's a chart that says exactly what types of actions were taken and when those actions were taken?
MR. PAGE: Object to the form.
THE WITNESS: Well, I guess I'm saying

Page 172

does -- do -- does "no actions taken" mean something's missing from the case file or does it mean that they didn't check one of these boxes?
Q (BY MS. INGBER) When is it appropriate not to document in a case file an action taken during an investigation?
MR. PAGE: Object to the form.
THE WITNESS: I don't know.
Q (BY MS. INGBER) Do you think it is appropriate to not document in the case file the actions you take during an investigation of a maltreatment referral?
A What I'm saying is that you can't tell if no actions taken means the thing was missing from the case file or was simply the action wasn't checked. You don't -- you can't tell the difference between the two.
Q So you can't tell if a -- if a DHS worker violated DHS policy and statute and failed to document an action they took in the child's case file, you can't differentiate that from whether, in fact, they didn't do such an action?
A Yeah.
Q Okay. But that would be a violation of DHS policy and law if they hadn't done it?

Page 173

A I don't know --
MR. PAGE: Object to the form.
THE WITNESS: I don't know DHS policy. All I know is that you -- you can't tell from the data whether something was missing or they didn't take an action.
Q (BY MS. INGBER) Well, this table specifically --
A Where are you at?
Q Table 10, same table. Specifically describing the types of action taken in those cases where there were actions; right?
A Where they -- where they could -- where they have recorded one, yeah.
Q Right. So you're saying we don't know whether maybe they took some more actions and simply just didn't write it down in the case file. That's your point in this paragraph.
A Or something was missing when they mailed it to the -- I mean, there are a number of possibilities. I don't know what they all are. But the thing I'm saying is that you don't know if they didn't take an action or you -- or -- as opposed to something's missing from the record.
Q How do you define a good move?

Page 174

A I can give you two.
Q I don't want examples. I want a definition that you could give to case reviewers when they were doing a case review.
A Less restrictive placements.
Q Are always good moves?
A Typically they're thought of as good moves.
Q Are they always good moves?
A In theory.
Q So if you were designing this and trying to distinguish between good moves and bad moves, would you tell your reviewers, "Don't count any move to a less restrictive placement because that's a good move"?
A That's what I've done in the past. I've also considered moves from shelters as being a good move when they've got to place the child -- when a child then goes to a home that has to be verified. If you have to remove a child and you haven't got a readily available home to go to, then a shelter stay would be an appropriate move till you got a home verified or got a relative -- which takes longer -- verified.
Q So your instructions to your case

Page 175

reviewers would be, "Any move from more to less restrictive placement is good. Any stay in a shelter while they're verifying a home is good."
A What I've done is remove shelter stays and count moves past that.
Q You would remove all shelter stays?
A That's one way to do it.
Q Are all shelter stays good moves?
A Probably not.
Q Is a shelter stay that's excessively lengthy a good move?
MR. PAGE: Object to the form.
Q (BY MS. INGBER) A good placement, I should say.
MR. PAGE: Object to the form.
THE WITNESS: Shelter stays can vary, depending upon what they're trying to do, whether they're trying to verify a home or whether they're trying to assess the child.
Q (BY MS. INGBER) So if you were excluding all shelter stays because you were trying to exclude those as good moves, you would, in fact, be excluding some shelter stays that were, in fact, not good placements?
A It would.

Page 176

Q And if you excluded all moves from more restrictive to less restrictive, you would be excluding some moves that were, in fact, not appropriate. Because those aren't always appropriate moves either; right?
A I think everybody would pretty much agree with less restrictive's good.
Q But that would introduce subjectivity and would underestimate placement stability, the process that you're proposing?
MR. PAGE: Object to the form.
THE WITNESS: Might. Don't know.
Q (BY MS. INGBER) Let me ask you this. I'm going to read you a hypothetical. And I believe you said that you think it would be positive for a child if they were waiting in a shelter while a relative home is verified; right?
A Uh-huh.
Q Yes?
A Yes. Sorry.
Q What if they wait in the shelter for, let's say, three weeks while they're waiting for their relative home to be verified? Is that a good placement in that shelter?
A I don't know.

Page 177

Q You don't know; right? It would be hard to tell?
A Yeah.
Q What if they waited for three months while a relative home was being verified? Is that, then, a good stay?
A I don't know what the standard would be to be honest. I don't know.
Q It would be very subjective?
A Yeah.
Q What if after they were in the shelter for however long, they moved to a relative home and it turns out after a week the relative is beating them and they had to be moved? Would that affect your assessment of whether the initial move was a good one if, in fact, the placement in the relative home was not a good choice?
A You want to count -- you want to count moving and disruptions together? Is that what you're saying?
Q I want to know if in order to determine whether a move was a good one, you need to have information, long-term information about the second place the child was placed.
A Yes.

**Q What if a child was very young or had special needs and was placed in a shelter anyways? Would that affect your determination whether that shelter placement was a good one?**
A It depends on what you're doing in the shelter, whether you're doing an assessment. If they have special needs, I'm assuming you're going to be doing an assessment to figure out what's the best place -- the best place to put them.
**Q What if the only reason the child was in the shelter is because the agency had failed to recruit and retain enough homes so that they could get into a family-like setting right away? Is that a good placement in a shelter?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know. I don't know.
**Q (BY MS. INGBER) It's hard to tell; right? Whether something's a good move or a bad move?**
A It's difficult to do, but it can be done.
**Q I'm going to give you a scenario, and you tell me whether each move is a good move. Child is moved from shelter to relative home.**
A And you want -- want me to just say --
**Q Tell me, "good move," "bad move."**



**A Good.**
**Q After a week the relative decides they don't want the child because of behavioral problems so the child's moved to another relative.**
A I'm going to answer this in a complex way because I think that the questions are -- don't take into account enough of the context of what's possible and not possible. Narrowly defining it like that I'm not sure is the way I would think of it.
**Q How would you give instructions to case reviewers on whether -- how to determine if a move was a good move or a bad move so that they would all reach the same conclusion and --**
A I would do an analysis of it. I wouldn't have them determine good move, bad move. What I would do is record some data and analyze it.
**Q Is there a certain number of moves where the mere fact of an additional move isn't harmful to the child just because of cumulative effect?**
MR. PAGE: Object to the form.
THE WITNESS: Say it again.
**Q (BY MS. INGBER) Does the cumulative effect of moves, is that -- the mere cumulative effect of the number of moves harmful to children at**



**a certain point?**
MR. PAGE: Object to the form.
THE WITNESS: It depends on the -- depends on the moves.
**Q (BY MS. INGBER) So you think that there's no point at which -- if a child had 15 moves and every move was a good one, you would think that the cumulative effect doesn't matter at all to the child?**
A I think it would be less of an impact than bad moves.
**Q But it would still have an impact just the number; right?**
MR. PAGE: Object to the form.
THE WITNESS: I guess. I don't know.
**Q (BY MS. INGBER) You haven't looked into the child welfare literature on that?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Have you looked into the literature on that?**
MR. PAGE: Object to the form.
THE WITNESS: I've read the -- I have read the literature on placement moves, yeah.
**Q (BY MS. INGBER) And what does that research show?**



A For one thing, it's really complicate is what it shows. It is a very, very difficult thing to study and that you need to take into account time in care and you need to take into account the nature of the move. And you need to have an outcome.
(Exhibit 785.)
Q I am going to show you a document that was part of the considered materials for your reports. It's a -- I think this was actually done by --
A Looks like Fred Wilson.
**Q Is this Wilson?**
A Maybe.
**Q "Placement Stability in Child Welfare Services."**
**A Probably Wilson.**
**Q It actually doesn't say. Simply done by the UC Davis Extension Center for Human Services.**
A Let's see. Who is it? Oh, this is somebody else?
**Q If you turn to page 4 and 5 of this document which was cited to in your own report, it discusses the, quote unquote, wealth of research on the importance of placement stability and how moves can be harmful to children. You said you're aware of this research; right?**

MR. PAGE: Object to the form.
THE WITNESS: Where do you want me to look?
**Q (BY MS. INGBER) Just at this section, page 4 to 5 when it talks about -- I'm quoting now -- the "wealth of research" on the importance of placement stability.**
A So what was your question?
**Q You're familiar with the research that it's referencing here?**
A Some of it. Some of it not.
**Q Is there any discussion of good moves versus bad moves in that section?**
A It doesn't look like it here.
**Q So that's not always something that's taken into account on your research on moves?**
A That's correct.
(Exhibit 786.)
Q I'm going to give you another article by Munro and Hardy, which is one that's also referred to in your reports. Are you familiar with this article which was cited to in your report?
A No. I didn't cite it, but --
**Q That's something Dr. Fluke cited to?**
A Uh-huh.



**Q Okay. On page 20 -- page 6.**
A Page what?
**Q Six. It discusses the difficulty of differentiating between, quote unquote, good and bad moves because -- and now I'm quoting -- "perceptions of the need for changes of placement and the quality of provision may well differ depending upon whose views are elicited and on what stage outcomes are examined." Do you agree with that statement?**
A Where are you -- where are you on the page?
**Q It's page 6. I'm sorry. That's the number.**
A Okay. What's the question?
**Q Do you disagree with that statement, that "placement changes" -- I'm sorry, that "perceptions of the need for changes of placement and the quality of provision may well differ depending upon whose views are elicited and at what stages outcomes are examined"?**
A They'll differ.
**Q Right. So it's difficult and subjective, would you not agree -- would you agree, to determine which moves are good and which moves are bad?**
MR. PAGE: Object.



THE WITNESS: Yes, it's difficult.
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) It's also involves some subjectivity?**
A Yes.
**Q On page 20 of your report.**
A Back to that?
**Q Yes.**
A Let's see. Which -- I've got to find it. Hold on.
**Q Sure, sure. Of course. Take your time.**
A Okay.
**Q Sorry. Let me see to make sure I got that. Okay. Sort of in the -- there's a short paragraph sort of in the middle of the page beginning "There is no evidence." Do you see that?**
A Uh-huh.
**Q "There is no" -- and I'm just going to quote from your report. "There is no evidence offered that would indicate that a move from an initial placement to a subsequent less restrictive one would indicate that the first placement was inappropriate."**
**Dr. Milner's study indicated that 43.9 percent of the time the reason for the first**



**move was less restrictive placement.**
A Uh-huh.
**Q Does that seem like a lot to you, that 43.9 percent of the time that first placement was more restrictive than the second one?**
A I thought it was less is what you're saying. Read me --
**Q I'm sorry. Yeah. It says "less restrictive."**
**A I don't know.**
**Q Can you think of any hypothesis of why almost 45 percent of the time children are placed in a more restrictive placement first?**
MR. PAGE: Object to the form.
THE WITNESS: I have no idea.
**Q (BY MS. INGBER) Do you think it's possible that all of those initial placements in more restrictive settings were appropriate?**
A I don't know. I really don't.
**Q You just have no idea. When in your opinion is it appropriate to place kids in shelters?**
MR. PAGE: Object to the form.
THE WITNESS: When you need to do an assessment. When you're trying to verify a relative home, say, for example. Two examples.

Page 186

Q (BY MS. INGBER) Is it appropriate to place a child in a shelter because you don't have sufficient homes to place them in a more family-like setting?

A I don't know.

Q You think that is appropriate?

A Seems like --

MR. PAGE: I'll object to the form.

THE WITNESS: I'm really not a child welfare expert so --

Q (BY MS. INGBER) Okay. On page 21 of your report in the third full paragraph beginning with "Because it is not." Do you see that?

A Uh-huh.

Q "Because it the not clear whether placement changes were positive or negative, the results in chart 1, showing that services to prevent a removal were not offered in a high percent of the cases, is also not clear. This finding could indicate that no services were needed because the move was positive."

And let's look at chart 1 in Dr. Milner's report, which should be on page 51 if my notes are right.

A What page?

Page 187

Q Page 51. Do you see that?

A Yes.

Q So this is Dr. Milner's analysis of whether services were provided to prevent placement moves. And in the sentence right above chart one, it says, "The findings regarding services offered to caregivers in the 175 cases where maintaining any disruptive placement would have been appropriate are shown in chart 1 below."

So you're criticizing Dr. Milner for -- because his finding could indicate that no services were needed because the move was positive. From my reading of what he did, he, in fact, only analyzed it in those cases where services would have been appropriate.

MR. PAGE: Object to the form.

THE WITNESS: How does he know? How does he know?

Q (BY MS. INGBER) Well, didn't you say it was possible to figure out whether a move was a good one or a bad one?

A Well, where's the data?

Q Let's assume he has the data. And I think he does give some -- he does describe how that -- how that was -- some examples and -- the way you

Page 188

were saying, you can tell, some moves are good moves and some moves are bad moves, where he thought it was appropriate to put down a place.

So are you saying two things, that he couldn't have done this because he couldn't have figured out which moves are good and bad? It seems like you're contradicting your earlier point which is that he should have done exactly that.

MR. PAGE: Object to the form.

THE WITNESS: I can't tell if that's what he did, but it seems to me that if he was able to tell between good and bad moves, why didn't he just count bad moves in his disruption count? I mean, you can't tell from the data.

Q (BY MS. INGBER) Did you look at this data?

A There's no -- there's no table that shows good and bad moves.

Q You also say in your report -- and this is on page 21 -- that same paragraph, but near the end.

A Where?

Q Same paragraph. "He removes cases where the child had two or more placement settings, and there is no reason to believe that they are inappropriate ones." And that is in chart 2 that

Page 189

you're referring to.

A Right.

Q I'm just trying to understand if that's actually what Dr. Milner did. Because if you read the paragraph above chart 2, it says, "With regard to whether or not services were offered to the child to try to prevent placement disruptions, reviewers indicated that in 164 of the 344 cases in which the child had at least two placement settings, it would not have been appropriate to offer services."

So where is he removing children who had two or more placement settings? Isn't he simply saying here that obviously you wouldn't have provided services for a kid who had less than two placement settings because they only had one placement setting?

MR. PAGE: Object to the form.

THE WITNESS: I don't understand the question. I think what I was saying -- just a second.

Q (BY MS. INGBER) You say that -- in chart 2, "He removed cases where the child had two or more placement settings." And I'm asking you: Where did you get that from?

MR. PAGE: Object to the form.

Page 190

THE WITNESS: Well, here's what he -- it says it right here.
**Q (BY MS. INGBER) It says, "He removed" -- says he removed the children? Doesn't it say, "He only looked at the children that had two or more placement settings"?**
A I didn't say that.
**Q I'm sorry. Who didn't say what?**
A What he's doing as I understand this is he's just looking at a subset of cases.
**Q What subset is he looking at?**
A And I -- as I understood it, he was trying to look at the cases in which -- he's trying to get -- get rid of those cases where service offering would be inappropriate, I think, if I'm getting this right.
**Q But that's not what your report says. Your report says that, "He removes cases where the child had two or more placement settings, and there is no reason to believe that they are inappropriate ones." And I'm asking you: Did Dr. Milner, in fact, remove cases where the child had two or more placement settings?**
MR. PAGE: Object to the form.
THE WITNESS: What I'm not understanding

Page 191

about what he's doing is why he's assuming that he's looking at cases where the child had at least two placement settings and it would not have been appropriate to offer services. I'm asking: Why not?
**Q (BY MS. INGBER) Why not what? Why not -- why --**
A Why would -- why would it not have been appropriate to offer services?
**Q But he's not removing, as you say in your report.**
A Well, maybe this is -- maybe this is typed wrong. But my point's the same, I think. Except I --
**Q Well, your point is what's in your report. That's what you can testify to.**
MR. PAGE: Objection. Argumentative.
**Q (BY MS. INGBER) So you're saying that what's in your report is actually not right?**
MR. PAGE: Objection. Argumentative.
THE WITNESS: What I'm saying is that I don't think he remedies the problem with chart 2.
**Q (BY MS. INGBER) But when you say, "He removes cases where the child had two or more placement settings," that's not true?**

Page 192

A I don't know.
**Q Well, said, "He only looked at children that had at least two placement settings."**
**A Yeah. I think that's what he's doing. He's looking at kids who have -- let's see. Two placement settings. And he's saying it wouldn't have been appropriate to offer services. How do you know that, is what I'm saying?**
**Q But that's not actually what you said in your report.**
MR. PAGE: Objection. Argumentative.
**Q (BY MS. INGBER) I just want to know whether you'll stand by your statement that Dr. Milner removed cases where the child had two or more placement settings, in chart 2.**
MR. PAGE: Objection. Argumentative.
THE WITNESS: I just can repeat myself. I don't think that he gets at good and bad moves and services that result from those kinds of things through charts 1 and 2.
MR. PAGE: Take a lunch break now.
VIDEOGRAPHER: Off videotape record. Time is 12:04 p.m.
(A lunch recess was taken from 12:04 PM to 1:09 PM.)

Page 193

VIDEOGRAPHER: We're now back on the videotaped record. Time is 1:09 p.m.
**Q (BY MS. INGBER) I want to go back generally to some topics we covered earlier.**
**(Discussion off the record.)**
**Q (BY MS. INGBER) So I'm going to go back to just generally some topics. So when we were talking about whether Dr. Milner's study was descriptive or not, it was your opinion that because he was drawing inferences, it wasn't purely descriptive.**
**You understand that there's -- and I'm sure you do, that there's a difference between explanatory research, experimental research, descriptive research; right?**
THE WITNESS: Yes. There -- there is. Again, I don't think his study is descriptive.
**Q (BY MS. INGBER) All I asked was whether you understand that in the different types of research you can do, those are three different purposes that can be for research, describe, to explain, to do an experiment and try to prove cause and effect? Or that an intervention had a certain effect; right?**
A You don't have to do an experiment to make

an inference.

Q If you don't mind, just answering the questions I'm asking would make this go quicker.

MR. PAGE: Objection. Argumentative.

Q (BY MS. INGBER) All I asked was whether you understand that there are different types of research you can do? And some of those categories include descriptive, explanatory and experimental.

A Sure.

Q What determines whether something is descriptive, explanatory or experimental? Is it what you do with the data, or is it how the research is designed?

A It's -- I think it's both. It's what you --what the design is and what you do with the data.

Q Is that a widely accepted view?

A Sure.

Q So if, for example, I designed a survey -- this is totally hypothetical -- to determine how many people have a Canadian relative. I just -- I'm curious. I want to describe the number of people living in the United States with a Canadian relative.

And I pull a sample and I survey these



people and they say, "Yes, I have a Canadian relative," "No, I don't." And my purpose is just to describe out of curiosity. And then someone uses my research to draw inference from that about the relationship between Canada and the United States.

Does that make my survey not descriptive because someone has used the data to draw an inference?

A Depends. I guess on the nature of the questions you're asking in the survey. Survey's just a way to collect data. You can -- you could do a structural model with a survey.

Q But if someone uses my research to draw inferences, do you think that that makes my research something other than descriptive?

A Depends on what you -- as again, it depends on what you did with the survey data. You can take survey data and take the questions you have in a survey and do basically what would be -- a structural model means you're going to look at different pathways of predictors to an outcome. And you can do that from survey data. And when you're doing that, you're inferring cause and effect. So surveys are just a way to get data.

Q So if someone -- if I used my survey data



and did a structural model, that would make it into something different. But I'm not saying that I did that. I'm saying I did my survey and someone then said, "Well, based on the literature that I read out there about the relationship between Canada and the United States, the survey suggests blah, blah, blah, about the relationship between Canada and the United States."

Does that change my survey from a descriptive instrument, a descriptive project into something else?

MR. PAGE: Object to the form.

THE WITNESS: Let me see if I get your question right.

Q (BY MS. INGBER) Sure.

A You want a one-item survey and all you're asking is -- I mean hypothetically; right?

Q Hypothetically.

A I don't know. If you had one item and somebody else draws an inference from it, I guess you could call that descriptive.

Q What if you have 20 items and someone draws an inference from some of those items?

A Well, again, I think that they're drawing inferences from the study.



Q I'm not asking you anything about Milner's study right now. All I'm asking you for is: Generally speaking, if I do a 20-item survey and someone, whether me or someone else, third party or the person who did the study says, "My inference from this is the following." Does that make that not a descriptive survey?

MR. PAGE: Object to the form.

THE WITNESS: It depends on how the questions are asked and what -- how you state your results and what you do with it.

Q (BY MS. INGBER) So it depends primarily -- it depends on the way I designed my survey?

A Well, sure. And depends partly on the way you design it, partly on how you write up the results and partly on what somebody does with those results.

Q So you think that -- ex post facto, depending on what I do with my results, that can change whether something was descriptive, explanatory or experimental?

MR. PAGE: Object to the form.

THE WITNESS: I'm not sure quite what you mean.

Q (BY MS. INGBER) Let me rephrase it if it's confusing. Because I agree that it was a confusing question.
So I set out to do a descriptive study. I create an instrument. I collect information. And my purpose is descriptive. I design my methodology to be descriptive. Do you understand what I'm saying when I say that?
A Sure.
Q After the fact, you know, a year later I say, "Wait a second. I'm going to go back to that data, and I want to do some additional analysis. I want to look at the research and see what maybe hypotheses I can draw from that." Does that change the fact that maybe what I did initially was descriptive because a year later I go out and do some research review and think of some hypotheses?
MR. PAGE: Object to the form.
THE WITNESS: Again, surveys are a method of data collection. They're not a research methodology. They're a method of data collection. Research methodologies have to do with design. And some designs are better than others. Like the survey could be a number of things. You could -- it could range all the way from a one-shot case study,



you know, to something you're going to model, you know. It can -- it can be a number of things.
Q (BY MS. INGBER) Okay. So it sounds like my use of the word "survey" is part of the problem here. I design a case-record review instrument with the purpose of describing what happened in the cases that I'm reviewing. Not specifically Milner, but that's -- that's my purpose, I want to describe what happened in these cases using a factual case-record review instrument.
Do you take my point that that's what I'm trying to do?
MR. PAGE: Object to the form.
Q (BY MS. INGBER) Yes. Hypothetically. I just want to make sure step by step you understand what I'm saying. Do you understand what I'm saying there?
MR. PAGE: Object to the form.
Q (BY MS. INGBER) Yes or no?
A I do.
Q Okay.
A And my answer's the same. In a --
Q I haven't asked you a question yet beyond "do you understanding what I'm saying?"
A Okay.



Q So I design my case-record review instrument, I collect all the factual data using all the questions that I've asked and I draw up some tables saying, "This happened X number of times. This happened Y number of times." Are we together so far?
MS. INGBER: Sure.
MR. PAGE: Object to the form.
Q (BY MS. INGBER) A year later, I decide -- I get some more funding, let's say; and I say, "I'm going to look into all the literature on things related to the facts that I found and see if I can draw any hypotheses." Does that change what I did from being descriptive to being something else?
MR. PAGE: Object to the form.
THE WITNESS: I don't know. I don't know.
Q (BY MS. INGBER) So you think that sometimes it did?
A To me, I -- to me, it's pretty rare to -- in child welfare anyway, in my experience in child welfare -- to do a study that's just simply describing something. You almost always know that somebody's going to use it to make inferences. And so that's why you're careful to do more than just one-shot case studies and stuff like that.



Q Well, you can do a descriptive study that someone uses for inferences. That doesn't mean that what you did was not a descriptive study. It just means some --
A Well, if you know --
MR. PAGE: Object to the form.
Q (BY MS. INGBER) I didn't finish my question yet.
A Go ahead.
Q Okay. If you do a descriptive study in child welfare research and that information is used by someone, whether you or someone else, to draw inferences after you're finished with the descriptive study, does that make what you did not a descriptive study?
MR. PAGE: Object to the form.
THE WITNESS: I think it does.
Q (BY MS. INGBER) In your opinion, it does?
A I think in my opinion it does because you know they're going to draw inferences from it and you guard -- you try and guard against threats to validity. So that -- so that they aren't improperly drawing inferences from your research.
Q Would that be a widely-accepted view among

**researchers?**

A I think so.

**Q Do you have any literature to support that?**

A I think if you looked at Campbell and Stanley, if my memory serves, they sort of start with one-shot case studies and sort of move through different designs to get a greater complexity to try and handle the problem.

**Q Campbell and Stanley's book on experimental and quasi-experimental research?**

A Yeah, yeah.

**Q That's not a book that's talking about, for example, qualitative research, is it?**

A No.

**Q Or descriptive research?**

A I think they would include descriptive under one-shot case studies, but they would also regard them as lacking in internal validity.

**Q Do you know that -- that was a 1963 document; right?**

A Yeah.

**Q Have you read any of their later work, by Campbell or Stanley?**

A Yeah. Well, Stanley was a graduate



student of Campbell --

**Q Uh-huh.**

A -- and I don't think he wrote anything later. Campbell then teamed up with Tom Cook, and they wrote a '76 version that had more of an introduction than the '63 book. So they talked about sort of their philosophical position to start with and some other things in the front hand and then went through their designs.

And I think in that one, they might included more recent stuff on structural modeling. I think in the earlier stuff they talked about path analysis.

**Q Are you aware that Campbell repudiated a lot of what he said in that chapter, the one that you're referring to that starts with case studies and moves forward, in a latter article he wrote called "Degrees of Freedom"?**

A I might have read that a long time ago.

**Q So his position evolved after his 1963 work which was about 50 years ago?**

A Right.

**Q And I'm assuming that the field has evolved since then, too?**

A To some degree. But that's his seminal



work. That's the one everybody cites all the time. You could cite Cook and Campbell if you wanted to. But that isn't the one where he -- to say he evolved -- he, like, Pearson and Fisher basically invented modern research methodology, quasi-experimental methodology. That's what he invented. That didn't change.

**Q So to go back to my original question, which is: Is there any literature to support your view that what you do with the results of a descriptive study can change it from being a descriptive study into something else? You believe that Campbell and Stanley support that position?**

A Sure. And Cook and Campbell. I'm trying to think. Sure. Bentley, maybe.

**Q They support that specific position that what you do with the results of a descriptive study can change it so that it's no longer a descriptive study?**

A Yes.

**Q Okay. So if we had that book in front of us, you could flip through it and find me a page reference through that.**

A Do you mean with -- with an exact quote? I don't know.



**Q Or something that supports that?**

A Probably not.

**Q Can you think of anything else that supports that other than Campbell and Stanley or the later Cook and Campbell book?**

A I think Bentley on structural modeling might make the same point. I'm not sure.

**Q Bentley's book on structural modeling would support the point?**

A It's a -- it's an article that was written about -- somewhere in the '80s, and it's considered sort of -- of a classic piece about structural modeling.

**Q Okay. Let's turn now to our discussion about what is and is not an abstract construct. And it's your opinion that the seven subparts of the instrument -- and we can look at this together. Page 108, Sections 1 through 7. You're saying that while the individual questions may not be abstract, that these larger topics are abstract constructs; is that right?**

A Yeah. I wouldn't include Section 1, but I would include Section 2, 3, 4, maybe 6. Yeah.

**Q What about 5 on "placement and adoption services"?**

Page 206

A Yeah. I think so except the -- yeah. I'd have to say yeah on the -- there aren't maybe enough items in it. But, yeah.
**Q So you think placement and adoption services is an abstract construct?**
A Well, placement is and -- and adoption is, yeah.
**Q That's not what the section is about. It's about placement and adoption services.**
A It's got both -- it's got both of them together.
**Q But it's about the services for placement and adoption; right?**
A Okay. So we call it -- the construct could be services if you like.
**Q So you think services is an abstract construct?**
A Yeah.
**Q Do you think the question of whether and what services are provided to children is abstract?**
A Yeah. I'm trying to think of a way to phrase this differently. Just give me a second. The way I would put it in -- in non-research terms would be that concepts or constructs or variables have attributes, you know. Like to me if I said

Page 207

"house," the attributes of a house would be doors, windows, ceilings, floors and so forth. And house would be the construct. Just like if I said "home," it's a different kind of construct. Probably contains more complex elements or representations of it.
**Q Explain to me how the existence -- or strike that.**
**Explain to me how whether services are provided to a child and what services are provided to a child is abstract in the way that depression is abstract or intelligence is abstract.**
A Well, services, if you were to think of the construct services, you know, the attributes of a service -- of services would be where, when, what, how many, things like that.
**Q How is that abstract?**
A Services is the -- to me the construct and the representations of that construct are features or attributes of services.
**Q So from your definition of what abstract is, what is not abstract? Give me an example of a nonabstract construct.**
A I would think that the -- some individual items that -- or elements that are the attributes of

Page 208

a construct can be not abstract. As I said before, to me the concepts or things like services and the attributes are things that -- and the -- the items within it, like you have placement stability and services and adoption there, are representations of the idea of services. There could be other representations.
**Q Do you think that the questions in Dr. Milner's instrument largely ask for abstract constructs or -- for example, explain to me how this question is abstract. "For the child's most recent entry into OKDHS custody, is there documentation in the case file that the child received routine annual dental evaluations?" What about that is abstract?**
MR. PAGE: Object to the form.
THE WITNESS: I didn't say it was abstract. I -- it's an -- to me -- which one -- what section is it under?
**Q (BY MS. INGBER) That's page -- that was under, I believe, services if I had to guess. It's in Section 4.**
A Okay. It wouldn't necessarily be abstract, but services would be.
**Q Okay. So that question's not abstract?**
A No. I think it's a -- it's a

Page 209

representation or an element of services.
**Q What about this? This is from Section 3. "Between the time of the child's most recent entry into foster care and the time of the case review, is there documentation in the case file of efforts made to find or develop a placement that would accept the entire sibling group?" Is that an abstract construct?**
A It's under "family visits"?
**Q That's under Section 3.**
A Okay. I think, again, it's a representation or an element of family visits.
**Q But that question itself is not an abstract question?**
MR. PAGE: Object to the form.
THE WITNESS: Perhaps not.
**Q (BY MS. INGBER) If you were looking at, let's say, an instrument trying to measure depression -- depression you would agree is an abstract construct?**
A Sure.
**Q And if you asked a question like, "Are you happy today?" Happiness is an abstract construct, as well.**
A As I said, some items can be abstract; and

some are less so. It's a -- it's a -- it's more like degree, don't you think?

**Q Whereas on my hypothetical depression -- depression measurement instrument, I could ask a question like, "Have you ever tried to kill yourself?" In contrast to the question of, "Are you happy today? One is, on the scale of abstractness, quite abstract and one pretty much isn't.**

A Yeah.

**Q And most of Milner's questions, not his headings, but his questions fall pretty far to the nonabstract side of that spectrum; correct?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know. I -- my point was -- the broader point is that these are -- the sections, almost all of them are abstract constructs. The items within the construct what -- you'd want to know if they hang together within a particular construct. And there's a way to test that.

**Q (BY MS. INGBER) That's not my question at all. My question was whether most of Milner's questions, not his headings or his section titles, but his questions, fall pretty far to the nonabstract side of the abstraction spectrum that**



**we've been discussing.**

MR. PAGE: Same objection.

THE WITNESS: I don't know if they do or not. I mean --

**Q (BY MS. INGBER) Can you show me an example of one that's trying to get at an abstract thing, like the contrast between, "Have you ever tried to kill yourself," and, "Are you happy?" Can you show me a single question in his instrument that's more like, "Are you happy?"**

**A "Proximity of child's placement to parents."**

**Q Okay. Well, let's look --**

A "Proximity" meaning what?

**Q Well, let's look at the questions that he actually asked because that's just, again, a heading. So that's 3C. See what questions are asked about proximity. "At the time" -- this is page 138 if you want to look at it.**

A Okay. What are you looking at?

**Q I'll read you the questions on proximity. "At the time of the child's most recent entry into OKDHS custody, is there documentation in the case file regarding the proximity of the child's initial placement to the parents or legal guardians?" There**



**are then nine options.**

A Uh-huh.

**Q "Child's placement was in the same community. Child's placement was in the same county. Child's placement was in adjacent county, but close to their residence. Child's placement was in an adjacent county, but not close to their residence. Child's placement was in Oklahoma, but not in the same or adjacent county. Child's placement was in another state. Information was not included, not applicable. Nine within 40 miles, but cannot determine more specifically." What about that is abstract to you?**

A Some are -- some are pretty concrete, and others are a little more abstract. Like "not close." I don't know what "not close" would mean. But --

**Q Okay.**

A Yeah. I'd give you -- yeah. They're -- they're fairly concrete. My point's still the same.

**Q Right. But you pointed as an example of a section that might be more abstract and less concrete to proximity. And when you actually look at questions, some of them are --**

A Some are; some aren't.



**Q -- some are pretty concrete. Can you give me another example of a section that you think has abstract constructs embedded in it, and then we can look at the actual questions and see whether they're concrete or not?**

A Again, I keep repeating myself. But the thing I think of as being the abstract -- the abstract concepts are the sections. And you can have items within sections. And typically case reading kind of works like that where you have lots of yes, no kind of things in case reading with concepts; and then under the concept, you've got a lot of yes, no kind of questions.

**Q So you think that because his section headings are abstract, that turns his instrument into one that's measuring abstract constructs?**

A I think that's so, yeah.

**Q Is that going to be a widely-accepted view in the field, that this is an -- an instrument trying to measure abstract constructs?**

A I don't know.

**Q Do you have anything to support your view that it is?**

A Thirty years of teaching research methods.

**Q So your own personal experiences and**

**knowledge?**
A Well, trying to give you a book. I'm trying to think of the name of the second author. If -- to give you a reference. It's -- gosh, I wish I would have referenced it. Paul Meehl is one of the authors of it. And I'm trying to remember the other one. But if you were to look up Paul Meehl and put in "multi-trait, multi-method," kind of something like that or put in "construct validity," things like that, you would arrive at the conclusion I arrived at.
**Q Let's look at some of Dr. Milner's results as set forth in the tables, and you can tell me whether these tables are measuring abstract constructs or not. Let's look, for example, at page 80 on the "frequency of sibling visitation." And this is just random examples I'm pulling out of his report.**
**So he has a table on the frequency of sibling visitation on page 80, and then he lists a number of different potential frequencies, "No frequency specified, at least once per week," and so on and so forth, and then gives a number at -- percent. Is this table measuring an abstract construct?**



A It's a -- it's a part of a concept that is not abstract, no. Is it --
**Q This is not abstract? This is --**
A No, it's -- well, depends on what you -- what you think of as a scale. You could think of it if you wanted as an ordinal scale.
**Q So this is -- but what he's doing here is he's simply has a finding about how frequently siblings were visited -- visited each other while they were in custody; right?**
A Right.
**Q Would you agree that that's pretty concrete thing?**
A Yes.
**Q Okay. Let's look at another table. Let's look at page 64. "Number of consecutive permanency goals as of June 1st, 2010." He has the number of children and the percent of children are the one goal, two goal, three goal, four goal, five or more goals. Do you see that?**
A Uh-huh.
**Q Is that a concrete fact, how many children had one, two, three, four, five goals?**
A Yes, uh-huh.
**Q That's not measuring an abstract**



**construct, is it? It's measuring a concrete fact?**
A Yeah. And it's -- it's within the context of whatever they're trying to measure, whatever that table -- whatever construct that table belongs to. I don't know.
**Q Understood. But this table itself and this finding itself is not an abstract finding.**
MR. PAGE: Object to the form.
THE WITNESS: Seems pretty concrete.
**Q (BY MS. INGBER) Can you think of a single table or chart in his report that's measuring a -- an abstract construct rather than a concrete fact?**
A I gave you one just a minute ago.
**Q Which one was that?**
A I --
**Q Proximity?**
A Yeah. Proximity. One of the items seemed more abstract than the others. But that's not the point. My point still is that the areas of the constructs, these are the items that measure the areas, and you should see if they hang together.
**Q And my question to you was: Whether he measured a whole lot of concrete facts in his report, whether he used those for some purpose, but**



**whether there's a lot of concrete facts measured in this report.**
A There are -- there are facts measured in the report. At least so far as they're factual by the caseworker that wrote them down.
**Q Right. So to put it another way, facts as they existed in the child's case record?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Would you agree with that?**
A That's what it said.
MR. PAGE: Same objection.
**Q (BY MS. INGBER) Facts as they existed in the child's case record as that might have been filtered through the caseworkers or anyone else.**
MR. PAGE: Same objection.
MS. INGBER: If you can let me finish my questions first, that would be really appreciated. And I'll say it again.
**Q (BY MS. INGBER) He's measuring a lot of concrete facts as those facts are reflected in the child's case record?**
A Uh-huh.
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) And uh-huh is yes?**

A Yes.
**Q Is the concept of criteria and validity applicable to the measurement of concrete facts?**
A Yes.
**Q In your view it is?**
A Yes. Want an example?
**Q No. Didn't ask you for an example.**
A Okay.
**Q Can you point to anything in the literature that will say criteria and validity is applicable to the measurement of facts, concrete facts?**
A Almost all research methods, texts would include that, yeah.
**Q They're going to say that specific thing?**
A Well, I don't know about that specific. They're going to say that if you want to know -- if you want to know if your facts validly represent an outcome to a child, like -- lot of these things you're pointing to as facts are not outcomes. They're process measures.
So if you wanted to know if the number of goals, for example, had some validity by measuring it against a criterion, you might want to try and correlate it with something like an outcome.



**Q Right.**
A Are kids better off with fewer goals?
**Q Got it. I think we're talking the same language now. You said if you wanted to know whether those process measures are related to an outcome, you would have to look at some sort of -- you would want to try to correlate it to something from the outside.**
A Uh-huh.
**Q Is that right?**
A Yes.
**Q That's what you said? What if you don't want to know that. What if all you want to do is describe the number of goals that a child had? Would you, then, need to compare it to something on the outside to see if your description of X percent of children had X number of goals is right?**
A I don't think this is a descriptive study. I think that they knew when they -- when the -- when they were asked to do this study, the objective of this study was to be part of a lawsuit, to change child welfare practice.
And in order to do that, if you want -- you know there's an inference going to be made about it. In my view, you would try and take your



measures and correlate them with something to get some criterion validity so you could say, "My instrument's valid beyond face validity."
Q I read you what Dr. Milner and Dr. Smollar said was their purpose in this study. Nor did they say that their purpose was to try to change child welfare practice; right?
MR. PAGE: Objection. Argumentative.
THE WITNESS: I disagree with what they are saying. They -- they had to know somebody who's going to make an inference from what -- from the data they were gathering.
**Q (BY MS. INGBER) So you're saying that your description of what their purpose is is better than their description of what their purpose is?**
A I think more accurate.
**Q So you've imposed your own purpose on their work and then judge it according to that criteria; is that right?**
MR. PAGE: Object to the form.
THE WITNESS: You -- I'm not sure what you're asking. It's more like a statement you're making than asking you --
**Q (BY MS. INGBER) I'm asking you whether you agree or disagree with that statement.**



MR. PAGE: Object to the form.
THE WITNESS: What's the statement?
**Q (BY MS. INGBER) You imposed your own purpose on their work and then judged it according to those criteria.**
MR. PAGE: Object to the form.
THE WITNESS: I think the purpose of their study is not descriptive.
**Q (BY MS. INGBER) Even though they say repeatedly that it is?**
A Yes.
**Q Okay. Okay. Let's look at page 22 of your report.**
A Which one?
**Q The second one.**
A 15th?
**Q That's right.**
A Just a second. Let me get the whole one here.
**Q Sure.**
A Okay.
**Q You say on page 22 the second paragraph --**
A Oh, 22. I'm sorry.
**Q No problem.**
A I went to the wrong page.

Q And I'll just tell you that I'm going to be asking you about the concurrent goal issue. You say, "It may be appropriate to have a primary permanency goal and a concurrent goal. It is unclear in the report if both were set on the same day and, if so, whether it would count as two goals in the measure in grid 2a."
So it seems -- and tell me if I'm wrong here -- that what you're saying is you weren't sure from Milner's report whether he was counting as two separate goals a goal of -- two goals that were set on the same day; right?
A Yeah.
Q Let's look at page 64 of Dr. Milner's report. And there's a table here that's talking about the "number of consecutive permanency goals." Table 24. Do you see that?
A Uh-huh.
Q There's a little double star underneath it that says, "In this analysis concurrent goals are considered as one goal." Do you see that?
A Uh-huh.
Q Yes, you do?
A Yes.
Q And then let's look now at table -- I'm



sorry, grid 2a which you reference in your report. And that's on page 120 of Milner's report. And let's look at the instructions to grid 2a, which is "dates of child's permanency goals." Says, "Complete grid 2a for all permanency plan goals identified for the child during the child's most recent entry into foster care."
A Where are you.
Q I'm sorry. I'm just reading the instructions to grid 2a.
A Okay.
Q You see it says "instructions." "Identify the goal and the date established and date changed. If a concurrent goal was added to the initial goal to -- use the date that the concurrent goal was added as the 'date changed,' and identify the appropriate concurrent goals code for the new permanency goal."
And this is the part I want to focus on, "Remember that a permanency plan goal can be either a single goal or one of the possible concurrent goals listed under 2.32."
2.32 if you look at it, it's on page 117, a few pages -- oh, I'm sorry -- sorry. It's right above it. I believe they meant here 2.36. I think



that's a typo. It lists all of the possible permanency plan goals. Some of them are individual goals. And you'll look at numbers 8 through 23 -- I'm sorry, 22 are concurrent goals.
A Okay.
Q Doesn't that make it pretty clear that Milner, in fact, counted goals established on the same day as a single goal, a single concurrent goal both from his instructions and his key and from the -- from his own report which says that, "Concurrent goals are considered as one goal"?
MR. PAGE: Object to the form.
THE WITNESS: It wasn't clear to me when I read it.
Q (BY MS. INGBER) Is it clear to you now that you've looked at it again?
A It's a lot of stuff to keep in your head from where we began to now so I don't know -- I'm -- you're going to have to give me a minute to look through and see.
Q Sure. Why don't you -- why don't you do that. And I do want to make sure that you pay attention to page 64 of his report where it is stated very explicitly that he counted concurrent goals as one goal. So look at that in conjunction



with anything else you need to, and then tell me if you still think it's confusing about what I --
MR. PAGE: Object to the form.
THE WITNESS: It seems that he was counting concurrent goals as one.
Q (BY MS. INGBER) So it's no longer unclear to you about what he did?
A It's clearer now that I've looked more thoroughly at it, yeah.
Q And you also read Dr. Milner's testimony; correct?
A In part. Not -- I -- I went through it, but to say -- it's -- I can't remember how many pages long. It's two -- two volumes. So I don't really remember all of it, no.
Q Because I'll represent to you that he testified at pages 432 to 434 of his testimony that if the goals were set on the same day, they were counted as one goal; but if a concurrent goal was set at a later date, that was counted as a goal change. That -- if I've accurately represented what he testified to, that would be pretty clear; right?
MR. PAGE: Object to the form.
THE WITNESS: Yes.
Q (BY MS. INGBER) Do you have any opinion

**about whether services provided to children in custody improve outcomes for those children?**

MR. PAGE: Object to the form.

THE WITNESS: As I said, I'm not really an expert in child welfare. I think that --

**Q (BY MS. INGBER) That's fine, if you don't have a basis or don't feel comfortable.**

A I've done analyses of services and the impact of services on kids. It's hard to find an effect for them. Family group decision making seems to work. Done several studies on that and published it. Some of the other services, the stuff on preventive services, the literature shows pretty small effects for that.

**Q Well, what --**

A Only under particular certain sets of circumstances if we mean by -- I mean, you know what -- those are two types that I know of.

**Q What about things like educational services, mental health services, medical services? Do you -- are you aware of any research on whether those services are good for kids or bad for kids or no impact?**

A Well, that CFSR thinks they're good. I would assume medical services are good. The absence



of them is a form of neglect.

**Q And same thing with mental health services for children who need those services?**

A That's debatable.

**Q Why would you provide a service if it's not in order to help the child?**

MR. PAGE: Object to the form.

THE WITNESS: I -- I don't understand the context of the question, but I assume that people who are providing services are doing so to help kids out. I'm not -- you don't -- I don't think you have to be child welfare expert to know that. Whether they actually do or not, who knows.

**Q (BY MS. INGBER) I noticed that in your report, you have a section on "findings" and those sort of match up to each of Milner's large finding sections except there's nothing on sibling. Milner has a whole section on sibling placements and visitation, and that's kind of skipped over in your report.**

**Was there a specific reason for that? It struck me as odd.**

A No. Not really. I think we were just trying to hit the -- the high points.

**Q There's a number of criticisms sort of**



**repeated throughout this report about how he included case examples that were not randomly drawn; is that correct?**

A Yes.

**Q In social work research are case examples always describing a typical case or are they sometimes used to represent a phenomenon that is being discussed?**

A You're asking about the use of case examples?

**Q Case vignettes, case examples.**

A Are they used for what? Say it again.

**Q Are they always used to describe a typical case, i.e., one -- a random case; or are they sometimes used to represent a phenomenon that is being discussed?**

A I think they're done both ways. Depends on the purpose of the research. I think sometimes they're done to represent -- at least when I do them, to illuminate something. I'm trying to show what sort of is typically, you know what I mean? Like if you're talking about qualitative kinds of things where you'd write a vignette about a case. In my research I use it to illuminate what we're finding.



**Q Do you think Dr. Milner used his case vignettes to illuminate what he was finding?**

A It's not clear to me really if the -- because I -- I don't know -- have the set of cases that he could draw from, you know. So I don't know. It -- it could have been he was trying to show something that's bad. Could have been that. Or they could have been representative of what the cases all looked like. I don't know. You can't tell.

**Q Well, your criticism of him is that they are not randomly drawn. That he doesn't randomly draw those case vignettes. That's the criticism in your report.**

A Well, to sort of get -- get what the average is, yeah, you know. To get what -- what most of the cases looked like, it would have been helpful if he'd done that.

**Q And you said that you've used case vignettes before to illuminate certain findings. Have yours always been randomly drawn?**

A No. Not always.

**Q So reasonable experts disagree about the proper method of selecting those case examples?**

MR. PAGE: Object to the form.

THE WITNESS: I'm not a qualitative researcher so I don't -- I don't know. They probably have methods for that. I just don't know what they are.
**Q (BY MS. INGBER) Is Dr. Fluke a qualitative researcher, to your knowledge?**
A I don't know.
**Q Have you ever discussed that with him?**
A Not really.
**Q Do you feel like you're qualified to critique qualitative research?**
A Sort of. To some degree.
**Q Even though you're not an expert in it, you feel qualified to critique it?**
A Well, there -- in some instances, yeah.
**Q Did you have any involvement in the critique in the June 9th report of Dr. Hess's research?**
A No.
**Q That was all Dr. Fluke?**
A Uh-huh. I read it. I read what he wrote.
**Q Did you have an opinion on what he wrote?**
A We're going to Hess? Probably not. I don't even know where it is. Let's see.
**Q It was in your first report. I think it's**



**starting on page 2. Two to 5.**
A Yeah. I tend to use case studies to generate hypotheses in my own work.
**Q Do you know whether every researcher uses case studies to generate hypotheses?**
A Huh-uh.
**Q You don't know?**
A Huh-uh.
**Q No?**
A Yeah. I don't know.
**Q On page 24 of your June 15th report on Dr. Milner, sort of in your conclusion section, you say that, "The actual likelihood of maltreatment in care and movement from place to place is smaller and potentially much smaller." And presumably that's because you believe that he's oversampled the long stayers; is that right?**
A Where are you at?
**Q It's in that sort of middle paragraph, the last sentence.**
A There's a -- I'm trying to remember. I didn't -- I didn't write this, but there's a missing word in there. And John will have to tell you what it is. But there's a word missing, which I --
**Q Where is the word missing?**



A That's what I don't know. He can tell you when you depose him. Anyway, he wrote -- he wrote this and I noticed that the last sentence confused me. And he said, "Well, there's a word that should have been there." And he can tell you what it is. So if you'd -- I mean, I don't --
**Q Okay. Well, let me -- let me ask you this: Do you agree with the general statement that the likelihood of certain events that occur to these children is smaller and potentially much smaller than what Dr. Milner reported?**
A Because of the missing word, I'm not sure I can respond to that. Let me think about it for a second.
**Q Sure. I'll just say I read this and it didn't strike me that a word was missing. It seemed to make sense, but obviously that's my mistake.**
A Well, you'll have to ask him. He wrote it and -- I can tell you -- I just can't remember it. I -- we did discuss it because I -- it confused me a little. And -- and he said, "Well, there's a word that didn't get typed in." So it's a typo, and he can tell you what it is. I just can't.
**Q Okay. Well, I want to move you away from the specific sentence and just ask you whether you**



**agree -- setting the sentence aside, whether you agree that Dr. Milner's analysis overestimated the frequency with which certain events occurred.**
A Yes.
**Q You do? And the reason for that is because, in your view, he oversampled the long stayers; is that right?**
A He used a cross-sectional sample which does that.
**Q Exactly. So because he used a cross-sectional sample, he oversampled the long stayers; and, in your view, therefore, overestimated certain events?**
A Yes.
**Q Okay. So we're on the same page here. Would it be possible to do an analysis to see how much that affected his results? So, for example, if --**
A Sure.
**Q You could do that analysis; right?**
A Yes.
**Q You could do an analysis that will say, "Okay. He's overestimated the stays by an average" -- I'm making this up -- "three and a half months." So on average instead of 12 percent of**

**kids getting maltreated in care, it's likely to be somewhat smaller and I do some sort of magical numerical analysis that I wouldn't understand and you say, "It's actually only 9 percent." Would it be possible to do that type of analysis?**
A It is possible, yeah.
**Q Did you do that type of analysis?**
A No.
**Q So you can't really say how much of an effect the use of the point-in-time had on his results?**
A The only analysis that we did was the one John did in here where he looked at time in care. And the time in care, if you do it with an entry cohort, is shorter than his time in care.
**Q Absolutely. That's set out in your record, and I understand that's what you did. My question is: You could have, but chose not to do an analysis to see the impact of what you view as a bias on the actual results.**
A No.
**Q So you don't know whether the magnitude of that is a big effect or a small effect?**
A No.
**Q And it would probably depend on which**



**result you're talking about?**
A It would vary depending upon what outcome you're talking about.
**Q Right.**
A I mean, the general idea, though, is that time in care -- that's why they use time in care as a standard, as a national standard, is that the longer kids are in care, more bad things happen to them. That's -- if you look at the studies on kids that age out of care, you know, that they -- when they go interview them as adults, most -- mostly bad things have happened to them.
**Q Okay. I understand. And it seems like for specifically the length of stay measure, you did do an analysis to show how much off it was.**
A Uh-huh.
**Q But that's the only one that you did that analysis for.**
A Yes. I didn't. John did.
**Q John did. Okay. And so going back to my question: So you don't know the magnitude of the effects of his use of point-in-time sample instead --**
A No.
**Q -- of an entry cohort -- let me finish my**



**question -- on any of his other results?**
MR. PAGE: Correct.
**Q (BY MS. INGBER) On page 24 it also says -- and this is at the beginning of the last paragraph, "To the extent that the specific events impacting the children were accurately identified, it would be difficult to argue that actual negative events are not a cause for concern."**
**What "negative events" are you referring to here that could be a potential cause for concern?**
A John wrote this, but let me think about it. I don't know what negative events he had in mind.
**Q You read Dr. Milner's report; correct?**
A Uh-huh.
**Q Yes, you did?**
A Yes.
**Q And I understand you have some methodological issues with what he did. But was there anything about his results that caused you concern as is referenced in this paragraph?**
MR. PAGE: Object to the form.
THE WITNESS: And, again, it's -- it's kind of vague. I don't know what you mean. You mean what -- do I have an opinion on the conclusions



he reached?
**Q (BY MS. INGBER) Was there anything about his conclusions or his report, anything that he found or documented that caused you concern about the experiences of the children in DHS custody?**
MR. PAGE: Object to the form.
THE WITNESS: I didn't look at it that way. I looked at it from a methodological perspective.
**Q (BY MS. INGBER) So you have no opinion one way or the other?**
A No. I mean, here's the thing, the basis of that reasoning is that since the data aren't representative, it would be hard to have an opinion about it, you know what I mean. If -- if you were to perhaps use a different methodology, then it would be easier to have an opinion. Does that make sense?
**Q Let's turn now to your first report, the June 9th report, which focuses on Mr. Goad, Dr. Miller and Dr. Hess.**
A And as I said, I didn't do Hess or Miller.
**Q Understood.**
THE WITNESS: Could we take a quick bathroom break?

MS. INGBER: Yes. We can go off the record.
VIDEOGRAPHER: We're now off the videotape record. The time is 1:59 p.m.
(A recess was taken from 1:59 PM to 2:06 PM.)
VIDEOGRAPHER: We're now back on the videotaped record. Time is 2:06 p.m.
**Q (BY MS. INGBER) I'm marking as Exhibit 787 Mr. Goad's March 15, 2011 report.**
THE WITNESS: Got it. You want it?
MR. PAGE: What's -- what's the number?
THE WITNESS: Exhibit 787.
MS. INGBER: Exhibit 787.
MR. PAGE: Thank you.
**Q (BY MS. INGBER) Just give me one second. I'm going to get out my own copy of that which is right here. In your report on page 6 -- this is your June 9th report -- you state that, "Mr. Goad -- the actual method for sampling is not described in the report, nor was he able to describe the sampling method in his deposition."**
**A Are you talking about the -- the one up here on -- on the nine kids?**
**Q No. I'm not talking about the nine kids.**



**I'm talking about the second report. It's the paragraph that starts "The second report."**
**A Trying to find it.**
**Q Just right over here.**
A Oh, okay.
**Q And sort of in the middle of that paragraph I just pointed out to you, it says, "Mr. Goad claims that these samples were drawn at random from a population of these events that occurred in 2009. However, the actual method for sampling is not described in the report, nor was he able to describe the sampling method in his deposition. Do you see where I just read that from?**
A Yes, uh-huh.
**Q Do you know whether Mr. Goad personally conducted the sampling for his report?**
A I don't think he did. If I'm remembering correctly. I think somebody else did.
**Q And I'll represent to you that that person -- you're correct. And that person was Richard Thompson who, like you, has a Ph.D. in psychology. Would it have been helpful to you to have some testimony, a deposition from Mr. Thompson -- from Dr. Thompson to have a better understanding of how Mr. Goad's sampling --**



A Possibly, yeah.
**Q Given that -- I understand that without that testimony, it's difficult to understand it. Do you have any specific criticisms of the size of the samples Mr. Goad used?**
A No.
**Q Do you have any reason to believe that those samples weren't chosen randomly?**
MR. PAGE: Object to the form.
THE WITNESS: I just couldn't tell.
**Q (BY MS. INGBER) You just don't know?**
A Yeah.
**Q He represents that he chose them randomly, and you don't --**
A I was looking for the method and I couldn't find it.
**Q Okay. Turning to page 7 to 8 where there's a discussion in your report about the nonindependence of the sample.**
A Yeah. That -- that's John's point, but I think I can make it for you if you want.
**Q Okay. I'll ask you some questions. If you feel like Dr. Fluke would be the better person to answer, just let me know and I'm happy to ask him those questions tomorrow. Do you think it was**



**inappropriate to use the referrals as the unit of analysis in this review?**
A He's got two units -- here's my understanding of it, is there are two units of analysis going on. One is case level, and the other is child level. And when you're drawing children from cases, some cases have more children in them than others. The example John used, I think, was on neglect cases versus physical abuse cases.
Most of the time you will find for all the neglect cases and not physical abuse cases. What people typically do to get around the problem of that -- of the unit analysis problem is sample one child rather than -- you know, rather than take them all.
**Q I think you're going farther ahead than me.**
A Oh, okay. Well, I --
**Q So let me --**
A So I don't know if I quite get your question then.
**Q So -- that's my mistake, then. Let me try to rephrase it. Do you know when Mr. Goad was drawing his sample, do you know whether he chose the sample by randomly selecting X number of referrals**

Page 242

**out of a total population of Y or whether he chose X number of children out of a total of Y number of children involved in referrals?**
A Here's what I think happened, and you -- you can ask John to get -- probably get greater clarity, is he was choosing the X out of Y. He was getting a sample of cases, referrals.
**Q Uh-huh.**
A And then within that reporting on kids, too. That's my understanding of it.
**Q And I believe that your understanding is correct. So I'm glad we're on the same page there. Do you think it would have been a better choice to do the other thing, to choose children -- to select children randomly rather than cases; or do you think it was better to choose the referrals?**
A I don't know the answer to that. I think to do both is appropriate. What's inappropriate is to take all the kids in a case. But if you -- you usually want to talk about referrals as a case. Like a family. And you also want to talk about kids, too.
**Q I'm going to give you a quote from Andrew Barclay who's one of DHS's retained experts in this case. And in his report he stated that it was "a**

Page 243

**wise choice" to use referrals as the sampling unit because "units of referral will be more independent than units of children." That was at page 4 of Mr. Barclay's report. Do you agree with Mr. Barclay?**
A Yes, yes.
**Q So given that that's what Mr. Goad, in fact, did, would you agree that that was the correct methodological choice?**
A No. I disagree.
**Q I don't want to -- I'm not asking you about his analysis of that. I'm asking you about his sampling process. The sampling to choose cases rather than children, was that the right choice in terms of the sampling process?**
A That part was correct. The second part wasn't.
**Q You're referring the second part to drawing conclusions about those children?**
A No. To not sample the kids, too.
**Q So you think he should have separately sampled children?**
A Within cases, yeah, he should have picked a kid. Randomly pick a kid rather than have all of them.
**Q Are there any disadvantages to the**

Page 244

**approach that you're saying he should have done?**
A Not as much as there are with multiple kids because you can over or underrepresent the number of kids depending upon how large or small families are in your set. So relative to what would be my choice, there are more disadvantages to his.
**Q But there are disadvantages to yours, as well?**
A Yes.
**Q Are all children in a household perfectly correlated?**
A Meaning --
**Q Are they all -- did they all experience things exactly the same way? So if you're randomly selecting one out of four, maybe it doesn't matter if those four all had the exact same experiences. But if they're not perfectly correlated --**
A They're not --
MR. PAGE: Object to the form.
THE WITNESS: They're -- the question is: Are they -- try it again.
**Q (BY MS. INGBER) Are all of those children perfectly correlated?**
A No.
**Q So it would be possible for one child to**

Page 245

**be maltreated while others in the household are not?**
A Yes.
**Q So aren't you losing some valuable information by randomly selecting only one child?**
A Yes.
**Q And wouldn't that result in underestimating certain events?**
A I would stratify. I would make sure I -- I picked them. Like if the -- in -- in some instances, I suppose you could pick the child who was maltreated like in physical abuse; and with all of them in neglect, you could randomly do it. But your point's still correct. There would not be identical kids.
**Q Right. I'm going to mark as Exhibit 788 -- this is an article by Webster that is referenced in your report. Specifically --**
A Yeah. This is a John reference, but --
**Q And this article discusses the difficulties of dealing analytically with groups of children who are not independent. And they discuss the solution that you've proposed, which is randomly selecting one child. And then they conclude, quote -- and this is at page 767 to 768 if you want to see it in writing.**

A Got to get there.
**Q Sure, sure. Take your time.**
A This is John's reference, by the way.
**Q Understood.**
A Seven what?
**Q 767 to 768. I believe it's probably at the bottom because it's a short quote. That you can "potentially lose valuable information" by using that method. Would you agree with that?**
A You can.
**Q So couldn't reasonable experts disagree about whether it's better to use all the kids or better to randomly sample a child? Because clearly there's disadvantages to both methodologies.**
A I think there are advantages and disadvantages to each. And as I said, I think there -- that the disadvantages of taking all the kids outweigh the disadvantages of taking -- selecting particular kids because it over -- can over or underrepresent your generalizations to the population.
**Q And that would -- that criticism would only apply to Mr. Goad's conclusions about children. It wouldn't apply to his conclusions about cases; correct?**



MR. PAGE: Object to the form.
THE WITNESS: I don't want to say I would -- I would agree with his conclusions about cases. It would depend on what conclusion we're talking about. If you're meaning -- if he's trying to infer how many cases in the population, he would be more accurate with the cases than he would be the kids.
**Q (BY MS. INGBER) Right. Because that's a criticism that applies to his statements about things at the child level, not his statements about things at the case level, this nonindependence issue?**
A Within -- specifically with the idea of nonindependence, yeah.
**Q I understand you have other methodological criticisms. But focusing on that.**
A Yeah.
**Q Okay. I just want to make sure that I understand correctly that that's a criticism that's limited to a subset of his statements, not to all of them.**
A Uh-huh.
**Q That's right, isn't it?**
A Yes.



**Q When you're discussing -- and, again, this is on page 7 to 8?**
A Where are we at? Right here?
**Q On page 7 to 8 of your report. You can set aside Webster. You know, let's just stick it in your pile of stuff if you don't mind.**
A Okay. Seven to 8.
**Q Uh-huh. And I'm just looking at that last -- paragraph 1 of the consequences. Do you see where I'm reading from?**
A Uh-huh.
**Q "One of the consequences of a nonindependent sample is described below in our discussion of the analysis of the percentage of allegations. Certain maltreatment allegations may have been counted multiple times because they were counted across a household with multiple children.**
**And I want to look now at Mr. Goad's instrument which comes at the conclusion of his report. It's appendix B. And unfortunately for all of us, it is not page numbered so --**
A Where are we -- where are we looking about?
**Q It's at the very, very end.**
A Let me just see if I can do it.



**Q Yeah. It's appendix B.**
A Let me see kind of where you are. Appendix A, something like that?
**Q Yeah. I might not have included his resume in mine so it might be just before his CV or the CVs that are there. Yeah. I believe that -- you're right.**
A I think I'm near there.
**Q Uh-huh. I think you're on the right section.**
A Okay. Appendix B or A?
**Q Appendix B. Just hold that page. I'm going to get you a little flag which we can take off after just so if we have to go back to this again, we don't have to look for it.**
A Okay.
**Q Okay. That should save us some time next time. So -- and I just want to make sure that I'm understanding what your point is. So if you look at the bottom of this first page of the instrument of appendix B, there's a little bold thing that says "alleged victims". Do you see that?**
A Yeah.
**Q And says, "Click on button entitled 'Enter Information on New Alleged Victim' located above and**

Page 250

to the right of the alleged victim field. The detail will open and the detail window. Enter" -- and you're supposed to enter certain information about the alleged -- each alleged victim separately.

A Okay.

Q And then it goes on to the next page. To talk specifically about how the reviewer should enter information about maltreatment allegations. And the instructions say, "First select an alleged victim from the victim drop-down at the type -- at the top of the tab, both type and detail allegation must be completed separately for each alleged victim." Do you see that?

A I do.

Q So am I correct to -- is my understanding correct that Mr. Goad is instructing his reviewers to enter case-specific information about each victim including the allegations that they were subject to?

A Yes.

Q So in your report when it says that, "Certain maltreatment allegations may have been, counted multiple times because they were counted across a household with multiple children." I guess since those maltreatment allegations were actually entered on a child-specific basis, how could you be

Page 251

overcounting them?

A I don't know. I didn't write this, and he may mean something by "multiple times" that I don't know.

Q So you just don't understand what that's saying there?

A Well, I --

Q That's a -- Dr. Fluke --

A I don't know if I'd conclude that. I don't know what he means by "multiple times." You'll have to ask him.

Q Okay. In a couple of different places in your report including page 8, among other places, Mr. Goad is criticized because "it's not possible to make any determination with respect to outcomes."

A Let's see. Could you tell me the specific -- where you're looking?

Q Sure. Sure it's the first full paragraph.

A "Because Mr. Goad"?

Q Uh-huh. And if you could just read that sentence, that's where I'm quoting from.

A Okay.

Q Was the purpose of Mr. Goad's report to analyze outcomes?

A He's -- he's making outcome inferences,

Page 252

yeah.

Q What outcome inferences is he making?

A Well, he's -- he's basically drawing conclusions from his data that have to do with how well decision making was done, the adequacy of decision making and so forth; right?

Q Is that an outcome? Is the adequacy of decision making an outcome?

A It can be. It can be an outcome or a process variable. But the way -- I think what's being suggested here is that a better way to find out whether decision making was adequate is to have an outcome.

Q That's, in your view, a better way. That's a different way, though, than the one that Mr. Goad chose? He chose to look into whether DHS was meeting its own standards and other sort of reasonable practice standards; correct?

A Partly that, yes. But wouldn't -- go ahead.

Q No, no. I understand that reasonable experts can disagree about how you should go about doing things in research.

A Would you rather have an opinion or an outcome?

Page 253

Q I'm not going to answer questions here. Luckily for me that's not my role.

A Okay.

Q But Mr. Goad chose to describe the frequency with which DHS met or did not meet reasonable professional standards in DHS policies; correct?

MR. PAGE: Object to the form.

THE WITNESS: Partly.

Q (BY MS. INGBER) What else did he do beyond that?

A He compared it to the CWLA standards, and he asked for -- and he -- and he wanted to know -- he had people make determinations of what was reasonable, what was not reasonable.

Q Okay.

A I mean, we could sort of go through -- go ahead.

Q Do you have any opinion on whether agencies should or should not have policies and standards that set out requirements about responding to abuse and neglect referrals?

A Every agency I know has them.

Q Do you think it's important that they do?

A Sure.

**Q Is it important for the agency to comply with those policies and standards?**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) In your opinion, if you have one.**

A Mine's more empirical than anything. I'm not sure what the relationship is between the standards and known outcomes. And in my own work in analyzing data, I've not found the relationship to be particularly strong, though John has done some research -- Dr. Fluke has done research on policies and procedures more than I have.

**Q Do you have any understanding of why an agency would have a policy and standard in place?**

A To produce reliable judgments, I would assume. If the question really is: Do strict or more standards, stricter and even more standards improve judgments -- it's -- it -- the first question is: Are -- does it produce greater reliability? And the second question is: Are they valid?

**Q Right. I understand the distinction between reliability and validity. But that's not my question. My question was -- and let me rephrase it actually. Do you think agencies would have policies**



**and standards if they didn't think those policies and standards were important?**

MR. PAGE: Object to the form.

THE WITNESS: Agencies do think that policies and procedures are important.

**Q (BY MS. INGBER) Over time could you expect the implementation and execution of reasonable policies and standards to have some affect on outcomes for children?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know.

**Q (BY MS. INGBER) You just don't know. Okay.**

A I haven't seen any evidence of it.

**Q Have you seen any evidence that they don't?**

A No.

**Q So you just don't know one way or another? Is that right?**

A Right.

**Q In fact, page 12 of your report, if you'll look at it.**

A Okay.

**Q And on the very top of the page, second line from the top, says, "This is not meant to**



**invalidate the value of a concept -- of a concept regarding standards from a nonscientific perspective." So do you disagree that there is some value to a concept regarding standards?**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Since that's what's written in your own report?**

A I didn't write this. But ask the question again.

**Q Do you disagree with this statement written by Dr. Fluke in the report that you signed?**

A Yes, I agree with it.

**Q Do you know how COA and CWLA standards are promulgated?**

A Developed. Do you mean developed?

**Q Sure.**

A I take "promulgated" to mean disseminated. But, no?

**Q No. How they came to those standards, how they decided what they should include.**

A I would imagine they got experts together, and they developed the standards by virtue of consensus among experts. In my experience they -- with risk assessment and safety assessment models that are arrived at by virtue of consensus, the



literature's pretty clear on that, that they tend not to be very good.

**Q So you think we should just ignore the practice wisdom and expert judgment of people with experience in child welfare?**

A No. No, I don't think we should.

**Q Okay. Has any research been done that proves that certain child protective services processes improve outcomes?**

A Yeah.

**Q Which specific processes have been studied?**

A Well, studied lots of them. The most current ones would be risk and safety instruments that are in use that have been validated. Another one would be the use of family group decision making, which amounts to having people have a say in the outcomes for the kids.

**Q I'm talking specifically about child protective services.**

A Oh, protection?

**Q Yes. Protection process --**

A Okay. You want to stick with the investigation --

**Q I just want to stick with Mr. Goad's**

**report and the concept of CPS. And I understand there's been some evidence-based research on --**
A That's the biggest area, yeah.
**Q Any other area where that kind of research has been done?**
A I've done stuff on referrals, screening out cases and screening them in with criteria. Like if you -- the question is: If you screen out a referral, what's the likelihood of reentry, another referral?
**Q I'm asking specifically about has there been any research done that proves that certain processes in CPS improve outcomes?**
A Risk and safety would be the biggest one.
**Q Okay. Would it be possible to ethically do that kind of research to prove that other processes affect outcomes? Just as an example, that if you want to look into whether completing an investigation in a timely manner is better for kids than not completing an investigation in a timely manner, however that's defined, would you ethically do that kind of research?**
A Sure.
**Q How would you do that?**
A You'd look at the consequences to the



children as a result of investigations being quicker.
**Q That would be a correlation study; right?**
A Uh-huh.
**Q It wouldn't be an experimental study. It wouldn't be ethical to do an experiment on that.**
A Well, you could do it -- you could do it in between. You could do it -- it would be correlational, but you could get fancier than that. You could put it into a structure model where you try and take into account other variables, like worker variable, organizational variables, stuff like that.
**Q Understood. But you couldn't actually simply not do certain investigations timely and then see what happened?**
A Oh, you couldn't -- you would -- no.
**Q That wouldn't be ethical?**
A No.
**Q Same thing with other sort of standard CPS processes?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Contacting collaterals, for an example.**
A Some you -- you could do experimentally by



adding on rather than taking away. So that if you -- you could do an experiment in the sense that everybody got something, only you're trying out something you don't know the answer to. So you -- everybody gets something, and you give other people the -- the dosage or whatever you want to call it that's the more. I've done that.
**Q But it wouldn't be ethical to give some people nothing?**
A No.
**Q So, for example, you couldn't say, "We're just not going to have the collateral contact with this group of kids, and let's see what happens."**
**A No. You couldn't do that, no.**
**Q Right. Would you agree that it's sort of common sense that some of these processes are likely to affect children negatively if they're not completed properly? For example, contacting collaterals?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know. Like I said, I'm not -- I'm not a child welfare expert.
**Q (BY MS. INGBER) Okay.**
A I looked over the -- this and saw the number -- who all the collaterals were that they



were supposed to be contacting. I've read enough cases, too, to sort of have a general sense of who they're contacting. And I've gone out with caseworkers, too.
**Q But you're not a child welfare expert so you just don't have an opinion on that?**
A Well, I don't know what's -- what amounts to good is what the problem is for me. You know what I mean? I don't know who is most important among the collaterals to contact, nor do I know how many need to be contacted.
**Q I understand. And I appreciate when you feel like I'm asking you questions that take you outside of your area of expertise.**
A I would be kind of guessing.
**Q Which is great. And I don't want your guesses on that. So if the answer is, "I'm sorry, I don't know. I'm not an expert in that," that's great. That's perfectly acceptable.**
**I found a -- if you look at page 8 of your report, there's a paragraph -- the second from the bottom paragraph.**
A Let me get there. Just give me a second.
**Q Sure.**
A Second from the bottom?

**Q Right. "Another problem is found in the possible interpretation." If you just want to read that paragraph which refers to the Milner report a couple of times. I simply just didn't understand what this paragraph was getting at. So if you can shed some light, that would be great.**
A I don't know because I -- John wrote that. I don't know.
**Q Did you read over this report before you signed it?**
A Yes.
**Q Do you agree with the statements in this report?**
MR. PAGE: Object to the form.
THE WITNESS: Let me -- let me read it for a minute to myself.
**Q (BY MS. INGBER) Sure.**
A I don't know.
**Q So when you read over this report before signing it and came upon a paragraph like that which you don't understand sitting here today, did you do anything about that?**
A When I came across things that I didn't understand, I discussed them with John. This one I didn't notice.



**Q How carefully did you read this before you signed it?**
A I read it several times.
**Q And yet didn't think to discuss this with Dr. Fluke?**
MR. PAGE: Object to the form.
THE WITNESS: No.
**Q (BY MS. INGBER) So, again, on page 8 you make a similar criticism of Mr. Goad as you did of Dr. Milner, that the reviewers were not blind and thus there was potential confirmatory bias; is that correct?**
A Yes.
**Q And I believe you testified earlier with respect to Dr. Milner that it may or may not have been practical to have the reviewers be blind; is that correct?**
MR. PAGE: Object to the form.
THE WITNESS: Depends on how you do it.
**Q (BY MS. INGBER) Right. Well, Mr. Goad was, in fact, one of the main reviewers.**
A Right.
**Q And he was, in fact, the one who was contacted by and contracted with children's rights; correct?**



A Right, right.
**Q So it would have been impossible for him to be a reviewer if all the reviewers needed to be blind; correct?**
A What I've done in the past is hire people to read cases without vested interests and basically blacked out of the case the -- the outcomes so that they were reading -- if -- if they were reading for process. So they could read process stuff and record them.
**Q What if you were reading a case for both process and outcome, you couldn't have blocked out the outcomes, then; right?**
A You couldn't.
**Q So in case reviews like Mr. Goad's and Dr. Milner's where both process and outcome is being read, it wouldn't be practical to black out the outcomes; correct?**
A You would have to think about it for some time to figure out a way to do it.
**Q Right. It would also be extremely time consuming to take case files, some of which were 10,000 pages long, and black out the outcomes in each of those.**
A It is time consuming.



**Q Would it have been practical to, considering the time frame here?**
MR. PAGE: Object to the form.
THE WITNESS: I don't -- I don't know.
**Q (BY MS. INGBER) You just don't know?**
A I don't know.
**Q Do you think that the concept of utility plays a role when you're designing a research methodology?**
MR. PAGE: Object to the form.
THE WITNESS: There are -- there are several types of utility -- can you give me some types you're interested in?
**Q (BY MS. INGBER) Sure, sure. Do you think it's important for -- to design a methodology that will provide results within the cost constraints, within the time frame of your client, your end user?**
MR. PAGE: Object to the form.
THE WITNESS: That's dependent on so many things. It's sort of like speed and quality and price all three.
**Q (BY MS. INGBER) Uh-huh, right.**
A You know. If you get enough money, you can usually get both.

Page 266

Q Okay. What if you have a hard-and-fast court deadline that says, "This has got to be done in a year from beginning to end"? Would that have an impact on the type of research methodology that you could design?
MR. PAGE: Object to the form.
THE WITNESS: It's -- it's difficult to answer that. It's -- it's highly dependent on where you're going to get the information, whether you're going to get it through administrative data or case reading.
Q (BY MS. INGBER) Uh-huh.
A Case reading data's very labor intensive.
Q Uh-huh.
A Administrative data pulls are labor intensive, but not nearly as labor intensive as this. But they usually yield better results to my mind.
Q Your -- what if you were told that you couldn't have access to the database? Would you, then, be limited to case files?
A I guess so. I don't know if --
Q Just hypothetical.
A -- why you would be limited.
Q Well, if you're the adversary in a

Page 267

litigation and you're told that you can't have access to the database, that would be a limit; correct?
A Never heard of that.
Q Have you ever been involved in a litigation?
A I -- the department I worked in has been involved not in this kind of litigation, but other kinds where they've requested records and they've been sent records.
Q There's a difference between being sent records and being given access to a live database; correct?
A Yes. Would you give them a data set.
Q But you would agree at least at a -- at a very general level that all research is limited by the time, the money and the type of data available?
MR. PAGE: Object to the form.
THE WITNESS: There are constraints on what you can and can't do. And it's so highly dependent upon what's available. I've had -- I've handled the department's data requests in -- in Texas; and, if nothing else, they can always get it through open records. That's what my experience was with it. I mean, they may not get names, but they

Page 268

get data.
Q (BY MS. INGBER) Page 9 criticizes the number of cases used to obtain inter-rater reliability. First sentence on page 9. And it says, "N equals six."
A Yes.
Q Do you think that's correct, that the N equals 6 for the inter-rater reliability review?
A That's what I thought it was, yeah, six.
Q Let's look at Mr. Goad's report and see if that's actually right. If you look at page 15 of his report.
A Okay.
Q Last paragraph. And he's talking about his CPS review. "To this end, six CPS investigations were reviewed by both reviewers to measure inter-rater reliability." You see that; right?
A Yeah.
Q Now, let's look at page 42. Where he's talking about his OCA review. Last paragraph, "To this end, six OCA investigations were reviewed by both reviewers to measure inter-rater reliability." Do you see that?
A Uh-huh.

Page 269

Q Yes?
A Yes.
Q Now, let's look at page 83. Where he's talking about his screen-out review. The last paragraph of Section A, "To this end, six screened out referrals were reviewed by both reviewers to measure inter-rater reliabilities." Do you see that?
A Uh-huh. Yes, yes.
Q Would you -- would you agree that, in fact, 18 cases were reviewed for inter-rater reliability, 6 screen-outs, 6 OCA investigations and 6 CPS investigations?
MR. PAGE: Object to the form.
THE WITNESS: There's sets of six for each type of case reviewed to me.
Q (BY MS. INGBER) That's not what it says in your report, though. It says, "The number of cases is too small at six. It's possible that these six cases could be extremely easy cases to obtain agreement." This doesn't say there's 6 and 3 sets, a total of 18; the 18 may have been extremely easy cases. Your report says it was six; right?
MR. PAGE: Object to the form. Argumentative.

Page 270

**Q (BY MS. INGBER) You can answer that.**
A There are six in each instance to get reliability. That's how I took that. Took it to mean he does six. He does inter-rater reliability with six here. And he goes and gets another set for a different purpose, does six there. Another set for a different purpose and does six there. That's not a total of 18. That's three sets of six to me.
**Q He had a total of 215 cases that were reviewed from a sample.**
A Right. I think so. It depends on which thing he was looking at.
**Q Well, the fatalities, he reviewed all 9; and the assessments, he reviewed all 17. So there were three criteria where he pulled a sample and -- and I take that back. There's only two reviewers for CPS investigations, OCA investigations and screen-outs. A single reviewer did the assessments; correct?**
MR. PAGE: Object to the form.
THE WITNESS: I don't remember.
**Q (BY MS. INGBER) I'll represent to you that that's the case, that a single reviewer did the assessments.**
A Okay.

Page 271

**Q So inter-rater reliability's not applicability, then, to assessments; correct?**
A Okay.
**Q And there were 215 CPS investigations plus OCA investigations plus screen-outs. I'll represent that to you.**
A I think that's correct. I -- I just read it again last night.
**Q Okay.**
A I think that's right.
**Q Okay.**
A If memory serve.
**Q Out of that total of 215, he did inter-rater reliability on 18 of those 215, a total of 8.4 percent.**
A I, again --
MR. PAGE: Is there a question there? I didn't hear a question.
MS. INGBER: I was going to finish it before he asked. Would you agree that that sounds about right to you.
THE WITNESS: No. I see six, six and six.
**Q (BY MS. INGBER) So you don't think that your statement about this here is misleading at all to the reader. That, in fact, he entered**

Page 272

**inter-rater reliability on 18 cases?**
A I read it -- I --
**Q You think this is totally accurate?**
A I wasn't trying to mislead anyone. I read it as six, six and six.
**Q Even though he says, "It's possible that these six cases could be extremely easy cases to obtain agreement about," when, in fact, there's 18 cases involved?**
A Again, he did inter-rater reliability on six, six and six.
**Q Which totals 18; correct?**
A In order to get to 18, he would have to add them up and calculate one at 18. He didn't do that. Near as can I tell.
**Q Uh-huh. You quote Gwet here in a handbook that we weren't provided, that says, "There is considerable improvement when these numbers reach around 30."**
**A Right.**
**Q Do all research methodologies agree that you need to do 30 to get accurate results on inter-rater reliability?**
A Well, they don't need to agree. He does an empirical test of it.

Page 273

**Q Okay. That's Gwet's empirical test?**
A Yes.
**Q Do all research methodologies do 30 or more when they're doing inter-rater reliability?**
A They do more than six.
**Q Do they do more than 18?**
A I have no way of knowing if all people do anything.
**Q Do reasonable -- do experts agree that inter-rater reliability is an iterative process that depends both on the size of the sample and the degree of agreement as well as other factors?**
A What do you mean by "iterative"?
**Q It's one that you do, let's say -- you do 10 percent of inter-rater reliability. If you're getting really good results, you stop there. If you -- getting really bad results, you do another 10 percent or 5 percent.**
A People can do it that way, too.
**Q That's one way of doing it; right?**
A Uh-huh. But usually you don't get those kinds of results with six. It's unusual.
**Q So are you saying that his results are -- are incorrect, that they somehow --**
A No, no. I -- I think I speculated about

why that may be, why the -- why the reliability was that high. And one of my thoughts was -- and having done this, you know, inter-rater reliability among people who read cases, that just struck me as a really high number; and I speculated about how one would get that high a number with six when the literature shows not much agreement with six.

**Q Where is the speculation in your report?**

A I thought I did in this one.

**Q I don't recall reading that anywhere. I recall reading that in your discussion of Milner.**

A In Milner? Then it was Milner.

**Q So you didn't actually draw any opinions or hypotheses or speculations about his inter-rater reliability results?**

A I did here. It's -- they could be extremely easy cases to agree about.

**Q Easy cases? What if I represented to you that the cases were drawn randomly?**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Would that affect that opinion, that speculation?**

A I don't know if they were drawn randomly.

**Q I'll tell you that they were. Does that affect that opinion?**



MR. PAGE: Object to the form.

THE WITNESS: I still would do more than six to be certain. I really would.

**Q (BY MS. INGBER) I understand you don't think the number that he did, whether it's 6 or 18, however it's defined, was enough. I'm asking you whether if, in fact, the cases selected for inter-rater reliability were chosen randomly out of all the cases, your speculation that it's possible that the six cases could be extremely easy cases would be a fair one.**

A Again, I would -- I would do more than six to be more certain. I would.

**Q Can you answer my question, please? Would that still be a fair criticism if they were chosen randomly?**

A Not an expert in random sampling. But it seemed like -- I'm going to guess here because I'm not an expert in sampling, but that you might want to draw more than six to begin with. Randomly. Because the numbers are so small, they might not be random with six things.

**Q But you're not an expert in sampling?**

A No.

**Q And you won't acknowledge that if they're**



**drawn randomly, that affects that criticism?**

MR. PAGE: Object to the form.

THE WITNESS: I just don't know. I just don't know.

**Q (BY MS. INGBER) Do you think that Mr. Goad's instrument is trying to measure abstract constructs?**

A Yes.

**Q What are the abstract constructs Mr. Goad is measuring in his instrument?**

A I want to do something with this. Just a second. I'm trying to find a place where I can get the categories. Where would that be?

**Q I'm not sure what categories you're referring to so I'm sorry. I don't know.**

A Well, just a second. You're going to have to give me a minute to look.

**Q Sure.**

A The thoroughness of a CPA investigation, the decision making, is it -- the correctness of the decision. Those are abstract.

**Q Okay. Let's look at the instrument itself because what I asked you was whether the instrument is measuring abstract constructs, not whether his table of contents is measuring abstract constructs.**



**So let's look at appendix B, which is his instrument. And let's look at -- let's look, for example, at the second page under the "screen-out" tab.**

**"Is there evidence that child welfare staff responsible for involved OKDHS wards were notified of the referral information?" Is whether someone is notified or not notified an abstract construct?**

MR. PAGE: Object to the form.

THE WITNESS: And. It's an item within a construct. Like we were talking about earlier.

**Q (BY MS. INGBER) So -- so if Mr. Goad had a statement in his report -- and I'm not saying he does or doesn't -- that X percent of child welfare staff were notified and X percent were not notified, would that be an abstract conclusion?**

A No.

**Q We could go through some more examples, but I'm assuming there are certainly other questions in this instrument that you don't view as abstract constructs.**

A What I see as abstract constructs are the areas that he's reporting on. What I see as items, most of those items probably are not. Maybe some

are. Those are measured items. Or, again, they're attributes of a construct. So that's why I was turning to the appendix because he's got sections in there where he's saying, "Now we're going to talk about the adequacy of decisions," and he's got a bunch of items that represent the construct adequacy of a decision.

**Q But you would agree that those items themselves, as you testified just a moment ago, probably are not abstract constructs?**

A I would have to look at every single one, and we could go back and --

**Q Understood.**

A I don't know. I mean, probably some are and some aren't.

**Q Okay. Page 10 of your report criticizes Mr. Goad because his instrument doesn't provide sufficient guidance concerning certain determinations. And the examples given have to do with the screening decision being reasonable and whether the findings were reasonable.**

A Just a second.

**Q Sure.**

A Yeah. What do you want to do with that now?



**Q Do you recall that opinion about Mr. Goad's instrument?**

A Okay.

**Q If, in fact -- and I'm just asking you a hypothetical now. If, in fact, there were verbal training and discussions between the reviewers about those specific questions, would that affect your judgment about whether there was insufficient guidance?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know if there was -- if they did that or not.

**Q (BY MS. INGBER) I understand you don't know. I'm telling you to assume that they did. Would that affect that opinion?**

MR. PAGE: Same objection.

THE WITNESS: I guess it would depend on the quality of the training and what you got out of it.

**Q (BY MS. INGBER) Well, let's assume hypothetically it was great training and they got a lot out of it. Would that, then, affect that opinion?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know.



**Q (BY MS. INGBER) You don't know?**

A No. It -- it depends on the -- you're saying they're perfectly trained?

**Q Right. And they specifically discuss those items and were verbally trained on how to answer those questions that you say there is insufficient guidance in the instrument about. Would it -- another alternative method, instead of providing explicit instructions in the instrument, to provide training to the reviewers on how to answer those questions?**

MR. PAGE: Is there a question there?

**Q (BY MS. INGBER) Yes. Is that an alternative?**

A It's an alternative method of training. I think it's a really difficult thing to have people answer, even with training.

**Q Okay. But training could help?**

A That, as I said, I would do -- I'd test it against an outcome.

**Q I understand you would test everything against an outcome. That's your preferred method of doing things. I understand that. We're talking now about whether his instrument provided sufficient guidance to the reviewers. And I'm asking whether**



**another way of providing guidance to reviewers --**

A Yes.

**Q -- is training?**

A Yes.

**Q What about having specific discussions between the reviewers about cases that are challenging? Is that another way of providing guidance?**

A Yes.

**Q What about making sure you hire reviewers who have extensive experience and training in there professional lives in exactly these types of questions?**

A Yes.

**Q On page 11 of your report -- and this is sort of the first full paragraph. Your report states, "In the case of OCA investigations, the applicable legal standard 'greater weight of the evidence' is not included in the instruction. This raises the possibility for further confusion by the case reviewers."**

**And I want to draw your attention now to page 42 of Mr. Goad's report.**

A Just a second.

**Q Sure. Please. And actually let's begin**

on page 41. My apologies. And at the bottom of page 41, Mr. Goad notes what you're saying there, that, "The requirements for OCA investigations are more relaxed with regard to" -- and his third bullet point is --
A Where?
Q Sorry. Very bottom of the page just right there?
A Okay.
Q That, "The evidentiary standard for -- for substantiation is the greater weight of the evidence instead of the sum credible evidence standard required in CPS investigations." So that's the point you're getting at here, that, in fact, there's different standards in OCA versus CPS investigations.
And then on page 42, the third paragraph, Mr. Goad says, "Despite these differences, for the purpose of this review, OCA investigations will be examined according to the same standards as CPS investigations and CPS assessments." Do you see where it says that here?
A Uh-huh.
Q And now if you look at appendix B, his instrument -- and now I'm glad we flagged that. And



you flip to page 6. So you just count 1, 2 -- up to page 6. The very top where it says "reasonable finding."
A I guess I'm on page 6. Is this it?
Q No. Let met see if -- it's one page before. There we go. That's page 6. "Reasonable findings."
A Let me get to this.
Q You should be able to see it.
A Okay. Got it.
Q "Reasonable findings." "Identify the reasonable findings from the choices in the drop-down menu. Select/confirm when the OKDHS established sufficient evidence to meet the 'some credible evidence,' standard of evidence." And this is -- applies to all of the investigations, both CPS and OCA.
A Uh-huh.
Q Now, your criticism was that there was the possibility of confusion by case reviewers because the different OCA standard wasn't used. What is confusing about it when he tells the reviewers that every investigation should be assessed according to the standard used for CPS investigations?
A It's not confusing.



Q Did you take a look at the Oklahoma statute that sets forth what the standard should be for substantiating allegations of abuse and neglect?
A No.
Q Do you know that that statute says that, in fact, some credible evidence is the standard that should be used?
MR. PAGE: Object to the form.
THE WITNESS: It says it in here.
Q (BY MS. INGBER) Right. I can show you the statute if you'd like.
A I don't need to.
Q Right. So does that explain why Mr. Goad thought it was appropriate to use the statutory standard for all investigations, both CPS and OCA?
MR. PAGE: Object to the form.
THE WITNESS: I don't know. I -- I don't know what his thinking on was it. I know he had a problem of having two standards; and this was a method he chose, it looks like, to solve that. Tested it.
Q (BY MS. INGBER) By looking at outcomes; right?
A Uh-huh.
Q That's how you think everything should be



done? You should test everything by looking at outcomes?
A Generally, yeah.
Q But other people think that you can do things in different ways; right?
A Sure.
Q Okay. Page 12 of your report criticizes Mr. Goad -- and this section of the report goes on for some time -- because he -- and this is the third paragraph in this page. "Mr. Goad assumes that CPS decision making is or can be made precise through the use of prescriptive and detailed OKDHS criteria and procedures." Do you see that criticism?
A Yes.
Q And there's a citation here to page 7 of Mr. Goad's report. Do you see that citation?
A Uh-huh.
Q Can you show me where on page 7 Mr. Goad assumes that "CPS decision making is or can be made precise through the use of prescriptive and detailed criteria and procedures"?
A I don't know if the reference to -- I didn't put in the reference to page 7, but he does discuss that in the report.
Q "He says he assumes that CPS decision

**making can be made precise"? Does Mr. Goad make that statement?**

A I thought so. And I'm not sure it's on page 7, but I thought so.

**Q The citation in your report is to page 7. So if you find it someplace else, please, point it out to me because I couldn't find it anywhere in Mr. Goad's report.**

A Having reread it last night, I'm pretty sure I ran across that again. But do you want me to just take some time and read through it.

**Q Well, let me show you what I found on Mr. Goad's conclusion about this; and tell me if this is what you're remembering is what you think supports this statement. If you look at page 6. That's the page before.**

A Uh-huh.

**Q It says OKDHS CPS investigation regulation. And the second paragraph in that section, Mr. Goad says, "Generally OKDHS's child protective services procedures for the investigations of allegations concerning children in OKDHS custody are sparse, vague, confusing and insufficiently prescriptive. And then he has a bunch of bullet points that give some examples of**



**that.**

A Yeah. Again, right.

**Q And then on page 7 his conclusion on that is that -- and this is the very bottom of page 7. Is that, "The procedural guidance that the agency provides to casework staff fails to meet any reasonable standard." And I'm not asking you to agree with that. "This failure is likely to result in errors, both in the response to allegations of child abuse and neglect and in decision making as referrals are screened and investigative outcomes are determined."**

**And tell me if you disagree with me. My reading is that he's making two points here. DHS procedures are insufficiently prescriptive. Two, this problem is likely to result in errors. Is that how you read this?**

A Yes.

**Q I don't read that as him assuming that CPS decision making is or can be made precise. Would you agree, looking at what Mr. Goad actually said, that that's --**

A So your disagreement is with the word "precise"?

**Q I read him to say it's not precise enough**



**and that can lead to errors. I don't read him as saying that it's possible to use prescriptive and detailed criteria and procedures to have -- to make things precise. I see that as an overstatement, a significant overstatement of what Mr. Goad is actually saying.**

**And tell me if you disagree. If you think Mr. Goad is saying it and you can show me where he's said it, I would be happy to look at it.**

A I don't see this as an overstatement. I think that we're dancing around the word "precise" I guess. The basic point is that nobody knows.

**Q So you think that --**

A That -- that, in other words, there -- here's another way of saying it. That even when you have more prescriptive policies and procedures, there's lots of variability in decision making anyway as a result of a lot of things.

**Q Do you think Mr. Goad disagrees with that?**

A I don't know.

**Q He doesn't, in fact, say in his report that he disagrees with that; correct?**

A I guess not. I -- I don't know.

**Q I mean, in his report he simply says that if it's less precise, you're likely to have more**



**errors; correct?**

A Yes. And -- and I'd say how do you know?

**Q Well, I think that if we look at Dr. Fluke's work, which I'm happy to do right now, he, in fact, says -- and actually some of your work, it says, in fact, that, "Decision making is affected by external factors including policy." Correct?**

A That's in the model, yeah. It's a matter of how much and what kind and all that, yeah.

**Q Right. But you -- your -- your own article -- and let's look at it right now.**

A It's one of the factors in the model. John -- like I said, John Fluke has tested that with policy and procedures; and I think he provided an example in here, too, with regard to Illinois.

**Q We'll visit the Illinois example in a second. Let's look first at your article that you and -- Dr. Fluke was also involved in. It's called, "The Decision-Making Ecology."**

**A Uh-huh.**

**Q That's going to be Exhibit 789. And on page 5 of your article on decision-making ecology you say that, "Decision making is affected by external factors including policy." Would you agree that that's in your article?**

A Yes.
**Q And on page 11 of your article --**
A I don't know where 11 is. Let's see. Where are the page numbers? Oh, I can see them now. Okay. Okay.
**Q There's a statement in there about how knowing the errors can allow mitigation by writing, "clearer and more precise policy." That's in your article that you're the lead author on; right?**
A Uh-huh. Those are theoretical statements at present.
**Q Did you think they were correct when you wrote them?**
A Yes. But I don't have any evidence for it.
**Q Understood. But you certainly have presented a theory where you can have better decision making if you have clearer and more precise policy; correct?**
A That's the theoretical point, yeah.
**Q Isn't that the same theoretical point Mr. Goad is making in his report? He said, "This failure is likely to result in errors." He's not saying, "I proved it." He's saying it's likely.**
A That's what he's saying. I'm saying that



we don't have any evidence for it yet.
**Q Right. And Mr. Goad doesn't disagree. He's simply theorizing about that; correct?**
A I don't know what he's doing.
**Q Okay.**
A I think he's saying that Oklahoma DHS policies are -- are, if will you, vague and they're not very prescriptive and as a result bad things happen to kids, bad decisions are made.
**Q Would you --**
A That's what he's saying. And -- and that -- that's a stronger statement than I'm making.
**Q Do you think that you're more likely to have consistency in decision making between workers if you have clearer and more prescriptive policies?**
A That's the theory.
**Q That's, in fact, your theory in your own article?**
A Yes. That's the theory. Wish it was true. Don't know.
**Q So on page 14 you mentioned your Illinois example.**
A That's John's example in Illinois. I didn't have the data.
**Q Okay. Well, I --**



A Do you want me to look at it?
**Q Sure. Let's look at the Illinois example. I actually had the data which you gave us, and I looked at it. And that's on page 14. Do you know -- let's look at the -- the first full paragraph on this page. And your report states in the second sentence, "As a state-administered system with uniform" --**
A Where -- where are you again?
**Q Sorry. Apologize. Starting right there.**
A Oh, okay.
**Q "As a state-administered system with uniformed and detailed policies regarding the decision to substantiate cases." What's the basis for the statement that Illinois has uniform and detailed policies regarding the decision to substantiate?**
A John worked with them for a number of years, and I think it's from his experience. You can ask him about it. But I -- I have not worked for Illinois.
**Q Have you reviewed those policies yourself?**
A No.
**Q Okay. So you don't know, sitting here today, whether, in fact, that's true?**



A I just know he worked with them for a number of years and -- that's what he says.
**Q And -- sure. And I'll ask him about that tomorrow. And then there's a discussion later in that same paragraph about how "the percentages of indicated" -- which is the Illinois version of substantiated.**
A Right.
**Q -- "reports varies at the county level from as few as 9.8 percent to as many as 39.7 percent."**
**Would you expect similar substantiation rates in Cook County, the large urban county that includes Chicago and in a small rural county?**
A Are you asking if the -- there would be more variation in Cook as opposed to rural?
**Q No.**
A I mean, I don't know.
**Q Whether when you're comparing Cook to a rural county, you would expect them to have similar substantiation rates?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know. I've never looked at Illinois data.
**Q (BY MS. INGBER) Are there**

**county-specific factors that could contribute to this variance?**

A Sure.

**Q Wouldn't detailed policies and procedures lead to a fixed reliability method decision and not necessarily to similar proportions of substantiation?**

A Theoretically it should. But there are other factors that influence -- that make for variability, too.

**Q Right.**

A You know, like worker -- what -- what's going on in the head of the worker at the time. What the case is about. Some are easy; some are hard.

**Q Right. Or, for example, the type of management in that specific county, that could have a big effect on the rate of substantiation?**

A All of those things. I think that was our general point, is that will -- will affect the variability. There are lots of things that affect variability.

**Q So would you agree with the statement that is made in this paragraph in your report that, "As state-administered system with uniform and detailed**



**policies regarding the decision to substantiate cases, the percentages you -- one might expect that in Illinois the percentages of substantiated cases would be similar from county to county?" Do you really think that's realistic that even assuming you had detailed policies you were still going to have a similar percentage of substantiated cases?**

A It's really hard for me to answer it because I didn't work in Illinois, and I don't know what the factors involved. You would expect -- if -- if he's correct, if we're -- let's say we're all correct, and we say more detail should lead to less variability.

**Q Right.**

A So you'd take a place that has -- I mean, if you're going to do the study, I guess, you'd take a place that has, I guess, not detailed policies and procedures and one that does and compare them.

**Q But that's not actually what you did in your report. Instead you took a single state that has the same policies and said that because there's variability, looked at the range, that means that --**

A That's right because I think that --

**Q -- the detailed policies and procedures have no effect.**



A I think that -- that was his point, is to show that -- I mean, I'm guessing for him. You can ask him. But to show that even when you have detailed policies and procedures, you're going to see a lot of variability.

**Q Do you think it's a valid point to conclude from the Illinois data, the range of 9.8 percent to 39.7 percent that is reported here, that, in fact, detailed policies and procedures have no effect on reliability and consistency in decision making?**

A I think you're going to have to ask him, again. But I think he's saying you're going to have variability in the substantiation decision even when you have policies and procedures. Even when you have strong, if you want to use that term, policies and procedures. I think that's what he's saying. You can ask him.

**Q Okay. So you don't really know much about this paragraph in the report?**

MR. PAGE: Object to the form.

THE WITNESS: I know what -- I know what you know.

**Q (BY MS. INGBER) Do you agree with that paragraph and the point that it's trying to make?**



A Yes.

**Q Do you agree that -- do you think that Mr. Goad made an assumption that if you had detailed policies and procedures, you would expect the percentage of substantiation -- substantiated cases to be similar?**

A I don't know what he would do. I don't know.

**Q You read Mr. Goad's report. Did he make that assumption in his report?**

A I think he said the opposite. I think he said when you lack detailed policies and procedures, you put kids at risk, basically, is what I think he was saying.

THE WITNESS: Want to take a little break?

MS. INGBER: Sure. We can take a short break.

VIDEOGRAPHER: We're off the videotaped record. The time is 3:08 p.m.

(A recess was taken from 3:08 PM to 3:15 PM.)

VIDEOGRAPHER: We're now back on the videotaped record. The time is 3:15 p.m.

**Q (BY MS. INGBER) I want to look briefly at -- well, let me just ask one follow-up question**

to the discussion we were having before the break.
A Sure.
Q On page 15 of the report --
A Which -- whose --
Q I'm sorry. Of your report. Yes. The first full paragraph.
A Say it again.
Q First full paragraph. It says, "Variability is the rule rather than the exception. And it's kind of talking about decision making and all of the factors that go into it."
Would you agree -- understanding that variability is the rule -- which I don't think anyone disagrees with -- that there will be less variability when there's well-articulated policies and procedures?
MR. PAGE: Object to the form.
THE WITNESS: We don't know. John's done a couple of studies on that, and -- and he'll have to answer it with regard to his studies. I've never done a study looking specifically at variability with regard to policy and procedures.
Q (BY MS. INGBER) It's true in your -- in your article that we were just looking at, you theorize that, in fact, that would be the case. But



you just don't know for sure?
A Yeah. I don't. And -- and it's a matter of the degree to which that will impact decision making relative to other kinds of things. Yeah. I don't know.
Q You don't know, but certainly it was your theory that that was --
A You would think it would help.
Q You would think it would help. Okay. That's what I wanted to get at. So looking at page 15 on the "findings" section, there's a reference to -- the paragraph starting with the word "generally."
A In general?
Q It says "generally." The paragraph right above the one you were referring to.
A I'm trying to find it. Oh, I've got it.
Q "Generally the confidence intervals are large, and this lack of precision could have the consequence of exaggerating negative findings." And there's an example given, if you have a 9 percent finding and the confidence interval is plus or minus 10, it says we might be led to infer that possibly as much as 19 percent of the time these investigations might not have been timely." Do you



see that statement?
A Yes.
Q And as we discussed earlier if you have a large confidence interval, it's just as likely that you could be underestimating a finding because the other side of that would be nine minus ten is --
A That's right.
Q So it's not just that it exaggerates findings. It --
A It does both.
Q It does both. And if you're transparent about your confidence interval, it gives the reader both sides of that; correct?
A Yes.
Q On page 15 of the report, the paragraph just below the one we were looking at, it says, "In general, Mr. Goad does not provide any context regarding practices they view" -- I'm assuming that means he views -- "as inappropriate or contrary to OKDHS policy." And there's the example given of background checks and there might be legitimate reasons not to conduct a background check.
So you say in general he doesn't provide context, and then one example is given. And I want to have an understanding of where else does Mr. Goad



not provide sufficient context that leads to your statement that in generally he doesn't do so?
A I would have to look. I don't know.
Q So sitting here today offhand, you can't give any other examples?
A Not unless I start looking.
Q Did you have something else in mind when you were writing this?
A No. I didn't write it. I -- John wrote this, I think. But I had no reason to suspect that it was an error.
Q Okay. And then there's -- his example that he gives is that, "The six instances cited by Mr. Goad where background checks were not conducted, there might be legitimate reasons a background check could not be conducted." I believe he was referring to the CPS investigation section of Mr. Goad's report.
A Probably was.
Q But if you look at page 49 of Mr. Goad's report. And this is in the "OCA investigation" section of his report. Mr. Goad found that, "In the 41 OCA investigations reviewed, there's evidence that CPS history checks were completed in only one instance." That's 1 out of 41.

**Do you think that in the other 40 instances, it was -- it's likely that the reason why they weren't conducted is because it was impossible?**

A I don't know. Is this the history check table you're referring to, Figure -- the Figure 4?

**Q That's right.**

A So when you're referring to a "history check," you're not talking about criminal background check? You're talking about whether or not there was CPS history?

**Q Well, we'll get to criminal background check in a second because he found that that was not checked even once in the OCA investigations. This is specifically referring to CPS history checks where 98 percent of the time 1 out of 40 -- 40 out of 41 it wasn't checked.**

**And I understand if it was two or three, maybe there's some excuse, they just simply couldn't, their computer system was down. God knows what could have happened. Do you think it was likely that 40 out of 41 times the reason why a CPS background check wasn't done is -- because, as you hypothesize in your report, because there -- there's a legitimate reason?**

MR. PAGE: Object to the form.



THE WITNESS: I don't know.

**Q (BY MS. INGBER) Does that seem likely to you? Is that a common sense interpretation of that finding?**

MR. PAGE: Same objection.

THE WITNESS: Well, you're asking -- you're kind of asking me to be a CPS expert, and I don't know. Maybe they -- maybe they did it and didn't write it down. I don't know.

**Q (BY MS. INGBER) Policy requires them to do it. And you think it's possible that 98 percent of the time they did it and just didn't write it down?**

A I don't know.

**Q Okay. What about law enforcement background collection? Do you think there could be a legitimate reason for conducting background checks -- law enforcement background checks 0 times out of 41?**

A I don't know.

**Q Can you think of a legitimate hypothesis?**

A Just they didn't write it down, one. Maybe -- these were in institutions; correct?

**Q That's right.**

A I think I would have interviewed the



people in the institution personally.

**Q Okay. You would have interviewed the people in the institution, or you would have interviewed the investigators who did these -- who did these investigations?**

A Both. I would try and figure out why there's such a difference between the OCAs and the non-OCAs -- CPS and the OCAs.

**Q Do you think that if --**

A I'd try and follow up on it and figure it out.

**Q Sure. You say that one hypothesis for why these were not found in the files is because maybe they were just doing them and not writing it down. Can you think of a legitimate reason why you would be doing a background check and never writing it down?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know.

**Q (BY MS. INGBER) You don't know. Okay. The next example that is given in your report for the lack of contextualization by Mr. Goad is that, "He" -- and this is the bottom paragraph on that page.**

A I'm here?



**Q Yeah. That's right.**

A Okay.

**Q "He equated investigations with a finding of unsubstantiated with services recommended as substantiated maltreatment. And I'm going to tell you what I think happened here. I think this is a cut and paste from the Milner report and that this is just not right. Because I actually don't think that's what Mr. Goad did.**

**And I'm telling you that up front so you know where we're going with this. And now we can look at Goad's report and see if you can find anyplace where he conflates those two things. Let's look at page 30 of Mr. Goad's report.**

MR. PAGE: Is there a question here somewhere?

MS. INGBER: That was background to my question. Now I'm asking him to look at page 29 and 30 of Mr. Goad's report. And then I will ask him a question about it.

**Q (BY MS. INGBER) So you see on page 29 this is a section on "Were CPS investigative decisions correct?"**

THE WITNESS: Uh-huh.

**Q (BY MS. INGBER) And he goes through the**

**different categories in Oklahoma administrative code for potential finds. Do you see that?**

A Yes.

**Q And then if you look at page 30. Mr. Goad says quite clearly, "For purposes of this review including the reviews of OCA investigations and CPS assessments below, substantiated services recommended and substantiated court intervention recommended are considered as one because the kids are already in care." So court intervention is kind of irrelevant because those kids have already been brought into care.**

**"Unsubstantiated services recommended will be referred to as 'unsubstantiated' and will where relevant be separated from ruled out because there's a significant difference in the definitions of the two." You say in your report that, "He equated unsubstantiated services recommended with substantiated." Is that consistent with what Mr. Goad says in his report?**

MR. PAGE: Object to the form.

THE WITNESS: I would have to look through it all to determine that, but I have a recollection that he did do the combination. But maybe it isn't in there. I don't know. Do you want me to start



looking?

**Q (BY MS. INGBER) I would like you to start looking because I'm pretty confident that he never did that.**

A Okay.

**Q But you'll agree that what he says on page 30 --**

MR. PAGE: You have one question. Would you let him answer one question at a time.

MS. INGBER: Stop making speaking objections.

MR. PAGE: Look if I object to the form -- but you're just badgering this witness. You asked him a question. Let the man ask -- look in the -- the -- answer your question.

MS. INGBER: I'll withdraw that question --

MR. PAGE: Well, withdraw the question.

MS. INGBER: -- and we'll return to it in a second.

MR. PAGE: Yeah. Just withdraw it. That's a good idea.

MS. INGBER: And I would really appreciate it if you'd stop with the speaking objections as you know they're totally inappropriate.



**Q (BY MS. INGBER) So I'm going to withdraw that question. Would you agree that on page 30 Mr. Goad makes it very clear that he's not combining substantiated services recommended -- unsubstantiated services recommended and substantiated?**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Is there anything on that page that says he's combining those two categories?**

MR. PAGE: Same objection.

THE WITNESS: And you're specifically asking about the second paragraph?

**Q (BY MS. INGBER) Read the whole page. Tell me if it says it anywhere else.**

A I don't see it on this page.

**Q Do you see it on page 31 where he has three categories, "unsubstantiated" -- which is what he's calling unsubstantiated services recommended -- "ruled out" and "substantiated"?**

A Let me -- what page were the definitions on? Can you remember that?

**Q The definitions are on page 29.**

A Thanks. Well, I do see it on page 29 if the -- that -- just a second. Give me a minute.



No, I don't see it there.

**Q So what you said in your report is incorrect?**

MR. PAGE: Object to the form.

THE WITNESS: First of all, I didn't write this part. But --

**Q (BY MS. INGBER) But you reviewed it and you signed it; right?**

A Yes.

**Q And at least from pages 29 and 30 and 31.**

A From -- from 29 to 31, it doesn't look like he's combining the unsubstantiated services recommended with substantiated services recommended. I think the point I would make is combining services recommended with either substantiated or unsubstantiated tends to confound the two. They're two separate things, you know.

**Q So you're making a new point now verbally that's not in your report. Because your report says that he combined unsubstantiated services recommended with substantiated services --**

A Possibly it's a typo. Possibly we meant to say that doing -- combining services -- that's how I thought of it, that services and -- substantiation and services and unsubstantiation are

two different things. They're combined.
Q Where does he combine those?
A No, no. Not -- I -- separately. Like in -- what they have is unsubstantiated and service -- services recommended. Substantiation services recommended. And it -- well --
Q Is that really a criticism of DHS's own policy and not a criticism of what Mr. Goad did?
A Pardon?
Q Aren't you saying that DHS should not have combined unsubstantiated services recommended in one category?
A I'm just thinking of how I would solve it methodological right now.
Q I'm not asking you to solve anything methodologically. I'm asking whether your criticism of Mr. Goad on page 15 is accurate and whether you stand behind it right now.
A I don't know.
Q Based on what we've looked at, it's not?
A Well, if you'd -- page 30, I think not; but I don't know. Could mean something else.
Q Something other than what it says?
A It could.
Q How would a judge or another reader



understand that this means something that it doesn't say?
A I don't know.
Q On page 16 of your report on "CPS investigation findings," very first sentence, "There" --
A Where are you at?
Q Sorry. "Findings regarding out-of-home care investigations."
A I'm looking. I can't -- oh, got it. Okay.
Q The first sentence is, "There are other explanations besides the one offered by Mr. Goad in his report that would account for the fact that most referrals are made by CPS caseworkers." And there's a case -- a statement there from Mr. Goad where he says that, "Caseworkers are presumably well informed about what constitutes child abuse and neglect and should have reliable information about the situations of the children in their caseloads."
Do you disagree with Mr. Goad that caseworkers should be well informed about what constitutes child abuse and neglect?
A I assume they are.
Q What about -- do you disagree with



Mr. Goad that caseworkers should have reliable information about the situation of the children in their caseloads?
A No, I don't.
Q So you agree with both parts of Mr. Goad's statement. You just think there could be other reasons why they would be making most of the referrals? Is that an accurate summary?
A I think so.
Q Do you have an alternate explanation for why caseworkers are the single largest source of referrals?
MR. PAGE: Object to the form.
THE WITNESS: I don't really know. I'm kind of tired. Let's see.
Q (BY MS. INGBER) Well, did you have one in mind when you wrote your report?
MR. PAGE: Object to the form.
THE WITNESS: Well, they're the ones working the case so I would assume that they would be -- most often be referring. Even if they're not well informed.
Q (BY MS. INGBER) Right. And that's sort of what Mr. Goad says; right?
A Well, they're presuming; and he's



presuming they are well informed. Or maybe that's why, I think. Right?
Q Okay. So you basically just said, "Well, Mr. Goad, this is just -- this is just a hypothesis that you have. But you can't, sitting here today, think of an alternate hypothesis and I'm assuming you didn't test any alternate hypothesis.
A I didn't test one. I just thought of one.
Q Which is that they just have more interaction with the kids?
A Yeah.
Q And you think that's a different hypothesis than Mr. Goad's?
A That's different, yeah.
Q Okay. On page 17 of your report, you're basically implying that Mr. Goad was exaggerating his findings with respect to the failure to conduct physical examinations. And that's because, as you say -- and this is the bottom of that first paragraph, which is not a complete paragraph.
A I don't -- here?
Q Should be right around here. Yeah. That's right. "How" -- and you say in your report, "How allegations were investigated may have -- may have also been an issue with respect to whether a

physical examination of children's bodies was required inasmuch as an allegation of physical abuse may have been with respect to a threat of harm, suggesting the possibility that if no actual harm occurred, a physical examination was not needed. From the report and depositions this cannot be determined."

Would you agree that what you're trying to say here is that he may have been exaggerating the times when physical examination should have been, but was not conducted?

A I wouldn't say "exaggerating" I wouldn't use that term. I'm saying there may be reasons that a physical examination was not done, was not conducted.

Q Right.

A And -- and in a neglect case as an example.

Q Totally understood. So you're basically saying Mr. Goad may have overreported that? Would that be an accurate --

A I -- I didn't even see it as overreporting or exaggerating either one. I just was thinking that it's possible that the -- that examinations were done for legitimate reasons is all I'm saying.



Q Totally. And if Mr. Goad reported that DHS failed to do an examination when, in fact, there was a legitimate reason why they didn't do one, because it wasn't necessary, that would be Mr. Goad overreporting DHS's failure?

A I didn't -- I didn't conclude that.

Q Okay. Well, I want to look -- and you said you couldn't determine this from the report and the deposition. I want to look in Mr. Goad's instrument to see whether that clarifies for you whether, in fact, he was doing what you say he might be doing.

If you'll look at appendix B again. And this is going to be page 5.

A This counts as a page?

Q Yes. That's probably where we were getting off before.

A Okay.

Q And the second from the top, the question is, "Did the reported allegations or allegations that came to light during the investigation necessitate observation of a child's body?" And then there's an instruction given. "Observation of a child's body is necessary when observation is reasonably likely to reveal evidence of child



abuse/neglect, e.g., bruises or severe, untreated diaper rash. Observation by the investigator or a medical professional is included."

Would you agree that in his instrument Mr. Goad is making clear to the reviewers that it's only necessary to observe a child's body if that observation is reasonably likely to reveal evidence of child abuse and neglect?

A I'm not sure quite how to answer that. I think it's a complex kind of a judgment to make, and there are probably other examples needed. I guess you're relying on the reviewer to know what those instances would be.

Q Understood that this is a judgment call. But clearly Mr. Goad is not saying that you should have to do an observation in every single investigation?

A He's saying that. He's saying that.

Q He's saying you need to do it when it's necessary. And you can disagree with him about whether he gives sufficient instructions about what "necessary" is. But he's certainly telling reviewers, "Only say that they have to do it if it was necessary to do it." Right?

A Right. We -- you have to know when it's



necessary.

Q Right. And he gave some examples and he defines it as "reasonably likely to reveal evidence" in his -- in his instructions.

So in your report when you say that, "There's a suggestion that the -- the -- suggest that Mr. Goad suggested the possibility that if no actual harm occurred, a physical examination was not needed. And Mr. Goad wasn't taking that into account." Do you think that's fair given what's in his instrument and the instructions?

A Yes.

Q Why?

A I think "necessary" is a -- is probably an insufficient instruction.

Q He didn't just say "necessary."

A He did --

Q He defined necessary as observation reasonably likely to reveal evidence of child abuse and neglect.

A And he gives -- and he gives --

MR. PAGE: Object to the form. Argumentative. Not letting the witness answer the question.

Q (BY MS. INGBER) Does he or does he not

**define necessary?**
MR. PAGE: Same objection.
THE WITNESS: He defines it with one example -- two -- two examples.
**Q (BY MS. INGBER) And a definition in words. "Reasonably likely to reveal evidence of child abuse/neglect."**
**A I think he's vague.**
**Q You think that's vague; but you don't disagree that he defined it and gave examples, do you?**
A He defined it and gave some examples.
**Q Did you review that instruction when you were writing that section of the report and take it into account?**
A No, I didn't write that section.
**Q Do you know whether Dr. Fluke did so?**
A Uh-huh.
**Q I'm sorry?**
A Yes.
**Q He did?**
A Yes. And I didn't review this section.
**Q Do you know whether Dr. Fluke reviewed that section --**
A I don't.



**Q -- of the instrument when he was writing that section of your report?**
A I don't. I don't know.
**Q Later on on page 17, the last paragraph before the "OCA investigation findings," your report says, "When identifying allegations for children who Mr. Goad believes were harmed, no information is provided about what maltreatment the children might have experienced."**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Do you see that?**
A I don't know where you are.
MS. INGBER: I hadn't asked my question yet.
MR. PAGE: Well, you misread the statement.
MS. INGBER: Okay. Thank you for letting me know, Mr. Page. I appreciate that and I will reread it.
THE WITNESS: Where are you?
**Q (BY MS. INGBER) Your report says -- if you look right there.**
A Okay.
**Q "While identifying allegations for children who Mr. Goad believes were harmed (Goad**



**report March 2011, page 37), no information is provided about what maltreatment the children might have experienced." Do you see that statement in your report?**
A I see it.
**Q And there's a citation there to page 37 of Mr. Goad's report; correct?**
A Are we going to go there?
**Q Yes. And I just don't understand that statement, what -- what it's getting at. Because on that page, there's actually a chart that shows the types of maltreatment the children might have experienced.**
A I don't -- I didn't write it. You might ask John that.
**Q Did you understand what he meant when you read this before you signed it?**
MR. PAGE: Object to the form.
THE WITNESS: I understand what it says.
**Q (BY MS. INGBER) Did you agree with it?**
A Yes.
**Q Can you show me where on page 37 Mr. Goad does not provide information about what maltreatment the children might have experienced? Because I see a chart there where he provides exactly that type of**



**information. I just want to understand what this criticism is because I didn't --**
A I don't. I don't -- and you're going to have to ask John.
**Q Okay. So you don't understand this criticism either?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know what his intention was.
**Q (BY MS. INGBER) At his deposition, Mr. Goad testified that he had a hypothesis that the increase in screen-outs meant that protection was withdrawn for some children. He makes a similar statement in his report. Do you remember that testimony and that section of the report?**
A Could you -- could you repeat? I was still back thinking about this.
**Q Sure. Sure. In his testimony and also in his report, Mr. Goad writes about his hypothesis that the increase in screen-outs means that protection has been withdrawn from some children. He calls the decline a "quantum drop." And says that the rate of child abuse could not have declined that much in the time period.**
**Do you recall that testimony and that**

**statement in his report?**
A I -- I do recall it, yeah.
**Q In your experiences as a researcher, have you ever seen -- let's go to Goad, page 82.**
A Goad 82?
**Q Yeah. Goad's report, page 82. Just so we can see the data. And this shows that from 2006 to 2009 there was a --**
A I see it.
**Q An almost 12 percent increase in screen-outs. In your experiences, have you ever seen a similar increase in screen outs over a similar time frame?**
A Yeah.
**Q Where?**
A Texas.
**Q Texas?**
A Uh-huh.
**Q Texas has increased its screen out rate by how much over what period of time?**
A I don't know by how much, but I've seen a big giant jump in screen-outs because they hired screeners. In other words, they put additional people on the job and put -- and had sort of back-ups for the screeners so they had an



intervention that caused the screen-out rate to go up. I don't know if Oklahoma did or not.
**Q Setting aside the Texas case where there was clearly specific intervention that caused a change, have you ever seen that type of increase anywhere else?**
A Oh, I haven't -- that's the only place I worked.
**Q And you don't know whether DHS had any type of intervention?**
A I don't -- no, I don't. I -- you know, I don't know.
**Q Would you agree that one hypothesis -- it would be something you would have to investigate for that rise in screen outs -- is that DHS has withdrawn the protection of CPS investigations from any children?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Is that a hypothesis that's possible?**
A I would test it by seeing if they came back. If they -- if they got re-referred.
**Q Understood you could test it. I'm just asking you whether that's one legitimate hypothesis to draw from that data.**



MR. PAGE: Object to the form.
THE WITNESS: I don't know if it's -- I don't know. Say it again.
**Q (BY MS. INGBER) I understand you would have to test it to know if it was true. But is Mr. Goad's hypothesis, that one reason is that DHS has withdrawn the protection of CPS investigations for many children, a legitimate hypothesis to draw from that data?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know if it is or not because I don't know enough about what OHS was doing -- or DHS was doing in 2009. I don't know.
**Q (BY MS. INGBER) Understood. So if there was some sort of intervention, it might not be; if there wasn't an in intervention, it might be.**
A That's what I would look for, yeah.
**Q Okay.**
**REPORTER: I didn't understand the answer.**
THE WITNESS: Which -- to which?
**Q (BY MS. INGBER) Let me ask it again. So if -- in your view, if there was some sort of intervention, like the type there was in Texas, Mr. Goad's hypothesis might not be a legitimate one.**
A Correct.



**Q But if there -- if there wasn't that type of interventions, this might be a legitimate hypothesis?**
MR. PAGE: Object to the form. Would you, please -- I'm going to ask the witness to wait. Let her finish the question, allow me a time to object and then the witness will answer. It will also make the record a lot clearer for the court reporter. I know it's late, Dr. Baumann. We have to go by that procedure.
MS. INGBER: I will tell you that no witness is ever successful at following that procedure completely so you shouldn't feel badly.
**Q (BY MS. INGBER) And would you like me to ask --**
A I really don't know.
**Q Okay.**
A I don't.
**Q Okay. On page 19 of your report, there is a criticism of Mr. Goad's fatality review because "it cannot be meaningfully compared to the general CPS population."**
**A Uh-huh.**
**Q And I just want to show you because I believe that you and Mr. Goad are in agreement and**

**he actually said that exact same thing in his own report. So I just want to show that to you and see if you agree that Mr. Goad and you actually have an agreement. On page 91 of Mr. Goad's report.**

**And it's the last -- second last sentence of the first paragraph, Mr. Goad says, "Because this review does not focus on a large number of children, the results are not statistically significant and so the findings can not be applied to the entire population of children in OKDHS care."**

**So he's saying here that -- and then he goes on to say -- let me continue -- "rather these findings are presented as other examples of OKDHS's failure to take reasonable action to protect the children in its care.**

A We actually disagree.

**Q So where do you disagree?**

A He's right about not having enough cases. There's another reason, though, too, that they can't be comparable.

**Q And what is that?**

A It's that the information -- that a child fatality case is really different than any other case you can think of that CPS has. That's one thing. And the second thing is that the information



in a child fatality case is much richer than in a non-fatality case. And they're very hard to equate.

So what you typically do to get around that problem is to -- in other words, you -- let's say you find in a fatality case that all the children are young, the fatalities occur to children that are young. Most of the -- of the clients seen by CPS are young, too.

So it may not distinguish a fatality from a non-fatality, you know. So what people typically do is they back up and take the event preceding a fatality to try and understand something about the fatality cases. And I know everybody reads the -- reads fatality cases because they're important and all that. It's just that they're -- they're just not comparable for a number of reasons beyond just the sample size.

**Q I want to ask two follow-up questions on what you said. You said, "I know everyone reads fatality cases because they are important." Why are fatality cases important?**

A Well, if nothing else, they're trying to learn from them. How much can be learned from the fatality case is questionable because you've got the advantage of hindsight, you've got a different kind



of case and so forth and so on. But to disregard them would not be politically or any other way -- you would -- would at least want to do it so you can report to somebody what the fatality was about.

**Q You also say that typically what is done is you back up and you read the case prior to the fatality.**

A No. If you're studying it, that's what do you.

**Q Okay. And I read that Graham, et al. article that's referenced in your report.**

A Uh-huh.

**Q It actually says that that's what they suggest that people do for certain purposes, but say quite clearly that that's not actually what's typically done, in that article.**

A It was meant as a criticism of the others.

**Q But you agree that Graham, et al. say that that's not actually what researchers typically do.**

A Again, that point we're making is a critique of other studies.

**Q I understand. But when you stated earlier that, "typically what's done is" -- and this is what you propose. That's not actually true that that's what's typical. That's what you think and some**



**people think is a better methodology, but is not actually what everyone agrees is the best methodology.**

MR. PAGE: Object to the form.

THE WITNESS: I don't know if everyone agrees that's the best -- best methodology. Some things that are done that are typical are not the best methodology.

**Q (BY MS. INGBER) But they're done by researchers in the field, legitimate researchers in the field?**

A I don't know what you mean by "legitimate," I guess.

**Q Researchers who publish articles in peer-reviewed journals.**

A The ones I've seen have done it the way I'm suggesting.

**Q So you disagree with Graham, et al. when they say that's not what's typically done in the field?**

MR. PAGE: Object to the form.

THE WITNESS: What we're saying, it's meant as a criticism.

**Q (BY MS. INGBER) Do you agree that there are child welfare researchers out there who don't**

**use your preferred methodology to review fatality cases?**
A They are.
**Q And as you said earlier, there's a lot of disagreements about methodology in child welfare research; right?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know how to answer that.
**Q (BY MS. INGBER) Are there disagreements in child welfare research about how to do things, what methodologies to use?**
A Specifically with regard to child fatalities?
**Q My question was a general one.**
MR. PAGE: Object to the form.
THE WITNESS: I don't know. Generally -- I don't know. I don't know.
**Q (BY MS. INGBER) You don't -- you don't know generally whether or not there is a consensus in child welfare research and every one agrees every type of study should be done exactly the same way? You don't know if that's true or not?**
MR. PAGE: Object to the form.
THE WITNESS: I don't. I don't know what



you would even mean by "consensus."
Q (BY MS. INGBER) Are there experts out there who disagree about the proper methodology to do certain types of child welfare research?
MR. PAGE: Object to the form.
THE WITNESS: I don't know about all the kinds of child welfare research.
**Q (BY MS. INGBER) So you just really don't know?**
A I don't know.
**Q Did you read his fatality review?**
A You mean the ones of the kids, yeah. I didn't -- I read it kind of rapidly, but I did read it.
**Q Do you have any opinion to -- any basis to agree or disagree with any of his conclusions?**
A No.
**Q Would you feel comfortable giving opinions about whether DHS demonstrated professional judgment in those cases?**
MR. PAGE: Object to the form.
THE WITNESS: I'm not comfortable doing that. I'm -- I'm basically reading for scientific merit and methodology.
**Q (BY MS. INGBER) Do you have any opinions**



**about Mr. Goad's first report, the one that was a case study, or about Dr. Hess's report which was also a case study?**
A Both case studies we said -- as I said earlier, that I used them for hypothesis generation.
**Q You personally used them for hypothesis generation?**
A Uh-huh.
**Q Do you know whether others used them for other reasons?**
A They probably do. I don't know. I'm not a qualitative researcher.
**Q I'm just -- let me just back up. I'm trying to get a sense of whether you plan to testify at trial about either Dr. Hess's report or Mr. Goad's first report. Do you have any opinions about those reports that you plan to testify about?**
A Not really, no. I didn't really review them. You talking about the Hess report and the Goad 9 or whatever it was?
**Q Yes. Mr. Goad's first report. Not his --**
A No, I don't.
**Q Okay. So you won't be testifying at trial about those two reports?**
A Not unless I'm asked. I don't know



what -- you know what I mean? I would say at trial probably what I'm telling you. I didn't review them.
**Q Okay. What about Dr. Miller's report?**
A I didn't read that one either.
**Q So it would be correct to say that you believe Dr. Fluke is going to be the person to testify about Dr. Miller's report and your discussion of that in your report. And same thing with Dr. Hess' and Mr. Goad's first report?**
A I'm assuming that. I don't know.
**Q But it's not going to be you?**
A Probably not.
MS. INGBER: Let's take a break. Off the record.
VIDEOGRAPHER: We're now off the videotape record. Time is 3:53 p.m.
(A recess was taken from 3:53 PM to 4:00 PM.)
VIDEOGRAPHER: We're now back on the videotaped record. The time is 4:00 p.m.
**Q (BY MS. INGBER) Dr. Baumann, I understood that there's a -- you and Dr. Fluke had a couple of sort of larger scale methodological criticisms of Dr. Milner. And my understanding was**

Page 334

**the two big ones were the 60-day exclusion and the point-in-time sample; is that right?**
A Yes. I think.
**Q What -- did you have any similar -- similarly broad criticisms of Mr. Goad's methodology?**
A I mean, the themes that I'm recalling are the one John -- Dr. Fluke wrote about about the sampling of children, the --
**Q That would be the nonindependence issue?**
A The nonindependence issue. The use of standards rather than outcomes would be another. Those are the broad ones, I think.
**Q And I just want to go back to your testimony on --**
A His -- his was more inferential, too. You know what I mean?
**Q Uh-huh.**
A Like the report -- he makes stronger inferences than the Milner ones. That's different than it.
**Q Is there anywhere in your report that makes the stronger inferences point?**
A No.
**Q I want to talk just for one more second**

Page 335

**about that nonindependence issue. I believe you testified earlier that that applies only to his child level conclusions. Not to his case level conclusions.**
A In my opinion, yeah.
**Q Okay. Understanding the methodological criticisms you have of both reports, would you stand up in court and say that they've absolutely no utility at all?**
A Pretty strong statement. I would probably qualify that statement on the sense of they're not very strong research designs is the way I would say it -- say it. So that inferences from the findings would not be necessarily good ones, especially with regard to cross-sectional samples relative to longitudinal studies and outcomes for kids.
**Q But you wouldn't feel comfortable saying that these reports were without utility?**
MR. PAGE: Object to the form.
THE WITNESS: I don't think I make statements like that, to tell you the truth.
**Q (BY MS. INGBER) If you were a judge who wanted to get a better understanding of the experiences of children in DHS custody, do you think these reports have some utility?**

Page 336

A I don't know. Don't know any judges. I don't know.
**Q Do you think they could have some utility.**
A I really don't know. I just don't. I know some -- I do know some judges, but not well. You know. Having presented data to them, but -- in a out-of-court context.
**Q If you were an interested third party who wanted to gain a better understanding of the experiences of children in DHS custody, do you think these reports would have some utility?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know. I just have to answer it the way I did earlier, that they're not very strong research designs to the degree they're useful to somebody. How useful is a design that's weak? Not terribly. You know.
**Q (BY MS. INGBER) Would you agree that all research designs have flaws?**
MR. PAGE: Object to the form.
THE WITNESS: Some more than others.
**Q (BY MS. INGBER) But they all have some flaws?**
A Is there a perfect research design? No.
MS. INGBER: Okay. We're off the record.

Page 337

MR. PAGE: No, we're not. I've got a couple questions.

CROSS EXAMINATION

BY MR. PAGE:
**Q Dr. Baumann, do you recall this morning some questions by plaintiff's counsel where she asked you about some E-mails that were exchanged between you and --**
A Yeah.
**Q -- and Dr. Fluke and some documents were passed back and forth?**
A Yes.
**Q Okay. What were the documents that were being passed back and forth between you and Dr. Fluke, if you can recall?**
A I think there were three categories of them. One was our reports. The -- the writing of the reports that -- what you would call drafts of the reports. A second category were the reports from the people that -- the plaintiffs folks that were given to me. I think he sent them. And the third were the articles that we -- that he put together, one of which is here. And I don't know where they went. We sent them to you.
**Q Okay. Those E-mails between you and**

**Dr. Fluke, the content of the E-mail itself, do you recall whether or not they discussed the information that was being transmitted or were they simply transmittal E-mails?**

A I looked through my E-mails with that in mind kind of rapidly, and they were just basically transmitting -- saying, "Here are the reports." I didn't find any that were -- where we were writing back and forth about our thoughts. I mean, that's my memory of it.

I can check with greater detail. I have lots of E-mails because we're on lots of projects together so I have hundreds and hundreds of E-mails from John that have nothing to do with this.

MR. PAGE: Pass the witness.

MS. INGBER: No questions. You're all done.

MR. PAGE: Dr. Baumann will read and sign.

VIDEOGRAPHER: We're now off the videotaped record. The time is 4:07 p.m.

(The deposition of DONALD BAUMANN was concluded at 4:07 PM.)



JURAT

D.G. vs. C. Brad Henry

JOB No. 69505

I, DONALD BAUMANN, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

______________________________

DONALD BAUMANN

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, DONALD BAUMANN, on this ______ day of ________________, 2011.

______________________________

NOTARY PUBLIC, STATE OF OKLAHOMA

MY COMMISSION EXPIRES:__________

(JLG)



ERRATA SHEET

D.G. vs. C. Brad Henry

DEPOSITION OF: DONALD BAUMANN

REPORTER: Jody Graham, CSR, RPR, RMR, CRR

TAKEN ON: JULY 13, 2011

JOB NO.: 69505

PAGE LINE IS SHOULD BE



CERTIFICATE

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jody Graham, CSR, RPR, RMR, CRR, do hereby certify that on JULY 13, 2011 at the offices of Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, Oklahoma, there came before me DONALD BAUMANN who was duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the foregoing pages constitute a full, true, and correct transcript of the deposition of said witness on the date as indicated.

I do further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal at my office in Oklahoma City Oklahoma County, Oklahoma, this 21st day of July, 2011.

Jody Graham
______________________________,

Jody Graham CSR, RPR, RMR, CRR

CSR No. 203.