# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

1) D.G., by Next Friend G. Gail Stricklin, et al., for themselves and those similarly situated,

Plaintiffs,

vs. No. 08-CV-074-GKF-FHM

1) C. BRAD HENRY, in his official capacity as Governor of the State of Oklahoma, et al.,

Defendants.

VIDEOTAPE DEPOSITION OF JOHN D. FLUKE
TAKEN ON BEHALF OF THE PLAINTIFFS
ON JULY 14, 2011 AT 8:36 AM
IN TULSA, OKLAHOMA

APPEARANCES

On behalf of the PLAINTIFFS:
Miriam Ingber
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, NY 10001
212.683.2210
mingber@childrensrights.org

VIDEOTAPED BY: Gabriel Pack

REPORTED BY: Jody Graham, CSR, RPR, RMR, CRR

APPEARANCES (Continued)

On behalf of the DEFENDANTS:
David Page
RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS
502 West 6th Street
Tulsa, OK 74119
918.587.3161
dpage@riggsabney.com



INDEX

| | Page |
|---|---|
| JOHN D. FLUKE | 4 |
| Direct Examination by Ms. Ingber | 4 |
| Cross Examination by Mr. Page | 275 |

EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| 776 | Report of Dr. Milner | 58 |
| 780 | Report of J. Fluke and D. Baumann dated 6-9-11 | 10 |
| 781 | Report of J. Fluke and D. Baumann dated 6-15-11 | 10 |
| 783 | Website Article titled "Internal Validity" | 146 |
| 784 | Article titled "Threats to Validity of Research Design" | 146 |
| 786 | Article titled "Placement Stability - A Review of the Literature" | 166 |
| 787 | Report of Mr. Goad dated 3-15-11 | 197 |
| 788 | Article titled "The Ties that Bind II" by D. Webster, et al. | 203 |
| 790 | Article titled "Degrees of Freedom" authored by D. Campbell | 27 |
| 791 | "The Dynamics of Unsubstantiated Reports: A Multi-State Study - Final Report" | 247 |

STIPULATIONS

It is stipulated that the deposition of JOHN D. FLUKE may be taken pursuant to agreement and Federal Rules of Civil Procedure on JULY 14, 2011, before Jody Graham, CSR, RPR, RMR, CRR.



VIDEOGRAPHER: This is the videotape deposition of John Fluke in the matter of D.G. versus C. Brad Henry. This deposition is being held at 502 West Sixth Street in Tulsa, Oklahoma on July 14th, 2011. We are on the record at 8:36 a.m. Will Counsel, please, state their appearances for the record.

MS. INGBER: Miriam Ingber from Children's Rights for the plaintiffs.

MR. PAGE: David Page for the State of Oklahoma.

VIDEOGRAPHER: The court reporter will now swear in the witness.

JOHN D. FLUKE,

being first duly sworn, was examined and testified as follows, to wit:

DIRECT EXAMINATION

BY MS. INGBER:

**Q Good morning, Dr. Fluke. Thank you for coming today.**

A Good morning.

**Q Can you state your full name for the record.**

A John Davidson fluke.

**Q And you understand that you're here today**



**to give sworn testimony; correct?**

A Yes.

**Q Is there any reason at all why you feel you can't testify fully and accurately today?**

A Not that I'm aware of.

**Q Have you ever been deposed before?**

A No.

**Q Isn't it true that you were an expert witness in a class action lawsuit alleging inadequate child welfare services due to large caseloads in 1990?**

A Yes.

**Q Were you deposed in connection with that matter?**

A No.

**Q Who retained you?**

A I believe that was involving a case in Indiana, but I can't recall for certain who it was that retained me in that instance so --

**Q Were you representing the people who were suing or the people who were sued?**

A I can't recall.

**Q And what was your role in that litigation?**

A Basically to provide a little bit of information about caseload and workload standards.

And I think provided a bit of context for the attorney that I spoke with. And I believe we spoke once or twice over the phone and I might have provided him with a bit of written material, but I really can't recall.

**Q So your role was more of a consultant than as a testifying expert; is that correct?**

A Correct; right.

**Q Do you -- do you view yourself as an expert in caseload and workload standards?**

A I do, yes.

**Q Since you've never been deposed before, I want to go through a couple of the ground rules just to make sure that today goes smoothly. The most important thing for me is that you understand my questions. I don't want you to answer something that isn't what I'm asking.**

**So if there's -- at any point you need me to repeat something, if you want me to clarify something, please, just let me know and I'm happy to do so. Is that okay?**

A Uh-huh.

**Q And that leads me to my second point, which is the importance of verbal communication. We have to make sure the transcript is clear. So**



**things like uh-huh seem pretty vague on the transcript. So I'll usually prompt you if you say uh-huh or huh-uh to say yes or no. I'm not tying to be rude. I just want to make sure that our transcript is clear; okay.**

A Yes.

**Q Thank you very much. I am -- I would bet my bottom dollar that your attorney, Mr. Page, will have objections today. Unless he specifically instructs you not to answer, you can go ahead and answer my questions despite his objections; okay?**

A Okay.

**Q Have you ever testified at trial?**

A No. I've never done that.

**Q What did you do to prepare for your deposition today?**

A For the deposition today, I read the -- reread the reports that we had prepared. I reread the reports that we rebutted and reread some other materials that we had used in our report.

**Q What specific materials that you used in your report did you reread?**

A I believe I looked at Dr. Milner's deposition.

**Q Okay. So let me just see if I can give**



**you a complete list of the things you've said you reviewed. You reviewed the two reports that you and Dr. Baumann prepared; correct?**

A Correct.

**Q And you reviewed the expert reports of Dr. Hess, the two expert reports of Mr. Goad, the expert report of Dr. Milner and the expert report of Dr. Miller; is that correct?**

A Not precisely.

**Q Okay. Tell me where I got it wrong.**

A The report by Dr. Hess I did not read or reread. And the report by Dr. Miller I did not read.

**Q What about Mr. Goad's first report?**

A I did reread portions of that.

**Q And in addition to those reports that you described for me, you also read part of Dr. Milner's deposition transcript; is that correct?**

A Correct, uh-huh.

**Q Is there anything else that you did to prepare for today?**

A Had some conversations with Dr. Baumann.

**Q What conversations with Dr. Baumann did you have?**

A Just concerning the nature of the report,



you know, what we concluded, whether there were any errors or problems with it that we were concerned about.

**Q Were there any errors or problems that you were concerned about?**

A Nothing substantial.

**Q Anything not substantial?**

A There was a -- a misquote of a particular reference where we referred to a "risk and harm standard" when actually it had been an "evidence and harm standard" that they had been defining.

**Q Is that the only error that you found when you -- that you found in your report?**

A Other than several typos and grammatical errors, yes.

**Q Did you have any conversations with Counsel before your deposition?**

A I did, yes.

**Q When?**

A Yesterday and Monday.

**Q When yesterday?**

A Yesterday afternoon.

**Q And when did you speak to Dr. Baumann?**

A I spoke to Dr. Baumann Monday, and I spoke to Dr. Baumann yesterday afternoon.

**Q And what did Dr. Baumann tell you yesterday afternoon?**
A He described some of the process that had occurred in his deposition.
**Q I'm going to now hand you what -- what have been previously marked as Exhibit 780 and 781. These, I believe, are your two reports in this matter. Just take a quick moment and make sure that you agree that's what they are because we will be using them frequently today.**
A As far as I can tell, these look to be the reports that we had prepared.
**Q Are all of the opinions that you plan to testify about contained in these two reports?**
A All of the opinions that I plan to testify on are contained in the reports. There may be other materials that would be relevant in response to specific types of questions that may or may not appear in the report.
**Q Can you think of anything specific, or are you just hypothesizing?**
A I'm just hypothesizing.
**Q Do you have any educational experience related to child welfare?**
A I'm not exactly sure what you mean by



that.
**Q Do any -- does any of your education focus on child welfare? Any of your undergraduate or graduate degrees?**
A It does not focus on child welfare specifically, no.
**Q Does it focus on social work?**
A My doctoral program incorporated aspects of social work. And child welfare, actually, for that matter.
**Q So can you explain to me what organizational decision science is?**
A Yeah. It's a configuration of fields involving economics, social work, information technology and social psychology.
**Q Do you consider yourself to be an expert in child welfare practice?**
A No, I do not consider myself an expert in practice matters related to child welfare.
**Q What about in practice matters related to social work?**
A I wouldn't consider myself to be an expert in practice matters in social work.
**Q Do you consider yourself to be an expert in statistics?**



A I consider myself to be proficient in statistics and quite experienced in the use of statistics. But there are limitations to my knowledge; and they would be fairly advanced in terms of my capacity, I think, to deal with statistical concepts. I have a fairly strong mathematical background. But I don't view myself as an expert in statistics, per se.
**Q What has given you the -- your proficiency in statistics?**
A A great deal of undergraduate coursework, as I mentioned, not only in statistics, but in mathematics; a great deal of experience in applying statistical methodology in studies that I've conducted; and the application of those types of studies in the context of, you know, postgraduate educational opportunities; and work with people who are, in fact, more skilled than I am in many cases, with respect to their knowledge and understanding, who I've collaborated with over the years.
**Q So would it be fair to say that some coursework, although not a graduate degree in statistics, your own personal experience and your collaboration with others who are more expert in statistics has given you what you consider a**



**proficiency to use statistics in your day-to-day work?**
MR. PAGE: Object to the form.
THE WITNESS: I guess I would say that there are a range of different types of educational and experiential opportunities that I've had over the years to become pretty proficient in my statistical background.
**Q (BY MS. INGBER) But you still don't consider yourself to be an expert in statistics?**
MR. PAGE: Object to the form.
THE WITNESS: I would consider myself to be on a -- a scale of individuals who are experienced with statistics sort of in a middling range in terms of my understanding of the types of things that might be possible to do and some of the underlying mathematical concepts.
**Q (BY MS. INGBER) How did you come to be retained by DHS?**
A I was contacted by Mr. Page.
**Q When was that?**
A I believe that was in April.
**Q Of 2011?**
A Of 2011.
**Q Let me go back one second. Do you**

**consider yourself to be an expert in qualitative research methodology?**

A I have been involved in qualitative studies and have done work of a qualitative nature, but it's not necessarily something that I would tend to focus on professionally. I tend to view qualitative analysis as something that should be conducted in tandem with quantitative analysis.

**Q Is your view that qualitative research should always be conducted in tandem with quantitative research one that all experts in research methodology agree with?**

MR. PAGE: Object to the form.

THE WITNESS: I think that there's a range of views with respect to the applicability of qualitative and quantitative research. And that, you know, for that reason, it's really hard to suggest that there's a particular perspective that would be, you know, fundamentally accepted.

**Q (BY MS. INGBER) So you would agree that there are researchers out there who believe that qualitative research has values as a stand-alone form of research?**

A Yes. I would agree.

**Q Well, you said -- would you -- you said**



**you had some personal experience conducting qualitative research. Can you briefly describe for me the frequency and the timing of those experiences?**

A Mostly those would involve interviews of -- or focus groups of individuals who might be the subjects of study. In my case, more often than not, it tends to be workers, supervisors, administrators of child welfare agencies.

**Q Have -- sorry. Keep on going.**

A And to some extent interviews of --

MR. PAGE: Excuse me.

(Discussion off the record.)

THE WITNESS: In some cases it would involve interviews of family members, clients, depending upon the study that we're conducting.

**Q (BY MS. INGBER) Did you personally conduct those interviews?**

A I have, yes.

**Q When's the last time you did that?**

A I would say probably the last time that I conducted an extensive set of interviews would have been about four years ago in the State of Washington.

**Q So throughout your career, what percentage**



**of the time would you say you focus on quantitative research versus qualitative research?**

A I guess I would say possibly as much as 60 percent has been oriented towards quantitative and maybe 40 percent has been oriented towards qualitative research.

**Q So 40 percent of the time, you conduct qualitative research?**

A Right.

**Q In the last four years, have you conducted qualitative research 40 percent of the time?**

A I wouldn't -- I wouldn't know for sure, but I don't think that it would be quite that high.

**Q I'm just trying to understand because you said the last time you conducted extensive interviews was four years ago.**

A Correct. But I've got a, you know, career that spans about 30-odd years; and, you know, I was trained as an undergraduate in anthropology which -- particularly social anthropology which, you know, strongly emphasizes the use of qualitative research methodologies.

And so, you know, it's important, I think, to recognize, from the standpoint of my career, that both of those are, in my view, interlinked ways of



getting good knowledge and information. And there's some things that just aren't -- that just don't lend themselves to quantitative approaches. There's some things that are much better handled by qualitative approaches.

**Q Have you ever critiqued a journal article in a peer-reviewed journal that's based on qualitative research?**

MR. PAGE: Object to the form.

MS. INGBER: What's the basis of your objection?

MR. PAGE: I think it's ambiguous. I don't know what "critique" means.

**Q (BY MS. INGBER) Have you ever been involved in the process of reviewing an article in a peer-reviewed journal based on qualitative research? Do you understand what I mean by that question?**

A I think so, but maybe you could clarify a little bit.

**Q You're familiar --**

A Many -- yeah. Many studies involve, you know, just sort of like I'm describing, both a quantitative and a qualitative component. And so while not all studies would have both, many studies would have some element of both types of design

incorporated into what they were presenting.
So it's -- it's sort of difficult for me to, A, recall what I might have looked at in the -- in the past that might have only emphasized a qualitative perspective. And it's very difficult for me to be clear that anything that I would identify as being quantitative only might not have had a qualitative component.
**Q Understood. In your report -- this is your first report, the one dated June 9th. If you can take a look at that, please.**
A Uh-huh.
**Q You state in the section on Dr. Hess's research on page 2 that, "Case studies, while they may be an appropriate source of hypothesis generation for subsequent studies, they are not considered valid scientific studies." What's the basis of that statement?**
A I think what's important is to keep in mind that we're referring to a particular type of case review. And in this instance the case review is not consistent with a scientific design.
**Q I asked you a very specific question. You said, "While case studies may be an appropriate source of hypothesis generation for subsequent**



**studies, they are not considered -- they are not considered valid scientific studies." And I want to know what the basis is for that specific sentence in your report.**
MR. PAGE: Object to the form. Argumentative.
THE WITNESS: What I'm trying to explain is that this particular type of case review is not a valid scientific study in my view.
**Q (BY MS. INGBER) Let me ask this question in a different way. What is it about case studies that make them only appropriate for hypothesis generation?**
A Well, some case studies are appropriate for more than hypothesis generation.
**Q That's not what you say in your report.**
MR. PAGE: Object to the form.
THE WITNESS: What I've said in the report is that this particular type of case study is only appropriate for hypothesis generation.
**Q (BY MS. INGBER) And what do -- what do you mean by "this particular type of case study"?**
A Well, I mean, we're parsing the sentence here. But the sentence above says, "From a scientific standpoint case reviews of the sort."



And what I mean by that is a particular type of case review.
**Q "Fall into the category of case studies." I read that to mean that a review of the sort falls into the category of case studies. And then, "While they, i.e., case studies may be an appropriate source of hypothesis generation for subsequent studies, they are not considered valid scientific studies." Am I misunderstanding what you wrote?**
A Yes, I would say so.
**Q Okay. Since that was my understanding as a lay reader, maybe you can explain what you actually meant.**
MR. PAGE: Object to the form. Argumentative.
MS. INGBER: You can just say "object to the form," David. That's sufficient.
MR. PAGE: Oh, okay. Well, earlier you asked me for a basis. So I'll -- I'll just say "object to the form" unless you ask me for a specific basis.
MS. INGBER: That would be great. Thank you.
THE WITNESS: I guess what I'm trying to say here is that a -- a case review process is a



good source of information if you have a set of hypotheses that you are testing from a scientific perspective, if you go into the case study with that perspective in mind, and if you can demonstrate in your design of that case study that you've implemented sufficient controls and are able to introduce conditions into the case process that allow you to test specific hypothesis.
What I would say outside of that domain is that they are a way to scan more broadly -- potentially more broadly a set of information in order to come to some determination if there's something that would be worth investigating further. And I would put that type of perspective on the sort of case study that was conducted by Dr. Hess.
**Q (BY MS. INGBER) That was a lot of information in that one sentence. Let me see if I can break that down. You said that a case review process is a good source of information if you have some hypothesis you're testing and then if you're able to put in conditions that allow you to test those hypothesis generation. So you said -- that's one thing you said. And then you said, secondly, that outside of that domain, you can sort of use them for hypothesis generation. Is that basically**

**what you said?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) If I'm misunderstanding or not summarizing it properly, I really do want to understand what your points are. Would that be a fair summary of what you said?**
MR. PAGE: Object to the form.
THE WITNESS: I think what's important to keep in mind here is that there are studies that have a level of scientific validity that can be conducted at a case level and there's studies that can be used as a way of gathering information to generate ideas, hypotheses, if you will. And that the latter is, I think, more consistent with the type of study that Dr. Hess conducted. But I wouldn't refer to it as a "scientific study" because it isn't designed to test hypothesis.
**Q (BY MS. INGBER) You're familiar with -- or are you familiar with literature on how case studies can be used to accomplish various aims including description, theory testing and generating theory?**
A I'm aware that case studies can be used for a variety of different purposes, yes.
**Q Including the three that I mentioned?**



A Those would be possibilities, yes.
**Q And you're aware that there are case studies that are explanatory, case studies that are descriptive, case studies that are exploratory among others?**
A Again, those would be possibilities for what a case study might address.
**Q Are you familiar with the different methods that are used to critique qualitative data in contrast to the methods used to critique quantitative data?**
A It's probably not an area that I would consider myself to be particularly proficient in, no.
**Q So you don't consider yourself an expert in the methods used to critique qualitative data?**
A I wouldn't consider myself to be particularly proficient in that area.
**Q Yet you chose to critique Dr. Hess qualitative study. Do you feel like you were qualified to do that?**
A I feel that I was qualified to evaluate its scientific efficacy with respect to statements in the report that seem to suggest that she was generalizing her results more to the population as a



whole.
**Q Would it be fair to say that the main criteria you focus on when evaluating Dr. Hess's work is -- are internal and external validity?**
A I would say those are two of the main criteria that we were using to evaluate, yes.
**Q Are those criteria widely accepted as the appropriate criteria to evaluate qualitative data?**
MR. PAGE: Object to the form.
THE WITNESS: I think those criteria are applicable to any scientific endeavor.
**Q (BY MS. INGBER) Are you aware of literature supporting that view?**
A With respect to qualitative studies --
**Q Yes.**
A -- or with respect to quantitative studies or both?
**Q Qualitative studies like Dr. Hess's.**
A I would say that that's not an area of literature that I'm extremely familiar with, no.
**Q Are you familiar with the work of Egon Guba, G-U-B-A?**
A No, I'm not.
**Q Are you familiar with the work of Yvonna Lincoln?**



A No, I am not.
**Q Are you familiar with the work of Norm Denzin?**
A No, I am not.
**Q Are you familiar with the work of anyone who specializes in the methodology and the evaluation of qualitative research?**
A Yes.
**Q Who?**
A Michael Patton.
**Q I'm sorry?**
A Michael Patton.
**Q Michael Patton. Excellent. What criteria are typically used to critique and evaluate qualitative research?**
A That's a very good question. I'm not sure that I would be able to answer that.
**Q Are you familiar with the criteria -- criteria of credibility, transferability, dependability and confirmability?**
A I am not familiar with those terms in that context.
**Q So you couldn't define any of those terms for me?**
A I could not.

**Q Are you familiar with the terms meaning and context, "recurrent patterning" and "saturation" as those terms apply to qualitative research?**
A Those would not be terms that I would be familiar with.
**Q So I'm assuming you cannot define them for me?**
A I would not be able to do that, no.
**Q What about dense description?**
A I don't have any knowledge as to what that particular term refers to.
**Q When you discuss internal and external validity in the context of Dr. Hess's study, the citation that you use on page 4 of your report is Stanley and Campbell.**
A Uh-huh.
**Q That's a citation to their 1963 work titled "Experimental and Quasi-Experimental Designs For Research." Correct?**
A Correct.
**Q Do you know whether an expert in qualitative research would use the Campbell and Stanley framework as set forth in that book to judge the adequacy of a qualitative study?**
A I don't know if they would or not.



**Q But it's what you chose to use; correct?**
A That's what I chose to use.
**Q Are you aware of Campbell's article, "Degrees of Freedom," which he wrote after his 1963 book?**
A No, I'm not familiar with that article.
**Q So you're not aware that in his later work he acknowledged the value of qualitative research and took back some of what he said in his 1963 work?**
MR. PAGE: Object to the form.
MS. INGBER: You can wait till I've finished my question before your objections.
MR. PAGE: I'll object when I need to object.
**Q (BY MS. INGBER) You can go ahead.**
A I would be surprised if he recanted his views. So it would be important I think to know what he said.
**Q Let us take a look. We're going to mark this as Exhibit 790. This is an article from the "Comparative Political Studies" from 1975 written by Donald T. Campbell called "Degrees of Freedom."**
MR. PAGE: Dr. Fluke, I encourage you, take your time and review the article.
**Q (BY MS. INGBER) You're always welcome to**



**review whatever you feel you need to review. I believe the most relevant pages are 179, 181 and 191. And when you've had a chance to skim through this or read whatever you feel you need to read, I'll point you to -- if you feel you need to read the whole article, we'll move on to something else and I'll let you take a look at that over a break and then we can come back to him later.**
MR. PAGE: If you want to ask him questions about this --
MS. INGBER: I won't ask him questions about it until he's had a chance to read it.
MR. PAGE: Stop and let me finish. If you want to ask him questions about something, then you can take your time asking him to look at it. He's already said he's not familiar with the article. If you want to get him familiar with this, ask him questions, then he gets familiar on the record. At the time during your deposition. It's your choice.
MS. INGBER: I totally understand. Are you going to read the whole thing?
THE WITNESS: I'd like to.
**Q (BY MS. INGBER) Okay. Let's -- then I'm going to withdraw that, and we don't need to do that. I don't want to spend the time on it. You're**



**welcome to take a look at that on own time. We'll leave that as an exhibit.**
**Would you agree that both qualitative and quantitative research are valuable analytical methods?**
A I would agree with that.
**Q Would you agree that both qualitative and quantitative research can be used for multiple purposes including descriptive research?**
A I would agree that -- that that is the case. I think the -- the issue is whether you're inferring anything from that information and drawing conclusions from it and whether that's consistent with a design that's meant to be, say, descriptive.
**Q In your view is it impossible to -- is it always impossible to generalize or transfer knowledge from a case study to the population as a whole?**
A No. I think under properly controlled scientific conditions, it's possible to take a case study and draw some inferences that would be generalizable. But they have to be properly controlled.
**Q What do you mean by "properly controlled scientific conditions"?**

Page 30

A You need to be able to test something.

**Q So in your view, if you can't test something, you can't generalize from a qualitative case study to the population?**

A No. I don't think that you can do that.

**Q Do you have any basis in the literature on qualitative research to support that?**

A I would have a fair amount of basis in the quantitative literature that would suggest that certain types of views that are looked at, certain types of information that are looked at often turn out to be erroneous when it's brought up to scale in terms of a more quantitative look. I've had that experience often.

**Q But you don't have anything in the qualitative research that says that unless you have -- you can scientifically test something, you can't transfer that knowledge to a larger population?**

MR. PAGE: Object to the form.

THE WITNESS: I would say that I would not trust a qualitative analysis to be generalizable unless it was either testing something that could be controlled or that a hypothesis about a possible condition could be scaled up on a more quantitative

Page 31

level.

**Q (BY MS. INGBER) Is that your personal opinion, or is that something that you believe is a widely-accepted view?**

A I believe that's a widely-accepted view. Certainly a widely-accepted view amongst the researchers that I work with.

**Q Do you think it would be a widely-accepted view amongst qualitative researchers?**

A I'm sure that there are some qualitative researchers who would disagree with that perspective.

**Q On page 2 of your report you state at the bottom of the page in that last paragraph, "From the case studies Dr. Hess performs in these reports, it was not possible to create any 'treatment' conditions that the researcher could manipulate prospectively to achieve internal validity."**

MR. PAGE: Where are you reading and.

MS. INGBER: From the bottom of page 2.

MR. PAGE: What line?

MS. INGBER: The first line of the last paragraph on page 2.

MR. PAGE: And we're looking at the June 9th report?

Page 32

MS. INGBER: We are.

**Q (BY MS. INGBER) Was the purpose of Dr. Hess's research to create treatment conditions?**

A I don't believe that it was her purpose to do that.

**Q Are treatment conditions relevant to experiments where there is an intervention and then cause and effect is analyzed?**

A Can you repeat the question and clarify it for me, please?

**Q Sure. My understanding is that treatment conditions are something that's relevant when you have an experiment. The treatment condition would be considered to be the intervention and then you would analyze the effect of that intervention. Is that a correct understanding?**

A That would be a normal expectation of an experimental design.

**Q Are treatment conditions something that's applicable outside of the experimental context?**

A If what you are asserting is that the conditions that you are examining have an impact upon outcomes, then what you assert as impacting those outcomes is, in effect, a form of treatment because it's affecting a subsequent event or a

Page 33

subsequent process.

**Q How would Dr. Hess have imposed treatment conditions that she could have manipulated prospectively to achieve internal validity?**

A I don't believe she could have. And I believe I indicate that in the report, that I don't believe that that was possible.

**Q Why not?**

A Primarily because she wasn't coming at her study from that perspective. I mean, that wasn't something that she was attempting to do. What I was trying to do is to define a set of conditions that I would view as scientifically appropriate from the standpoint of being able to generalize a single study design or a case-level design. So that's my purpose in making that comment.

**Q Her work wasn't a single case study design, was it?**

A No, it was not.

**Q And there are differences between single case study designs and multiple case study designs; correct?**

A A single case study design is a specific methodology. The -- the notion of a -- I'm not sure what you might mean by a "multiple case study

design" inasmuch as that could include, you know, potentially a much larger quantitative analysis.

**Q For example, a single case study design would be if Dr. Hess had looked only at the files of a single child. She looked at the files of seven children. And my understanding is that in qualitative research that's considered to be a multiple case study, not a single case study. Is that understanding incorrect?**

A I have no idea.

**Q I believe you testified earlier that you're not familiar with the concept of triangulation as it applies to qualitative research; correct?**

A If that was one of the terms that you used in describing different types of conditions for conducting qualitative research --

**Q Well, let me ask it just in case I didn't before. Are you familiar with the concept of triangulation as it applies to qualitative research?**

A I'm familiar with the concept of triangulation as it applies to research in general.

**Q Can you define triangulation for me?**

A My understanding of triangulation is is that it's an effort to use multiple methodologies



and to determine if, in fact, similar findings would result from those multiple methodologies.

**Q And that's the extent of your understanding of that term as it applies to qualitative research?**

MR. PAGE: Object to the form.

THE WITNESS: I'm not sure how it applies to qualitative research.

**Q (BY MS. INGBER) Do you know what steps Dr. Hess took to ensure the trustworthiness of her report, if any?**

A I don't recall.

**Q Do you know if she used any of the following -- and I'll list them for, and you can answer to each one. Auditing.**

A I don't know.

**Q Triangulation.**

A I don't know.

**Q Dense description.**

A I don't know.

**Q Maintenance of working documents.**

A I don't know.

**Q So you didn't evaluate her report based on any of those criteria?**

A No, I did not.



**Q On page 4 of your report, the bottom paragraph on that page under "Issues Related to Dr. Hess's Conclusion."**

**A Uh-huh.**

**Q Yes?**

A Yes.

**Q It will be both of us all day. You say second sentence, "In other words, in providing information about casework, no effort was made to document why decisions were taken by workers or other OKDHS staff." And you give one example.**

**Is it your opinion and do you agree with the statement you made in this report that Dr. Hess did not provide any documentation about why decisions were made?**

A I did not identify any information where she had contacted workers to determine why they had made particular types of decisions.

**Q So this is basically a statement about her lack of interviewing?**

A It's a statement about a lack of testing or looking for other explanations for her conclusions.

**Q Would it be possible to provide -- to find information about why caseworkers made decisions in documents and not just through interviews?**



A It's conceivable that that information might be available in documents, as well as in interviews.

**Q For example, is that information possibly available in contemporaneous E-mails written by those workers?**

A It may be.

**Q Would that information be less valuable than information that can be obtained through interviews?**

A I don't know that I would be in a position to evaluate that.

**Q So I just want to make sure I understand. So you said here that "no effort was made to document why decisions were taken." I can go through some examples; but, in fact, in her report, there are instances where she documents the reasons. And I was confused by that statement because it seemed inconsistent with her report.**

**But it sounds like really what this criticism was was of the failure to interview. So I just want to make sure that I'm understanding correctly your statement.**

MR. PAGE: Object to the form.

THE WITNESS: The purpose of my statement was to point out that in many instances I did not find where she had documented why a decision had been made, and I found no effort to try and identify alternative explanations for why some of those decisions might have been made.
**Q (BY MS. INGBER) Alternative decisions to the ones set forth in the documents?**
A Alternative reasons.
**Q So you think Dr. Hess should have been looking for alternative reasons other than the ones she found in the documents for why decisions were made?**
MR. PAGE: Object to the form.
THE WITNESS: I think in conducting a broad-based, descriptive study where the objective is to identify the range of issues that one might explore, that it would be beneficial to identify all of the possible explanations that might apply to a given set of decisions.
**Q (BY MS. INGBER) Was Dr. Hess's objective to identify the range of issues that one might explore?**
A If she was conducting a descriptive study, I would assume that that would have been her



purpose.
**Q Do you know whether that was her purpose?**
A I don't know what her purpose was.
**Q On page 5 of your report you suggest at the top in that first paragraph, "It may have been possible to interview the workers directly." Do you know whether that's something that's practical in the context of an adversarial, ongoing litigation?**
MR. PAGE: Object to the form.
THE WITNESS: I know that in the context of a well-formulated scientific study, it would and should be possible.
**Q (BY MS. INGBER) Do all well-formulated, scientific studies run up against constraints based on practical reasons, money, time and other issues?**
MR. PAGE: Object to the form.
MS. INGBER: What's the basis of that objection, David?
MR. PAGE: Speculation. It calls for the witness to speculate. It's also compound and ambiguous.
**Q (BY MS. INGBER) You can feel free to answer my speculative, ambiguous --**
MR. PAGE: If I follow a little bit more, I probably can find a few more reasons for why



it's --
**Q (BY MS. INGBER) -- ambiguous and compound question. Would you like me to reread it?**
MR. PAGE: Improper question.
REPORTER: You guys, I can't do that.
MR. PAGE: I know. I didn't -- she asked me a question. She cut me off. I apologize.
**Q (BY MS. INGBER) Do you want me to reread it?**
A Please.
**Q Do all well-formulated, scientific studies run up against practical constraints?**
MR. PAGE: Same objection.
THE WITNESS: When well-formulated scientific studies run up against constraints, one of the important things to be able to do is to document the nature of those constraints and limitations so that the reader is informed about them and understands what the constraints and limitations are. In the case of this instance, that type of documentation was not presented.
**Q (BY MS. INGBER) Do you know how many workers and supervisors the seven children whose cases were reviewed had during the course of the period reviewed?**



A Can you repeat the question, please?
**Q Do you know the total number of workers and supervisors that the seven children whose cases were reviewed had during the time period that Dr. Hess reviewed their files?**
A I remember it being cited in the report, but I don't remember the number.
**Q I'll represent to you that in Dr. Hess's report at page 84 -- this is her second report -- she writes that it was 258 workers and 227 supervisors. Does that sound consistent with your recollection?**
A I'm not certain, but --
**Q I can show you the report if you want to take a look.**
A Well, I -- I can -- I can take your word that that's what you were --
**Q I'm never going to admit the impossibility of a typo, but I did look it up. Would it have been practical for Dr. Hess to interview approximately 475 people in the context of her case review?**
A I don't know if it would have been or not.
**Q Would you expect that many of those almost 500 workers would have left the agency by the time Dr. Hess's case study was conducted?**

MR. PAGE: Object to the form.
THE WITNESS: I'm not sure. I think it depends upon the particulars of the cases themselves. Some cases might be more current than others.
**Q (BY MS. INGBER) But certainly some of those workers would have left the agency?**
MR. PAGE: Object to the form.
THE WITNESS: It seems to me that, you know, given the -- the average way that workers work within most systems, that there is a certain level of turnover that one can anticipate.
**Q (BY MS. INGBER) Would you agree that it would introduce a selection bias if you only interviewed workers who remained at the agency because they perhaps have different characteristics than those who left?**
A Well, if that's what you were limited to interviewing. I'm not sure that that would necessarily be a limitation in the sense that -- the fact that a person hadn't left the agency --
MS. INGBER: Can you not kick me, please? Thanks.
THE WITNESS: The fact that someone hadn't -- that had left the agency wouldn't be



available for an interview, I'm not sure is a valid assumption.
**Q (BY MS. INGBER) So you think she should have interviewed both current and former employees almost 500 of them?**
MR. PAGE: Object to the form.
THE WITNESS: It would have been a more compelling study.
**Q (BY MS. INGBER) A more difficult study, you'd agree?**
A Yes. A more difficult study, but a much more compelling study.
**Q And significantly more time consume?**
A Of course.
**Q And do you think it would in the end have been possible to track down all 500 workers and interview them?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know that it would or wouldn't have, but there would be other alternatives in terms of samples of workers and other ways that she could have obtained, you know, representative information.
**Q (BY MS. INGBER) You've had some experience interviewing workers; correct?**



A Yes.
**Q Do they always remember events that might have taken place a year or more ago involving a specific child?**
A No, they don't.
**Q Are their memories always correct?**
A No.
**Q Are their memories sometimes self-serving?**
A Sometimes they are, and sometimes they're not. And I think that it depends on the individual worker that you're interviewing.
**Q Page 5 of your report, the very end of that page, you say, "All that can be said based on Dr. Hess's study is that some things that should not have happened did happen to a small number of children." What are those things?**
A I think she describes a range of conditions that, in my view, it would have been better had they not occurred. And those could have potentially included multiple placements, perhaps not meeting some of the needs of some of the children that she reviewed their casework -- their case files of with respect to services that might have been put in place earlier.
So I don't think that the -- the issue for



me wasn't necessarily that the events that occurred were appropriate or, you know, consistent with what I would view as appropriate children -- treatment of children. Nevertheless, I'm not sure what the cause of those things were. I'm not sure from her report what the cause of those unfortunate things happening to children actually were.
Were they issues that were related to developmental changes that the children themselves experienced? Were they related to decisions that workers made? And I think by not having a -- sort of a full sense of all the alternative reasons why some of these things may have occurred with respect to some of these children, it's very difficult to understand what one might be able to do about it.
And what's more, it's a small number of children and it may not be representative of what's occurring within the system as a whole.
**Q Was Dr. Hess's purpose to understand what you should be doing about these things?**
MR. PAGE: Object to the form.
THE WITNESS: I don't have a clear understanding of what Dr. Hess's purpose was in looking at these reports except that it's part of a process of litigation. So I'm not sure what her

motivations were for constructing the information that she put down here.
**Q You read her deposition; correct?**
A You know, I did not.
**Q Oh, you did not read Dr. Hess's deposition?**
A No.
**Q Do you agree that DHS was responsible for at least some of these negative events that happened to the children?**
A I believe it's possible that DHS may have had some responsibility, yes.
**Q In her report Dr. Hess lists certain things that child welfare systems need to do to meet the needs of the children in their care. Do you agree that child welfare systems need to monitor and evaluate the safety of children's placements, both before and during those placements?**
A I would agree that that's considered a good practice; however, I'm not sure that most agencies are necessarily equipped to -- to do that very well. I don't know that we have a good basis for being able to do that generally.
**Q Would you agree that it's considered a good practice for a child welfare agency to have a**



**sufficient number of placements for the children in its care?**
A Can you repeat the question because I'm not sure exactly what you mean by "sufficient number of placements."
Q A sufficient number of placements to meet the needs of the children in its care.
MR. PAGE: Object to the form.
THE WITNESS: I -- I mean, I sort of object to the assumption because I'm not sure that the idea that you have a sufficient number of placements is consistent with my understanding of the notion of placement. And my understanding of the notion of placement would suggest that if you're attempting to avoid placements, that the volume of placements -- placement facilities' capacity should vary in accordance with what you're attempting to do. So I'm not sure that I understand the question from that perspective.
**Q (BY MS. INGBER) Before I ask more questions along this line, you don't consider yourself a child welfare practice expert; correct?**
A No, I don't consider myself a child welfare practice expert.
**Q Okay. So I will stop asking you questions**



**as they relate to child welfare practice. And if at any point I ask you a question that seems to go outside what you consider your areas of expertise, please, just let me know. I don't want to waste your time or my time asking those; okay?**
MR. PAGE: Is that a promise?
**Q (BY MS. INGBER) You said you were first contacted by Mr. Page in April. Did -- what did -- what facts and assumptions did Mr. Page tell you about your assignment?**
A At the time what he said was that if we agreed to be involved, that there would be a need to examine some reports that had been prepared by the plaintiff and to produce reports that would be rebuttal reports of those. He also suggested that we might be going through a process like we are today and that there might be a possibility of testifying at a trial.
**Q Did you have any written communications with Mr. Page or anyone else at DHS or any other attorney for DHS?**
A We signed an agreement, a written agreement for services and we exchanged what I would consider to be sort of logistical E-mails with respect to phone calls and other scheduling kinds of



issues.
**Q Any non-logistical E-mails?**
A Not that I'm aware of.
**Q Have you reviewed your E-mail to determine whether there were any non-logistical E-mails?**
A There were E-mails that contained documents. So some documents, for example, would have been the reports that we were wanting to review or the depositions.
**Q In order to prepare your report, did you conduct a case-record review like Dr. Milner and Mr. Goad did or any case-study work like Dr. Hess and Mr. Goad did?**
A No. I mean, I did conduct an analysis of data that was supplied to me by the department.
**Q You're referring to your entry cohort analysis in your June 15th report?**
A Correct.
**Q Any other analysis that you conducted aside from that?**
A No.
**Q Did you attempt to replicate the analysis of any of the reports you criticized in whole or in part?**
A I did not.

**Q Did you do any independent analysis of their data?**
A I did not.
**Q Would it be fair to say that, maybe setting aside your entry cohort length-of-stay analysis, your reports are limited to criticisms of the methodologies used by plaintiffs' experts?**
A I would say the methodology and the sort of scientific conceptualization.
**Q Did you review any court documents?**
A Other than the depositions, no.
**Q And what depositions specifically did you review?**
A I reviewed the depositions for Milner, Goad and Smollar.
**Q What about Dr. Miller?**
A I can't recall if I reviewed hers or not. And I'm pretty sure I didn't review Hess's.
**Q So refresh your recollection of Dr. Miller, there is a section in your report on that transcript.**
A Ah, yes, okay. That's right. I did review that one. Thank you.
**Q Did you review any children's case files?**
A No, I did not.



**Q Did you request those?**
A No.
**Q Did you review any DHS policy?**
A Yes. I reviewed for the Goad report DHS policy on the website regarding the OCA policy and the standard for substantiation.
**Q Is that the only policy section you considered?**
A Yes.
**Q What made you choose that one policy section?**
A I couldn't find a reference in the Goad report that was satisfactory to me in terms of understanding what the legal standard was that was being applied.
**Q Aside from Mr. Page, did you communicate with anyone else about your analysis or your report?**
A Well, with Dr. Baumann, of course. And also with Dr. Shlomo. I've forgotten Shlomo's last name.
MR. PAGE: Sawilowsky.
THE WITNESS: Sawilowsky. And also Larry Brown and Andy Barclay.
**Q (BY MS. INGBER) Can you describe all of your communications with defendants' other experts**



**that you named?**
A Mostly they were communications regarding the -- you know, the nature of the report or the reports and our concerns about them.
**Q Can you describe those in any more detail?**
A Other than to say that I think that we were in, you know, broad agreement about some of the principles that we at least wrote up in our report. I don't think that I can recall any specific details of what we discussed.
**Q Who coordinated those discussions?**
A Those would have been coordinated either, you know, through Mr. Page; or they would have been coordinated by the individuals.
**Q And whose idea were these discussions?**
A I think we sort of came to a mutual agreement that, you know, it might be useful to share ideas.
**Q Were these communications verbal?**
A Yes.
**Q All of the communications with the other experts were verbal?**
A Yes. I mean, I think I -- in my case I think I shared the results of the SPSS analysis that I did in the form of the output; but other than



that, all of the conversations were verbal.
**Q So you didn't exchanges any E-mails aside from the one you described with any of the other experts or defendants?**
A Not that I recall.
**Q Do you have any communications with Barbara Needell?**
A Yes, I did.
**Q Were those verbal?**
A Yes.
**Q So she sent you that chart?**
A Uh-huh, uh-huh.
**Q Verbally?**
A Well, she sent me the -- via E-mail, she sent me the chart.
**Q Did you have any other E-mail contact with Ms. Needell in connection with this work?**
A Nothing that would have been substantive.
**Q Your communications with Dr. Baumann, were all of those verbal?**
A Yes.
**Q So you have no E-mails with Dr. Baumann about your work?**
A No. Other than exchanging documents, draft documents.

**Q Do you know Dr. Casillas?**
A I do.
**Q Did you have any discussions with her about this report?**
A You know, actually, we didn't discuss this particular report.
**Q Did you include all of the facts and data that you considered in forming the opinions in your report in the report itself?**
A No, I didn't.
**Q What facts and data that you considered did you not include in your report?**
A I included a -- or I didn't include it in the report, but did include SPSS output and analysis of a period prevalence analysis of the data. And I did that analysis to basically look at the issue from another perspective.
**Q Why did you choose not to include it in your report?**
A Because it essentially concluded the same thing that the other analysis did.
**Q Were you ever asked by anyone to collect all of the materials that you considered in forming your opinions and collect those documents, whether they be E-mail communications, articles, books,**



**anything else?**
A What we were told was that if the sources were generally available from libraries and other resources, that -- that that information would be, you know, available to anyone who sought it out and it wouldn't be necessary to include that in what we submitted as considered material.
**Q So you were told that if a book was available at a library, it was considered to be publicly available?**
A Yes. Or if it was available for sale.
**Q Or if it was available for sale?**
A Uh-huh.
**Q Who told you that?**
A I believe that was a discussion that we had with the attorneys.
**Q Do you remember which attorney?**
A I can't recall if it was one or several that agreed with that opinion.
**Q Do you recall any of the people who were involved in that discussion?**
A Well, of course, Mr. Page and Mr. Nance.
**Q Would it be fair to say that every single article or book or other documents cited, either in the footnotes or in the references of your report,**



**is a document that you considered when forming your opinions?**
A I wouldn't say that that would be fair in the sense that I had a coauthor who considered material that I didn't necessarily examine.
**Q Thank you for that clarification. Would it be fair to say that every article or book or other documented -- document cited in your report either in the footnotes or in the references is a material that either you or your coauthor considered in forming the opinions?**
A Yes, I would say that that would be fair.
**Q Prior to this work that you did on your report, did you have any involvement with DHS in Oklahoma?**
A Years ago, I think. We had some involvement with the state.
**Q How many years ago and what involvement?**
A I'm thinking it might have been as much as 20 years ago. And I had done some meetings and discussions when the state was interested in looking at conducting a workload study.
**Q How did you and Dr. Baumann divide the responsibilities for this report?**
A Well, I guess the -- to be clear, we



divided the responsibilities differently, depending upon the report.
**Q Why don't you give me the details.**
A For both reports?
**Q Sure. Why don't we start with the June 9th report.**
A Okay. I think mostly what I was focusing on were sort of the broader kind of methodological issues. Dr. Baumann was focusing more on the issues that had to do with validity that were raised particularly with respect to Dr. Goad's -- or Mr. Goad's report.
The -- I did most of the writing on Dr. Hess's report and the writing on Dr. Miller's report.
**Q Most or all?**
A I would say all.
**Q And how did you divide the responsibilities for the June 15th report on Dr. Milner?**
A Again, I would say that I took lead on most of the broader conceptual pieces, the analysis that we discussed earlier in terms of cohorts from the state. And then we divided up the other elements of the report a bit. I can't recall

exactly which topics we took, but we sort of took turns. And then enhanced or worked on each other's sections.

**Q Did you agree with -- by the time it was all done, did you agree with the entire report, whether it had been drafted by you or by Dr. Baumann?**

A Yes, I would say that I agreed with it.

**Q Do you know whether Dr. Baumann agreed with the opinions expressed in the report? Whether they were drafted by him or by you?**

A He did not indicate that he didn't.

**Q Would it be correct to say that every word of the first draft of both of your reports were drafted by either you or by Dr. Baumann?**

A Yes, that would be fair.

**Q I'm going to hand you a document that was previously marked as Exhibit 776. Unfortunately we don't have the official exhibit sticker. We haven't gotten it back from the court reporter. But you can take my word that that's Exhibit 776. It's a copy of Dr. Milner's report. If you want to take a quick look and make sure that it meets your recollection of that report, if you can do that.**

A Okay. Okay. Yeah.



**Q You would agree that Dr. Milner based his review solely on the electronic and paper case records of the children in his sample; correct?**

A That's what he described, yes.

**Q In your view, is it important for caseworkers to fully and accurately document what happens to a child in the child's official records?**

A I think that that's sort of a difficult question. And I don't necessarily mean to be difficult about it. But I guess what I would say is that I think there are limitations on what it is or isn't possible to document and that in some instances some information that might be meaningful or useful is not included because it's not viewed as being meaningful or useful at the time. And that full and complete documentation is probably not a standard that's very feasible for anyone to achieve.

**Q Can you give me an example of a type of information that might be -- might be meaningful or useful, but that's not viewed as such at the time and, therefore, might not be recorded?**

A Well, one type of information that I tend to be very interested in is whether or not workers pursue alternative services with respect to the cases that they're handling. In many instances



those services may not pan out, may not be available for one reason or another. But because they're not what the family or child necessarily received, the activity is not recorded.

So you don't necessarily know all that's gone into the process of providing the particular services that were provided. And the fact that you don't know that means that you don't have any insights into what the barriers or what the issues are that the worker may have experienced in trying to make arrangements for a particular case or a particular child.

**Q That's a very helpful explanation. So let me rephrase my original question. Would you agree that it's important for caseworkers to document what actually happens to a child? For example, visits, whether it's with a worker or someone else, services that are actually provided, placements that actually happened, referrals of abuse or neglect that are made with respect to the child? Would you agree that it's important to document that type of factual information in the child's record?**

MR. PAGE: Object to the form.

THE WITNESS: I think the -- the specific types of events that you're describing are important



parts of a documentation.

**Q (BY MS. INGBER) Would you agree that that's required by reasonable professional practice?**

MR. PAGE: Object to the form.

THE WITNESS: As we discussed, I don't really have that --

**Q (BY MS. INGBER) Thank you. Did you read Dr. Milner's description of the case files that he was reviewing? It's at page 16 to 19 of his report if you want to take a look.**

A You said 60?

**Q Sixteen, I apologize, to 19.**

A Okay. And can you repeat the question again?

**Q Sure. Did you read those pages, his description of the quality, documentation and organization of the case files?**

A I'm sure at one point I did read this, yes.

**Q In your research do you ever look at case files?**

A On rare occasions, yes.

**Q How rare?**

A I've probably looked at case files two or three times in my career. Some of the issues that

he is describing here are very common, and it makes it very difficult work to do.

**Q It makes it difficult and time consuming to review case files; correct?**

A Yes, yes. But I've never -- in my experience, what he's encountered would be consistent with what you would encounter in virtually every child welfare agency in the country.

**Q In the two or three times that you've reviewed them throughout the course of your career?**

A And in conversations with many other people who've conducted case reviews.

**Q Do you believe that others might have more experience with files and their quality than you?**

A Of course.

**Q In your report -- this is your June 15th report -- on page 3 in that big paragraph -- I'm looking a few lines down. You make -- you have what I view as a broad statement. "To draw valid, scientifically sound conclusions regarding such experiences," i.e., the experiences of children while in care, "a longitudinal study of incidence is minimally required."**

MR. PAGE: I just want to say for the record that is not a quote of that sentence that's



found in Exhibit 781.

**Q (BY MS. INGBER) Why don't you read that sentence for me, the one beginning "such" -- "to draw valid."**

**A Okay. "To draw valid, scientifically sound conclusions regarding such experiences, a longitudinal study of incidents is minimally required."**

**Q And when you say "such experiences," are you referring to what's stated in the previous sentence, "the experiences of children while in care"?**

A Yes.

**Q Can you explain for me what you mean by "longitudinal study of incidents"?**

A Sometimes it's described as a cohort design, but basically it refers to a study that follows the trajectory of a group of children who begin their experiences in the system at the same time.

**Q So that would be referring to an entry cohort design rather than an exit cohort design?**

A Correct.

**Q And what's the basis for your statement that, "A longitudinal study of incidents is," quote,**



**"minimally required in order to draw valid, scientifically sound conclusions"?**

A The basis for me is -- is -- emerges from work that I did on my dissertation. And basically what I would have to tell you is that unless you do it that way, the math just doesn't work out. You aren't able to -- it's -- it's possible, if you do that sort of design, to get two plus two to equal four. If you use another type of design, two plus two might equal five or two plus two might equal seven. So it just doesn't work.

If you try to model that type of information using any of the type of design, you end up with information about these experiences that just isn't consistent with the actual data.

**Q Is your opinion one that all experts in the field of social science research agree with?**

A I would say that it would be possible to find experts in the field of child welfare who don't necessarily agree with that perspective. I would say it's increasingly more difficult to find researchers who would disagree with that perspective.

**Q But you would agree that those people are out there?**



A There might be a few. I don't know that they would necessarily have much success getting an article in a peer-reviewed journal using a design that wouldn't reflect these types of principles, but there might be a few.

**Q Are you aware of any child welfare research that has been done that involves -- that does not involve longitudinal studies of incidents?**

A Yes. But not -- yes. And, again, the point here, though, is that if the purpose of the study is to look at experiences and outcomes, you would need to use a longitudinal design.

**Q Was the purpose of his -- of his work to look at outcomes?**

A I would say that if you're talking about maltreatment in care, if you're talking about moves in care, that that is a type of outcome. And that's the sort of information that he was presenting.

**Q Do you think that you can use a point-in-time analysis to describe the experiences of the specific population from which you drew your sample?**

A Can you ask the question again?

**Q Can you use a point-in-time analysis to describe the experiences of the specific population**

Page 66

**from which you drew your sample?**
A I don't believe that you can, no.
**Q So you don't think that any conclusions that you draw or any descriptive facts about the sample reflect the experiences of the population that you drew that sample from?**
A I -- to be clear, I would have to say that you would want to be certain that you knew what your population was representative of to begin with, not necessarily the sample.
**Q So if I have a sample as Dr. Milner did of 6,701 children who were in care on a specific day and what I wanted to do for the purpose of my study was to describe the experiences of that specific group of children, could I draw a sample from that group, review their case files, write some facts about what happened to them and say, "There's a 95 percent chance, depending on my confidence intervals, that these can be generalized to the population"?**
MR. PAGE: Object to the form.
THE WITNESS: I don't believe that that would be a representative view of children in the system.
**Q (BY MS. INGBER) Understood that you**

Page 67

**don't believe it to be a representative view of children in the whole foster care system. But my question is whether it's a representative view of the population of 6,701 children in care on a specific day that I drew my sample from.**
MR. PAGE: Object to the form.
THE WITNESS: I really don't want to be any more confusing about this than is necessary; but I think it's just important to go back to some basic principles and be clear that when we're talking about experiences, that experiences occur over time and that more experiences occur the longer you observe a child or a family.
As a consequence, unless you're taking into account the amount of time that your observations are occurring over, that is unless you have some longitudinal view that's associated with your measurement, then whatever you're saying about those experiences would not be representative of the actual occurrences of those experiences.
**Q (BY MS. INGBER) So you're going to say that Dr. Milner's findings are not descriptive of the experience of the group of children who were in care for 60 days or more on March 1st, 2010?**
A I'm going to say that the methodology that

Page 68

he used to draw any conclusions about the experiences was deeply flawed.
**Q That wasn't my question. And if you can, please, answer my specific question, that would be great. Are you or are you not saying -- you can say either way. Are you or are you not saying that Dr. Milner's findings are descriptive of the experience of the group of children who were in care for 60 days or more on March 1st, 2010?**
A I think the most definitive thing that I could say about that is that I simply don't know because the methodology was so flawed.
**Q So you don't think that -- you -- so you think that if Dr. Milner found that 12 percent of children who have been in care for 60 days or more on March 1st, 2010 had been subject to substantiated maltreatment allegations, you just can't say whether that is descriptive of the larger population from which he drew his sample?**
A I don't think that that is a valid representation.
**Q Is it not a valid representation of the population of all children in foster care, or is it not a valid representation of the children who were in care for 60 days or more on March 1st, 2010?**

Page 69

A It is information that is not usable to -- I -- I understand, but I'm -- all I'm saying is is that I can't evaluate whether that information is representative of anything because I view the sample as being -- and the population as being a fundamentally flawed source of information from which to draw any conclusions.
**Q I understand you view the way he drew his population as flawed. I want you to set that aside now so you can answer my specific question.**
A I can't set it aside because it violates a fundamental principle.
**Q What you view as a fundamental principle even though there's been lots of --**
A What many people view as a fundamental principle.
**Q Let me finish my question, please. What some people believe is a fundamental principle and what other child researchers believe is not a fundamental principle; correct?**
MR. PAGE: If you want to argue with the witness, let's not do it on the record. This is a question and answer thing, and this is not a place for Counsel to try to advocate its positions or try to rehabilitate its experts. I think you should ask

the witness a question rather than try to persuade him today that his view isn't as he has represented in his report.

**Q (BY MS. INGBER) I'll read my question again because I can't even remember it after that. Does everyone agree that what you've said is a fundamental principle is a -- does every child welfare researcher out there agree with that?**

A Do you agree that two plus two is four?

**Q You don't get to ask the questions today unfortunately. Does every child welfare researcher agree with what you've described as a fundamental principle?**

A I don't know. I would hope they do. As I said, I don't believe that they would have much success in the field if they didn't hold that perspective at this time.

**Q Do entry cohorts include all children in care?**

A It depends on the question that the entry cohort was designed to answer. Sometimes entry cohorts are designed to answer specific questions about specific subpopulations.

**Q If I chose an entry cohort for all children who entered care in 2009 -- which I believe**



**is what you suggest in your report --**

A Uh-huh.

**Q -- would that entry cohort include all children in foster care in Oklahoma?**

A Theoretically it should, yes.

**Q It will include children who entered care in 2008?**

A No. It would include only those children who entered care in 2009.

**Q Right. So it would not include all children in foster care in Oklahoma. It would only include those children who entered foster care in Oklahoma in 2009; is that right?**

A It would only include those individuals who entered care in 2009.

**Q How would you design a longitudinal case-review study that would address the concerns identified in this case about DHS's systemic failures to the children in its custody that would meet -- that you would be able to complete within one year and that would capture the experience of the long stayers?**

A What I would probably do is look at an entry cohort from 2007 or 2008 and look at their case records and -- but I would try to look at it



prospectively. So I would say, for all of the children who entered care in 2007, what were the experiences that those individual children had? So it's not unfeasible from the standpoint of the data collection methodology so much as the sample that was used.

**Q Would that case-record review provide you with information about children who had been in care for more than four years?**

A No. But I could -- if I was intending to get information that was that long a span, I could look at data from 2004 onward.

**Q Okay.**

A 2003 onward.

**Q Okay. So let's say you took an entry cohort for 2003. Wouldn't there be a very large focus in your report on practices that took place seven or eight years ago?**

A Yes, that's absolutely true. But ideally with a cohort study you're looking at multiple cohorts over time and evaluating changes. Many events occur within short periods of time after children are in care, including reunification events and even maltreatment in care. So it's possible to create estimates from shorter time spans with



respect to a general population over a longer period of time.

**Q Not all events occur within a short period of time; correct? For example, adoption typically is an event that takes place after a longer period of time?**

MR. PAGE: Object to the form.

THE WITNESS: Usually adoptions require a longer period of time. You know, in the vicinity of one at least two perhaps three or four years. In some cases much longer.

**Q (BY MS. INGBER) In your report, I believe --**

MR. PAGE: Miriam, we've been going for about 90 minutes, is this a good time for a break?

MS. INGBER: Let me finish my line of questioning, and then we can take a break.

**Q (BY MS. INGBER) In your report you suggest that you use an entry cohort from, I believe it was, state fiscal year 2009 or 2010. Is that the recommendation you make in your report?**

A I was suggesting that that would be a possibility, yes.

**Q If indeed you chose an entry cohort that entered in, let's say, state fiscal year 2009 and**

**you had to finish your research by the end of 2010, that would only provide you information about the experiences of children who had been in care for two years roughly, maximum; correct?**

A Yes.

**Q Would that be a potential disadvantage to the method that you suggested in your report?**

A It depends on the purpose of the study.

**Q If the purpose of the study is to describe the experiences of all children including those with long stays in care, would that be a disadvantage?**

A If you wanted to incorporate longer stays of care, then you would probably want to use earlier cohorts, as well.

**Q And if you used an earlier cohort, as we discussed earlier, that would lead to a focus -- larger focus on past practice because many of those children would enter care in prior years; correct?**

MR. PAGE: Object to the form.

THE WITNESS: While that might seem like a disadvantage, it may also be an advantage in the sense that one could use that information to see if systemic change has actually had an impact on various outcomes.

**Q (BY MS. INGBER) That would be -- that**



**would be if you did multiple cohort analysis done from prior years and some from recent years?**

A Over -- right, right. I mean, ideally you would want to do this over an extended period of time.

**Q Right. So ideally -- I understand the ideal would be to do multiple cohort analysis, let's say the last 18 years -- because some kids enter at 0, age out at 18. Eighteen year -- 18 cohorts, that would be the ideal; correct?**

MR. PAGE: Object to the form.

THE WITNESS: If it were possible to do that sort of design, that would be ideal, yes.

**Q (BY MS. INGBER) It would also be significantly more time consuming and more expensive; correct?**

A Well, in some ways that's sort of a false dichotomy in the sense that -- you know, in my view, if you're going to use a methodology that's invalid and invest a lot of time and money to conduct a study of that nature, you end up with results that are essentially not usable.

So, in effect, by doing something that is of lower quality, lower rigor, you know, you've invested resources and time and energy in ways that,



you know, constitutes something that's not useful.

**Q Two follow-up questions and then we can take a break. You would agree, though, however, that conducting a 18-cohort, multi-year analysis would be more time consuming and more expensive than conducting a single-year cohort analysis?**

A I don't know if it would be more expensive.

**Q You had to review 18 years worth of files?**

A If you were reviewing a sample, it might not be any more expensive. There are other types of outcome indicators that you could use that aren't necessarily dependent upon having to review the case records.

**Q Just say you wanted to actually review real case records. Would it be more time consuming and more expensive to do a multi-year cohort analysis than to do an analysis that focused on a single sample?**

MR. PAGE: Object to the form.

THE WITNESS: Well, I mean, first of all, I wouldn't use case records exclusively for that sort of analysis. I would use a combination of administrative data and case records. And I would use case-record reviews sparingly and only as



necessary to either reinforce or verify some of the administrative data.

**Q (BY MS. INGBER) Would you be limited to the information that's collected in the administrative system?**

A Just as you would be limited to the information in case records and that level of documentation.

**Q So your answer to that is yes?**

A Of course.

MS. INGBER: Okay. Let's take a break.

VIDEOGRAPHER: We're now off the videotape record. Time is 10:09 a.m.

(A recess was taken from 10:09 AM to 10:18 AM.)

VIDEOGRAPHER: We're now back on the videotaped record. The time is 11:18 (sic) a.m.

**Q (BY MS. INGBER) You state in your report, page 9 to 10 --**

A Which one?

**Q I'm going to be talking about the June 15th report for a while.**

A Okay.

**Q So I'll tell you when I move on to the other one. And you state that it's your opinion --**

Page 78

**and this is at the very bottom of the page -- that the point-in-time methodology "is problematic with respect to all of the findings concerning events that Dr. Milner presents that have to do with length of time in care."**

**Is every event that Dr. Milner describes -- do all of those have to do with length of time in care?**

A Well, they're aspects of the sample that he looks at that aren't necessarily associated with length of time in care. Like child demographics, for instance. Gender.

**Q What about number of missed visits in a specific one-year period? Does that have to do with length of time in care?**

A Well, it does in the sense that it would be confined to a particular period of time.

**Q Would you expect the number of missed visits in a set one-year period to correlate with how long the children had been in care?**

A I don't know.

**Q So would it be fair to say that in order to determine what, if any, effect the length of time in care has on the events that Dr. Milner describes, you would have to go through each of the events he**

Page 79

**describes one by one and really do an analysis?**

A I would say so.

**Q So sometimes the length of time in care might have a big effect. For example, length of stay. Sometimes it might have a small effect. Sometimes it might have no effect; correct?**

A It's possible.

**Q And you didn't do that analysis?**

A I did not do that analysis.

**Q Let's look at your length-of-stay entry cohort analysis on page -- I believe you start describing it on page 12, and you have some charts on page 14 of your report.**

A Uh-huh.

**Q It wasn't clear to me from reading your report what the -- when this analysis was -- was done, i.e., you drew the data for the entry cohorts, but what was the last possible exit date that would have been included in your analysis?**

A That's a very good question and one that I would have to actually look up in order to determine that because I just can't remember. I think we might have set it, you know, to be -- I mean, I would be speculating. I think it was sometime in 2011, but I'm not sure exactly when.

Page 80

**Q Is that information that would be helpful in getting -- gaining a full understanding of your analysis?**

A It might be helpful. It might be useful to know that.

**Q Did you calculate the number of children who had not exited care as of the date you conducted your analysis?**

A The analysis is a standard survival analysis procedure. And so what that requires that you incorporate are what are referred to as "censored observations." And typically in a context of an analysis like this, a censored observation would be a child who was still in care at the time that the observation concluded. And the methodology, in effect, adjusts for that type of observation.

**Q So are you saying you didn't do any calculation to see what children -- what percentage of children in each of your entry cohorts were still in care, just to see what number, how many age --**

A That's part of the output that's produced, but it's not a -- not necessarily a relevant statistic because it's biased as -- I mean, part of the issue in terms of doing this sort of analysis is

Page 81

that you have to take those observations into account in order to calculate what those percentages actually are.

And the -- so while the information is available, it's more for sort of a quality-assurance process in terms of the data itself, just so that you have some sense of it; but it's not something that you would actually use in interpreting any of the findings.

**Q I actually calculated those numbers; and as you would expect, more children are in care from the more recent entry cohorts than from the earlier entry cohorts.**

A Sure.

**Q Ranging from about 250 for the state fiscal year 2006 entry cohort to approximately 1,100 in the state fiscal year 2009 entry cohort.**

**I understand this may not have been the analysis you did, but am I correct from a layman's perspective to understand that all of those children who remained -- who were still in care when you conducted your analysis, their length of stay would continue to grow?**

MR. PAGE: Object to the form.

THE WITNESS: It's possible that they

would have continued to grow. But the more likely scenario is that they would have continued to grow consistent with the experiences of their peers in the cohort.

**Q (BY MS. INGBER) I guess I'm -- you're speaking, I think, at a more detailed level than me. For every child who is still in care as of the date that you ran your analysis, that child's length of stay would be longer than it -- than it was on the date that you conducted your analysis. We don't know by how much longer, but it would be longer by some amount. Is that a correct statement?**

MR. PAGE: Object to the form.

THE WITNESS: It is -- it's a correct statement, but it's not very relevant in terms of understanding the data or how it works.

**Q (BY MS. INGBER) I understand you don't believe it to be relevant.**

A It's completely irrelevant.

**Q I understand your perspective on that. I understand that you did a survival analysis which is a different type of analysis and you calculated medians and quartiles. So I understand your point.**

**Your length-of-stay analysis was based totally on data from DHS's SACWIS system; correct?**



A Yes.

**Q Did you do anything to validate the accuracy of that data?**

A I did a little bit of work with the data to -- to validate it. One of the things that I did was to verify that they -- that there were, in fact, instances involving reentry into care, that I wasn't merely being given children at sort of random. But other than that and looking at the distributions based on my experience with other states' data and making sure that it sort of looked reasonable, I didn't do any further quality assurance of the data.

**Q Did you do anything to compare it to either case files, financial records, anything else to see whether the dates of entry you were relying on were accurate?**

A I did not.

**Q Would it concern you if you learned that a significant percentage of those entry dates were not accurate? Would that affect your results? Hypothetically.**

A If they were, it would be perhaps useful to know. I guess the question would be: To what extent were they different and for what reason? But it doesn't affect the overall principle of the



analysis.

**Q Well, let me just ask it this way. In your chart it looks like there's approximately between 4,000, 6,000 children or 7,000 children in each of those years. If it turned out that the dates of entry you were using for two-thirds of the kids in each year were wrong, would that change -- possibly change the numbers in your chart?**

A It would change the numbers in the chart, but it might not affect the findings.

**Q But it might?**

A It's possible.

**Q You would have no way of knowing unless you knew what the actual dates of entry were; correct?**

A I wouldn't know other than the dates that were provided for me in the data set.

**Q You compare the median length of stay that you -- that you calculated to the median length of stay that Dr. Milner calculated based on his case-record review; correct?**

A Yes.

**Q Are you aware that in addition to the case-record review which found a median length of stay of somewhere around 23 months, Dr. Milner also**



**had available to him the SACWIS data for these children with their entries into care?**

A I am assuming he would have had the entry dates right in order to calculate the -- the median length of stay that he did, yes.

**Q Well, his median length of stay in his report, to be clear, was based on the case-record review, which was information in the child's files.**

A I understand. Correct.

**Q I will represent to you that in addition to that -- and not just for a sample, but for the entire population -- Dr. Milner had SACWIS data on the entry dates for those children. Does that make sense to you what I said?**

A Yes.

**Q Would it have been -- could you have used the SACWIS data for Dr. Milner's population to calculate -- to do the same analysis you did here?**

A No.

**Q Why not?**

A Because his was a point-in-time sample.

**Q You can't calculate a median length of stay for a point-in-time sample? Mathematically it's not possible?**

A You can. It's just that it wouldn't be

the same as this.
**Q Okay. I understand. But mathematically I could use those entry dates and find the middle one and that would be my median; correct?**
A He did that, yes.
**Q He did that based on the case records. He did not do that based -- for the entire population based on SACWIS data; correct?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know what he used.
**Q (BY MS. INGBER) Okay. I will tell you that if you use the SACWIS data for Dr. Milner's entire population instead of using the case records for his sample, the median length of stay is significantly different. Does that make sense to you what I just said?**
MR. PAGE: Object to the form.
THE WITNESS: It makes sense to me, but I'd have to evaluate it to verify that.
**Q (BY MS. INGBER) You made no effort to evaluate the SACWIS data for Dr. Milner's population, did you?**
A No.
**Q Did you ask for that data?**
A I believe it was provided, but I don't --



as part of the considered material, but I didn't actually look at it.
**Q Why not?**
A Because it was a point-in-time sample and I didn't view it as being relevant to the particular point that I was trying to make.
**Q On page 4 of your report in your discussion of "sample size," you say that, "The sample size in Dr. Milner's report may be adequate for estimating the population as a whole from which it was drawn."**
**Do you have any criticisms of the size of the sample Dr. Milner drew from his population?**
A Not in terms of the size of the sample. I don't think that the way that the data were used was appropriate, but I don't necessarily -- if, for example, I was interested in estimating the -- the gender of children in care on those particular dates, if I had a question about that for some reason, I wouldn't have any objection to the sample and to use the information to describe that feature.
**Q So just to be totally clear -- and I understand your other methodological criticisms, and I don't want to discount them. But focusing just on sample size. In your view, the sample size was**



**adequate --**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) -- given the confidence intervals that he wanted to use?**
MR. PAGE: Object to the form.
THE WITNESS: Well, I'm not -- I'm not sure about the confidence intervals in all cases, but I do think that the sample itself was sufficient to be able to -- to basically represent fixed characteristics of the children in care at that point in time.
**Q (BY MS. INGBER) And when you say it wasn't adequate always, are you speaking about when he did subgroup analyses?**
A Yes.
**Q So, for example, if either there was missing information in some of the files or if a certain event only affected some of the children -- because the denominator, if you will, would be smaller -- that would have an effect on confidence intervals; correct?**
A I believe that's correct, yes.
**Q And the size of that effect would depend significantly on the size of the subgroup; correct?**
A That's correct, yes.



**Q The larger the subgroup, the closer it is to 374, the smaller the effect?**
A It would also depend on the size of the characteristics that were being measured. So if it was something that was a relatively small proportion --
**Q Uh-huh.**
A -- of that subsample, it would be more subject to wider confidence intervals than something that was perhaps a bit larger. So if you're talking about 50 percent of the subsample, the confidence then would be narrower. If you're talking about 5 percent, the confidence interval would be quite wide.
**Q Understood. But if, for example, you had a subgroup analysis that, for whatever reason, was on 370 out of 374, the confidence interval would be quite close to the confidence interval on an analysis of all 674. Is that a correct understanding?**
A I would say for the most part. There again, there might be some exceptions to that.
**Q Did you do any analysis to determine the size of the confidence intervals for any of the subgroup analyses performed by Dr. Milner?**

A No.
**Q So you don't know the size of those effects?**
A I don't, no.
**Q Now, you described some criticisms of Dr. Milner's stratification process. How do you think he should have stratified? And if you want, to be specific, the beginning of the paragraph on "sample size," you again make your longitudinal point and you say that it should -- should have been "one that was stratified by the characteristics of the children and the outcomes being reviewed to ensure representativeness." So do you see that sentence?**
A I do, yes.
**Q That was a paraphrase of that sentence. What characteristics and outcomes should, in your view, Dr. Milner have stratified on?**
A Well, I mean, I think there's some, you know, potential subpopulations that it might have been useful to look at a little bit differently. Perhaps age groups could have been looked at a little bit differently.
He may have been able to stratify with respect to his long-term populations that he was



concerned about in a more, you know, sort of accurate way and still had a representative sample that would have done a better job of depicting the experiences of all children, including those in care for less than 60 days.
So he -- if -- you know, if there were -- if there were specific objectives that he had that he wanted to make sure that he addressed in order to be -- or to create a sample that was more representative, then I think those should have been clarified in part of the sample designed.
**Q If Dr. Milner's purpose was to describe the experiences of all children in custody on that date for more than 60 days, was it necessary to stratify along age groups or according to long stayers?**
A Well, if his -- again, I -- I have to say that fundamentally it's a problem to create a sample on that basis in terms of the question of experiences. So --
**Q I understand your point-in-time, longitudinal -- we've discussed it.**
A Right.
**Q I will not forget it. Even if you don't say it as a caveat to every answer, it's there. So**



**if you can, please, try to focus on the specific issue, we will be able to get through this a little bit --**
MR. PAGE: It's argumentative, Ms. Miriam.
MS. INGBER: Could you not call me Ms. Miriam.
MR. PAGE: What would you prefer to be called?
MS. INGBER: You can call me Miriam, or you can call me Ms. Ingber.
MR. PAGE: Okay. Sorry. Ms. Ingber, I think that was argumentative.
**Q (BY MS. INGBER) Okay. I was just trying to make things go more smoothly.**
**Do you think that kind of stratification was necessary if the purpose is to describe the experiences of all children in care, understanding your criticism of point-in-time methodologies?**
A Well, I mean, I don't really know because I don't really know what the -- you know, the complete set of objectives were for this particular study. But the fact that he incorporated a stratification of one subgroup as a part of his design process, you know, would lead me to believe that he was considering certain types of information



as being more important than others.
If that was the case, then there should have been an explication of a stratification strategy that would have helped us to understand what the objectives of the analysis were, as well as producing an analysis that would be consistent with those objectives.
**Q Is one purpose of stratification to ensure adequate representation of smaller subgroups?**
A Yes.
**Q I believe that Dr. Milner testified that that was his purpose when he stratified that congregate care. Did you read that testimony?**
A Correct. And that's why it's curious that he wouldn't include other types of stratifications.
**Q Like what?**
A I mentioned age, for instance.
**Q Do you have any reason to believe that his sample that he drew was not representative of various age groups?**
A I am not entirely sure that it was representative.
**Q But you don't know that it was not?**
A But I don't know. And what's more, I think it's -- I can't say what his -- all of his

Page 94

objectives were in terms of producing the analysis, but certain types of stratifications may have been more helpful to include in order to be able to meet some of those objectives.

**Q I'm hearing you say that your -- the choice to stratify is based on your objectives and that can drive the choices. And that you don't really understand what Dr. Milner's objectives are so it's hard for you to say exactly how he should have stratified; is that correct?**

A I would say that's a -- a reasonable characterization of my position.

**Q Would you agree that reasonable people can disagree about how to stratify in a specific research study?**

A I believe that they can and probably do disagree about that particular issue.

**Q I have difficulty understanding one of the sentences on page 4, and I'm hoping you can explain it to me. It's sort of in the middle of that paragraph when you're talking about how to display representativeness. And you said, "It would have been much more meaningful to show percentages in the sample in comparison to the population for parts 1 to 7." Can you explain what that sentence means?**

Page 95

A It's in reference to the sentence above. "Dr. Milner's claim of representative (sic) through the display of similar proportions in the sample, as in the population for the goals and placement types, is misleading. It would have been much more meaningful to show percentages in the sample in comparison to the population for parts one to seven."

And I think what we were trying to suggest by that is that there would have been information about the experiences of children in the sample that he drew that would have also been available in the population. And that simply having the information regarding -- I believe it was age groups that he was making a comparison of -- wasn't necessarily helpful in terms of making a determination that the sample was representative of his population.

**Q That's helpful. So what you're saying is that Dr. Milner should have compared his sample to the population that he drew it from for a number of other --**

A On more -- on more characteristics.

**Q Do you know what data he had for his entire population?**

A I have no idea.

Page 96

**Q He would have been limited to the data that he had for the entire population in drawing those comparisons; correct?**

MR. PAGE: Object to the form.

THE WITNESS: I'm sure he would have been limited to that in terms of what he obtained, but it isn't necessarily clear to me that, you know -- that that was a limitation.

**Q (BY MS. INGBER) But you didn't look at the SACWIS data that Dr. Milner was given, even though it was available to you; correct?**

A And I don't know what he requested or why he requested what he requested. So he potentially could have obtained other data that he didn't have access to at the time.

**Q Understood. When you're doing these types of comparisons between a sample and a population -- a sample of this size and a population, would you expect that 5 percent of the comparisons made would show significant differences as a result of statistical artifacts?**

MR. PAGE: Object to the form.

MS. INGBER: What's the basis of that objection?

MR. PAGE: Ambiguous.

Page 97

**Q (BY MS. INGBER) Do you find that question ambiguous?**

A Well, actually if you could repeat it, it would be helpful.

**Q Sure. And then let me know if it's ambiguous and I'm happy to try and clarify.**

A Okay. Sure.

**Q When you're doing these types of comparisons between a sample of this size and a population of this size, would you expect that 5 percent of the comparisons made would show significant differences?**

A I believe that was his assumption in terms of the sample size that he actually drew. Had he drawn a larger sample, then the level would have been lower. Had he drawn a smaller sample, then the level would have been larger.

**Q But you would -- you would expect to see -- because of the fact that it is a sample drawn with certain confidence levels and intervals in mind, that you would see statistical differences between the population and the sample because of random chance; correct?**

A I would agree that that would happen, yes.

**Q At the very bottom of page 4 you say,**

Page 98

"Additionally the sample size is not sufficient to prevent large confidence intervals for some items." Is that simply a repeat of your prior point, that when subgroup analyses are done, that would affect the size of the confidence intervals?
A Or when you're looking at, even with an entire sample, low frequency events.
Q Okay. But, again, you didn't do those calculations to determine the actual confidence intervals, did you?
A No. I'm not sure it would have been possible.
Q But you didn't try?
A No.
Q On page 5 you give an example. "For example, if 12 percent of the time children in the sample were substantiated for maltreatment and the confidence interval around that finding was 10 percent, one could conclude that as much as 22 percent of the time, children could have been substantiated for maltreatment." Do you see that sentence?
A If you could --
Q Sorry. Very top of page 5. I apologize.
A Uh-huh.

Page 99

Q You might -- I'm sure you know, one of Dr. Milner's findings was that 12 percent of the time children in the subsample were substantiated for maltreatment. My question is whether this is simply a hypothetical example of a confidence interval of 10 percent?
A It is.
Q So you don't know what the actual confidence interval is for that finding?
A Well, it may have been derived from his report; but I can't recall.
Q You don't -- you don't know?
A I don't know.
Q Do you recall calculating a confidence interval for that finding?
A I cannot recall. I -- I mean, I didn't.
Q And you say here that, "One could conclude that as much as 22 percent of the time children could have been substantiated for maltreatment." It's also true that with a 10 percent confidence interval, 2 percent of the children could have been substantiated for maltreatment; correct?
A Yes.
Q So confidence intervals I know are not always symmetric. But assuming a symmetric

Page 100

confidence interval, it would have an equal effect of either exaggerating or underestimating the event?
A That's -- that's correct, yes.
Q But you only reference the exaggeration part in your report; correct?
A Yes.
Q Why is that?
A I think to point out that that's a possibility in terms of how the data could be interpreted.
Q And you didn't point out the equally likely possibility that it could be 2 percent; correct?
A I did not point that out in the report, no.
Q Your next section of your report, beginning on page 5, is about the 60-day criteria. Do you know whether child welfare researchers ever use -- ever exclude children with a certain length of stay when they're doing research?
A I'm sure in certain circumstances that they do for specific reasons. But I don't know that it would be a 60-day interval or a 30-day interval.
Q Or possibly a 90-day interval in some research?

Page 101

A Right.
Q And would you agree that sometimes the exclusion of children with shorter stays can be valid depending on the purpose of the study?
A I would agree that it is possible that it would be useful to look at subpopulations of that nature. I think it would be important, however, to be clear about what you're generalizing to and why.
Q Do you think that Dr. Milner was unclear that he was generalizing only to the population of children in care for more than 60 days?
A No. I think he was clear about that.
Q Would it be fair to say that your criticism on this point is that you disagree with Dr. Milner's rationale for excluding those children?
A I think his rationale is not consistent with the idea that you would be looking at a representative view of children in the Oklahoma system.
Q I believe Dr. Milner was trying to look at a representative view of all children in care for more than 60 days, but -- and I believe he testified to that, as did Dr. Smollar. Is that inconsistent with your memory of their testimony?
MR. PAGE: Object to the form.

Page 102

THE WITNESS: It's not so much that it's inconsistent with their testimony or their objectives. It's that if one were trying to use the data to formulate policy or to make changes within the system, it would leave out a very, very large segment of the population and might lead you to develop policies that would be potentially inequitable or that might have other deleterious sort of systemic effects with respect to perhaps even the population of children in 60 days or longer.

**Q (BY MS. INGBER) Was Dr. Milner's purpose to develop policy or formulate change?**

A I have to assume that these data were assembled for the purposes of convincing someone, presumably a judge, that they would need to require changes in policy and that this would be a basis -- an assumption would be that this would be a basis for making those types of changes. Otherwise why would one invest the level of money and attention to a study like this?

**Q That's your assumption about what his purpose was? What's that based on?**

A Why else would you do it? I mean, you've certainly identified other ways of -- of looking at

Page 103

potential problems within the system.

**Q Was it invalid to exclude children who may not have been in custody, according to the state's definition of custody?**

MR. PAGE: Object to the form.

THE WITNESS: Can you repeat the question again?

**Q (BY MS. INGBER) Sure. I think we can all agree, can we not, that the purpose of the study was to look at children in foster care custody; correct?**

A Yes. That's my understanding.

**Q Would it be invalid to exclude children who were in care for less than 60 days because they may not have met the state's definition of being in custody?**

A If that's the case, then it would have been necessary to exclude the experiences of those children in care for less than 60 days in the analysis.

**Q Have you looked at DHS -- any DHS statute or other document that defines custody?**

A No. Other than what's been in the report.

**Q Are you familiar with the criticism of the CFSR that by including children with very short**

Page 104

**stays, it is, in fact, raising questions about whether those children should have been in foster care to begin with?**

A I would argue that regardless of how long a child is in care, that there are questions about whether they should be in foster care to begin with.

**Q Is that question especially pointed when a child is in care only for a very short period of time?**

A Not necessarily.

**Q Is that just your personal opinion?**

A I would say that I don't have enough information to be able to provide a specific conclusion. I think the only thing that I would have to say about that is that, you know, the whole business of making decisions about whether children should be in care or not is very suspect in my view.

**Q That's based on your background in research and decision making?**

A Correct.

**Q The bottom of page 5 you say, "Perhaps Dr. Milner does not believe that OKDHS has the same responsibility for protecting the child during the first 60 days as in the days following."**

**What's the basis for your statement that**

Page 105

**Dr. Milner does not believe that?**

A The fact that he would exclude them.

**Q That's the only basis for that statement?**

A Yes.

**Q Are you aware of whether he did or did not analyze the experiences during the first 60 days for the children in his sample?**

A As far as I know, he actually did examine the experiences of children; and it more or less states in the paragraph on the next page that he was instructing his reviewers to do that.

**Q Does that suggest that, in fact, he does care about the experience of children during their first 60 days?**

A What it suggests to me was that there's a contradiction in perspective because it suggests in the first instance that if you're excluding children who had been in care for less than 60 days, that perhaps those children are -- the experiences that they have are not important.

But if you're including them in your study as a part of the analysis from the point of view of children who had been in care for 60 days or longer, the experiences prior to 60 days, then it would suggest that those are -- are relevant. So it's --

Page 106

it just seems like a contradiction to me.

If you were going to -- if you were going to do a comparison that was a bit fairer, you would probably exclude the experiences of the children prior to 60 days.

**Q Is it really a contradiction if there are other valid reasons for excluding the children in care for 60 days or less aside from the fact that you don't care about them?**

MR. PAGE: Object to the form.

THE WITNESS: I don't know that I don't care about them. I think that the -- the issue is I don't understand why he would have excluded them.

**Q (BY MS. INGBER) Did you read his deposition testimony and the testimony of Dr. Smollar --**

A It still makes no sense to me.

**Q -- on why they excluded them?**

A They talked about some articles that looked at longer lengths of stays. They talked about -- or Smollar did anyway. And I didn't see a convincing rationale in any of the deposition that would lead me to believe that there was a good reason for excluding them.

**Q Do you recall Dr. Milner's testimony that**

Page 107

**he excluded the children in part because they may not have met the state's definition of custody?**

A Nevertheless, they were in care, whether they met the state's definition or not. And their experiences while they were in care during that period of time were relevant for his study.

**Q But you don't -- do you recall that specific testimony?**

A I don't recall the specific testimony. I'm taking your word that that's what he said. But it doesn't make any difference. From -- from my perspective, he's excluding a particular subpopulation for no clear reason.

**Q Can you explain to me again what you believe Dr. Milner's reasons were for excluding that population so I can understand what reasons you think are not clear or not valid.**

MR. PAGE: Object to the form.

THE WITNESS: Well, what I've tried to say is I don't really understand what his reasons were. What I do understand is that excluding children would have a potential impact on an analysis of experiences of children in care. Because some of the children in care less than 60 days would also have some of the same experiences as children who

Page 108

are in care for longer.

**Q (BY MS. INGBER) I understand you don't understand those reasons. I'm just asking you to give me your best recollection of what those reasons are.**

MR. PAGE: Object to the form.

THE WITNESS: I have no idea. I really don't. I really don't understand his reason or his rationale.

**Q (BY MS. INGBER) I'm trying to distinguish -- there's lots of things I don't understand that I recall. So I'm just asking you if, sitting here today, you can recall any of those reasons, understanding you don't understand them.**

A I really -- no, I don't recall them.

**Q Do you believe -- turning now to the inter-rater reliability process. Do you believe that the number of cases, 34 children, on whom inter-rater reliability review was conducted was a sufficient number?**

A I don't know if it was a sufficient number or not. I think it was probably a bit on the low side. But I think, you know, it might have been a reasonable number to at least make some sort of assessment on.

Page 109

**Q Do you recollect the statement in your June 9th report that there's considerable improvement in the process if a number of cases reviewed reaches around 30?**

A Yes.

**Q So when you say that it might have been a bit on the low side, what do you mean?**

A Oh, you know, 50 would have been better.

**Q More is always better with inter-rater reliability review; right?**

A Right, right.

**Q But given your statement in your June 9th report, do you have a specific criticism of the choice of 34?**

A Not specific.

**Q On page 7 of your report, very top of the page, the end of that top paragraph, it reads, "Ideally the raters would not have known the purpose of the study and would have relied on blind reviewers to ensure internal validity of the review process."**

**Can you explain to me how internal validity is related to the concept of blind reviewers?**

A Right. The basic notion is that if you

Page 110

are not aware of the purpose of the data that's being collected, that you're more likely to come to an unbiased conclusion about what you're seeing. And if the reviewers of the study had no real clear sense of what the purpose of the review was, then one could be a bit more confident that they hadn't in some way responded in a biased way to the information that they saw.

**Q I understand the concept of confirmatory bias, but my specific question is about internal validity and your reference to it in that sentence.**

A Uh-huh.

**Q I understand that internal validity is related to research design factors that allow you to discuss a causal relationship between variables.**

A Uh-huh.

**Q How is that concept of internal validity -- assuming I've described it correctly -- related to whether or not you have blind reviewers?**

A If there's a bias in the information, what that would do is it would cause the -- the information to be inaccurate. And if the information is inaccurate, then it wouldn't be possible to say that, in fact, there was a relationship between, say, A and B because you just

Page 111

don't know that. The information in itself may be not correct.

You may not be specifying B in exactly the same way that you're -- that you would if you didn't have a preconceived notion of what B should be.

**Q Wouldn't there be an equal effect on external validity if you had invalid information?**

A Well, internal -- issues of internal validity affect external validity.

**Q Is the question of whether reviewers are blind or not one that's generally considered in the context of internal validity?**

A I don't know that it's necessarily a specific statement in terms of the framework that Campbell sets out. But you could infer it, I think, from some of the principles.

**Q Do you think it's preferable to conduct inter-rater reliability reviews before or after the reviewers have been trained?**

A I think ideally you would like to do it both.

**Q If you're only going to do it once, when's the better time?**

A If you had high confidence in your instrument, if you'd used it before and if you knew

Page 112

that it worked pretty well and was relatively reliable, then it might be appropriate to do it after training. If it was the case where you needed to evaluate whether the instrument itself was functioning properly, it might be better to do it before training so that you could modify the instrument.

**Q As you say in your report, if it's done after training, that" -- I believe that's a typo. Oh, sorry. "Then they could indicate a degree of success with respect to training. So you would agree that if you conduct inter-rater reliability review after training and you see relatively acceptable levels of review, that indicates your training was successful?**

MR. PAGE: Object to the form.

THE WITNESS: Well, I mean, I guess I would say that the -- the combination of the instrument and the training, you know, were reasonably successful.

**Q (BY MS. INGBER) Understood. It was unclear to you, though, from Dr. Milner's report and deposition when they conducted the inter-rater reliability reviews; correct?**

A Correct.

Page 113

**Q Would you agree that it's proper to conduct your -- to calculate your inter-rater reliability review results based on what the two reviewers found before those differences were resolved? Was that unclear?**

A I think a little bit, yeah.

**Q Okay. Let me -- let me try again. I don't think that was a very good question. I'll describe a hypothetical IRR. Let's call it IRR process. You have two reviewers. They review the same case. They disagree on certain items. They then discuss, resolve those differences and reach conclusions about what the right answers would be. For those that they can resolve.**

**Would, in your view, it be more legitimate to calculate, however you're going to calculate it, the rates of agreement before the resolution of any differences?**

A I think that would be preferable.

**Q And it wasn't clear to you whether or not that was what Dr. Milner did?**

A Yes. That was unclear.

**Q You say at the end of that middle paragraph on page 7, "Moreover, the rather high rate of agreement for such a complex instrument leads one**

Page 114

**to believe that the inter-rater reliability results were inflated."**

**Is this some -- is this an attack on Dr. Milner's credibility about whether he actually was was misleading or manipulating, or is this simply a statement that maybe there is some technical reasons why they were inflated?**

A I think it's a technical reason. And what I would also have to tell you is is that that statement is based upon Dr. Baumann's experience, not necessarily mine, in the sense that Dr. Baumann has done a lot more work of this nature than I have so he has a lot more experience with respect to what you might expect from a case-record review process.

**Q So you don't have an opinion one way or another whether -- just looking at those rates, whether they were likely inflated?**

MR. PAGE: Object to the form.

THE WITNESS: I would base my opinion on my confidence that Dr. Baumann is correct in his assessment.

**Q (BY MS. INGBER) Your report then gives several possibilities that might have led to this potential artificial inflation in the level of inter-rater reliability. The first one, as it's**

Page 115

**described here, is that the case readers who were better at interpreting the information in the case record rated the cases for inter-rater reliability.**

**Do you know whether, in fact, every case reviewer had one or more cases rated for the purposes of inter-rater reliability?**

A I don't know that. Or I don't recall.

**Q If, in -- if, in fact, every reviewer was involved in the inter-rater reliability process in the sense that at least one of their cases was selected for inter-rater reliability review, would this statement be applicable?**

A I don't know. I mean, I think that the question would be if -- you know, if one case was included, that might not be sufficient. If more cases were included, that might be. I just don't really know.

**Q Let's say that every reviewer on the team had approximately an equal number of cases included in the inter-rater reliability review process. Would that make that sentence inapplicable?**

A Well, I don't know how many raters there were. And we're talking about 34 cases. So it's hard for me to evaluate that.

**Q I'm asking you hypothetically speaking.**

Page 116

A I would say if there were enough cases that each were included by each reviewer, then it would not necessarily be applicable.

**Q The next point, the other -- the next possibility is one that I believe we've discussed earlier. That would be when these raters disagreed, they would discuss the case, come to an agreement when they could and then re-rate the case; correct?**

A We did discuss that, yes.

**Q So if indeed the inter-rater reliability calculations were done before that re-rating, that would be preferable and this criticism would be inapplicable; correct?**

MR. PAGE: Object to the form.

THE WITNESS: We don't know what occurred. If, in fact, the procedure that we've outlined here was used, that would be a preferred approach.

**Q (BY MS. INGBER) Understood. There's a footnote here about "Cohen's kappa coefficients."**

**A Uh-huh.**

**Q Do you know what a Cohen's kappa coefficient is?**

A I do know what a Cohen's kappa coefficient is.

**Q What is the purpose of a -- of kappa**

Page 117

**coefficients?**

A It's essentially to provide a metric for the extent to which two individuals agree about the same information in an instrument or in some other type of information that they've both been asked to respond to.

**Q And is it correct to say that kappa coefficients take into account the possibility of chance agreement?**

A Yes.

**Q Do all researchers agree on which measure should be used to calculate inter-rater reliability agreement?**

A I don't think that they do necessarily. And one of the things that's difficult about Cohen's kappa, for example, is that it's essentially a binary view.

**Q Uh-huh.**

A So you're only comparing one rater to another.

**Q Uh-huh. So -- sorry.**

A There's a limitation in the methodology.

**Q So this footnote says that Cohen's kappa coefficient is generally considered the preferred measure. Would it be fair to say that although some**

**people prefer it, others disagree and think another measure is the preferred measure?**
A It's certainly possible. It would be good to know what approach was actually used.
**Q Do you know whether certain researchers and statisticians believe that it's inappropriate to correct for chance agreements when calculating the rate of agreement?**
A That would not be consistent with my experience, but I suppose it's possible that there could be a rationale for that.
**Q Are you familiar with the work of John Uebersax?**
A I am not.
**Q The final hypotheses for what might have caused the relatively high levels of inter-rater reliability in your report is a suggestion that what should have -- they should have excluded agreements on missing information because presumably it was quite easy to determine whether information was missing.**
**Do you have any basis for stating that it's easier to determine whether something's missing than what the actual information is?**
A Again, I'd have to probably defer to



Dr. Baumann on that particular question in terms of case reviews. My sense is that in my work with data, that missing information is generally relatively easy to identify.
**Q And you generally work with administrative data; correct?**
A Most often with administrative data, but other sources, as well.
**Q Have you ever -- so you have less experience with case files and whether it's easy to --**
A I certainly have less experience with case files than Dr. Baumann does, yes.
**Q Would it surprise you to learn that the area where there was the least agreement was on whether there was missing information?**
A It would surprise me.
**Q But if that was correct and, in fact, there was the least agreement on whether there was missing information, it would have, in fact, inflated their rates of agreement to exclude that; correct?**
MR. PAGE: Object to the form.
THE WITNESS: Presumably it would have.
**Q (BY MS. INGBER) You refer to -- on page**



**8 of your report to three articles, Friedrich, Nickerson and Wason, on blind reviewers. Did you consider those articles in forming your opinions?**
A I did not, no.
**Q Did Dr. Baumann?**
A Yes.
**Q Are those child welfare articles?**
A I don't believe so, no.
**Q What field are they from?**
A Social psychology.
**Q Are you aware of any articles in the field of child welfare about blind reviewers?**
A Not specifically, no. I do know that we have significant issues in our field in terms of implementing experimental, random controlled trials because often we're not able to adequately address issues of blind reviews.
**Q Is it always practical to implement blind reviews?**
A It would have been in this case, I think.
**Q That wasn't my question.**
A It's not always practical to do a lot of things with respect to research.
**Q In order for the reviewers in this case to be blind, they would have -- not have been able to**



**be told who their ultimate employer was; correct?**
A Or what the purpose of the study was.
**Q Correct. Which would have prevented Dr. Milner and anyone else on his team who was interacting with Children's Rights from participating in the review process; correct?**
MR. PAGE: Object to the form.
THE WITNESS: It would have been more difficult for them to participate as originators of the data. You know, I think they clearly would have had a role in quality assurance and other processes related to the data.
**Q (BY MS. INGBER) Were you blind about your employer and the purpose of the project when you took this assignment?**
A I was not.
**Q Does the possibility of confirmatory bias also apply to your work?**
A Of course, it applies to everyone's work.
**Q Did you say anything positive about the -- any of the reports that you read in your reports?**
A I can't recall if we said anything positive or not.
**Q Do you believe that there were positive elements to the process and methodology undertaken**

**by the experts whose reports you reviewed?**
MR. PAGE: Object to the form.
THE WITNESS: I think that there were aspects of the instrumentation that I thought were useful and, you know, represented some appropriate ways to answer the kinds of questions that they were looking at.
**Q (BY MS. INGBER) Anything else positive that you can recall?**
A Well, trying to remember if there's anything that -- I guess what I would say is that I admired the effort that was taken to do the data collection and the analysis and appreciate the difficulties that were surmounted in order to complete that work.
**Q Do you think that the inter-rater reliability review process and quality assurance process implemented by Dr. Milner was the strength of his work?**
MR. PAGE: Object to the form.
THE WITNESS: I believe that it was an important part of the work that he did, and I think that it would be an important part of any study of that nature.
**Q (BY MS. INGBER) I want to turn to the**



**section on "construct validity (face, content, predictive and construct)."**
**A Uh-huh.**
**Q Is that a section that you feel comfortable testifying about?**
A A bit. Certainly in terms of the predictive validity I feel pretty confident about.
**Q Do you agree that there are certain types of instruments in research that attempt to measure abstract constructs?**
A Yes.
**Q Give me an example.**
A Intelligence.
**Q Give me another example.**
A Risk.
**Q Would depression be another example?**
A Sure.
**Q Was Dr. Milner's instrument trying to measure abstract constructs?**
A I don't know.
**Q Do you want to take a look at it and you can let me know?**
A Yeah. No, I mean, I think that there were some parts of it that perhaps were tied to a construct like placement stability, for example, you



know, which imply sort of the multiple types of measures.
**Q Uh-huh.**
A All of which need to sort of converge. And that as a -- as a construct, it's not necessarily clear that, you know, his particular measurement of placement moves was a consistent or a valid construct of a concept like placement stability.
**Q I understand that Dr. Milner was attempting to get at larger questions, possibly abstract questions, like was a child -- did they have placement stability, were they maltreated? Which can have, as you said, multiple measures and be sort of an abstract construct.**
A Uh-huh.
**Q But wasn't -- wouldn't it be fair to say that he was trying to get at that by asking concrete questions, e.g., was there a substantiated allegation of maltreatment? How many moves did a child have?**
A I would say that those would be indicators of those -- of those constructs, but they're not necessarily valid.
**Q We'll get into the validity of those**



**later. But it would be fair to say that what his instrument is trying to measure is those concrete indicators?**
MR. PAGE: Object to the form.
THE WITNESS: I'm not sure how he perceives of those constructs. So if he perceives them -- of them only in a concrete fashion -- so, for example, one could think of placement stability in terms of the degree to which one has access to a consistent type of community, being in school in the same place, being with -- with relatives, having access to family, having access to key people in children's lives.
All of those might be indicative of some degree of placement stability. Whether a single measure is sufficient to allow us to determine whether there's a stable placement or not, I think, is not clear.
**Q (BY MS. INGBER) I do understand your point, but I think we're talking a little bit past each other. I'm just trying to get a statement from you one way or the other of whether the specific questions in Dr. Milner's instrument were asking concrete questions or abstract questions.**
**So, for example -- and this may be a bad**

**example, but I'll use it -- in a depression measurement instrument, I can imagine a question of are you happy? That's sort of an abstract question. There could also be a question of have you tried to kill yourself in the last year? That's a concrete question.**

**Are the questions, the specific questions in his instrument asking concrete questions or abstract questions?**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Do you understand my question?**

A I believe I understand the question.

**Q And if you want to look at his instrument to refresh your recollection, feel free to take the time to do that if you think it's necessary.**

A I think that from the standpoint of the nature of the questions that he's asking, that they were meant to get at concrete events; however, what we mean by a construct in this case doesn't necessarily have a relationship to that.

**Q Understood. But the questions themselves are concrete? We can agree on that?**

A I think so, yes.

**Q And obviously we haven't looked at every**



**question?**

A Right.

**Q Maybe there's one hidden abstract in there I don't want to prevent you from --**

A Or something that's -- that's -- on the face of it might look to be concrete, but, in fact, is really quite abstract.

**Q Understood. There's a criticism on page 8 to 9 of your report of whether or not the instrument has face validity. Would it be fair to say that face validity requires a third party to independently review the instrument and determine whether it's capturing what it's intending to capture?**

A I think that's one method for getting at face validity, yes.

**Q What are other methods?**

A Sometimes face validity is arrived at by, you know, consensus with a group of, you know, individuals who have some experience or knowledge of something. Sometimes face validity is arrived at by piloting an instrument and, you know, determining if the -- you know, based on what you know amongst the people who have been subject of that pilot, whether or not the instrument seems to be consistent with



what you would expect to learn from them.

**Q What if you have an instrument which is based on another very similar instrument that was previously used successfully for a similar purpose? Would that be one way of determining that it had face validity?**

A At least for those parts of the instrument that you transferred, that would be, you know, one indicator. But, you know, we didn't have any knowledge of that from the report or from the deposition, if that had occurred.

**Q So you don't recall Dr. Milner's testimony that his instrument was based on the one used by Dr. Hess in a previous study?**

MR. PAGE: Object to the form.

THE WITNESS: Now that you mention it, I vaguely remember that that might have been part of the deposition.

**Q (BY MS. INGBER) Do you recall any testimony or anything in the report about how a group of people worked on the instrument and, as you said, reached consensus that it was capturing what it intended to capture?**

A Again, I don't really recall that part of the deposition.



**Q Assuming -- and you can only assume based on my representations -- that there was that testimony, would those be some indicators of facial validity?**

A That would be some indication that there is some face validity. It would, you know, be good to know who reviewed it and --

**Q Understood. There's also a criticism here about content validity. My admittedly limited understanding is that that is whether the content captured in the instrument is drawn from a pool of representative measures appropriate to the question at hand. Would you agree that that's a way of describing content validity?**

A Yeah. I think that that's a reasonable definition.

**Q Have you reviewed Dr. Milner's instrument?**

A Yes.

**Q Do you have any questions about its content validity?**

A I might have some questions about some specific items and the way they're structured.

**Q But generally and over all, do you have questions about his content validity?**

A No. I mean, I think it's consistent with

Page 130

the domain.
**Q So when Dr. Milner is criticized in your report for not attempting to assess content validity, that's not a statement by you that it actually doesn't have content validity?**
MR. PAGE: Object to the form.
THE WITNESS: Correct. It's not -- right. I mean, all it means is that we didn't find any discussion of that in the report.
**Q (BY MS. INGBER) Understood. So it's a criticism of what was included in the report, not a criticism of what he actually did or didn't do because you don't know.**
A We don't know.
**Q My understanding of criterion validity, both concurrent and predictive, is that it -- is that it relates to whether standardized tests that measure abstract constructs are good measures of the constructs they're attempting to measure. Is that a correct understanding?**
A Yes.
**Q Is Dr. Milner's instrument a standardized test?**
A If I could restate. I guess what I would say is is that the concept of criterion validity

Page 131

applies to any instrument, whether it's standardized or not. And the idea is that it relates to an independent measure that's not necessarily measured by the instrument itself with respect to whether or not measures or the instrument as a whole has some relationship to the external factor.
**Q Is it a widely-accepted view that concurrent and predictive validity are relevant to every instrument and not just to those that are attempting to measure abstract constructs?**
A I would say that it's not necessarily the case that every instrument must have a criterion validity in order to be valid, inasmuch as there are other forms of validity that we've been discussing that are relevant, as well. There clearly are, though, instruments that are based upon any number of different types of principles for which criterion validity could be assessed.
For example, a risk assessment instrument in child protection is often based on some of the factors that we've been defining as concrete and not necessarily abstract items that, you know, are used as a -- a basis for some decisions and for which criterion validity has been and can be assessed.
**Q Do you believe that criterion and**

Page 132

**predictive validity are relevant to the instrument designed by Dr. Milner?**
A I think in this case it would be good to have some sense of it. And the reason for that is because of the objective of, again, measuring experiences.
**Q Can you describe for me how you would demonstrate concurrent and predictive validity in a count measure of the number of moves a child has experienced?**
A I don't know if I would look at that particular measure. I might look at another type of measure.
**Q I'm asking you how you would demonstrate criterion validity for that measure. Is it possible to do that?**
A It might be if I thought about it a little bit.
**Q Do you want to take a couple minutes and think about it?**
A If I could, I wouldn't mind maybe getting a little bit of water.
MS. INGBER: Sure. Let's take a break and you can ponder that question off the record.
VIDEOGRAPHER: We're off the videotape

Page 133

record. Time is 11:29 a.m.
(A recess was taken from 11:29 AM to 11:38 AM.)
VIDEOGRAPHER: We're now back on the videotaped record. Time is 11:38 a.m.
**Q (BY MS. INGBER) So I had asked you a question before the break about how you would demonstrate criterion validity for a count measure of the number of moves. Have you thought of a method to do that?**
A Yeah. I've thought of a couple of different ways that you could actually go about that. One would be to look at -- I mean, primarily the -- you know, the concept of construct -- or criterion validity involves identifying another variable that's not necessarily measured in the instrument that you're using.
And so in this case, for example, you might be able to use something like school records to learn whether or not a child had been able to stay in the same school throughout the time that they were in placement. Theoretically if you had a lot of moves, there should be a relationship between the amount of time that one was in a particular school and how many moves you might have had in

terms of going to other schools.

If the -- you know, if the placement occurred in the same, you know, school district, there might even be less moves within a school district, but there might still be moves from school to school.

**Q Let me ask you just to make sure I understand your example unless you want to keep on describing it. Quoting from one of the websites that you provided to us -- a website by someone named Carol -- it says that, "Criterion validity focuses on how well the instrument compares with external variables considered to be direct measures of the characteristic or behavior being examined."**

**Now, if my instrument is focused on a count measure of the number of moves, how is the number of school zones that a child has moved through a "direct measure of the characteristic or behavior being examined"?**

A Well, the construct -- and this gets back to that other issue of construct -- is --

**Q I do want to focus on criterion validity.**

MR. PAGE: Objection. He's trying to answer your question. Cutting him off because you don't like what you're hearing is inappropriate.



**Q (BY MS. INGBER) I'm not. I'm happy with what I'm hearing, and I'm happy to let you answer. But I do want to make sure we're focused on criterion validity, please.**

A Well, the fact of the matter is is that they go hand in hand. All forms of validity go hand in hand. So having some notion of a construct is useful in terms of having a criteria. Often when you're looking at measuring criterion validity, you're measuring abstract constructs. What we're talking about here actually are somewhat concrete.

So the idea that a child is in the same school interacting with the same peers, interacting with the same teachers is, in my view, an indicator of their stability.

**Q Understood. Do you -- do you believe that measuring -- looking at school records and looking at school moves would really tell you the criterion validity of the number of placement moves, a count measure of the number of placement moves a child had?**

A I would anticipate that if there were more moves in placement, that there would be more moves in school. That would be something that I would view as a likelihood. I would also suggest that



even though this may only be my -- my opinion, that having a child in the same classroom interacting with the same peers for a given school year would be indicative of a type of stability as opposed to a situation where they might be yanked from one school to another.

**Q Do you believe that the number of school districts a child is moved into is a direct measure of the characteristic or behavior being examined?**

A Well, first of all, when they say "direct," I think the idea is really ambiguous. Most of the time when you are looking at things from the standpoint of assessing criterion validity, you're attempting to do a type of correlation.

It's unusual and probably unlikely that you would get a correlation of one between one measure and a measure that you're using as a criterion. In fact, it's, you know, almost unheard of. So the fact that it might be a direct or -- measure isn't necessarily meaningful in the same way I think to both of us.

**Q How would you demonstrate a criterion validity in a -- in a percentage measure of the presence or absence of an individualized service plan in a child's file?**



A I don't -- I don't know. And I guess one of the things that I'd want to do is to, you know, perhaps have some sort of sense of what type of information might be available in the file regarding that to begin with. You know, it occurs to me that you could potentially look at records that would be available from whatever service provider a particular child is using and determine if they had access to information about the individualized plan.

**Q Continue. Finished?**

A Yeah.

**Q I just want to make sure I didn't cut you off.**

**How would you demonstrate criterion validity for a count measure of the various reasons documented for the separation of siblings?**

A I don't know. I would have to think about that.

**Q Do you believe that it would have been possible to demonstrate criterion validity for all of the indicators, whatever word you want to use, measured by Dr. Milner in his report?**

A Probably not for all the indicators, but it might have been possible to look at it from the perspective of, you know, some of the major

constructs that he was playing with. So, for example, stability, maltreatment in care, worker turnover, I think that would have been possible to develop or have access to alternative measures of those things that would have been outside of his study that you conceivably could have correlated with the frequency of the types of general constructs that he was describing.

**Q Do you agree with the conclusions stated in your report that because of his failure to assess these various forms of validity we've been discussing "any conclusions reached in Dr. Milner's report regarding the use of the instrument cannot be regarded as meeting the requirements for reasonable scientific methods typically used in this type of study"? That's on page 9.**

A Uh-huh.

**Q Do you agree with that conclusion as it's stated in your report?**

A I do.

**Q Can you explain to me what the basis for it is? I understand that above you were criticizing Dr. Milner for not attempting to assess the forms of validity, at least as far as you could tell. And then from that you reach a conclusion that**



**therefore, all of his conclusions cannot be regarded as meeting the requirements for reasonable scientific methods. And I want to understand the -- the logic train from one to the other.**

A Well, that is -- that is the rationale. I mean, the idea is that you have an instrument that has a demonstrated validity and that that is a much stronger basis for meeting a scientific criteria for the accuracy of a study or the accuracy of the findings.

**Q So it's fair to say that because you were unable to determine if and how Dr. Milner assessed these forms of validity, you think that we should disregard all of his conclusions?**

MR. PAGE: Object to the form.

THE WITNESS: I think it's a little bit more nuanced than that in the sense that there may be -- there may be some conclusions that, you know, on close examination one could have some confidence in relative to the instrument. I would still have to -- and I realize that, you know, we have discussed this before. Other conclusions, even if they were valid relative to the instrument, would still be problematic, though.

**Q (BY MS. INGBER) And that's because of**



**your other criticisms of his methodology; correct?**

A Correct.

**Q But you do admit, speaking solely about this instrument validity point, that some of those conclusions you would agree don't have that problem?**

MR. PAGE: Object to the form.

THE WITNESS: There are -- it's very possible -- and I haven't done this. But it's very possible that there are some specific items within the instrument that are perfectly valid. I just don't know that.

**Q (BY MS. INGBER) So I just want -- so this conclusion that any conclusions is -- you're now giving me a more nuanced perspective on that statement? Is that fair to say?**

MR. PAGE: Object to the form.

THE WITNESS: I think it was a more nuanced response to your question about that.

**Q (BY MS. INGBER) Do you still stand behind that sentence in its entirety?**

A I do, yes.

**Q Okay. Was Dr. Milner's study attempting to prove causation?**

A I don't know.

**Q I'm going to read to you some testimony.**



**Did you read Dr. Smollar's deposition?**

A I did.

**Q I'm going to read this to you. I will do my very, very best to read it accurately. And I'll give the page references. If you'd like to look at a copy, I unfortunately only brought one; but you're welcome to read over my shoulder.**

A Okay.

**Q This is from page 12 of Dr. Smollar's deposition. She states, "This was a descriptive study primarily. It is a study that I say that I would refer to as answering the what. What does X look like in Oklahoma based on the case reviews that were being reviewed -- the cases that were being reviewed? So I would describe that as a 'what study.'" Did I read that accurately?**

A Yes, as far as I can see.

**Q Okay. Now, I will look at page 112 of Dr. Smollar's deposition. Page 112, she is asked the question: "If someone wanted to understand the Oklahoma foster care program, could information such as social/economic status or education of the parents be valuable to determine the effectiveness of a foster care program?"**

**She answers, "Okay. Again, this is**

Page 142

**outside the scope of the study because the study does not evaluate the effectiveness of the program. The study just describes these children's experiences while they were in foster care. It does not evaluate effectiveness."**

**Do you see that testimony that I just read?**

A I see it, yes.

**Q And on page 114 -- starting on 113 is the question: "You are not suggesting that the antecedent variables would not affect or impact the number of placements?" Answer: "They would explain why. But this study is not about the why. It is about the what." That's Dr. Smollar's testimony.**

**In looking at Dr. Milner's testimony, page 203 from his testimony on May 19th, 2011, he's asked the question: "Did you control for any -- for extraneous variables?" Answer: "This was not a control group design. This was simply a descriptive study. It describes what's in the case files of the children in custody of OKDHS."**

**And then again on page 207, he's asked the question: "And do you know what a distorter variable is?" Answer: "I -- I could speculate, but I won't." Question: "Okay." Answer: "It's very**

Page 143

**important to remember with those -- those kinds of questions that many of these questions will refer to a far more complex experimental research design than we conducted here. We had no hypothesis. We were not testing any particular intervention or treatment. We were simply doing a description of the information that was in the files."**

**Now that I've read you some testimony from Dr. Milner and Dr. Smollar, do you agree that their purpose was not to prove causality? It was simply to describe what was in the child's case files?**

A I believe that that's consistent with what they said. I guess the question that I would have as a result of that, though, is, you know, why would you conduct this sort of study to begin with if it wasn't your expectation that it would be used in a way to infer that there were particular types of issues with the -- with the OKDHS system.

**Q But you agree that they described the purpose of their study as being a descriptive one; correct?**

A One that is designed to be descriptive of problems with the OKDHS system.

**Q On page 15 of your report in the discussion of "internal validity," the very first**

Page 144

**line there, it says, "Internal validity refers to the ability of a study to determine cause and effect." Is internal validity applicable to studies that are not attempting to determine cause and effect?**

A I think this criticism is aimed at the idea that you could actually use this document to make any sort of determination that there is a specific problem based in the OKDHS system that results in the events that are being described in the Milner report that are also representative of the children of the system -- in the system.

And as a consequence, the -- the issue of internal and external validity become relevant. Because if you were trying to suggest that these problems were as a result of the system, that therefore the system needed to be reformed, that would not be a valid conclusion that you could draw.

And, in effect, that's what the -- the report is being used to support. Or at least that's why I would assume you would put a report like that together. If it's not being used for that, then it serves really no purpose that I can see.

**Q You say that, "If you were trying to suggest that these problems were as a result of the**

Page 145

**system." Was Dr. Milner trying to suggest that these problems were a result of anything? Or as he testified repeatedly, was he simply trying to describe the experiences of the children in DHS custody on a specific date?**

A I don't know.

**Q You don't know based on his testimony?**

A I mean, I don't know what -- what the motivation was for conducting the study to begin with.

**Q I just read you what he said was his motivation. Do you not accept that to be a true statement of his motivation?**

A I don't know why the report was created. I don't know what the motivation was for having the report in general or what purpose it was supposed to serve in this process.

**Q Well, let me ask you this -- and this is back to the question that I originally answered (sic) and you gave me a very long response -- generally speaking, not speaking about Dr. Milner's report specifically. Generally in the field of research, do you use internal validity to evaluate studies that are not attempting to determine cause and effect?**

A Not always.
**Q I marked yesterday Exhibit 783 and Exhibit 784. These are two documents that were part of your considered materials and are cited in your report.**
A Uh-huh.
**Q It's a website by William -- I will mispronounce this -- Trochim?**
A Uh-huh.
**Q And another printout from Chong-ho Yu and Barbara Ohlund. These are documents on internal validity. In Mr. -- Dr. Trochim's website it says --**
MR. PAGE: Ms. -- so I make sure the record's clear. You're representing that the document that's marked JFluke-CM-00108 through 118 was marked as an exhibit yesterday as Exhibit 784?
MS. INGBER: Yes, it was. It has an exhibit sticker on it. Do you want to see it?
MR. PAGE: I just wanted to see what your representation is. Thank you.
**Q (BY MS. INGBER) Now, if you look at the Trochim website printout, I believe it's at the bottom of the first page. Actually, I take that back. It's just at the very -- very top. First sentence. "Internal validity is the approximate**



**truth about inferences regarding cause-effect or causal relationships. Thus internal validity is only relevant in studies that try to establish a causal relationship." Do you see that statement?**
A I do.
**Q Do you disagree with this document that you cited in your report?**
A I don't disagree with it, no.
**Q The next sentence in this document is, "It" -- referring to internal validity. "It's not relevant in most observational or descriptional (sic) studies, for instance." Do you disagree with that statement?**
A I would not necessarily disagree with that statement.
**Q And then if you look at the Yu and Ohlund document, which is marked as Exhibit 784. At the bottom of the first page, there's a bullet point on "internal validity." And it reads, "Internal validity refers specifically to whether an experimental treatment/condition makes a difference or not and whether there is sufficient evidence to support the claim." Would you disagree with that statement?**
A Yes.



**Q What is your disagreement with that?**
A I think it has broader applicability than to experimental and treatment conditions.
**Q But you would agree with Trochim's statement that it's only relevant in studies that try to establish a causal relationship?**
A Yes.
**Q I know you don't necessarily agree with what the purpose of Dr. Milner's research was. Assuming Dr. Milner's work was, in fact, an entirely descriptive study, would internal validity be relevant?**
MR. PAGE: Object to the form.
THE WITNESS: It would be relevant if it were being used to set policy.
**Q (BY MS. INGBER) Does internal validity have to do with the research design, or does it have to do with the uses to which the data is put?**
A It has to do with both.
**Q Is that a widely-accepted view?**
A As far as I would say, yes, I would think that it would be.
**Q Do you have any basis for saying that internal validity could change depending on the use to which you put your research?**



A What I would say is is that even in a descriptive study, it would be important to have some sense of the validity. And that while it may not be relevant from the standpoint of being able to make the point that a particular cause or effect condition occurs, it would be relevant from the standpoint of understanding the quality of the research itself.
If you were measuring something, for example, the -- the number of leaves on a tree, for instance, having some valid sense of what that count might be would be a better description than just giving a guess without ever having looked at it or having had some way of determining how many leaves there might be on a tree.
**Q Does that have to do with internal validity which is related to cause and effect, the number of leaves on a tree?**
A Internal validity has to do with the design of your scientific study. And there are elements of internal validity that have to do with all aspects of a study. So measurement and instrumentation is certainly an aspect of internal validity.
**Q Can you explain to me how you would design**

**a survey that demonstrates causality and meets the criteria you set out in your report for internal validity?**

A Well, first of all, I think that if you're referring to the process related to the type of data that was collected here and its purpose --

**Q I'm not. I'm asking you to explain to me how you would design a survey that demonstrates causality and meets the criteria you set out in your report for internal validity.**

A Well, I'd have to specify a study; and I'd have to specify a design. And I'm not exactly sure I'm prepared to do that today. I could describe a design that I've used in the past or something of that nature, but I'm not sure I'm prepared to just sit here and describe a design for a particular survey in the absence of contextualizing it.

**Q Are you -- have you used surveys in the past that demonstrate causality and meet your criteria for internal validity?**

A Yes, I have.

**Q But you can't describe any of those for me today?**

A I could.

**Q Okay. Why don't you describe one survey**



**that you've designed that demonstrates causality and meets your criteria for internal validity.**

A Okay. So this would be a survey of workers in child protection. We were interested in a variety of characteristics of those workers. So we developed an instrument that looked at those characteristics. Those included things like their skills at casework, their proclivities with respect to substantiation decisions and other features of casework practice.

We went through a process of determining whether or not there were valid constructs associated with those measurements. So we did analyses of the survey data to determine that on a pilot basis. We then took that survey instrument into the field and collected data on a substantial number of workers. We then combined that type of information with administrative data in order to look at specific outcomes that --

**Q If you don't mind, I'm just going to stop you there because it seems like now it's no longer just a survey instrument. Now you're combining it with administrative data.**

MR. PAGE: Objection. Argumentative.

**Q (BY MS. INGBER) Is that true? Was that**



**a pure instrument?**

A You asked me if I had designed a survey that met the criteria for internal validity. And I explained that you had to have it in the context of a research design that was associated with whatever questions you felt were relevant.

**Q How did your survey prove cause and effect, which I believe is what's relevant with internal validity.**

A Right. And I would have to tell you is that some of the features of internal validity were not necessarily met with that particular survey or with the analysis that was conducted. So we don't have a -- an absolutely clear, scientifically valid analysis that would suggest a particular cause and effect.

We have relationships that are suggestive of cause and effect based on what we created, but we don't have -- in the absence of an experimental design -- an absolutely clear way to define cause and effect. So even though we went through a process of trying to assure to the extent possible that what we were doing met scientific criteria, there were scientific limitations to what we were doing.



**Q So some of these threats to internal validity are going to apply to all survey instruments; correct?**

A Well, to almost any study. But the point is is that one has to have some sense of what those limitations are and whether or not you can use them for certain purposes. So if you were to tell me that because this is a descriptive study, without any clear sense of cause and effect, then I would have to say, "Well, that's fine, but I can't use this to draw any conclusions about the status of children in the Oklahoma system, nor can I use this to draw any conclusions that would lead me to specific policy recommendations to remedy those conditions."

Q I'll move to strike the nonresponsive portion of that answer.

You have a very brief section on page 17 of your report about external validity. And the point is made again that Dr. Milner is not achieving that because, "the sample drawn is not representative of the population of children in OKDHS's care."

My only question about this is whether this is simply a summary and repeating of arguments

that are made elsewhere in your report or whether you're trying to make a new point here.

A It's not -- it's not a new point, but it's -- it's a point that's consistent with those other arguments.

**Q In your "findings regarding child maltreatment" on page 18, you criticize Dr. Milner for equating investigations with a finding of' unsubstantiated with services recommended with those that have a finding of substantiated maltreatment; correct?**

A Yes.

**Q I want to draw your attention to page 29 of Dr. Milner's report. And specifically to table 9. In table 9 does Dr. Milner equate investigations that have a finding of unsubstantiated services recommended with those that have a finding of substantiated?**

A Not in table 9, no.

**Q So it wouldn't be true to say that everywhere in Dr. Milner's report he equates those two things; correct?**

A Not everywhere, no.

**Q In your report do you reflect the fact that at least in certain places Dr. Milner does not**



**equate those two things?**

A No, we don't do that. But, you know, there are instances where he does equate those things.

**Q And that would be in his section on maltreatment that took place prior to entry into custody; correct?**

A No. Actually I think it's in the executive summary, if I'm not mistaken.

**Q I think you're -- the relevant section would be page 4. That's the executive summary section on maltreatment.**

A Yeah. Okay. "21.4 percent of children in the sample were subject of a maltreatment allegation while in custody that was substantiated or where there were -- where there was sufficient concern to recommend services even though the allegation was not substantiated."

Q And then if you read to the end of the sentence, it breaks out the 12 percent for whom it was substantiated making it clear that 9.4 percent had a -- services recommended; correct? So if you read that whole sentence, in fact, it is broken out.

MR. PAGE: Object to the -- object to the form.



**Q (BY MS. INGBER) Would you disagree?**

A I would agree that that information is contained in the second sentence; but in the first sentence, the information is combined and it leaves one with the impression that -- that, in fact, he's equating the information.

**Q But you would agree that his report is transparent about the separation of those two things even if it is equated in that one sentence? The first half of that sentence; correct?**

MR. PAGE: Object to the form.

THE WITNESS: I'm not really sure it's transparent. And when I reviewed the instrument, one of the things that we noticed was that he included that in -- and I would have to find the part of the instrument where he was looking at it. But there's a particular table where he describes actions that were taken. And that category of unsubstantiated with services recommended is a part of what he includes in that particular set of information.

So, in other words, his reviewers were being asked to determine whether or not the action was taken in the event that a case was unsubstantiated with services recommended.



**Q (BY MS. INGBER) I want to discuss your -- the section of your report that talks about "no actions taken." And that, I believe, appears on 19, the short paragraph above the placement stability finding section. Do you see that?**

A Uh-huh.

**Q You say that the meaning of no actions taken is unclear -- and let me just read the sentence. "The meaning of no actions taken because they were not reported in the files of 24.8 percent of the cases (also likely inflated for because of selection bias) is unclear."**

**What is the point that you're trying to make here? And let's leave aside a selection bias point which we've discussed.**

A Uh-huh. I think all we're trying to say there is that we don't know how much missing data was associated with whether or not actions were taken. So it's possible that even though there was no information in the case record, actions might have been taken.

**Q When you were writing this section or at any other time, did you look at DHS policy on whether -- and statutes in Oklahoma on whether they require the documentation of actions taken during an**

**abuse and neglect referral investigation?**
A We didn't review any of that policy.
**Q So you don't know whether it's, in fact, required that those things be documented, do you?**
A Correct.
**Q When would it be appropriate to not document an action taken during or as a result of an investigation in a child's file?**
A Well, I don't know since I don't know what the policy is for the department. What I would say, though, is that in terms of the actions taken, particularly if the case was unsubstantiated, I could see where a worker wouldn't indicate what services were provided if they weren't part of a set of services that would be associated with an action like removing children or something of that nature.
**Q Well, the question of removing children's irrelevant because this was an in-custody population; correct?**
MR. PAGE: Object to the form.
THE WITNESS: Well, in this case I think the -- the issue of removal has to do with was a child removed either as a result of the investigation or during the investigation from the home that they were extent in.



**Q (BY MS. INGBER) But your hypothesis that they may not document that and it may be appropriate to do so, that's just a hypothesis because you haven't looked at the policies on what documentation is required; correct?**
A I don't know what the policy is. But it seems conceivable to me that there are certain actions that would be clearly within the confines of a policy like that and other actions where it may be a little bit more ambiguous.
**Q That's conceivable to you, but you haven't looked at it so you don't really know; right?**
A Don't know.
**Q Let's turn to your findings on placement stability. And it seems like one of the major criticisms in this section on pages 19 to 20 is how Dr. Milner included all placements when he was counting placements, the number of placements rather than distinguishing between what I'll call good and bad moves. Is that a fair summary of one of your criticisms?**
A One of our criticisms. Yes, it is.
**Q Can you define for me what is a good move and what is a bad move for a child in foster care custody?**



A Well, I think that's part of the issue. One of the nice things about being able to do a case review in this instance is that you might actually gain some insights about that issue. From administrative data we often really don't have any idea as to why a particular move might have been -- might have occurred."
If one were designing -- I mean, this is, I think, a limitation of the instrument; but if -- if one were designing an instrument with the idea that you really wanted to look at this issue of placement stability, it seems to me that one of the things that you'd want to do is incorporate a series of questions that would allow you to get at that issue more clearly rather than just noting whether the moves have occurred or not.
**Q I guess I want to go back to my original question. Can you provide a definition for me of good move and bad move?**
A I can't provide a definition. I could provide some examples and maybe a definition could be derived from that eventually.
**Q Well, let me ask it this way: If you were designing an instrument and you wanted to instruct your caseworkers on what information is necessary to**



**provide so that you could analyze good moves versus bad moves, what would you train your reviewers and put in your instrument to make that distinction?**
MR. PAGE: Object to the form.
THE WITNESS: One of the things I think I would do is do a careful examination of the data that I did have, either from case-record reviews or from administrative data and look at some possible moves that I might identify from the standpoint of their quality in terms of the likely improvement or not with respect to children's outcomes.
I might even at that point try to make an effort to tie them to some other outcome measure like reunification or adoption and see if, in fact, the different types of moves I would have identified in that process had some relationship to those sorts of outcomes.
In addition to that, I think I would probably look at some case records and see if it was possible to extract other information. And then I would start organizing either instrumentation or formats that would allow workers to provide responses that would be more specific to the rationales for why they made a move, why the -- the circumstances dictated that, what the worker thought

the outcome would likely be, what benefit that they thought the child might have or not, if -- if that was part of their decision-making process.

So I think there are a number of ways to kind of get at this information that would be helpful, actually, in terms of knowing more about moves in care.

**Q (BY MS. INGBER) That sounds like a very lengthy process that would require some substantial analysis of administrative data; correct?**

A Administrate data and possibly case-record data and possibly interviews with workers and foster care providers and children.

**Q Do you know whether it was practical for Dr. Milner to undertake that type of process in the context of his review in order to do what you say he should have done and distinguish between good and bad moves?**

A I don't know whether it was possible for him to have done any of that or not. On the other hand, it would have been perhaps helpful to at least suggest the possibility that some of these moves might have been beneficial.

**Q You give as an example in your report of what you consider to be a good move, when a child is**



**placed in a shelter while a relative home is verified for safety. And you also give as a second example a move to less restrictive care.**

**Would a 60-day placement in a shelter of a one-year-old while a relative home was verified be a good move -- a good placement for that child?**

A I don't know. In some cases it might be in the sense that one of the big issues that we have in the field is the identification of fathers. Fathers can often provide, you know, significant resources in terms of relative care for children. Sometimes a child's mother is unwilling to let people know who the father of the child is. In other instances it may be difficult to engage the father to agree to be a part of the process. And it may take time to accomplish that.

On the other hand, the ability to place a child with a paternal relative might provide, you know, a very permanent type of placement that could be very effective in terms of the child's ultimate outcomes.

**Q So you're telling me that you can imagine a scenario where it would be appropriate and good for the child, a one-year-old child to be placed in a shelter for two months? Is that my -- is that**



**correct?**

A I'm saying that under certain circumstances --

**Q I just want a yes or no, not your usual long answer, please.**

MR. PAGE: Object. You don't have to listen to her telling you how to answer the questions.

MS. INGBER: You do have to answer my questions, though, please.

MR. PAGE: And he is trying to answer it.

THE WITNESS: And all I'm trying to say is that under certain circumstances that might be a -- might result in better outcomes.

**Q (BY MS. INGBER) Are you familiar with the child welfare literature on bonding in young children and the negative effects of congregate care facility on childhood development?**

A I'm not familiar with specific studies in that area, but I'm familiar with the concept.

**Q Would it be fair to say that even your example that it would be beneficial to the child to place them in a shelter while a relative home is verified, that would not always be true. There could be circumstances in which a child is placed in**



**a shelter for too long, in a shelter that can't meet their needs; and so even though they're waiting there for a relative home to be verified, that that would not, in fact, be beneficial for the child?**

MR. PAGE: Object to the form.

THE WITNESS: That's the point I think that I'm trying to make is that unless we have more information, it's almost impossible to know whether these things are beneficial or not.

**Q (BY MS. INGBER) And wouldn't it always be highly subjective?**

A Not necessarily.

**Q You think that two people are always going to reach the same conclusion on whether a specific placement was good?**

A It may not have -- from the standpoint of research, it's possible to tie these things into longer term outcomes. So it may be that -- you know, the outcomes are similar; it may be that they're different, better or worse. But it's sort of an empirical question from my perspective.

**Q Do you think the question of whether a move is good or bad is both contextual and time dependent?**

A Yes, I would say that those are at least

Page 166

two of the factors that should be taken into account.

**Q Would you agree that whether any individual move is a good one, at a certain point the cumulative effect of multiple moves can be harmful to children?**

A On a general basis, I would agree that that's likely.

**Q Do you think that every researcher would say that when you're counting placement moves, it's necessary to exclude, quote unquote, good moves?**

A No. I'm sure every researcher wouldn't say that; and it's, as we've discussed, difficult information to get. And as a consequence hasn't necessarily been included in very many studies.

**Q We marked yesterday Exhibit 786. This is an article by Munro and Hardy that was part of your considered materials. Are you familiar with that document? And I want to turn your attention first to page 6 of this article.**

**I'm sorry. I don't think I got an answer to my question, "Are you familiar with this document?" I think you may have just nodded.**

A I'm sorry. I don't remember this specific document.

Page 167

**Q But if it's one that you cited in your report, it's one that you reviewed?**

A I'm -- let's make sure we've cited it in the report.

**Q Sure. I'm happy to do that.**

A Because I can't even recall that for sure.

**Q If you give me a moment, I can tell you what page it's cited on. Well, let me put it this way. I don't know if you've cited it in your report, but it was certainly produced to us as a -- as part of your considered materials. We can tell that from the Bates number on it.**

A Right. And it's conceivable that I pulled it into my file and didn't look at it or just scanned it briefly.

**Q Are there documents that you didn't consider as part of your report that you produced to us as part of your considered materials?**

A There would have been materials --

MR. PAGE: Object -- let me object to the form of that question.

THE WITNESS: There would have been materials that I might have looked at for their potential for inclusion in our report and perhaps read the abstract or perhaps, you know, read a bit

Page 168

of and realized either weren't relevant or weren't helpful in terms of the process that we were involved in. And my understanding was is that all of those materials needed to be included.

**Q (BY MS. INGBER) That's a correct understanding. That would meet the definition of considered materials, which I know you may not be familiar with. But let's look at this article regardless since it appears to be something you at least looked at in the process of creating your report, whether you cited to it or not.**

**Turning first to page 6. There's a paragraph in the middle of the page. And it discusses this exact issue of trying to distinguish between "purposive and beneficial moves" and "reactive and" -- trying to make that distinction.**

A Uh-huh.

**Q But the last sentence of this paragraph is, "Simple categorizations are, however, problematic as perceptions for the need for changes of placement and the quality of provision may well differ, depending upon whose views are elicited and at what stage the outcomes are examined." Do you agree with that statement?**

MR. PAGE: Object to the form.

Page 169

THE WITNESS: I think this would be not inconsistent with other perspectives that I would have expressed in the past regarding other kinds of phenomenon. So it isn't inconsistent from that point of view. Nevertheless, it would be, in my view, possible to develop a study that would be valid with respect to this particular issue. And I -- I still believe that that would be an important and useful thing to do.

The other thing that's -- that's important here is the statement, I think -- you know, not having read this -- and I really can't recall having read this at all. Although it looks pretty interesting. The notion of "simple categorizations" could simply mean that, that they're just not, you know, doing as much work as might need to be done in order to really create a data set that they could analyze for that type of purpose.

**Q (BY MS. INGBER) But you would agree that that -- to even attempt to do that would require significant work and would be difficult?**

A I do agree that it would be significant work and it would be difficult.

MR. PAGE: Is this a good time for a lunch break, Miriam?

MS. INGBER: I have a little bit more on the Milner report, but we can finish that up after lunch. Would you like to take a lunch break now?
THE WITNESS: Yeah. I think it would be a good time to take a little break.
MS. INGBER: All right. Off the record.
VIDEOGRAPHER: We're now off the videotaped record. Time is 12:29 p.m.
(A lunch recess was taken from 12:29 PM to 1:09 PM.)
VIDEOGRAPHER: We're now back on the videotaped record. Time is 1:09 p.m.
**Q (BY MS. INGBER) On page 21 of your report.**
A And this is Milner again?
**Q Yes. Your June 15th, 2011 report.**
A Okay.
**Q Second paragraph from the bottom, you are discussing Dr. Milner's data on behavioral problems --**
A Uh-huh.
**Q -- of the children in the sample; correct? In my paragraph?**
A Uh-huh.
**Q Yes?**



A Yes.
**Q And the final sentence in that paragraph is, "This problem is not remedied by the analysis that categorizes behavioral problems by time in care." And I want you to give me your explanation for what you mean in that sentence.**
A The fundamental issue, I think, is that if one is trying to represent that behavioral problems occur at the rate that appear in Milner's report, the underlying problem of the representativeness of the sample is still a factor. So you've still got a population of children who have been in care for a much longer period of time in the sample and, therefore, a sample that's more at risk for those behavioral problems in general.
**Q But on page 56 Dr. Milner does, in fact, do longitudinal analysis with respect to behavioral problems, does he not?**
A I will have to look at it.
**Q Please.**
A Yeah. No. The same issue applies.
**Q Why is that?**
A So, for example, when it says, "50 percent of the children -- for 50 percent of the children --" the second bullet on page 56 -- "the problem



behaviors were not identified until the child had been in custody for longer than six months. Well, the fact of the matter is is that because his sample includes children who have been in care longer, that estimate, 50 percent, is likely to be a higher estimate than you would get if you were able to look at this data longitudinally from a cohort perspective.
**Q But he's only looking at the first six months that those children were in custody for the purposes --**
A But it's --
**Q Let me finish my question, please. So for the purposes of that statement, only the first six months of their custody was relevant.**
A Nevertheless, they're based on a population that was selected that includes longer lengths of stay. And in this particular case, we're not clear and he doesn't clarify whether they've been in care for longer than six months. All he's saying is that -- were not identified until they had been in care for longer than six months.
**Q I'm not sure I understand your last point about how he says they haven't been identified. What is the point you're trying to make there?**



A It's convoluted, and it's -- so let me -- let me try again. And I'm just tying to make sure I understand it myself. But the -- the basic issue, I think, is is that we have problem behaviors of a subsample of this sample. For 50 percent of those children, they were not identified until the child had been in custody for longer than six months is what he's saying.
So the issue is that there very well may be a -- a smaller number of children who would have been in care for six months, a smaller percentage of children who would have been identified with behavioral problems if you were actually using a sample that was based on longitudinal design. There could potentially be a larger number. I just don't know.
But the fact of the matter is is that the sample itself has that inherent bias built into it and it can't be removed because that set of children with the longer stays is still the fundamental sort of underlying group that you're including in the study.
**Q So your point in that paragraph is simply a repetition about the point that you've made earlier about the bias inherent in --**

A Right. But, I mean, if you were to --
**Q -- point-in-time -- in point-in-time methodology.**
A If you were to try to use 50 percent to say that you've got these problems being identified at a -- you know, for a larger percent of the children, it just wouldn't be accurate.
**Q I guess my question was whether your point in that paragraph was simply a repetition of your earlier point about how there's what you call a bias in point-in-time analysis.**
A It is a function of that, yes. And that's the point that we've been trying to make in the report, as well, that, you know, simply by looking at various lengths of time doesn't mitigate that particular problem in any of the analyses.
**Q That's your opinion; right?**
A It is a very strongly held opinion, yes.
**Q You cite in the next paragraph to an article that you coauthored when you're making your point that, "It would be very difficult to identify behavioral problems for children under 3."**
**Was that article cited to support the point that it's difficult to identify behavioral problems for children under three?**



A Yes.
**Q So you believe that that article contains that point, that it's difficult to identify behavioral problems for children under three?**
A I believe it in -- this -- that article infers that, yes.
**Q Does it infer it? How does it infer it?**
A Well, I would have to reread the article at this stage. Basically it had to do with the issue that diagnoses for children under three -- mental health diagnoses was not necessarily something that was accepted and wasn't part of, at that point in time, the -- the DSM diagnosis considerations.
In other words, there were certain specific behavioral problem issues that couldn't be identified because the field of children's mental health had said you can't define these kinds of conditions for children under these ages.
**Q I have read this entire article. I did not get that from it at all, but I will reread it and see if I can draw that conclusion from it. Because that was not at all the impression I had of that article.**
A Okay.



**Q But I just wanted to make sure that that was your point in citing to it was for that point?**
A Uh-huh.
**Q Yes, it was?**
A Yes, it was.
**Q Are you aware of any other articles other than your own that say that it's difficult to identify behavioral problems in children under three?**
A I'm not aware of other articles that address that specific issue. I'm aware of other researchers, though, who are working on that issue; and I'm also aware of some of the Medicaid policies that are tied into that particular set of decisions. Although those have recently changed.
**Q On page 22 of your report, you claim in the second paragraph that, "It is unclear in the report if both were set on the same date and, if so, whether it would count as two goals in the measure in grid 2a." And you're referring there to primary permanency goals and concurrent goals; correct?**
A Uh-huh.
**Q Yes?**
A Yes.
**Q I want you to take a look at page 64,**



**table 24 of Dr. Milner's report. And specifically the small type underneath it with two stars that says, "In this analysis concurrent goals are considered as one goal." Do you see that?**
A I do see that.
**Q Does that make it clear that, in fact, he is counting concurrent goals as one goal when he's counting the number of consecutive permanency goals?**
A It appears to, yes.
**Q So your criticism of him that it's unclear what he's doing, does that make that easier for you to understand?**
A It does.
**Q Have you looked at DHS's financial records to determine what information they contain?**
A I have not.
**Q Have you had any conversations with anyone about what those records contain and do not contain?**
A I recall a brief conversation that we had, I believe, with DHS staff back in April where we were discussing the development of the cohort analysis. And in that discussion was trying to find out about the relationship between their length-of-stay data and their financial payment system.

**Q Can you tell me what that discussion was?**
A Basically the issue is is that length-of-stay data is generally fairly reliable in most state SACWIS system. And one of the reasons that it tends to be reliable is that it has a relationship to payments that are made to providers. And if the SACWIS system and the financial system are integrated, then that's even more the case.
And so what I was attempting to do was to at least determine some basic sense of whether or not the data that we might use for the analysis that we included had a -- a type of validity associated with it.
**Q Is the financial data integrated with DHS's SACWIS data?**
A I was informed that it was.
**Q Did you do anything to cross check those two sources of data beyond that conversation?**
A I did not.
**Q Did you do anything to check the length-of-stay data that you used against other sources like the children's case file, court records to see whether, at least on a sampling basis, they were accurate?**
MR. PAGE: Object to the form.



THE WITNESS: I did not do any sort of additional checking for that data.
**Q (BY MS. INGBER) Did you discuss how you would access the financial data if you wanted to do so?**
A No.
**Q Do you have any idea how easy or difficult it is to do so?**
A I have no idea.
**Q On page 23 of your report you state at the end of your section on services, "Dr. Milner offered no evidence that the absence of services resulted in negative outcomes for children." Do you see that statement? Last sentence of the services section.**
A Uh-huh.
**Q Yes, you do?**
A I do see it.
**Q And I read it accurately?**
A Yes.
**Q Was Dr. Milner's purpose to correlate the absence of services to negative outcomes for children?**
A I think as I've stated before I'm not really sure what his purpose was.
**Q Despite reading his deposition and his**



**report?**
A I would say that I'm not feeling particularly enlightened as a result of either.
**Q So you can't state whether his purpose or one of his purposes was to correlate presence or absence of services with outcomes?**
A The only point I think that we would make is that if one is concerned about the presence or absence of services and concerned whether or not children receive services, that it's important to be able to relate those services to outcomes. We've had the experience of situations where the provision of services appears to result in -- in poorer outcomes under certain circumstances.
And so, you know, the issue is not so much a question of only whether services were provided or not, but what kind of impact those actually had on the child's health, well-being and so forth.
**Q That would be if you were interested on the impact of services on the child's health, well-being, et cetera; right?**
A That's correct.
**Q And if you were not, if you were interested in simply describing whether or not children got services --**



A Then why would you ask --
**Q -- you would not be able to -- you would -- it would not be necessary to do that; correct?**
A What I would say is that it's unclear to me why you would ask about it if you weren't concerned about being able to answer that question.
**Q I understand it's unclear to you, but my question was: Assuming it was for some hypothetical person the purpose to describe things and not to prove causation, you wouldn't need to prove whether or not services resulted in certain outcomes; correct?**
MR. PAGE: Object to the form.
THE WITNESS: I'm not sure. I just don't think that it would make any -- any sense to spend a great deal of time focusing on the collection of services data if there wasn't some interest in having an understanding of its relationship or to outcomes.
**Q (BY MS. INGBER) And that's your personal opinion?**
A That is a personal opinion.
**Q Okay.**
A And it's, you know, one that I think is based on a lot of work that I've done to try and

look at the issue of why services make a difference or don't.

**Q Understood. Is there a reason you didn't include anything in here about Dr. Milner's findings on siblings? You cover every other section of his report and you skip that one.**

A I don't know that there's any particular reason why we would have elected not to do that. I know that we were running up against a bit of a deadline in terms of preparing the report.

**Q So it's simply an oversight?**

A I'm not sure it's an oversight as much as it is a prioritization.

**Q Is there anything else that you left out of your report that you would have liked to include with more time?**

A I'm sure there are many things that we could have done to make the report better. Certainly I would have liked to have taken the time to have a few days to review it and correct some of the basic errors in it and some of the grammatical issues. But, you know, by and large, I would say that there's not a lot else that I think we would have added to it at this point.

**Q You criticize both Dr. Milner and, I**



**believe, Mr. Goad for there inclusion of case examples. And it's your position that they weren't randomly drawn and thus aren't representative; correct?**

A I don't know how they were drawn and whether they're representative or not.

**Q Well, on page 22 of your report when you discuss the findings on permanency, you say at the bottom of that page, "The case study used as illustration is not randomly drawn from a proper sample and is not representative of children in the care of OKDHS." Correct?**

A Yes.

**Q So, in fact, you do say in your report that the case samples -- case studies are not randomly drawn and are not representative; correct?**

MR. PAGE: Object to the form.

THE WITNESS: What I'm saying is that it's not randomly drawn because I don't -- but I don't really know that. On the other hand, it is not a proper sample in my view.

**Q (BY MS. INGBER) In social work research are case examples always randomly drawn and do they always represent a typical case?**

MR. PAGE: Object to the form.



THE WITNESS: In that type of research as in any other research where qualitative analysis would be part of the process, those types of examples are often used to illustrate points. The -- I think the issue with respect to this particular report, though, is that there were a range of potential points and alternatives that could be emphasized and there was no indication of, you know, drawing other types of information that might have perhaps told a different story.

**Q (BY MS. INGBER) But you would agree that in social work research sometimes these cases are selected in order to illustrate certain phenomenon?**

A I would agree that that is one of the reasons that they're drawn, yes.

**Q Does Milner make any claims in his report that those case examples are representative of the entire population?**

A Not that I'm aware of.

**Q When we -- when I spoke with Dr. Baumann yesterday, he said that on page 24 of your report in the middle paragraph there was some sort of typo that you and he discussed. And it wasn't clear to him what that typo was and he couldn't remember. So if you can, tell me what the typo is.**



MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Some -- a word that was missing, something like that.**

MR. PAGE: Same objection.

THE WITNESS: He and I did discuss this. And it's -- it's, I think, a grammatical issue with respect to one of the sentences where it could be clarified by the potential of a -- an additional word.

**Q (BY MS. INGBER) What sentence and what needs to be clarified?**

MR. PAGE: Object to the form.

MS. INGBER: What's the basis?

MR. PAGE: You asked two questions.

**Q (BY MS. INGBER) What sentence?**

A It's the second sentence and the second paragraph.

**Q That's the one that begins, "However, because."**

**A Uh-huh.**

**Q Yes?**

A Yes.

**Q And what needs to be clarified in that sentence?**

A What needs to be clarified is that the --

Page 186

that there needs to be some reference to the -- the sample that's described in the paragraph above as being the subject that's not representative.

**Q Can you redraft that sentence now as you would correct it?**

A Yes. I think one simple possible solution would be to simply state, "However, because Dr. Milner's sample are not representative of all the children who come into care."

Q Did you conduct any analysis to determine how much what you consider to be a bias in favor of longer lengths of stay affected any of his specific findings?

A None.

**Q Would you expect that the effect would be the same for every single finding?**

A The fact is is that I don't know if his findings would be consistent with findings we have if we did the study in a better way. I anticipate that some of the proportions that he's reporting are exaggerated because the normal expectation, based on other research, is that the events that he's concerned about, maltreatment in care, other types of events, are more likely to occur a -- the longer that children are in care.

Page 187

**Q Let me ask my question again. Would you expect that the effect of a longer length of stay would be the same on every single finding in the report? Yes or no?**

A I don't know.

**Q You found in your analysis, I believe, when you did your entry cohort analysis that the difference in the length of stay between your analysis and Dr. Milner's ranged between about four months and five months; correct?**

A Well, it depends on which of the tables you're referring to.

**Q I'm looking at table 2 on page 14.**

A Uh-huh.

**Q That is correct?**

A Yes, that looks to be correct.

**Q And that's when you compare your analysis based on SACWIS data to Dr. Milner's analysis based on case files; correct?**

A That's correct.

**Q And you don't know if that difference would be the same, less, more if your analysis was compared to the SACWIS data for Dr. Milner's sample; correct?**

A I'm certain that for Dr. Milner's data his

Page 188

lengths of stay would be longer.

**Q Longer, but you don't know whether it would be longer in the same way or -- you just don't know what that SACWIS data would show. It might show the difference between --**

A It might be different --

MR. PAGE: Let me object to the form first. Thank you.

THE WITNESS: It might be different.

**Q (BY MS. INGBER) Uh-huh.**

A But what I would say is that regardless, the length of stay in Dr. Milner's sample would be longer.

**Q You would expect for it to be longer, but you don't know how much the difference would be without doing the analysis; correct?**

A Correct.

**Q So let's say -- let's take the longer end of it, that, in fact, there's a four-month difference. So on average Dr. Milner had children who were in care for four months longer than what you've found. Can we think about it that way? I just want to make sure we're --**

A If it's clear that it's hypothetical.

**Q Yes. Hypothetically speaking. And**

Page 189

**Dr. Milner found it was about 23 months in care. And so if, in fact, your data's correct, it would be more like, let's say, 17 or 18 months in care. My math is not great, but about 5 months out of 23 is somewhere under 20 percent difference; correct?**

A In that vicinity.

**Q Let's just take 20 percent for this hypothetical as a ballpark. And I know that the effect on each finding would differ because some of them might be better or less well correlated to length of stay; correct? You couldn't simply say, well, chop 20 percent off all of his findings and that would give you the real findings; correct?**

A Correct, correct.

**Q Let's say you can do that roughly. You want to get a rough estimate of what the effect might be. Do you have any opinion on whether if you say, in fact, it wasn't 12 percent of children who were maltreated in care, it was 80 percent of 12 percent who were maltreated in care, whether that would be acceptable?**

A It wouldn't be acceptable to me even on a hypothetical. Because I think the issue is that what we're talking about is a distribution over time. And some of these phenomenon have a

different distribution than others. So it's not as though you can just apply a proportion like that.

**Q Understood. But you could probably do some sort of analysis that would estimate what the effect would be, could you not?**

A I wouldn't venture to do that.

**Q And you didn't try to do that here, did you?**

A No. That was not -- I mean, my purpose was simply to suggest that there was a flaw and that the nature of the flaw had to do with issues of exposure.

**Q And you didn't make any effort to analyze or figure out what the impact or magnitude of that effect is, did you?**

A I did not.

**Q And you have no opinion, I'm assuming, based on your lack of child welfare expertise, about whether any of the findings in Milner's report, assuming they were correct, would be of concern.**

MR. PAGE: Object to the form.

THE WITNESS: I don't know whether the things that he has identified would be of concern or not. And that's actually my concern. What I get deeply concerned about and sometimes offended about



is the idea that one can apply a research design of this nature and then make decisions about what one should do.

**Q (BY MS. INGBER) Did Milner make any decisions about what one should do?**

A I anticipate that the purpose of this report is to be used to help make decisions of that nature. Whether that's what Milner intended or not. And he certainly hasn't created any sense that the data should not be used for that purpose.

**Q Did Dr. Milner make any decisions or make any suggestions about what should be done or not done in Oklahoma with foster care children?**

A He hasn't made any decisions with respect to Oklahoma foster care --

**Q Thank you.**

A -- systems.

**Q And it would be fair to say that you're not an expert in child welfare so you don't know what would be acceptable practice in a foster care system?**

A Well, first of all, while I've said that I'm not an expert in child welfare practice, I do know a bit about child welfare systems. And the -- I think the thing that's important to understand



about those sorts of systems is is that they're influenced by a range of different types of factors and that before making decisions about how they should operate or how they should be changed, one should be taking those factors into consideration and making adjustments based on that type of evidence.

**Q Do you have the expertise to say whether a specific practice is good or bad in a child welfare system?**

A Not a practice, no.

**Q That was what my original question was, so thank you for answering it. I want to look now at your June 9th report.**

A Uh-huh.

**Q Yes? Let's look first at page 6.**

MR. PAGE: I don't think there was a question on the table. You just made a statement. And he said uh-huh.

**Q (BY MS. INGBER) Let's look at page 6. And you have a criticism of Mr. Goad here for failing to describe his sampling method and for not being able to describe the sampling method in his deposition. Do you see that? It's in the middle of the page, that larger paragraph.**



A Uh-huh.

**Q Yes?**

A Yes.

**Q Do you know whether Mr. Goad is the one who conducted the sampling?**

A I don't believe he was.

**Q Do you know whether the person who, in fact, conducted the sampling was deposed by defendants in this litigation?**

A I don't know that.

**Q Were you provided with the deposition transcript from him?**

A I don't believe so.

**Q Did you ask whether one existed?**

A I can't recall.

**Q If one existed, presumably there could have been additional information about the sampling process; correct?**

A Yes.

**Q Do you have any specific criticisms about the size of the sample selected by Mr. Goad?**

A Nothing specific, no.

**Q Do you have any reason to believe a sample was not chosen randomly?**

A I have no reason to believe that it was or

Page 194

it wasn't.
**Q Mr. Goad states in his report, does he not, that it was a random sample.**
A Yes.
**Q So do you have any reason to believe that it was not --**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) -- in fact, a random sample as Mr. Goad states in his report?**
A I simply don't know.
**Q You have a discussion on page 7 about the nonindependence of the sample. Do you think that it was inappropriate to use referrals as the unit of analysis in Mr. Goad's review?**
A No, I don't necessarily think that that was inappropriate. But one of the things I think that occurred is that he ends up using several what we refer to as "units of analysis" in his presentation of data. The three that are clear to me that he's used are referrals, children and allegations.
And each one of those could be considered as a different subject for analysis. And he sort of mixes those together in terms of describing his results.

Page 195

**Q Do you think that it was appropriate to use as a sampling unit referrals?**
A I believe I answered that question.
**Q And your answer was?**
A That there -- from my perspective is not necessarily a problem with using referrals as long as it's used in a consistent fashion.
**Q Do you think referrals are correlated?**
A I don't understand the question.
**Q Do you think that different referrals are likely to share features?**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) Are they independent?**
MR. PAGE: Same objection.
THE WITNESS: The content of referrals can be nonindependent.
**Q (BY MS. INGBER) The content of the single referral can be nonindependent. I'm asking you with cross referrals, whether they are or are not independent.**
A In some cases they are not independent.
**Q Give me an example.**
A If you have a referral that is with respect to the same family as one that occurred before.

Page 196

**Q Understood. Generally speaking, are referrals more independent than the children within a single referral?**
MR. PAGE: Object to the form.
THE WITNESS: If the data are examined at the referral level.
**Q (BY MS. INGBER) I understand. You state in your report that Mr. Goad may have counted certain maltreatment allegations multiple times because they were counted across a household with multiple children. Is that a statement that you make in your report?**
A Some statement to that effect, probably, yes.
**Q If, in fact, Mr. Goad and his reviewers entered specific information about each child in each home in the maltreatment allegations that were made about those children, how could he have counted them across a household with multiple children improperly?**
A If he was using referral as a basis for his analysis, that should have been the denominator that was used in developing his proportions. So the counts that we're referring to are the counts that he used in the denominators.

Page 197

**Q Is there any point in his report or any finding where one of the findings is not at the referral unit of analysis?**
A Yes.
**Q So he has findings that only relate to children, and he doesn't give a comparable --**
A In some cases I'm not --
**Q -- comparable finding for the referral unit, referral level.**
A That's true.
**Q Why don't you show me an example where his finding is solely on the child level and not on the referral or investigation level.**
A I don't know if I have a copy of his report.
**Q Be happy to give you one. This was previously marked as Exhibit 787.**
A Okay. I'm trying to head to page 18, I believe. Okay. So on the table that appears on 44, he has a count of 279. These are allegations investigated during a CPS investigation. So that is the denominator that he's using for the distribution that appears in that column.
**Q Do you think this was one of the key findings in Mr. Goad's report, the allegations --**

**the types of allegations investigated during CPS investigations?**

A I don't know if it's a key finding or not.

**Q Okay. Would you agree that your criticism of this nonindependence issue applies only to findings that are made on the child level and not to findings that are made on the referral or investigation level?**

A It applies to findings that are made with respect to children, and it applies to findings that are made with respect to other units of analysis like allegations.

**Q But it does not apply to findings made with respect to the unit of analysis, referral or investigation?**

A If it is consistently applied at that level. So, in other words, the -- the data have to be -- and I would have to look at each table to tell you. The data have to be, you know, confined to what you could say about a referral.

**Q I guess I just want to get a straight answer.**

A That is a straight answer.

**Q Generally speaking, would your criticism of nonindependence apply to allegation level**



**findings?**

MR. PAGE: Objection. Argumentative.

THE WITNESS: I'm not sure how to respond to that.

**Q (BY MS. INGBER) Do you want me to repeat it?**

A The -- what I would say is that if the analysis was conducted in a way that was consistent with the unit of analysis that is a referral, then it would be legitimate to report in this context.

**Q How would you conduct analysis in a way that's "consistent with a unit of analysis that is a referral"?**

A Well, there are several ways to go about it. One way, for example, with respect to allegations would be to simply note that a particular type of allegation occurred at least once in the case.

**Q I guess I'm not asking for findings where he's using a different unit of analysis. I'm trying to get an answer from you about whether his findings at the referral level suffer from his nonindependence issue. And maybe the best thing to do is to use an example and see if you think that independence problem --**



A Is at issue. Sure.

**Q Sure. So let's look at page 67.**

A Okay.

**Q This is in the CPS assessment section where there wasn't even a sample. You know what, I take that back. I'm going to find a better example where there was actually a sampling. Okay. Let's look at page 55. He has a finding here about what the DHS findings were for OCA investigations. Do you see that?**

A Uh-huh.

**Q Yes?**

A Uh-huh.

**Q Yes?**

A Yes, I see it.

**Q And he found that 71 percent were ruled out, 27 percent were substantiated, 2 percent were unsubstantiated; correct?**

A Yes, that's what appears in the figure.

**Q And here the unit of analysis is investigations; right?**

A Yes.

**Q Is the problem of nonindependence applicable to this type of finding?**

A It is not.



**Q Would it be applicable to any other finding similar to this that had investigations as the level of analysis?**

A If the -- if the -- again, if it's focused on that particular decision, I would say that it -- it does -- it is applicable at the referral level. But you have to go through this and kind of review each of the tables to make sure that that was the case.

**Q Did you do that and pick out which tables were affected by your criticism and which ones were not?**

A No. I think our role was to simply identify the fact that there were problems with at least some of the tables that we examined of that nature.

**Q You suggest as a possible solution to the nonindependence issue that you identify that a single child should have been selected at random from each household. Are there disadvantages to that approach?**

A Yes, there are.

**Q What are those disadvantages?**

A It can still result in -- in various types of errors creeping into the analysis, but it's

Page 202

better than not doing it.
**Q That's your opinion, that it's better than not doing it?**
A Yes.
**Q Does everyone agree that that's the proper approach, or do researchers differ on that?**
A Researchers differ on that.
**Q Are children -- all children in a household perfectly correlated?**
A No, they are not.
**Q So it's possible for one child in a household to be maltreated while others are not?**
A That's certainly true.
**Q Is it possible to lose valuable information when you randomly select only one child from each household?**
A If the sample is adequate, it's not very likely, but it's certainly possible.
**Q Would it result possibly in underestimating certain events?**
A It's possible.
**Q You said that you think it was unlikely that you would lose valuable information by randomly selecting one child; correct?**
A Yes. That it's unlikely. But it's

Page 203

certainly possible.
**Q Indeed I'll show you what was marked as Exhibit 788. That's an article that you cite on this question of independence; correct?**
A Uh-huh.
**Q Yes?**
A I can't recall if we cite this one or not, but it's very likely that we do.
**Q On page 7 of your report, the first paragraph on "sample review," if you can just take a look at your report so I can show you your citation to this article.**
A Okay.
**Q Do you see the citation there to Webster, et al.?**
A Uh-huh, I do.
**Q So it is an article that you cite in connection with this nonindependence issue?**
A Uh-huh.
**Q And so we learn to rely on the connection with that issue --**
A Correct.
**Q Just take a quick look at page 767 to 68 of this article. And just sort of at the bottom of the page where they're discussing the solution that**

Page 204

**you propose, randomly selecting a single child from the household. If you'll look at the last sentence on page 786, "Yet as a result of having to account for nonindependent data, neither did -- neither of these approaches utilizes all children in their sample, potentially losing valuable information." Do you see that?**
A Uh-huh.
**Q Yes?**
A Yeah. No, I'm familiar with this paper.
**Q Right. So at least Webster, et al. said that you could lose valuable information by randomly selecting one child; correct?**
A That there is the potential for that, yes.
**Q Yes.**
A And on the other hand one of the things that's important to know about this particular article is that they're examining data in a multi-variant context. And as a consequence, they have an ability to, in that analytic framework, control their errors.
And that's not something that would be available in a purely descriptive study. So the type of methodology that they're recommending would be superior is not one that's really available in a

Page 205

study of this nature.
Nevertheless, the problem still exists so you have to do something about it.
**Q Understood. Thanks for the clarification. It would seem to me like one of your big criticisms of Mr. Goad is the fact that he focused on compliance with policy and standards and not on outcomes; correct?**
A Correct.
**Q Do you believe that it is completely irrelevant to study whether an agency has complied with its own policies and standards in determining whether it's doing its job?**
A I believe that that information coupled with an examination of outcomes is useful.
**Q Are you familiar with any work in the field that's been done that examines compliance with policy?**
A Yes.
**Q So some researchers have chosen that as a methodology?**
A Right. But usually coupled with other information.
**Q Usually or always?**
A Usually.

Page 206

**Q Do you think it's important whether DHS complies with its policies?**
A I do think that it's important that it complies with its policies. On the other hand, it's not necessarily clear that some of the policies that are being discussed by Mr. Goad would necessarily result in improved outcomes or would result in deleterious outcomes for children.
**Q Would you agree that certain policies have a certain common-sense logic to them?**
MR. PAGE: Object to the form.
THE WITNESS: I would expect that some policies do have a common-sense logic to them. I would also say that in some instances policy is not necessarily helpful.
**Q (BY MS. INGBER) Would you agree that some policies and hopefully most policies are based on practice, wisdom and experience?**
MR. PAGE: Object to the form.
THE WITNESS: Yes. In fact, I think that's one of the problems with policies, is that often policies emerge as a result of issues that are not necessarily a major -- need to be a major focus of concern to the agency, but that may have created issues for the agency and the media with the

Page 207

legislature or in some other kind of fashion. And as a consequence, attention is paid in ways that are disproportionate to the problem in policy.
**Q (BY MS. INGBER) Do you reject the value of practice, wisdom and experience?**
A If it's coupled with good evaluation, I think it's perfectly fine.
**Q Is it always possible to do good evaluation?**
A It may not be possible, but it's something that should always be attempted.
**Q Do you know any child welfare agency that has attempted to evaluate its policies and see whether they affect outcomes?**
A Yes, actually.
**Q Which ones?**
A Well, we've done a lot of work in the State of Texas. And in that state one -- one of the areas of policy that we looked at had to do with approaches to dealing with disparities and disproportionality in the system. And in those instances we were able to find a relationship between the implementation of practice and policy and mitigation of some of those kinds of concerns.
**Q Do you know whether Oklahoma has made any

Page 208

effort to evaluate its policies in that way?**
A I don't know.
**Q Do you know whether anyone has made an attempt to evaluate the policies with respect to response to abuse and neglect referrals?**
MR. PAGE: Object to the form.
THE WITNESS: I am really not familiar with the nature of research and evaluation work except in some limited circumstances here in the State of Oklahoma in child welfare.
**Q (BY MS. INGBER) I wasn't speaking, I guess, specifically about Oklahoma; and I apologize if you misunderstood. Do you know whether anyone has done any research that has attempted to evaluate policies specific to the response to abuse and neglect referrals? And I want to set aside risk and safety assessments.**
MR. PAGE: Object to the form.
THE WITNESS: Yes.
**Q (BY MS. INGBER) What has been done?**
A Well, we did a study a few years ago on the issue of unsubstantiation and whether or not policy had a direct impact on levels of unsubstantiation or the variability in substantiation rates.

Page 209

**Q Was that an attempt to evaluate the effectiveness of the policy?**
A It was an attempt to try and understand how policy might influence those decisions so that hopefully better policy could be crafted.
**Q And that was limited to the question of substantiated decisions?**
A Actually unsubstantiated decisions.
**Q Understood. Has anyone ever evaluated whether policies that deal with timely investigations are effective in improving outcomes that you're aware of?**
A I don't know of any, but --
**Q Do you know whether anyone has done an evaluation of whether policies dealing with thoroughness of investigation affects outcomes?**
A I'm not aware of any.
**Q Do you know whether anyone has done a study to evaluate whether taking protective actions during the course of investigations improves outcomes?**
A Yes. To some extent.
**Q What? To what extent?**
A Well, I think the -- there's been a little bit of research that's been done on the

implementation of safety plans, for example, and its impact on whether or not reporting or re-reporting with recurrence happens.

**Q And what has that research shown?**

A It shows that the presence of that type of safety planning is effective in reducing those rates.

**Q So to some extent that research has shown that at least certain types of protective actions are effective at improving outcomes?**

A Yes. And the research has also shown that it's possible to do that sort of research and that it probably should be done.

**Q So the child welfare field, I agree, should be doing more research; right?**

A Right.

**Q I guess that's what keeps you in business just like lawsuits keep me in business. There's a paragraph on page 8 -- well, let me just step back for a second. You would agree that there's a lot of open questions in child welfare, research that hasn't yet been done that would be helpful if it was done; correct?**

A Yes. Absolutely.

**Q Let's look at page 8. You have a**



**paragraph, second paragraph from the bottom, that begins, "Another problem is found." If you take a moment to read that, I just simply didn't understand what this paragraph was about. It refers to the Milner report and it's in your section on Goad and I just didn't get it.**

A Well, some of the conditions that are described in Mr. Goad's report are based upon the -- the subpopulation that Milner identifies of children who are maltreated in care. So if you were relying on Milner's data to give you an estimate of how often maltreatment in care occurs, then you might infer that some of the kinds of events that Mr. Goad describes are actually more frequent in the system than they are.

**Q Is anyone relying on Dr. Milner's data and then using that to infer anything about Mr. Goad's findings?**

A Well, again, I don't know why this particular report was written with respect to this particular subject, but I made the assumption that because they were talking about some similar phenomenon that there might, in fact, be a relationship. But I frankly don't know what the expectation of this particular report is in terms



of -- in forming policy or other types of decisions.

**Q So this was a hypothetical paragraph about if someone was trying to combine the data from the two reports; is that correct?**

A Correct.

**Q Okay. I understand better now. You make the same criticism of Mr. Goad as you do about -- of Dr. Milner about the failure to utilize blind reviewers; correct?**

A Uh-huh.

**Q Yes?**

A Yes.

**Q It would be correct to say that if blind reviewers were required, then Mr. Goad would not have been able to participate in review of the files; correct?**

A I believe that's correct, yes.

**Q And you're aware that Mr. Goad was one of only two reviewers in the main case study; correct?**

A I -- yes, I understood that, yes.

**Q So would it be your recommendation that that -- he should not have participated in that way?**

A I think it would be better if he had not.

**Q And, again -- and I apologize if I asked this before. In this type of case study review**



**project in child welfare, are blind reviewers always used?**

A Not always.

**Q I'm not sure if you're aware of it, but a former DHS employee was retained as an expert for defendants and she rereviewed a sample -- subset of Mr. Goad's cases and then chose another group of cases that she reviewed. Are you aware of the work that she did?**

A I believe I heard something about some work of that nature being done, but I haven't seen any of the results from that.

**Q Did you consult at all with her on methodology?**

A I don't believe so.

**Q If she used the same methodology as Mr. Goad, would your same criticisms apply to her report?**

A It would be better if the reviewer was blind to the purpose of the study.

**Q Would you agree that a former employee of DHS, there's a likelihood of confirmatory bias in her work?**

MR. PAGE: Object to the form.

THE WITNESS: Confirmatory bias is an

Page 214

aspect of human behavior, and anyone doing this type of work is subject to those biases.
**Q (BY MS. INGBER) If she reached similar factual conclusions, so if she had tables in her report that had similar factual conclusions -- and I want to set aside all the language of hyperbole and interpretation of those conclusions. But just the facts.**
**If her facts, in fact, were similar to Mr. Goad's, hypothetically speaking, in certain areas, would that suggest that, in fact -- that this problem of bias was, in fact, not a large one?**
A There might be that suggestion. You know, it would be the sort of thing where you would have to look at it a bit, but I -- you know, it's certainly possible that that would reduce those concerns.
**Q Are you familiar -- I'm sure are you. You're familiar with the concept of selection bias; correct?**
A Yes.
**Q When conducting a review of abuse and neglect investigations, do you think it would be appropriate to only look at substantiated cases?**
A No, I don't believe so.

Page 215

**Q Why not?**
A It's sort of the same issue of not looking at children in care under 60 days. The realty is is that children who are in -- in unsubstantiated cases often share the same risk factors and the same kinds of concerns as children in substantiated cases and that the -- the actual rationale -- and I think we point this out in the study -- for the decision is very heterogenous. It depends greatly on the individual who's viewing the information.
**Q Let me ask it another way. Do you suspect that substantiated cases might share certain characteristics that are not shared by unsubstantiated cases?**
MR. PAGE: Object to the form.
THE WITNESS: I believe that they do have a tendency to have some characteristics that are not shared.
**Q (BY MS. INGBER) So by only selecting the substantiated cases, it's, in fact, a selection bias because certain characteristics exist in those cases that don't exist in unsubstantiated cases; correct?**
A Well, can you tell me what the purpose of the study that you're describing is?
**Q Sure. The study that DHS's expert when**

Page 216

**she looked at additional cases, she selected only substantiated cases. And I'm wondering whether that was an appropriate methodological choice. From my very layman's perspective, it seems like there might be some differences between substantiated and unsubstantiated cases. And to get a full picture, you would want to look at both. And I'm asking you whether in your expert opinion that would be correct.**
MR. PAGE: Object to the form.
THE WITNESS: You know, I have to be really clear about this. If the purpose was to understand whether or not a substantiation decision was appropriate or not, you would need to know something about the cases that were unsubstantiated.
**Q (BY MS. INGBER) What if you wanted to know if investigations were timely? Would you need to look at both categories?**
A I believe you would, yes.
**Q What if you wanted to see whether investigations were thorough? Would you need to look at both categories?**
A Yes.
**Q I believe there's a small error in your report about -- well, maybe I'm wrong. Let me --**

Page 217

**let me strike that.**
**You say that Mr. Goad only did inter-rater reliability on six cases; correct?**
A That was what I believe we read, yes.
**Q Six cases total?**
A I believe that's correct, yes.
**Q So you think that the totality of his inter-rater reliability analysis was six cases? Just want to be very clear.**
A Can you find the point in our report where we cite that, just --
**Q Sure. I apologize. It's on page 9. Very first sentence. "The number of cases used to obtain inter-rater is too small (n=6)."**
**A Yes, I think that was our understanding from having read the report.**
**Q I just want to point you to three pages in Mr. Goad's report. First, let's look at page 15. And I want to look at the second to last sentence on that page. "To this end, six CPS investigations were reviewed by both reviewers to measure inter-rater reliability." Do you see that?**
A Uh-huh.
**Q Yes?**
A Yes.

**Q And then I want to turn your attention to page 42. And, again, the second to last sentence. This is in the section on OCA investigative review. "To this end, six OCA investigations were reviewed by both reviewers to measure inter-rater reliability." Do you see that sentence?**
A Uh-huh, I do.
**Q And then again on page 83, there's a similar sentence about the CPS screen-outs. Just above in Section A, second to last sentence of Section A. "To this end, six screened-out referrals were reviewed by both reviewers." Do you see that?**
A Uh-huh.
**Q Yes?**
A I do.
**Q Was your statement that it was a total of six simply an oversight; or were you aware that he did, in fact, do inter-rater reliability on 18 cases?**
MR. PAGE: Object to the form.
THE WITNESS: Well, I think that what we probably should have been clearer about is that there are only six per subsample.
**Q (BY MS. INGBER) So when I asked you earlier if when you said six, you meant a total,**



**grand total of six, you, in fact, meant, "I meant a grand total six in each category"?**
MR. PAGE: Object to the form.
THE WITNESS: Because I don't recall -- or I didn't recall at the time that you asked the question how we obtained that number, I can't say whether that's what I really intended or not.
**Q (BY MS. INGBER) Do you think it's preferable to review 18 cases rather than 6?**
MR. PAGE: Object to the form.
THE WITNESS: I believe it's better to review more cases than six when you're basing your analysis on a -- on a subsample.
**Q (BY MS. INGBER) But you would agree --**
A The data weren't combined across subsamples. So the 18 applied to only each individual subsample -- or the 6 only applied to each individual subsample. The 18 didn't.
**Q Understand. But you are aware that it was the same two reviewers for each of the three subsamples and that the questions were largely the same for each of those subsamples; correct?**
A I'm aware of that, yes.
**Q Is that relevant to the question of whether it was enough cases for inter-rater**



**reliability?**
A In some case it is may have been. In other cases there's some subtle differences that may not have been as reliably determined. And some of those differences are kind of important. So, for example, the decision about substantiation for CPS investigations in home versus OCA investigations at home are based upon a different standard. And the instrument that we reviewed only describes the one for the CPS investigation.
**Q Well, we'll get to that in a second. Because I believe Mr. Goad is very clear he's using the same standard for both. But we'll get to that point in a second.**
**You also state in your report and you refer to the "Handbook of Inter-Rater Reliability." Is that a book that you have, Gwet's "Handbook on Inter-Rater Reliability"?**
A I don't have that book, no. It's a .pdf, I believe, that Don Baumann -- Dr. Baumann has.
**Q A .pdf of a book, of a handbook?**
A Yes.
**Q And you cite that -- for the point that there's considerable improvement when these numbers reach around 30. Do all researchers agree that you**



**need to do inter-rater reliability on 30 cases and that's the right number to do?**
A I'm sure that depending upon the study you'd find that some people believe you need to have more than that.
**Q Does anyone -- would anyone say you need less than that?**
A I've not seen any citation to that effect.
**Q Have you seen any citation to the rule of thumb of doing approximately 10 percent for inter-rater reliability?**
A Well, that may be a rule of thumb, but I think it would be highly dependent upon the size of the sample.
**Q Would it also depend on the degree of agreement you're seeing when you began the inter-rater reliability process?**
A It could, yes.
**Q Could it depend on other factors, as well?**
A Yes.
**Q So it's not like there's a set number of cases you need to do to determine inter-rater reliability. There's many factors that come into that; correct?**
A That's correct.

**Q And it would be true that the higher the rate of agreement you're seeing between the two reviewers, the smaller the number of cases that may be appropriate; correct?**
A I'm not entirely sure of that because I think it depends a bit on the process that the reviewers would use.
**Q Would you agree that it's preferable to select the cases for inter-rater reliability on a random basis?**
A Yes, I would say that that would be a better way to go about it.
**Q You say in your report, "It's possible that these 6" -- and I'm assuming by that you meant these 6 times 3, 18 cases -- "could be extremely easy cases to obtain agreement about."**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) What's the basis --**
MS. INGBER: I hadn't asked the question yet.
**Q (BY MS. INGBER) What's the basis for your statement that these "could be extremely easy cases" --**
MR. PAGE: Object to the form.
**Q (BY MS. INGBER) -- "to obtain agreement**



**about"?**
A The fact that the numbers are so small.
**Q Would that be the case if those 18 cases had been randomly selected?**
MR. PAGE: Object to the form.
THE WITNESS: It would be the case if there were six cases selected for a subsample. Certainly possible that those six cases would predominantly be easy ones.
**Q (BY MS. INGBER) So you think that it's likely that for each of the three subsamples, the six cases randomly selected were extremely easy cases?**
A No. It's more likely that they would be easier cases with a smaller number of cases included in the inter-rater reliability study.
**Q But you have no reason. That's simply a hypothesis?**
A Simply a hypothesis.
THE WITNESS: Would it be all right if we did a break?
MS. INGBER: Sure.
VIDEOGRAPHER: We're now off the videotaped record. Time is 2:18 p.m.
(A recess was taken from 2:18 PM to 2:31



PM.)
VIDEOGRAPHER: We're now back on the videotaped record. Time is 2:31 p.m.
**Q (BY MS. INGBER) I want to very briefly discuss the question of instrument validity as it applies to Mr. Goad's report. We discussed in connection with Dr. Milner's report whether his instrument was measuring abstract constructs or whether the individual questions in the report were attempting to measure something concrete. Do you remember that discussion from this morning?**
A I do; right.
**Q Would you testify about Mr. Goad's instrument as you did about Dr. Milner's that the individual questions are about concrete concepts rather than abstract concepts?**
MR. PAGE: Object to the form.
THE WITNESS: Well, I guess the same thing would apply. I would say that to some extent Milner's -- some of Milner's key constructs are actually, in my view, very abstract. And in particular the concept of whether to screen in or screen out a report, the concept of whether something is substantiated or not is actually a very, very abstract kind of concept.



**Q (BY MS. INGBER) But specifically with respect to substantiated, is it abstract -- an abstract construct whether DHS has substantiated an allegation?**
A Yes.
**Q Is it an abstract construct of whether in the case record you were looking at there is a notation that says "substantiated"? Is that abstract?**
A What's abstract is making the determination to begin with. And if you have to evaluate, as Mr. Goad did, whether or not they felt the decision was correct, then you're evaluating a very abstract set of information.
**Q I understand that the caseworker's decision about should I or should I not substantiated, that's an abstract decision. My only question to you is: If I have a question in an instrument that says, "Write down here what the finding was of this investigation based on the file you're looking at," is that asking the reviewer to do anything abstract by writing down the finding that they see in the record?**
A And what I was referring to was the decision that Mr. Goad and his reviewer made about

whether they agreed with the worker's decision or not.

**Q Okay. Well, I was asking about their recording of what was in the file itself. And can you tell me whether that's abstract or concrete?**

A I would assume that if the information about substantiation or screening is in the file, that it is not necessarily an abstract piece of information to extract. But what I was -- the point I was trying to make is that there are critical abstract constructs in -- that Goad is addressing in several points in his report.

**Q But you would agree that not every piece of information that he's collecting is one that you would categorize as abstract; correct?**

A Correct.

**Q Again, with the question of face validity and your criticism of instrument -- the instrument is on page 9 to 10 of your report if you want to refer to it.**

A Uh-huh.

**Q Would it be fair to say that this criticism like the criticism of Dr. Milner was of Mr. Goad's -- what you call his "failure to assess certain forms of validity"?**



A Correct.

**Q And so it's not a criticism of whether, in fact, the instrument has those forms of validity. It's simply a criticism of him for, you believe, failing to assess those things; correct?**

MR. PAGE: Object to the form.

THE WITNESS: It's the issue of not knowing what the nature of the validity of the instrument is.

**Q (BY MS. INGBER) You've looked at Mr. Goad's instrument, have you not?**

A Yes.

**Q Do you have any question about whether the instrument was capturing what it intended to capture?**

A I think in some specific instances I do.

**Q In the majority of instances, do you or do you not?**

A Probably not in the majority of instances. But, you know -- but I couldn't really say, you know, without going through it line item by line item, you know, what I would be concerned about and what I wouldn't.

**Q With respect to content validity, i.e., whether the content captured in an instrument is**



**drawn from a pool of representative measures appropriate to the question or questions at hand, do you have any concerns about the content validity of Mr. Goad's instrument?**

A I have some. And --

**Q What would those be?**

A Well, again, I think that there wasn't very much of an effort to look at, to some extent, what might have been going on in workers' heads. Some of the same concerns that I had about what Dr. Hess was doing, that some of the rationales for some of the decisions might have been extractable under certain circumstances for some of the items. And the fact that there was no sort of attention paid to any of that is kind of concerning.

You know, why would there have been a delay of a certain amount of time between a report and an investigation? There may have been potentially legitimate kinds of reasons that could have been organized from the case-level data, from the -- the case-review data.

**Q In fact, I want you to look at Mr. Goad's instrument because I believe he did, in fact, take into account barriers to achieving contacts in a timely manner in his instrument. And I want to see**



**if you agree. It's appendix B of the report, and it's the fourth page of that appendix.**

A I think there may be two reports combined here or something.

**Q His fatality review is part of this report. I believe it will be after that.**

A Okay.

**Q Do you want me to help you find it?**

A Yeah. If you wouldn't mind. Here is it. There it is.

**Q Here, I'll give you a little --**

A I've finally found it, sorry.

**Q I'll give you a little flag to put on the page so that if we need to get back to it, we can do that. And it's the fourth page of this appendix. Unfortunately they are not numbered. Sort of at the bottom of this page where he's asking a review to determine whether contact was achieved within a reasonable period of time.**

MR. PAGE: Could you just hold off for a second and make sure I can find this. There I think I found it.

MS. INGBER: Great.

MR. PAGE: Now where are we, on what -- fourth page?

MS. INGBER: Page 4 of appendix B near the bottom.
MR. PAGE: Thank you.
**Q (BY MS. INGBER) And it says here that this should take into account any legitimate barriers to making contact, does it not?**
A I guess in theory it may. Again, I would say, though, this is a very abstract piece of information.
**Q I guess my question wasn't whether it was abstract or not. It's just whether Mr. Goad was, in fact, instructing his reviewers to take into account, as you described it, what was going on in the caseworker's head, the reasons why they might not have been able to make timely contact.**
MR. PAGE: Object to the form.
THE WITNESS: Right. And what I meant by that was that we're not provided the benefit of that information. So we don't know what might have been going on that constitutes these barriers. He's just asking his -- himself or his reviewer to make a judgment as to whether or not there was a reasonable barrier and --
**Q (BY MS. INGBER) Have you looked at his data?**



A I thought I had.
**Q Not his report. The underlying data.**
A No.
**Q So you don't know whether, in fact, in there there are notes or descriptions of the reasons, do you?**
A Right. I have no idea. And, you know, what I would have expected, though, is that -- or what I would have preferred to see is -- is a qualitative analysis of if -- if comments were made with respect to this item. I don't -- I'm not sure how the -- the actual instrument worked. This appears to be instructions for an automated system. I don't know if it was even possible to make notes on this particular item.
**Q You just don't know?**
A Right. And it would be useful to know in order to be able to evaluate the perception.
**Q So it wouldn't be -- it would be fair to say that you simply don't know the extent to which Mr. Goad was taking into account the reasons why workers were doing things in his review?**
A Correct. Right.
**Q Correct?**
A And I think, you know, from the standpoint



of knowing or -- again, understanding what might or might not be problems in the system, that that would be the sort of information that you'd want.
**Q And that's imposing your purpose -- your assumed purpose for this review onto it; correct?**
A Correct.
**Q Would it be correct to say that a number of your criticisms are based on what you assume to be the purpose of these reviews?**
A I would say that if the purpose of this review is to inform an outside party, particularly a judge which -- who then has to make a decision on the basis of these sorts of data, that I wouldn't necessarily feel comfortable that this information was organized or put together in a way that would allow for an appropriate decision.
**Q Let's speak specifically about Mr. Goad's review. What are your major criticisms, if you could give me the top two or three criticisms of Mr. Goad's report.**
A The first is that he doesn't use any real outcomes --
**Q Okay.**
A -- in terms of the issues that he identifies.



**Q So he simply describes what happened and whether they complied with policies and doesn't give outcomes. Okay. Number one. What else?**
A The second would be that he makes certain assumptions that aren't necessarily supported by his data or for which there might be alternative explanations.
**Q Give me an example of that.**
A His sort of general allusion to the idea that lower rates of screening or increased rates of screen outs reflect a system that's not providing services to certain numbers of children.
**Q Was that -- you said -- I asked you to give me the most major criticisms of Mr. Goad's report and you said that he makes certain assumptions and your example, I believe, refers to a single line in his report. Do you think that's a problem that applies more generally across his report?**
A I think so.
**Q Can you give me another example in addition to this one where he, according to you --**
A It may take a little time to find it.
**Q -- that he makes certain assumptions?**
**Because if that's indeed a major problem, I want to**

**understand the extent of what you view that problem to be.**

A Well, the issue with -- that we talked about earlier with respect to allegations, there's sort of an inference that the -- because the allegations are fairly diverse and cover a wide range of different types of maltreatment, that there is a -- you know, high cause for concern. There's an inference --

**Q Mr. Goad never says that in his report; correct?**

A No. I'm saying it's an inference.

**Q How is that a major criticism of his report that you've inferred something that he didn't say?**

A You asked me for an example of a set of conditions that have to do with describing or not describing alternative explanations. And this is an example. I've given you that -- so that's the second example.

**Q Do you have a third one in mind? It just sounds like you think it's a major problem so I want to understand it to its full extent.**

A Right. I mean, I think that -- the issue is that almost any inference that is explicit or



implicit in this report isn't necessarily balanced by any alternative explanation that I can identify.

**Q And you've given me two examples of that?**

A Right. And if you want more, it will take us some time. Because I'll have to go through and sort those out.

**Q Any other major criticism of Mr. Goad other than the reliance on -- not relying sufficiently on outcomes and these so-called assumptions that he's making?**

A Yeah. So for me the issues of the decision to substantiate and the notion of a correct decision and the decision to screen in or screen out and the notion of a correct decision is very problematic.

**Q And what -- did you say that in your report?**

A I believe we do.

**Q Can you show me where you say that in your report? It does say on page 10 that there's insufficient guidance about how to make those decisions.**

A Correct, correct.

**Q But you don't say anything beyond that, I believe, about that.**



A Page 12.

**Q Uh-huh.**

A Third paragraph.

**Q Sure.**

A "Mr. Goad assumes that CPS decision making related to accepting reports, making investigative determination, and -- and closing abusive/neglectful foster homes is or can be made precise through the use of descriptive and detailed criteria and procedures."

Q This seems to me to be a specific criticism of Mr. Goad's statements with respect to the importance of prescriptive procedures. That doesn't seem to me to be a statement about Mr. Goad's decisions about how to decide if something was correct in terms of substantiation or screening in, screening out. Am I incorrectly understanding that?

A Well, I guess that would be an interpretation of this. My sense is that it's a more general criticism that's directed at the issue of someone -- the belief that somehow it's possible to know whether someone should be screened in or screened out or determined to be substantiated or not substantiated in all instances.



**Q So you believe I should be inferring that from that sentence in your report?**

A That's certainly my intention, yes.

**Q Do you believe that's clear to a lay reader, that that's what you're intending?**

A It may not be.

**Q Okay. You, as we just discussed, say that one of the problems is that Mr. Goad provided insufficient instructions on some of the items in his instrument. And the two examples you give are whether the screening decision was reasonable and whether the finding was reasonable.**

A Correct.

**Q Is the only way to provide that type of instruction in writing?**

A No.

**Q So if you were to learn that, in fact, there were verbal trainings and discussions about those issues, would that at least partially mitigate your concern?**

MR. PAGE: Object to the form.

THE WITNESS: I think it would be important to know, you know, sort of what transpired from that perspective and that -- you know, at this point we don't know. Or at least I don't know.

Q (BY MS. INGBER) But certainly it could be relevant to that criticism?
A It could be, yes.
Q What about if the two reviewers, hypothetically speaking, discussed specific cases on exactly those findings in order to gain further understanding of how to make those decisions? Would that be helpful?
MR. PAGE: Object to the form.
THE WITNESS: Well, yeah. I mean, presumably, you know, one can hypothesize that they perhaps did that with the -- the cases that were selected for the inter-rater reliability. But the fact of the matter is that that's not specifically described anywhere.
Q (BY MS. INGBER) I understand.
A And the other possibility is that this is an area where there may have been a need for a little bit more explication in the -- in the actual discussion of the instrument.
Q So this is really a criticism of the -- his description of what he did. It's not necessarily a criticism of what he actually did; correct?
MR. PAGE: Object to the form.



THE WITNESS: Well, again, I don't know what he did so it's hard to -- to be clear about what was or wasn't appropriate.
Q (BY MS. INGBER) And if you were provided additional information about what he did, that may or may not affect your opinion; correct?
MR. PAGE: Object to the form.
THE WITNESS: It may or may not, yes.
Q (BY MS. INGBER) I want to get to this point about the "greater weight of the evidence" standard which you discuss on page 11 of your report. The first full paragraph or sentence it says, "In the case of OCA investigations, the applicable legal standard 'greater weight of the evidence' is not included in the instruction."
How do you know that's the applicable legal standard?
A I think I mentioned earlier today that I reviewed -- that I didn't do much in the way of review of DHS policy. But that was a bit of policy that I did go up on their website and identify.
Q Did you look at Oklahoma statutes?
A No. Just the website.
Q If an Oklahoma statute contradicted that policy, which one would be more relevant?



A I don't --
MR. PAGE: Object to the form.
THE WITNESS: I don't know which would be more relevant because I don't know which one is actually used in practice.
Q (BY MS. INGBER) Do you think that the people employed by DHS are required to follow state law?
MR. PAGE: Object to the form.
THE WITNESS: I expect that all of us, at least in theory, are required to follow whatever law is applicable.
Q (BY MS. INGBER) So would you agree that if there's a law that sets out what the evidentiary standard should be, that's the one that should be used by the agency?
MR. PAGE: Object to the form.
THE WITNESS: It's likely that that's the one that should be used by the agency, but if training and other information is being provided to staff that suggests that perhaps they should be doing something different and it's contradicted, then I'm not sure what they're doing.
Q (BY MS. INGBER) Your criticism seems to be that -- not that DHS employees might be confused.



You say there's the possibility for further confusion by the case reviewers; correct?
A Correct.
Q Would it be confusing if Mr. Goad had told the case readers exactly which standard they should be using when they were analyzing what the correct decision was?
A Well, I guess what I would have liked to have seen is a statement in these descriptions saying whether or not the standard was applicable to both types of cases.
Q So let's look at page 42.
A Okay. Of?
Q Mr. Goad's report.
A Okay.
Q And actually let's begin on page 41. So at page 41, Mr. Goad is generally describing his OCA investigation review. And he discusses in the final bullet point that, "The evidentiary standard for substantial is different for OCA investigations than it is for CPS investigations. Do you see that statement?
A I do.
Q And then on page 42 in the final paragraph before Section A, it says, "Despite these

**differences, for the purpose of this review, OCA investigations will be examined according to the same standards as CPS investigations and CPS assessments." Do you see that?**
A I do.
**Q So, in fact, there is a statement in Mr. Goad's report that he's going to be using the standard applicable to CPS investigations and assessments in the context of his OCA review; correct?**
A Evidently.
**Q And indeed if you look at -- in appendix B, which is thankfully flagged at this point. And we'll look at page 6. Actually we'll begin, sorry, page 5.**
A I'm sorry.
**Q The lack of page numbering is really annoying. So this -- if you look -- if you're on the right page, there should be sort of in the middle "allegation/investigation tab."**
**A There it is. Okay.**
**Q Do you see that?**
A Uh-huh.
**Q So this is the instructions relevant to the allegations and investigations. And then when**



**you go to the next page in that same section where it says "reasonable finding," it says, "Identify the reasonable finding from the choices in the drop-down menu. Select confirmed when the OKDHS established sufficient evidence to meet the 'some credible evidence' standard of evidence." So, in fact, he is informing his reviewers, is he not, what standard of evidence they should be using.**
A I guess he is. In which case, you know, we've misstated our criticism; and it probably should say something to the effect that if they're in disagreement with the OCA, there may be a concern that has to do with the fact that the OCA investigators were using a different standard.
**Q Understood. But the criticism as it's stated in your report is not correct?**
A Is not correct.
**Q As we discussed a little bit earlier, one of your criticisms of Mr. Goad is his assumption that "CPS decision making can be made precise through the use of prescriptive and detailed criteria and procedures." Correct?**
A Yes.
**Q That's on page 11 of your report.**
A Uh-huh.



**Q I'm sorry. It's actually -- might be on page 5. I apologize. Of your report.**
A Correct. The last paragraph.
**Q The last paragraph on page 12. That's right. And you cite page 7 of Mr. Goad's report which is apparently where you believe he made that assumption. I just want to take a look at page 7 of Mr. Goad's report and see if you can show me where on this page Mr. Goad is making the assumption that CPS decision making can be made precise.**
A Okay. So in the first paragraph he says, "For example, a referral to be screened in for investigation is one that is defined as a situation in which 'the allegations indicate there is serious and immediate threat of harm to the child.' This is followed by a list of 18 examples.
"This lack of definition may not matter much, however, because most of the procedural direction" -- in quotes -- "is preceded by the statement this guide (reviewer's emphasis) is not intended to be all inclusive and does not replace judgment about the alleged risk. This lack of clear definition is certain to result" -- and this is -- I think the term "certain" here is key -- "to result in inconsistency and error when decisions related to



accepting reports for investigation and confirmation of reports are made."
Q I read that to make a slightly different point than the one that you are taking from it. I take Mr. Goad's point -- and he makes it quite strongly -- that DHS procedures -- that, number one, DHS, procedures are insufficiently prescriptive. And, two, as you pointed out here, that this is certain to result in errors. Would you agree that that's the point Mr. Goad is making?
A And that's the point that I would disagree with.
**Q Well, your point is that he assumes that they can be made prescriptive. I don't read that anywhere in this section. I read him to say prescriptive is better, there's errors if it's not prescriptive. I don't read him to say anywhere that you could ever get a set of prescriptive procedures that would be sufficient to -- that would be sufficient to effect decision making completely.**
A Well, my interpretation of his information is is that there's a remedy that has to do with the nature of the policy that's being prepared.
**Q Does he suggest that remedy?**
A He doesn't suggest any remedy except for

the apparent lack of information that he believes or he states will result in inconsistency and error.

**Q Does he say that the remedy which you're inferring he's suggesting from his report would make decision making precise? Or would it perhaps just be better?**

A My assumption is is that if you have inconsistency and error, that you are talking about a process that's imprecise.

**Q And perhaps what he's suggesting is it could be more precise if you had better policies and procedures. Not that it could be totally precise.**

MR. PAGE: Object to the form.

**Q (BY MS. INGBER) Would you agree that that's what he's saying, not the point that you're making which appears to be an overstatement?**

A I think it's unclear to me what he's saying. He talks consistently of the need for clear definitions, clear policy, prescriptive policy as a remedy for many of the flaws that he apparently infers from the system. And I have to assume that as a result of that he believes that addressing those things will improve decision making. And I am just arguing that I don't believe that that's the remedy that is going to result in that kind of



improvement.

**Q You don't think clear prescriptive policies are better than vague, imprecise policies?**

A It's an empirical question, and I would suggest to you that in all of the studies that we've looked at that the presence of more precise or less precise information doesn't really change the level of heterogeneity in most systems.

**Q In your own work have you not theorized that, in fact, more precise policy will, in fact, lead to less variability in decision making?**

A When it is tied to an empirical justification. So in other words, when you can tie it to a specific outcome, yes.

**Q So you don't disagree with Mr. Goad's general point that it is better to have clear and more prescriptive policies, do you?**

A I do disagree because I believe that in some instances those policies can become a burden on the decision making progress essentially.

**Q Let me show you your article from 2011. This is a recent article that you wrote.**

A Uh-huh.

**Q That you cite in your own report. This will be Exhibit 791. Do you recognize this article?**



A Actually it's a report, but I do recognize it.

**Q Do you recognize this report?**

A Yes.

**Q Can you turn to page 45? I want to look at the second paragraph under "discussion." "Results of the policy analysis offer support for the hypothesis that differences in rates of unsubstantiation are due in part to differences in state policy."**

**And then later down in the paragraph below that, "Findings of the current study also suggest that how comprehensive and specific policy is with respect to disposition definitions may be important apart from the specific content of those definitions. The presence of a clearly-defined standard of evidence regardless of what it was tended to reduce the differences in unsubstantiation rates associated with having more or fewer categories.**

**"It may be that one way for a state to improve consistency in decision making is to examine the comprehensiveness and explicitness of state policy with regard to disposition category definitions. All other factors associated with**



**decision-maker training, values and organization environment will still be important considerations. The provision of clear guidelines and standards is an important first step."**

**Do you agree with what you said in that report?**

A I do.

**Q And doesn't that suggest that there is some value to having clear guidelines and standards in improving the consistency of decision making?**

A It does, but they ought to be balanced against a degree to which you can actually assert that they improve consistency and decision making. All this does is suggest a possible avenue. It doesn't --

**Q I'm sorry. Keep on going.**

A It doesn't really say that it's possible to affect those types of decisions by improving policy. The other thing I would say is is that this is a study that was based on work that we did in late -- the late -- late 1998, '99, and that in subsequent work that we've done, I would say that I've become convinced that policy is even less of a concern.

**Q When was that article -- that report**

**published?**

A 2001.

**Q On page 14 you give an example in Illinois.**

MR. PAGE: Which document are we referring to now?

MS. INGBER: His report.

MR. PAGE: Oh, his report that was -- for this case?

MS. INGBER: Yes.

**Q (BY MS. INGBER) I want to look at the first full paragraph where you say, "As a state-administered system with uniform and detailed policies." What's the basis for your statement that Illinois has uniform and detailed policies regarding the decision to substantiate?**

A Well, for a period of about four or five years in the late '90s, we were very involved in working with the State of Illinois on the development of their child-endangerment, risk-assessment protocol.

And so one of the things that we had to spend a great deal of time looking at were the policies that were related to substantiation and other decisions that were being made by the staff of



the department. And examining the -- you know, the policies from the point of view of, you know, what did they consist of, how would we integrate the child-endangerment, risk-assessment protocol into them?

And the -- the other assertion that I would make is that Illinois has a centralized hotline system so that at least at the point of initial screening, there's a high degree of consistency in terms of how cases come into the system to begin with.

And so for all those reasons plus some sense of sort of the culture that operates in Illinois with respect to policies and procedure -- because our organization is working in Illinois again now -- that, in fact, they do have, you know, fairly detailed policies and procedures with respect to substantiation decision making.

**Q When is the last time you looked at the Illinois policies on substantiation?**

A It's probably been 10 years.

**Q So you don't know what the current policies are?**

A I don't know what the current policies are.



**Q And when you made this statement you didn't bother to look them up to determine whether they are still --**

A Correct.

**Q -- detailed and precise and uniform?**

A Correct.

**Q And when you said that there was a centralized hotline, why did the existence of a centralized hotline have any effect on whether there's uniform and detailed policies?**

A Well, in theory at least, a centralized hotline would mean that the decision to screen in reports is being consistently implemented. Plus the way the Illinois policy is set up -- and I do know this because of the work that we're doing there currently -- is very prescriptive with respect to how local offices are to respond to the referrals that they receive from the hotline.

So what that means is that unlike other states that don't have sort of a centralized intake, that the base of children that are coming into the system are all essentially meeting the same initial screen-in criteria.

**Q Do you think everyone who reviewed the current Illinois policies would believe that they're**



**uniform and detailed regarding the decision to substantiate?**

A That may be a bit of a hyperbole on our point -- on our part.

**Q You then go on to discuss the range in substantiation from as few as 9.8 percent to as many as 39.7 percent. What's the point you're trying to make there?**

A That there's heterogeneity in the decision-making process essentially.

**Q Would you expect there to be similar substantiation rates in Cook County, the large urban county, and a small rural county even if there was -- even if there was no variability, homogeneity and substantiation?**

A I would expect that there would be multiple factors that contribute to differences in substantiation rates. Geographically and with respect to individual workers. We've examined --

**Q And with respect to management?**

A When we've examined that in other studies, what we've found is that on the basis of case factors alone, we can explain very little of that heterogeneity. One of the findings from this particular study was that a fair amount of

heterogeneity could be explained by reference to heterogeneity at the worker level and at the supervisory level.

So I would expect that we would find exactly the same thing in Illinois. There's a fairly recent study that we didn't cite that actually looked at placement rates in Illinois and looked at them in relationship to the proclivity of the worker, the likelihood that the worker would place a child based upon their past performance. And that contributed significantly to the likelihood that a child would end up in placement.

**Q This is exactly my point. So you wouldn't expect that the reason -- or the only reason for the variability from 9.8 percent to 39.7 percent would be policy? There would be many, many factors that would go into explaining that variability; correct?**

A Exactly.

**Q So just because you have -- assuming you do have uniform and detailed policies in Illinois, you still would not expect to see the same rate of substantiation in every county; correct?**

A Right. And the other thing that I would say in order to complete my answer is that the implementation of policies is not necessarily going



to improve that heterogeneity, no matter how detailed or how precise. I don't know that it would. And it depends, you know, very, very specifically on how the policy is written. And it's something that has to be tested.

**Q Do you believe that there's likely to be less variability in jurisdictions that have well articulated policies and procedures holding everything else equal?**

MR. PAGE: Object to the form.

THE WITNESS: I would hope that that would be the case, but I don't believe that it is.

**Q (BY MS. INGBER) Despite the statements in your research that, in fact, that's what should be done?**

A Right. I don't -- I mean, I think that it's -- it's a more complex kind of question than that. The issue of the content of the policy and how it's not just articulated, but how people are trained in it, how they're supervised in it, those are all factors that in some ways may be much, much more important than the actual policy itself.

**Q Do you think there's any disadvantages to having clear, precise and descriptive policies?**

A Yes, in some cases I believe there are



disadvantages.

**Q What are those?**

A In some cases I believe that the policy becomes so burdensome in terms of what one has to consider that it defies the ability of an individual to truly understand the policy and to act on it appropriately.

**Q Have you looked at any of DHS's policy as they relate to CPS or OCA?**

A I have not. Other than -- other than the one that I told you about where I was looking at the standard of evidence.

**Q So you have no opinion on whether those are burdensome and make it difficult for individuals to understand and act on those policies?**

A That's correct. I have no basis for evaluating policy. But Goad -- Mr. Goad apparently does.

**Q And he actually looked as those policies; correct?**

A Correct.

**Q Do you have any reason to disagree with his conclusions about how some of those are confusing, et cetera?**

A I don't know if they're confusing or not.



All I know is that in his examination of those policies, he didn't actually take outcomes into account. So I don't know if those policies have negatively or affected those outcomes or not.

**Q I want to look at page 15 to 16 of your report where you state that Mr. Goad -- and I'm paraphrasing -- equates investigations with findings of unsubstantiated with those that have substantiated findings.**

**And, in fact, on page 20 of your report when you're discussing your overall concerns related to his conclusion, you call this the "most obvious example is the classification of unsubstantiated with services recommended together with substantiated investigations." Do you see that?**

A I do, yes.

**Q Do you know what specific part of Mr. Goad's report you're referring to when you say that he inflates these two things?**

A I would have to look at the report and find them.

**Q I will represent to you that I have read this report carefully and discussed this issue extensively with Mr. Goad and I couldn't find it and he says he didn't do it. I don't want to spend the**

**time now to go through his entire report, although I will show you a single example. But, hypothetically speaking, if, in fact, he does not do that in his report, is your criticism irrelevant?**

MR. PAGE: Object to the form.

THE WITNESS: If, in fact, he does not do that, then the -- the criticism wouldn't be relevant. But I would want to look over the report again and make sure that I understood that.

**Q (BY MS. INGBER) Sure. I completely understand that. I want to look first at page 29 and 30.**

A Of?

**Q Mr. Goad's report. And he's discussing for the first time in his report his findings on whether decisions were correct. And the first thing he does on page 29 is he sets out the four potential findings that you can find in the Oklahoma Administrative Code in CPS investigations. Do you see that?**

A Right at the second paragraph?

**Q So -- no, no. Under number 3, "Were CPS investigative decisions correct?" On page 29.**

A Sorry. Page 30.

**Q Sorry. My apologies.**



A Yes, okay.

**Q You see he sets forth four possibilities as set forth in the code, "ruled out," "unsubstantiated services recommended," "substantiated services recommended," "substantiated court intervention recommended." Do you see that?**

A Uh-huh.

**Q According to your report he equated two of those categories; correct? He equated the second one with -- number 2 with numbers 3 and 4; correct?**

A Yes.

**Q If we look at page 30 where he describes what he did with those categories, he says, "For the -- for purpose of this review including the reviews of OCA investigations and CPS assessments below, substantiated services recommended and substantiated court intervention recommended are considered as one because this review focuses on children who are already in out-of-home care."**

**So he's setting forth the fact that he combined categories 3 and 4, the two substantiated categories; correct?**

A Okay.

**Q And then he goes on to say, "Unsubstantiated services recommended will be**



**referred to as 'unsubstantiated' and will, where relevant, be separated from ruled out because there's a significant difference in the definitions of the two."**

**So he's saying that unsubstantiated services recommended, he's going to call "unsubstantiated." And he's going to sometimes, but not always separate it from ruled out; correct?**

A That's what he says, yes.

**Q So at least according to what he says he's going to do, he's not -- he's not conflating categories 2 with categories 3 and 4; correct?**

A Correct.

**Q And let's look at a few examples of where he actually applies this to see if he's actually done what he says he's going to do. If you look at page 31, he separates "unsubstantiated," "substantiated" and "ruled out." Do you see that?**

A Uh-huh.

**Q If you look at page 32, he includes "insufficient information," "substantiated," and he combines "unsubstantiated" with "ruled out," but not with substantiated; correct?**

A Uh-huh.

**Q Same thing with figure 48 at the bottom of**



**page 32. Do you see that?**

A Uh-huh.

**Q On page 33, again, this is the child level. And I believe this is actually a typo. "Ruled out," "substantiated" and "unsubstantiated." If you'll look at his findings above that, slash, "ruled out." Well, let me -- let me just look at the text to see if I understand this.**

**18.4 percent were found to have been abused and neglected. That's substantiated. 50 percent were found to be unsubstantiated. So that, slash, "ruled out" I believe is the typo. And for the remaining 50, 31.6 percent, they were ruled out. Do you see that?**

A Uh-huh.

**Q Yes? And then on page 34, again, he separates "substantiated" from "unsubstantiated" while combining "unsubstantiated" with "ruled out." Correct?**

A Yes.

**Q And I'll represent to you -- and you're welcome to check the other two sections where he does this type of analysis. But it's pretty much a standard form. In all of those he sometimes separates unsubstantiated from ruled out, but always**

Page 262

**separates substantiated into its own category. If, in fact, that's true, is your criticism valid?**
A If it's, in fact, true, I would have to agree that that criticism is probably not valid.
**Q On page 17 of your report the paragraph that begins, "How allegations were investigated." Do you see that? Sort of in the middle of the page.**
A Seventeen?
**Q Yeah. Page 17. It's a new paragraph, but it kind of looks like it's merged to the other one.**
A Right, right.
**Q You say, "How allegations were investigated may have also been an issue with respect to whether a physical examination of children's bodies were -- was required inasmuch as an allegation of physical abuse may have been with respect to a threat of harm, suggesting the possibility that if no actual harm occurred, a physical examination was not needed." Did I read that correctly?**
A Yes.
**Q Am I correct to say that your criticism here is that he might is been overestimating DHS's failure to perform necessary physical examinations?**
A Correct.

Page 263

**Q And the reason why he might have -- according to you, why he might have been doing that is because if in certain cases a physical examination wasn't necessary, he might have said, "Well, it wasn't done so" -- and counted that against DHS even though really it might not have been necessary to do it. Am I understanding correctly?**
A That would -- that would have been my concern, yes.
**Q Okay. Well, let's look at his instrument, again. Now I'm really glad we flagged it. And it will be page 5 of that instrument. I numbered the pages for myself because it was becoming very cumbersome.**
A Okay.
**Q And it's just to make sure we're on same page, it's the page that says "allegation/investigation tab" in the middle; correct? That's what I have as page 5.**
A Yes.
**Q Okay. I want to look above that where there's a question about, "Did the reported allegations or allegations that came to light during the investigation necessitate observation of the**

Page 264

**child's body." Do you see that question?**
A Uh-huh.
**Q Presumably that's a question where he's getting his information from.**
A Yes. Okay.
**Q Then he goes on to say, "Observation of the child's body is necessary when observation is reasonably likely to reveal evidence of child abuse and neglect." And he gives some examples. So it certainly seems like he's taking into account the fact that it might not always be necessary to observe a child's body in an investigation; correct?**
A I don't know. I mean, that's one I -- I would have a lot of trouble interpreting from the standpoint of what the instruction is here. In the sense that if the -- the classification was threat of harm and if the reviewer -- I mean, and it's very possible that he excluded those cases from this type of consideration, but I just don't know.
**Q So you don't know whether, in fact, he was overestimating the extent to which physical examinations were not performed?**
A No. I think the only observation that we're making there is that it's certainly possible given the fact that when he looked at allegations on

Page 265

the earlier portion of his report and enumerated allegations as what he was basing his distribution of allegations on, it gave the appearance that threat of harm was a very infrequent event. Still the most frequent, but very infrequent.
But when looked at from the standpoint of the referral level, it turned out that the majority of cases actually had that type of classification. So it's just hard for us to know, I think, what --
**Q Were you aware of this instruction when you wrote that paragraph?**
A No, I don't think in detail I was, no.
**Q Do you know whether or not Mr. Goad and the other reviewers entered specific information about the allegations that applied to each child or whether that was done on a referral or investigation level?**
MR. PAGE: Object to the form.
THE WITNESS: I don't know.
**Q (BY MS. INGBER) If you learned -- and I can actually show you where it's done. Let's look at his -- his instruments. Page 2. Actually it's on page 5, as well.**
A Okay.
**Q And he does the same instruction for each**

of the categories. And under "the allegation/investigations tag," it asks the -- asks the reviewer to "select a victim from the drop-down menu." And then in the "maltreatment allegations" field, "Select a general maltreatment category from the drop-down menu. If multiple allegations are identifying, you should select 'multiple' for each child." "Specific details," same instruction, do it for each child.

So it seems like when they were entering information about the -- what allegations, they were doing that on a child level, were they not?

A Yes, it appears that they were doing that.

Q So presumably they would have known whether a threat of harm allegation was what that child was subject to or whether that child was subject to a physical abuse allegation; correct?

A Or both.

Q Or both; correct. But that information would be relevant to whether it was necessary to do a physical examination; correct?

A I would assume that it could be relevant, but I guess the question is: How did they evaluate it?

Q How did they evaluate what?



A How did they evaluate threat of harm.

Q Okay. On page 17 you also say, in that paragraph below the one we were just looking at, "When identifying allegations for children who Mr. Goad believed were harmed, no information is provided about what maltreatment the children might have experienced."

And I'm afraid I don't totally understand that statement. Because when I looked at page 37, which is what you refer to, there's a chart that identifies the types of harm for those children. So I just think I'm probably missing something about your statement.

MR. PAGE: Is there a question there?

Q (BY MS. INGBER) Yeah. If you can explain your statement for me. If it wasn't clear that's what I was asking you to do, I apologize.

A And what I'm not sure of here is whether or not -- and, again, this is an allegation count. It's not a child count. The -- whether or not these were the allegations -- in this case -- in this case these are the ones that they felt should have been confirmed or substantiated.

What I'm concerned about here is that I don't know if these were, in fact, the allegations



that they would have viewed as being substantiated or if these were all of the allegations that were made with respect to these children.

Q I understand the point now. And you believe that information was necessary for you to understand the basis of his conclusions about whether they agreed or disagreed? Is that your point?

A That's part of it. The other part of it relates to this issue that we were discussing before. So, for example, if they were identifying a failure to protect, for instance, or a threat of harm, was that the substantiated allegation or was it medical neglect or bruises? So I don't know for sure which of those were the ones that were actually applicable for that particular child's circumstance.

Q Do you think it's more acceptable for a child to suffer from certain of these categories than others?

A I'm not going to render an opinion on that. I would say that some of these conditions in my view are more risky than others from the standpoint of, you know, longer term outcomes for children.

But what I -- what I would say is that if



I were trying to understand what someone should or should not have done as a result of the investigation, it would be important to know what the nature of the actual harm was that the child experienced.

Q If we were trying to understand -- was what someone should or should not have done; correct?

A Which has to do with the issue of should we do a physical inspection?

Q Understood. Well, actually I don't understand, but we'll leave that anyways. But you would agree it's not appropriate for children to suffer from any of these types of abuse and neglect; correct?

MR. PAGE: Object to the form.

THE WITNESS: It would be better if children did not suffer from any of those types of events.

Q (BY MS. INGBER) Understood. Glad we agree on that at least. You mention on your report on page 15, I believe, that Mr. Goad doesn't provide context and you give an example where there were six instances cited by Mr. Goad where background checks were not conducted and you say, "Oh, might have been

**legitimate in those six instances not to conduct background checks. And that was in the context of, I believe, CPS investigations where he found that six times background checks weren't conducted.**

A I think this is -- was it investigation or was it --

**Q Maybe it was assessments?**

A I thought it might have been screen outs.

**Q That's possible. I will look, and we can easily figure that out. Yeah. It looks like that's screen outs. Thank you for correcting me.**

**Let's look at page 49 which deals with the question of background checks in the context of OCA investigations.**

A His 49. Sorry.

**Q I'm sorry. I'm sorry. Yes. We have too many reports.**

A Yeah. Okay.

**Q So he found here that when he looked at OCA investigations with respect to CPS background checks, that was only conducted one time out of 41. And then when he looked at criminal background checks that was conducted zero times out of 41. Do you think it's likely that the reason why CPS background checks were conducted only once and**



**criminal background checks were conducted zero times is because -- as you hypothesize in your report, because of legitimate reasons?**

A It's possible. I mean, we were referring to a decision to screen things out in that particular instance; and I probably should have made that clearer. But it's certainly possible that that could apply to the OCA investigations in some instances, as well.

**Q In some instances or in 98 percent of the instances?**

A I would agree that 98 seems a little high in this record.

**Q Did you read Mr. Goad's fatality review?**

A I read through it. I didn't actually do most of the work on that section of our report.

**Q Did you have any reason -- or do you feel qualified to agree or disagree with any of his conclusions about whether DHS could have prevented some of those deaths?**

A I feel qualified to state based on Dr. Baumann's work that the methodology that was used would have made it very possible that those finds were biased on Mr. Goad's part.

**Q But you don't have any -- enough expertise**



**to do your own independent evaluation of whether DHS could have prevented those deaths; correct?**

A I think we would have enough expertise to do that type of review. It would be a different methodology.

**Q But you didn't do that type of review, did you?**

A No.

**Q So you don't know whether, in fact, DHS could have prevented some, all or none of those deaths?**

A That's correct.

**Q Do you think there's any value in conducting a fatality review of that type to provide illustrative examples of DHS practice?**

A A fatality review of which type?

**Q Of every fatality case in a set time period.**

A If it's conducted properly, yes, I think that can be a very valuable tool.

**Q We discussed at the very beginning of the day the criteria, internal and external validity that you used to criticize Dr. Hess's qualitative research; correct? Do you remember that?**

A Yes.



**Q And I believe there was some testimony from you about how you weren't familiar with certain terms that I gave you and weren't necessarily familiar with what a -- an expert in qualitative research would do in order it evaluate a qualitative research study; correct?**

A Yes, that's correct.

**Q Would that same testimony apply to your criticism of Mr. Goad's case study, his first report?**

A Yes, I think it would.

**Q I want to turn now to your discussion of Dr. Miller's report. It's on page 21 of your first -- June 9th, 2011 -- report. You're not an expert in child welfare administration or management; correct?**

A That's correct.

**Q And you're not an expert in management theory?**

A No.

**Q So as you state in your report, you don't believe that you're qualified to comment or to offer opinions on the scientific merits of the administrative management aspects of her report?**

A That's correct.

**Q You state on page 22 that Dr. Miller's testimony describes the concept of cohorts and the problems with point-in-time samples. Do you believe that Dr. Miller would agree with your description of her testimony?**
A I don't know if she would or not. All I know is is that she referenced those things and described the fact that she was familiar with them and familiar with the issues that were associated with point-in-time samples.
**Q So you don't know whether Dr. Miller would agree that there's problems with point-in-time samples?**
A I don't know if she would or not. All I know is that she endorsed Dr. Wilson's work. And if she's as familiar with his work as she claimed, then I would hope that she would be familiar with the problems with those sorts of analyses.
**Q So you consider her testimony to be an endorsement of his work?**
A That's the way I read it, yes.
MS. INGBER: Let's take a break.
VIDEOGRAPHER: We're now off the videotaped record. Time is 3:35 p.m.
(A recess was taken from 3:35 PM to 3:40



PM.)
VIDEOGRAPHER: We're now back on the videotaped record. The time is 3:40 p.m.
MS. INGBER: I have no further questions. Thank you for your time.
MR. PAGE: I have just got a couple questions, Dr. Fluke.

CROSS EXAMINATION

BY MR. PAGE:
**Q Let's see here. I believe it was this morning where you were asked about the possibility -- let me find my notes here -- you were talking about Dr. Hess's report and your criticism of Dr. Hess this morning. Do you recall that testimony?**
A Certainly parts of it, yeah.
**Q Okay. You were asked some questions by Counsel for Children's Rights concerning whether it was possible that DHS was the cause of some of the things that Dr. Hess found in her case review. Do you recall that line of questioning?**
MS. INGBER: Objection to form. I'm Counsel for plaintiffs. Not Counsel for Children's Rights.
**Q (BY MR. PAGE) Do you recall that**



**testimony?**
A Yes, to some extent, I do, uh-huh.
**Q Okay. You mentioned that -- in response to Counsel's question that it was possible that DHS may have been the cause of the terrible things that happened to the named plaintiffs. Can you explain for the Court what you meant by the possibility that DHS was the cause of those things?**
A Well, I think that Hess in her report represents that there are what she believes to be specific causes associated with DHS involvement in those cases and that the problem with her analysis is is that it isn't able to demonstrate cause. And I think we've kind of discussed that.
But the -- the issue there is that since no other alternatives are offered other than that, there isn't any real way to evaluate the possibility that there may have been other causes that were operating that might have created some of the conditions that some of those children experienced.
**Q Well, when someone asks you whether it's possible, in particular this situation, that the -- the causes of the harms to the children was possible in DHS, does that question suggest to you that it would also be possible that David Page caused those**



**problems for the children?**
MS. INGBER: Objection to form.
THE WITNESS: Well, obviously that's very unlikely. But in the absence of any other information, it's certainly a very, very remote possibility.
**Q (BY MR. PAGE) So you just can't tell who caused the problems or what caused the problems -- excuse me. You just can't tell, based on Dr. Hess's analysis, what was or were the causes for the --**
MS. INGBER: Objection to form. Apologies for interrupting.
**Q (BY MR. PAGE) -- for the problems that were identified by Dr. Hess?**
MS. INGBER: Objection.
THE WITNESS: From the data that was presented in her report, it wasn't clear to me that all of the possible causes that might have been operating were addressed, considered and -- or that there were in that process legitimate reasons for excluding any of those other possible causes.
**Q (BY MR. PAGE) Is there any basis based on Dr. Hess's work to believe that the activities of DHS was a likely cause of those harms?**
MS. INGBER: Objection to form.

THE WITNESS: I think that would depend on what one meant by "likely" in that instance. And I can't really evaluate that, whether it's likely that it was DHS or not.

MR. PAGE: Pass the witness.

MS. INGBER: No further questions.

MR. PAGE: The witness will read and sign the deposition.

VIDEOGRAPHER: We're off the videotape record. Time is 3:45 p.m.

(The deposition of JOHN D. FLUKE was concluded at 3:45 PM.)



JURAT

D.G. vs. C. Brad Henry

JOB No. 69507

I, JOHN D. FLUKE, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcription of my testimony so given at said time and place.

______________________________

JOHN D. FLUKE

Subscribed and sworn to before me, the undersigned Notary Public in and for the State of Oklahoma by said witness, JOHN D. FLUKE, on this ______ day of ________________, 2011.

______________________________

NOTARY PUBLIC, STATE OF OKLAHOMA

MY COMMISSION EXPIRES:__________

(JLG)



ERRATA SHEET

D.G. vs. C. Brad Henry

DEPOSITION OF: JOHN D. FLUKE

REPORTER: Jody Graham, CSR, RPR, RMR, CRR

TAKEN ON: JULY 14, 2011

JOB NO.: 69507

| PAGE | LINE | IS | SHOULD BE |
|---|---|---|---|



CERTIFICATE

STATE OF OKLAHOMA )
) SS:
COUNTY OF OKLAHOMA )

I, Jody Graham, CSR, RPR, RMR, CRR, do hereby certify that on JULY 14, 2011 at the offices of Riggs, Abney, Neal, Turpen, Orbison & Lewis, Tulsa, Oklahoma, there came before me JOHN D. FLUKE who was duly sworn to testify the truth, the whole truth, and nothing but the truth; and that the foregoing pages constitute a full, true, and correct transcript of the deposition of said witness on the date as indicated.

I do further certify that I am not counsel, attorney, or relative of either party, or otherwise interested in the event of this suit.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal at my office in Oklahoma City, Oklahoma County, Oklahoma, this 22nd day of July, 2011.

Jody Graham

______________________________

Jody Graham CSR, RPR, RMR, CRR

CSR No. 203.