# EXHIBIT U

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

1.) D.G., by Next Friend G. Gail Stricklin, et al., for themselves and those similarly situated,
Plaintiffs,

CASE NO. 08-CV-074-GKF-FHM

VS.

1.) C. BRAD HENRY, in his official capacity as Governor of the State of Oklahoma, et al.,
Defendants.

VIDEOTAPED DEPOSITION OF ANDREW BARCLAY
TAKEN ON BEHALF OF THE PLAINTIFFS
ON JULY 14, 2011, BEGINNING AT 9:08 A.M.
IN TULSA, OKLAHOMA

APPEARANCES:

On behalf of the Plaintiffs:

MR. WILLIAM KAPELL
CHILDREN'S RIGHTS
330 Seventh Avenue
New York, New York 10001
212.683.2210
wkapell@childrensrights.org

On behalf of the Defendants:

MR. DONALD M. BINGHAM
RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS
5801 North Broadway Extension, Suite 101
Oklahoma City, Oklahoma 73118
405.843.9909
dbingham@riggsabney.com

VIDEO TECHNICIAN: Joe Orgill

REPORTED BY: Cheryl D. Kendall, CSR, RPR

(Appearances continued on page 2)

On behalf of the Defendants:

MR. RICHARD A. RESETARITZ
OK DHS LEGAL DIVISION
Post Office Box 53025
Oklahoma City, Oklahoma 73152-3025
405.521.3638
richard.resetaritz@okdhs.org



INDEX

| | PAGE |
|---|---|
| Direct Examination by Mr. Kapell | 5 |
| Cross Examination by Mr. Resetaritz | 208 |
| Redirect Examination by Mr. Kapell | 210 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 900 | Critique of "Foster Care Case Review of the OK DHS" 2/17/11 | 10 |
| 901 | Critique of "Review of the Response by OK DHS to the Suspected Abuse and Neglect of Children in its Care" 3/15/11 | 10 |
| 902 | Critique of "D.G. et al. V. Henry et al. Review of Named Plaintiffs' Case Files" 2/25/10 | 10 |
| 903 | Data Use Agreement | 19 |
| 904 | FCI State Websites map | 24 |
| 905 | E-mail string between Barclay and Meezan 02/11 | 35 |
| 906 | E-mail string between Barcley and Meezan 03/11 | 37 |
| 907 | Placement Stability graph | 43 |
| 908 | Long-Stay Permanency Composite | 44 |
| 909 | Letter from Gaudiosi to Roberts 3/4/11 | 94 |
| 910 | Barclay handwritten notes | 94 |



STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the videotaped deposition of Andrew Barclay may be taken on behalf of the Plaintiffs, on July 14, 2011, in Tulsa, Oklahoma, at 502 West 6th, by Cheryl D. Kendall, Certified Shorthand Reporter, Registered Professional Reporter, within and for the state of Oklahoma, taken pursuant to Agreement.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that all objections, except as to the form of the question, are reserved until the time of trial, at which time they may be made with the same force and effect as if made at the time of the taking of this deposition.

It is further stipulated and agreed by and between the parties hereto, through their respective attorneys, that time of the filing is waived.

* * * * *



PROCEEDINGS

VIDEO TECHNICIAN: This is a videotaped deposition of Andrew Barclay, taken in the case of D.G., et al., versus C. Brad Henry, et al. Today's date is July 14th, 2011. The time is approximately 9:08. Would counsel please identify themselves for the record.

MR. KAPELL: Bill Kapell from Children's Rights for the Plaintiffs.

MR. BINGHAM: Don Bingham for the Defendants.

VIDEO TECHNICIAN: Will the court reporter please swear the witness.

THE REPORTER: Raise your right hand, please.

THE WITNESS: (Complies).

THE REPORTER: Do you solemnly swear the testimony you're about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS: I do.

ANDREW BARCLAY,

having been duly sworn, testifies as follows:

DIRECT EXAMINATION

By Mr. Kapell:

**Q. Good morning, Mr. Barclay.**

A. Good morning.
**Q. My name is Bill Kapell. I'm an attorney with Children's Rights. We, among others, represent the Plaintiffs in the D.G. versus Henry lawsuit. Please state your full name for the record?**
A. Andrew Barton Barclay.
**Q. You understand, don't you, that you're here today to give sworn testimony?**
A. Yes, I do.
**Q. And that your deposition is taken under oath?**
A. Yes, I do.
**Q. Is there any reason at all why you feel you cannot testify fully and accurately today?**
A. No.
**Q. Let me just go over a few ground rules for the deposition today. They're really very simple. It's most important that you understand my questions, so if you don't understand a question, please tell me and I'll do my best to clarify it to make sure that you understand the question. Okay?**
A. Okay.
**Q. And if you need to take a break, let me know and we can take a break. The only thing I ask**



**is that if a question is pending, please -- we'll wait until you've answered the question before we take a break. Okay?**
A. Okay.
**Q. The court reporter is making a written transcript today, so please be sure to answer my questions audibly so that we can obtain an accurate record. Nods of the head are difficult to transcribe. Okay?**
A. Yes.
**Q. And there may be times during the deposition when you hear objections or discussion among the lawyers. I would just note that, unless you are instructed not to answer a question by your lawyer, you are required to answer all of the questions that I ask you. Okay?**
A. Okay.
**Q. Are you represented here by counsel?**
A. I am not.
**Q. You're not being represented by the Riggs Abney firm?**
A. No.
**Q. Have you been deposed before?**
A. I have not.
**Q. Have you been retained as an expert witness**



**before?**
A. I have not.
**Q. Have you ever testified at trial before?**
A. I have not.
**Q. Have you ever been a plaintiff or a defendant in a lawsuit?**
A. No.
**Q. Did you do anything to prepare for this deposition today?**
A. I did.
**Q. What did you do?**
A. I read over my three reports. I made some notes from those reports and I looked over some Wikipedia pages on Oklahoma and then looked at the census numbers for Oklahoma.
**Q. Okay. And do you have the notes that you were just referring to in front of you?**
A. Yes. Just these.
**Q. Okay.**
MR. KAPELL: Off the record for a moment.
(A break was taken.)
VIDEO TECHNICIAN: We're back on the record at 9:12.
Q. (By Mr. Kapell) Mr. Barclay indicated that he has notes with him and he's looking at -- he has



a sheet of notes in front of him right now. I have asked Mr. Bingham to copy those notes during the first break and we will mark those notes as an exhibit here at the deposition. And Mr. Bingham is agreeable to do that?
MR. BINGHAM: That's correct.
Q. (By Mr. Kapell) Did you review any documents in preparation for your deposition other than your reports that you prepared in this case?
A. I did not.
**Q. You didn't read any deposition transcripts in preparation for the deposition?**
A. I did not.
**Q. Did you speak to anyone in preparation for the deposition?**
A. Mr. Bingham.
**Q. When did you speak with Mr. Bingham?**
A. Last night.
**Q. Was that the first time that you talked to him to prepare for the deposition?**
A. Yes. Except for travel arrangements and such.
**Q. How long did you talk with him last night?**
A. We spoke for about -- we were together for about 3 hours.

Q. That was an in-person meeting?
A. Yes.
**Q. Did you speak to any other lawyers at Riggs Abney in preparation for your deposition?**
A. No.
(Whereupon, Exhibit Numbers 900, 901 and 902 were marked for identification and made part of the record.)
Q. (By Mr. Kapell) I'd like to show you your reports in this case which have been premarked as Exhibits 900, 901 and 902.
A. Okay.
**Q. And I'll put those in front of you.**
MR. KAPELL: Don, this is his report directed to Dr. Milner as 900, his report directed to Mr. Goad is 901, and his report directed to Dr. Hess is 902.
Q. (By Mr. Kapell) Do you recognize these reports?
A. I do, yes.
**Q. Are these the expert reports you prepared in this case?**
A. Yes, they are.
**Q. Are all of the opinions that you plan to testify about contained in these reports?**



A. Yes, they are.
**Q. All right. I'd like to ask you some questions about some items on your CV. And I saw that your CV is attached to all three of your reports. The one I'm looking at right here is the attachment to your report directed to John Goad, which is Exhibit 901. Why don't you take a look at that one.**
A. Okay.
**Q. So the appendix to that report has -- that contains your CV. Correct?**
A. Correct.
**Q. There's a bullet at the bottom of the page under employment and professional experience that refers to data -- it refers to your acting as a data consultant and software developer for the independent verification agent under contract to the University of North Carolina in the LJ versus Massinga Federal Class Action Lawsuit. Do you see that?**
A. Yes, I do.
**Q. Can you tell me what the nature of that litigation is?**
A. It's a class action lawsuit that was brought against the city of Baltimore for their



foster care system.
**Q. And do you know what the nature of the allegations are in that case?**
A. I don't recall the specific complaints.
**Q. Do you know if there are allegations that the Baltimore foster care system has certain systemic problems --**
A. Yes.
Q. -- that are harming children?
A. Yes.
**Q. All right. And you were retained in January of 2010 as the data consultant and software developer for the independent verification agent in that suit?**
A. Correct.
**Q. Can you tell me what the role is of the independent verification agent?**
A. The independent verification agent in LJ v Massinga has a role of verifying the reporting data that comes from the agency in Baltimore, the Defendant. So the verification agent will certify -- I think is the language they use -- the reports from the agency.
**Q. Is there a consent decree in that case?**
A. I'm not sure whether it's a consent decree



or a settlement.
**Q. But you believe there is some type of an agreement between the parties --**
A. Oh, yes. Yes.
**Q. Pursuant to which Baltimore is providing reports to the independent verification agent?**
A. Correct.
**Q. And what is your role in connection with that process?**
A. My role is to work with the independent verification agent to -- to ensure that the reporting is -- is correct, is accurate, reliable, and to work with the agency there to help them with that reporting.
**Q. Are the reports in that case publicly available?**
A. I believe they are.
**Q. Have you prepared any reports in that case?**
A. I have not.
**Q. If I could direct your attention to the next page, the fourth bullet from the top of the page. Do you see it indicates that you have served as a reviewer for preliminary protective hearing, bench card study for the National Council of Juvenile and Family Court Judges in Reno, Nevada.**

**Do you see that?**
A. Yes.
**Q. Can you tell me what the preliminary protective hearing bench card study concerns?**
A. Yes, I can. It -- it concerns a -- a bench card, which is a set of questions that I believe three different pilot sites juvenile court judges around the country have been using in an effort to reduce racial disproportionality.
**Q. These juvenile court judges that you just referred to, are these state court judges?**
A. These would be local juvenile court judges.
**Q. In Nevada?**
A. No.
**Q. No?**
A. I don't believe Nevada is a site. I think the sites are Omaha, Portland and I'm not sure of the other. There's one other.
**Q. Okay. And what is your responsibility in connection with that process?**
A. I -- I was asked to review the report -- the report, their first report on their bench card study.
**Q. And so that was just basically a one-shot deal?**



A. It was.
**Q. And how much time did you spend doing that?**
A. I think about four hours.
**Q. The second bullet also refers on the same page, on page A2, refers to the -- your serving as a data consultant and software developer for Casey Family Programs. Do you see that?**
A. Correct, yes.
**Q. And that's your -- your CV indicates that started in April of 2011?**
A. Correct.
**Q. How much time have you spent working as a data consultant for Casey Family to date?**
A. Billed time, which is different. The billed time I believe -- let's see. I think I have about 15 hours.
**Q. Okay. When you say billed time, you mean time that you have billed them for -- to be reimbursed?**
A. Yes.
**Q. And is there any particular area of data that you are involved with for Casey Family?**
A. Yes. We have a contract for me to help them with the linking of AFCARS data across multiple reporting periods and to help them with



the city of Las Vegas, Clark County, Nevada, in producing some measures for their long-term foster care.
**Q. Who has the contract with Casey? You said we have a contract. Is it someone other than yourself?**
A. Oh, no, no. I have a contract with Casey.
**Q. Okay. You individually?**
A. I individually.
**Q. All right. And you mentioned that the contract is -- involves at least in part the linking of AFCARS data across multiple periods. Is it your understanding that that linking doesn't exist as of now?**
A. No. It -- it does exist as of now, and I've done it. What I'm doing is producing a piece of software to do it automatically so that anyone can do it.
**Q. I see. So, without the software then, it's not possible to do it?**
A. No, it's certainly possible to do it, but you'd have to write your own software.
**Q. I'd like to ask you some questions about the first bullet point on page A2, which refers to your being a visiting statistician in the**



**Permanency Innovation Initiative. Can you tell me what that involved?**
A. That is just getting started, so I'm working through the University of Illinois for the state of Illinois to provide them with some statistics for the Permanency Innovation Initiative, which is a federal grant that they have.
**Q. And how much time have you spent on that so far?**
A. So far, again, billed time I believe is about 10 hours.
**Q. All right. I'd also like to ask you some questions about the first bullet point under ongoing and past projects. It refers to your serving as a statistician to the Fostering Court Improvement Project. Do you see that?**
A. Yes, sir.
**Q. Am I correct that the Fostering Court Improvement Project has developed a software program that state child welfare agencies can use to track their performance?**
A. That's not quite correct.
**Q. What's incorrect about it?**
A. That the software isn't used by the state.

Page 18

The reports are used by the state but the software is used by me to produce the reports for the state.
**Q. Right. But the software allows the states to track their performance?**
A. Through the reports.
**Q. Okay. And I'm going to refer to the Fostering Court Improvement Project as FCI, if I could, just because it will be less cumbersome?**
A. That will be better for me.
**Q. Okay. Am I correct that states that wish to use FCI's services agree to provide their AFCARS and their NCANDS data to FCI?**
A. That's correct.
**Q. And these states enter into written data use agreements regarding the release of their AFCARS and NCANDS data to FCI?**
A. That's correct.
**Q. And the data use agreement, correct me if I'm wrong, I believe it's entered into between the state child welfare agency and the University of North Carolina where the data is stored?**
A. It is.
**Q. And am I also correct that under these data use agreements, the University of North Carolina and its consultants are restricted in their use of**

Page 19

**the data that's provided by participating states?**
A. That's correct.
(Whereupon, Exhibit Number 903 was marked for identification and made part of the record.)
Q. (By Mr. Kapell) okay. I'd like to show you what's been premarked as Exhibit 903, which is a data use agreement. And I will represent that I printed this agreement from the FCI website earlier this week. Is this the general form of data use agreement that FCI uses?
A. It is.
**Q. Now, is UNC -- I'm sorry. Is the University of North Carolina limited to using state data for the purposes described in paragraph 2 of this agreement?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: I don't know if that is the full limitation of the use. We -- let me think about this. Yes, I -- I think that's the limit, yes, sir.
Q. (By Mr. Kapell) And in paragraph 4, in particular paragraph 4B, "University of North Carolina Chapel Hill agrees to require employees or consultants to agree to the restrictions on the use

Page 20

of the data contained in this agreement as a condition of receiving access to the data."
Are you considered to be a consultant for purposes of this provision?
A. I believe I am.
**Q. Now, FCI offers some free services to participating states. Correct?**
A. Correct.
**Q. And those services include the development of AFCARS and NCANDS measures that are part of FCI's standard website. Is that correct?**
A. Correct.
**Q. Okay. Can you tell me what measure -- what NCANDS measures those are that are part of the standard FCI website?**
A. Just the NCANDS's measures?
Q. (Nods head).
A. There are many that are derived from NCANDS. The -- I can give you examples.
**Q. So let me back up for a second and see if I understand. As part of the free services, there are many NCANDS measures that you all track?**
A. Yes, that's correct.
**Q. For participating states?**
A. That's correct.

Page 21

**Q. And the same is true with AFCARS as well, that there are many measures?**
A. That's correct.
**Q. All right. And FCI also offers -- strike that.**
**If I were to go on the FCI website and look at one of the states that's obtaining the services, I probably will be able to see the reports that are generated. Would that be fair to say?**
A. That would be fair to say for the states that have made their reports public.
**Q. Right. And some do?**
A. And some do.
**Q. Okay. FCI also offers other services to participating states for a fee. Correct?**
A. I -- I don't think so at the moment.
**Q. No?**
A. I think that's incorrect, yeah.
**Q. When you say you don't think so, are you saying that there are no participating states who have agreed to the fee services that FCI offers or that FCI doesn't offer fee services at all?**
A. I -- I would say that the former, that there aren't any states paying any -- for any fee services.

**Q. Okay. But those -- but there are services that FCI offers for a fee. Is that correct?**

A. I believe there's -- there would be in theory.

**Q. Okay. Even though no states have agreed to obtain those services?**

A. That's correct. There have been some in the past.

**Q. Okay. And would those fee services include allowing states to view the measures that the federal government uses to evaluate a state's performance on the federal CFSR?**

A. That's correct.

**Q. In fact, according to the FCI website, "The fee services provide child welfare agencies with an excellent gauge of their performance related to the CFSR measures." Do you agree with that statement?**

A. I do, yes.

**Q. And the FCI website also states that, "The services provided by FCI, for a fee, can greatly assist states in preparing for their federal CFSR review." Is that a true statement?**

A. That is.

**Q. All right. Do you think it's important for states to track how they're doing on the CFSR**



**measures?**

A. I do.

**Q. Why is that?**

A. Because they are linked to, for many states, their primary funding source. Also because some of the measures I believe are very good outcome measures.

**Q. Which measures would you say are good outcome measures?**

A. I think that the measures under composite 3, the long -- long-term foster care or stays in foster care, measures are particularly good. Some of the -- some of the -- the way that measures are blended into the permanency composite one measure of timely reunification are good. And I think that the recurrence of maltreatment measure, safety measure one is good.

**Q. Any others?**

A. No.

**Q. Okay. Which measures are you referring to when you say the ones that are blended into the permanency composite one?**

A. The -- the measures that -- that balance between reentry rate, which is the fourth and permanency composite one and the speed of



reunification, timeliness of reunification, which make up all of the other three. I think that that's -- that's a good balance.

**Q. Okay. So basically you're saying that you think that that permanency composite one is a good measure of how states are performing with regard to timeliness and permanency of reunification?**

A. I would say it's -- yes, I would say it's a good measure. It's not a -- it's not a comprehensive measure, but, you know, it's -- there's certainly room for improvement, but it's an improvement over the previous measure.

**Q. And for what it is attempting to measure, you think that it's effective in measuring what it intends?**

A. I do.

**Q. Okay.**

A. Yes.

(Whereupon, Exhibit Number 904 was marked for identification and made part of the record.)

Q. (By Mr. Kapell) I would like to direct your attention to Exhibit 904, which I also printed from the FCI website earlier this week. You'll see that there are states indicated on this map in two different colors?



A. Correct.

**Q. And the color blue signifies states who have provided information to FCI but want that information to remain password protected. Is that correct?**

A. Correct.

**Q. And then the states with the lighter color -- I have to admit I have some trouble identifying exactly what that color was, yellowish, orange, green maybe?**

A. We call them the green states.

**Q. The green states?**

A. It appears green to me.

**Q. That those are states that have agreed to provide data to FCI and have data accessible to the general public?**

A. Correct.

**Q. All right. I counted nine states here that fall into those two categories. Are these states all currently involved with FCI?**

A. They are -- well, I guess we -- they are currently involved with FCI. They are in -- a couple of these are in the process of renewing their data sharing agreements. So when we made the switch from University of Illinois to University of

North Carolina, we had to get new data sharing agreements in place. I think Nebraska is in process right now.

**Q. When did you make that switch from University of Illinois to University of North Carolina?**

A. It was last year. I can't remember specific.

**Q. And has Nebraska provided information to FCI since that switch?**

A. They've not provided data to FCI since that switch.

**Q. Right. Okay. What about Missouri, has Missouri provided data to FCI since the switch?**

A. I believe they have, yes.

**Q. Do you recall if there was a gap in the period of time that Missouri did not provide -- when Missouri did not provide data to FCI?**

A. Yes.

**Q. What -- do you recall the period of that gap?**

A. I don't. I can't give you specific periods. Missouri had some trouble putting together their NCANDS AFCARS data for a few years, I think. I noticed some inconsistencies in their



reporting and reported that back to them, and I think they've been trying to correct some of those.

**Q. Do you know what the period was that you say they had trouble putting together their NCANDS and AFCARS data?**

A. I don't exactly. I would have to guess I think -- if you want me to guess.

**Q. Well, was it in the past two years?**

A. Did it cover the past two years data?

**Q. Yes.**

A. Yes.

**Q. So you think it probably covered their data for federal fiscal year 2009?**

A. I do, yes.

**Q. And possibly for federal fiscal year 2010 as well?**

A. I think so.

**Q. All right.**

A. I think I don't -- I think I do not have data from Missouri for 2010.

**Q. Okay. Are there any other states aside from these nine that are colored on the map who are participatory states with FCI?**

A. There are.

**Q. I believe your CV made reference to 12**



**states?**

A. Yes.

**Q. So there are three others. Is that correct?**

A. Yes.

**Q. Can you tell me which states those are?**

A. It would be Illinois, South Carolina, and Maryland.

**Q. Okay. Have they signed on to FCI just recently?**

A. No.

**Q. Has the FCI website just not been updated to show their participation with FCI?**

A. No.

**Q. I'll represent, you can see from the map that they're not included here?**

A. That's correct.

**Q. Why is that?**

A. They've asked not to be included on the map.

**Q. I see. So they don't want the world to know that they're participating with FCI. Is that correct?**

A. I don't interpret their reasons.

**Q. All right.**



A. They don't want to be included on the map.

**Q. They haven't told you that that's the reason why; they just haven't told you that they don't want the public to know that they have signed on to FCI?**

A. They have not told me that.

**Q. No?**

A. I can tell you that in presentations I refer to them as the cowards.

**Q. Okay. I think you mentioned before that some states have signed on with FCI in the past and then dropped their involvement with FCI?**

A. Yes. That's true.

**Q. Have there been many states in that category?**

A. I don't think it's very many. I think I can tell you which states.

**Q. Okay. Great.**

A. Ohio signed on for a few years and then terminated the agreement.

**Q. Do you recall when that was that they terminated?**

A. That they terminated?

**Q. Or approximately when they signed on?**

A. I would -- I would guess they signed on

about 2006 and terminated in 2008 --

**Q. Okay.**

**A. -- perhaps. Who else? Oh, Indiana as well signed on in -- I would say about -- about the same period, about 2006 to 2008.**

**Q. Okay.**

A. I think that's all. Just Ohio and Indiana.

**Q. Okay.**

A. Now, we've had other agreements to produce reports but not under the FCI data-sharing agreement, so we -- we don't include those in the -- in the FCI.

**Q. When you say we, who are you referring to now?**

A. Dr. Mark Testa and I.

**Q. You see. By you're operating on your own and not under FCI's auspices?**

A. Yes, correct. So he had pre-existing agreements with Wisconsin and I think Montana, and I think we produced reports for them as well, but that was -- that was in 2006, I think.

**Q. And you haven't produced reports from -- for them since then?**

A. I have not.

**Q. Have you produced reports for any other**



**states that we haven't already mentioned?**

A. Not FCI reports, no.

**Q. Okay.**

A. Oh, if I could amend that. I produced some reports for Hawaii from -- not from data supplied by the state to me but from data supplied by the National Data Archive from child abuse and neglect.

**Q. When was that? When were those reports produced?**

A. In 2010. And I produced reports for Nevada in preparation -- again, from the National Data Archive data set for Casey Family Programs in two -- it would have been at the end of 2010, I think.

**Q. The reports for Hawaii that you produced, can you tell me what general areas those covered?**

A. It covered their -- their counties. The only -- I -- the National Data Archive takes out the codes for smaller counties, and I think only Honolulu had -- had individual county data. The others were blended together.

**Q. But was this data -- was this AFCARS and NCANDS data?**

A. Just AFCARS data.

**Q. Okay. And were you preparing -- strike**



**that.**

**All right. We can put this map aside. I'd like to refer you back to your CV for a moment. The bottom of the first page of your CV under employment and professional experience, so page A1.**

A. Uh-huh. Yes.

**Q. Shows that you've been retained as an expert witness in this case. Correct?**

A. Correct.

**Q. And is it correct that you were retained as an expert witness in August 2010?**

A. That's my understanding. I don't think we got the contract signed until later.

**Q. Okay. But your understanding is that you were retained from the start to serve as an expert witness?**

A. Yes.

**Q. When did you start performing work in this case in your capacity as an expert witness?**

A. In August 2010.

**Q. When did you start drafting your expert reports that were produced in this case?**

A. I can't remember. I would have to -- the end of May. I'm not exactly sure. I'd have to look at my notes to tell you the -- the date.



**Q. May of 2011?**

A. May of 2011 --

**Q. Okay.**

**A. -- yes.**

**Q. Now, on the next page of your CV the third bullet down from the top of the page, it refers to training and data consultation on the federal job and family services review for Children's Rights in New York in April 2011. Do you see that?**

A. Yes.

**Q. Do you recall giving a presentation at Children's Rights about the CFSR?**

A. I do.

**Q. And you came to -- you came to Children's Rights offices in New York and spoke to their attorneys there?**

A. I did.

**Q. And is it fair to say you were there all day basically?**

A. Yes.

**Q. All right. They started with a group discussion about the CFSR, your presentation?**

A. I think I started off with my presentation.

**Q. Right. And it was before a large group of attorneys at Children's Rights?**

A. Correct. Attorneys and paralegals and others.

**Q. Right. And that went to about lunchtime. Is that fair to say?**

A. Correct.

**Q. And you had lunch with the policy staff at Children's Rights?**

A. Correct.

**Q. And then in the afternoon you consulted with individual lawyers at Children's Rights about issues CFSRs use specific to their cases?**

A. I did, yes.

**Q. Okay. Do you recall which states those lawyers were working on for which you had those case-specific discussions?**

A. I don't believe we talked about individual states. They didn't identify the states to me.

**Q. They talked about specific issues relevant to their lawsuit with you?**

A. No. I don't think so.

**Q. Well, I thought you just said that you consulted with lawyers at Children's Rights about CFSR issues specific to their cases?**

A. Yes, I think they were specific to their cases but I didn't know the specifics of the cases.



**Q. Do you recall how many groups of lawyers fell into that category of consulting with you about CFSR issues specific to their cases?**

A. Yes.

**Q. Approximately how many?**

A. One.

**Q. Just one group?**

A. Yes, sir.

**Q. And how long did you spend with that group?**

A. I think about an hour.

**Q. And do you recall how many lawyers there were?**

A. Two.

**Q. Do you recall who they were?**

A. Marsha Lowry and I don't recall the other lawyer's name.

**Q. And you don't know what state --**

A. I don't.

Q. -- they may have been involved with?

A. I don't.

(Whereupon, Exhibit Number 905 was marked for identification and made part of the record.)

Q. (By Mr. Kapell) Let me show you what's been premarked as Exhibit 905. And I'd like to direct your attention to the bottom e-mail on page



1, which is from you to Bill Meezan dated February 17. Do you see that?

A. Yes.

**Q. And do you know who Bill Meezan is?**

A. I do.

**Q. He's the policy director at Children's Rights?**

A. Correct.

**Q. And his e-mail indicates -- actually, if you -- the e-mail I wanted to refer you to, it starts at the bottom of page 1 and carries over to page 2 and it's from Bill to you. And you see that Bill says to you, "I understand that you had a conversation with Ira about coming to CR to do some training on the CFSR and related topics." Do you see that?**

A. I do.

**Q. Do you know who the Ira is that he's referring to?**

A. I do.

**Q. Who is that?**

A. Ira Lustbader.

**Q. And is Bill Meezan's characterization of your discussion with Ira accurate?**

A. Yes.



**Q. And then you subsequently sent an e-mail to Bill Meezan that's indicated -- it's reflected on this exhibit at the top?**

A. Yes.

**Q. Dated February 25th. And it says -- you say to Bill Meezan that you've worked out a new agreement with the state that will allow you to work with CR. Do you see that?**

A. Yes.

**Q. Are you referring there to the state of Oklahoma?**

A. I am.

**Q. What was the new agreement that you worked out?**

A. That was the -- that was a modification to the agreement that we were negotiating at the time that would allow me to consult with Children's Rights.

**Q. So under the original agreement, you would not have been allowed to do that?**

A. Correct.

(Whereupon, Exhibit Number 906 was marked for identification and made part of the record.)

Q. (By Mr. Kapell) Let's move on to the next exhibit, 906, which continues the e-mail chain that

Page 38

we were looking at in Exhibit 905, but in particular I wanted to direct your attention to the e-mail at the bottom of page 1 that's dated March 3, 2011. Where you provided Bill Meezan with the estimated cost of your presentation at Children's Rights. Do you see that?
A. Yes, I do.
**Q. Do you recall how much you received from Children's Rights for the presentation?**
A. I don't recall exactly.
**Q. Do you think it was approximately $3,200, the figure indicated in this e-mail?**
A. Approximately, yes.
**Q. And then you also state that, "If my work with Oklahoma rules me out, then I've saved myself some time in preparing a proposal."**
**But your work with Oklahoma didn't rule you out. Is that correct?**
A. That's correct.
**Q. All right. And then the e-mail above that from Bill Meezan to you says that he spoke with Marsha and your being in Oklahoma does not rule you out.**
**I -- I assume you understood that to mean that it didn't rule you out for your presentation at**

Page 39

**Children's Rights?**
A. I did.
**Q. And the reference to Marsha is Marsha Lowry?**
A. Correct. Well, that's my interpretation, yes.
**Q. Okay. Prior to your presentation at Children's Rights, did you have any discussions with Bill Meezan about the nature of your work for Oklahoma?**
A. Beyond that I was serving as an expert witness for Oklahoma, no, but I -- I think that that's -- that was the limit.
**Q. Your testimony is that you told Bill that you were serving as an expert witness for Oklahoma?**
A. Yes.
**Q. You didn't say that in writing, did you?**
A. I don't know if I did.
**Q. Well, you don't see it in any of these e-mails that went back and forth between you and Bill, do you?**
A. I do not.
**Q. But -- so when did you tell Bill that you were serving as an expert witness?**
A. I don't know. I -- I think I told him on

Page 40

the phone, but I -- I can't recall.
**Q. You can't recall telling him?**
A. I -- I can't recall telling him.
**Q. So you're not sure if you told him you were an expert witness?**
A. I'm not sure.
**Q. You may not have told him you are an expert witness?**
A. I may not have told him I'm an expert witness.
**Q. All right.**
A. Prior to this -- prior to our working out an agreement, yes. I think after we worked out an agreement, yes, I did.
**Q. Is it your testimony that you told Bill Meezan that you were serving as an expert witness before you gave a presentation at Children's Rights?**
A. I can't recall exactly.
**Q. Okay.**
A. No. So no.
**Q. Did you speak to anyone at the state of Oklahoma or representing the state of Oklahoma about your presentation at Children's Rights?**
A. I did, yes.

Page 41

**Q. To whom did you speak about that?**
A. I spoke to Bob Nance, attorney with Riggs Abney.
**Q. Who else?**
A. I -- I don't recall speaking with anyone else.
**Q. And would that have been fairly soon after you gave the presentation at Children's Rights that you spoke with Mr. Nance?**
A. No. Before the presentation at Children's Rights.
**Q. I see.**
A. I spoke with Mr. Nance I think it was some -- it was sometime after that I -- I spoke with Mr. Nance about the presentation, but I don't recall how long after.
**Q. Well, tell me what your conversations were with Mr. Nance both before and after the presentation, starting with the before?**
A. With the before? Our conversation was related to how -- how I could -- how -- the limits of what I could talk about with Children's Rights in New York City with respect to Oklahoma. And my understanding was that I could not talk about anything with respect to Oklahoma.

**Q. Okay.**
A. With Children's Rights.
**Q. What about after your presentation, what did you talk about with Mr. Nance concerning the presentation?**
A. I think we talked about some of the questions that I got at the presentation, some of the information that was provided to me at the presentation.
**Q. Did Mr. Nance ask you what questions were asked at the presentation by Children's Rights?**
A. I can't recall.
**Q. But you recall discussing those questions?**
A. I do.
**Q. Okay.**
A. I don't recall the specific questions though.
**Q. But you don't -- do you recall whether he asked you about the questions or whether you just volunteered that information?**
A. I don't recall.
**Q. Did you tell him anything about the discussion with Marcia Lowry and the other lawyer at Children's Rights regarding the issues that were specific to their particular case?**



A. I did not.
(Whereupon, Exhibit Number 907 was marked for identification and made part of the record.)
Q. (By Mr. Kapell) All right. Let's move on to the next exhibit, which is Exhibit 907. And this is a chart. I will represent that it was provided by you to Children's Rights in connection with your April 2011 presentation --
A. That's correct.
Q. -- at Children's Rights' offices. Do you recognize this chart?
A. I do.
**Q. And you recognize as having provided it to Children's Rights?**
A. Yes.
**Q. In connection with your presentation?**
A. Yes.
**Q. Okay. Did you prepare this chart yourself?**
A. I did.
**Q. Would you tell me what this chart is intending to show?**
A. This is intending to show a ranking of the states on the placement stability composite permanency composite four of the child and family services review for FFY 2009.



**Q. And so what data was used to prepare this chart?**
A. Data from a federal website that supplies this.
**Q. Does the federal website show the state ranking in the bar chart format?**
A. No.
**Q. That's -- you prepared the bar charts?**
A. I prepared the bar charts.
**Q. Let's take a look at the next exhibit, 908. Before we turn to 908, just going back to 907 for a second, am I correct that Oklahoma ranks fourth worst among the states on this measure that's shown in Exhibit 907?**
A. You're correct.
(Whereupon, Exhibit Number 908 was marked for identification and made part of the record.)
Q. (By Mr. Kapell) So now turning to 908. This chart is entitled, "Long Stay Permanency Composite Permanency Failures." Is that -- did you come up with that title?
A. I did.
**Q. All right. And is this also a chart that you provided to Children's Rights in connection with your presentation?**



A. Yes.
**Q. Let's take a look at the chart in the middle of the page that's -- it's called Legal Orphans Exiting to nonpermanency. Did you come up with that title?**
A. I did.
MR. BINGHAM: Excuse me if I may. Did --
MR. KAPELL: I'm sorry. I apologize.
MR. BINGHAM: Thank you.
MR. KAPELL: I just handed Mr. Bingham a copy of the exhibit.
Q. (By Mr. Kapell) What does that middle chart attempt to show?
A. That attempts to show the ranking on one of the measures that makes up the permanency composite three. The measure is the percentage of children with TPR, termination of parental rights on both parents who exited to discharges other than permanency.
**Q. And you're referring to the federal CFSR measure. Correct?**
A. I am, yes.
**Q. Am I reading it correctly, this chart shows that Oklahoma has the fourth worst score among the states in this category?**

Page 46

A. That's correct.
**Q. And then the next chart, Emancipating After Three Years, the bar chart on the right of this page. Do you see that?**
A. Yes.
**Q. Again, did you come up with that title?**
A. I did.
**Q. All right. And what does this chart attempt to show?**
A. The -- this is a ranking of the states on the Federal Child and Family Service Review Measure. One of three measures that makes up composite, permanency composite three, and it shows a ranking of the states on that composite -- or I'm sorry -- on that measure.
**Q. Are you familiar with the phrase that CFSR refers to -- with regard to this measure as tracking children growing up in foster care? Have you heard that phrase?**
A. Yes.
**Q. And that's this measure, isn't it?**
A. I'm not sure if it's this measure or if that -- they've used that to refer to the composite as a whole.
**Q. And this chart shows that Oklahoma has the**

Page 47

**eighth worst ranking among the states. Is that correct?**
A. That's correct.
**Q. All right. I'm going to represent to you that your report to doctor -- regarding Dr. Hess states that you spent 160 hours on that report, and your report regarding Mr. Goad states that you also spent 160 hours on that report. Is that just a coincidence that you spent exactly the same amount of time on both those reports?**
A. No.
**Q. How did that come about that you spent exactly the same amount of time on those two reports?**
A. I was not specifying the amount of time I spent on the reports.
**Q. What were you specifying?**
A. I was specifying the amount of time I had spent as an expert witness on this case.
**Q. And so you were dividing it equally among those two --**
A. No, no, no. I was -- I was putting the entire time on each report.
**Q. I see. So turning to Exhibit 900, which is the report -- wait. Let's not. Let's look at --**

Page 48

**let's get the three reports in front of us. You have them there. Let me just get my copies. I've got 900, 902. I just have to find 901. All right. So looking at Exhibit 902, which is the report that you directed to Dr. Hess' report?**
A. Yes.
**Q. The last sentence of the report states that you've expended 160 hours for a total of 28,200 -- I'm sorry. $28,800?**
A. Correct.
**Q. And then, if you look at the report that you prepared with regard to Dr. Milner, which is Exhibit 900, at the end it states that, as of June 15th, you expended 216 hours for a total of $38,880 compensation. Do you see that?**
A. I do.
**Q. So the -- I understand now. The 216 hours reflected on the -- your report regarding Dr. Milner is an update of the 160 hours that you spent as of June 9th?**
A. That's correct.
**Q. All right. I understand.**
**So the 216 hours reflected in the -- your report on Dr. Milner is the total amount of time that you spent on all three reports?**

Page 49

A. On -- on the entire consulting.
**Q. Okay.**
A. The expert witness and consulting.
**Q. All right. Can you tell me who prepared the first draft of these reports, the three reports?**
A. I did.
**Q. Was there anyone else involved in the drafting process?**
A. No.
**Q. You didn't receive comments from anyone about your report?**
A. I -- I did. I think I did receive -- I did send drafts to attorneys at Riggs Abney and asked for comments. I believe I received comments primarily from Bob Nance.
**Q. Can you tell me approximately what percentage of the three reports -- let's take them one at a time. What percentage of your report regarding Dr. Milner was drafted by you and what percentage was drafted by Mr. Nance?**
A. I think 100 percent was drafted by me.
**Q. Mr. Nance was not involved in the drafting process at all?**
A. He supplied comments to me.

**Q. Okay. All right. And is that also true with regard to your reports directed to Mr. Goad and Dr. Hess?**
A. It is, yes.
MR. KAPELL: Why don't we take a short break right now.
VIDEO TECHNICIAN: We're off the record at 10:09.
(A break was taken.)
VIDEO TECHNICIAN: We're back on the record at 10:21.
Q. (By Mr. Kapell) I'd like to ask questions about the report you prepared regarding Dr. Milner and his case record review, so that's Exhibit 900, your report on Dr. Milner. Do you have that in front of you?
A. I do.
**Q. Let's turn to page 1.**
MR. BINGHAM: Off the record.
VIDEO TECHNICIAN: We're off the record at 10:21.
(A break was taken.)
VIDEO TECHNICIAN: We are back on the record at 10:23.
Q. (By Mr. Kapell) So turning your attention



to page 1 of your report regarding Dr. Milner's case record review, under the summary section in the first paragraph you state that, "In your opinion, the choice by Drs. Milner and Smoller to draw their sample from a slice of cases in custody on March 1, 2010, dictated that their review would present a biassed view of the experiences of the class in this case."
What do you mean by a "slice of cases" in custody on March 1, 2010?
A. I'm referring to a time slice there.
**Q. Are you referring to the cases of children who have been in custody for less than 60 days as of March 1, 2010 or more than 60 days?**
A. Well --
**Q. What is the slice that you're referring to?**
A. I'm referring to, in using the word slice, I'm referring to the specific date, March 1st, 2010. That's a slice of time.
**Q. But you're saying a slice of cases on March 1st, 2010?**
A. A slice of cases in custody on March 1st, 2010.
**Q. Right.**
A. Yes.



**Q. So what is the slice that you're referring to there?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: Slice of time.
Q. (By Mr. Kapell) All right. Are there -- what cases are you saying that he did not consider if that's indeed what you're saying in this sentence?
MR. BINGHAM: Object to the form, go ahead.
THE WITNESS: The cases that were in custody prior to March 1st, 2010.
Q. (By Mr. Kapell) Your understanding is he --
A. Who may have been discharged.
**Q. So --**
A. And cases that would have come into custody after March 1st, 2010.
**Q. Right. But you understand that he had a report that has to be provided to the court in this case and that there had to be some period in which he could evaluate?**
A. Yes.
**Q. All right. So you're criticizing him for**



**not including children who may have come into custody after March 1, 2010?**
A. No.
**Q. So what is your criticism here?**
A. That he didn't include children who were -- who had achieved permanency, for instance, prior to March 1st, 2010.
**Q. Okay. We'll get to that.**
A. Okay.
**Q. Are you also referring to the fact that he didn't include in his review children who had been in custody for fewer than 60 days as of March 1, 2010?**
A. Not in that sentence.
**Q. No. Okay?**
A. Yes.
**Q. But you do criticize Dr. Milner for not including the cases of children who had been in custody for fewer than 60 days as of March 1, 2010? Is that a criticism that you make?**
A. Yes.
**Q. All right. Are you aware of other studies where child welfare researchers have eliminated children who have been in care for 60 days or less from their analyses?**

A. I can't recall any specifically.
**Q. Okay.**
A. At 60 days.
**Q. Or less?**
A. Or less? Well, there have been studies that, for instance, the federal review measures. Some of the measures eliminate children in foster care for 7 days or less.
**Q. Okay.**
A. Do not include them in the calculation.
**Q. Are you aware of any federal measures that eliminate the cases of children who have been in care for 30 days or less?**
A. I have to think about that.
**Q. Or 60 days?**
A. I don't recall any in the child and family services review.
**Q. Are you familiar with the study by David Fanschel and Eugene Shin that eliminated all children not in care for 90 days or less from their study of children in foster care?**
A. No, I'm not.
**Q. You're not familiar with their study that was entitled, "Children in Foster Care, a Longitudinal Investigation?"**



**A. I'm not.**
**Q. Do you agree that Dr. Milner was upfront about the fact that he was not considering children who had been in custody for less than 60 days in connection with his review?**
A. I agree.
**Q. Are you aware that DHS policy allows 60 days to complete a family assessment?**
A. No, I'm not aware of that.
**Q. Are you aware that DHS policy allows 30 days to complete an ISP?**
A. I'm not.
**Q. Do you know what an ISP is?**
A. I can't -- I can't recall exactly.
**Q. All right.**
A. I recall -- I recall reading about ISPs.
**Q. An Individualized Service Plan?**
A. Yes.
**Q. Do you know what that is?**
A. I don't know the details of that --
**Q. All right.**
**A. -- no.**
**Q. Do you agree that Dr. Milner's sample is representative of all children who had been in custody at DHS for 60 days or more as of March 1,**



**2010?**
A. No.
**Q. How is it not?**
A. Well, I did one simple check and their lengths of stay are not representative.
**Q. Do you have any other bases for asserting that it's not representative, aside from the length of stay check?**
A. No.
**Q. Do you understand that the -- for the children in Dr. Milner's sample, that he reviewed their experiences from their initial date of entry into DHS custody?**
A. I do understand that that's -- that's what he represented.
**Q. Do you have any reason to doubt that representation?**
A. Yes.
**Q. What is that?**
A. I recently checked some of the dates of entry into custody and the dates of entry into custody that Dr. Milner used were not the dates of entry into custody that were provided from the Oklahoma Kids system to him.
**Q. How does that make you conclude that he did**



**not review all of the experiences of the children in his sample from the initial date of entry into DHS custody?**
A. It doesn't.
**Q. Turn to page 2 of your report, under the section entitled, "Study Population Chosen to Not Represent the Class," you state that, "Dr. Milner chose to draw his sample from a population that made up about 45 percent of the class," and then you site to footnote 8. Do you see that?**
A. I do.
**Q. Now, there's a -- and footnote 8 represents -- contains a fraction. And the numerator is 6701. Do you see that?**
A. I do.
**Q. And am I correct that that's the number of children in DHS custody for at least 60 days as of March 1, 2010?**
A. That is the -- the number of children delivered in this -- the population to Dr. Milner.
**Q. Right.**
A. Yes.
**Q. Delivered by DHS?**
A. Delivered by DHS.
**Q. On their list that they provided to the**

**Plaintiffs?**
A. Correct.
**Q. And that was the universe of Dr. Milner's study. Correct?**
A. That's my understanding.
**Q. All right.**
A. Yes.
**Q. And so that universe consisted of all children in DHS custody as of a single point in time, namely March 1, 2010 for at least 60 days. Correct?**
A. Correct.
**Q. Now, going back to footnote 8, the denominator in the -- in the fraction in that footnote is 15,000. Do you see that?**
A. Yes, I do.
**Q. And am I correct that that 15,000 figure represents the total number of children in DHS custody at anytime during federal fiscal year 2009?**
A. No.
**Q. How did you determine the 15,000?**
A. It's the -- it's approximately the number of children served in foster care during federal fiscal year 2009.
**Q. And you also say, "Plus other children in**



**legal custody outside foster care." Is that correct?**
A. Correct.
**Q. So --**
A. But they served over 15,000 in foster care. I don't know how many were served in --
**Q. All right.**
**A. -- legal custody outside of foster care.**
**Q. So what are you referring to there when you say, "In foster care?"**
**A. I'm referring to in -- in foster care as defined by Oklahoma DHS.**
**Q. So does that include group homes and institutional placements?**
A. It would. Some children would be in those placement types and in foster care.
**Q. Right. So you're including those children in your 15,000 figure?**
A. Yes.
**Q. Are you aware that DHS uses the phrase "above foster care" in its operations?**
A. No.
**Q. So you don't know what "above foster care" means?**
A. I don't.



**Q. So the 15,000 figure you use in your denominator in footnote 8 is all the children that DHS served in foster care during federal fiscal year 2009?**
A. That's correct.
**Q. So that's not a point in time figure?**
A. That is not.
**Q. All right. So you're using a point in time figure for the numerator but for the denominator a figure that's not a point in time?**
A. Correct.
**Q. Okay. Now, it's true, isn't it, that many of the children in the denominator of 15,000 were no longer in DHS custody as of March 1, 2010. Correct?**
A. That's correct.
**Q. All right. And if those children were no longer in DHS custody as of March 1, 2010, then they were no longer members of the class as of that -- the plaintiff class as of that time. Correct?**
A. As of that time. That's my understanding --
**Q. Right.**
**A. -- yes.**



**Q. If a reviewer has a choice between reviewing the experiences of, A, children who left DHS custody in 2009 or, B, children who are still in DHS custody as of March 1, 2010, which category would result in more current information being obtained by the case reviewer?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: Certainly the -- the latter would be more current.
Q. (By Mr. Kapell) I'd like to turn your attention to page 3 of your report. The first full paragraph on this page that starts, "The single most distinctive," do you see that?
A. Yes.
**Q. I'd like to direct you to the second sentence in that paragraph where you say -- I'll just read the first two sentences but I have a question about the second sentence.**
**But the first two sentences are, "The single most distinctive characteristic that those other 55 percent of the class possess is that they were not in OK DHS custody on March 1, 2010. About 95 percent of them exited custody to a permanent family prior to March 1, 2010."**

Page 62

**What is the source of authority for that statement that about 95 percent of those children exited custody to a permanent family prior to March 1, 2010?**
A. That would be the federal reporting.
**Q. That's the federal reporting?**
A. Yes.
**Q. Is that what you site to in your footnote?**
A. No. The footnotes are out of order, I think.
**Q. Oh, okay.**
A. Right here.
**Q. Well, what -- which federal reporting would that be --**
A. That would be --
Q. -- that supports that statement?
A. That would be footnote 11.
**Q. You think that's the footnote that you had in mind there?**
A. Yes.
**Q. Instead of what you have for footnote 13?**
A. Yes.
**Q. Let me direct your attention to page 5 of your report. Just give me one second. On page 5 in the last paragraph before the section that's**

Page 63

**captioned Length of Stay, the start of that last paragraph states, "Dr. Milner's sample of 374 is representative of the ages in his study population."**
**Did you believe that was true at the time you signed this report?**
A. Yes, I did.
**Q. And you still believe it's true today?**
A. Yes, I do.
**Q. All right. So turning back to page 3 of your report, at the end of that page the last sentence, you state, "With two simple checks of the children's ages at entry and lengths of stay, I will demonstrate that Dr. Milner's sample of 374 children is not representative of either the population in the federal fiscal year 2009 report to congress or his study population of 6,701 children."**
**How can you square that statement with the statement that we just looked at on page 5 where you concluded that Dr. Milner's study sample is representative of the ages in his study population?**
A. I -- I would square it by that the inclusion of the FFY 2009 report to congress, that the ages in Dr. Milner's sample and Dr. Milner's

Page 64

population are not representative of the ages in the population in the FFY 2009 report to congress.
**Q. All right. So you're saying that in this sentence you're only comparing the ages of Dr. Milner's sample to the ages of the population in the report to congress?**
A. That's correct.
**Q. All right. So you're not attempting here to make any conclusions regarding the ages of Dr. Milner's study sample in comparison to the ages of the study population of 6,701 children?**
A. That's correct.
**Q. I see.**
**Would you agree with me that that sentence doesn't quite make that point clear?**
A. I would agree with you --
**Q. All right.**
**A. -- yes.**
**Q. So on pages 4 to 5 of your report, you focus on children in the age group of 16 to 17 years old. Correct?**
A. That's correct.
**Q. And one of the things that you do is to compare the percentage of children in Dr. Milner's sample aged 16 to 17 with the percentage of**

Page 65

**children in that age group that were included in Oklahoma's report to congress. Right?**
A. That's correct.
**Q. You don't present any similar comparison for the other age groups, do you? Just children ages 16 to 17?**
A. Well, I do present the whole of the Dr. Milner's comparison.
**Q. Right. But you don't conduct any comparison yourself or any analysis --**
A. I do not. On the other age groups, no.
**Q. Right. And there are six other age groups shown in Milner -- in Milner report table 4, which you have on page 4 of your report?**
A. Correct.
**Q. And so there were six other age groups from which such a comparison could have been made. Correct?**
A. That's correct.
**Q. All right. And the one age group that you did choose to focus on, the children ages 16 to 17, had the smallest number of children in both Dr. Milner's sample and in the report to congress. Right?**
A. That's correct.

**Q. In fact, the number of children aged 16 to 17 included in the report to congress was almost twice as small as the next smallest category, which would consist of children aged 13 to 15. Is that correct?**
A. That's correct.
**Q. All right. I'd like to move on to page 6, table 1. Do you see that?**
A. Yes, I do.
**Q. And this is a comparison of median lengths of stay?**
A. Correct.
**Q. Row 3 of this table shows a median length of stay of 18.6 months. Right?**
A. Correct.
**Q. Now, did you calculate that median by using the dates of entry in the list that DHS provided to the Plaintiffs in this case?**
A. I did.
**Q. And I believe that that's the list that's referenced in footnote 28 on the next page if we can just jump ahead a little bit. But you'll see that the sentence that corresponds to footnote 28 refers specifically to row 3 of the table. So is that the document -- the document cited in footnote**



**28, is that the document that you're referring to that the state provided to Plaintiffs in this case?**
A. Yes, I am.
**Q. All right. And this list showed the -- purported to show the dates of entry for the 6,701 children in Dr. Milner's study population. Is that right?**
A. Yes, that's correct.
**Q. And you used those dates for purposes of determining the median length of stay?**
A. I did.
**Q. And did you use the most recent entry into DHS custody for that purpose?**
A. I did.
**Q. For each child?**
A. For each child.
**Q. All right. Now, moving to row 2, the 20.5 median length of stay, do you see that?**
A. Yes, I do.
**Q. All right. Is it your understanding that that's the median length of stay that Dr. Milner found to exist as of March 1, 2010 based on his review of the case files of the 374 children in his sample?**
A. No. I don't believe Dr. Milner ever



referenced that median on March 1st, 2010.
**Q. Right. He didn't calculate the median himself. Right?**
A. No, he did not. In the report I don't think that they calculated the median length of stay on March 1st, 2010.
**Q. Okay. How did you calculate the 20.5 months?**
A. I -- I used the dates of entry and the -- in some cases, the dates of discharge, although none had discharged on March 1st, 2010. So just dates of entry in Dr. Milner's SPSS file, the dot-save file referenced there.
**Q. But wasn't that SPSS file based on his review of the case files?**
A. It was, yes.
**Q. So your understanding then -- am I correct that your understanding is that the 20.5 months was based on his review of the case files?**
A. Yes.
**Q. So am I correct then that the 18.6 figure in row 3 and the 20.5 figure in row 2 were based on different data sets?**
A. You're correct.
**Q. One of the data sets, the one calculated by**



**Dr. Milner or from his data, was based on the case files and the 18.6 was based on the list provided by DHS to the Plaintiffs. Correct?**
A. That is correct.
**Q. All right. Did you attempt to calculate the median length of stay for the children in Dr. Milner's sample based on the dates provided in the DHS list?**
A. I did not.
**Q. That information was available to you, was it not?**
A. No, it was not. I was not able to link together the two data sets reliably.
**Q. You had a list of the children that were part of the -- Dr. Milner's sample. Correct?**
A. I did, yes.
**Q. And you also had the custody dates that were on the list that DHS provided to the Plaintiffs. Correct?**
A. Correct.
**Q. So you could have determined the median length of stay for the sample based on those custody dates just as you did for the entire universe. Correct?**
A. No, I was not able to do that.

**Q. Why were you not able?**
A. Because I could not link the client IDs between the two reliably.
**Q. Why was that a problem? Why did you have trouble linking the client IDs?**
A. Some of the client ID -- I could not find some of the client IDs in Dr. Milner's SPSS file in the study population, so I didn't have an identifier to link between the two.
**Q. Did you ask for any assistance from DHS to help you determine the children on the DHS list that corresponded to the children in Dr. Milner's sample?**
A. I did not.
**Q. Before you prepared this report, did you ever examine whether there were any discrepancies between the lengths of stay shown on the DHS list provided to the Plaintiffs and the lengths of stay found by Dr. Milner in his SPSS data?**
A. I'm sorry, could you repeat the beginning of that question, please?
(Reporter reads back.)
THE WITNESS: I -- I did that comparison during the preparation of this report, so no. Before the report, no.



Q. (By Mr. Kapell) Okay. But you did it while you were preparing the report?
A. Yes, I did.
**Q. And did you find many discrepancies in those length of stay dates between the length of stays shown in Dr. Milner's SPSS data and the length of stays shown on the DHS sheet or list that were -- that was provided to the Plaintiffs?**
A. I compared only the median, the aggregate, the aggregate statistic here, so I didn't compare individual lengths of stay.
**Q. All right.**
A. Because I couldn't line up the records reliably.
**Q. Okay. So you don't know how many discrepancies may exist between the DHS list and Dr. Milner's SPSS spreadsheet with regard to lengths of stay for the study population?**
A. I do now know that there were 195 discrepancies.
**Q. Okay. That's based on information that you just recently learned?**
A. Yes.
**Q. But you didn't know that at the time that you created this report --**



A. Correct.
Q. -- correct? All right. And how did you go about determining recently that there were 195 discrepancies?
A. I used the -- an Excel file that was in Dr. Milner's considered materials that I believe was prepared by Ms. Van Dusen, Eliza Van Dusen, from which I could link together the client IDs.
**Q. And that -- that Excel file was available to you at the time you prepared your report, was it not?**
A. It was, yes. But I was unaware of it.
**Q. Have you made any attempt to review the individual case files to confirm -- to look into whether or not Dr. Milner's findings as to the length of stay for individual children were correct?**
A. Did I review individual case files? Is that --
**Q. In order to examine the discrepancies?**
A. I did not.
**Q. So you have no basis for disputing the lengths of stay that Dr. Milner found for the 374 children in his sample?**
A. My basis for disputing that would be that



the study population that was delivered to him. So I -- I --
**Q. But there were -- go ahead.**
**A. -- have a conflict between the study population that was delivered to him in terms of dates of entry and the -- and the dates of entry found in his review.**
**Q. Right. I think we've already established that there were many discrepancies. Correct?**
A. Yes. Correct.
**Q. But do you have any basis for disputing his conclusions as to the custody dates? We know that there are differences in the dates, but do you have any basis for concluding that his dates are wrong other than what's stated on the list that DHS provided to the Plaintiffs?**
A. No. Other than what's stated on the list, no.
**Q. Let's take a look at the first full paragraph on page 6. And you state, "The Plaintiffs' expert, Dr. Viola Miller's judgment is that this median far exceeds the national median of 15.4 months. There are two important details that the casual reader might miss in Dr. Milner's statement above." And I think there you're**

Page 74

referring to the prior paragraph, but you can clarify it. But the two important details that you say that the casual reader might miss are, "One, the length of stay of the sample was taken on June 1, 2010 and, Two, Dr. Milner's sample excludes children with length of stay less than 60 days."
Am I correct that when you're referring to Dr. Milner's statement above, you're referring to the prior paragraph?
A. Correct.
Q. And, in particular, you're referring to the quoted language in that paragraph?
A. Correct.
Q. All right. And that quoted language says, "The median length of stay in OK DHS custody of the children in our sample as of June 1, 2010 was approximately 23 months."
And so is it your view that a "casual reader," as you put it, might miss in Dr. Milner's statement that the length of stay of the sample was taken on June 1, 2010 even though he specifically mentioned that he computed the median length of stay as of June 1, 2010?
A. Yes, that's what I -- that's what I've written. There's an implication that goes along

Page 75

with that, that the -- the casual reader might miss that the study was actually drawn on March 1st, 2010. And by taking the median on June 1st, 2010, you -- you might be simply adding 3 months to the length of stay.
Q. Right. And didn't you testify before that Dr. Milner was transparent about taking his sample as of March 1, 2010?
A. Yes.
Q. So going back to table 1, the row 4 of that table shows a median length of stay of 17.6 months. Do you see that?
A. Yes.
Q. And I'm correct, aren't I, that that is for all children in DHS foster care on March 1st, 2010?
A. Correct.
Q. And so that would include children who have been in DHS custody for less than 60 days as of March 1st?
A. Six -- yes, correct.
Q. Row 4 is also a point in time figure, is it not?
A. It is.
Q. And so are the median lengths of stay shown in rows 5 and 6, those are as of a point in time?

Page 76

A. That's correct.
Q. In fact, every row on this table shows a median length of stay as of a point in time. Correct?
A. Correct.
Q. All right. Is it fair to say that, in comparing rows 4 and 6, that the median length of stay for children in Oklahoma foster care as of March 1, 2010 was 2.2 months higher than the median length of stay for all children in US foster care as of September 30, 2009?
A. That's correct.
Q. Just referring -- I'd like to refer you to this footnote 26 on page 6. It indicates that John Gelona provided you with an AFCARS extract of children in DHS foster care on March 1, 2010. Is that correct?
A. That's correct.
Q. Did that extract show that the median length of stay for children in DHS foster care on March 1, 2010 was 17.6 months?
A. That's correct.
Q. Do you know whether Mr. Gelona obtained the information in the extract that he provided to you by querying any of DHS' Access databases?

Page 77

A. I don't know that, no.
Q. Did anyone at DHS, or any of their representatives, ever tell you of any -- about any problems that DHS has had with its Access databases?
A. No.
Q. So no one told you that many of the queries used to generate information from the Access databases were generating inaccurate information?
A. No.
MR. BINGHAM: Object to the form. Go ahead.
Q. (By Mr. Kapell) Okay.
A. No.
Q. On page 7 of your report, you say in the first full paragraph that, "The choice by Dr. Smoller to calculate the median length of stay of children in the sample as of June 1, 2010 simply added three months to the median." Do you see that?
A. Yes, I do.
Q. And you go on to say that that's because so few of the children in the sample discharged between March 1st and June 1, 2010. Do you know how many children in the sample discharged between

those two dates?
A. I do not know exactly how many children in the sample discharged between those two dates.
**Q. I believe on pages 6 to 7 in the carryover sentence you refer to the fact that 20 children were identified by Dr. Milner as discharged from custody between the date the population was drawn, March 1st, and the date of the calculation, June 1. Do you see that?**
A. Yes, I do.
**Q. Is it fair to say that if more children in the sample had, in fact, been discharged from DHS custody between March 1st and June 1, 2010, then the median would have been lower?**
A. Yes, that's true.
**Q. In fact, any discharges between March 1st and June 1, 2010, would have had the effect of only lowering the median length of stay. Correct?**
A. That's true or not changing it. Zero or less.
**Q. Right.**
A. Yeah.
**Q. Pages 8 to 10 of your report describe a computer simulation that you performed of one million sample draws from the study population. Is that right?**



A. That's correct.
**Q. So, from those one million draws, you calculated one million sample median lengths of stay?**
A. That's correct.
**Q. And were the median lengths of stay that you calculated for those draws based on the custody date information contained in the DHS study population list provided to the Plaintiffs?**
A. They were.
**Q. And then you compared the median length of stay of those one million draws to the median length of stay that Dr. Milner determined based on his review of the case files. Correct?**
A. That's correct.
**Q. Am I correct that referring to -- to figure one on page 9. Am I correct that your simulation shows that the median determined by Dr. Milner was not in the extreme five percent of the overall distribution?**
A. Was not in the extreme? Yes, that's true.
**Q. Did you try comparing the median length of stay of your one million draws, to the median length of stay for the sample population, using for the sample population custody dates contained in the population list that DHS provided to the Plaintiffs?**



A. Could you read that back, please?
THE REPORTER: Sure.
Q. (By Mr. Kapell) Let me try to clarify it.
A. Or maybe you could clarify it.
**Q. Yeah. Did you try comparing the median length of stay calculated from your one million draws, to the median length of stay for the sample population, that would have been -- that you could have calculated using the dates -- the custody dates and the population list that DHS provided to the Plaintiffs? So if you had used the custody dates on the DHS population list for the sample, the 374 children, did you try comparing that median to the medians that you found as a result of your one million draws?**
A. No, I did not.
**Q. Okay.**
A. Because I couldn't link between the two.
**Q. Right. We talked about that before.**
**Did you run any simulation tests to compare the population and sample values for any other variables beyond length of stay?**



A. I did not.
**Q. Assume as a hypothetical that you ran simulation tests to compare the population and study values for seven different variables and only one variable for the sample was outside of the expected range when compared to the -- to the study population. Would you conclude then, under those circumstances, that the sample is not representative of the study population?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: With a hypothetical set of seven measures, I -- it was -- one of them being outside -- I'm sorry. I guess I'll need to have it read back.
MR. KAPELL: Would you read it back, please?
(Reporter reads back.)
THE WITNESS: I think we would have to agree on a definition of "expected range" then. So I would commonly use a 95 percent confidence interval, though these are not confidence intervals.
Q. (By Mr. Kapell) So feel free to use that interval for purposes of this question.

A. Yes, I think so. So, on -- I think it would depend on the seven measures that you chose because you -- you know, you could hypothetically choose measures that aren't relevant to the study. And if the populations in the sample differ on that, it -- it might not impact the study. Let's see. So it would depend on the measures you chose, I think would be my answer.

**Q. Okay. Well, let's assume that you chose as the six other measures the child's date of birth, the custody start date, whether or not the case plan is a return to home, whether or not the case plan is adoption, whether or not resource type is kinship foster care, whether or not the resource type is non-related foster care. Those are six other variables?**

A. Okay.

**Q. Let's say that all six of those variables, if you ran a simulation test, found that the study population in the sample values were -- or that the sample -- that the sample values were within the expected range when compared to the study population. Would you then conclude, under those circumstances, the sample is not representative of the study population?**



A. I would --

MR. BINGHAM: Object to the form. Go ahead.

THE WITNESS: Yes, I would conclude that the sample was not representative of the study population on that -- that one measure that was outside the expected range.

Q. (By Mr. Kapell) If there were six other measures that were within the expected range, would you still conclude that the sample is not representative of the study population?

A. Yes.

MR. BINGHAM: Object to the form.

Q. (By Mr. Kapell) But just as to that one --

A. Yes.

Q. -- measure?

A. Yes.

**Q. Right. And if there were six other measures that showed that the sample was within the expected range of the study population, what would you conclude about those results?**

A. I would --

MR. BINGHAM: Object to the form.

THE WITNESS: I would conclude that the sample was representative of the population on



those particular measures.

Q. (By Mr. Kapell) Okay. And you would be unable to make any conclusions with regard to the sample, the representativeness of the sample as a whole, if six out of seven variables showed that they were within the expected range of the study population?

MR. BINGHAM: Object to the form. Go ahead.

THE WITNESS: No.

MR. BINGHAM: Bill, when you get to an appropriate place, can we take a break?

MR. KAPELL: About 5 or 10 more minutes.

Q. (By Mr. Kapell) Let's go back to page 6 of your report and look at row 5 of table 1. Row 5 shows that the median length of stay for children in DHS foster care on September 30, 2009 was 17 months according to Oklahoma's report to congress. Is that correct?

A. That's correct.

**Q. Now, that figure includes all children in DHS foster care including children who had been in care for less than 60 days?**

A. That's correct.

**Q. So wouldn't you expect that median to be**



**lower than a median length of stay figure which includes -- which consists of children who have been in care for 60 days or more?**

A. Yes.

**Q. Did you try comparing Dr. Milner's sample group to the population in this report to congress, referenced in row 5, for any other variables unrelated to length of stay?**

A. Yes. Age. I -- I compared on age.

**Q. Right. We talked about that before?**

A. Yes.

**Q. Any other variables?**

A. No.

**Q. Let's go back to the simulation tests that we were talking about before that you performed.**

A. Yes.

**Q. If you had used the custody dates for the sample group that are shown on the list provided by DHS to the Plaintiffs instead of the custody dates found by Dr. Milner based on his review of the case files, is it fair to say that your simulation tests would have had different results?**

A. Yes.

**Q. Now, assuming that there were discrepancies in approximately 50 percent of the custody dates**

Page 86

**shown on the DHS list compared to the dates that Dr. Milner determined based on his review of the case files, under those circumstances, assuming those discrepancies, can you state under oath that it is very unlikely that Dr. Milner's sample was a simple random sample with equal probabilities of each unit being drawn for the sample?**
A. I think -- I'll have to ask you to restate the --
MR. KAPELL: You can read it back.
THE WITNESS: Read it back to me, please.
(Reporter reads back.)
THE WITNESS: No.
Q. (By Mr. Kapell) Now, Dr. Milner testified that he used a table of random numbers to select his sample. Do you think he was wrong when he testified to that effect?
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: I don't -- I don't recall him testifying that he used a table of random numbers. I -- I thought his testimony was that Ms. Van Dusen used the table of random numbers to select the cases.
Q. (By Mr. Kapell) Yes. I was using "he" in

Page 87

the global sense of his case review.
A. His team.
**Q. His team.**
A. Okay. Yes. Then yes.
**Q. You think he was wrong --**
A. No.
Q. -- when he testified that sample was drawn randomly?
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: Could you please restate the question?
Q. (By Mr. Kapell) Sure. Do you recall there was testimony that the -- a table of random numbers was used to select Dr. Milner's sample?
A. I do recall, yes.
**Q. And do you think that Dr. Milner was not telling the truth when he testified that the sample -- his sample was drawn randomly?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: No.
Q. (By Mr. Kapell) Do you think that that testimony was wrong, that the sample was drawn randomly?

Page 88

MR. BINGHAM: Object to the form.
THE WITNESS: The evidence that I had at the time would indicate that that testimony was wrong.
Q. (By Mr. Kapell) All right. Tell me all of the evidence that you're basing that statement on?
A. It's here in the report. The median lengths of stay --
**Q. On the --**
**A. -- being different between the sample and the population.**
**Q. So the sole basis for that conclusion is the -- is the length of stay information contained on the DHS list?**
A. That's correct.
MR. KAPELL: All right. This is a good time to break.
MR. BINGHAM: Okay.
VIDEO TECHNICIAN: We're off the record at 11:16.
(A break was taken.)
VIDEO TECHNICIAN: We are back on the record at 11:40.
Q. (By Mr. Kapell) Mr. Barclay, do you agree that it's important to have objective standards

Page 89

upon which to assess how well states are protecting the safety of foster children in their custody?
A. I agree that it's important to have objective measures and, yes, I would agree that it's important to have objective standards, but the -- the key word there is objective.
**Q. Uh-huh.**
A. And setting objective standards I believe is a very difficult if not impossible thing.
**Q. Let's turn to page 11 of your report. And in particular, to figure 3?**
A. Yes.
**Q. Did you prepare that bar graph on page 11?**
A. I did.
**Q. And does this graph depict how states performed during federal fiscal year 2009 on the safety measure developed for the federal CFSR?**
A. The Safety in Foster Care Measure, yes, it does.
**Q. And it shows that Oklahoma had a maltreatment in care rate of 0.20 percent. Right?**
A. It does.
**Q. But you know, don't you, that Oklahoma subsequently changed its rate to 0.57 percent?**
A. I do.

**Q. And 0.57 percent is almost three times higher than 0.2 percent?**
A. Yes.
**Q. But you agree with me that figure 3 does not accurately portray Oklahoma's performance on the maltreatment measure?**
A. I do.
**Q. All right. On page 12 of your report, right before the section that's entitled, "Incidents Versus Prevalence," in the last sentence before that section, you state that in your opinion, "Dr. Smoller's asserted rationale does not justify the abandonment of the usual and accepted practice of accounting for exposure time by limiting the incidents to a 12-month period."**
**Has the federal government adopted the practice of looking at incidents of abuse-in-care over a 12-month period?**
A. Yes, they have.
**Q. And that's the measure that you refer to in footnote 35 of your report. Correct?**
A. Correct.
**Q. And the states track this measure as well. Correct?**
A. Correct.



**Q. Sir, going back to footnote 35, the federal government's measure for abuse-in-care calls for states to report on maltreatment by foster parents and facility staff members. Correct?**
A. It's foster parents or facility staff members, yes.
**Q. They're supposed to report on both?**
A. Yes.
**Q. Do you know if Oklahoma reports maltreatment by facility staff members to the federal government?**
A. I believe there were footnotes in their reports that they did not report from some facilities, maltreatment from some facilities.
**Q. You believe it's the case that their reporting includes abuse at some facilities but not others?**
A. I don't know if it includes abuse in all facilities, but I know that they have exceptions on -- on what they report from facilities.
**Q. Right.**
A. So there may be -- as far as I know, there may be some facilities where they do report in the federal reporting.
**Q. Is that your understanding, that they are**



**including abuse or neglect for some facilities in their federal reporting?**
A. I don't know that they are, but my understanding is that they could be.
**Q. Okay. But you don't know?**
A. I don't know.
**Q. Are you aware that after this suit was filed in 2008, that DHS started conducting an administrative review of all substantiated findings that children in foster homes had been abused or neglected?**
A. No.
**Q. No one at DHS ever told you about that administrative review process?**
A. Not that I recall.
**Q. Okay. Are you aware of the fact that the results of this administrative review process are reflected in DHS' NCANDS reports?**
A. Not specifically. I know that there was a footnote in their federal reports that they had -- that they were attempting to make some changes to their reporting, but whether that was related to that administrative review, I don't know.
**Q. Okay.**
A. And I think that was prior to that



administrative review.
**Q. All right. So what I'm asking is whether you're aware that the results of the administrative review process are reflected in DHS' NCANDS data? Do you know that?**
A. I don't know that.
**Q. Okay. Do you know if DHS conducts an administrative review of unsubstantiated findings of reported abuse or neglect involving children in foster homes?**
A. I don't know that.
**Q. Do you think -- assuming that DHS were uncertain about the accuracy of its NCANDS data and that that was the reason it decided to conduct an administrative review of substantiated findings, do you think it would be appropriate for DHS to also conduct a review of unsubstantiated findings?**
MR. BINGHAM: Object to the form.
THE WITNESS: I do think it would be appropriate --
Q. (By Mr. Kapell) Okay.
A. -- yes.
**Q. I'd like to refer you to footnote 36 of your report. And it refers to a March 15, 2011 communication from attorney Bob Nance at Oklahoma's**

Page 94

**corrected federal fiscal year 2009 CFSR measure of maltreatment in foster care, 0.57 percent. Do you see that?**
A. I do.
**Q. Do you know why DHS made that correction?**
A. I do not.
**Q. No one ever spoke to you about the reasons for that correction in connection with your expert work in this case?**
A. Not that I recall, no.
(Whereupon, Exhibit Number 909 was marked for identification and made part of the record.)
Q. (By Mr. Kapell) I'd like to show you what's been marked as Exhibit 909?
MR. BINGHAM: Bill, have we yet marked the one-page --
MR. KAPELL: Yes.
MR. BINGHAM: -- handwritten notes.
MR. KAPELL: I believe that's been marked as Exhibit 910.
(Whereupon, Exhibit Number 910 was marked for identification and made part of the record.)
MR. BINGHAM: Thank you.
Q. (By Mr. Kapell) Have you ever seen this letter before?

Page 95

A. Not that I recall.
**Q. No one showed you it to you in connection with your expert work?**
A. Not that I recall, no.
**Q. You can set that aside now.**
A. Okay.
**Q. On page 12 of your report, you state that, "According to Dr. Smoller, the decision to calculate abuse or neglect over the entire period in the Milner study was -- was simply a convenience because NCANDS data did not -- does not follow children over two reporting periods."**
**Do you see the quoted language that I'm referring to?**
A. I do. But that's not what it says.
**Q. Well, you say, "The choice to limit to a consistent exposure time was not as Dr. Smoller contends. It's simply a convenience because the National Child Abuse and Neglect Data System can not follow children over two reporting periods."**
**Do you see that language?**
A. Yes, I do.
**Q. And you found that quoted language in Dr. Smoller's deposition transcript --**
A. I did.

Page 96

Q. -- is that right? Did you find that language yourself?
A. Yes, I did.
**Q. Do you recall any other testimony from Dr. Smoller on why the case record review tracked abuse or neglect over the entire period the children were in DHS custody?**
A. Not specifically. I -- I mean, I -- I recall questions to that effect and answers, but I can't recall the specific answers.
**Q. Okay. So you don't recall what else you may have said on the subject?**
A. I don't. I don't recall right now.
**Q. Okay.**
A. Well, this subject is a different subject from that, what you're asking about though. This -- this -- the subject of this is the reasons for the federal review limiting to 12 months.
**Q. Right.**
A. And then there's separately Dr. Smoller's reasons for not limiting to 12 months.
**Q. That's -- we're talking about Dr. Smoller's reasons.**
A. Uh-huh.
**Q. And one of the reasons that you're quoting**

Page 97

**here as to why Dr. Smoller decided to -- or why Dr. Smoller and Dr. Milner decided to track abuse or neglect over the entire period the children were in DHS custody was, according to you, because the NCANDS -- or you're quoting Dr. Smoller saying it was because NCANDS cannot follow children over two reporting periods. Right?**
A. No.
**Q. No? Isn't that a quote of Dr. Smoller?**
A. That is a quote of Dr. Smoller.
**Q. Okay.**
A. But it's in the context of the federal review being limited to 12 months. It's not in the context of Dr. Smoller reviewing the entire history of the case, using the entire history.
**Q. Well, isn't that what you're talking about here? Aren't you talking about Dr. Smoller's decision to look at maltreatment over the entire history of the case. Isn't that what the subject is basically of this whole paragraph?**
A. No.
MR. BINGHAM: Object to the form.
Q. (By Mr. Kapell) No?
A. No. The subject of this paragraph is the reasons for the federal government limiting it to a

Page 98

12-month period.
**Q. It's more than that, isn't it? There's a sentence in here, "Drs. Milner and Smoller have abandoned that work, aggregating incidents of maltreatment over several years rather than limiting the exposure time to 12 months?"**
**A. Correct.**
**Q. I mean, you're -- the reason you're referring to what the federal government is doing is to try to draw a contrast between that and what Dr. Milner and Smoller did?**
A. That's correct.
**Q. Okay. All right. And so you quoted from Dr. Smoller's deposition transcript to help support the contrast that you're trying to draw?**
A. To support the contrast, but mainly to quote that she believes that the reason that the federal government limits it to a 12-month period was because they couldn't follow the children over two reporting periods --
**Q. Correct.**
**A. -- and that is incorrect.**
**Q. Okay. And you're criticizing her for that. Correct?**
A. I'm merely pointing out that that's

Page 99

incorrect.
**Q. And so my question was whether you recall seeing any other testimony from Dr. Smoller on why she and Dr. Milner -- strike that.**
**Do you recall seeing any other testimony from Dr. Smoller on why she and Dr. Milner decided to track abuse or neglect in care over the entire period?**
A. I -- I do recall that she testified with some reasons. I can't recall what those reasons were.
**Q. And you didn't put those other reasons in this --**
A. I did not.
Q. -- discussion, did you?
A. I did not.
**Q. Do you think it's fair treatment for you to pick and choose what pieces of testimony to include in your report on a particular subject and just leave others out that are relevant to the same subject?**
MR. BINGHAM: Object to the form.
THE WITNESS: Yes, I do.
Q. (By Mr. Kapell) Do you think that's fair?
A. Yes, I do.

Page 100

MR. BINGHAM: Object to the form.
THE WITNESS: Because I wanted to -- because I found something in her testimony where she was incorrect, and I'm a rebuttal witness so I'm pointing out that that's incorrect.
Q. (By Mr. Kapell) But you're also ignoring why she -- additional testimony as to why she said that the Milner team decided to consider abuse and neglect over the entire period of a child being in custody, and that's the subject of this paragraph. And you're ignoring testimony on that subject. And you think that that's fair --
MR. BINGHAM: Object to the form.
Q. (By Mr. Kapell) -- to refer to some testimony and then to ignore other testimony on the same subject?
MR. BINGHAM: Object to the form.
THE WITNESS: No. I -- I am -- this paragraph is about -- about the reasons for the federal -- the federal government choosing a 12-month period. It's not about -- it does draw a contrast to the measure that was used by Drs. Smoller and Milner, but this is merely talking about the reasons for the federal review choosing a 12-month period.

Page 101

Q. (By Mr. Kapell) But it's doing more than that. We talked about this already. It's saying that Dr. Smoller's asserted rationale for how they decided to track abuse and care does not justify the abandonment of the usual and accepted practice of accounting for exposure time by limiting the incidents to a 12-month period.
A. Uh-huh.
**Q. So you're criticizing Dr. Smoller for not using what you say is the usual and accepted practice and quoting her testimony as to one reason why they decided to proceed that way but ignoring other testimony as to why they decided to proceed that way. And I'm asking you if you think that that's fair treatment?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: I -- I did not ignore that testimony. I did read that testimony. I cannot recall that testimony right now, but, yes, I did not include all of that testimony in my report.
Q. (By Mr. Kapell) Okay. Would you say that that shows bias on your part, that you include some explanation for why someone does something and not others bearing on the same point?

MR. BINGHAM: Object to the form.
THE WITNESS: I -- I would not in this case.
Q. (By Mr. Kapell) All right.
A. I don't think that that shows bias. I am pointing out some testimony that was incorrect, and that's my main purpose here.
**Q. But you agree that you ignored other testimony on the same subject?**
MR. BINGHAM: Object to the form.
THE WITNESS: I do not.
Q. (By Mr. Kapell) Well --
A. I agree that I did not include that testimony in my report.
**Q. Right. That's what I meant by ignored.**
A. If that's what you meant by ignored, I will agree that I did not include that testimony in my report.
**Q. Okay. Now, on page 12 of your report you refer to figure 3 on page 11, and you say that, "It evidences that in some states the risk accumulated by the children served in foster care over the course of a year is greater than in other states."**
**Do you agree that the different rates shown in figure 3 are the result, at least in part, of**



**differences in the quality of care that states are providing to ensure the safety of children?**
A. Yes.
**Q. In your view, what other factors, aside from the quality of care, impact the state's abuse-in-care rates as reflected in figure 3?**
A. In my opinion, one of the strong factors is the reporting practices. Other factors would be the inherent risks for abuse and neglect that come from matching of proper placements for children. So it would -- there would be some dependence on the population of children and the characteristics of those children and the expertise, the quality of your placement settings. I'm sure there are others, but the major ones I think are the reporting practices and the -- the appropriateness of the placements.
**Q. So you would agree with me that, if children are placed in inappropriate placements, that that could increase the risk that they will be abused or neglected while in custody?**
A. Yes.
**Q. Now, when you say the reporting practices, can -- can you give me a little bit more detail of what you're referring to there?**



A. Yes. Sure.
**Q. Please.**
A. So I have seen many examples in states where they -- for the federal reporting purposes, there was a lack of clarity on the relationship of the perpetrator to the victim, and that -- that influences the results. So, you know, an example that I -- I use sometimes in presentations is a -- a foster child on her way to school -- on her way to kindergarten class is put on the bus by her foster mother. Bus driver exposes himself to all of the children and we have a substantiated incidence of -- incident of sexual abuse by a facility staff member. So the key relationship there is the relationship of the bus driver as to -- to the child as the -- was the child in the care and responsibility of the school system at that point. And that's -- that's a difficult one to answer sometimes.
**Q. Are there any other reporting practices that you have in mind beyond the lack of clarity on the relationship of the perpetrator to the victim?**
A. Yes.
**Q. What else?**
A. Well, there's certainly -- in Georgia I saw



and I believe that there were some footnotes in the -- in the federal reporting for Oklahoma as well that they may have been reporting disciplinary infractions as substantiated incidents of abuse. And that -- in Georgia that was a difficult thing to untangle.
**Q. So the possibility that states are reporting policy violations as opposed to true child abuse or neglect, is that what you're referring to?**
A. Yes.
**Q. Okay.**
A. Policy violations, licensing violations and other things.
**Q. Any other reporting practices?**
A. Oh, sure. There's -- it's particularly hard to -- to determine, but some states may be using different standards for judging whether it was substantiated abuse or neglect in foster care versus the general population. You know, having specific examples from some states.
**Q. So are you saying that there are different standards for --**
A. For a foster --
Q. -- within a state itself or among states?

A. Within the state itself there are sometimes different standards for determining substantiation of abuse or neglect when it is a foster parent versus a birth parent, say. There's -- there's some evidence that foster parents are sometimes held to a higher standard and they -- there -- there might be some evidence that they're held to a lower standard as well. Might be different.
**Q. Any other reporting practices?**
A. Yes. The -- the simple -- simply that data systems have missing data in them almost always, and missing the data on abuse and neglect in foster care will make it appear that a state is better than they actually are in this measure.
**Q. Those are the main ones?**
A. Those are the main ones I can think of right now. I think I listed them out in my presentation to Children's Rights. There might be others. If you want me to look at that.
**Q. I'll ask you some questions instead.**
A. Okay.
**Q. Let's go through these reporting practices. Actually, before we do that, let's take -- let's talk about the other factor that you mentioned, the inherent risks for abuse and neglect resulting from**



**inappropriate matching. You're not expressing any opinion in this case, are you, as to whether DHS does an adequate job in matching children with appropriate placements?**
A. I'm not.
**Q. So you -- you don't know how well they're doing in that area, do you?**
A. I don't.
**Q. Do you believe that the reporting practice of reporting policy violations as abuse or neglect is applicable to Oklahoma DHS?**
A. I don't have -- the only basis I have for that is what -- is the footnotes that they put on their federal reports. So I -- I don't -- I don't -- that's all I know about it.
**Q. So all you've seen is what they report to the federal government. You haven't dug deeper on that issue?**
A. I have not.
**Q. And you haven't done any kind of analysis of substantiated findings in order to determine how many of those might really be policy violations?**
A. No, I have not.
**Q. All right. And you haven't attempted to obtain information to that -- to those ends from**



**anyone at DHS?**
A. I have not.
**Q. You mentioned that there could be different standards for determining abuse or neglect by foster parents compared to birth parents. Does the NCANDS measure include abuse or neglect by birth parents while the child is in DHS custody?**
A. The -- the federal review measure does not include abuse or neglect by birth parent while the child is in custody. NCANDS does report that.
**Q. But it's not -- is it included -- is that type of abuse included in the data that goes -- that's shown in figure 3?**
A. It is not.
**Q. Okay. So the abuse and care rate that's depicted in figure 3 does not include abuse by bio parents while the child is in DHS custody?**
A. Correct.
**Q. Do you know, turning to the next factor you mentioned, that data systems may have missing information, and if they do, it might make their results look better than they really are. Would you say that that -- does that factor apply to Oklahoma DHS?**
A. I don't know.



**Q. Okay. You haven't assessed the adequacy of Oklahoma's data system?**
A. I have not.
**Q. All right. I'd like to refer you to table 2 on page 14 of your report. Do you see that?**
A. Yes, I do.
**Q. Did you obtain the information regarding the number of children maltreated in Georgia, Tennessee and Florida from the public reports on the FCI website?**
A. I did.
**Q. And is that also where you got the information about those three states regarding exposure in child years?**
A. That is correct.
**Q. All right. And the information regarding the number of children -- strike that.**
**Is the information in the table regarding the number of children maltreated in Georgia, Tennessee and Florida publicly available on FCI's web site?**
A. It is.
**Q. And is the information on exposure in child years shown in this table publicly available on FCI's website?**
A. It is.

Page 110

Q. All right. Did you perform any kind of a calculation in order to come up with the exposure in child years numbers or could I go onto FCI's website and find these very numbers on their website?
A. I -- I can't recall if I needed to do a calculation there. It may be in child days, so you might have to divide by 365.25.
Q. Uh-huh.
A. So yeah. I -- I can't recall. There may be a calculation involved.
Q. You think there might be a calculation involved?
A. Yes.
Q. Do you know whether Georgia counts substantiated maltreatment of children in facilities in its NCANDS data?
A. I think that it does, yes.
Q. Does it count it in the calculation of the rate that's depicted in -- in your report, the abuse-in-care rate?
A. The figure 3 --
Q. Yes.
A. -- rate?
Q. Yes. The figure 3 rate.

Page 111

A. Yes, it does.
Q. And how about Tennessee, does Tennessee count substantiated treatment of children in facilities in its figure 3 rate?
A. I think that it does.
Q. Does Florida?
A. I think that it does.
Q. Do you know whether Georgia has a practice similar to Oklahoma of conducting administrative reviews of confirmed findings of abuse and neglect involving children in foster homes?
A. At present I don't know if they do. In the past we have certainly conducted administrative reviews of those cases in Georgia.
Q. And has Georgia conducted administrative reviews of unsubstantiated findings as well?
A. Not that I recall.
Q. Okay. How about Tennessee, does Tennessee have a practice similar to Oklahoma of conducting an administrative review of confirmed findings?
A. I don't know.
Q. How about Florida, do you know if they have a practice of conducting an administrative review of confirmed findings?
A. I do not know.

Page 112

Q. All right. I assume you selected Georgia, Tennessee and Florida for your analysis here because they agreed to make their data accessible to the general public on FCI's website?
A. As well as it was current or the most current I had.
Q. And I think you mentioned before that Missouri hasn't provided the most current information?
A. Yes.
Q. And Nebraska is in a process of just signing back on?
A. Not current, yes.
Q. So you didn't do any similar type of analysis for Missouri or Nebraska based on whatever data you have?
A. I don't think that I did.
Q. Okay.
A. To do this analysis, I would have to update the site to reprocess all the data and I haven't -- I haven't updated their sites because I don't have new information.
Q. So you don't think you did a similar analysis for Missouri or Nebraska?
A. I don't think I did.

Page 113

Q. Is the -- if I could just focus your attention on the Tennessee line in table 2. Is that a typo where it says federal fiscal year 2008? Is it supposed to be federal fiscal year 2010?
A. No.
Q. It's 2008?
A. Yes.
Q. Okay. Why did you choose 2008 for Tennessee?
A. Because that's the most recent data I have from Tennessee.
Q. Do you have more recent data from any of the other states that have signed onto FCI and who have agreed to allow their data to be publicly available?
A. No. Not -- not NCANDS data. This would need NCANDS data so that's the limiting factor. I do have much more current data from Tennessee for AFCARS but not for NCANDS.
Q. All right. This table tracks NCANDS?
A. It needs to use NCANDS, yes.
Q. And you don't have more recent data from any other states than Georgia, Tennessee and Florida that you could have used for this purpose?
A. Not for NCANDS, not that's on the public

portion.
**Q. Have you told anyone in Tennessee, Georgia or Florida that you would be using their data for purposes of this litigation?**
A. I have not.
**Q. So is it your understanding then that when those states entered into the data use agreement with FCI, that they were basically assuming the risk that you would use their data for litigation purposes? It had nothing to do with FCI?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: The agreement was that, if they would make the data public, then it would be public. So if -- they could infer that I could use it in litigation, yes.
Q. (By Mr. Kapell) Well, we looked at the agreement before?
A. Yes.
**Q. Doesn't it also contain restrictions on the use of data?**
A. It does.
**Q. And you didn't believe that those restrictions applied in this instance?**
A. No, I didn't.



**Q. So that you would be able to use their data for litigation purposes, for matters having -- that are completely unrelated to FCI?**
A. I'm using a derivative quantity from their data, from public reports in litigation, yes.
**Q. I see that your report on page 14 states that you don't have data for Oklahoma that would allow you to compute a similar estimated rate of abuse or neglect per child year. Is that correct?**
A. That's correct.
**Q. Did you ask DHS for that data?**
A. I did not.
**Q. You didn't think it would be useful to see how Oklahoma came out on this performance measure that you devised using Oklahoma's own data?**
A. No. I do think it would be useful to see how Oklahoma came out on this measure.
**Q. Why didn't you ask them for the data then?**
A. I just didn't ask them for the data. I --
**Q. Were you afraid of what the data might show?**
A. No. No, it's not that. It would have involved some time which I didn't have at the time in getting the data, specifying the data and then processing it.



**Q. So you didn't want to spend the time to do the analysis or you didn't have the time to do the analysis?**
A. I didn't have the time to do the analysis.
**Q. But you had the time to do the analysis of these other states?**
A. That was done previously, so I had those numbers available to me.
**Q. Okay.**
A. Yeah.
**Q. So you were just too busy to do the analysis for Oklahoma. Is that what you're saying?**
A. I -- I could say I didn't have the time to do the analysis for Oklahoma, yes. It would have -- it would have involved specifying the data and getting a secure transfer of it and then calculating it separately, because Oklahoma is not an FCI state.
**Q. Did you know at the time you conducted this analysis that's shown in table 2 that Oklahoma's abuse-in-care rate for federal fiscal year 2010 was worse than its rate for federal fiscal year 2009?**
A. At the time I did this table, I did not know that.
**Q. Have you found that out subsequently?**



A. I have.
**Q. How did you find that out?**
A. Attorney Bob Nance told me that the rate had increased, and I can't remember how much.
**Q. Okay.**
A. I think it was about .7 percent for 2010. But I can't recall exactly when he told me that, but it was after this.
**Q. So you don't know, sitting here today, you're not sure what Oklahoma's abuse-in-care rate is --**
A. Correct.
Q. -- for federal fiscal year 2010?
A. Correct.
**Q. Turning to page 15 of your report, the first -- I'm going to read the first two sentences on page 15 and then I'll ask you a question. But it says, "Based on my estimate of 0.050 victims per child year, I find that the rate of maltreatment in custody among the children in Dr. Milner's sample is higher than all three of these states. The rates in table 2 are adjusted only for the exposure time, not for the many other risk factors that may be overrepresented in Dr. Milner's sample relative to the children in foster care in these three**

**states."**
**I'm correct, aren't I, that your report does not contain any analysis of any other risk factors that you believe may be overrepresented in Dr. Milner's sample relative to children in foster care?**
A. That's correct.
**Q. And you're not expressing any opinions regarding the impact of any other factors. Is that correct? With regard to this analysis?**
MR. BINGHAM: Object to the form. Go ahead.
THE WITNESS: I am expressing an opinion that there may be other factors that would -- could influence these numbers and that I did not analyze those, yes.
Q. (By Mr. Kapell) Exactly. That's the point I was making. Was that you didn't analyze them so you wouldn't be able to express any opinion as to their effect?
A. Well, no. I could have an opinion as to their effect, but it wouldn't be based on an analysis.
**Q. Okay. What would it be based on?**
A. Logic, some of it. As we talked about earlier, some of these risk factors, like



inappropriate placements can influence the rate of maltreatment in care.
**Q. Right. But you said that you didn't assess --**
A. I did not.
Q. -- the matching process?
A. So in Oklahoma I couldn't -- or in Dr. Milner's sample I couldn't speak to that.
**Q. But you're not expressing any opinions, are you, regarding the impact of any other factors that you believe may be overrepresented in Dr. Milner's sample?**
MR. BINGHAM: Object to the form.
THE WITNESS: I am expressing an opinion that there may be other risk factors in his sample that are overrepresented.
Q. (By Mr. Kapell) I --
A. Yeah.
**Q. I understand that you're saying that there may be other factors, but you're not expressing an opinion as to the impact of those factors, are you? Can you show me where in your report --**
A. I'm not in my report.
**Q. Do you understand that you're bound in this case by what you -- your opinions in this case are**



**bound by what you provide in your report?**
A. I understand that my opinions expressed to the court in this case are bound by my report, yes.
**Q. Okay.**
MR. KAPELL: I think this is a good time to break for lunch.
THE WITNESS: I do too.
VIDEO TECHNICIAN: Off the record at 12:23.
(A break was taken.)
VIDEO TECHNICIAN: We're back on the record at 1:28.
MR. KAPELL: I just want the record to reflect two things, one that we had agreed that we were going to resume at 1:15 today, but Mr. Bingham and the witness arrived at about 1:25 and we're just getting started now. The other thing is that Mr. Bingham just told us that, because of his eye problem, that he is not going to be sitting in the deposition this afternoon and Mr. Resetaritz will be acting as counsel for the Defendants this afternoon.
MR. RESETARITZ: That is correct. I've been present since the witness was initially sworn, although I did not initially announce my presence.



MR. KAPELL: Okay. With that said, we're ready to get started with the deposition this afternoon.
Q. (By Mr. Kapell) Mr. Barclay, I meant to ask you before. Have you ever led a case record review before?
A. No.
**Q. Have you ever participated in a case record review?**
A. Yes.
**Q. When was that?**
A. I -- I participated in the cold case file review in Georgia. We call it the cold case file. When over the past I guess 2 years we've been reviewing cases.
**Q. Have you been actually reviewing case files?**
A. No.
**Q. What has your role been in connection with that file review?**
A. My role has been the sample selection identifying the cases.
**Q. Right. Okay. Did you review any of the investigation files that Mr. Goad reviewed in connection with his analysis?**

A. No, I did not.
**Q. And so you didn't review any of the CPS investigation files. Correct?**
A. Not any of the files themselves, no, sir.
**Q. All right. So that includes the OCA investigation files and the screen-out files and the CPS assessment files as well as the investigation files?**
A. I --
**Q. Right?**
A. I did not see any of the files, yes, sir.
**Q. So you don't know then if there were additional victims of reported abuse or neglect mentioned in those files over and above the children referenced in the list that DHS provided to Plaintiffs?**
A. No.
MR. RESETARITZ: Objection as to form.
Q. (By Mr. Kapell) Okay.
A. No, I do not.
**Q. All right. Assuming that the CPS investigation files that Mr. Goad reviewed referred to additional children as victims of reported abuse or neglect in addition to the children who were referenced on the list provided by DHS, do you see**



**anything wrong with Mr. Goad including those additional children as part of his review?**
A. Yes.
**Q. What is that?**
A. That that would then modify the -- the size of his sample, that his sample would go outside of the population that he was provided. So you would normally not include those because it will influence the statistics among other things.
**Q. Do you know what the pop -- what the definition of the population was that he was provided?**
A. I'm just -- from memory. I think it was children victims of maltreatment while in custody of Oklahoma DHS during calendar year 2009.
**Q. I believe that's correct. So the additional children that he may have reviewed, assuming those were also children who were reported to have been victims of abuse or neglect while in DHS custody during 2009, how does that go outside of the sample population?**
MR. RESETARITZ: Objection as to form.
THE WITNESS: His population, as he stated it in his report I think, was the population provided to him by Oklahoma DHS, and those children



were not in that population supplied to him by DHS.
Q. (By Mr. Kapell) Right. But if the list is incomplete and there were, in fact, additional children referenced in the files that were part of the definition of the population that he wanted to review, how would his review of those files have been outside of the population?
MR. RESETARITZ: Objection as to form.
THE WITNESS: Well, his -- his population was defined by that list, is my interpretation. So those were outside of the list. They met the definition of the population, yes.
Q. (By Mr. Kapell) Right.
A. From his review, perhaps --
**Q. So you're not -- okay. You're not suggesting that he shouldn't look at files that are within the definition of the population because, for the simple reason, that DHS's list failed to include those files, are you? What if DHS's list was inaccurate?**
A. Then I -- I still think he should confine his review, since he took a sample, he should confine his review to that sample from that population.
**Q. Well, didn't he do that though? I mean, he**



**asked for referrals, a certain number of referrals. Correct?**
A. Correct.
**Q. And he didn't know before he received those referrals how many children would be referenced in those referrals. Correct?**
A. Before he received them, that is correct, he did not know how many children would be in those referrals.
**Q. Right.**
A. When he received them, he did have a list of children in those referrals.
**Q. On a spreadsheet that DHS provided to him. Right?**
A. Correct.
**Q. And so you -- you -- it's your opinion that it was improper for him to review the cases of additional children included in those referrals that he selected simply because they were not on the list that DHS provided?**
A. No. If -- if he reviewed referrals that -- if he reviewed children from cases that were not in the referrals that were provided to him, then that would be improper.
**Q. No. These were -- let me rephrase it.**

**Mr. Goad -- it's my understanding that Mr. Goad reviewed facts surrounding additional children who were included in the referrals that he selected.**
A. Well, if that's -- if that's the case --
**Q. Uh-huh.**
**A. -- then -- and if he's defining his population in terms of the unit of observation being referrals, then I think that would be proper.**
**Q. Okay. But why not -- why would it be improper in terms of the -- even assuming hypothetically that the unit of observation were wards instead of referrals?**
A. Well, if the unit of observation were wards, then he had a population of wards that -- that he was selecting from. To go outside that population would then --
**Q. Okay.**
**A. -- of course, not be -- those children had a zero probability of being selected into a sample because they weren't in the population, so it wouldn't be a simple random sample.**
**Q. Well, he did -- he wouldn't have known that those children existed, so it's not as if there was a zero chance. They would have a chance of being chosen if they were included in the referrals.**



MR. RESETARITZ: Objection to the form.
Q. (By Mr. Kapell) I see what you're saying.
A. But they were not, so --
**Q. I understand what you're saying. The fact of the matter is that Mr. Goad's sample was based on referrals. Correct? He selected a number of referrals. Is that your understanding?**
A. That --
**Q. It was the selection of referrals that comprised his sample?**
A. It's not entirely clear from his report that that's what he did, but, yes, I can infer that from his report. He never states that his unit of observation was referrals.
**Q. But you can infer from his report and from the deposition testimony in this case that he selected the sample by reference to referral numbers and not by reference to children?**
A. I can, yes.
**Q. Okay.**
A. Yes. Yes. Because he reports his sample size in terms of referrals.
**Q. Right. And given that to be the case, am I correct that you don't see anything wrong with him reviewing the facts surrounding additional children**



**contained in those selected referrals that may not have been included on the spreadsheet that DHS provided to Plaintiffs?**
A. I don't see anything wrong with that in reviewing those cases, but when you start to include it in counts of wards, then -- then there is a problem.
**Q. Okay.**
A. Because the wards were not the -- number one, the wards were not the unit of observation, but number two, those wards were not in his original population.
**Q. Well --**
A. They -- they were included by -- if you -- if you -- if his population is referrals, then -- and if he were merely given a list of referrals and told to go out and find all the children in them, then, yes, I think this would be proper.
**Q. It's not that he was told to go out and find the children; that's what he did --**
A. Yeah.
Q. -- correct? And you don't see anything improper with that?
A. Well, I do -- I don't see anything improper with going out and finding the children and



reviewing their cases, but I do see things improper with including them in counts of wards to produce statistics from.
**Q. Let's -- I'd like to direct your attention to page -- to your Goad report, which is Exhibit 901, page 4. At the top of the page you're making a distinction there between children in DHS custody and children placed in foster care. Do you see that?**
A. Yes, I do.
**Q. Do you agree that DHS has a duty to keep all children in its custody reasonably safe regardless of whether they're placed in a foster home or a group home or a trial home reunification or some other type of placement?**
A. I -- I can't -- it would depend on your definition of duty. If you mean a legal duty, then I don't think I can express an opinion on that because I haven't read the statutes.
**Q. Okay. So you don't know whether DHS has a duty, a legal duty to keep all children in its custody safe, reasonably safe?**
A. I do not. I do not.
**Q. You make the statement -- in the section on unit of observation, you make the statement that --**

**it's the second paragraph of this section. "That units of referral will usually be more independent and less correlated than units of children, so referral is the better unit of observation for sampling and statistical inference."**
**Do you see that?**
A. Yes, I do.
**Q. Do you agree that the process undertaken by Mr. Goad of reviewing investigation files and entering information from those files into a database did not involve statistical inference?**
A. Yes.
**Q. He didn't try to determine the relationship between different sets of variables, did he?**
A. I don't recall him doing that in his report, no.
**Q. Now, he -- there was an attempt in his report to calculate confidence intervals. Correct?**
A. Correct.
**Q. And that does involve some level of statistical inference?**
A. Correct -- well, it -- confidence intervals are often used in inference, so yes.
**Q. And, in your view, referrals were a better unit of observation than children for the purpose**



**of determining the confidence intervals?**
A. For -- yes.
**Q. And this is because, in your view, referrals will typically be more independent than units of wards?**
A. Correct.
**Q. Okay.**
A. Because one of the assumptions that you're commonly using in applying a confidence interval and inferring from it is independence.
**Q. If two children who are part of the same referral are reported to be subject to different types of abuse or neglect, would you agree that the relationship between those children is not perfectly correlated?**
A. Yes.
**Q. I'd like to refer you to page 5 of your report. The second paragraph in particular and the last sentence of that paragraph, you state that, "Mr. Goad fails to cite or credit the source of his random numbers."**
**Do you see that?**
A. Yes, I do.
**Q. I assume you're referring to his report that he fails to credit?**



A. Yes.
**Q. The source of his random numbers in his report?**
A. Yes.
**Q. Did you review his deposition transcript?**
A. I did, yes.
**Q. Did you review all of it?**
A. I did, yes.
**Q. Do you recall him testifying that another individual named Dr. Richard Thompson conducted the random sample?**
A. I do, yes.
**Q. Are you aware that the Defendants chose not to depose Mr. Thompson in this case?**
A. I was not aware of that, no.
**Q. Have you ever reviewed a deposition transcript from Dr. Thompson?**
A. I have not.
**Q. Okay.**
A. I have not.
**Q. Would you agree with me that the Defendants could have asked Dr. Thompson about the source of the random numbers used to generate the review sample?**
A. Yes.



MR. RESETARITZ: Objection as to form.
THE WITNESS: Yes.
Q. (By Mr. Kapell) All right. Do you know what type of software package was used to analyze the data from Mr. Goad's review?
A. I -- I'm trying to recall his deposition. I don't know for sure what -- what software package was used. I --
**Q. If I told you it was SPSS, would that sound familiar with you?**
A. I would have guessed it was SPSS, yes, sir.
**Q. I'd like to read you a passage from a report by another one of the Defendants' experts, Shlomo Sawilowsky. And he states at pages 18 to 19 of his report regarding Dr. Milner's case record review that, open quotes, PASW, parens, now IBM, SPSS, closed parens, and Excel, the two software packages used extensively by Plaintiffs' experts, either directly contains a pseudo random number generator or has many commercial add-in modules that provide a C number in order to create a replicable sequence of pseudo random case IDs, closed quote.**
**Do you agree with that statement?**
A. Yes.

**Q. So assuming Mr. Goad and Dr. Thompson were using SPSS, do you know of anything that would have stopped the Defendants from inquiring whether that SPSS program contains features that allow the user to create a replicable sequence of randomly selected numbers?**
A. No, I do not.
**Q. In the section of the -- the next section of your report entitled Sample Size, you state that, "Mr. Goad did not reference a sample size calculation in any of his materials."**
**Do you see that?**
A. Yes, I do.
**Q. Okay. I'm going to have to show you a table from Mr. Goad's report. I'm not going to mark this as an exhibit, but it's table 3-1. Here it is.**
A. That looks like it.
**Q. Table 3-1 on page 12 of Mr. Goad's report. And I'll put that page in front of you and ask you, do you agree that that table sets forth the size of each of his sample categories?**
A. Yes, it does.
**Q. And do you recall Mr. Goad testifying at his deposition that Dr. Thompson determined the**



**number of samples to be drawn in each category?**
A. Yes, I do.
**Q. Would you agree with me that Defendants could have asked Dr. Thompson how he calculated the sample size if the Defendants had wanted more information than what Mr. Goad provided in his report and in his deposition testimony?**
MR. RESETARITZ: Objection as to form.
THE WITNESS: Yes, I do.
Q. (By Mr. Kapell) I'd like to direct your attention to page 7 of your report, which is part of your discussion regarding confidence intervals. And in the second paragraph on page 7 you discuss the data for children in a referral would be correlated. Is that right?
A. Yes.
**Q. And this is the same point that you were making in page 4 of your report in the discussion of unit of observation?**
A. Correct.
**Q. I -- am I correct that the discussion on page 7 is not directed to the calculation of confidence intervals in connection with Mr. Goad's findings based on counts of referrals?**
A. You are correct.



**Q. It only pertains to his count -- his calculation of confidence intervals based on the number of wards?**
A. Correct.
**Q. All right.**
A. Well, let me amend that. This is a discussion of -- starts out with a discussion of independent observations, and there -- there could be some correlation between referrals as well.
**Q. Well, are you --**
A. So, it would apply there as well. You -- you might want to make corrections for correlation amongst referrals as well.
**Q. Are you opining in your report that Mr. Goad should have done so?**
A. No, I don't think so.
**Q. All right. The opinion in your report was limited to his calculation of confidence intervals involving numbers of wards?**
A. That's correct.
**Q. All right. Now, you also state in the second paragraph on page 7, the paragraph that starts, one assumption is. You state -- there's a parenthetical in that paragraph where you state that you would leave it to Mr. Goad to calculate**



**the amount -- let me read you the sentence before that too. It says, "The correlation of those wards response times would effectively widen the confidence interval. And then the parenthetical. I leave it to Mr. Goad to calculate the amount."**
**Did you attempt to calculate the confidence intervals for Mr. Goad's findings?**
A. I -- I did later calculate some confidence intervals, I think.
**Q. Where is that?**
A. Using a conservative assumption.
**Q. Let me ask you another question.**
A. Yes.
**Q. Are any -- does the report contain all of the confidence interval calculations that you made?**
A. Does my report contain all of the confidence interval calculations that I made?
**Q. Yes. Did you make other confidence interval calculations that are not included in the report?**
A. In the process of -- of analyzing Mr. Goad's results, I did make some confidence interval calculations that are not in the report.
**Q. Do you recall what those findings were?**
A. Yes. The one specifically that I recall

was that I -- I tried to apply a -- a common method of -- of calculating a confidence interval on a proportion using the Wald approximation and I did not get the same result as Mr. Goad or Dr. Thompson got, so I was ruling out the Wald approximation. So it's still a mystery to me how they calculated their confidence intervals.

**Q. So basically you're saying that you were unable to replicate his calculations?**

A. Yes, I am saying I was unable to replicate his calculations.

**Q. All right. And you're not expressing any opinions in your report, are you, about what -- what you believe the proper confidence intervals should be with respect to units of wards as the -- with respect to children as the unit of observation?**

A. With respect to children? Let me think about that.

**Q. So let me ask you again just so it's clear.**

A. Okay.

**Q. With respect to children as the unit of observation, you're not expressing any opinions, are you, about what the proper confidence intervals should be?**



A. I'm only expressing the opinion that the confidence intervals would be wider.

**Q. Right. But you have -- you're not expressing an opinion as to how wide those levels should be?**

A. I am not --

**Q. Okay.**

**A. -- yes.**

**Q. So you don't know, sitting here today, do you, how much different the confidence intervals would be assuming you took the correlation impact into account?**

A. I do not.

**Q. I'd like to direct your attention to the bottom of page 7. And you say in the last paragraph on that page that, "Mr. Goad has at least four and possibly more data entry errors in his referral and contact dates."**

**Did you look at the case files with respect to those four purported errors to compare the information in the files to the information entered on the database?**

A. No, I did not.

**Q. Can you describe each of these four errors?**

A. Yes, I can.



**Q. Please do.**

A. This would be on page 8 at the bottom in the footnote 14, so we have -- the second row we have a contact date that was 2409, 400 years in the future. ID21, we have a contact date that was prior to the referral date.

**Q. Which one was that?**

A. ID21. It would be the ID column 21.

**Q. I see. Okay.**

A. And then ID26, you have two wards that were contact date 1899. And then ID45 you have a contact date prior to the referral date again. And then ID59 the contact date is missing.

**Q. You view that as an error?**

A. Well, no, that may not be an error, no.

**Q. Okay. Are those all the errors that you detected in his referral and contact dates for his entire review?**

A. Yes.

**Q. All right. And you're not expressing any opinion outside of those particular errors, are you about -- about other errors?**

A. Only that it indicates some issues with data quality --

**Q. Okay.**



**A. -- yes.**

**Q. But the -- that conclusion is based on these particular errors and none others?**

A. It is.

**Q. So in your report the sentence that I read before, when you said that he has at least four and possibly more data entry errors, the word possibly there is just a speculation on your part that there might be others. Is that fair? As opposed to certainty on your part that there were?**

A. It's -- it's a -- the -- I can make mistakes too. That's -- I may have missed some other data errors.

**Q. Okay. But you don't know for certain if you did?**

A. I do not.

**Q. All right. The last -- on page 8 of your report you state that, "Mr. Goad's calculations are too unreliable to be used to draw inferences."**

**Do you see that?**

A. No.

**Q. It's -- well, I'll read you the whole last sentence on page 8. You say that, "His estimates involving counts of the observation unit referrals might be salvageable, but as presented in**

**Mr. Goad's report, they were drawn from a nonrepresentative universe in that the universe contained 420 referrals while Mr. Goad's universe contained 343 referrals. They may not be a simple random sample. They include children outside of the universe and the calculations are also too unreliable to be used to draw inferences."**

**What are you referring to there when you say the calculations are too unreliable to be used to draw inferences?**

A. The variability in the width of his confidence intervals. That if he wanted to specify a plus or minus 5 percent, we don't know actually what precision he wanted to specify, that his -- his confidence intervals have a wide range so drawing inferences from them will be difficult.

**Q. Isn't it true that there were some confidence intervals -- well, strike that.**

**What do you consider to be a wide range for purposes of your last answer?**

A. Let me think. I -- it will be difficult to put a number on what a wide range is, but the practice, the usual practice would be to specify that we would like to have a 5 percent precision and anything outside of that that we guide our



inference, that if it weren't in our confidence intervals, then we could make an inference on it.

**Q. So you're saying the usual practice is to have a 5-percent confidence interval?**

A. I'm saying a usual practice is to specify a precision for the confidence interval ahead of time, and usually for a minimum sample size. So some of Mr. Goad's calculations use a lot fewer children than his full sample, so they get the -- the confidence interval gets wide there. And by wide I mean greater than whatever he specified in determining his sample size, which we don't know.

**Q. So you're saying the usual practice is to specify the precision for your confidence interval ahead of time?**

A. Yes.

**Q. How would you know the confidence interval ahead of time? Don't you have to calculate it after you've determined the --**

A. You're selecting your sample size to meet your confidence interval specification as Dr. Milner did.

**Q. We may be talking past each other as far as confidence levels and confidence intervals. My understanding is that Dr. Milner specified a**



**95-percent confidence level?**

A. Right.

**Q. Right. And I'm focused on confidence intervals here. I thought that's what we were talking about. When you were talking about the variability of the width of the confidence intervals, you were referring to confidence intervals. Right? Not confidence levels. When you said that some of Mr. Goad's -- some of his confidence intervals have a wide range?**

A. Yes.

**Q. So I was asking you, what is a wide range of confidence intervals? And you said it was difficult to put a number on it --**

A. Yes.

Q. -- correct? And then I believe you said that it was -- the usual practice to specify precision for confidence intervals ahead of time. And that's what I'm trying to get a better understanding of.

A. Okay. Yes. So the precision -- you'd specify -- in specifying the confidence interval, you'd specify both the precision and the interval width. So you -- when you're -- when -- as in Mr. Goad's analysis, the -- the counts used in



one -- in his calculation may vary quite a lot. If he fixes the confidence interval at 95 percent, then his precision varies. But if he fixes his precision, then his confidence interval could vary, so you could go either way. So I'm just wrapping it all up and saying a wider confidence interval. Statisticians often refer to the whole thing as the interval.

**Q. Okay. Is it your understanding that he had varying confidence precision levels in his analysis?**

A. He did, yes. Yes, it is my understanding.

**Q. Can you show me where in his report that's the case if I give it to you?**

A. Sure. I'll find one. Here's confidence interval.

**Q. I'm asking about precision confidence levels, not confidence intervals.**

A. When he refers to a plus or minus around his estimate, that's what I'm talking about in terms of the precision.

**Q. See, I was referring to those as intervals, the plus or minus?**

A. It is an interval and it has a certain precision associated with it which varies. So you

can fix your 95-percent confidence that you have within that interval and the interval varies.

**Q. But the 95-percent level, is it your understanding that he used different levels other than 95 percent?**

A. No, it's not.

**Q. That's what I was trying to get at.**

A. No, no, no. Yeah. So I'm saying the precision varied.

**Q. Okay.**

A. You could let one vary or the other vary, so you could have a consistent 5-percent precision with a lower confidence interval.

**Q. Right.**

A. Okay?

**Q. But what he did, if I'm not mistaken, is calculate a 95-percent precision level and then his intervals varied depending on the particular variable in question?**

A. He has a 95-percent confidence level but his precision varies, I think.

**Q. Okay. We're on the same page?**

A. Are we? Okay.

**Q. It's your understanding that he had a 95-percent confidence level for his calculations?**



A. Yes.

**Q. And that didn't vary from estimate to estimate?**

A. That's -- that's my understanding --

**Q. All right.**

**A. -- from his report, yes. So he let the precision vary.**

**Q. Right. And you can't define what a wide range would be for purposes of saying that he had a wide range in his confidence intervals?**

A. Well, in order to define that, I think I would have to know what his -- the parameters that he was using for his sample size calculation were, and I don't know what those were.

**Q. So, going back to page 8 of your report, which is where we started here when I was asking you the basis of your statement that the calculations are too unreliable to be used to draw inferences, you said that the basis of that statement was the variability of the width of his confidence intervals. Is there any other basis for that statement?**

A. Yes, in that the 77 referrals missing from his universe.

**Q. Well, you referred to that before. Right?**



A. Right. So that's part of the basis for saying it's unreliable. It would be difficult to draw inferences about the universe with 77 referrals missing from the universe.

**Q. Right. But the way this is presented is that these are different factors?**

A. Okay.

**Q. But you're saying that they're not different factors; for instance, the issue about the 77 is subsumed in your last statement that the calculations are too unreliable. I'm trying to figure out what all the bases are here. So if there's anything -- if there's any basis for the last portion of that sentence where you say that the calculations are too unreliable to be used to draw inferences beyond what you've already said in this sentence.**

A. Oh, okay. Yes. And -- yes. So I am saying specifically that the calculations are too unreliable to be used to draw inferences. And in that I'm also referring to the lack of specification of the confidence interval calculation. I don't know what calculation they used for the confidence intervals, but I do know that it was symmetric and that most or all, I



think, of the confidence intervals that they have here are on proportions and those would not be symmetric any more than 50 percent, so that makes them less than reliable.

**Q. You say you don't know what calculation they used for the confidence intervals?**

A. Uh-huh.

**Q. Again, isn't that a question that could have been posed to Mr. Thompson?**

A. It is.

**Q. All right.**

A. Yes.

**Q. I'd like to direct your attention to page 9 of your report. You have a chart on page 9 that's entitled Mean Time to Investigation.**

**Do you see that?**

A. Yes, I do.

**Q. Did you prepare this chart?**

A. I did.

**Q. And what was the basis of the information that you used to prepare this chart, if you know?**

A. I believe it's referenced below in footnote 15.

**Q. And what is --**

A. It's a federal report, Child Welfare

Outcomes Report.
**Q. And do you have an understanding of what constitutes the initiation of an investigation under Oklahoma policy?**
A. No, I have not reviewed Oklahoma policy to see what.
**Q. Do you know if there is a policy in Oklahoma that defines what constitutes the initiation of a response to a report of potential abuse or neglect?**
A. I do not know.
**Q. Now, this chart on page 9, is it fair to say that it includes children not in state custody?**
A. Yes.
**Q. In fact, in all likelihood, the vast majority of the referrals depicted in this chart involved children not in state custody. Correct?**
A. Yes. Correct.
**Q. Mr. Goad reviewed referrals of children in state custody. Correct?**
A. That's correct.
**Q. Do you know what DHS's mean time to investigate is for referrals involving just children in DHS custody?**
A. I do not.



**Q. Did you ask DHS for that information?**
A. I did not.
**Q. Do you know if they track it?**
A. I don't.
**Q. Would you expect it to be tracked?**
A. I would not expect the mean to be tracked, but I would expect them to track the time to contact for referrals in custody and elsewhere.
**Q. Okay. But to have a -- a separate tracking of the -- of the time for referrals involving just children in custody?**
A. I would expect them to have that.
**Q. Now, you state in the paragraph below this chart that, "Illinois median time to investigate is 13 hours versus 80 hours in Oklahoma." Is that correct?**
A. No. I believe you said median and I think it's mean.
**Q. Mean time. If I said median, I apologize. Yes.**
**"The mean time to investigate in Illinois is 13 hours versus 80 hours in Oklahoma?"**
**A. Correct.**
**Q. And that you worked for 6 years with Illinois and that you've learned that Illinois**



**practices very different from the rest of the country.**
**Can you tell me what work -- what was the 6 years of work you did with Illinois?**
A. I continue to work with Illinois as part of the Permanency Innovations Initiative and through the Fostering Court Improvement Project. So it's ongoing. But I think I've described that work previously.
**Q. What are the -- how do you arrive at the 6 years? Can you break that down for me?**
A. In 2005 I believe I started working as a -- as staff to the University of Illinois with Illinois data.
**Q. And have you been working with that data through the University of Illinois since 2005?**
A. Yes.
**Q. So you've had their data every year from 2005 to the present?**
A. Yes.
**Q. And Illinois, were they involved in the Fostering Court Improvement Project?**
A. Yes.
**Q. Were they one of the coward states?**
A. Yes.



**Q. And when --**
A. They're the lead coward, yes, since the project was housed in Illinois.
**Q. And when were they involved with the project, or how long have they been involved with the project?**
A. For 6 years.
**Q. For 6 years?**
A. Yes.
**Q. Continuously?**
A. Yes.
**Q. And they still are?**
A. Yes.
**Q. And so they're still providing reports to FCI?**
A. They're replying -- reporting -- supplying data to FCI, yes.
**Q. Right. They're -- have they been providing their NCANDS and their AFCARS data continuously for the last 6 years?**
A. Yes, they have.
**Q. And I think I may have asked you this before, and I apologize if I did, but when was the change made from University of Illinois to University of North Carolina in connection with the**

**FCI project?**
A. Yes. I -- I don't know if you asked me that before. But Dr. Testa moved last year. Do you want me to be more specific than that? I'm not sure if I can.
**Q. Well, so last year being 2010?**
A. Yes. 2010.
**Q. So it was in 2010 that the University of North Carolina began hosting the data for FCI?**
A. I think so, yes. That's my recollection.
**Q. Now, what is it that you've learned about practice in Illinois that led you to conclude that it's very different from the rest of the country?**
A. The -- the main thing that I had in mind here, the main data point that I had in mind here was Illinois's response to reports of maltreatment, that they were moved to foster care very very quickly, much more quickly than -- than most states. So Illinois' median time from a referral to a removal to foster care is 1 day. It is in a few -- it's similar in a few other states, about 1 day to 2 days, but there are some states that take up to 45 days to remove. So Illinois has a practice of responding very, very quickly and very -- very decisively I would say.



**Q. Okay.**
A. And I also do have in mind there that Illinois has the lowest removal rate in the country as well. So it's the combination of a very fast response that -- coupled with a -- what appears to be a very high bar for removal to foster care, differentiates Illinois.
**Q. So they're not removing that many children relative to other states, but the children that they are removing they remove very quickly?**
A. That's right.
**Q. Well, doesn't that leave open the question of all the other reports that don't result in removal, which is the majority of reports. Right? Since you're saying that they don't remove that many children. What you said before about how Illinois removes children within a day is inapplicable to all those other reports that don't result in removal. Right?**
A. True, yes.
**Q. So what is it about DHS -- about Illinois practice, if you know, with respect to all those other reports that makes them -- that makes their mean time to investigate so low?**
A. I don't -- I don't know that.



**Q. Okay.**
A. I -- you know, the only timeframe I have to go on from my Fostering Court Improvement reports is the timeframe from -- for the children who have been removed to foster care. So I -- I don't have contact dates in NCANDS, so I can't -- I can't speak to that.
**Q. Okay.**
A. I only have the federal data to go on there.
**Q. But that's the large portion of their investigations, right --**
A. It is.
Q. -- involving children who have not been removed?
A. Yes. And in Illinois case, it's very large proportion.
**Q. Right. And, as far as those referrals are concerned, involving the children who were not removed, you're not sure -- is it fair to say that you're not sure how their practice is different from the rest of the country?**
A. That's fair to say, yes.
**Q. Okay. In the last paragraph on this page you make the point that New York state has the**



**highest federally measured rate of maltreatment in foster care, and it also has the second shortest mean time to investigation. Right?**
**A. (Nods head).**
**Q. Are you suggesting that there's a causal connection between a shorter time to investigate and a higher rate of maltreatment in foster care?**
A. I am not.
**Q. Do you agree that New York's relatively fast time to investigate is not likely to be the cause of its higher rate of maltreatment in foster care?**
A. I do agree, yes.
**Q. You agree that other factors are likely to be the cause of their high rate of maltreatment in foster care?**
A. I do, yes. I -- I -- yes.
**Q. In fact, isn't it possible that if the time to investigate in New York were longer, that maltreatment might be even higher?**
A. I -- I don't know that. What I'm pointing out here is that there -- there may not be a causal relationship between that response time and the rate of maltreatment in foster care.
**Q. All right. But isn't it possible that, if**

Page 158

**the time to investigate were longer, that the maltreatment rate might be higher?**
A. It is possible.
**Q. Are you suggesting that shorter response times after a report of potential abuse or neglect has been received are not something states should be striving for?**
A. No. I'm --
**Q. You're not suggesting that?**
A. No. I'm not suggesting that.
**Q. Do you think that it's something that states should be striving for?**
A. I do, yes.
**Q. On page 10 of your report, the first sentence under the section the protection of CPS investigation, you state that you challenge the assumption that CPS investigations protect children from harm.**
**Are you suggesting that agencies do not need policies and standards that set out how to respond to reports of potential abuse or neglect?**
A. No.
**Q. All right.**
A. No.
**Q. Are you suggesting that it is acceptable**

Page 159

**for CPS workers to ignore or violate agency policies or standards that set out how to respond to reports of potential abuse or neglect?**
A. I'm not.
**Q. Can you agree with me that child safety is advanced when CPS workers make in-person contact with alleged victims within a reasonable time after a referral is received?**
A. Yes.
**Q. And can you agree with me that child safety is enhanced when CPS workers avoid long gaps during which time no activity in response to a referral takes place?**
A. Yes.
**Q. Can you agree with me that child safety is advanced when completion of the response is done within a reasonable time?**
A. Yes.
**Q. Can you agree with me that child safety is advanced when CPS workers make contact within a reasonable time with sources for likely to have information necessary to make an accurate determination of what type of intervention is necessary?**
A. Yes.

Page 160

**Q. Are you aware that DHS policy requires case workers to make in-person contact with alleged victims within a specified period of time?**
A. Yes, I am.
**Q. And are you also aware that DHS policy requires workers to complete their response to a referral within a specified period of time?**
A. I -- no, I'm not.
**Q. You don't know what DHS policy is as far as setting up -- as far as whether there's a timeframe for the completion of -- strike that.**
**You don't know if there's any DHS policy that sets a timeframe for the completion of a referral --**
A. I do not.
Q. -- investigation? Okay.
Do you know if DHS policy requires workers in Oklahoma to contact sources who are likely to have information about a referral?
A. I -- I can't recall. I may have read that in Mr. Goad's report, but I -- I'm uncertain.
**Q. Okay.**
A. For Oklahoma DHS policy. I did not read the policy myself.
**Q. Do you think it's inappropriate to assess**

Page 161

**whether DHS is complying with its own CPS policies?**
A. I'm sorry. Could you read that again? Do you think --
**Q. Yeah. Do you think it's inappropriate for someone to assess whether DHS is complying with its own CPS policies?**
A. No, I do not think it's inappropriate.
MR. KAPELL: Why don't we take a short break. Can we do that?
VIDEO TECHNICIAN: We're off the record at 2:30.
(A break was taken.)
VIDEO TECHNICIAN: Back on the record at 2:38.
Q. (By Mr. Kapell) I'd like to refer you to the bottom of page 11 of your report directed to Mr. Goad, and in particular the section caption Perpetrator Relationship?
A. Yes.
**Q. I think you testified before that the federal CFSR measure of maltreatment in foster care does not include maltreatment perpetrated by biological parents? Is that correct?**
A. That's correct. Among others.
**Q. What others?**

A. Relatives. There are many other relationships that -- it only specifies two relationships.
**Q. And those are foster parents and facility staff?**
A. Correct.
**Q. Do you think that including maltreatment by bio parents and relatives in addition to maltreatment by foster parents and facility staff would result in a more thorough understanding of abuse-in-care in a given state?**
A. I do.
**Q. A more accurate understanding of abuse-in-care?**
A. I do.
**Q. At the bottom of page 10 of your report you state that it is your opinion that, "It's currently implemented the CFSR measure serves to inform us more about state reporting practices than about the true underlying incidents of maltreatment in foster care."**
**We talked earlier today, didn't we, about those reporting practices and I asked you to get me some more specific information about what reporting practices you had in mind?**



A. Yes, we did.
**Q. And would you agree that state reporting practices can reflect differences among states in the quality of the protection that states are providing to children in their custody?**
A. Yes, it can.
**Q. Now, you also state in the last sentence on page 10 that you think that training and policy are the primary drivers of the high variability of the federal CFSR maltreatment in foster care measure.**
**Do you see that?**
A. Yes, I do.
**Q. How is that -- in the prior paragraph you said that you -- that practice differences are responsible for variations or the large variations in the maltreatment rates are primarily the result of practice differences. And then in this paragraph -- or I'm sorry. Strike that. Strike that question.**
**Let's just focus on your statement in the last sentence on page 10, that "The decrease in Oklahoma's federal CFSR maltreatment in foster care measure from fiscal -- federal fiscal year 2007 to federal fiscal year 2009 is an example of why you think training and policy are the primary drivers**



**of the high variability of this measure."**
**Do you see that sentence?**
A. Yes, I do.
**Q. So, if you're saying that training and policy are primary drivers of the high variability in this measure, would you agree with me that poor worker training is likely to have a negative impact on maltreatment in foster care, on the rate?**
A. Negative in the sense that it will underreport. It could over report as well, so negative in the sense that it will be less accurate, yes.
**Q. Well, so if workers are poorly trained that there is likely to be more abuse-in-care. Is that a fair statement?**
A. No, I don't think it is.
**Q. Well --**
A. If workers are poorly trained, they could be reporting more abuse-in-care or less abuse-in-care. And the -- one of the significant problems with this measure is that it is tied to just these two perpetrator relationships, which do -- do require some subjectivity from the -- the case manager.
**Q. So it's hard to say, if workers are poorly**



**trained, it could result in higher maltreatment -- in a higher maltreatment in foster care rate or I guess under some potential circumstances, it could result in a lower maltreatment in foster care rate?**
A. Yes.
**Q. All right.**
A. And this is my point about the variability in this rate across states being so high. It could be due to a lot of different things.
**Q. All right.**
A. There are a lot of places for subjectivity and variability here.
**Q. But at the top of page 11 of your report.**
A. Uh-huh.
**Q. You say that you, "Find it reasonable that the 53-percent decrease in Oklahoma's maltreatment in foster care rate is primarily due to a training change, namely that Oklahoma made changes to its SACWIS system in December 2007 that should help workers identify when a referral should be entered as a policy violation rather than an investigation."**
**Do you see that?**
A. Yes, I do.
**Q. So are you suggesting that before that**

Page 166

**Q. ... training change that you're referring to there, that Oklahoma was counting policy violations as substantiated abuse or neglect?**
A. I'm saying that I find it reasonable -- I find Oklahoma's footnote, which I've quoted there, to be a reasonable explanation for why they might have had over reporting.
**Q. Right. But you don't know for certain that that's the case, do you?**
A. I do not. I do not.
**Q. Because you didn't perform any independent assessment of whether Oklahoma DHS was reporting cases of abuse or neglect that were really policy violations?**
A. I don't know that. I'm merely looking at the temporal correlation here and saying that they made a change in 2007 and this pattern is consistent with that change.
**Q. Okay. Based on the timing --**
A. Yes.
Q. -- that you're seeing?
And -- but I just want the record to be clear. You didn't review Oklahoma's data to see if that theory could be confirmed?
A. I did not.

Page 167

**Q. And isn't it also possible that the decline in the abuse-in-care rate from 2007 to 2009 could be the result of DHS's decision to conduct an administrative review of all substantiated findings of abuse or neglect starting in 2008?**
A. It certainly could.
**Q. Are you aware that Oklahoma's abuse-in-care rate for federal fiscal year 2010 is 99.2 percent?**
A. I -- I was not aware of that.
**Q. So you don't know whether that rate reflects DHS's administrative review of substantiated findings?**
A. No, I do not.
**Q. In other words, you're not sure if the 99.2 rate is before or after the administrative review of substantiated findings has been conducted?**
MR. RESETARITZ: Objection as to form.
THE WITNESS: No. I was not aware of the administrative review.
Q. (By Mr. Kapell) On page 11 in the paragraph right before the section entitled Perpetrator Relationship, you state that, "The lack of consistency and objectivity in state reporting can be overcome by independent reviewers, but the reviewers need to have detailed knowledge of CFSR

Page 168

procedures."
Is it your opinion that Mr. Goad lacked that knowledge?
A. I did not see that knowledge of CFSR procedures demonstrated in his report, so --
**Q. Did you see a lack of that knowledge demonstrated in his report?**
A. Only in that Mr. Goad did not report the perpetrator relationships and I thought that that was odd.
**Q. Any other basis for concluding that he may have lacked -- strike that.**
**Any -- do you know of any other basis to support your assertion that he may have lacked detailed knowledge of the -- of CFSR procedures?**
MR. RESETARITZ: Objection as to form.
THE WITNESS: Yeah. I'm not asserting that he did not have that knowledge.
Q. (By Mr. Kapell) You're not?
A. I'm not.
**Q. All right. You also say that, "Reviewers need to interview stakeholders." Do you see that?**
A. Yes, I do.
**Q. Is it your opinion that Mr. Goad's methodology was unsound because he did not

Page 169

interview stakeholders?**
A. No, it's not.
**Q. You just made it unnecessary for me to ask you another half dozen questions or so.**
A. Thank you. I'm merely pointing out here that the federal review could be improved upon.
**Q. You note -- you knew before you started your expert work in this case that the state wanted you to provide a critique of the Milner Goad and Hess reports for the purposes of this litigation. Correct?**
A. Actually, when I started I did not know who the experts, the Plaintiffs' experts would be, so...
**Q. Right. But you knew -- you knew that the state wanted you to critique reports for litigation purposes --**
A. Yes, I did.
Q. -- right?
A. Yes.
**Q. And to submit a report that would be contrary to the reports of the Plaintiffs' experts?**
MR. RESETARITZ: Objection as to form.
THE WITNESS: At the -- at the time that we were discussing my work on this case, it was --

reports were a possibility but not necessary -- not a necessity.

Q. (By Mr. Kapell) But you understood, didn't you, that the state wanted you to find or to look for potential shortcomings in the expert reports of the Plaintiffs?

A. Yes.

**Q. And did your knowledge of that fact, do you believe that that biassed you to find problems when you were doing your analysis?**

A. I believe that it -- that I -- I was asked to find problems in the analysis.

**Q. Okay.**

A. Yes.

**Q. Okay. I understand that. And do you believe that that biassed you in connection with the work that you performed?**

MR. RESETARITZ: Object as to form.

THE WITNESS: I don't think that biassed me. I'm trying to be as fair as I can in finding the -- the problems. I do this a lot, not for litigation but in reviewing research, and I find a lot of mistakes. And I don't see that bias comes into it. I'm looking for mistakes, yes.

Q. (By Mr. Kapell) So knowing the purpose of



the review, in your mind, didn't necessarily bias you in conducting the work that you were asked to perform?

A. No.

**Q. We're done reviewing Mr. Goad's report, so if we could take 5 minutes, I'd like to get myself organized and I have a short amount of questioning regarding Dr. Hess's report and then we'll be finished for today.**

A. Great.

VIDEO TECHNICIAN: We're off the record at 2:52.

(A break was taken.)

VIDEO TECHNICIAN: We're back on the record at 3:01.

Q. (By Mr. Kapell) Mr. Barclay, I'd like to focus now on the report that you prepared directed to Dr. Hess?

A. Yes.

**Q. And if we could start with page 2 on that report. In the section of the report entitled Sampling you state there that you, "Collaborated with Children's Rights in the selection of named Plaintiffs for the Kenny A. Versus Perdue Child Welfare Class Action Lawsuit in Georgia's Fulton**



**and DeKalb Counties."**

**Can you tell me which named Plaintiffs you collaborated on?**

A. No, I cannot.

**Q. Okay.**

A. I don't know the names.

**Q. Did you collaborate in some manner with respect to the particular -- with respect to one or more of the children who were actually named as named Plaintiffs in that case?**

A. Yes, I believe I did.

**Q. And in what sense did you collaborate in the selection of the named Plaintiffs?**

A. In the sense that I helped Children's Rights attorneys to get contacts with child attorneys in the state, and there may have been some who -- who came to us via case workers at the agency. I can't recall. It's a long time ago.

**Q. What do you mean when you say there may have been some who came to us via case workers at the agency? There may have been some named Plaintiffs? I'm not sure what you mean by that.**

A. Yes. I mean, in finding named Plaintiffs, we -- I talked to child attorneys and some people who worked for the state agency as well.



**Q. Okay. And your understanding is that, as a result of those discussions, that named Plaintiffs were found for that case?**

A. My understanding is that the result -- as a result of contacts that came from those, name Plaintiffs were found.

**Q. And do you know how many?**

A. I can't recall how many named Plaintiffs there were in county A.

**Q. No, that you collaborated with Children's Rights --**

A. Oh, no. I don't know. I only know -- well, it's so long ago, I can't recall. But I know that I made some contacts to child attorneys and others who then worked with Children's Rights to find named Plaintiffs, I think.

**Q. And the others, as best you recall, were workers at the agency?**

A. Well, this is a long time ago, so there was one case worker that I spoke with back then, and then there were some people at the state office that I spoke to as well.

**Q. What state office?**

A. In Atlanta, the Georgia State Defax office.

**Q. Okay.**

Page 174

A. The division of family and children services.
**Q. Who was that?**
A. I can't remember. It's too long ago.
**Q. And do you remember who the case workers were that you spoke with?**
A. I don't remember, no.
**Q. Do you remember the names of the attorneys, the child attorneys that you spoke with?**
A. Well, I know Linda Pace was one of them and Mary Herman. There was another attorney in -- I can't remember the names.
**Q. And what was the substance of your discussions with Linda Pace?**
A. Linda Pace?
**Q. With regard to the selection of the named Plaintiffs for the lawsuit?**
A. I can't recall. It was too long ago.
**Q. What about your discussions with Mary Herman regarding the selection of named Plaintiffs for the Georgia case?**
A. I can't recall details of the discussion. Too long ago.
**Q. All right. This was the period before the case was filed?**

Page 175

A. This was, yes.
**Q. And you don't recall which named Plaintiffs --**
A. No.
Q. -- you may have --
A. No, I do not.
Q. -- collaborated on selecting?
A. (Shakes head).
**Q. Okay.**
A. No. No, I do not.
**Q. And you go on to say on page 3 that, in your opinion, "The named Plaintiffs in the Georgia case were not representative of the class of foster children in Georgia." Do you see that?**
A. Where did I say that?
**Q. I will find -- here, in the first full paragraph on page 3. "In my opinion." It's the third sentence of that paragraph. "Even during Georgia's low point, the named Plaintiffs in the case were not representative of the large class of foster children in Georgia."**
**A. Yes.**
**Q. Do you see that?**
A. Yes, I do.
**Q. Are you aware that the class certification**

Page 176

**issue was litigated by the parties in the Georgia case?**
A. Yes, I am.
**Q. And you're aware, aren't you, that the Defendants opposed Plaintiffs' request for class certification?**
A. Yes, I am.
**Q. And you're aware that the federal court granted class certification in that case?**
A. Yes.
**Q. And are you aware that, in granting class certification, the Georgia court specifically found that the named Plaintiffs were typical of the class they represented?**
MR. RESETARITZ: Object to the form.
THE WITNESS: No, I was not.
Q. (By Mr. Kapell) You're not aware of that?
A. Yes.
**Q. If you would have known that, would that change your opinion that the named Plaintiffs were not representative of the large class of foster children in Georgia?**
A. No, I don't think it would. No, it would not.
**Q. Okay. And the fact remains though that**

Page 177

**your opinion that the named Plaintiffs were not representative of the class was rejected by the court. Correct?**
MR. RESETARITZ: Object as to form.
THE WITNESS: No, I don't.
Q. (By Mr. Kapell) You don't know that?
A. I don't know that.
**Q. Have you ever critiqued a journal article based on qualitative research?**
A. No, I have not.
**Q. Have you ever been asked to do so?**
A. No, I have not.
**Q. Have you ever evaluated a grant proposal based on qualitative research?**
A. Let me think. A grant proposal based on qualitative research --
**Q. Yes.**
**A. -- is the question? No, I have not.**
**Q. Have you ever been asked to do so?**
A. I have not.
**Q. Have you ever critiqued a dissertation proposal based on qualitative research?**
A. I have not.
**Q. Have you ever been asked to do so?**
A. No, I have not.

**Q. Do you have any personal experience conducting qualitative research?**
A. No, I do not.
**Q. On page 2 of your report, you state that you are not an expert in qualitative research. That's a fair statement, isn't it?**
A. Yes, it is.
**Q. And you also state on page 2 of your report that "Dr. Hess' methods for conducting her analysis were partially disclosed only in depositions."**
**Do you recall saying that?**
A. I can see where I said that on page 2, yes.
**Q. Okay.**
A. Dr. Hess' methods were partially disclosed only in deposition, yes.
**Q. You're not aware, are you, of any limitations on the questions that the state's counsel could have asked Dr. Hess during her deposition about her methods?**
A. No, I'm not.
**Q. Do you know what criteria are used to substantiate qualitative research?**
A. To substantiate qualitative research? No, I do not.
**Q. Well, are you familiar with the concept of**



**recurrent patterning as a qualitative criteria?**
A. No, I'm not familiar with the concept.
**Q. How about the concept of confirmability as a criteria for substantiating qualitative studies?**
A. I have some understanding of it, I would say, but it's a -- it's a concept that -- that I saw as a result of Dr. Hess' deposition, I think.
**Q. Okay.**
A. But, beyond that, no.
**Q. How about the concept of saturation? Is that something that you're familiar with as a criteria for qualitative research?**
A. Not in the context of qualitative research, no.
**Q. How about the concept of credibility? Are you familiar with that concept?**
A. I am familiar with the concept of credibility.
**Q. In the context of qualitative research?**
A. I don't know how it would be different from the concept of credibility outside of qualitative research, but if it is, I'm unaware of it.
**Q. Well, what's your understanding of the term -- or of the criteria of credibility as it's used to substantiate qualitative research?**



A. I -- I don't have a -- an understanding in the area of qualitative research. I do have a general understanding of credibility in that it's equivalent to believable. And how qualitative researchers interpret that, I do not know.
**Q. How about the concept of transferability, is that something that you're familiar with in the context of qualitative research?**
A. Only from Dr. Hess' testimony and maybe some of these references I have here, but I did -- I did look at transferability and tried to get some understanding of that.
**Q. Okay. But it was as a result of reading Dr. Hess' deposition testimony that you became familiar with that concept?**
A. That's correct.
**Q. All right.**
A. For me the -- the concept of external validity and things related to that led me to transferability.
**Q. Okay.**
A. Which seems to be the term that they use in qualitative research, which means something similar.
**Q. But you just testified before that it was**



**the result of reading her -- Dr. Hess' deposition testimony that led you to become familiar with the concept of transferability?**
A. That's correct, yeah.
**Q. Okay. And so you -- am I correct that you learned as a result of reading her transcript, her deposition transcript that qualitative research experts use transferability to -- strike that.**
**Did you learn by reading Dr. Hess' deposition transcript that one of the processes that qualitative research experts implement to ensure transferability is triangulation?**
A. Yes.
**Q. Were you familiar with the concept of triangulation in connection with qualitative research before reading Dr. Hess' deposition transcript?**
A. I was not.
**Q. Okay.**
A. In the context of qualitative research, I was not familiar with that concept.
**Q. Do you understand that -- well, can you define triangulation in the context of qualitative research?**
A. I can only give you a vague recollection of

the definition that you will get some information from one source and you'll try to corroborate that information with another source and, thereby, triangulating.

**Q. Okay. Do you understand that qualitative researchers can triangulate across different sources of information?**

A. Yes.

**Q. Do you understand that they can triangulate across geography, so different counties in a state?**

A. I suppose that they could, and that would be much closer to the -- the concept of triangulation that I'm familiar with in terms of spacial statistics.

**Q. And do you understand that qualitative researchers can triangulate across time?**

A. Yes.

**Q. And in the case of a review, a qualitative research review involving child welfare, such as this case, do you understand that a qualitative researcher can triangulate across people, such as foster parents?**

A. Yes.

**Q. And case workers?**

A. Yes.



**Q. And do you understand that a qualitative researcher in a case such as this can triangulate across foster homes?**

A. Yes.

**Q. Is it your opinion that there's no indication of triangulation in Dr. Hess' reports?**

A. I don't -- I don't have an opinion on that.

**Q. Did you look at any of the named plaintiff case files yourself?**

A. I did not.

**Q. So you don't know if those case files contained information about children other than the named Plaintiffs themselves?**

A. No, I do not.

**Q. And you don't know if those files contained information about children -- other children placed in the same foster homes, say, as the named Plaintiffs?**

A. I don't have any information firsthand on that.

**Q. Or secondhand?**

A. Well, from Dr. Hess, I do.

**Q. From reading her transcript?**

A. From reading her transcript, I think that she did say that.



**Q. Do you understand that the purpose of Dr. Hess' study was not to examine a representative sample from which generalizations can be made as to the class as a whole, that that was not the purpose of her study?**

A. I believe I spent some time trying to -- trying to understand what the purpose of her study was.

**Q. Wasn't it a review of the case files of certain named Plaintiffs?**

A. Yes, it was. That was my understanding.

**Q. And so the purpose was to see -- was to assess case practice in connection with the named Plaintiffs and to assess whether those children had been harmed while in DHS custody?**

A. That's consistent with what I -- with my reading of Dr. Hess' reports, yes.

**Q. And do you also understand that in the course of conducting that review, Dr. Hess found evidence that there were systemic problems that extended beyond just the named Plaintiffs themselves?**

MR. RESETARITZ: Object as to form.

THE WITNESS: Yes, I understand that.

Q. (By Mr. Kapell) But do you also understand



that the purpose of her study was not to examine a representative sample from which generalizations can be made as to the class as a whole?

MR. RESETARITZ: Object as to form.

THE WITNESS: That was my understanding of the -- of her study, was that it was not intended to be a representative sample from which generalizations on the class could be made.

Q. (By Mr. Kapell) Okay.

A. And that's why I'm questioning my generalizations on the class.

**Q. Right. So the first sentence of your conclusion is that, in your opinion, her review lacked a sufficient representative sample to draw conclusions about the class in the case but, yet, you state that that's your conclusion, but, yet, you also state that you understand that that wasn't the purpose of her review. Is that correct?**

A. That's correct.

**Q. All right.**

A. But, nevertheless, in her review, she did draw the conclusions about the class in this case.

**Q. Well, didn't she say that she found evidence suggesting that there were systemic problems?**

Page 186

A. Yes, she did.
MR. RESETARITZ: Object as to form.
Q. (By Mr. Kapell) Okay. And do you dispute that there was evidence suggesting systemic problems in the named plaintiff case files?
A. I do not.
MR. RESETARITZ: Object as to form.
THE WITNESS: I do not.
Q. (By Mr. Kapell) All right. I was going to -- I typically would ask questions about education and employment history at the beginning of a deposition, but I didn't do that today because I wanted to make sure that there was enough time to cover all three of the reports that you prepared. But I'm going to go back to that now --
A. Okay.
Q. -- and finish up with some questions in that area. And so if we can go back to your CV.
A. Yes, I have it.
**Q. Great. You received -- let's focus on your education first. You received a BS degree in mechanical engineering from Tulane University in 1982?**
A. Correct.
**Q. And a master of science degree in**

Page 187

**mechanical engineering from Stanford University in 1985?**
A. Correct.
**Q. How long would the master's program at Stanford take full-time students to complete?**
**A. 1 year.**
**Q. And is that how long it took you to complete the program?**
A. Yes, it was.
**Q. And then you got another master of science degree in electrical engineering from the Georgia Institute of Technology in 1992?**
A. That's correct.
**Q. Was that also a one-year program?**
A. No, that was not.
**Q. How long would that program take to complete for full-time students?**
A. I am not sure. I was not originally in the master of science program. I was in the Ph.D. program, and I'm not sure of the length of time on that one either. Guess, typically four to five years.
**Q. For the master's?**
A. The Ph.D.
**Q. For the Ph.D.?**

Page 188

A. For the master's at Georgia Tech, I'm not sure. I don't know.
**Q. One or 2 years?**
A. I think -- yes, less than 2 years. They might have had a one-year master's, but I don't think so at Georgia Tech at that time.
**Q. Do you recall if it took you longer than it would typically take a full-time student to obtain your master's degree at Georgia Institute of Technology?**
A. Yes, it did, because I was in the Ph.D. program and I wasn't -- I completed the requirements for the master's in the -- in the typical time, but I didn't apply for the master's degree.
**Q. Okay.**
A. Until 1992.
**Q. Okay. When did you complete -- how long did it take you to complete the program for the master's degree, the requirements?**
A. Oh. I don't know. I -- I'd have to go back to my records and see. I don't recall.
**Q. Was it some -- a number of some years?**
A. Yes.
Q. 5 years? Maybe 7 years. I notice there's

Page 189

a gap between 1985 and 1992 between your degrees at Stanford and Georgia Tech?
A. Yes. Well, I was working -- I worked at Sloan-Kettering until -- where's my work experience? Let me see. Maybe I can figure it out from that. So I was at Sloan until 1988, so four years in between that and applying for the master's, but the -- I completed the requirements for the master's much earlier than that but had not applied for it.
**Q. Well, that's right. That's what I'm trying to get a sense of.**
A. Yes.
**Q. So when did you complete the requirements for the master's?**
A. I don't know. I don't know. I'd have to look over my transcripts to see what the required courses were.
**Q. And you believe it took you some years although you're not sure how many years to complete those requirements?**
A. No. A guess would be 2 years.
**Q. Okay.**
A. I was working at the time as well.
**Q. So you were a part-time student?**

A. I was.
**Q. Okay. At Georgia Tech?**
A. At Georgia Tech.
**Q. Okay.**
A. On the co-op.
**Q. And you didn't obtain any other education degrees beyond what's listed in your CV, did you?**
A. I have not.
**Q. So you don't have any degrees in social sciences?**
A. I do not.
**Q. When you were at Tulane, Stanford and Georgia Tech, did you take any courses in social sciences?**
A. No, I did not.
**Q. Now, you've been working toward a Ph.D. in biostatistics at Emory University. Is that correct?**
A. Yes.
**Q. And can you just tell me what bio statistics means?**
A. It would be the -- it would be applied statistics, but applied in the field of public health, so it -- it can alternatively be public health statistics.



**Q. And you've been working toward that degree since 1998, the Ph.D. Is that correct?**
A. I wouldn't say working toward that degree for all that time, no.
**Q. On and off since 1998. Is that fair to say?**
A. Well, off since I don't know when. 2001 maybe.
**Q. Okay.**
A. Maybe I can pin it down based on the work experience. Maybe 2000 -- well, I had my fellowship at the CDC through 2004, so I was an active student still at that time.
**Q. So --**
**A. 1998 through 2004.**
**Q. Okay. And so you haven't taken any steps toward your Ph.D. degree since 2004?**
A. That's correct.
**Q. Have you completed all the requirements except your dissertation?**
A. I have.
**Q. But you're not working on a dissertation presently?**
A. I'm not.
**Q. Have you started working on it?**



A. Yes.
**Q. When was that?**
**A. 2002 to 2004.**
**Q. And what -- what's the subject of it?**
A. The subject of it was spacial statistics and trying to make inferences from spacial statistics in -- using interpolation methods or perhaps regression methods or some combination of those to make inference on a gap missing data in spacial statistics. Long explanation because I didn't complete it and didn't have a title.
**Q. Has any of your coursework or any of your work toward your Ph.D. degree that you've completed concerned child welfare specifically?**
A. Yes. In that I did -- I did a couple of reports during my Ph.D. work on survival analysis in child welfare -- using child welfare data.
**Q. And what was the data that you used?**
A. It's so long ago, I can't remember. At the -- at the time I was -- I had obtained some data from the state of Georgia on length of stay, I believe. And I think I might have supplied -- performed some survival analysis using the length of stay data.
**Q. And this was back when, in the late '90s?**



A. Early -- no. Yeah. Late '90s to 2000.
**Q. Okay.**
**A. 2001 maybe.**
**Q. And I apologize for my ignorance, but can you tell me what you mean by a survival analysis?**
A. Yeah. Applying methods of -- well, alternately known as life tables but survival analysis. It comes out of cancer research in which I worked earlier, the name survival. So it would be methods for handling censored observations and statistics. And censored meaning we have a certain period of time under which we have the unit under observation, patient, child. And then after that we don't know. So we censor at that point. So you get -- by putting it together into a survival analysis, you take out some of the bias that's produced by the censoring that we lose track of patients sometimes. In the case of cancer treatments, you look at and apply chemotherapy, for instance, and look 5 years out the road and see what percentage was surviving at 5 years. But the analysis would include, up until the time you lost track of them, it would include patients that you might have lost track of.
**Q. Okay. But with regard to the child welfare**

**data that you used, were you attempting to estimate mortality rates --**
A. No.
Q. -- of the children?
A. No. We have a lot of problems with censoring in child welfare because we lose track of children --
**Q. Right.**
**A. -- after they leave custody sometimes.**
**Q. So what was it that you were using the child welfare data for? Toward what purpose?**
A. I can't remember the specifics of the analysis I did back then.
**Q. Okay.**
A. I just know I did -- in one of my student projects, I think I used some of the child welfare data because it was had -- it had censored observations.
MR. KAPELL: Just one second. I just have to get something from my briefcase.
Q. (By Mr. Kapell) If we could turn to page -- the third page of your CV under the employment section.
A. Yes.
**Q. Or actually going back to the first page.**



**It indicates that you had worked for 15 years in medical imaging research. And so then I wanted you to flip back to the third page and ask you which jobs comprised those 15 years of medical imaging research? Is it the -- all 5 of them or is it 2 through 5? In other words, starting research scientists with the cardiothoracic research lab and the three bullets that follow that?**
A. It would be those in addition to some consulting work that I did after leaving the cardiothoracic research lab.
**Q. Okay. Is the consulting work referenced on your CV that you were just referring to?**
A. Yes, partially, in that -- in the consulting third bullet, Software Architecture Consulting, Java and Web.
**Q. Right. Through 1997. So is it fair to say that the 15 years in medical imaging research that you reference on the first page of your CV that that includes that software architectural consulting work that's listed in the last bullet on page 2 --**
A. Uh-huh.
Q. -- and then the second, third, fourth and fifth bullets at the top of page 3?



A. Yes. In addition to some other consulting after 1997, which I didn't list.
**Q. So maybe it was more than 15 years in medical imaging research?**
A. No. How many is that? '86 through 2001, I --
**Q. So the -- what about the last -- you're not including the research assistant job?**
A. No, no, no.
**Q. I see. Okay. So tell me again which work comprises the 15 years of medical imaging research? The last bullet on page 2?**
A. The last bullet on page 2.
**Q. What other bullets?**
A. And under employment the second, third and fourth bullets.
**Q. Okay. The top bullet on page 3, the fellowship with the Centers For Disease Control. Was that full-time or part-time work?**
A. Part-time work.
**Q. Do you know about what percentage of your time was spent on that project?**
A. Let me think back. I should. I think it was about a 25-percent engagement.
**Q. And then so now turning to page 2, just**



**kind of working our way up from the bottom of the page, the software architecture consulting work for on job and web technologies, was that full-time or part-time work?**
A. Part-time.
**Q. And what about the bullet point above that, the simulator for Thomson's Physicians World, was that part-time?**
A. I would -- yes, that was part-time.
**Q. And the bullet above that, statistical software consultant, building of Markov and Monte-Carlo simulators, was that part-time or full-time?**
A. Part-time.
**Q. For that top bullet, were you a full-time -- I'm sorry. Were you a consultant for Policy Analysis, Inc., or a consultant for these companies that you have listed, including Pfizer and Wyeth?**
A. I was a consultant for Policy Analysis, Inc.
**Q. Just if we could focus a little bit on the ongoing and past projects listed on page 2 of your CV. We've already talked about the Fostering Court Improvement Project, the first bullet, so I won't**

**ask you about that again. But the second bullet refers to your serving as a consultant to the Georgia Supreme Court Committee on Justice for Children, 1998 to the present. I assume that's part-time?**
A. Yes.
**Q. And can you tell me what you've done in that role?**
A. Oh, my. Quite a lot of things that -- my wife is the director of the Georgia Supreme Court Committee on Justice for Children, so I work with her a lot on data analysis, presenting to judges, selecting cases for file reviews.
**Q. What kind of file reviews? What kind of cases?**
A. Oh, well, they'll select cases looking for representation, for instance, looking for child representation, looking for whether foster parents were notified of hearings, that sort of thing. She has to report under the Court Improvement Project to the federal government on a lot of things.
**Q. I'm just trying to get an -- I don't quite have an understanding of what you're doing with regard to this committee. Can you try to give me a little bit more --**



A. I guess you could say that I serve as the data consultant for anything to do with child welfare in the courts in Georgia. And it's via this committee --
**Q. Okay.**
**A. -- largely.**
**Q. So what kind of data do you work with in connection with the committee?**
A. Almost entirely agency data through AFCARS and NCANDS but also the raw records are also supplied to me in Georgia and I produce NCANDS files from them.
**Q. When you say the raw records, what are you referring to?**
A. I'm referring to records from their SACWIS system in Georgia that aren't necessarily -- they have more information than the NCANDS.
**Q. Right. Is it individual child case files?**
A. Individual child case files, yes.
**Q. And so do you review those records personally?**
A. No. I compile statistics from those records.
**Q. But do you -- do you review the records in order to determine the -- the correct statistics?**



**How do you come up with the statistics unless you review the records?**
A. I run them through a program that reads the records and compiles the statistics.
**Q. Okay.**
A. So these are records from a database where they have indicators for fields, maltreatment type, perpetrator, et cetera, so I compiled these statistics.
**Q. I gotcha. Okay.**
A. And then there are some court records as well that have been supplied to me previously.
**Q. And tell me again what the purpose of the statistics, the ultimate purpose of the statistics that you're generating would be?**
A. Many different purposes. So the big project that they're working on in the -- our Georgia court improvement project is the cold case project, where we look at the -- what we've defined as cold cases that would be children in foster care over 24 months who are at high risk for an unfavorable outcome. So they're often older children. And I put together a predictive model that identifies these children with about 95-percent accuracy.



**Q. How many children are in that category?**
A. There were 500 when we originally started working on this and I think we're down to about 200 now. But our definition of cold case has changed because -- because we've been working on it.
**Q. And have you been working on bringing about more favorable outcomes for these children? Is that --**
A. Yes.
Q. -- the goal?
A. That is the goal.
**Q. Uh-huh.**
A. So working with the court system to -- to try and find permanency for children in cases that would otherwise exit to nonpermanency.
**Q. And do you feel you've been somewhat successful in achieving that goal?**
A. I do.
**Q. And how many -- approximately how many children in your study group would you say have found permanency?**
A. Out of the original 500, I can't recall the statistic right now. We had -- you know, this -- this is where the survival analysis comes up. We have a censoring issue, so answering that in a

straightforward way is not easy. It's a complicated answer, in that not all of these children -- well, most of them have not exited yet. So of those that have exited, yes, most of them -- over 50 percent have gone to permanency, have gone to reunification, guardianship or adoption or a relative. But that's -- that doesn't really indicate what the true outcomes are because most of them have not exited yet.

**Q. Are any of the -- are there reports with regard to this project?**

A. Yes.

**Q. Are they publicly available?**

A. Yes.

**Q. Do you know if they're available on the Internet?**

A. Yes.

**Q. If we could focus on the next bullet, you served as a consultant to Georgia State Office of the Child Advocate. Can you tell me what that work has involved?**

A. Yes. That -- that was -- that was the original work that led to the Fostering Court Improvement Project. So the state Office of the Child Advocate wanted some reports and I helped --



I produced those for them. We used the state office of the child advocate's authority to access the data at the agency data, and I used that to produce the reports.

**Q. So these are the types of reports that FCI is preparing now?**

A. Yes.

**Q. And did you have access to Georgia's data during this whole period that you have mentioned in your resumé, 2000 to 2010?**

A. Via the Office of the Child Advocate, yes, I did.

**Q. Is Georgia one of the FCI states?**

A. We consider them one of the FCI states, because Georgia shares its data publicly and particularly FCI was set up to share data with the courts. So that's -- that's the test. And that's why Illinois is not shown on the map, is because they don't share their data with the courts. So Georgia does, but Georgia doesn't have the form -- the agreement with the University of North Carolina. They have an agreement with me through -- well, now directly with me, not through the Office of the Child Advocate, but for those 10 years they did.



**Q. And that's an agreement to provide you with their NCANDS and AFCARS data?**

A. Yes. It's -- well, it's a data sharing agreement that can cover more than just AFCARS and NCANDS.

**Q. Okay. What else does it cover?**

A. All of their -- it covers any records that the Office of the Child Advocate asks for.

**Q. Okay.**

A. They can ask for any records.

**Q. And are any -- have you -- you said that you've prepared reports for the Office of the Child Advocate. Are those reports publicly available?**

A. Yes, they are.

**Q. Do you know if they're available via the Internet?**

A. Yes.

**Q. Did your consulting arrangements with the Office of the Child Advocate end in October of 2010?**

A. I -- my interpretation is that it did. That's -- that's the best I can do.

**Q. Okay.**

A. We haven't formally ended the relationship.

**Q. Why did it come to an end?**



A. The -- the child advocate changed over, and I haven't heard from the current child advocate.

**Q. Okay.**

A. And I have an agreement with the department that allows me to get all the same data.

**Q. How long was the former advocate in place before the current one?**

A. I think Melissa Carter was in there for 8 months.

**Q. Just 8 months?**

A. I think so.

**Q. So you've worked with a number of child advocates that -- in the Office of Child Advocate?**

A. Just three.

**Q. Okay. Who was --**

A. Melissa Carter.

**Q. Who's the one before her?**

A. Tom Ralings.

**Q. And how long was he in that position of the Office of Child Advocate?**

A. I can't remember. Five or 6 years. And I think he did two terms.

**Q. But your work for the Office of Child Advocate goes back to November 2000?**

A. Yeah. Dee Sims was the first selected

child advocate and she preceded Tom.
**Q. So those are the three, Dee Sims, Tom and Melissa?**
A. Yes.
**Q. And now there's a fourth one and you're not sure if you'll be working with her?**
A. That's right.
**Q. Or do you know? What's the person's name?**
A. Tonya Boga.
**Q. Has she told you one way or the other whether she wants you to continue to serve as a consultant to the Office of Child Advocate?**
A. No, she has not.
**Q. If she hasn't told you one way or the other, then why do you assume that the work has ended?**
A. I guess I'm not assuming that. I'm asserting that. So I -- since I was a volunteer anyway, I'm asserting that I'm no longer a volunteer to the Office of the Child Advocate.
**Q. You don't want to volunteer? Is that what I hear you saying?**
A. No. I would be willing to. I haven't been asked to, so I am not saying I am. If she doesn't ask me to do it, I'm not going to do it.



**Q. How long has she been in the Office of Child Advocate?**
A. I think she came in in -- in November or December of last year.
**Q. All right. The next bullet shows that you've done consulting work for the University of Illinois, Jane Adams College of Social Work. Can you just describe what that work is?**
A. That was under the Fostering Court Improvement umbrella.
**Q. Right.**
A. So they paid me to develop additional reports for Fostering Court Improvement and to set up, secure, upload a site for the data. Now, that work actually continues. At the time that I made this CV, we didn't -- we hadn't completed it yet or we hadn't completed the agreements.
**Q. Okay. I think we're just about done here. So that was work that was done under the FCI umbrella?**
A. Correct.
**Q. And tell me -- I apologize if I asked you this before, I don't remember. But what was the reason why the FCI work switched from University of Illinois to University of North Carolina?**



A. No. You didn't ask me.
**Q. Okay.**
A. Dr. Mark Testa, left the University of Illinois for a chair at the University of North Carolina, so he took the project with him.
**Q. I see. Okay.**
MR. KAPELL: I think we are finished.
MR. RESETARITZ: I just have a couple of questions.
MR. KAPELL: Okay.

CROSS EXAMINATION

By Mr. Resetaritz:
**Q. You mentioned that the differences in state rates of maltreatment was affected by state reporting practices. Do these reporting practices include differences in the burden of proof that's used?**
A. Yes.
**Q. Could you elaborate upon that?**
A. Well, I guess an example would be Florida where they had varying levels of proof. They used to report substantiated indicated and unsubstantiated. And when they realized that the federal government was including the indicated reports as victims, they changed their reporting



practices. So now they just report substantiated and unsubstantiated. So I guess that -- that's an example of -- of where they had these very subjective standards that -- that were open to a lot of interpretation. And the statutes vary, the states make their own statutory definitions of maltreatment. There's a certain minimum that for federal funding that's required, but, beyond that, there's a lot of variation in the state statute and policy and practice in determining victims.
**Q. Would you also describe those factors as important differences in state reporting practices that influence differences in state rates of maltreatment?**
MR. KAPELL: Object to the form.
THE WITNESS: Could you restate that, please?
Q. (By Mr. Resetaritz) Okay.
A. That was a little long.
**Q. In terms of state -- differences in state rates of maltreatment, do definitions in state statutes and differences in state burden of proof, are those important influences and differences between the states in maltreatment?**
A. They're important -- yes, they are, but

they are particularly important in the case of the child and family services review safety indicator too, which is the maltreatment in foster care. So that is particularly sensitive to the variations in state burdens of proof. The other safety indicator, which also uses the -- the maltreatment designation, victim designation, is not as sensitive because it's a recurrence rate. So it's one victimization followed by another with presumably a very similar definition between the two.

**Q. Prior to the time that you gave your presentation to Children's Rights, did you advise Children's Rights that you were working in defense of this lawsuit for Oklahoma's law firm?**

A. Yes, I did.

MR. RESETARITZ: I have no further questions.

MR. KAPELL: Okay. I have a few more.

REDIRECT EXAMINATION

By Mr. Kapell:

**Q. Have you attempted to measure or assess, in any kind of scientific way, the impact, the differences in state definitions that maltreatment may have on the federal abuse-in-care rate that's**



**calculated in the CFSR?**

A. I've never made a serious attempt at that.

**Q. Who did you tell at Children's Rights that you were working for Oklahoma in defense of the lawsuit?**

A. Bill Meezan.

**Q. And did you explain to him what you meant by defense of the lawsuit?**

A. I don't know. I don't recall.

**Q. You don't recall telling him that you were serving as an expert witness for the state of Oklahoma?**

A. I don't recall if I used the words expert witness. I do recall telling him that I was working in defense of the Oklahoma lawsuit.

**Q. And that's as much as you remember telling him on the subject?**

A. Well, I -- I remember other things, but not relevant to that.

**Q. Well, with regard to your role in connection with the Oklahoma case, that's what I'm focusing on.**

A. Yes. Is there a question?

**Q. Yes. Did you tell him anything other than that you were working in defense of the lawsuit?**



A. Yes. I told him that I was working with Riggs Abney and that my -- the contract that we were negotiating would have prohibited me from serving as a consultant to Children's Rights. And so I was going -- I was going to ask Riggs Abney to modify that to allow me to serve as a consultant to Children's Rights.

**Q. Is this information that -- this conversation that you had that you told Bill Meezan that you were working in defense of the lawsuit something that you just remembered after I asked you questions about this subject earlier this morning?**

A. No.

**Q. No. Because I asked you about your discussions and you didn't mention this. So is this something that you remembered during a break?**

A. No.

**Q. No?**

A. No. I don't think you asked me about this specifically, so that -- that's why I was --

**Q. You don't think I asked you about the nature of your discussions with Bill Meezan regarding your role on the Oklahoma case?**

A. I don't recall a question that broad. Did



we have one that was that broad?

**Q. I believe that we did. I believe I asked you about the nature of your discussions.**

MR. RESETARITZ: Objection as to form.

Q. (By Mr. Kapell) The record will speak for itself.

A. Okay. I -- you know, it depends on your definition of nature, I guess. There's -- there was plenty of discussion about this, so I don't know whether I'm supposed to recite back all of that discussion or not.

**Q. Well, what else have you discussed about the nature of your work on the Oklahoma case with Bill Meezan prior to the presentation at Children's Rights?**

A. Prior to the presentation? What I can recall is -- is discussing the terms of the contract with Riggs Abney. I think I recall that --

**Q. You discussed the terms of your contract with Bill Meezan?**

A. Yes. In terms of whether it would allow me to consult with Children's Rights or not.

**Q. Right. I think we talked about that earlier this morning when I asked you what the old**

**arrangement was and then what the new arrangement was. And you said that the new arrangement would allow you to testify -- I'm sorry, would allow you to give a presentation at Children's Rights?**

A. Right. But that -- yeah. I wouldn't characterize it as the old or the new arrangement. It was the arrangement.

**Q. Uh-huh. Well, you did in your e-mails characterize it as the old arrangement.**

A. Oh, well, maybe I did. The proposed arrangement from Riggs Abney. There were various proposals.

**Q. Oh. So this testimony that you're giving now that you told Bill Meezan that you were working in defense of the lawsuit, we've had several breaks between the time that I asked you questions about that subject this morning and the time that Mr. Resetaritz just asked you that question now. Is that correct?**

A. That's correct.

**Q. And during those breaks you've had discussions with counsel --**

A. That's correct.

Q. -- for the Defendants?

A. That's correct.



MR. KAPELL: No further questions.

MR. RESETARITZ: Nothing further. We'll read and sign.

VIDEO TECHNICIAN: We're off the record at 4:01.

(Record concluded, 4:01 p.m.)



JURAT PAGE

D.G. VS. HENRY

JOB FILE # 69509

STATE OF OKLAHOMA

SS

COUNTY OF OKLAHOMA

I, Andrew Barclay, do hereby state under oath that I have read the above and foregoing deposition in its entirety and that the same is a full, true and correct transcript of my testimony so given at said time and place, except for the corrections noted.

______________________________

Andrew Barclay

Subscribed and sworn to before me, the undersigned Notary Public in and for the state of Oklahoma, by said witness ___________________, on this ______ day of ________, 2011.

________________________

Notary Public

My Commission Expires: _______________

JOB FILE # 69509



ERRATA SHEET

D.G. VS. HENRY

DEPOSITION OF ANDREW BARCLAY

REPORTER: CHERYL D. KENDALL, CSR-RPR

DATE DEPOSITION TAKEN: JULY 14, 2011

JOB FILE # 69509

PAGE LINE CORRECTION

____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________
____ ____ ____________________________________

CERTIFICATE

STATE OF OKLAHOMA
SS
OKLAHOMA COUNTY

I, Cheryl D. Kendall, Certified Shorthand Reporter, Registered Professional Reporter, within and for the state of Oklahoma, certify that the above-named witness was sworn, that the deposition was taken in shorthand and thereafter transcribed; that it is true and correct; and that it was taken on July 14, 2011, in Tulsa, county of Tulsa, state of Oklahoma, pursuant to Agreement and under the stipulations set out, and that I am not an attorney for nor relative of any of said parties or otherwise interested in the event of said action.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal this 15th day of July, 2011.

CDKendall

CHERYL D. KENDALL, CSR, RPR
Certificate No. 1448