**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| D.G., by Next Friend G. Gail Stricklin; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 08-CV-074-GKF-FHM |
| | ) | |
| C. BRAD HENRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OKDHS DEFENDANTS' MOTION TO EXCLUDE THE TESTIMONY OF VIOLA P. MILLER, Ed.D PURSUANT TO DAUBERT V. MERRELL DOW PHARMACEUTICALS, INC. AND BRIEF IN SUPPORT**

Respectfully submitted,

**RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS, INC.**

Kristopher E. Koepsel, OBA #19147
Email: kkoepsel@riggsabney.com
2 West Sixth Street, Tulsa, OK 74119
Tel (918) 587-3161 / Fax (918) 587-9708

*Attorneys for the Defendants Richard L. DeVaughn, Jay Dee Chase, Steven Dow, Michael L. Peck, Aneta F. Wilkinson, Rev. George E. Young, Sr., Linda English Weeks, Bob Rawlings, Anne M. Roberts, and Howard H. Hendrick*

# TABLE OF CONTENTS


TABLE OF AUTHORITIES……………………………………………………...…..... ii

MOTION ……………………………………………………………………...……….... 1

INTRODUCTION ....................…………………………………………….……….. 1

ARGUMENTS AND AUTHORITIES ....................................……………………… 3

A. Standard for admissibility ........................................................................... 3

B. The opinions expressed by Dr. Miller are based upon incomplete facts and data, and the resulting opinions and conclusions arise from conjecture, subjective belief, and unsupported speculation. ........................ 6

C. Proffered expert will not assist the trier of fact in that Dr. Miller's opinions provide no reliable basis for the existence of generally recognized professional standard. ...................................................................... 12

D. Dr. Miller does not rely on a scientific methodology to reach her conclusions. ............................................................................................... 15

E. Certain opinions expressed by Dr. Miller are based solely upon data and findings of plaintiffs' other experts absent independent testing for validity or reliability. ....................................................................... 17

CONCLUSION ………………………………………………………………….…….. 20

# TABLE OF AUTHORITIES

## CASES


*Attorney General of State of Oklahoma v. Tyson Foods, Inc.*,
565 F.3d 769, 779-780 (10th Cir. 2009) ...................................................... 16

*Berry v. City of Detroit*,
25 F.3d 1342, 1351 (6th Cir. 1994),
*cert. denied*, 513 U.S. 1111, 115 S. Ct. 902, (1995) .................................. 5

*Bitler v. A.O. Smith Corp.*,
400 F.3d 1227, 1232-1233 (10th Cir. 2005) ............................................... 4, 5

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579, 589, 590, 591, 592, 593 (1993) ........................................... 1, 3, 4, 5, 6, 11, 12, 19, 20

*Dodge v. Cotter Corp.*,
328 F.3d 1212, 1222 (10th Cir. 2003) ........................................................ 6, 12

*Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc.*,
546 F.Supp.155, 181 (D. N. J. 2008) ......................................................... 16

*General Elec. Co. v. Joiner,*
522 US 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ........................ 6, 11

*Guzman v. Memorial Hermann Hospital System*,
637 F. Supp. 2d 464, 476 (S.D.Tex. 2009) ................................................ 20

*Hollander v. Sandoz Pharmaceuticals Corp.*,
289 F.3d 1193, 1204, 1205 (10th Cir. 2002) ............................................... 5

*In re Paoli R.R. Yard PCB Litigation*,
35 F.3d 717, 744, 745 (3rd Cir. 1993) ......................................................... 6, 12

*In re Williams Securities Litigation*,
496 F.Supp.2d 1195, 1230, 1232, 1245 (N.D. Okla. 2007) ........................ 4, 5, 16

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137, 152, 592 (1999 ...................................................................... 1, 4, 12

*McGovern v. Brigham & Women's Hospital*,
584 F. Supp.2d 418, 426 ............................................................................... 16

*Mehus v. Emporia State University*,
222 F.R.D. 455, 458, 461 (D. Kan. 2004) .................................................. 9, 16

*Miller v. UPS, Inc.*
No. C-03-2405 PJH, 2004 US Dist. LEXIS 15809 (N.D. Cal.) ................. 11

*Mitchell v. Gencorp, Inc.*,
165 F.3d 778, 781, 782 (10th Cir. 1999) .................................................... 5, 6, 12

*Mooring Capital Fund, LLC v. Knight*,
388 Fed. Appx. 814, 820, (10th Cir. 2010) ................................................. 18, 19

*O2 Micro International Limited v. Monolithic Power Systems,*
420 F. Supp. 2d 1070, 1088, 1089 (N.D. Cal. 2006) .................................. 18, 19

*Ralston v. Smith & Nephew Richards, Inc.*,
275 F.3d 965, 969, 970 n.4 (10th Cir. 2001) .............................................. 4

*Sitter v. Ascent Healthcare Solutions, Inc.*
2011 WL 2682976, ......................................................................................... 11

*TK-7 Corp. v. Estate of Barbouti*,
993 F.2d 722, 732 (10th Cir. 1993) ........................................................... 20

*Truck Ins. Exch. V. MagneTek, Inc.*,
360 F.3d 1206, 1210 (10th Cir., 2004) ....................................................... 4

*U.S. v. Nacchio*,
555 F.3d 1234, 1241, 1258 (10th Cir. 2009) .............................................. 4, 11

*Valley View Development, Inc. v. U.S. ex rel U.S. Army Corps of Engineers*,
712 F.Supp.2d. 1024, 1047 (N.D.Okla.2010) ............................................ 4

*Westfed Holdings, Inc. v. United States*,
55 Fed. Cl. 544, 571 (2003),
*rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005) ................. 5

*Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*,
254 F.3d 706, 715 (8th Cir. 2001) .............................................................. 5

*103 Investors I. v. Square D. Co.*,
470 F.3d 985, 9 (10th Cir. 2006) ................................................................. 10

## STATUTES & RULES


Federal Rule of Evidence 702 ........................................................................ 1, 3, 4, 5, 6, 12

Federal Rule of Evidence 703 ..................................................................... 18

Federal Rule of Evidence 704 ..................................................................... 14

COME NOW, OKDHS Defendants respectfully move the Court for an order excluding the testimony of Dr. Viola Miller as unreliable and inadmissible under Federal Rule of Evidence 702 and the grounds set forth in *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

## INTRODUCTION

Dr. Viola Miller's expert report, opinions, and conclusions are of no evidentiary value and do not meet the reliability requirements for admissibility for expert testimony as prescribed by Federal Rule of Evidence 702. Specifically, the bases for her opinions lack any reliable methodology, as is evidenced throughout her report entitled "A Review of the Oklahoma Department of Human Services' Child Welfare Practices from a Management Perspective." The opinions expressed in the report are formulated from inadequate facts and data, and the chasm between those opinions and the relied upon data is too far of a stretch for her opinions to have any credibility. Due to her reliance on both inadequate and incomplete facts and data, Dr. Miller's opinions and conclusions lack foundation and are unreliable.

A very clear example of this analytical gap between the data and her opinion comes from a statement made by Dr. Miller early in her report. When speaking about the organizational structure of OKDHS, she states "In my opinion, no specific structure is necessary to ensure efficient and satisfactory delivery of child welfare services to children in custody." *See* Exhibit "A" "A Review of the Oklahoma Department of Human Services' Child Welfare Practices from a Management Perspective, by Viola P. Miller, Ed.D., March 15, 2011 ("Miller Report") at p. 12. This very statement demonstrates the lack of depth of her analysis from a management perspective, admitting that there is no specific structure that has to be followed for a child welfare agency, yet she proffers her opinion that the current structure of OKDHS is

"problematic" for children in the custody of the OKDHS Defendants. *See* Exhibit "A" Miller Report at p. 13. Her opinion regarding OKDHS's organizational structure in relation the separation between OKDHS's Field Operations Division ("FOD") and the Children and Family Services Division ("CFSD"), wherein she states that this separation "creates the potential for a serious disconnect between policy and practice," is likewise lacking a foundation as her methodology in reaching this conclusion was to simply look at the organization chart for OKDHS. *See* Exhibit "A" Miller Report at p. 12-13; *see also* Exhibit "B" Deposition of Viola Miller, May 5, 2011 ("Miller Deposition") p. 100, ln. 22-25. Not only is the opinion lacking any foundation, the opinion itself does not put forth a causational link between the structure and harm to children. In fact Dr. Miller has admitted that the organizational structure of OKDHS does not doom OKDHS to failure, and that the "potential disconnect" is not an actual disconnect when questioned about her opinion on the organizational structure of OKDHS during her deposition. *See* Exhibit "B" Miller Deposition at p. 106, ln. 4-15.

Dr. Miller's report addresses the following areas of OKDHS's management: its organizational structure, its quality assurance system, its data management, its workforce management, its placement system, and its private placement providers.[1] In order to render the opinions with regard to these six areas, Dr. Miller reviewed a limited set of information provided

[1] It is interesting to note that Dr. Miller's report tracks another report previously prepared for Children's Rights in its litigation against the State of Michigan by Dr. Cathy Crabtree, entitled "'Formula for Disaster' A Management Review of the Michigan Department of Human Services." Dr. Miller admits to having reviewed this report in the preparation of her report and in drawing her conclusions. Her opinions were arrived at from the opinions expressed in the Michigan case, instead of from her own experience or review of the data presented to her. This clearly demonstrates that her analysis was performed from a preconceived perspective and not in a manner that other professionals with her qualifications would have conducted this study. Even by simply reviewing both the Table of Contents of each report and the recommendations sections of each report, there is a shocking overlap between these two reports. *See* Exhibit "C", "Formula for Disaster" A Management Review of the Michigan Department of Human Services, by Cathy R. Crabtree, 2008.

to her from Children's Rights, neglecting to go beyond any of the information she was provided, thus allowing her to form her opinions in reliance on a clearly insufficient amount of data. Further, in order to reach certain conclusions, she relies solely on the work of other experts identified by Children's Rights without taking any steps to verify or validate any of the research methods or reliability of the findings from those other experts.

The recommendations identified by Dr. Miller at the end of her report are nothing more than subjective conclusions that lack any basis in theory. Due to the fundamental flaws in her methodology, Dr. Miller's review and analysis will not aid the Court in any meaningful way. Her opinions and conclusions are not relevant to the issue of whether the Plaintiff class's substantive due process rights have been violated, and are not helpful to the Court in understanding the evidence or determining any fact in issue. *Daubert* and its progeny dictate that trial courts act as gatekeepers for the purpose of ensuring that this kind of speculative, unreliable expert testimony does not reach the trier of fact. As will be evidenced more fully herein, Dr. Miller's expert report and her testimony do not meet the standards for scientific or expert testimony, and must be excluded by the Court.

## ARGUMENT AND AUTHORITIES

### A. Standard for admissibility.

Under Rule 702 of the Federal Rules of Evidence an expert may testify if "(1) the testimony is based upon sufficient facts and data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." In *Daubert v. Merrell Dow Pharmaceuticals, Inc.* and *Kumho Tire Co. v. Carmichael* the Supreme Court provided guidance and interpretation of Rule 702. *Daubert* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Kumho* 526 U.S. 137, 119 S.Ct. 1167, 143

L.Ed.2d 238 (1999). In applying *Daubert* to determine the admissibility of an expert's opinion, courts examine a number of non-exclusive factors, including:

(1) whether the opinion has been subjected to testing or is susceptible of such testing;

(2) whether the opinion has been subjected to publication and peer review;

(3) whether the methodology used has standards controlling its use and a known rate of error; and

(4) whether the theory has been accepted in the scientific community.

*Truck Ins. Exch. V. MagneTek, Inc*., 360 F.3d 1206, 1210 (10th Cir., 2004). The first part of the analysis under Rule 702 is for the district court to "determine if the expert's proffered testimony-whether it concerns scientific, technical, or other special knowledge-has 'a reliable basis in the knowledge and experience of his [or her] discipline.'" *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-1233 (10th Cir. 2005), *citing Kumho* at 592.

Thus, "Fed. R. Evid. 702 imposes on the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). "The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *U.S. v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (citing *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n. 4 (10th Cir. 2001). "When faced with a *Daubert* objection to proposed expert testimony, the court must adequately demonstrate by specific findings on the record that it has performed its duty as gatekeeper." *In re Williams Securities Litigation*, 496 F.Supp.2d 1195, 1230 (N.D. Okla. 2007). Even in a bench trial, the *Daubert* standards governing the admissibility of expert testimony must still be met. *Valley View Development, Inc. v. U.S. ex rel U.S. Army Corps of Engineers*, 712 F.Supp.2d. 1024, 1047 (N.D.Okla.2010).

At the outset of a *Daubert* analysis, the court must determine that the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion. *Id.* While persons with doctorate level degrees may qualify as experts, it is important for the court to delineate exactly what discipline their expertise lies within. *See Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994), *cert. denied*, 513 U.S. 1111, 115 S. Ct. 902, (1995). *See also, Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) ("To begin with, we agree with the district court that Dr. Curtis . . . easily qualifies as an expert under Federal Rule of Evidence 702. The real question is, *what is he an expert about*?"); *Westfed Holdings, Inc. v. United States*, 55 Fed. Cl. 544, 571 (2003), *rev'd in part on other grounds*, 407 F.3d 1352 (Fed. Cir. 2005). This very court when examining an expert's qualifications stated:

> *Ralston* and like cases establish that the qualification of the proposed expert is to be assessed only after the specific matters he proposes to address have been identified. The controlling Tenth Circuit cases, exemplified by *Ralston*, establish that the expert's qualifications must be both (i) adequate in a general, qualitative sense (i.e., "knowledge, skill, experience, training or education" as required by Rule 702) and (ii) specific to the matters he proposes to address as an expert.

*In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1232 & 1245 (N.D. Okla. 2007).

An expert is not required to necessarily provide general acceptance in the scientific community, but it must be shown that methodology utilized by the expert in drawing his or her opinions and conclusions "is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements. *Bitler* at 1233, *citing Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid." *Hollander v. Sandoz Pharmaceuticals Corp.*, 289 F.3d 1193, 1204 (10th Cir. 2002), *citing Daubert* at 592-593. "Under *Daubert's* reliability prong, 'an inference or assertion must be

derived by the scientific method . . . [and] must be supported by appropriate validation-i.e. 'good grounds,' based on what is known.'" *Id* at 1205, *citing Daubert* at 590.

Under the *Daubert* standard, the courts are directed to focus on the methodology employed by a particular expert in order to determine whether or not their testimony should be admissible, but the courts should also look at the conclusions generated by the experts because such conclusions are not immune from scrutiny. *See Dodge v. Cotter Corp*, 328 F.3d 1212, 1222 (10th Cir. 2003), *citing General Elec. Co. v. Joiner,* 522 US 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ("[A]n expert's conclusions are not immune from scrutiny: 'A court may conclude that there is simply too great an analytical gap between the data and the opinions proffered.'"). It is very clear under *Daubert* that the methodology must be both reliable and applied correctly, and that any misstep in the application of the methodology in or in the reliability of that methodology renders the expert's opinions inadmissible. *Id.* ("Under Daubert, 'any step that renders the analysis unreliable … renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 782 (10th Cir. 1999), *quoting In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 745 (3rd Cir. 1993)).

**B. The opinions expressed by Dr. Miller are based upon incomplete facts and data, and the resulting opinions and conclusions arise from conjecture, subjective belief, and unsupported speculation.**

The preliminary analysis to be conducted by the Court is whether the expert's testimony is based upon "sufficient facts or data." Fed.R.Evid. 702. There is no question that Dr. Miller's report is replete with conclusions arrived at from incomplete facts and data, rendering her testimony inadmissible. As a result of this lack of information, the opinions expressed by Dr. Miller are nothing more than her subjective beliefs arising from conjecture and unsupported

speculation, and oftentimes the result of her own assumptions without any basis in fact. For example, Dr. Miller criticizes OKDHS's separation between the CFSD and FOD and states that "the level of communication both between CFSD and FOD, and within FOD, is woefully inadequate." *See* Exhibit "A" Miller Report at p. 13. However, Dr. Miller admits that she has no evidence or factual data or information to support her statements that there is a lack of communication between CFSD and FOD. *See* Exhibit "B" Miller Deposition at p. 65, ln. 3-12. This conclusion was based on her own speculation and nothing else.

Dr. Miller is critical of various different positions within the OKDHS structure. Dr. Miller derives her opinions regarding these positions out of thin air, having no factual premises for these conclusions. For example, Dr. Miller opines that field liaisons have limited effectiveness because they only serve as consultants, and that this ineffectiveness is part of the problem with the separation of responsibilities between CFSD and FOD. *See* Exhibit "A" Miller Report at p. 13; *see also* Exhibit "B" Miller Deposition at p. 109, ln. 9-21. Upon further inquiry regarding the basis for the alleged ineffectiveness of the field liaisons, Dr. Miller was asked specifically whether there was any specific example in any of the depositions she read that demonstrated this alleged ineffectiveness in how the field liaisons were currently functioning, to which she responded no. *See* Exhibit "B" Miller Deposition at p. 111, ln. 6-10. Despite having no data to support the alleged ineffectiveness of the field liaisons or lack of communication between CFSD and FOD, Dr. Miller leaps to the conclusion that the "structure has created a very troubling disconnect between policy and service delivery." *See* Exhibit "A" Miller Report at p. 15.

There is no question that Dr. Miller did not have complete information in order to draw such a conclusion. She had not been provided with any testimony to support her assertion that

there was a lack of communication between the divisions or that there was any ineffectiveness of the field liaisons. The lack of such data is fundamental flaw of Dr. Miller's conclusions as to the organizational structure. Of course, this is not the only example of the analytical leaps that Dr. Miller made in developing her conclusions.

Dr. Miller's report offers testimony regarding the effect that employee turnover is having within CFSD and on OKDHS generally, yet again such opinions were based on a lack of data. Specifically, she attributes significant turnover as leading to discontinuity and confusion within CFSD, citing the number of different positions that have become available. *See* Exhibit "A" Miller Report at p. 16-17. This majority of this turnover was not unexpected by OKDHS and was in fact planned for by the OKDHS Defendants. Specifically, three individuals identified by Dr. Miller in her report who left OKDHS, left for purposes of retirement, a fact that Dr. Miller was unaware of at the time of her deposition. *See* Exhibit "B" Miller Deposition at p. 123, ln. 19-25. Dr. Miller also did not have any data provided as part of her analysis as to when the successors to these retirees were identified and whether or not any mentoring to place as part of the succession process for these positions. *See* Exhibit "B" Miller Deposition at p. 125, ln. 6-9. All such information would be necessary in order to opine as to the effect of such turnover on OKDHS, yet Dr. Miller did not even consider this factual information as part of her analysis, or inquire further beyond the documentation she was provided.

Dr. Miller further criticizes the structure of CFSD in that the supervision of permanency, independent living, CQI, and training is placed under a single Programs Administrator, and labels this combination as "troubling." *See* Exhibit "A" Miller Report at p. 17. She leaps to the conclusion that this combined unit is "simply too big, with too many difficult and very different program areas for one person to properly supervise." *See* Exhibit "A" Miller Report at p. 17.

Once again, when pressed about this opinion, Dr. Miller admitted that she had not seen any information or data evaluating how the unit was functioning. *See* Exhibit "B" Miller Deposition at p. 127, ln. 18-23.

Dr. Miller further criticizes the manner in which OKDHS performs case reviews. *See* Exhibit "A" Miller Report at p. 27. She states that case reviews are a "critical method for evaluating the quality of visits and of casework generally", and then concludes that the manner in which OKDHS is performing their case reviews is flawed. *See* Exhibit "A" Miller Report at p. 27. Once again, Dr. Miller did not review any data relating to any of the case reviews that she was critiquing, nor did she have a fundamental understanding on how many reviews were being performed. *See* Exhibit "B" Miller Deposition at p. 149, ln. 25 through p. 150, ln. 1-2.

Dr. Miller opined on training issues within OKDHS, yet admittedly did not review the curriculum documents relating to OKDHS's CORE training program. *See* Exhibit "B" Miller Deposition at p. 155, ln. 8-18. Additionally, she opined as to reasons for worker turnover in Oklahoma, one of which was the compensation of workers, but relied upon her own general understanding of the reasons why turnover may exist and did not rely on Oklahoma specific information or data relating to turnover. *See* Exhibit "B" Miller Deposition at p. 169, ln. 12-23. In fact, Dr. Miller could not point to any literature to support this opinion and admitted to not having any research on the effect of compensation on turnover within OKDHS. Exhibit "B" Miller Deposition at p. 169, 21-23; and p. 170, ln 4-12.

"The proponent of expert testimony must show 'a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation.'" *Mehus v. Emporia State University*, 222 F.R.D. 455, 458 (D. Kan. 2004). When testimony that is proposed is not grounded in a hard science or where there is a

manner in which the methods of an expert cannot be tested or replicated, those experts must still withstand the *Daubert* scrutiny, and must show that the expertise and opinions they are offering to the court are accepted methodology in the scientific community as well as showing that they have the appropriate knowledge base to offer the opinions. In *103 Investors I. v. Square D. C*o., 470 F.3d 985, 9 (10th Cir. 2006), the court made specific findings with regard to the qualifications of the expert, his knowledge or lack of knowledge as the basis for making such opinions, and the acceptance of his methods in the scientific community.

> In considering the issue of [an expert's] qualifications to render an opinion on whether the busway contained a manufacturing defect, the district court noted that it did not question [the expert's] general qualifications as a fire investigator. The district court concluded that [the expert] was qualified to testify on the origin of the fire. The court determined, however, that plaintiff had not established that [the expert] had any expertise that was relevant to the question of how the contaminants got into this particular duct system. In making this determination, the court noted that [the expert] had testified that: he is not familiar with the basic steps of the manufacturing processes specific to busways; he is not familiar with what precautions are taken during the manufacturing process; he does not know what codes govern the manufacturing process or whether defendant met those standards; and he did not conduct any research into the manufacturing of busways. In addition, the court noted that plaintiff had not demonstrated any generally accepted scientific methodology for addressing the question of how the contaminants got into the busway or that [the expert] had followed any such method.

*Id.*

While the OKDHS Defendants do not dispute that Dr. Miller has certain credentials that qualify her to provide certain testimony regarding a child welfare system, those credentials do not allow her to haphazardly draw conclusions or arrive at opinions that have no basis in facts or data. As previously stated, Dr. Miller attempts to opine regarding management practices, but cannot provide any basis for her theory and in essence states that these came out of her head and does not point to any literature or other method by which those conclusions were draw. Dr. Miller lacks any foundation for her

allegations regarding the management practices utilized by the OKDHS Defendants, and her testimony should be excluded as a baseless conclusion. *See Sitter v. Ascent Healthcare Solutions, Inc.* 2011 WL 2682976, *citing Miller v. UPS, Inc.* No. C-03-2405 PJH, 2004 US Dist. LEXIS 15809 (N.D. Cal.)(In *Miller* "the court sustained an objection to an expert declaration, apparently agreeing with the defendant that the 'declaration is not reliable under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), as there is no foundation for [the] assertion that UPS's investigation was 'inconsistent with recognized management practices' 'the expert did not 'point to any source for these 'practices,' but rather simply asserts in a conclusory fashion that they exist.'").

When an expert relies upon his or her own education, training and experience, the expert must explain factually why and how the conclusions were reached. "An expert witness's testimony can rely solely on experience. When that is the case, however, "the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Nacchio*, 555 F.3d at 1258, *citing* Fed.R.Evid. 702 advisory committee's note (2000). The *Nacchio* court went on to state that that "gatekeeper function requires more than simply taking the experts word for it." *Id.* Nothing in either Daubert of the Federal Rules of evidence requires that district court to admit opinion evidence that is connected to existing data only by the *ispse dixit* of the expert. *Id*, *citing Joiner* at 522 U.S. at 146, 118 S.Ct. 512.

A party who proffers an expert "must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which

sufficiently satisfy Rule 702's reliability requirements." *Mitchell*, 165 F.3d at 781, *citing In re Paoli,* 35 F.3d at 744. Dr. Miller fails to explain how her experience led to her conclusions or how she made such analytical jumps, assuming facts that were not presented to her, in order to draw her opinions.

The court's gatekeeper function with regard to *Daubert* dictates that the court must ensure that the scientific testimony being offered is "not only relevant, but reliable." *See Daubert*, 509 U.S. at 589.[2] "To be reliable under *Daubert*, an expert's scientific testimony must be based on scientific knowledge . . . ." *Dodge*, 328 F.3d at 1222. The Supreme Court has explained that the term "scientific" "implies a grounding in the methods and procedures of science." *Daubert*, 509 U.S. at 590. Likewise, the Supreme Court has explained that the term "knowledge" "connotes more than subjective belief or unsupported speculation." *Id.* Thus, "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation -- *i.e.,* 'good grounds,' based on what is known." *Id.* The assumptions made by Dr. Miller with regard to incomplete data and information makes her conclusions fundamentally flaws lacking any bases in what is known, and should be excluded.

**C. Proffered expert will not assist the trier of fact in that Dr. Miller's opinions provide no reliable basis for the existence of generally recognized professional standard.**

Dr. Miller's opinions are not necessary to assist the trier of fact with understanding the issues presented in the case. For example, Dr. Miller purports to do an in-depth assessment of the organizational structure of OKDHS, but that assessment is nothing more than her viewing the

[2] The Supreme Court held in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), that the gatekeeping function set out in *Daubert* applies not only to expert testimony based on scientific knowledge, but also expert testimony based upon technical or other specialized knowledge -- *i.e.,* it applies to all expert testimony.

organizational chart as she did not speak or even consider speaking with any individual at OKDHS to formulate her opinions regarding the organizational structure and the need for OKDHS to restructure. *See* Exhibit "B" Miller Deposition at p. 100, ln. 22-25. The ultimate issue that needs to be addressed by the Court in this case is whether there is a custom, pattern, or practice that violates the rights of the children in the care of OKDHS Defendants. Dr. Miller admits that she has "no reason to think" that the organizational structure of OKDHS has any effect on child outcomes. *See* Exhibit "B" Miller Deposition at p. 104, ln. 19-25 through p. 105, ln. 1-20. The allegations and criticisms regarding the organizational structure and management of OKDHS are not based on any professional standard, and will not aid the trier of fact in understanding the issues presented at trial.

In formulating her opinions, Dr. Miller identifies her methodology as comparing OKDHS policies with "nationally recognized standards of reasonable child welfare management practice." *See* Exhibit "A" Miller Report at p. 1. Her reliance on accrediting standards and professional organizations lacks validated basis for use in assessment of OKDHS Defendants policy and practices. Miller identifies these standards as follows: "The information provided in these documents was analyzed in the context of nationally accepted standards for child welfare practice; applicable federal and state laws, policies, and guidelines; and my professional experience and expertise." *See* Exhibit "A" Miller Report at p. 6. The nationally accepted standard referred to by Dr. Miller is the Child Welfard League of America's ("CWLA") goal oriented standards.[3] CWLA is not a compliance measure; to the contrary, it is useful as a benchmark to measure continued improvement but not a marker of required performance. *See*

[3] Dr. Miller also makes reference in her deposition to the Council on Accreditation as another basis for the nationally recognized standard, but no such reference is made in her report. *See* Exhibit "B" Miller Deposition at p. 43, ln. 20-25, p. 44, ln. 1-5.

Exhibit "D", CWLA Description of CWLA Standards of Excellence, What is the difference between CWLA Standards, accreditation, and licensing. CWLA standards of excellence are "goals for practice" which are philosophical in nature, intended as a guide to develop and improve service, and are educational in nature. *See* Exhibit "D". Miller cites to CWLA standards at various places in her report, wherein she recites the content of the reference correctly; however, she ignores the context of the CWLA standard, and she creates her conclusion that the OKDHS Defendants' mismanagement results in children being "placed in danger on a daily basis" without any objective standard for such statement. The CWLA standards are benchmarks for continuing improvement rather than a measure of compliance.

Plaintiffs' own experts fail to agree on the acceptance of these standards in the child welfare industry, and it is the position of the OKDHS Defendants that neither the CWLA nor the COA reflect a constitutional requirement.[4] Mr. John Goad, one of Plaintiffs' other retained experts, stated that COA and CWLA standards regarding staffing and management are "a little pie in the sky." Exhibit "E", Deposition of Mr. John Goad ("Goad Deposition), p. 185, ln. 8-12. He further stated that the standards promoted by CWLA and COA are established by private organizations and do not have the power to make law. Exhibit "E", Goad Deposition, p. 208, ln. 23-25 through p. 209, ln. 1-4.

The presentation of such evidence as being a "national standard" has the likelihood of misleading the trier of fact into believe that a failure to meet such standards is in and of itself a violation of the law. Such statements are inadmissible in that they go to the ultimate issue of the case and is impermissible under Federal Rule of Evidence 704.

---

[4] In support of this proposition, the OKDHS Defendants incorporate by reference the arguments and authorities in OKDHS Defendants' Opening Brief in Support of Their Motion in Limine to Preclude Admission of Goals That Do Not Reflect Constitutional Requirements.

**D. Dr. Miller does not rely on a scientific methodology to reach her conclusions.**

The methodology utilized by Dr. Miller in assesses the organizational and management structure of the OKDHS Defendants lacked any theoretic basis for such an assessment. Further, her overall methodology was nothing more than a review of documentation provided by Children's Rights and formulating opinions based on that review. *See* Exhibit "A" Miller Report at p. 5; *see also* Exhibit "B" Miller Deposition p. 29, ln. 14-18.; p. 37, ln. 9-25. Dr. Miller did not speak to any individuals employed by the OKDHS Defendants, meaning that she did not speak to any OKDHS caseworkers, supervisors, field liasons, or management level personnel, and she appears to believe that speaking to those individuals would not have aided her in formulating valid opinions regarding the OKDHS Defendants. *See* Exhibit "B" Miller Deposition at p. 38, ln. 23-25 through p. 39, ln. 1-17. She further neglected to use any formal evaluation tool in her assessment of the OKDHS Defendants. *See* Exhibit "B" Miller Deposition at p. 44, ln. 13-15. In fact, Dr. Miller admitted to not having any formal methodology and that her methodology was not disclosed in her report as it was in her head. *See* Exhibit "B" Miller Deposition at p. 47, ln. 10-12.

Further the analysis prepared by Dr. Miller was labeled as a review from a "management perspective," yet it is unclear what theory or basis there is for her management perspective. Dr. Miller when opining about the overall operation of the OKDHS Defendants agency, could not identify a basis for her management structure outlined in the report. Specifically, when asked if this management structure had a name, she indicated that it did not and that she did not adhere to any management theory. *See* Exhibit "B" Miller Deposition at p. 54, ln. 5-22. When asked to provide a basis for the organizational elements that she believed need to be part of a reorganized

OKDHS, she could not identify any literature upon which she bases her conclusions upon and none was identified in her report. *See* Exhibit "B" Miller Deposition at p. 56, ln. 1-16.

When experts apply methodologies in novel ways, they may arrive at conclusions that result in too great an analytical gap between the data and opinion proffered to be determined reliable. *Attorney General of State of Oklahoma v. Tyson Foods, Inc.*, 565 F.3d 769, 779-780 (10th Cir. 2009). Alteration of an established methodology is a step that renders the analysis unreliable and renders the expert's testimony inadmissible. *In re Williams Securities Litigation,* 496 F.Supp.2d 1195, 1245 (N.D. Okla. 2007).

Dr. Miller's methodology is nothing more that her opinions based on her experience with other state's child welfare systems, and is not based on any other formalized methodology. "Although expert testimony can be admitted based upon relevant experience, there needs to be some objective and verifiable indicia of reliability and relevance." *Floorgraphics, Inc. v. News America Marketing In-Store Services, Inc.*, 546 F.Supp.155, 181 (D. N. J. 2008) "Expert opinions may be based on education, training and experience, combined with reliance on reports, depositions or other information related to the particular circumstances, but an expert must explain factually why and how he reached his conclusions." *Mehus v. Emporia State University*, 222 F.R.D. 455, 461 (D. Kan. 2004). *See also, McGovern v. Brigham & Women's Hospital*, 584 F. Supp.2d 418, 426 (the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts"). Dr. Miller has wholly failed to demonstrate how her experience with other child welfare systems can apply to OKDHS, having failed to perform any in-depth analysis or rely on any measureable mechanism by which her opinions can be checked.

**E. Certain opinions expressed by Dr. Miller are based solely upon data and findings of Plaintiffs' other experts absent independent testing for validity or reliability.**

In drawing certain opinions regarding the OKDHS Defendants, Dr. Miller reviewed and relied upon the reports prepared by Dr. Zoran Obradovic, Dr. Jerry Milner, and Mr. John Goad. With regard to each of these other experts, Dr. Miller made no attempt to understand the methodologies utilized by these experts, nor did she make any attempt to determine the validity and reliability of their data and findings, despite drawing conclusions and opinions regarding the functioning of OKDHS's data management system and its provision of care and services. Other than reviewing the reports of these other experts, Dr. Miller neglected to take any steps to replicate the findings of those other experts.

Dr. Miller opines that the computer data system utilized by OKDHS lacks integrity in reliance upon Dr. Obradovic's report. *See* Exhibit "A" Miller Report at p. 32-34. Upon being questioned about her efforts to determine the reliability of Dr. Obradovic's report, she stated that other than reviewing Obradovic's report there was not basis for her conclusion. She took no steps to validate the findings of that report, she took no steps to validate the reliability of the findings of that report, and she took no steps to replicate those finding. *See* Exhibit "B" Miller Deposition p. 67, ln. 1-21.

Dr. Miller also draws opinions about the management of OKDHS based upon the findings of both Mr. Goad and Dr. Milner, and likewise she neglected to take any steps to validate their findings. Dr. Miller relies on Dr. Goad's finding that OKDHS's "entire system for responding to maltreatment reports of children in custody is deficient," as part of her criticism of the management structure of OKDHS. *See* Exhibit "A" Miller Report at p. 51-53. With regard to Mr. Goad's analysis she stated that she did not independently evaluate the validity of the data

sampling, she did not review the reliability of the survey design, and she took not steps to replicate his findings. *See* Exhibit "B" Miller Deposition at p. 87, ln. 10-21. When asked the same questions regarding her efforts to validate Dr. Milner's findings, her answers were the same, that she did not independently assess the reliability or validity of Milner's data. *See* Exhibit "B" Miller Deposition at p. 87, ln. 22-25. Shockingly, despite the fact that these reports are the premise for her conclusions relating to OKDHS's management practices as they relate to responding to abuse and neglect reports, Dr. Miller has stated that her opinions would not change even if a determination was made that neither Dr. Milner's or Mr. Goad's reports were reliable or valid. *See* Exhibit "B" Miller Deposition at p. 88, ln. 8-15; p. 173, ln. 12-23.

An expert is not entitled to testify to opinions that rely on the work of another without verifying the validity and reliability of that data. "Although an expert may not adopt another's data without verifying the validity and reliability of that data, Rule 703 allows an expert to rely on facts or data relied upon by experts in the particular field in forming opinions or inferences upon the subject; an expert is not required to testify only upon data the expert has personally gathered or tested." *O2 Micro International Limited v. Monolithic Power Systems,* 420 F. Supp. 2d 1070 (N.D. Cal. 2006).

In *Mooring Capital Fund, LLC v. Knight*, 388 Fed. Appx. 814, (10th Cir. 2010), the proposed witness was an economist. He sought to rely upon a real estate appraisal prepared by another to testify that the party suffered lost rentals. The Trial Court did not permit this:

> [The expert's] references to the 2004 report do not suggest that he made any systematic effort to evaluate the methods employed in the appraisal or to evaluate its applicability to the present circumstances. There is no indication that he has any particular background in real estate leasing operations or that he undertook any investigation to independently determine what the leasing activity for a shopping center of this sort in this location would have generated….any opinion testimony as to what lease revenues from the shopping center would have been in various circumstances, or as to the reasonableness of the 2004 report's assumptions, must be excluded.

*Id* at 820 (quoting trial court opinion, internal citations omitted). The Tenth Circuit found that the trial court had not abused its discretion, and noted, that based on the *Daubert* standards "any step that renders the analysis unreliable renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Id.* In the case at bar, Miller deliberately choose not to perform any analysis with regard to the work performed by Obradovic, Goad, or Milner. Any opinion relying on the work performed by Obradovic, Goad and Milner should be excluded.

Again Miller testified that she did not verify the validity and reliability of the data or methods utilized by Obradovic, Goad, or Milner. Even her own description of her qualifications to perform the management analysis demonstrate that she simply does not have the expertise to do an analysis of the OKDHS data management system, or the data analysis performed by Goad and Milner. Therefore, she is relying completely upon others whom have been named as an expert for everything in her opinions relating to the computer data system, OKDHS's response to referrals of abuse or neglect, and allegations of abuse and neglect while in care. Her report relies heavily upon certain stated percentages from the Goad and Milner reports. The sections of Miller's report relying on Obradovic, Goad, and Milner are all subjects for which Miller is not qualified to testify about, since these sections of her report are not based on any expertise or knowledge that she possesses.

In *O2 Micro*, the court noted that the evidence supported a finding that the expert there specified what he wanted tested and how it should be tested. There, "the testing was performed according to methods commonly accepted in the industry." *O2 Micro*, 420 F.Supp. at 1088-1089. Miller's testimony makes it very clear that she did not direct the work of Obradovic, Goad or Milner; to the contrary, she admits to having done nothing to understand the validity or

reliability of those studies. Miller is not an expert in these areas and cannot testify regarding whether the findings in those reports were reached properly or whether they are valid or reliable. Without this foundation, Miller's testimony in these areas is cumulative and of no use to the Court.

In *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), the court found that an expert who adopted the projections of another expert did not reasonably rely on those projections when he knew little or nothing at all about the expert and the record did not reveal what efforts the expert independently made to corroborate the projections.

The plaintiffs will likely argue that an expert may offer opinions, including those that are not based on first-hand knowledge or observation. *Daubert v. Merrill Dow. Pharms., Inc.*, 509 U.S. 579, 591 (1993). Experts are not free to base their opinions upon data about which they have no personal knowledge despite the fact "[s]uch a witness need not have observed or participated in the gathering of the data underlying his opinion," *Guzman v. Memorial Hermann Hospital System*, 637 F. Supp. 2d 464, 476 (S.D.Tex. 2009). "Rather, the personal knowledge requirement hinges on whether the expert personally analyzed the data that was made known to him and formed an expert opinion based upon his own assessment of the data within his area of expertise." *Guzman* at 476 (internal quotes and citations omitted). Miller performed no analysis of the data upon which she purports to rely in forming her opinion and recommendations.

## **CONCLUSION**

Dr. Viola Miller's opinions regarding management lack any probative value in guiding the trier of fact, as her conclusions are based on analytical leaps between the data and opinions proferred. Much of her "opinions" equate to nothing more than conjecture, unsupported speculation and her own subjective beliefs. She failed to independently test the validity and

reliability of the other expert's opinions upon which she relied, making her opinions based on those other experts fundamentally flawed.

For each of the foregoing reasons, Viola Miller's testimony should be excluded as having no scientific bases in methodology and as wholly lacking in reliability for the above stated reasons.

Respectfully submitted,

**RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS, P.C.**

By: s/ Kristopher E. Koepsel
Kristopher E. Koepsel, OBA 19147
*Email*: stheban@riggsabney.com
Donald M. Bingham, OBA 794
*Email*: don_bingham@riggsabney.com
Donna M. De Simone, OBA 18271
*Email*: ddesimone@riggsabney.com
502 West Sixth Street, Tulsa, OK 74119
*Tel* (918) 587-3161 / *Fax* (918) 587-9708

*Attorneys for the Defendants Richard L. DeVaughn, Jay Dee Chase, Steven Dow, Michael L. Peck, Aneta F. Wilkinson, Rev. George E. Young, Sr., Linda English Weeks, Anne M. Roberts, Bob Rawlings, and Howard H. Hendrick*

## CERTIFICATE OF SERVICE

I hereby certify that on the 1st of August, 2011, I electronically transmitted OKDHS Defendants' Motion to Exclude the Testimony of Viola P. Miller, Ed.D Pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc. and Brief in Support to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Frederic Dorwart
*fdorwart@fdlaw.com*
Paul DeMuro
*pdemuro@fdlaw.com*
**Frederic Dorwart Lawyers**
124 E. 4th Street, Suite 100
Tulsa, OK 74103-5010

Marcia Robinson Lowry
*mlowry@childrensrights.org*
William Kapell
*wkapell@childrensrights.org*
**Children's Rights**
330 Seventh Ave., 4th Floor
New York, NY 10001

Larry Borten
*lborten@childrensrights.org*
Miriam Ingber
*mingber@childrensrights.org*
Patrick S. Almonrode
*palmonrode@childrensrights.org*

*/s* Kristopher E. Koepsel
Kristopher E. Koepsel