# Exhibit A

# A Review of the Oklahoma Department of Human Services' Child Welfare Practices from a Management Perspective

Viola P. Miller, Ed.D.

March 15, 2011

As a result of these serious, agency-wide failures in the operation of Oklahoma's child welfare system, children are routinely harmed and placed at risk of harm. Until systemic reform of DHS is accomplished, Oklahoma will continue to fail the very children it is responsible for protecting.

**A. Qualifications**

Essentially all of my 40+ years of professional experience has involved working with and advocating on behalf of children and families. Much of my early career was focused on special needs children, particularly the severely disabled. My research work included early childhood development with an emphasis in communicative and language development in young children, skills directly linked to early attachment and bonding. My doctoral work was in special education with a minor in early childhood development. Both my undergraduate and master's degrees were in Speech Language Pathology.

For the past 15 years, I have served as a chief executive officer for public child welfare. For eight years I was Secretary of the Cabinet for Families and Children in Kentucky. This agency has a service array almost identical to DHS. There were approximately 7,500 children in custody and the agency's budget was slightly less than $1 billion. For the past seven years I was Commissioner of the Department for Children's Services in Tennessee, which serves approximately 5,500 foster children and has a budget of approximately $650 million. In both positions, I led major reforms in organization, administration, quality assurance, and direct service delivery, taking both child welfare agencies to national accreditation by the Council on Accreditation. I have served on the executive committee of both the American Public Human Services Association and the National Association of Public Child Welfare Administrators. I have held numerous administrative positions over the years and done extensive work in organizational change management and leadership.

On account of my educational and professional background, I have extensive experience in the areas of children's services, social services agency management, quality assurance, and minimum practice standards. A current copy of my *curriculum vitae* is attached as Appendix B.

**B. Methodology**

I reviewed multiple sources to assess the overall organization and operation of DHS, including:

- DHS policy and regulations;
- DHS organizational charts;
- DHS training materials;
- DHS state and federal child welfare performance outcome data;
- DHS reports and audits;
- DHS budget documents;

- Deposition testimony of key DHS personnel provided in the *D.G. v. Henry* case;

- Plaintiffs' other expert reports completed for the purposes of this case, including Dr. Milner's Case Record Review; Mr. John Goad's Review of the Response by DHS to the Suspected Child Abuse and Neglect of Children in its Care (Mr. Goad's Review), and Dr. Zoran Obradovic's Report on the KIDS System Review and Analysis (Dr. Obradovic's Report).

A full list of the documents reviewed for the purposes of preparing this report is attached as Appendix C. The information provided in these documents was analyzed in the context of nationally accepted standards for child welfare practice; applicable federal and state laws, policies, and guidelines; and my professional experience and expertise.

### C. Historical Background

Oklahoma has long been aware of the serious, ongoing deficiencies in the administration of its child welfare agency. Over the past ten years, a number of federal, state and third-party reports – as well as tragic and avoidable child deaths – have repeatedly highlighted serious failings in the system designed to protect and care for abused and neglected children, including:

- In June of 2001, the Governor's Task Force on Children in Custody presented its Annual Report to the Governor and the Director of DHS, which focused on the lack of support given by DHS to foster parents throughout the state. The report found that children in DHS custody were frequently placed in homes without foster parents receiving adequate information about their needs, medical history, or family history; that DHS was performing only cursory face-to-face visits with children in custody; and that DHS caseworkers were not equipped to answer foster parents' most basic questions about the status of their child's case.[2]

- In the July 2002 federal CFSR for Oklahoma, conducted by the U.S. Department of Health and Human Services' Administration for Children and Families, Oklahoma failed to meet five out of the six national standards reviewed – often by a wide margin. In addition, Oklahoma failed to meet any of the seven performance outcome measures used to evaluate the agency's ability to meet the safety, permanency, and well-being needs of children in its custody. Noteworthy concerns included the fact that Oklahoma was "[n]ot investigating reports of child maltreatment in a timely manner," "[n]ot preventing repeat maltreatment of children," and "[n]ot making sufficient efforts to reduce the risk of harm to children." Furthermore, DHS was "[n]ot providing stable placements," "establishing appropriate permanency goals," or preserving children's connections to their family and community. The review also noted that DHS was not meeting the educational, physical, dental, and mental health needs of children, and services were not accessible to all children and families and were not individualized to serve unique needs.[3]

- In May 2007, Oklahoma published its own CFSR "Statewide Assessment," which documented DHS's continuing failure to protect children. For example, the reported

[2] Governor's Task Force on Children in Custody, Annual Report, June 2001, at 1-5.
[3] Dep. Ex. 174 (CFSR Key Findings Report, Oklahoma, 2002) at 3-4, 6.

The primary responsibility of FOD, the other main child welfare division within DHS, is to ensure service delivery for all of the program areas for which it is responsible, including the two largest – child welfare and family support services.[33] In order to provide these services, the state is divided into "county" offices (confusingly also called Human Services Centers), most of which cover a single county but some of which cover more than one county (primarily in rural areas) and some of which cover less than a county (in Oklahoma and Tulsa Counties). Each county is assigned to one of six administrative areas (known as Areas I-VI), which cover anywhere from eight to 22 county offices.[34] There is also a small central office, headed by FOD Director Larry Johnson, with administrative oversight over all of the area and county offices.[35]

The chain of authority for a child welfare caseworker begins with a child welfare supervisor, who reports to a county director or assistant county director, who in turn reports to an area director, who reports to the director of FOD, Mr. Johnson.[36] The front-line workers and supervisors for all of the other program areas in FOD also report to the county directors or assistant county directors and on up the chain. Mr. Johnson described the responsibility of area directors as primarily "overseeing administration," whereas "the buck stops at the county director for all programs under field operations. . . . They're responsible to ensure that all functions, whether they be program related or general operations within a county office are handled appropriately."[37] This is consistent with the finding of the HZA Audit that "[a]rea offices are viewed largely as administrative in nature. . . . Virtually all program work occurs at the county level."[38]

The primary point of linkage between the program units at CFSD and FOD is through field liaisons. The field liaisons report to the area directors but "the intent is that they serve as the link between the central office program divisions [CFSD] and the line staff in the county offices."[39] The field liaisons "are considered experts in the program to help staff with decisions" and are frequently approached for assistance with difficult cases and for help with training staff on policy.[40] The child welfare field liaisons have no line authority over the child welfare workers and supervisors, even though they often give input into their decisions.[41]

### B. The Organizational Structure of DHS Creates a Disconnect Between Policy and Services

In my opinion, no specific structure is necessary to ensure efficient and satisfactory delivery of child welfare services to children in state custody. While the organizational structure of DHS is particularly complex, this, on its own, does not doom DHS to failure. However, when child welfare policy and service delivery are separated into two independent divisions – as they are at DHS with CFSD and FOD – this creates the potential for a serious disconnect between

---

[33] OAC 340:115-1-1, OAC 340:115-1-3; Field Operations Division: About Us (http://www.okdhs.org/divisionsoffices/hsc/fod/docs/aboutus.htm); Johnson Dep. 6/17/09 at 29.
[34] OKDHS Organizational Chart.
[35] OAC 340:115-1-3; Dep. Ex. 173 (HZA Audit) at 101.
[36] WhiteA-007612 at 23; Poplin Dep. 10/10/08 at 24, 44-45; Johnson Dep. 6/17/09 at 17, 58.
[37] Johnson Dep. 6/17/09 at 47, 57-59; Johnson Dep. 2/15/11 at 21-22.
[38] Dep. Ex. 173 (HZA Audit) at 105.
[39] Ibid. at 102; OAC 340:115-1-3.
[40] Thompson Dep. 2/2/11 at 17-18; Clour Dep. 2/4/11 at 81-83.
[41] Thompson Dep. 2/2/11 at 20-21, 39-40.

policy and practice. Extra effort must be taken to ensure that the policy-makers and those responsible for service delivery are communicating effectively and that those charged with service delivery are given enough authority to perform their role. Unfortunately, the level of communication both between CFSD and FOD, and within FOD, is woefully inadequate. Furthermore, FOD has been stripped of so many crucial responsibilities – including policy, budgeting, contracting, and adoptions – that it is unable to adequately serve the children in its care.

Unfortunately, the effectiveness of field liaisons, who are the primary points of connection between FOD and CFSD, is limited because they do not have line authority over child welfare workers and thus can only serve as consultants.[42] When a field liaison makes a decision, or gives input to a child welfare worker, the county director or assistant county director must always act as an intermediary to ensure that input or decision is effectuated.[43] Therefore, field liaisons serve as an insufficient link between CFSD and FOD.

Another problem with the way DHS has organized its child welfare operations is that the field staff has been stripped of many important responsibilities, which are vital to their ability to deliver child welfare services to the children in DHS custody. These responsibilities have been handed over to CFSD, which is largely disconnected from FOD.

First and foremost, FOD has very limited involvement in decision-making about child welfare policy. This is problematic because child welfare workers and their supervisors are the individuals in the agency engaged directly with casework and direct service delivery and are likely to have valuable insight that should inform policy and practice decisions. Instead, policy decisions are made by CFSD, with some input from high-level administrative personnel at FOD and sign-off by the FOD director.[44] Front-line child welfare workers, their supervisors, and even county directors are not involved in developing child welfare policy.[45]

A second example is the fact that FOD does not have control over the budget for child welfare services, with the singular exception of payroll costs.[46] As Area Director Debra Clour explained, CFSD controls "the purse strings" and decides what services within her area are funded.[47] Similarly, CFSD – not FOD – is responsible for the vast majority of contracts for child welfare-related services.[48] As with policy-making, county directors and the workers and supervisors who report to them are removed from the budgeting and contracting process. According to one county director, she does "not really" have any responsibility for her county's budget and, with the exception of contingency funds, she does not monitor any money related to child welfare.[49] In my opinion, it is completely untenable for FOD to be responsible for service delivery but to lack control for budgeting and contracting for those services. It is precisely those

---

[42] Johnson Dep. 6/17/09 at 66; Thompson Dep. 2/2/11 at 39-40; Clour Dep. 2/4/11 at 70-73.
[43] Thompson Dep. 2/2/11 at 20-21.
[44] Clour Dep. 2/4/11 at 80; Johnson Dep. 6/17/09 at 8-9.
[45] Thompson Dep. 2/2/11 at 75; OAC 340:75-1-6 (a)(1); Johnson Dep. 2/15/11 at 10, 18-20; Burleigh Dep. 2/3/11 at 29; Johnson Dep. 6/17/09 at 7-9; Poplin Dep. 10/10/08 at 40.
[46] Johnson Dep. 6/17/09 at 144-145.
[47] Clour Dep. 2/4/11 at 56.
[48] Ibid. at 55; Johnson Dep. 2/15/11 at 14-15.
[49] Thompson Dep. 2/2/11 at 73-76.

multiple modes of communication,[57] and about the serious communication problems within FOD.[58] Below are some telling comments from the focus groups:

- "Right now, communication is something that is done to us. . . . There is an increasing disconnect between day-to-day work of field staff and State Office. It's an 'us versus them' mentality. Communication is completely one way, and our voices are not heard. The people in State Office are so far removed, they do not know the issues we face every day."[59]

- "Regular workers are not allowed to contact administration without doing [so] through the supervisor or field liaison. It's only an open door for leadership, like field liaisons and County Directors. . . . Employees do not trust administration . . . ."[60]

- "There needs to be true two-way communication. Have a true open-door policy for all staff rather than having this hierarchical procedure. . . . It's hard for employees to feel like they are a part of this thing called OKDHS, especially when we are not heard and we don't have any influence."[61]

- "There are too many places where information is lost in translation because there are too many levels between the front line and the people who make decisions. [The FOD central office] needs to come to the field and talk to real workers – not Field Liaisons [and] not Area Office staff. . . . Unfortunately, the picture on the web is the only time [workers] see leadership."[62]

- "There are so many different layers of OKDHS, and things (policy, information, etc.) get lost in the layers. There are some very bright people, but because of all the bureaucracy, a lot of things just don't happen."[63]

The huge gap in communication between the FOD central office and the county offices makes it almost impossible for policy to be effectively translated into practice.

The separation of the program and service delivery functions of DHS requires extra attention to communication. However, DHS has failed to nurture the required inter-connections between CFSD and FOD, and instead has stripped FOD of much of its authority. This situation is only made worse by poor communication within FOD itself. In sum, this structure has created a very troubling disconnect between policy and service delivery.

---

[57] While they consistently read the intranet and email messages, employees reported that the intranet is "not user-friendly" and "very frustrating" because "[y]ou can't find anything!" and "[t]he policy search engine is a joke." They also felt that the broadcast e-mail messages sometimes fail to convey the importance of the information because it is "just another email" (BR-Grant-00576-77).
[58] BR-Grant-00901.
[59] BR-Grant-00577.
[60] BR-Grant-00577-78.
[61] BR-Grant-00578.
[62] BR-Grant-00578-79.
[63] BR-Grant-00582.

### C. Significant Turnover and Reorganization Has Led to Discontinuity and Confusion

DHS has recently experienced significant turnover of senior personnel at CFSD and reorganization of that division. While some turnover is unavoidable, and change can be productive, too much is damaging and can have a number of deleterious effects. Precious time is spent planning, implementing, and training, and the focus is taken away from a primary mission of the child welfare agency: providing the best possible service to Oklahoma's children and families. Institutional knowledge is often lost and continuity is compromised. It can become very difficult to ensure that a consistent message is passed down when the messengers at the top are constantly reshuffled. In my opinion, too much change has occurred recently at CFSD, and it has almost certainly adversely affected the functioning of this division.

CFSD has had four directors since February 2008 (Linda Smith left DHS in February 2008; Gary Miller left in February 2010; Chief Operating Officer Marq Youngblood served as interim director until August 2010; and Deborah Smith serves as the current director). Bill Hindman served as Programs Director at CFSD – an intermediary position between the director and the programs administrators – for a few months in 2008 before retiring. As far as I am aware, his position has never been filled and appears to no longer exist.[64]

Significant turnover at CFSD has also occurred at the level of the programs administrators, who report directly to the director of CFSD. Three of the six have been replaced in less than two years, since April 1, 2009:

- Kelli Litsch replaced Margaret DeVault as the Programs Administrator for the Prevention and Protection Services Unit.[65]
- Amy White replaced H.C. Franklin as the Programs Administrator for the Continuous Quality Improvement (CQI) and Training Unit.[66]
- Carol Clabo has replaced Mary Grissom as Programs Administrator for the Technology and Governance Unit.[67]

Further, Deborah Goodman was recently appointed Programs Administrator to oversee a new unit for Adoption and Post-Adoption Services.[68] There has also been significant turnover within the individual units of CFSD since April 1, 2009.[69]

This kind of organizational disruption is very problematic because transitions are hard – both for the people who have to adjust to a new position and also for the people who report to

---

[64] Webster Dep. 1/6/10 at 7:14-24, 8:14-16; Webster Dep. 9/23/09 at 27:6-17; "Associate District Judge To Head Oklahoma's Children's Programs" (http://www.okdhs.org/library/news/rel/2008/02/hsc_02092008.htm); "Smith Named Children and Family Service Director at OKDHS," (http://www.okdhs.org/library/news/rel/2010/08/hsc08052010.htm); Org P&P-4-00001.
[65] Litsch Dep. 2/4/11 at 11, 26.
[66] Ibid. at 26-27.
[67] Howell Dep. 2/15/11 at 114-115.
[68] Litsch Dep. 2/4/11 at 27-28.
[69] Ibid. at 25-29; Roberts Dep. 11/9/10 at 41-43.

them. An example is Ms. Litsch, who became the Programs Administrator for the Prevention and Protection Services Unit in September 2010.[70] Six months later, she was still not up to speed on the responsibilities of her new position (*e.g.*, Ms. Litsch was "still learning" about a grant for training through the child abuse and neglect office;[71] was still "learning" about her responsibility for reporting maltreatment statistics to the federal government, and did not know what was included in those statistics;[72] had a "vision" to regularly meet with her direct reports, but these meetings were "not in place yet;"[73] had not "yet" reviewed a report that shows the number of children subject to multiple referrals of abuse or neglect;[74] and was not familiar with the national screen-out rate for abuse and neglect referrals, and had not "[t]o date" compared Oklahoma's screen-out rate to the national average[75]).

In addition to the turnover, there have also been a number of very troubling organizational changes within CFSD. Most problematic is the recent combination of permanency, independent living, CQI, and training under the supervision of Programs Administrator Amy White.[76] Before this change, permanency, adoptions and independent living made up one unit, while CQI and training made up another, each with its own programs administrator. This new combined unit is simply too big, with too many difficult and very different program areas for one person to properly supervise. Moreover, as I discuss further below, it is troubling that continuous quality improvement is combined with, and reports to the same person as, one of the other program units because it is essential that the CQI Unit maintain a certain level of autonomy.

Also concerning is the fact that DHS has recently separated adoptions from the rest of permanency, and created a new, stand-alone unit that focuses only on adoption and post-adoption services.[77] Adoptions are integral to permanency and it makes no sense – except perhaps to reduce the burden on Ms. White – to divide adoptions from the rest of permanency planning.

## II. DHS FAILS TO ENSURE ACCOUNTABILITY AT ANY LEVEL OF ITS OPERATIONS

One of the most alarming findings of this report is that DHS lacks an integrated, functional system of accountability and quality assurance. I am well aware of how difficult it is to implement proper accountability and quality assurance processes. In order to work, accountability and quality assurance must be formalized, consistent, data-driven, and a top priority of the agency's leadership. Both individual and agency accountability must be built into the operational system. Without accountability and quality assurance, an agency like DHS is doomed to repeat the same mistakes over and over again.

---

[70] Litsch Dep. 2/4/11 at 11.
[71] Ibid. at 20-21.
[72] Ibid. at 53-55.
[73] Ibid. at 73, 76.
[74] Ibid. at 90.
[75] Ibid. at 90-92.
[76] Ibid. at 26-27, 74.
[77] Ibid. at 26-28.

In addition to ignoring the quality of its visits, DHS also fails to track whether workers are increasing visitation during times of stress (as required by policy),[169] whether visits are done in private (also a policy requirement), or the length of visits.[170] Nor does DHS appear to track whether unannounced visits or visits within two weeks of each placement are taking place as policy dictates.[171] In sum, DHS's reports do not track whether children are receiving substantive, private visits from their caseworkers, or whether they are simply "drive by" contacts done in order to demonstrate compliance. In the words of Mr. Johnson: "[T]he report is intended to report visits regardless of the . . . quality or characteristic[s] of the visit."[172]

Case reviews are another critical method for evaluating the quality of visits and of casework generally. Unfortunately, the case reviews conducted by DHS's senior leaders are inadequate in a number of ways. Every month, Director Hendrick conducts case reviews, via conference call, and reviews three to five randomly selected cases from each area of children that have been in care for over 24 or 36 months.[173] The purpose is primarily

> to try and brainstorm solutions to help get the child to permanency, see what barriers can be overcome. And sometimes we find systemic issues that arise in those that help us then make a decision on, well, do we need to change policy? Do we need to do something differently?[174]

The first problem with this process is the small number of cases reviewed and the random way in which those cases are selected. The agency would be better served if its leaders focused on problematic areas or counties, or specific types of problematic cases, and reviewed all of those cases. This type of approach would be much more likely to reveal systemic challenges. It is also a mistake to focus solely on those children who have been in custody for a long period of time because children who have been in custody for only a few months will eventually become long-stayers unless any problems are caught early. Finally, this process is set up in a way that makes it unlikely behavior will ever change because key leaders, like area directors, participate only when cases they are responsible for are being reviewed.[175] It is crucial for senior managers to learn from each other's successes and failures, therefore they should participate in all of the reviews.[176]

---

[169] Howell Dep. 2/15/11 at 144.
[170] White Dep. 12/18/09 at 76.
[171] Howell Dep. 2/15/11 at 145.
[172] Johnson Dep. 2/15/11 at 131.
[173] Ibid. at 30; Clour Dep. 2/4/11 at 37-39.
[174] Clour Dep. 2/4/11 at 38.
[175] Ibid. at 38.
[176] While other forms of quality review are conducted at the agency, the same problems permeate these reviews. For example, DHS policy requires child welfare supervisors to conduct at least one comprehensive case review per review period for each worker he or she supervises, plus focused reviews on items related to service refinement that are noted in the Program Improvement Plan (OAC 340:75-18-13). Yet these reviews appear to be conducted on an ad hoc basis. Child welfare supervisor Justin Hoenshell testified that "there's no guarantee of what specific cases we may discuss . . . . It's handled case by case" (Hoenshell Dep, 9/18/08 at 77). Similarly, at least one assistant county director has weekly case reviews that each supervisor is required to attend, with child welfare workers, at least once every five weeks to discuss "hard" cases, but number and selection of cases discussed are left to the supervisor's discretion (Thompson Dep. 2/2/11 at 27-29). In addition, at least one Area Director conducts annual case reviews in each county office (Clour Dep. 2/4/11 at 21). However, this review only covers about five to ten cases, and is

The absence of a functioning CQI process seriously limits the agency's ability to monitor and improve its effectiveness in delivering services to children and families.

### D. The Reports and Data Used by DHS Workers, Supervisors, and Managers Lack Integrity

High-quality services to children and families require data-based decision making. A comprehensive statewide information system is necessary to support casework, strategic planning, and needs assessment. The system must be able to capture individual data that is useful to workers as well as aggregate data that supports policy and practice improvements. Well-designed reports allow an agency to not only see where it needs to go, but to measure its performance and hold people accountable for achieving the goals set. Without defensible data regarding case practice and outcomes, it is virtually impossible to drive good casework. Thus, it is crucial that DHS maintain data that is accessible, easy to use, and – most importantly – accurate. Unfortunately, it appears that much of the data provided to DHS staff is totally unreliable.

According to Dr. Zoran Obradovic, an expert retained by Plaintiffs to review DHS's computer data system, the lack of change control and quality control over the KIDS System creates a high risk that many – if not all – of DHS's child welfare reports contain inaccurate, unreliable, or out-of-date information.[206]

As explained in more detail in Dr. Obradovic's Report, change control is fundamental because the software code underlying the KIDS System is constantly changing, and the programs that extract information from the KIDS System in order to create child welfare reports must be updated accordingly. However, DHS does not have any formal process in place to ensure that changes made to KIDS are implemented in the programs that underlie the child welfare reports. Instead, DHS relies on informal communication from members of the Technology and Governance Unit of CFSD, who have no computer programming background or experience, to ensure that the programmers responsible for the reports are kept abreast of all relevant changes. According to Dr. Obradovic, this creates a serious risk that the child welfare reports are unreliable and out-of-date.[207]

Another serious problem is the almost total lack of quality control over the child welfare reports. "Quality control" refers to various types of testing, which ensure that software code meets the needs of users and is built as intended. Careful testing is necessary to ensure that the child welfare reports are correct, both before they are put into use and on a regular basis thereafter. However, as Dr. Obradovic explains, there is no rigorous testing of whether the software used to create the reports is functioning correctly or meets the end users' needs, nor do the reports themselves undergo any standardized testing protocol.[208] Instead, it appears that DHS's only form of quality control is an informal assessment of whether the reports look like

---

[206] Obradovic Report at 2.
[207] Ibid. at 9-13.
[208] Ibid. at 13-15.

they will work, and a search for problems that "stick out like a sore thumb."[209] As a result, there can be no guarantee that any of the reports are accurate.

As Dr. Obradovic reports, these problems are caused in part by organizational and management dysfunctions within DHS. Ultimate responsibility for the quality of the reports rests with the Technology and Governance Unit,[210] despite their lack of training in computer science or computer programming.[211] The Technology and Governance Unit is supported by a small number of programmers from the Data Services Division, whose supervisor does not have any background or experience in the computer programming languages used to create the child welfare reports.[212] DHS's failure to put in place a properly qualified management team over the crucial area of reporting is unacceptable.

While Dr. Obradovic opined that there is a high risk that every child welfare report is inaccurate, DHS itself has also admitted that there are serious problems with one of the two major categories of child welfare reports in use at the agency, the so-called Access reports (which consist of YI 678, YI 684 and YI 701 reports).[213] As early as June 2010, DHS Data Services Division Programmer John Gelona discovered problems with the YI 684 Access reports.[214] In two June 28, 2010 emails, he provided Technology and Governance Unit Programs Administrator Mary Grissom with several examples of incorrect, incomplete, and/or inconsistent queries.[215] Mr. Gelona continued to email with Ms. Grissom about these issues in early July 2010, describing a number of YI 684 queries as "massively wrong,"[216] and stating that "they are just flat out giving the wrong results, especially the ones dealing with contacts."[217] Mr. Gelona subsequently testified that between 50% and 70% of the YI 684 queries he reviewed were affected by the problems he discovered, and that they provide inconsistent and incorrect information.[218] Ms. Grissom has acknowledged that DHS has insufficient quality control to ensure that the queries used to create the Access reports were accurate, and that she is not certain that any of the reports produced are correct.[219] Furthermore, she testified that it is "[c]ertainly possible" that the same problems identified with the YI 684 reports will also be found with the YI 678 and YI 701 reports.[220]

---

[209] Ibid. at 15-16; Roberts Dep. 11/9/10 at 50-51.
[210] Roberts Dep. 11/9/10, at 61; Jew Dep. 11/9/10 at 80; Gelona Dep. 9/23/10 at 62.
[211] The Programs Administrator of the Technology and Governance Unit, Mary Grissom, stated that she is "not a technical person" and does not "know anything about programming and best practice." She has had no computer science education or programming experience, and neither she nor anyone in her group is able to read or understand computer programming code (Grissom Dep. 9/7/10 at 28, 17-18, 27, 108). See also Roberts Dep. 11/9/10 at 15-18, 46-47; Grissom Dep. 9/7/10 at 44-45; Jew Dep. 11/9/10 at 40-42.
[212] Obradovic Report at 7; Nair Dep. 12/1/10 at 102, 121.
[213] Grissom Dep. 8/5/10 at 48; Grissom Dep. 9/7/10 at 62; Gelona Dep. 9/23/10 at 146, 151.
[214] Grissom Dep. 9/7/10 at 58-59; Issuesw-AccessComm-00003; Issuesw-AccessComm-00004; Gelona Dep. 9/23/10 at 149-150.
[215] Issuesw-AccessComm-00004.
[216] Issuesw-AccessComm-00094.
[217] Issuesw-AccessComm-00003.
[218] Gelona Dep. 9/23/10 at 151-153, 146.
[219] Grissom Dep. 9/7/10 at 67-68.
[220] Ibid. at 95.

In my opinion, the clearest indication that the administration and management of Oklahoma's child welfare agency is deficient is the incredibly high rate at which children in state custody are suffering from abuse and neglect, as demonstrated by Dr. Milner's Case Record Review. He found that:

- 35% of children had at least one formal report alleging that they were the victim of maltreatment while in DHS custody;[345]

- 21% of children were the subject of a maltreatment allegation while in DHS custody that was substantiated or where there was sufficient concern to recommend services;[346] and

- 12% of children were the subject of a maltreatment allegation while in DHS custody that was substantiated.[347]

These findings are alarming, and are evidence of an agency that has failed at the most basic level. Based on my experience, such high rates of abuse in care are indicative not only of a child welfare agency that lacks an adequate system of accountability, but also of a mismanaged, poorly-trained, and overburdened workforce, and an agency with unsafe and inadequate placement and visitation practices for the children and families in its care.

Equally as concerning is the fact that DHS is not adequately responding to referrals of abuse or neglect of children in its care. This serious failure was found by both Dr. Milner's Case Record Review and Mr. Goad's Review. Mr. Goad's Review demonstrates that DHS's entire system for responding to maltreatment reports of children in custody is deficient, including extremely poor quality investigation practices, and places children at further risk of harm, in some instances, even leading to their death. Most importantly, he found:

- The deaths of *five* out of the nine children whose case files he reviewed – all of whom died as a result of abuse or neglect while in DHS custody since January 1, 2007 – could have been prevented if DHS had exercised reasonable steps in protecting those children from potential harm.[348]

- Investigations of allegations that foster children who are placed in foster and kinship care homes have been abused or neglected by their foster parents are untimely, incomplete, display extremely poor-quality decision-making, and fail to include appropriate action to protect children from further maltreatment. Mr. Goad found that as many as 46% of all these investigations conducted in 2009 resulted in flawed findings, placing the agency outside of any reasonable child welfare standard.[349] He also noted DHS's disturbing practice of continuing to use foster and kinship parents as caregivers for children in custody even *after* they had been found to abuse and neglect foster children in their homes.

---

[345] Milner Report at 26.
[346] Ibid. at 26-27.
[347] Ibid. at 27.
[348] Goad Report, Executive Summary.
[349] Ibid.

- Investigations into abuse and/or neglect allegations concerning children in the agency's custody who are placed in shelters, group homes, and residential treatment centers are delayed for shocking periods of time, are routinely superficial, display extremely poor-quality decision-making, and fail to include appropriate action to protect children from further maltreatment. Mr. Goad found that as many as 38% of all alleged victims in these investigations conducted in 2009 were affected by flawed findings, placing the agency far outside any reasonable standard.[350]

- Far too many referrals alleging that children in custody have been abused or neglected by the caregivers with whom the agency has placed them are screened out and not investigated. DHS's failure to identify child abuse and neglect subjects the children about whom the referrals have been made, as well as the other children placed in the same homes or facilities in the future, to danger. Mr. Goad found that as many as 32% of alleged victims in referrals screened out in 2009 were affected by flawed findings, placing the agency far below any reasonable standard of child protection practice.[351]

In sum, Mr. Goad concluded that "[b]ecause of OKDHS's many failures to protect its child wards, foster care in Oklahoma is a dangerous place to be."[352]

While Dr. Milner's Case Record Review did not focus on assessing DHS's response to indications of abuse or neglect of children in custody, it found serious concerns with DHS's practice in this area, including:

- In a large percentage of cases where maltreatment reports were investigated, DHS did not take any action either during or after the investigation in response to the report, such as removing the child from the home, closing the foster home permanently or temporarily, or terminating the child's trial reunification placement.[353] Specifically, in 25% of the cases involving maltreatment reports that were investigated, no action was taken by DHS either during the investigation or after the investigation other than to investigate the report; in 39% of the cases no action was taken during the investigation; and in 45% of the cases no action was taken after the investigation.[354]

- 50% of cases involving maltreatment reports involving children in state custody were referred to the child's caseworker for action rather than conducting a formal investigation, in violation of DHS's own policy.[355]

---

[350] Ibid.
[351] Ibid.
[352] Ibid.
[353] Milner Report at 30-31.
[354] Ibid.
[355] Ibid. at 28. OAC 340:75-3-8.1, Instructions to Staff, No. 2(2) requires that for children in foster or trial adoptive homes, an investigation be conducted on all reported allegations that meet the definition of abuse or neglect, including all non-accidental physical or mental injuries to children of any age; neglect; sexual abuse; and any practices by the foster or trial adoptive parent that involve hitting or striking a child three years of age or younger, even when there is no report or observation of injury.

- 12 children in the sample had information in their case file indicating that possible abuse or neglect had occurred while the child was in DHS custody, but it was not formally reported by DHS, and therefore never addressed.[356]

Testimony from DHS management only further confirms the agency's inadequate and dangerous practices for responding to abuse and/or neglect reports of children for whom it is responsible:

- Tricia Howell, Programs Manager for the Permanency Planning Unit of CFSD, testified that in October 2009, she told Amy White, then-Programs Administrator of CFSD's Permanency, Adoptions, and Independent Living Unit: "I am amazed at how many of our staff think they have no power when they have concerns of care in a foster home. Unless it is blatant abuse, they think the foster parent can do whatever they want. I have seen this with supervisors as well."[357]

- Office of Client Advocacy (OCA) Director Mark Jones, who reports to the Commissioner of DHS, testified that OCA investigates reports of abuse and neglect of all children who are placed in facilities "above" the therapeutic foster care (TFC) level, including shelters, group homes, residential treatment centers and psychiatric hospitals.[358] His deposition testimony makes it clear that the focus of OCA investigations is on the perpetrator rather than the victim and that the findings of OCA investigations are primarily for the purpose of allowing the district attorney to consider possible prosecution.[359] When asked if OCA sends notices to the alleged victim's caseworker when an investigation is pending, he responded, "we don't know who their caseworker is. And, frankly, we don't care."[360] When asked about the definition of "serious risk to the victim" that would require an immediate response under OCA policy, Mr. Jones was unable to provide the parameters his unit uses to assess such risk, stating, "I don't know if it is specifically defined in our rules or in the guide."[361]

- OCA has a process called "caretaker conduct reviews" that allows certain maltreatment referrals – including those involving "minor physical injur[ies]" or "serious physical injur[ies]" that are "unlikely" to be the result of abuse or neglect – to be referred back to the facility to be dealt with internally.[362] Ms. Litsch, Programs Manager for CFSD's unit responsible for CPS, testified that she has never seen any report tracking the number of referrals that OCA refers back to facilities for caretaker conduct reviews, nor was she aware of any measures taken to ensure that caretaker conduct reviews are being conducted under the appropriate circumstances.[363] In fact, from January 1, 2007 to July

---

[356] Milner Report at 27.
[357] Dep. Ex. 409; Howell Dep. 2/15/11 at 137, 149.
[358] Jones Dep. 8/5/09 at 29-35.
[359] Ibid. at 127, 148, 179, 194-195.
[360] Ibid. at 117-118.
[361] Ibid. at 150.
[362] OAC 340:2-3-37; Jones Dep. 8/5/09 at 148-149.
[363] Litsch Dep. 2/4/11 at 53.