# Exhibit B

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA

```
D. G., by Next Friend          )
G. Gail Stricklin, et al,      )
for themselves and those       )
similarly situated,            )
                               )
            Plaintiffs,        )
                               )    Class Action
vs.                            )No. 08-CV-074-GKF-FHM
                               )
C. BRAD HENRY, in his          )
official capacity as Governor)
of the State of Oklahoma,      )
et al,                         )
                               )
            Defendants.        )
```

- - - - - - - - - - - - - - - - - - - - - - - - - -

THE VIDEOTAPED DEPOSITION OF

VIOLA MILLER, Ed.D., produced as a witness on behalf of the Defendants in the above styled and numbered cause, taken on the 5th day of May, 2011, in the City of Tulsa, County of Tulsa, State of Oklahoma, before me, Lisa A. Steinmeyer, a Certified Shorthand Reporter, duly certified under and by virtue of the laws of the State of Oklahoma.



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

Q Okay, okay. The e-mails that were sent to you from Children's Rights, did they have attachments of the documents that you reviewed in preparation for this report?
A No. Because there was so many of them, they sent them another way that allowed them to bundle those for easier transmission, and I know nothing else about that. 09:14AM
Q That's okay, that's okay. Were they sent electronically? 09:14AM
A Yes.
Q Okay. So all the material was sent electronically to you, and you went to either a website or you opened up whatever it was and you viewed it electronically? 09:14AM
A That's correct.
Q Okay. Was -- let me ask you this: Did you review the complaint in this case?
A Yes.
Q You did. Did you review the answers? 09:15AM
A I don't think I reviewed all of them. I reviewed some of the answers I know.
Q Okay. The answers that -- the answer to the complaint that was prepared by the defendants in this case? 09:15AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

A I reviewed -- I'm not -- I'm not sure. I'm sorry.
Q Okay.
A I reviewed a number of legal documents.
Q Do you remember the names of any of those legal documents that you reviewed? 09:15AM
A I'm sorry, I don't.
Q Okay. When you said you reviewed the complaint, an answer to the complaint is something that the defendants -- 09:15AM
A Right.
Q -- do to answer it. Do you remember any document that had the word answer on it?
A I'm sorry, I don't.
Q Okay. Were any assumptions given to you by the attorneys in this case in preparation for this report? 09:15AM
A No.
Q Did you formulate an opinion before you reviewed any material? 09:16AM
A No.
Q Okay. Do you know Howard Hendrick?
A No.
Q Okay. How much time did you spend on the report, writing the report? 09:16AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

A Actually writing it?
Q Uh-huh.
A Oh, I don't know. Quite a long time.
Q Okay. Greater than ten hours?
A Oh, yes. 09:16AM
Q Okay. Did anyone else assist you in writing the report?
A I did the report on Google Docs so that the folks at CRI could look at it as I was moving along and give me any feedback that they wanted to give me. 09:16AM
Q Define Google Docs.
A Okay. It's an online document system where multiple people can view a document at the same time. 09:17AM
Q Okay. When you said it was so that individuals at Children's Rights could give you comments about the document; is that correct?
A That's correct.
Q Okay. Were there comments given about the document? 09:17AM
A Occasionally. Usually when I would ask questions.
Q Okay. Did you have anyone else assist you in the preparation of the report? 09:17AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

of the quality and adequacy of the organizational and prommatic (sic) decision making by the Oklahoma Department of Human Services management and its administration of the state's child welfare system. What is prommatic (sic) decision making; what does that mean? 09:35AM

A Programmatic --

Q Programmatic.

A -- decision making?

Q Uh-huh. 09:35AM

A That has to do with how problems are solved within the context of an organizational structure and how decisions are made.

Q Okay. When -- this paragraph indicates that this work concerns an analysis of the quality and adequacy. How did you perform an analysis of the quality and adequacy? 09:35AM

A By reviewing the materials.

Q Okay. When you -- in this report, the findings in your report, and we will go over this report in its entirety, are those findings similar to any other states that you have been familiar with? 09:36AM

MR. KAPELL: Object to the form.

A I don't know how to answer that. 09:36AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

Q Was it -- do you have any idea of the volume of the documents?
A It's not a great deal. It's maybe eight pages.
Q Okay. Aside from those four areas, was there any other documents that you reviewed in consideration for this report? 09:45AM
A No.
Q Okay. Did you review any e-mails of any individuals at DHS besides the ones that you have listed in your considered materials? 09:45AM
A No.
Q Did you ever ask for any e-mails of any DHS employees in preparation for your review?
A No. 09:45AM
Q Okay. Why not?
A I never saw a reason to.
Q Okay. Did you review any of the indexes that the defendants produced in this case that listed all the documents that were produced? 09:46AM
A Can you clarify? I'm sorry.
Q In documents that were produced in this case, there were also an index of the documents. Have you reviewed any index of any documents that were produced by defendants in this case? 09:46AM

A No.
Q Did you ask to review any of those indexes?
A No.
Q Okay. Did you ever speak to any DHS employees in relation to this report? 09:46AM
A In relation to this report?
Q Correct.
A Okay. This probably is totally irrelevant but full disclosure.
Q Please. 09:47AM
A At one point Howard Hendricks called me to ask me about the possibility of helping him in the negotiation around this lawsuit. I told him I had already been, you know, committed to work with CRI, and he at that point said then it would not be appropriate for us to have further communication. 09:47AM
Q What was the date of that conversation?
A I can tell you almost exactly because we were on a cruise. It was -- we left on the 31st of January. So it was very early February. 09:47AM
Q February of 2011?
A That's correct.
Q Aside from that conversation, which I'm not going to ask you any more questions about, did you ever speak to any caseworkers at DHS? 09:48AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

A No.
Q Did you ever speak to any supervisors at DHS?
A No.
Q Did you ever speak to any field liaisons at DHS? 09:48AM
A No.
Q Did you ever consider speaking to any of those individuals in formulating your opinions about this report?
A No. 09:48AM
Q Okay. Why not?
A Because I had the information from the depositions and from the other materials.
Q Okay. Were there any other depositions that you would have liked to review besides the ones you did? 09:48AM
A I think what I had was adequate.
Q Okay. Did anyone else assist you in formulating your opinions in this report?
A No. 09:48AM
Q Who is the Bonnie Hommrich?
A Hommrich.
Q Hommrich.
A She was my deputy commissioner in -- well, actually in Kentucky and in Tennessee. 09:48AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

Pike?

A No.

Q Okay. Did Bonnie Hommrich assist --

A No.

Q -- in form -- I didn't finish my question. 09:52AM

A I'm sorry; I am sorry.

Q Did she assist in formulating or assisting you with getting any other information from the department at HHS?

A No. 09:52AM

Q Okay, and there's no language in your report that is not yours?

A None.

Q What methodology and techniques did you utilize to evaluate OKDHS? 09:53AM

A I evaluated materials that were available. I compared those materials to national best practice standards and to my knowledge of the public child welfare operations.

Q Okay. When you say you evaluated it in 09:53AM comparison to national best practice standards, is there a governing body that you applied that to?

A There's a national accrediting agency called Council On Accreditation.

Q Are the initials COA? 09:54AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

A That's correct.
Q Okay. You compared it to COA. Did you compare it to any other national standards?
A Yes. Child Welfare League of America.
Q And that's CWLA? 09:54AM
A Right.
Q Okay, and if you want to use those initials in this deposition, that would be fine.
A Okay. Thank you.
Q Have you ever been asked to evaluate another state child welfare system? 09:54AM
A No.
Q Okay. Did you utilize any evaluation tools?
MR. KAPELL: Object to the form.
A Tools? No. 09:54AM
Q Okay. Do you know what I mean by an evaluation tool?
A I think so.
Q Okay. It's an objective -- objective set of information which you compare a set of data to. 09:55AM
Would you agree?
A Yes. COA is similar to that in that it is -- it is an evaluative tool.
Q COA, the Council --
A The Council On Accreditation. 09:55AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

working with Fred now. The information that -- that it provides in forming the decisions that an agency makes about where to put resources, where to put additional emphasis is extraordinarily helpful in improving good outcomes for children. 09:59AM

Q Okay. Can you cite and point me to the page in your report where you have listed this as your methodology?

A This -- it's my head.

Q Okay. 09:59AM

A I've worked with Fred for the last almost fifteen years.

Q Okay. Is there a description of that anywhere in your report?

A I don't think so. 09:59AM

Q Okay. Has Fred published any assessment tool?

A Oh, my goodness. If you go on his website at Chapin -- if you go on the Chapin Hall website, there's just an enormous amount of information, and the other thing he is doing that is so incredibly 09:59AM valuable is he's collecting these data from a number of states, and he is very protective and he doesn't -- so you can look at how you are doing in relationships to other -- you don't know which states, you know, because he wants everybody to feel 10:00AM

Q Okay. In the third paragraph it says, this report provides expert opinion from a management perspective, and then the rest of the sentence on the capability of Oklahoma child welfare system, et cetera, et cetera. What do you mean by management perspective? 10:20AM
A I mean the operation of the agency.
Q Is that in relation to any management theory?
MR. KAPELL: Object to the form.
A Best practice management theory. 10:21AM
Q Do you adhere to a best management -- best practice management theory?
A I think if you take a look at the report, it's pretty clear that it lays out a management structure. 10:21AM
Q Does that management structure have a name?
A No.
Q Okay. Do you adhere in your practice, in your previous practices in your involvement with Tennessee or Kentucky to a certain management theory? 10:21AM
A No.
Q How would you describe your management style when you were at Tennessee?
MR. KAPELL: Object to the form. 10:21AM


c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

A An organization has to have strong leadership. An organization has to have a strong workforce. An organization has to have an accountability system. An organization has to have resources and services to manage whatever the product of that organization is. 10:23AM
Q And are those elements of an organization your opinion or can you point me to someplace in the literature where those are defined?
A They're my opinion, and I cannot point you to a place in the literature, but it certainly exists in the literature. 10:24AM
Q Okay. You can't name one place where you've read anything about those elements of an organization? 10:24AM
A No.
Q Okay. I'm in the third paragraph and you say here that this report is based on extensive assessment of DHS business records, federal welfare performance data, as well as testimony of key DHS officials in the February 17th, 2011, foster care review of Oklahoma Department of Human Services by Dr. Jerry Miller -- Milner's case record review. Did you review all of his report? 10:24AM
A Yes. 10:25AM

possible that communications happens through e-mails?
A It's hard for me to believe, as a fifteen-year career person, that e-mail alone is sufficient to solve the level of instability that exists in this agency. It's just hard for me to believe. 10:37AM
Q Can you point me to any evidence that says there is no communication between CFSD and a caseworker in field operations?
A No communication? 10:37AM
Q No communication.
A No.
Q Okay. Let's go to the second bullet point. It talks about Pervasive Lack of Accountability and Inadequate Quality Assurance System. The lack of leadership and accountability that pervade DHS's child welfare programs prevent the agency from improving outcomes for children and families. Can you state the basis of that opinion? 10:37AM
A It's impossible to run any organization effectively, certainly not child welfare, without some way to control the quality of the work and to inform the decisions that are made based on data. It's just an underpinning of the work that is essential. 10:37AM 10:38AM

Q How do you know the data lacks integrity?
A Well, Mary Grissom's report, the information from the expert, Mr. Zoran, Dr. Zoran I think it is.
Q Okay. So you reviewed Dr. Zoran Obradovic's report? 10:40AM
A Yes.
Q And that led you to believe the data lacks integrity?
A Right.
Q Okay. Did you do anything to validate the findings in his report? 10:40AM
A No.
Q Did you do anything to validate the reliability of the findings in his report?
A No. 10:40AM
Q Okay. Did you replicate the findings in his report?
A No.
Q Did you just -- did you read his report in its entirety? 10:40AM
A Yes.
Q Okay. You also mentioned Mary Grissom, you read her deposition in its entirety?
A Right.
Q And from both of those sources, you determined 10:40AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

stability in that caseworker, which is the one thing that child welfare tries hard to offer to kids is that relationship with that caseworker. Then you've got an enormous risk of harm in the -- in that process itself, in how children who are coming into 11:12AM the system are managed from the day they enter our first -- our front door. So you've got the abuse and care, but you've got those systemic issues that are equally putting kids at risk.

Q Okay. Let me ask you a question. You 11:13AM mentioned two other reports that have been filed in this case, John Goad and Dr. Milner's report. In John Goad's report, did you independently evaluate the validity of his data sampling?

A No. 11:13AM

Q Okay. Did you independently review the reliability of his survey design?

A No.

Q Okay. Did you attempt to replicate his findings in any way? 11:13AM

A No.

Q Okay. In the Milner report, I think I've already asked you if you have independently assessed the reliability and validity of his data.

A No. 11:14AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

Q Okay. Have you independently assessed the reliability and validity of his findings?
A No.
Q Okay. Did -- you mentioned that he had 12 case studies, 12 case records. Did you review those 12 case records yourself? 11:14AM
A No.
Q Okay. If John Goad's report and findings are determined to be invalid and unreliable, would your opinion change? 11:14AM
A No.
Q Okay. If Dr. Milner's report is determined to be unreliable and not valid, would your opinions change?
A No. 11:14AM
MR. KAPELL: Object to the form.
MS. De SIMONE: Okay. It looks like I have a two-minute warning, so this is a good time for a break. And I realize that when we divided up the workforce management, we didn't come back to the second part of the sentence, and we'll get back to that, but let's take a break. 11:15AM
VIDEOGRAPHER: We are now off the record. The time is 11:14 a.m.
(Following a short recess at 11:14 11:29AM

MR. KAPELL: Yes, absolutely.
MS. De SIMONE: Let's take a peek at the rule, and the rules change.
MR. KAPELL: You're entitled to know about the data that was provided, not as to who requested it. 11:46AM
MS. De SIMONE: Okay. Under 26 -- let's see where we are. 26(a), (b), 4(c), the communication, except to the extent that the communications identify the data or that the parties' attorney provided and that the expert considered in forming opinions. 11:46AM
MR. KAPELL: Right. So you're entitled to know about the data that was provided by counsel and that she considered in forming her opinions. You're not entitled to know whether she requested it or not or what the substance of the communication was between her and counsel regarding the transcript. 11:47AM
MS. De SIMONE: Okay. So you're going to instruct her not to answer that question? 11:47AM
MR. KAPELL: Yes, I will.
Q Okay. In looking at the organizational chart, did you ever consider speaking with any individuals in order to formulate your opinions in this report?
A No. 11:47AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

specific structure is necessary to ensure efficiency and satisfactory delivery of child welfare services to children in state custody. So please state your basis for the statement on 9 and how that meshes with your statement on Page 12. 11:51AM
A I can really see how that's confusing. The 9 is the bigger structure, not the DHS piece. This is -- and I should have -- my language should have been clearer.
Q Okay. 11:51AM
A This is the big DHS that has the community-based services and the vertically integrated, and then when we got back over to 12, I was really talking about and addressing the child welfare pieces. 11:51AM
Q Okay, okay. That's fine. Now, let's go back to your statement that it's unusual. It's unusual -- and I'm back to Page 9. I apologize. DHS structure is unusual. Compared to what?
A Well, most agent -- and there are many, many 11:52AM agencies nationwide that have a structure similar to this human services, and I don't mean structure. I mean that have those -- that particular array of services under a single head. Many states have that. As a matter of fact, it's the structure I had 11:52AM

separation of some of the programs into vertically integrated and some of them more deployed is affecting outcomes.

Q Okay. In the section under B, while the organizational structure of DHS is particularly complex, this on its own doesn't doom DHS to failure. However, when child welfare policy and service delivery are separated into two independent divisions, as they are at DHS with CFSD and FOD, this creates the potential for a serious disconnect between policy and practice, and you use the word this creates a potential. It's a potential disconnect; it's not an actual disconnect; is that correct? 11:54AM 11:54AM

A That's correct. 11:55AM

Q Then a little later on in that same paragraph --

A Can I put a caveat? Except as I was describing before, that there is evidence in the deposition that there is an effect with that separation of actually it's the program folks and the direct service deliverers. 11:55AM

Q Uh-huh. Now, you also have -- you use the word in that paragraph, unfortunately, the level of communication between CFSD and FOD and within FOD is 11:55AM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

that work. I don't think I, in this report, made a specific suggestion about what that should ultimately look like.

Q Okay.

A I did suggest a business process analysis for them to figure that out. 11:59AM

Q And that was in the last part of your report?

A That's right.

Q Then you go on to a discussion of field liaisons, and their effectiveness is limited because they can only serve as consultants. Do you not -- the basis for that statement is that they need authority to function as a consultant to increase the effectiveness? 11:59AM

A They don't need authority to function as consultants, but if they are going to be in the structure that impacts the quality of service that's happening with children, then they need some level of authority to make that happen, and they don't have it. Right now they're in a recommending sort of role. 11:59AM 12:00PM

Q You feel they need authority in order to make that happen?

A Yes.

Q You do? 12:00PM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

think that there would be a great deal of value in having this programmatic expertise at that level to both support -- the support is just as important as the holding them accountable for the work that they're doing. 12:02PM

Q Okay, and that's on the general global opinion. Can you give me a specific example in the depositions you read about any ineffectiveness of the field liaison as they currently are functioning?

A No. 12:02PM

Q Okay. We've already talked about your opinions about the budget and the policy, and I'm not going to go over that again. On Page 14 you say that there's a basic -- one of the most disappointing aspects of this review is from the lack of trust that DHS places in its frontline workers, and if you could, state for me your basis of that opinion. 12:03PM

A Every time if you look back at all of the documentation that I was looking at, and the HZA audit saw this as well, I don't know whether -- yeah, I did, I quoted them. Whenever there is an issue, rather than -- that needs -- that that agency feels a sense of urgency about, rather than integrating that and solving it by putting more 12:03PM

section, and then we can probably break for lunch, and this has to do with significant organization has led to discontinuity and confusion, and you say that this type of organizational disruption is very problematic because transitions are hard both for 12:20PM people to adjust to a new position and the people to report, et cetera. You have stated in your report that you see that an organizational change is needed in OKDHS. So how do you justify that statement with this statement here that there's been reorganization 12:21PM that has caused confusion?

A Organizational change is planned, and it involves all of the players, and it's done in a thoughtful and systematic way over time. It's very different than just having a high staff turnover in 12:21PM some area or another.

Q Okay. So it's a planned organized change?

A Uh-huh.

Q Do you have any data that any of these changes that occurred at administration at DHS wasn't 12:21PM planned prior to it happening?

A No -- no.

Q Okay. Do you know if Margaret DeVault retired?

A No, I don't know. 12:21PM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

system to take another job, you consider that turnover?
A Well, yeah.
Q The job has turned over?
A Right. 12:23PM
Q Okay, but, again, you have no knowledge of any data that this change was planned in that their successor was mentored?
A No.
Q Okay. Let's talk about that -- the restructuring that you mentioned, and I think you are referring to the program's administrator, Amy White, and that something new was added to her responsibilities; is that correct? 12:23PM
A That's correct. 12:23PM
Q Did you review the deposition of Amy White?
A Yes.
Q She's now -- what -- what area has she picked up?
A CQI. 12:24PM
Q CQI. Do you know how long ago she did that?
A No.
Q Do you know how long Amy White has been with the organization?
A No. 12:24PM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

A -- all of those things coming together. So in a way, and not just with private providers but within the agency as well. So these folks need a certain level of -- I hate to use the word separation, but that's what it is, so that they have that evaluative role and can maintain it, and if DHS moves to having the kind of performance quality improvement that I'm talking about, that is an enormous responsibility; it is an enormous responsibility, and to give that to Amy, first of all, you're mixing the program piece with the evaluative piece, which is a little bit dicey, and then you're giving her what is -- I mean, permanency, permanency planning, that's where a big chunk of program comes. Then you're adding this other what should be an enormous piece of work and a very important, critically important piece of work. I don't -- I don't see how that's going to work very well -- very well for the agency. 12:25PM 12:26PM 12:26PM

Q Do you have any data that has evaluated whether it's working or not working; have you reviewed any data? 12:27PM

A No.

Q Okay. The CQI that in your opinion needs to be separated, the CQI process, is that rec -- and it 12:27PM

size of the state. I'm not sure.
Q Would you consider that a small number of cases if the number of children in DHS custody is, say, 8 or 9,000?
A But I think the function is two different -- I think there are two different functions there. 01:48PM
Q Okay. Well, what would you -- if you're saying that the first problem with this process is small number of cases reviewed and the random way in which these cases are selected, tell me what is wrong with that process. 01:48PM
A If the case review is being done to change behavior, to really make a difference, you're going to have to review a pretty large number of cases. For instance, if, as he's doing, he's looking at children in care 24 to 36 months. Well, one person said 24 and one person said 36. I don't know what his cut-off line is. Then the goal, if he's really going to impact that population, should probably be to review all of those kids. 01:49PM 01:49PM
Q So in your view, he should review them all?
A Depending on what his goal is. If his goal is getting those kids to permanency, then, probably, yeah.
Q Okay. Did you review any data on any of these 01:49PM

case reviews?
A No.
Q Okay. How did you know that they were taking place; what data?
A They were in the -- people mentioned them in the depositions. 01:49PM
Q In the depositions, okay. The next big area that is discussed on your report is on Page 28 and goes for a number of pages, but on Page 30 is when the Milner report is discussed, and I've asked you your -- I've asked you some questions about the Milner report and your review of it, and I don't need to ask you those again, but I -- I do have a question, did you -- you've already testified I think that you read Dr. Milner's full report; is that correct? 01:50PM 01:50PM
A Yes.
Q Did you ever talk to Dr. Milner about his report?
A No. 01:50PM
Q Did he ever -- did you ever assist him in the writing of his report?
A No.
Q Okay, and he didn't assist you in the writing of your report? 01:50PM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02

right along.
A Much faster than morning.
Q Which I bet you are happy. Okay. We're on Page 42. In this section, and this is under the section about child welfare training, and there's some discussion about the CORE training. Did you review any of the curriculum for the CORE training? 01:57PM
A I reviewed everything I could find that had anything to do with CORE. I went online. I searched for everything that I could find, and if there are curricula there, I could not locate them, and when HZA said that he couldn't find curricula either, I decided I wasn't missing anything. 01:57PM
Q Okay. In any of the documents that you were provided, there was no CORE curriculum? 01:57PM
A There was no curriculum.
Q Okay.
A There was an outline of CORE.
Q Uh-huh.
A A structure of CORE, a pre-prep list of things that they were to do for CORE, but there was no curriculum. 01:57PM
Q Okay. The next -- what other -- what other data did you -- did you review on the training that occurs at DHS? 01:58PM

A I'm not sure. I'm not -- I don't think -- I don't know.
Q Okay. That's fair. On Page 47 you have a discussion about Dr. Milner's case review. Again, I'm not going to ask you questions on that. And that actually continues in the report until Page 49. Now, there is a section here that I do want to discuss with you and it's in the middle of Page 49, there are a number of factors, and you're discussing -- you're talking about turnover, number of factors that contribute to turnover in child welfare agency. In my experience these factors include workers' feelings of lack of empowerment and respect, inadequate salary and benefits, lack of overtime pay, job stress, poor work environment, dissatisfaction with training and support, and you preface that sentence with in my experience. Are those factors exclusive to Oklahoma?
A No.
Q Are those factors, okay, in the literature that you can point me to, in any research literature?
A No.
Q Okay. On page -- I think we're getting ready to take a break. On Page 50, though, there's a

02:18PM 02:18PM 02:18PM 02:19PM 02:19PM



c2bf5ff8-e22c-4300-b01f-4dee8e86bb02