# Exhibit C

# "FORMULA FOR DISASTER"

# A MANAGEMENT REVIEW OF THE MICHIGAN DEPARTMENT OF HUMAN SERVICES

**Cathy R. Crabtree**

**2008**

## TABLE OF CONTENTS

**EXECUTIVE SUMMARY**

**I. INTRODUCTION**
- **A. Review Qualifications and Methodology**
- **B. Agency Overview**
- **C. Historical Background**

**II. MDHS HAS INADEQUATE STAFFING AND INCONSISENT LEADERSHIP**
- **A. Caseloads**
- **B. Qualifications and Training**
- **C. Turnover**
- **D. Supervision and Administration**

**III. MDHS FAILS TO KEEP CHILDREN SAFE THROUGH LICENSING AND MONITORING OF CHILDREN'S PLACEMENTS**
- **A. MDHS has no meaningful child welfare quality assurance system**
- **B. MDHS has a failed management information system for data collection and, therefore, fails to maintain adequate aggregate reporting on key elements of child safety, permanency, and well-being**
- **C. MDHS uses management reports containing performance benchmarks that are neither understood by staff nor measurable by the agency**
- **D. MDHS fails to require compliance with licensing requirements designed to assure safety**
- **E. MDHS fails to maintain a minimally adequate system for private agency contract monitoring**

**IV. MDHS FAILS TO PROTECT CHILDREN FROM HARM**
- **A. MDHS knowingly places children in inappropriate settings because of a lack of resources**
- **B. MDHS fails to ensure that caseworkers visit children in MDHS custody and that children visit their parents and siblings**

**V. MDHS HAS INADEQUATE PLACEMENT RESOURCES FOR CHILDREN AND A DEFICIENT SERVICE DELIVERY SYSTEM**
- **A. MDHS has an inadequate array of services for children**
- **B. MDHS fails to adequately access federal entitlement**

**dollars for its foster care program**
**C. MDHS lacks sufficient numbers of licensed foster placements for children**

**VI. MDHS FAILS TO FIND PERMANENT HOMES FOR CHILDREN, LEAVING THEM TO LINGER IN TEMPORARY FOSTER CARE**

**VII. CONCLUSIONS AND RECOMMENDATIONS**
**A. Conclusions**
**B. Recommendations**
**1) Administration**
**2) Staffing**
**3) Training and Ensuring Competency**
**4) Resources**
**5) Quality Assurance**

**Appendix A. *Curriculum Vitae* for Cathy R. Crabtree**

## EXECUTIVE SUMMARY

This report provides the findings following an in-depth study of the quality and adequacy of the organizational, programmatic, and fiscal decision-making by the Michigan Department of Human Services ("MDHS") management in its administration of the Michigan child welfare system. The study is based on a full assessment of MDHS business records and child welfare performance data, federal Department of Health and Human Services ("HHS") performance data for Michigan, annual MDHS budget and staffing data, and the testimony of key MDHS officials at the state and county levels in the *Dwayne B. v. Granholm* federal class action lawsuit. I compared to and evaluated this data against nationally recognized and industry-promulgated standards of reasonable child welfare management practice, as well as standards articulated in child welfare policies and regulations promulgated by the State of Michigan. I have concluded, based on my professional experience and expertise in child welfare management, my education and training in the child welfare field, and my familiarity with accepted standards of reasonable practice, that MDHS management fails to meet even minimum standards of practice in its operation and administration of the child welfare system in Michigan, resulting in severe and ongoing harm to children in foster care.

MDHS management failures include:

- ***AN UNSTABLE, DISJOINTED AND INEFFICIENT ORGANIZATIONAL STRUCTURE:*** MDHS suffers from instability of leadership and a convoluted organizational structure that assures confusion and inconsistency rather than top-to-bottom accountability and positive outcomes for children. Since January 2003, the leadership of MDHS has changed hands four times. No social services agency can withstand such inconsistent leadership and the consequent lack of stable vision and clear direction. Moreover, MDHS has failed to create an accountable and clearly defined management hierarchy that is dedicated to child welfare practice. Instead, the agency asks too many officials to be administrators of too many programs, thereby diluting expertise and accountability in all core functions. MDHS cannot provide children with the safety and care that they deserve until the basic organization is reconfigured to provide for sound management structures and reporting lines within a dedicated child welfare infrastructure. The lack of leadership and vision is exemplified by the fact that annual MDHS business plans are based on key benchmarks that the agency cannot even measure.

- ***EXCESSIVE CASELOADS:*** MDHS routinely assigns caseloads to its foster care, adoption, and child protective services ("CPS") workforce that far exceed recognized standards of acceptable child welfare practice. These high caseloads have prevented caseworkers from consistently and reliably delivering the services required to protect and care for children in foster care. High caseloads have caused caseworker burnout, resulting in high staff turnover rates, a structural weakness that deprives MDHS of the knowledge, experience, and stability

required to meet children's needs and keep them safe. In October 2007, the North Central District Office in Wayne County reported foster care caseloads of 48 children, even as it operated on a third provisional license because it was found to be in material violation of basic safety regulations for a period of 18 consecutive months.

- ***INADEQUATE STAFF TRAINING:*** MDHS has failed to design and implement a staff training program that adequately meets agency needs and the needs of children. It is axiomatic that a child welfare staff cannot protect and care for the vulnerable children in its care without a base of necessary knowledge and skills. MDHS routinely permits foster care caseworkers in private child placing agencies to carry active caseloads for periods exceeding six months, sometimes much longer, without having first completed even one day of pre-service training. This exposes the 40% of children who are under private agency supervision to an unnecessary and unacceptable risk of harm. Additionally, MDHS requires far too little in-service training to assure that caseworkers are up to date on fundamental policy and practice developments. In-service training is an acute need in a system experiencing the high caseloads and staff turnover that plague MDHS. Finally, MDHS historically has not required much, if any, supervisory training for its first-line supervisory staff. Mandatory and rigorous supervisory training is absolutely essential if the agency is to reasonably rely on front-line supervisors to manage the caseworker staff effectively. As observed by a MDHS Central Office official, the current training program is "a formula for disaster."

- ***NON-EXISTENT DATA MANAGEMENT:*** A large child welfare agency cannot deliver adequate care and services to the 19,000 children in its care without an internal capacity to measure and assess child welfare performance against established benchmarks. Despite investing tens of millions of dollars over many years into the development of a child welfare data management system, known as the Social Worker Support System ("SWSS"), MDHS still cannot measure child welfare performance in numerous critical areas of practice, including such basic areas as caseworker visits with children and caseworker caseloads. Without this data, MDHS management finds itself operating in the dark when making key decisions because it is unable to identify agency strengths and weaknesses with adequate confidence, to design corrective actions to meet identified weaknesses, and to intelligently allocate resources to the areas most in need. MDHS's lack of a proper data management system is a critical failure that must be rectified immediately if the agency is to provide even minimally adequate protection and care to the children in its foster care custody.

- ***NON-EXISTENT QUALITY ASSURANCE:*** MDHS has not committed itself to quality improvement by building a well-designed, well-focused, and fully staffed child welfare quality assurance program. Agency managers recognized the vital importance of quality assurance when they noted in the Program Improvement Plan submitted to the federal Department of Health and Human Services in May of 2004 that they were building a Child Welfare Quality Assurance Unit. MDHS

has failed to create and sustain such a unit. The absence of a quality assurance unit significantly contributes to the ongoing failures plaguing MDHS in numerous program areas.

- ***POOR CONTRACT MONITORING:*** MDHS has not built a contract monitoring function and has not hired monitoring staff sufficient to assure quality services to the 40% of foster children placed through private agencies. Child welfare contract monitoring is so under-resourced in MDHS that on-site contract performance audits of private providers are only conducted once every 18 to 36 months. This is wholly inadequate. The vast majority of private child placing agencies ("CPAs") in Michigan, when audited, are deemed deficient in multiple practice areas and are required to prepare and submit a corrective action plan. However, MDHS has no system to assure CPAs actually undertake these corrective actions. MDHS management admits that private agency corrective action plans routinely receive no MDHS follow-up until the next on-site audit is performed some 18 to 36 months later. In fact, private agencies often renew their term-limited contracts with MDHS even though they have yet to implement the remedies set forth in their prior corrective action plan.

- ***POOR LICENSING COMPLIANCE:*** All MDHS county offices, in their function as child placing agencies, are required to secure and maintain licenses to operate from the Bureau of Child and Adult Licensing ("BCAL") within MDHS. Astoundingly, Wayne, Oakland and Macomb Counties, which together serve between 45% and 50% of the children directly supervised by MDHS, all now operate under six-month provisional licenses from BCAL because they are out of compliance with BCAL's basic safety regulations. Macomb and Oakland Counties are now operating under their second consecutive provisional licenses. The Wayne County North Central District just recently came off of its third consecutive provisional license and, even then, only came off it by transferring hundreds of open foster care cases to private agencies to reduce its dangerously high caseloads. No public agency can assure child safety and well-being when its largest offices cannot comply with basic licensing regulations.

- ***INADEQUATE SUPERVISION AND SUPPORT OF RELATIVE FOSTER HOMES:*** MDHS has placed increasing reliance on the relatives of abused and neglected children to provide temporary foster care services. In fact, more than 7,000 children in the State's foster care custody are now placed with relatives. Though the goal of retaining familial connections for abused and neglected children is in itself laudable, MDHS management has compromised child safety by failing to properly screen or adequately support relative caretakers. Nearly 75% of relative caretakers do not undergo safety assessments prior to the placement of children in the home, and 35% do not undergo criminal background or Central Registry checks, which would otherwise reveal whether the relative caregiver is a listed sex offender or child abuser. Less than 40% of children in unlicensed relative homes are seen by their workers as frequently as required, compared to 70% of children in licensed placements. Additionally, the

substantial majority of relative providers are not licensed as foster caretakers and, therefore, do not receive the monthly foster care maintenance payments ($450 or more) and clothing allowances that are required to be paid to licensed caretakers so that child needs are met. In failing to license unlicensed relative providers, MDHS foregoes millions of federal Title IV-E dollars. Despite the fact that every child in MDHS custody is entitled to full protection, MDHS has operated a system that effectively treats children in relative placements as "second-class citizens."

- ***INADEQUATE SERVICE DELIVERY TO CHILDREN:*** MDHS has failed to assure that basic medical, dental, educational, and mental health services are delivered to children in foster care consistent with their identified needs. This is a grievous failure given that, by definition, every child in foster care is a known victim of abuse or neglect and, therefore, likely to have significant service needs. The fundamental nature of this management failure is exemplified by MDHS's utter failure in more than 85% of cases to comply with a Michigan state law that requires the agency to give the foster care provider for every child an updated Medical Passport setting forth the child's complete health history. Forty percent of children do not receive all required medical exams and more than half do not receive required dental exams. Compounding this problem is MDHS's failure to develop a mechanism for the assessment of children's needs across the child welfare system. As a result, the management of MDHS is unable to develop an appropriate array of services to meet children's needs.

- ***POOR PERMANENCY PLANNING PRACTICES:*** A core responsibility of MDHS is to find permanent families for all children in foster care as soon as safely possible. It is widely accepted in the child welfare literature that a lack of stability for children in their family attachments and home environments causes them significant emotional harm. MDHS, nevertheless, has not provided the required infrastructure to meet this compelling and core need. In fact, more than 6,200 children in MDHS foster care are now legally free for adoption, but lack a permanent family. Many of these children have been waiting for years and are close to "aging out" of foster care without DHS ever finding them permanent homes. MDHS policy and practice impedes timely adoption by failing to use concurrent planning, a widely accepted practice that requires simultaneous planning for reunification and adoption. Unlike most child welfare systems in the country, MDHS does not provide children with an adoption worker or any adoptive parent recruitment services until the legal rights of their birth parents have been severed, unnecessarily delaying any hope of permanency. MDHS also fails to reunify children with their birth parents in a timely way when it is safe to do so and, in fact, is among the slowest systems in the nation. Notwithstanding federal and state laws that require MDHS to terminate parental rights in a timely fashion (where termination is appropriate), MDHS routinely maintains a reunification goal for children long after it becomes clear that reunification is not a viable plan.

- ***INADEQUATE PLACEMENT ARRAY:*** A child welfare system cannot provide adequate care to children unless it has developed and consistently maintains a full array of placement resources, including licensed foster family homes, intensive or therapeutic treatment homes, group homes, residential treatment centers, and other appropriate clinical settings. MDHS has a woefully insufficient placement array, and has not even undertaken the periodic needs assessments necessary to determine the actual number and types of placements required to meet the needs of the children in its care. The failure of MDHS to build a proper child welfare placement array most recently came to light in the widely publicized outrage about children being forced to sleep overnight in Wayne County DHS offices. Children are placed in homes that cannot meet their needs, often based upon available space considerations alone, and then moved among foster homes frequently. Children who experience multiple moves suffer escalating emotional harm from the instability, often developing behaviour problems requiring in more restrictive residential facilities. Further, children too often linger in institutional settings because foster homes that offer the level of care that these children need—including therapeutic foster homes and foster homes for children with serious medical needs—are not available.

These findings reveal a child welfare system that is severely lacking in fundamental infrastructure, quality controls, and overall staff competency as a result of poor management practices. Though MDHS requires the investment of additional resources, both in terms of caseworkers and program funds, the infusion of fresh resources will not alone be sufficient to raise outcomes for children to acceptable levels. Reasonable child welfare performance can only be achieved if MDHS develops stable and competent leadership, a reconfigured organizational structure with accountability at all levels, and vastly improved systems for data collection and management. Until then, children in foster care will continue to be harmed or placed at risk of harm.

# I. INTRODUCTION

This management report assesses the functioning of the Michigan child welfare system and the ability of the organization to meet reasonable child welfare standards for the protection of children in its foster care custody. It concludes that the Michigan Department of Human Services ("MDHS") fails to meet reasonable professional standards due to inadequate staffing and department resources, inconsistent leadership, an ineffective management structure, inadequate recruitment of foster care placement resources, and an inability to determine and meet children's needs on a systemic basis. As a result, MDHS fails to meet even the most basic safety, permanency, and well-being needs of children in foster care.

A child welfare agency must meet at least five criteria to function effectively:

- The agency must have stable leadership to provide the staff with support by setting official policy, monitoring the services provided, ensuring accountability, and maximizing available resources.
- The agency must have a sufficient number of workers.
- The agency must have sufficiently qualified and trained staff.
- The agency must have sufficient resources to meet the needs of children.
- There must be clearly defined responsibilities across the agency and a robust accountability system.

If even one of the above criteria goes unmet, an agency can experience serious problems ranging from minor disruptions in services to a complete failure of the agency's ability to care for children. MDHS fails in all five of these areas. MDHS has serious, systemic deficiencies including:

- Lack of consistent and stable leadership to effectively implement and enforce policy, monitor the delivery of services, and manage resources.

- Lack of a quality assurance system and a data management system to gauge the effectiveness of the agency in meeting the needs of children and to identify areas requiring correction.

- Caseworkers carrying dangerously high caseloads.

- Inadequately supervised caseworkers who are unable to meet policy and procedural job requirements.

- Failure to develop and provide adequate resources for both staff and the children served by the agency.

Children in foster care are routinely harmed and placed at risk of harm as a result of these failures. They are denied appropriate services and safe places to live and they are routinely without adequate supervision, necessary mental health care, and other essential services. A staggering number of children free for adoption, approximately 6200, languish in foster care with no permanent home.

This report details MDHS's failure to meet minimum legal and professional standards for managing a child welfare system, causing harm to the children in its care. Section I of the report provides my qualifications and the methodology for the report, a description of the MDHS structure and agency responsibilities, and a brief history of the ongoing failure of MDHS to meet legal mandates. Section II analyzes leadership, supervision and training, staffing and caseloads, and turnover at MDHS, and concludes that, unless dramatic changes are implemented, the agency will continue to fail the children it is charged with protecting. Section III demonstrates how inadequate licensing and monitoring of children's placements by DHS management leads to dangerous, and even deadly, situations for children. Lack of management follow-through, lack of data, and an inadequate quality assurance system all contribute to the failings of MDHS. Section IV looks at the failure of MDHS to protect children from

harm. Also included in this section are observations and conclusions regarding children being placed in inappropriate homes, the frequent movement of children among multiple temporary placements, and the failure of caseworkers to regularly visit children. Section V examines the failure of MDHS to deliver essential services to children in foster care, and to develop and maintain an adequate array of placement resources. Section VI describes MDHS's inability to attain permanency for children. Finally, Section VII offers recommendations for improving MDHS through significant and essential child welfare reform.

**A. Reviewer Qualifications and Methodology**

The reviewer has more than 30 years of professional experience working with and advocating on behalf of children and families. She is currently a private consultant in the field of child welfare and a Senior Consultant on the staff of the Auburn University Center for Government in Montgomery, Alabama. She has served as a child welfare expert in both federal and state litigations. In addition, she has worked as a direct service provider as well as in management and administrative positions in the fields of child welfare and mental health. The reviewer was Assistant Commissioner of the Tennessee Department of Children's Services for eight years and has extensive experience in the areas of children's services, social services agency management, quality assurance and compliance, and minimum practice standards. A current copy of her *curriculum vitae* is attached to this report as Appendix A.

Many sources to assess the organization and operation of MDHS as the state agency charged with the safety, permanency, and well-being of children. Included among these sources were:

- MDHS policy manuals
- MDHS organizational charts
- MDHS planning documents, reports, and correspondence
- MDHS audit documents
- MDHS county and state reports and data
- MDHS budget documents
- Federal review results and correspondence
- The following transcripts of MDHS deposition testimony in the *Dwayne B. v. Granholm* case:
    - Mary Mehren deposition with exhibits
    - Debora Buchanan depositions with exhibits
    - James Gale depositions with exhibits
    - James Nye depositions with exhibits
    - Jerry Frank deposition with exhibits
    - Marianne Udow deposition with exhibits
    - James Hennessey deposition with exhibits
    - Laura Champagne deposition with exhibits
    - Angelo Nicholas deposition with exhibits
    - Steve Yager deposition with exhibits
    - Ted Forrest deposition with exhibits
    - Tom Schwarz deposition with exhibits
    - Margaret Warner deposition with exhibits
    - Susan Kangas deposition with exhibits
    - Bill Johnson deposition with exhibits
    - Helen Weber deposition with exhibits
    - Kate Hanley deposition with exhibits
    - Kathryne O'Grady deposition with exhibits
    - Jim Redella deposition with exhibits
    - Susan Hull deposition with exhibits
    - Dan Cowan deposition with exhibits
    - Margaret Warner deposition with exhibits
    - Sheryl Thompson deposition with exhibits
    - Jerome Rutland deposition with exhibits

This information was reviewed in light of professionally accepted standards, including standards articulated in applicable federal and state laws and policies, and my professional experience and expertise.

### B. Agency Overview

The chief executive officer of the state of Michigan is Governor Jennifer Granholm. In her role as Governor, she has ultimate responsibility for the State's child

welfare system. The state agency charged by statute with the day-to-day operational responsibility for the child welfare system is the Michigan Department of Human Services.[1] MDHS is led by a Director who is appointed by the Governor. The current Director is Ismael Ahmed. Mr. Ahmed's immediate predecessor was Marianne Udow, who acted as Director from January 2004 through August 2007.

There are approximately 8000 employees within MDHS, though many do not perform work related to child welfare programs.[2] The Director of MDHS is responsible for the overall administration and oversight of all programs for children and families within the agency and for the more than 100 offices across 83 counties of the State. In addition to child welfare programs, the agency administers the federal welfare program known as Temporary Assistance to Needy Families (TANF), the Food Stamps program, child support, juvenile justice, adult protective services programs, and Medicaid eligibility.

In its child welfare role, MDHS is charged with protecting the safety, permanency, and well-being of abused and neglected children throughout Michigan. The child welfare programs of MDHS are allocated between two divisions of the Department: "Children and Adult Policy" and "Field Administration." The Children and Adult Policy division is responsible for the Department's policy-making and program development functions. These policy and program functions are assigned to various offices within Children and Adult Policy, including, among others, Permanency, Protection/Preservation, Juvenile Justice, Disability Determination, Income Support, Adult Services, and HIV/AIDS. The Field Administration division is responsible for

[1] MCL § 400.1 et seq. and Executive Reorganization Order E.R.O. No. 2004-4.
[2] MIDHS00031754.

policy implementation and service delivery throughout the State and includes Community Based Services Monitoring, Foster Care and Adoption Contract Monitoring, Medicaid Eligibility, and Cash Assistance, among others.[3]

There is a Deputy Director for Children and Adult Policy, who reports directly to the Director of MDHS, and a Deputy Director for Field Operations, who reports to the Chief Deputy Director of MDHS. The Deputy Director for Field Operations has state-wide responsibility for overseeing the implementation of policy and the delivery of services to children within Wayne County (metro Detroit) and the 82 "Outstate" counties, which are grouped, for administrative purposes, into Regions I, II, III and IV, and a collection of "Urban" counties (four of the five most populous counties in the state). Wayne County, the State's largest county, is a stand alone region that reports directly to the Deputy Director for Field Operations. Regions I through IV and the Urban counties report to regional managers who, in turn, report to the Deputy Director for Field Operations. All county and regional managers, as well as both of the MDHS Deputy Directors, have a wide range of responsibilities in addition to their child welfare responsibilities.

The organization of MDHS is inefficient and diffused. There are administrators at every level, state and local, with responsibility across too great a span of programming, especially when one considers their vast responsibilities in addition to child welfare. It is simply not possible for these administrators to devote the time and attention necessary to operate a successful child welfare program. Accountability is so diluted that no one person or unit can be identified as ultimately responsible for the welfare of the children in the foster care custody of MDHS. Absent a reconfigured

[3] MDHS organizational chart, December 3, 2007.

MDHS structure that focuses dedicated child welfare managers on child welfare programs, the agency will continue to fail children.

### C. Historical Background

With responsibility for more than 19,000 abused and neglected children, Michigan has the sixth highest number of children in state foster care custody in the country.[4] In recent years, MDHS has increasingly failed to meet the challenges and needs of these children who rely on the agency for their basic safety and care. In 2004, at any time during the year, there were 13,676 children under the age of 11 in foster care. In that same year, 667 children "aged out" of foster care at age 18 with no permanent family ever identified for them.[5] A startling number of these "aged out" youth – as many as half in Wayne County - went from foster care to homelessness.[6] This pattern is only going to accelerate given that there are currently more than 6000 children legally free for adoption with no identified adoptive home, many of them teens.[7]

Concerns over the agency's failure to meet children's basic needs have been raised in the public arena numerous times over recent years, to no avail. MDHS administrators have readily acknowledged the severe failings within the agency, yet have done too little, and in some cases nothing at all, to change the course of this deteriorating system. Concerns raised over the past five years include:

---

[4] Federal AFCARS data, 2004. AFCARS (Adoption and Foster Care Analysis and Reporting System) is data states are required to submit to the federal government on a regular basis.

[5] Annie E. Casey Foundation, KIDS COUNT State Level Data Online 2007, <http://www.kidscount.org/datacenter/db_07pdf/al_mo.pdf>: 4. KIDS COUNT is a project of the Foundation, which collects national and state data on the status of children on a yearly basis and makes the data available for policymakers and the public.

[6] "Interdepartmental Task Force on Service to At-Risk Youth Transitioning to Adulthood," Department of Human Services, (Sept. 2006): 1.

[7] MIDHS00330850.

- In the 2002 federal Child and Family Services Review ("CFSR") for Michigan conducted by the U.S. Department of Health and Human Services' Administration for Children and Families ("ACF"), MDHS failed to meet any of the seven performance outcome measures used to gauge the agency's ability to meet the safety, permanency, and well-being needs of children in its custody.[8] These measures contain two safety outcomes, including "Children are, first and foremost, protected from abuse and neglect" and "Children are safely maintained in their homes whenever possible and appropriate," as well as two permanency and three well-being outcomes.[9] Results of the federal review revealed that MDHS was not providing for the educational or mental health needs of children, was not providing stable foster care placements, and was not timely and appropriately identifying case plans for children.[10]

- In 2003, Joshua Causey, a four-year-old child in foster care, was beaten to death by his foster parent in a Wayne County foster home, leading to criminal charges against his foster care workers.[11] Following the August 8, 2006 filing of the *Dwayne B. v. Granholm* lawsuit, at least three more children in state foster care have died at the hands of their state-approved caretakers. The 2006 Annual Report of the Michigan Foster Care Review Board ("FCRB") asserted that MDHS's inadequate workforce was "a substantial factor in the abuse and death of children in the foster care system during the past year…."[12]

- Michigan's Office of the Children's Ombudsman ("OCO") reported in the 2003-2004 Children's Ombudsman Annual Report that MDHS was frequently failing to find permanent homes for children, to keep siblings together when they had to be removed from their family homes, and to provide needed services to children.[13] The 2004-2005 OCO Annual Report found that these systemic inadequacies continued to plague MDHS.[14] In its 2005-2006 Annual Report, the Office of the Children's Ombudsman continued to cite these significant systemic failings within MDHS, including unacceptable practices and policy development in the areas of adoption, licensing, child protective services, private child placing agency oversight and the matching and placement of children in suitable foster family homes.[15]

- In 2004, Michigan Supreme Court Justice Maura Corrigan said, "[o]ur current foster care system is in disarray, with terrible consequences for the children."[16]

---

[8] Children's Bureau, Child and Family Services Review, Key Findings Report, Michigan, 2002.
[9] Ibid. 2.
[10] Ibid 2.
[11] Jack Kresnack, "Report Spreads Blame for Child's Beating Death," *The Detroit Free Press*, (Sept. 16, 2004): 1b.
[12] "2006 Annual Report," *Michigan Foster Care Review Board*, 7.
[13] Office of the Children's Ombudsman, "2003-2004 Annual Report."
[14] Office of the Children's Ombudsman, "2004-2005 Annual Report."
[15] Office of the Children's Ombudsman, "2005-2006 Annual Report."
[16] Maura Corrigan, "Michigan should increase foster care court oversight," *The Detroit News*, (May 18, 2004): 2.

The Michigan Supreme Court Administrative Office oversees the State's juvenile courts as well as the State's Foster Care Review Boards ("FCRB"), which review individual foster care cases.

- A 2005 Annual Report of the FCRB identified problems at MDHS that included high caseloads, high staff turnover, poor case assessments, lack of early treatment for children entering foster care, and a failure to "provide…children with stable and appropriate placements and/or necessary treatment and support services."[17] In its 2006 Annual Report, the FCRB decried MDHS for not having "an adequate workforce of trained and experienced foster care workers to fulfill the [required] responsibilities in a manner that can ensure safe and timely permanency for all children in [the] foster care system."[18]

- The August 2005 State Audit Report by the Office of the State Auditor General in relation to the MDHS foster care program found that MDHS (1) "did not comply with material provisions of state laws and regulations related to the delivery of Program services," (2) "was not effective and efficient in monitoring the delivery of services by Program contracted service providers," and (3) "was not effective in meeting its outcome goals."[19]

- In 2006, an internal MDHS communication between the agency's manager of contract monitoring and one of her auditing staff identified and addressed the pervasive issue of high staff turnover within private child placing agencies ("CPAs") that contributed to a foster care workforce riddled with untrained new hires. The staffer thought that the problem was so severe as to be a "formula for disaster."[20] Four months after this internal communication, one private CPA cited by these MDHS officials as having a particularly poor history of training new hires and staff reported the brutal death of a three-year-old boy at the hands of his state-approved foster parent.[21]

Disasters continue to occur and children continue to be hurt, abused, and even killed while in the care of the very agency that is responsible for keeping them safe and finding them permanent homes.

[17] "2005 Annual Report," Michigan Foster Care Review Board, 7.
[18] "2006 Annual Report," Michigan Foster Care Review Board, 7.
[19] "Performance Audit of the Children's Foster Care Program," *Office of the Auditor General*, (August 2005): Report Summary.
[20] Debora Buchanan deposition, (Oct. 15, 2007): 161; Exh. 190.
[21] Kim Kozlowski, "Van Buren Township foster child's death a homicide," *The Detroit News*, <http://www.detnews.com/apps/pbcs.dll/article?AID=/20070418/METRO/704180415>.

**In 2005, one-year-old Isaac was placed in a foster home. He died at age two, the victim of horrendous abuse in the home. According to the MDHS Protective Services Investigation Summary, there were a total of nine separate complaints about that foster home dating back as far as 1999. Despite numerous reports detailing ongoing harm and dangers in the home, MDHS failed to take minimally necessary safety measures and continued to place children in the home year after year. These children survived somehow; baby Isaac did not.[22]**

**After Isaac's death, MDHS discovered that his caseworker had not seen Isaac or his birth or foster parents as required, had not completed Isaac's service plans on time, and had not provided for a medical exam for Isaac. His caseworker was carrying as many as 46 cases at the time of Isaac's death. The caseworker had received a directive from his employer *not* to visit foster homes except in an emergency so case reports could be kept up to date. This can only be described as a travesty of child welfare practice when paperwork is the priority over child safety.[23]**

**The file on Isaac's tragic death included the report that "once the child arrived at the hospital, he was discovered to have second degree burns to the chest and abdomen area, a fresh bruise on the forehead and right ear, old bruises on his chin and left shoulder, and 3 old bruises on his left upper arm, left thigh and right tibia."[24] MDHS abandoned Isaac this foster and left him completely unprotected.**

## II. <u>MDHS HAS INADEQUATE STAFFING AND INCONSISENT LEADERSHIP</u>

### A. Caseloads

Child welfare is, by nature, dangerous, time-consuming, and emotionally demanding work. In order to be effective, child welfare agencies must have enough educated and well-trained social workers on staff to meet the basic needs of the children they serve. Without adequate staff, an agency cannot assure that caseworkers have the time to perform their functions in accordance with policy and proper practice. It is essential that child welfare agency management regularly monitor agency staffing needs and make necessary adjustments as needs change.

[22] MIDHS00250762-00250767.
[23] MIDHS00074214-00074218.
[24] MIDHS00250762-00250767.

The Child Welfare League of America ("CWLA"), the country's oldest child advocacy organization, comprised of public child welfare administrators and workers throughout the country, has promulgated the following nationally accepted caseload standards:

- 12 – 15 children already in care for a foster care worker[25]
- 12 families for a child protective services worker doing abuse and neglect investigations[26]
- 10 – 12 children for an adoption worker preparing children for adoption who are older or who have special needs[27]
- 17 families for a worker following ongoing "in-home" cases (also known as prevention or protective supervision cases)[28]
- 10 ongoing and 4 investigations for a child protective services worker carrying mixed or combined caseloads[29]
- A supervisory ratio of 1:5 for supervisors to social workers[30]

MDHS caseloads are, at best, a moving target, difficult to discern from the scant data collected by the agency and provided to management, but much too high by all accounts. MDHS only maintains regular reporting as to (1) the overall staff allocations made by the Central Office to each of the 83 county field offices, and (2) the number of workers on payroll (including workers on leave) in local offices in a given month. Neither of these measures provides information about the *actual* number of cases carried by workers. Even the Deputy Director of Field Operations, who is responsible for staff in all field offices, admitted that MDHS has no efficient way to obtain management reporting on the number of cases workers are carrying at any point in time,

[25] CWLA, Standards of Excellence for Foster Care Services (1995): 113.
[26] CWLA, Standards of Excellence for Services for Abused or Neglected Children and Their Families (1999): 137.
[27] CWLA, Standards of Excellence for Adoption Services (2000): 101.
[28] CWLA, Standards for In-Home Aide Services for Children and their Families (1990): 46.
[29] CWLA, Standards of Excellence for Services for Abused or Neglected Children and Their Families (1999): 138.
[30] CWLA, Standards of Excellence for Foster Care Services (1995): 114.

other than to request a manual "hand count."[31] Hand counts are time-consuming, labor-intensive, rarely conducted, and a poor substitute for an electronic caseload tracking system.

Since the inception of the *Dwayne B. v. Granholm* lawsuit, MDHS has conducted two *ad hoc* hand counts of actual caseworker caseloads. The first was conducted on a state-wide basis in the fall of 2006, and the second was conducted in the largest 14 county offices in the State in December 2007. MDHS management can identify no other instances within the last three years in which actual caseloads were measured.[32] It is unacceptable for child welfare agency management to pay so little attention to such a critical aspect of proper agency staffing and program support. There is no evidence that MDHS management has any immediate plan to remedy this serious data reporting deficiency.

A review of the 2006 state-wide hand count by MDHS revealed extremely high caseloads for both foster care and adoption workers. For example, in Genessee County, adoption workers carried caseloads ranging from 47 to 103 children per worker. Even more egregious, these same workers were carrying "foster care licensing" cases, making their actual caseloads range from 56 to 139.[33] Navigating a foster child's case through the adoption process is complicated and time-consuming. It is simply impossible for a caseworker to be successful at finding permanent homes for children if they are carrying cases at these extraordinary levels. And certainly it is poor practice to further complicate the work of adoption caseworkers by adding duties in another work area, such as licensing.

[31] MIDHS00238871; James Nye deposition, (June 20, 2007): 118.
[32] Angelo Nicholas deposition, (Nov. 29, 2007): 151-153.
[33] MIDHS00238901.

In deposition testimony, the Deputy Director of Field Operations reported that he considered any caseloads over 30 children per worker to be "excessive."[34] Even the 30:1 ratio is twice the CWLA caseload recommended for foster care caseworkers. He also indicated that, though he routinely relies on county directors and regional managers to inform him if that ratio is being exceeded, he did not know if anyone within the Field Operations staff had actually identified such excessive caseloads.[35] In fact, the 2006 hand count revealed numerous individual caseworker caseloads in excess of 30 throughout many county offices across the State.[36]

The second hand count of actual DHS caseloads, completed in December of 2007, showed little change and certainly no meaningful reduction in the high caseloads reported in the previous year.[37] The following sample of three counties - Wayne County, Oakland County and Macomb County (the three largest county offices in the State) - indicates that caseloads remain far above the recommended CWLA standards. In addition, caseworkers continue to carry mixed caseloads, such as licensing and Purchase of Service ("POS") monitoring cases, further exacerbating caseworkers' inability to ensure the safety and well-being of children.

[34] James Nye deposition, (June 20, 2007): 125.
[35] Ibid. 124-129.
[36] MIDHS00238874 -MIDHS00238956.
[37] MIDHS00428047-MIDHS00428069; MIDHS00430213-MIDHS00430226.

**FOSTER CARE CASELOADS FOR WAYNE, OAKLAND & MACOMB COUNTIES - DECEMBER 2007** [38]

| COUNTY | > 15 CASES/WORKER | > 30 CASES/WORKER | TOTAL # FC CASES EXCEEDING CWLA STANDARD | TOTAL # WORKERS CARRYING FC CASES | % OVER CWLA STANDARD | HIGHEST MIXED FC CASELOAD |
|---|---|---|---|---|---|---|
| Wayne | 94 | 24 | 118 | 195 | 61% | 45 |
| Oakland | 13 | 9 | 22 | 24 | 92% | 60 |
| Macomb | 11 | 18 | 29 | 33 | 88% | 50 |

Caseload standards within a child welfare agency should never be set arbitrarily. A workload study based on the actual day-to-day tasks that must be performed by a social worker to meet policy and reasonable practice is a commonly accepted tool for evaluating reasonable caseload levels. The CWLA caseload standards resulted from just such a workload study. Significantly, in 2001, MDHS engaged the Children's Research Center (the "CRC") to perform a workload study in relation to its foster care and CPS caseloads. Though CRC concluded that at least 348 additional foster care workers were required at that time to attain acceptable foster care caseloads within the agency, MDHS did *nothing* to implement this finding. In fact, MDHS management actually transferred a group of foster care caseworker staff to another function, aggravating the shortage of caseworkers. The foster care caseworker staff of MDHS has not increased to meet actual need, placing children at severe risk of harm.

MDHS makes no effort in the annual budget process to secure the number of workers actually required to meet agency policy and practice requirements. Rather, MDHS develops and utilizes an "allocation formula" each year that is designed to

[38] MIDHS00428064-00428065; MIDHS00430213-00430222; MIDHS00430223-00430225.

balance the average caseloads across county offices, but not to assure or achieve acceptable individual caseloads.[39] Indeed, though MDHS in FY2007 recommended foster care caseloads of 15 children per worker, application of the staffing allocation formula yielded average foster care caseloads at only 73% of that target.[40] And even *this* percentage is over-stated in terms of the actual caseloads carried by workers in the field because it assumes that all funded positions will be continuously filled, that all employed caseworkers will be fully trained and eligible to carry an active caseload, and that no worker will ever be on any form of temporary or paid leave.

Similarly, MDHS annually uses a formula for setting the supervisor-to-caseworker ratio that fails to establish a reasonable management structure in the front lines of case practice. In fact, the supervisory ratio of one supervisor to every eight workers utilized by MDHS is nearly double that recommended by the CWLA.[41] A child welfare agency cannot reliably and consistently deliver minimally adequate services to children in foster care without a stable and dedicated staff of supervisors who oversee only that number of front-line caseworkers that they can regularly observe and direct. MDHS fails to achieve and sustain this level of supervisory staffing.

In the FCRB's 2006 Annual Report, the first "problematic workforce issue" identified as afflicting MDHS was "high-volume caseloads, exacerbated by caseworker turnover, stress-related medical leaves, and the inability of agencies to control workload and case intake."[42] When workers and supervisors are spread too thin, children are not safe.

---

[39] "FY 2007 Staffing Allocation for Outstate and Wayne County Operations," (2007): 31-33, 59.
[40] Ibid. 39.
[41] Ibid. 55.
[42] "2006 Annual Report," Michigan Foster Care Review Board, 7.

**Beginning at the age of three, Ricky endured five years of terror at the hands of foster parents who were approved by MDHS first as foster care providers and then as adoptive parents. He was denied food, tied to his bed, led around on a leash, locked in the basement, beaten with a hammer, and ultimately killed by his adoptive mother.**

**Even though an allegation of abuse was called into MDHS, Ricky's MDHS caseworker "never spoke with Ricky's therapist. The caseworker had other cases and didn't have time. He later said he was getting four or five new cases a week and his ongoing caseload stood at more than 20."[43] Had the worker met the therapist, he would have learned that "Ricky was opening up more…, talking about 'Mr. Bloody Bones' who locked him in the basement for a timeout. Then he told [the therapist] in a Feb. 28 session that he was no longer being tied to the bed, saying "Mom and I promised that I will stay in my bed and she won't tie me to it."[44]**

**Ricky was beaten to death by his adoptive mother when he was eight-years-old. His adoptive father threw Ricky's body in a pond. MDHS failed this child by overlooking the severe and continued abuse that was right in front of them.**

Following Ricky's death, Marianne Udow, the former Director of the agency, admitted that MDHS maintained caseworker caseloads that were "far higher" than the CWLA standards. She noted "we do not have enough caseworkers to perform child protection services."[45] Caseloads ranged at that time from 25 children per worker to 40 children per worker.[46] Despite several more preventable child deaths, including Isaac Lethbridge, Allison Newman, and James Earl Bradley, MDHS still does not have enough caseworkers in CPS, foster care, or adoption.

The excessive caseloads within MDHS most recently manifested themselves in the highly unusual management decision by MDHS to transfer foster care cases from

[43] "Could You Have Saved Ricky?" Chapter 3, Jack Kresnak, Detroit Free Press, December 4, 2007.
[44] Ibid.
[45] Marianne Udow deposition, (Oct. 10, 2007): 60.
[46] "DHS director says department has made significant strides to protecting children and families," *Michigan Department of Human Services*, Press Release, (September 6, 2005).

public to private case management.[47] In October 2007, the North Central District Office in Wayne County, which had already been placed on a third provisional license by BCAL (because it had failed to meet basic licensing standards for 18 consecutive months), reported foster care caseloads of 48 children per worker, a number described by the Wayne County director as "too high, way too high."[48] In order to reduce the caseloads of state-employed caseworkers, MDHS transferred case responsibility for almost three hundred children's cases to private agencies unfamiliar with the children or their needs.[49] This disruption in service and caseworker continuity is the result of the mismanagement of staff resources by MDHS and constitutes unacceptable crisis management. Moreover, these cases were transferred with no knowledge of the existing caseloads of the private caseworkers or their capacity to take over management of these children's lives.

MDHS also fails to assure in the first instance that reasonable caseloads are assigned to the caseworkers employed by private CPAs that deliver case management services. The MDHS child welfare system places approximately 40% of the children in foster care with private child placing agencies. According to BCAL licensing regulations, the caseload maximum for the private CPA foster care workers is 30 children to every worker.[50] This means that even where caseloads do not exceed the level recommended by BCAL (they often do), they are at least *twice* the standard set by CWLA. Further, MDHS maintains no regular system within either Field Operations or Child and Adult Policy to assure that CPAs are even abiding by this caseload limit.

---

[47] MIDHS00410643.
[48] Jerome Rutland deposition, (Feb. 1, 2008): 223.
[49] MIDHS00410640.
[50] Marianne Udow deposition, (Oct. 10, 2007): 81.

Private CPA caseloads are reviewed only once per year during the annual BCAL licensing inspection.[51] This level of oversight is inadequate, especially in a state with a severe staff turnover problem.

**B. Qualifications and Training**

A child welfare agency cannot function without educated, trained, and competent caseworkers. Ideally, all caseworkers would be required to have bachelor of social work degrees, and all supervisors would be required to have advanced degrees in social work or a related field. For both caseworkers and supervisors, MDHS requires only an undergraduate degree in any major, as long as 25% of course credits were earned in a human behavioural science.[52] These reduced qualifications heighten the need for rigorous and well-designed pre-service and in-service caseworker and supervisory training. But, MDHS child welfare training is inadequate. In its 2006-2007 Annual Report, the OCO found that "insufficient training opportunities and inadequate supervisory support for workers" was a key factor in the extensive non-compliance with child welfare laws and policies it found within MDHS.[53]

> **"It appears … that Michigan does not have an adequate workforce of trained and experienced foster care workers….This inadequacy appears to be a substantial factor in the abuse and death of children in the foster care system during the past year…."[54] - Michigan Foster Care Review Board**

It is essential that state child welfare agencies provide pre-service training in the specific skills and specialized areas of knowledge needed by CPS, foster care, and adoption caseworkers so that they can learn how to deliver services in accordance with

[51] Nye, (June 20, 2007): 144-145.
[52] 400.12205, Rule 205.4, <http://www.mi.gov/documents/dhs/BCAL-PUB-11_216515_7.pdf>.
[53] "Annual Report 2005-2006," *Office of the Children's Ombudsman*, 16.
[54] "2006 Annual Report," Michigan Foster Care Review Board, 7.

applicable policy and practice standards. States accomplish this task in many different ways. Common methods include using some combination of a consortium of the State's universities, state-run training academies, or contracts for training with private businesses or organizations.

Training for new caseworkers at MDHS is provided through the Child Welfare Training Institute ("CWTI"). All new child protection, foster care, adoption, and juvenile justice workers receive training through CWTI.[55] Private agency caseworkers also receive their training through the Institute. However, though every child taken into state foster care custody is equally entitled to adequate care and services, MDHS inexplicably requires materially different pre-service training for public agency and private agency staff. Public agency caseworkers are not eligible to carry active caseloads until they have completed an eight-week CWTI curriculum. In contrast, private agency caseworkers may carry active caseloads for up to six months without having received any pre-service training.[56]

This differing set of training requirements is wholly contrary to child safety and well-being. It flows entirely from financial considerations – the fact that private agencies cannot always afford to "lose" caseworkers required in the field to the CWTI classroom. Moreover, MDHS routinely fails to assure that private agency caseworkers receive the required training within six months of their hire dates.[57] A caseworker, therefore, can begin work with the State's most vulnerable children with *no* training and

[55] Nye, (June 20, 2007): 185-188.
[56] Nye, (Oct. 4, 2007): 100-102.
[57] Letter from Susan L. Leahy to Private Agency Directors, (July 25, 2007); MIDHS00179553.

can continue in that untrained status for a considerable amount of time. As already noted, MDHS staff has appropriately described this reality as a "formula for disaster."[58]

Even when training occurs, training topics sorely needed for certain job functions are unexplainably absent from the CWTI curriculum. For example, foster care caseworkers need to have basic knowledge about the federal Title IV-E foster care reimbursement process and placements and resources for children. Strangely, these topics are included in the training for juvenile justice workers who have very little need for the Title IV-E training, in particular, but do not appear in the foster care curriculum.[59] And despite the fact that the department has selected "Family to Family" - an Annie E. Casey Foundation program aimed at improving foster care through community-based practice - as the child welfare practice model for all 83 counties, training course descriptions fail to mention the Family to Family program. Though Team Decision Making ("TDM") – the practice of holding team meetings at key points in a child's foster care episode - is an important part of the Family to Family model, there is no training course associated with it.

Further, despite the complex nature of adoption work, information on training for adoption caseworkers is particularly sparse. Adoption workers are provided with a mere three-week course that focuses only on generic foster care practice. This ignores the fact that the skills and knowledge needed for adoption work is very different from the skills required for foster care case management.

**"….there are an increasing number of newly hired and un-trained staff trying to provide service to children and their families in foster care. My most recent review…is an example of how poorly trained some of the workers are….[T]he**

---

[58] Email from Jeffrey Washburn to Debora Buchanan, (Dec. 21, 2006); Exh. 190.
[59] MIDHS00012355; CWTI Course Descriptions.

**senior staff at one location has 3 months on the job, and the senior staff at the other location has only 6 weeks. None of their staff has had CWI training yet….This continues to be a big problem throughout the agencies. It all adds up to a formula for disaster if continued along this track."[60] – E-mail between Deb Buchanan, MDHS manager of contract monitoring and one of her auditing workers**

In addition to pre-service training, a functional child welfare agency establishes and enforces skills through in-service training or continuing education requirements. It is important that caseworkers and their supervisors maintain up-to-date knowledge about changes in policy or law, and advances in social work theory and practice. MDHS has insufficient in-service training requirements for both public and private agency caseworkers. It requires only 16 hours of in-service training per year, and has no core substantive requirements. This in-service training requirement fails to meet standards of reasonable practice and sound management in the child welfare field. "The Report From the 2004 Child Welfare Workforce Survey," conducted by the American Public Human Services Association ("APHSA"), found that the average annual mandatory in-service training hours for foster care staff (among the over 20 states participating in the survey) is 30 hours. Moreover, CWLA and the Institute for Human Services have jointly published "The Core Curriculum for Child Welfare Caseworkers," an in-service training program that includes a 14-day set of teaching modules. Making matters worse, private caseworker training is only monitored once per year through a BCAL licensing audit.[61] MDHS requires a more rigorous system for assuring that in-service training requirements are being met by private CPA caseworkers.

[60] Exh. 190.
[61] Jim Gale deposition, (June 26, 2007): 58.

Finally, MDHS does not require or provide adequate supervisory training. The 2004 APHSA workforce survey determined that the responding public child welfare agencies had instituted mandatory in-service supervisory training programs with an annual average requirement of 28 classroom hours. Until recently, no supervisory training for foster care supervisors was offered through the CWTI. Though MDHS now plans to require the completion of a supervisory training curriculum for all newly promoted or hired foster care supervisors, it has established no track record of success in this critical area, nor has it promulgated any requirement that current supervisors also be required to complete the training to assure their knowledge and skill base. A stable corps of well-trained and knowledgeable supervisors provides the backbone of a child welfare workforce. It is the supervisor who enforces policy and practice at the individual case level day-to-day. Most supervisors attain this position by virtue of promotion from the front-line caseworker ranks. There is no rational basis to assume that even an effective caseworker possesses the management skills to act as an effective supervisor. Supervisory training is essential.

**C. Turnover**

Caseworker turnover inevitably leads to high caseloads whenever a child welfare agency fails to implement effective retention strategies to combat the causes of staff departures. The case assignments vacated by a departing worker must be reassigned to remaining workers, raising their caseloads. Furthermore, with high staff turnover, children lose continuity of care and any trust that may have been built with their caseworkers.

Oakland County Director Margaret Warner reported that, by the end of 2006, conditions had worsened to the point that 90% of her CPS caseworkers and 30% of her foster care caseworkers had turned over.[62] Problems of turnover, however, are not limited to front-line workers; Macomb County Director Angelo Nicholas reported "massive" turnover in management and director positions over the last two to three years, further impeding the ability of MDHS leadership to stabilize and support the work of caseworkers.[63]

Making matters worse, increasing turnover rates coincided with a four-year period in which the total foster care population was on the rise in many parts of the State. Between 2003 and 2007, the total foster care caseload in Oakland, for example, had increased by more than 60%, while the foster care staff had increased by only approximately 20%.[64] This period culminated with an agency-wide hiring freeze in April 2007,[65] which halted or made futile all efforts to increase the number of staff as a means of reducing caseload size and turnover.[66]

MDHS has not implemented any state-wide plans for worker retention. In fact, a combination of events over the years instead *exacerbated* the problem of worker turnover. First, during the tenure of Governor John Engler, MDHS instituted two early retirement programs designed to reduce the overall MDHS payroll by freeing up caseworker slots held by more senior workers with higher salaries. As a result of this initiative, MDHS lost roughly 22% of its workforce, eliminating much of the experience

[62] Margaret Warner deposition, (Nov. 13, 2007): 117-118.
[63] Nicholas 49-50.
[64] Ibid. 101-102.
[65] John Sorbet deposition, (July 26, 2007): 169; Exh. 95.
[66] Susan Hull deposition, (Nov. 8, 2007): 151, 146.

and "legacy" knowledge within the agency and raising already burdensome caseloads.[67] When asked about the agency's ability to perform administrative reviews in all 83 counties, the Director for Field Operations, Jim Nye, blamed this early retirement plan for the insufficient staff levels that prevented completion of these reviews.[68] Second, for much of the last two years, a hiring freeze has been in place because of the State's budget crisis. In the face of the hiring freeze, MDHS management has not made adequate effort to stabilize the child welfare workforce, instead allowing a self-propelling cycle of worker frustration, worker departures, and caseload reassignments to accelerate unabated. Private agencies have reported turnover in the range of 35% annually,[69] and the Oakland County DHS office reported an annual turnover rate exceeding an astonishing 90% for CPS staff and 30% for foster care caseworkers.[70] In the end, the children in foster care suffer most as a result of this turnover problem.

> **"This system has become a troubled mechanism with unresolved workforce issues (large caseloads and high worker turnover) that limits accountability for timely permanency and may compromise the care and safety of children in the system."[71] - Michigan Foster Care Review Board**

Prior to 2002, the State had in place "just in time" hiring, which kept a pool of already-trained social workers in the pipeline, allowing vacancies to be immediately filled. "Just in time" hiring was discontinued in the wake of the 2002 fiscal crisis in Michigan.[72] As the hiring pool disappeared, vacated positions remained unfilled for

---

[67] Wendy Wendland-Bowyer, "Early Retirement Worry FIA Union," *The Detroit Free Press*, (July 29, 2002).
[68] Nye, (June 21, 2007): 303.
[69] Nicholas 166.
[70] Warner 117–118.
[71] "2006 Annual Report," Michigan Foster Care Review Board, 4.
[72] Nicholas 170-173.

months at a time as new workers were recruited and interviewed, and then subject to the eight-week training period.[73] During these gaps in staffing, caseloads were redistributed to the already overburdened and overworked remaining workers, pushing caseloads into the fifties, sixties and even the nineties for some foster care workers, and well over 100 for some CPS workers.[74] Increasing caseloads exacerbated problems of low morale and high stress plaguing the agency.[75]

> **"We've been in a freeze for the last nine months of hiring any workers. The case loads have shot up a great deal. There's been a lot of chaos in the department….Simply massive turnover in terms of management and different directors, an incredible fiscal situation….not knowing whether people are going to be laid off or not, not knowing whether privatization was going to lay off eight hundred people….there was a tremendous amount of wringing hands."[76] - Angelo Nicholas, Director of Macomb County**

**D. Supervision and Administration**

Child welfare agencies must have competent, stable leadership in order to provide caseworkers and supervisors with the guidance, support, and feedback they need to make critical decisions regarding the safety, permanency, and well-being of the children they serve. Poorly managed caseworkers on the front lines place children at serious risk of injury and even death.

MDHS has an organizational structure that is astonishing in its complexity and operational chaos. The turnover of multiple MDHS directors over the last several years (from Director Doug Howard to Director Nanette Bowler in January 2003; from

[73] Ibid. 171.
[74] Exh. 230; Hull 141.
[75] "2006 Annual Report," Michigan Foster Care Review Board, 7-8.
[76] Nicholas 49-50.

Director Bowler to Director Marianne Udow in January 2004; from Director Udow to Director Ismael Ahmed in September 2007) has resulted in constant change in priorities and little in the way of a common value system for the organization. The MDHS organizational chart changes so frequently that those affected by the moves are unsure exactly where their areas of responsibility begin and end. Indeed, Deb Buchanan, the Director of the Purchased Services Division, responsible for contract monitoring, saw her division move from the program chain of command to the Administrative chain of command, back to the program chain, and then to the Field Operations chain of command, all within four to five years.[77] When she last testified in the *Dwayne B. v. Granholm* case in the fall of 2007, Ms. Buchanan did not know if her function was going to move again, nor had she been informed of the rationale for her unit's latest move to Field Operations, hastily announced by Director Udow on her way out of MDHS in August 2007.[78] The lack of clear areas of jurisdiction and responsibility within MDHS has created an environment in which organizational and individual accountability cannot be sustained.

This problem of high management turnover is further illustrated by the fact that the Director for Children's Services position changed hands at least *four* times between 2002 and 2004, during which time the position carried with it responsibility for implementing the State's federally required Child and Family Services Review ("CFSR") Program Improvement Plan ("PIP").[79] With such unstable leadership the agency was delayed nearly two years in getting an acceptable PIP approved by the HHS in Washington, D.C., and the State ultimately failed to meet its PIP targets and

---

[77] Buchanan 23-24, 90.
[78] Buchanan 90.
[79] Nye, (Aug. 27, 2007): 911.

commitments. Indeed, though MDHS set improvement goals in its May 2006 PIP, it later negotiated with HHS to reduce those goals in multiple key areas of systemic performance only to miss even those more modest targets at the end of the PIP implementation period. Predictably, unstable management and supervision yielded poor outcomes for children.

With instability at the top tier of the MDHS administrative structure and a lack of adequately trained supervisors for front-line caseworkers at the bottom, it is not surprising that the middle management tier of MDHS is also rife with accountability and performance problems. What is, however, surprising is the lack of knowledge that managers, such as county directors, have displayed in terms of child welfare policy and practice. For example:

- The county directors for Wayne,[80] Berrien,[81] Ingham,[82] Macomb[83] and Oakland[84] counties were all unable to explain agency policy in regard to the most fundamental of safety areas – the investigation of alleged abuse or neglect of vulnerable children in licensed child caring institutions. The directors could not explain how such allegations were to be investigated, decided and entered on the Central Registry (listing substantiated abuse/neglect perpetrators), even though their own CPS staffs possess the sole authority under MDHS policy to make entries into the Central Registry. Of course, in order for any management to enforce policy, it first must know that policy.

- Wayne County Director Jerome Rutland, admittedly responsible for supporting all foster placements for children in Wayne County, did not know that unlicensed relative foster care providers are not eligible for the monthly foster care maintenance payments or annual clothing allowances paid to licensed foster providers. When confronted with this reality, Mr. Rutland stated that such a practice was "unfair."[85] More than 7000 children are now placed with unlicensed relatives.

[80] Rutland 187-188.
[81] Jerry Frank deposition, (Oct. 30, 2007): 200-202.
[82] Hull 97-99.
[83] Nicholas 182-184.
[84] Warner 211-215.
[85] Rutland 142-143.

- The county directors have displayed a startling absence of knowledge regarding the federally mandated child welfare performance indicators designed by HHS for the CFSR process. Indeed, none of these directors indicated any familiarity with the "PS 830" management report published monthly to report on these indicators on a county-by-county basis since November 2006.[86] The PS 830 report shows performance in relation to the CFSR national performance indicators. There is a glaring lack of data-based management capacity within MDHS counties, and little evidence of any formal supervisory review of casework by county directors. To make matters worse, the State office is so disconnected from the counties that Jerry Frank, the Director of Berrien County, said he was the director of a "decentralized agency."[87]

- County business plans are nothing more than a paper exercise in which the same basic information is typed into a template from year to year.[88] As noted previously, county directors do not know what their caseworkers' caseloads are, and do not seem concerned about the lack of data and reports that could provide them with key management tools.

Without knowledgeable, consistent, and stable leadership in the agency, MDHS is unable to perform its primary function of protecting children.

## III. <u>MDHS FAILS TO KEEP CHILDREN SAFE THROUGH LICENSING AND MONITORING OF CHILDREN'S PLACEMENTS</u>

### A. MDHS has no meaningful child welfare quality assurance system

The ability to assess agency performance and case practice through a functioning quality assurance program is a requisite of any child welfare system. A quality assurance system should include a standardized internal case review system and the ability to aggregate and generate data in a comprehensive manner to gauge current practice and to facilitate improved practice in substandard areas. Through quality assurance, child welfare agencies are able to monitor performance and make necessary corrections to prevent entrenchment of systemic problems.

---

[86] Rutland 125-129; Hull 114; Frank 91-97; Warner 125-134; Sheryl Thompson, (Nov. 15, 2007): 144-145; Nicholas 108-116.
[87] Frank 48.
[88] MIDHS00053033-00053059; MIDHS00238387-00238412; MIDHS00409751-00409776.

The National Child Welfare Resource Center for Organizational Improvement (a service of the Children's Bureau, U.S. Department of Health & Human Services) has established a quality assurance framework for child welfare agencies that includes five components:

- Adoption of outcomes and standards
- Incorporation of QA (Quality Assurance) throughout the child welfare agency
- Gathering data and information
- Analyzing data and information
- Using the analysis and information to make improvements[89]

Not *one* of these components is functional within MDHS. Without a well-functioning quality assurance unit, a system is unable to gauge, let alone improve, practice because it lacks the data and controls necessary to diagnose and remedy systemic failings.

MDHS has failed to establish a child welfare quality assurance unit to assess child welfare outcomes and performance, and diagnose systemic shortcomings and case practice, despite recognition within MDHS leadership that such a unit is essential. Steve Yager, the Director of the Office of the Family Advocate, has raised this issue numerous times over the last two year – "My position [was] then and is now that we need to have a…regular quality assurance program." In 2006, according to Mr. Yager, there was a "general consensus" among MDHS staff that initiating a quality assurance program "would be a good thing to do."[90] But it never happened. MDHS maintains an "Office of Quality Assurance" in the Central Office; however, this office serves *no* child welfare function at all, focusing only on the agency's Food Stamps and Adult Services programs.

---

[89] "A Framework for Quality Assurance in Child Welfare," *National Child Welfare Resource Center for Organization Improvement*, (March 2002).
[90] Steve Yager deposition, (Nov. 30, 2007): 19.

The absence of an effective and stable quality assurance function within MDHS was a material contributing factor to the agency's failure to meet the improvement goals set in the Program Improvement Plan it submitted to HHS after the first round of the federal CFSR reviews. In fact, MDHS not only fell short of the original performance targets set in the PIP, but did not even achieve the reduced performance benchmarks in several key areas that it renegotiated with HHS when it became clear that the initial targets would not be attained.[91]

**"….DHS doesn't have an overarching quality assurance system for child welfare practice, particularly related to the PIP and the requirement for a quality assurance system as one of the systemic factors in the federal review."[92]**
**– Mary Mehren, Manager of the Office of CPS and Foster Care**

It is imperative that MDHS implement a system for child welfare quality assurance. Without regularly scheduled, qualitative reviews that show what is happening with children, the managers and administrators at MDHS have left the safety and welfare of children in foster care to chance.

### B. MDHS has a failed management information system for data collection and, therefore, fails to maintain adequate aggregate reporting on key elements of child safety, permanency, and well-being

The detailed nature of child welfare work demands that managers and staff have access to as much data and information as possible, in the most organized fashion possible, so that they can make appropriate decisions about children's safety and welfare. At a minimum, caseworkers must be able to access information about the number of cases to which they are assigned, the location of the children for whom they

[91] Nye, (Aug. 27, 2007): 986-993; 1035-1044.
[92] Mary Mehren memo re: CFSR/PIP/CFSP, ( Sept. 13, 2005).

are responsible, the number and dates of permanency plans due and overdue, the service needs of particular children and whether these are being met, and progress towards permanency. In addition, important information about reports of abuse and neglect by foster parents or relatives, licensing violations in a home, and the current funding eligibility status of any child must be accessible on a management information system.

More than 15 years ago, the federal government initiated and helped to partially fund State Automated Child Welfare Information System ("SACWIS") technology projects for all 50 states, the District of Columbia, and Puerto Rico. SACWIS data infrastructure is supposed to provide an official repository for all child welfare case records and information. HHS lists Michigan as being a "System in Development" with only a partial functionality in place.[93] HHS further reports that fully 27 states have "operational" systems in place.

Michigan lacks a functional, appropriate management information system. The Michigan Department of Information Technology ("DIT"), a separate executive agency from MDHS, provides services to MDHS, including ongoing consultation and installation of the State's intended SACWIS system, known as the Social Workers Support System ("SWSS").[94] MDHS indicates that implementing a functional SWSS is a top priority in its strategic plan.[95] Likewise, DIT identifies SWSS as a key IT project for the State.[96] Despite this fact, MDHS and DIT have not prioritized the development of SWSS. Another computer project, known as Bridges, has taken priority

---

[93] ACF Chart of States' SACWIS Status, Exh. 86.
[94] < http://www.michigan.gov/dit>.
[95] 2007-2008 MDHS Strategic Plan, Exh. 92.
[96] Ibid.

and is currently not expected to reach even a pilot phase until June 2008.[97] The SWSS system, which is unable to deliver aggregate performance reports in a number of key areas at this time, will not come on-line until after Bridges installation is complete. MDHS has failed to provide any reliable, interim data system to support case practice during SWSS development.

**"We have not proceeded with the SWSS…module as revisions or enhancements as originally planned. We do have staff currently testing SWSS but that testing is limited to the bridges interphase that's coming up. I only have seen one test batch run of SWSS…data that I wouldn't have bet any money on as being particularly accurate. Things just weren't counted that made any sense."[98]**
**– James Nye**

Front-line case practice is best supported by a single, comprehensive data information system, as any tool that streamlines the written reporting process also increases the overall time that caseworkers can devote to actual contact with children and families. MDHS data systems currently do not support this essential goal of streamlining the reporting functions of front-line caseworkers. There are currently at least seven (possibly more) separate systems that have some usage or connection to the work done in child welfare.[99] Indeed, the diagram above depicts the complexity and inefficiencies of the disparate data information system used by MDHS.[100]

---

[97] Nye, (July 18, 2007): 64-65
[98] Nye (Oct. 4, 2007): 128.
[99] "DHS Organization and Current Eligibility Systems Overview, Appendix G – Detailed System Summary," Exh. 85, 22-42.
[100] Ibid. 40.




MDHS's failure to put in place a functional data system affects not only caseworkers' ability to access key case data, but management's ability to perform quality assurance. The ability to trend data over time, understand the implications for case practice, and adjust the agency accordingly is critical to child welfare performance. Data reports should be available to everyone in the agency from the highest level administrators to the front-line caseworkers in order to facilitate the best possible outcomes for children and families. MDHS lacks, almost entirely, the ability to run and use reliable aggregate data reports.

**C. MDHS uses management reports containing performance benchmarks that are neither understood by staff nor measurable by the agency**

A key element for providing effective quality assurance within a child welfare agency is well-defined management reporting that captures aggregate data on core areas of performance. It is vital that this data be well understood by managers and staff in

terms of what it measures, what it means in relation to current performance and what it calls for in pursuing systemic improvement. As stated by the National Child Welfare Resource Center for Organizational Improvement and Casey Family Programs:

> Data and measurement are not ends unto themselves. The purpose of collecting, analyzing, and monitoring data and information is to identify trends and anomalies that can guide and improve (but not dictate) practice at all levels of child welfare. Most importantly, data and information must be used to tell stories about what is happening in practice and policy.[101]

MDHS has not instituted a management reporting system capable of reporting data on performance trends to a staff that has been trained to understand the data, let alone a data reporting system that supports decision-making, improves case practice, or identifies the needs of children and families that are not being met. Even the limited management reporting that does occur within MDHS is inadequate. MDHS has not established performance targets for the few practice areas that are measured, and agency managers have no real concept as to how to use the data to improve performance and practice. For example, the monthly Local Office Management Reports ("LOMRs") that are distributed throughout MDHS provide county-by-county totals for the current number of licensed foster homes without providing any yardstick to gauge those totals.[102] Similarly, these LOMRs provide data on the county-by-county percentage of children who have been in foster care for less than 24 months, without setting a performance benchmark to guide decision-making. Thus, MDHS Central Office management has not provided its county directors and other local office managers with the necessary set of performance expectations to drive improvement in the field. Tellingly, none of the county directors who gave depositions could explain the meaning

---

[101] "Using Continuous Quality Improvement to Improve Child Welfare Practice," *National Child Welfare Resource Center for Organizational Improvement*, (May 17, 2005): 2.
[102] *See e.g.* MIDHS00150810.

and purpose of the performance elements in the LOMR. Sound practice in management reporting includes the development of performance measures that are well understood by the managers responsible for ensuring that they are met.

The poor data reporting and management within MDHS completely undermine sound business planning. Though MDHS prepares an annual business plan that identifies core strategies for improving child welfare practice and sets forth quantifiable performance benchmarks, these business plans actually establish performance benchmarks in areas that the agency cannot measure. The 2007 business plan prepared by Wayne County DHS explicitly states that the county cannot measure virtually all of the performance areas for which a target is set. This is a clear example of the purely "paper" form of business planning and management reporting that exists throughout MDHS. The agency's business planning is not based on a concrete set of values or a commitment to continuous improvement. By setting performance goals for practice areas that cannot be measured, MDHS management actually turns the planning process into an empty exercise that line staff have no reason to take seriously.

**D. MDHS fails to require compliance with licensing requirements designed to assure safety**

The purpose of licensing child placing agencies, child caring institutions and individual foster care providers is to ensure that children are placed in safe environments with caretakers who can effectively meet the children's individual needs. BCAL, headed by Jim Gale, is the MDHS unit responsible for licensing both private and public agencies. All DHS county offices and private agencies must maintain valid licenses from BCAL. Licenses are issued for two-year periods and are subject to suspension or revocation as circumstances dictate. Each licensed CPA is charged with

certifying the conformance of the individual foster family homes it recruits with BCAL licensing standards.[103]

BCAL is required to perform an annual licensing review and inspection at each licensed CPA and each DHS county office. If an inspection reveals one or more licensing violations, BCAL can either (1) continue the license, if the violations are deemed minimal, (2) continue the license subject to a corrective action plan, if the violations are deemed significant, or (3) issue a six-month provisional license, if the violations are deemed severe.[104] If a provisional license is issued, BCAL requires the CPA to undertake a corrective action plan. Under Michigan law, a CPA may receive a maximum of four consecutive provisional licences; however, failure to meet licensing standards following a fourth provisional license requires that the CPA be either closed (in the case of a private CPA) or defunded (in the case of a DHS office).

MDHS fails to operate even its own field offices in conformance with BCAL regulations, placing children at risk and undermining MDHS authority in relation to the private agencies that it oversees. Remarkably, MDHS's largest county offices, including Wayne, Oakland, and Macomb counties, have *all* been stripped of regular licenses and issued only provisional licenses. These three counties serve 47.1% of the children directly supervised by DHS offices state-wide.[105] Oakland County and Macomb County are both currently operating under a second provisional license.[106] The Central, Western and South Central District offices in Wayne County are all

---

[103] Nye, (June 20, 2007): 94-95; Gale 56.
[104] Gale 39-41.
[105] Figure determined using LOMRs for Wayne, Oakland, and Macomb counties.
[106] Statewide Detail for Licensed Child Welfare Facilities, MDHS Web site, 2007: http://www.dleg.state.mi.us/brs_cwl/dt_cwl.asp?CWL_NBR=CP630201334&cnty_name=OAKLAND; Tom Schwarz deposition, (Nov. 15, 2007): 80.

currently operating under a first provisional license. The North Central District office in Wayne County recently returned to a full license after operating under a third provisional license.[107]

The North Central District office in Wayne County is a particularly egregious example of licensing failures within MDHS. This office operated for 18 consecutive months on a provisional license. When the North Central office was scheduled for licensing review upon expiration of its third provisional license in October 2007, the office had to undertake drastic measures to avoid issuance of a fourth, and final, provisional license. To avoid this, North Central simply conducted a mass transfer of 276 case files to private agencies in order to satisfy BCAL conditions for the issuance of a regular license.[108] Prior to the transfer of these files, North Central foster care workers were carrying caseloads of 48 children per worker on average. Such enormous caseloads led to poor and untimely case planning, poor child visitation and poor delivery of needed medical and dental services. The fact that a major county office could experience such a prolonged history of failure reveals the depth of the systemic ills that exist within MDHS and the inability of management to rectify known dangers. (Note: the Lewanee, Midland and Jackson County DHS Offices also operated under provisional licenses in 2007). Transferring these case files *en masse* can do nothing but create more chaos in the lives of the children whose files were transferred, and was not a sound business decision.

---

[107] Statewide Detail for Licensed Child Welfare Facilities, MDHS Web site, 2007: http://www.dleg.state.mi.us/brs_cwl/dt_cwl.asp?CWL_NBR=CP820201494&cnty_name=WAYNE
http://www.dleg.state.mi.us/brs_cwl/dt_cwl.asp?CWL_NBR=CP820201496&cnty_name=WAYNE
http://www.dleg.state.mi.us/brs_cwl/dt_cwl.asp?CWL_NBR=CP820201497&cnty_name=WAYNE
[108] MIDHS00410640.

**In June of 2004, infant Brandon died in a foster home due to positional asphyxiation. The foster parents "indicated that on at least two separate occasions prior to the baby's death, they were aware that he had turned over, after being placed on his side and on his back. Placing him on their bed on top of two pillows with this knowledge, resulted in a child's death."[109]**

**Prior to Brandon's death, the home had a history of seven complaints and ten rule violations, a history of improper discipline with foster children, and a finding of improper use of clothing monies and failing to follow through with the MDHS corrective action plan. The problems began in 1980.[110] Brandon died in 2004.**

**It took Brandon's death for MDHS to revoke the license of these foster parents.**

### E. MDHS fails to maintain a minimally adequate system for private agency contract monitoring

Contract monitoring of private CPAs is equally troublesome. This function is handled by the Foster Care and Adoption Contract Monitoring office (formerly known as the Purchased Services Division) headed by Deb Buchanan. In her deposition testimony, Ms. Buchanan testified that a contract monitoring review, known as a "quality assurance review" or a "QAR," is to be performed at every private child placing agency only once every 18 to 36 months.[111] A QAR is an on-site audit conducted by a MDHS contract monitor that involves the review of a small sample of foster care case files at a private CPA for compliance with contractual requirements. The 18 to 36 month period is far too long of a time between formal contract oversight visits. The QARs should be performed at every private agency once per year at the very least and, more appropriately, semi-annually or quarterly.

[109] MIDHS00093985.
[110] MIDHS00094017.
[111] Buchanan, (Oct. 15, 2007): 107-108.

The contract monitoring function in MDHS is not only inadequate in terms of frequency, but also in terms of accountability. Though a private agency determined to be non-compliant with contract requirements at a QAR is required to prepare a corrective action plan, the implementation of these corrective actions is not monitored by Ms. Buchanan and her staff. In fact, a private agency can have its contract with MDHS renewed without having rectified the contract violations found in a prior QAR.[112] Ms. Buchanan testified that her staff most typically knows whether a corrective action plan has been fully implemented only through subsequent QARs at the same private agency, performed some 18 to 36 months later.[113] Such a deficient practice places children at known risk.

Finally, MDHS has failed to implement a system of performance-based contracting with its private providers, a standard practice in child welfare systems. Performance-based contracts establish outcomes for children to be achieved by the contact agency and sets financial penalties or disincentives that are to be applied when outcomes fall below acceptable levels. The absence of performance-based contracting together with the absence of a rigorous and effective contract monitoring function within MDHS leaves the agency without a reliable means for assuring acceptable service delivery to children placed under private supervision and care.

[112] Buchanan, (Sept. 7, 2007): 19.
[113] Buchanan, (Oct. 15, 2007): 51-55.

## IV. MDHS FAILS TO PROTECT CHILDREN FROM HARM

### A. MDHS knowingly places children in inappropriate settings because of a lack of resources

In Michigan, over 7,000 children are placed with relatives for temporary foster care, and over 90% of these relatives are unlicensed and untrained.[114] As of the date of this report, 6768 children in custody are placed in foster homes and 7195 are in unlicensed relative homes.[115] When a home has not been subjected to the licensing process, other basic screening must be performed to ensure the home is safe. In Michigan, workers are required to conduct a safety assessment, a criminal history check, and a check of whether any adult in the home is on the State's Central Registry.[116] MDHS does not perform required safety assessments for an astonishing 75% of relative providers.[117] Thirty-five percent of relative homes do not have criminal background or Central Registry checks completed (to determine whether an adult in the home has a history of abuse or neglect).[118] According to the Audit Report issued by the Office of the Auditor General in August 2005, "DHS did not ensure that its local office workers conducted and documented criminal history background checks and assessed the related risks prior to placing children in the homes of potentially unsuitable relative foster care providers."[119] The findings made by CRC following its case record review reveal that this major hole in the MDHS "safety net" has not been repaired.

The assumption that children are safe because they are with relatives can have deadly consequences, as in the case of Heather, who killed herself while in a relative

---

114 Foster Care Fact Sheet, (Sept. 2007), <www.mi.gov/dhs>
115 Ibid.
116 CFF722-9b 2007-006; CFF722-3.
117 "Analysis of Case Practice in Compliance with Standards in Michigan Foster Care," *The Children's Research Center*, (2008): 28.
118 Ibid.
119 "Audit Report," *Office of the Auditor General* (August 2005): Report Summary, Finding 1.

foster care placement. MDHS completely ignored her needs and must have decided that it was her relatives' responsibility to help her, when the legal responsibility belonged to MDHS.

**Heather entered care at age 15 in June of 2002 after her mother stabbed her. When she was placed in a relative home in 2002, MDHS knew that there were 11 people living in the home and that some were sleeping in the living room. MDHS also knew that a home study had not been done. Six months passed before MDHS completed a home study.**

**The MDHS foster care worker found that:**

- **There were 17 people living in a four bedroom home**
- **There were three sets of bunk beds crowded into one bedroom and four individual beds in another bedroom; one person slept on a bed in the living room**
- **The walls and floors of the home were "very dirty"**
- **A two-year-old child in the home was "very dirty"**
- **Heather's uncle had an "explosive" temper and was uncooperative in allowing visits by the caseworker**
- **The home was "not … environmentally safe"[120]**

**In addition, Heather was diagnosed as in need of psychotropic medication to control a bipolar condition and mental health counseling for emotional disturbance.[121] The relatives discontinued counseling for Heather and stopped her medication. Demonstrating a complete lack of judgment, MDHS failed to remove Heather even when her uncle became verbally aggressive with the caseworker and had what was described as a "fit."[122] MDHS left Heather with these relatives, subjecting her to further harm after she had already experienced a violent attack at the hands of her own mother.**

**After being moved from the home to a residential facility, Heather ran away to live with anther relative. She received no education, medical care, or dental care.[123] MDHS essentially abandoned Heather at the home of this unfit relative, where, in November 2004, Heather hanged herself.[124]**

---

[120] MIDHS00071570.; MIDHS00071423
[121] MIDHS00071427
[122] Ibid.
[123] MIDHS00071304.
[124] MIDHS00071283.

Even with such tragic results, MDHS has done little to improve its oversight and support of relatives who provide homes for children in foster care. This failure is exacerbated by the fact that children in unlicensed care are visited by their caseworkers far less frequently than children in licensed foster homes.[125] Further, unlicensed homes do not receive the same monthly foster care maintenance payments that are mandatory for licensed providers. Unlicensed relative providers are not even provided with clothing allowances for the children placed in their homes or with an opportunity to apply for the determination of care ("DOC") monthly payments that are paid to licensed providers who establish that the child placed with them requires an enhanced level of supervision and care.[126] The lack of casework and financial supports to unlicensed relative homes creates an unacceptable risk that children will be denied adequate clothing, nutrition, medical and dental care, and other basic care simply because they were placed with a relative instead of a licensed foster parent. Indeed, the rates at which service needs are identified are very different for children in licensed and unlicensed foster homes. Child foster care records show that at least one service need is identified at a nearly 15% lower rate for children in unlicensed relative homes.[127] Additionally, the financial burden that MDHS places on unlicensed relatives is well-recognized among child welfare professionals as a cause of parental stress and frustration that can trigger child abuse or neglect.

---

125 CRC 50.
126 Nye, (July 10, 2007): 63-66.
127 CRC 81.

### B. MDHS fails to ensure that caseworkers visit children in MDHS custody and that children visit their parents and siblings

MDHS cannot possibly protect children from harm unless caseworkers make regular visits with the children and their foster caretakers at the home locations. Without such regular visits, the agency is essentially blind to the quality of treatment that any child in care is actually receiving. Further, child welfare research demonstrates that successful reunification of children with their birth parents is directly related to the frequency of visitation between parents and children during the foster care episode.[128] Indeed, direct contacts with both parents and children in their foster care placements are the primary methods by which caseworkers gauge the progress of a family toward being reunited. Visits and contacts allow caseworkers to craft and implement permanency plans with families, determine the continuing safety of the children, and develop supportive resources necessary for ongoing family stability after reunification. In addition, siblings who are able to maintain ties with one another through regular visitation do better in foster care. In summary, the absence of regular caseworker contacts with children and inconsistent visitation exposes children to physical harm and the emotional harm that results from the separation of a child from his or her family.

MDHS management has long understood that the failure of caseworkers to make all required contacts with children and foster parents or to arrange for sibling visits and parent/child visits is chronic. In 2002, the CFSR found that caseworkers were "not visiting with children and parents frequently enough to monitor and promote the safety and well-being of children."[129] The internal audit performed by MDHS in 2006-

[128] Lenore M. McWey and Ann K. Mullis, "Improving the Lives of Children in Foster Care: The Impact of Supervised Visitation," *Family Relations Review, Vol. 53, No. 3.,* (2004).
[129] Exh. 100.

2007 found non-compliance with caseworker contact and visitation requirements to be material weaknesses of the foster care program.[130] The agency's stated corrective action in response to this finding provided that required caseworker contacts and visitation would be assured, but it gave no indication as to how MDHS would even measure compliance, much less assure it. At present, MDHS still has no automated system for aggregating and reporting compliance with caseworker contact and visitation requirements, and agency performance in these vital practice areas continues to suffer as reflected in the results of the case record review conducted by the Children's Research Center for purposes of the *Dwayne B. v. Granholm* lawsuit, where it is shown that only 63% of children were visited by their caseworkers at their placement site as required.[131]

## V. MDHS HAS INADEQUATE PLACEMENT RESOURCES FOR CHILDREN AND A DEFICIENT SERVICE DELIVERY SYSTEM

### A. MDHS has an inadequate array of services for children

A child welfare agency is required under federal and state law and reasonable professional standards to take all necessary steps to assure that adequate services are available to meet the needs of the children in its care.[132] This includes the delivery of services necessary for child safety, permanency, and well-being. Children who have already experienced abuse and/or neglect must be protected from further harm and receive needed services to address issues related to the abuse and removal from home. These services are to include medical care, dental care, mental health care, special

[130] "Audit Report," *Office of the Auditor General* (August 2005): Report Summary, Finding 3.
[131] CRC 45-55.
[132] 45 CFR § 1355.34 (b)(i)(A); CWLA 6.3, FC 1.4, 2.69-2.70.

education, and other educational services and all supports required to address physical or developmental disabilities.

MDHS does not have a service delivery system that adequately identifies and meets children's needs. As reflected in the CRC case records review findings, MDHS routinely fails to provide essential health screenings to scores of children.[133] Forty percent of foster children do not receive all required medical exams, and more than half do not receive all required dental exams. These lapses in service delivery partly result from and are exacerbated by the poor caseworker visitation practice in MDHS.

Under Michigan law, MDHS is required to prepare a "medical passport" for every child in its foster care custody.[134] The medical passport is to contain the child's complete medical history and is to be regularly updated. Additionally, the medical passport is to be provided to every caretaker at the time a child is placed in their home. The medical passport law is designed to address a very real need: because children in foster care are often moved between foster homes, schools and doctors, their medical care can be compromised by the lack of continuity in treatment and knowledge regarding the child's history. MDHS has completely disregarded this critical statutory mandate. The results of the CRC case record review show that 49.3% of the children have no medical passport at all and that an additional 35% of the children have a passport that is not up to date.[135] This alarming degree of non-compliance with law and professional standards of care alone establishes that management has not seriously committed the agency to meeting the services needs of children.

---

[133] CRC 29-31.
[134] MCL 722.954c(2).
[135] "Analysis of Case Practice and Compliance with Standards in Michigan Foster Care," *The Children's Research Center*, (Feb. 5, 2008): v.

Another glaring example of inadequate service delivery by MDHS is the lackluster and altogether disingenuous approach it has taken to serving the urgent needs of teens preparing to "age out" of the foster care system. For years, MDHS has been aware of a large and growing number of teen youths in foster care, a population that, without additional services, will exit foster care without the skills or resources to live independently. Multiple studies have established that teen foster youth are in dire need of enhanced supports from MDHS.[136]

Indeed, the Interdepartmental Task Force made 21 concrete recommendations regarding initiatives that were to be undertaken immediately to meet the needs of teens "aging out." One year later, in August 2007, MDHS delivered a self-administered report card to the Michigan Legislature grading its progress in implementing these recommendations. This report card scored MDHS as having earned either an "A" (meaning **A**ccomplished) or "B" (meaning **B**eing Implemented) on all Task Force recommendations. Deposition testimony of Kate Hanley, the MDHS official who authored the report card, has made clear that, in truth, *none* of the 21 Task Force initiatives has been accomplished to date.[137] Rather, some of the initiatives had begun implementation in a reduced or significantly modified manner as of August 2007, others were just coming up for initial action and others were not happening at all.

A major factor aggravating MDHS's substandard performance in delivering services is its total failure to undertake periodic needs assessments – an important

[136] The 2004 study, "Aging Out of Foster Care in Michigan," by Gary Anderson of the Michigan State University School of Social Work, a later study on the prevalence of homelessness among teems who "age out" by the Wayne State University Research Group on Homelessness and Poverty, and the September 2006 findings issued by a Michigan Interdepartmental Task Force on Services to At-Risk Youth Transitioning to Adulthood all concluded that teen foster youth are in dire need of enhanced supports from MDHS.
[137] Kate Hanley deposition, (Sept. 26, 2007): 217-225.

management tool for any competent social services agency. Such assessments are critical for understanding the needs of the client population and creating a plan to address identified service needs. Not a single MDHS manager who testified in the *Dwayne B. v. Granholm* lawsuit, including the agency's Chief Financial Officer, the Deputy Director for Field Operations, and the Chief Deputy Director, could recall MDHS ever performing a needs assessment for purposes of budget planning, program and policy planning or contract development. The lack of such information and, for that matter, any kind of needs-driven planning process, undermines the ability of MDHS to recruit and develop the right array of services to serve the needs of the children in its care and violates reasonable professional practice.

**B. MDHS fails to adequately access federal entitlement dollars for its foster care program**

Under the Title IV-E federal foster care program, states may seek reimbursement from the federal government for the costs of foster care room and board, administration, and training. This federal reimbursement is subject to a state matching requirement (40% in Michigan) and is available only for children determined to be eligible for the Title IV-E program. Federal reimbursements can be made for children residing with licensed foster parents, in licensed group homes, or in licensed residential care facilities, but cannot be requested for children residing in unlicensed placements. The percentage of Title IV-E eligible children within the State's overall foster care population is known as the Title IV-E "penetration rate." A low penetration rate indicates that the child welfare system is failing to take the necessary steps to qualify all potentially eligible children for Title IV-E federal reimbursements, thereby placing an

undue burden on state resources. Nationally, well-managed child welfare systems maintain a penetration rate in the range of 50%.[138]

Quite significantly, unlicensed relative homes are not eligible for federal Title IV-E reimbursement as a matter of federal law. Though MDHS now places over 7,000 children in the care of relatives whom it does not license, without such a license they cannot be supported with federal funds. MDHS is well aware that this licensing failure is costing the State substantial federal dollars.[139] The 46.19% penetration rate reported by MDHS in July 2007 actually *overstates* the penetration rate because it excludes children placed into unlicensed relative homes from the calculation. When children in unlicensed relative homes are included in the penetration rate calculation, the rate in Michigan drops below 35%.

### C. MDHS lacks sufficient numbers of licensed foster placements for children

Michigan has too few home-like, licensed foster care placements for children. As a result, children are often placed in inappropriate placements, temporary placements, and, in some cases, no placement at all. MDHS has been known to keep children in offices overnight when no home was available for a child. In Wayne County, resources were so lacking that for at least a six month period in 2007 children were regularly forced to sleep in chairs overnight, had minimal food, and spent hours sitting in offices.[140] Children missed school and treatment needs were delayed. In one case, a teenage mother and her baby were kept at the office overnight. The very people

[138] "The Cost of Protecting Vulnerable Children, V." *The Urban Institute*, (2006): 8.
[139] MIDHS00187452.
[140] Bureau of Children and Adult Licensing, Investigation #2007C0208058, Nov. 1, 2007.

charged with the responsibility for these neglected children's welfare further damaged them.

The 2006-2007 internal audit of MDHS found "limited community resources to provide needed services for children and families within the foster care system" to be an area of material weakness.[141] MDHS's response to this finding was woefully inadequate; it planned to take a look at what services were available and offer support and information to the county offices. It was unclear how MDHS expected to get even this accomplished with no mechanism for assessing services and no reliable data.

Despite an increase in the two-year period after a new director's appointment in July 2004, there has been a steady decline in the total number of licensed foster homes available for placement of foster children state-wide since August of 2006. MDHS has not indicated that there are any plans in place to rectify this problem. It is shocking that an agency responsible for more than 19,000 children could be unaware of the services that are and are not available to meet the needs of these children.

A second part of the 2006-2007 audit response indicated that MDHS would implement treatment foster care and expand the Family to Family program state-wide. Given that a fundamental premise of Family to Family is increased recruitment of community-based foster care placements, this is problematic. The limited data that is available indicates that the Family to Family expansion has taken place, a conclusion that cannot be true since the number of licensed foster homes available in the two pilot counties for the Family to Family program have either remained static or *dropped* since July of 2006. There was no information about how MDHS intended to make this

[141] MIDHS00339805.

expansion happen given a hiring freeze, a staff already stretched thin, and a lack of funding for services such as these.




Beyond its failure to conduct the needs assessment and related planning required to design and implement an effective foster and adoptive family recruitment plan, MDHS management fails to comply with federal requirements for the provision of adequate foster care maintenance payments to licensed foster care providers. Under Title IV-E, 42 U.S.C. Section 675(4)(a), MDHS is obligated to furnish a monthly foster care maintenance payment, also known as a per diem, to meet the costs to a foster care provider in supporting a child or children in the foster home. Federal law mandates that the per diem rate be adequate to defray the costs of "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with

respect to a child, and reasonable travel to the child's home for visitation." MDHS currently pays per diems at rates that were last examined and adjusted in October 2004 (the base rate for children ages 0-12 is $14.24/day and for children ages 13-18 is $17.59/day). These rates did not meet actual costs in 2004 based on the most recent data then reported by the United States Department of Agriculture in "Expenditures on Children by Families, 2003" in relation to costs in the urban Midwest.

The MDHS Foster Care/Agency Provider Payment Handbook, published nearly two years later in August 2006, falsely states:

> The family foster care payment rates are determined from the USDA standard cost of raising a child. These rates are reviewed annually and adjusted according to changes in the cost of living standards. The payment rates include the normal expenses such as food, replacement and maintenance of clothing, spending money and the cost of personal items, such as diapers, deodorant and shampoo.[142]

In his deposition testimony, Bureau of Children's Services Manager James Hennessey, admitted that MDHS has not "annually" reviewed and adjusted its per diem rates in accordance with the annual USDA "Expenditures on Children by Families" report. The failure by MDHS to adjust its per diem rates in accordance with federal law and its own policies over-burdens foster care providers and hinders recruitment of more loving families to meet the needs of children coming into Michigan foster care.

## VI. MDHS FAILS TO FIND PERMANENT HOMES FOR CHILDREN, LEAVING THEM TO LINGER IN TEMPORARY FOSTER CARE

MDHS has abdicated its responsibility for finding permanent homes for children in foster care. Ideally, children who must be removed from home are reunited with their parents as soon as possible. The goal, as stated in the federal CFSR, is to meet the national standard of reunification with parents within 12 months of entry into foster

[142] "Foster Care/Agency Provider Payment Handbook," *Michigan Department of Human Services Foster Care Program*, 1.

care. Only 59.2% of children reunified with their parents were reunified within 12 months, far short of the 76.2% national norm.

When children come into care, the State should develop a primary permanency goal for the child as well as a secondary, or concurrent, goal to work towards, in a parallel fashion, should the primary goal not work out for the child, a practice known as "concurrent planning." Concurrent planning is intended to reduce the amount of time a child must spend in foster care and more rapidly stabilize the child in a permanent home and family. Michigan has a disastrous record in this regard and has not adopted concurrent planning.[143]

With more than 6000 children legally free for adoption, the State has created an enormous group of legal orphans without permanent homes.[144] The State has contracted with MARE (Michigan Adoption Resource Exchange) for listing some of these children on a public database, as well as with private providers for adoption recruitment and caseworker services. However, the MARE online listing of children available for adoption is woefully underutilized, not monitored by MDHS, and not in and of itself a sufficient adoption recruitment tool. Of the more than 6000 children waiting for permanent homes, only 270 have been listed on MARE. With adoption caseloads at extremely high levels, it is unclear how MDHS can expect the caseworkers to complete all the work that must be done for successful adoption recruitment and finalization. As seen in the following graph, the number of finalized adoptions has drastically decreased over the last three years.

---

143 "Concurrent Planning for Permanency for Children: Summary of State Laws," *Child Welfare Information Gateway*, (July 2005): 2*n*1.
144 MIDHS00330850.




MDHS reports that, of the more than 6000 children free for adoption, over 1500 are reportedly older youth "who are satisfied with their placements and don't wish to be adopted."[145] This number appears inordinately high and, in fact, is likely unreliable given that record-keeping and service planning are so poorly done in the Michigan system.

## VII. CONCLUSIONS AND RECOMMENDATIONS

### A. Conclusions

MDHS is an overly complex system, both organizationally and programatically. It is marked by confusion and a lack of accountability for children's welfare. The agency has multiple administrative layers within the State office and often no one person has complete responsibility for critical child welfare functions, leading to a "not

[145] Adoption Services and Adoption Subsidy Fact Sheet, MDHS website statistics

my job" mentality on the part of MDHS staff. As a result, children are harmed and placed at risk of harm.

MDHS deals with a lack of services for children by shifting resources and promoting under-resourced programs rather than creating enough services to meet children's actual needs as identified in a service plan. This misguided approach has left the agency with many uncoordinated and unrelated programs and no clear sense of how such programs help children or even why they are needed. Indeed, MDHS seems always to be looking for another program that can be "plugged in" to address the latest crisis within the agency. The result is an agency with no clear sense of how child welfare work should be done. The State agency that should show the most concern for children is harming the very children it is charged with protecting.

This complex and chaotic system leads to some odd circular reasoning when the agency attempts to address problems. For example, in addressing an internal audit finding on a lack of services for children, the MDHS response was:

- Finding: lack of community resources
- Corrective Action: identify current available resources
- Barrier: lack of community resources [146]

It is impossible for MDHS to generate and implement a logical plan based on a management approach that goes nowhere and has no substance. MDHS will require massive, systemic child welfare reform if it is to fulfill its legal, professional and moral obligations to the vulnerable children it has taken into its care.

As mentioned at the beginning of this report, specific areas are critical to the success of a child welfare agency. Following are recommendations in that regard.

[146] MIDHS00339884

## B. Recommendations

### 1) Administration

- Michigan should undertake a restructuring of MDHS giving consideration to either 1) creating a separate child welfare agency to house child protective services, foster care, and adoption, or 2) restructuring the State MDHS office around public welfare programs and their supports (e.g. Food Stamps, Child Support, Child Welfare, Welfare to Work).

- MDHS should implement specialized child welfare managerial performance objectives as a part of the agency's overall performance evaluation process.

- MDHS should implement a Child Welfare Quality Assurance office with clearly defined responsibilities including the adoption and use of a standardized quality services review instrument for measuring the progress of individual children while in the State's care.

- MDHS should implement a Child Welfare Resources and Services Development office to be charged with development of resources and services based on a regular cycle of needs assessment.

- MDHS should implement a Child Welfare Data Management office with clearly defined responsibilities to include development, adoption, reporting, and use of data to gauge agency progress on specific measurable outcomes.

### 2) Staffing

- MDHS should solicit a workload study to assess the tasks of the caseworkers.

- MDHS should clearly define the work responsibilities of different staff to avoid overlap in duties.

- MDHS should simplify the work structure for caseworkers (e.g. fewer mixed caseloads).

- MDHS should implement caseload standards recommended through the workload study and in keeping with the CWLA standards.

- MDHS should implement supervisor ratios in keeping with the CWLA standards.

- Michigan should re-introduce the "just in time" hiring process used in past years to ensure the availability of a pool of trained caseworkers at all times.

- MDHS should hire a sufficient number of caseworkers and supervisors.

**3) Training and Ensuring Competency**

- Michigan should develop a mandatory training curriculum for new supervisors in child welfare which includes competency based evaluation**.**

- MDHS should include an on-the-job training component for *all* child welfare job functions.

- Requirements for continuing education for all child welfare workers and supervisors should be developed and implemented.

- Child welfare supervisors should hold an advanced social work degree from an accredited institution of higher learning prior to assuming supervisory responsibilities.

- Public and private child welfare agency caseworkers should be required to complete the same curriculum, number of training hours, and on-the-job training.

- MDHS should require new child welfare caseworkers to complete a competency exam by prior to assuming a caseload.

**4) Resources**

- MDHS should develop and implement a foster parent recruitment and retention plan with defined outcomes to be measured over time.

- MDHS should develop and implement an adoptive parent recruitment plan with defined outcomes to be measured over time.

- MDHS should obtain an outside resource to conduct a needs assessment and should implement the recommendations of the assessment.

- MDHS should develop and implement performance outcome measures for both public and private agency service providers.

**5) Quality Assurance**

- MDHS should develop a Quality Assurance case review protocol for the state agency as well as for counties to use in reviewing cases of children in foster care.

- MDHS should include in private agency contracts a requirement for an approved quality assurance process to gauge the progress of children in the care of private agencies.

- MDHS should develop a communication feedback loop with counties to ensure that recommendations made in quality assurance reviews have been addressed and the relevant problems have been fixed.

**6) Contract Monitoring**

- MDHS should fully staff and resource its contract monitoring unit so that audits can be conducted at least semi-annually and so that corrective action plans can be enforced.

- MDHS should implement performance-based contracting with its private providers.