UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| D.G., by Next Friend G. Gail Stricklin; et al., | ) |
| | ) |
| Plaintiffs, | ) |
| v. | ) Case No. 08-CV-074-GKF-FHM |
| | ) |
| C. BRAD HENRY, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**OKDHS DEFENDANTS' MOTION TO STRIKE "FINAL CORRECTED" REPORT
OF JOHN GOAD, SUBMITTED AUGUST 12, 2011 AND BOLSTERING
DECLARATIONS OF MR. GOAD AND DR. THOMPSON**

The OKDHS Defendants respectfully move the Court to enter an order striking the supplemental "corrected" report of Plaintiffs' expert John Goad, submitted August 12, 2011 and the bolstering declarations of Mr. Goad and Dr. Thompson filed herein as Dkt. 636-1 and 5. Grounds for this motion appear in the following brief.

**BRIEF**

**I.     BACKGROUND**

On March 15, 2011, the date that Plaintiffs' expert witness disclosures were due, Plaintiffs submitted a report by John Goad.  Exhibit 1, "Review of Response of Oklahoma Department of Human Services Response to Suspected Abuse and Neglect in its Care."  Exhibit 1.  In that report, Mr. Goad identified a "universe" of 343 CPS investigations in 2009 as the basis for his statistical work.  Exhibit 1, p. vii.  Mr. Goad stated in his report that there were 343 CPS referrals in the "unduplicated universe."  Exhibit 1, p. 12.  He further stated that the sample consisted of 84 of these 343 referrals.  Id.  He stated that the review team, which consisted of Mr. Goad and Ms. Adele Prass, reviewed the 84 referrals in the sample.  Exhibit 1, p. 13.  Mr. Goad

wrote his entire report based upon this number of 343 referrals and calculated percentages and confidence intervals based upon this number (343).

OKDHS Defendants timely filed expert reports rebutting the reports of Plaintiffs' experts, In particular, in Andrew Barclay's report, entitled "Critique of '"Review of Response of Oklahoma Department of Human Services Response to Suspected Abuse and Neglect in its Care.'" dated June 9, 2011, Exhibit 2, p. 2, Mr. Barclay noted a discrepancy between the 420 CPS referrals identified and supplied by OKDHS and the 343 referrals used by Mr. Goad in his report.  In his own report, Mr. Barclay expressed a specific concern regarding the representativeness of the sample due to the apparent and unexplained decision to leave out 77 referrals.  Also, as noted by Mr. Barclay, Mr. Goad's confidence intervals were premised on the 343 referrals.

The OKDHS Defendants filed their *Daubert* motion on Mr. Goad's original report on August 1, 2011.  Dkt. 572.  Eleven days later, on August 12, 2011, Plaintiffs submitted a "corrected" report of Mr. Goad.  Mr. Goad corrected report redline, Exhibit 3.  Thereafter, in response to the *Daubert* motion challenging Mr. Goad's opinions, Plaintiffs filed new declarations of both Mr. Goad and Dr. Thompson in an attempt to bolster both Mr. Goad's original March 2011 report and this "corrected" August 2011 report. Dkt. 636-1 and 5.  Without further elaboration, both Mr. Goad and Dr. Thompson claimed that references in the original 2011 report to a universe of 343 referrals were typographical errors, correction of which, inexplicably, required recalculation of Mr. Goad's confidence intervals for his CPS findings. Dkt. 636-1, p. 7 ¶¶ 25 & 26, Dkt. 636-5, p. 5, ¶¶ 21 & 22.

The Plaintiffs have made repeated efforts to rehabilitate the sloppy work of their expert witnesses, attempting to salvage their opinions from the well-deserved criticisms of OKDHS

Defendants' expert witnesses. First, when faced with criticism of the methods used by Mr. Goad and Plaintiffs' other expert Dr. Jerry Milner, Plaintiffs sought to file two additional expert reports by previously undisclosed experts – one a statistician, the other an expert in social science research, to address "various statistical methodological challenges" raised by OKDHS Defendants' experts. Plaintiff Children's Motion for Leave to File Two Rebuttal Expert Reports, Dkt. 539, filed July 1, 2011. The Court properly refused to allow Plaintiffs to file these two additional expert reports. Opinion and Order, Dkt. 557. Next, the Plaintiffs sought to recast the work done by their experts, Mr. Goad and Dr. Hess, asserting that their work was "qualitative research," although neither of their reports mentioned qualitative research or any terms or methodologies associated with qualitative research. Plaintiffs' *Daubert* Motion to Exclude in Part the Testimony of Three of Defendants' Expert Witnesses, Dkt 579. Having renamed the work done by their experts, Plaintiffs then asserted that OKDHS Defendants' experts Dr. John Fluke, Dr. Donald Baumann and Mr. Andrew Barclay were not experts in "qualitative research" and should be barred from testifying regarding their critiques of the work done by Dr. Hess and Mr. Goad. Dkt 579. Dkt. 579 seeks to defend and bolster the work of Dr. Hess and Mr. Goad as "qualitative" researchers more than to criticize the ability of Drs. Fluke and Bauman, and Mr. Barclay to offer valid scientific and statistical critiques of the work of Dr. Hess and Mr. Goad.

The belated declarations of Mr. Goad and Dr. Thompson continue Plaintiffs' efforts to rehabilitate the sloppy work of their experts and are impermissible efforts to bolster both Mr. Goad's original 2011 report, and to justify the "corrected" 2011 report, submitted after the close of discovery.

3

## II. THE COURT SHOULD EXCLUDE THE BOLSTERING DECLARATIONS OF MR. GOAD AND DR. THOMPSON

Mr. Goad and Dr. Thompson presented declarations expressly intended to defend against the *Daubert* motion of the OKDHS Defendants, and to bolster the legitimacy of both Mr. Goad's original 2011 report and the "corrected" report. Dkt. 636-1 and 5. These declarations present detail about the original report that do not appear in the original report itself. Mr. Goad gave additional information to strengthen his original 2011 report and to justify its "correction" after Mr. Barclay pointed out the inconsistency with the size of the referral universe.[1] Dkt. 636-1, pp. 3-7, ¶¶ 8-26. Dr. Thompson offers details, albeit at a very high level of generality, *see* Dkt. 636-5 pp. 2-5, ¶¶ 3-22, about the work he did and the software he used to perform the statistical work underlying Mr. Goad's original 2011 report and its later "correction." Neither Mr. Goad's original 2011 report nor his deposition provided even this highly generalized level of support for Dr. Thompson's work, which Mr. Goad in one instance characterized as "magical." Exhibit 4, Tr. Vol 1, pp. 154:19-155:14.

Rule 26(e) "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *Oklahoma v. Tyson Foods, Inc.*, 2009 WL 2252129 *3 (N.D.Okla. July 24, 2009). Additionally, Rule 26(a)(2)(A) requires disclosure of the identity of experts a party intends to use pursuant to Federal Rules of Evidence 702, 703 and 705. *Id.* Plaintiffs made no timely disclosure whatsoever regarding Dr. Thompson, and Mr. Goad's bolstering declaration came after the close of discovery.

Mr. Goad's bolstering declaration, Dkt. 636-1, runs afoul of the principle that a supplemental expert report that states additional opinions or rationale or seeks to "strengthen" or

---

[1] Neither Mr. Goad nor Plaintiffs admit the corrections made were in response to Mr. Barclay's analysis.

4

"deepen" opinions expressed in the original expert report exceeds the bounds of permissible supplementation and is subject to exclusion under Rule 37(c). *Tyson,* 2009 WL 2252129 at *2. Mr. Goad is explicitly attempting to strengthen the foundations of his both his original 2011 report and the new report as "corrected" by Dr. Thompson. Consequently, the Court should strike his declaration from consideration.

> Dr. Thompson clearly cannot testify to the contents of his declaration, Dkt. 636-5:
>
> Rule 26(a)(2)(B)(i) requires an expert witness to prepare a report containing "a complete statement of all opinions to be expressed." Under Rule 37(c)(1), a party's failure to disclose the identity of an expert witness or provide an expert report, as required by Rule 26(a)(2), mandates that the court exclude expert testimony unless the failure was "substantially justified or is harmless." Fed R. Civ. P. 37(c)(1). "The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." *Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Company,* 170 F.3d 985, 993 (10th Cir.1999).

*Tyson,* 2009 WL 2252129 at *3. Exclusion is automatic unless the offending party can show substantial justification or harmlessness. *Cohlmia v. Ardent Health Services, LLC,* 254 F.R.D. 426, 430 (N.D. Okl. 2008). Plaintiffs have neither offered a proper and timely report for Dr. Thompson, nor attempted to demonstrate that his late declaration is "substantially justified or is harmless."

While the court may consider the testimony of an expert who will not testify at trial in the context of evaluating a *Daubert* motion, *Tyson,* 2009 WL 2252129 at *3, Dr. Thompson's declaration runs afoul of the same rule that bars use of Mr. Goad's declaration: Dr. Thompson attempts to "strengthen" or "deepen" Mr. Goad's opinions expressed in his original report, *Tyson,* 2009 WL 2252129 at *2, as well as to justify the "corrections" Dr. Thompson made to the original 2011 report. Thus, the Court should strike Dr. Thompson's declaration.

5

If the Court <u>were</u> to consider Dr. Thompson's declaration, it will find that it is not sufficiently reliable to be persuasive in the Court's evaluation of the expert reports that it supports, especially with regard to the "corrections" to the original 2011 report. *Cf., Tyson,* 2009 WL 2252129 at *4 (applying rule to use of new expert opinions in *Daubert* context to criticize expert opinion's work). For instance, Dr. Thompson claims that he (not Mr. Goad) drew the CPS sample of 84 referrals from the universe of 420, rather than the typographically erroneous universe of 343 originally reported by Mr. Goad. Dkt. 636-5, p. 3, ¶¶ 9-11 and p. 5, ¶ 21. Then Dr. Thompson claims, in very general terms, that he calculated Mr. Goad's confidence interval by inputting (1) the prevalence of the finding (presumably in the sample), (2) the size of the sample, (3) *the size of the population,* and (4) the confidence level chosen by Mr. Goad into the SSCALC function. Dkt. 636-5, p. 4 ¶ 20 (emphasis added). Then Dr. Thompson states, without elaboration or explanation, the correction of the "typographical error" somehow affected the calculation of the confidence intervals for the CPS investigation findings, which Dr. Thompson "corrected" at Mr. Goad's direction "using the method described above." Dkt. 636-5, p. 5, ¶ 22.

Why was any change in the confidence intervals necessary at all to correct this "typographical error"? Changing the text of the report from an incorrect universe of 343 referrals to the correct universe of 420 referrals would not require any correction of the confidence intervals *if the confidence intervals had been properly done using a population size of 420 in the first place.* Dr. Thompson claims he originally computed the confidence intervals by inputting (1) the prevalence of the finding; (2) the size of the sample; (3) *the size of the population;* and (4) the confidence level chosen by Mr. Goad. Neither Mr. Goad nor Dr. Thompson suggests factors (1), (2), or (4) changed in any way by correcting the "typographical

6

error" relating to *the size of the population.* Obviously, the confidence intervals were originally computed using an incorrect population/universe size of 343 referrals.

But wait. It was Dr. Thompson himself who supposedly drew the sample from the correct universe of 420 referrals. Dr. Thompson would have known the universe contained 420 referrals, because he drew the sample himself. Why did he then compute the confidence intervals from the incorrect universe of only 343 referrals (with 77 referrals missing from the 420) and later have to "correct" them? Neither he nor Mr. Goad explains why. Or did Dr. Thompson draw the sample from an incorrect universe of only 343 referrals, and use the same incorrect number in computing the original confidence intervals? Which is more likely, that Dr. Thompson forgot the size of the universe between the time he drew the sample and the time he figured the confidence intervals, somehow adopting an unexplained "typographical error" when he input the numbers to compute the confidence interval, <u>or</u> that he was consistently wrong in figuring the universe was 343 in both steps, and realized his error only when Mr. Barclay pointed it out? Whatever the true explanation, something does not compute. Dr. Thompson's declaration is unreliable on its face.

Dr. Thompson's work in "correcting" the errors in the original 2011 report is also unreliable, according to the recent analysis performed by Andrew Barclay. Dkt. 663-1, Exhibit 5 hereto. If the corrections made were required by replacing the missing 77 referrals, Mr. Barclay has calculated that the confidence intervals should have widened by 3%. Exhibit 5 hereto, Barclay declaration, p. 3 ¶ 3. However, after "correction" of 12 unique confidence intervals, six of them are wider (3 of them are wider by 3%), 3 are unchanged, and 3 are narrower. *Id.,* at p. 4, ¶ 5. Thus, 9 of 12 of the "corrected" confidence intervals do not behave as they should. *Id.,* at p. 4, ¶ 5.

Mr. Barclay followed the methods reported by Dr. Thompson in his declaration, using the same software, SSCalc, and replicated Mr. Goad's results for 8 of the 12 unique confidence intervals within 1%. However, the other four confidence intervals reported in the "corrected" August, 2011 report are wider than the SSCalc results Mr. Barclay calculated. *Id.* at p. 5, ¶ 7. Thus, four of the 12 confidence intervals do not appear to have been calculated by SSCalc. *Id.*

Moreover, three of the midpoints of Dr. Thompson's new confidence intervals changed without explanation from the March 2011 report to the August 2011 report. *Id.,* at p. 4, ¶ 6 and pp. 6-13, ¶¶ 9 a-c. Shifts of symmetric confidence intervals should only occur when the corresponding point estimates from the sample change, and Mr. Goad does not inform the reader of his August 2011 report of such a change, *Id.,* at p. 4, ¶ 6. Mr. Goad claims he applied the proportion of various things found in the sample to the universe and verified that the resulting value fell at the midpoint of the confidence interval range for each symmetric confidence interval.[2] Dkt. 636-1, p. 6, ¶ 23. However, in point of fact, one of the proportions found by Mr. Goad in his original report was not only not at the midpoint of the confidence interval, it was actually *outside* his confidence interval. Barclay declaration, Exhibit 5 hereto, p. 7, ¶ 9(a). In his August, 2011 "corrected" report, Mr. Goad corrected this error without providing notice to the reader. Barclay declaration, Exhibit 5, p. 8-9, ¶ 9(a). Mr. Goad made this undisclosed correction under the guise of correcting the 343/420 "typographical error." In another instance, that of allegedly poor decision making affecting OKDHS wards who were subjects of investigations or assessments in 2009, the August 2011 "correction" of the confidence interval in Mr. Goad's original report shifted the midpoint of the interval from 30.3% to 33%. *Id.,* p. 9-10, ¶ 9(b).

---

[2] SSCalc, supposedly used by Dr. Thompson, only calculates symmetric confidence intervals, so the asymmetric confidence intervals Mr. Goad continues to refer to in his deposition and his August, 2011 declaration, Dkt. 636-1, p. 6, ¶ 23, remain a mystery. Barclay declaration, Ex. 5 hereto, p. 5, ¶ 7.

8

After following Dr. Thompson's procedures, and applying the most conservative assumptions, Mr. Barclay found Mr. Goad's confidence interval was more than twice as wide as found by applying SSCalc. Exhibit 5, pp. 9-10, ¶ 9(b).   Finally, Mr. Goad, contrary to mainstream statistical theory, "corrected" a confidence interval which had included zero investigations in his March 2011 report by *narrowing* the interval and moving its midpoint higher  *Id.,* pp. 11-13, ¶ 9(c).  Mr. Goad did not explain how increasing the universe from 343 referrals to 420 referrals could *narrow* the confidence interval.  *Id.*  If Mr. Goad's confidence interval had included zero, he would have been unable to reject the null hypothesis that his findings were different from zero children in investigations being placed with abusive or neglectful caregivers.  *Id.*

In summary, Mr. Barclay found Mr. Goad goes beyond correcting a typographical error, injecting some new errors, and correcting some additional errors from his March 2011 report, all without informing the reader of the changes.  *Id.,* at p. 13, ¶ 10.

Mr. Barclay concluded that more has been changed than a correction of a real typo, but neither Mr. Goad nor Dr. Thompson reveals enough information to understand  exactly what has been done.  This process reinforced Mr. Barclay's June, 2011 opinion that Mr. Goad is not qualified to determine sample size, determine the measures, oversee the calculation, or interpret the results.  Mr. Goad's work is unreliable.  *Id.,* at pp. 13-14, ¶ 10.

### III.  The Court should strike Mr. Goad's corrected report.

Courts faced with the decision of whether to admit supplemental expert opinions first consider Fed.R.Civ.P. 26(e), which provides, in pertinent part:

> (1)   In General.  A Party who has made a disclosure under Rule 26(a) -- or who has responded to an interrogatory, request for production or request for admission -- must supplement or correct its disclosure or response…in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional corrective information has not

9

> been made known to the other parties during the discovery process or in writing
> …
> (2)    Expert Witness.  For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition.  Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due.

As this Court has noted, Rule 26(e) "allows supplementation of expert reports only where a disclosing party learns that **its information** is incorrect or incomplete." *Oklahoma ex rel. Edmondson v. Tyson Foods*, 2008 WL 4832658 at *2. (emphasis added).  The supplementation is only proper if the correction is to the information reported and not to the methodology or process followed to discern that information or reach those conclusions:

> Rule 26(e) envisions supplementation when a party's discovery disclosures happen to be defective in some way so that the disclosure was incorrect or incomplete, and therefore, misleading.  **It does not cover failures of omission because the expert did an inadequate or incomplete preparation**.  To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation.

*Akeva v. Mizuno*, 212 F.R.D. 306, 310 (M.D.N.C. 2002) (emphasis added).

Goad's "corrected" report states that a typographical error occurred and that as a result the report stated that there were 343 CPS referrals as opposed to the 420 referrals that actually existed, and that Mr. Goad (actually Dr. Thompson) corrected this and changed all the calculations based upon this "error".  Exhibit 3, Mr. Goad's corrected report, p. vii, fn. 1.  However, neither Mr. Goad nor Dr. Thompson makes any attempt to explain how this "typographical error" was made, or why a typographical error in the text of Mr. Goad's report required Dr. Thompson to recalculate his CPS investigation confidence intervals.  Not only the cursory suggestion of a typographical error but also the unexplained need to correct the confidence intervals is highly suspect.  We do know that the "error" was only "corrected" after

10

brought to the Plaintiffs attention by the OKDHS Defendants' expert, Andrew Barclay, in his report.

It is not sufficient that an expert report merely set forth the opinions the expert will offer; it must also describe the reasons and basis for those opinions; expert reports must include "how" and "why" the expert reached a particular result, not just his conclusory opinion. *Cohlmia,* 254 F.R.D. at 430. To say the least, Mr. Goad's "corrected" report falls short of that mark. As demonstrated in the *Daubert* motion of the OKDHS Defendants, Dkt. 572, and their reply, Dkt. 663, Mr. Goad is not qualified to offer the opinions he proposes to give. Dr. Thompson did Mr. Goad's statistical work, and even wrote part of Mr. Goad's original report. The "corrected" report is no better than the original in terms of explaining the "how" and "why" supporting Mr. Goad's opinions. The "corrected" confidence intervals do not behave as one would expect, and Mr. Goad offers no "why" for their anomalies. What is more, the "corrections" were not timely, coming as they did after the close of discovery.

The determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the "broad discretion of the district court." *Tyson,* 2009 WL 2252129 at *3, citing *Woodworker's Supply, Inc. v. Principal Mutual Life Insurance Company,* 170 F.3d 985, 993 (10th Cir.1999). In *Woodworker's,* the Tenth Circuit identified four factors the court should consider: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *Id.* Plaintiffs cannot justify Mr. Goad's "corrected" report under these standards, and have not even tried.

### A.      Prejudice and surprise.

Mr. Goad's "corrected" confidence intervals certainly surprised the OKDHS Defendants.

11

Defendants' experts had reviewed the old ones in some detail, and now have new intervals to puzzle out. As demonstrated above, the "corrected" confidence intervals do not behave as one would expect if Dr. Thompson had merely changed the size of the population he put into the software he used. Other things are going on with these intervals that are not obvious without better explanation than Mr. Goad or Dr. Thompson give in their bolstering declarations. The purpose of Rule 26(a)(2)(C) is to prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal expert reports, to depose the expert in advance of trial, and to prepare for depositions and cross-examination at trial. *Foraker v. Schauer,* 2005 WL 6000493 *4 (D.Colo. Sept. 8, 2005).

Mr. Goad's "corrected" report does not fulfill the purpose of an expert report under Rule 26. The OKDHS Defendants are prejudiced by the belated change in the confidence intervals.

### B.    Prejudice cannot be cured.

Since discovery has closed, the OKDHS Defendants have no way to cure the prejudice. Reopening discovery would not cure the prejudice, because after finding the bases for the new confidence intervals, as best Mr. Goad or Dr. Thompson could explain them, OKDHS Defendants' experts would have to prepare revised reports of their own. Revised *Daubert* motions would doubtless be required. Plaintiffs would want to redepose defense experts in turn. *See Beller v. U.S.,* 221 F.R.D. 696, 701 (D.N.M. 2003)(rejecting reopening discovery after late change to expert report).

### C.    Disruption of the trial.

OKDHS Defendants will essentially have to conduct discovery on the fly at trial during cross examination, rendering trial even more cumbersome than otherwise would be the case. This would obviously disrupt the flow of the trial.

### D. Bad faith.

Andrew Barclay pointed out the discrepancy between Mr. Goad's reported universe of 343 CPS referrals and the 420 referrals found in Mr. Goad's considered materials in his report served on June 9, 2011. *See* Exhibit 2, Barclay declaration, p. 2. Expert discovery was cut off effective July 1, 2011. Dkt. 615. Over a month later, after the filing of the *Daubert* motion on Mr. Goad, and over two months after Mr. Barclay pointed out the discrepancy in the size of the universe of CPS referrals, on August 12, 2011, Plaintiff served Mr. Goad's "corrected" report. Throughout, Plaintiffs have stuck by the story that a "typographical error" caused the discrepancy between the 343 referrals in the universe of CPS referrals in the original report and the correct number of 420 referrals in the "corrected" report. A handwritten calculation from Mr. Goad's considered materials uses 343 as the universe of CPS investigations, as did Mr. Goad's original report, calling the "typographical error" story into serious question. Barclay declaration, Exhibit 5, p. 2, ¶ and Goad 1604 (considered materials excerpt), Exhibit 1 thereto. Plaintiffs have never explained why a typo required them to recompute the confidence intervals. Now Mr. Barclay's analysis of the "corrected" confidence intervals reveals that Plaintiffs have, without notice or explanation, "corrected" other errors and committed new errors as well. The timing of the disclosure after the close of discovery, coupled with a pronounced lack of candor about why the error was made and about the unexplained nature of the "corrected" work, justifies a finding of bad faith.

When an expert makes an error and purports to correct that error, the expert has an obligation to explain why the error was made. In *Foraker v. Schauer*, 2005 WL 6000493, at *4, the court stated:

> Boswell does not state, or does not state with particularity, what error he made, where the error appears in his testimony or report, the reason that he made the

> error, and the nature of the correction that he is making in his revised reports. At best, as asserted by counsel for defendants, all of the changes being made by Boswell appear to be little more than his morning-after efforts to answer the deposition questions of defense counsel better than he did during the deposition.

The court's characterization quoted above is also a good description of Mr. Goad's "corrected report." Mr. Goad does not tell us why he or Dr. Thompson made the error, and his changes "appear to be little more than his morning-after efforts to answer [the criticism in Defendants' expert's report] better than he did [in his initial report]," and his changes are themselves highly suspect. As the court in *Foraker* did, this Court should disregard the "corrections" and prohibit Mr. Goad from testifying at trial regarding his "corrected" report.

In *Beller v. U.S.*, 221 F.R.D. 696, 702 (D.N.M. 2003), the court struck the expert's supplemental report when the report changed the calculations from what had appeared in the initial report. The Plaintiff there argued that there was no prejudice to the defendants in allowing the supplemental report. The court was not persuaded, noting that the calculations would have been appropriate subject matter for deposition questions and that since discovery was closed, the defendant would be prevented from getting those relevant answers:

> Is the change due to a calculation or typographical error, which Dr. Grant is entitled to change or, on the other hand, is it a new opinion? If it is an error, the doctor could have been examined at his deposition concerning the accuracy of his calculations. A fact finder may well determine, for example, that if the reports were based on misinformation or flaws due to calculation and computation errors, the witness should not be given the same credence as another witness who did not make errors. USA has been denied the opportunity to explore that in a pretrial deposition, because the supplemental report was submitted after the close of discovery.

Id. at 699. Even if Goad's supplemental report is intended to correct only a typographical error, Plaintiffs have waited over two months after the submission of Mr. Barclay's report which pointed out the problem to attempt to correct it and have done so only after discovery has closed. Like USA in *Beller*, the OKDHS Defendants have been denied the opportunity to explore in a

14

pretrial deposition the cause and effect of the alleged typographical error, as well as the lack of care and precision which causes Goad's opinion to be of little, if any, value to the Court.

## IV.     CONCLUSION

Once Mr. Barclay found and disclosed the erroneous use of a universe of 343 CPS referrals, Mr. Goad's report was in serious trouble, though the trouble was not limited to the error regarding the number of CPS referrals. Mr. Goad now tries to strengthen and bolster his flawed report by fixing one of his mistakes. Instead of candor to the OKDHS Defendants, Mr. Goad tries to pull the wool over their eyes regarding both the nature of the error and of the work done to correct it. The Court should not permit this, and should strike Mr. Goad's "corrected report" and the two bolstering declarations of Mr. Goad and Dr. Thompson.

Respectfully Submitted,

**RIGGS, ABNEY, NEAL, TURPEN, ORBISON & LEWIS, P.C.**

By:  /s/Robert A. Nance
Robert A. Nance, OBA No. 6581
*E-Mail*: rnance@riggsabney.com
5801 N. Broadway Extension, Suite 101
Oklahoma City, OK 73118
*Tel* (405) 843-9909 / *Fax* (405) 842-2913
Attorneys for the Defendants Richard L. DeVaughn, Jay Dee Chase, Steven Dow, Michael L. Peck, Aneta F. Wilkinson, Rev. George E. Young, Sr., Linda English Weeks, Anne M. Roberts, Bob Rawlings, and Howard H. Hendrick

**CERTIFICATE OF SERVICE**

I hereby certify that on the 22nd day of September, 2011, I electronically transmitted the forgoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

| | |
|---|---|
| Marcia Robinson Lowry<br>*mlowry@childrensrights.org*<br>Ira P. Lustbader<br>*ilustbader@childrensrights.org*<br>William Kapell<br>*wkapell@childrensrights.org*<br>Miriam Ingber<br>*mingber@childrensrights.org*<br>Patrick S. Almonrode<br>*palmonrode@childrensrights.org*<br>Susan Lambiase<br>*slambiase@childrensrights.org*<br>Larry Borten<br>*lborten@childrensrights.org*<br>Sarah Russo<br>*srusso@childrensrights.org*<br>Jason Moff<br>*jmoff@childrensrights.org*<br>Philip Gelelrt Barber<br>*pbarber@childrensrights.org*<br>**Children's Rights**<br>330 Seventh Ave., 4th Floor<br>New York, NY 10001 | Frederic Dorwart<br>*fdorwart@fdlaw.com*<br>Paul DeMuro<br>*pdemuro@fdlaw.com*<br>**Frederic Dorwart Lawyers**<br>124 E. 4th Street, Suite 100<br>Tulsa, OK  74103-5010<br><br>Kindanne C. Jones<br>*kindannejones@oag.ok.gov*<br>Office of Oklahoma Attorney General |

　　　　　　　　　　　　　　　　　　*/s/* Robert A. Nance
　　　　　　　　　　　　　　　　　　Robert A. Nance