**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| D.G., by Next Friend, G. Gail Strickland, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 08-CV-074-GKF-FHM |
| v. | ) ) | |
| BRAD YARBROUGH,* Chairman of the Oklahoma Commission for Human Services, et al., | ) ) ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Before the court is the Motion to Decertify the Class [Dkt. #558] filed by the defendants, members of the Oklahoma Commission for Human Services and the director of the Oklahoma Department of Human Services ("DHS").

In February 2008, nine Oklahoma foster children ("Named Plaintiffs"), acting through their next friends, filed suit under 42 U.S.C. § 1983 seeking declaratory and injunctive relief against the DHS defendants in their official capacities. They sought certification of a class of foster children in the legal custody of DHS, alleging DHS's agency-wide foster care policies and practices expose all class members to an impermissible risk of harm in violation of their Fourteenth Amendment right to substantive due process. Additionally, Named Plaintiffs alleged class-wide violations of their Fifth and Fourteenth Amendment rights to procedural due process and liberty and privacy interests under the First, Ninth and Fourteenth Amendments.

On May 5, 2009, the court, pursuant to Fed.R.Civ.P. 23, certified the following class:

---

\* Pursuant to Fed.R.Civ.P. 25(d), Brad Yarbrough is substituted for Richard L. DeVaughn as Chairman of the Oklahoma Commission for Human Services.

> All children who are or will be in the legal custody of the Oklahoma Department of Human Services (1) due to a report or suspicion of abuse or neglect; or (2) who are or will be adjudicated deprived due to abuse or neglect.

[Dkt. #272 at 17].  In so ruling, the court—accepting as true the allegations of the complaint—found plaintiffs had satisfied the requisites for Rule 23(a) of numerosity, commonality, typicality and adequacy of representation  [*Id.* at 7-11].  Based upon the Statement of Relief [Dkt. #241] filed by plaintiffs pursuant to *Shook v. Board of County Commissioners,* 543 F.3d 597, 605 (10th Cir. 2008), the court identified at least one common issue of fact:  Whether DHS has a policy or practice of failing to adequately monitor the safety of Plaintiff Children causing significant harm and risk of harm to their safety.  [*Id.* at 9].  The court also found that this common issue of fact raised at least one common legal issue:  Whether the alleged policies or practices violate plaintiffs' right to be reasonably free from harm and imminent risk of harm while in state custody.  [*Id.* at 9-10].   The court concluded that at least one remedy sought by Named Plaintiffs—their request for an injunction setting limits on the caseloads of caseworkers and their supervisors—met the requirements of Rule 23(b)(2) and Rule 65(d) for a remedy that is both cohesive and sufficiently specific. [*Id.* at 13].

The Tenth Circuit affirmed the court's class certification order on interlocutory appeal. *D.G. ex rel Stricklin v. DeVaughn,* 594 F.3d 1188, 1195 (10th Cir. 2010).  The parties have since conducted and completed classwide discovery.  Defendants now urge the court to decertify the class pursuant to Rule 23(c)(1)(C), asserting the evidence adduced does not show commonality under Rule 23(a)(2) or that DHS has "acted or refused to act on grounds that apply generally to the class."  Defendants simultaneously filed a Motion for Summary Judgment on all of plaintiffs' claims, including the claims at issue in this motion.  [Dkt. #561].

In *General Telephone Co. of the Southwest v. Falcon,* 457 U.S. 147, 160 (1982), the court observed , "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiffs' cause of action." (quotations and citations omitted). This case is no exception. The factual and legal issues underlying the class certification issue are intertwined, at least to some extent, with the facts and law at issue in defendants' summary judgment motion.

## I. Applicable Legal Standards

An order that grants class certification may be altered or amended at any time before final judgment. Fed.R.Civ.P. 23(c)(1)(C). *DG,* 594 F.3d at 1201-02; *Weinman v. Fid. Captial Appreciation Fund,* 354 F.3d 1246, 1261 (10th Cir. 2004). While the decision to decertify is discretionary, *Id.,* the court has an obligation to monitor the class decision in light of evidentiary developments in the case. *See Anderson v. Boeing Co.,* 2006 WL 2990383 at *1 (N.D. Okla. October 16, 2006); *Beer v. XTO Energy, Inc.,* 2010 WL 2773311 at *2 (W.D. Okla. July 13, 2010).

In its class certification order, the court, as required by law, accepted as true the substantive allegations of plaintiffs' complaint, *See Shook v. El Paso County,* 386 F.3d 963, 968 (10th Cir. 2004), and stressed that its decision to certify a class was not a decision on the merits. [Dkt. #272 at 7]. Even at this juncture, the court cannot and will not decide the case on the merits. *Lightfoot v. District of Columbia,* 273 F.R.D. 314, 323 n. 6 (D.D.C. 2011); *Anderson* at *2. However, a review of the decision is appropriate at this time in light of the extensive discovery undertaken since the court's initial certification of the class.

Defendants' post-discovery challenge focuses, once again, on whether the evidence adduced satisfies Rule 23(a)(2)'s requirement of commonality and the requirements for cohesiveness and specificity of remedies imposed by Rule 23(b)(2) and Rule 65(d).

Plaintiff Children acknowledge they retain the burden of establishing commonality under Rule 23(a)(2). [Dkt. #599 at 8]. The finding of commonality requires only a single issue of fact or law common to the class. *J.B. v. Valdez,* 186 F.3d 1280, 1288 (10th Cir. 1999). However, mere allegations of systemic failures of an agency such as DHS will not suffice; a discrete legal or factual question common to the class must exist. *DG,* 594 F.3d at 1195, citing *J.B.*, 186 F.3d at 1288. The Tenth Circuit will not allow plaintiffs "to broadly conflate a variety of claims to establish commonality via an allegation of system failures." *J.B.,* 186 F.3d at 1288-89.

In its ruling denying defendants' appeal of the court's class certification order, the Tenth Circuit instructed, "Rule 23's certification requirements neither require all class members to suffer harm nor Name Plaintiffs to prove class members have suffered such harm." 594 F.3d at 1198. The court stated:

> [A] class will often include persons who have not been injured by the defendant's conduct….Such a possibility or indeed inevitability does not preclude class certification. Rule 23(a) only requires the district court to find a *question* of fact or law common to all class members. Requiring Named Plaintiffs to prove all class members were inadequately monitored or are actually exposed to a threat of harm due to OKDHS's monitoring practices at the certification stage would require them to *answer* the common question of fact or law, rather than just prove it exists. Rule 23(a) does not require the district court to have an answer before certifying a class; Classwide discovery and further litigation answer the question after certification.

*Id.* (quotations and citations omitted).

Another statement by the Tenth Circuit in this case bears repeating:

> Defendants maintain because the evidence presented demonstrated a class member has only a 1.2% chance of being injured, then 98.8% of the putative class is not under an imminent threat of serious harm and, therefore, no issue of fact or law common to its members exists. This argument entirely misses the mark. The

"injury" the Named Plaintiffs allege which the district court found constituted a question of fact common to the class is not solely actual abuse or neglect.  The injury, instead, includes exposure to an impermissible risk of harm due to OKDHS's alleged agency-wide failure to monitor class members adequately.  That "only" 1.2% of OKDHS foster children actually suffered abuse reveals nothing about how many of those children were not properly monitored and yet survived an unconstitutional risk of abuse or neglect unscathed.  Logically, the fact that 1.2% of OKDHS foster children reported abuse or neglect does not mean the rest of the class was not exposed to an impermissible risk of serious harm.  In theory, 100% of foster children could live under an imminent threat of serious harm, but only 1.2% ultimately suffer and report abuse or neglect.

*Id.*  Thus, the court is mindful that the issue here is not what percentage of children have actually suffered abuse while in state custody, but whether and to what extent foster children are at *imminent risk of serious harm.*

## II. Analysis

### A.  Applicability of *Wal-Mart* Decision

Citing *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 254, (June 20, 2011), defendants renew their argument that Named Plaintiffs have failed to identify any common  issues of fact or law.  In *Wal-Mart*, named plaintiffs sought certification of a nationwide class of some 1.5 million female employees claiming local managers of Wal-Mart exercised their discretion over pay and promotions disproportionately in favor of men, and Wal-Mart's refusal to cabin its managers' authority amounted to disparate treatment.  *Id.* at 2544.  The district court granted plaintiffs' motion for class certification and the Ninth Circuit substantially affirmed the decision.  *Id.*  The Supreme Court reversed, finding certification of the plaintiff class was not consistent with Rule 23(a)(2).  In so ruling, the court observed:

[I]n resolving an individual's Title VII claim, the crux of the inquiry is the reason for a particular employment decision.  Here, respondents wish to sue about literally millions of employment decisions at once.  Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored.*

5

*Id.* at 2552.  (emphasis in original) (quotation and citation omitted).  Wal-Mart had an explicit

policy of nondiscrimination and hiring  *Id.* at 2550-51.   The court stated:

> Commonality requires the plaintiff to demonstrate that the class members have
> suffered the same injury.  This does not mean that they have all suffered a violation
> of the same provision of law….Quite obviously, the mere claim by employees of
> the same company that they have suffered a Title VII injury, or even a disparate-
> impact Title VII injury, gives no cause to believe that all their claims can be
> productively litigated at once.  Their claims must depend upon a common
> contention—for example, the assertion of discriminatory bias on the part of
> the same supervisor.  That common contention, moreover, must be of such a
> nature that it is capable of classwide resolution—which means that determination
> of its truth or falsity will resolve an issue that is central to the validity of each
> one of the claims in one stroke.
>
> What matters to class certification…is not the raising of common "Questions"—
> even in droves—but rather the capacity of a classwide proceeding to generate
> common *answers* apt to drive the resolution of the litigation.  Dissimilarities
> within the proposed class are what have the potential to impede the generation
> of common answers.

*Id.* at 2551 (quotations and citations omitted).

In *Wal-Mart,* plaintiff were unable to identify "some glue holding the alleged reason for

[plaintiffs' harms] together," so that the case would be capable of class-wide resolution.  *Id.* at

2552.  Defendants assert the same is true in this case.  The court disagrees.

Here, as the Tenth Circuit noted, "every class member, by virtue of being in OKDHS

custody, is subject to OKDHS's monitoring practices or lack thereof…"  *DG,* 594 F.3d at 1197,

and faces harm or imminent risk of harm if the monitoring practices are insufficient.  Further,

plaintiffs have identified at least one proposed remedy or "answer"—i.e., an injunction setting

limits on caseloads—that would be common to all plaintiffs.

In *Wal-Mart,* the court described how the commonality issue must be approached in an

employment discrimination case, pointing out: "[T]here is a wide gap between (1) an

individual's claim that he has been denied a promotion [or higher pay] on discriminatory

grounds, and his otherwise unsupported allegation that the company has a policy of

discrimination, and (b) the existence of a class of persons who have suffered the same injury as

that individual, such that the individual's claim and the class claim will share common questions

of law or fact and that the individual's claim will be typical of the class claims." *Id.* at 2553,

citing *Falcon,* 457 U.S. at 157-58.   The court, citing *Falcon,* suggested one way plaintiffs could

bridge the gap was to show "significant proof" that Wal-Mart operated under a general policy of

discrimination.  *Id.*

Based on this statement, defendants suggest plaintiffs must come forward with

"significant proof" that DHS has a policy or practice of failing to adequately monitor the safety

of plaintiffs, causing significant harm or risk of harm to their safety.

The court is not convinced "significant proof" is required for plaintiffs to resist

defendants' motion to decertify, or whether some lesser standard is required outside of

employment discrimination cases.[1]  However, even assuming "significant proof" is the

appropriate standard, the court finds, as set forth below, that  plaintiffs have met that standard

with respect to the bases upon which the class was initially certified.

### B. Failure to Monitor Safety of Children

Plaintiffs assert that notwithstanding the official policy of DHS, the agency has an actual

practice of failing to adequately monitor the safety of plaintiff children, causing significant harm

and risk of harm to their safety.  They cite the following evidence in support of their claim:

1.  The Oklahoma Commission for Human Services has conceded it makes no
    attempt monitor children in its custody.

2.  DHS caseworker caseloads are excessively high.

---

[1] In *Vuyanich v. Republic Bank of Dallas,* the court recognized that the standard of proof for
satisfying elements required for certification under Rule 223(a) is "ill-defined" and "has not yet
[been] articulated by the higher courts."  505 F. Supp. 224, 239 (N.D. Tex. 1980).

3.   A large percentage of children are not being visited as required by regulation.

**1. Commission's Alleged Lack of Monitoring Efforts**

The Oklahoma Commission for Human Services has oversight responsibility for the conduct of the state's foster care system and is responsible for hiring, firing and setting the salary of the DHS Director.  Okla. Const., art. 25, §§ 3-4.  Plaintiffs allege the Commission has made no attempt at all to monitor the problems at DHS that result in harm to children.

The Commission usually meets monthly for two to three hours.  [Dkt. #601-21, Ex. 21, Aneta Wilkinson Dep., 70:14-21; Dkt. #601-22, Ex. 22, Steven Dow Dep., 102:16-20; Dkt. #601-23, Ex. 23, Michael Peck Dep., 88:21-25].  Steven Dow, who was appointed to the Commission after this lawsuit was filed, testified that in his opinion, "the meetings are rather perfunctory and not very engaging with respect to the level of oversight that the Commission is providing." [Dkt. #601-22, Ex. 22. Dow Dep., 103:15-18].

Commissioners generally do not set the agenda, but consider only the information selected and provided by the Director and senior DHS managers.  [Dkt. #601-24, Ex. 24, Hendrick Dep., 29:5-14; Dkt. #601-23, Ex. 23, Peck Dep., 187:15-188:7].  Commissioner Steven Dow testified that in his tenure, the Commission has never inquired about, or been told anything negative about, the performance of DHS's child welfare operations, or any shortcomings "that we as a Commission ought to know whether self-identified or identified by an outside body." [Dkt. #601-22, Ex. 22, Dow Dep., 70:21-71:7, 108:4-14].  Director Hendrick testified in recent history no commissioners have asked him for a report on anything relating to child welfare, and no one has come in and talked about any of the department's data that was troubling to them. [Dkt. 601-24, Ex. 24, Hendrick Dep., 29:15-19, 33:7-13].  Commissioner DeVaughn could not

remember whether there have been any reports to the Commission on rate of abuse in care, the number of placements per child, the number of permanency plans put in place by the department, the length of stay in custody of foster children, out-of-county placements, family separations, or the shortage of foster care homes available for children in the custody of the state.  [Dkt. #602-2, Ex. 27, DeVaughn Dep., 23:23-25:21].  He testified regarding missed caseworker visits, that "Most all information is presented in forms, but as to getting down to the specific items, I can't recall…specificity on those."  [*Id.,* 24:23-25:8].

Commissioner Michael Peck did not ask for, nor does he remember receiving, any data on services such as independent-living services provided to children, caseworker visits to children, visits between children and their parents, visits between workers and children's parents, or worker caseloads.  [Dkt. #601-23, Ex. 23, 106:15-107:13]. He does not think the Commission has ever asked for, or been provided with any, updates about DHS's performance on federal standards for foster children.  [*Id.,* 132:19-21].  He has never asked for, nor been given information about abuse and neglect in care for calendar year 2011 to date, and does not know if it is trending up or down.  [*Id.,* 145:25-146:8].  He does not recall the Commission asking for, nor receiving, any data on caseworker visitation.  [*Id.,* 152:17-20].  He recalls no discussions about placement stability at Commission meetings.  [*Id.,* 159:11-14].  There has been no discussion about how DHS is doing on meeting its own policies with respect to visits between children and their parents and between workers and parents.  [*Id.,* 175:11-20].  He does not know whether there has recently been overcrowding and overcapacity at the DHS's two shelters.  [*Id.,* 199:25-200:8].

Commissioner Linda Weeks testified she was unaware that from 2005 to 2008, Oklahoma was among the bottom five states in the country on the federal government's measure

of abuse in care.  [Dkt. #601-25, Ex. 25, Weeks Dep., 95:12-23].  She was unaware of how the Oklahoma DHS performed in the data on abuse in care for 2009 or 2010.  [*Id.,* 96: 8-14].  She cannot recall any discussions about shelters other than the locations of the two shelters DHS has. [*Id.,* 115:18-23].

Commissioner Aneta Wilkinson testified that although she does not have any specific recollection of discussions about caseloads, she is sure there have been discussions, and the discussions would be reflected in minutes of the meetings.  [Dkt. #601-21, Ex. 21, Wilkinson Dep., 128:20-129:19].  Similarly, she did not recall discussion about placement and stability at the Commission meetings, but stated they would be reflected in the minutes of the meetings. [*Id.,* 145:14-20].

Commissioner George Young testified commissioners receive monthly reports used to measure the performance of children in the custody of DHS.  [Dkt. #602-1, Ex. 26, Young Dep., 27:16-25].  He did not think the reports included a rate of abuse in care.  [*Id.,* 28:22-29:1].

Commissioner Dow does not recall any discussion of child welfare worker caseloads at the Commission's meetings.  [Dkt. #601-22, Ex. 22, 176:2-5].  He has not asked for, nor been given any, information by DHS that would help him evaluate caseload levels, although he believes he could ask for the information.  [*Id.,* 176-:22-177:6].  Dow recalls no discussion at Commission meetings about worker/parent or worker/child contacts or whether those policy expectations are being met.  [*Id.,* 194:7-14; 195:4-6].

The Commission never inquired about, and was never informed of, the outcome of DHS's most recent federal CFSR [Dkt. #601-24, Ex. 24, Hendrick Dep., 138:7-21; Dkt. #602-2, Ex. 27, DeVaughn Dep., 64:22-65:1; Dkt. #601-22, Ex. 22, Dow Dep., 73:4-8; 75:9-17; Dkt. #601-25, Ex. 25, Weeks Dep.,  52:14-18; Dkt. #602-1, Ex. 26, Dkt. #601-2, Ex. 21, Dkt. #601-24:133:9-

23; 135:7-14, 138:7-21].Wilkinson Dep., 57:6-19; Young Dep., 45:7-15, 48:6-11; 102:11-103:4, 103:20-15].  Nor did commissioners ask about, or receive information about, the February 2009 Performance Audit of DHS commissioned by the state legislature, although commissioners were told about legislative proposed changes.  [Dkt. #601-24, Ex. 24, Hendrick Dep., 143:13-144:9, 150:24-151:12; Dkt. #601-23, Ex. 23, Peck Dep., 133:13-18, 134:4-17; Dkt. #602-1, Ex. 26, Young Dep., 43:2-13, 86:4-12].

In accordance with state law, DHS was accredited by the Council on Accreditation ("COA") from 1985 to 2002.  [10A O.S. § 1-9-105(A)(4); Dkt. #602-3, Ex. 28, Letter from COA to Hendrick, COA-5-00012].  In September 2002, DHS chose not to renew its accreditation. [Dkt. #602-3, Ex. 28, Letter from Hendrick to COA, COA-5-00010].  The Oklahoma DHS remains unaccredited to date.  [Dkt. #600, Plaintiffs' Statement of Additional Material Fact ¶6]. Current commissioners were unaware of the statute requiring COA accreditation or DHS's violation of it, although the Commission at the time was.  [Dkt. #601-24, Ex. 24, Hendrick Dep., 128:12-129:2; Dkt. #602-2, Ex. 27, DeVaughn Dep., 77:24-78:3, 78:16-23, 83:4-19; Dkt. #601-22, Ex. 22, Dow Dep., 217:10-23; Dkt. #601-23, Ex. 23, Peck Dep., 203:23-204:15; Dkt. #601-25, Ex. 25, Weeks Dep., 128:25-129:2; Dkt. #601-21, Ex. 21, Wilkinson Dep., 213:23-214:6; 214:15-21, 215:1-6; Dkt. #602-1, Ex. 26, Young Dep., 55:15-24, 56:24-57:3, 57:14-15, 61:25-62:4, 62:16-17].

Finally, plaintiffs' expert John Goad opines that in no fewer than 64 (19%) and as many as 157 (46%) of 343 DHS investigations into reports of maltreatment of foster children during 2009, the investigators' findings were flawed.  [Dkt. #610-2, Ex. 31, Goad Report, pp. 37-38].

This, plaintiffs contend, is additional evidence of defendants' failure to exercise professional judgment.[2]

### 2. Child Welfare Worker Caseloads

DHS managers and Commissioners admit that manageable caseloads for child welfare workers are important to ensure that children are kept safe from harm.  [Dkt. #601-22, Ex. 22, Dow Dep., 175:16-176:1; Dkt. #602-25, Ex. 49, Gary Miller Dep., 229:19-230:6; Dkt. #603-2, Ex. 52, Deborah Smith Dep., 144:16-145:3; Dkt. #603-3, Ex. 53, Joanie Webster Dep., 48:17-25, 51:14-52:5, 52:19-53:13; Dkt. #601-25, Ex. 25, Weeks Dep., 39:5-40:3; Dkt. #601-3, Ex. 3, Amy White Dep., 184:14-24; Dkt. #601-21, Ex. 21, Wilkinson Dep., 16:6-15, 127:17-23; Dkt. #603-4, Ex. 54, Marq Youngblodd Dep., 224:15-23; Dkt. #601-23, Ex. 23, Peck, 38:1-3, 38:12-39:2]. Similarly, both plaintiffs' and defendants' experts acknowledge the importance of reasonable caseloads in protecting foster children.  [Dkt. #603-5, Ex. 55, Affid. of Peg Hess, PhD, ACSW, ¶6(a); Dkt. #601-2, Ex. 2, Viola Miller, Ed.D. Report, 34, 37; Dkt. #603-6, Ex. 56, Larry Brown Dep., 85:15-86:16; Dkt. #720-1, Ex. 29, Arnold-Williams Dep., 141:8-142:12].

Extensive child welfare research links high caseloads to poor decision making, increased turnover and worse outcomes for children.  [Dkt. #604-2, Ex. 77, U.S. General Accounting Office, Report to Congressional Requesters, *Child Welfare: HHS Could Play a Greater Role in Helping Child Welfare Agencies Recruit and Retain Staff,* pp. 3-4, 14, 19-21; Dkt. #604-3, Ex. 7, D. DePanfilis, H. Girvin, *Investigating child maltreatment in out-of-home care: Barriers to effective decision-making,* 27 Children & Youth Services Rev. 353-374 (2005), pp. 367-370; Dkt. #604-4, Ex. 79, D.J. English *et al., Factors That Influence the Decision Not to Substantiate a CPS Referral—Phase II:  Mail and Telephone Surveys of Child Protective Services Social*

---

[2] The issue of abuse in care rates is more fully discussed in § II.C.1. below.

*Workers* (2002), p. 97; Dkt. #604-5, Ex. 80, Am. Public Human Services Ass'n, *Report From the 2004 Child Welfare Workforce Survey:  State Agency Findings* (2005), p. 46; Dkt. #604-6, Ex. 81, , Social Work Policy Institute, *High Caseloads: How do they Impact Delivery of Health and Human Services?* (2010); Dkt. #604-7, Ex. 82, H. Lawson *et al., Retention Planning to Reduce Workforce Turnover in New York State's Public Child Welfare Systems* (2005), pp. 11, 41.

COA standards provide that permanency planning worker caseloads should not exceed 18 children or 8 children with special needs.  [Dkt. #600, Plaintiffs' Statement of Additional Material Facts, ¶25 and Dkt. #602-3, Ex. 28, PA-FC 19.06, PA-KC 16.06].  CWLA sets out similar standards.  [Dkt. #603-7, Ex. 57, CWLA Standards for Foster Care Services, § 3.48, KC § 4.20].

Every child in DHS custody is assigned a "primary" caseworker who is located in the county of juvenile court jurisdiction.  When a child is placed outside the county of court jurisdiction, the child is also assigned a "secondary" worker in the county of placement.  OAC §§ 340:75-1-29, 340:75-6-48.  DHS managers have testified that both primary and secondary workers have equal and important responsibilities and both must be taken into account when calculating workers' caseloads.  [Dkt. #603-8, Ex. 58, Johnson Dep., 85:3-20, 115:13-118:3; Dkt. #603-2, Ex. 52, D. Smith Dep., 145:4-23; Dkt. #601-3, Ex.3, White Dep. (5/12/11), 188:17189:9].  As of May 2011, 41% of children in DHS custody were placed outside the county of court jurisdiction.  [Dkt. #603-10, Ex. 60, DHS Placement Summary, Y1617A-00380-81].

DHS's "YI743 report" as of March 2011 shows that more than 5,300 children in out-of-home care (68% of the total number of such children) had a primary caseworker whose caseload was greater than 20 children; more than 3,000 children had a primary worker whose caseload was greater than 25 children; and more than 1,200 children had a primary caseworker whose

caseload was more than 30 children. [Dkt. #600, Plaintiffs' Statement of Additional Material Facts, ¶34 and Dkt. #603-15, Ex. 65, YI743 Report "built on December, 10, 2010"].

Larry Johnson, Director of the DHS Field Operations Division ("FOD"), acknowledged that another report he uses to track average worker caseloads—referred to as the Combined Workload Report ("CWR")—omits entire categories of assignments from its calculation of average workloads, and thus understates the average number of children assigned to permanency planning workers  [Dkt. #600, Plaintiffs' Statement of Additional Material Facts, ¶¶29-30].

Defendants' own expert, Robin Arnold-Williams, concluded that DHS does not accurately measure caseloads and that its caseloads exceed professionally accepted standards. [Dkt.601-10, Ex. 10, Arnold-Williams Report, at 5].  Commissioners Peck and Weeks admit that worker caseloads are too high.  [Dkt. #601-23, Ex. 23, Peck Dep.,146:17-148:6, 151:4-9, 212:6-24; Dkt. #601-25, Ex. 25, Weeks Dep., 62:16-64:2.

Defendants' expert Robin Arnold-Williams testified issues with caseloads continue [Dkt. #720-1, Ex. 29, Arnold-Williams Dep., 144:18-19], that caseloads need to be reduced [*Id.,* 145:21-145:2], that current reporting practices hamper effective caseload and workload monitoring [*Id.,* 150:15-151:3], and that in her opinion, "the best professional judgment would be to seek more staff and to...reduce [caseloads] down lower, which I have recommended in [my report].  [*Id.,* 216:16-217:19].  Defendants' expert Larry Brown opined that individual caseload or workload levels are, at this point, known only "at an individual unit level."  [Dkt. #603-6, Ex. 56, Larry Brown Dep., 85:6-10], that "there is no systematic way that the central office here—or in Oklahoma City can know that information," [*Id.,* 87:4-21], that Johnson "doesn't have the data that he needs to manage the system," and "[h]e's working to develop a report to give him that information," and "those are positive steps that demonstrate to me that there's reasonable

exercise of some professional judgment that's being shown here." [*Id.,* 103:13-104:1]. In her report, plaintiffs' expert Viola P. Miller opined that caseworkers were inadequately supervised and staff turnover is excessive. [Dkt. #601-2, Ex. 2, Miller Report].

### 3. DHS Case Worker Visits

Federal law requires monthly visits between caseworkers and children in foster care. 42 U.S.C. § 624(2)(A). DHS policy also requires visits with each foster child a minimum of one time per month, with no less than two visits per quarter in the foster placement. 168 Okla. Admin. Code ("OAC") 340:75-6-48. Each child is to be interviewed, or if an infant observed, alone without the foster parent present at least one time per quarter. *Id.*

DHS Commissioners and managers and experts on both sides admit worker-child visitation is important, that it is critical for the same worker to visit the child each month and that the visit should include one-on-one interactions with the child as well as observation of the child's interactions with others. [Dkt. #601-24, Ex. #24, Howard Hendrick Depo., 173:8-18; 174:12-175:10; 175:21-176:1; Dkt. #603-8, Ex. #58, Larry Johnson Depo., 59:11-60:10; Dkt. #601-23, Ex. #23, Michael Peck Depo., 37:4-25, 151:20-23, 152:2-11; Dkt. #601-25, Ex. #25, Linda Weeks Depo., 35:7-24, 36:23-25, 62:16-63:1; Dkt. #601-3, Ex. #3, Amy White Depo., 318:19-23; Dkt. #601-21, Ex. 21, Aneta Wilkinson Depo., 15:17-16:5; Dkt. #602-1, Ex. #26, George Young Depo., 36:13-25, 95:23-25, 97:9-15, 98:3-1; Dkt. #603-4, Ex. #54, Marq Youngblood Depo., 213:9-24; Dkt. #602-4, Ex. 29, Robin Arnold-Williams Depo., 195:25-196:14; Dkt. #601-16, Viola Miller Depo., 141:24-142:5; Dkt. #601-1, Foster Care Case Review of the OKDHS by Center for the Support of Families (CSF), Inc., p.70]. Additionally, the federal government has found an association between caseworker visits and positive outcomes for children. [Dkt. #606-4, Ex. 129, Results of the 2007 and 2008 Child and Family Services

Reviews at 22-24; Dkt. #606-5, Ex. 130, "52 Program Improvement Plans—Strategies for Improving Child Welfare Services and Outcomes," at 36-38; Dkt. #606-6, Ex. 131, GAO Child Welfare report, at 24-25, 33].

Plaintiffs contend in *practice,* however, the requisite visits are not occurring. Larry Johnson, Director of the DHS Field Operations Division ("FOD"), stated in his declaration that the FOD is responsible for accurate and timely delivery of services to eligible clients of the CFSD, the Family Support Services Division and the AIDS Coordination Information Service. [Dkt. #558, Ex. 8, Decl. of Larry Johnson, ¶2]. Approximately 1,000 of 3,700 FOD staff are child welfare workers. [*Id.*]. DHS keeps track of the number of visits or "contacts" of its workers with foster children. A copy of the report is attached to his declaration and referred to as Ex. 15-1, Contacts Report June 2011, run July 10, 2011. [*Id.,* ¶3]. Johnson states that between 90% and 96% of children living in their own homes while in foster care jurisdiction received the required visits; between 96% and 98.6% of children in therapeutic foster care ("TCF") placements received the required visits. Of the 20 or fewer children in unpaid relative placements each month, between 90% and 100% received the required visits each month. Johnson states that data regularly kept by DHS indicate that, since July 2000, DHS workers have made monthly visits to children in foster care due a visit over 90% of the time. Since January 2007, data shows DHS workers have made more than 95% of monthly visits in all but two months. In those months, 94.2% and 94.9% of visits were made. [*Id.*, ¶3].

However, the report, "Caseworker Visits: Visited Every Month (Required Federal Reporting)," shows that 3,707 children—32% of all children in out-of-home care for at least one month as of December 2010—did not receive all 12 monthly visits due that year. [Dkt. #600, Plaintiff's Statement of Additional Material Facts ¶64; Dkt. #606-7, Ex. 132]. Defendants'

expert, Robin Arnold-Williams, recommends in her report that DHS should "[c]ontinue progress meeting federal expectations in the area of monthly visitation between case workers and children. [Dkt. #601-10, Ex. 10, A Review of Management of OKDHS's Child Welfare System, Robin Arnold-Williams, D.S.W. at 7, 58].

Plaintiffs assert, "In light of the large number and percentage of children whom DHS workers have failed to visit, it is fair to say that *all* members of the Plaintiff Class are at risk of being assigned to a caseworker who will miss a required visit."

The Tenth Circuit, in affirming the class certification decision, rejected an argument by DHS that because a child in custody of the state has less than a 2% chance of being injured there is a dearth of commonality.  As the appellate court noted, the injury alleged in this case is "not solely actual abuse or neglect," but includes "exposure to an impermissible risk of harm."  The court finds plaintiffs have presented "significant proof" of exposure to an impermissible risk of harm.

The court finds that plaintiffs have presented "significant proof" that DHS has a policy or practice of failing to adequately monitor the safety of plaintiff children causing significant harm and risk of harm to their safety.  In so finding, the court stresses that it is *not* making a finding that DHS in fact has such a policy or practice; rather, the court merely concludes Plaintiff Children have met the burden described in *Wal-Mart* to survive defendants' motion to decertify the class.  A determination on the merits of the claim still lies ahead.

### C. Other Alleged Common Issues of Fact and Law

Plaintiffs allege the evidence shows the existence of other common issues of fact and law, including:  (1) Whether DHS is subjecting Plaintiff Children to an impermissible level and risk of abuse and neglect while in state custody; (2) whether DHS has failed to develop a

sufficient number and array of placement resources;  (3) whether DHS has a practice of subjecting Plaintiff Children to impermissibly frequent placement moves; and (4) whether DHS has a practice of subjecting Plaintiff Children to excessively long stays in state custody.   The remaining issues are considered below.

### 1.  Abuse in Care

Named Plaintiffs assert the issue of whether DHS subjects foster children to an impermissible level and risk of abuse and neglect while in state custody presents a common question of fact suitable for class certification.

The federal government tracks the rate at which children are abused or neglected while in state foster care (the "abuse-in-care rate").  The rate is calculated by taking the number of child victims of maltreatment perpetrated by foster parents and facility staff, and dividing it by the number of children served in foster care during the reporting year.  [Dkt. #602-12, Ex. 36, *Child Maltreatment 2009,* p. 24].

Plaintiffs have presented evidence that for every year from federal fiscal year ("FFY") 2002 through FFY 2010, DHS's reported rate at which children in its custody are being maltreated (the "abuse-in-care rate") has been 1.54 to 3.97 times greater than the federal standard, and was among the five highest reported rates in the country from FFY 2002 through FFY 2008.  [Dkt. #602-13, Ex. 37 NCANDS-DP-00001; Dkt. #602-14, Ex. 38 State-CFSR-2007-09956; Dkt. #602-15, Ex. 39, CDSR.PIP.Huckabee-00004, Dkt. #602-16, Dkt. #602-16, Ex. 40, CSFR.PIP.Farjardo-00002; Dkt. #601-2, Ex. 5 HindmanB-012423; ].  From FFY 2002 to FFY 2008, DHS's reported abuse-in-care rate was among the five highest reporting jurisdictions in the country.  [Dkt. #602-19, Ex. 43 PLAINTIFFS 01220.1-01220.2; Dkt. #602-20, Ex. 44 Children's Bureau, *Child Maltreatment 2004,* 64; Dkt. #602-12, Ex. 36, *Child Maltreatment*

*2009,* 53].  Additionally, Director Hendrick testified DHS does not report to the federal government any instances of maltreatment committed by facility staff members.  [*Id.,* ¶13 and Ex. 24, Hendrick Dep. 70:13-24].  Thus, plaintiffs assert, the DHS is under-reporting abuse-in-care rates.  Defendants acknowledge that at least 154 children in 2009 and 80 children in 2010 were maltreated by facility staff.  [*Id.,* ¶14 and Ex. 45 Lee Decl. ¶¶1-2].  If the 154 children had been included in DHS's reported abuse-in-care data for 2009, DHS would have reported a total of 241 children abused by foster parents and facility staff during that year, setting DHS's abuse-in-care rate at 1.58%--almost five times the federal standard.  Likewise, if the other 80 children had been included in DHS's reported abuse-in-care data for FFY 2010, DHS would have reported a total of 183 children abused by foster parents and facility staff during that year, setting DHS's abuse-in-care rate at 1.41%--more than four times the federal standard.  [*Id.,* Ex. 37 NCANDS-DP-00002].  The number reported by DHS also does not include children abused by their birth parents while in DHS custody.  [Dkt. #561, Ex. 18, ¶9].   Defendant's expert Barclay testified that such maltreatment should be considered to obtain a fuller picture of abuse in care.  [Dkt. #601-9, Ex. 9, Barclay Dep., 162:7-15].  According to DHS data, 210 children in FFY 2009 and another 191 children in FFY 2010 were maltreated by their birth parents while in DHS custody.  [Dkt. #561, Ex. 18-2 Row XI].

After this lawsuit was filed, Director Hendrick directed DHS to conduct an "administrative review" of all reports of maltreatment in care already substantiated by DHS's CPS staff.  The administrative review continues to date.  [Dkt. #602-22, Ex. 46, Margaret Devault Dep., 145:19-146:7; Dkt, #602-23, Ex. 47, Debra Knecht Dep., 13:5-15, 33:223-34:3; Dkt. #605-2, Ex. 102 (Dep. Ex. 605)].  The reviewers were allegedly instructed to reverse any substantiated findings of child maltreatment they believed were decided incorrectly, or where

there was insufficient information in the case file.  [Dkt. #602-22, Ex. 46, Devault Dep., 145:19-146:7; Dkt. #602-23, Ex. 47, Knecht Dep, 30:6-20].  Since DHS does not include unsubstantiated reports in this process, the review's results can only lower its abuse-in-care rate.  [Dkt. #602-22, Ex. 46, DeVault Dep., 121:18-122:10; Dkt. #602-23, Ex. 47, Knecht Dep., 30:6-20; Dkt. #602-25, Ex. 49, Gary Miller Dep., 231:25-233:14].  At least 61 substantiated findings of child maltreatment involving foster parents were reversed between 2008 and 2010.  [Dkt. #602-22, Ex. 46, DeValut Dep., 131:25-132:2; Dkt. #602-23, Ex. 47, Knecht Dep., 15:7-23].  Defendants' experts Dr. John Fluke and Andrew Barclay, as well as Margaret DeVault, the former Program Administrator of DHS's Prevention and Protection Unit, admitted that if DHS's goal is to determine the accuracy of its reported abuse in care, both substantiated *and* unsubstantiated findings must be reviewed.  [Dkt. #602-22, Ex. 46, DeVault Dep., 122:4-15; Dkt. #602-7, Ex. 32, John Fluke Dep., 215:25-216:23; Dkt. #601-9, Ex. 9, Andrew Barclay Dep., 93:12-22].

The question of whether the abuse in care rate is excessive (or whether it is even accurately tracked) is closely related to the common issue of whether defendants have failed to adequately monitor the safety of foster children.  Indeed, the agency's ability to accurately track instances of abuse inevitably impacts the efficacy of its monitoring efforts.  It is an issue that affects foster children on a class wide basis and for which a class wide remedy—i.e., improved investigatory techniques and reporting—is conceivable.  Moreover, the proposed remedy is both cohesive and sufficiently specific.  Therefore, the court finds this issue is appropriate for class certification.

### 2. Number and Array of Placements/Impermissibly Frequent Placement Moves

In its order granting plaintiffs' motion to certify, the court stated:

[T]he question whether DHS has a policy or practice of subjecting plaintiffs to
unreasonably frequent moves from placement to placement causing significant

harm and risk of harm to plaintiffs' health and well-being is not common to all children because many, perhaps the majority, of children in foster care are not subjected to frequent moves.

[Dkt. #272 at 9]. The court remains unpersuaded that the allegation of impermissibly frequent placement moves presents a common question of fact. Likewise, the alleged inadequacy of placement options lacks commonality. Moreover, these issues do not necessarily give rise to the legal question presented by inadequate monitoring—that is, whether the alleged policies or practices violate plaintiffs' right to be reasonably free from harm and imminent risk of harm while in state custody. It is fairly easy to "connect the dots" between situations in which child welfare workers have excessive caseloads, miss required visits with children, or fail to properly investigate suspected abuse or neglect with resulting harm or risk of harm to children. The relationship between frequent placement moves or limited placement options and the safety of children is more attenuated. While these two factors could lead to less than ideal placements, they do not necessarily put a child in harm's way. Therefore, the court finds these two issues do not present common questions of fact or law.

### 3. Excessive Stays in State Custody

Plaintiffs also urge the court to certify the class based on the question of whether defendants' policies and practices subject foster children to excessively long stays in state custody. However, this issue—like the issues of placement options and excessive placement moves—fails to meet the commonality requirement. Most children are not subjected to excessively long stays in state custody, and the connection between long stays and harm or risk of harm to children is much more attenuated than, for example, the connection between inadequate investigations into reports of abuse and resultant harm or risk of harm to children. Therefore, the court declines to expand class certification to this issue.

### III. Conclusion

For the foregoing reasons, defendants' Motion to Decertify the Class [Dkt. #558] is denied.  The class remains certified on the question of whether DHS has a policy or practice of failing to adequately monitor the safety of Plaintiff Children causing significant harm and risk of harm to their safety.  Additionally, the class is certified on the question of whether DHS is subjecting Plaintiff Children to an impermissible level and risk of abuse and neglect while in state custody.

ENTERED this 15th day of November, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma