**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**


| | | |
|---|---|---|
| D.G., by Next Friend G. Gail Strickland et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-074-GKF-FHM |
| | ) | |
| BRAD YARBROUGH, Chairman of the | ) | |
| Oklahoma Commission for Human Services, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |


**OPINION AND ORDER**


Before the court is the Motion for Summary Judgment [Dkt. #561] filed by the

defendants, members of the Oklahoma Commission for Human Services and the director of the

Oklahoma Department of Human Services ("DHS").   This class action was filed pursuant to 42

U.S.C. § 1983 on behalf of all foster children in the legal custody of DHS.  Plaintiff children

sued defendants in their official capacities, alleging policies and procedures adopted and

approved by defendants have subjected foster children to significant, ongoing harm and risk of

harm, deprivation of the chance for safe and stable childhoods and violation of their

constitutional and statutory rights.  Three Section 1983 claims remain in this lawsuit:[1]

> 1. Plaintiffs' first cause of action for violation of plaintiff children's substantive due
>    process rights under the Fourteenth Amendment to be free from harm and risk of
>    harm;

---

[1] In their Complaint, plaintiffs also asserted claims for violation of the Federal Adoption Assistance and Child
Welfare Act of 1980, 42 U.S.C. §§ 621 *et seq.,* and breach of federal contractual obligations to third party
beneficiaries.  [Dkt. #2].  The court granted defendants' motion to dismiss those claims.  [Dkt. #220].

2. Plaintiff's second cause of action for violation of plaintiff children's liberty and privacy rights guaranteed by the First, Ninth and Fourteenth Amendments; and

3. Plaintiffs' fourth cause of action for violation of plaintiff children's procedural due process rights under the Fifth and Fourteenth Amendments based on deprivation of state law entitlements.

On May 5, 2009, the court, pursuant to Fed.R.Civ.P. 23, certified the following class:

All children who are or will be in the legal custody of the Oklahoma Department of Human Services (1) due to a report or suspicion of abuse or neglect; or (2) who are or will be adjudicated deprived due to abuse or neglect.

[Dkt. #272 at 17]. The court, in certifying the class, found plaintiffs had satisfied the requisites for Rule 23(a) of numerosity, commonality, typicality and adequacy of representation. On November 15, 2011, the court denied defendants' Motion to Decertify the Class. [Dkt. #727].

Defendants seek summary judgment on all remaining claims.

## I.  Material Facts

The Oklahoma Commission for Human Services (the "Commission") has oversight responsibility for formulating the policies and adopting the rules and regulations for the administration of the Oklahoma Department of Human Services ("DHS") and for appointing the director of DHS. [Dkt. #2, Complaint, ¶32; Dkt. #227, Answer, ¶1.32; Okla. Const. art. 25, §§ 3, 4]. Each year, the governor appoints one of nine members of the Commission for a term of nine years. Okla. Const. art. 25, §§ 3, 4.

Defendant Brad Yarbrough is now Chairman of the Commission. [Dkt. #2, ¶32; Dkt. #227, ¶1.32]. Defendant Aneta Wilkinson is now Vice-Chairman of the Commission. [Dkt. #2, ¶32; Dkt. #227, ¶1.41]. Jay Dee Chase, Steven Dow, Linda English Weeks, Michael L. Peck and Anne M. Roberts are currently members of the Commission.[2] [Dkt. #2, ¶¶34-40; Dkt. #227,

---

[2] At the time the lawsuit was filed, Richard L. DeVaughn was Chairman and Ronald C. Mercer was Vice Chairman of the Commission, and Aneta Wilkinson, Jay Dee Chase, Patrice Dills

¶¶1.34-1.40].  Defendant Howard H. Hendrick is the Director of the Department of Human Services.  [Dkt. #2, ¶41; Dkt. #227, ¶1.41].

At the time this case was brought, more than 10,000 foster children in Oklahoma were in the legal custody of DHS.  [Dkt. #2, ¶1].  In their Complaint, plaintiffs alleged children who require placement in foster care are the most vulnerable members of Oklahoma society.  They are found in the four corners of the State; they come from cities, suburbs and rural areas.  [Dkt. #2, ¶2; Dkt. #227, ¶1.2].  They stated, "In all cases, these children find themselves in DHS custody as a result of desperate and extreme circumstances that threaten their ability to live normal childhoods, to grow and develop and, in many instances, to even survive."  [Dkt. #2, ¶3; Dkt. #227, ¶1.3].

Under the Oklahoma Children's Code, state district courts take jurisdiction over children who are or who are alleged to be abused or neglected.  10A O.S. § 1-4-101(A).  Courts participate in many decisions regarding abused or neglected children.  10A O.S. §§ 1-4-101(A)(2)(b), 1-4-201(A)(2); 1-4-202, 1-4-102(C), 1-4-205(C), 1-4-206, 1-4-601, 1-4-703, 1-4-706(A)(4), 1-4-706(B)(2)(a), 1-4-707, 1-4-709, 1-4-806, 1-4-811, 1-4-904.

The rules promulgated by the Commission are included in the Oklahoma Administrative Code ("OAC") 340: Chapter 75. Child Welfare.  The Child and Family Services Division ("CFSD") of the DHS provides professional advice to the DHS for the making of child welfare policy, supports child welfare workers in the field by providing professional advice regarding policy and implementation, provides Continuous Quality Improvement ("CGQI") for child welfare and manages the KIDS computer system. [Dkt. #561-19 Ex. 18-1, Decl. of Deborah G.

_____

Douglas, Michael L. Peck, Garoldine Webb and Rev. George E. Young were members of the Commission.

Smith, MSW, ¶2]. KIDS is one of only nine federally approved State Automated Child Welfare Systems ("SACWIS") in the nation. [*Id.*]. Professional Child Welfare staff of the CFSD consult, and have consulted, with the Commission's policy committee to ensure that newly promulgated rules are professionally sound. [*Id.,* ¶3]. The rules and "Instructions to Staff" for each such rule are available on line at http://www.okdhs.org/library/policy/oac340/075/. [*Id.*]. The rules on the website contain links to related statutes and the Instructions to Staff to assist workers seeking additional information about particular aspects of the rule. [*Id.*].

## A. Commission Oversight

The Commission usually meets monthly for two to three hours. [Dkt. #601-21, Ex. 21, Aneta Wilkinson Dep., 70:14-21; Dkt. #601-22, Ex. 22, Steven Dow Dep., 102:16-20; Dkt. #601-23, Ex. 23, Michael Peck Dep., 88:21-25]. Steven Dow, who was appointed to the Commission after this lawsuit was filed, testified that in his opinion, "the meetings are rather perfunctory and not very engaging with respect to the level of oversight that the Commission is providing." [Dkt. #601-22, Ex. 22. Dow Dep., 103:15-18].

Commissioners generally do not set the agenda, but consider only the information selected and provided by the Director and senior DHS managers. [Dkt. #601-24, Ex. 24, Hendrick Dep., 29:5-14; Dkt. #601-23, Ex. 23, Peck Dep., 187:15-188:7]. Commissioner Dow testified that in his tenure, the Commission has never been told anything negative about the performance of DHS's child welfare operations, or any shortcomings "that we as a Commission ought to know whether self-identified or identified by an outside body." [Dkt. #601-22, Ex. 22, Dow Dep., 70:21-71:7, 108:4-14]. Director Hendrick testified in recent history no other person has come in and talked to the Commissioners about any of the department's data or practices that was troubling to them. [Dkt. 601-24, Ex. 24, Hendrick Dep., 33:7-13]. Commissioner

DeVaughn could not remember whether there have been any reports to the Commission on rate of abuse in care, the number of placements per child, the number of permanency plans put in place by the department, the length of stay in custody of foster children, out-of-county placements, family separations, or the shortage of foster care homes available for children in the custody of the state.  [Dkt. #602-2, Ex. 27, DeVaughn Dep., 23:23-25:21].  He testified regarding missed caseworker visits, that "Most all information is presented in forms, but as to getting down to the specific items, I can't recall…specificity on those."  [*Id.,* 24:23-25:8].

Commissioner Michael Peck does not remember receiving any data on services such as independent-living services provided to children, caseworker visits to children, visits between children and their parents, visits between workers and children's parents, or worker caseloads. [Dkt. #601-23, Ex. 23, 106:15-107:13]. He does not think the Commission has ever been provided with any updates about DHS's performance on federal standards for foster children. [*Id.,* 132:19-21].  He does not remember asking for, or being given information about, abuse and neglect in care for calendar year 2011 to date, and does not know if it is trending up or down. [*Id.,* 145:25-146:8].  He does not recall the Commission receiving any data on caseworker visitation.  [*Id.,* 152:17-20].  He recalls no discussions about placement stability at Commission meetings.  [*Id.,* 159:11-14].  There has been no discussion about how DHS is doing on meeting its own policies with respect to visits between children and their parents and between workers and parents.  [*Id.,* 175:11-20].  He does not know whether there has recently been overcrowding and overcapacity at the DHS's two shelters.  [*Id.,* 199:25-200:8].

Commissioner Linda Weeks testified she was unaware that from 2005 to 2008, Oklahoma was among the bottom five states in the country on the federal government's measure of abuse in care.  [Dkt. #601-25, Ex. 25, Weeks Dep., 95:12-23].  She was unaware of how the

Oklahoma DHS performed in the data on abuse in care for 2009 or 2010.  [*Id.,* 96: 8-14].  She cannot recall any discussions about shelters other than the locations of the two shelters DHS has. [*Id.,* 115:18-23].

Commissioner Aneta Wilkinson testified that although she does not have any specific recollection of discussions about caseloads, she is sure there have been discussions, and the discussions would be reflected in minutes of the meetings.  [Dkt. #601-21, Ex. 21, Wilkinson Dep., 128:20-129:19].  Similarly, she did not recall discussion about placement and stability at the Commission meetings, but stated they would be reflected in the minutes of the meetings. [*Id.,* 145:14-20].

Commissioner George Young testified commissioners receive monthly reports used to measure the performance of children in the custody of DHS.  [Dkt. #602-1, Ex. 26, Young Dep., 27:16-25].  He did not think the reports included a rate of abuse in care.  [*Id.,* 28:22-29:1].

Commissioner Dow does not recall any discussion of child welfare worker caseloads at the Commissions meetings.  [Dkt. #601-22, Ex. 22, 176:2-5].  He has not asked for, nor been given, any information by DHS that would help him evaluate caseload levels, although he believes he could ask for the information.  [*Id.,* 176:22-177:6].  Dow recalls no discussion at Commission meetings about worker/parent or worker/child contacts or whether those policy expectations are being met.  [*Id.,* 194:7-14; 195:4-6].

In accordance with state law, DHS was accredited by the Council on Accreditation ("COA") from 1985 to 2002.  [10A O.S. § 1-9-105(A)(4); Dkt. #602-3, Ex. 28, Lettter from COA to Hendrick, COA-5-00012].  In September 2002, DHS chose not to renew its accreditation.  [Dkt. #602-3, Ex. 28, Letter from Hendrick to COA, COA-5-00010].  The Oklahoma DHS remains unaccredited to date.  [Dkt. #600, Plaintiffs' Statement of Additional

Material Fact ¶6].  Current commissioners were unaware of the Oklahoma statute requiring COA accreditation or DHS's violation of it, although the Commission at the time was.  [Dkt. #601-24, Ex. 24, Hendrick Dep., 128:12-129:2; Dkt. #602-2, Ex. 27, DeVaughn Dep., 77:24-78:3, 78:16-23, 83:4-19; Dkt. #601-22, Ex. 22, Dow Dep., 217:10-23; Dkt. #601-23, Ex. 23, Peck Dep., 203:23-204:15; Dkt. #601-25, Ex. 25, Weeks Dep., 128:25-129:2; Dkt. #601-21, Ex. 21, Wilkinson Dep., 213:23-214:6; 214:15-21, 215:1-6; Dkt. #602-1, Ex. 26, Young Dep., 55:15-24, 56:24-57:3, 57:14-15, 61:25-62:4, 62:16-17].

Finally, plaintiffs' expert John Goad opines that no fewer than 64 (18.6%) and as many as 157 (45.8%) of 343 DHS investigations into reports of maltreatment of foster children during 2009, the investigators' findings were flawed.  [Dkt. #610-2, Ex. 31, Goad Report, pp. 37-38]. Plaintiffs contend this is additional evidence of defendants' failure to exercise professional judgment.[3]

## B. Use of Objective Standards in Child Welfare

Plaintiffs' expert, John Goad, A.M., stated in his report:

CWLA and COA standards generally describe reasonable practice.  Who would suggest that it is reasonable for CPS investigations to be anything but thorough, that it is acceptable for foster parents to have violent criminal backgrounds, or that foster children should be seen any less often than once per month?  Child welfare caseloads that exceed the standards are not reasonable because they prevent caseworkers from effectively doing the work necessary to achieve safety, permanency and well-being for the children who depend on them.

Considering the importance of child welfare services to the children who receive them, it is not possible to reasonably conclude that child welfare agencies should be held to any lesser standard than those that have been established by the CWLA and the COA.  If airline pilots were held only to standards of mediocrity, no one would choose to fly.  The difference is that children have no choice about their involvement with the child welfare system.

---

[3] The issue of abuse in care rates is more fully discussed in § I(C) below.

[Dkt. #610-2, Ex.31, Report of John Goad, A.M., p. 4].  Defendants' expert John D. Fluke testified he believes information about whether an agency has complied with its own policies and standards, coupled with an examination of outcomes, is useful in determining whether the agency is doing its job.  [Dkt. #602-7, Ex. 32, John Flukes Dep., 205:10-15].

In March 2008, the federal government reported that DHS failed to meet all six CFSR national standards reviewed and also failed to meet all seven safety, permanency, and well-being outcomes.  [Dkt. #602-8, Ex. 33, Final Report, Oklahoma Child and Family Services Review, March 2008].

## C. Abuse in Care

The federal government tracks the rate at which children are abused or neglected while in state foster care (the "abuse-in-care rate").  The rate is calculated by taking the number of child victims of maltreatment perpetrated by foster parents and facility staff, and dividing it by the number of children served in foster care during the reporting year.  [Dkt. #602-12, Ex. 36,*Child Maltreatment 2009,* p. 24].

For every year from federal fiscal year ("FFY") 2002 through FFY 2010, DHS's abuse-in-care rate has been 1.54 to 3.97 times greater than the federal standard.  [Dkt. #600, Plaintiffs' Statement of Additional Material Facts, ¶12 and Ex. 37, NCANDS-DP-00001; Ex. 38, Dkt. #602-14 at 2; Ex. 39, Dkt. #602-15 at 2; Ex. 40, Dkt. #602-16 at 9; Ex. 5, Dkt. #602-5 at 3.] From FFY 2002 to FFY 2008, DHS's reported abuse-in-care rate was among the five highest reporting jurisdictions in the country.  [Id., ¶12 and Ex. 43 PLAINTIFFS 01220.1-01220.2; Ex. 44 Children's Bureau, *Child Maltreatment 2004,* 64; Ex. 36, *Child Maltreatment 2009,* 53].

Additionally, DHS does not report to the federal government any instances of maltreatment committed by facility staff members.  [Dkt. #600, Plaintiff's Statement of

Additional Material Facts, ¶13 and Ex. 24, Hendrick Dep. 70:13-24].  Defendants acknowledge

that at least 154 children in 2009 and 80 children in 2010 were maltreated by facility staff.  [*Id.,*

¶14 and Ex. 45 Lee Decl. ¶¶1-2].  If the 154 children had been included in DHS's reported

abuse-in-care data for 2009, DHS would have reported a total of 241 children abused by foster

parents and facility staff during that year, setting DHS's abuse-in-care rate at 1.58%--almost five

times the federal standard.  Likewise, if the other 80 children had been included in DHS's

reported abuse-in-care data for FFY 2010, DHS would have reported a total of 183 children

abused by foster parents and facility staff during that year, setting DHS's abuse-in-care rate at

1.41%--more than four times the federal standard.  [*Id.,* Ex. 37 NCANDS-DP-00001].

The number reported by DHS also does not include children abused by their birth parents

while in DHS custody.  [Dkt. #601-9, Andrew Barclay Dep., 161:15-162:3].   Defendants'

expert Andrew Barclay testified that such maltreatment should be considered to obtain a fuller

picture of abuse-in-care.  [*Id.*, 162:7-15].  According to DHS data, 210 children in FFY 2009 and

another 191 children in FFY 2010 were maltreated by their birth parents while in DHS custody.

[Dkt. #561, Ex. 18-2 Row XI].

### D. Worker Caseloads

DHS managers and Commissioners admit that manageable caseloads for child welfare

workers are important to ensure that children are kept safe from harm.  [Dkt. #601-22, Ex. 22,

Dow Dep., 175:16-176:1; Dkt. #602-25, Ex. 49, Gary Miller Dep., 229:19-230:6; Dkt. #603-2,

Ex. 52, Deborah Smith Dep., 144:16-145:3; Dkt. #603-3, Ex. 53, Joanie Webster Dep., 48:17-

49:18, 51:14-52:5, 52:19-53:13; Dkt. #601-25, Ex. 25, Weeks Dep., 39:5-40:3; Dkt. #601-3, Ex.

3, Amy White Dep., 184:14-24; Dkt. #603-4, Ex. 54, Marq Youngblood Dep., 224:15-23; Dkt.

#601-23, Ex. 23, Peck, 38:1-39:2].  Similarly, both plaintiffs' and defendants' experts

acknowledge the importance of reasonable caseloads in protecting foster children.  [Dkt. #603-5, Ex. 55, Affid. of Peg Hess, PhD, ACSW, ¶7(a); Dkt. #601-2, Ex. 2, Viola Miller, Ed.D. Report, 34, 37; Dkt. #603-6, Ex. 56, Larry Brown Dep., 85:15-86:16; Dkt. #720-1, Ex. 29, Robin Arnold-Williams Dep., 141:8-142:12].

Extensive child welfare research links high caseloads to poor decision making, increased turnover and worse outcomes for children.  [Dkt. #604-2, Ex. 77, U.S. General Accounting Office, Report to Congressional Requesters, *Child Welfare: HHS Could Play a Greater Role in Helping Child Welfare Agencies Recruit and Retain Staff,* pp. 3-4, 14, 19-21; Dkt. #604-3, Ex. 78, D. DePanfilis, H. Girvin, *Investigating child maltreatment in out-of-home care: Barriers to effective decision-making,* 27 Children & Youth Services Rev. 353-374 (2005), pp. 367-370; Dkt. #604-4, Ex. 79, D.J. English *et al., Factors That Influence the Decision Not to Substantiate a CPS Referral—Phase II:  Mail and Telephone Surveys of Child Protective Services Social Workers* (2002), p. 97; Dkt. #604-5, Ex. 80, Am. Public Human Services Ass'n, *Report From the 2004 Child Welfare Workforce Survey:  State Agency Findings* (2005), p. 46; Dkt. #604-6, Ex. 81, Social Work Policy Institute, *High Caseloads: How do they Impact Delivery of Health and Human Services?* (2010); Dkt. #604-7, Ex. 82, H. Lawson *et al., Retention Planning to Reduce Workforce Turnover in New York State's Public Child Welfare Systems* (2005), pp. 11, 41].

COA standards provide that permanency planning worker caseloads should not exceed 18 children or 8 children with special needs.  [Dkt. #600, Plaintiffs' Statement of Additional Material Facts, ¶25 and Dkt. #602-3, Ex. 28, PA-FC 19.06, PA-KC 16.06].  CWLA sets out similar standards.  [Dkt. #603-7, Ex. 57, CWLA Standards for Foster Care Services, § 3.48, KC § 4.20].

Every child in DHS custody is assigned a "primary" caseworker who is located in the county of juvenile court jurisdiction.  When a child is placed outside the county of court jurisdiction, the child is also assigned a "secondary" worker in the county of placement.  OAC §§ 340:75-1-29, 340:75-6-48.  DHS managers have testified that both primary and secondary workers have equal and important responsibilities and both must be taken into account when calculating workers' caseloads.  [Dkt. #603-8, Ex. 58, Johnson Dep., 85:3-20, 115:13-118:3; Dkt. #603-2, Ex. 52, D. Smith Dep., 145:4-23; Dkt. #601-3, Ex.3, White Dep. (5/12/11), 188:17-189:9].  As of May 2011, 41% of children in DHS custody were placed outside the county of court jurisdiction.  [Dkt. #603-10, Ex. 60, DHS Placement Summary, Y1617A-00380-81].

DHS's "YI743 report" as of March 2011 shows that more than 5,300 children in out-of-home care (68% of the total number of such children) had a primary caseworker whose caseload was greater than 20 children; more than 3,000 children had a primary worker whose caseload was greater than 25 children; and more than 1,200 children had a primary caseworker whose caseload was more than 30 children. [Dkt. #600, Plaintiffs' Statement of Additional Material Facts, ¶34 and Dkt. #603-15, Ex. 65, YI743 Report "built on December 7, 2010"].

Larry Johnson, Director of the DHS Field Operations Division ("FOD"), acknowledged that another report he uses to track average worker caseloads—referred to as the Combined Workload Report ("CWR")—omits some part of the caseloads from its calculation of average workloads, and thus understates the average number of children assigned to permanency planning workers for at least some counties.  [Dkt. #603-11, Ex. 61, Combined Workload Report; Dkt. #603-8, Ex. 58, Larry Johnson Dep., 75:13-20, 101:22-24, 108:7-20; 110:10-111:1, 112:24-113:22, 114:13-18].

Defendants' own expert, Robin Arnold-Williams, concluded that DHS does not accurately measure caseloads and that its caseloads exceed generally accepted levels.  [Dkt. #601-10, Ex. 10, Arnold-Williams Report, pp. 5-6].

Dr. Arnold-Williams testified issues with caseloads continue [Dkt. #720-1, Ex. 29, Arnold-Williams Dep., 144:18-19], that caseloads in Oklahoma have to be reduced [*Id.,* 145:21-145:2], that current reporting practices hamper effective caseload and workload monitoring [*Id.,* 150:15-151:3], and that in her opinion, "the best professional judgment would be to seek more staff and to...reduce [caseloads] down lower, which I have recommended in [my report].  [*Id.,* 216:16-217:19].  Defendants' expert Larry Brown opined that individual caseload or workload levels are, at this point, known only "at an individual unit level."  [Dkt. #603-6, Ex. 56, Larry Brown Dep., 85:6-10], that "there is no systematic way that the central office here—or in Oklahoma City can know that information," [*Id.,* 87:4-21], that Johnson "doesn't have the data that he needs to manage the system," that "[h]e's working to develop a report to give him that information," and "[t]hose are positive steps that demonstrate to me that there's reasonable exercise of some professional judgment that's being shown here."  [*Id.,* 103:13-104:1].  In her report, plaintiffs' expert Viola P. Miller opined that caseworkers were inadequately supervised and staff turnover is excessive.  [Dkt. #601-2, Ex. 2, Miller Report at pp. 45-50].

### E. Worker-Child Visitation

Federal law requires states to have a plan for child welfare services that describes the state standards for frequency of caseworker visits, which, at a minimum, ensures that children in foster care are visited by a caseworker on a monthly basis. 42 U.S.C. § 622(b)(17).  DHS policy also requires visits with each foster child a minimum of one time per month, with no less than two visits per quarter in the foster placement.  Ex. 168, Okla. Admin. Code ("OAC") 340:75-6-

48. Each child is to be interviewed, or if an infant observed, alone without the foster parent present at least one time per quarter.  *Id.*

DHS Commissioners and managers, and experts on both sides, admit worker-child visitation is important, that it is important for the same worker to visit the child each month and that the visit should include one-on-one interactions with the child as well as observation of the child's interactions with others.  [Dkt. #601-24, Ex. #24, Howard Hendrick Depo., 173:8-176:1; Dkt. #603-8, Ex. #58, Larry Johnson Depo., 59:11-60:10; Dkt. #601-23, Ex. #23, Michael Peck Depo., 37:4-25, 151:20-152:11; Dkt. #601-25, Ex. #25, Linda Weeks Depo., 35:7-36:25; Dkt. #601-21, Ex. 21, Aneta Wilkinson Depo., 15:17-16:5; Dkt. #603-4, Ex. #54, Marq Youngblood Depo., 213:9-24; Dkt. #720-1, Ex. 29, Robin Arnold-Williams Depo., 195:25-196:14; Dkt. #601-1, Foster Care Case Review of the OKDHS by Center for the Support of Families (CSF), Inc., p.70].  Additionally, the federal government has found an association between caseworker visits (with children and parents) and positive outcomes for children.  [Dkt. #606-4, Ex. 129, Results of the 2007 and 2008 Child and Family Services Reviews at 22-24; Dkt. #606-5, Ex. 130, "52 Program Improvement Plans—Strategies for Improving Child Welfare Services and Outcomes," at 36-38; Dkt. #606-6, Ex. 131, GAO Child Welfare report, at 24-25, 38.

Plaintiffs contend in *practice,* however, the requisite visits are not occurring.  Larry Johnson, Director of the DHS Field Operations Division ("FOD"), stated in his declaration that the FOD is responsible for accurate and timely delivery of services to eligible clients of the CFSD, the Family Support Services Division and the AIDS Coordination Information Service. [Dkt. #558, Ex. 8, Decl. of Larry Johnson, ¶2].  Approximately 1,000 of 3,700 FOD staff are child welfare workers.  [*Id.*].  DHS keeps track of the number of visits or "contacts" of its workers with foster children.  A copy of the report is attached to his declaration and referred to

as Ex. 15-1, Contacts Report June 2011, run July 10, 2011.  [*Id.*, ¶3]. Johnson states that between 90% and 96% of children living in their own homes while in foster care jurisdiction received the required visits; between 96% and 98.6% of children in therapeutic foster care ("TCF") placements received the required visits.  Of the 20 or fewer children in unpaid relative placements each month, between 90% and 100% received the required visits each month. Johnson states that data regularly kept by DHS indicated that, since July 2000, DHS workers have made monthly visits to children in foster care due a visit over 90% of the time.  Since January 2007, data shows DHS workers have made more than 95% of monthly visits in all but two months.  In those months, 94.2% and 94.9% of visits were made.  [*Id.*, ¶3].

However, the report, "Caseworker Visits: Visited Every Month (Required Federal Reporting)," shows that 3,707 children—32% of all children in out-of-home care for at least one month as of December 2010—missed at least one monthly visit due that year (as contrasted with the federal standard of only 10%).  [Dkt. #600, Plaintiff's Statement of Additional Material Facts ¶64; Dkt. #606-7, Ex. 132].  Defendants' expert, Robin Arnold-Williams, recommends in her report that DHS should "[c]ontinue progress meeting federal expectations in the area of monthly visitation between case workers and children." [Dkt. #601-10, Ex. 10, A Review of Management of OKDHS's Child Welfare System, Robin Arnold-Williams, D.S.W. at 7, 58].

### F. Number and Array of Placement Resources

According to DHS policy, recruiting an adequate number of resource families for children in DHS custody "is a crucial component for providing safe home environments for children requiring out-of-home placement" and ensures that children live near their birth families; placements meet children's unique needs; and sibling groups remain together.  O.A.C. § 340:75-7-10].

DHS reports from 2005 to 2009 show that the ratio of foster homes to children ranged from 0.28 to 0.32.  In 2009, there were 2,978 approved homes and 9,887 children, a ratio of 0.30.  [Dkt. #601-6, Ex. 6, Oklahoma Foster Care Data Summary 2009, BR-Grant-00070].  Commissioner Weeks testified there is a shortage of foster homes in Oklahoma.  [Dkt. #61-25, Ex. 25, Weeks Dep., 73:2-74:8].  Commissioner Dow testified there are concerns about whether DHS has an adequate number of foster care homes.  [Dkt. #601-22, Ex. 22, 204:24-206:4, 207:12-19].

Director Hendrick testified there is a shortage of foster homes due to a high number of adoptions by foster parents since June of 2008, which has reduced the number of foster homes available.  [Dkt. #601-24, Ex. 24, Hendrick Dep., 191:2-193:6].  Annette Burleigh, a program manager with DHS, testified that DHS does not have enough therapeutic foster homes for children in its custody.  [Dkt. #604-8, Ex.83, Annette Burleigh Dep., 82:13-83:4].  Deborah Goodman testified the number of adoptive homes is inadequate for the number of foster children with a goal of adoption.  [Dkt. #604-9, Ex. 84, Goodman Dep., 249:13-251:16].  Deborah Smith testified there was a concern about overuse of shelters, and DHS needs more foster homes.  [Dkt. #603-2, Ex. 52, D. Smith Dep., 52:24-53:5].  DHS programs administrator Joannie Webster testified DHS does not have an adequate number of emergency foster care homes available [Dkt. #604-10, Ex. 85, Joannie Webster Dep., 199:1-6, 212:25-213] and there is a shortage of foster homes, although the type of shortages vary from county to county. [*Id.,* 212:23-213:10].

DHS grant documents, evaluations by and for the federal government, and analysis by third parties recognize the long-standing issue of lack of adequate placement resources.  [Doc. #604-12, Ex. 87, Diligent Recruitment of Families for Children in the Foster Care System, May 29, 2008 grant application, #68&69-BR-Grant-1-00039; Dkt. #604-17, Ex. 92, Family

Connection Discretionary Grants, OKB-Prog Nar-7.1.09-00018; Dkt. #601-6, Ex. 6, BR-Grant-00173, 00291, 00829; Dkt. #604-13, Ex. 88, DRG-BTF-Eval-10.09 to 3.10-00001; Dkt. #604-14, Ex. 89, H_Hendrick-Docs-2008-00271; Dkt. #604-15, Ex. 90, PIP Strategy Summary and TA Plan, PLAINTIFFS 07519, 07521; Dkt. #602-17, Ex. 41, Child and Family Services Review Program Improvement Plan, CFSR-PIP-2008-Rev 10.12.09-00023, 00025; Dkt. #602-18, Ex. 42, HC Franklin OKPIP Reminders and Talking Points, pp. 5, 7; Dkt. #601-14, Ex. 14, Performance Audit by Hornby Zeller Associates, Inc., p. 13].

DHS often maintains waiting lists for group homes [Dkt. #604-10, Ex. 85, Webster Dep., 163:6-164:2, Dkt. #604-20, Ex. 95, Monthly Waiting List Repts., pp. 8, 9, 35, 50, 65, 74, 89] and emergency foster care homes. [Dkt. #604-10, Ex. 85, Webster Dep., 198:3-199:6; Dkt. #604-17, Ex. 92, Family Connection Discretionary Grants, OKB-Prog Nar-7.1.09-00006].  Although DHS does not maintain a centralized waiting list for therapeutic foster homes, the responsible DHS manager acknowledged that "as long as I've been in the position I don't believe we've had enough therapeutic foster homes."  [Dkt. #604-8, Ex. 83, Burleigh Dep., 82:6-83:4].

DHS has acknowledged placement availability "as a major issue in stability of placements and appropriate placements for children in out-of-home care.  Generally placements are made based on available space rather than the individual needs of the child, skills of the foster parents or both."  [Dkt. #604-17, Ex. 92, OKB-Prog Nar-7.1.09-00018].  Due to the large number of children entering emergency custody in Oklahoma's two metropolitan counties, DHS is not always able to meet its goal of placing children under six years of age in emergency foster care within 24 hours of shelter admission. [*Id.,* OKB-Prog Nar-7.1.09-00006].  In addition, there are times when children have to stay in emergency foster care in excess of the intended limit of

30 days because of a shortage of regular foster homes.  [Dkt. #604-10, Ex. 85, Webster Dep., 188:18-189:1].

Plaintiffs' expert Peg M. Hess has opined that DHS has an "extreme placement shortage, including both an insufficient number and range of placements for children in custody," which has led to "dangerous and inappropriate placements."  [Dkt. #610-1, Ex. 19, Hess Report, 111; Dkt. #610-3, Ex. 103, Hess Supp. Report, 80].

### G. Use of Shelters

Senior DHS managers and Commissioners admit that overall shelter use and length of shelter stays should be minimized because it is not in the child's interest to remain in a shelter, shelters cannot meet all of children's needs and children are better off in family-like settings. [Dkt. #602-25, Ex. 49, Miller Dep., 95:14-97:11, 101:23-102:6; Dkt. #601-23, Ex. 23, Peck Dep., 190:4-8; Dkt. #603-2, Ex. 52, D. Smith Dep., 67:18-24; Dkt. #605-4, Ex. 104, Nancy Thompson Dep., 122:9-19; Dkt. #604-1, Ex. 85, Webster Dep., 197:10-12; Dkt. #601-25, Ex. 25, Weeks Dep., 114:20-23; 115:8-17; Dkt. #601-21, Ex. 21, Wilkinson Dep., 156:4-157:5; Dkt. #601-22, Ex. 22, Dow Dep., 197:17-198:4].  Defendants' expert Dr. Arnold-Williams recommends that DHS reduce its use of shelters.  [Dkt. #601-10, Ex. 10, p. 57].  According to plaintiffs' expert Dr. Miller, the overuse of emergency placements, including shelters, by DHS is harmful to children.  Specifically, "widespread use of temporary placements harms children by jeopardizing their ability to form the emotional attachments that are crucial for their development." [Ex. 2, Miller Rep., p. 65].

According to DHS reports, the number of children placed in the two DHS-operated shelters has declined from 5,230 in 2006 to 3,167 in 2010.  [Dkt. #605-13, Ex. 113, Shelter Pop-Aggregate Nos-00005].  However, the average daily shelter population has recently trended

upward, from 53 in May 2010 to 104 in May 2011.  [*Id.,* Shelter Pop-Aggregate Nos-00008].

According to DHS reports, in 2010, 24% (3,009 of 12,429) of the children in DHS custody were

placed in a shelter.  [Dkt. #605-11, Ex. 111, YI613-00181; Dkt. #603-1, Ex. 51, YI624-11267].

In 2010, 635 shelter placements lasted longer than 30 days.  [Dkt. #603-1, Ex. 51, YI624-11266].

### H. Placement Stability

A stated objective in Oklahoma law is to "promote stability for foster children and limit

repeated movement of such foster children from one foster placement to another."  10A O.S. § 1-

4-805(C).  Senior DHS managers, Commissioners and DHS documents acknowledge that

frequent placement moves and disruptions interrupt schooling, impair the ability of children to

form attachments, and lead them to lack trust in adults [Dkt. #604-1, Ex. 76, Debra Clour Dep.,

115:9-24; Dkt. #603-3, Ex. 53, Webster Dep., 38:18-39:12; Dkt. #605-14, Ex.114, Patricia

Howell Dep., 122:4-14; Dkt. #602-25 Ex.49, Miller Dep., 145:15-24; Dkt. #603-2, Ex. 52, D.

Smith Dep., 139:11-21; Dkt. #601-24, Ex. 24, Hendrick Dep., 163:17-164:7; Dkt. #601-21, Ex.

21, Wilkinson Dep., 144:8-145:13; Dkt. #601-22, Ex. 22, Dow Dep., 183:17-184:25; Dkt. #601-

23, Peck Dep., 122:6-9].  Defendants' expert Dr. Katherine Casillas admitted that multiple

placements can contribute to, and exacerbate, children's pathologies.  [Dkt. #605-5, Ex. 105,

Katherine Casillas Dep., 54:15-55:4; 79:12-17].  Plaintiffs' expert Dr. Hess opines that "[w]hen

placement changes are numerous and frequent, such as those experienced by all seven plaintiff

children, they create an intolerable level of caregiver discontinuity, accompanied by chronic

grief, development regression, and other developmental and emotional problems.  [Dkt. #610-3,

Ex. 103, Hess Report, p. 88].

According to data reported to the federal government, in FFY 2008 and 2009, Oklahoma

ranked 45th out of 51 jurisdictions nationwide on the Placement Stability measure.  [Dkt. #605-

24, Ex. 124, OK-08-08b09a-DP2.23.10-00012; Dkt. #605-25, Ex. 125, PLAINTIFFS 06949].

According to DHS reports, 26% of children who had been in out-of-home care for less than 12

months had three or more placements in FFY 2009; in FFY 2010, that number rose to 28%

(approximately double the federal benchmark of 13%). [Dkt. #606-1, Ex. 126, CFSR-PO-P1.2-

00027, 43].  According to DHS reports, the number of children in DHS custody who had more

than 20 placements was 150 as of March 2010, and increased to 164 as of March 2011.  [Dkt.

#606-2, Ex. 127].

        DHS managers and commissioners have expressed concern about DHS's performance

regarding placement stability.  [Dkt. #601-22, Ex. 22, Dow Dep., 186:6-188:6; 190:1-13; Dkt.

#602-25, Ex. 49, G. Miller Dep., 147:25-148:10; Dkt. #603-2, Ex. 52, D. Smith Dep., 140:19-

141:11; Dkt. #601-23, Ex. 23, Peck Dep., 163:17-164:7; Dkt. #604-14, Ex. 89, H_Hendrick-

Docs-2008-00272].

### I. Maintenance of Family Connections

        According to DHS policy, "[t]he child and parent(s) have a right to regular visitation"

with each other more than once a month.  "Visitation is the single most predictive factor in

whether a child is successfully reunified."  O.A.C. § 340:75-6-30.

        DHS managers recognize it is important to have frequent, consistent and substantive

parent-child interactions.  [Dkt. #602-25, Ex. 49, G. Miller Dep., 154:1-156:1; Dkt. #601-3, Ex.

3, White Dep., 269:16-270:24].  DHS representatives stated at a 2009 conference addressing

placement stability that parent-child visits lessen children's anxiety, depression and behavior

problems.  [Dkt. #605-15, Ex. 115,CFSR-PIP-2009TO2011-QR-00053, 106].

        According to DHS reports, from 2008 to 2010, between 85% to 88% of parent-child

visits were not completed.  [Dkt. #607-17, Ex.167, YI624-05991; Dkt. #607-14, Ex. 164, YI624-

00008; Dkt. #603-1, Ex. 51, YI624-11271].   DHS's federally submitted Program Improvement

Plan listed "[i]nadequate parent/child visitation," "[l]ack of quality visitation which promotes

parent/child/sibling bonds," and "[i]nadequate child and family engagement" as "[k]ey [i]ssues."

[Dkt. #602-17, Ex. 41, CFSR-PIP-2008-Rev. 10.12.09-00022-23].

     Additionally, under federal statute, Oklahoma law and DHS policy, siblings in foster care

are to be placed together unless doing so would be contrary to their well-being.  If siblings are

placed separately, they must have frequent visitation or other interactions.  42 U.S.C. §

671(a)(31)(A)-(B); 10A O.S. § 1-7-107; O.A.C. §§ 340:75-6-30, 340:75-6-85.3.  DHS field

liaisons have emphasized that sibling contact improves outcomes for children, increases

placement stability, increases the likelihood of reunification and is important to well-being.

[Dkt. #606-15, Ex. 140, CWFL-MN-11.14.07-00016-17].  Plaintiffs' and defendants' experts

agree that sibling separation can contribute to children's pathologies.  [Dkt. #605-5, Ex. 105,

Casillas Dep., 66:12-67:8; Dkt. #605-22, Ex. 122, Eugene Reynolds, Ph.D., Report, p. 10].

     According to an internal DHS report, as of December 2010, 2,726 children were not in

the same placement as all of their siblings.  [Dkt. #606-19, Ex. 144, YI684-Q#360-02987-

03152].  Plaintiff's expert Dr. Milner found that 72% of eligible children in his sample did not

have all required visits with their siblings in separate placements during the 12 months prior to

June 1, 2010, and 22% of eligible children had no visits with siblings in any of the 12 months.

[Dkt. #601-1, Ex. 1, CFS Report, p. 79].

### J. Permanence

     DHS managers and commissioners acknowledge that it is DHS's responsibility that

children in custody exit quickly and safely to a permanent home, either through reunification

with their birth family or through adoption.  [Dkt. #601-24, Ex. 24, Hendrick Dep., 210:9-16;

Dkt. #602-25, Ex. 49, G. Miller Dep., 194:16-195:3; Dkt. #601-23, Ex. 23, Peck Dep., 81:18-21;

Dkt. #603-2, Ex. 52, D. Smith Dep., 125:20-126:4; Dkt. #601-25, Ex. 25, Weeks Dep., 123:14-

18; Dkt. #601-21, Ex. 21, Wilkinson Dep., 14:17-20, 30:1-9, 169:24-170:5; Dkt. #603-17, Ex.

67, William Wilson Dep., 41:19-22; Dkt. #603-4, Ex. 54, Youngblood Dep., 24:6-25:17, 215:25-

216:4].

Plaintiffs' and defendants' experts recognize the importance of achieving permanence

quickly and safely because, *inter alia,* lengthy stays in custody negatively impact children's

development and well-being, and also make it less likely that the children will ever be placed in a

permanent home.  [Dkt. #720-1, Ex. 29, Arnold-Williams Dep., 200:14-18; Dkt. #601-1, Ex. 1,

CFS Report, pp. 57-58; Dkt. #601-2, Ex. 2, Miller Report, pp. 58-63].

From FFY 2007 to 2010, the average length of time to permanent exit from foster care

steadily increased from 20.4 months to 25.9 months.  [Dkt. #607-5, Ex. 155].  Nationwide, the

average length of stay for children exiting foster care was 21.7 months in FFY 2010.  [Dkt. #607-

6, Ex. 156, AFCARS Report, p. 4].  According to DHS reports, of those children who achieved

permanence in 2010, it took longer than three years for 34% of them (620 of 1,844 children) to

do so.  [Dkt. #603-1, Ex. 51, YI624-11270].  Nationally, in FFY 2010, only 17% of children

exiting foster care had been in foster care for more than three years.  [Dkt. #607-6, Ex. 156,

AFCARS Report, p. 4].

In state fiscal year 2010, only 8.2% of children with a goal of adoption were in trial

adoptive homes.  [Dkt. #607-19, Ex. 169].  According to plaintiffs' expert, Dr. Milner, in his

sample of 128 children who were free for adoption, 41% did not become free for adoption for

two years or more.  Of the 244 children in his sample who were not free for adoption as of June

1, 2010, 31% had been in custody for longer than two years and 23% had been in custody for

longer than three years.  Dr. Milner also found that many required adoption activities (e.g., identifying an adoptive family, placement in a pre-adoptive home, referral to an adoption worker) had not taken place for children with a goal of adoption.  [Dkt. #601-1, Ex. 1, CSF Report, pp. 65-67].

## K. DHS's Practice Model

The DHS has developed a Child Welfare Practice Model Guide ("Practice Model").  The Practice Model is "based on a study of best child welfare practices from across the nation, and was developed through a process of consultation with many professionals at the OKDHS, including policy specialists as well as line staff."  [Dkt. #561-19, Ex. 18, Declaration of Deborah G. Smith, MSW, ¶10].  The Practice Model focuses on the safety of children from receipt of a referral call alleging abuse or neglect of a child through permanency. [*Id.*].

Plaintiffs criticize the Practice Model, arguing that it focuses almost entirely on how to assess the risk and safety of children who are not in custody and does not address many of the children face while in DHS custody, including placement moves, shelter stays, placement resources, time in custody and independent living services.  [Dkt. #600 at 37].  Further, they contend the Practice Model does not adequately address safety issues.  [*Id.*].  Defendants' consultant/expert Dr. Sue Steib identified numerous areas needing attention.  [Dkt. #604-3, Ex. 98, Sue Steib Dep., 75:7-24, 77:1-82:1; Dkt. #607-11, Ex. 161, Field Notes, pp. 1-5].  Steib testified  that she was not aware of efforts yet taken to remedy all but one of these problems and that many, if not all, of these issues put children at risk.  [Dkt. #604-3, Ex. 98, 77:1-82:1).

## L. Compliance With Statutory Requirements for Reporting

Under 10A O.S. §1-4-704(2010) (the successor statute to 10 O.S. § 7003-5.3 (2007)), DHS is required to prepare and maintain a written individualized service plan for any child who

has been adjudicated to be a deprived child.  DHS records show that for 2010, 94.2% of all such plans were delinquent as of January 5, 2011.  [Dkt. #603-1, Ex. 51 at YI624-11267].

Under 10A §§ 1-4-810 and 811 (2010) (successor statutes to 10 O.S. § 7003-5.6(2007)), DHS is required, prior to permanency hearings for children who have been in out-of-home care for 12 months or longer, to prepare a report that includes a proposed permanency plan. Subsequent permanency hearings are to be held at least every six months for any child who continues to be in an out-of-home placement.  According to DHS reports, however, in 2010, it had taken 37 months or more to complete permanency plans for 1,673 children.  [Dkt. #607-15, Ex. 165, OKHS Outcome Indicator Report, Permanency—Length of Time of Achieve Plan].

In interrogatory responses, plaintiffs identified 131 children who they allege did not receive adequate procedural due process under 10A O.S. §1-4-704(2010) and 10A O.S. §§ 1-4-810 and 811 (2010) "because by June 10, 2010, each child had three or more consecutive permanency goals during their time in DHS custody and a meaningful permanency report is not possible with constantly changing permanency goals."  [Dkt. #561-13, Ex. 12 at 10].

Under 10A O.S. § 1-40-902(2010) (the successor statute of 10 O.S. § 7006-1.6 (2007)), the district attorney is required to file a petition or motion for termination of the parent-child relationship and parental rights under certain enumerated circumstances, including before the end of the fifteenth month when a child has been placed in foster care by DHS for 15 of the most recent 22 months.  The district attorney is not required to file such a petition where the department has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the best interests of the child, or where the state has not provided to the family of the child, consistent with the time period in the state case plan, services that the state deems necessary for the safe return of the child to the child's home.  *Id.*

In interrogatory responses, plaintiffs identified 64 children they have been deprived of their entitlements under 10A O.S. § 1-40-902(2010) because each was not timely placed on a list for termination of parental rights ("TPR List) in a timely manner.  [Dkt. #561-13, Ex. 12 at 33-36].  Additionally, plaintiffs cite a DHS report showing that termination of parental rights petitions were not filed for 79% of children in custody for 15 of the prior 22 months [Dkt. #607-23, Ex. 173] and a DHS report showing that as of December 2010, the average length of time before foster children's parental rights were terminated was 18-20 months.  [Dkt. #607-24, Ex. 174.

Under 10 O.S. § 1-7-103(1)(e)(2010) (the successor statute to 10 O.S. § 7004-1.1 (2007)), DHS is  required to provide educational instruction to children through enrollment in a public school or an alternative program consistent with the needs and abilities of the child.  Plaintiffs have identified 41 children they allege did not receive their constitutionally protected interests in adequate educational services.  [Dkt. #561-13, Ex. 12 at 105-106].  In addition, plaintiffs point to the expert report of Dr. Milner, who concluded based a review of a sampling of children that 90.7% of the individualized service plan materials contained no educational stability plan and 56.2% of school-aged children had a school change at initial placement unrelated to graduating from one level to another.  [Dkt. #601-1, Ex. 1, Foster Care Case Review of the ODHS by Center for the Support of Families (CSF), Inc., p. 74].

## II.  Standard of Review

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Kendall v. Watkins,* 998 F.2d 848, 850 (10th Cir. 1993).  "The plain language of

Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material fact. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (citations omitted).  In its review, the court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker,* 164 F.3d 1249, 1251 (10th Cir. 1998).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.  In essence, the inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.  Analysis

### A.  Substantive Due Process Rights Violations (First Cause of Action)

Children in the custody of the state have a Fourteenth Amendment substantive due process right to be reasonably safe from harm.  *Yvonne L. v. New Mexico Dep't. of Human Services,* 959 F.2d 883, 892-93 (10th Cir. 1992).  Officials may be held liable for a violation of this right when it is shown that they have failed to exercise professional judgment. *Id.* at 893-94. The Tenth Circuit has stated:

> "Failure to exercise professional judgment" does not mean mere negligence…
> while it does not require actual knowledge the children will be harmed, it

implies abdication of the duty to act professionally in making the placements.

*Id.* at 894. "Such abdication must be sufficient to shock the conscience." *Johnson v. Holmes,* 455 F.3d 1133, 1143 (10th Cir. 2006).

In order to establish standing to pursue their claims, plaintiff must show (1) they have suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by the relief sought. *Tandy v. City of Wichita,* 380 F.3d 1277, 1283 (10th Cir. 2004). Where— as here—plaintiffs seek prospective relief, plaintiffs "must be suffering a continuing injury or be under a real and immediate threat of being injured in the future." *Id.* At the summary judgment stage, the elements of standing must be set forth, through specific facts, by affidavit or other evidence. *Id.*

Plaintiffs have presented evidence that from 2002 through 2008, the reported rate of abuse or neglect of Oklahoma foster children has been 1.54 to 3.97 times greater than the federal standard. Oklahoma had one of the five highest reported rates in the country from 2002 through 2008. Further, Oklahoma's reported numbers do not include instances of abuse or neglect in state foster care facilities, which would have substantially boosted the reported rate, or of abuse of children by their birth parents while the children were in the legal custody of the state. The court finds this evidence creates a genuine dispute of material fact about whether foster children in Oklahoma are being harmed or put at imminent risk of harm.

Plaintiffs have also presented evidence of serious issues with inadequacy of placement options, overuse of shelters, and lack of placement stability in the foster care system. The summary judgment evidence shows an overall shortage of foster homes, and shortages of

therapeutic and emergency foster homes; a shortage of group homes; and a shortage of adoptive homes.  Plaintiff's expert opined that the shortage has led to dangerous and inappropriate placements.  Further, the evidence shows that while the number of children placed in the two DHS shelters declined from 2006 to 2010, the average daily population has trended upward from May 2010 to May 2011.  Children under the age of six are being placed in shelters for more than 24 hours.  At times, children are being kept in shelters longer than 30 days.  Plaintiffs' expert opines that the overuse by DHS of emergency placements such as shelters is harmful to children because it jeopardizes their ability to form emotional attachments that are crucial for their development.  Finally, plaintiffs have presented evidence that Oklahoma ranks 45th out of 51 jurisdictions nationwide in the area of placement stability, that 26% of children who had been in out-of-home care for less than 12 months had three or more placements in FFY 2009 and that number increased to 28% in 2010.  The number of foster children who had more than 20 placements was 150 in March 2010 and increased to 164 as of March 2011.  Plaintiff's expert opined that excessive placement changes cause chronic grief, development regression and other developmental and emotional problems.[4]

Defendants assert there is no causal link between defendants' policies, practices or procedures and harm or risk of harm to children.  However, plaintiffs' and defendants' experts, as well as defendants and senior DHS managers, all agree that excessive caseloads, missed visits between case workers and children, and  inadequate investigations of abuse and neglect pose a threat to the safety of foster children, and that inadequate placement options, excessive use of shelters and frequent placement moves threaten the psychological and emotional health of

---

[4] Plaintiffs, in presenting evidence that inadequate placement options, use of shelters and frequent placement moves result in psychological harm or risk of psychological harm to children, assume that the "harm" or "risk of harm" standard set out in *Yvonne* apply not only to physical harm, but psychological harm as well.  Defendants do not challenge this assumption.

children.  Further, plaintiffs have presented evidence—albeit disputed—that defendants'
oversight of the DHS foster care program is so inadequate as to give rise to a question of material
fact whether defendants have abdicated their professional judgment.

The court concludes plaintiffs have presented proof sufficient to create a genuine dispute
of material fact about whether defendants' policies, practices and procedures violate plaintiffs'
substantive due process right to be reasonably safe from harm.

Therefore, defendants' motion for summary judgment on plaintiffs' first cause of action
for violation of substantive due process rights is denied.

## B.  Right of Familial Association (Second Cause of Action)

Plaintiffs contend defendants' policies, practices and procedures interfere with their First,
Ninth and Fourteenth Amendment liberty and privacy rights.  Plaintiffs assert that while DHS
policy requires visits between parents and children and placement of siblings together whenever
possible, DHS's own records from 2008 to 2010 reflect that less than 15% of visits due between
foster children and their biological parents were completed, and DHS has a routine practice of
separating siblings in custody.

Courts recognize that certain personal relationships must be afforded a "substantial
measure of sanctuary from unjustified interference by the State."  *Roberts v. U.S. Jaycees,* 468
U.S. 609, 618 (1984).  However:

> Not every statement or act that *results* in an interference with the rights of
> intimate association is actionable.  Rather, to rise to the level of a constitutional
> claim, the defendant must *direct* his or her statements or conduct at the intimate
> relationship with knowledge that the statements or conduct will adversely affect that
> relationship.

*Griffin v. Strong,* 983 F.2d 1544, 1548 (10th Cir. 1993).

The evidence presented at summary judgment does not establish the requisite conduct or state of mind described in *Griffin*. Conceivably, individual plaintiffs could show specific DHS *workers* failed to ensure that children met with their parents or other family members, and thus, the workers' conduct was "directed at the intimate relationship with knowledge the conduct would adversely affect the relationship."[5] However, the same cannot be said about these defendants. They are responsible for setting policy and for oversight of DHS operations and activity, but they do not deal with foster children directly. At most, the evidence might support a conclusion that defendants failed to adequately supervise workers who were charged with the responsibility of ensuring parent-child visitation occurred. However, plaintiffs have failed to present evidence of conduct by any of *these* defendants *directed* at any plaintiff with *knowledge* that his or her conduct would adversely affect that plaintiff's familial relations.

Plaintiffs' claim is also subject to summary judgment because—while individual children can establish acts by DHS workers that have violated their right of familial association—a class-wide deprivation cannot be proven. Under *Griffin,* an actual infringement of the right is required to establish a claim for violation of the right of familial association. *Id.* at 1549. In contrast, under *Yvonne,* a claim for violation of a foster child's substantive right of due process arises when the child is either harmed *or* placed at "risk of harm." *Yvonne L.,* 959 F.2d at 892-93.[6] Plaintiffs have cited no authority for the proposition that a violation of the right of familial

---

[5] In *Griffin,* for example, the wife of a man who was the subject of a child abuse investigation sued a police officer who participated in the investigation for interfering with the couple's familial relationship. 983 F.2d at 1545.

[6] The Tenth Circuit, in the appeal of the district court's grant of class certification of this case, noted, "In theory, 100% of foster children could live under an imminent threat of serious harm." *DG,* 594 F.3d at 1198.

association occurs when a child is put "at risk" of a deprivation; rather, an actual deprivation must have occurred.

For these reasons, defendants are entitled to summary judgment on plaintiffs' Second Cause of Action.

### C.  Procedural Due Process Violations (Fourth Cause of Action)

Plaintiffs contend defendants' policies and practices systematically deprive or threaten to deprive them of state entitlements without procedural safeguards.  *See Ky. Dept of Corr. v. Thompson,* 490 U.S. 454, 462 (1989); *Tri-State Contractors, Inc. v. Fagnant,* 393 F. App'x 580, 584 (10th Cir. 2010).

Plaintiffs recite violations of Oklahoma statutes pertaining to procedural rights of foster children, including the right to individualized treatment and service plans under 10A O.S. § 1-4-704 (2010) (successor statute to 10 O.S. § 7003-5.3 (2007)); the entitlement to drafts of semi-annual, meaningful reports pursuant to 10A O.S. §§ 1-40-810 and 811 (2010) (successor statutes to 10 O.S. § 7003-5.6 (2007)); the entitlement to being identified on a list to the district attorney when they have been in custody for 15 of the prior 22 months, pursuant to 10 O.S. §§ 1-4-902 (2010) (successor statute to 10 O.S. § 7006-1.6 (2007)); and the entitlement to suitable educational instruction pursuant to 10A O.S. §1-7-103 (2010) (successor statute to 10 O.S. § 7004-1.1 (2007)).

The Supreme Court has stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it.
>
> *     *     *
>
> Property interests, of course, are not created by the Constitution.  Rather, they are

> created and their dimensions are defined by existing rules or understandings that
> stem from an independent source such as state law-rules or understandings that
> secure certain benefits and that support claims of entitlements to those benefits.

*Roth v. Board of Regents,* 408 U.S. 564, 577 (1972).  Because the statutes at issue confer upon

foster children specific rights or entitlements, the court finds the plaintiff children are entitled to

procedural due process protection of those entitlements.

To establish a procedural due process violation, a plaintiff must prove two elements:  (1)

that he possessed a constitutionally protected liberty or property interest such that due process

protections were applicable; and (2) that he was not afforded an appropriate level of process.

*Couture v. Bd. of Education of the Albuquerque Public Schools,* 535 F.3d 1243, 1256 (10th Cir.

2008).  Additionally, the Supreme Court has held that in order to hold officials liable for a

procedural due process violation under § 1983, a plaintiff must demonstrate the officials'

decisions "have cause the deprivation of rights at issue by policies which affirmatively command

that it occur, or by acquiescence in a long-standing practice or custom which constitutes the

'standard operating procedure' of the local government entity."  *Jett v. Dallas Ind. School Dist.,*

491 U.S. 701, 737 (1989) (citations omitted).[7]

Plaintiffs have established the first element of a procedural due process claim, i.e., that

the statutes at issue create entitlements to which procedural due process protections attach.

---

[7] Defendants contend that under *Canton v. Harris,* 489 U.S. 378 (1989), *Bd. of County Comm'rs of Bryan County v. Brown,* 520 U.S. 411 (1997), and *Connick v. Thompson,* ---U.S.---, 131 S.Ct. 1350 (2011) the applicable standard of culpability is "deliberate indifference."  The court disagrees.  Those cases all involved claims of procedural due process violations based on officials' alleged failure to train employees.  Because "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train," the court held that a municipality's failure to train its employees in a relevant respect "must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact."  *Connick,* 131 S.Ct. at 1359 (quotations and citations omitted).  "Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983."  *Id.* at 1359-60.

However, the second element of the claim—that plaintiffs were not afforded the appropriate level of procedural due process—has only been shown with respect to specific children identified in interrogatory responses.  Perhaps those children have individual claims for violation of their procedural due process rights, but plaintiffs assert only class-wide claims.

It is impossible, however, for the class as a whole to establish the second element of a procedural due process claim because most children's procedural due process rights have *not* been violated.  Plaintiffs contend all members are "at risk" their procedural due process rights will be violated.  However, they cite no authority for the proposition that being "at risk" meets the requirements for establishing a procedural due process violation.  Moreover, they do not claim, nor do they provide evidence, that all members have been denied an appropriate level of process.

Therefore, defendants are entitled to summary judgment on plaintiffs' claim for alleged violations of the plaintiff children's right to procedural due process.

### IV. Conclusion

For the reasons set forth below, defendants' Motion for Summary Judgment [Dkt. #561] is denied with respect to plaintiffs' First Cause of Action.  It is granted with respect to plaintiffs' Second and Fourth Causes of Action.

ENTERED this 1st day of December, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma