IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| D.G., by Next Friend G. Gail Strickland et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 08-CV-074-GKF-FHM |
| | ) | |
| BRAD YARBROUGH, Chairman of the Oklahoma Commission for Human Services, et al., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Before the court is defendants' Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to *Younger v. Harris,* [Dkt. #562]. Defendants, the Commissioners of the Oklahoma Commission for Human Services and the Executive Director of the Oklahoma Department of Human Services, seek dismissal of this action pursuant to Fed.R.Civ.P. 12(b)(1) on the *Younger* abstention doctrine. Defendants' first *Younger* motion [Dkt. #72] was denied by the court on January 7, 2009. [Dkt. #210].

In denying defendants' earlier motion, the court engaged in the three-prong analysis set forth in *Middlesex County Ethics Committee v. Garden State Bar Association,* 457 U.S. 423 (1982) and applied by the Tenth Circuit in *J.B. v. Valdez,* 186 F.3d 1280 (10th Cir. 1999), and *Joseph A. ex rel. Wolfe v. Ingram,* 262 F.3d 1113 (10th Cir. 2001). In *J.B.* and *Joseph A.*, both of which involved foster children, the Tenth Circuit held that *Younger* requires a federal court to refrain from hearing an action over which it has jurisdiction when the federal proceeding would

(1) interfere with an ongoing state judicial proceeding; (2) that implicates important state interests; and (3) affords an adequate opportunity to raise the federal claims. *J.B.,* 186 F.3d at 1291; *Joseph A.,* 275 F.3d at 1267.   Further, in *Joseph A.,* the Tenth Circuit held that where prospective injunctive or declaratory relief is sought, the court should engage in a provision-by-provision *Younger* analysis to determine which forms of relief interfered with state court proceedings and which did not.  275 F.3d at 1272.

The court denied defendants' *Younger* motion, finding at that relatively early stage in the case that some of the relief sought by plaintiffs' Complaint could possibly survive the *Younger* analysis.  However, it also ordered plaintiffs to file a statement of relief sought and acknowledged certain forms of relief traditionally sought in other foster care cases might not survive *Younger* scrutiny.  [Dkt. #217, Transcript of Hearing on January 7, 2009 at 136-137].

On February 13, 2009, plaintiffs filed their Statement of Relief Sought.  [Dkt. #241].  The statement set out seven general proposed forms of relief:  imposition of caseload limits; better education and training for workers and foster parents; increases in placement options; more effective monitoring of the safety of children in foster care; a requirement that DHS meet federal outcome measures; improvements in DHS's quality assurance system; and appointment of a neutral monitor.

Defendants, in their renewed motion, assert all seven proposed forms of relief run afoul of *Younger,* because every child in the class has been adjudicated to be deprived and is the subject of ongoing juvenile proceedings in Oklahoma district courts.   Plaintiffs, in response, contend that *Brown v. Day,* 555 F.3d 882 (10th Cir. 2009), decided shortly after the court denied defendants' first *Younger* motion, compels a conclusion that abstention is neither necessary nor appropriate in this matter.

### A. The *Brown* Analysis

In *Brown,* a Medicaid beneficiary sued the Director of Kansas's Division of Health Policy and Finance ("HPF") in federal court pursuant to 42 U.S.C. § 1983 after the director issued a final order terminating plaintiff's Medicaid benefits because she was no longer "medically needy" as the result of an amendment of Kansas law deeming trust resources available to a recipient of medical assistance to be "available assets." *Id.* at 886. The district court granted defendant's *Younger* motion, finding abstention was mandatory. On appeal, the Tenth Circuit reversed the district court's decision. In doing so, the court articulated a threshold issue to be decided as part of the first prong of the three-prong *Younger* analysis. The court explained:

> The initial prong of the *Younger* inquiry involves two sub-parts. This court must determine whether there is an *ongoing* state proceeding. The court must also decide whether that proceeding is the *type* of state proceeding that is due the deference accorded by *Younger* abstention.

*Id.* at 888 (citations omitted) (emphasis in original). The court distinguished between administrative proceedings that are *remedial* in nature and proceedings that are *coercive. Id.* It instructed that if the district court determines a proceeding is remedial in nature, then it should move on to the remaining prongs of the *Younger* analysis. However, if the court determines the proceeding is coercive, *Younger* abstention is mandatory, and the court need proceed no further.

Citing *Kercado-Melendez v. Aponte-Roque,* 829 F.2d 255 (1st Cir. 1987), the Tenth Circuit identified three factors relevant to the determination of whether a proceeding was coercive or remedial in nature: (1) whether the state proceeding is an option available to the federal plaintiff on her own initiative to redress a wrong inflicted by the state or instead, the participation of the federal plaintiff in the state administrative proceeding is mandatory; (2) whether the state proceeding is itself the wrong which the federal plaintiff seeks to correct via

3

injunctive relief under section 1983; and (3) whether the federal plaintiff has committed an alleged bad act.  *Id* at 890-91.[1]

Application of this three-part inquiry to the case at hand yields mixed results:

**1. Whether the state proceeding is optional or mandatory**—Plaintiffs seek relief focused on changes in DHS policies and procedures.  Thus, they contend their action is directed at an executive rather than a judicial function.  However, defendants argue these changes could potentially impact individual juvenile cases pending in state court. The individual cases are mandatory rather than optional.

**2. Whether the state court proceeding is itself the "wrong" sought to be redressed**— Plaintiffs disclaim any intent to involve themselves in individual cases pending in state court. The "wrongs" for which they seek redress are DHS policies and procedures that plaintiffs contend have a systemic harmful effect on the welfare of foster children. Once again, however, defendants point to potential interference with individual juvenile proceedings in state court.

**3. Whether plaintiffs have committed any "bad acts"**—Clearly, foster children in state court juvenile cases are not there by virtue of any "bad acts" of their own.  Nonetheless, the proceedings are coercive in the sense that the children are not voluntary participants.

The court's *Younger* analysis is complicated by the fact that—unlike *Brown,* where the aggrieved plaintiff sought one remedy (reversal of an agency decision terminating her Medicaid benefits)— plaintiffs in this case seek *seven* types of relief, all prospective in nature.  As in *Joseph A.,* resolution of the *Younger* issues requires examination of each of the specific remedies sought.

---

[1] The court noted *Younger* originally sought to prevent federal courts, sitting in equity, from enjoining state prosecution of criminal defendants.   Through a series of subsequent decisions, the *Younger* doctrine was expanded to state civil enforcement actions and administrative agency proceedings.  *Id.* at 889-90.

### B. The *Middlesex* Analysis

Under *Middlesex,* the court reviews each of the seven requests for relief with an eye to whether it (1) interferes with an ongoing state judicial proceeding; (2) that implicates important state interests; and (3) affords an adequate opportunity to raise the federal claims. *J.B.,* 186 F.3d at 1291; *Joseph A.,* 275 F.3d at 1267.

#### 1. Caseload Limits

Plaintiffs seek to compel defendants to establish limits on the caseloads of all case-carrying workers and supervisors based on standards set for accreditation of public child welfare agencies set by the Council on Accreditation ("COA") and the professional standards set by the Child Welfare League of America ("CWLA").  Defendants have argued that these limits could potentially interfere with decisions in children's individual cases because, for example, a state court judge might feel constrained to request a specific caseworker for a child if it would cause the worker's caseload to exceed the new standards.

The court concludes that the requested relief of caseload limits would not interfere with the state court's ability to conduct juvenile proceedings.  Moreover, a juvenile court is not an adequate forum in which plaintiffs, or other similarly situated juveniles, can raise their claims of constitutional violations resulting from excessive caseloads.

#### 2. Education/Training

Plaintiffs seek to force defendants to develop and implement educational qualifications and a comprehensive pre-service and in-service training program for caseworkers, supervisors, foster parents and adoptive parents, based on standards for training established by the COA and CWLA.  Defendants have not identified, and the court cannot conceive, of any way in which this

relief would interfere with on-going state juvenile proceedings. Further, state court juvenile proceedings do not afford an adequate opportunity to seek such relief.

### 3.   Placement Resources

Plaintiffs ask the court to order defendants to have an assessment performed by qualified professionals to determine the need for additional placements to provide the necessary range of placement options for foster children, the time period during which the placements will be developed and the steps necessary to develop placements. It does not appear this remedy would interfere with individual juvenile cases, nor do those cases afford affected juveniles the opportunities to raise such a claim for relief.

### 4.   Monitoring Safety of Children in Placement

Plaintiffs seek an order requiring DHS workers to visit all children in placement and their foster parents as frequently as set forth in the standards set by the COA and the CWLA to ensure that the children are safe; to comply with state regulations for investigation of complaints of abuse and neglect of children in placement; and to comply with state regulations for approval, screening, oversight and utilization of all placement types that house foster children. The court concludes this form of relief would not interfere with individual children's state court proceedings. In addition, individual state court juvenile proceedings do not afford affected juveniles an adequate opportunity to raise this claim for systemic relief.

### 5.   Outcomes for Children

Plaintiffs ask the court to order defendants to meet "outcome measures set by the U.S. Department of Health and Human Services ("DHHS"), including, for example, the DHHS measures aimed at protecting foster children from abuse and neglect, ensuring permanency and stability in their living situations, and preserving the continuity of family relationships and

6

connections." Defendants argue decisions about length of stay in foster care and whether and to what extent family relationships are maintained are matters at the core of what a juvenile court decides in an individual child's case.

This broad-brush, unspecific claim for relief raises serious concerns, insofar as court-ordered compliance with certain "outcome measures" may well interfere, either directly or indirectly, with ongoing state juvenile proceedings. The state proceedings involve important state interests, as the judges presiding over such proceedings look to state law for the resolution of such matters. Further, the state proceedings may in many cases afford an adequate opportunity to raise the juveniles' claims.

### 6. Quality Assurance/Data

Plaintiffs seek an order requiring that defendants ensure DHS "has a quality assurance ("QA") system consistent with the standards of the COA and CWLA standards that is capable of measuring the quality of treatment and services" provided to foster children. The QA system should include, they assert, predefined benchmarks for measuring the quality of family foster care services and the collection and management review of valid, reliable data on a regular basis to monitor the functioning of DHS operations and the quality of its service delivery. Defendants argue this type of order would intrude on the jurisdiction of juvenile court judges, who daily engage in review of the adequacy of care given and services provided to foster children.

Although this claim for relief is also general and unspecific, the defendants have not explained how a quality assurance system focused on monitoring the "functioning of DHS operations and the quality of its service delivery" would improperly interfere, either directly or indirectly, with ongoing state juvenile proceedings. Nor have defendants explained how

individual state court juvenile proceedings afford an adequate opportunity to raise such a claim for systemic relief.

### 7.  Monitoring/Enforcement

Plaintiffs ask the court to appoint a neutral monitor to oversee compliance with any order the court enters pursuant to Fed.R.Civ.P. 65(d).  Additionally, the court would retain jurisdiction to oversee compliance with that order.  Plaintiffs state that any *de minimus* violation of the relief granted by the court would not constitute a violation of the court's order, and "Plaintiff Children do not intend the remedy in this case to have any preclusive effect except between the parties hereto during the term such relief is in effect."  [Dkt. #241 at 6-7].  The court concludes that the relief requested does not interfere with any on-going juvenile proceedings, and that state juvenile proceedings do not afford an adequate opportunity to obtain such relief.

In summary, the court concludes that most of the general forms of relief requested by plaintiffs do not pose a risk of interference with state court proceedings.  Those remedies include plaintiffs' requests for caseload limits; education and training of DHS caseworkers and supervisors, foster parents and adoptive parents; developing additional placement options for foster children; improved monitoring of the safety of foster children; quality assurance; and for appointment of a neutral monitor.  The court has serious concerns about the direct or indirect impact on individual juvenile proceedings of imposing outcome measures set by the U.S. Department of Health and Human Services. Whether this requested remedy is subject to *Younger* abstention will depend, however, on the language and terms of the relief, if any, granted after trial of this matter.

The court is mindful of the Tenth Circuit's directive that "[a]bstention is the exception, not the rule," and should rarely be invoked "because the federal courts have a virtually

unflagging obligation … to exercise the jurisdiction given them." *Joseph A.,* 275 F.3d at 1267 (quotations and citations omitted).  Thus, having found that at least some of the remedies sought by plaintiffs do not appear to pose a risk of interference with state court juvenile proceedings, the court rejects defendants' *Younger* challenge.

### C. Conclusion

For the reasons set forth above, defendants' Renewed Motion to Dismiss for Lack of Subject Matter Jurisdiction Pursuant to *Younger v. Harris* [Dkt. #562] is denied.

ENTERED this 16th day of December, 2011.

*[signature]*
Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma