UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| D.G., by Next Friend G. Gail Stricklin; et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| v. | ) |
| | ) **Class Action** |
| BRAD YARBROUGH, Chairman of the | ) **Civil Action No. 08-CV-074-GKF-FHM** |
| Oklahoma Commission for Human Services; et | ) |
| al., | ) |
| | ) |
| **Defendants.** | ) |

## JOINT STATEMENT IN SUPPORT OF FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AGREEMENT

The Plaintiff class ("Plaintiff Children" or "Plaintiffs"), the Oklahoma Department of Human Services ("OKDHS") and the Oklahoma Commission for Human Services (the "Commission") jointly and respectfully submit this brief in support of their request for an Order granting final approval of the proposed settlement agreement in this action on the grounds that the settlement is fair, reasonable and adequate under Fed. R. Civ. P. 23(e)(2).

### Preliminary Statement

By Order dated January 23, 2012 (Dkt. No. 774), this Court preliminarily approved the parties' Settlement Agreement (the "Agreement"). A copy of the Agreement was attached as Exhibit A to the Joint Motion for Order Preliminarily Approving Compromise and Settlement Agreement (Dkt. No. 770-1).

The Agreement sets forth the commitment of OKDHS and the Commission to implement meaningful reform to the State's child welfare system. In particular, the Agreement calls for the appointment of three nationally-recognized, independent experts in child welfare and grants them broad authority to require OKDHS to undertake remedial activities to ensure that OKDHS makes good faith efforts towards sustained progress in 15 key child welfare-related performance areas.

The Agreement, executed less than two months before this case was to proceed to trial, is fair, reasonable and adequate, and results from extensive arm's length negotiations conducted over a period of several months under the active supervision of a U.S. Magistrate Judge.  The settlement embodied by the Agreement is the culmination of nearly four years of litigation and follows the completion of exhaustive factual and expert discovery.  Plaintiffs request that the Court approve the Agreement in its entirety pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.

Review of the Agreement will easily establish that it meets the threshold for such approval.

## Statement of Facts

### A.      Summary of the Litigation

Named Plaintiffs, by their Next Friends, brought this action on February 13, 2008, alleging that children in OKDHS custody were being subjected to harm and an ongoing risk of harm as a result of deficiencies in the child-welfare system operated by OKDHS.  Defendants are the nine members of the Commission and the Director of DHS, all in their official capacities.[1]

Plaintiff Children's class action Complaint asserted five different causes of action. Specifically, it alleged that Oklahoma's child welfare system violated Plaintiff Children's substantive due process rights; procedural due process rights; rights of liberty, privacy and association under the First, Ninth and Fourteenth Amendments; federal statutory rights under the Adoption Assistance and Child Welfare Act of 1980, as amended in 1997 by the Adoption and Safe Families Act (42 U.S.C. § 670, *et seq.*); and federal contractual rights arising from the State of Oklahoma's Title IV-E State Plan.  *See* Dkt. No. 2 at 77-84.

---

[1] The Governor of the State of Oklahoma was also named as a defendant, but he was dismissed from the action by Order of the Court, dated December 11, 2008.  Dkt. No. 189.

On May 5, 2009, following briefing and oral argument, this Court certified a Plaintiff class under Fed. R. Civ. P. 23(b)(2), defined as "all children who are or will be in the legal custody of the Oklahoma Department of Human Services (1) due to a report or suspicion of abuse or neglect, or (2) who are or will be adjudicated deprived due to abuse or neglect."  Dkt. No. 270 at 17.  The Court's Order approving the class was affirmed by the Tenth Circuit Court of Appeals on February 8, 2010.

Class-wide discovery began in earnest after the Tenth Circuit's decision.[2]  Throughout the action, discovery was vigorously contested, and included the production of approximately 6 million pages of documents and 74 depositions, including 17 expert depositions.

Document discovery included, *inter alia*, the production of: (1) the OKDHS case files of the Named Plaintiffs; (2) OKDHS case files for 484 other children that were randomly selected for review by one of Plaintiffs' experts; (3) dozens of additional OKDHS investigation files revealing the manner in which OKDHS responded to reports that children had been abused or neglected; (4) OKDHS case files of nine children who died of abuse or neglect while in OKDHS custody from January 2007 through December 31, 2010; (5) the official business records, management reports and child welfare performance data compiled and maintained by OKDHS; and (6) the emails of numerous OKDHS managers regarding the issues raised in Plaintiff Children's Complaint.

Deposition discovery included fact depositions of DHS management officials, certain consultants retained by OKDHS, members of the Commission, numerous witnesses designated by Defendants under Fed. R. Civ. P. 30(b)(6), and the Named Plaintiffs' Next Friends.  In addition to the 17 expert depositions, the parties also exchanged lengthy and detailed reports

---

[2] Prior to that ruling, Plaintiff Children had obtained extensive document and deposition discovery concerning the care that OKDHS had provided to the Named Plaintiffs.

prepared by experts retained in the fields of child welfare agency and system management, child protective services management, child welfare case practice, child psychology, computer systems and statistics.

After discovery was completed, Defendants filed a motion for summary judgment seeking to dismiss the action. They also moved to decertify the Plaintiff class and renewed a prior motion to dismiss for lack of subject matter jurisdiction based on the abstention doctrine recognized in *Younger v. Harris*, 401 U.S. 37 (1971). On November 15, 2011, this Court denied the motion to decertify, ruling that the class remained certified on the questions of whether OKDHS has a policy or practice of failing to adequately monitor the safety of Plaintiff Children, causing significant harm and risk of harm to their safety, and whether OKDHS is subjecting Plaintiff Children to an impermissible level and risk of abuse and neglect while in state custody. *See* Dkt. No. 727. On December 1, 2011, in a detailed Opinion, this Court denied Defendants' request for summary judgment as to Plaintiffs' core substantive due process claim. *See* Dkt. No. 741 at 2-28. On December 16, 2011, this Court denied Defendants' renewed *Younger* motion. *See* Dkt. No. 757.

In anticipation of trial scheduled to begin on February 21, 2012, the parties filed their final witness lists (Dkt. Nos. 742 and 748) and exhibit lists (Dkt. Nos. 747 and 751) on December 5, 2011. Under this Court's August 16, 2011 Amended Scheduling Order, the deadline for the filing of the Agreed Pretrial Order was January 3, 2012.[3]  *See* Dkt. No. 624 ¶ 13.

At the same time that this case was being litigated, the parties engaged in extensive and intensive settlement negotiations pursuant to the Settlement Conference Order of this Court dated August 25, 2011. Dkt. No. 543. Those negotiations occurred from August 2011 to December

---

[3] The Pretrial Order deadline was subsequently extended to January 6, 2012. *See* Dkt. No. 761.

15, 2011 under the active supervision of Magistrate Judge T. Lane Wilson, and ultimately culminated in the Agreement.  On December 20, 2011, the Commission approved the Agreement at a specially-called meeting.  On December 28, 2011, the Agreement was approved by the Oklahoma Contingency Review Board ("CRB") with minor modification, and on January 4, 2012, the Commission duly approved the Agreement as modified by the CRB.  Dkt. No. 774 at 2.

By Order dated January 23, 2012 (Dkt. No. 774), this Court preliminarily approved the Agreement and directed that notice be given to class members of the proposed settlement and of a hearing scheduled for February 29, 2012, to determine whether the Agreement should be approved by the Court as fair, reasonable and adequate, and in the best interests of the Class. OKDHS is to certify to the Court at the hearing that such notice was duly given.

### B.      The Settlement Agreement

#### 1.      The Co-Neutrals

As discussed above, the Agreement requires OKDHS to retain the services of three independent child welfare experts, referred to as the "Co-Neutrals," to oversee implementation of the Settlement Agreement.  *See* Dkt. No. 770-1 ¶ 2.8.  The three neutrals are Kathleen Noonan, Kevin Ryan and Eileen Crummy.  *Id.* ¶ 1.18.  Mr. Ryan previously served as commissioner of New Jersey's child welfare agency after it entered into a consent decree requiring the state to implement court-ordered reforms, and Ms. Crummy later served as acting commissioner over the same agency.   Mr. Ryan and Ms. Crummy are currently partners at Public Catalyst, an independent organization that works with states, counties, nonprofit organizations and courts to improve child welfare and juvenile justice systems.  Ms. Noonan, a clinical associate professor at the University of Wisconsin law school, has worked extensively in child welfare law and policy.

In addition to serving as a mediator in several class action public impact cases concerning health and human services, she has worked with dozens of state and local government agencies to help them restructure their policies and systems.

Under the Agreement, neither the parties nor any of their agents or employees have any supervisory authority over the Co-Neutrals or their activities, reports, findings or recommendations. *Id.* ¶ 2.8(b). Moreover, the Co-Neutrals will have free and unfettered access to the staff and records of OKDHS and the private agencies with which it contracts. *Id.* ¶¶ 2.8(d), 2.11. The Co-Neutrals are to be paid reasonable and customary fees for their services and will be reimbursed for their actual expenses. *Id.* ¶ 2.8(e). They will have a budget and staff sufficient to allow them to carry out their responsibilities under the Agreement, and authority to contract with experts and consultants as they may deem appropriate. *Id.*

With the written agreement of a majority of the Co-Neutrals, any decision made by them may be presented to the Court for entry as a judgment in accordance with the procedures set forth in the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and may be vacated only upon a judicial determination that one or more of the grounds set forth in 9 U.S.C. § 10(a)(1)-(4) exists. *See* Dkt. No. 770-1 ¶ 2.9. Once the Co-Neutrals' decision has been entered as a judgment, it may be enforced by counsel for the Plaintiff class, the Class Representatives and the Plaintiff Class. *Id.*

The Co-Neutrals are also empowered to act as arbiters of any dispute between the parties arising under the Agreement, and the Co-Neutrals' decision regarding any such dispute is final. *Id.* ¶ 2.8(a).

### 2.    The Child Welfare Plan

Under the Agreement, OKDHS is required to submit a child welfare plan (the "Plan") to the Co-Neutrals and Plaintiff Children by March 30, 2012, that, at a minimum, targets 15 different performance areas (discussed below) which were of particular concern to Plaintiff Children in this action.  *Id.* ¶ 2.10(a).  Once submitted, Plaintiffs have 15 days to provide their own comments on the proposed Plan to the Co-Neutrals, and the Co-Neutrals will then have 30 days to decide whether or not to accept the Plan.  *Id.* ¶ 2.10(e).  If the Co-Neutrals reject the Plan, OKDHS will have an additional 30 days to modify the Plan and to resubmit it to the Co-Neutrals and Plaintiffs.  *Id.* ¶ 2.10(g).  If the Co-Neutrals reject the Plan a second time, they may designate a third party to modify or create a new Plan, or they may develop the Plan themselves. *Id.*

The Plan is required to set forth specific strategies to improve Oklahoma's child welfare system as it relates to the Performance Areas, specific structural and/or organizational changes needed to implement those strategies, and the anticipated cost of implementation.  *Id.* ¶ 2.10(a). The Plan must target, but need not be limited to, the following 15 performance areas (the "Performance Areas"):

(1)    Child abuse and neglect in care;

(2)    The number of foster homes available for children in need of therapeutic care;

(3)    The number of foster homes available for children not in need of therapeutic care;

(4)    Visitation of children by case workers;

(5)    Continuity of visitation by the same case worker;

(6)    On an annual basis, the average number of placements experienced by children two years old or older (excluding the 10% of children in that age range with the least and highest number of changes in placement);

(7)     The actual number of placements for each child two years old or older who is in the 10% of children in that age range with the highest number of changes in placement;

(8)     On an annual basis, the average number of placements experienced by children under two years old (excluding the 10% of children in that age range with the least and highest number of changes in placement);

(9)     The actual number of placements for each child under two years old who is in the 10% of children in that age range with the highest number of changes in placement;

(10)    As of March 31 and September 30 of each year, the number of children in shelters delineated by even ages (i.e., younger than 2 years old, 2-4 years old, 4-6 years old, etc.);

(11)    During the same six-month time period (April through September and October through March), the average stay in a shelter for each age group identified in subparagraph (10) (excluding the 10% of children with the shortest and longest stays in a shelter);

(12)    The actual length of stay for each child that is in the 10% of children with the longest shelter stays;

(13)    Permanency (i.e., the child exits the system with a connection to a permanent family);

(14)    Adoption, including adoption failure rates; and

(15)    Caseloads. *Id.*

Once the Co-Neutrals endorse the Plan (or issue their own Plan), OKDHS will have 75 days to submit a report to the Co-Neutrals and to Plaintiffs that identifies specific baseline measurements ("Baselines") and specific target outcomes and/or performance standards ("Target Outcomes") with respect to each of the 15 required Performance Areas. *Id.* ¶¶ 2.10(f)-(g).[4] Plaintiffs will have 15 days to submit comments on the proposed Baselines and Target Outcomes to the Co-Neutrals, who will then endorse or reject each of the individual Baselines and Target

---

[4] The report may include additional Performance Areas, but any such Performance Areas cannot form the basis of a violation of the Agreement.  Dkt. No. 770-1 ¶ 2.10(f).

Outcomes within 45 days of the report's submission. *Id.* If the Co-Neutrals reject any Baseline or Target Outcome, they will then determine and issue revised Baselines and/or Target Outcomes within 90 days. *Id.* The Baselines and Target Outcomes, once endorsed by the Co-Neutrals, will become an amendment to the Plan. *Id.*

If OKDHS believes that it will be unable to implement the Plan without further appropriations in excess of its existing funding, OKDHS is required to seek approval from the state legislature or the CRB of any required appropriations. *Id.* ¶ 2.10(h). Regardless of any such request, however, OKDHS is required to implement the Plan in good faith. *Id.*

### 3.        Implementation of the Child Welfare Plan

As soon as the Co-Neutrals endorse or determine the Baselines and Target Outcomes (the "Acceptance Date"), OKDHS is required to implement the Plan. Beginning with the third month after the Acceptance Date, OKDHS is required to issue monthly reports to the Co-Neutrals and Plaintiffs measuring its progress toward achieving the Target Outcomes. Within 60 days of their receipt of the first report, the Co-Neutrals will issue a finding stating whether or not the report provides sufficient information to measure OKDHS's progress toward the Target Outcomes, and may revise this finding as they deem appropriate for subsequent reports. The Co-Neutrals may, in their discretion, independently confirm the data in the reports provided by OKDHS, require additional data as they deem necessary, or conduct record reviews or other analyses as they deem necessary to determine OKDHS's compliance with the Agreement. If the Co-Neutrals find that the report is insufficient, OKDHS must revise the report, as required by the Co-Neutrals. While the reports will be issued pursuant to the Agreement, the data in the reports will be incorporated into routine public reporting by OKDHS. *Id.* ¶ 2.10(i).

Twice annually, the Co-Neutrals will provide commentary regarding OKDHS's overall progress, as reflected by the reports, and whether OKDHS is making good faith efforts to achieve substantial and sustained progress toward each of the Target Outcomes. *Id.* ¶¶ 2.10(i), 2.15(a). Moreover, on or before October 15, 2014, the Co-Neutrals will issue written findings to the parties identifying, for the period through June 30, 2014, those Target Outcomes that the Co-Neutrals have determined, in their sole discretion, have been met, and those for which OKDHS has and has not achieved sustained, positive trending toward the Target Outcomes (the "Target Outcome Findings"). *Id.* ¶ 2.12. A second Target Outcome Findings report shall also be issued to the parties on or before October 15, 2015, for the period through June 30, 2015.[5] *Id.* The Co-Neutrals' Target Outcome Findings are not subject to judicial review. *Id.* Further, even if OKDHS has met one or more Target Outcomes or achieved sustained, positive trending toward one or more Target Outcomes, OKDHS must continue to report to the Co-Neutrals on all 15 of the required Performance Areas. *Id.* ¶ 2.13.

If OKDHS fails to achieve positive trending or begins to trend negatively in any Performance Area, the Co-Neutrals have the authority at any time to require OKDHS to undertake and maintain diagnostic and remedial activities in that area. *Id.* ¶ 2.14.

The Agreement also contemplates that, from the time the Co-Neutrals accept the Plan until the time the Agreement terminates, the Co-Neutrals will hold at least quarterly discussion meetings with OKDHS and Plaintiffs. The number and length of these meetings is left to the Co-Neutrals' discretion. *Id.* ¶ 2.10(d). The meetings will be an opportunity to apprise Plaintiffs of the progress in implementing the Plan and to discuss and resolve any concerns. *Id.*

---

[5] The Target Outcome Findings will replace one of the Co-neutrals' twice annual commentaries called for under Section 2.10(i) of the Agreement. *Id.* ¶ 2.12.

### 4.      Termination of the Settlement Agreement

Under the Agreement, the Co-Neutrals are required to issue a final report on December 15, 2016 (the "Final Report"), which, in addition to providing the Target Outcome Findings, is also to include a finding that OKDHS either has, or has not, made good faith efforts for a continuous period of at least two years prior to December 15, 2016, to achieve substantial and sustained progress toward each of the Target Outcomes. *Id.* ¶ 2.15(a).  If the Co-Neutrals find that such good faith efforts have been made, then OKDHS's obligations under the Agreement terminate and the parties will jointly seek to vacate any judgment entered by the Court as a result of a finding or decision by the Co-Neutrals. *Id.*  If the Co-Neutrals find that such good faith efforts have not been made, OKDHS will continue to be subject to the terms of the Agreement for successive one-year periods, and will be required to continue to provide monthly reports to the Co-Neutrals as discussed above.  At the end of each such one-year period, the Co-Neutrals will issue additional Target Outcome Findings reports until the Co-Neutrals find that OKDHS has made good faith efforts for a continuous period of at least two years prior to the report to achieve substantial and sustained progress toward each Target Outcome. *Id.*

Each of the parties has the right to appeal the Co-Neutrals' Final Report to Magistrate Wilson, if he is still serving as a member of the federal judiciary and his hearing the appeal does not violate any federal rule or statute; otherwise, the appeal shall be to the District Court. *Id.* ¶ 2.15(b).[6]  The standard of review for such an appeal will be whether the Co-Neutrals' determination was "arbitrary and capricious." *Id.*  The ruling on the appeal will be final and not subject to any further appeal. *Id.*  If the appeal is unsuccessful, the non-appealing party will be entitled to recover their reasonable attorneys' fees and costs incurred in defending the appeal. *Id.*

---

[6] The parties have stipulated to the disposition of the appeal to Magistrate Judge Wilson in accordance with 28 U.S.C. § 636(c)(1). *See* Dkt. No. 770-1 ¶ 2.15(b).

### 5.    Other Terms of the Settlement Agreement

The parties have agreed that, upon this Court's approval of the Agreement, judgment shall be entered dismissing the class action with prejudice.  *Id.* ¶ 3.2(b).  Notwithstanding such dismissal, the Court will retain jurisdiction to enter enforceable orders embodying the Co-Neutrals' decisions, to consider any appeal of the Co-Neutrals' Final Report, and to determine the amount of attorneys' fees and expenses to be awarded to Plaintiffs and their counsel.  *Id.* ¶¶ 2.2, 3.2(g).  Upon Final Approval of the Agreement,[7] all claims of Plaintiff class members that "were asserted or could have been asserted" in the class action will be released.[8]  *Id.* ¶¶ 1.14, 2.4.  Neither the Agreement nor any action taken to carry out the Agreement is to be construed as an admission by Defendants of any fault, wrongdoing or liability, and Defendants expressly deny all allegations of wrongdoing or liability with respect to Plaintiffs' claims.  *Id.* ¶ 5.1.  Likewise, by entering into the Agreement, Plaintiffs do not admit to any deficiency in the merits of their claims.  *Id.*

Finally, Defendants and OKDHS have stipulated that Plaintiffs' counsel is entitled to class counsel fees and expenses, but reserve the right to dispute the amount to be awarded.  *Id.* ¶¶ 1.3, 1.17.  Plaintiffs will not seek reimbursement for the legal fees and expenses expended by Frederic Dorwart Lawyers which agreed to provide their time and expenses *pro bono publico* for the benefit of the Plaintiff Class.[9]  *Id.* ¶ 1.3.

---

[7] "Final Approval" is defined in the Agreement to mean the date on which the Judgment of this Court approving the Agreement becomes final, either because no appeal from the Court's Judgment has been taken or such an appeal has been taken, but is unsuccessful and no further appeal is possible.  *See* Dkt. No. 770-1 ¶ 1.5.

[8] The Agreement does not operate to release any individual damages claims belonging to any member of the Plaintiff Class because such claims were not and could not have been asserted in the class action.

[9] Plaintiffs will also not seek reimbursement of the fees of Kaye Scholer LLP which has agreed to provide such services *pro bono publico* for the benefit of the Plaintiff Class.

## Argument

## The Settlement Agreement is Fair, Reasonable and Adequate and Should Therefore be Approved

Under Fed. R. Civ. P. 23(e), the claims of a certified class may be settled only with the court's approval. Where, as here, the proposed settlement binds absent class members, it may be approved upon notice to those class members after a hearing and upon a finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court has broad discretion in deciding whether a class action settlement should be approved. *See Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1189 (10th Cir. 2002) (finding that District Court did not abuse its discretion in determining that proposed settlement was fair, reasonable and adequate); *see also Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir. 1984).

The Tenth Circuit has directed courts to consider the following four factors when assessing whether a proposed class action settlement is fair, reasonable and adequate:

> (1) whether the proposed settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt; (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Rutter*, 314 F.3d at 1188; *see also Jones*, 741 F.2d at 324.

An examination of each of these four factors demonstrates that the proposed Agreement is fair, reasonable and adequate to the Plaintiff Class.

### A.     The Agreement Was Fairly and Honestly Negotiated

As the Court is aware, this case was vigorously litigated by seasoned counsel for nearly four years before the parties executed the Agreement, just weeks before trial. Throughout the pre-trial period, Class Counsel zealously pursued the best interests of the Plaintiff Class, and Defense Counsel and Defendants likewise mounted an aggressive defense. Before the settlement

was negotiated, the parties engaged in extensive document, deposition, written and expert discovery; the parties filed numerous contested discovery motions (*see*, *e.g.*, Dkt. Nos. 172, 181, 315, 339, 348, 363, 412, 421, 425, 448, 490, 512 and 758); and Defendants filed several dispositive motions (*see* Dkt. Nos. 72, 77, 208, 561 and 562).

The Agreement itself is the culmination of vigorous and extensive negotiations conducted by the parties over a period of five months under the active supervision of Magistrate Judge T. Lane Wilson, with frank exploration of the issues and the benefit of full discovery.  Defendants even retained their own separate settlement counsel, D. Kent Meyers, to participate in these negotiations.

As in *In re Qwest Communications International, Inc. Securities Litigation*, 625 F. Supp. 2d 1133, 1137 (D. Colo. 2009), "there is no indication that any of the negotiating parties unfairly was pressured or coerced into agreeing to the settlement" or any "indication that the settlement is flawed and potentially unfair because it is founded on inadequate information, inadequate analysis, or inadequate legal representation."  In short, no reasonable suggestion can be made that the Agreement is the product of anything other than fair and honest negotiation.  "Because the settlement resulted from arm's length negotiations between experienced counsel after significant discovery had occurred, the Court may presume the settlement to be fair, adequate, and reasonable." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006).

## B.      Serious Questions of Law and Fact Exist

In determining whether to approve a class action settlement, the court should "not decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 88 n.14 (1981).  "This is because the essence of settlement is compromise, and settlements are generally favored." *Wilkerson v. Martin Marietta Corp.*, 171 F.R.D. 273, 284 (D. Colo.

1997) (citing *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910)).

Nevertheless, it is clear that this case involved a highly complex set of factual and legal issues that made the ultimate outcome of the trial less than certain.  Among the complex legal issues to be determined at trial, the Court would have been called upon to decide the scope of Plaintiffs' substantive due process rights under the Fourteenth Amendment, whether Defendants failed to exercise their professional judgment in their administration of OKDHS's child welfare function, and the scope of appropriate injunctive relief assuming that Plaintiffs prevailed at trial. Moreover, several important legal issues were undecided at the time the parties entered into the Agreement, including (i) Defendants' three *in limine* motions (Dkt. Nos. 582, 584 and 587), the resolution of which would directly impact the scope and magnitude of the evidence presented at trial; (ii) Plaintiffs' motion to compel supplemental disclosures from Defendants regarding facts and circumstances post-dating the discovery cut-off date (Dkt. No. 758); (iii) Defendants' motion to strike numerous deposition designations filed by Plaintiffs (Dkt. No. 612); (iv) Defendants' six *Daubert* motions (Dkt. Nos. 572, 575, 576, 580, 581 and 588; and (v) Plaintiffs' *Daubert* motion (Dkt. No. 579).  The factual complexity of the case is underscored by this Court's recent summary judgment ruling, in which the Court's listing of "material facts" consumed 23 pages. *See* Dkt. No. 741 at 2-24.

Because of the Agreement, meaningful steps toward reform of OKDHS's child welfare system are assured, and the risk of no relief after long and expensive litigation is eliminated. Thus, this factor weighs strongly in favor of approval of the settlement.

### C.    The Value of an Immediate Settlement Outweighs the Possibility of Future Relief After Protracted and Expensive Litigation

Here, the value of the measures required under the Agreement far outweighs the possibility of greater relief at a later time.  The Agreement locks in meaningful progress by

giving broad authority and discretion to the three independent Co-Neutrals over the steps that

OKDHS must take to improve its child welfare system.  The decisions of the Co-Neutrals may

be entered as judgments of the Court, making them enforceable through the Court's contempt

powers.  If necessary, the judgments of the Court can be enforced by Plaintiffs and Class

Counsel, thus ensuring ongoing vigilance over OKDHS's compliance with those decisions

throughout the period that the settlement is being implemented.

As discussed above, the Co-Neutrals have been given the following broad powers under

the Agreement:

● authority to approve or issue a Child Welfare Plan that must specify how OKDHS

intends to improve its performance in 15 key Performance Areas;[10]

● authority to approve or issue OKDHS's proposed Baselines and Target Outcomes

relating to the 15 Performance Areas covered by the Plan;

● authority to require OKDHS to provide them with monthly reports detailing

OKDHS's progress toward achieving each of the Target Outcomes and to dictate the form of the

reports to ensure that OKDHS is providing meaningful information;

● authority to require OKDHS to provide them with any information they may

demand in order to confirm the data in OKDHS's monthly reports and to ensure that the agency

is complying with the terms of the Agreement;

---

[10] Even assuming, *arguendo*, that any of the Performance Areas concern matters upon which
Plaintiffs could not have obtained relief at trial, the parties were free to require more by way of
settlement than that which the court could have ordered absent the settlement.  *See Rufo v.
Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 389 (1992) ("We have no doubt that . . . [the parties]
could settle the dispute over the proper remedy for the constitutional violations  .  .  .  by
undertaking to do more than the Constitution itself requires . . . [and] also more than what a court
would have ordered absent the settlement."); *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO
C.L.C. v. City of Cleveland*, 478 U.S. 501, 525 (1986) ("[A] federal court is not necessarily
barred from entering a consent decree merely because the decree provides broader relief than the
court could have awarded after a trial.").

● authority to determine whether the Target Outcomes have been met, and to identify those Target Outcomes for which OKDHS has and has not achieved sustained, positive trending;

● authority to require OKDHS to undertake and maintain diagnostic and remedial activities in any Performance Area that the Co-Neutrals determine is either failing to trend positively or is beginning to trend negatively; and

● authority to determine whether OKDHS has made sufficient efforts to achieve substantial and sustained progress toward each of the Target Outcomes for a continuous period of at least two years period, such that OKDHS's obligations under the Agreement may come to an end.

The authority vested in the independent Co-Neutrals ensures progress in the 15 Performance Areas.

### D.     The Parties Believe that the Settlement is Fair and Reasonable

Plaintiff Class is represented by counsel at Children's Rights, including Marcia Robinson Lowry, who has 37 years of experience litigating this type of constitutional challenge to systemic deficiencies in the operation of child welfare systems, by highly experienced trial counsel at the offices of Frederic Dorwart, Lawyers, including Mr. Dorwart himself, and Kaye Scholer LLP.  It is their considered judgment, along with the judgment of Mr. Meyers, the lawyer who negotiated the Agreement on Defendants' behalf, that the Agreement is fair and reasonable.  Their judgment is entitled to "considerable weight."  *Childs v. Unified Life Ins. Co.*, No. 10-CV-23-PJC, 2011 WL 6016486, at *14 (N.D. Okla. Dec. 2, 2011) (quoting *Lucas*, 234 F.R.D. at 695); *see also Qwest*, 625 F. Supp. 2d at 1138.  All of the Next Friends also support the Agreement.

The fact that, despite wide publication of notice of the Settlement, including notice to all of the approximately 16,000 members of the Oklahoma Bar Association without a single objection being filed attests to the fairness, reasonableness, and adequacy of the Settlement.  In sum, consideration of the four factors articulated by the Tenth Circuit in *Rutter* amply demonstrates that the Agreement is fair, reasonable and adequate.

## Conclusion

For the foregoing reasons, the Plaintiff Class and the Defendants jointly and respectfully request that the Court approve the proposed settlement embodied in the Agreement as fair, reasonable and adequate to the Plaintiff Class.

Dated: February 23, 2012.

RESPECTFULLY SUBMITTED:

**FOR THE PLAINTIFF CLASS:**

/s/ Frederic Dorwart
FREDERIC DORWART (Bar No. 2436)
*(signed by Filing attorney with permission)*
/s/ Paul DeMuro
PAUL DEMURO (Bar No. 17605)
*(signed by Filing attorney with permission)*
FREDERIC DORWART, LAWYERS
124 East Fourth Street
Tulsa, Oklahoma 74103-5010
Telephone:  918-583-9922
Facsimile:  918-583-8251
Email:  FDorwart@fdlaw.com
            PDemuro@fdlaw.com

/s/ R. Thomas Seymour
R. THOMAS SEYMOUR (Bar No. 8099)
*(signed by Filing attorney with permission)*
100 W. Fifth Street, Suite 550
Tulsa, Oklahoma 74103-4288
Telephone:  918-583-5791
Facsimile:  918-583-9251
Email:  Rtseymour1@aol.com

/s/ Marcia Robinson Lowry
MARCIA ROBINSON LOWRY *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Ira P. Lustbader
IRA P. LUSTBADER  *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ William Kapell
WILLIAM KAPELL *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Patrick S. Almonrode
PATRICK S. ALMONRODE *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Miriam F. Ingber
MIRIAM F. INGBER *(pro hac vice)*
/s/ Laurence Drew Borten
LAURENCE DREW BORTEN *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Jason Moff
JASON MOFF *(pro hac vice)*
*(signed by Filing attorney with permission)*
CHILDREN'S RIGHTS
330 Seventh Avenue, Fourth Floor
New York, New York 10001
Telephone:  (212) 683-2210
Facsimile:  (212) 683-4015
Email:  mlowry@childrensrights.org


/s/ Phillip A. Geraci
PHILLIP A. GERACI *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ Angela Vicari
ANGELA VICARI *(pro hac vice)*
*(signed by Filing attorney with permission)*
/s/ John Cahalan
JOHN CAHALAN *(pro hac vice)*
*(signed by Filing attorney with permission)*
KAYE SCHOLER LLP
425 Park Avenue
New York, NY 10022-3598
Telephone:  (212) 836-8000
Email:  pageraci@kayescholer.com

**FOR THE SETTLING DEFENDANT:**

**RIGGS, ABNEY, NEAL, TURPEN,**
**ORBISON & LEWIS, INC.**
By: /s/ D. Kent Meyers, OBA #6168
CROWE & DUNLEVY
20 North Broadway, Suite 1800
Oklahoma City, Oklahoma 73102
*Tel* (405) 235-7700 / *Fax* (405) 239-6651

*Attorneys for the Defendants Brad Yarbrough, Jay*
*Dee Chase, Steven Dow, Michael L. Peck, Aneta F.*
*Wilkinson, Wes Lane, Anne R. Roberts, Linda*
*English Weeks, and Howard H. Hendrick*