**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| D.G., by Next Friend G. Gail Stricklin, *et al.*, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> BRAD YARBROUGH, Chairman of the ) <br> Oklahoma Commission for Human Services, ) <br> *et al.*, ) <br> ) <br> Defendants. ) | Case No. 08-CV-074-GKF-FHM |

## ORDER

This matter comes before the court on the Motion to Vacate Pursuant to 9 U.S.C. § 10(a) [Doc. No. 875] of defendant Oklahoma Department of Human Services. For the reasons discussed below, the motion is denied.

**I.    Background**

On February 13, 2008, the named plaintiffs—nine children in foster care—on behalf of themselves and more than ten thousand similarly-situated Oklahoma children, filed suit seeking class certification and a permanent injunction enjoining defendants from subjecting plaintiff children to practices that violate their constitutional rights, among other relief. [Doc. No. 2]. This court certified a class of plaintiffs more specifically described as follows:

> All children who are or will be in the legal custody of the Oklahoma Department of Human Services (1) due to a report or suspicion of abuse or neglect; or (2) who are or will be adjudicated deprived due to abuse or neglect.

[Doc. No. 272]. The Plaintiff Class and the Oklahoma Department of Human Services subsequently reached a Compromise and Settlement Agreement, which this court approved by virtue of an Order and Judgment dated February 29, 2012. [Doc. No. 778 and Doc. No. 779]. The

Compromise and Settlement Agreement designated Kathleen G. Noonan, Kevin M. Ryan, and Eileen Crummy as Co-Neutrals and authorized the Co-Neutrals to "act as arbiters of any dispute between the parties arising out of th[e] Settlement Agreement, whether or not the subject matter of the dispute is specifically identified herein." [Doc. No. 770-1, p. 5 ¶ 1.18; p. 6 ¶ 2.8(a)]. To that end, the Settlement Agreement includes the following provision:

> **2.9    Enforcement of Co-Neutral Decision**.  With the written majority agreement of the Co-Neutrals (and only with such agreement), any decision of the Co-Neutrals may be presented to the Court for entry as a judgment in accordance with the procedures set forth in the FAA.  The parties acknowledge that the FAA may, or may not, apply to the subject matter of the Lawsuit; therefore, the parties expressly incorporate the procedural provisions of the FAA into this Settlement Agreement as if those provisions were expressly set forth herein, except that the provisions of the Settlement Agreement control in the event of any inconsistencies between the FAA and the Settlement Agreement.  A decision of the Co-Neutrals can be vacated by the Court only upon a judicial determination that one or more of the grounds set forth in 9 U.S.C. § 10(a)(1)-(4) exists.  Once a decision of the Co-Neutrals has been entered as a judgment by the Court, it may be enforced by Class Counsel, the Class Representatives and the Plaintiff Class.

[Doc. No. 770-1, p. 7 ¶ 2.9].

Pursuant to that provision, on May 24, 2018, the Co-Neutrals filed a "Certification in Support of the Order of the Co-Neutrals" to which they attached their decision of March 5, 2018, ordering that DHS may not make any new child placements at the Laura Dester Children's Center in Tulsa, Oklahoma and must relocate the children placed at Laura Dester to alternate, safe, needs-based placements by June 30, 2018. [Doc. No. 871]. In their May 24 filing, the Co-Neutrals presented their decision of March 5 to the Court for entry as a judgment in accordance with the procedures set forth in the Federal Arbitration Act. [*Id.*]. On May 30, 2018, the Oklahoma Department of Human Services filed a Response Brief [Doc. No. 875], which this court has construed as a Motion to Vacate the Co-Neutrals' decision to relocate the remaining twelve (12) children placed at Laura Dester to alternate, safe, needs-based placements by June 30, 2018.

## II. Laura Dester Children's Center

Although the Compromise and Settlement Agreement and Oklahoma Pinnacle Plan developed pursuant thereto relate to the Oklahoma foster care system generally[1], the Co-Neutral's request for order and DHS's motion to vacate pertain only to the Laura Dester Children's Center in Tulsa, Oklahoma.

Laura Dester is a state-operated shelter for placement of foster children in Oklahoma. [Doc. No. 875-2, p. 3]. Pursuant to the Pinnacle Plan, DHS expressed its intent to close the shelter as early as February of 2015. [*Id.* pp. 2-3]. However, for a variety of reasons, from March 2017 through February 2018, DHS increased the number of children placed at Laura Dester. [Doc. No. 871, p. 5; Doc. No. 875-2, pp. 2-3].

The Co-Neutrals have found that, across three reporting periods spanning from April 1, 2016 to September 30, 2017, DHS failed to achieve positive trending on the performance standard for Child Maltreatment in Care 1.A., which measures among all children in foster care the percentage of children who were not victims of child maltreatment by a foster parent or facility staff member during the twelve-month period. [Doc. No. 871, p. 1]. Further, although still preliminary, data from the period from April 1, 2017 to March 31, 2018 indicates a further decline in the percentage of children in foster care who were not victims of maltreatment. [*Id.* pp. 1-2].

Specific to Laura Dester, the number of substantiated claims of child maltreatment during placement at the shelter increased during the period from October 1, 2017 to March 31, 2018. [Doc. No. 871, p. 2]. From October 1, 2016 to March 31, 2017, DHS documented one (1)

---

[1] The Oklahoma Pinnacle Plan is an improvement plan developed by DHS pursuant to the Compromise and Settlement Agreement to guide the agency in improving the state's child welfare and foster care system. The Oklahoma Pinnacle Plan is publically available at http://www.okdhs.org/okdhs%20pdf%20library/OklahomaPinnaclePlanFinal_cfsd_07252012.pdf.

substantiated incident of child maltreatment; from April 1, 2017 to September 30, 2017, DHS documented three (3) substantiated incidents of child maltreatment; and from October 1, 2017 to March 31, 2018, DHS documented ten (10) incidents of child maltreatment. [*Id.*]. Based on the negative trending in substantiated child maltreatment incidents in children placed at Laura Dester, the Co-Neutrals concluded that Laura Dester "present[s] an unreasonable risk of harm to children placed there," and, on March 5, 2018, issued their decision requiring DHS to: (1) immediately cease any new placements at Laura Dester, and (2) develop and submit a transition plan to place all the children out of Laura Dester no later than June 30, 2018. [*Id.* pp. 5-6].

DHS ceased placements of children at Laura Dester in early March 2018. [Doc. No. 871, p. 2 n.3; Doc. No. 875-5, p. 3 ¶ 7]. On March 15, 2018, DHS submitted the "Proposed Plan to Eliminate Laura Dester Children's Center as an Emergency Shelter." [Doc. No. 875-2]. The plan included a description of eleven (11) separate transition efforts to end shelter placements at Laura Dester. First, the plan described the admission approval process to place children at Laura Dester, although new admissions to the shelter ceased in early March 2018. [*Id.* pp. 7-8]. Second, the plan emphasized inter-agency cooperation between DHS and sister agencies to find suitable placements, particularly cooperation with the Oklahoma Healthcare Authority. [*Id.* p. 8]. Third, DHS expressed its commitment to coordination with Developmental Disabilities Services to satisfy eligibility requirements to allow children to qualify and receive approval for DDS waiver services and transition to a DDS supported setting. [*Id.* pp. 8-9]. Fourth, DHS described its efforts to contact DDS agency companions and specialized foster care parents in an effort to identify potential placements. [*Id.* p. 9]. Fifth, the plan described its work with external partners—specifically the J.D. McCarty Center—to develop a statewide recruitment unit geared toward families with the ability or desire to satisfy the placement needs of children with intellectual

disabilities or those who are medically fragile. [*Id.*]. Sixth, the plan detailed the Oklahoma Fosters Initiative to target families willing and capable of serving as a home for special needs children through social media and recruitment advertisements. [*Id.*]. Seventh, DHS initiated a program to contact existing foster homes and identify those interested in becoming emergency, temporary placements. [*Id.* p. 10]. Eighth, DHS outlined its efforts to develop a Medicaid waiver model to include small out-of-home settings that satisfy the needs of children. [*Id.*]. Ninth, DHS detailed its efforts to work with the Oklahoma Association of Youth Services to identify children at Laura Dester who are appropriate for placement in another shelter. [*Id.*]. Tenth, the plan describes DHS's efforts to secure funding to expand existing group homes. [*Id.* pp. 10-11]. Finally, DHS initiated an enhanced Shelter Reduction Protocol in January 2018, and assigned a program field representative and two child welfare specialists to expedite safe placements and reduce children placed at both Laura Dester and Youth Services Shelters. [*Id.* p. 11].

In response, the Co-Neutrals informed the parties that they would submit a list of questions to DHS regarding its proposed plan, and offered plaintiffs' counsel the same opportunity. In the interim, the Co-Neutrals' March 5 decision remained in effect. [Doc. No. 871, p. 3].

On April 9, 2018, the Co-Neutrals conducted an unannounced visit to Laura Dester. [*Id.*]. Later that month, on April 23, 2018, DHS provided the Co-Neutrals "Closure Commitments" as to Laura Dester. [Doc. No. 875-8]. Among these commitments, DHS expressed its intent "by September 1, 2018, . . . [to] have developed and be implementing child-specific transition plans for any children remaining at the shelter at that time." [*Id.* p. 2]. "Closure will occur as soon as those resources are in place for each child." [*Id.*]. The memorandum concluded with an expression of the DHS's optimism that "[b]arring the occurrence of factors outside the agency's control," it would meet the commitments included therein. *[Id*. p. 4].

Two days later, on April 25, 2018, the Co-Neutrals conducted a telephone conference with the parties during which DHS leadership, DHS's counsel, and plaintiffs' counsel were given the opportunity to present additional information, comments, and questions. Further, the Co-Neutrals questioned DHS regarding ongoing safety concerns, ongoing delays in investigation of maltreatment claims, and its commitment to transition children from Laura Dester to safe placements. [Doc. No. 871, p. 3]. DHS subsequently released a press release, dated April 30, 2018, expressing its intent to "cease using the Laura Dester Children's Center in Tulsa as a shelter for abused and neglected children in September," and transition the facility into a treatment center for children with co-occurring intellectual disabilities, mental illness, and extreme behavioral issues beginning in November 2018. [Doc. No. 875-3, p. 2].

In April 2018, DHS substantiated one additional incident of child maltreatment at Laura Dester. [Doc No. 871, p. 2]. Further, as of May 22, 2018, four (4) additional child maltreatment investigations remained pending, including a single referral of May 6, 2018, involving three children who were reportedly left unsupervised, resulting in harm to the children. [*Id.*]. On May 24, 2018, the Co-Neutrals presented their decision to close Laura Dester by June 30, 2018 for entry as a judgment. [Doc. No. 871].

As of May 30, 2018, twelve (12) children remained at Laura Dester. Seven of those children had an identified placement with transitions in place. One child was scheduled to be discharged the week ending June 1, 2018, and two other children were scheduled to be discharged the week ending June 8, 2018. [Doc. No. 875-5, p. 2 ¶ 2]. Thus, only four (4) children remained without a specific placement identified, and DHS averred to its ongoing efforts to secure safe, needs-based placements. [*Id.* p. 2 ¶ 3].

**III.   Analysis**

With regard to confirmation of awards, the Federal Arbitration Act provides as follows:

> If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title.

9 U.S.C. § 9. Pursuant to § 10, the court may vacate an award upon the application of any party to the arbitration:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[2] Outside of the "limited circumstances" of the grounds for vacation set forth in § 10(a), "an arbitration award must be confirmed." *Denver & Rio Grande W. R.R. Co. v. Union Pac. R.R. Co.,* 119 F.3d 847, 849 (10th Cir. 1997).[3]

---

[2] The Compromise and Settlement Agreement limits the court's review to the grounds for vacation set forth in 9 U.S.C. § 10(a)(1)-(4). *See* [Doc. No. 770-1, p. 7 ¶ 2.9].

[3] The Tenth Circuit has recognized "a handful of judicially created reasons." *Denver & Rio Grande W. R.R. Co.*, 119 F.3d at 849. "'[J]udicially created exceptions' apply to awards that violate explicit public policy, derive from a manifest disregard of the law, or were the result of an unfair hearing." *Lewis v. Circuit City Stores, Inc.,* 500 F.3d 1140, 1150 (10th Cir. 2007). However, the continued validity of the judicially created reasons for vacation has been called into question by the Supreme Court's decision in *Hall Street Associates, L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 587 (2008), where the court emphasized that "expanding the detailed categories would

The district court's review of an arbitration award "is among the narrowest known to law." *Hollern v. Wachovia Secs., Inc.*, 458 F.3d 1169, 1172 (10th Cir. 2006) (quoting *Brown v. Coleman Co.*, 220 F.3d 1180, 1182 (10th Cir. 2000)). The court is required to "give extreme deference to the determination of the [arbitrator]." *DMA Int'l, Inc. v. Qwest Commc'ns Int'l, Inc.,* 585 F.3d 1341, 1344 (10th Cir. 2009) (quoting *Brown*, 220 F.3d at 1182). "Errors in either the arbitrator's factual findings or his interpretation of the law (unless that interpretation shows a manifest disregard of controlling law) do not justify review or reversal on the merits of the controversy." *Denver & Rio Grande R.R. Co.*, 119 F.3d at 849. "[C]ourts 'are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract.'" *THI of New Mexico at Vida Encantada, LLC v. Lovato*, 864 F.3d 1080, 1083-84 (10th Cir. 2017) (quoting *CEEG (Shanghai) Solar Sci. & Tech. Co. v. Lumos LLC*, 829 F.3d 1201 (10th Cir. 2016)).

DHS does not specifically identify any of the grounds set forth in § 10(a) pursuant to which it seeks to vacate the Co-Neutrals' March 5 decision. Further, based on this court's review of the briefing and evidentiary materials submitted, none of the § 10(a) statutory grounds are implicated.

Rather, DHS asks the court to "take a reflective moment to consider whether, in light of the Department's obvious commitment and success to-date in ending admissions and making appropriate placements to achieve the goal of closing [Laura Dester], this endeavor to seek its certification at this time and impose an artificially imposed deadline is truly in the best interests of the children relegated to the care of the Department of Human Services." [Doc. No. 875, p. 9].

---

rub too much against the grain of the § 9 language, where provision for judicial confirmation carries no hint of flexibility." DHS does not raise any of the judicially created exceptions and, therefore, the court need not consider the continued viability of the exceptions in light of *Hall Street*.

However, pursuant to the procedures of the Federal Arbitration Act—procedures specifically negotiated for and adopted by the parties pursuant to the Compromise and Settlement Agreement—this court is prohibited from independently judging the merits of the Co-Neutrals' decision. *See Ormsbee Dev. Co. v. Grace*, 668 F.2d 1140, 1147 (10th Cir. 1982) ("A court, therefore, is not entitled to judge an arbitration award independently."); *THI of New Mexico at Vida Encantada, LLC*, 864 F.3d at 1083-84. Nor would the court be inclined to substitute its judgment for that of the Co-Neutrals under the circumstances. Not only were the Co-Neutrals chosen for their expertise in the subject matter, but they possess information beyond that which has been presented to this court regarding conditions and practices at Laura Dester—particularly with regard to claims of child maltreatment, some allegedly as late as May 6, 2018.

Under the limited and deferential review required by law, no § 10(a) statutory grounds exist to vacate the Co-Neutrals' March 5 decision. Thus, the motion to vacate must be denied.

**IV. Conclusion**

WHEREFORE, the Motion to Vacate Pursuant to 9 U.S.C. § 10(a) [Doc. No. 875] of defendant Oklahoma Department of Human Services is denied. Pursuant to section 2.9 of the Compromise and Settlement Agreement, the court shall enter the Co-Neutrals' decision of March 5, 2018 as a judgment of this court.

DATED this 5th day of June, 2018.

Gregory K. Frizzell

GREGORY K. FRIZZELL, CHIEF JUDGE