**<u>AGREEMENT TO AMEND THE COMPROMISE AND SETTLEMENT AGREEMENT
AND PARTIALLY SUSPEND GOOD FAITH REPORTING ON SELECTED
PERFORMANCE AREA MEASURES</u>**

Reference is hereby made to the Compromise and Settlement Agreement between the Parties dated December 15, 2011, and approved by the United States District Court for the Northern District of Oklahoma by Order dated February 29, 2012, Case 4:08-cv-00074-GKF-FHM Document 778 (the "Settlement Agreement"). All defined terms hereafter used shall have the meanings ascribed to them in the Settlement Agreement.

Upon the occurrence of all signatures being affixed to this Agreement, the Parties hereby enter into and this Court approves amendments to Sections 2.10(i) and 2.15 of the Settlement Agreement to bifurcate and partially suspend Good Faith reporting on selected Performance Area Measures by and between the Parties on behalf of themselves and as representatives of the Plaintiff Class, Class Counsel, and Settling Defendant (hereafter also referred to as the "Department").

As set forth in greater detail below, the Plaintiff Class, Class Counsel, and the Department, intending to be legally bound hereby, for good and sufficient consideration the receipt and sufficiency of which is mutually acknowledged, request that the Co-Neutrals suspend their twice annual Commentary regarding the Department's overall progress to make Good Faith efforts to achieve substantial and sustained progress (hereafter, "Good Faith Assessments") in the Performance Areas of: 1) Therapeutic Foster Care, and 2) selected Permanency measures identified below.

(1) **<u>Covid Recovery Period.</u>**  It is AGREED by the parties that:

(a)    Circumstances neither foreseen nor contemplated by the Parties during the drafting and signing of the Settlement Agreement have created conditions that significantly hamper the Department's efforts to positively impact the data metrics for certain performance areas. The continuing impact of the COVID-19 pandemic has dramatically hindered both the Department's activities and efforts as well as those of external parties upon which the Department depends to achieve substantial and sustained progress.

(b)    Until the impact of the COVID-19 pandemic on the Oklahoma child foster care system is more fully understood, addressed, and ameliorated, the Parties seek to hold in abeyance during a "COVID Recovery Period" the twice annual determinations of the Co-Neutrals whether the Department has engaged in good faith efforts to achieve substantial and sustained progress with regard to the following Performance Area Measures (hereafter, collectively referred to as "Delayed Performance Area Measures"):

1

**<u>EXHIBIT 1</u>**

(i)     TFC Performance Area Measure 2.B: Number of new therapeutic foster homes (TFC) reported by DHS as approved for the reporting period;

(ii)    TFC Performance Area Measure Net Gain/Loss in TFC homes for the reporting period;

(iii)   Permanency Performance Area Measure 6.2a: The number and percent of children who entered foster care 12-18 months prior to the end of the reporting period who reach permanency within one year of removal, by type of permanency;

(iv)   Permanency Performance Area Measure 6.2b: The number and percent of children who entered their 12th month in foster care between 12-18 months prior to the end of the reporting period who reach permanency within two years of removal, by type of permanency;

(v)    Permanency Performance Area Measure 6.2c: The number and percent of children who entered their 24th month in foster care between 12-18 months prior to the end of the reporting period who reach permanency within three years of removal, by type of permanency;

(vi)   Permanency Performance Area Measure 6.2d: The number and percent of children who entered their 36th month in foster care between 12-18 months, prior to the end of the reporting period who reach permanency within four years of removal;

(vii)  Permanency Performance Area Measure 6.4: Among legally free foster youth who turned 16 in the period 24 to 36 months prior to the report date, the percent that exited to permanency by age 18; stayed in foster care after age 18, and exited without permanency by age 18.

(c)    All remaining Performance Area Measures will not be impacted by or otherwise subject to the COVID Recovery Period (hereafter, collectively referred to as "Non-Impacted Performance Area Measures").

(d)    During the COVID Recovery Period, the Co-Neutrals will continue to provide Technical Assistance as well as validate, report, and comment upon the performance of the Department and its trending for all Performance Area data as it pertains to Delayed Performance Area Measures.  The Co-Neutrals, however, will refrain from making any Good Faith determinations of the Department's efforts as it pertains to Delayed Performance Area Measures during the COVID Recovery Period.

**EXHIBIT 1**

(e)   During the COVID Recovery Period, the Co-Neutrals will continue to provide Technical Assistance as well as validate, report, and comment upon the performance of the Department and its trending for all Performance Area data as it pertains to the Non-Impacted Performance Area Measures.  Additionally, the Co-Neutrals will continue to make Good Faith determinations of Departmental efforts in all Non-Impacted Performance Area Measures in the Seventeenth and subsequent Commentaries.

(2)   **Term**. The Parties further agree:

(a)   The COVID Recovery Period shall continue for a period of 18 months and shall be taken into account by the Co-Neutrals when they prepare and publish the Seventeenth, Eighteenth, and Nineteenth Commentaries addressing the Department's activities and efforts during the calendar periods of:

    (i)     January 1, 2021 through June 30, 2021
    (ii)    July 1, 2021 through December 31, 2021
    (iii)   January 1, 2022 through June 30, 2022

(b)   Absent further agreement between the Parties, the Co-Neutrals shall resume their Good Faith determinations as to the Delayed Performance Area Measures for Departmental efforts beginning July 1, 2022 and shall resume publishing those Good Faith findings in the Twentieth Commentary.  For Delayed Performance Area Measures that had not yet achieved two successive years of Good Faith Assessments, the Co-Neutrals will continue to make Good Faith determinations of Departmental efforts until that Performance Area Measure has achieved two successive years of Good Faith Assessments, inclusive of all assessments made prior to the initiation of the COVID Recovery Period.  Upon resumption of Good Faith Assessments and after Delayed Performance Area Measures have collectively achieved two successive years of Good Faith Assessments, they will no longer be subject to any validation, reporting, comment, or Good Faith Assessment by the Co-Neutrals.

(c)   Because of the continuing uncertainties posed by COVID 19, the Parties further agree to assess and negotiate in good faith and determine whether the reporting period in which the Co-Neutrals resume their Good Faith determinations of these Delayed Performance Area Measures should be further altered.

**EXHIBIT 1**

(d)     Should the Department continue to achieve Good Faith Assessments by the Co-Neutrals for Commentaries Seventeen, Eighteen, and Nineteen as to the Non-Impacted Performance Area Measures, those Measures will no longer be subject to any validation, reporting, comment, or Good Faith Assessment by the Co-Neutrals. Otherwise, the terms of the original Compromise and Settlement Agreement shall continue to apply.

(3)     **Final Report.**  To reflect modifications made to the Co-Neutrals' determinations of Good Faith efforts and their impacts upon the publication of the Co-Neutrals' Final Report, the Parties further agree as follows:

(a)     As referenced in Section 2(d) supra, should the Department achieve successive Good Faith Assessment for all Non-Impacted Performance Area Measures in Commentaries Seventeen, Eighteen, and Nineteen, Commentary Nineteen shall be considered the Final Report for the Target Outcomes of the Non-Impacted Performance Area Measures and the Department's responsibilities and obligations under the Settlement Agreement for those measures shall terminate.

(b)     Pursuant to Section 2.13 of the Settlement Agreement and as a demonstration of transparency and sustainability of progress, the Department agrees to report to the Co-Neutrals and Class Counsel, for a minimum period of one year after publication of the Non-Impacted Performance Area Measures Final Report, the data metrics reflecting the Target Outcomes for all Non-Impacted Performance Area Measures.

(c)     After resumption of Good Faith Assessments by the Co-Neutrals and the Department subsequently achieving Good Faith Assessments for all Delayed Performance Area Measures over a period of two successive years, inclusive of Good Faith Assessments made prior to the COVID Recovery Period, the final Commentary reflecting such efforts shall be considered the Final Report for the Target Outcomes of the Delayed Performance Area Measures and the Department's responsibilities and obligations under the Settlement Agreement shall terminate.

(d)     Pursuant to Section 2.13 of the Settlement Agreement, and as a demonstration of transparency and sustainability of progress, the Department agrees to report to the Co-Neutrals and Class Counsel, for a minimum period of one year after publication of the Delayed Performance Area Measures Final Report, the data metrics reflecting the Target Outcomes for all Delayed Performance Area Measures.

**EXHIBIT 1**

(e)     Should the Department submit any request for a Final Report before the conclusion of two successive years of Good Faith findings by the Co-Neutrals, such request must identify whether the Department is seeking a Final Report as to the Delayed Performance Area Measures, the Non-Impacted Performance Area Measures, or both.

(f)     The Parties retain the right to seek an appeal, in accordance with the Settlement Agreement, as to each and any Final Report published by the Co-Neutrals as referenced above

(4)     **Settlement Agreement**.  Subject to the modifications outlined above, all remaining terms and conditions for both the Settlement Agreement and the 2016 Suspension of Final Date for Pinnacle Plan remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Request in several counterpart originals on the date set forth opposite their names.

FOR AND ON BEHALF OF THE SETTLING DEFENDANT

By _____
        Justin Brown, Director, Oklahoma Human
        Services (Authorized Signatory)
        Dated _____

By _____
        Attorney General of the State of Oklahoma
        Dated _____

FOR AND ON BEHALF OF THE PLAINTIFF CLASS:

By _____
        Dated _____

        FREDERIC DORWART
        FREDERIC DORWART, LAWYERS
        Old City Hall
        124 East Fourth Street
        Tulsa, OK 74103

By _____

5

**EXHIBIT 1**

Dated _____

MARCIA ROBINSON LOWRY
A BETTER CHILDHOOD, INC.
1095 Hardscrabble Rd.
Chappaqua, NY 10514

**<u>EXHIBIT 1</u>**